**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al*.,[1] | Case No. 25-12055 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF J. MICHAEL ISSA IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, J. Michael Issa, do hereby declare as follows:

1.      I am the Chief Restructuring Officer ("CRO") of Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds"), Lugano Holding, Inc. ("Lugano Holding"), Lugano Buyer, Inc. ("Lugano Buyer"), K.L.D. Jewelry, LLC ("KLD"), and Lugano Prive, LLC ("Lugano Prive") (collectively, the "Debtors," and the Debtors, collectively with their non-Debtor subsidiaries and the Lugano Prive Investment Trust, "Lugano" or the "Company").

2.      I am a Senior Managing Director of GlassRatner Advisory & Capital Group LLC ("GlassRatner"), have over 30 years of experience in corporate turnarounds, restructurings, and bankruptcies, and have led or been involved in more than 100 corporate rehabilitations. I have managed billions in debt restructuring and financing and served as chief restructuring officer for dozens of clients.   I have held court-appointed fiduciary roles including chapter 11 trustee and liquidating trustee, as well as receiver. I am a certified public accountant and certified turnaround professional and hold FINRA Series 79 and 63 licenses. I am a well-published author whose work

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc.  (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

has been included in the "Best of 2019" special publication of the ABI Journal. I have also advised numerous clients, regarding debtor in possession financing, bankruptcy preparation and compliance and plans, asset sales, forecasting, and restructuring and sale strategies.

3.     I submit this declaration in support of the First Day Motions (as defined herein) and pursuant to 28 U.S.C. § 1746. Except as otherwise indicated, all facts set forth in this declaration are based upon information supplied to me by members of the Debtors' management, employees, and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and information supplied to me about the Debtors' operations and financial condition. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

4.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). No trustee or examiner has been appointed in the Chapter 11 Cases.

5.     To minimize the adverse effects of filing for bankruptcy protection on their businesses and assets, the Debtors have requested "first day" relief (collectively, the "First Day Motions"). The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors-in-possession. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion:  (a) is necessary to enable the Debtors to maximize the value of

33769076.1

2

their assets; (b) constitutes a critical element in achieving a successful resolution to the Chapter 11 Cases; and (c) best serves the Debtors' estates and creditors' interests.

6.      Part I of this Declaration describes the Debtors' businesses, the circumstances surrounding the commencement of the Chapter 11 Cases, and their secured and unsecured debt. Part II summarizes the relief requested in each First Day Motion and the facts supporting those requests.

## I.    BACKGROUND

### A.    Overview of the Company's Business and History

7.      Lugano is a designer, manufacturer, and retailer of high-end jewelry with its headquarters in Newport Beach, California.  Mordechai Haim Ferder and his wife, Idit Ferder, established Lugano in 2004.  Lugano takes its name from the picturesque Lake Lugano in southern Switzerland, often described as a unique "gemstone of nature."

8.      Lugano enjoyed success selling one-of-a-kind jewelry to wealthy clientele and partnering with organizations to host and sponsor equestrian, social, and philanthropic events. Lugano opened its first retail store in Newport Beach in 2005 with an exclusive, appointment-only sales strategy.  Thereafter, Lugano added three additional retail locations, started its equestrian division in 2008, and expanded production capabilities in 2020.

9.      In 2021, Compass Diversified Holding ("CODI Parent"), through its subsidiary Compass Diversified Holdings LLC ("CODI"), acquired a majority interest in Lugano Holding from Mr. Ferder and affiliated entities for an enterprise value of $256 million.  Mr. Ferder and affiliated entities retained a significant portion of the equity (approximately 40% of Lugano Holding), and Mr. Ferder continued as chief executive officer and a member of the board of directors of certain Debtors.

33769076.1

10. Following the CODI acquisition, Lugano added additional locations and opened a private social club – Lugano Privé – for its clients. By 2025, Lugano expanded to operate nine retail locations – eight in the United States and one in London, UK – as well as an equestrian division and pop-up show rooms.

Lugano's Jewelry

11. Lugano achieved success in the high-end jewelry market through unique positioning and its business model. Lugano is attentive to the preferences of its sophisticated, high-net-worth clientele. These individuals tend to highly value unique or exclusive jewelry and a personalized sales approach involving long-standing relationships. Thus, Lugano's approach focuses on building lasting relationships and the creation of jewelry to tell a story.

12. Along with its partners, Lugano's design and production capabilities create the unique jewelry its clientele prefer. Lugano's jewelry starts with an idea inspired by beauty and designed to reflect its wearer's request for self-expression. From there, master artisans bring ideas to life, with extreme precision and high attention to detail.

13. Creating Lugano's exceptional jewelry requires the coordination of a team of designers, gemologists, goldsmiths, gem-setters, polishers, and specialists operating in a single facility in Newport Beach and, historically, often engaging with third-party vendors. Designers start with a rare stone as inspiration and craft jewelry that highlights the beauty and perceived value of the stone. Lugano's design team draws inspiration from a range of sources, including the stone and the natural world, needed to turn vision into works for fine jewelry.

14. Lugano uses a supply chain with differentiated sourcing and opportunistic purchasing to acquire stones, which enables the Company to control its pricing. Lugano uses its in-house production workshop and a close network of workshops and vendors to control its

inventory and to produce and bring its jewelry to market more efficiently.  Lugano also uses its global network of vendors to opportunistically acquire finished jewelry.

15.    This combination, exceptional production of inspired and artistic designs, is well-suited for a highly desirable niche in the broader jewelry marketplace.  Lugano's high-end jewelry includes unique rings, necklaces, earrings, bracelets, and brooches that range in price from under $1,000 to well over seven figures.  A few examples can be seen below:

  

16.    Producing exquisite pieces is only part of Lugano's success.  The balance comes from its relationship with its clientele and its sales approach.

<u>Lugano's Sales Approach</u>

17.    Lugano's clientele consists of high-net-worth individuals who appreciate the high quality, unique pieces produced by Lugano's design and production team.  Lugano's high-touch sales approach fosters developing relationships with its clients, who tend to favor a personalized sales approach and long-standing relationships over one-time purchases and high-pressure sales tactics.

18.    Most retail sales take place at boutiques.  The retail boutiques are strategically located in wealthy regions or near popular vacation and up-scale shopping destinations frequented by Lugano's target clientele:   Newport Beach, California; Aspen Colorado; Greenwich, Connecticut; Houston, Texas; London, United Kingdom; Ocala, Florida; Palm Beach, Florida; Washington, D.C; and Chicago, Illinois.  Lugano recently closed its London boutique, and is in the process of closing its Greenwich and Washington D.C. boutiques.

19.     In addition to its boutiques, Lugano conducts sales through its equestrian division and pop-up showrooms.  Initiated in 2008, Lugano's equestrian division concentrates on the Southeastern United States and complements its retail sales efforts.  Lugano is a prominent sponsor of equestrian events and remains a dedicated supporter of equestrian-related causes.  Lugano also markets and sells jewelry via pop-up showrooms at Lugano-hosted or sponsored events or in the homes of its clients.  The equestrian division and pop-up showrooms generate a smaller percentage of sales than Lugano's boutiques.

Philanthropy, Wholesale, and Privé

20.     Philanthropy.  Lugano supports organizations, directly or through partnerships, in four key areas:  arts; education; health and wellness; and community.  Over the years, Lugano has donated millions of dollars to non-profits, benefiting local communities.

21.     Lugano has developed relationships with many clients through shared support of causes.  Sharing a core value – charitable giving – enables Lugano to meet its clients where they are.  Its philanthropies have thus been critical to the development and maintenance of many client relationships.  Lugano's charitable support not only benefits the communities, but it is also a key to Lugano's business success.

22.     Lugano Privé.  Lugano Privé is an exclusive private social club designed for Lugano's clients.  The club, introduced in 2023, is located in Newport Beach and derives revenues primarily from membership fees.  At Lugano Privé, individuals committed to philanthropic endeavors and giving back to and supporting the community can socialize and take part in specialized programming centered around food, wine, art, music, and world affairs.  While the club is located adjacent to Lugano's Newport Beach boutique, Lugano Privé is focused on the experience and Lugano does not sell jewelry at Lugano Privé.

33769076.1

23.    <u>Wholesale</u>.  Lugano periodically sells loose diamonds on a wholesale basis.  Such sales account for a small portion of Lugano's revenues.

**B.    Corporate Structure**

24.    Lugano Holding is the direct or indirect parent of the other Debtors and their foreign affiliates.  Lugano Holding is the sole shareholder of Lugano Buyer, and Lugano Buyer is the sole shareholder of Lugano Diamonds.  Lugano Diamonds is the sole member of KLD, the trustor and sole beneficiary of the Lugano Prive Investment Trust ("<u>Lugano Trust</u>"), and the sole owner of the non-U.S. entities.  Lugano Trust is the sole member of Lugano Prive.  A corporate organization chart is attached hereto as **<u>Exhibit 1</u>**.  Lugano Diamond is a California corporation.  All of the other Debtors are Delaware entities.

25.    The Debtors' day-to-day operations are primarily carried out by Lugano Diamonds, which designs, produces and sells jewelry.  Lugano Prive operates the Lugano Privé social club where members can dine, lounge, socialize, and participate in enriching cultural experiences.  Until KLD's recent suspension of its operations, KLD acquired diamonds from third parties and sold them to its sole customer, Lugano Diamonds.

<u>Lugano's Funded Debt (CODI Credit Agreement)</u>

26.    CODI is the Debtors' sole lender.  Lugano Diamonds, as borrower, and Lugano Buyer, as co-borrower, and CODI, as lender, entered into a Credit Agreement (as amended, the "<u>Credit Agreement</u>"), dated as of September 3, 2021.  The Credit Agreement provides for both revolving and term loans.  Pursuant to a Guarantee and Collateral Agreement, dated as of September 3, 2021, the Credit Agreement is secured by liens on substantially all of the Debtors' personal property and the obligations under the Credit Agreement are guaranteed by the other Debtors.  The revolving loans terminate, and the term loan matures, on September 3, 2027.

27.    Since 2021, the Credit Agreement has been amended 23 times.  Among other things, these amendments increased the revolving loan and term loan commitments, from $140 million to $275 million today (subject to certain advance limited) for the revolving loans and from $90 million to just over $488 million today (some of which has been repaid) for the term loans.  The increased borrowings were used to fund Lugano's operations, including costs relating to the expansion of boutiques and the associated inventory costs.  The outstanding principal balance under the Credit Agreement consists of $211,694,800.47 in revolving loan obligations, $466,704,424.25 in term loan obligations, and $2.63 million in letter of credit obligations, excluding advances under the Twenty Third Amendment to the Credit Agreement discussed below.[2]

Equity Interests

28.    CODI owns 59.9% of the outstanding stock of Lugano Holding.  The remaining outstanding shares of Lugano Holding are owned by entities affiliated with the Ferders (*e.g.*, Simba IL Holdings, LLC (33.8%)), trusts for which a Ferder is a trustee (the Haim Family Trust, 5.9%), and by current and former directors, officers, and employees (0.4%).  In addition, there are authorized options representing approximately 10% of the outstanding equity, of which options representing approximately 7% of the outstanding equity are issued and outstanding.  Most of the outstanding options are held by the Debtors' current directors, officers, and employees.

C.    **Events Leading Up to Chapter 11 Filing**

29.    Until early spring 2025, Lugano appeared to be a highly profitable and rapidly growing business.  Indeed, the Company believed its 2024 revenues and operating income were

---

[2]    In connection with the Forbearance Agreement (as hereafter defined), as of August 29, 2025, the borrowers under the Credit Agreement agreed that a total of $701,317,337.03, inclusive of interest, fees, and expenses, was payable to CODI.

approximately $470 million and $180 million, respectively.   Unfortunately, the Company's performance appears to have been overstated; since learning of the developments described below, those amounts are being revised to reflect actual revenues and operating income at substantially lower levels.

CODI's Announcement and Stabilizing the Business

30.     On May 7, 2025, CODI Parent and CODI filed a Form 8-K disclosing that, in April 2025, CODI "commenced an internal investigation into the financing, accounting, and inventory practices of [Lugano Holding], a subsidiary and operating segment of [CODI], based on concerns reported to [CODI] management as to these practices."   CODI Parent and CODI also reported that "[i]n connection with the ongoing investigation, on May 7, 2025, Mordechai Haim 'Moti' Ferder, resigned from his position as Chief Executive Officer of [Lugano Holding], and from all offices and directorships previously held with Lugano and its subsidiaries and affiliates."

Investment Contracts and Mr. Ferder's Alleged Scheme

31.     Within weeks of the 8-K disclosures, the Debtors heard from close to sixty (60) persons asserting substantial claims relating to alleged transactions ("Investment Contracts") entered into by Mr. Ferder.   The Investment Contracts, which were outside Lugano Diamond's ordinary course of business, were generally joint investment agreements in which a third party would co-invest in a loose diamond, ostensibly for resale at a significant profit.  Since the summer of 2025, approximately a dozen parties have commenced lawsuits against Lugano Diamonds, Mr. Ferder, and/or other parties, and several plaintiffs unsuccessfully sought prejudgment attachments against Lugano Diamonds.

32.     On June 24, 2025, Lugano Diamonds commenced an action against Mr. Ferder and a related trust for which he is a trustee.   The complaint included claims for fraud, concealment, constructive fraud, and breach of fiduciary duty.   The Complaint alleges that Mr. Ferder

"concealed and mispresented the nature of numerous financing transactions he entered into with third party, high net worth individuals."  It further alleges that these contracts "created potential liabilities for Lugano [Diamonds], but [Mr. Ferder] disguised them as direct sales.  He forged invoices and sale documents, sent out empty box shipments, falsely recorded the money from the third-party individuals as revenue for Lugano [Diamonds], and concealed the payment obligations from Lugano [Diamond's] books."

33.     As discussed more fully below, these allegations also prompted the Lugano Diamond's Board of Directors (the "Board") to establish the Special Committee (as defined herein) to investigate, *inter alia*, these Investment Contracts and the allegations associated therewith.

Default and the CODI Forbearance Agreement

34.     On June 6, 2025, CODI sent Lugano Diamonds and Lugano Buyer a notice of default under the Credit Agreement.

35.     On August 29, 2025, the Debtors and CODI entered into a forbearance agreement (the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, CODI agreed not to exercise certain remedies, if the Debtors met certain sale agreement milestones, did not default under the Forbearance Agreement or the Credit Agreement (or other loan documents) and did not suffer certain prejudgment remedies.  In exchange, the Debtors, among other things, acknowledged the outstanding principal amount and accrued but unpaid interest, released certain claims against CODI and certain related parties,[3] acknowledged that CODI had valid, perfected, enforceable first-priority liens and security interests in its collateral, subject to certain exceptions, and agreed to certain milestones in a sales process.

---

[3]     The Debtors did not release certain claims, including those against (a) CODI and related parties in their capacities as shareholders, officers, directors, managers under a certain management agreement, or controlling persons claims again, and (b) Mr. Ferder and related parties.

Stabilizing the Business

36.     Since the 8-K disclosures and in response to the events Mr. Ferder's alleged fraud triggered, management and employees have worked tirelessly to preserve the Company's business operations.  This included reaching out to parties that entered into the Investment Contracts (many of whom were clients), preserving the Company's critical relationships with its clientele, assessing the Company's true financial condition and the value of its physical inventory, revising the business plan based on the actual sales volume, addressing employee morale issues in light of a reduction in force needed to right-size the business based on actual revenue, and embarking on a sales process without reliable historical financial statements.

37.     The Company and its advisors are working to stabilize operations, revise its business plan, and implement a strategy, centered around a sales process, to maximize the value of its business for the benefit of its stakeholders.

Corporate Governance

38.     Beginning in early 2024, Lugano Diamonds brought in a new management team, including Joshua Gaynor as President and Christoph Pachler as Chief Financial Officer.

39.     On May 7, 2025, Mr. Ferder resigned his positions and offices throughout the Company (including as Chief Executive Officer, director, manager, and trustee).  Mr. Gaynor became the Interim Chief Executive Officer of Lugano Diamonds.  Mr. Pachler was selected as Chief Financial Officer, Treasurer, and Executive Vice President of Lugano Diamonds and was appointed as the sole trustee of the Lugano Prive Investment Trust.

40.     On June 4, 2025, among other governance changes, Mr. Gaynor and Mr. Pachler were selected as directors of Lugano Holding, Lugano Buyer, and Lugano Diamonds.  The next day, certain of the directors and managers appointed by CODI resigned their positions throughout the Company.

33769076.1

41.     To address potential conflicts and to provide for independent governance where appropriate in light of Mr. Ferder's scheme, the Board selected two independent directors (to supplement two legacy independent directors that remain on the Board) with no prior connection to the Company, CODI or the Ferders.  Mr. Thomas FitzGerald and Mr. L. Spencer Wells joined the Lugano Diamonds Board on July 9, 2025, and a week later, on July 16, 2025, the Board delegated certain matters to a Special Committee of the Board (the "Special Committee") comprised of Messrs. FitzGerald and Wells.

42.     The purview of the Special Committee includes overseeing an investigation of the fraud and commencing, prosecuting, or settling any actions related to matters addressed by, or causes of action that may be developed in, the investigation.  By doing so, the Board ensured that Board members who were officers or directors of the Company at the time of the scheme would not be involved in the related investigation or litigation.

43.     The Special Committee also assumed responsibility for, among other things, reviewing, evaluating, and, if appropriate, making recommendations to the Board about strategic transactions (whether within or outside a bankruptcy) and the commencement of an insolvency proceeding.  To assist in carrying out its delegated responsibilities, the Special Committee retained Barnes & Thornburg LLP as independent counsel.   In addition, by agreement dated October 27, 2025, the Special Committee retained Glass Ratner to provide CRO and support services for the Debtors, and to provide forensic accounting services for the Special Committee.

44.     The Special Committee commenced an internal investigation surrounding the fraud to determine, among other things, what happened and what claims may exist as a result of the fraud.  That investigation is ongoing.  And, in accordance with the delegation from the Board, the Special Committee took the lead role in evaluating various proposals and ultimately made

recommendations to the Board regarding potential strategic transactions and the commencement of the Chapter 11 Cases. The Board accepted those recommendations.

### CODI Bridge Financing and Forbearance Agreement Amendments

45.     Due in part to the complications relating to the fraud, the sale process took longer than anticipated. To address these delays and to provide the Debtors with necessary liquidity, on October 2, 2025, the Debtors and CODI entered into to the First Amendment to Forbearance Agreement and the Twenty Third Amendment to Credit Agreement (the "Twenty Third Amendment"), as well as related documentation.

46.     Absent entry into the Twenty Third Amendment and due to the defaults under the Credit Agreement, Lugano Diamonds and Lugano Buyer could not borrow additional amounts under the Credit Agreement. The Twenty Third Amendment enabled Lugano Diamonds and Lugano Buyer to borrow up to $4 million under the Credit Agreement, subject to CODI's discretion. Following entry into the Twenty Third Amendment and as of the Petition Date, CODI provided $2.2 Million under the Credit Agreement.

47.     As a condition to the Twenty Third Amendment (and as required by the Guarantee and Collateral Agreement), Debtors executed a Guarantee and Collateral Agreement Supplement thereby providing CODI with a security interest in certain commercial tort claims.

48.     Contemporaneously with the Twenty Third Amendment, CODI and the Debtors agreed to the First Amendment to Forbearance Agreement. A Second Amendment to Forbearance Agreement dated as of October 10, 2025, followed. These amendments, among other things, extended certain sale process milestones contained in the Forbearance Agreement.

### The Sales Process

49.     By letter dated May 22, 2025, Lugano Diamonds engaged Armory Securities, LLC ("Armory") on an exclusive basis in connection with a possible restructuring, sale, or financing.

33769076.1

50.     The Debtors and their professionals identified over 100 parties who might be interested in a purchase or financing transaction with the Company.  Over 50 parties signed non-disclosure agreements and received a confidential information memorandum.  Five parties submitted indications of interest.  The Debtors provided those parties with due diligence materials, including access to a virtual data room and meetings with management.

51.     The Debtors subsequently received six letters of intent to acquire their assets, with different proposed transaction structures.  The letters of intent included "going concern" and liquidation proposals, certain of which the Special Committee (in consultation with the full Board), instructed Armory and the Debtors' counsel to further negotiate.

52.     Ultimately, the Debtors determined that the proposed transaction with Enhanced Retail Funding, LLC (the "Agent"), subject to higher and better offers, was the path that would maximize the value to its stakeholders.  The Debtors engaged the Agent in good faith, arms'-length negotiations and entered into that certain Agency Agreement (the "Agency Agreement"), dated as of November 16, 2025 with the Agent.

53.     I am generally familiar with the terms and conditions of the Agency Agreement which is described in the Sales Motion (as defined below).  The Agency Agreement as outlined in the Sales Motion is a combination of two frequently used approaches approved in retail bankruptcies around the United States (an (a) agency agreement and (b) an equity agreement subject to overbid and auction) that in the interest of time and the pending Holiday season are combined and pursued contemporaneously by the Debtors.

54.     Pending approval of the Agency Agreement or a higher or better offer, the Debtors anticipate the continuing operation of their retail businesses and look forward to maintaining retail sales efforts through the holiday season.

33769076.1

<u>Post-Petition Financing and Use of Cash Collateral</u>

55.     To fund their operations during the Chapter 11 Cases, the Debtors need access to CODI's cash collateral and, in addition, access to additional financing.  The Debtors commenced negotiations with CODI for several reasons.  First, in light of the fraud allegations discussed above the Debtors' financial information and reporting is under review, finding a third party postpetition lender might prove difficult.  Second, CODI indicated that, while it would be willing to provide financing, it was unlikely to consent to the priming of its liens.  These factors suggested that third party lenders would not be able to provide financing on more advantageous terms, particularly when the expenses of a priming fight are considered.

56.     Prior to the filing of the Chapter 11 Cases, several potential lenders confirmed to me or members of the GlassRatner team acting at my direction that they did not have an interest in providing financing to the Debtors on a non-priority or junior lien basis.

57.     The Debtors' negotiations with CODI were conducted in good faith and at arms'-length.  As noted above, CODI has (and at the time of Mr. Moti's fraud had) many connections with the Debtors, including as majority owner and lender.  Accordingly, the Special Committee and its professionals were involved in the negotiations.

58.     I am familiar with the terms of the Debtors' proposed postpetition financing facility (the "<u>DIP Facility</u>").  The DIP Facility, and the use of CODI's cash collateral will enable the Debtors to conclude their sale negotiations and thereby maximize the value of their assets.  Absent the DIP Facility, the Debtors would be unlikely to be able to continue operations for more than a few weeks in chapter 11, jeopardizing the ability to achieve maximum value in its sale process.

59.     By enabling the Debtors to continue operations through the upcoming Holiday Selling Season and maximize its sales value during their most profitable sales period, the DIP

Facility will greatly increase the likelihood that the Debtors can maximize the value of their assets for their stakeholders.

60.     The terms of the DIP Facility as set forth in greater detail in the Debtors' motion to approve the DIP Facility.

61.     Based on my experience, the terms of the DIP Facility are reasonable under the circumstances. For the foregoing reasons, I believe that the DIP Facility represents the best available alternative for the Debtors under the circumstances.

## II.    FIRST DAY MOTIONS

62.     To minimize the disruption of a chapter 11 filing and maximize the value of their assets until the Debtors are able to either resume operations or monetize their assets, the Debtors have requested various types of relief in the following First Day Motions, all of which are being filed concurrently with this Declaration.  A list of the First Day Motions is set forth below:

Administrative and Operational First Day Motions

- Motion of Debtors for Order Directing the Joint Administration of the Debtors' Chapter 11 Cases

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (B) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain Insurance Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, Surety Bonds, and Letters of Credit, (III) Honor and Renew Premium Financing Agreements Entered Into Prepetition, Satisfy Prepetition Obligations Related Thereto, and Enter Into Premium Financing Agreements, and (IV) Continue To Pay Broker Fees, and (B) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors To (I) Continue to Operate the Cash Management System, (II) Honor Certain Prepetition Obligations Related Thereto, (III) Maintain Existing Business Forms, and (IV) Continue Intercompany Transactions, (B) Granting Administrative Expense Status to Postpetition Intercompany Transactions, and (C) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Approving the Debtors' Proposed Adequate Assurance Procedures with Respect to the Debtors' Utility Providers, (B) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (C) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, and (D) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Redact Certain Confidential Information of Customers and (II) Redact Certain Personally Identifiable Information of Individuals; and (B) Granting Related Relief

- Application of Debtors for an Order (A) Authorizing and Approving the Appointment of Omni Agent Solutions, Inc. as Claims and Noticing Agent, and (B) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Continue Employee Benefits Programs, and (B) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain and Administer Their Customer Programs, and (II) Honor Prepetition Obligations, and (B) Granting Related Relief

- Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing, and (II) Utilize Cash Collateral, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection to the Prepetition Lender, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief

- Motion of Debtors for (A) an Interim Order (I) Authorizing the Debtors to Perform Under the Agency Agreement, (II) Approving the Sale Guidelines, Dispute Resolution Procedures, Waiver of Various Lease Restrictions, and Modifications to the Debtors' Customer Programs, (III) Scheduling, If Necessary and Prior to Any Auction, the Agent Protections Hearing to Consider Entry of the Agent Protections Order (1) Approving the Agent Protections, (2) Scheduling, If Necessary, the Auction, and (3) Approving (X) the Bidding Procedures, and (Y) the Sale Notice; (IV) Authorizing, If Necessary, the Debtors to Execute an Alternative Transaction Agreement, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief; and (B) a Final Order (I) Authorizing the Debtors to Assume (1) the Agency Agreement, or (2) an Alternative Transaction, (II) Authorizing (1) Agent to Sell the Agency Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, or Authorizing (2) Another Successful Bidder to Sell the Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Granting Related Relief (the "Sales Motion").

63.     The Debtors have narrowly tailored the First Day Motions to meet the goals of continuing their operations in the Chapter 11 Cases with as little disruption and loss of productivity until the sales process is complete, maintaining the confidence and support of key customer and employee constituencies during this time, and efficiently administering the Chapter 11 Cases.

64.     I have reviewed each of the First Day Motions (and exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate reliance on the Debtors' employees and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Motions as though set forth herein.

65.      I believe that the relief requested in each of the First Day Motions is necessary and appropriate to maximize the value of the Debtors' estates and is in the best interest of the Debtors' estates, creditors, and other parties-in-interest.

[*Remainder of page intentionally left blank*]

33769076.1

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Irvine, California, on November 16, 2025.

/s/ J. Michael Issa
J. Michael Issa
Chief Restructuring Officer

33769076.1

## <u>EXHIBIT 1</u>

**Corporate Structure Chart**

# Lugano Organizational Chart

