## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (___) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING THE DEBTORS TO (I) OBTAIN POSTPETITION FINANCING, AND (II) UTILIZE CASH COLLATERAL, (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER, (D) MODIFYING THE AUTOMATIC STAY, (E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file this motion (this "Motion") for entry of an interim order (the "Interim DIP Order"), substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders"):  (a) authorizing the Debtors to (i) obtain postpetition financing and (ii) utilize cash collateral; (b) granting liens and superpriority administrative expense claims; (c) granting adequate protection to the prepetition lender; (d) modifying the automatic stay; (e) scheduling a final hearing; and (f) granting related relief.  In support of this Motion, the Debtors submit the *Declaration of J. Michael Issa in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration")[2] filed

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308).  The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration, the DIP Documents (as defined herein), or the DIP Orders, as applicable.

contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

**JURISDICTION AND VENUE**

1.        The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.        Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.        The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506, 507, 541, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, and 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1(b), 4001-2, and 9006-1.

**BACKGROUND**

**I.        General Background**

4.        On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

33769082.1

5.      No official committee has been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

6.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

## CONCISE STATEMENTS PURSUANT TO BANKRUPTCY RULE 4001(b) AND LOCAL RULE 4001-2

7.      The below chart contains a summary of the material terms of the proposed DIP Facility (as defined herein), together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, which is qualified in its entirety by reference to the DIP Credit Agreement (as defined herein) and the DIP Orders.[3]

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
| --- | --- |
| **DIP Borrowers** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i), 4001-2(a)(i)(J) | Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds"), Lugano Buyer, Inc. ("Lugano Buyer"), Lugano Holding, Inc. ("Lugano Holding"), K.L.D. Jewelry, LLC ("KLD"), and Lugano Prive, LLC ("Lugano Prive," and collectively with Lugano Diamonds, Lugano Buyer, Lugano Holding, and KLD, the "Borrowers" or the "Loan Parties"). *See* Interim DIP Order, Preamble (i); DIP Credit Agreement, Preamble. |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | Compass Group Diversified Holdings LLC ("CODI" or "DIP Lender") *See* Interim DIP Order, Preamble (i); DIP Credit Agreement, Preamble. |
| **Term** Bankruptcy Rule 4001(b)(l)(B), 4001(c)(1)(B) Local Rule 4001-2(a)(i)(M) | The term of the DIP Loan begins upon entry of the Interim DIP Order and continues through and including the earliest to occur of: <br> a) May 31, 2026, or such later date as may be agreed to in writing by the DIP Lender in its sole discretion (the "Maturity Date"); <br> b) the date that is 30 calendar days after the filing of this Motion absent entry of the Final DIP Order, unless otherwise agreed to in writing by the DIP Lender in its sole discretion; <br> c) the acceleration of the Loans and the termination of the Commitments under the DIP Credit Agreement; |

---

[3]   The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced.  In the event of any conflict between the summary, the DIP Orders, and the DIP Documents, the terms of the applicable document(s) shall control in the order of precedence set forth therein.

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | d) the termination of DIP Lender's commitment to make Loans and the Borrowers' prepayment of all outstanding amounts; |
| | e) the date that is 10 calendar days after the occurrence of the effective date of any Acceptable Plan; |
| | f) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; |
| | g) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases; |
| | h) the consummation of the sale of all or substantially all of any Borrower's assets; and |
| | i) any other Event of Default (as defined in the DIP Credit Agreement or DIP Orders, as applicable) after giving effect to customary remedies afforded to the Borrowers in the applicable DIP Orders. |
| | *See* Interim DIP Order ¶ 17(a); DIP Credit Agreement § 1.1. |
| **Amount of DIP Facility** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(i)(A) | The aggregate principal amount of the DIP Facility is $12 million. The interim borrowing limit is $1.5 million. *See* Interim DIP Order, Preamble (i)(a), (b); DIP Credit Agreement, Preamble, §§ 1.1, 2.1.1–2.1.3. |
| **"Roll-Up" Provisions** Local Rule 4001-2(a)(i)(N), (O) | Section 2.1.3 of the DIP Credit Agreement provides as follows: <br><br> Roll-Up Loans. <br><br> a) Immediately upon entry of the Interim DIP Order, a portion of the outstanding Prepetition Obligations in an aggregate principal amount equal to $2,200,000 (the "Roll-Up Amount") held by the DIP Lender shall be automatically "rolled up" and converted into the DIP Facility, on a cashless basis and substituted and deemed to constitute Obligations (on a dollar-for-dollar basis) of the Loan Parties under the DIP Credit Agreement for all purposes under the DIP Credit Agreement as if originally funded on the Interim DIP Order Date (the "Roll-Up Loans"), without further action by any party, including the Bankruptcy Court (which conversion shall not, for the avoidance of doubt, constitute a novation). From and after the Interim DIP Order Date, the Prepetition Obligations shall be automatically and irrevocably reduced by the Roll-Up Amount. For the avoidance of doubt, the aggregate principal amount of the Roll-Up Loans shall not reduce the Interim DIP Loan Commitment. For the further avoidance of doubt, the aggregate principal amount of the Roll-Up Loan shall reduce the Final DIP Loan Commitment on a dollar-for-dollar basis. <br><br> b) Subject to the terms and conditions set forth in the DIP Credit Agreement and in the DIP Orders, and without further action by any party to the DIP Credit Agreement, the DIP Lender's Roll-Up Loans shall be deemed to be Loans, administered under the DIP Credit Agreement and secured by perfected Liens on, and security interests in, all of the Collateral of the Loan Parties to the same extent as the other Obligations of the Loan Parties under the DIP Credit Agreement. For the avoidance of doubt, until any Prepetition Obligations under the Prepetition Credit Agreement are deemed to be Roll-Up Loans as provided in the DIP Credit Agreement, such Prepetition Obligations shall remain Prepetition Obligations |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | under the Prepetition Credit Agreement and guaranteed by the guarantors of and secured by and entitled to the benefits of all liens created and arising under the Prepetition Loan Documents, which liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority. The Roll-Up Loans and the other Loans shall jointly constitute a single facility under the DIP Credit Agreement. |
| | c)   The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, as a necessary inducement for, and solely on account of, the agreement of the Prepetition Lender, as lender under the DIP Credit Agreement, to fund the Loans under the DIP Credit Agreement and not as payments under, adequate protection for, or otherwise on account of, the Prepetition Obligations. Notwithstanding any other provision of the Interim DIP Order, the Final DIP Order, or the Loan Documents, all rights of the Prepetition Lender shall be fully preserved, including with respect to the Roll-Up Loans. |
| | Notwithstanding anything to the contrary in the DIP Credit Agreement, the claims and Liens in respect of the Roll-Up Loans shall (x) to the same extent as the DIP Loans, be subject and subordinate to the Carve-Out, (y) be subject to the Challenge Period, and (z) not attach to or be payable from the proceeds of the Retained Actions. |
| | *See* Interim DIP Order, Preamble (i)(a), (b), ¶ 34; DIP Credit Agreement §§ 1.1, 2.1.3. |
| **Conditions Precedent** Bankruptcy Rule 4001(c)(1)(B)  Local Rule 4001-2(a)(i)(E) | Section 4.1 of the DIP Credit Agreement provides as follows: |
| | <u>Conditions to Initial Borrowing</u>: |
| | The obligation of DIP Lender to make the Loans is subject to the following conditions precedent: |
| | a)   The obligation of DIP Lender to make the initial Loans under the DIP Credit Agreement on or after the Closing Date is, in addition to the conditions precedent specified in Section 4.2 of the DIP Credit Agreement, subject to the following conditions precedent, each of which shall be satisfactory in all respects to DIP Lender: |
| |     1)   The DIP Lender shall have received the Initial Budget setting forth projected cash flows, together with detailed information as to projected disbursements and receipts, including all updates and supplements thereto, to be in form and substance reasonably acceptable to the DIP Lender (upon approval by the DIP Lender of the Initial Budget, such Initial Budget shall become an Approved Budget). |
| |     2)   The DIP Lender shall have received a sale plan detailing the proposed process for the orderly sale of the Borrowers' assets (the "<u>Sale Plan</u>") in form and substance acceptable to the DIP Lender in its sole discretion. |
| |     3)   Borrowers shall have appointed the Sales Agent acceptable to and on terms and conditions acceptable to the DIP Lender in its sole discretion. |
| |     4)   Borrowers shall have appointed the CRO acceptable to and on terms and conditions acceptable to the DIP Lender in its sole discretion. |
| |     5)   Borrowers shall have engaged a Financial Advisor acceptable to the DIP Lender in its sole discretion; *provided* that advisors retained by or to support the CRO may act in the stead of a retained Financial Advisor. |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | 6) Borrowers shall have delivered the following documents in form and substance satisfactory to DIP Lender, each, as applicable, duly executed by each Borrower a party thereto and dated the Closing Date or an earlier date satisfactory to DIP Lender:<br><br>(i) The DIP Credit Agreement.<br><br>(ii) The Note.<br><br>(iii) The Interim DIP Order.<br><br>(iv) The Collateral Agreement, all other Collateral Documents, and all instruments, documents, certificates and agreements executed or delivered pursuant thereto (including intellectual property assignments and pledged Collateral, with undated irrevocable transfer powers executed in blank).<br><br>(v) For each Borrower, such Person's (i) charter (or similar formation document), (ii) bylaws (or similar governing document), (iii) resolutions of its board of directors (or similar governing body) approving and authorizing such Person's execution, delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby, and (iv) signature and incumbency certificates of its officers executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification.<br><br>(vi) Evidence that all necessary consents, permits and approvals (governmental or otherwise) required for the execution, delivery and performance by each Loan Party of the Loan Documents have been duly obtained and are in full force and effect.<br><br>(vii) Such other certificates, legal opinions, documents and agreements as DIP Lender may reasonably request.<br><br>Conditions to All Borrowings:<br><br>The obligation of DIP Lender to make each Loan is subject to the additional conditions precedent that (unless such conditions are waived by DIP Lender), both before and after giving effect to any borrowing:<br><br>a) the representations and warranties of each Borrower set forth in the DIP Credit Agreement and the other Loan Documents shall be true and correct in all material respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);<br><br>b) no Event of Default or Default shall have then occurred and be continuing;<br><br>c) the DIP Lender shall have received a Borrowing Request in accordance with the requirements of the DIP Credit Agreement;<br><br>d) the DIP Lender shall have received and approved the Approved Budget and Budget Variance Report, as applicable, required to be delivered pursuant to Section 6.1.1 of the DIP Credit Agreement; |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | e) the Borrowers shall be in compliance with the Approved Budget (subject to any Permitted Variances) in all respects; <br><br> f) the Borrowers' cash balance of all accounts held by the Borrowers as of the date of any Borrowing Request, after giving effect to such Borrowing Request, shall not exceed the amount of cash required to fully fund the Approved Budget for the two-week period following such date of Borrowing; <br><br> g) the borrowing of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; and <br><br> h) the Interim DIP Order, or, after the entry of the Final DIP Order, the Final DIP Order, shall be in full force and effect and shall not be the subject of any appeal, motion for reconsideration, stay, order of reversal, amendment or modification. <br><br> Each request by Borrowers for the making of a Loan shall be deemed to constitute a representation and warranty by Borrowers that the conditions precedent set forth in Section 4.2 of the DIP Credit Agreement will be satisfied at the time of the making of such Loan. <br><br> *See* Interim DIP Order ¶ 3(b); DIP Credit Agreement §§ 4.1–4.2. |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(B) | <u>Default Rate</u> means, with respect to any Loan or other obligation under the DIP Credit Agreement, an interest rate equal to the Stated Interest Rate plus four percent (4.0%) per annum. <br><br> Section 2.6 of the DIP Credit Agreement provides as follows: <br><br> <u>Interest</u>. <br><br> a) Subject to clause (b) below, each Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to eight percent (8%) (the "<u>Stated Interest Rate</u>").  Interest shall accrue monthly and shall be payable in kind by adding such interest to the outstanding principal amount under such Loan (the "<u>PIK Interest</u>"). <br><br> b) If any amount payable by a Borrower under any Loan Document is not paid when due (after expiration of any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by applicable Laws until such Borrower cures or otherwise remedies the events or omissions resulting in the application of the Default Rate. <br><br>     1) If any other Event of Default exists, then the DIP Lender may require (and notify Borrowers thereof) that all outstanding Obligations shall thereafter bear interest at a rate per annum at all times equal to the Default Rate. <br><br>     2) Accrued and unpaid interest on past due amounts shall be due and payable on demand. <br><br> c) So long as there is no Event of Default under the DIP Credit Agreement or the Final DIP Order, as may be modified or amended, interest will accrue at the Stated Interest Rate on amounts originated under the DIP Facility (including, for the avoidance of doubt, the Roll-Up Loan) and shall be paid upon the DIP Termination Date. <br><br> *See* DIP Credit Agreement §§ 1.1, 2.6. |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| **Use of DIP Facility and Cash Collateral** Bankruptcy Rule 4001(b)(1)(B) Local Rule 4001-2(a)(i), 4001-2(a)(i)(L) | **Carve-Out** means an amount equal to the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court pursuant to a final, non-appealable order, all unpaid fees and expenses (including any restructuring, sale, finance, success, or other transaction fee of any investment bankers or financial advisors) incurred at any time by persons or firms retained by the Borrowers or the Special Committee pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>" and such fees the "<u>Allowed Debtor Professional Fees</u>") in amounts strictly limited to those contained in the Approved Budgets at any time before or on the first Business Day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; (iv) to the extent allowed by the Bankruptcy Court pursuant to a final, non-appealable order, all unpaid fees and expenses incurred at any time by persons or firms retained by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and such fees the "<u>Allowed Committee Professional Fees</u>" and together with the Allowed Debtor Professional Fees, the "<u>Allowed Professional Fees</u>") in amounts strictly limited to those contained in the Approved Budgets at any time before or on the first Business Day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; (v) Allowed Debtor Professional Fees incurred after the first Business Day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $100,000; and (vi) Allowed Committee Professional Fees incurred after the first Business Day following delivery by DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $25,000 (the amounts set forth in clauses (v) and (vi) being the "<u>Post Carve-Out Trigger Notice Cap</u>"); *provided, however*, nothing in the DIP Credit Agreement shall be construed to impair the ability of the DIP Lender to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity. Section 6.12 of the DIP Credit Agreement provides as follows: <u>Use of Proceeds.</u> Use the proceeds of the Loans solely in accordance with the Approved Budget (including Permitted Variances) and the terms and conditions of the DIP Credit Agreement and the DIP Orders, including (but subject to the Approved Budget) to (i) provide working capital and for other general working corporate purposes of the Borrowers, (ii) fund the Chapter 11 Cases, sales of the Borrowers' assets including the consummation of the Sale Plan, and the chapter 11 plan process, (iii) fund the costs of the administration of the Chapter 11 Case (including United States Trustee fees and professional fees and expenses subject in all respects to any limitations and procedures set forth in the DIP Orders), and (iv) fund the Carve-Out and the Fee Escrow Accounts, in each case of clauses (i) through (iv) above, in strict accordance with the Approved Budget or as otherwise approved by the DIP Lender in writing in its sole and absolute discretion.  No portion of the proceeds of the Loans, Carve-Out, or Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution or any claims, causes of action, adversary proceedings or other litigation, including any Retained Actions solely to the extent any Retained Action falls within the scope of the actions described in paragraph 26 of the Interim DIP Order, against the Prepetition Lender or DIP Lender; *provided* that, the Carve-Out, proceeds of the Collateral and Loans may be used for (i) allowed fees and expenses, |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | in an amount not to exceed $25,000 in the aggregate, incurred solely by an official committee of unsecured creditors, if any appointed in the Chapter 11 Cases for such otherwise prohibited purposes within the Challenge Period (the "<u>Investigation Budget</u>") and (ii) fees and expenses, in an amount not to exceed the amount set forth in the Approved Budget, incurred by the special committee of the board of directors of Lugano Diamonds (the "<u>Special Committee</u>") in connection with its investigation of any claims relating to fraud allegations associated with the Borrowers' prepetition operations (the "<u>Special Committee Budget</u>"). <br><br> *See* Interim DIP Order ¶¶ 8, 13, 26; DIP Credit Agreement §§ 1.1, 6.12. |
| **Adequate Protection** <br> Bankruptcy Rule 4001(b)(l)(B), 4001(c)(1)(B)(ii), 4001(c)(1)(B)(xi) <br><br> Local Rule 4001-2(a)(i)(B), (F), (G), (K), (N), (U) | Section 2.14 of the DIP Credit Agreement provides as follows: <br><br> <u>Prepetition Lender Protections</u>. <br><br> Subject to the Carve-Out and excluding the Retained Actions and the proceeds thereof, due to the DIP Lender's DIP Liens on the DIP Collateral, Prepetition Lender shall receive as adequate protection for its prepetition secured status pursuant to the Prepetition Loan Documents the following: <br><br> a)   <u>Rollover Liens</u>: As adequate protection for any diminution in the value of the prepetition Encumbered Collateral, including based upon the priming by the DIP Lender other than with respect to any priming arising as a result of the Roll-Up Loans ("<u>Diminution</u>"), Prepetition Lender shall continue to have valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all DIP Collateral and the proceeds, rents, products, and profits therefrom, whether acquired or arising before or after the Petition Date, to the same extent, priority, and validity that existed as of the Petition Date (the "<u>Rollover Liens</u>"); *provided, however*, the Rollover Liens shall be subject to the DIP Liens and the Carve-Out; and *provided further* that the Rollover Liens shall not attach to the Retained Actions or any proceeds therefrom; <br><br> b)   <u>Supplemental Liens</u>: Subject to approval on a final basis, as additional adequate protection for any Diminution, Prepetition Lender shall have a valid, perfected, and enforceable continuing supplemental lien on, and security interest in, all of the assets of the Borrowers of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products, and profits therefrom, inclusive (subject to entry of the Final DIP Order) of the Avoidance Actions and any proceeds therefrom (the "<u>Supplemental Liens</u>"); *provided, however*, the Supplemental Liens shall be subject to the DIP Liens and the Carve-Out and liens on Encumbered Collateral, if any, in the same priority as existed prepetition; and *provided further* that the Supplemental Liens shall not attach to the Retained Actions or any proceeds thereof; <br><br> c)   <u>Prepetition Superpriority Claim</u>: As additional adequate protection for any Diminution, Prepetition Lender shall receive a superpriority expense claim allowed under section 507(b) of the Bankruptcy Code (the "<u>Prepetition Superpriority Claim</u>") payable from the proceeds of all assets of the Borrowers' estates. The Prepetition Superpriority Claim shall have priority over any and all other unpaid administrative expenses now existing or hereafter arising, of any kind whatsoever, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
|  | to the rights of the Borrowers, any successor trustee, or any creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment; *provided, however*, the Prepetition Superpriority Claim shall be subject to the DIP Liens, DIP Superpriority Claims, and the Carve-Out; and *provided further* that the Prepetition Superpriority Claims shall not be payable from the Retained Actions or any proceeds therefrom; |
|  | d) <u>Prepetition Lender's and DIP Lender's Fees and Expenses</u>: As additional adequate protection, the Borrowers shall reimburse the reasonable and documented fees and expenses (including attorney's fees) of the Prepetition Lender and DIP Lender, payable on the DIP Termination Date; |
|  | e) <u>Financial Reports</u>: The Borrowers shall provide Prepetition Lender with all reports, documents, and other materials, including financial reports, as may be required to be delivered to the DIP Lender and such other and further access to the Borrowers' books and records, advisors, and professionals as may be reasonably requested by Prepetition Lender from time to time (collectively, "<u>Prepetition Lender's Adequate Protection</u>"); and |
|  | f) <u>Intercompany Subordination</u>. All intercompany Liens of the Borrowers and their Affiliates, if any, shall be contractually subordinated to the DIP Facility and to the Prepetition Lender's Rollover Liens and the Supplemental Liens. |
|  | *See* Interim DIP Order ¶ 14; DIP Credit Agreement § 2.14. |
| **Repayment Features / Provisions Limiting Repayment** <br> Local Rule 4001-2(a)(i)(B) | Section 2.9.1 of the DIP Credit Agreement provides as follows: <br><br> <u>Voluntary Prepayment</u>. <br><br> Borrowers may, from time to time, on at least one Business Day's written (including via email) notice or telephonic notice (if a telephonic notice, followed immediately by written confirmation thereof) to DIP Lender not later than 3:00 p.m. New York City time on such day, prepay the Loans in whole or in part. Such notice to DIP Lender shall specify the Loans to be prepaid and the date and amount of prepayment. Any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $10,000. All prepayments of Loans pursuant to Section 2.9.1 of the DIP Credit Agreement shall be applied pursuant to Section 2.9.3 of the DIP Credit Agreement. <br><br> Section 2.9.2 of the DIP Credit Agreement provides as follows: <br><br> <u>Mandatory Prepayments</u>. <br><br> Borrowers shall prepay the Loans until Paid in Full at the following times and in the following amounts, in each case except as otherwise expressly provided in the DIP Credit Agreement: <br><br> a) on the date on which any and all sales of assets that are not Merchandise (as defined in the Sale Plan) occur, in an amount equal to such net proceeds; *provided* that such net proceeds shall be paid at closing of such sale directly to the DIP Lender; *provided further* that all net proceeds paid pursuant to this clause (a) shall be applied in accordance with Section 2.11.2(b) of the DIP Credit Agreement; <br><br> b) no later than three Business Days following the date of receipt by any Borrower of any net proceeds from any insurance on any Collateral or condemnation, taking or other casualty of any Collateral, in an amount equal to such net proceeds; and |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | c)   concurrently with receipt by any Borrower of any cash proceeds from any capital contribution to, or any issuance of equity securities (other than equity securities that are issued pursuant to Section 7.11(a) of the DIP Credit Agreement) of any Borrower, or the issuance of Debt (other than Debt permitted by Section 7.1 of the DIP Credit Agreement), in an amount equal to such cash proceeds.<br><br>Payment made pursuant to clause (a) above shall be made notwithstanding any Challenge (as defined in the Interim DIP Order); *provided, however*, that in the event any such Challenge is successful, the fact that such payment or payments were made to the DIP Lender shall not prevent any return or disgorgement thereof.<br><br>Section 2.9.3 of the DIP Credit Agreement provides as follows:<br><br><u>All Prepayments</u>.<br><br>a)   Borrowers shall give written (including via email) notice (the "<u>Prepayment Notice</u>") to DIP Lender not later than 3:00 p.m. New York City time at least one Business Day prior to each mandatory prepayment pursuant to clause Section 2.9.2 of the DIP Credit Agreement.  Such Prepayment Notice shall state the proposed date of prepayment, the amount of such prepayment, the clause of Section 2.9.2 of the DIP Credit Agreement pursuant to which such prepayment is made, and a reasonably detailed calculation of such amount.<br><br>b)   Borrowers shall deliver, no later than the date on which such prepayment is made, a certificate of an Authorized Officer of each Borrower certifying the calculation of the cash proceeds or net proceeds, as applicable.<br><br>c)   In the event that the Borrowers or DIP Lender shall subsequently determine that the actual amount received by the Borrowers exceeded the amount set forth in such certificate delivered pursuant to clause (b) above, the Borrowers shall promptly make an additional prepayment of the Loans and shall, concurrently with such prepayment, deliver a certificate of an Authorized Officer of each Borrower demonstrating the derivation of such excess cash proceeds or net proceeds, as applicable.<br><br>Section 2.10 of the DIP Credit Agreement provides as follows:<br><br><u>Repayment</u>.<br><br>The Borrowers shall repay to the DIP Lender on the DIP Termination Date, an amount equal to the aggregate principal amount of all Loans, including PIK Interest, outstanding on such date.<br><br>*See* DIP Credit Agreement §§ 2.9.1, 2.9.2, 2.9.3, 2.10. |
| **Fees and Expenses**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), (K) | Section 2.12 of the DIP Credit Agreement provides as follows:<br><br><u>DIP Lender Expenses</u>.<br><br>On the DIP Termination Date, the Borrowers are authorized and directed to pay, without further order of the Bankruptcy Court, the reasonable and documented fees and expenses, whether incurred before or after the Petition Date, by professionals, advisors, or consultants retained by the DIP Lender (including all fees, costs, disbursements, and expenses of the DIP Lender's counsel, Squire Patton Boggs (US) LLP and its Delaware Counsel Polsinelli PC) in connection with or associated with (i) the discussion, negotiation, preparation, execution, and delivery of any documents in connection with the Loan, the DIP Credit Agreement, and the DIP Orders, and (ii) the DIP Lender's interests in Chapter 11 Cases (the "<u>DIP Lender Expenses</u>").  The DIP Lender's professionals shall not be required to file |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | motions or applications with respect to the DIP Lender Expenses but shall comply with the notice requirements set forth in the Interim DIP Order. |

Section 2.14 of the DIP Credit Agreement provides as follows:

<u>Prepetition Lender Protections</u>.

Subject to the Carve-Out and excluding the Retained Actions and the proceeds thereof, due to the DIP Lender's DIP Liens on the DIP Collateral, Prepetition Lender shall receive as adequate protection for its prepetition secured status pursuant to the Prepetition Loan Documents the following:

…

    a)  <u>Prepetition Lender's and DIP Lender's Fees and Expenses</u>: As additional adequate protection, the Borrowers shall reimburse the reasonable and documented fees and expenses (including attorney's fees) of the Prepetition Lender and DIP Lender, payable on the DIP Termination Date; and

…

Section 9.4 of the DIP Credit Agreement provides as follows:

<u>Costs; Expenses</u>.

Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses of DIP Lender (including Legal Costs) incurred after (but not prior to or on) the DIP Termination Date in connection with the administration (including protection of Collateral) of the DIP Credit Agreement, the other Loan Documents and all other documents provided for in the DIP Credit Agreement or delivered or to be delivered under the DIP Credit Agreement or in connection with the DIP Credit Agreement (including any proposed or actual amendment, supplement or waiver to any Loan Document), and all reasonable out-of-pocket costs and expenses (including Legal Costs) incurred by DIP Lender after an Event of Default in connection with the collection of the Obligations and enforcement of the DIP Credit Agreement, the other Loan Documents or any such other documents.

*See* Interim DIP Order ¶¶ 14(d), 25; DIP Credit Agreement §§ 2.12, 2.14(d), 9.4.

| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(E), 4001-2(a)(iii) | <u>Initial Budget</u> means a minimum 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning the week in which the Petition Date occurs, setting forth, among other things, the Borrowers' cash, revenue, cash flow and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures (if applicable), vendor disbursements, working capital, and fees and expenses of the DIP Facility and the Chapter 11 Cases (including categories for each professional of the Borrowers, Special Committee and Committee) during such minimum 13-week period that the Borrowers are authorized to use proceeds of the Loans. Such Initial Budget shall be in the form set forth in <u>Exhibit D</u> to the DIP Credit Agreement. Until supplemented pursuant to Section 6.1.1 of the DIP Credit Agreement and approved by the DIP Lender in accordance with the DIP Credit Agreement, the Initial Budget shall constitute the Approved Budget. |

Section 4.1.1 of the DIP Credit Agreement provides as follows:

<u>Initial Budget</u>.

The DIP Lender shall have received the Initial Budget setting forth projected cash flows, together with detailed information as to projected disbursements and receipts, including all updates and supplements thereto, to be in form and substance reasonably acceptable to the

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | DIP Lender (upon approval by the DIP Lender of the Initial Budget, such Initial Budget shall become an Approved Budget).<br><br>Section 6.1.1 of the DIP Credit Agreement provides as follows:<br><br>Approved Budget.<br><br>a) The Borrowers shall provide to the DIP Lender: (i) following delivery of the Initial Budget, by not later than 5:00 p.m. Eastern Time on the third Business Day of the fourth full week following the Closing Date and by not later than 5:00 p.m. Eastern Time on the third Business Day of every fourth week thereafter, an updated Approved Budget (provided that, in the event that the Borrowers predict any Borrowing in an amount to exceed $250,000 more than any projected Borrowing in the most recent Approved Budget, such updated Approved Budget shall be delivered not later than 5:00 p.m. Eastern Time on the third Business Day of the third week after delivery of the then current Approved Budget), in each case, in form and substance reasonably satisfactory to the DIP Lender for the subsequent 13 week period consistent with the form of the Initial Budget, and such updated Approved Budget shall become the "Approved Budget" for the purposes of the DIP Facility upon the DIP Lender's acknowledgement that the proposed updated Approved Budget is substantially in the form of the Initial Budget and in substance satisfactory to the DIP Lender (provided, that, until a new Approved Budget has been approved by the DIP Lender, the most recently Approved Budget shall govern); and (ii) beginning on the Friday of the fourth full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the Friday of each week thereafter (by not later than 5:00 p.m. Eastern Time), a variance report (the "Budget Variance Report") for the immediately preceding four-week period (the "Variance Period") setting forth the difference between, on a line by line and aggregate basis, (a) actual operating disbursements, non-operating activities, and first day motion relief and budgeted operating disbursements, non-operating activities, and first day motion relief, (b) actual operating receipts and budgeted operating receipts, and (c) actual professional fees and budgeted professional fees. Each such Budget Variance Report shall include explanations for all material variances and shall be certified by an Authorized Officer of the Borrowers. The Borrowers will promptly provide notice to the DIP Lender of any matter or condition that could reasonably be expected to result in a Material Adverse Effect.<br><br>b) Other than to the extent otherwise permitted in the Loan Documents, the Interim DIP Order, the Final DIP Order, or any other applicable order of the Bankruptcy Court, no Borrower shall make or commit to make any payments other than those identified in the Approved Budget.<br><br>c) Each Borrower by the DIP Credit Agreement acknowledges and agrees that any updated Approved Budget (each such updated Approved Budget, a "Budget Update") provided to the DIP Lender shall not amend and supplement the applicable Approved Budget until the DIP Lender delivers a notice (which may be delivered by electronic mail) to Lugano Diamonds stating that the DIP Lender has approved of such Budget Update; *provided* that if the DIP Lender does not deliver a notice of approval to Lugano Diamonds, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Budget Update is agreed to among the Borrowers and the DIP Lender; *provided* that the Budget Update shall be deemed approved by the DIP Lender if (a) the Borrowers provide notice to the DIP Lender and provides the DIP Lender the Budget Update at least five Business Days prior to the end of the |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | then applicable Approved Budget and (b) the DIP Lender fails to approve or reject the Budget Update prior to the expiration of the then applicable Approved Budget. Once such Budget Update is so approved in writing by the DIP Lender, it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget. |
| | *See* Interim DIP Order ¶ 7; DIP Credit Agreement § 1.1, 4.1.1, 6.1.1. |
| **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(i)(E), 4001-2(a)(iii) | Section 7.19 of the DIP Credit Agreement provides as follows: |
| | Budget Variance Covenant. |
| | With respect to any Variance Period, not permit (tested on the date the Borrowers deliver a Budget Variance Report pursuant to Section 6.1.1 of the DIP Credit Agreement) the variance (as compared to the Approved Budget and excluding, for purposes of determining compliance with the Approved Budget and calculation of the Permitted Variance, fees for Debtors' Professionals and Committee Professionals (if any), DIP Lender Expenses, and interest and fees under the DIP Credit Agreement) to reflect (a) total receipts of less than 75% of projected receipts for the Variance Period or (b) more than 110% of projected total payments for the Variance Period (the "Permitted Variance"); *provided* that a breach of the foregoing shall not constitute an Event of Default so long as the Borrowers' ending cash is within $200,000 of the ending cash indicated at the end of the Variance Period. |
| | *See* Interim DIP Order ¶ 7(c); DIP Credit Agreement §§ 6.1.1(a), 7.19. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B), 4001(c)(l)(B)(v) Local Rule 4001-2(a)(i)(M), (S) | Section 8.1 of the DIP Credit Agreement contains various Events of Default, many or all of which are customary for debtor-in-possession credit facilities of this nature. Section 8.1.3 of the DIP Credit Agreement contains certain bankruptcy-related events of default. |
| | *See* Interim DIP Order ¶ 18; DIP Credit Agreement §§ 8.1, 8.1.3. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Section 9.5 of the DIP Credit Agreement provides as follows: |
| | Indemnification by Borrowers. |
| | In consideration of the execution and delivery of the DIP Credit Agreement by DIP Lender and the agreement to extend the Commitments provided under the DIP Credit Agreement, each Borrower by the DIP Credit Agreement agree to indemnify, exonerate and hold DIP Lender, and each of the officers, directors, employees, Affiliates and agents of DIP Lender (each a "Lender Party") free and harmless from and against any and all actions, causes of action, suits, losses, liabilities, damages and expenses, including Legal Costs (collectively, the "Indemnified Liabilities"), incurred by Lender Parties or any of them as a result of, or arising out of, or relating to (a) any tender offer, merger, purchase of equity interests, purchase of assets or other similar transaction financed or proposed to be financed in whole or in part, directly or indirectly, with the proceeds of any of the Loans, (b) the use, handling, release, emission, discharge, transportation, storage, treatment or disposal of any Hazardous Material at any property owned or leased by Borrower or any other Loan Party, (c) any violation of any Environmental Laws with respect to conditions at any property owned or leased by any Loan Party or the operations conducted thereon, (d) the investigation, cleanup or remediation of offsite locations at which any Loan Party or their respective predecessors are alleged to have directly or indirectly disposed of Hazardous Materials or (e) the execution, delivery, performance or enforcement of the DIP Credit Agreement or any other Loan Document by DIP Lender, except to the extent any such Indemnified Liabilities result from the applicable Lender Party's own gross negligence or |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | willful misconduct as determined by a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Borrower by the DIP Credit Agreement agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. All Obligations provided for in Section 9.5 of the DIP Credit Agreement shall survive repayment of the Loans, cancellation of the Notes, any foreclosure under, or any modification, release or discharge of, any or all of the Collateral Documents and termination of the DIP Credit Agreement. <br><br> *See* Interim DIP Order ¶ 25; DIP Credit Agreement § 9.5. |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B) <br><br> Local Rule 4001-2(a)(i)(H) | Section 6.13 of the DIP Credit Agreement provides as follows: <br><br> Milestones. <br><br> Within the time periods set forth below (or such later times as the DIP Lender may agree in its sole and absolute discretion), the Borrower shall perform each action with respect to the Chapter 11 Cases as set forth below (the "Milestones"): <br><br> a) the Chapter 11 Cases shall be filed on or before November [__], 2025; <br><br> b) the entry by Bankruptcy Court of the Interim DIP Order, in form and substance acceptable to the DIP Lender in the DIP Lender's sole and absolute discretion, no later than three Business Days after the Petition Date; <br><br> c) within 10 calendar days after the Petition Date, the Borrowers shall have filed with the Bankruptcy Court a motion to retain the CRO and the Financial Advisor; <br><br> d) within 10 calendar days after the Petition Date, the Borrowers shall have filed with the Bankruptcy Court a motion to retain an agent or consultant to sell the Borrower's assets, acceptable to the DIP Lender in its sole discretion (the "Sales Agent"); <br><br> e) within 10 calendar days after the Petition Date, the Borrowers shall have filed with the Bankruptcy Court a motion for entry of an order approving the procedures and process by which the Borrowers will implement and execute on the Sale Plan, which such order shall be acceptable to the DIP Lender in its sole discretion; and <br><br> f) the entry by Bankruptcy Court of the Final DIP Order within 30 calendar days after the Petition Date. <br><br> *See* Interim DIP Order ¶ 19; DIP Credit Agreement § 6.13. |
| **Entities with Interests in Cash Collateral** <br> Bankruptcy Rule 4001(c)(1)(B) | The Prepetition Lender has an interest in Cash Collateral. <br><br> *See* Interim DIP Order ¶ F. <br><br> Bank of America (potential right of setoff)[4] |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) | Carve-Out means an amount equal to the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $10,000 incurred by a trustee under |

---

[4]  The Debtors anticipate that Bank of America will waive or otherwise consent to the use of Cash Collateral (as defined below).

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(F) | section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court pursuant to a final, non-appealable order, all unpaid fees and expenses (including any restructuring, sale, finance, success, or other transaction fee of any investment bankers or financial advisors) incurred at any time by persons or firms retained by the Borrowers or the Special Committee pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals" and such fees the "Allowed Debtor Professional Fees") in amounts strictly limited to those contained in the Approved Budgets at any time before or on the first Business Day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; (iv) to the extent allowed by the Bankruptcy Court pursuant to a final, non-appealable order, all unpaid fees and expenses incurred at any time by persons or firms retained by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and such fees the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, the "Allowed Professional Fees") in amounts strictly limited to those contained in the Approved Budgets at any time before or on the first Business Day following delivery by the DIP Lender of a Carve-Out Trigger Notice whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; (v) Allowed Debtor Professional Fees incurred after the first Business Day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $100,000; and (vi) Allowed Committee Professional Fees incurred after the first Business Day following delivery by DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $25,000 (the amounts set forth in clauses (v) and (vi) being the "Post Carve-Out Trigger Notice Cap"); *provided, however*, nothing in the DIP Credit Agreement shall be construed to impair the ability of the DIP Lender to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.<br><br>*See* Interim DIP Order ¶ 8; DIP Credit Agreement § 1.1. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i), 4001(c)(l)(B)(vii), 4001(c)(l)(B)(xi)<br><br>Local Rule 4001-2(a)(i)(F), (G) | Section 2.13 of the DIP Credit Agreement provides as follows:<br><br>All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out; *provided, however*, that such superpriority claims shall not be payable from any proceeds of the Retained Actions. The DIP Claims will, at all times during the period that DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, subject only to the Carve-Out, the Retained Actions and the proceeds therefrom.<br><br>a) The priority of the Secured Parties' DIP Liens on the DIP Collateral owned by the Borrowers shall be set forth in the DIP Orders.<br><br>b) All Obligations shall constitute DIP Superpriority Claims.<br><br>c) Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender shall have a first priority lien on and security interest in all of the Borrowers' property (exclusive of the Retained Actions and the proceeds thereof), wherever located and the proceeds thereof, that is not subject to a valid, perfected, and unavoidable lien in favor of third parties that was in existence immediately prior to the Petition |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | Date, including, subject to entry of the Final DIP Order, the proceeds of any Avoidance Actions (the "<u>364(c)(2) Collateral</u>"). |
| | d)   Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Lender shall have a junior lien on and security interest in in all of the Borrowers' property (exclusive of the Retained Actions and the proceeds thereof), wherever located and the proceeds thereof, that is subject to a valid, perfected, and unavoidable lien in favor of third parties that were in existence immediately prior to the Petition Date (the "<u>Encumbered Collateral</u>"). |
| | e)   Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender shall have a first priority, senior priming lien on and security interest in all Prepetition Collateral that is not 364(c)(2) Collateral or Encumbered Collateral (the Liens and security interests in clauses (c) through (e), inclusive, but excluding the Retained Actions and any proceeds thereof, are collectively referred to in the DIP Credit Agreement as the "<u>DIP Liens</u>"). |
| | f)   Upon entry of the Interim DIP Order, the DIP Liens granted to the DIP Lender on the DIP Collateral shall be valid and automatically perfected and with the priority as set forth in the DIP Orders. |
| | g)   Except as set forth in the DIP Credit Agreement or the DIP Orders, the Borrowers shall not seek approval of any other claim having a priority superior or *pari passu* to that granted to the DIP Lender by the DIP Orders while any Obligations remain outstanding. |
| | Section 5.11 of the DIP Credit Agreement provides as follows: |
| | <u>Security Interest/Priority.</u> |
| | The Collateral Agreement creates a valid security interest in favor of the DIP Lender, for the benefit of the holders of the Obligations, in the Collateral and, when properly perfected by filing, shall constitute a valid and perfected, first priority security interest in such Collateral (including all uncertificated equity interests pledged pursuant to the Collateral Agreement consisting of partnership or limited liability company interests that do not constitute securities), to the extent such security interest can be perfected by filing under the UCC, free and clear of all Liens except for Liens permitted under Section 7.2 of the DIP Credit Agreement.  The taking possession by the DIP Lender of the certificated securities (if any) evidencing the equity interests pledged pursuant to the Collateral Agreement and all other instruments constituting Collateral will perfect and establish the first priority of the DIP Lender's security interest in all such equity interests evidenced by such certificated securities and such instruments.  With respect to any Collateral consisting of a deposit account, security entitlement or held in a securities account, upon execution and delivery by the Borrower and the DIP Lender of an agreement granting control to the DIP Lender over such Collateral, the DIP Lender shall have a valid and perfected, first priority security interest in such Collateral. |
| | *See* Interim DIP Order ¶¶ 5, 6; DIP Credit Agreement §§ 2.13, 5.11. |
| **506(c) Waiver; 552(b) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(B), 4001- | Section 9.24 of the DIP Credit Agreement provides as follows:<br><br><u>Section 552(b).</u><br><br>Upon entry of the Final DIP Order, the DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code; in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any person |

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| 2(a)(i)(V), 4001-2(a)(i)(W) | asserting a prepetition lien on property of the estates under section 541 of the Bankruptcy Code with respect to proceeds, products, offspring, or profits of such property.<br><br>*See* Interim DIP Order ¶¶ 9, 11, 12; DIP Credit Agreement § 9.24. |
| **Release**<br>Bankruptcy Rule 4001(c)(1)(B)(viii) | Paragraph 28 of the Interim DIP Order provides as follows:<br><br>Release. Effective upon entry of the Final DIP Order, and subject to the rights of parties in interest, other than the Debtors, pursuant to paragraphs 26 and 27 of the Interim DIP Order, each of the Debtors, on their own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, by the Interim DIP Order absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the DIP Lender, Prepetition Lender, and their respective affiliates, and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature, or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or in equity, upon contract, tort, or under any state or federal law or otherwise, to the extent arising out of or related to the DIP Facility, the DIP Obligations, the DIP Loans, the DIP Liens, the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, the DIP Superpriority Claims, the Prepetition Facility, the Prepetition Obligations, the Prepetition Liens, the Prepetition Superpriority Claims, and all other obligations owing and financial obligations made under such facilities and agreements, and the negotiation of any of the foregoing, in each case that the Debtors at any time had, now have, or may have, or that their successors or assigns hereafter can or may have, against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of the Interim DIP Order; *provided* that nothing in the Interim DIP Order shall relieve the Released Parties from fulfilling their obligations under the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, and the Interim DIP Order; and *provided further* that notwithstanding anything to the contrary in the Interim DIP Order or the Final DIP Order (including paragraph 28 of the Interim DIP Order), none of the Debtors are releasing any Retained Actions against any party nor shall anything impair the rights of the Special Committee to pursue such Retained Actions; *provided, however*, to the extent a Retained Action falls within the scope of the actions described in paragraph 27 of the Interim DIP Order, then such Retained Action is subject to the mechanics of a Challenge as provided for in paragraphs 26 and 27 of the Interim DIP Order.<br><br>*See* Interim DIP Order ¶ 28. |
| **Stipulations to Prepetition Liens and Claims & Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(Q) | Section 9.22 of the DIP Credit Agreement provides as follows:<br><br>Stipulations.<br><br>After consultation with their professionals, and without prejudice to the rights of parties in interest, the Borrowers, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim DIP Order, to certain stipulations specifically set forth in Paragraph F of the Interim DIP Order regarding the validity and extent of the Prepetition Lender's liens, claims, and obligations, including with respect to the Borrowers' Prepetition Obligations and the Prepetition Lender's Prepetition Collateral pursuant to the Prepetition Loan Documents. |

33769082.1

| Bankruptcy Rule or Local Rule | Summary of Material Terms |
|---|---|
| | *See* Interim DIP Order ⁋ 27; DIP Credit Agreement § 9.22. |
| **Waiver/Modification of the Automatic Stay and Limitation on Remedies Hearing** Bankruptcy Rule 4001(c)(1)(B)(iv)<br><br>Local Rule 4001-2(a)(i)(S), 4001-2(a)(i)(T) | Section 9.21 of the DIP Credit Agreement provides as follows:<br><br>Modification of Automatic Stay.<br><br>The automatic stay provisions of section 362 of the Bankruptcy Code or otherwise are vacated and modified to the extent necessary to permit the DIP Lender to exercise:<br><br>a)  immediately upon the DIP Termination Date, all rights and remedies under the Final DIP Order; and<br><br>b)  upon the occurrence and during the continuance of an Event of Default and the giving of five calendar days' prior written notice to the Notice Parties (the "Remedies Notice Period"), all rights and remedies against the Borrowers' property provided for in the Final DIP Order, *provided* that, upon the receipt of any such notice and during the Remedies Notice Period, the Borrowers, the Committee (if any) and/or any other party in interest shall be entitled to seek an expedited hearing with the Bankruptcy Court.<br><br>To the extent not otherwise provided, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code shall be modified pursuant to the Final DIP Order as necessary for the relevant parties to effectuate all of the terms and provisions of the Final DIP Order.<br><br>To the extent not otherwise provided in the Interim Order, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code shall be modified pursuant to the Final DIP Order as necessary for the relevant parties to effectuate all of the terms and provisions of the Final DIP Order.  The automatic stay provisions of section 362 of the Bankruptcy Code or otherwise are vacated and modified to the extent necessary to permit the DIP Lender and Prepetition Lender to exercise immediately upon an Event of Default, the Maturity Date as well as all rights and remedies under this Interim Order and the Final DIP Order.<br><br>*See* Interim DIP Order ⁋⁋ 18(c), 43; DIP Credit Agreement § 9.21. |
| **Marshaling** Local Rule 4001-2(a)(i)(X) | Section 9.6 of the DIP Credit Agreement provides as follows:<br><br>Marshaling; Payments Set Aside.<br><br>Upon entry of the Final DIP Order, DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations; *provided* that, Recovery Action Proceeds (as defined in the Interim DIP Order) may only be applied in satisfaction of the DIP Obligations or the Prepetition Obligations after the DIP Lender has exhausted all other sources of recovery for repayment of such claims.  To the extent that any Borrower makes a payment or payments to DIP Lender, or DIP Lender enforces its Liens or exercises its rights of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by DIP Lender in its discretion) to be repaid to a trustee, receiver or any other party in connection with any bankruptcy, insolvency or similar proceeding, or otherwise, then to the extent of such recovery, the obligation under the DIP Credit Agreement or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.<br><br>*See* Interim DIP Order ⁋ 10; DIP Credit Agreement § 9.6. |

## RELIEF REQUESTED

8.      The Debtors seek entry of an Interim DIP Order and Final DIP Order:[5]

(i)      Authorizing the Debtors to obtain postpetition financing in connection with a senior secured, superpriority, priming debtor-in-possession delayed draw term loan facility (the "DIP Facility") subject to the terms and conditions set forth in that certain *Superpriority Secured Debtor-in-Possession Credit Agreement*, dated as of [●] (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Debtors and CODI, or an affiliate of CODI (solely in such capacity, the "DIP Lender"),[6] attached to the Interim DIP Order as **Exhibit 1**, consisting of:

   a.      a senior secured DIP Facility up to an aggregate amount of $12 million denominated in USD, which shall be available (1) following entry of the Interim DIP Order, as weekly draws, not to exceed $1.5 million in the aggregate, in accordance with the Approved Budget until entry of the Final DIP Order (exclusive of the Roll-Up DIP Loan as defined herein) (the "Interim Draw(s)"), and (2) following the entry of the Final DIP Order, as subsequent draws in an additional aggregate principal amount not to exceed $12 million less the Interim Draw(s) (each such draw after the Interim Draw(s), a "Subsequent Draw," and together with the Interim Draw(s), the "Draws") and satisfaction of the other applicable conditions set forth in the DIP Documents; and

   b.      a "roll-up" of Prepetition Obligations held by CODI (solely, in its capacities as lender under the Prepetition Credit Agreement, the "Prepetition Lender"), as further described in the DIP Term Sheet and DIP Credit Agreement, effective immediately upon entry of the Interim DIP Order, in an aggregate principal amount equal to $1.5 million (the "Roll-Up DIP Loan," and together with any Draws, the "DIP Loans"), in accordance with the terms and conditions set forth in the DIP Credit Agreement, and all other terms and conditions of the DIP Documents.

(ii)     authorizing the Debtors to (a) execute and enter into the DIP Documents; (b) perform their respective obligations thereunder; and (c) take all such other and further acts as may be necessary, appropriate, or desirable in connection therewith;

(iii)    granting to the DIP Lender allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any successor cases, including any

---

[5]    The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

[6]    The DIP Credit Agreement, collectively with that certain *DIP Term Sheet*, dated as of November 9, 2025 (the "DIP Term Sheet"), between the Debtors and CODI, the Interim DIP Order, the Final DIP Order, and all agreements, documents and instruments delivered or executed in connection therewith, and other security documentation, the "DIP Documents." To the extent of any inconsistency between the DIP Credit Agreement and DIP Term Sheet, the DIP Credit Agreement shall control.

chapter 7 cases, with respect to the DIP Facility and all liabilities, obligations, and indebtedness due or payable under the DIP Documents and the Interim DIP Order (collectively, the "DIP Obligations"), subject to the priorities set forth herein;

(iv)   granting to the DIP Lender automatically perfected security interests in, and liens on, with respect to the DIP Loans (including, for the avoidance of doubt, the Roll-Up DIP Loan), all of the DIP Collateral to secure the DIP Loans and the DIP Obligations, subject only to the Carve-Out;

(v)   authorizing the Debtors, subject to and pursuant to the terms and conditions set forth in the Interim DIP Order, to continue to (a) use the cash collateral of the Prepetition Lender within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") and (b) provide adequate protection to the Prepetition Lender on account of any diminution in value of the Prepetition Collateral, including Cash Collateral, as a consequence of the Debtors' use, sale, or lease of the Prepetition Collateral, including any Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of debt under the DIP Documents, and the priming of certain Prepetition Liens by liens and security interests granted by the DIP Documents, and any other basis consistent with section 361 of the Bankruptcy Code;

(vi)   authorizing the Debtors to incur and pay, on the terms set forth herein and in the DIP Documents, on a final and irrevocable basis, the principal, interest, premiums, fees, expenses, indemnities, claims, and other amounts payable under the Interim DIP Order and the DIP Documents as such amounts become earned, due, and payable and the fees and disbursements of the DIP Lender's attorneys, advisors, and other consultants, all and solely to the extent provided in, and in accordance with the Interim DIP Order and the DIP Documents and without further order of the Court;

(vii)   waiving, subject to the terms of the Interim DIP Order, (a) the Debtors' and their estates' right to seek or obtain a surcharge against the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code, (b) the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and (c) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, each effective as of the Petition Date;

(viii)   authorizing the DIP Lender to exercise remedies under the DIP Documents on the terms described herein and therein upon the occurrence, and during the continuation of, an Event of Default;

(ix)   modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Interim DIP Order;

(x)     waiving any applicable stay (including under section 362 of the Bankruptcy Code and Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim DIP Order; and

(xi)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in this Motion on a final basis and the entry of the Final DIP Order, and approval of the form of notice with respect to the Final Hearing.

## EXPLANATION FOR INCLUSION OF SIGNIFICANT PROVISIONS PURSUANT TO LOCAL RULE 4001-2(a)(i)

### I.     The Significant Provisions Are Appropriate and Justified Under the Circumstances of the Chapter 11 Cases.

9.      Local Rule 4001-2(a)(i) requires that the Debtors explain the reason for including certain significant provisions described in Local Rules 4001-2(a)(i)(N)–(X) (collectively, the "Significant Provisions").  The Debtors believe that each of the Significant Provisions and the Carve Out is justified and necessary in the context and circumstances of the Chapter 11 Cases.

### A.     The DIP Roll-Up Is Appropriate.

10.     Local Rule 4001-2(a)(i)(O) requires explicit disclosure of provisions that apply the proceeds of postpetition financing to pay, in whole or in part, prepetition debt or which otherwise has the effect of converting prepetition debt to postpetition debt.  *See* Local Rule 4001-2(a)(i)(O).  Local Rule 4001-2(a)(i)(N) requires disclosure of any provisions that elevate prepetition debt to administrative expense or higher priority status.  Here, the DIP Roll-Up is a roll-up of certain Prepetition Obligations that implicates Local Rule 4001-2(a)(i)(N) and (O).  Upon the entry of the Interim DIP Order, the aggregate amount of $1.5 million will automatically be deemed "rolled up" and converted on a cashless basis into DIP Loans.  The Prepetition Obligations will be deemed repaid on a dollar-for-dollar basis with the "roll up" of the Prepetition Obligations.

11.     The DIP Roll-Up represents prepetition, post-default advances from the Prepetition Lender that provided essential capital, unavailable from any other source, to allow the Debtors to

continue operations while their sale process proceeded and, as such, constituted a "bridge" financing that the Debtors believe is appropriately included among their Postpetition Obligations.

12.     The DIP Roll-Up is an essential condition for the DIP Lender to provide the DIP Facility.  The DIP Lender is not willing to provide the DIP Facility or extend credit to the Debtors thereunder without a roll-up on the Interim DIP Order.  In addition, as explained below, the DIP Roll-Up ratio is well below the ratio that has been approved by the Court in other chapter 11 cases. Given these circumstances, the DIP Roll-Up is reasonable, appropriate, a sound exercise of the Debtors' business judgment, and the Debtors request that it be approved.

**B.     The Provisions Immediately Approving All Terms and Conditions of the DIP Documents Are Appropriate.**

13.     Local Rule 4001-2(a)(i)(R) requires explicit disclosure of provisions that immediately approve all terms and conditions of the underlying loan agreement.  *See* Local Rule 4001-2(a)(i)(R).  Here, the Interim DIP Order provides that upon entry, the parties to the DIP Facility are authorized to enter into their DIP Credit Agreement and other DIP Documents. *See* Interim DIP Order ¶ 3.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of the Interim DIP Order and the DIP Documents. *See* Interim DIP Order ¶ 4.  This provision is necessary and appropriate for the Debtors to access the DIP Facility and to provide all parties with the assurance that the Debtors' postpetition entry into the DIP Facility is valid.  Without this provision, the Debtors would be unable to access the DIP Facility or use Cash Collateral on an interim basis.

**C.     The Provisions Modifying the Automatic Stay, Providing for a Remedies Notice Period, and Providing for an Expedited Hearing Are Appropriate.**

14.     Local Rules 4001-2(a)(i)(S) and (T) require explicit disclosure of provisions that modify the automatic stay upon an Event of Default without a remedies notice period of at least

five days and provisions that seek to limit what parties in interest may raise at an emergency hearing scheduled during the remedies notice period. *See* Local Rules 4001-2(a)(i)(S)–(T). Here, the Interim DIP Order provides for a five-day remedies notice period for all Events of Default to the Debtors, the United States Trustee for the District of Delaware (the "U.S. Trustee"), and any committee appointed in the Chapter 11 Cases, if any (the "Committee"). *See* Interim DIP Order ¶ 18(b).

15.    During the Remedies Notice Period, (a) the DIP Lender may not exercise any rights or remedies to satisfy the DIP Obligations, including any rights and remedies against the DIP Collateral; (b) the Prepetition Lender may not exercise any rights or remedies to satisfy the Prepetition Obligations and the Adequate Protection Obligations, including any rights or remedies against the Prepetition Collateral; and (c) the Debtors shall continue to have the right to use the proceeds of the DIP Facility (the "DIP Proceeds") and the Cash Collateral solely to fund the Carve-Out and expenses critically necessary to preserve the value of the Debtors' businesses and the DIP Collateral and to pay employee related expenses incurred through and including the expiration of the Remedies Notice Period, which expenses shall be incurred in accordance with the terms of the Interim DIP Order and the Approved Budget. *See* Interim DIP Order ¶ 18(c). The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code shall be modified pursuant to the Final DIP Order as necessary for the relevant parties to effectuate all of the terms and provisions of the Final DIP Order. The automatic stay provisions of section 362 of the Bankruptcy Code or otherwise are vacated and modified to the extent necessary to permit the DIP Lender and Prepetition Lender to exercise immediately upon an Event of Default, the Maturity Date as well as all rights and remedies under the Interim DIP Order and the Final DIP Order. *See* Interim DIP Order ¶ 43. During the Remedies Notice Period, the Debtors, the U.S. Trustee, the Committee,

and any party in interest may seek an expedited hearing with respect to any remedies sought to be exercised by the DIP Lender.

16.     The above procedures are sufficient to enable the Debtors, U.S. Trustee, and the Committee to timely request an expedited hearing that provisions the Debtors and their estates with sufficient protections in the event the DIP Lender asserts that an Event of Default has occurred.

**D.     The Other Provisions Requiring Explanation Are Not Applicable.**

17.     Local Rule 4001-2(a)(i)(P) is not applicable because the Debtors are not seeking to prime any valid, perfected, and unavoidable liens of parties other than the Prepetition Lender (who is also the DIP Lender and has, thus, consented to the priming).

18.     Local Rule 4001-2(a)(i)(Q) requires explicit disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection, amount, priority, extent, or enforceability of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least 75 days from the entry of the order to investigate such matters.  *See* Local Rule 4001-2(a)(i)(Q).  Here, the Interim DIP Order complies with this requirement by providing a challenge period for any party with the requisite standing, including the Special Committee as well as any statutory committee appointed in the Chapter 11 Cases.  Those parties may seek standing to commence colorable actions challenging the validity, extent, perfection, or priority of the Prepetition Liens on the Prepetition Collateral, the validity, allowability, priority, or amount of the Prepetition Liens and Prepetition Obligations, or the Stipulations, in each case on the terms set forth in the Interim DIP Order, by the date that is 75 days from after the entry of the Interim DIP Order, subject to extension by the consent of the Prepetition Lender and the Debtors or Order of the Court for good cause shown following the filing of an application within the challenge period.  *See* Interim DIP Order ¶ 27.

33769082.1

19.     Local Rule 4001-2(a)(i)(U)-(X) requires disclosure of provisions that "immediately" (a) grant a prepetition secured creditor liens on causes of action under sections 544, 545, 547, and 548 of the Bankruptcy Code or their proceeds, (b) waive the Debtors' rights under section 506(c) of the Bankruptcy Cide, (c) affect the Court's power to consider the equities of the case doctrine under section 552(b)(1) of the Bankruptcy Code, or (d) shield the lender from the equitable doctrine marshaling.  Here, the grant of liens on such actions and their proceeds as part of the Prepetition Lender's adequate protection, the waiver under section 506(c) of the Bankruptcy Code, and the limitations on the equities of the case exception and marshaling and similar doctrines are all subject to a final order.

20.     In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of the Chapter 11 Cases.  Accordingly, the Significant Provisions in the Interim DIP Order should be approved.

## THE DEBTORS' PREPETITION CREDIT AGREEMENT

21.     CODI is the Debtors' sole lender.  Lugano Diamonds, as borrower, and Lugano Buyer, as co-borrower, and CODI, as lender, entered into a Credit Agreement (as amended, the "Prepetition Credit Agreement"), dated as of September 3, 2021.  The Prepetition Credit Agreement provides for both revolving and term loans.  Pursuant to a Guarantee and Collateral Agreement, dated as of September 3, 2021, the Prepetition Credit Agreement is secured by valid and properly perfected liens on substantially all of the Debtors' personal property and the obligations under the Prepetition Credit Agreement are guaranteed by the other Debtors.  The revolving loans terminate, and the term loan matures, on September 3, 2027.

22.     Contemporaneously with its entry into the Prepetition Credit Agreement, CODI acquired a majority equity interest in Lugano Diamonds & Jewelry Inc. from Mr. Mordechai Haim

Ferder and affiliated entities for $256 million.  CODI, a wholly owned subsidiary of Compass

Diversified Holding, owns approximately 59.9% of the outstanding stock of Lugano Holdings.

23.      Since 2021, the Prepetition Credit Agreement has been amended 23 times.  Among

other things, these amendments increased the revolving loan and term loan commitments, from

$140 million to $275 million today (subject to certain advance limits) for the revolving loans and

from $90 million to just over $488 million today for the term loans.  The increased borrowings

were used to fund Lugano's operations, including costs relating to the expansion of boutiques and

the associated inventory costs.  The outstanding principal balance under the Prepetition Credit

Agreement consists of $211,694,800.47 in revolving loan obligations, $466,704,424.25 in term

loan obligations, and $2.63 million in letter of credit obligations, excluding advances under the

Twenty Third Amendment to the Prepetition Credit Agreement discussed below.[7]

24.      On June 6, 2025, CODI sent Lugano Diamonds and Lugano Buyer a notice of

default under the Prepetition Credit Agreement.

25.      On August 29, 2025, the Debtors and CODI entered into a forbearance agreement

(the "Forbearance Agreement").  Pursuant to the Forbearance Agreement, CODI agreed not to

exercise certain remedies, if the Debtors met certain sale agreement milestones, did not default

under the Forbearance Agreement or the Prepetition Credit Agreement (or other loan documents)

and did not suffer certain prejudgment remedies.  In exchange, the Debtors, among other things,

acknowledged the outstanding principal amount and accrued but unpaid interest, released certain

claims against CODI and certain related parties,[8] acknowledged that CODI had valid, perfected,

---

[7]    In connection with the Forbearance Agreement (as hereafter defined), as of August 29, 2025, the borrowers under
the Prepetition Credit Agreement agreed that a total of $701,317,337.03, inclusive of interest, fees, and expenses,
was payable to CODI.

[8]    The Debtors did not release certain claims, including those against (a) CODI and related parties in their capacities
as shareholders, officers, directors, managers under a certain management agreement, or controlling persons
claims again, and (b) Mr. Ferder and related parties.

enforceable first priority liens and security interests in its collateral, subject to certain exceptions, and agreed to certain milestones in a sales process.

26.     Due in part to the complications relating to the fraud at Lugano, the Debtors' sale process took longer than anticipated.  To address these delays and to provide the Debtors with necessary liquidity, on October 2, 2025, the Debtors and CODI entered into to the First Amendment to Forbearance Agreement and the Twenty Third Amendment to Credit Agreement (the "Twenty Third Amendment"), as well as related documentation.

27.     Absent entry into the Twenty Third Amendment and due to the defaults under the Prepetition Credit Agreement, Lugano Diamonds and Lugano Buyer could not borrow additional amounts under the Prepetition Credit Agreement.  The Twenty Third Amendment enabled Lugano Diamonds and Lugano Buyer to borrow up to $4 million under the Prepetition Credit Agreement, subject to CODI's discretion.  Following entry into the Twenty Third Amendment and as of the Petition Date, CODI provided $2.2 million under the Prepetition Credit Agreement.

28.     As a condition to the Twenty Third Amendment (and as required by the Guarantee and Collateral Agreement), Debtors executed a Guarantee and Collateral Agreement Supplement thereby providing CODI with a security interest in certain commercial tort claims.

29.     Contemporaneously with the Twenty Third Amendment, CODI and the Debtors agreed to the First Amendment to the Forbearance Agreement.  On October 10, 2025, CODI and the Debtors agreed to the Second Amendment to the Forbearance Agreement.  These amendments, among other things, extended certain sale process milestones contained in the Forbearance Agreement.

30.     While CODI is technically an insider of the Debtors as a result of its ownership of a majority of the equity in Lugano Holding, Lugano has operated independently of CODI since

33769082.1

the appointment of the Special Committee.  Lugano has evaluated and pursued its restructuring efforts, including negotiating and implementing the financing sought by this Motion, independently of CODI and at arms'-length.

## THE DIP FACILITY

**I.      The Debtors' Need for Postpetition Financing and Use of Cash Collateral.**

31.      To fund their operations during these Chapter 11 Cases, the Debtors need access to CODI's cash collateral and, in addition, access to additional financing pursuant to the DIP Facility. Absent the DIP Facility, the Debtors would be unable to continue operations for more than a week or two in chapter 11, jeopardizing the ability to maximize the value of their estates.  By enabling the Debtors to continue operations through the upcoming holiday selling season and liquidate their assets in an orderly manner, the DIP Facility will greatly increase the likelihood that the Debtors can maximize the value of their assets for their stakeholders.

32.      Over the past several months, the Debtors have repeatedly analyzed their ongoing liquidity needs, including in connection with the sale process. And, as the sale process matured and the Debtors' paths crystalized, the Debtors developed projections to implement potential alternatives.  Ultimately, the Debtors developed a budget, which became the Approved Budget, reflecting the Debtors' financing needs over the first 13 weeks of the Chapter 11 Cases, to implement the sale process and administer the Chapter 11 Cases.

33.      Based on the Approved Budget, the Debtors require use of Cash Collateral and the incremental Funding of the DIP Facility to fund their business operations, the sale process, and the administration of the Chapter 11 Cases.  Access to the proposed DIP Facility and Cash Collateral is essential to provide stability to the Debtors' operation during the sale process.  Funding this process is funding is necessary to enable the Debtors to maximize the value of their estates.

II.    **Alternative Sources of Financing Are Not Readily Available.**

34.    The Debtors commenced negotiations with CODI for several reasons.  First, in light of the fraud allegations discussed above and the fact that the Debtors' financial information and reporting is under review, finding a third party postpetition lender proved difficult.  Second, CODI indicated that, while it would be willing to provide financing, it would not consent to the priming of its liens.  These factors suggested that third party lenders would not be able to provide financing on more advantageous terms, particularly when the expenses of, and difficulty in winning, a priming fight are considered.

35.    Prior to the filing of these cases, several potential lenders confirmed to the Chief Restructuring Officer or members of the GlassRatner team acting at his direction, that they did not have an interest in providing financing to the Debtors on a non-priority or junior lien basis.

36.    The Debtors' negotiations were conducted in good faith and at arms'-length. *See* First Day Decl. ¶ 59.  The DIP Facility provides critical liquidity to the Debtors on reasonable terms, and represents the best, and likely only, available financing option for the Debtors under the facts and circumstances of the Chapter 11 Cases.  Accordingly, the DIP Facility is in the best interest of the Debtors' estates and represents a sound exercise of the Debtors' reasonable business judgment.

III.    **The DIP Facility Is Intended to Fund Operations Pending Approval of the Agency Agreement or an Alternative Transaction.**

37.    As described in the *Motion of Debtors for (A) an Interim Order (I) Authorizing the Debtors to Perform Under the Agency Agreement, (II) Approving the Sale Guidelines, Dispute Resolution Procedures, Waiver of Various Lease Restrictions, and Modifications to the Debtors' Customer Programs, (III) Scheduling, If Necessary and Prior to Any Auction, the Agent Protections Hearing to Consider Entry of the Agent Protections Order (1) Approving the Agent*

*Protections, (2) Scheduling, If Necessary, the Auction, and (3) Approving (X) the Bidding Procedures, and (Y) the Sale Notice; (IV) Authorizing, If Necessary, the Debtors to Execute an Alternative Transaction Agreement, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief; and (B) a Final Order (I) Authorizing the Debtors to Assume (1) the Agency Agreement, or (2) an Alternative Transaction, (II) Authorizing (1) Agent to Sell the Agency Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, or Authorizing (2) Another Successful Bidder to Sell the Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Granting Related Relief*, filed contemporaneously herewith, prior to the Petition Date, the Debtors commenced a sales process seeking a purchaser for all or substantially of their assets.

38.     On November 16, 2025, Lugano Diamonds and Enhanced Retail Funding, LLC ("Agent") entered into that certain *Agency Agreement* (the "Agency Agreement"), which enables the Debtors to seek a higher or better transaction (an "Alternative Transaction").  Until the entry of an order assuming the Agency Agreement or an Alternative Transaction on a final basis (the "Final Approval Order"), the Debtors must fund certain operations.  Additionally, the Debtors must fund the administration of the Chapter 11 Cases, including the costs associated with the Debtors' professionals.  While the DIP is intended to fund the administration of the Chapter 11 Cases through the effective date of a chapter 11 plan, following the entry of the Final Approval Order, Agent, or the purchaser under the Alternative Transaction, will need to fund the Debtors' operations if the Debtors' revenue is insufficient to do so.

**BASIS FOR RELIEF**

I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Documents.**

   A.     **Entry into the DIP Documents Is a Sound Exercise of the Debtors' Business Judgment.**

39.     The Court should authorize the Debtors, as a sound exercise of their business judgment, to execute and deliver the DIP Documents, obtain access to the DIP Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor in possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

40.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should

not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

41.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) ("Viewed in isolation, several of the terms of the [postpetition financing] might appear to be extreme or even unreasonable.  Certainly, many of them favor the DIP Lenders.  But, taken in context, and considering the relative circumstances of the parties, the Court does not believe that the terms are unreasonable."); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing that a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  Courts may also appropriately take into consideration noneconomic benefits to a debtor offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

2009 WL 2902568, at *4 (Bankr.  S.D.N.Y. July 6, 2009) (emphasis added).

42.     The Debtors' decision to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of alternatives (or lack thereof).  The Debtors need additional liquidity and the use of Cash Collateral to operate their business postpetition, to fund the Chapter 11 Cases, and to preserve the Debtors' ability to maximize the value of their assets through appropriate sales.  As noted above, without the DIP Facility, the Debtors are unable to continue operations for more than a week or two in chapter 11. *See* First Day Decl. ¶ 60.  Access to the DIP Facility and the use of Cash Collateral will enable the Debtors to continue operations through the Holiday Selling Season and significantly increase the likelihood of the Debtors maximizing the value of their estates.

43.     The Debtors negotiated the DIP Credit Agreement and other DIP Documents with the DIP Lender in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best and only financing available under the circumstances.  *See Id.* at ¶ 57.  The Debtors, in consultation with their advisors, determined that the DIP Lenders' financing proposal represents the only viable postpetition financing option available to the Debtors.  *Id.* at ¶ 58.  It is important to note that the Debtors negotiated the DIP Documents at arms' length with the full participation of the Special Committee.  In connection with that process, CODI functioned solely in its capacity as lender and did not direct any decisions of the Debtors.   Accordingly, the Court should authorize the Debtors' entry into the DIP Documents, as it is a sound exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

44.     The Debtors propose to obtain financing under the DIP Facility by providing first priority, senior security interests and liens as set forth in the DIP Documents pursuant to section 364(c) of the Bankruptcy Code.  More specifically, the Debtors propose to provide to the DIP Lender, subject to the Carve Out, continuing, valid, binding, enforceable, non-avoidable, and

33769082.1

automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, which include substantially all of the Debtors' assets, and, specifically, (a) a priming security interest in and lien on the DIP Collateral to the extent such DIP Collateral is subject to prepetition liens that secure the prepetition secured obligations of the Prepetition Lender, (b) a junior security interest in and lien on the DIP Collateral to the extent such DIP Collateral is subject to the prepetition liens of third parties that are valid, perfected, and not subject to avoidance and (c) a first priority senior security interest in and lien on all property of the Debtors that is not subject to a valid, perfected and non-avoidable liens, subject to and as further provided for in the DIP Documents and the Interim DIP Order. The Retained Actions are excluded from the DIP Collateral.

45. The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see also In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained). Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a. the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (*i.e.*, by allowing a lender only an administrative claim);
>
> b. the credit transaction is necessary to preserve the assets of the estate; and
>
> c. the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); *L.A. Dodgers LLC*, 457 B.R. at 312–13 (Bankr. D. Del. 2011); *Ames Dep't Stores*, 115 B.R. at 37–40 (Bankr. S.D.N.Y. 1990); *In re St. Mary Hosp.*, 86 B.R. 393, 401 (Bankr. E.D. Pa. 1988).

46.    As described above and as set forth in the First Day Declaration, the Debtors recognized that it would be particularly difficult to secure financing because of the fraud, and CODI's indicated unwillingness to consent to the priming of its liens.  *See* First Day Decl. ¶ 57. Absent access to the DIP Facility, the value of the Debtors' estates could be significantly impaired to the detriment of all stakeholders.  *See* First Day Decl. ¶ 60.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  Indeed, as described herein, the terms of the DIP Facility are economically favorable to the Debtors, which terms include, *inter alia*, paid in kind interest and the deferral of adequate protection fees until maturity of the DIP Facility.  For all these reasons, the Debtors have met the standard for obtaining postpetition financing under section 364(c) of the Bankruptcy Code.

47.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court may:

> authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lender is reasonable and appropriate.

33769082.1

48.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Lender has consented to being "primed" or (b) the Prepetition Lender's interests in collateral are adequately protected.

49.     Here, the Prepetition Lender is also the DIP Lender, and in its capacity as DIP Lender, required priming the liens of the Prepetition Lender, and has consented to the DIP Facility, subject to the proposed adequate protection.  Moreover, as more fully discussed herein and as set forth in the Interim DIP Order, the Debtors propose to provide an adequate protection package to protect the interests of the Prepetition Lender, whose security interests in and liens on the Prepetition Collateral are being primed.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

### C.     No Comparable Alternative to the DIP Facility Is Reasonably Available.

50.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Snowshoe*, 789 F.2d at 1088 (demonstrating

that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (holding that the bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that the section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (finding that the debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

51.     As discussed above, the Debtors began negotiations with CODI because multiple factors suggested that third-party lenders would not provide financing on more advantageous terms, particularly considering the favorable terms offered by CODI and the expense of a priming fight.  CODI has offered attractive economic and other terms that are below market, which include paid in kind interest and that the DIP Lender is not expressly preserving its credit bid rights.  The Debtors believe that it is unlikely that other lenders would provide more advantageous terms.  Moreover, several potential lenders have confirmed that they would not be willing to financing the Debtors on a non-priority or junior lien basis.  Any potential third party financing would likely result in expensive and distracting litigation at the very outset of the Chapter 11 Cases, which would interfere with the Debtors' sale process.

52.     Thus, the Debtors have determined that the DIP Facility provides the most favorable terms while reducing execution risks and providing the incremental liquidity necessary to fund the Chapter 11 Cases.  *See* First Day Decl. ¶¶ 60–63.  Accordingly, the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

**D.**    **The Debtors Should Be Authorized to Use Cash Collateral.**

53.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of their estates, including Cash Collateral.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Here, the Prepetition Lender has effectively consented to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.  The Debtors anticipate that Bank of America, one the Debtors' depository bank in which the Debtors maintain bank accounts, and to which the Debtors have substantial outstanding credit card obligations, will agree to the Debtors' use of Cash Collateral.[9]  Access to Cash Collateral on an interim basis is essential to the Debtors' continued operations, smooth entry into the Chapter 11 Cases, and sales process.  *See* First Day Decl. ¶ 57. Accordingly, use of the Cash Collateral is in the best interests of the Debtors' estates and all of their stakeholders, including the Prepetition Lender, and should be approved.

**E.**    **Adequate Protection provided to the Prepetition Lender Is Appropriate.**

54.    Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses cash collateral.  *See* 11 U.S.C. § 363(e).  Section 364(d)(1) of the Bankruptcy Code also provides adequate protection for the secured creditors whose interest in properties are primed in connection with the debtors' obtaining of postpetition financing. *See* 11 U.S.C. § 364(d)(1)(B).  Further, section 362(d)(1) of the Bankruptcy Code provides that the automatic stay may be lifted for cause, including the lack of adequate protection for a party's interests in property due to the imposition of the automatic stay.  *See* 11 U.S.C. § 362(d)(1).  While

---

[9]    The Debtors have initiated such conversations and anticipate having the issue resolved by the time of the first day hearing on this Motion.

33769082.1

section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case-by-case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) (holding that "the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (holding that "what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

55.     As described herein and as set forth in the Interim DIP Order, the Debtors propose to provide the Prepetition Lender with a reasonable adequate protection package to protect against the postpetition diminution in value, if any, of the Prepetition Collateral from the incurrence of additional debt and the imposition of the Priming Liens on the Prepetition Collateral (other than with respect to any priming arising as a result of the Roll-Up DIP Loan), the Carve-Out, the imposition of the automatic stay, the sale, lease, or use of the Prepetition Collateral (including Cash Collateral), or any other reason for which adequate protection may be granted under the Bankruptcy Code.   The Adequate Protection package includes, among other protections, (a) replacement liens and supplemental liens on the DIP Collateral in accordance with the priorities

set forth in the Interim DIP Order, (b) allowed, superpriority administrative expense claims in accordance with the priorities set out in the Interim DIP Order, (c) the reasonable and documented fees and expenses of counsel and other professionals of the DIP Lender and Prepetition Lender, as set forth in the Interim DIP Order, and (e) various reporting as set forth in the Interim DIP Order (collectively, the Adequate Protection Package"). In light of the foregoing, the proposed Adequate Protection Package to be provided for the benefit of the Prepetition Lender is appropriate. The Debtors' provision of the Adequate Protection Package is not only necessary to protect against any diminution in value, but is fair and appropriate under the circumstances of the Chapter 11 Cases to ensure the Debtors are able to continue using the Prepetition Collateral, including DIP Collateral, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates.

56.    The Debtors believe that the proposed Adequate Protection Package, subject to the terms and limitations set forth in the Interim DIP Order, for the benefit of all parties in interest and their estates. is appropriate and sufficient to protect the Prepetition Lender from any potential diminution in value to the Cash Collateral.

**F.    The DIP Roll-Up Is Appropriate.**

57.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose. *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) of the Bankruptcy Code should be approved if the debtor can demonstrate a sound business justification for the proposed transaction). The business judgment rule shields a debtor's management from judicial second-guessing. *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16

33769082.1

(Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

58.    Repaying prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.    The importance of "roll-up" features in DIP facilities has been repeatedly recognized by courts in this district and others, and such courts have granted relief similar to the relief requested herein.    *See, e.g.*, *In re Wheel Pros, LLC,* No. 24-11939 (JTD) (Bankr. D. Del. Sept. 10, 2024 & Oct. 15, 2024) (authorizing DIP facilities of approximately $285 million, including $110 million of new money DIP term loans and a roll-up of approximately $175 million of a prepetition ABL facility); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. June 12, 2024 & July 11, 2024) (authorizing a $180 million DIP facility, including $45 million of new money DIP term loans and a $135 million roll-up of prepetition first lien term loans (3:1 roll-up)); *In re Sientra, Inc*., No. 24-10245 (JTD) (Bankr. D. Del. Feb. 14, 2024 & Mar. 11, 2024) (authorizing a $90 million DIP facility, including $22.5 million of new money DIP term loans and a $67.5 million roll-up of the prepetition debt obligations (2.9:1 roll-up)); *In re PGX Holdings, Inc.*, No. 23-10718 (CTG) (Bankr. D. Del. June 6, 2023 & Aug. 4, 2023) (authorizing an approximately $62.7 million DIP facility, including a $42.75 million creeping roll-up of the prepetition term loan (i.e., 3.1:1 roll-up)); *In re Phoenix Services Topco, LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Sept. 29, 2022 & Nov. 2, 2022) (authorizing an approximately $200 million DIP facility including $150 million roll-up (i.e., 3:1 roll-up), of which $75 million was rolled up on entry of the interim order).[10]

---

[10]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

33769082.1

59.     Here, the proposed DIP Roll-up is an exercise of the Debtors' sound business judgment.  As set forth above, the DIP Credit Agreement provides for a junior "roll up" tranche facility in an aggregate principal amount of $1.5 million upon entry of an Interim DIP Order – the amount of the bridge funding provided to the Debtors post-default pursuant to the 23rd Amendment.  In addition, the roll-up ratio is approximately 1:4.4 – with only $1.5 million in rolled up loans compared to up to $9.8 million – is well within the range of approved roll-ups.  The Debtors submit that the DIP Roll-Up is reasonable under the circumstances of the Chapter 11 Cases.  This repayment is a material component of the structure of the DIP Facility. Agreeing to the Roll-Up to secure the benefits of the DIP Facility represents a sound exercise of the Debtors' business judgment.

## II.     The Debtors Should Be Authorized to Pay the Interest and Fees Required by the DIP Agent and the DIP Lenders Under the DIP Documents.

60.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Lender.  The fees payable to the DIP Lender are the reasonable fees and expenses of the DIP Lender and Prepetition Lender (including attorneys' fees). These interest and fees are summarized below:

a.     **Interest Rate:**  Eight percent (8%) per annum on the outstanding funded amount of the DIP Loan, Paid in Kind (PIK) interest, which is added to the principal amount funded on a monthly basis.

b.     **Default Rate:** Twelve percent (12%) per annum on the outstanding funded amount of the DIP Loan, PIK interest Payment in kind (PIK) interest, which is added to the principal amount funded on a monthly basis (an increase of four percent (4%) over the non-default interest rate).

c.     **Fees and Expenses:** Reasonable fees, costs, disbursements, and expenses of the DIP Lender (including all fees, costs, disbursements, and expenses of its counsel) and reasonable fees and expenses (including counsel fees) of the Prepetition Lender.

61. The DIP Facility does not provide for any commitment fees, origination fees, exits fees, or similar fees. The payment of interest and the reasonable fees and expenses of the DIP Lender (and, as adequate protection, the Prepetition Lender), whether incurred prepetition or post-petition, are reasonable and are integral components of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing. Notably, unlike other potential lenders, the fees and expenses payable to the DIP Lender are only payable upon the DIP Termination Date. Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection with the DIP Facility.

## III. The DIP Lender Should Be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.

62. Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

63. While CODI is technically an insider of the Debtors as a result of its ownership of a majority of the equity in Lugano Holding, Lugano has operated independently of CODI since the appointment of the Special Committee. Lugano has evaluated and pursued its restructuring efforts, including negotiating and implementing the financing sought by this Motion, independently of CODI and at arms'-length.

33769082.1

64.     The DIP Documents are the result of:  (a) the Debtors' reasonable and informed determination that no alternative sources of postpetition financing are readily available to the Debtors (whether unsecured or secured) on terms better than the DIP Facility, and (b) arm's-length, good-faith negotiations between the Debtors and DIP Lender.  The DIP Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and the DIP Documents.  Further, upon realizing there was a lack of interest from third-party lenders, and the Debtors and their advisors determined that the DIP Facility represents the best and the only available financing option.  First Day Decl. at ¶ 58.

65.     The Debtors' negotiations were conducted in good faith and at arms'-length. conducted in good faith and at arm's length.  Numerous drafts of the DIP Documents and proposed Interim DIP Order were exchanged between the parties.  CODI has (and at the time of Mr. Moti's fraud had) many connections with the Debtors, including as majority owner and lender. Accordingly, the Special Committee of the Board of Lugano Diamonds and its professionals were actively involved in the negotiations.  In addition, the provisions of the DIP Facility are within market norms and, on some points (such as the absence of certain fees), favorable to the Debtors.

66.     Accordingly, the Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Agents and the DIP Lenders in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and therefore the DIP Secured Parties are entitled to all of the protections afforded thereby.

**IV.     The Automatic Stay Should Be Modified on a Limited Basis.**

67.     The proposed Final DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to effectuate the

terms and provisions of the Final DIP Order (which includes allowing the DIP Lender to file financing statements, security agreements, mortgages, leasehold mortgages, notices of liens, and other similar documents to validate and perfect the liens and security interests granted to them in the Interim DIP Order).  The proposed Interim DIP Order further provides that the automatic stay be modified to the extent necessary pursuant to the Final DIP Order to implement the terms of the Final DIP Order.  Finally, the proposed Interim DIP Order provides that (a) immediately upon the Maturity Date or (b) after five calendar days' notice following the occurrence and during the continuation of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies in accordance with the Final DIP Order, subject to the Remedies Notice Period as described above.

68.    Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Chapter 11 Cases.  *See, e.g.*, *In re Marelli Automotive Lighting USA LLC,* No. 25-11034 (CTG) (Bankr. D. Del. June 12, 2025) (modifying automatic stay as necessary to effectuate the terms of the order and following occurrence of an event of default); *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. March 19, 2025) (same); *In re Am. Tire Distrib., Inc.*, No. 14-12391 (CTG) (Bankr. D. Del. Nov. 22, 2024) (same); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) (same); *In re Vyaire Med., Inc.*, No. 24-11217 (BLS) (Bankr. D. Del. July 11, 2024) (same).[11]

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

33769082.1

**V.     Failure to Obtain Immediate Interim Access to the DIP Facility Would Cause Immediate and Irreparable Harm.**

69.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to use cash collateral and to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  *See* Bankruptcy Rule 4001(b)(2), 4001(c)(2).   Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]."  11 U.S.C. § 363(c)(3).

70.     For the reasons noted above, in the First Day Declaration, the Debtors have an immediate need for the liquidity provided by the DIP Facility.  *See* First Day Decl. ¶ 57.  The proposed DIP Facility is critical to the Debtors' ability to fund their operations and these cases without creating a value-destructive "priming" dispute at the outset of the Chapter 11 Cases.  *See id.*  Access to the proceeds of the DIP Facility and Cash Collateral are essential to the Debtors' sale process and to maximize the value of the Debtors' estates for the benefit of all parties in interest.

71.     Accordingly, pursuant to section 363(c)(3) of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 4001(c), the Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive initial funding under the DIP Facility and to use Cash Collateral.  This relief will enable the Debtors to preserve and maximize value

and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## **REQUEST FOR FINAL HEARING**

72.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after 21 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## **NOTICE**

73.     The Debtors will provide notice of this Motion to the following parties or their respective counsel:  (a) the U.S. Trustee; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Securities and Exchange Commission; (h) counsel to CODI, the Debtors' prepetition secured lender and postpetition secured lender; and (i) any party that is entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors will serve copies of this Motion, and any order entered in respect of this Motion, as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Interim DIP Order,

substantially in the form attached hereto as **Exhibit A**, and after the Final Hearing on this Motion,

the Final DIP Order, (a) granting the relief requested herein, and (b) granting such other relief as

the Court deems appropriate under the circumstances.

<table>
<tr><td>Dated: November 17, 2025<br>      Wilmington, Delaware</td><td>**YOUNG CONAWAY STARGATT &<br>TAYLOR, LLP**</td></tr>
</table>

/s/ Timothy R. Powell
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Timothy R. Powell (Del. No. 6894)
Benjamin C. Carver (Del. No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email:  emorton@ycst.com
         sbeach@ycst.com
         tpowell@ycst.com
         bcarver@ycst.com

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (*pro hac vice* pending)
Traci L. Shafroth (*pro hac vice* pending)
Scott Friedman (*pro hac vice* pending)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone: (415) 496-6723
Facsimile:  (650) 636-9251
Email:   tkeller@kbkllp.com
          tshafroth@kbkllp.com
          sfriedman@kbkllp.com

*Proposed Attorneys for Debtors*
*and Debtors-in-Possession*

33769082.1

**<u>EXHIBIT A</u>**

**Interim DIP Order**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (___) |
| Debtors. | (Jointly Administered) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, AND (B) USE CASH COLLATERAL; (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDER; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Bankruptcy Cases") for entry of this interim order (this "Interim Order") and a final order (the "Final Order," together with the Interim Order, the "DIP Orders") pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 4001-1, 4001-2, and 9013-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking, among other things:

(i)    authorization for Lugano Diamonds & Jewelry, Inc., a California corporation ("Borrower"), Lugano Buyer, Inc., a Delaware corporation ("Co-Borrower"), Lugano Holding, Inc., a Delaware corporation ("Parent"), Lugano Prive, LLC

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2]    Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion, the DIP Credit Agreement (as defined below) or the DIP Term Sheet (as defined below), as applicable.

("Prive"), and K.L.D. Jewelry, LLC ("KLD," collectively and as applicable, the "DIP Borrowers"), to obtain postpetition financing in connection with a senior secured, superpriority, priming debtor-in-possession delayed draw term loan facility (the "DIP Facility") subject to the terms and conditions set forth in that certain Superpriority Secured Debtor-in-Possession Credit Agreement dated as of [●] (as amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"),[3] by and among the DIP Borrowers and Compass Group Diversified Holdings LLC, a Delaware limited liability company, or an affiliate thereof (solely in its capacities as a lender under the DIP Credit Agreement and party to the DIP Documents, the "DIP Lender"), attached hereto as **Exhibit 1**, consisting of:

    a.    a senior secured DIP Facility up to an aggregate amount of $12,000,000 denominated in USD, which shall be available (1) following entry of this Interim Order, as weekly draws, not to exceed $1.5 million in the aggregate, in accordance with the Approved Budget until entry of the Final Order (excluding the Roll-Up DIP Loan (as defined below), the "Interim Draw(s)"), and (2) following the entry of the Final Order, as subsequent draws in an additional aggregate principal amount not to exceed $12 million less the Interim Draw(s) (each such draw after the Interim Draw(s), a "Subsequent Draw," and together with the Interim Draw(s), collectively the "Draws") and satisfaction of the other applicable conditions set forth in the DIP Documents; and

    b.    a "roll-up" of Prepetition Obligations (as defined below) held by Compass Group Diversified Holdings LLC (solely in its capacities as lender under the Prepetition Credit Agreement and party to the Prepetition Loan Documents, the "Prepetition Lender"), as further described in the DIP Term Sheet and DIP Credit Agreement, effective immediately upon entry of this Interim Order, in an aggregate principal amount equal to $2,200,000 (the "Roll-Up DIP Loan," and, together with any Draws referenced in the immediately preceding subparagraph (a), the "DIP Loans"), in accordance with the terms and conditions set forth in the DIP Credit Agreement, and all other terms and conditions of the DIP Documents.

    (ii)    authorization for the Debtors to (a) execute and enter into the DIP Documents; (b) to perform their respective obligations thereunder; and (c) to take all such other and further acts as may be necessary, appropriate, or desirable in connection therewith;

---

[3]    The DIP Credit Agreement, together with that certain DIP Term Sheet dated as of November 9, 2025, between the Parties (the "DIP Term Sheet"), this Interim Order, the Final Order, and all agreements, documents and instruments delivered or executed in connection therewith, and other security documentation, shall collectively be referred to as the "DIP Documents." In the event of any conflict between the DIP Term Sheet and the DIP Credit Agreement, the DIP Credit Agreement shall control.

(iii)    the granting to the DIP Lender allowed superpriority administrative expense claims in each of the Debtors' Bankruptcy Cases and any successor cases, including any chapter 7 cases, with respect to the DIP Facility and all liabilities, obligations, and indebtedness due or payable under the DIP Documents and this Interim Order (collectively, the "<u>DIP Obligations</u>"), subject to the priorities set forth herein;

(iv)    the granting to the DIP Lender of automatically perfected security interests in, and liens on, with respect to the DIP Loans (including, for the avoidance of doubt, the Roll-Up DIP Loan), all of the DIP Collateral (as defined below) to secure the DIP Loans and the DIP Obligations, subject only to the Carve-Out (as defined below);

(v)    authorization for the Debtors, subject to and pursuant to the terms and conditions set forth in this Interim Order, to continue to (a) use Cash Collateral (as defined below) and (b) provide adequate protection to the Prepetition Lender on account of any Diminution in Value (as defined below) of the Prepetition Collateral (as defined below), including Cash Collateral, as a consequence of the Debtors' use, sale, or lease of the Prepetition Collateral, including any Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of debt under the DIP Documents, and the priming of certain Prepetition Liens (as defined below) by liens and security interests granted by the DIP Documents, and any other basis consistent with section 361 of the Bankruptcy Code;

(vi)    authorization for the Debtors to incur and pay, on the terms set forth herein and in the DIP Documents, on a final and irrevocable basis, the principal, interest, premiums, fees, expenses, indemnities, and other amounts payable under this Interim Order and the DIP Documents as such amounts become earned, due, and payable and the fees and disbursements of the DIP Lender's attorneys, advisors, and other consultants, all and solely to the extent provided in, and in accordance with this Interim Order and the DIP Documents and without further order of the Court;

(vii)    the waiver of, subject to the terms of this Interim Order and upon entry of the Final Order, (a) the Debtors' and their estates' right to surcharge against the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, and (iii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code, each effective as of the Petition Date;

(viii)    authorization for the DIP Lender to exercise remedies under the DIP Documents on the terms described herein and therein upon the occurrence, and during the continuation of, an Event of Default (as defined below);

(ix)    modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Interim Order;

(x)     waiver of any applicable stay (including under section 362 of the Bankruptcy Code and Bankruptcy Rule 6004) and providing for immediate effectiveness of this Interim Order; and

(xi)    the scheduling of a final hearing (the "<u>Final Hearing</u>") to consider the relief requested in the Motion on a final basis and entry of the Final Order, and approval of the form of notice with respect to the Final Hearing.

This Court having considered the Motion, the exhibits attached thereto, the *Declaration of J. Michael Issa in Support of Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), the DIP Documents, and the evidence submitted, and arguments of counsel made at, the interim hearing (the "<u>Interim Hearing</u>"); and notice of the Motion and the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and 9014 and all applicable Local Bankruptcy Rules, and it appearing that no other or further notice is necessary; and the Interim Hearing having been held and concluded; and all objections and reservations of rights, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled on the merits by this Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, and all parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtors' performance with respect to the DIP Term Sheet, the DIP Credit Agreement, and entry into the other DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THIS COURT HEREBY MAKES THE FOLLOWING PRELIMINARY FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[4]

A.    <u>Petition Date</u>.  On November 16, 2025 (the "<u>Petition Date</u>"), each of the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (this "<u>Court</u>").

B.    <u>Debtors in Possession</u>.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Bankruptcy Cases.

C.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over these Bankruptcy Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Bankruptcy Cases and the proceeding on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    <u>Committee</u>.  As of the date hereof, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") has not yet appointed an official committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (any such committee, the "<u>Committee</u>").

E.    <u>Notice</u>.  Upon the record presented to this Court at the Interim Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and granted in this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b),

---

[4]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.

4001(c)(1), and 4001(d), and Local Bankruptcy Rule 9013-1, which notice was appropriate under the circumstances and sufficient for the Motion. No other or further notice of the Motion or entry of this Interim Order is necessary or required.

F.     <u>Prepetition Secured Debt</u>.    Subject to the limitations thereon contained in paragraphs 26 and 27 of this Interim Order, the Debtors represent, admit, stipulate, acknowledge and agree as follows:

i.      <u>Prepetition Loan Documents</u>.

a.      Prior to the Petition Date, the Prepetition Lender, Borrower and Co-Borrower were parties to that certain Credit Agreement, dated as of September 3, 2021, as amended by certain amendments, the most recent of which is the Twenty-Third Amendment to Credit Agreement dated as of October 2, 2025 (and as may be further amended, supplemented, restated or otherwise modified from time to time and including all exhibits, attachments and appendices thereto, the "<u>Prepetition Credit Agreement</u>," and the related facility, the "<u>Prepetition Facility</u>").

b.      Prior to the Petition Date, the Prepetition Lender, Borrower, Co-Borrower, and Parent were parties to that certain Guarantee and Collateral Agreement, dated as of September 3, 2021 (the "<u>Guarantee Agreement</u>"), pursuant to which, among other things, (a) Parent guaranteed the obligations of Borrower and Co-Borrower under the Prepetition Credit Agreement; and (b) Borrower, Co-Borrower, and Parent granted the Prepetition Lender a security interest in substantially all of the property of Borrower, Co-Borrower, and Parent. Prive and KLD (collectively with Borrower, Co-Borrower, Parent, and Prive, the "<u>Prepetition Obligors</u>") were added by joinder to the Guarantee Agreement (together, the

"Joinders") to jointly and severally guarantee to the Prepetition Lender the prompt and complete payment and performance by Borrower and Co-Borrower when due of Borrower's and Co-Borrower's liabilities, indebtedness, and obligations (whether monetary or otherwise) owed to the Prepetition Lender.

c.    Prior to the Petition Date, the Prepetition Obligors and Prepetition Lender executed that certain Forbearance Agreement dated as of August 29, 2025, as amended by certain amendments, the most recent of which is the Third Amendment to Forbearance Agreement dated as of October 10, 2025 (collectively with the Prepetition Credit Agreement, Guarantee Agreement, Joinders, and any related documents, agreements, or instruments, the "Prepetition Loan Documents"), whereby the Prepetition Lender agreed to temporarily forbear from exercising remedies against the Prepetition Obligors on account of their various defaults under the Prepetition Credit Agreement and the Prepetition Obligors executed a confession of judgment confessing that the Prepetition Obligors owed the Prepetition Lender $701,317,337.03 pursuant to the Prepetition Credit Agreement and related promissory note and loan documents.

d.    As of the Petition Date, the Prepetition Obligors were jointly and severally indebted and liable, without defense, counterclaim, or offset of any kind to the Prepetition Lender with respect to the Prepetition Loan Documents in the aggregate principal amount of not less than $718,222,591.91, plus accrued and unpaid interest thereon and all other fees (including attorneys' fees), costs, expenses, indemnification obligations, reimbursement obligations, charges, premiums, additional interest, and any other obligations thereunder (the

"Prepetition Obligations"). The Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations against each of the Prepetition Obligors and are not subject to any avoidance, recharacterization, effect, counterclaim, defense, offset, recoupment, subordination, other claim, cause of action, or other challenge of any kind under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise. No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the Prepetition Lender by or on behalf of any of the Debtors prior to the Petition Date under or in connection with the Prepetition Loan Documents are subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action, or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

e.      The Prepetition Obligations are secured by valid, binding, perfected, and enforceable liens on and security interests in (the "Prepetition Liens") the enumerated property and assets of the Prepetition Obligors under the Prepetition Loan Documents (all such property and assets in their capacity as security for the Prepetition Obligations, the "Prepetition Collateral"). As of the Petition Date: (A) the Prepetition Liens were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Lender for fair consideration and reasonably equivalent value; (B) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral other than any lien over the assets of the Debtors senior by operation of law or otherwise expressly permitted to be senior by the Prepetition Loan Documents; (C) no offsets,

recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense, including avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (D) the Debtors and their estates have no claims, objections, challenges, causes of action, or choses in action (including claims and causes of action under sections 502(d), 544, 545, 547, 548, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code), whether pursuant to federal law or applicable state law or applicable state law equivalents, or actions for recovery or disgorgement, against the Prepetition Lender or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees arising out of, based upon, or with respect to the Prepetition Loan Documents and the Prepetition Obligations; and (E) the Debtors waive, discharge, and release any right to challenge or seek to recharacterize or subordinate any of the Prepetition Obligations, the priority of the applicable Debtors' obligations thereunder, and the validity, perfection, extent, and priority of the Prepetition Liens securing the Prepetition Obligations.

ii.    <u>Cash Collateral</u>.  The Debtors' cash, including cash and other amounts on deposit or maintained in any account or accounts by the Debtors, existing as of the Petition Date, and any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral, existing as of the Petition Date, and the proceeds

of any of the foregoing, wherever located, is the Prepetition Lender's cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

      iii.    No Control. As of the Petition Date, the Prepetition Lender did not and does not control the Debtors or their properties or operations or have authority to determine the manner in which any Debtor's operations are conducted; *provided*, *however*, that Compass Group Diversified Holdings LLC does not dispute that it owns a direct or indirect controlling interest in each of the Debtors.

G.    Findings Regarding the DIP Facility and Use of Cash Collateral.

      i.    Good and sufficient cause has been shown for the entry of this Interim Order and for authorizing the Debtors to obtain financing pursuant to the DIP Term Sheet and DIP Credit Agreement, to use the Cash Collateral, and to authorize the provision of adequate protection as a proper exercise of the Debtors' business judgment and to avoid immediate and irreparable loss or damage to the Debtors and the estates.

      ii.    As set forth in the Motion and the First Day Declaration, the Debtors have an ongoing and immediate need to continue to use Cash Collateral and to obtain credit pursuant to the DIP Facility: (A) for working capital and general corporate purposes, and (B) to fund (1) the administration of the Bankruptcy Cases, (2) the sales of the Debtors' assets, including the consummation of the Sales Plan (as defined below) and the chapter 11 plan process, (3) the Carve-Out and the Fee Escrow Accounts (as defined below), and (4) the payments due to Agent (as defined below) under the Agency Agreement (as defined below), all in strict accordance with the Approved Budget (as defined below) or as otherwise approved by the DIP Lender in writing in its sole discretion. The Debtors will not have sufficient sources of working capital to operate their businesses in the ordinary

course of business during these Bankruptcy Cases without the use of Cash Collateral and the extension of the DIP Facility.  Absent granting the relief set forth in this Interim Order, the Debtors' estates and their businesses will be irreparably harmed.

iii.    As set forth in the Motion and the First Day Declaration, the Debtors are unable to obtain postpetition financing or other financial accommodations on more favorable terms under the circumstances from sources other than the DIP Lender pursuant to the terms and provisions of the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, and are unable to obtain satisfactory unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit with liens equal or junior to existing liens allowable under sections 364(c)(2) or 364(c)(3) of the Bankruptcy Code and, therefore, must grant, for the benefit of the DIP Lender, liens that are priming or *pari passu* to the Prepetition Liens under section 364(d)(1) of the Bankruptcy Code and a DIP Superpriority Claim (as defined below) on the terms and conditions set forth in this Interim Order and the DIP Documents. The Roll-Up DIP Loan, as provided for under the DIP Facility and pursuant to this Interim Order and the Final Order, is appropriate because the DIP Lender is not willing to provide the DIP Facility or extend postpetition credit to the Debtors thereunder without the inclusion of the Roll-Up DIP Loan within the DIP Facility.

iv.    Based upon the Motion, the First Day Declaration and the record presented to the Court at the Interim Hearing, the terms of the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, and the terms of the adequate protection granted to the Prepetition Lender as provided in this Interim Order, are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent

with the Debtors' fiduciary duties, and provide the Debtors reasonably equivalent value and fair consideration.

     v.     The Prepetition Lender has not objected to entry of this Interim Order, the Debtors' entry into the DIP Facility, including the granting of priming liens and claims in connection therewith and the continued use of Cash Collateral, and has consented to such relief only on the terms and conditions set forth in this Interim Order.

     vi.     The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) to, among other things, fund the administration of the Bankruptcy Cases and for working capital and general corporate purposes, and the incurrence and payment of any Adequate Protection Obligations pursuant to this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, have been negotiated in good faith and at arm's-length among the Debtors and the DIP Lender, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Facility, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, including, without limitation, all loans made to, and guarantees issued by, the Debtors pursuant to the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, and any DIP Obligations, shall be deemed to have been extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender (and its successors and assigns) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or modified on appeal.

H.      Sections 506(c) and 552(b).  Subject to entry of the Final Order, and to the extent provided therein, the Debtors and the DIP Lender have agreed, as a condition to the DIP Lender extending postpetition financing to the Debtors under the DIP Facility, a material inducement to the DIP Lender to agree to provide the DIP Loans and enter into the DIP Facility, and in exchange for (a) the DIP Lender's willingness to provide the DIP Facility to the extent set forth herein, (b) the DIP Lender's agreement to subordinate its DIP Liens and superpriority claims granted hereunder to the Carve-Out, and (c) the consensual use of Cash Collateral consistent with the Approved Budget and the terms of this Interim Order, the DIP Lender and Prepetition Lender have negotiated for, and the Debtors intend to seek, (1) a waiver of any equities of the case exceptions or claims under section 552(b) and a waiver of unjust enrichment and similar equitable relief as set forth below, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

I.      Immediate Entry.  Good and sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2).  Consummation of the DIP Facility and the use of Cash Collateral in accordance with this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.  There is an immediate need for the relief provided herein and, accordingly, it is necessary to waive the 14-day stay of certain orders otherwise provided in the Bankruptcy Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before this Court with respect to the Motion, and after due consideration, and good and sufficient cause appearing therefor,

33769084.1

13

**IT IS HEREBY ORDERED THAT:**

1.     <u>Motion Granted</u>.  The Motion is granted on an interim basis to the extent set forth herein.  The Debtors are authorized to borrow from the DIP Facility on an interim basis, subject to the terms of this Interim Order.  The use of Cash Collateral on an interim basis is authorized, subject to the terms of this Interim Order.

2.     <u>Objections Overruled</u>.  Any and all objections to this Interim Order, to the extent not withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

3.     <u>Authorization of the DIP Facility and the DIP Documents</u>.

(a)     The Debtors are hereby expressly authorized and directed to execute, enter into and perform all obligations under the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents.

(b)     The DIP Lender's obligations to make any Draws under the DIP Loans, whether pursuant to the Interim Draw(s) or Subsequent Draws, shall be expressly subject to the DIP Lender's receipt of a certificate signed by the Debtors' CEO, CFO or CRO confirming that the following conditions precedent are satisfied:  (i) there shall exist no Default or Event of Default under and defined in the DIP Credit Agreement; (ii) the representations and warranties of the Debtors therein shall be true and correct in all material respects (except with respect to representations and warranties that include materiality qualifiers, which representations and warranties will be true and correct in all respects) immediately prior to, and after giving effect to, such funding; (iii) the making of such Draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; (iv) the Debtors shall be in compliance

with the Approved Budget (subject to Permitted Variances (as defined below)) in all respects; (v) this Interim Order (unless superseded by the Final Order) shall be in full force and effect and shall not have been vacated, reversed, modified, amended, or stayed in any respect without the prior written consent of the DIP Lender and the Debtors unless superseded by the Final Order; (vi) the Debtors' cash balance, after giving pro forma effect to the request, does not exceed the amount of cash required to adhere to the Approved Budget for the following two weeks; and (vii) the amount of such Draw will be reflected in any then Approved Budget.

(c)     Upon the first business day following entry of this Interim Order, the Debtors are immediately authorized, subject to the terms and conditions of this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, to borrow the Interim Draw(s) under the DIP Loans and to incur and pay the principal, interest, premium, fees, expenses and other amounts provided for in the DIP Term Sheet, DIP Credit Agreement, the other DIP Documents, and this Interim Order, pursuant to the terms and provisions thereof, subject to any limitations on availability or borrowing under the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, and this Interim Order, which borrowings shall be used for all purposes as permitted under the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, and this Interim Order (including pursuant to the Approved Budget).

(d)     In furtherance of the foregoing, and without further approval of this Court, the Debtors are authorized to perform all acts, to make, execute, and deliver all instruments, certificates, agreements, and documents (including, without limitation, the execution or recordation of pledge and security agreements, financing statements, and other similar documents) and to pay all fees, expenses, and other amounts authorized by the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, and this Interim Order, appropriate or desirable for the

Debtors' performance of their obligations under or related to the DIP Facility, including, without limitation:

(i)      the execution and delivery of, and performance under, each of the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents and any collateral documents contemplated thereby;

(ii)      the granting of all liens and claims with respect to, and the making of any payments in respect of, the Adequate Protection Obligations to the extent provided for in this Interim Order; and

(iii)      the performance of all other acts necessary, appropriate, or desirable under, or in connection with, the DIP Term Sheet and the other DIP Documents.

4.      DIP Obligations.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute legal, valid, binding, and non-avoidable obligations of the Debtors, enforceable in accordance with the terms of this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, against the Debtors and their estates and any successors thereto, including any trustee appointed in the Bankruptcy Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Bankruptcy Cases, or in any other proceedings superseding or related to any of the foregoing.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall cease on the Maturity Date (as defined below) or the occurrence of any event or condition set forth in paragraph 18 of this Interim Order; *provided, however*, that the Debtors may utilize Cash Collateral in amounts not to exceed the Approved Budget pending a hearing, if any, on the Debtors' challenge to the occurrence of any event or condition set forth in paragraph 18 of this Interim Order.  Except as permitted by this Interim Order, no authorized obligation, payment, transfer, or grant of security hereunder or

under the DIP Term Sheet, the DIP Credit Agreement, or the other DIP Documents to the DIP Lender shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code, or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or challenge, whether under the Bankruptcy Code or any other applicable law or regulation by any person or entity for any reason.

5.     DIP Liens.  Subject and subordinate only to the Carve-Out and to the exceptions set forth in the DIP Documents, and exclusive of the Retained Actions (defined below) and proceeds thereof, effective and automatically perfected upon entry of this Interim Order, the DIP Obligations shall be secured by valid, binding, continuing, enforceable, fully-perfected, non-avoidable, automatically and properly perfected liens on, and security interests in (such liens and security interests granted with respect to the DIP Facility and the DIP Loans thereunder, collectively, the "DIP Lien") (a) all assets (whether tangible, intangible, real, personal, or mixed) of the Debtors (and their bankruptcy estates) of any nature whatsoever and wherever located, whether first arising prior to or following the Petition Date (including the Prepetition Collateral), now owned or hereafter acquired, including all accounts, chattel paper, claims and causes of action, deposit accounts, documents, equipment, general intangibles, goods (including fixtures), instruments, inventory, investment property, money, cash, cash equivalents, and all deposit accounts, securities accounts, commodities accounts, and lockboxes, together with all money, cash, securities, and other investment property on deposit from time to time therein, letters of

33769084.1

credit, letter-of-credit rights, and other supporting obligations, real property, books and records, and to the extent not otherwise included, all substitutions, replacements, accessions, products, and other proceeds and products (whether tangible or intangible and including, without limitation, insurance proceeds (including all proceeds from any directors'/officers' liability insurance policies payable directly to such officers and directors), licenses, royalties, income, payments, claims, damages, and proceeds of suit) of any and all of the foregoing, and all collateral security and guarantees given by any person with respect to any of the foregoing, the right, title, or interest in any capital stock, investment property, partnership, membership, or other equity or similar interests in any entity (whether or not such entity is a Debtor), including all capital stock, securities accounts, investment property, partnership, and membership, other equity or similar interests (and including all rights, beneficial interests, causes of action, and choses of action related thereto) of the Debtors, whether existing as of the Petition Date or after acquired, including, upon entry of the Final Order (x) the proceeds or property recovered, whether by judgment, settlement, or otherwise, unencumbered or otherwise, of any claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b) of the Bankruptcy Code ("Avoidance Actions"), (y) the proceeds of property recovered, whether by judgment, settlement, or otherwise from all claims and causes of action under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral, and (z) all amounts recovered by the Debtors' estates under section 506(c) of the Bankruptcy Code ((x) through (z), the "Recovery Actions," and the proceeds of property recovered, whether by judgment, settlement, or otherwise from Recovery Actions ("Recovery Action Proceeds")); and (b) all Prepetition Collateral (all such property, excluding the Encumbered Collateral (as defined below), the Retained Actions, and proceeds from the Retained Actions, collectively, the "DIP Collateral").  Notwithstanding anything in this Interim Order to the contrary,

the DIP Collateral shall exclude, and the Debtors shall retain for the benefit of their estates, any claims or cause of action (whether at law, in equity, or otherwise) against (i) Compass Group Diversified Holdings LLC, solely in its capacities as shareholder, officer, director, manager under the Management Agreement, or controlling person of the Debtors; and (ii) any corporate affiliate(s) of Compass Group Diversified Holdings LLC to the extent such affiliate(s) were or acted as shareholders, officers, directors, managers under the Management Agreement, or controlling persons of the Debtors (collectively "Retained Actions").  For the avoidance of doubt, the DIP Collateral shall also exclude any Additional Agent Goods Proceeds (as defined in the Agency Agreement) held in the Designated Deposit Accounts, if any, prior to the daily transfer of such funds into accounts of the Agent as provided in the Agency Agreement.  Subject only to the Carve-Out, and exclusive of the Retained Actions and proceeds thereof, the DIP Liens will otherwise have the following priorities:

(a)      *First Priority Liens on Unencumbered Collateral*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, first-priority senior security interest in and lien upon all of the DIP Collateral, including, without limitation, all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to Prepetition Liens or any other valid, perfected, and unavoidable lien that was in existence immediately prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) including, upon entry of this Interim Order and the Final Order, the Recovery Action Proceeds (collectively, the "364(c)(2) Collateral").

(b)      *Junior Liens on Encumbered Property*.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, junior security

interest in and lien on and security interest in all of the Debtors' property, wherever located, that is subject to a valid, perfected, and unavoidable lien in favor of third parties that were in existence immediately prior to the Petition Date (collectively, the "Encumbered Collateral").

(c)    *Priming Liens on Prepetition Collateral and Encumbered Collateral.* Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully perfected, first-priority priming security interest and lien (the "Priming Liens") on all Prepetition Collateral that is not 364(c)(2) Collateral or Encumbered Collateral.  The Priming Liens shall prime and be senior in all respects to the liens and security interests in such property of the Prepetition Lenders with respect to the Prepetition Loan Documents.

(d)    *No Senior Liens*.  Except to the extent permitted hereunder, the DIP Liens shall not be made subject or subordinate to or made *pari passu* with (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (ii) any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the DIP Lender, (iii) any intercompany or affiliate claim, lien, or security interest of the DIP Lender or its affiliates, or (iv) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the entry of this Interim Order.

(e)    *Agency Agreement*.  Pursuant to that certain Agency Agreement, dated as of November 16, 2025 (the "Agency Agreement") executed by and between Borrower and Enhanced Retail Funding, LLC ("Agent"), Borrower shall establish depository accounts designated solely for the deposit of Proceeds, Additional Agent Goods Proceeds, other amounts contemplated by the Agency Agreement (as each term is defined in the Agency Agreement) and

the disbursement of amounts payable to or by Agent (such accounts, the "<u>Designated Deposit Accounts</u>").  Agent shall have authority to sweep amounts on deposit in the Designated Deposit Accounts on a daily basis.  Upon transfer of amounts in the Designated Deposit Accounts to accounts maintained by Agent in accordance with the Agency Agreement, title to such funds shall automatically transfer to the Sale Agent, subject solely to Agent's obligations to make required payments to the Borrower or the DIP Lender under the Agency Agreement.  Notwithstanding anything to the contrary in this order or the Agency Agreement, Agent shall not be entitled to or granted any lien on or security interest in any of the Debtors' assets, including the DIP Collateral, Prepetition Collateral, or the Retained Actions.

6.    <u>DIP Superpriority Claims</u>.  Subject only to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against the Debtors on a joint and several basis (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and any and all administrative expenses or other claims ("<u>Administrative Expense Claims</u>") arising under or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order to the extent set forth therein), 507(a), 507(b), 726, 1113, or 1114 of the Bankruptcy Code (including the Adequate Protection Obligations (as defined below)), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, which allowed claims (the "<u>DIP Superpriority Claims</u>") shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable

33769084.1

from, and have recourse to, all of the DIP Collateral and all proceeds thereof in accordance with the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, and this Interim Order, subject only to payment in full of the Carve-Out. The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code if this Interim Order or any provision hereof is reversed or modified on appeal. Notwithstanding the foregoing, the DIP Superpriority Claims shall not be payable from the proceeds of any of the Retained Actions.

7.    <u>Approved Budget Compliance and Reporting</u>.

(a)    Attached to this Interim Order as **<u>Exhibit 2</u>** is a minimum 13-week cash flow forecast beginning the week in which the Petition Date occurs, in form and substance acceptable to the DIP Lender, setting forth, among other things, the Debtors' cash, revenue, cash flow, and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures (if applicable), vendor disbursements, working capital, Consulting Fees (as defined in the Agency Agreement) and expenses due to Agent under the Agency Agreement, and fees and expenses of the DIP Facility and the Bankruptcy Cases (including categories for each professional for the Debtors, including Agent, Special Committee, and Committee) during such minimum 13-week period that the Debtors are authorized to use proceeds of the DIP Loan (each budget, an "<u>Approved Budget</u>"). The Approved Budget shall be revised on a four-week cycle (*i.e.*, every four weeks a new minimum 13-week cash flow forecast will be delivered to the DIP Lender), unless otherwise required under the DIP Credit Agreement, and shall be subject to the advance written approval of the DIP Lender.

(b)    Any amendments, supplements, or modifications to the Approved Budget or Budget Variance Report (as defined below) shall be subject to the prior written approval of the DIP Lender (email being sufficient), in its sole discretion, prior to the implementation thereof.

(c)     The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances.  Commencing on the fourth Friday following the entry of this Interim Order (or the successive business day if such Friday is not a business day) and continuing every week thereafter (by 12:00 p.m. (prevailing Eastern Time) on each such applicable Friday (or the successive business day if such Friday is not a business day)), the Debtors shall deliver by email to the DIP Lender a variance report (each, a "Budget Variance Report") for the immediately preceding four-week period then ended (the "Variance Period") setting forth the difference between, on a line-by-line and aggregate basis, (i) actual operating disbursements, non-operating activities, and first day motion relief and budgeted operating disbursements, non-operating activities, and first day motion relief, (ii) actual operating receipts and budgeted operating receipts, and (iii) actual professional fees and budgeted professional fees and describing in adequate detail all material variances for such Variance Period.  The actual variances for each Variance Period (excluding, for purposes of determining Approved Budget compliance and calculation of the Permitted Variance (as defined below), fees for Debtors' Professionals, Special Committee's Professionals, and Committee Professionals (if any) (each as defined below), Lender's Professional Fees (as defined below), Consulting Fees (as defined in the Agency Agreement) and expenses of Agent, and interest and fees under the DIP Credit Agreement) shall not reflect (a) total receipts of less than 75% of projected receipts for the Variance Period or (b) more than 110% of projected total payments for the Variance Period (the "Permitted Variance"); *provided* that a breach of the Permitted Variance shall not constitute an Event of Default, so long as the Debtors' ending cash is within $200,000 of the ending cash indicated at the end of the Variance Period.

(d)     Except as otherwise agreed to by the DIP Lender, the Debtors' use of the proceeds of the DIP Loans and Cash Collateral shall only be permitted pursuant to the terms of,

and in accordance with, the Approved Budget, subject to the Permitted Variances.  The DIP Lender and Prepetition Lender shall have no obligation with respect to the Debtors' use of the proceeds of the DIP Loans and Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with the Approved Budget or to pay (directly or indirectly from the DIP Loans or Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Approved Budget. The consent of the DIP Lender and Prepetition Lender to the use of DIP Loans or Cash Collateral pursuant to this Interim Order and the DIP Documents shall not be construed as consent to the use of any DIP Loans or Cash Collateral after the occurrence of an Event of Default (other than funding the Carve-Out as set forth herein or otherwise provided in this Interim Order), regardless of whether the aggregate funds shown on the Approved Budget have been expended.  The Debtors shall provide the DIP Lender with all reporting and other information required to be provided to the DIP Lender under the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Lender or the Prepetition Lender have under the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, or the Prepetition Facility, upon reasonable notice, at reasonable times during normal business hours, the Debtors (or any successor thereto, including, but not limited to, a chapter 11 or chapter 7 trustee) shall permit representatives, advisors, agents, and employees of the DIP Lender or the Prepetition Lender to:  (i) have access to and inspect the Debtors' books and records; and (ii) discuss the Debtors' affairs, financings, and conditions with the Debtors' attorneys, financial advisors and employees (the "Access Rights") and the Debtors (or any successor thereto, including, but not limited to, a chapter 11 or chapter 7 trustee) shall cooperate with such Access Rights; provided, however, that neither the DIP Lender nor the Prepetition Lender shall have any rights to access materials created or maintained by, or any work product of, the Special Committee.

8.      <u>Carve-Out</u>.

(a)      <u>Carve-Out</u>.  As used in this Interim Order, the "<u>Carve-Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Court, all unpaid fees and expenses incurred at any time by persons or firms retained or to be retained, pursuant to sections 327, 328, or 363 of the Bankruptcy Code, by (x) the Debtors (the "<u>Debtors' Professionals</u>") or (y) the Special Committee (as defined below) (the "<u>Special Committee's Professionals</u>") and such fees and expenses of the Debtors' Professionals and Special Committee Professionals, the "<u>Allowed Debtor Professional Fees</u>," which amounts are limited to those contained in the Approved Budgets and incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; (iv) to the extent allowed by the Court, all unpaid fees and expenses incurred at any time by persons or firms retained or to be retained, pursuant to sections 327, 328, or 1103 of the Bankruptcy Code, by the Committee (the "<u>Committee Professionals</u>") and such fees and expenses of the Committee Professionals, the "<u>Allowed Committee Professional Fees</u>" (together with the Allowed Debtor Professional Fees, the "<u>Allowed Professional Fees</u>"), which amounts are limited to those contained in the Approved Budgets and incurred at any time before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; (v) Allowed Debtor Professional Fees incurred after the

first business day following delivery by the DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $100,000; (vi) Allowed Committee Professional Fees incurred after the first business day following delivery by DIP Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $25,000 (the amounts set forth in clauses ((v) and (vi) being the "Post Carve-Out Trigger Notice Cap"); and (vii) to the extent the Agency Agreement is approved by the Court pursuant an interim order, all unpaid fees and expenses, due at any time to Agent under the Agency Agreement, including the Agency Protections (as defined in the Agency Agreement), whether incurred prior to or after delivery of a Carve-Out Trigger Notice (the "Agent Fees").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lender to the Debtors (with the Debtors to promptly provide a copy of such notice to counsel to the Committee (if any) and the U.S. Trustee) (collectively, the "Notice Parties"), which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)    No Direct Obligation to Pay Allowed Professional Fees.  Neither the DIP Lender nor the Prepetition Lender shall be responsible for the payment or reimbursement of any fees or disbursements of any Debtors' Professionals, Special Committee's Professionals, Committee Professionals, or Agent (collectively, and including any other professional for a statutory or court-appointed group or individual, including a trustee or examiner, in the Bankruptcy Cases, collectively, the "Professionals") incurred in connection with the Bankruptcy Cases or any successor cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to

reimburse expenses of, any Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(c)      Fee Escrow Accounts.  Subject to paragraph 3(b) of this Interim Order, on the first Friday following entry of this Interim Order, and thereafter every Friday prior to the Maturity Date , the DIP Lender shall deposit into three (3) separate escrow accounts the following: (i) the aggregate amount of the fees and disbursements allocated to the Debtors' Professionals and the Special Committee's Professionals for the week immediately following the deposit date beginning on Monday,  as set forth in the Approved Budget (the "Debtors' Fee Escrow Account"); (ii) the aggregate amount of the fees and disbursements allocated to the Committee's Professionals for the week immediately following the deposit date beginning on Monday as set forth in the Approved Budget (the "Committee Fee Escrow Account"); and (iii) the aggregate amount of any Consulting Fees (as defined in the Agency Agreement) and expenses due to Agent under the Agency Agreement for the week immediately following the deposit date beginning on Monday as set forth in the Approved Budget (the "Agent Fee Escrow Account" and together with the Debtors' Fee Escrow Account and the Committee Fee Escrow Account, the "Fee Escrow Accounts").  None of the Fee Escrow Accounts shall be subject to any liens or claims of the DIP Lender or the Prepetition Lender, including any liens or claims under the DIP Order, the Prepetition Loan Documents, the DIP Documents, or the DIP Facility, up to and including the Allowed Debtor Professional Fees, the Allowed Committee Professional Fees, and amount of the Agent Fees contained in the Approved Budgets , respectively*; provided, however*, the DIP Liens, DIP Superpriority Claims, and all other claims of the DIP Lender under this Interim Order shall attach to amounts in the applicable Fee Escrow Accounts that, as applicable, (i) exceed the amounts set forth in the Approved Budget, (ii) after orders with respect to final fee applications become final

33769084.1

and non-appealable, are otherwise not used or ordered to be used to pay the Allowed Debtor Professional Fees or the Allowed Committee Professional Fees (as applicable), or (iii) with respect to amounts in the Agent Fee Escrow Account, after the conclusion of the Final Reconciliation (as defined in the Agency Agreement) are not used or necessary to pay amounts outstanding to Agent under the Agency Agreement.  The Debtors Professionals' fees and expenses shall be paid from the Debtors' Fee Escrow Account and the Committee Professionals' fees and expenses shall be paid from the Committee Fee Escrow Account as provided for by an order of the Court.  The Agent Fees shall be paid from the Agent Fee Escrow Account to the extent permitted under the Agency Agreement and any Court order approving such agreement.  Upon the Maturity Date and subject to the Carve-Out, the Debtors shall pay the DIP Lender, without further order from the Court, any excess amounts remaining in (x) the Debtors' Fee Escrow Account and/or the Committee Fee Escrow Account that (i) exceed the amounts set forth in the Approved Budget or (ii) after orders with respect to final fee applications become final and non-appealable, are otherwise not used or ordered to be used to pay the Allowed Debtor Professional Fees or the Allowed Committee Professional Fees, and (y) the Agent Fee Escrow Account that after the conclusion of the Final Reconciliation (as defined in the Agency Agreement) are not used or necessary to pay amounts outstanding to Agent under the Agency Agreement.

9.    <u>Limitation on Charging Expenses against Collateral</u>.  Upon entry of the Final Order to the extent provided therein, in light of the agreement of the DIP Lender and Prepetition Lender to (a) provide the DIP Loans, (b) allow the Debtors to use Cash Collateral as provided for herein, and (c) allow for the Carve-Out and the funding of the Fee Escrow Accounts, no costs or expenses of administration of these Bankruptcy Cases or future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be

charged against or recovered from the Prepetition Collateral or the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment, or claims against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise.

10.    No Marshaling/Application of Proceeds.  Upon entry of the Final Order, the DIP Lender and Prepetition Lender shall be entitled to apply the payments or proceeds of the DIP Collateral and the Prepetition Collateral in accordance with the provisions of the Final Order and in no event shall the DIP Lender and Prepetition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or Prepetition Collateral, as applicable, *provided that* Recovery Action Proceeds may only be applied in satisfaction of the DIP Obligations or the Prepetition Obligations after the DIP Lender and the Prepetition Lender have exhausted all other sources of recovery for repayment of such claims.

11.    Equities of the Case.  Upon entry of the Final Order and to the extent provided therein, in light of, among other things, the agreement of the DIP Lender and Prepetition Lender to provide the DIP Loans and allow the Debtors to use Cash Collateral on the terms set forth herein, (a) the DIP Lender and Prepetition Lender shall be entitled to the rights and benefits of section 552(b) of the Bankruptcy Code, if any, and (b) in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any person asserting a prepetition lien on property of the estates under section 541 of the Bankruptcy Code with respect to proceeds, products, offspring, or profits of such property.

12.     <u>Payments Free and Clear</u>.  Subject and subordinate to the Carve-Out and subject to paragraph 27 of this Interim Order and the provisions of this Interim Order relating to Retained Actions, any and all authorized payments or authorized proceeds remitted to the DIP Lender and the Prepetition Lender pursuant to the provisions of this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and any other DIP Document or any subsequent order of this Court shall be irrevocable, received free and clear of any claim, charge, assessment, or other liability, including, without limitation, and upon entry of the Final Order to the extent provided therein, any claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through, or on behalf of the Debtors.

13.     <u>Use of Cash Collateral</u>.  The Debtors are hereby authorized to use all Cash Collateral solely in accordance with this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, to the extent set forth in the Approved Budget, including, without limitation, to make payments on account of the Adequate Protection Obligations and other obligations provided for in this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents.  Except as authorized pursuant to (a) the Approved Budget, (b) the terms and conditions of this Interim Order, (c) an order of the Court, or (d) as otherwise agreed to by the DIP Lender, prior to payment in full in cash of the DIP Obligations and termination of the DIP Facility, the Debtors shall be prohibited from at any time using the Cash Collateral.

14.     <u>Adequate Protection for the Prepetition Lender</u>.  Subject and subordinate only to the Carve-Out, the DIP Liens on the DIP Collateral, DIP Superpriority Claims, and the terms of this Interim Order, and excluding the Retained Actions and proceeds thereof, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, as adequate protection of the Prepetition Lender's

interests in the Prepetition Collateral (including Cash Collateral), for any postpetition diminution in value of such interests (such diminution, exclusive of any diminution arising as a result of the Roll-Up DIP Loan, a "Diminution in Value") resulting from the incurrence of additional debt and the imposition of the Priming Liens on the Prepetition Collateral, the Carve-Out, the imposition of the automatic stay, the sale, lease, or use of the Prepetition Collateral (including Cash Collateral), or any other reason for which adequate protection may be granted under the Bankruptcy Code, the Prepetition Lender is hereby granted the following (collectively, the "Adequate Protection Obligations"), and the adequate protection will otherwise include:

(a)     Adequate Protection Liens.  As security for and solely to the extent of any Diminution in Value, (i) continued valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all DIP Collateral and the proceeds, rents, products, and profits therefrom, whether acquired or arising before or after the Petition Date, to the same extent, priority, and validity that existed as of the Petition Date (the "Rollover Liens"), and (ii) subject to entry of the Final Order, valid, perfected, and enforceable continuing supplemental lien on, and security interest in, all of the assets of the Debtors (excluding the Retained Actions and any proceeds therefrom) of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products, and profits therefrom, inclusive of the Avoidance Actions and any proceeds therefrom (the "Supplemental Liens," together with the Rollover Liens, the "Adequate Protection Liens"), without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, intellectual property filings, mortgages, deeds of trust, notices of lien, or other similar instruments or documents.  The Adequate Protection Liens shall be (i) subject and

33769084.1

31

subordinate to the Carve-Out and the DIP Liens on the DIP Collateral, and (ii) senior to any and all other liens and security interests in the DIP Collateral.

(b)     <u>Prepetition Superpriority Claims</u>. As additional adequate protection for any Diminution in Value, and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Bankruptcy Cases of each of the Debtors and payable from the proceeds of all assets of the Debtors' estates except any proceeds of the Retained Actions (the "<u>Prepetition Superpriority Claims</u>"). The Prepetition Superpriority Claims shall have priority over any and all other unpaid administrative expenses now existing or hereafter arising, of any kind whatsoever, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, any successor trustee, or any creditor in the Bankruptcy Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment; *provided, however*, the Prepetition Superpriority Claims shall be subject to the DIP Liens on the DIP Collateral, DIP Superpriority Claims, and the Carve-Out.

(c)     <u>Fees and Expenses</u>.  As additional adequate protection, on the Maturity Date (or a date otherwise mutually agreeable to the Debtors and the DIP Lender), and in no event prior to the date provided for below with regard to the Fee Objection Period (or any objection to such fees and expenses), the Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses (the "<u>Adequate Protection Fees</u>"), whether incurred before or after the Petition Date, of the Prepetition Lender, to the extent set forth in the

DIP Term Sheet, the other DIP Documents, and this Interim Order.  The Adequate Protection Fees shall include, without limitation, the reasonable documented fees, costs, and expenses of (i) Squire Patton Boggs (US) LLP, as counsel to the DIP Lender and Prepetition Lender, (ii) Polsinelli PC, as Delaware counsel to the DIP Lender and Prepetition Lender, and (iii) Ankura Consulting Group, LLC, as financial advisors to the DIP Lender and Prepetition Lender (collectively, the "Lender's Professionals"); *provided, however*, that any time prior the Maturity Date that such professionals seek the payment of fees and expenses from the Debtors, each professional shall provide a summary invoice (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) to counsel to the Debtors, the U.S. Trustee, and counsel to any Committee (collectively, the "Fee Notice Parties").  If no objection to payment of the requested Adequate Protection Fees is made, in writing, by any of the Fee Notice Parties within ten (10) business days after delivery of such invoices (the "Fee Objection Period"), then such invoice shall be promptly paid by the Debtors on the Maturity Date (or a date otherwise mutually agreeable to the Debtors and the DIP Lender), without further order of, or application to, this Court or notice to any other party, and, in any case, within five (5) business days following the expiration of the Fee Objection Period.  For the avoidance of doubt, the provisions of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.  If, within the Fee Objection Period, a Fee Notice Party

---

sends to the affected professional a written objection to such invoice, then only the disputed portion of such Adequate Protection Fees shall not be paid as set forth above until the objection is resolved by the applicable parties in good faith or, if no resolution can be achieved after good faith discussions, by order of this Court, and any undisputed portion shall be paid as soon as reasonably practicable and, in any case, within five (5) business days following the expiration of the Fee Objection Period and shall not be subject to any further review, challenge, or disgorgement. Subject to the terms hereof, the Debtors are authorized, without further notice or hearing, to pay all reasonable and documented fees, costs, and out-of-pocket expenses of the Prepetition Lender. Subject to paragraph 27 of this Interim Order, any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to the DIP Lender (solely in its capacity as DIP Lender and in no other capacity) are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of recovery by the Debtors or any other person.

(d)    Intercompany Liens.    All intercompany liens of the Debtors and their affiliates, if any, are hereby subordinated to the DIP Liens and the Adequate Protection Liens.

15.    Perfection of DIP Liens and Adequate Protection Liens.

(a)    The DIP Lender and Prepetition Lender is hereby authorized, but not required, without any action by any other person, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) security agreements, pledge agreements, financing statements, intellectual property filings, deeds of trust, mortgages, depository account control agreements, notices of lien, or similar instruments in any jurisdiction, or take possession of or control over cash or securities, equity certificates or promissory notes, or take any other action in order to validate

and perfect the DIP Liens and the Adequate Protection Liens. Whether or not the DIP Lender and/or Prepetition Lender shall, in its discretion, choose to file such security agreements, pledge agreements, financing statements, intellectual property filings, deeds of trust, mortgages, depository account control agreements, notices of lien, or similar instruments or documents, or take possession of or control over cash or securities, equity certificates or promissory notes, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such DIP Liens and Adequate Protection Liens shall be deemed valid, automatically perfected, allowed, enforceable, non-avoidable and effective by operation of law, and not subject to challenge, dispute, or subordination (subject to the priorities set forth in this Interim Order), at the time and on the date of the entry of this Interim Order, in any jurisdiction (domestic and foreign), without the need of any further action of any kind. This Interim Order shall be sufficient and conclusive evidence of the creation, validity, automatic perfection, and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any security agreements, pledge agreements, financing statement, intellectual property filing, deed of trust, mortgage, depository account control agreement, notice of lien, or other instrument or document which my otherwise be required under the law of any jurisdiction or the taking of any other action to create, attach, validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein. Upon the request of DIP Lender and/or Prepetition Lender, as applicable, the Debtors, without any further consent of any party, is authorized to, and shall, take, execute, deliver, and file such instruments to enable the DIP Lender and/or Prepetition Lender, as applicable, to further validate, perfect, preserve, and enforce the DIP Liens and Adequate Protection Liens, respectively, at the

Debtors' sole cost and expense.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)      A copy of this Interim Order may, in the discretion of the DIP Lender or Prepetition Lender, as applicable, be filed with or recorded in filing or recording offices in addition to, or in lieu of, such security agreements, pledge agreements, financing statements, intellectual property filings, mortgages, depository account control agreement, deeds of trust, notices of lien, or similar instruments, and all filing offices in all jurisdictions (domestic and foreign) are hereby authorized to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Lender and/or Prepetition Lender to take all actions, as applicable, in this subparagraph (b) and the immediately preceding subparagraph (a).

(c)      Subject to entry of the Final Order, and to the extent provided therein, any provision of any lease or other license, contract, or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any the Debtors' interests in any lease, license, or other agreement, or the proceeds thereof, or other collateral related thereto, in connection with the granting of the DIP Liens and the Adequate Protection Liens, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Thereupon, any such provision shall have no force and effect with respect to the granting of the DIP Liens and the Adequate Protection Liens on the Debtors' interests in any lease, license, or other agreement, or the proceeds of any assignment and/or sale thereof by any Debtor in accordance with the terms of the DIP Term Sheet, the other DIP Documents, or this Interim Order.

33769084.1

16.    <u>Section 507(b) Reservation</u>.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event the Adequate Protection Obligations provided to the Prepetition Lender are insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during the Bankruptcy Cases.  Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by the Prepetition Lender, that the adequate protection granted herein does in fact adequately protect against any Diminution in Value of the Prepetition Lender's interests in the Prepetition Collateral (including the Cash Collateral).

17.    <u>DIP Facility Maturity Date</u>.

(a)    The term of the DIP Loan shall commence upon the entry of this Interim Order through the earliest of the foregoing to occur (the "<u>Maturity Date</u>"): (i) May 31, 2026, which date may be extended at the sole discretion of the DIP Lender; (ii) an Event of Default; (iii) ten (10) calendar days after the occurrence of the effective date of any chapter 11 plan acceptable to DIP Lender in its sole discretion (an "<u>Acceptable Plan</u>"); (iv) the failure of the Final Order to be entered within thirty (30) calendar days after the filing of the Motion (unless otherwise agreed in writing by the DIP Lender in its sole discretion); and (v) the closing of the sale(s) of substantially all of the Debtors' assets.

(b)    Upon the Maturity Date, (i) all the DIP Lender's commitments under the DIP Term Sheet, DIP Credit Agreement, other DIP Documents, and this Interim Order shall terminate and be of no further force or effect upon the Maturity Date, and no further amounts of the DIP Loans shall be available to be drawn under the DIP Facility; and (ii) the Prepetition Lender's consent to the use of Cash Collateral shall terminate.

18.     <u>Events of Default and Remedies</u>.

(a)     As used herein, an "<u>Event of Default</u>" shall mean the occurrence of any of the following events, unless waived in writing by the DIP Lender, in the DIP Lender's sole discretion:

(i)     Failure of the Debtors to make payments on any of the DIP Obligations, including Mandatory Prepayments, as and when due;

(ii)    Failure of the Debtors to pay all of their undisputed administrative expenses in full in accordance with and subject to the terms as provided for in the Approved Budget and such failure shall not have been remedied or waived within five (5) calendar days after the earlier of (A) the date upon which an authorized agent of the Debtors had knowledge of such default and (B) the date upon which notice thereof is given to the Debtors by the DIP Lender;

(iii)   Failure of the Debtors to pay any of the undisputed Adequate Protection Fees or Lender's Professional Fees when due;

(iv)    Failure of the Debtors to perform or comply with any of their affirmative or negative covenants in the DIP Credit Agreement, this Interim Order, or the Final Order;

(v)     Any representation, warranty, certification or other statement made or deemed made by the Debtors in the DIP Credit Agreement or in any statement or certificate at any time given by the Debtors in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(vi)    This Interim Order or Final Order becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender, except by the Final Order;

(vii)    The Debtors shall default in the performance of or compliance with any term contained in the DIP Credit Agreement, this Interim Order, or the Final Order;

(viii)    The entry of an order dismissing any Bankruptcy Case or converting any Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, or the Debtors file, without the prior written consent of the DIP Lender, a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion;

(ix)    A trustee, responsible officer, or an examiner having expanded powers under section 1104 of the Bankruptcy Code (other than (A) a fee examiner or (B) for purposes of an investigation pursuant to sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Bankruptcy Cases, or the Debtors apply for, consent to, support, acquiesce in, or fail to timely oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in the DIP Lender's sole discretion;

(x)    The Debtors take any action to, or fail to take all reasonable actions necessary to oppose any action by any other person (including, but not limited to, (A) challenging the standing of such party to bring any such action, (B) filing pleadings, providing evidentiary support, and appearing in court to support and present the same in opposition of such party's action, and (C) timely prosecuting all available appeals of any order or decision authorizing such party's actions or approving relief granted to such party or timely opposing all appeals (or attempts to appeal) of decisions denying standing or relief to such party), in each case, except as expressly permitted hereunder and in the DIP Orders, (i) impair any of the material rights and remedies of the DIP Lender under the DIP Credit Agreement, or (ii) avoid, subordinate, disallow, or require disgorgement by the DIP Lender or the Prepetition Lender of any amount received in respect of

the DIP Obligations, the Adequate Protection Obligations, or under this Interim Order or the Final Order;

(xi)     At any time after the execution and delivery thereof, (A) the DIP Credit Agreement ceases to be in full force and effect (other than by reason of a release of DIP Collateral in satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Lender shall not have or shall cease to have a valid and perfected first priority DIP Liens, subject only to the Carve-Out, in any material portion of DIP Collateral purported to be covered by the DIP Credit Agreement or (B) the Debtors shall contest the validity or enforceability of the DIP Credit Agreement, other DIP Documents, or the Prepetition Loan Documents in writing or deny in writing that it has any liability under the DIP Credit Agreement, other DIP Documents, or the Prepetition Loan Documents;

(xii)     At any time after the execution and delivery thereof, the DIP Liens created by the DIP Credit Agreement shall not constitute a valid and perfected first priority lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein) in favor of the DIP Lender, free and clear of all other liens (other than the Carve-Out and liens permitted by the DIP Credit Agreement), or, except for expiration in accordance with its terms, the DIP Credit Agreement shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by the Debtors;

(xiii)     Any super-priority administrative expense claim or lien (other than the Carve-Out) that is *pari passu* with or senior to the DIP Superpriority Claims, Prepetition Superpriority Claims, DIP Liens, Adequate Protection Liens, Prepetition Liens, and/or claims of the DIP Lender in connection with the DIP Loans shall have arisen or been authorized or allowed;

(xiv)    Any judicial process, condemnation, or forfeiture proceedings is brought against any material item or portion of the DIP Collateral or any rights therein shall be subject to such judicial process, condemnation, or forfeiture proceedings and such judicial process, condemnation, or foreclosure proceeding is not stayed within five (5) business days, or any order is entered adversely affecting the DIP Lender's rights with respect to any material item or portion of the DIP Collateral;

(xv)    The filing of a motion, pleading, or proceeding by the Debtors which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the DIP Credit Agreement or any DIP Orders or a determination by a court with respect to a motion, pleading, or proceeding brought by another party which results in such a material impairment;

(xvi)    The Debtors seek entry of an order seeking confirmation of a Chapter 11 plan other than an Acceptable Plan;

(xvii)    The failure of the Debtors to comply with any of the Milestones (as defined below);

(xviii)  The Debtors make any payments of principal or interest or otherwise on account of any prepetition claims other than payments authorized by the Approved Budget and/or the Court in respect of "first day orders" or other orders entered upon pleadings in form and substance reasonably satisfactory to the DIP Lender;

(xix)    The Court shall enter an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to any creditor or party in interest (other than the DIP Lender) (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor, or (ii) to permit other actions that, in each

case, the DIP Lender may, in the DIP Lender's sole discretion, deem to have a Material Adverse Effect;

(xx)    Any Governmental Authority (as defined in the DIP Credit Agreement), by a final, nonappealable order, ruling or other action, shall prevent the Debtors from conducting any material part of the Debtors' business, to the extent such prevention could reasonably be expected to result in a Material Adverse Effect;

(xxi)    The loss, revocation, or termination of any license, permit, lease, or agreement necessary or material to the Debtors' business, or the cessation of any material part of the Debtors' business, to the extent such loss, revocation, or termination could reasonably be expected to result in a Material Adverse Effect;

(xxii)    Any judgments which are in the aggregate in excess of $25,000 as to any postpetition obligation shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there shall be rendered against the Debtors a nonmonetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a Material Adverse Effect;

(xxiii)    Resignation or termination of the Debtors' Chief Restructuring Officer ("CRO") if a replacement is not identified within five (5) business days of such resignation or termination and such replacement is not acceptable to the DIP Lender in its sole discretion;

(xxiv)    An application shall be filed by the Debtors for the approval of, or an order of the Court shall be entered granting, any liens in the Bankruptcy Cases that are *pari passu* with or senior to the DIP Liens or Prepetition Liens (other than the Carve-Out);

33769084.1

42

(xxv)   Any claims (as such word is defined in the Bankruptcy Code) senior to or *pari passu* with the DIP Lender's DIP Superpriority Claims, other than the Carve-Out and the Adequate Protection Obligations owed to the Prepetition Lender;

(xxvi)   Any claims (as such word is defined in the Bankruptcy Code) senior to or *pari passu* with the Prepetition Lender's Prepetition Superpriority Claims, other than the Carve-Out and the DIP Obligations owed to the DIP Lender;

(xxvii) An order shall be entered by the Court terminating any of the Debtors' exclusive periods for proposing a chapter 11 plan;

(xxviii)Dismissal or conversion of any of the Bankruptcy Cases;

(xxix)   Allowance of a claim under section 506(c) of the Bankruptcy Code;

(xxx)   An amendment or modification to, or revocation or termination of, the letter of credit issued for the benefit of any Debtor in connection with the Sales Plan;

(xxxi)   The Debtors pursue a sale that is not acceptable to the DIP Lender in the DIP Lender's sole discretion; or

(xxxii) The Debtors file or support any pleading seeking relief the granting of which would give rise to an Event of Default.

(b)      Upon the occurrence of an Event of Default, the DIP Lender may, but is not required to, exercise all rights and remedies provided for in the DIP Credit Agreement, this Interim Order, and the Final Order, and may declare (i) the termination, reduction, or restriction of (A) any further DIP Loan or Draw commitment to the Debtors and/or (B) the Debtors' use of Cash Collateral; (ii) all obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, and (iii) the termination of the commitments under the DIP Loan as to any future liability or obligation of the

DIP Lender, but without affecting any of the DIP Liens, the Adequate Protection Liens, or the liabilities or obligations of the Debtors; *provided that* upon the occurrence and during the continuance of an Event of Default, prior to the exercise of any enforcement or liquidation remedies by the DIP Lender, the DIP Lender shall be required to provide to the Notice Parties with five (5) calendar days' written notice (the "<u>Remedies Notice Period</u>"), which may be by email (the "<u>Enforcement Notice</u>").

(c)     Upon delivery of an Enforcement Notice, any Notice Party or other party in interest may request an expedited hearing, and each of the DIP Lender, the Prepetition Lender, the Debtors, and the Committee (if any), as applicable, consent to a hearing on an expedited basis; *provided* that if a request for such hearing is made prior to the end of the Remedies Notice Period, then the Remedies Notice Period shall be continued until the Court hears and rules with respect thereto.  During the Remedies Notice Period, (i) the DIP Lender may not exercise any rights or remedies to satisfy the DIP Obligations, including any rights and remedies against the DIP Collateral; (ii) the Prepetition Lender may not exercise any rights or remedies to satisfy the Prepetition Obligations and the Adequate Protection Obligations, including any rights or remedies against the Prepetition Collateral; and (iii) the Debtors shall continue to have the right to use the proceeds of the DIP Facility (the "<u>DIP Proceeds</u>") and the Cash Collateral solely to fund the Carve-Out and expenses critically necessary to preserve the value of the Debtors' businesses and the DIP Collateral and to pay employee-related expenses incurred through and including the expiration of the Remedies Notice Period, which expenses shall be incurred in accordance with the terms of this Interim Order and the Approved Budget.  At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary or otherwise fashioned an appropriate remedy, the Debtors' right to use the DIP Proceeds and the Cash Collateral shall immediately cease, unless

33769084.1

otherwise provided herein, and the Prepetition Lender and the DIP Lender shall have the rights set forth in paragraph I.18(b), without the necessity of seeking relief from the automatic stay.

(d)    Notwithstanding the foregoing, and irrespective of the Remedies Notice Period, but except solely as otherwise expressly provided with respect to the Carve-Out, the DIP Lender shall not be obligated to provide any DIP Loans, fund amounts into the Fee Escrow Accounts, or execute Draws at any time a Default (as defined in the DIP Credit Agreement) or Event of Default has occurred and is continuing or after the Maturity Date.

19.    <u>Milestones</u>.  The Debtors shall comply with the following deadlines ("<u>Milestones</u>"), unless otherwise waived by the DIP Lender in the DIP Lender's sole discretion:

(a)    the Court shall have entered the Interim Order, in a form and substance acceptable to the DIP Lender in the DIP Lender's sole discretion, no later than three (3) business days after the Petition Date;

(b)    within ten (10) calendar days after the Petition Date, the Debtors shall have filed with the Court a motion to retain the CRO and support personnel;

(c)    within ten (10) calendar days after the Petition Date, the Debtors shall have filed with the Court a motion to retain Agent to sell the Debtors' assets, upon terms acceptable to the DIP Lender in its sole discretion, to advise on and execute a sales plan detailing the proposed process for the orderly sale of the Debtors' assets ("<u>Sales Plan</u>");

(d)    within ten (10) calendar days after the Petition Date, the Debtors shall file with the Court a motion for entry of an order approving the procedures and process by which the Debtors will implement and execute on the Sales Plan, which order shall be acceptable to the DIP Lender in its sole discretion; and

33769084.1

(e)    the Court shall have entered the Final Order, in form and substance acceptable to the DIP Lender in the DIP Lender's sole discretion, no later than thirty (30) calendar days after the Petition Date.

20.    <u>Reporting Covenants</u>. The Debtors shall comply with the following reporting requirements:

(a)    delivery by the Debtors or their advisors to the DIP Lender of a confidential weekly report summarizing weekly sales and results of the implementation of the Sales Plan, including delivery of bank statements and other information available regarding the Designated Deposit Accounts;

(b)    within one (1) business day of receipt, the Debtors will provide to the DIP Lender or their advisors copies of all indications of interest, letters of intent, or draft purchase agreements received from any third-party;

(c)    the Debtors and their advisors will hold a weekly call with the DIP Lender and their advisors to provide an update on the implementation of the Sales Plan; and

(d)    weekly collateral (accounts receivable, inventory, and cash) reporting.

21.    <u>Joint and Several</u>.    The Debtors are jointly and severally liable for the DIP Obligations, the Adequate Protection Obligations, and all other obligations hereunder owed to the DIP Lender and Prepetition Lender.

22.    <u>No Waiver for Failure to Seek Relief</u>.  No failure or delay on the part of the DIP Lender to exercise any rights under the DIP Credit Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by DIP Lender of any right under the DIP Credit Agreement preclude any further exercise thereof, or the exercise of any other right.  Each and every right or remedy granted under the DIP Credit Agreement or any final order relating to the DIP Loan or

under any document delivered thereunder or in connection therewith or allowed to the DIP Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

23.    <u>Preservation of Rights Granted Under this Interim Order</u>.

(a)    Subject and subordinate in all cases to the Carve-Out, and other than as otherwise set forth in this Interim Order, neither the DIP Liens nor, subject to paragraph 27 of this Interim Order, the Adequate Protection Liens shall be made subject or subordinate to, or *pari passu* with, any lien or security interest granted in any of the Bankruptcy Cases or arising after the Petition Date, and neither the DIP Liens nor the Adequate Protection Liens shall be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code.

(b)    In the event that this Interim Order or any provision hereof is reversed or modified on appeal, the validity and priority of any liens or claims granted to the Prepetition Lender hereunder arising prior to the effective date of any such reversal or modification of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein, and the Prepetition Lender shall be entitled to the protections afforded in section 364(e) of the Bankruptcy Code.

(c)    Notwithstanding any order dismissing any of the Bankruptcy Cases under section 1112 of the Bankruptcy Code or otherwise entered at any time:  (i) the Carve-Out, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the Prepetition Superpriority Claims, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect, and shall maintain their relative priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full, in cash

(and such DIP Liens, DIP Superpriority Claims, Adequate Protection Liens, Prepetition Superpriority Claims, and other administrative claims granted pursuant to this Interim Order shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in this paragraph and otherwise in this Interim Order.

(d)     Notwithstanding anything to the contrary in this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, or the other DIP Documents, nothing in this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, or the other DIP Documents shall affect any right of the DIP Lender to object, in its sole discretion, to any sale of the Debtors' assets or any chapter 11 plan that does not pay the DIP Obligations in full, and all such rights are expressly preserved.

24.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>. The DIP Lender and Prepetition Lender have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based upon the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter reversed or modified on appeal, the DIP Lender and Prepetition Lender are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such reversal or modification on appeal shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

25.     <u>Expenses and Indemnification of the DIP Lender</u>.

(a)     On the Maturity Date (or such other date as agreed to by the Debtors and the DIP Lender), the Debtors are authorized and directed to pay, without further Court order, the reasonable and documented fees and expenses, whether incurred before or after the Petition Date, by professionals or consultants retained by the DIP Lender (as specifically set forth in the DIP Term Sheet, the DIP Credit Agreement, or herein), including, for the avoidance of doubt, the fees and expenses of the Lender's Professionals, incurred in connection with the Bankruptcy Cases (in any capacity) and the DIP Facility, including in connection with (i) the discussion, negotiation, preparation, execution, and delivery of any documents in connection with the DIP Loans, DIP Credit Agreement, and the DIP Orders, and (ii) the wind-down, sale, liquidation, reorganization or other disposition of any or all of the Debtors' assets (collectively, the "Lender's Professional Fees").  The Lender's Professionals shall not be required to file motions or applications with respect to the Lender's Professional Fees but shall comply with the notice requirements set forth in paragraph 14(c) of this Interim Order.

26.     Limitation on Use of DIP Facility Proceeds, DIP Collateral, and Cash Collateral. Subject to paragraph 27 hereof, none of the DIP Facility, the DIP Collateral, the Prepetition Collateral, or the proceeds thereof, including Cash Collateral, or the Carve-Out may be used: (a) to investigate, initiate, prosecute, join, or finance the initiation or prosecution of any claim, counterclaim, action, suit, arbitration, proceeding, application, motion, objection, defense, or other litigation of any type, including any Retained Actions solely to the extent any Retained Action falls within the scope of the actions described in this paragraph 26, (i) against the DIP Lender or the Prepetition Lender under the DIP Documents, this Interim Order, or the Prepetition Loan Documents, including, without limitation, for the payment of any services rendered by the Debtors' Professionals, the Special Committee's Professionals, or the Committee Professionals (if

any) in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense, or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration, or similar relief that would impair the ability of the DIP Lender or the Prepetition Lender to recover on the DIP Collateral or the Prepetition Collateral, or seeking affirmative relief against the DIP Lender or the Prepetition Lender related to the DIP Obligations or the Prepetition Obligations, (ii) seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the DIP Obligations, the DIP Superpriority Claims, or the DIP Liens in the DIP Collateral, the Adequate Protection Obligations, Adequate Protection Liens, the Prepetition Obligations, or the Prepetition Liens in the Prepetition Collateral, or (iii) for monetary, injunctive, or other affirmative relief against the DIP Lender or the Prepetition Lender, or their respective liens on, or security interests in, the DIP Collateral or the Prepetition Collateral, the Prepetition Superpriority Claims or the DIP Superpriority Claims, or the DIP Obligations, Prepetition Obligations, Adequate Protection Liens, or Adequate Protection Obligations, in each case that would impair the ability of the DIP Lender of Prepetition Lender to assert or enforce any lien, claim, right, or security interest, or to realize or recover on the DIP Obligations, the Prepetition Obligations, or the Adequate Protection Obligations to the extent permitted or provided hereunder; (b) for objecting to or challenging in any way, the legality, amount, validity, extent, priority, perfection, or enforceability of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of the Prepetition Lender related to the Prepetition Obligations or the Adequate Protection Obligations or by or on behalf of the DIP Lender related to the DIP Obligations; (c) for asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any Recovery Actions, to the extent such claims or causes of action are related to the DIP Obligations, the DIP Superpriority

Claims, the DIP Liens, the Prepetition Superpriority Claims, the Adequate Protection Obligations, the Adequate Protection Liens, the Prepetition Obligations, or the Prepetition Liens; and (d) for prosecuting an objection to, contesting in any manner or raising any defenses to, the legality, validity, extent, amount, perfection, priority, or enforceability of:  (i) any of the DIP Liens, the DIP Superpriority Claims, or any other rights or interests of the DIP Lender related to the DIP Obligations or the DIP Liens or (ii) through any Retained Actions or otherwise, any of the Prepetition Liens or any other rights or interests of the Prepetition Lender related to the Prepetition Obligations, the Prepetition Superpriority Claims, or the Adequate Protection Obligations; *provided* that the DIP Facility, the DIP Collateral, the Prepetition Collateral, including Cash Collateral, and the proceeds thereof used to fund the Carve-Out, may be used to pay the (y) allowed fees and expenses, in an amount no more than $25,000 (the "Investigation Budget"), incurred solely by the Committee (if any) to investigate, but not to prepare, initiate, litigate, prosecute, object to, or otherwise pursue a Challenge (as defined below), the claims, causes of action, adversary proceedings, or other litigation against the Prepetition Lender solely concerning the validity, priority, perfection, enforceability, or extent of the claims, liens, or interests (including the Prepetition Liens) held by or on behalf of the Prepetition Lender related to the Prepetition Obligations; and (z) fees and expenses, in an amount not to exceed the amount set forth in the Approved Budgets, incurred by the Special Committee of the Board of Directors of Borrower (the "Special Committee") (including the fees and expenses of the Special Committee's Professionals as set forth in the Approved Budgets) in connection with its investigation of any claims, including Retained Actions, relating to fraud allegations associated with the Borrower's prepetition operations.

33769084.1

27.     <u>Effect of Stipulations on Third Parties</u>.

(a)     The stipulations, admissions, waivers, and releases contained in paragraph F hereof shall be binding upon the Debtors (including their representatives) and any successors or assigns thereto upon entry of this Interim Order.   The stipulations, admissions, waivers, and releases contained in this Interim Order shall also be binding upon all other parties in interest, including or any statutory or non-statutory committees appointed or formed in the Bankruptcy Cases, including the Special Committee and the Committee (if any), or any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors (a "<u>Trustee</u>"), unless (i) such party with requisite standing has duly filed an appropriate pleading challenging the legality, amount, validity, perfection, priority, extent, or enforceability of the Prepetition Liens or the Prepetition Obligations, or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims, or causes of action, objections, contests, or defenses against the Prepetition Lender or any such parties' affiliates or representatives in connection with any matter related solely to the Prepetition Loan Documents, the Prepetition Collateral, the Prepetition Liens, or the Prepetition Obligations (each such proceeding or contested matter, a "<u>Challenge</u>") by no later than the date that is seventy-five (75) days from entry of the Interim Order, subject to further extension (A) by written agreement (which writing may be in the form of e-mail by counsel) of the Debtors and the Prepetition Lender, each in their sole discretion, or (B) by this Court for good cause shown pursuant to an application filed and served by a party in interest prior to the expiration of the Challenge Period (the "<u>Challenge Period</u>"); *provided*, in the event that, prior to the expiration of the Challenge Period, (1) the Bankruptcy Cases are converted to cases under chapter 7 of the Bankruptcy Code or (2) a chapter 11 trustee is appointed in the Bankruptcy Cases, then in each such case, the Challenge Period shall be extended for a period of thirty (30) calendar days solely

with respect to any Trustee, commencing on the occurrence of either of the events described in the foregoing clauses (1) and (2); and (ii) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such Challenge or claim in any such duly filed adversary proceeding or contested matter.  If no such adversary proceeding or contested matter is timely filed prior to the expiration of the Challenge Period, without further order of this Court: (i) the Prepetition Obligations shall constitute allowed claims, not subject to any Challenge (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law), for all purposes in the Bankruptcy Cases and any subsequent chapter 7 cases, if any; (ii) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, and of the priority specified in paragraph F hereof, not subject to setoff, subordination, defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (iii) the Prepetition Obligations, the Prepetition Liens on the Prepetition Collateral, and the Prepetition Lender shall not be subject to any other or further Challenge, and any party in interest shall be forever barred from seeking to exercise the rights of the Debtors' estates or taking any such action, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period).  If any adversary proceeding or contested matter is timely filed by a party that has standing as provided above and in accordance with applicable law prior to the expiration of the Challenge Period, (i) the stipulations and admissions contained in this Interim Order shall nonetheless remain

binding and preclusive on all other parties in interest, including any Trustee, except with respect to any party that timely files a Challenge and solely as to any stipulations or admissions that are specifically and expressly challenged in such adversary proceeding or contested matter; and (ii) any Challenge not brought in such adversary proceeding or contested matter shall be forever barred; *provided* that if and to the extent any Challenges to a particular stipulation or admission are withdrawn, denied, or overruled by a final non-appealable order, such stipulation shall also be binding on the Debtors' estates and all parties in interest.  For the avoidance of doubt, none of the DIP Collateral (including any proceeds thereof) shall be used to fund any professional fees or expenses of any party in connection with any Challenge (other than such fees and expenses of the Committee Professionals which, subject to entry of the Final Order (to the extent provided therein), shall not exceed the Investigation Budget) whether pursuant to this Interim Order or otherwise. Additionally, the Prepetition Lenders, the DIP Lenders, and, to the extent necessary, the Debtors, waive any right to contest the Committee's ability to obtain standing on grounds that the Committee cannot obtain standing as a matter of law because the applicable Debtor is a limited liability company and applicable non-bankruptcy law prohibits a party other than the Debtors from bringing claims on behalf of such an entity.

(b)    Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any Committee, standing or authority to pursue any claims or causes of action belonging to the Debtors or their estates, including, without limitation, any Challenge with respect to the Prepetition Loan Documents or the Prepetition Obligations, and all rights to object to such standing are expressly reserved.

28.    <u>Release</u>.  Effective upon entry of the Final Order, and subject to the rights of parties in interest, other than the Debtors, pursuant to paragraphs 26 and 27 of this Interim Order, each of

the Debtors, on their own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally, and irrevocably releases and forever discharges and acquits the DIP Lender, Prepetition Lender, and their respective affiliates, and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, and the respective successors and assigns thereof, solely in their capacities as such (collectively, the "Released Parties"), from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising prior to the Petition Date of any kind, nature, or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or in equity, upon contract, tort, or under any state or federal law or otherwise, to the extent arising out of or related to the DIP Facility, the DIP Obligations, the DIP Loans, the DIP Liens, the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, the DIP Superpriority Claims, the Prepetition Facility, the Prepetition Obligations, the Prepetition Liens, the Prepetition Superpriority Claims, and all other obligations owing and financial obligations made under such facilities and agreements, and the negotiation of any of the foregoing, in each case that the Debtors at any time had, now have, or may have, or that their successors or assigns hereafter can or may have, against any of the Released Parties for or by reason of any act, omission, matter, cause, or thing whatsoever arising at any time on or prior to the date of this Interim Order; *provided that* nothing herein shall relieve the Released Parties from fulfilling their obligations under the DIP

Term Sheet, the DIP Credit Agreement, the other DIP Documents, and this Interim Order; and *provided further* that notwithstanding anything to the contrary in this Interim Order or the Final Order (including this paragraph 28), none of the Debtors are releasing any Retained Actions against any party nor shall anything impair the rights of the Special Committee to pursue such Retained Actions*; provided, however*, to the extent a Retained Action falls within the scope of the actions described in paragraph 27, then such Retained Action is subject to the mechanics of a Challenge as provided for in paragraphs 26 and 27 of this Interim Order.

29.    <u>Turnover</u>.  Except as expressly permitted in this Interim Order, any "first day order," or the DIP Documents, and except with respect to the DIP Lender, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral (other than with respect to the Carve-Out or any preexisting perfected, valid, and not avoidable liens senior to the DIP Liens), receives any DIP Collateral or any proceeds of the DIP Collateral or receives any other payment or distribution with respect thereto from any other source prior to indefeasible payment in full in cash of all DIP Obligations, such person or entity shall be deemed to have received, and shall hold, any such DIP Collateral or any payment on account or proceeds thereof in trust for the benefit of the DIP Lender and, upon the indefeasible payment in full in cash of the DIP Obligations, such person or entity shall immediately turn over such collateral, proceeds, payment, or distribution to the DIP Lender for application in accordance with the applicable DIP Documents and this Interim Order, in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.  The DIP Lender is hereby authorized to make any such endorsements as agent for such person or entity, and such authorization is coupled with an interest and is irrevocable.

30.     <u>Priming Liens</u>.  The Prepetition Lender is authorized and directed to take all steps required to give full force and effect to the DIP Lender's Priming Liens granted pursuant to the terms of this Interim Order which may include, but not be limited to: (a) entering into and adhering to one or more intercreditor agreements (and any ancillary documents that are necessary or desirable in connection therewith) with the DIP Lender on terms sufficient to: (i) acknowledge or consent to, and otherwise give full force and effect in all jurisdictions (domestic and foreign) to, the priority of the Priming Liens provided for in this Interim Order over any other competing lien, security interest, or encumbrance of any kind or nature (including Prepetition Liens); and (ii) implement the turnover provisions provided for in this Interim Order or any other DIP Documents; and (b) facilitating in all respects the effective registration and priority of the DIP Liens in all relevant jurisdictions (including non-U.S. jurisdictions) on any and all DIP Collateral envisaged by and required under the DIP Term Sheet, DIP Credit Agreement, and the other DIP Documents (including this Interim Order).

31.     <u>Insurance</u>.  At all times the Debtors shall maintain casualty and loss insurance coverage for the Prepetition Collateral and the DIP Collateral on substantially the same basis as maintained prior to the Petition Date.  Upon entry of this Interim Order, the DIP Lender is, and will be deemed to be, without any further action or notice, named as an additional insureds and lender's loss payees on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

32.     <u>Loss or Damage to Collateral</u>.  The DIP Lender and Prepetition Lender shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral or Prepetition Collateral, as applicable, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in value thereof, or (d) any act or default of

any carrier, servicer, bailee, custodian, forwarding agency, or other person. All risks of loss, damage, or destruction of DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

33.    <u>No Requirement to Accept Title to Collateral</u>. Except as may be otherwise agreed in writing, the DIP Lender and Prepetition Lender shall not be obligated to accept title to any portion of the respective DIP Collateral or Prepetition Collateral in the payment of the indebtedness owed to such parties by the Debtors, in lieu of payment in cash or cash equivalents, nor shall the DIP Lender or Prepetition Lender be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the DIP Lender or Prepetition Lender.

34.    <u>Roll-Up of Certain Prepetition Obligations</u>.

(a)    Upon the entry of this Interim Order, the Roll-Up DIP Loan is approved.

(b)    The Roll-Up DIP Loan shall be, on a cashless basis, automatically "rolled-up" and substituted and deemed to constitute DIP Obligations (on a dollar-for-dollar basis) which shall be due and payable in accordance with the terms and conditions set forth in the DIP Credit Agreement as if originally funded on the date of the entry of the Interim Order, and from and after the entry of this Interim Order, the Prepetition Obligations shall be automatically and irrevocably reduced by the amount of the Roll-Up DIP Loan.

(c)    The cashless substitution and exchange of Prepetition Obligations by "rolling-up" such amounts into DIP Obligations shall be authorized as compensation for, in consideration for, as a necessary inducement for, and on account of the agreement of the DIP Lender to fund the DIP Loans and not as adequate protection for, or otherwise on account of, the Prepetition Obligations. Notwithstanding anything to the contrary herein or in the DIP Credit Agreement, the claims and liens in respect of the Roll-Up DIP Loan shall (i) to the same extent as

the DIP Loan, be subject and subordinate to the Carve-Out, (ii) be subject to the Challenge Period, and (c) not attach to or be payable from the proceeds of the Retained Actions.

35.    <u>No Obligation to Extend Credit</u>.  The DIP Lender shall have no obligation to make any loan or advance under the DIP Term Sheet, the DIP Credit Agreement, or the DIP Documents unless all of the applicable conditions precedent (as applicable) under the DIP Term Sheet, the DIP Credit Agreement, the DIP Documents, and this Interim Order have been satisfied in full or waived by the DIP Lender and in accordance with the terms of the DIP Term Sheet, the DIP Credit Agreement, this Interim Order, and the other applicable DIP Documents.

36.    <u>Restrictions on Transfer of DIP Collateral or Prepetition Collateral to Non-Debtor Affiliates</u>.  The Debtors shall not transfer or use any DIP Collateral or Prepetition Collateral, including Cash Collateral, to or for the benefit of any direct or indirect non-debtor affiliate or subsidiary of the Debtors, including Lugano Diamonds UK, Ltd, absent the express written consent of the DIP Lender or as set forth in the Approved Budget or otherwise engage in a liability management exercise to the detriment of the DIP Lender or Prepetition Lender.

37.    <u>No Waiver by Failure to Seek Relief</u>. The failure of the Debtors, DIP Lender, or Prepetition Lender to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

38.    <u>Binding Effect; Successors and Assigns</u>.  Subject to paragraph 27(a) of this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Bankruptcy Cases, including, without limitation, the DIP Lender, the Prepetition

Lender, the Committee (if appointed), and the Debtors and their respective successors and assigns (including any trustee hereinafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of the DIP Lender and the Prepetition Lender; *provided* neither the DIP Lender nor Prepetition Lender shall have any obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) or to extend any financing to any trustee or similar responsible person appointed for the estates of the Debtors.

39.    <u>Limitation of Liability</u>.  Solely in determining to make any loan under the DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents, permitting the use of Cash Collateral, or exercising any rights or remedies (excluding any actions taken after an exercise of remedies) as and when permitted pursuant to this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, or the Prepetition Loan Documents, the DIP Lender and Prepetition Lender shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or their respective business, nor shall they owe any fiduciary duty to any of the Debtors, their creditors, or estates, or constitute or be deemed to constitute a joint venture or partnership with any of the Debtors; *provided* that the Court may assess conduct referenced in the foregoing after it occurs and act accordingly.  Furthermore, nothing in this Interim Order, the DIP Term Sheet, the DIP Credit Agreement, the other DIP Documents, or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or to allow the imposition upon the DIP Lender or the Prepetition Lender of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section

101(2) of the Bankruptcy Code); *provided, however*, that nothing in this Interim Order shall prohibit the assertion of any Retained Actions against any party.

40.     <u>Amendment of the DIP Documents</u>.   The DIP Term Sheet, the DIP Credit Agreement, and the other DIP Documents may from time to time be amended, restated, waived, modified, or supplemented by the Debtors and the DIP Lender in accordance with the terms and conditions of this Interim Order and such DIP Documents, without further order of the Court, if the amendment, restatement, waiver, modification, or supplement does not (a) shorten the original stated maturity of the DIP Loans, (b) increase the aggregate commitments or the rate of interest payable thereunder, or (c) amend the Events of Default or covenants under the DIP Term Sheet, the DIP Credit Agreement, or the other DIP Documents to be materially more restrictive to the Debtors (taken as a whole) (such amendment, restatement, waiver, modification or supplement, an "<u>Approved Modification</u>"); *provided, that*, for the avoidance of doubt, other than as explicitly set forth herein, in the DIP Term Sheet, the DIP Credit Agreement, or another DIP Document, updates and supplements to the Approved Budget required to be delivered by the Debtors under the DIP Term Sheet, the DIP Credit Agreement, or this Interim Order shall not require further order of the Court.  Before or promptly after the effectiveness of any Approved Modification, the Debtors shall provide notice (which may be provided through email) to counsel to the Committee (if appointed), the U.S. Trustee, the DIP Lender, and the Prepetition Lender.  In the case of an amendment, restatement, waiver, supplement, or other modification of the DIP Term Sheet, the DIP Credit Agreement, or any other DIP Documents that is not an Approved Modification, the Debtors shall (a) provide notice (which may be provided through email) to counsel to the Committee (if appointed), the U.S. Trustee, the DIP Lender, and Prepetition Lender and (b) obtain approval of the Court.

41.  <u>Master Proofs of Claim</u>.  The DIP Lender and Prepetition Lender shall not be required to file proofs of claim in any of the Bankruptcy Cases or any successor cases for any claim allowed herein, and the entry of the Final Order shall be deemed to constitute a timely filed proof of claim with respect to the DIP Loans against each of the applicable Debtors in the Bankruptcy Cases.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Bankruptcy Cases or any successor cases to the contrary, the DIP Lender and/or Prepetition Lender are authorized and entitled, but not directed or required, to file jointly or separately (and amend and/or supplement, as the respective agents see fit) one master proof of claim on account of any and all of the respective claims arising under the DIP Facility or Prepetition Facility, as applicable (the "<u>Master Proof of Claim</u>").  For administrative convenience, any Master Proof of Claim authorized herein may be filed in the claims register in the case of Debtor Lugano Diamonds & Jewelry, Inc. with respect to all amounts asserted in such Master Proof of Claim, and such Master Proof of Claim shall be deemed to be filed and asserted by the applicable entity or entities against every Debtor asserted to be liable for the applicable claim.  For the avoidance of doubt, the provisions set forth in this paragraph and any Master Proof of Claim filed pursuant to the terms hereof are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party in interest or their respective successors in interest, including, without limitation, the numerosity requirements set forth in section 1126 of the Bankruptcy Code.  Neither the DIP Lender nor Prepetition Lender, as applicable, shall be required to attach any instruments, agreements, or other documents evidencing the obligations owing by each of the Debtors to the DIP Lender or Prepetition Lender, as applicable, which instruments, agreements, or other documents will be provided upon written request to counsel to the DIP Lender or Prepetition Lender, as applicable.  Any order entered by the Court in relation to the

establishment of a bar date for any claim (including any administrative claim) in any of the Bankruptcy Cases or any successor cases shall not apply to the DIP Lender or Prepetition Lender. For the avoidance of doubt, neither the DIP Lender nor Prepetition Lender will be required to file any request for allowance and/or payment of any administrative expenses authorized under this Interim Order.

42.     _Reservation of Rights_.  Nothing in this Interim Order shall be construed as consent to the allowance of any fees, expenses, reimbursement, or compensation sought by any Professional, and the DIP Lender and Prepetition Lender reserve the right to review and object to any fee statement, interim application, monthly application, or final application issued or filed by any Professional.  Notwithstanding anything to the contrary herein or in the DIP Documents, (a) in no event shall the DIP Lender be required to fund any amounts in excess of the DIP Loans, or be required to fund after the DIP Obligations have been repaid and the DIP Lender's commitments under the DIP Facility have been terminated, and (b) the payment of any Allowed Professional Fees pursuant to the Carve-Out shall not (i) reduce any Debtor's obligations owed to the DIP Lender or the Prepetition Lender (whether under this Interim Order or otherwise) or (ii) modify, alter, or otherwise affect any of the liens and security interests of such parties (whether granted under this Interim Order or otherwise) in the DIP Collateral or Prepetition Collateral.

43.     _Automatic Stay Modified_.  To the extent not otherwise provided, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code shall be modified pursuant to the Final Order as necessary for the relevant parties to effectuate all of the terms and provisions of the Final Order.  The automatic stay provisions of section 362 of the Bankruptcy Code or otherwise are vacated and modified to the extent necessary to permit the DIP Lender and Prepetition Lender to

exercise immediately upon an Event of Default, the Maturity Date as well as all rights and remedies under this Interim Order and the Final Order.

44.    <u>Cash Management Collections and Remittances</u>.  Pursuant to a "first day motion," the Debtors shall seek authority, and obtain relief from the Court related to, maintaining their existing, prepetition cash management system.  Any material changes from such prepetition cash management system must be acceptable to the DIP Lender in the DIP Lender's sole discretion. This Interim Order and the Final Order shall grant the DIP Lender the DIP Liens on the cash held in the Debtors' bank accounts to secure repayment of the DIP Loan.

45.    <u>Necessary Action</u>. The Debtors are authorized to take any and all such actions and to make, execute, and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

46.    <u>Right to Seek Additional Adequate Protection</u>. This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Lender to request additional forms of adequate protection at any time, subject to the consent of the DIP Lender and any party in interest's right to object thereto.  Nothing herein shall be deemed a finding by the Court or an acknowledgment by the Prepetition Lender that the Adequate Protection Obligations granted herein do in fact adequately protect the Prepetition Lender against any Diminution in Value.

47.    <u>Effectiveness</u>. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this

Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

48. <u>Interim Order Governs</u>. In the event of any inconsistency or conflict between the express terms or provisions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall govern.

49. <u>Bankruptcy Rules</u>. The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

50. <u>Final Hearing</u>. A final hearing on the Motion will be held on November __, 2025, at _:__ _.m., prevailing Eastern Time. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the final hearing) to the parties having been given notice of the Hearing, and to any other party that has filed a request for notices with this Court. Any objections or responses to entry of the Final Order shall be filed on or before _:__ _.m., prevailing Eastern Time, on November __, 2025; *provided* that the Final Hearing may be adjourned or otherwise postponed upon the Debtors' filing of a notice of such adjournment with the DIP Lender's prior written consent.

51. <u>Notice of Entry of Interim Order</u>. The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court, and to the Committee, if and after the same has been appointed.

52. <u>Retention of Jurisdiction</u>. The Court shall retain jurisdiction to resolve any and all disputes arising under or related to the DIP Obligations, the DIP Credit Agreement, the DIP Term Sheet, the other DIP Documents, and/or the provisions of this Interim Order, and to enforce all of

the conditions of the DIP Credit Agreement, the DIP Term Sheet, the other DIP Documents, and

this Interim Order.

## **EXHIBIT 1**

### **DIP Credit Agreement**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
CREDIT AGREEMENT
dated as of November [__], 2025

among

LUGANO DIAMONDS & JEWELRY INC.,
LUGANO BUYER, INC.,
LUGANO HOLDING, INC.,
K.L.D. JEWELRY, LLC,
LUGANO PRIVE, LLC,
jointly and severally, as Borrowers

and

COMPASS GROUP DIVERSIFIED HOLDINGS LLC,
as Lender

# TABLE OF CONTENTS

**Page**

SECTION 1.    DEFINITIONS; INTERPRETATION.................................................................... 2

    1.1    Definitions............................................................................................................. 2

    1.2    Interpretation...................................................................................................... 17

SECTION 2.    CREDIT FACILITIES....................................................................................... 17

    2.1    Advances.............................................................................................................. 17

    2.2    Loan Procedures.................................................................................................. 19

    2.3    [Reserved]............................................................................................................ 21

    2.4    Certain Conditions.............................................................................................. 21

    2.5    Loan Accounting................................................................................................. 21

    2.6    Interest................................................................................................................. 21

    2.7    [Reserved]............................................................................................................ 22

    2.8    [Reserved]............................................................................................................ 22

    2.9    Prepayment.......................................................................................................... 22

    2.10   Repayment........................................................................................................... 23

    2.11   Payment............................................................................................................... 23

    2.12   Lender Expenses.................................................................................................. 26

    2.13   Superpriority Nature of Obligations and Lender's DIP Liens............................ 26

    2.14   Prepetition Lender Protections............................................................................ 27

SECTION 3.    YIELD PROTECTION........................................................................................ 28

    3.1    Taxes.................................................................................................................... 28

    3.2    Increased Cost..................................................................................................... 29

    3.3    [Reserved]............................................................................................................ 30

    3.4    [Reserved]............................................................................................................ 30

    3.5    [Reserved]............................................................................................................ 30

    3.6    [Reserved]............................................................................................................ 30

    3.7    Conclusiveness of Statements; Survival............................................................. 30

SECTION 4.    CONDITIONS PRECEDENT.............................................................................. 30

    4.1    Initial Credit Extension....................................................................................... 30

-i-

# TABLE OF CONTENTS
(continued)

|  |  |  |
|---|---|---|
| 4.2 | All Credit Extensions. | 32 |
| SECTION 5. | REPRESENTATIONS AND WARRANTIES | 33 |
| 5.1 | Organization. | 33 |
| 5.2 | Authorization; No Conflict. | 33 |
| 5.3 | Validity; Binding Nature. | 33 |
| 5.4 | Financial Condition. | 33 |
| 5.5 | No Material Adverse Change. | 34 |
| 5.6 | Litigation. | 34 |
| 5.7 | Ownership of Properties; Liens. | 34 |
| 5.8 | Capitalization. | 34 |
| 5.9 | Pension Plans. | 34 |
| 5.10 | Investment Company Act. | 35 |
| 5.11 | Security Interest/Priority. | 35 |
| 5.12 | Margin Stock. | 35 |
| 5.13 | Taxes. | 35 |
| 5.14 | Use of Proceeds. | 35 |
| 5.15 | Environmental Matters. | 36 |
| 5.16 | Insurance. | 36 |
| 5.17 | [Reserved]. | 36 |
| 5.18 | Intellectual Property. | 36 |
| 5.19 | Restrictive Provisions. | 37 |
| 5.20 | Labor Matters. | 37 |
| 5.21 | No Default. | 37 |
| 5.22 | Compliance with Law. | 37 |
| 5.23 | Permits, etc. | 37 |
| 5.24 | Anti-Money Laundering Laws. | 38 |
| 5.25 | Anti-Corruption Laws. | 38 |
| 5.26 | Sanctions. | 38 |
| 5.27 | Bankruptcy Matters. | 38 |

**TABLE OF CONTENTS**
(continued)

**Page**

SECTION 6.    AFFIRMATIVE COVENANTS. ........................................................ 38

6.1    Information. ............................................................................................ 39

6.2    Books; Records; Inspections. ................................................................ 41

6.3    Maintenance of Property; Insurance. .................................................... 42

6.4    Compliance with Laws; Payment of Taxes and Liabilities. ................ 43

6.5    Maintenance of Existence. .................................................................... 43

6.6    Employee Benefit Plans. ....................................................................... 43

6.7    Environmental Matters. ......................................................................... 43

6.8    Obtaining of Permits, Etc. ..................................................................... 44

6.9    Collateral Access Agreements. ............................................................. 44

6.10    Blocked Accounts. ................................................................................ 44

6.11    Further Assurances; Post-Closing Items. ............................................. 45

6.12    Use of Proceeds. ................................................................................... 46

6.13    Milestones. ............................................................................................ 46

6.14    Bankruptcy Covenants. ......................................................................... 47

6.15    Chapter 11 Cases. ................................................................................. 47

6.16    Financial Advisor. ................................................................................. 47

6.17    Operation of Business. .......................................................................... 47

6.18    CRO. ...................................................................................................... 47

6.19    Cash Management. ................................................................................. 48

SECTION 7.    NEGATIVE COVENANTS. ......................................................... 48

7.1    Debt. ...................................................................................................... 48

7.2    Liens. ..................................................................................................... 48

7.3    Operating Leases. .................................................................................. 49

7.4    Restricted Payments. ............................................................................. 49

7.5    Mergers; Consolidations; Asset Sales. ................................................ 50

7.6    Modification of Organizational Documents. ........................................ 50

7.7    Use of Proceeds. ................................................................................... 50

7.8    Transactions with Affiliates. ................................................................ 50

7.9    Inconsistent Agreements. ...................................................................... 50

33769081.1

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 7.10 | Business Activities. | 51 |
| 7.11 | Investments. | 51 |
| 7.12 | Restriction of Amendments to Certain Documents. | 51 |
| 7.13 | Fiscal Year. | 51 |
| 7.14 | Financial Covenants. | 52 |
| 7.15 | Bank Accounts. | 52 |
| 7.16 | Subsidiaries. | 52 |
| 7.17 | Jurisdiction. | 52 |
| 7.18 | Bankruptcy Covenants. | 52 |
| 7.19 | Budget Variance Covenant. | 54 |
| 7.20 | CRO. | 54 |
| 7.21 | Additional Professionals. | 54 |
| SECTION 8. | EVENTS OF DEFAULT; REMEDIES. | 54 |
| 8.1 | Events of Default. | 54 |
| 8.2 | Remedies. | 57 |
| SECTION 9. | MISCELLANEOUS. | 58 |
| 9.1 | Waiver; Amendments. | 58 |
| 9.2 | Notices. | 59 |
| 9.3 | Computations. | 59 |
| 9.4 | Costs; Expenses. | 59 |
| 9.5 | Indemnification by Borrowers. | 59 |
| 9.6 | Marshaling; Payments Set Aside. | 60 |
| 9.7 | Nonliability of Lender. | 60 |
| 9.8 | Assignments; Participations. | 61 |
| 9.9 | Certain Pledges. | 62 |
| 9.10 | Confidentiality. | 62 |
| 9.11 | Captions. | 63 |
| 9.12 | Nature of Remedies. | 63 |
| 9.13 | Counterparts. | 63 |
| 9.14 | Severability. | 63 |

# TABLE OF CONTENTS
### (continued)

**Page**

9.15    Entire Agreement. ................................................................................................ 63

9.16    Successors; Assigns. ........................................................................................... 64

9.17    Governing Law. .................................................................................................. 64

9.18    Forum Selection; Consent to Jurisdiction. ......................................................... 64

9.19    Waiver of Jury Trial. ........................................................................................... 64

9.20    Joint and Several Liability. ................................................................................. 65

9.21    Modification of Automatic Stay. ........................................................................ 65

9.22    Stipulations. ........................................................................................................ 66

9.23    [Reserved]. .......................................................................................................... 66

9.24    Section 552(b). .................................................................................................... 66

9.25    No Waiver. ........................................................................................................... 66


EXHIBIT A FORM OF ASSIGNMENT AGREEMENT

EXHIBIT B FORM OF NOTE

EXHIBIT C FORM OF BORROWING NOTICE

EXHIBIT D FORM OF INITIAL BUDGET

# SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION
# CREDIT AGREEMENT

This Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of November [__], 2025 (as amended, restated or otherwise modified from time to time, this "<u>Agreement</u>"), is made and entered into by and among Lugano Diamonds & Jewelry Inc., a California corporation, Lugano Buyer, Inc., a Delaware corporation, Lugano Holding, Inc., a Delaware corporation, K.L.D. Jewelry, LLC, a Delaware limited liability company, Lugano Prive, LLC, a Delaware limited liability company (jointly and severally, the "<u>Borrowers</u>" and each a "<u>Borrower</u>"), as debtors and debtors-in-possession in the Chapter 11 Case (as defined below), and Compass Group Diversified Holdings LLC, a Delaware limited liability company (together with its successors and assigns, "<u>Lender</u>"), as lender.

WHEREAS, the Borrowers shall commence chapter 11 cases (the date of such filings, the "<u>Petition Date</u>") which shall be jointly administered (collectively, the "<u>Chapter 11 Cases</u>"), by filing voluntary petitions for relief under the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"); and the Borrowers shall continue to operate their business and manage their properties as debtors and debtors-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, pursuant to the Credit Agreement, dated as of September 3, 2021 (as has been amended, supplemented and modified prior to the date hereof, the "<u>Prepetition Credit Agreement</u>"), by among certain of the Borrowers, as borrowers (in such capacity, the "<u>Prepetition Borrowers</u>"), certain other of the Borrowers, including Holdings (as defined below), as guarantors (in such capacity, the "<u>Prepetition Guarantors</u>"), and Compass Group Diversified Holdings LLC, as lender (in such capacity, the "<u>Prepetition Lender</u>"), the Prepetition Lender made certain credit facilities and advances of credit available to certain of the Borrowers prior to the Petition Date on the terms and conditions set forth therein, which credit facilities and advances of credit and all other Prepetition Obligations thereunder are unconditionally guaranteed by the Prepetition Guarantors and secured by Liens on substantially all the assets of the Prepetition Borrowers and the Prepetition Guarantors;

WHEREAS, the Bankruptcy Court shall enter an interim order (the "<u>Interim DIP Order</u>" and the date the Bankruptcy Court enters such Interim DIP Order, the "<u>Interim DIP Order Date</u>"), which shall approve the Interim DIP Loans pursuant to the terms thereof;

WHEREAS, the Borrowers have requested that the Lender provide, and the Lender has agreed to provide, a replacement senior secured, superpriority, debtor-in-possession term loan facility available in multiple draws as set forth herein to the Borrowers in the maximum aggregate principal amount of $12,000,000 (which amount may be reduced in the sole discretion of the Lender (but in no event not less than the Interim DIP Loan Commitment plus the Roll-Up Loan) if the Lender is not afforded a senior priming lien on the assets of the Borrowers) (the "<u>DIP Facility</u>") as further set forth herein and in the DIP Orders, including, without limitation, to fund the costs of Chapter 11 Cases and other purposes set forth in <u>Section 6.12</u>;

WHEREAS, in order to secure the Borrowers' Obligations, each Borrower has granted to the Lender, subject to the Carve-Out, the Professional Fee Escrow and the Retained

Actions, a security interest in and a DIP Lien (as defined below) upon substantially all of the now existing and hereafter acquired personal property of each Borrower;

WHEREAS, the relative priority of the DIP Liens and security interests granted to secure the Obligations in relation to the DIP Liens and security interests securing certain other obligations will be set forth in the DIP Orders; and

WHEREAS, the Lender is willing to extend such credit, and with respect to the Loans made pursuant to the Interim DIP Order, has extended such credit to the Borrowers on the terms and subject to the conditions set forth herein and the DIP Orders, as applicable.

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

Section 1.    Definitions; Interpretation.

1.1    Definitions.

When used herein the following terms shall have the following meanings:

364(c)(2) Collateral has the meaning given to such term in Section 2.13.

Acceleration Event means the occurrence of any of the following: (i) an Event of Default under Section 8.1.3; (ii) an Event of Default under Section 8.1.1 and the termination of the Commitments; or (iii) any other Event of Default under Section 8.1 and the election by Lender to declare the Obligations to be due and payable.

Acceptable Plan means a chapter 11 plan, in form and substance acceptable to the Lender in its sole and absolute discretion.

Account has the meaning set forth in the UCC.

Account Debtor means any Person who is obligated to any Loan Party with respect to any Account, Chattel Paper or General Intangible.

Affiliate of any Person means (a) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person, (b) any officer or director of such Person and (c) with respect to Lender, any entity administered or managed by Lender or an Affiliate or investment advisor thereof which is engaged in making, purchasing, holding or otherwise investing in commercial loans.  A Person shall be deemed to be "controlled by" any other Person if such Person possesses, directly or indirectly, power to vote 10% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managers or power to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Unless expressly stated otherwise herein, Lender shall not be deemed an Affiliate of any Loan Party.

Agent Fee Escrow Account has the meaning given to such term in the Interim DIP Order.

2

Agreement has the meaning set forth in the Preamble.

Anti-Corruption Laws means any and all laws, ordinances, and regulations in any jurisdiction where any Borrower or any of its Subsidiaries is located or doing business from time to time concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act 2010 and other similar legislation in any other jurisdictions.

Anti-Terrorism Laws means any and all laws or regulations in effect from time to time in any jurisdiction where any Borrower or any of its Subsidiaries is located or doing business relating to anti-money laundering and terrorism, including, without limitation, Executive Order No. 13224 (effective September 24, 2001) and the USA Patriot Act (Pub. L. No. 107-56 (Oct. 12, 2001)).

Approved Budget means, initially, the Initial Budget, and subsequently, each budget that becomes an Approved Budget in accordance with Section 6.1.1.

Assignee has the meaning set forth in Section 9.8.1.

Assignment Agreement means an agreement substantially in the form of Exhibit A.

Attributable Indebtedness means, with respect to any Person on any date, (a) in respect of any Capital Lease, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease, and (c) in respect of any Securitization Transaction, the outstanding principal amount of such financing, after taking into account reserve accounts and making appropriate adjustments.

Authorized Officer means the CRO, the chief executive officer or the chief financial officer of a Borrower.

Avoidance Actions means any claims or causes of action of the Borrowers pursuant to Section 502(d), 544, 545, 547, 548, 549, 550, 551, or 553(b).

Bankruptcy Code means the United States Bankruptcy Code (11 U.S.C. 101 *et. seq.*), as amended, and any successor statute.

Bankruptcy Court has the meaning set forth in the recitals to this Agreement.

Blocked Account has the meaning set forth in Section 6.10.

Blocked Account Bank has the meaning set forth in Section 6.10.

Borrower and Borrowers have the meanings set forth in the Preamble.

Borrowing means any Interim DIP Loan or Final DIP Loan, as applicable.

Borrowing Notice means a notice in substantially the form of Exhibit D.

Business Day means any day other than any Saturday and Sunday on which commercial banks are open for commercial banking business in New York, New York.

Capital Lease means, with respect to any Person, any lease of (or other agreement conveying the right to use) any real or personal property by such Person that, (i) in conformity with GAAP, is accounted for as a capital lease on the balance sheet of such Person, or (ii) is a transaction of a type commonly known as a "synthetic lease" (i.e. a lease transaction that is treated as an operating lease for accounting purposes but with respect to which payments of rent are intended to be treated as payments of principal and interest on a loan for Federal income tax purposes), in each case, existing on the Closing Date.

Carve-Out means an amount equal to the sum of the following: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses up to $10,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in clause (iii) below); (iii) to the extent allowed by the Bankruptcy Court pursuant to a final, non-appealable order, all unpaid fees and expenses (including any restructuring, sale, finance, success, or other transaction fee of any investment bankers or financial advisors) incurred at any time by persons or firms retained by the Borrowers or the Special Committee pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals" and such fees the "Allowed Debtor Professional Fees") in amounts strictly limited to those contained in the Approved Budgets at any time before or on the first Business Day following delivery by the Lender of a Carve-Out Trigger Notice whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice; (iv) to the extent allowed by the Bankruptcy Court pursuant to a final, non-appealable order, all unpaid fees and expenses incurred at any time by persons or firms retained by the Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and such fees the "Allowed Committee Professional Fees" and together with the Allowed Debtor Professional Fees, the "Allowed Professional Fees") in amounts strictly limited to those contained in the Approved Budgets at any time before or on the first Business Day following delivery by the Lender of a Carve-Out Trigger Notice whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; (v) Allowed Debtor Professional Fees incurred after the first Business Day following delivery by the Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $100,000; (vi) Allowed Committee Professional Fees incurred after the first Business Day following delivery by Lender of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise in an aggregate amount of $25,000 (the amounts set forth in clauses (v) and (vi) being the "Post Carve-Out Trigger Notice Cap"); and (vi) to the extent the Sale Plan is approved by the Bankruptcy Court pursuant an interim order, all unpaid fees and expenses, due at any time to the Sales Agent under the Sale Plan, including the Agency Protections (as defined in the Sale Plan), whether incurred prior to or after delivery of a Carve-Out Trigger Notice (the "Agent Fees"); provided, however, nothing herein shall be construed to impair the ability of the Lender to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.

Carve-Out Trigger Date means the date on which a Carve-Out Trigger Notice is sent.

Carve-Out Trigger Notice means a written notice (which may be delivered by e-mail (or other electronic means)) by the Lender to the Borrowers and their counsel (with Borrowers to promptly provide a copy of such notice to the United States Trustee for the District of Delaware, and lead counsel to the Committee (the "Notice Parties")), which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

Cash Collateral means any and all of the Borrower's cash, including cash and other amounts on deposit or maintained in any account or accounts by the Borrowers and any amount generated by the collection of Accounts or other disposition of the prepetition assets, and the proceeds of any of the foregoing, whether existing on the Petition Date or thereafter.

Cash Management Order means the order of the Bankruptcy Court approving the use of the Borrowers' existing cash management system and establishment and maintenance of the Borrowers' deposit accounts, as such order may be amended, supplemented or modified from time to time, in each case, which shall be in form and substance acceptable to the Lender in its sole and absolute discretion.

Cash Taxes means the amount of cash income taxes paid (or due to be paid) by the Loan Parties (without duplication).

CEA means the Commodity Exchange Act (7 U.S.C. §1 et seq.), as amended from time to time, and any successor statute.

Challenge Period has the meaning given to such term in the Interim DIP Order.

Chapter 11 Cases has the meaning specified in the recitals to this Agreement.

Chattel Paper has the meaning set forth in the UCC.

Closing Date means November [__], 2025.

Code means the Internal Revenue Code of 1986.

Collateral means, collectively, the 364(c)(2) Collateral and Encumbered Collateral.

Collateral Access Agreement means an agreement in form and substance reasonably satisfactory to Lender pursuant to which a mortgagee or lessor of real property on which Collateral is stored or otherwise located, or a warehouseman, processor or other bailee of property owned by any Borrower or any other Loan Party, acknowledges the Liens of Lender and waives (or, if approved by Lender, subordinates) any Liens held by such Person on such property, and, in the case of any such agreement with a mortgagee or lessor, permits Lender reasonable access to and use of such real property during the continuance of an Event of Default to assemble, complete and sell any Collateral stored or otherwise located thereon.

Collateral Agreement means that certain Collateral Agreement, dated as of November [___], 2025, by each Borrower in favor of Lender, as amended, restated or otherwise modified from time to time.

Collateral Documents means, collectively, the Collateral Agreement, each Mortgage, each DIP Order, each Collateral Access Agreement, each financing statement and each other agreement or instrument pursuant to or in connection with which any Loan Party or any other Person grants a security interest in any Collateral to Lender in order to secure the Obligations, each as amended, restated or otherwise modified from time to time.

Commitment means the means the Interim DIP Loan Commitment or the Final DIP Loan Commitment, as applicable.

Committee means an official committee of unsecured creditors holding unsecured claims, if any, appointed in the Chapter 11 Cases pursuant to Section 1102(a) of the Bankruptcy Code.

Committee Fee Escrow Account has the meaning given to such term in the Interim DIP Order.

Committee Professionals has the meaning specified in the definition of "Carve-Out."

Contingent Obligation means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to or otherwise to invest in a debtor, or otherwise to assure a creditor against loss) any indebtedness, obligation or other liability of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the shares of any other Person. The amount of any Person's obligation in respect of any Contingent Obligation shall (subject to any limitation set forth therein) be deemed to be the principal amount of the debt, obligation or other liability supported thereby.

Controlled Group means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with any Borrower, are treated as a single employer under Section 414 of the Code or Section 4001 of ERISA.

CRO means the chief restructuring officer of Lugano Diamonds, acceptable to Lender in its sole discretion.

Debt of any Person means, without duplication, (a) all indebtedness of such Person, whether current or long-term, for borrowed money, whether or not evidenced by bonds, debentures, notes or similar instruments, (b) all purchase money indebtedness, (c) all obligations of such Person to pay the deferred purchase price of property or services (excluding trade accounts payable in the ordinary course of business and not outstanding for more than 90 days after the date such trade account payable was created or for more than 60 days after the due date thereof), including any obligations of any Loan Party to make earn out or other contingency payments

(including purchase price adjustments, non-competition and consulting agreements, or other indemnity obligations) pursuant to the documentation relating to such acquisition, (d) all Attributable Indebtedness, (e) all indebtedness (excluding prepaid interest thereon) secured by a Lien on the property of such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse, (f) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of such Person, (g) all Hedging Obligations of such Person, (h) all indebtedness of any partnership of which such Person is a general partner, (i) all Contingent Obligations of such Person, (j) all surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business, and (k) all indebtedness of the types referred to in clauses (a) through (j) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) of which such Person is a general partner or a joint venture, except to the extent that such indebtedness is expressly made non-recourse to such Person.

Debtor Fee Escrow Account has the meaning given to such term in the Interim DIP Order.

Debtor Professional has the meaning specified in the definition of "Carve-Out."

Default means any event that, if it continues uncured, will, with the lapse of time or the giving of notice or both, constitute an Event of Default.

Default Rate means, with respect to any Loan or other obligation hereunder, an interest rate equal to the Stated Interest Rate plus four percent (4.0%) per annum.

DIP Claims means the Lender's claims under the DIP Facility.

DIP Collateral means the Collateral.

DIP Facility has the meaning specified in the recitals to this Agreement.

DIP Liens has the meaning specified in Section 2.13(e).

DIP Loan Funding Date means the date on which any Loan is advanced hereunder.

DIP Order means the Interim DIP Order or the Final DIP Order, as applicable, or each of them as the context may require.

DIP Proceeds means the proceeds received by the Borrowers from the Loans.

DIP Superpriority Claims has the meaning specified in the then Interim DIP Order.

DIP Termination Date means the date that all Obligations will be due and payable in full in cash unless otherwise agreed to by the Lender on the earliest of (a) the Maturity Date, (b) the failure of the Final DIP Order to be entered within thirty (30) days after the filing of the Borrowers' motion for approval of the DIP Facility, unless otherwise agreed to in writing by the Lender in its sole discretion (c) the acceleration of the Loans and the termination of the

Commitments hereunder, (d) the termination of Lender's commitment to make Loans and the Borrowers' prepayment of all outstanding amounts, (e) date that is ten (10) days after the occurrence of the effective date of any Acceptable Plan, (f) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (g) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (h) the consummation of the sale of all or substantially all of any Borrower's assets, and (i) any Event of Default (hereunder or as defined in the DIP Orders), after giving effect to customary remedies afforded to the Borrowers in the applicable DIP Orders.

Disposition means, as to any asset or right of any Loan Party, (a) any sale, lease, assignment or other transfer (other than to a Borrower or any Wholly-Owned Subsidiary), (b) any loss, destruction or damage thereof or (c) any actual or threatened condemnation, confiscation, requisition, seizure or taking thereof, in each case excluding assets subject to a Disposition which are replaced within 180 days with assets performing the same or a similar function.

Document has the meaning given to the term "document" in the UCC.

Dollar and $ mean lawful money of the United States of America.

Domestic Subsidiary means any Subsidiary that is incorporated or organized under the laws of a State within the United States of America or the District of Columbia.  Unless the context otherwise requires, each reference to Domestic Subsidiary or Domestic Subsidiaries herein shall be a reference to Subsidiary or Subsidiaries of Borrower.

Eligible Institution means (a) any Person that (i) is organized for the purpose of making equity or debt investments in one or more other Persons and (ii) is an Affiliate of Lender or Manager, (b) any Person that invests in, or extends credit pursuant to, commercial loans in the ordinary course of business, or (c) any finance company, insurance company or other financial institution which temporarily warehouses Loans for Lender or any Person described in clauses (a) or (b) above.

Encumbered Collateral has the meaning given to such term in Section 2.13(d) of this Agreement.

Environmental Claims means all claims, however asserted, by any governmental, regulatory or judicial authority or other Person alleging potential liability or responsibility for violation of any Environmental Law, or for release or injury to the environment or any Person or property.

Environmental Laws means all present or future federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case relating to any matter arising out of or relating to health and safety, or pollution or protection of the environment or workplace, including any of the foregoing relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, discharge, release, control or cleanup of any Hazardous Material.

ERISA means the Employee Retirement Income Security Act of 1974, as amended.

Event of Default means any of the events described in Section 8.1.

Exchange Act means the Securities Exchange Act of 1934 and the regulations promulgated thereunder.

Excluded Cash means any cash, cash equivalents or funds held or to be used for the funding of the Professional Fee Escrow, the Carve-Out and any accounts for such Professional Fee Escrow and Carve-Out.

FATCA means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

Fee Escrow Account has the meaning given to such term in the Interim DIP Order.

Final DIP Closing Date means the date on which the Final DIP Order becomes effective.

Final DIP Loan Commitment means the commitment of the Lender to make Final DIP Loans. The aggregate amount of the Final DIP Loan Commitment shall be the lesser of (a) the aggregate amount of the DIP Facility (the amount of which may be reduced in the sole discretion of the Lender if the Lender is not afforded a senior priming lien on the assets of the Borrowers) in excess of the Interim DIP Loans and the Roll-Up Loan and (b) such amount as approved by the Bankruptcy Court for funding pursuant to the Final DIP Order.

Final DIP Loans means the term loans to be made from time to time on and after the Final DIP Closing Date and until the DIP Termination Date, in one or more drawings (but not to exceed more than one draw per week (unless the Lender consents to more frequent draws in its sole and absolute discretion)) in an aggregate principal amount not to exceed the Lender's Final DIP Loan Commitment.

Final DIP Order means an order entered by the Bankruptcy Court in the Chapter 11 Cases substantially in the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a final order and other modifications as are satisfactory in form and substance to the Lender).

Financial Advisor shall mean a qualified financial advisor or support staff provided by the firm providing the CRO, in each case acceptable to the Lender in its sole discretion.

Fiscal Quarter means a fiscal quarter of a Fiscal Year.

Fiscal Year means the fiscal year of each Loan Party, which period shall be (i) for each year other than the year that includes the Closing Date, the 12-month period ending on December 31 of such year, and (ii) for the year that includes the Closing Date, the period beginning on Closing Date and ending on December 31 of such year.

FRB means the Board of Governors of the Federal Reserve System or any successor thereto.

GAAP means generally accepted accounting principles in effect in the United States of America set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the U.S. accounting profession), which are applicable to the circumstances as of the date of determination.

Governmental Authority means any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

Hazardous Material means any hazardous wastes, or other wastes, chemical substances or mixtures, pesticides, pollutants, contaminants, toxic chemicals, petroleum products or byproducts, asbestos, polychlorinated biphenyls, or radiation regulated under, including any material, substance or waste defined as a "hazardous waste," "hazardous material," "hazardous substance," "toxic waste," "hazardous pollutant" or "toxic substance" in, the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended (42 U.S.C. Section 9601, et. seq.), the Occupational Health and Safety Act (29 U.S.C. Section 651, et. seq.), the Hazardous Materials Transportation Act, as amended (49 U.S.C. Section 1801, et. seq.), the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act, as amended (42 U.S.C. Section 6901, et. seq.), the Toxic Substances Control Act, as amended (15 U.S.C. Section 2601, et. seq.), the Federal Water Pollution Control Act, as amended by the Clean Water Act, 33 U.S.C. Section 1251 et seq.; the Clean Air Act (42 U.S.C. Section 7401 et seq.), the Atomic Energy Act (42 U.S.C. Section 2014, et seq.), and Energy Reorganization Act (42 U.S.C. Section 5801 et seq.), each and all as amended, and each state counterpart, or any other Environmental Laws, provided that the term "Hazardous Materials" shall not include any soil, cuttings, liquids, or other material accepted, processed, generated, handled, recycled, treated, placed, deposited and/or disposed as part of the ordinary course operations and business of the Loan Parties.

Hedging Obligation means, with respect to any Person, any liability of such Person under any interest rate, currency or commodity swap agreement, cap agreement or collar agreement, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, currency exchange rates or commodity prices.  The amount of any Person's obligation in respect of any Hedging Obligation shall be deemed to be the incremental obligation that would be reflected in the financial statements of such Person in accordance with GAAP.

Holdings means Lugano Holding, Inc., a Delaware corporation.

Initial Budget means a minimum 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning the week in which the Petition Date occurs, setting forth, among other things, the Borrowers' cash,

revenue, cash flow and net operating cash flow, trade payables, ordinary course expenses, total expenses, capital expenditures (if applicable), vendor disbursements, working capital, and fees and expenses of the DIP Facility and the Chapter 11 Cases (including categories for each professional of the Borrowers, Special Committee and Committee) during such minimum 13-week period that the Borrowers are authorized to use proceeds of the Loans. Such Initial Budget shall be in the form set forth in Exhibit D hereto. Until supplemented pursuant to Section 6.1.1 and approved by the Lender in accordance herewith, the Initial Budget shall constitute the Approved Budget.

Intellectual Property means all past, present and future: trade secrets, know-how and other proprietary information; trademarks, uniform resource locations (URLs), internet domain names, service marks, sound marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing) indicia and other source and/or business identifiers, and the goodwill of the business relating thereto and all registrations or applications for registrations which have heretofore been or may hereafter be issued thereon throughout the world; copyrights (including copyrights for computer programs) and copyright registrations or applications for registrations which have heretofore been or may hereafter be issued throughout the world and all tangible property embodying the copyrights, unpatented inventions (whether or not patentable); patent applications and patents; industrial design applications and registered industrial designs; license agreements related to any of the foregoing and income therefrom; books, records, writings, computer tapes or disks, flow diagrams, specification sheets, computer software, source codes, object codes, executable code, data, databases and other physical manifestations, embodiments or incorporations of any of the foregoing; the right to sue for all past, present and future infringements of any of the foregoing; all other intellectual property; and all common law and other rights throughout the world in and to all of the foregoing.

Intellectual Property Claim means the assertion, by any means, by any Person of a claim that any Loan Party's ownership, use, marketing, sale or distribution of any inventory, equipment, intellectual property or other property or asset is violative of any ownership of or right to use any intellectual property of such Person.

Interim DIP Loan Commitment means the commitment of the Lender to make Interim DIP Loans in the aggregate principal amount of $1,500,000, which, for the avoidance of doubt, does not include the Roll-Up Amount.

Interim DIP Loans means the term loans to be made from time to time on and after the Interim DIP Order Date and until the Closing Date, in one or more drawings (but not to exceed more than one draw per week (unless the Lender consents to more frequent draws in its sole and absolute discretion)) in an aggregate principal amount not to exceed the Lender's Interim DIP Loan Commitment.

Inventory means and includes as to each Loan Party all of such Loan Party's inventory (as defined in the UCC) and all of such Loan Party's goods, merchandise and other personal property, wherever located, to be furnished under any consignment arrangement, contract of service or held for sale or lease, all raw materials, work in process, finished goods and materials and supplies of any kind, nature or description which are or might be used or consumed in such

Loan Party's business or used in selling or furnishing such goods, merchandise and other personal property, and all Documents.

Investment means, with respect to any Person, (a) the purchase of any debt or equity security of any other Person, (b) the making of any loan or advance to any other Person, (c) becoming obligated with respect to a Contingent Obligation in respect of obligations of any other Person (other than travel and similar advances to employees in the ordinary course of business) or (d) the making of an acquisition.

Legal Costs means, with respect to any Person, (a) all reasonable fees and charges of any counsel (including counsel employed by such Person), accountants, auditors, appraisers, consultants and other professionals to such Person, and (b) all court costs and similar legal expenses.

Lender has the meaning set forth in the Preamble.

Lien means, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person which secures payment or performance of any obligation and shall include any mortgage, lien, pledge, encumbrance, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

Loan means the Interim DIP Loans, the Final DIP Loans and the Roll-Up Loan, as applicable.

Loan Documents means this Agreement, the Notes, the Collateral Documents and all documents, instruments and agreements delivered in connection with the foregoing, all as amended, restated or otherwise modified from time to time.

Loan Party means each of the Borrowers; collectively, the Loan Parties.

Lugano Diamonds means Lugano Diamonds & Jewelry Inc.

Management Agreement means the Management Agreement, dated as of September 3, 2021, by and between the Manager and Lugano Diamonds, as amended from time to time.

Manager means Compass Group Management LLC, a Delaware limited liability company.

Margin Stock means any "margin stock" as defined in Regulation T, U or X of the FRB.

Material Adverse Effect means a material adverse change in, or a material adverse effect upon, (a) the financial condition, operations, assets, business, properties or prospects of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its Obligations under any Loan Document, or (c) the rights and remedies of Lender under any Loan Document, the validity, perfection or priority of any Lien in favor of Lender on any substantial portion of the

Collateral under the Collateral Documents or upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document, in each case taken as a whole; provided, however, that the following events, changes, conditions or effects shall not be deemed to have a "Material Adverse Effect": (i) any event change, condition or effect occurring generally in the industry in which any Borrower or any of the Subsidiaries operates; (ii) changes in events, conditions or effects in connection with general economic or political conditions; (iii) any adverse change in the financial condition, operations, assets, business, properties or prospects of the Loan Parties taken as a whole that does not impact the long term economic prospects and performance of the Loan Parties taken as a whole; (iv) a failure to meet internal projections or forecasts, (v) the commencement of the Chapter 11 Cases; and (vi) the execution and implementation of the Sale Plan and any change, condition, or effect resulting therefrom.

Maturity Date means May 31, 2026, or such later date as may be agreed to in writing by the Lender in its sole discretion.

Milestone has the meaning specified in Section 6.13.

Mortgage means a mortgage, deed of trust, leasehold mortgage or similar instrument granting Lender a Lien on a real property interest of any Loan Party, each as amended, restated or otherwise modified from time to time.

Multiemployer Pension Plan means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, to which any Borrower or any member of the Controlled Group may have any liability.

Non-Senior Debt means any unsecured Debt of any Loan Party which has subordination terms, covenants, pricing and other terms which have been approved in writing by Lender.

Note means a promissory note substantially in the form of Exhibit C, as the same may be amended, restated or otherwise modified from time to time.

Obligations means all liabilities, indebtedness and obligations (whether monetary or otherwise and including post-petition interest, whether or not allowed) of any Loan Party under this Agreement, any other Loan Document, any Collateral Document or any other document or instrument executed in connection herewith or therewith and all Hedging Obligations permitted hereunder which are owed to Lender or its Affiliates, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, liquidated or unliquidated, disputed or undisputed, legal or equitable, secured or unsecured, now or hereafter existing, or due or to become due, and whether or not a claim for any of the foregoing is allowed in whole or in part in any proceeding under the Bankruptcy Code with respect to any Loan Party.

OFAC has the meaning specified in Section 6.4.

Operating Lease means, with respect to any Person, any lease of (or other agreement conveying the right to use) any real or personal property by such Person, as lessee, other than any Capital Lease.

Ordinary Course of Business means the ordinary course of business of Borrowers and their Subsidiaries as of the Petition Date, consistent with past practices and undertaken in good faith.

Paid in Full means, with respect to any Obligations, (a) the payment in full in cash and performance of all such Obligations, and (b) the termination of all Commitments relating to such Obligations.

PBGC means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

Petition Date has the meaning given to such term in the recitals to this Agreement.

Pension Plan means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA (other than a Multiemployer Pension Plan), and to which Borrowers or any member of the Controlled Group may have any liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

Permitted Variance has the meaning specified in Section 7.19.

Person means any natural person, corporation, partnership, trust, limited liability company, association, Governmental Authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

PIK Interest has the meaning specified in Section 2.6.

Post-Carve-Out Trigger Notice Cap has the meaning specified in the definition of "Carve-Out."

Prepetition Borrowers has the meaning to such term in the recitals to this Agreement.

Prepetition Collateral means, collectively, all of the Borrowers' property, wherever located, and the proceeds thereof subject to a security interest or first priority lien in favor of the Prepetition Lender or any Secured Party as security for all or any portion of the Prepetition Obligations.

Prepetition Credit Agreement has the meaning given to such term in the recitals to this Agreement.

Prepetition Guarantors has the meaning given to such term in the recitals to this Agreement.

Prepetition Lender has the meaning given to such term in the recitals to this Agreement.

Prepetition Loan Documents means the Prepetition Credit Agreement, the other "Loan Documents" as defined in the Prepetition Credit Agreement and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Petition Date.

Prepetition Obligations means the Obligations (as defined in the Prepetition Credit Agreement) outstanding under the Prepetition Loan Documents immediately prior to the Petition Date.

Professional Fee Escrow has the meaning given to such term in the Interim DIP Order.

Recipient means (a) the Lender or (b) or any other recipient of any payment to be made by or on account of any obligation of a Borrower, as applicable.

Related Parties means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, and representatives of such Person and of such Person's Affiliates.

Relevant Governmental Body means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

Reportable Event means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

Retained Actions means any claims or causes of action (whether at law, in equity, or otherwise) of the Borrowers for the benefit of their estates against (i) the Prepetition Lender solely in its capacities as shareholders, officers, directors, managers under the Management Agreement, or controlling persons of the Borrowers; and (ii) any corporate affiliate(s) of the Prepetition Lender to the extent such affiliate(s) were or acted as shareholders, officers, directors, managers under the Management Agreement, or controlling persons of the Borrowers.

Roll-Up Amount has the meaning given to such term in Section 2.1.3.

Roll-Up Loan has the meaning given to such term in Section 2.1.3.

Sale Plan has the meaning set forth in Section 4.1.2.

Sales Agent has the meaning set forth in Section 6.13(d).

SEC means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

Secured Party means the Lender and its successors and assigns.

Securities Laws means the Securities Act of 1933, the Exchange Act, Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards, and

practices promulgated, approved, or incorporated by the SEC or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

Securitization Transaction means, with respect to any Person, any financing transaction or series of financing transactions (including factoring arrangements) pursuant to which such Person or any Subsidiary of such Person may sell, convey or otherwise transfer, or grant a security interest in, accounts, payments, receivables, rights to future lease payments or residuals or similar rights to payment to a special purpose Subsidiary or other Affiliate of such Person.

Special Committee has the meaning given to such term in Section 6.12.

Stated Interest Rate has the meaning specified in Section 2.6.

Subsidiary means, with respect to any Person, a corporation, partnership, limited liability company or other entity of which such Person owns, directly or indirectly, such number of outstanding shares or other equity interests as to have more than 50% of the ordinary voting power for the election of directors or other managers of such corporation, partnership, limited liability company or other entity. Unless the context otherwise requires, each reference to Subsidiary or Subsidiaries herein shall be a reference to Subsidiary or Subsidiaries of any Borrower.

Synthetic Lease Obligation means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

Taxes has the meaning set forth in Section 3.1(a).

Transaction means, individually or collectively as the context may indicate, the Borrowers' entering into of the Loan Documents, and the Lender's funding of the DIP Facility.

UCC means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if, with respect to any financing statement or by reason of any mandatory provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Lender pursuant to any applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, the term "UCC" shall also include the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of this Agreement, each Loan Document and any financing statement relating to such perfection or effect of perfection or non-perfection.

Wholly-Owned Subsidiary means, as to any Person, another Person all of the equity interests of which (except directors' qualifying shares) are at the time directly or indirectly owned by such Person and/or another Wholly-Owned Subsidiary of such Person. Unless the context otherwise requires, each reference to Wholly-Owned Subsidiary or Wholly-Owned Subsidiaries

herein shall be a reference to Wholly-Owned Subsidiary or Wholly-Owned Subsidiaries of Borrower.

1.2    Interpretation.

In the case of this Agreement and each other Loan Document, (a) the meanings of defined terms are equally applicable to the singular and plural forms of the defined terms; (b) Annex, Exhibit, Schedule and Section references are to such Loan Document unless otherwise specified; (c) the term "including" is not limiting and means "including but not limited to"; (d) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including"; (e) unless otherwise expressly provided in such Loan Document, (i) references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent such amendments and other modifications are not prohibited by the terms of any Loan Document, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation; (f) this Agreement and the other Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters, all of which are cumulative and each shall be performed in accordance with its terms; (g) this Agreement and the other Loan Documents are the result of negotiations among and have been reviewed by counsel to Lender, Borrowers and the other parties thereto and are the products of all parties; accordingly, they shall not be construed against Lender merely because of Lender's involvement in their preparation; (h) the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or"; and (i) accounting terms relating to any Loan Party not defined in Section 1.1 and  accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP (provided that, notwithstanding anything to the contrary in this Agreement, all obligations of any Person that are or would have been treated as operating leases for purposes of GAAP prior to the effectiveness of ASC 842 shall continue to be accounted for as operating leases for all purposes hereunder or under any Loan Document (whether or not such operating lease obligations were in effect on such date) notwithstanding the fact that such obligations are required in accordance with ASC 842 (on a prospective or retroactive basis or otherwise) to be treated as capital leases).

Section 2.    Credit Facilities.

2.1    Advances.

On and subject to the terms and conditions of this Agreement and the DIP Orders, Lender agrees as follows:

2.1.1    Interim DIP Loan.

Subject to the terms and conditions of this Agreement and the Interim DIP Order, and pursuant to and solely in accordance with the Approved Budget, the Lender agrees, from time to time on and after the Closing Date and until the Final DIP Closing Date, to make Interim DIP Loans to and for the Borrowers' account as provided herein, in the aggregate amount of the

Lender's Interim DIP Loan Commitment (subject to any limitations contained within the Interim DIP Order). The Interim DIP Loan Commitment of the Lender shall be reduced by the amount of any Interim DIP Loans advanced hereunder and shall be terminated on the Final DIP Closing Date; provided that PIK Interest shall not reduce the Interim DIP Loan Commitment. Once repaid, no part of the Interim DIP Loan may be reborrowed.

2.1.2    Final DIP Loans.

Subject to the terms and conditions set forth herein, and pursuant to and solely in accordance with the Approved Budget, the Lender agrees, from time to time on and after the Final DIP Closing Date and until the DIP Termination Date, to make the Final DIP Loans to and for the Borrowers' account as provided herein, in the aggregate amount of the Lender's Final DIP Loan Commitment (subject to any limitations contained within the Final DIP Order). The Final DIP Loan Commitment of the Lender shall be reduced by the amount of any new loans advanced hereunder and shall be terminated on the DIP Termination Date; provided that PIK Interest shall not reduce the Final DIP Loan Commitment. Once repaid, no part of the Final DIP Loan may be reborrowed.

2.1.3    Roll-Up Loans.

(a)    Immediately upon entry of the Interim DIP Order, a portion of the outstanding Prepetition Obligations in an aggregate principal amount equal to $2,200,000 (the "Roll-Up Amount") held by the Lender shall be automatically "rolled up" and converted into the DIP Facility, on a cashless basis and substituted and deemed to constitute Obligations (on a dollar-for-dollar basis) of the Loan Parties hereunder for all purposes hereunder as if originally funded on the Interim DIP Order Date (the "Roll-Up Loans"), without further action by any party, including the Bankruptcy Court (which conversion shall not, for the avoidance of doubt, constitute a novation). From and after the Interim DIP Order Date, the Prepetition Obligations shall be automatically and irrevocably reduced by the Roll-Up Amount. For the avoidance of doubt, the aggregate principal amount of the Roll-Up Loans shall not reduce the Interim DIP Loan Commitment. For the further avoidance of doubt, the aggregate principal amount of the Roll-Up Loan shall reduce the Final DIP Loan Commitment on a dollar-for-dollar basis.

(b)    Subject to the terms and conditions set forth herein and in the DIP Orders, and without further action by any party to this Agreement, the Lender's Roll-Up Loans shall be deemed to be Loans, administered hereunder and secured by perfected Liens on, and security interests in, all of the Collateral of the Loan Parties to the same extent as the other Obligations of the Loan Parties hereunder. For the avoidance of doubt, until any Prepetition Obligations under the Prepetition Credit Agreement are deemed to be Roll-Up Loans as provided herein, such Prepetition Obligations shall remain Prepetition Obligations under the Prepetition Credit Agreement and guaranteed by the guarantors of and secured by and entitled to the benefits of all liens created and arising under the Prepetition Loan Documents, which liens shall remain in full force and effect on a continuous basis, unimpaired, uninterrupted and undischarged, and having the same perfected status and priority. The Roll-Up Loans and the other Loans shall jointly constitute a single facility hereunder.

(c)     The conversion (or "roll-up") shall be authorized as compensation for, in consideration for, as a necessary inducement for, and solely on account of, the agreement of the Prepetition Lender, as Lender hereunder, to fund the Loans hereunder and not as payments under, adequate protection for, or otherwise on account of, the Prepetition Obligations.  Notwithstanding any other provision of the Interim DIP Order, the Final DIP Order, or the Loan Documents, all rights of the Prepetition Lender shall be fully preserved, including with respect to the Roll-Up Loans.

Notwithstanding anything to the contrary herein, the claims and Liens in respect of the Roll-Up Loans shall (x) to the same extent as the DIP Loans, be subject and subordinate to the Carve-Out, (y) be subject to the Challenge Period, and (z) not attach to or be payable from the proceeds of the Retained Actions.

2.2     Loan Procedures.

2.2.1     Disbursement of Loans.

Pending use in accordance with the Approved Budget and subject to Section 4, all DIP Proceeds (including any intra-company transfers of such DIP Proceeds) shall be deposited into a Blocked Account (or in any case subject to the DIP Liens pursuant to the DIP Order) and invested at all times by the Borrowers in accordance with the Borrower's "first day" pleadings governing cash management. Any such DIP Proceeds may only be used by the Borrowers in accordance with the Approved Budget.

2.2.2     Fee Escrow Accounts.

(a)     Debtor Fee Escrow Account.

(i)     A Debtor Fee Escrow Account shall be established.

(ii)     On the first Friday following the Interim DIP Order Date and every Friday prior to the DIP Termination Date thereafter, the aggregate amount of the fees and disbursements allocated to Debtor Professionals retained or to be retained pursuant to sections 327, 328, or 363 of the Bankruptcy Code for the week immediately following the deposit date beginning on Monday, as set forth in the Approved Budget shall be requested by the Borrowers as a Borrowing pursuant to Section 2.2.3. and deposited in the Debtor Fee Escrow Account.

(b)     Committee Fee Escrow Account.

(i)     A Committee Fee Escrow Account shall be established.

(ii)     On the first Friday following the Interim DIP Order Date and every Friday prior to the DIP Termination Date thereafter, the aggregate amount of the fees and disbursements allocated to Committee Professionals retained or to be retained pursuant to sections 327, 328, or 1103 of the Bankruptcy Code for the week immediately following the deposit date beginning on Monday, as set forth in the Approved Budget shall be requested

by the Borrowers as a Borrowing pursuant to <u>Section 2.2.3.</u> and deposited in the Committee Fee Escrow Account.

(c)    <u>Agent Fee Escrow Account</u>.

(i)    An Agent Fee Escrow Account shall be established.

(ii)    On the first Friday following the Interim DIP Order Date and every Friday prior to the DIP Termination Date thereafter, the aggregate amount of the Consulting Fees (as defined in the Sale Plan) allocated to the Sales Agent for the week immediately following the deposit date beginning on Monday, as set forth in the Approved Budget shall be requested by the Borrowers as a Borrowing pursuant to <u>Section 2.2.3.</u> and deposited in the Agent Fee Escrow Account.

(d)    Neither the Debtor Fee Escrow Account, the Committee Fee Escrow Account, not the Agent Escrow Account shall be subject to any liens or claims of the Lender of the Prepetition Lender, including any liens or claims under any DIP Order, the Prepetition Loan Documents, or the Loan Documents, up to and including the Allowed Debtor Professional Fees, the Allowed Committee Professional Fees, and the amount of the Agent Fees contained in the Approved Budget, respectively; provided that the DIP Liens, the DIP Superpriority Claims and all other claims of the Lender under this Agreement, the DIP Orders or any other Loan Document shall attach to amounts in the applicable Fee Escrow Account that (x) exceed the amounts set forth in the Approved Budget, (y) after orders with respect to final fee applications become final and non-appealable, are otherwise not used to pay amounts owed to Debtor Professionals or Committee Professionals, as applicable, or (z) with respect to amounts in the Agent Fee Escrow Account, after the conclusion of the Final Reconciliation (as defined in the Sale Plan) are not used or necessary to pay amounts outstanding to the Sales Agent under the Sale Plan, in each case, pursuant to a final, non-appealable order in the Chapter 11 Cases.

(e)    (i) The Debtor Professional fees shall be paid from the Debtor Fee Escrow Account (ii) the Committee Professional fees shall be paid from the Committee Fee Escrow Account, and (iii) the Consulting Fees shall be paid from the Agent Fee Escrow Account, in each case, as provided for by an order of the Bankruptcy Court and, solely in the case of the Agent Fees, to the extent permitted under the Sale Plan.

(f)    Without further order from the Bankruptcy Court, any excess amounts remaining (i) in the Debtor Fee Escrow Account that (x) exceed the amounts set forth in the Approved Budget, or (y) after orders with respect to final fee applications become final and non-appealable, are otherwise not used to pay Allowed Debtor Professional Fees, (ii) in the Committee Fee Escrow Account that (x) exceed the amounts set forth in the Approved Budget, or (y) after orders with respect to final fee applications become final and non-appealable, are otherwise not used to pay Allowed Committee Professional Fees, or (iii) in the Agent Fee Escrow Account that (x) exceed the amounts set forth in the Approved Budget, or (y) after the conclusion of the Final Reconciliation (as defined in the Sale Plan) are not used or necessary to pay amounts outstanding to the Sales Agent under the Sale Plan, shall be returned to the Lender on the last Business Day of each applicable month.

2.2.3    <u>Borrowings</u>.

Unless waived by Lender in writing in its sole discretion, the Borrowers shall give written (including via email) notice or telephonic notice (followed immediately by written confirmation thereof) to Lender of each proposed Borrowing of a Loan not later than 11:00 a.m. New York City time at least two (2) Business Days prior to the proposed date of such Borrowing; provided that, prior to the entry of the Final DIP Order, such Borrowing Notice may be delivered on the date of such proposed Borrowing.  Each such notice shall be effective upon receipt by Lender, shall be irrevocable, shall be executed by an Authorized Officer of each Borrower and shall, in the form of a Borrowing Notice, (i) specify the date of Borrowing, (ii) specify the amount of Borrowing, (iii) specify the wiring instructions, (iv) certify that such Borrowing is consistent with the categories, amounts and timing set forth in the Approved Budget, and (v) certify that all conditions set forth in this <u>Section 2.2.3</u> and in <u>Section 4</u> are and will be satisfied as of the date of the request and the date of the Borrowing.  So long as such Borrower's request is timely made and the conditions precedent set forth in Section 4 with respect to such Borrowing have been satisfied, Lender shall pay over the proceeds of such borrowing request to Borrower on the requested borrowing date.  Each Borrowing shall be on a Business Day.  Each Borrowing shall be in strict accordance with the Approved Budget, unless the amounts available under the applicable Commitment are less than such amounts, in which case the Borrowing may be equal to the amounts available under such Commitments.

2.3    [Reserved].

2.4    <u>Certain Conditions</u>.

Notwithstanding any other provision of this Agreement, Lender shall not have an obligation to make any Loan if an Event of Default or Default exists.

2.5    <u>Loan Accounting</u>.

Lender shall record in its records the date and amount of each Loan made and each repayment thereof.  The aggregate unpaid principal amount so recorded shall be rebuttably presumptive evidence of the principal amount of the Loans owing and unpaid.  The failure to so record any such amount or any error in so recording any such amount shall not, however, limit or otherwise affect the Obligations of Borrowers hereunder or under any Note to repay the principal amount of the Loans hereunder, together with all interest accruing thereon.

2.6    <u>Interest</u>.

(a)    Subject to clause (b) below, each Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to eight percent (8%) (the "<u>Stated Interest Rate</u>").  Interest shall accrue monthly and shall be payable in kind by adding such interest to the outstanding principal amount under such Loan (the "<u>PIK Interest</u>").

(b)    If any amount payable by a Borrower under any Loan Document is not paid when due (after expiration of any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear interest at the Default Rate to the

fullest extent permitted by applicable Laws until such Borrower cures or otherwise remedies the events or omissions resulting in the application of the Default Rate.

(i)    If any other Event of Default exists, then the Lender may require (and notify Borrowers thereof) that all outstanding Obligations shall thereafter bear interest at a rate per annum at all times equal to the Default Rate.

(ii)    Accrued and unpaid interest on past due amounts shall be due and payable on demand.

(c)    So long as there is no Event of Default under this Agreement or the Final DIP Order, as may be modified or amended, interest will accrue at the Stated Interest Rate on amounts originated under the DIP Facility (including, for the avoidance of doubt, the Roll-Up Loan) and shall be paid upon the DIP Termination Date.

2.7    [Reserved].

2.8    [Reserved].

2.9    Prepayment.

2.9.1    Voluntary Prepayment.

Borrowers may, from time to time, on at least one (1) Business Day's written (including via email) notice or telephonic notice (if a telephonic notice, followed immediately by written confirmation thereof) to Lender not later than 3:00 p.m. New York City time on such day, prepay the Loans in whole or in part. Such notice to Lender shall specify the Loans to be prepaid and the date and amount of prepayment. Any such partial prepayment shall be in an amount equal to $100,000 or a higher integral multiple of $10,000. All prepayments of Loans pursuant to this Section 2.9.1 shall be applied pursuant to Section 2.9.3.

2.9.2    Mandatory Prepayment.

Borrowers shall prepay the Loans until Paid in Full at the following times and in the following amounts, in each case except as otherwise expressly provided in this Agreement:

(a)    on the date on which any and all sales of assets that are not Merchandise (as defined in the Sale Plan) occur, in an amount equal to such net proceeds; provided that such net proceeds shall be paid at closing of such sale directly to the Lender; provided further that all net proceeds paid pursuant to this clause (a) shall be applied in accordance with Section 2.11.2(b);

(b)    no later than three (3) Business Days following the date of receipt by any Borrower of any net proceeds from any insurance on any Collateral or condemnation, taking or other casualty of any Collateral, in an amount equal to such net proceeds; and

(c)    concurrently with receipt by any Borrower of any cash proceeds from any capital contribution to, or any issuance of equity securities (other than equity securities that are

issued pursuant to Section 7.11(a)) of any Borrower, or the issuance of Debt (other than Debt permitted by Section 7.1), in an amount equal to such cash proceeds.

Payment made pursuant to clause (a) above shall be made notwithstanding any Challenge (as defined in the Interim DIP Order); *provided, however,* that in the event any such Challenge is successful, the fact that such payment or payments were made to the Lender shall not prevent any return or disgorgement thereof.

2.9.3    All Prepayments.

(a)    Borrowers shall give written (including via email) notice (the "Prepayment Notice") to Lender not later than 3:00 p.m. New York City time at least one (1) Business Day prior to each mandatory prepayment pursuant to clause Section 2.9.2.  Such Prepayment Notice shall state the proposed date of prepayment, the amount of such prepayment, the clause of Section 2.9.2 pursuant to which such prepayment is made, and a reasonably detailed calculation of such amount.

(b)    Borrowers shall deliver, no later than the date on which such prepayment is made, a certificate of an Authorized Officer of each Borrower certifying the calculation of the cash proceeds or net proceeds, as applicable.

(c)    In the event that the Borrowers or Lender shall subsequently determine that the actual amount received by the Borrowers exceeded the amount set forth in such certificate delivered pursuant to clause (b) above, the Borrowers shall promptly make an additional prepayment of the Loans and shall, concurrently with such prepayment, deliver a certificate of an Authorized Officer of each Borrower demonstrating the derivation of such excess cash proceeds or net proceeds, as applicable.

2.10    Repayment.

The Borrowers shall repay to the Lender on the DIP Termination Date, an amount equal to the aggregate principal amount of all Loans, including PIK Interest, outstanding on such date.

2.11    Payment.

2.11.1    Making Payments.

All payments of principal of the Loans, and of all fees, shall be made to Lender without setoff, recoupment or counterclaim and in immediately available funds by wire transfer initiated by Borrowers by not later than 11:00 a.m. New York City time on the date due.  Any such wire of funds not received by Lender prior to 2:00 p.m. New York City time shall be deemed to have been received by Lender on the following Business Day.

2.11.2    Application of Payments and Proceeds.

(a)    Except as set forth in Section 2.9.2 and Section 2.9.3, and subject to the provisions of Sections 2.11.2(b), 2.11.2(c) and 2.11.2(d) below, each payment of principal shall be applied to such Loans as Borrowers shall direct by notice to be received by Lender on or before

the date of such payment or, in the absence of such notice, as Lender shall determine in its discretion.

(b)      If an Acceleration Event shall have occurred and be continuing, notwithstanding anything herein or in any other Loan Document to the contrary, Lender shall apply all or any part of payments in respect of the Obligations and proceeds of Collateral, in each case as received by Lender, to the payment of the Obligations in the following order:

(i)      FIRST, to the payment of all fees, costs, expenses and indemnities due and owing to Lender under this Agreement or any other Loan Document, and any other Obligations owing to Lender in respect of sums advanced by Lender to preserve or protect the Collateral or to preserve or protect its security interest in the Collateral (whether or not such Obligations are then due and owing to Lender), until Paid in Full;

(ii)      SECOND, to the payment of all interest that has accrued but has not yet been paid in kind;

(iii)      THIRD, to the payment of all principal of the Loans due and owing until Paid in Full;

(iv)      FOURTH, to the payment of all other Obligations owing to Lender until Paid in Full;

(v)      FIFTH, to the payment of all Prepetition Obligations owing to the Prepetition Lender; and

(vi)      SIXTH, the balance, if any, after all the Obligations and the Prepetition Obligations have been paid in full, to the Borrowers or as otherwise required by law.

(c)      If an Event of Default shall have occurred and be continuing but an Acceleration Event shall not exist, notwithstanding anything herein or in any other Loan Document to the contrary, Lender shall apply all or any part of payments in respect of the obligations and proceeds of Collateral, in each case as received by Lender, to the payment of the Obligations in such order as Lender may elect.  In the absence of a specific determination by Lender, payments in respect of the Obligations and proceeds of Collateral received by Lender shall be applied in the following order:

(i)      FIRST, to the payment of all fees, costs, expenses and indemnities due and owing to Lender under this Agreement or any other Loan Document, and any other Obligations owing to Lender in respect of sums advanced by Lender to preserve or protect the Collateral or to preserve or protect its security interest in the Collateral (whether or not such Obligations are then due and owing to Lender), until Paid in Full;

(ii)      SECOND, to the payment of all interest that has accrued but has not yet been paid in kind;

(iii)     THIRD, to the payment of all principal of the Loans due and owing until Paid in Full;

(iv)     FOURTH, to the payment of all other Obligations owing to Lender until Paid in Full;

(v)     FIFTH, to the payment of all Prepetition Obligations owing to the Prepetition Lender; and

(vi)     SIXTH, the balance, if any, after all the Obligations and the Prepetition Obligations have been paid in full, to the Borrowers or as otherwise required by law.

(d)     In the case of a mandatory prepayment made pursuant to Sections 2.9.2(a) and 2.9.2(d), Lender shall apply all or any part of payments in respect of the Obligations and proceeds of Collateral, in each case as received by Lender, to the payment of the Obligations in the following order:

(i)     FIRST, to the payment of all fees, costs, expenses and indemnities due and owing to Lender under this Agreement or any other Loan Document, and any other Obligations owing to Lender in respect of sums advanced by Lender to preserve or protect the Collateral or to preserve or protect its security interest in the Collateral (whether or not such Obligations are then due and owing to Lender), until Paid in Full;

(ii)     SECOND, to the payment of all interest that has accrued but has not yet been paid in kind;

(iii)     THIRD, to the payment of all principal of the Loans due and owing until Paid in Full;

(iv)     FOURTH, to the payment of all other Obligations owing to Lender until Paid in Full;

(v)     FIFTH, to the payment of all Prepetition Obligations owing to the Prepetition Lender; and

(vi)     SIXTH, the balance, if any, after all the Obligations and the Prepetition Obligations have been paid in full, to the Borrowers or as otherwise required by law.

2.11.3  Payment Dates.

If any payment of principal or interest with respect to any of the Loans, or of any fees, falls due on a day which is not a Business Day, then such due date shall be extended to the immediately following Business Day and, in the case of principal, additional interest shall accrue and be payable for the period of any such extension.

2.11.4  Set-off.

Borrowers agree that Lender and its Affiliates have all rights of set-off provided by applicable law, and in addition thereto, Borrowers agree that at any time an Event of Default has occurred and is continuing, Lender may apply to the payment of any Obligations hereunder, whether or not then due, any and all balances, credits, deposits, accounts or moneys of Borrowers then or thereafter with Lender.

2.12    Lender Expenses.

On the DIP Termination Date, the Borrowers are authorized and directed to pay, without further order of the Bankruptcy Court, the reasonable and documented fees and expenses, whether incurred before or after the Petition Date, by professionals, advisors, or consultants retained by the Lender (including all fees, costs, disbursements, and expenses of the Lender's counsel, Squire Patton Boggs (US) LLP and its Delaware Counsel Polsinelli PC) in connection with or associated with (i) the discussion, negotiation, preparation, execution, and delivery of any documents in connection with the Loan, this Agreement, and the DIP Orders, and (ii) the Lender's interests in Chapter 11 Cases (the "DIP Lender Expenses").  The Lender's professionals shall not be required to file motions or applications with respect to the DIP Lender Expenses but shall comply with the notice requirements set forth in the Interim DIP Order.

2.13    Superpriority Nature of Obligations and Lender's DIP Liens.

All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out; *provided, however,* that such superpriority claims shall not be payable from any proceeds of the Retained Actions. The DIP Claims will, at all times during the period that DIP Loans remain outstanding, remain, in right of payment, senior in priority to all other claims or administrative expenses, subject only to the Carve-Out, the Retained Actions and the proceeds therefrom.

(a)    The priority of the Secured Parties' DIP Liens on the DIP Collateral owned by the Borrowers shall be set forth in the DIP Orders.

(b)    All Obligations shall constitute DIP Superpriority Claims.

(c)    pursuant to Section 364(c)(2) of the Bankruptcy Code, the Lender shall have a first priority lien on and security interest in all of the Borrowers' property (exclusive of the Retained Actions and the proceeds thereof), wherever located and the proceeds thereof, that is not subject to a valid, perfected, and unavoidable lien in favor of third parties that was in existence immediately prior to the Petition Date, including, subject to entry of the Final DIP Order, the proceeds of any Avoidance Actions (the "364(c)(2) Collateral").

(d)    pursuant to Section 364(c)(3) of the Bankruptcy Code, the Lender shall have a junior lien on and security interest in in all of the Borrowers' property (exclusive of the Retained Actions and the proceeds thereof), wherever located and the proceeds thereof, that is subject to a

valid, perfected, and unavoidable lien in favor of third parties that were in existence immediately prior to the Petition Date (the "Encumbered Collateral").

(e)     pursuant to Section 364(d)(1) of the Bankruptcy Code, the Lender shall have a first priority, senior priming lien on and security interest in all Prepetition Collateral that is not 364(c)(2) Collateral or Encumbered Collateral (the Liens and security interests in clauses (c) through (e), inclusive, but excluding the Retained Actions and any proceeds thereof, are collectively referred to herein as the "DIP Liens").

(f)     Upon entry of the Interim DIP Order, the DIP Liens granted to the Lender on the DIP Collateral shall be valid and automatically perfected and with the priority as set forth in the DIP Orders.

(g)     Except as set forth herein or the DIP Orders, the Borrowers shall not seek approval of any other claim having a priority superior or pari passu to that granted to the Lender by the DIP Orders while any Obligations remain outstanding.

2.14     Prepetition Lender Protections.

Subject to the Carve-Out and excluding the Retained Actions and the proceeds thereof, due to the Lender's DIP Liens on the DIP Collateral, Prepetition Lender shall receive as adequate protection for its prepetition secured status pursuant to the Prepetition Loan Documents the following:

(a)     Rollover Liens:  As adequate protection for any diminution in the value of the prepetition Encumbered Collateral, including based upon the priming by the Lender other than with respect to any priming arising as a result of the Roll-Up Loans ("Diminution"), Prepetition Lender shall continue to have valid, binding, enforceable, and perfected additional and replacement mortgages, pledges, liens, and security interests in all DIP Collateral and the proceeds, rents, products, and profits therefrom, whether acquired or arising before or after the Petition Date, to the same extent, priority, and validity that existed as of the Petition Date (the "Rollover Liens"); provided, however, the Rollover Liens shall be subject to the DIP Liens and the Carve-Out; and *provided further* that the Rollover Liens shall not attach to the Retained Actions or any proceeds therefrom;

(b)     Supplemental Liens:  Subject to approval on a final basis, as additional adequate protection for any Diminution, Prepetition Lender shall have a valid, perfected, and enforceable continuing supplemental lien on, and security interest in, all of the assets of the Borrowers of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products, and profits therefrom, inclusive (subject to entry of the Final DIP Order) of the Avoidance Actions and any proceeds therefrom (the "Supplemental Liens"); provided, however, the Supplemental Liens shall be subject to the DIP Liens and the Carve-Out and liens on Encumbered Collateral, if any, in the same priority as existed prepetition; and *provided further* that the Supplemental Liens shall not attach to the Retained Actions or any proceeds thereof;

(c)     Prepetition Superpriority Claim:  As additional adequate protection for any Diminution, Prepetition Lender shall receive a superpriority expense claim allowed under section

507(b) of the Bankruptcy Code (the "Prepetition Superpriority Claim") payable from the proceeds of all assets of the Borrowers' estates. The Prepetition Superpriority Claim shall have priority over any and all other unpaid administrative expenses now existing or hereafter arising, of any kind whatsoever, of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Borrowers, any successor trustee, or any creditor in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy, or attachment; provided, however, the Prepetition Superpriority Claim shall be subject to the DIP Liens, DIP Superpriority Claims, and the Carve-Out; and *provided further* that the Prepetition Superpriority Claims shall not be payable from the Retained Actions or any proceeds therefrom;

(d)     Prepetition Lender's and Lender's Fees and Expenses: As additional adequate protection, the Borrowers shall reimburse the reasonable and documented fees and expenses (including attorney's fees) of the Prepetition Lender and Lender[1], payable on the DIP Termination Date; and

(e)     Financial Reports: The Borrowers shall provide Prepetition Lender with all reports, documents, and other materials, including financial reports, as may be required to be delivered to the Lender and such other and further access to the Borrowers' books and records, advisors, and professionals as may be reasonably requested by Prepetition Lender from time to time (collectively, "Prepetition Lender's Adequate Protection").

(f)     Intercompany Subordination.  All intercompany Liens of the Borrowers and their Affiliates, if any, shall be contractually subordinated to the DIP Facility and to the Prepetition Lender's Rollover Liens and the Supplemental Liens.

Section 3.     Yield Protection.

3.1     Taxes.

(a)     All payments of principal and interest on the Loans and all other amounts payable hereunder shall be made free and clear of and without deduction for any present or future income, excise, stamp, documentary, property or franchise taxes and other taxes, fees, duties, levies, withholdings or other charges of any nature whatsoever imposed by any taxing authority, excluding taxes imposed on or measured by Lender's net income by the jurisdiction under which Lender is organized or conducts business (all non-excluded items being called "Taxes").  If any withholding or deduction from any payment to be made by any Borrower hereunder is required in respect of any Taxes pursuant to any applicable law, rule or regulation, then such Borrower will: (i) pay directly to the relevant authority the full amount required to be so withheld or deducted; (ii) promptly forward to Lender an official receipt or other documentation satisfactory to Lender evidencing such payment to such authority; and (iii) pay to Lender such additional amount or amounts as is necessary to ensure that the net amount actually received by Lender will equal the full amount Lender would have received had no such withholding or deduction been required.  If

---

[1] TBD: Not normally available to undersecured creditors.  Also, Does this count against DIP availability and Permitted Variances?  CODI: no, it should not count

any Taxes are directly asserted against Lender with respect to any payment received by Lender hereunder, Lender may pay such Taxes and Borrowers will promptly pay such additional amounts (including any penalty, interest or expense) as is necessary in order that the net amount received by such Person after the payment of such Taxes (including any Taxes on such additional amount) shall equal the amount such Person would have received had such Taxes not been asserted so long as such amounts have accrued on or after the day which is 180 days prior to the date on which Lender first made demand therefor; provided, that if the event giving rise to such costs or reductions has retroactive effect, such 180 day period shall be extended to include the period of retroactive effect.

(b)    If any Borrower fails to pay any Taxes when due to the appropriate taxing authority or fails to remit to Lender the required receipts or other required documentary evidence, Borrowers shall indemnify Lender for any incremental Taxes, interest or penalties that may become payable by Lender as a result of any such failure.

(c)    Each Assignee that (i) is organized under the laws of a jurisdiction other than the United States of America and (ii) becomes an assignee of an interest under this Agreement under Section 9.8.1 after the Closing Date (unless such Person was already a Lender hereunder immediately prior to such assignment) shall execute and deliver to Borrowers and Lender one or more (as Borrowers or Lender may reasonably request) Forms W-8ECI, W-8BEN, W-8IMY (as applicable) or other applicable form, certificate or document prescribed by the United States Internal Revenue Service certifying as to such Person's entitlement to exemption from withholding or deduction of Taxes.  Borrowers shall not be required to pay additional amounts to Lender pursuant to this Section 3.1 to the extent that the obligation to pay such additional amounts would not have arisen but for the failure of such Person or Lender to comply with this paragraph.

3.2    Increased Cost.

(a)    If, after the Closing Date, the adoption of, or any change in, any applicable law, rule or regulation, or any change in the interpretation or administration of any applicable law, rule or regulation by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall impose on Lender any other condition affecting its Loans, its Note or its obligation to make Loans; and the result of anything described above is to increase the cost to (or to impose a cost on) Lender of making or maintaining any Loan, or to reduce the amount of any sum received or receivable by Lender under this Agreement or under its Note with respect thereto, then upon demand by Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail), Borrowers shall pay directly to Lender such additional amount as will compensate Lender for such increased cost or such reduction, so long as such amounts have accrued on or after the day which is 180 days prior to the date on which Lender first made demand therefor; provided, that if the event giving rise to such costs or reductions has retroactive effect, such 180 day period shall be extended to include the period of retroactive effect.

(b)    If Lender shall reasonably determine that any change in, or the adoption or phase-in of, any applicable law, rule or regulation regarding capital adequacy, or any change in

the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or the compliance by Lender or any Person controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Lender's or such controlling Person's capital as a consequence of Lender's obligations hereunder to a level below that which Lender or such controlling Person could have achieved but for such change, adoption, phase-in or compliance (taking into consideration Lender's or such controlling Person's policies with respect to capital adequacy) by an amount deemed by Lender or such controlling Person to be material, then from time to time, upon demand by Lender (which demand shall be accompanied by a statement setting forth the basis for such demand and a calculation of the amount thereof in reasonable detail), Borrowers shall pay to Lender such additional amount as will compensate Lender or such controlling Person for such reduction, so long as such amounts have accrued on or after the day which is 180 days prior to the date on which Lender first made demand therefor; provided, that if the event giving rise to such costs or reductions has retroactive effect, such 180 day period shall be extended to include the period of retroactive effect.

3.3     [Reserved].

3.4     [Reserved].

3.5     [Reserved].

3.6     [Reserved].

3.7     Conclusiveness of Statements; Survival.

Determinations and statements of Lender pursuant to this Section 3 shall be conclusive absent demonstrable error. Lender may use reasonable averaging and attribution methods in determining compensation under this Section 3 and the provisions of such Sections shall survive repayment of the Loans, cancellation of the Notes and termination of this Agreement.

Section 4.     Conditions Precedent.

The obligation of Lender to make the Loans is subject to the following conditions precedent:

4.1     Initial Credit Extension.

The obligation of Lender to make the initial Loans hereunder on or after the Closing Date is, in addition to the conditions precedent specified in Section 4.2, subject to the following conditions precedent, each of which shall be satisfactory in all respects to Lender:

4.1.1     Initial Budget.

The Lender shall have received the Initial Budget setting forth projected cash flows, together with detailed information as to projected disbursements and receipts, including all updates and supplements thereto, to be in form and substance reasonably acceptable to the Lender (upon

approval by the Lender of the Initial Budget, such Initial Budget shall become an Approved Budget).

      4.1.2   Sale Plan.

      The Lender shall have received a sale plan detailing the proposed process for the orderly sale of the Borrowers' assets (the "Sale Plan") in form and substance acceptable to the Lender in its sole discretion.

      4.1.3   Sales Agent.

      Borrowers shall have appointed the Sales Agent acceptable to and on terms and conditions acceptable to the Lender in its sole discretion.

      4.1.4   [Reserved].

      4.1.5   [Reserved].

      4.1.6   Chief Restructuring Officer.

      Borrowers shall have appointed the CRO acceptable to and on terms and conditions acceptable to the Lender in its sole discretion.

      4.1.7   Financial Advisor.

      Borrowers shall have engaged a Financial Advisor acceptable to the Lender in its sole discretion; *provided* that advisors retained by or to support the CRO may act in the stead of a retained Financial Advisor.

      4.1.8   Delivery of Loan Documents.

      Borrowers shall have delivered the following documents in form and substance satisfactory to Lender, each, as applicable, duly executed by each Borrower a party thereto and dated the Closing Date or an earlier date satisfactory to Lender:

      (a)   Agreement.  This Agreement.

      (b)   Note.  The Note.

      (c)   Interim DIP Order.  The Interim DIP Order.

      (d)   Collateral Documents.  The Collateral Agreement, all other Collateral Documents, and all instruments, documents, certificates and agreements executed or delivered pursuant thereto (including intellectual property assignments and pledged Collateral, with undated irrevocable transfer powers executed in blank).

      (d)   Authorization Documents.  For each Borrower, such Person's (i) charter (or similar formation document), (ii) bylaws (or similar governing document), (iii) resolutions of its board of directors (or similar governing body) approving and authorizing such Person's execution,

delivery and performance of the Loan Documents to which it is party and the transactions contemplated thereby, and (iv) signature and incumbency certificates of its officers executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification.

(f)  <u>Consents</u>.  Evidence that all necessary consents, permits and approvals (governmental or otherwise) required for the execution, delivery and performance by each Loan Party of the Loan Documents have been duly obtained and are in full force and effect.

(g)  <u>Other Documents</u>.  Such other certificates, legal opinions, documents and agreements as Lender may reasonably request.

4.2  <u>All Credit Extensions</u>.

The obligation of Lender to make each Loan is subject to the additional conditions precedent that (unless such conditions are waived by Lender), both before and after giving effect to any borrowing:

(a)  the representations and warranties of each Borrower set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects with the same effect as if then made (except to the extent stated to relate to a specific earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date);

(b)  no Event of Default or Default shall have then occurred and be continuing;

(c)  the Lender shall have received a Borrowing Request in accordance with the requirements hereof;

(d)  the Lender shall have received and approved the Approved Budget and Budget Variance Report, as applicable, required to be delivered pursuant to <u>Section 6.1.1</u>;

(e)  the Borrowers shall be in compliance with the Approved Budget (subject to any Permitted Variances) in all respects;

(f)  the Borrowers' cash balance of all accounts held by the Borrowers as of the date of any Borrowing Request, after giving effect to such Borrowing Request, shall not exceed the amount of cash required to fully fund the Approved Budget for the two-week period following such date of Borrowing;

(g)  the borrowing of such Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently; and

(h)  the Interim DIP Order, or, after the entry of the Final DIP Order, the Final DIP Order, shall be in full force and effect and shall not be the subject of any appeal, motion for reconsideration, stay, order of reversal, amendment or modification.

Each request by Borrowers for the making of a Loan shall be deemed to constitute a representation and warranty by Borrowers that the conditions precedent set forth in <u>Section 4.2</u> will be satisfied at the time of the making of such Loan.

Section 5.    <u>Representations and Warranties</u>.

To induce Lender to enter into this Agreement and to induce Lender to make Loans hereunder, each Borrower represents and warrants to Lender that:

5.1    <u>Organization</u>.

Each Borrower is a corporation or limited liability company, as applicable, validly existing and in good standing (or equivalent) under the laws of the jurisdiction of its organization; and each Borrower is duly qualified to do business in each jurisdiction where, because of the nature of its activities or properties, such qualification is required, except for such jurisdictions where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect.

5.2    <u>Authorization; No Conflict</u>.

Each Borrower is duly authorized to execute and deliver each Loan Document to which it is a party; each Borrower is duly authorized to borrow monies hereunder; and each Borrower is duly authorized to perform its Obligations under each Loan Document to which it is a party.  The execution, delivery and performance by Borrowers of this Agreement and by Borrowers of each Loan Document to which it is a party, and the borrowings by Borrowers hereunder, do not and will not (a) require any consent or approval of any Governmental Authority (other than any consent or approval which has been obtained and is in full force and effect), (b) conflict with (i) any provision of applicable law, (ii) the charter, by-laws certificate of formation, articles of organization, limited liability company agreement or other organizational documents of any Borrower or (iii) any agreement, indenture, instrument or other document, or any judgment, order or decree, which is binding upon any Borrower or any of their respective properties, or (c) require, or result in, the creation or imposition of any Lien on any asset of any Borrower (other than Liens in favor of Lender created pursuant to the Collateral Documents).

5.3    <u>Validity; Binding Nature</u>.

Each of this Agreement and each other Loan Document which any Borrower is a party is the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

5.4    <u>Financial Condition</u>.

The Approved Budget was prepared by Borrowers in good faith and was prepared in accordance with assumptions for which Borrowers have a reasonable basis.

5.5     No Material Adverse Change.

Since the Petition Date, no event has occurred that could reasonably be expected to result in a Material Adverse Effect.

5.6     Litigation.

No litigation (including derivative actions), arbitration proceeding or governmental investigation or proceeding is pending or, to any Borrower's knowledge, threatened against any Borrower, that, if adversely determined, could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect, except for such litigation as is stayed by the automatic stay provisions of section 362 of the Bankruptcy Code.  As of the Closing Date, other than any liability incident to such litigation or proceedings, no Borrower has any material Contingent Obligations.

5.7     Ownership of Properties; Liens.

Each Borrower owns good and, in the case of real property, marketable title to all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever (including patents, trademarks, trade names, service marks and copyrights), free and clear of all Liens, charges and claims (including infringement claims with respect to patents, trademarks, service marks, copyrights and the like), except as permitted by Section 7.2.

5.8     Capitalization.

All issued and outstanding equity securities of each Borrower are duly authorized and validly issued, fully paid, non-assessable, and, except for the equity securities of Lugano Holding, Inc., free and clear of all Liens other than those in favor of Lender, and such securities were issued in compliance with all applicable state and federal laws concerning the issuance of securities.  As of the Closing Date, no Borrower directly or indirectly owns any Subsidiaries except as set forth on Schedule 5.8, each of which Subsidiaries is a Wholly-Owned Subsidiary of such Borrower.

5.9     Pension Plans.

During the twenty-four consecutive month period prior to the Closing Date or the making of any Loan, (i) no steps have been taken to terminate any Pension Plan and (ii) no contribution failure has occurred with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA.  No condition exists or event or transaction has occurred with respect to any Pension Plan which could result in the incurrence by any Borrower of any material liability, fine or penalty.  All contributions (if any) have been made to any Multiemployer Pension Plan that are required to be made by such Borrower or any other member of the Controlled Group under the terms of the plan or of any collective bargaining agreement or by applicable law; neither Borrowers nor any member of the Controlled Group has withdrawn or partially withdrawn from any Multiemployer Pension Plan, incurred any withdrawal liability with respect to any such plan or received notice of any claim or demand for withdrawal liability or partial withdrawal liability from any such plan, and no condition has occurred which, if continued, could result in a withdrawal or partial withdrawal from any such plan, and neither Borrowers nor any member of the Controlled

Group has received any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of any excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent.

5.10    <u>Investment Company Act</u>.

No Borrower is an "investment company" within the meaning of the Investment Company Act of 1940.

5.11    <u>Security Interest/Priority</u>.

The Collateral Agreement creates a valid security interest in favor of the Lender, for the benefit of the holders of the Obligations, in the Collateral and, when properly perfected by filing, shall constitute a valid and perfected, first priority security interest in such Collateral (including all uncertificated equity interests pledged pursuant to the Collateral Agreement consisting of partnership or limited liability company interests that do not constitute securities), to the extent such security interest can be perfected by filing under the UCC, free and clear of all Liens except for Liens permitted under <u>Section 7.2</u>.  The taking possession by the Lender of the certificated securities (if any) evidencing the equity interests pledged pursuant to the Collateral Agreement and all other instruments constituting Collateral will perfect and establish the first priority of the Lender's security interest in all such equity interests evidenced by such certificated securities and such instruments.  With respect to any Collateral consisting of a deposit account, security entitlement or held in a securities account, upon execution and delivery by the Borrower and the Lender of an agreement granting control to the Lender over such Collateral, the Lender shall have a valid and perfected, first priority security interest in such Collateral.

5.12    <u>Margin Stock</u>.

No Borrower is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying Margin Stock.  No portion of the Obligations is secured directly or indirectly by Margin Stock.

5.13    <u>Taxes</u>.

Each Borrower has filed all tax returns and reports required by law to have been filed by it and has paid all taxes and governmental charges thereby shown to be owing, except any such taxes or charges which are being diligently contested in good faith by appropriate proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and for which adequate reserves in accordance with GAAP shall have been set aside on its books.

5.14    <u>Use of Proceeds</u>.

The Borrowers shall use the proceeds of the Loans in accordance with <u>Section 6.12</u>.

5.15    Environmental Matters.

Except as set forth in Schedule 5.15:

(a)    The on-going operations of each Borrower comply in all respects with all Environmental Laws, except such non-compliance which could not (if enforced in accordance therewith) reasonably be expected to result in a Material Adverse Effect.

(b)    Each Borrower has obtained, and maintained in good standing, all licenses, permits, authorizations and registrations required under any Environmental Law and necessary for their respective ordinary course operations, and Borrowers are in compliance with all material terms and conditions thereof, except where the failure to do so could not reasonably be expected to result in material liability to any Borrower and could not reasonably be expected to result in a Material Adverse Effect.

(c)    No Borrower or any of their respective properties or operations, is subject to any outstanding written order from or agreement with any Federal, state or local Governmental Authority, nor subject to any judicial or docketed administrative proceeding, respecting any Environmental Law, Environmental Claim or Hazardous Material.

(d)    There are no Hazardous Materials or other conditions or circumstances existing with respect to any property, or arising from operations prior to the Closing Date, of any Borrower that could reasonably be expected to result in a Material Adverse Effect.  No Borrower has any underground storage tanks that are not properly registered or permitted under applicable Environmental Laws or that are leaking or disposing of Hazardous Materials.

5.16    Insurance.

Each Borrower and their respective properties are insured with financially sound and reputable insurance companies which are not Affiliates of such Borrower, in such amounts and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where any of them operates.  A true and complete listing of such insurance as of the Closing Date, including issuers, coverages and deductibles, is set forth on Schedule 5.16.

5.17    [Reserved].

5.18    Intellectual Property.

Each Borrower owns and possesses or has a license or other right to use all patents, patent rights, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights and copyrights as are necessary for the conduct of business, without any infringement upon rights of others which could reasonably be expected to have a Material Adverse Effect.  No slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Borrower infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect.  To the knowledge

of each Borrower, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code is pending or proposed, which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

5.19    Restrictive Provisions.

No Borrower is a party to any agreement or contract or subject to any restriction contained in its operative documents which could reasonably be expected to have a Material Adverse Effect.

5.20    Labor Matters.

No Borrower is subject to any labor or collective bargaining agreement.  There are no existing or threatened strikes, lockouts or other labor disputes involving any Borrower that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payment made to employees of Borrowers are not in any material respect in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters.

5.21    No Default.

Except with respect to the Prepetition Loan Documents, no Event of Default or Default exists or would result from the incurrence by Borrowers of any Debt hereunder or under any other Loan Document.

5.22    Compliance with Law.

No Borrower is in violation of its organizational documents, any law, rule, regulation, judgment or order of any Governmental Authority applicable to it or any of its property or assets, or any term of any material agreement or instrument binding on or otherwise affecting it or any of its properties, which violation could reasonably be expected to have a Material Adverse Effect.

5.23    Permits, etc.

Each Borrower has, and is in compliance with, all material permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such material permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect.

5.24    Anti-Money Laundering Laws.

Each Borrower and, to the knowledge of such Borrower, each director, officer, employee, agent, affiliate or representative thereof, is in compliance with all Anti-Money Laundering Laws.

5.25    Anti-Corruption Laws.

Each Borrower and, to the knowledge of such Borrower, each director, officer, employee, agent, affiliate or representative thereof, is in compliance with all Anti-Corruption Laws.

5.26    Sanctions.

No Borrower nor, to the knowledge of such Borrower, each director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned pr controlled by any individual or entity that is (i) currently subject or target of any OFAC Sanctions Program or (ii) included in the OFAC SDN List.

5.27    Bankruptcy Matters.

(a) The Chapter 11 Cases were validly commenced on the Petition Date, (b) proper notice under the circumstances of the motion seeking approval of the Loan Documents and the entry of the DIP Order was given, (c) the Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent written consent by the Lender, which may be withheld in its sole discretion, and (d) subject to the entry of the DIP Orders and subject to the terms thereof, the joint and several Obligations of the Borrowers under this Agreement constitute superpriority claims and shall be allowed superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Borrowers now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in section 503(b) and 507(b) of the Bankruptcy Code and all superpriority administrative expense claims granted to any Person, subject only to the terms of the DIP Orders and the Carve-Out; *provided, however,* that such superpriority administrative expense claims shall not be payable from the proceeds of the Retained Actions.

Section 6.    Affirmative Covenants.

Until the expiration or termination of the Commitments and thereafter until all Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) are Paid in Full, Borrowers agree that, unless at any time Lender shall otherwise expressly consent in writing, that:

6.1     Information.

6.1.1     Approved Budget.

(a)     The Borrowers shall provide to the Lender: (i) following delivery of the Initial Budget, by not later than 5:00 p.m. Eastern Time on the third Business Day of the fourth full week following the Closing Date and by not later than 5:00 p.m. Eastern Time on the third Business Day of every fourth week thereafter, an updated Approved Budget (provided that, in the event that the Borrowers predict any Borrowing in an amount to exceed $250,000 more than any projected Borrowing in the most recent Approved Budget, such updated Approved Budget shall be delivered not later than 5:00 p.m. Eastern Time on the third Business Day of the third week after delivery of the then current Approved Budget), in each case, in form and substance reasonably satisfactory to the Lender for the subsequent 13 week period consistent with the form of the Initial Budget, and such updated Approved Budget shall become the "Approved Budget" for the purposes of the DIP Facility upon the Lender's acknowledgement that the proposed updated Approved Budget is substantially in the form of the Initial Budget and in substance satisfactory to the Lender (provided, that, until a new Approved Budget has been approved by the Lender, the most recently Approved Budget shall govern); and (ii) beginning on the Friday of the fourth full week following the Closing Date (by not later than 5:00 p.m. Eastern Time), and on the Friday of each week thereafter (by not later than 5:00 p.m. Eastern Time), a variance report (the "Budget Variance Report") for the immediately preceding four-week period (the "Variance Period") setting forth the difference between, on a line by line and aggregate basis, (a) actual operating disbursements, non-operating activities, and first day motion relief and budgeted operating disbursements, non-operating activities, and first day motion relief, (b) actual operating receipts and budgeted operating receipts, and (c) actual professional fees and budgeted professional fees.  Each such Budget Variance Report shall include explanations for all material variances and shall be certified by an Authorized Officer of the Borrowers. The Borrowers will promptly provide notice to the Lender of any matter or condition that could reasonably be expected to result in a Material Adverse Effect.

(b)     Other than to the extent otherwise permitted in the Loan Documents, the Interim DIP Order, the Final DIP Order, or any other applicable order of the Bankruptcy Court, no Borrower shall make or commit to make any payments other than those identified in the Approved Budget.

(c)     Each Borrower hereby acknowledges and agrees that any updated Approved Budget (each such updated Approved Budget, a "Budget Update") provided to the Lender shall not amend and supplement the applicable Approved Budget until the Lender delivers a notice (which may be delivered by electronic mail) to Lugano Diamonds stating that the Lender has approved of such Budget Update; provided that if the Lender does not deliver a notice of approval to Lugano Diamonds, then the existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the subject Budget Update is agreed to among the Borrowers and the Lender; provided that the Budget Update shall be deemed approved by the Lender if (a) the Borrowers provide notice to the Lender and provides the Lender the Budget Update at least five (5) Business Days prior to the end of the then applicable Approved Budget and (b) the Lender fails to approve or reject the Budget Update prior to the expiration of the then applicable Approved Budget. Once such Budget Update is so approved in writing by the Lender,

it shall supplement or replace the prior Approved Budget, and shall thereafter constitute the Approved Budget.

6.1.2   [Reserved].

6.1.3   Reports.

(a)   On the first Business Day of each week following the Closing Date, the Borrowers shall deliver a confidential weekly report summarizing weekly sales and results of implementation of the Sale Plan;

(b)   Within one (1) Business Day of receipt, the Borrowers shall deliver to Lender copies of all indications of interest, letters of intent, or draft purchase agreements received from a third-party bidder;

(c)   On the first Business Day of each week (or some other day of each week as agreed to by the Borrowers and the Lender), the Borrowers, Lender, Financial Advisor, and their respective advisors and counsel, as applicable, shall hold a teleconference call to provide an update on the implementation of the Sale Plan and related topics, which such meeting shall be accompanied by a report; and

(d)   On the first Business Day of each week following the closing date, the Borrowers shall deliver a report detailing the Collateral, consisting of an accounts receivable aging report, list of inventory and a balance sheet of all cash.

(e)   The Borrowers irrevocably authorize the CRO and the Financial Advisor to communicate directly with the Lender at any and all times to discuss or review any aspect of the business of the Borrowers and any other matter regarding the engagement between the Borrowers and the CRO and the Financial Advisor, respectively (except for privileged and confidential information), and to transmit any and all information relating to the Borrowers or this Agreement (except for privileged and confidential information).  For the avoidance of doubt, no authorization from or notice to the Bankruptcy Court, the Borrowers or any other Person shall be required.  For the further avoidance of doubt, such communications and discussions may include representatives of the Borrowers at the Borrowers' request.

6.1.4   [Reserved].

6.1.5   Notice of Default; Litigation; ERISA Matters.

Promptly upon becoming aware of any of the following, written notice describing the same and the steps being taken by any Borrower affected thereby with respect thereto:

(a)   the occurrence of an Event of Default or a Default;

(b)   any litigation, arbitration or governmental investigation or proceeding not previously disclosed by Borrowers to Lender which has been instituted or, to the knowledge of Borrowers, is threatened against any Borrower or to which any of the properties of any thereof is

subject which could reasonably be expected to have a Material Adverse Effect except for such litigation as is stayed by the automatic stay provisions of section 362 of the Bankruptcy Code;

(c)    the institution of any steps by any member of the Controlled Group or any other Person to terminate any Pension Plan, or the failure of any member of the Controlled Group to make a required contribution to any Pension Plan (if such failure is sufficient to give rise to a Lien under Section 302(f) of ERISA) or to any Multiemployer Pension Plan, or the taking of any action with respect to a Pension Plan which could result in the requirement that any Borrower furnish a bond or other security to the PBGC or such Pension Plan, or the occurrence of any event with respect to any Pension Plan or Multiemployer Pension Plan which could result in the incurrence by any member of the Controlled Group of any material liability, fine or penalty (including any claim or demand for withdrawal liability or partial withdrawal from any Multiemployer Pension Plan), or any material increase in the contingent liability of Borrowers with respect to any post-retirement welfare plan benefit, or any notice that any Multiemployer Pension Plan is in reorganization, that increased contributions may be required to avoid a reduction in plan benefits or the imposition of an excise tax, that any such plan is or has been funded at a rate less than that required under Section 412 of the Code, that any such plan is or may be terminated, or that any such plan is or may become insolvent;

(d)    any cancellation or material change in any insurance maintained by Borrowers or any Subsidiary; or

(e)    any other event (including (i) any violation of any Environmental Law or the assertion of any Environmental Claim or (ii) the enactment or effectiveness of any law, rule or regulation) which could reasonably be expected to have a Material Adverse Effect.

6.1.6    [Reserved].

6.1.7    [Reserved].

6.1.8    [Reserved].

6.1.9    Other Information.

Promptly from time to time, such other information concerning any Borrower as Lender may reasonably request.

6.2    Books; Records; Inspections.

Keep, and cause each other Loan Party to keep, its books and records in accordance with sound business practices sufficient to allow the preparation of financial statements in accordance with GAAP; permit, and cause each other Loan Party to permit, Lender or any representative thereof to inspect the properties and operations of any Borrower or such other Loan Party; and permit, and cause each other Loan Party to permit, at any reasonable time and with reasonable notice (or at any time without notice if an Event of Default exists), Lender or any representative thereof to visit any or all of its offices, to discuss its financial matters with its officers and its independent auditors (and each Borrower hereby authorizes such independent auditors to discuss such financial matters with Lender or any representative thereof), and to examine (and, at

the expense of such Borrower or the applicable Loan Party, photocopy extracts from) any of its books or other records; and permit, and cause each other Loan Party to permit, Lender and its representatives to inspect the Collateral and other tangible assets of such Borrower or such Loan Party, to perform appraisals of the assets of such Borrower or such Loan Party, Phase I Environmental Site Assessments (and if requested by Lender, Phase II Environmental Site Assessments) and to inspect, audit, check and make copies of and extracts from the books, records, computer data, computer programs, journals, orders, receipts, correspondence and other data relating to any Collateral.  All such inspections or audits by Lender shall be at Borrowers' expense.

6.3     Maintenance of Property; Insurance.

(a)     Keep, and cause each Subsidiary to keep, all property useful and necessary in the business of Borrowers and each Subsidiary in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of the Subsidiaries to comply, at all times with the material provisions of all leases to which it is a party as lessee or under which it occupies property, except as contemplated by the Sale Plan.

(b)     Except as contemplated by the Sale Plan. maintain, and cause each Subsidiary to maintain, with responsible insurance companies, such insurance coverage as shall be required by all laws, governmental regulations and court decrees and orders applicable to it and such other insurance, to such extent and against such hazards and liabilities, as is customarily maintained by companies similarly situated; provided that in any event, such insurance shall insure against all risks and liabilities of the type insured against as of the Closing Date and shall have insured amounts no less than, and deductibles no higher than, those amounts provided for as of the Closing Date.  Upon request of Lender, Borrowers shall furnish to Lender a certificate setting forth in reasonable detail the nature and extent of all insurance maintained by Borrowers and each Subsidiary.  Borrowers shall cause each issuer of an insurance policy to provide Lender with an endorsement (i) showing Lender as a loss payee with respect to each policy of property or casualty insurance and naming Lender as an additional insured with respect to each policy of liability insurance, (ii) providing that 30 days' notice will be given to Lender prior to any cancellation of, or reduction or change in coverage provided by or other material modification to such policy and (iii) reasonably acceptable in all other respects to Lender.  Borrowers shall execute and deliver to Lender a collateral assignment, in form and substance reasonably satisfactory to Lender, of each business interruption insurance policy maintained by Borrowers and any Subsidiary.

(c)     Unless Borrowers provide Lender with evidence of the continuing insurance coverage required by this Agreement, Lender may purchase insurance at Borrowers' expense to protect Lender's interests in the Collateral.  This insurance may, but need not, protect Borrowers' and each Subsidiary's interests.  The coverage that Lender purchases may, but need not, pay any claim that is made against Borrowers or any Subsidiary in connection with the Collateral.  Borrowers may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrowers have obtained the insurance coverage required by this Agreement.  If Lender purchases insurance for the Collateral, as set forth above, Borrowers will be responsible for the costs of that insurance, including interest and any other charges that may be imposed with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance and the costs of the insurance may be added to the principal amount of the Loans owing hereunder.

6.4     Compliance with Laws; Payment of Taxes and Liabilities.

(a)     Comply, and cause each Subsidiary to comply, in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits, except where failure to comply could not reasonably be expected to have a Material Adverse Effect; (b) without limiting clause (a) above, ensure, and cause each Subsidiary to ensure, that no person who owns a controlling interest in or otherwise controls a Loan Party is or shall be (i) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (ii) a person designated under Section 1(b), (c) or (d) or Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders; (c) without limiting clause (a) above, comply and cause each Subsidiary to comply, with all applicable Bank Secrecy Act and anti-money laundering laws and regulations and (d) pay, and cause each Subsidiary to pay, prior to delinquency, all taxes and other governmental charges against it or any of its property, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; provided that the foregoing shall not require Borrowers or any Subsidiary to pay any such tax or charge so long as it shall contest the validity thereof in good faith by appropriate proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP.

6.5     Maintenance of Existence.

Maintain and preserve, and (subject to Section 7.5) cause each Domestic Subsidiary to maintain and preserve, (a) its existence and good standing in the jurisdiction of its organization, (b) its qualification to do business and good standing in each jurisdiction where the nature of its business makes such qualification necessary, other than any such jurisdiction where the failure to be qualified or in good standing could not reasonably be expected to have a Material Adverse Effect, and (c) its registered address in its original jurisdiction of organization.

6.6     Employee Benefit Plans.

Maintain, and cause each Subsidiary to maintain, each Pension Plan in substantial compliance with all applicable requirements of law and regulations.

6.7     Environmental Matters.

If any release or disposal of Hazardous Materials shall occur or shall have occurred on any real property or any other assets of Borrowers or any Subsidiary, cause, or direct the applicable Subsidiary to cause, the prompt containment and removal of such Hazardous Materials and the remediation of such real property or other assets as is necessary to comply with all Environmental Laws and to preserve the value of such real property or other assets. Without limiting the generality of the foregoing, Borrowers shall, and shall cause each Subsidiary to, comply with each valid Federal or state judicial or administrative order requiring the performance at any real property by any Borrower or any Subsidiary of activities in response to the release or threatened release of a Hazardous Material and shall keep any property either owned or operated by it or any of the Subsidiaries free of any Liens which secure Environmental Claims.

6.8     Obtaining of Permits, Etc.

Obtain, maintain and preserve, and cause each of the Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary in the proper conduct of its business.

6.9     Collateral Access Agreements.

Promptly notify Lender any time any Collateral with a net book value in excess of $500,000 is located and remains on any single parcel of real property which is not owned or leased by any Borrower or any Subsidiary for more than thirty (30) consecutive days and, if requested by Lender, use commercially reasonable efforts to promptly obtain written subordinations or waivers, in form and substance reasonably satisfactory to Lender, of all present and future Liens to which the owner or lessor of such premises may be entitled to assert against the Collateral.

6.10    Blocked Accounts.

(a)     From and after the Closing Date and thereafter during the term of this Agreement, maintain blocked accounts (the "Blocked Accounts") with respect to all their principal accounts (including each such account identified on Schedule 7.15) with the financial institutions at which those accounts are maintained (each a "Blocked Account Bank"), and enter into a control agreement relating to the Blocked Accounts with Lender and the applicable Blocked Account Bank.

(b)     After the occurrence and during the continuance of an Event of Default, Lender may send a notice of assignment or notice of security interest to any and all of the Account Debtors and, thereafter, Lender shall have the sole right to collect the Accounts and Payment Intangibles (as those terms are defined in the UCC) of the applicable Loan Parties or take possession of the Collateral and the books and records relating thereto.  After the occurrence and during the continuance of an Event of Default, Borrowers and the Subsidiaries shall not, without prior written consent of Lender, grant any extension of time of payment of any Account or Payment Intangible, compromise or settle any Account or Payment Intangible for less than the full amount thereof, release, in whole or in part, any Person or property liable for the payment thereof, or allow any credit or discount whatsoever thereon.

(c)     Each Borrower hereby appoints Lender as attorney-in-fact with power exercisable during the continuance of an Event of Default to (i) endorse its name upon any notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Accounts or Payment Intangibles, (ii) sign its name on any invoice or bill of lading relating to any of its Accounts or Payment Intangibles, drafts against Account Debtors with respect to its Accounts or Payment Intangibles, assignments and verifications of Accounts or Payment Intangibles and notices to Account Debtors with respect to its Accounts or Payment Intangibles, (iii) send verification of its Accounts, and (iv) notify the U.S. Postal Service authorities to change the address for delivery of mail addressed to it to such address as Lender may designate and to do all other acts and things necessary to carry out this Agreement.  All acts of said attorney or designee are hereby ratified and approved, and said attorney or designee shall not be liable for any acts of

omission or commission (other than acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction), or for any error of judgment or mistake of fact or law; this power being coupled with an interest is irrevocable until all of the Obligations are Paid in Full and all of the Commitments are terminated.

(d)     Nothing herein contained shall be construed to constitute Lender as agent of any Borrower for any purpose whatsoever, and Lender shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof (other than from acts of omission or commission constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). Lender shall not, under any circumstance or in any event whatsoever, have any liability for any error or omission or delay of any kind occurring in the settlement, collection or payment of any of the Accounts of the Loan Parties or any instrument received in payment thereof or for any damage resulting therefrom (other than as a result of acts of omission or commission by Lender constituting gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction). Lender, by anything herein or in any assignment or otherwise, does not assume any of the obligations under any contract or agreement assigned to Lender and shall not be responsible in any way for the performance by any Loan Party of any of the terms and conditions thereof.

(e)     If any Account or Payment Intangible of any Loan Party includes a charge for any tax payable to any Governmental Authority, Lender is hereby authorized (but in no event obligated) in its discretion to pay the amount thereof to the proper taxing authority for such Borrowers' account and to charge Borrowers therefor. Borrowers shall notify Lender if any Account or Payment Intangible of any Loan Party includes any taxes due to any such Governmental Authority and, in the absence of such notice, Lender shall have the right to retain the full proceeds of such Account or Payment Intangible and shall not be liable for any taxes that may be due by reason of such Account or Payment Intangible.

6.11     Further Assurances; Post-Closing Items.

(a)     Take, and cause each other Loan Party to take, such actions as are necessary or as Lender may reasonably request from time to time to ensure that the Obligations of Borrowers and each other Loan Party under the Loan Documents are secured by substantially all of the assets of Borrowers and each other Loan Party (as well as all equity interests of each Loan Party), subject to such exclusions as contained herein and in the DIP Orders, and guaranteed by each Loan Party (including, promptly upon the acquisition or creation thereof, any Subsidiary acquired or created after the Closing Date), in each case including (i) the execution and delivery of additional Collateral Documents and other documents, and the filing or recording of any of the foregoing, and (ii) the delivery of certificated securities and other Collateral with respect to which perfection is obtained by possession.

(b)     Execute and/or deliver, and/or cause to be executed and/or delivered, as applicable, to the Lender each of the items, if any, listed on Schedule 6.11(b) attached hereto (collectively, the "Post-Closing Items") on or before the applicable due date listed for each such Post-Closing Item, each of which Post-Closing Items must be in form, substance and content reasonably satisfactory to the Lender.

6.12    Use of Proceeds.

Use the proceeds of the Loans solely in accordance with the Approved Budget (including Permitted Variances) and the terms and conditions of this Agreement and the DIP Orders, including (but subject to the Approved Budget) to (i) provide working capital and for other general working corporate purposes of the Borrowers, (ii) fund the Chapter 11 Cases, sales of the Borrowers' assets including the consummation of the Sale Plan, and the chapter 11 plan process, (iii) fund the costs of the administration of the Chapter 11 Case (including United States Trustee fees and professional fees and expenses subject in all respects to any limitations and procedures set forth in the DIP Orders), and (iv) fund the Carve-Out and the Fee Escrow Accounts, in each case of clauses (i) through (iv) above, in strict accordance with the Approved Budget or as otherwise approved by the Lender in writing in its sole and absolute discretion.  No portion of the proceeds of the Loans, Carve-Out, or Collateral may be used in connection with the investigation (including discovery proceedings), initiation or prosecution or any claims, causes of action, adversary proceedings or other litigation, including any Retained Actions solely to the extent any Retained Action falls within the scope of the actions described in paragraph 26 of the Interim DIP Order, against the Prepetition Lender or Lender; provided that, the Carve-Out, proceeds of the Collateral and Loans may be used for (i) allowed fees and expenses, in an amount not to exceed $25,000 in the aggregate, incurred solely by an official committee of unsecured creditors, if any appointed in the Chapter 11 Cases for such otherwise prohibited purposes within the Challenge Period (the "Investigation Budget") and (ii) fees and expenses, in an amount not to exceed the amount set forth in the Approved Budget, incurred by the special committee of the board of directors of Lugano Diamonds (the "Special Committee") in connection with its investigation of any claims relating to fraud allegations associated with the Borrowers' prepetition operations (the "Special Committee Budget").

6.13    Milestones.

Within the time periods set forth below (or such later times as the Lender may agree in its sole and absolute discretion), the Borrower shall perform each action with respect to the Chapter 11 Cases as set forth below (the "Milestones"):

(a)    the Chapter 11 Cases shall be filed on or before November [__], 2025;

(b)    the entry by Bankruptcy Court of the Interim DIP Order, in form and substance acceptable to the Lender in the Lender's sole and absolute discretion, no later than three (3) Business Days after the Petition Date;

(c)    within ten (10) calendar days after the Petition Date, the Borrowers shall have filed with the Bankruptcy Court a motion to retain the CRO and the Financial Advisor;

(d)    within ten (10) calendar days after the Petition Date, the Borrowers shall have filed with the Bankruptcy Court a motion to retain an agent or consultant to sell the Borrower's assets, acceptable to the Lender in its sole discretion (the "Sales Agent");

(e)    within ten (10) calendar days after the Petition Date, the Borrowers shall have filed with the Bankruptcy Court a motion for entry of an order approving the procedures and

process by which the Borrowers will implement and execute on the Sale Plan, which such order shall be acceptable to the Lender in its sole discretion; and

(f)    the entry by Bankruptcy Court of the Final DIP Order within thirty (30) calendar days after the Petition Date.

6.14    Bankruptcy Covenants.

Notwithstanding anything in the Loan Documents to the contrary, Borrowers shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders in all material respects.

6.15    Chapter 11 Cases.

(a)    The Borrowers shall deliver to the Lender and its counsel for review and comment, as soon as commercially reasonable, and to the extent practicable, not less than one (1) Business Day prior to filing (or as soon thereafter as is reasonably practicable under the circumstances), all pleadings, motions and other documents material to the Lender (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed by the Borrowers with the Bankruptcy Court.

(b)    The Borrowers shall deliver or cause to be delivered to the Lender, in accordance with the Acceptable Plan, as applicable, copies of any offers, term sheets, proposals, presentations, bids or other documents, from any party, related to (i) the restructuring of the Borrowers, or (ii) the sale of any material assets of one or more of the Borrowers.

(c)    Except to the extent permitted (or required) hereunder, under the DIP Orders, under the Approved Budget or as approved by an order of the Bankruptcy Court, no Borrower shall, without the express prior written consent of the Lender or pursuant to an order of the Bankruptcy Court after notice and a hearing, use the proceeds of the Loans to make any critical vendor payment with respect to any prepetition amount, unless such payments are approved by the Lender and an order of the Bankruptcy Court and permitted pursuant to any Approved Budget.

6.16    Financial Advisor.

The Borrowers shall have engaged and continued to engage the Financial Advisor.

6.17    Operation of Business.

The Borrowers shall conduct their business in accordance with the DIP Orders.

6.18    CRO.

The Borrowers shall have engaged and continued to employ the CRO, provided that such CRO may be replaced pursuant to Section 7.20.

6.19    <u>Cash Management</u>.

Subject to any order of the Bankruptcy Court and in accordance with the Cash Management Order, (a) the Borrowers shall maintain at all times their existing, prepetition cash management system unless agreed to in writing by the Lender in its sole discretion; and (b) at any time after the occurrence and during the continuance of an Event of Default, and other than with respect to the Carve-Out or the Fee Escrow Accounts, each Borrower shall cause all payments constituting proceeds of accounts to be directed into lockbox accounts under agreements in form and substance satisfactory to the Lender in its sole and absolute discretion.  The DIP Orders shall grant the Lender a Lien on and security interest in the cash held in Borrowers' bank accounts to secure repayment of the Obligations.

Section 7.    <u>Negative Covenants</u>.

Until the expiration or termination of the Commitments and thereafter until all Obligations (other than contingent indemnification obligations to the extent no claim giving rise thereto has been asserted) are Paid in Full, each Borrower agrees that, unless at any time Lender shall otherwise expressly consent in writing, it will:

7.1    <u>Debt</u>.

Not, and not permit any Subsidiary to, create, incur, assume or suffer to exist any Debt, except:

(a)    the Obligations;

(b)    Debt (exclusive of the Debt permitted pursuant to each other clause of this <u>Section 7.1</u>) described on <u>Schedule 7.1</u> as of the Closing Date; and

(c)    any Debt that would be a nonpriority unsecured claim in the Chapter 11 Cases.

7.2    <u>Liens</u>.

Not, and not permit any other Loan Party to, create or permit to exist any Lien on any of its real or personal properties, assets or rights of whatsoever nature (whether now owned or hereafter acquired), except:

(a)    Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and, in each case, for which it maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(b)    Liens arising in the ordinary course of business (such as (i) Liens of insurance premium financing companies (secured solely by such insurance policies), carriers, warehousemen, mechanics, landlords and materialmen and other similar Liens imposed by law and (ii) Liens incurred in connection with worker's compensation, unemployment compensation and other types of social security (excluding Liens arising under ERISA) or in connection with

surety bonds, bids, performance bonds and similar obligations) for sums not overdue or being diligently contested in good faith by appropriate proceedings and not involving any deposits or advances or borrowed money or the deferred purchase price of property or services and, in each case, for which it maintains adequate reserves in accordance with GAAP and the execution or other enforcement of which is effectively stayed;

(c)      Liens described on <u>Schedule 7.2</u> as of the Closing Date;

(d)      attachments, appeal bonds, judgments and other similar Liens, for sums not exceeding $100,000 arising in connection with court proceedings; provided that the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings;

(e)      easements, rights of way, restrictions, minor defects or irregularities in title and other similar Liens that do not (i) secure obligations for the payment of money or (ii) interfere in any material respect with the ordinary conduct of the business of any Borrower or any Subsidiary;

(f)      Liens arising under the Prepetition Loan Documents;

(g)      Liens arising under the Loan Documents; and

(h)      the replacement, extension or renewal of any Lien permitted by clause (c) above upon or in the same property subject thereto arising out of the extension, renewal or replacement of the Debt secured thereby (without increase in the amount thereof).

7.3      <u>Operating Leases</u>.

Not permit the aggregate amount of all rental payments under Operating Leases made (or scheduled to be made) by the Loan Parties (on a consolidated basis) to exceed $15,000,000 in any Fiscal Year.

7.4      <u>Restricted Payments</u>.

Not, and not permit any other Loan Party to, (a) make any dividend or other distribution to any of its equity holders, (b) purchase or redeem any of its equity interests or any warrants, options or other rights in respect thereof, (c) pay any management fees or similar fees to any of its equity holders or any Affiliate thereof, (d) make any redemption, prepayment (whether mandatory or optional), defeasance, repurchase or any other payment in respect of any Non-Senior Debt or (e) set aside funds for any of the foregoing.  Notwithstanding the foregoing, (i) any Subsidiary may pay dividends or make other distributions to a Borrower or to a domestic Wholly-Owned Subsidiary; (ii) in each case to the extent due and payable on a non-accelerated basis and permitted under any applicable subordination provisions thereof, Borrowers may make regularly scheduled payments of interest in respect of Non-Senior Debt; and (iii) any Loan Party may make repurchases of capital stock deemed to occur upon the exercise of options or warrants (i.e., a cashless exercise).

7.5    <u>Mergers; Consolidations; Asset Sales</u>.

(a)    Not, and not permit any other Loan Party to, be a party to any merger or consolidation, except for (i) any such merger or consolidation of any Subsidiary into a Borrower or any domestic Wholly-Owned Subsidiary, or (ii) any such merger or consolidation in connection with the Approved Plan.

(b)    Except as contemplated by the Sale Plan, not, and not permit any other Loan Party to, sell, transfer, dispose of, convey or lease any of its assets or equity interests, or sell or assign with or without recourse any receivables, except for sales and dispositions of assets (excluding any equity interests of a Borrower or any Subsidiary) for at least fair market value so long as the net book value of all assets sold or otherwise disposed of in any Fiscal Year does not exceed 10% of the net book value of the consolidated assets of Borrowers and the Subsidiaries as of the last day of the preceding Fiscal Year.

7.6    <u>Modification of Organizational Documents</u>.

Not permit the charter, by-laws or other organizational documents of any Borrower or any other Loan Party to be amended or modified in any way which could reasonably be expected to adversely affect the interests of Lender or the Prepetition Lender.

7.7    <u>Use of Proceeds</u>.

Use the proceeds of the Loans solely as set forth in <u>Section 6.12</u>; and not use or permit any proceeds of any Loan to be used, either directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any Margin Stock.

7.8    <u>Transactions with Affiliates</u>.

Not, and not permit any other Loan Party to, enter into, or cause, suffer or permit to exist any transaction, arrangement or contract with any of its other Affiliates, which is on terms which are less favorable than are obtainable from any Person which is not one of its Affiliates.

7.9    <u>Inconsistent Agreements</u>.

Not, and not permit any other Loan Party to, enter into any agreement containing any provision which would (a) be violated or breached by any borrowing by any Borrower hereunder or by the performance by such Borrower or any other Loan Party of any of its Obligations hereunder or under any other Loan Document, (b) prohibit any Borrower or any other Loan Party from granting to Lender a Lien on any of its assets or (c) create or permit to exist or become effective any encumbrance or restriction on the ability of any other Loan Party to (i) pay dividends or make other distributions to such Borrower or any other Subsidiary, or pay any Debt owed to any Borrower or any other Subsidiary, (ii) make loans or advances to any Borrower or any other Loan Party or (iii) transfer any of its assets or properties to any Borrower or any other Loan Party other than (A) customary restrictions and conditions contained in agreements relating to the sale of all or a substantial part of the capital stock or assets of any Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder (B) restrictions or conditions imposed by any agreement relating to

purchase money Debt, Capital Leases and other secured Debt permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Debt and (C) customary provisions in leases and other contracts restricting the assignment thereof.

7.10    Business Activities.

Not, and not permit any other Loan Party to, engage in any line of business other than the businesses engaged in on the Closing Date and businesses reasonably related thereto or acquire any properties or assets that are not reasonably related to the conduct of such business activities.  Not, and not permit any other Loan Party to, issue any equity interest other than (a) any issuance of shares of any Borrower's common equity securities pursuant to any employee or director option or stock purchase program, benefit plan or compensation program, or (b) any issuance by a Subsidiary to any Borrower or another Subsidiary in accordance with Section 7.4.

7.11    Investments.

Not, and not permit any other Loan Party to, make or permit to exist any Investment in any other Person or create or establish any Subsidiary (other than any Subsidiary formed in compliance with Section 7.16), except the following:

(a)    contributions by any Loan Party to any other Loan Party;

(b)    Investments constituting Debt permitted by permitted by Section 7.1;

(c)    Contingent Obligations constituting Debt permitted by Section 7.1 or Liens permitted by Section 7.2;

(e)    bank deposits in the ordinary course of business;

(f)    Investments in securities of Account Debtors received pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of such Account Debtors; and

(g)    Investments listed on Schedule 7.11 as of the Closing Date.

7.12    Restriction of Amendments to Certain Documents.

Not amend or otherwise modify, or waive any rights under (a) [reserved], (b) any provisions of any Non-Senior Debt or (c) the Management Agreement.

7.13    Fiscal Year.

Not change its Fiscal Year, other than, in the case of Borrower, to the 12-month period ending December 31 of each year.

7.14    <u>Financial Covenants</u>.

7.14.1  [<u>Reserved</u>].

7.15    <u>Bank Accounts</u>.

Not, and not permit any other Loan Party, to maintain or establish any new bank accounts other than the bank accounts set forth on <u>Schedule 7.15</u> without prior written notice to Lender and unless Lender, Borrower or such other Loan Party and the bank at which the account is to be opened enter into a tri-party agreement regarding such bank account pursuant to which such bank acknowledges the security interest and control of Lender in such bank account and agrees to limit its set-off rights on terms satisfactory to Lender and otherwise acceptable to Lender.

7.16    <u>Subsidiaries</u>.

Not, and not permit any other Loan Party, to establish or acquire any Subsidiary.

7.17    <u>Jurisdiction</u>.

Not, and not permit any other Loan Party, to change its original jurisdiction of organization or incorporation, as applicable.

7.18    <u>Bankruptcy Covenants</u>.

(a)     Not assert, file, seek, or consent, support, acquiesce to, or fail to timely oppose the filing of or joinder in, or use any portion of the proceeds of the Loans, Obligations, Collateral, the Carve-Out or cash collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which his to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief):

(i)     avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under section 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, the Obligations or the Liens, or reversing, modifying, amending, staying or vacating the DIP Order, without the prior written consent of the Lender, which consent may be withheld in its sole discretion;

(ii)    granting priority for any administrative expense, secured claim or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, section 105, 326, 327, 328, 330, 331, 503(b), 506(c) (subject to the entry of the Final DIP Order), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Obligations, except as provided under the Carve-Out or to the extent expressly permitted under the DIP Orders or <u>Section 7.2</u> hereof;

(iii)    granting or imposing, under section 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such section or any Lien equal or superior to the priority of the DIP Lien except to the extent expressly permitted under the DIP Orders;

(iv)    permitting the use of cash collateral as defined in section 363 of the Bankruptcy Code, expect as expressly permitted by the DIP Orders and this Agreement; or

(v)    modifying, altering, or impairing in any manner the DIP Liens, or any of the Lender's rights or remedies under the DIP Orders, this Agreement, any of the Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and to enforce the Lender's Liens and security interests in the Collateral), whether by reorganization order, order of confirmation, or any financials of, extensions or credit to, or incurring of debt of any Borrower or otherwise, whether pursuant to section 363 of the Bankruptcy Code or otherwise.

(b)    Seek, consent to, apply for, acquiesce in, or fail to timely oppose any order (i) dismissing any of the Chapter 11 Cases under the Bankruptcy Code or otherwise, (ii) converting any of the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, (iii) appointing a Chapter 11 trustee in any of the Chapter 11 Cases, (iv) appointing an examiner with enlarged powers beyond those set forth in section 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases, or (v) granting a change of venue with respect to any Chapter 11 Case or any related adversary proceeding.

(c)    Make any payments or transfer of any property on account of claims asserted by any vendors of any Borrower for reclamation in accordance with section 2-702 of any applicable UCC and section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Lender or unless otherwise consented to by the Lender.

(d)    Return any inventory or other property to any vendor pursuant to section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with section 546(g) of the Bankruptcyt Code upon prior notice to the Lender or unless otherwise consented to by the Lender.

(e)    Except as contemplated by the Sale Plan, propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral without prior written consent of the Lender.

(f)    (i) Make payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except, in each case, in amounts and on terms and conditions that (A) are approved by order of the Bankruptcy Court after notice and hearing, (B) are expressly permitted by the terms of the Loan Documents and within the limits, including any Permitted Variance, of the Approved Budget, and (C) as approved by the Lender in its sole discretion, or (ii)(A) enter into or make or implement any amendment, waiver, supplement, or other modification to any employment agreement or employee compensation plan or (B) pay or cause to be paid any amount contemplated by such agreements or plans before the

date on which such amount becomes due and payable pursuant to the terms of such agreements or plans, as applicable, in each case, unless in the ordinary course of business.

(g)    Allow any judicial process, condemnation, or forfeiture brought against any material item or portion of the Collateral or any rights therein to be subject to such judicial process, condemnation or forfeiture proceedings, and such judicial process, condemnation or foreclosure proceeding is not stayed within five (5) Business Days, or any order is entered that adversely affects the Lender's rights with respect to any material item or portion of the Collateral.

(h)    Fail to pay any Lender's Professional Fees (as defined in the Interim DIP Order) when due.

7.19    Budget Variance Covenant.

With respect to any Variance Period, not permit (tested on the date the Borrowers deliver a Budget Variance Report pursuant to Section 6.1.1) the variance (as compared to the Approved Budget and excluding, for purposes of determining compliance with the Approved Budget and calculation of the Permitted Variance, fees for Debtors' Professionals and Committee Professionals (if any), DIP Lender Expenses, and interest and fees under this Agreement) to reflect (a) total receipts of less than 75% of projected receipts for the Variance Period or (b) more than 110% of projected total payments for the Variance Period (the "Permitted Variance"); provided that a breach of the foregoing shall not constitute an Event of Default so long as the Borrowers' ending cash is within $200,000 of the ending cash indicated at the end of the Variance Period.

7.20    CRO.

Not, and not permit any other Loan Party or the Special Committee to, terminate, amend, alter or otherwise change the terms of the engagement and retention of the CRO without the prior written consent of the Lender, which may be withheld in its sole discretion; provided that in the case of the termination or resignation of the CRO, the Borrowers identify a replacement within five (5) Business Days and such replacement is acceptable to the Lender in its sole discretion, whose retention shall be approved by the Bankruptcy Court no later than thirty (30) calendar days after the identification thereof.

7.21    Additional Professionals.

Not, and not permit any other Loan Party to, engage and retain additional professionals (other than ordinary course professionals), including, without limitation, an investment bank, unless such engagement and retention is acceptable to, and on terms and conditions (i)(a) acceptable to the Lender in its sole discretion, and (b) authorized by the Approved Budget, or (ii) authorized pursuant to an ordinary course of professional order entered by the Bankruptcy Court.

Section 8.    Events of Default; Remedies.

8.1    Events of Default.

Each of the following shall constitute an Event of Default under this Agreement:

8.1.1   <u>Non-Payment of Credit</u>.

Any Borrower fails to pay when and as required to be paid, any amount of principal of any Loan; or fails to pay when and as required to be paid, any interest, fees or other amounts payable hereunder or under any other Loan Document.

8.1.2   <u>Sales Agent</u>.

The Sales Agent shall be granted or obtains (i) any Lien on or security interest in any of the Borrowers' assets, including the DIP Collateral, Prepetition Collateral, or the Retained Actions; or (ii) any claim, cause of action, right, or interest that is senior to or *pari passu* with the claims, causes of action, rights and interests of the Lender or the Prepetition Lender under this Agreement, any other Loan Document or the DIP Orders.

8.1.3   <u>Bankruptcy Matters</u>.

The occurrence of any of the following in the Chapter 11 Cases:

(a)   any of the Borrowers shall file a pleading seeking to vacate or modify any of the DIP Orders over the objection of the Lender;

(b)   entry of an order (except the Final DIP Order) without the prior written consent of the Lender amending, supplementing, or otherwise modifying the DIP Orders;

(c)   reversal, vacatur or stay of the effectiveness of the DIP Orders except to the extent stayed or reversed within five (5) Business Days or such stay constitutes an automatic temporary stay upon entry of the subject DIP Order under the Bankruptcy Code or Federal Rules of Bankruptcy Procedure, except by the Final DIP Order;

(d)   a failure by the Borrowers to comply with any material provision of the DIP Orders (except where such failure would not materially and adversely affect the Lender);

(e)   dismissal of any of the Chapter 11 Cases of a Borrower with material assets or conversion of any of the Chapter 11 Cases, in each case, of a Borrower with material assets to a case under Chapter 7 of the Bankruptcy Code or any Borrower files a motion or other pleading seeking such dismissal or conversion of any bankruptcy case;

(f)   appointment of a Chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrowers or any other Borrower or a Borrower shall file a motion or other pleading seeking such appointment;

(g)   any sale of all or substantially all assets of the Borrowers pursuant to Section 363 of the Bankruptcy Code, unless (A) such sale is conducted in accordance with an order of the Bankruptcy Court in form and substance satisfactory to the Lender in its sole discretion (B) results in sufficient proceeds to pay all Obligations in full or (C) the Lender consents to or is the purchaser in the subject transaction;

(h)    an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the Lender: (A) permitting any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal or superior to the DIP Superpriority Claims (other than the Carve-Out), or (B) granting or permitting the grant of a lien that is equal in priority or senior to the DIP Liens (other than the Carve-Out);

(i)    [reserved];

(j)    [reserved];

(k)    any Borrower shall seek, or shall support any other person's motion seeking (in any such case, by way of any motion or pleading with the Bankruptcy Court) to challenge the validity or enforceability of any of the DIP Lien;

(l)    finding that the DIP Liens or the DIP Superpriority Claims are invalid, unperfected, or unenforceable in any respect;

(m)    Permitted Variances under the Approved Budget are exceeded for more than one (1) week without consent of or waiver by the Lender;

(n)    subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender;

and

(o)    the payment of any prepetition claim other than (A) as consented to by the Lender, (B) as authorized by the Approved Budget, (C) permitted under the terms of this Agreement or (D) as authorized by the Bankruptcy Court or the DIP Orders and reflected in the Approved Budget.

8.1.4    <u>Non-Compliance with Loan Documents</u>.

(a)    Failure by any Loan Party to comply with or to perform any covenant set forth in <u>Section 6</u> and <u>Section 7</u> applicable to it; or (b) failure by any Loan Party to comply with or to perform any other provision of this Agreement or any other Loan Document applicable to it (and not constituting an Event of Default under any other provision of this <u>Section 8</u>) and continuance of such failure described in this clause (b) for 5 days.

8.1.5    <u>Representations; Warranties</u>.

Any representation or warranty made by any Loan Party herein or any other Loan Document is breached or is false or misleading, in each case, in any material respect on the date as of which the facts therein set forth are stated or certified.

8.1.6   <u>Pension Plans</u>.

Institution of any steps by any Person to terminate a Pension Plan if as a result of such termination any Loan Party or any member of the Controlled Group could be required to make a contribution to such Pension Plan, or could incur a liability or obligation to such Pension Plan, in excess of $25,000; (b) a contribution failure occurs with respect to any Pension Plan sufficient to give rise to a Lien under Section 302(f) of ERISA; or (c) there shall occur any withdrawal or partial withdrawal from a Multiemployer Pension Plan and the withdrawal liability (without unaccrued interest) to Multiemployer Pension Plans as a result of such withdrawal (including any outstanding withdrawal liability that Borrower or any other Loan Party or any member of the Controlled Group have incurred on the date of such withdrawal) exceeds $25,000.

8.1.7   <u>Judgments</u>.

Any judgments which are in the aggregate in excess of $25,000 as to any postpetition obligation shall be rendered against the Debtors and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or there shall be rendered against the Debtors a nonmonetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a Material Adverse Effect.

8.1.8   <u>Invalidity of Collateral Documents</u>.

Any Collateral Document shall cease to be in full force and effect; or any Loan Party (or any Person by, through or on behalf of any Loan Party) shall contest in any manner the validity, binding nature or enforceability of any Collateral Document.

8.1.9   [Reserved].

8.1.10   [Reserved].

8.1.11   <u>Administrative Expenses</u>.

Any Borrower fails to pay when due any undisputed administrative expenses in accordance with and subject to the terms of the Approved Budget and such failure shall not have been remedied or waived within five (5) calendar days after the earlier of (i) the date upon which an authorized agent of the Borrowers had knowledge of such default and (ii) the date upon which notice thereof if given to the Borrowers by the Lender.

8.2   <u>Remedies</u>.

If any Event of Default occurs and is continuing, the Lender may take any or all of the following actions:

(a)   Lender shall provide the Borrowers, the United States Trustee and the Committee with five (5) calendar days' written notice (which may be by email) and file such notice of the docket of the Chapter 11 Cases before exercising any enforcement rights or remedies;

(b)     Subject to the Carve-Out and Professional Fee Escrow, without further order from the Bankruptcy Court, and subject to the terms of the Interim DIP Order and the Final DIP Order (including in respect of any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Lender to exercise, upon the occurrence and during the continuance of any Event of Default under their respective Loan Documents, all rights and remedies provided for in the Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):

(i)  terminate the Borrowers' limited use of any Cash Collateral;

(ii) declare the commitment of the Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(iii) declare all Obligations to be immediately due and payable;

(iv) freeze monies or balances in the Borrowers' accounts (and, with respect to this Agreement and the DIP Facility, sweep all funds contained in the Controlled Accounts);

(v) set-off any and all amounts in accounts maintained by the Borrowers with the Lender against the Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the Obligations; and

(vi) take any other actions or exercise any other rights or remedies permitted under the Interim DIP Order and the Final DIP Order, the Loan Documents or applicable law to affect the repayment of the Obligations;

(c)     Neither the Borrowers, the Committee, any other statutory committee nor any other party-in-interest shall contest the enforcement of the remedies set forth in the Interim DIP Order and the Final DIP Order and the Loan Documents, except as set forth in <u>Section 9.21</u>, the Interim DIP Order or the Final DIP Order.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

Section 9.    <u>Miscellaneous</u>.

9.1    <u>Waiver; Amendments</u>.

No delay on the part of Lender in the exercise of any right, power or remedy shall operate as a waiver thereof, nor shall any single or partial exercise by it any right, power or remedy preclude other or further exercise thereof, or the exercise of any other right, power or remedy.  No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement, the Notes or any of the other Loan Documents (or any subordination and intercreditor

agreement or other subordination provisions relating to any Non-Senior Debt) shall in any event be effective unless the same shall be in writing and approved by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

9.2     Notices.

Except as otherwise provided in Sections 2.2.2 and 2.2.3, all notices hereunder shall be in writing (including electronic mail) and shall be sent to the applicable party at its address shown on Annex I or at such other address as such party may, by written notice received by the other parties, have designated as its address for such purpose. Notices sent by electronic mail shall be deemed to have been given when sent; notices sent by mail shall be deemed to have been given three Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier service shall be deemed to have been given when received. For purposes of Sections 2.2.2 and 2.2.3, Lender shall be entitled to rely on telephonic instructions from any person that Lender in good faith believes is an authorized officer or employee of Borrowers, and Borrowers shall hold Lender harmless from any loss, cost or expense resulting from any such reliance. Each Borrower and Lender hereby agree that Lender may, in its discretion, deliver information and notices to such financial institutions as may be a party hereto from time to time using the internet service "Intralinks."

9.3     Computations.

Unless otherwise specifically provided herein, any accounting term used in this Agreement shall have the meaning customarily given such term in accordance with GAAP, and all financial computations hereunder shall be computed in accordance with GAAP consistently applied. The explicit qualification of terms or computations by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

9.4     Costs; Expenses.

Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses of Lender (including Legal Costs) incurred after (but not prior to or on) the DIP Termination Date in connection with the administration (including protection of Collateral) of this Agreement, the other Loan Documents and all other documents provided for herein or delivered or to be delivered hereunder or in connection herewith (including any proposed or actual amendment, supplement or waiver to any Loan Document), and all reasonable out-of-pocket costs and expenses (including Legal Costs) incurred by Lender after an Event of Default in connection with the collection of the Obligations and enforcement of this Agreement, the other Loan Documents or any such other documents.

9.5     Indemnification by Borrowers.

In consideration of the execution and delivery of this Agreement by Lender and the agreement to extend the Commitments provided hereunder, each Borrower hereby agree to indemnify, exonerate and hold Lender, and each of the officers, directors, employees, Affiliates and agents of Lender (each a "Lender Party") free and harmless from and against any and all actions, causes of action, suits, losses, liabilities, damages and expenses, including Legal Costs

(collectively, the "Indemnified Liabilities"), incurred by Lender Parties or any of them as a result of, or arising out of, or relating to (a) any tender offer, merger, purchase of equity interests, purchase of assets or other similar transaction financed or proposed to be financed in whole or in part, directly or indirectly, with the proceeds of any of the Loans, (b) the use, handling, release, emission, discharge, transportation, storage, treatment or disposal of any Hazardous Material at any property owned or leased by Borrower or any other Loan Party, (c) any violation of any Environmental Laws with respect to conditions at any property owned or leased by any Loan Party or the operations conducted thereon, (d) the investigation, cleanup or remediation of offsite locations at which any Loan Party or their respective predecessors are alleged to have directly or indirectly disposed of Hazardous Materials or (e) the execution, delivery, performance or enforcement of this Agreement or any other Loan Document by Lender, except to the extent any such Indemnified Liabilities result from the applicable Lender Party's own gross negligence or willful misconduct as determined by a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Borrower hereby agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. All Obligations provided for in this Section 9.5 shall survive repayment of the Loans, cancellation of the Notes, any foreclosure under, or any modification, release or discharge of, any or all of the Collateral Documents and termination of this Agreement.

9.6     Marshaling; Payments Set Aside.

Upon entry of the Final DIP Order, Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations; provided that, Recovery Action Proceeds (as defined in the Interim DIP Order) may only be applied in satisfaction of the DIP Obligations or the Prepetition Obligations after the Lender has exhausted all other sources of recovery for repayment of such claims. To the extent that any Borrower makes a payment or payments to Lender, or Lender enforces its Liens or exercises its rights of set-off, and such payment or payments or the proceeds of such enforcement or set-off or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Lender in its discretion) to be repaid to a trustee, receiver or any other party in connection with any bankruptcy, insolvency or similar proceeding, or otherwise, then to the extent of such recovery, the obligation hereunder or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

9.7     Borrower/Lender Relationship.

The relationship under this Agreement between Borrowers on the one hand and Lender (solely in its capacity as Lender hereunder) on the other hand shall be solely that of borrower and lender.

9.8     Assignments; Participations.

9.8.1     Assignments.

(a)     Lender may at any time assign to one or more Persons (any such Person, an "Assignee") all or any portion of Lender's Loans and Commitments.  Borrowers shall be entitled to continue to deal solely and directly with Lender in connection with the interests so assigned to an Assignee until Lender shall have received and accepted an effective Assignment Agreement executed, delivered and fully completed by the applicable parties thereto.

(b)     From and after the date on which the conditions described above have been met, (i) such Assignee shall be deemed automatically to have become a party hereto and, to the extent that rights and obligations hereunder have been assigned to such Assignee pursuant to such Assignment Agreement, shall have the rights and obligations of a "Lender" hereunder and (ii) the assigning Lender, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, shall be released from its rights (other than its indemnification rights) and obligations hereunder.  For the avoidance of doubt, upon Lender's assignment of any or all of its Loans and/or Commitments to an Assignee, such Assignee shall have all of the rights and obligations of Lender in respect of such assigned Loans and/or Commitments, and shall be deemed to be "Lender" hereunder, as if such Person were an original party hereto.  Upon the request of the Assignee (and, as applicable, the assigning Lender) pursuant to an effective Assignment Agreement, Borrowers shall execute and deliver to Lender for delivery to the Assignee (and, as applicable, the assigning Lender) a Note in the principal amount of the Assignee's Pro Rata Share of the Revolving Loan Commitment plus the principal amount of the Assignee's Term Loans (and, as applicable, a Note in the principal amount of the Pro Rata Share of the Revolving Loan Commitment retained by the assigning Lender plus the principal amount of the Term Loans retained by the assigning Lender).  Each such Note shall be dated the effective date of such assignment.  Upon receipt by the assigning Lender of such Note, the assigning Lender shall return to Borrowers any prior Note held by it.

(c)     Notwithstanding the provisions of Section 9.8.1(a), Borrowers hereby authorize and direct Lender, for and on behalf of Borrowers, to maintain a record of ownership of the Notes and any interest therein, which record, or "book-entry system", shall identify the owner or owners of the Notes and any such interests therein.  The right to the principal of, and stated interest on, the Notes may be transferred only through such book-entry system.

(d)     Notwithstanding the foregoing provisions of this Section 9.8.1 or any other provision of this Agreement, Lender may at any time assign all or any portion of its Loans and its Notes (i) as collateral security to a Federal Reserve Bank, to Lender's trustee for the benefit of its investors or to any other Person (but no such assignment shall release Lender from any of its obligations hereunder) and (ii) to (x) an Affiliate of Lender or (y) an Eligible Institution.

9.8.2     Participations.

Lender may at any time sell to one or more Persons participating interests in its Loans, Commitments or other interests hereunder (any such Person, a "Participant").  In the event of a sale by Lender of a participating interest to a Participant, (a) Lender's obligations hereunder

shall remain unchanged for all purposes, (b) Borrowers shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations hereunder and (c) all amounts payable by Borrowers shall be determined as if Lender had not sold such participation and shall be paid directly to Lender.  No Participant shall have any direct or indirect voting rights hereunder. Borrowers agree that if amounts outstanding under this Agreement are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in such amounts to the same extent as if the amount of its participating interest were owing directly to it as Lender under this Agreement; provided that such right of set-off shall be subject to the obligation of each Participant to share with Lender, and Lender agrees to share with each Participant, as provided in Section 2.11.4.  Borrowers also agree that each Participant shall be entitled to the benefits of Section 3 as if it were a Lender (provided that no Participant shall receive any greater compensation pursuant to Section 3 than would have been paid to Lender if no participation had been sold).

9.9     Certain Pledges.

Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Loans) or any other Loan Document to secure obligations of Lender, including any pledge or assignment to secure obligations to Lender's lenders; provided that no such pledge or assignment shall release Lender from any of its obligations hereunder or substitute any such pledgee or assignee for Lender as a party hereto.

9.10    Confidentiality.

Lender agrees to use commercially reasonable efforts (equivalent to the efforts Lender applies to maintain the confidentiality of its own confidential information) to maintain as confidential all information provided to it by any Loan Party and designated as confidential, except that Lender may disclose such information (a) to Persons employed or engaged by Lender or any of its Affiliates (including collateral managers of Lender) in evaluating, approving, structuring or administering the Loans and the Commitments; (b) to any assignee or participant or potential assignee or participant that has agreed to comply with the covenant contained in this Section 9.10 (and any such assignee or participant or potential assignee or participant may disclose such information to Persons employed or engaged by them as described in clause (a) above); (c) as required or requested by any federal or state regulatory authority or examiner, or any insurance industry association, or as reasonably believed by Lender to be compelled by any court decree, subpoena or legal or administrative order or process; (d) as, on the advice of Lender's counsel, is required by law, *provided* that Lender shall give Borrowers' as much notice as practicable, and in no event fewer than five (5) days' advance notice before disclosing such information, unless advised by counsel that such notice may not be legally provided; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any litigation to which Lender is a party; (f) to any nationally recognized rating agency or investor of Lender that requires access to information about Lender's investment portfolio in connection with ratings issued or investment decisions with respect to Lender; (g) that ceases to be confidential through no fault of Lender; (h) to a Person that is an investor or prospective investor in a Securitization (as defined below) that agrees that its access to information regarding Borrowers and the Subsidiaries and the Loans and Commitments is solely for purposes of evaluating an investment in such Securitization and who agrees to treat such information as confidential; (i) to a Person that is a trustee, collateral

manager, servicer, noteholder or secured party in a Securitization in connection with the administration, servicing and reporting on the assets serving as collateral for such Securitization; or (j) to Lender's lenders.  For purposes of this Section, "<u>Securitization</u>" means a public or private offering by Lender or any of its Affiliates or their respective successors and assigns, of securities which represent an interest in, or which are collateralized, in whole or in part, by the Loans or the Commitments.  Notwithstanding the foregoing, Borrowers consent to the publication by Lender of a tombstone or similar advertising material relating to the financing transactions contemplated by this Agreement, and Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

9.11    <u>Captions</u>.

Captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

9.12    <u>Nature of Remedies</u>.

All Obligations of Borrowers and rights of Lender expressed herein or in any other Loan Document shall be in addition to and not in limitation of those provided by applicable law. No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

9.13    <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt by telecopy of any executed signature page to this Agreement or any other Loan Document shall constitute effective delivery of such signature page.

9.14    <u>Severability</u>.

The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

9.15    <u>Entire Agreement</u>.

This Agreement, together with the other Loan Documents, embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof and any prior arrangements made with respect to the payment by Borrowers of (or any indemnification for) any fees, costs or expenses payable to or incurred (or to be incurred) by or on behalf of Lender.

9.16    Successors; Assigns.

This Agreement shall be binding upon Borrowers and Lender and their respective successors and assigns, and shall inure to the benefit of Borrowers and Lender and the successors and assigns of Lender.  No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement or any of the other Loan Documents.  No Borrower or any Subsidiary may assign or transfer any of its rights or Obligations under this Agreement without the prior written consent of Lender.

9.17    Governing Law.

THIS AGREEMENT AND EACH NOTE SHALL BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN SUCH STATE, WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES TO THE EXTENT THAT SUCH PRINCIPLES WOULD REQUIRE THE APPLICATION OF LAWS OF ANOTHER JURISDICTION.

9.18    Forum Selection; Consent to Jurisdiction.

ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DECLINED TO EXERCISE ITS JURISDICTION, IN THE COURTS OF THE STATE OF DELAWARE OR IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE.  BORROWERS AND LENDER HEREBY EXPRESSLY AND IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE COURTS OF THE STATE OF DELAWARE AND OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE FOR THE PURPOSE OF ANY SUCH LITIGATION AS SET FORTH ABOVE.  BORROWERS FURTHER IRREVOCABLY CONSENT TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF DELAWARE.  BORROWERS HEREBY EXPRESSLY AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

9.19    Waiver of Jury Trial.

EACH OF BORROWERS, AND LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, ANY NOTE, ANY OTHER LOAN DOCUMENT AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH

ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

9.20    Joint and Several Liability.

Notwithstanding anything herein or in any Loan Document to the contrary, each Borrower shall have joint and several liability in respect of all Obligations (and the explicit qualification of terms or computations by the phrase "jointly and severally" shall in no way be construed to limit the foregoing), without regard to any defense (other than the defense that payment in full has been made), setoff or counterclaim which may at any time be available to or be asserted by any Borrower or any other Loan Party against Lender, or by any other circumstance whatsoever (with or without notice to or knowledge of any Borrower) which constitutes, or might be construed to constitute, an equitable or legal discharge of any Borrower's liability hereunder, in bankruptcy or in any other instance, and the Obligations of Borrowers hereunder shall not be conditioned or contingent upon the pursuit by Lender or any other person at any time of any right or remedy against any Borrower or against any other person which may be or become liable in respect of all or any part of the Obligations or against any Collateral or guarantee therefor or right of offset with respect thereto. Borrowers hereby acknowledge that, this Agreement is the independent and several obligation of Borrowers (regardless of whether such Borrower shall have delivered a request for borrowings under Section 2.2) and may be enforced against Borrowers separately, whether or not enforcement of any right or remedy hereunder has been sought against a particular Borrower. Each Borrower hereby expressly waives, with respect to any of the Loans made to any other Borrower hereunder and any of the amounts owing hereunder by such other Loan Parties in respect of such Loans, diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that Lender exhaust any right, power or remedy or proceed against such other Loan Parties under this Agreement or any other agreement or instrument referred to herein or against any other person under any other guarantee of, or security for, any of such amounts owing hereunder.

9.21    Modification of Automatic Stay.

The automatic stay provisions of section 362 of the Bankruptcy Code or otherwise are vacated and modified to the extent necessary to permit the Lender to exercise:

(a)    immediately upon the DIP Termination Date, all rights and remedies under the Final DIP Order; and

(b)    upon the occurrence and during the continuance of an Event of Default and the giving of five (5) calendar days' prior written notice to the Notice Parties (the "Remedies Notice Period"), all rights and remedies against the Borrowers' property provided for in the Final DIP Order, provided that, upon the receipt of any such notice and during the Remedies Notice Period, the Borrowers, the Committee (if any) and/or any other party in interest shall be entitled to seek an expedited hearing with the Bankruptcy Court solely to consider (i) whether an Event of Default has in fact occurred, and/or (ii) any appropriate relief (including, without limitation, the Borrowers' non-consensual use of Cash Collateral) for certain expenses detailed in the Interim DIP Order or the Final DIP Order.

To the extent not otherwise provided, the automatic stay imposed under section 362(a)(2) of the Bankruptcy Code shall be modified pursuant to the Final DIP Order as necessary for the relevant parties to effectuate all of the terms and provisions of the Final DIP Order.

9.22    Stipulations.

After consultation with their professionals, and without prejudice to the rights of parties in interest, the Borrowers, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim DIP Order, to certain stipulations specifically set forth in Paragraph F of the Interim DIP Order regarding the validity and extent of the Prepetition Lender's liens, claims, and obligations, including with respect to the Borrowers' Prepetition Obligations and the Prepetition Lender's Prepetition Collateral pursuant to the Prepetition Loan Documents.

9.23    [Reserved].

9.24    Section 552(b).

Upon entry of the Final DIP Order, the Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code; in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any person asserting a prepetition lien on property of the estates under section 541 of the Bankruptcy Code with respect to proceeds, products, offspring, or profits of such property.

9.25    No Waiver.

No failure or delay on the part of the Lender to exercise any rights under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right under this Agreement preclude any further exercise thereof, or the exercise of any other right.  Each and every right or remedy granted under this Agreement or any final order relating to the DIP Loan or under any document delivered hereunder or in connection herewith or allowed to the Lender in law or equity shall be deemed cumulative and may be exercised from time to time.

**[*SIGNATURE PAGES FOLLOW*]**

The parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

**LUGANO BUYER, INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Treasurer

**LUGANO DIAMONDS & JEWELRY INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Chief Financial Officer

**LUGANO HOLDING, INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Treasurer

**LUGANO PRIVE, LLC.**, as a Borrower
By: Lugano Prive Investment Trust, Member

By: _____
Name: Christoph Pachler
Title:   Trustee

[Signature Page to Credit Agreement]

**K.L.D. JEWELRY, LLC**, as a Borrower


By: _____
Name: Christoph Pachler
Title:   Manager



**COMPASS GROUP DIVERSIFIED HOLDINGS LLC**, as Lender


By: _____
Name:  Stephen Keller
Title:    Chief Financial Officer

# ANNEX I

### Addresses

Addresses for Notices:

Lugano Buyer, Inc.,
620 Newport Center Dr., Suite 800
Newport Beach, CA 92660
Attention: Christoph Pachler
Email: cpachler@luganodiamonds.com

Lugano Diamonds & Jewelry Inc.,
620 Newport Center Dr., Suite 800
Newport Beach, CA 92660
Attention: Christoph Pachler, CFO
Email: cpachler@luganodiamonds.com

Compass Group Diversified Holdings LLC,
as Lender
301 Riverside Avenue,
Second Floor
Westport, CT 06880
Attention:  Chief Financial Officer
Telephone:  (203) 221-1703
Telecopy:  (203) 221-8253

Address for Payments:

Bank:  CIBC Bank
Bank Address:  120 South LaSalle Street,
Chicago, IL 60603
ABA #:  071006486
Account Name:   Compass Group Diversified
Holdings LLC
Account #:  0002273104
Reference:  Lugano

**Exhibit A**

Form of Assignment Agreement

This Assignment Agreement (this "<u>Assignment Agreement</u>") is entered into as of [_____ __, 20__] by and between the Assignor named on the signature page hereto ("<u>Assignor</u>") and the Assignee named on the signature page hereto ("<u>Assignee</u>"). Reference is made to the Superpriority Secured Debtor-in-Possession Credit Agreement dated as of November [___], 2025 (as amended or otherwise modified from time to time, the "<u>Credit Agreement</u>") by and among Lugano Buyer, Inc., Lugano Holding, Inc., Lugano Diamonds & Jewelry Inc., Lugano Holding, Inc., K.L.D. Jewelry, LLC and Lugano Prive, LLC (jointly and severally, the "Borrowers") and Compass Group Diversified Holdings LLC, as lender (together with any successors or assigns, "<u>Lender</u>"), and the other parties thereto. Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Credit Agreement.

Assignor and Assignee agree as follows:

1.      Assignor hereby sells and assigns to Assignee, and Assignee hereby purchases and assumes from Assignor the interests set forth on the schedule attached hereto, in and to Assignor's rights and obligations under the Credit Agreement and the other Loan Documents as of the Effective Date (as defined below). Such purchase and sale is made without recourse, representation or warranty except as expressly set forth herein.

2.      Assignor (i) represents that, as of the Effective Date, it is the legal and beneficial owner of the interests assigned hereunder free and clear of any adverse claim; (ii) makes no other representation or warranty and assumes no responsibility with respect to any statement, warranties or representations made in or in connection with the Credit Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement, any Loan Documents or any other instrument or document furnished pursuant thereto; and (iii) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or any Subsidiary or any other Person or the performance or observance by Borrowers or any Subsidiary of its Obligations under the Credit Agreement or the Loan Documents or any other instrument or document furnished pursuant thereto.

3.      Assignee (i) represents and warrants that it is legally authorized to enter into this Assignment Agreement; (ii) confirms that it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant thereto and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (iii) agrees that it will, independently and without reliance upon Assignor or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Agreement; (iv) agrees that it will perform in accordance with their terms all obligations which by the terms of the Credit Agreement are required to be performed by it as a Lender; (vi) represents that on the date of this Assignment Agreement it is not presently

A-1

aware of any facts that would cause it to make a claim under the Credit Agreement; and (vii) if organized under the laws of a jurisdiction outside the United States, attaches the forms prescribed by the Internal Revenue Service of the United States, which have been duly executed, certifying as to Assignee's exemption from United States withholding taxes with respect to all payments to be made to Assignee under the Agreement or such other documents as are necessary to indicate that all such payments are subject to such tax at a rate reduced by an applicable tax treaty.

4.      The effective date for this Assignment Agreement shall be as set forth on the schedule attached hereto (the "<u>Effective Date</u>").

5.      Upon such acceptance, from and after the Effective Date, (i) Assignee shall be a party to the Credit Agreement and, to the extent provided in this Assignment Agreement, have the rights and obligations of a Lender thereunder and (ii) Assignor shall, to the extent provided in this Assignment Agreement, relinquish its rights (other than indemnification rights) and be released from its obligations under the Credit Agreement.

6.      Upon such acceptance, from and after the Effective Date, Borrower shall make all payments in respect of the interest assigned hereby (including payments of principal, interest, fees and other amounts) to Assignee. Assignor and Assignee shall make all appropriate adjustments in payments for periods prior to the Effective Date with respect to the making of this assignment directly between themselves.

7.      THIS ASSIGNMENT AND ACCEPTANCE SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

8.      This Assignment may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Assignment. Receipt by telecopy of any executed signature page to this Assignment shall constitute effective delivery of such signature page.

       The parties hereto have caused this Agreement to be executed and delivered as of the date first written above.

ASSIGNOR:

_____

By:_____
Title: _____

ASSIGNEE:

_____

By:_____
Title: _____

A-3

## Schedule to Assignment Agreement

Assignor: _____

Assignee: _____

Effective Date: _____

Superpriority Debtor-In-Possession Credit Agreement dated as of November [___], 2025 (as amended or otherwise modified from time to time, the "Credit Agreement") among Lugano Buyer, Inc., Lugano Diamonds & Jewelry Inc., Lugano Holding, Inc., K.L.D. Jewelry, LLC, Lugano Prive, LLC, and Compass Group Diversified Holdings LLC, as lender (together with any successors or assigns, "Lender"), and the other parties thereto.

Interests Assigned:

| Commitment/Loan | Revolving Loan Commitment | Term A Loan Commitment | Term B Loan Commitment |
|---|---|---|---|
| Assignor Amounts | $ | $ | $ |
| Amounts Assigned | $ | $ | $ |
| Assignee Amounts (post-assignment) | $ | $ | $ |

Assignee Information:

Address for Notices:

_____
_____
Attention: _____
Telephone: _____
Telecopy: _____

Address for Payments:

Bank: _____
ABA #: _____
Account #: _____
Reference: _____

**Exhibit B**

<u>Form of</u>
<u>DIP Promissory Note</u>

$12,000,000                                                November [___], 2025
                                                          Westport, Connecticut

The undersigned, for value received, promise to pay, jointly and severally, to the order of Compass Group Diversified Holdings LLC ("Lender") at its principal office of 301 Riverside Avenue, Second Floor, Westport, CT 06880, the aggregate unpaid amount of all Loans made to the undersigned by Lender pursuant to the Credit Agreement referred to below, such principal amount to be payable on the dates set forth in the Credit Agreement.

The undersigned further promise to pay, jointly and severally, interest on the unpaid principal amount of each Loan from the date of such Loan until such Loan is Paid in Full, payable at the rate(s) and at the time(s) set forth in the Credit Agreement.  Payments of both principal and interest are to be made in lawful money of the United States of America.

This DIP Promissory Note ("Note") evidences indebtedness incurred under, and is subject to the terms and provisions of, the Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of November [___], 2025 (as amended or otherwise modified from time to time, the "Credit Agreement"; terms not otherwise defined herein are used herein as defined in the Credit Agreement), among the undersigned and Lender, to which Credit Agreement reference is hereby made for a statement of the terms and provisions  under which this Note may or must be paid prior to its due date or its due date accelerated.

{Remainder of page intentionally left blank; signature page follows}

This Note is made under and governed by the laws of the State of New York applicable to contracts made and to be performed entirely within such State.

**LUGANO BUYER, INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:  Treasurer

**LUGANO DIAMONDS & JEWELRY INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:  Chief Financial Officer

**LUGANO HOLDING, INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:  Treasurer

**LUGANO PRIVE, LLC.**, as a Borrower
By: Lugano Prive Investment Trust, Member

By: _____
Name: Christoph Pachler
Title:  Trustee

**K.L.D. JEWELRY, LLC**, as a Borrower

By: _____
Name: Christoph Pachler
Title:  Manager

[Note Signature Page]

**Exhibit C**

Form of
Borrowing Notice

Date:  _____, _____

To:      Compass Group Diversified Holdings LLC, as Lender

Re:      Superpriority Debtor-in-Possession Credit Agreement dated as of November [__], 2025 (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Credit Agreement") among Lugano Buyer, Inc., Lugano Diamonds & Jewelry Inc., Lugano Holding, Inc., K.L.D. Jewelry, LLC, Lugano Prive, LLC, and Compass Group Diversified Holdings LLC, as lender (together with any successors or assigns, "Lender"), and the other parties thereto. Capitalized terms used but not otherwise defined herein have the meanings provided in the Credit Agreement.

Ladies and Gentlemen:

The undersigned hereby requests (select one):

        A Borrowing

                On _____ (a Business Day).[2]
                In the amount of $ _____.

To be wired to:

[_____]


With respect to such Borrowing, the Borrowers hereby represent and warrant that (i) such request complies with the requirements of the Approved Budget and (ii) each of the conditions set forth in Section 2.2.3 and Section 4 of the Credit Agreement have been satisfied on and as of the date of such Borrowing.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

_____

[2] To be at least two (2) Business Days after delivery of this Borrowing Notice after entry of the Final DIP Order.

**LUGANO BUYER, INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Treasurer


**LUGANO DIAMONDS & JEWELRY INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Chief Financial Officer

**LUGANO HOLDING, INC.**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Treasurer

**LUGANO PRIVE, LLC.**, as a Borrower
By: Lugano Prive Investment Trust, Member

By: _____
Name: Christoph Pachler
Title:   Trustee

**K.L.D. JEWELRY, LLC**, as a Borrower

By: _____
Name: Christoph Pachler
Title:   Manager

33769081.1

**Exhibit D**

<u>Form of</u>
<u>Initial Budget</u>

33769081.1

**Schedule 5.8**

Capitalization

**Schedule 5.15**

<u>Environmental Matters</u>

[None.]

**Schedule 5.16**

Insurance

## **Schedule 6.11**

Post-Closing Items

[None.]

**Schedule 7.1**

Debt

## **Schedule 7.2**

<u>Liens</u>

**Schedule 7.11**

Investments

**<u>Schedule 7.15</u>**

<u>Bank Accounts</u>

**<u>EXHIBIT 2</u>**

**13-Week Cashflow**

**Lugano Diamonds and Jewelry Inc.**
**DIP Budget Prepared by GlassRatner**

| | Pre-Petition | Post-Petition Period | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| *($ in thousands)* | 7-Nov | 14-Nov | 21-Nov | 28-Nov | 5-Dec | 12-Dec | 19-Dec | 26-Dec | 2-Jan | 9-Jan | 16-Jan | 23-Jan | 30-Jan | 6-Feb |
| Operating Receipts | -- | $398 | $483 | $531 | $1,598 | $2,872 | $1,198 | $1,150 | $1,101 | $798 | $253 | $253 | $253 | $253 |
| Operating Disbursements | -- | (3,184) | (907) | (1,805) | (952) | (2,470) | (125) | (40) | (39) | (28) | (312) | (13) | (13) | (13) |
| **Cash Flow from Operations** | **--** | **($2,786)** | **($424)** | **($1,274)** | **$646** | **$401** | **$1,073** | **$1,109** | **$1,062** | **$770** | **($59)** | **$240** | **$240** | **$240** |
| | | | | | | | | | | | | | | |
| Professional Fees | -- | (399) | (424) | (424) | (424) | (424) | (424) | (424) | (369) | (369) | (369) | (369) | (369) | (277) |
| Other Expenses | -- | -- | -- | -- | -- | -- | (10) | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| Crisis Management PR Firm Fees | -- | (125) | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| DIP Interest and Fees | -- | -- | -- | -- | (12) | -- | -- | -- | (29) | -- | -- | -- | (29) | -- |
| **Beginning Liquidity** | | **$4,289** | **$979** | **$131** | **--** | **$210** | **$188** | **$827** | **$1,503** | **$2,157** | **$2,548** | **$2,110** | **$1,972** | **$1,804** |
| | | | | | | | | | | | | | | |
| Net Cash Flow | -- | ($3,310) | ($847) | ($1,697) | $210 | ($22) | $639 | $676 | $654 | $391 | ($438) | ($139) | ($168) | ($47) |
| Funding From DIP | -- | -- | -- | $1,566 | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Ending Liquidity (without financing)** | **$4,289** | **$979** | **$131** | **--** | **$210** | **$188** | **$827** | **$1,503** | **$2,157** | **$2,548** | **$2,110** | **$1,972** | **$1,804** | **$1,757** |
| | | | | | | | | | | | | | | |
| **Pre-Petition Financing Balance** | **$2,200** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** | **--** |
| | | | | | | | | | | | | | | |
| **DIP Financing Balance** | **--** | **$2,200** | **$2,200** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** | **$3,766** |
| | | | | | | | | | | | | | | |
| **End Liquidity + Available Financing** | **$4,289** | **$12,000** | **$12,000** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** | **$10,434** |