## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (___) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR (A) AN INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO PERFORM UNDER THE AGENCY AGREEMENT, (II) APPROVING THE SALE GUIDELINES, DISPUTE RESOLUTION PROCEDURES, WAIVER OF VARIOUS LEASE RESTRICTIONS, AND MODIFICATIONS TO THE DEBTORS' CUSTOMER PROGRAMS, (III) SCHEDULING, IF NECESSARY AND PRIOR TO ANY AUCTION, THE AGENT PROTECTIONS HEARING TO CONSIDER ENTRY OF THE AGENT PROTECTIONS ORDER (1) APPROVING THE AGENT PROTECTIONS, (2) SCHEDULING, IF NECESSARY, THE AUCTION, AND (3) APPROVING (X) THE BIDDING PROCEDURES, AND (Y) THE SALE NOTICE; (IV) AUTHORIZING, IF NECESSARY, THE DEBTORS TO EXECUTE AN ALTERNATIVE TRANSACTION AGREEMENT, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF; AND (B) A FINAL ORDER (I) AUTHORIZING THE DEBTORS TO ASSUME (1) THE AGENCY AGREEMENT, OR (2) AN ALTERNATIVE TRANSACTION, (II) AUTHORIZING (1) AGENT TO SELL THE AGENCY ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, OR AUTHORIZING (2) ANOTHER SUCCESSFUL BIDDER TO SELL THE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, AND (III) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby file this motion (this "Motion"):

    (a)    seeking entry of an interim order (the "Interim Approval Order"), substantially in the form attached hereto as **Exhibit A**:

        (i)    authorizing the Debtors to perform, on an interim basis, under that certain *Agency Agreement*, dated as of November 16, 2025 (as may be amended and supplemented from time to time, the "Agency Agreement") made by

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

and between Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds") and Enhanced Retail Funding, LLC ("Agent"), substantially in the form attached as Exhibit 1 to the Interim Approval Order;

(ii)     approving the Sale Guidelines (as defined below), substantially in the form attached as Exhibit 2 to the Interim Approval Order, Dispute Resolution Procedures (as defined below), waiver of various restrictions under the Debtors' real property leases, and modifications to the Debtors' customer programs;

(iii)    scheduling, if necessary and prior to any Auction (as defined below), a hearing (the "Agent Protections Hearing") to consider entry of an order (the "Agent Protections Order"), substantially in the form attached as Exhibit 4 to the Interim Approval Order:

    (1)     approving the Agent Protections (as defined in the Agency Agreement);

    (2)     scheduling, if necessary, an auction (the "Auction");

    (3)     approving (x) proposed auction and bidding procedures (the "Bidding Procedures") in connection with the sale of some, or all, of the Debtors' assets (the "Assets") in an alternative transaction (the "Alternative Transaction"), substantially in the form attached as Exhibit 3 to the Interim Approval Order; and (y) the form and manner of notice thereof (the "Sale Notice"), substantially in the form attached as Exhibit 5 to the Interim Approval Order;

(iv)     authorizing, if necessary, the Debtors to execute an asset purchase agreement, an agency agreement, or another transaction document (an "Alternative Transaction Agreement"), consistent with the Bidding Procedures;

(v)      scheduling a final hearing (the "Final Approval Hearing");

(vi)     granting related relief; and

(b)     entry of a final order (either the "Final Approval Order" or the "Sale Order"), substantially in the forms attached hereto as **Exhibit B-1** and **Exhibit B-2**, respectively:

(i)      authorizing (1) the assumption of the Agency Agreement, pursuant to the Final Approval Order; or (2) the assumption of an Alternative Transaction Agreement, pursuant to the Sale Order;

(ii)     authorizing (1) Agent to act as the Debtors' consultant and exclusive agent, pursuant to the Agency Agreement and Final Approval Order, to dispose of and/or sell the Debtors' Merchandise, Merchant's Consignment Goods,

Remaining Merchandise, and Owned FF&E (each as defined in the Agency Agreement, and collectively herein, the "Agency Assets") free clear of all liens, claims, encumbrances, and other interests (collectively, the "Interests"); or (2) in the case of a Sale Order and an Alternative Transaction Agreement, the sale of some, or all, of the Assets to the Successful Bidder(s) (as defined below), free and clear of all Interests; and

(iii)    granting related relief.

The facts and circumstances supporting this Motion are set forth in the *Declaration of J. Michael Issa in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2] (the "First Day Declaration") and the *Declaration of Eben Paul Perison in Support of the Motion of Debtors for (A) an Interim Order (I) Authorizing the Debtors to Perform Under the Agency Agreement, (II) Approving the Sale Guidelines, Dispute Resolution Procedures, Waiver of Various Lease Restrictions, and Modifications to the Debtors' Customer Programs, (III) Scheduling, If Necessary and Prior to Any Auction, the Agent Protections Hearing to Consider Entry of the Agent Protections Order (1) Approving the Agent Protections, (2) Scheduling, If Necessary, the Auction, and (3) Approving (X) the Bidding Procedures, and (Y) the Sale Notice; (IV) Authorizing, If Necessary, the Debtors to Execute an Alternative Transaction Agreement, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief; and (B) a Final Order (I) Authorizing the Debtors to Assume (1) the Agency Agreement, or (2) an Alternative Transaction, (II) Authorizing (1) Agent to Sell the Agency Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, or Authorizing (2) Another Successful Bidder to Sell the Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Granting Related Relief* (the "Perison Declaration"),[2] both of which were filed contemporaneously herewith.  In further support of this Motion, the Debtors respectfully state as follows:

---

[2]    Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the First Day Declaration.

## PRELIMINARY STATEMENT[3]

1.      The Debtors commenced the Chapter 11 Cases to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.  After an extensive prepetition marketing process, the Debtors determined, in consultation with their advisors, that the approach outlined in this Motion provides the best path forward under the circumstances to consummate a value-maximizing transaction for the Assets.

2.      This Motion combines two frequently approved approaches utilized in retail bankruptcies around the United States:  (a) seeking approval and assumption of an agency agreement pursuant to which agent is retained to consult, sell, and/or dispose of a debtor's assets; and (b) seeking approval of bidding procedures and a formal bidding process.  To accommodate the opportunity for bidders to submit higher and better offers for the Assets, and thereby maximizing value for the Debtors' estates, the Agency Agreement discussed herein provides a hybrid-track structure:  (i) an agency agreement, and (ii) an equity agreement subject to overbid and auction.  During the time periods contemplated under both of the Agency Agreement's hybrid-track structures, the Debtors' business is being operating on a going concern basis to maintain the bulk of the Debtors' employees and operating in the normal course of business through the holiday season.

3.      The Agency Agreement contemplates two time periods and is designed to maximize the Debtors' retail opportunities during this holiday season.  During the Tier 1 Period, which begins upon the Court's entry of the Interim Approval Order, Agent will serve as the Debtors' exclusive agent and consultant to sell the Agency Assets.  Agent will be entitled to a commission of 3% of gross sales of Merchandise, plus a commission of 20% on the sale of the

---

[3]    Capitalized terms used but otherwise not defined in this section shall have the meanings ascribed to them elsewhere in this Motion.

Debtors' owned furniture, fixtures, and equipment. During the Tier 1 Period, the Debtors will be responsible for reimbursing Agent for all of its all costs and related expenses, including the costs of employees and Agent's Supervisors. The Tier 1 Period will conclude upon the entry of (a) the Final Approval Order approving the Agency Agreement, or (b) the Sale Order approving an Alternative Transaction. During the Tier 1 Period, the Debtors will be seeking higher or better offers than the proposed structure in the Tier 2 Period (*i.e.*, an Alternative Transaction), including going concern bids. Accordingly, the Agency Agreement (specifically the Tier 2 Period) serves as a *de facto* stalking horse bid, permits the Debtors to terminate the Agency Agreement without being in breach if there is an Alternative Transaction, and provides for a breakup fee and expense reimbursement to Agent (*i.e.*, the Agent Protections).

4.       If the Debtors do not seek approval of an Alternative Transaction, the Tier 2 Period will commence. Under the Agency Agreement, the Tier 2 Period Commencement Date occurs on the first calendar day after entry of the Final Approval Order, but the Tier 2 Period is deemed to have commenced on the first calendar day after the entry of the Interim Approval Order in accordance with the Agency Agreement (*i.e.*, the Debtors and Agent have agreed that the Tier 2 Period shall be effective retroactive to the beginning of the Chapter 11 Cases). The Tier 2 Period shall continue through the termination of the Agency Agreement in accordance with the terms of the Agency Agreement. If the Tier 2 Period occurs, the Debtors will implement the terms of the Agency Agreement on an equity (guaranteed) basis and will not be required to pay commissions earned during the Tier 1 Period, or reimburse Agent for expenses incurred during the Tier 1 Period. Any previously paid commissions or reimbursements will be reconciled and reimbursed to the Debtors. Thus, if there is no Alternative Transaction and the Tier 2 Period becomes effective, the economics under the Agency Agreement will be as if the Agency

Agreement was entered into on an equity basis from day one.  The Debtors will be entitled to the Guaranteed Amount and Agent will be entitled to all proceeds (subject to the sharing provisions of the Agency Agreement) and be responsible for certain expenses, on a retroactive basis from the entry of the Interim Approval Order.

5.      Pending approval of the Agency Agreement, or an Alternative Transaction, the Debtors anticipate the continuing operation of their retail businesses and look forward to maintaining retail sales efforts through the holiday season.

6.      The Agency Agreement's hybrid-track structure provides significant benefits to the Debtors' estates and requires an expedited process.  In consideration of Agent's commitment of resources and finances to support the transactions contemplated by the Agency Agreement, as well as Agent's willingness to accommodate the Debtors' desire to maintain maximum flexibility to solicit Alternative Transactions, the Debtors have agreed to provide Agent with the Agent Protections, approval of which the Debtors will seek at the Agent Protections Hearing, if necessary, and any issues related to the conduct of any subsequent Auction, if any, would be heard at the Final Approval Hearing.  This hybrid-track structure approach allows the Debtors to maximize the value of the guaranteed amount and net recoveries to the estates, thus setting a floor for other potential bidders.  At the same time, the formal Bidding Process (as defined herein) enables the Debtors to entertain higher or better offers, thus providing potential upside for their estates.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory and legal predicates for the relief requested herein are sections 105, 363, 365, 503, 507, and 554 of the Bankruptcy Code, rules 2002, 6004, 6006, and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 6004-1.

## BACKGROUND

### I.      General

10.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court.  The Debtors are authorized to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

11.      No official committee has been appointed in the Chapter 11 Cases, and no request has been made for the appointment of a trustee or an examiner.

12.      Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the First Day Declaration.

### II.      Prepetition Sale Efforts

13.      As set forth in greater detail in the First Day Declaration, the Debtors design, manufacture, and sell high-end jewelry through unique positioning and its business model.  Until early spring 2025, the Debtors appeared to be a highly profitable and rapidly growing business.  Unfortunately, the Debtors' performance appears to have been overstated.  On May 7, 2025, the

33769090.1

Debtors' majority owner filed a Form 8-K disclosing an investigation into the "financing, accounting, and inventory practices of" Lugano Holding, Inc. ("Lugano Holding") and the resignation of Mr. Mordechai Haim Ferder as the Chief Executive Officer of Lugano Holding and from his other offices and directorships with the Debtors.  On June 24, 2025, Lugano Diamonds commenced an action against Mr. Ferder and a related trust for which he is a trustee.  The complaint included claims for fraud, concealment, constructive fraud, and breach of fiduciary duty.

14.     By letter dated May 22, 2025, Lugano Diamonds engaged Armory Securities, LLC ("Armory") on an exclusive basis to be its financial advisor and investment banker in connection with a possible restructuring, sale, or financing.

15.     The Debtors and their professionals identified over 100 parties who might be interested in a purchase or financing transaction with the Debtors.  Over 50 parties signed non-disclosure agreements and received a confidential information memorandum.  More than five parties submitted indications of interest.  The Debtors provided those parties with due diligence materials, including access to a virtual data room and meetings with management.

16.     The Debtors subsequently received six letters of intent, that proposed to acquire a controlling interest in Lugano Diamonds or substantially all of its assets.  The proposals included "going concern" and liquidation proposals, certain of which the Special Committee of the Board of Directors of Lugano Diamonds (in consultation with the full Board), have instructed Armory and the Debtors' counsel to further negotiate.

17.     Following those discussions, the Debtors determined that the proposed transaction with the Agent, subject to higher or better offers, is the path that would maximize the value to its stakeholders.

33769090.1

### III.    Need for an Expedited Process

18.    The dual-track approach outlined in the Agency Agreement was based, in part, on the quantity of Merchandise (as defined in the Agency Agreement provides an expedited approach which is necessary in order for the Company to maximize value.  First, the ongoing uncertainty that the Debtors have faced recently has negatively impacted sales, the Debtors' relationships with its customers and the Debtors' ability to keep and retain employees necessary to facilitate ongoing sales.  The longer that this uncertainty continues, the less valuable the business becomes as a going concern and harder it is to maximize value through asset sales or liquidation of inventory.  Second, the need to promptly commence sales under the Agency Agreement is further driven by the upcoming holiday season, a time that is traditionally a critical selling period for the Debtors.  In order to best position the Debtors to maximize recovery, the Debtors need to commence such sales immediately and any delay in entering the Interim Approval Order could thus adversely affect the estates' recovery on the Agency Assets.  Third, the amount offered by any other bidder is likely to be reduced as the amount of available Merchandise decreases and the ongoing value of the business deteriorates.  The Agency Agreement hybrid approach addresses the Debtors' need for an expedited process while also providing potential upside that an auction can create.  Under the Agency Agreement, the Guaranteed Amount provides significant downside protection (*i.e.*, a minimum of amount of recovery plus the assumption of expenses) regardless of sales, while the auction mechanism provides significant upside potential if the Debtors is sold as a going concern to an alternate bidder or, if there isn't an Alternative Transaction, through the fee sharing set forth in the Agency Agreement.

19.    The Debtors therefore believe, in the exercise of their sound business judgment, that the tradeoffs of the dual-track approach – a guaranteed amount plus the option to seek higher or better alternatives – outweigh the alternatives and justify an expedited sale process.

33769090.1

**AGENCY AGREEMENT**

20.     The Agency Agreement contemplates two time periods.  During the Tier 1 Period, which runs from the entry of the Interim Approval Order through the entry of the Final Approval Order or Sale Order, as applicable, Agent will serve as the Debtors' consultant and exclusive agent to sell the Debtors' Merchandise (as defined in the Agency Agreement) and certain of the Debtors' owned furniture, fixtures, and equipment.  Agent will be entitled to a commission of 3% of gross sales of Merchandise, plus a commission of 20% on the sale of furniture, fixtures, and equipment.  During the Tier 1 Period, the Debtors will be responsible for reimbursing Agent for all of Agent's costs and related expenses, including the costs of Agent's Supervisors.

21.     If the Debtors decide to enter into an Alternative Transaction, the Debtors have the right to terminate the Agency Agreement, but subject to payment of the Agent Protections if approved at the Agent Protections Hearing.   If the Debtors do not pursue an Alternative Transaction and the Agency Agreement is approved by the entry of the Final Approval Order, the Tier 2 Period will automatically commence.  During the Tier 2 Period, (a) the Agency Sale (as defined below) will continue, and (b) there will be a reconciliation of Agent's fees and expenses that will put Debtors and Agent in the same economic position that Debtors and Agent would have enjoyed if the Tier 2 Period had, instead, commenced on the first calendar day after the entry of the Interim Approval Order.  As a result, the Agency Agreement will be implemented on an equity (guaranteed) basis, and the Debtors will not be required to pay commissions or reimburse Agent for fees and expenses that would have been otherwise payable in respect of the Tier 1 Period.

22.     Under the Agency Agreement's payment structure, the Debtors are entitled to a guaranteed amount equal to 40% of the aggregate Cost Value (as defined in the Agency Agreement) of Merchandise (as defined in the Agency Agreement).  Agent will post a letter of credit to secure its guarantee obligations.  After sale proceeds repay Agent for the Guaranteed

Amount (as defined in the Agency Agreement) and its expenses, excess proceeds are shared between Agent and the Debtors as specified in the Agency Agreement.

23.     The following chart summarizes material terms of the Agency Agreement:

| Provision | Description |
|---|---|
| **Merchandise**<br><br>*Agency Agreement § 5.2(a)* | "<u>Merchandise</u>" shall mean all (i) finished, first-quality goods that are saleable in the ordinary course of business located at the Sale Locations as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) all Transferred Merchandise, (iii) all cut or uncut loose stones and metals ("<u>Job Order Inventory</u>"), (iv) Memo Merchandise (subject to each such item having been verified in accordance with the Verification Procedures); (v) Defective Merchandise, and (vi) saleable goods that are deemed to be Merchandise under this Agreement pursuant to this <u>Section 5.2</u>. "<u>Merchandise</u>" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee ("<u>Consignment Goods</u>"); (3) Excluded Defective Merchandise (defined below); (4) Merchant Consignment Goods (defined below); (5) Additional Agent Goods; and (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, airplane(s), and other personal property or improvements to real property; <u>provided</u>, that Agent shall have the right to sell Owned FF&E as set forth in <u>Section 7</u> below. |
| **Sale Term**<br><br>*Agency Agreement § 6.1(a)* | Subject to certain limitations, Agent shall complete the Sale at each Sale Location no later than May 1, 2026.  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Sale Location-by- Sale Location basis upon not less than fourteen (14) days' prior written notice. |
| **Agent Fee and Expenses of the Sale**<br><br>*Agency Agreement §§ 2.7 & 2.8* | During the Tier 1 Period, Merchant shall pay to Agent, from Proceeds (as defined below) of the Sale, a consulting fee in an amount equal to the aggregate of (a) three percent (3.0%) of the Gross Sales at all of the Sale Locations, plus (b) twenty percent (20.0%) of the Gross Sales realized from dispositions of Owned FF&E.<br><br>All expenses incident to the conduct of the Sale and the operation of the Sale Locations during the Tier 1 Period, including, without limitation, all Agent Tier 1 Expenses (including, without limitation, Supervisors Costs), and all other Sale Location-level and corporate expenses associated with the Sale) shall be approved by the DIP Lender, incorporated in the Approved Budget, and borne by Merchant.<br><br>Such fees and expenses are payable to the Debtors in the event that the Agency Agreement is approved in all respects and the Tier 2 Period commences. *See, generally*, Agency Agreement § 3. |

| Provision | Description |
|---|---|
| **Debtors' Indemnification**<br><br>*Agency Agreement § 13.1* | The Debtor shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Debtor's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 of the Agency Agreement, any failure by Debtor to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Debtor to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term to the extent required hereunder; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Debtor's employees or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Debtor or any of its representatives; any failure of Debtor to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term to the extent required hereunder; and (vii) the gross negligence (including omissions) or willful misconduct of the Debtor or its officers, directors, employees, agents (other than Agent) or representatives.  Any claim by any Agent Indemnified Party for indemnification under this Section 13.1 shall be subject to approval of the Bankruptcy Court. |
| **Agent Indemnification**<br><br>*Agency Agreement § 13.2* | Agent shall indemnify and hold the Merchant, its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) as set forth in Section 7.3 above; (v) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives; (vi) any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes (including any such failure resulting from Agent's use of any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale; (vii) and any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Goods. The indemnification obligations set forth in this Section 13.2 shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in Section 9.3(a). |
| **FF&E**<br><br>*Agency Agreement § 3* | Substantially all fees and expenses are payable to the Debtors in the event that the Agency Agreement is approved in all respects and the Tier 2 Period commences. |

## THE PROPOSED BIDDING PROCEDURES

24.     The Debtors request approval of the Bidding Procedures, which provide, among other things:  (a) the assets available for sale, (b) the manner in which bids become "qualified," (c) the coordination of diligence efforts among the bidders and the Debtors, (d) the receipt and negotiation of bids received, (e) the conduct of any auction, and (f) the selection and approval of the Successful Bidder and the selection of the Next-Highest Bidder (each as defined below) (collectively, the "Bidding Process").  The Bidding Procedures reflect the Debtors' objective of conducting the Bidding Process in a controlled, but fair and open, manner while ensuring that the highest or otherwise best Bid (as defined below) is generated for the Assets.  Importantly, the Bidding Procedures also recognize the Debtors' fiduciary obligations to maximize sale value and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate.

25.     The Bidding Procedures contemplate two bidding routes:  First, Potential Bidders (as defined below) may submit Bids (as defined below) to acquire any, or all of the Assets, on a going concern or other basis.  Second, Potential Bidders may submit Bids to acquire the Agency Assets on a guaranteed equity basis, similar to the Tier 2 portion of the Agency Agreement.  The Debtors will not accept Bids on a pure agency basis without a guaranteed amount.

26.     As required by Local Rule 6004-1, the following is a summary of the proposed Bidding Procedures.[4]

---

[4]     Any summary of the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions of the Bidding Procedures attached as Exhibit 3 to the Interim Approval Order.  To the extent that there is any conflict between the summary contained herein and the actual terms and conditions of the Bidding Procedures reflected in Exhibit 3 to the Interim Approval Order, the terms and conditions of the Bidding Procedures shall control in all respects.

33769090.1

27.    <u>Confidentiality Agreement</u>.  Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process, each person or entity must enter into (unless previously entered into) with the Debtors, on or before the Bid Deadline (as defined below), a confidentiality agreement in form and substance satisfactory to the Debtors (each, a "<u>Confidentiality Agreement</u>").  Each person that enters into a Confidentiality Agreement with the Debtors in contemplation of participating in the Bidding Process on or before the Bid Deadline is hereinafter referred to as a "<u>Potential Bidder</u>."   After a Potential Bidder enters into a Confidentiality Agreement with the Debtors and demonstrates the financial wherewithal to potentially consummate a sale transaction, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information (including, if applicable, financial data) with respect to the Assets.

28.    <u>Determination by the Debtors</u>.   Following consultation with any statutory committee appointed in the Chapter 11 Cases (the "<u>Committee</u>"), Compass Group Diversified Holdings LLC ("<u>CODI</u>"), and Agent (collectively, the "<u>Consultation Parties</u>") the Debtors shall (a) coordinate with Potential Bidders regarding the conduct of their respective due diligence; (b) evaluate Bids (as defined below) from Potential Bidders on some, or all, of the Assets; (c) negotiate any Bid made to acquire some, or all, of the Assets; and (d) make such other determinations as are provided in the Bidding Procedures.

29.    <u>Due Diligence</u>.  The Debtors established a data room (the "<u>Data Room</u>") into which the Debtors have deposited substantial information about the Debtors and their business.  Except to the extent a Confidentiality Agreement, the Bidding Procedures, or other agreement provides otherwise, all Potential Bidders and the Consultation Parties will be granted access to the Data Room.  The Debtors, with the assistance of its professionals, will coordinate all reasonable requests

33769090.1

for additional information and due diligence access from Potential Bidders and the Consultation Parties. The Debtors will provide the Agency Agreement, or a form Alternative Transaction Agreement for the sale of some, or all, of the Assets (the "<u>Form Agreement</u>"), as applicable, and will grant each Potential Bidder and the Consultation Parties access to such in the Data Room. Notwithstanding the above, the Debtors shall be entitled to restrict any Potential Bidder's access to information if the Debtors determine, in their business judgment, that providing a Potential Bidder access to the Data Room, or any information contained therein, would harm the Bidding Process or compromise or otherwise impair the Debtors' business or the value of the Assets.

30.      <u>Bid Deadline</u>. On or before December 2, 2025, at 12:00 p.m. (prevailing Eastern Time) (the "<u>Bid Deadline</u>"), a Potential Bidder that desires to make a Bid for some, or all, of the Assets (each, a "<u>Bid</u>") is required to deliver written copies of such Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to the following: (a) counsel to the Debtors, (i) Keller Benvenutti Kim LLP, Attn: Tobias S. Keller (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Attn: Sean M. Beach (sbeach@ycst.com), Edmon L. Morton (emorton@ycst.com), and Timothy R. Powell (tpowell@ycst.com); (b) the Debtors' investment banker, Armory Securities, LLC, Attn: Nicholas Tell (ntell@armorysecurities.com), Eben Perison (eperison@armorysecurities.com), and Matthew Curtis (mcurtis@armorysecurities.com); (c) counsel to CODI, (i) Squire Patton Boggs (US) LLP, 1000 Key Tower 127 Public Square, Cleveland, OH, 44114 Attn: Peter R. Morrison (peter.morrison@squirepb.com), and (ii) Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, Attn: Shanti Katona (skatona@polsinelli.com), and (d) counsel to Agent, (i) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox

33769090.1

(sfox@riemerlaw.com), and (ii) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attn:  Gregory A. Taylor (gtaylor@ashby-geddes.com).  As soon as reasonably practicable following the Bid Deadline, the Debtors will provide to the Consultation Parties copies of all Qualified Bids (with such distribution permissible by electronic means).

31.    <u>Bid Requirements</u>.[5]  All Bids must comply with the following Bid requirements (collectively, the "<u>Bid Requirements</u>"):

(a)    be accompanied by a letter or email:

(i)    fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

(ii)    setting forth the price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price; *provided, however*, that all Bids (either viewed individually or in the aggregate) must provide consideration to the Debtors of at least the sum of (1) the amount provided for in the Agency Agreement, (2) the Agent Protections, (3) and a reasonable minimum overbid amount equal to or greater than $100,000 or such other amount determined by the Debtors, in consultation with the Consultation Parties, (the "<u>Incremental Overbid</u>") over the Starting Bid (as defined below) or the Leading Bid (as defined in the Bidding Procedures);

(iii)    stating with specificity the Assets (including the specific executory contracts and unexpired leases, if any) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder;

(iv)    providing, other than as may be exclusively applicable to Agent, that the Bid is not subject to any bidding, break-up fee, termination fee, transaction fee, expense reimbursement, or any similar type of

---

[5]    The Debtors will also consider proposals to acquire some, or all, of the Assets through a plan of reorganization. Should any such proposal be received prior to the Bid Deadline that the Debtors, in consultation with the Consultation Parties, conclude is in the best interest of the estates and stakeholders, then the Debtors reserve the right to postpone the Auction and proceed toward the confirmation of a plan.

reimbursement, and including an express waiver of any substantial contribution administrative expense claim under section 503(b) of the Bankruptcy Code related to bidding for some, or all, of the Assets;

(v)    agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until two business days after the Closing Date (as defined below);

(vi)    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than December 23, 2025, at 12:00 p.m. (prevailing Eastern Time);

(vii)    providing that the Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(viii)    containing an acknowledgment that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

(ix)    setting forth (1) a statement or evidence that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings and (2) any regulatory and third-party approval required for the Potential Bidder to close the contemplated transactions, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five calendar days following execution and delivery of such Potential Bidder's Alternative Transaction Agreement, those actions the Potential Bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Potential Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; *provided, further*, that each Bid contains a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements;

(x)    providing that the Potential Bidder agrees to serve as a backup bidder (the "Next-Highest Bidder") if Potential Bidder's Qualified Bid (as defined below) is the highest or best Bid after the Successful Bid (as defined below) (the "Next Highest Bid") with respect to the relevant Assets through the Closing Date (as defined below); and

(b)    be accompanied by (i) an executed Alternative Transaction Agreement in form and substance reasonably satisfactory to the Debtors (a "Qualified Bid Agreement"), and (ii) a redline of the executed Qualified Bid Agreement compared to the Agency Agreement or the Form Agreement, as applicable, to reflect any proposed amendments and modifications to the Agency Agreement or the Form Agreement, as applicable, and the schedules and exhibits thereto;

(c)    be accompanied by adequate assurance of future performance information (the "Adequate Assurance Information"), which may include (i) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (iv) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the sale in the event that the Debtors determine such bid to be a Qualified Bid (as defined below); and

(d)    be accompanied by (i) a deposit made by wire transfer to the Debtors, in the amount of 10% of the cash consideration of the Bid, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "Good Faith Deposit"), and (ii) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) with respect to the relevant Assets (*provided, however*, that the closing of a sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that any such funding or other financing commitments are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided further that such commitments may have covenants and conditions acceptable to the Debtors).  The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in their sole discretion after consulting

with the Consultation Parties. Notwithstanding the foregoing, any party submitting a Credit Bid (as defined below) shall not be required to provide a Good Faith Deposit.

32.     A Bid received from a Potential Bidder for some, or all, of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid," and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder."  For the avoidance of doubt, (a) Agent is deemed a Qualified Bidder, notwithstanding the requirements of paragraph 31 hereof, and shall be permitted to Credit Bid (as defined below) the Agent Protections (as defined in the Agency Agreement), and (b) any Bid submitted under section 363(k) of the Bankruptcy Code, or any other applicable provision of the Bankruptcy Code (a "Credit Bid"), will be deemed a Qualified Bid, and Potential Bidder and any bidder that submits a Credit Bid will be deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder.  To the extent applicable, the Debtors shall inform Agent of the Qualified Bid(s) received and shall provide copies of the Qualified Bid(s) to Qualified Bidder(s) prior to the commencement of an Auction, if any.

33.     Starting Bid.  If at least one Qualified Bid is received by the Bid Deadline with regard to any particular Assets, the Debtors will conduct an Auction with respect to such Assets and shall determine, in consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening Bid at such Auction for the relevant Assets (the "Starting Bid").  In the event the Agency Agreement is selected as the Starting Bid, the Starting Bid shall include the amount provided for in the Agency Agreement, plus the amount of the Agent Protections (as defined in the Agency Agreement).  The

Starting Bid will be communicated to Qualified Bidder(s) prior to the commencement of the Auction.

34.     The determination of which Qualified Bid constitutes the Starting Bid and which Qualified Bid constitutes the Successful Bid (as defined below) shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant, including, among other things, the following:  (a) the amount and nature of the consideration, including any obligations to be assumed; (b) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such Qualified Bid; (c) the number, type, and nature of any changes to the Agency Agreement, as applicable, requested by each Qualified Bidder; (d) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (e) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (f) the net benefit to the Debtors' estates (including after taking account of the Agent Protections); (g) the tax consequences of such Qualified Bid; and (e) the impact on employees and members and the proposed treatment of employee and member obligations.

35.     <u>Auction</u>.  The Auction, if required, will be conducted on December 10, 2025, starting at [●] (prevailing Eastern Time) at [●].  Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), the Consultation Parties, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction.  In addition, any of the Debtors' creditors who are not Qualified Bidders shall provide three business days' written notice to counsel to the Debtors of their intent to attend the Auction; *provided,*

*however*, that the Debtors reserve the right to retract their permission at any point during the Auction if such creditor party who is not a Qualified Bidder does not act in good faith and in orderly fashion during the Auction.  For the avoidance of doubt, only Qualified Bidders will be entitled to make any Bids at the Auction.  Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder (as defined below).

36.    At the Auction, participants will be permitted to increase their Bids and improve their terms in accordance with the Bidding Procedures; *provided* that any such increased or improved Bid must be a Qualified Bid (except that the Bid Deadline will not apply).  Bidding for some, or all, of the Assets will start at the Starting Bid and will continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid (as defined in the Bidding Procedures) is submitted by a Qualified Bidder.  Following consultation with the Consultation parties, the Debtors may at any time adopt rules for the Auction that the Debtors reasonably determine to be appropriate to promote the goals of the Bidding Process and not in conflict with the Bidding Procedures, the Bankruptcy Code, or applicable orders of the Court.

37.    Prior to the conclusion of the Auction, the Debtors will:  (a) review and evaluate each Bid made at the Auction on the basis of financial and contractual terms and other factors relevant to the Bidding Process, including those factors affecting the speed and certainty of consummating the sale transaction; (b) in the exercise of their good faith business judgment and consistent with the Bidding Procedures, identify the highest or otherwise best offer or collection of offers in respect of the Assets (the "Successful Bid"); (c) inform and consult with the Consultation Parties regarding the foregoing, so long as the Consultation Parties are not also

actively participating in the Bidding Process; and (d) notify all Qualified Bidders participating in the Auction, prior to its adjournment, of the successful bidder (the "Successful Bidder") and the amount and other material terms of the Successful Bid.

38.     After determining the Successful Bid(s) for the relevant Assets, the Debtors may determine, in their reasonable business judgment, in consultation with the Consultation Parties, which Qualified Bid is the Next-Highest Bid for such Assets.

39.     Acceptance of Qualified Bids.  The Debtors' selection and submission to the Court of the selected Bid as the Successful Bid will not constitute the Debtors' acceptance of the Bid. The Debtors will be deemed to have accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Final Approval Hearing.  If the Successful Bidder does not close their sale by the date agreed upon by the Debtors and the Successful Bidder, then the Debtors shall be authorized, but not required, to close with the Next-Highest Bidder pursuant to further order of the Court.

40.     Modification of Bidding Procedures.  Following consultation with the Consultation Parties, the Debtors may amend the Bidding Procedures or the Bidding Process at any time and from time to time in any manner that they determine in good faith will best promote the goals of the Bidding Process, including extending or modifying any of the dates described herein.

41.     Return of Good Faith Deposit.  The Good Faith Deposits of all Qualified Bidders will be held in escrow and while held in escrow will not become property of the Debtors' bankruptcy estates unless released from escrow pursuant to terms of the applicable escrow agreement or pursuant to further order of the Court.  At the closing of a sale transaction contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided.  The Good Faith

Deposits of any Next-Highest Bidder shall be retained until three business days after the applicable Closing Date.  The Good Faith Deposits of any other Qualified Bidders will be returned as soon as practicable but no later than ten business days following the Auction.

### NOTICE PROCEDURES FOR THE SALE, BIDDING PROCEDURES, AUCTION, AND FINAL APPROVAL HEARING

42.    The Debtors also request approval of the notice of the Auction, Final Approval Hearing, and Bidding Procedures (the "Sale Notice"), substantially in the form attached to the Interim Approval Order as Exhibit 5.

43.    As soon as practicable after the entry of the Interim Approval Order, the Debtors will cause the Sale Notice to be served by regular mail and/or email upon the following:  (a) the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Securities and Exchange Commission; (h) counsel to Compass Group Diversified Holdings LLC, the Debtors' prepetition secured lender and postpetition secured lender; (i) counsel to Agent; (j) all parties who are known by the Debtors to assert liens, if any, against any Assets; (k) any party known or reasonably believed to have expressed an interest in acquiring some, or all, of the Assets within six months prior to the Petition Date, which service may be sent electronically if a mailing address for any such parties is unknown; (l) any party that, as of the filing of this Motion is entitled to notice pursuant to Bankruptcy Rule 2002; and (m) any party on the Debtors' matrix of creditors not listed in this paragraph.

44.     The Debtors will also cause the Sale Notice to be published in The New York Times, or another publication with similar national circulation, and the Orange County Business Journal, as well as post the Sale Notice and the Interim Approval Order on the website of the Debtors' claims and noticing agent, Omni Agent Solutions, LLC: https://omniagentsolutions.com/Lugano.  The Sale Notice will include, among other things, the date, time, and place of the Auction, if any, the Agent Protections Hearing, and the Final Approval Hearing and the deadline for filing any objections to the relief requested in this Motion.

45.     As soon as possible following the Auction, if any, but no later than 24 hours following the conclusion of the Auction, the Debtors will file a notice on the Court's docket identifying the Successful Bidder for some, or all, of the Assets and the Next-Highest Bidder, if any (the "Notice of Successful Bidder").  Objections related solely to the conduct of the Auction, the identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder (other than Agent) must be in writing, state the basis of such objection with specificity, and be filed with the Court and served so as to be received on the following parties (collectively, the "Notice Parties") on or before December 11, 2025, at 4:00 p.m. (prevailing Eastern Time):    (a) counsel to the Debtors, (i) Keller Benvenutti Kim LLP, 101 Montgomery Street, Suite 1950, San Francisco, CA  94104, Attn:  Tobias S. Keller (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com); and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, DE 19801, Attn:  Sean M. Beach (sbeach@ycst.com), Edmon L. Morton (emorton@ycst.com), and Timothy R. Powell (tpowell@ycst.com); (b) the Debtors' investment banker, Armory Securities, LLC, 200 North Pacific Coast Highway, Suite 1525, El Segundo, CA 90245, Attn:   Nicholas Tell (ntell@armorysecurities.com), Eben Perison (eperison@armorysecurities.com), and Matthew

Curtis (mcurtis@armorysecurities.com); (c) the Office of the United States Trustee for the District

of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington,

Delaware 19801, Attn: Timothy Fox (timothy.fox@usdoj.gov); (d) counsel to the Committee, if

any; (e) counsel to CODI, (i) Squire Patton Boggs (US) LLP, 1000 Key Tower 127 Public Square,

Cleveland, OH, 44114 Attn: Peter R. Morrison (peter.morrison@squirepb.com), and (ii) Polsinelli

PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, Attn: Shanti Katona

(skatona@polsinelli.com), and (f) counsel to Agent, (i) Riemer & Braunstein LLP, Times Square

Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox

(sfox@riemerlaw.com), and (ii) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150,

Wilmington, DE 19899, Attn: Gregory A. Taylor (gtaylor@ashby-geddes.com)

## ASSUMPTION AND ASSIGNMENT PROCEDURES AND ABANDONMENT OF PERSONAL PROPERTY

46.     For the avoidance of doubt, in connection with the assumption of the Agency

Agreement or any Alternative Transaction Agreement, the Debtors reserve the right to seek Court

approval of the assumption and assignment of any executory contract or unexpired lease, the

abandonment of any personal property left on the premises subject to an unexpired lease, or any

procedures related thereto, at a later date.

## KEY SALE PROCESS DATES

47.     The following is a summary of the proposed key dates for the Sale process:

| Date | Deadline/Event |
|---|---|
| November 18, 2025 | • Interim Approval Hearing<br>• Entry of Interim Approval Order |
| December 2, 2025, at 12:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| December 3, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline for Debtors to notify Potential Bidders of whether their Bids are Qualified Bids |

| **Date** | **Deadline/Event** |
|---|---|
| December 4, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Sale[6] of the Assets |
| December 5, 2025 | Deadline for the Debtors to file a reply before the Agent Protections Hearing |
| December 9, 2025 | • Agent Protections Hearing (if necessary)<br>• Entry of Agent Protections Order |
| December 10, 2025, at [●] (prevailing Eastern Time) | Auction (if necessary) |
| December 11, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline to file and serve Notice of Successful Bidder(s) |
| December 12, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to (a) conduct of the Auction; (b) the sale to the Successful Bidder; and (c) ability of the Successful Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| December 15, 2025 | Deadline for Debtors to file a reply before the Final Approval Hearing |
| December 17-19, 2025 | Final Approval Hearing |
| December 23, 2025, at 12:00 p.m. (prevailing Eastern Time) | Closing Date (as applicable) |

48.     The Debtors respectfully submit that the timeline set forth above is reasonable and necessary under the circumstances of the Chapter 11 Cases.  This timeline will allow the Debtors to provide a market test against the Agency Agreement and provide Potential Bidders sufficient time to formulate Bids for some, or all, of the Assets.  Additionally, relevant information regarding the Debtors' business will be made available in the Data Room and will allow Potential Bidders

---

[6]     For the avoidance of doubt, this objection deadline applies to all objections to this Motion, final approval of the Agency Agreement, and the Sale of the Assets to a Successful Bidder; *provided, however*, that this objection deadline does not apply to objections related solely to conduct of the Auction, if any, identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder.

(subject to the execution of a Confidentiality Agreement) to immediately conduct due diligence on the Assets.

## THE PROPOSED APPROVAL ORDER AND SALE ORDER

49.     To the extent that the Sale Order is entered, the Debtors anticipate that the Sale Order may contain certain provisions that require disclosure under Local Rule 6004-1.  At this time, the Debtors makes the following statements:

(a)     <u>Local Rule 6004-1(b)(iv)(A)</u>.  To the extent a proposed purchaser is an insider (within the meaning of section 101(31) of the Bankruptcy Code), the Debtors will make the necessary disclosures to the Court and take measures to ensure the fairness of the Bidding Process and the proposed transaction. Agent is not an insider.

(b)     <u>Local Rule 6004-1(b)(iv)(B)</u>.  The Debtors do not presently have any agreement between any interested bidder and the Debtors' management or key employees.  If any agreements are reached, the Debtors will make the necessary disclosures.

(c)     <u>Local Rule 6004-1(b)(iv)(C)</u>.  The Agency Agreement requires a mutual release as a condition to certain payments following a settlement of amounts.  To the extent that the Sale Order or other documentation includes a release in favor of any entity, the Debtors will make the necessary disclosures.

(d)     <u>Local Rule 6004-1(b)(iv)(D)</u>.  An Auction is contemplated if the Debtors receive one Qualified Bid before the Bid Deadline.  The Debtors are permitted to respond to any inquires or offers to purchase some, or all, of the Assets in accordance with the terms of the Bidding Procedures.

(e)     <u>Local Rule 6004-1(b)(iv)(E)</u>.  Paragraphs 31 & 47 of this Motion set forth the Closing Date under the Sale Order.

(f)     <u>Local Rule 6004-1(b)(iv)(F)</u>.  Paragraphs 31 & 47 of this Motion requires Qualified Bids (other than any Credit Bids) to include a Good Faith Deposit constituting 10% of the total cash consideration of the Bid.

(g)     <u>Local Rule 6004-1(b)(iv)(G)</u>.  Upon the entry of the Interim Approval Order, Agent will have certain rights as consultant and exclusive agent.

(h)     <u>Local Rule 6004-1(b)(iv)(H)</u>.  Upon the entry of the Interim Approval Order and pursuant to the Agency Agreement, the Debtors are required to pay Agent from various proceeds of the Agency Sale.  *See* Agency Agreement

§§ 3.2–3.3.  If any other agreements are reached, the Debtors will make the necessary disclosures.

(i)      Local Rule 6004-1(b)(iv)(I).  The Debtors are not seeking to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code pursuant to this Motion.

(j)      Local Rule 6004-1(b)(iv)(J).  The Debtors will retain necessary books and records, copies thereof, or include as part of a purchase agreement appropriate access to such information, to enable them to administer the Chapter 11 Cases following the Sale.

(k)      Local Rule 6004-1(b)(iv)(K).  The Assets available for acquisition shall not include claims and causes of action arising under sections 502(d) and 544–553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or any analogous state law.

(l)      Local Rule 6004-1(b)(iv)(L).  The Agency Agreement, and the Final Approval Order, provide that Agent shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Agency Assets, including successor or vicarious liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, or substantial continuity. The Debtors anticipate that any Alternative Transaction Agreement, and the Sale Order, will provide that the Successful Bidder shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the relevant Assets, including successor or vicarious liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger, or substantial continuity.

(m)     Local Rule 6004-1(b)(iv)(M).  The Debtors are seeking to sell some, or all, of the Assets free and clear of all Interests to the fullest extent permitted by sections 363 and 365 of the Bankruptcy Code.

(n)      Local Rule 6004-1(b)(iv)(N).  Any party's right to submit a Credit Bid pursuant to section 363(k) of the Bankruptcy Code or any other applicable provision of the Bankruptcy Code is preserved.

(o)      Local Rule 6004-1(b)(iv)(O).  The Debtors are seeking relief from the 14-day stay imposed by Bankruptcy Rule 6004(h) for the sale, as further described below.

### ADDITIONAL PROVISIONS[7]

#### I.    Sale Guidelines

50.    The Debtors seek approval of procedures (the "Sale Guidelines"), which are attached to the Agency Agreement as Exhibit 8.1, for Agent, as the Debtors' consultant and exclusive agent, to dispose of and/or sell the Agency Assets (the "Agency Sale").  As set forth below, the Sale Guidelines are substantially similar to sale guidelines approved in retail bankruptcies around the United States.  The Debtors seek interim approval of the Sale Guidelines to permit, pursuant to the Agency Agreement, the Debtors or Agent, as applicable, to dispose of and/or sell the Agency Assets in a manner Agent may recommend or direct.  The Sale Guidelines provide, among other things, that:

(a)    the Agency Sale will be conducted during normal hours of operation and that any advertisements related thereto will conform with the advertising requirements of any shopping center or retail venue in which a boutique may be located.

51.    The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Sale Guidelines will provide the best and most efficient means of selling the Agency Assets to maximize the value of their estates.

#### II.    Certain State Laws

52.    Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closings, liquidations, or other inventory clearance sales, including, without limitation, state and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sales Laws").  The Liquidation Sales Laws may establish licensing, permitting, or bonding requirements, waiting periods, time limits, bulk sale

---

[7]    For the avoidance of doubt, in the event that the Debtors close an Alternative Transaction, the Debtors reserve the right to seek the approval of a Sale Order and Alternative Transaction Agreement, which may incorporate the relief sought in this section, at the Final Approval Hearing.

33769090.1

restrictions, and augmentation limitations that would otherwise apply to Agent's implementation of the Agency Agreement.  Because such requirements would hamper Agent's ability to maximize value by selling the Agency Assets, to the extent any Sale Guidelines conflict with the Liquidation Sales Laws, the Sale Guidelines shall control.

53.    To the extent that between the Petition Date and the date of the entry of the Final Approval Order or Sale Order, as applicable, there is a dispute arising from or related to the manner in which the Agency Sale is being conducted pursuant to the Interim Approval Order, the Agency Agreement, or the Sale Guidelines, which disputes relate to any Liquidation Sales Laws, the following procedures shall apply (collectively, the "Dispute Resolution Procedures"):

(a)    Within three business days after entry of the Interim Approval Order, the Debtors will serve by first-class mail copies of the Interim Approval Order, the Agency Agreement, and the Sale Guidelines on the following:  (i) the Attorney General's office for each state where the Agency Sale is being held, (ii) the county consumer protection agency or similar agency for each county where the Agency Sale is being held, (iii) the division of consumer protection for each state where the Agency Sale are being held, (iv) the chief legal counsel for the local jurisdiction, and (E) the landlords for the Sale Locations (as defined in the Interim Approval Order) (collectively, the "Dispute Notice Parties").

(b)    To the extent that there is a dispute arising from or relating to the Agency Sale, the Interim Approval Order, or the proposed Final Approval Order, as applicable, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "Reserved Dispute"), the Court shall retain jurisdiction to resolve the Reserved Dispute.  Any time within 10 days following entry of the Interim Approval Order, any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute (the "Dispute Notice"), explaining the nature of the dispute to: (i) proposed counsel to the Debtors (1) Keller Benvenutti Kim LLP, 101 Montgomery Street, Suite 1950, San Francisco, CA    94104, Attn: Tobias S. Keller, Esq. (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com), and (2) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com), Sean M. Beach (sbeach@ycst.com),  and  Timothy R. Powell  (tpowell@ycst.com); (ii) counsel to Agent, (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn:  Steven E.

Fox (sfox@riemerlaw.com), and (2) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attn: Gregory A. Taylor (gtaylor@ashby-geddes.com); (iii) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy Fox (timothy.fox@usdoj.com); and (iv) counsel to the Committee, if any. If the Debtors, Agent, and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with the Court requesting that the Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

(c)     In the event that a Dispute Resolution Motion is filed, nothing in the Interim Approval Order shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of the Interim Approval Order nor the conduct of the Debtors pursuant to the Interim Approval Order violates such Liquidation Sale Laws. Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Approval Order or to limit or interfere with the Debtors' or Agent's ability to conduct or to continue to conduct the Agency Sale pursuant to the Interim Approval Order, absent further order of the Court. Upon the entry of the Interim Approval Order the Court grants authority for the Debtors and Agent to conduct the Agency Sale pursuant to the terms of the Interim Approval Order, the Agency Agreement, and/or the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith. The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code. Nothing in the Interim Approval Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(d)     If, at any time, a dispute arises between the Debtors and/or Agent and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in the Interim Approval Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (b) and (c) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs. Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

### III.    Lease Restrictions

54.     The Debtors also respectfully request a waiver of any contractual restrictions that could otherwise inhibit or prevent Agent from maximizing value for creditors through the Agency

Sale.  In certain cases, the Agency Sale may be inconsistent with certain provisions of leases, subleases, or other documents with respect to the premises in which the Debtors operate, including (without limitation) reciprocal easement agreements, agreements containing covenants, conditions, and restrictions (including, without limitation, "go dark" provisions and landlord recapture rights), or other similar documents or provisions.  Such restrictions would also hamper Agent's ability to maximize value in selling the Agency Assets.

55.     The Debtors also request that no entity, including, without limitation, utilities, landlords, shopping center managers and personnel, creditors, and all persons acting for or on their behalf shall interfere with or otherwise impede the conduct of the sales or institute any action against the Debtors or Agent in any court (other than in the Court) or before any administrative body that in any way directly or indirectly interferes with, obstructs, or otherwise impedes the Debtors' or Agent's implementation of the Agency Agreement or Final Approval Order.

56.     Given that the Debtors are seeking this relief on an interim basis, the Debtors seek to resolve the concerns of landlords as expeditiously as possible.  In other similar cases, other debtors have proposed store closing procedures with materially similar lease restrictions.  Other debtors in these situations have obtained store closing orders which included a provision allowing for "side letters" between a debtor and landlord to resolve landlord concerns. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (approving store closing procedures which provide for side letters between the debtors and landlord); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same);

*In re Rite Aid Corp.*, No. 23-18993 (Bankr. D.N.J. Nov. 20, 2023) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[8]

## IV.   Modifications to Customer Programs

57.     Notwithstanding anything to the contrary in the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain and Administer Their Customer Programs, (II) Honor Prepetition Obligations, and (B) Granting Related Relief*, which was filed contemporaneously herewith, the Debtors may make modifications to such programs to facilitate the Agency Sale, including, but not limited to, the discontinuation of their return and trade-in policies.

## RELIEF REQUESTED

58.     By this Motion, the Debtors request:

(a)     entry of the Interim Approval Order:

    (i)     authorizing the Debtors to perform, on an interim basis, under the Agency Agreement;

    (ii)     approving the Sale Guidelines, Dispute Resolution Procedures, waiver of various restrictions under the Debtors' real property leases, and modifications to the Debtors' customer programs;

    (iii)     scheduling, if necessary and prior to any Auction, the Agent Protections Hearing to consider entry of the Agent Protections Order:

        (1)     approving the Agent Protections;

        (2)     scheduling, if necessary, the Auction; and

        (3)     approving (x) the Bidding Procedures; and (y) the Sale Notice;

    (iv)     authorizing, if necessary, the Debtors to execute an Alternative Transaction Agreement, consistent with the Bidding Procedures;

---

[8]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

(v)     scheduling the Final Approval Hearing;

(vi)    granting related relief; and

(b)     entry of either the Final Approval Order or Sale Order:

(iv)    authorizing (1) the assumption of the Agency Agreement, pursuant to the Final Approval Order; or (2) the assumption of an Alternative Transaction Agreement, pursuant to the Sale Order;

(v)     authorizing (1) Agent to act as the Debtors' consultant and exclusive agent, pursuant to the Agency Agreement and Final Approval Order, to dispose of and/or sell the Agency Assets free clear of all Interests; or (2) in the case of a Sale Order and an Alternative Transaction Agreement, the sale of some, or all, of the Assets to the Successful Bidder(s) (as defined below), free and clear of all Interests; and

(vi)    granting related relief.

## BASIS FOR RELIEF REQUESTED

**I.     Interim and Final Approval of the Agency Agreement, Approval of an Alternative Transaction Agreement, and Approval of a Sale of the Assets, as Applicable, Is Warranted Under Section 363(b) of the Bankruptcy Code and, with respect to the Agency Agreement or an Alternative Transaction Agreement, Section 365 of the Bankruptcy Code.**

59.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Debtors must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business.  *See, e.g.*, *In re Martin*, 91 F.3d 389 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983).

**A.     Interim and Final Approval of, and the Assumption of, the Agency Agreement Is Warranted Under Section 363(b) of the Bankruptcy Code and Section 365 of the Bankruptcy Code.**

60.     The Debtors request authority to perform under the Agency Agreement on an interim basis, and upon entry of the Final Approval Order, assume the Agency Agreement,

including the Agent Protections (as defined in the Agency Agreement). Additionally, to the extent necessary, the Debtors request approval of the Agent Protections pursuant to the entry of the Agent Protections Order, which would need to be entered prior to the Auction, if any. Sections 363(b) and 365 of the Bankruptcy Code provided the basis for this relief.

61.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard. *See, e.g.*, *In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. Oct. 27, 2009) (finding that a debtor's decision to assume or reject an executory contract will stand so long as "a reasonable business person would make a similar decision under similar circumstances."); *In re HQ Glob. Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim or caprice). "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

62.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See In re Integrated Res.*, 147 B.R. at 656; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued

operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See, e.g.*, *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co.* (*In re Wheeling-Pittsburgh Steel Corp.*), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate.").

### i.    Performance Prior to Assumption.

63.    The Debtors' decision to perform under the Agency Agreement until the Final Approval Hearing is supported by the exercise of their sound business judgment. The Agency Agreement sets a guaranteed floor for the Debtors' net recovery under the Agency Sale and also provides for potential additional upside. The Debtors and their professionals believe that the Agency Agreement is the best path forward at this time, particularly since it will be subject to an additional market test that preserves the ability of any Potential Bidder(s) to acquire the Debtors' business as a going concern. But, in order to preserve the net recovery, the Debtors must agree to retain Agent as an independent consultant, on an interim basis, in exchange for a fee (unless the Debtors ultimately deem Agent the Successful Bidder). The Debtors and their professionals have considered the advantages and disadvantages of such an approach, and determined that it is in the best interests of the estates to go forward.

64.    Further, the Debtors believe the approval of the Agent Protections is appropriate. The Agent Protections were a material condition to Agent agreeing to the approach referenced in the immediately preceding paragraph. The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a

business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives such as the Agent Protections must provide benefit to a debtor's estate.  *Id.* at 533.  The *O'Brien* opinion identified at least two instances in which bidding incentives may provide benefit to the estate.  First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

65.    The Agent Protections proposed by the Debtors are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard.  The Agency Agreement serves as a minimum or floor bid for other bidders, as demonstrated by the Bidding Procedures, which set a minimum bid based on the guaranteed amount of the Agency Agreement. Under the "administrative expense" standard enunciated in *O'Brien*, as well as the "sound business judgment" standard followed in other jurisdictions, the Agent Protections proposed by the Debtors should be approved as fair and reasonable.  The proposed Agent Protections are reasonable and generally consistent with the range of bidding protections typically approved by bankruptcy courts in this district.  *See, e.g.*, *In re Hipcricket, Inc.*, Case No. 15-10104 (LSS) (Bankr. D. Del., Feb. 11, 2015) (court approved break-up fee, which together with expense reimbursement, was 4.3% of the purchase price under stalking horse agreement); *In re Point Blank Solutions, Inc.*, Case No. 10-11255 (PJW) (Bankr. D. Del, Oct. 5, 2011) (court approved break-up and expense

reimbursement of 3.75% or $750,000 in connection with sale of debtor's assets for purchase price of $20,000,000); *In re Western Nonwovens, Inc.*, Case No. 08-11435 (PJW) (Bankr. D. Del., July 28, 2009) (court approved break-up fee and expense reimbursement of $250,000 in connection with sale of debtor's assets for purchase price of $4,000,000 to $6,500,000 purchase price); *In re Filene's Basement, Inc.*, Case No. 09-11525 (MFW) (Bankr. D. Del., May 15, 2009) (court approved break-up fee and expense reimbursement of 3.68%, or $810,000 in connection with sale of debtor's assets for purchase price of $22,000,000); *In re Global Motorsport Group, Inc.*, Case No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (court approved a break-up fee of approximately 4%, or $500,000 in connection with sale).

66.     Therefore, the Agent Protections are (a) an actual and necessary cost of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (b) of substantial benefit to the Debtors' estates and creditors and all parties in interest herein, (c) reasonable and appropriate, and (d) necessary to ensure that Agent will continue to pursue the Agency Agreement and undertake the Agency Sale.  Therefore, the Agent Protections constitute administrative expenses with priority pursuant to section 503(b) of the Bankruptcy Code.  There is a need to approve the Agent Protections as soon as possible, as it is a condition to Agent's agreement to begin providing independent consulting services and the establishment of the guaranteed amount of Agent's Bid.  Any delay in approval of the Agent Protections will reduce the guaranteed amount by 40% of the cost value of Merchandise sold prior to Agent commencing its consulting role.

### ii.     Assumption of the Agency Agreement.

67.     To the extent the Agency Agreement represents the highest or otherwise best Bid, at the Final Approval Hearing, the Court should approve assumption of the Agency Agreement. As noted above, assumption of the Agency Agreement provides a guaranteed return of 40% of the

33769090.1

cost value of the Merchandise. The Agency Agreement also requires Agent to fund any sale expenses over and above revenues, thus absolving the Debtors of the need to borrow under the DIP Facility (as defined in *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing, and (II) Utilize Cash Collateral, (B) Granting Liens and Providing Superpriority Administrative Expense Claims, (C) Granting Adequate Protection to the Prepetition Lender, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* [Docket No. 12] (the "DIP Motion")) to cover such costs.

68.     In other cases, the Court has recognized that assumption of an agency agreement—in substantially similar circumstances—is a procedurally appropriate mechanism for engaging Agent's services. *See In re Brookstone Holdings Corp.*, 592 B.R. 27, 38 (Bankr. D. Del. 2018) (approving assumption of an agency agreement and holding that the Agent was not a "professional" under section 327 of the Bankruptcy Code).

69.     Accordingly, the Debtors submit that there is sufficient business justification for assumption of the Agency Agreement (if there are no higher or otherwise better Bids) upon entry of the Final Approval Order.

## B.    Approval of a Sale Is Warranted Under Section 363(b) of the Bankruptcy Code.

70.     Courts typically consider the following factors in determining whether a proposed sale meets this standard:

    (a)    whether a sound business justification exists for the sale;

    (b)    whether adequate and reasonable notice of the sale was given to interested parties;

    (c)    whether the sale will produce a fair and reasonable price for the property; and

    (d)    whether the parties have acted in good faith.

*In re Decora Indus., Inc.*, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *Del. &*

*Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)).

71.     When a debtor demonstrates a valid business justification for a decision, a strong

presumption arises "that in making [the] business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re*

*Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1990) (holding that the Delaware business

judgment rule has "vitality by analogy" in chapter 11) (citations omitted).

72.     The Debtors submit that their decision to pursue a sale of some, or all, of the Assets

on the terms set forth in this Motion represents a reasonable exercise of the Debtors' business

judgment, and accordingly, such sale should be approved under section 363(b) of the Bankruptcy

Code.  The Debtors will continue to conduct an extensive and fulsome process to market the Assets.

The open and fair Auction, if any, and Bidding Process contemplated by the Bidding Procedures

will ensure that the Debtors' estates receive the highest or best value available for some, or all, of

the Assets by allowing the market to dictate the value of such Assets and will provide a greater

recovery than would be provided by any other available alternative.  Furthermore, compliance with

the Bidding Procedures will ensure the fairness and reasonableness of the consideration to be paid

by the Successful Bidder(s) and establish that the Debtors and the Successful Bidder(s) proceeded

in good faith.

73.     Additionally, the Debtors believe that the notice procedures described above are

reasonable and adequate under the circumstances.  Bankruptcy Rule 2002(a) and (c) requires the

Debtors to notify creditors of any sale contemplated herein, the terms and conditions of such sale,

the time and place of the Auction, if any, and the deadline for filing any objections.  The Debtors

believe that the proposed notice procedures fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Process, the Agency Agreement, any Alternative Transaction Agreement, any related sale, any Auction, the Agent Protections Hearing, if necessary, and the Final Approval Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring some, or all, of the Assets.

74.     Any sale contemplated herein, and conducted in accordance with the Bidding Procedures, will generate maximum value for the Debtors' estates, and represents the best path forward for maximizing recoveries. The Debtors submit that ample business justification exists for the consummation of any sale contemplated herein, and therefore, the Debtors request that the Court approve such sale.

## II.     The Sale of the Assets Free and Clear of All Interests Is Authorized Under Section 363(f) of the Bankruptcy Code.

75.     The Debtors request approval to sell the Assets free and clear of any and all Interests in accordance with section 363(f) of the Bankruptcy Code. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell estate property "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Serv., Inc. v. Elliot* (*In re Elliot*), 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (because section 363(f) is written in the disjunctive, a court may approve a "free and clear" sale even if only one of the subsections is met).

76.     Furthermore, it is well established that a bankruptcy court has the power, pursuant to section 363(f) of the Bankruptcy Code, to approve the sale of a debtor's assets free and clear of any claims against the debtors.  *In re TWA Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f)); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573 (4th Cir. 1996) (same).

77.     The Debtors submit that the sale of some, or all, of the Assets free and clear of the Interests will satisfy the requirements of section 363(f) of the Bankruptcy Code.  Further, the Debtors do not believe a consumer ombudsman is necessary.

## III.     The Sale Should Be Subject to the Protections of Section 363(m) of the Bankruptcy Code.

78.     Section 363(m) of the Bankruptcy Code provides, in part, that the reversal or modification on appeal of an authorization of a sale pursuant to section 363(b) or section 363(c) of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  *See* 11 U.S.C. § 363(m).

79.     In approving any sale contemplated herein free and clear of interests, the Debtors request that the Court find and hold that any purchaser of some, or all, of the Assets, pursuant to the relief requested in this Motion, is entitled to the protections afforded by section 363(m) of the Bankruptcy Code.  Such relief is appropriate in that the selection of any Successful Bidder will be

33769090.1

the result of a competitive Bidding Process and arm's-length, good-faith negotiations, and parties in interest will have the opportunity to review and object to a proposed transaction. *See Esposito v. Title Ins. Co. of Pa.* (*In re Fernwood Mkts.*), 73 B.R. 616, 620 (Bankr. E.D. Pa. 1987) (noting that good faith purchasers are protected under section 363(m) where notice is provided to lienholders).

## IV. The Court Should Approve the Sale Guidelines, Waive Compliance with Liquidation Sales Laws, and Approve the Dispute Resolution Procedures.

80.     As discussed above, the Court may authorize the Debtors to engage in transactions outside the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code. In addition, section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

81.     The relief requested by this Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code. The Debtors believe that the Sale Guidelines will establish a process that allows the Debtors to maximize the value of their estates while balancing the potentially competing concerns of landlords and other parties in interest. Meaningful amounts of Agency Assets, in the aggregate, will be monetized most efficiently and quickly through an orderly process in accordance with the Sale Guidelines.

82.     Courts in this and other districts have routinely approved store closing sale guidelines in chapter 11 cases, and numerous courts have granted retail debtors authority to implement such procedures. *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing the debtors, pursuant to sections 105(a) and 363(b), to conduct store closings in accordance with court-approved sale guidelines); *In re JOANN, Inc.*,

No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Bed Bath & Beyond Inc.*, No. 23-13359 (Bankr. D.N.J. June 7, 2023) (same).[9]    As such, the Court should approve the Sale Guidelines as a reasonable exercise of the Debtors' business judgment.

83.    The Court should waive compliance with Liquidation Sales Laws and approve the Dispute Resolution Procedures.  The Debtors' ability to conduct the Agency Sale in accordance with the Sale Guidelines and without complying with Liquidation Sales Laws is critical to the Agency Sale's success.  Although the Debtors intend to comply with state and local safety laws and consumer protection laws in conducting the Agency Sale, many Liquidation Sales Laws require special and cumbersome licenses, waiting periods, time limits, and other procedures for store closing, liquidation, or similar sales.

84.    To eliminate the time, delay, and expense associated with the administrative procedures necessary to comply with the Liquidation Sales Laws, the Debtors propose the Sale Guidelines as a way to streamline the administrative burdens on their estates while still adequately protecting the broad and varied interests of both landlords and applicable governmental agencies charged with enforcing any Liquidation Sales Laws that may apply to the Agency Sale.

85.    The Debtors submit that there is strong support for granting them the authority to not comply with the Liquidation Sales Laws, subject to the Sale Guidelines.  First, it is generally accepted that many state statutes and regulations provide that, if a bankruptcy sale is court-authorized, a company need not comply with the Liquidation Sales Laws.

---

[9]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

Tex. Bus. & Com. Code Ann. § 17.91(3) (exempting from subchapter sales conducted pursuant to court order).

86.     Second, pursuant to section 105(a) of the Bankruptcy Code, the Court has the authority to permit the Agency Sale to proceed notwithstanding any contrary Liquidation Sales Laws as it is essential to the continued operation of the Debtors' business and maximizing value from selling their inventory.

87.     Third, the Court will be able to supervise the Agency Sale because the Debtors and the Agency Assets are subject to the Court's exclusive jurisdiction. *See* 28 U.S.C. § 1334.  As such, creditors and the public interest are adequately protected by notice of this Motion and the ongoing jurisdiction and supervision of the Court.

88.     Fourth, bankruptcy courts have consistently recognized, with limited exception, that federal bankruptcy law preempts state and local laws that contravene the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Group. Inc.)*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . . [A] state statute . . . cannot place burdens on [a debtor] where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd*, 112 F.3d 633 (3d Cir. 1997).  Courts in some jurisdictions have found that preemption of state law is not appropriate if the laws deal with public health and safety. *See Baker & Drake. Inc. v. Pub. Serv. Comm'n of Nev. (In re Baker & Drake. Inc.)*, 35 F.3d 1348, 1353–54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure).  Preemption is appropriate where, as is the case here, the only state laws involved concern economic regulation rather than the protection of public health and safety.

89.    Courts in this district have recognized that the Bankruptcy Code preempts certain state laws and have granted similar relief from the Liquidation Sales Laws in other bankruptcy cases under similar circumstances.  *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (authorizing debtors to conduct store closing sales under the terms of the order and finding that "no further approval, license, or permit of any Governmental Unit shall be required."); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same); *In re Destination Maternity Corp.*, No. 19-12256 (BLS) (Bankr. D. Del. Nov. 14, 2019) (same).[10]

## V.    The Court Should Waive Compliance with Restrictions in the Debtors' Leases.

90.    Certain of the Debtors' leases governing the premises of the stores may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales in their boutiques.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its chapter 11 case and maximize the value of its assets under section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Ames Dep't Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (deciding that enforcement of such lease restrictions would "contravene overriding federal policy requiring [the debtor] to maximize estate assets . . . ."); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467–68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in chapter 11 case where the debtor sought to conduct a liquidation sale).

---

[10]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

91.     Courts in this district have authorized waivers of compliance with restrictive lease provisions affecting store liquidation sales in chapter 11 cases.  *See, e.g.*, *In re Liberated Brands LLC*, No. 25-10168 (JKS) (Bankr. D. Del. Apr. 17, 2025) (ordering that store closing sales be conducted without the further need for compliance with, among other things, lease provisions); *In re JOANN, Inc.*, No. 25-10068 (CTG) (Bankr. D. Del. Feb. 14, 2025) (same); *In re EXP OldCo Winddown, Inc.*, No. 24-10831 (KBO) (Bankr. D. Del. May 15, 2024) (same).[11]  Thus, to the extent that such provisions or restrictions exist in any of the leases of the boutiques, the Debtors request that the Court authorize the Debtors and Agent to conduct the Agency Sale without interference by any landlords or other persons affected, directly or indirectly, by the Agency Sale.

**VI.     The Court Should Approve the Bidding Procedures.**

92.     The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate.  *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that Debtors "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm.*, 330 F.3d at 573 (same).  Procedures used to enhance competitive bidding support this objective and, therefore, are appropriate in the context of bankruptcy sales.  *See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999); *see also Integrated Res. Inc.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the Debtors' assets").

93.     The Debtors and their professional advisors have designed the Bidding Procedures to promote a competitive and fair Bidding Process and, thus, to maximize value for the Debtors' estates and stakeholders.  Having entered into the Agency Agreement ensures that the Debtors retain flexibility to set the floor from which other potential bidders can submit higher or better Bids.  As a baseline Bid, the Agency Agreement fosters competitive bidding, increasing the

---

[11]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request of the Debtors' proposed counsel.

likelihood that the purchase price of the Assets will increase, allowing the Debtors to maximize value for the benefit of all stakeholders.

94.     The Bidding Procedures will allow the Debtors to conduct the Auction, if any, in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Assets.    Furthermore, the Bidding Procedures provide an appropriate framework for the Debtors and their independent fiduciaries and professional advisors to review, analyze, and compare any Bids received to determine which Bids are in the best interests of the Debtors' estates and their stakeholders.

95.     The Debtors submit that the Bidding Procedures are necessary and transparent and will derive the highest or best Bid(s) for some, or all, of the Assets.  Therefore, the Debtors request that the Court approve the Bidding Procedures.

## PROCESSING OF CHECKS AND ELECTRONIC FUND TRANSFERS SHOULD BE AUTHORIZED

96.     The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of access to cash on hand and anticipated access to cash collateral and debtor-in-possession financing.  In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein.  Accordingly, the Debtors do not believe that checks or wire transfer requests, other than those relating to authorized payments, will be inadvertently honored.  Therefore, the Debtors request authority, but not direction, to authorize all applicable banks and financial institutions (collectively, the "Banks"), when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

## THE REQUIREMENTS OF BANKRUPTCY RULE 6003(a) ARE SATISFIED

97.     Bankruptcy Rule 6003(a) empowers a court to grant certain relief within the first 21 days after the petition date only to the extent that "relief is needed to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003(a).  For the reasons discussed above, an immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations.  Failure to receive the requested relief during the first 21 days of the Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture and cause immediate and irreparable harm.  The requested relief is necessary for the Debtors to operate their business in the ordinary course, preserve the ongoing value of their operations, and maximize value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "needed to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003(a), and request that the Court grant the requested relief.

## RESERVATION OF RIGHTS

98.     Notwithstanding anything to the contrary herein, nothing contained in this Motion or any actions taken pursuant to any order granting the relief requested by this Motion (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be:  (a) an implication or admission as to the amount of, basis for, or validity of any particular claim against the Debtors under the Bankruptcy Code or other applicable non-bankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an

33769090.1

admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; (g) a waiver or limitation of the Debtors' or any other party in interest's claims, causes of action, or other rights under the Bankruptcy Code or any other applicable law; (h) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code; (i) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens; (j) a waiver of the obligation of any party in interest to file a proof of claim; or (k) otherwise affecting the Debtors' rights under section 365 of the Bankruptcy Code to assume or reject any executory contract or unexpired lease. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' or any other party in interest's rights to subsequently dispute such claim.

## WAIVER OF RULES 6004 AND 6006

99. The Debtors request that, upon entry of the Interim Approval Order, the Court waive the 14-day stay requirements of Bankruptcy Rules 6004 and 6006. The waiver of the 14-day stay imposed by Bankruptcy Rules 6004 and 6006 is necessary to permit the Sale to close expeditiously. The Debtors respectfully request that the Court waive the 14-day stay requirements contained in Bankruptcy Rules 6004 and 6006.

## NOTICE

100. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (i) the U.S. Trustee; (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) the office of the attorney general for each

33769090.1

of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Securities and Exchange Commission; (h) counsel to Compass Group Diversified Holdings LLC, the Debtors' prepetition secured lender and postpetition secured lender; (i) counsel to the Committee, if any; and (j) any party that is entitled to notice pursuant to Bankruptcy Rule 2002. The Debtors will serve copies of this Motion, and an order entered in respect of this Motion, as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

[<em>Remainder of page intentionally left blank</em>]

## CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B-1** or **Exhibit B-2**, (a) granting the relief requested herein, and (b) granting such other relief as the Court deems appropriate under the circumstances.

Dated: November 17, 2025
      Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Timothy R. Powell*
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Timothy R. Powell (Del. No. 6894)
Benjamin C. Carver (Del. No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:    emorton@ycst.com
       sbeach@ycst.com
       tpowell@ycst.com
       bcarver@ycst.com

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (*pro hac vice* pending)
Traci L. Shafroth (*pro hac vice* pending)
Scott Friedman (*pro hac vice* pending)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone:  (415) 496-6723
Facsimile:   (650) 636-9251
Email:    tkeller@kbkllp.com
       tshafroth@kbkllp.com
       sfriedman@kbkllp.com

*Proposed Attorneys for Debtors
and Debtors-in-Possession*

33769090.1