## EXHIBIT A

**Interim Approval Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al*.,[1] | Case No. 25-12055 (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. _____** |

**INTERIM APPROVAL ORDER (I) AUTHORIZING THE DEBTORS TO PERFORM UNDER THE AGENCY AGREEMENT, (II) APPROVING THE SALE GUIDELINES, DISPUTE RESOLUTION PROCEDURES, WAIVER OF VARIOUS LEASE RESTRICTIONS, AND MODIFICATIONS TO THE DEBTORS' CUSTOMER PROGRAMS, (III) SCHEDULING, IF NECESSARY AND PRIOR TO ANY AUCTION, THE AGENT PROTECTIONS HEARING TO CONSIDER ENTRY OF THE AGENT PROTECTIONS ORDER (1) APPROVING THE AGENT PROTECTIONS, (2) SCHEDULING, IF NECESSARY, THE AUCTION, AND (3) APPROVING (X) THE BIDDING PROCEDURES, AND (Y) THE SALE NOTICE; (IV) AUTHORIZING, IF NECESSARY, THE DEBTORS TO EXECUTE AN ALTERNATIVE TRANSACTION AGREEMENT, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Upon the motion (the "<u>Motion</u>")[2] of the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") for, among other things, entry of an interim order (this "<u>Interim Approval Order</u>"):  authorizing the Debtors to perform, on an interim basis, under the Agency Agreement; (b) approving the Sale Guidelines, Dispute Resolution Procedures, waiver of various restrictions under the Debtors' real property leases, and modifications to the Debtors' customer programs; (c) scheduling, if necessary and prior to any Auction, the Agent Protections Hearing to consider entry of the Agent Protections Order (i) approving the Agent Protections, (ii) scheduling,

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Agency Agreement, as applicable.

if necessary, the Auction, and (iii) approving (1) the Bidding Procedures, and (2) the Sale Notice; (d) authorizing, if necessary, the Debtors to enter into an Alternative Transaction Agreement; (e) scheduling the Final Approval Hearing; and (f) granting related relief; and upon the First Day Declaration; and upon the statements of counsel made in support of the relief requested in the Motion at the hearing before this Court on November [●], 2025 (the "Interim Hearing"); and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that it may enter a final order consistent with Article III of the United States Constitution; and it appearing that proper and adequate notice of the Motion has been given under the circumstances and in accordance with the Bankruptcy Rules and Local Rules and that no other or further notice is necessary; and after due deliberation thereon; and this Court having found that the relief herein is in the best interests of the Debtors' estates; and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND, CONCLUDED, AND DETERMINED THAT:**[3]

A.      The Debtors' decision to enter into, perform under, and make payments required by the Agency Agreement, a copy of which is attached hereto as **Exhibit 1**, is a reasonable exercise of the Debtors' sound business judgment, consistent with their fiduciary duties, and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.

---

[3]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.       The Agency Agreement, and the consideration to be paid thereunder, was negotiated, proposed, and entered into by Agent and the Debtors without collusion, in good faith, and from arm's-length bargaining positions.  The terms and conditions set forth in the Agency Agreement are fair and reasonable under these circumstances and were not entered into for the purpose of, nor do they have the effect of, hindering, delaying, or defrauding the Debtors or their creditors under any applicable laws.

C.       The Sale Guidelines, a copy of which is attached hereto as **Exhibit 2**, are reasonable and appropriate, will provide an efficient means for the Debtors to sell and/or dispose of the Agency Assets, and are in the best interest of the Debtors' estates.

D.       Subject to the Debtors' reservation of the ability to solicit one or more Alternative Transactions in accordance with the Agency Agreement, the sale of the Agency Assets (the "Interim Sale") contemplated therein when conducted in accordance with the Agency Agreement, the Sale Guidelines, and this Interim Approval Order, and with the assistance of Agent, will provide an efficient means for the Debtors to sell and/or dispose of the Agency Assets as quickly and effectively as possible, and are in the best interest of the Debtors' estates.

E.       The Debtors and Agent may sell the Agency Assets and Additional Agent Goods free and clear of all liens, claims, encumbrances, and interests (the "Interests") as provided for herein because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code have been satisfied.  Those holders of any such Interests who did not object, or who withdrew their objections, to the entry of this Interim Approval Order are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of any such Interests who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having such Interests attach to the Debtors' share of proceeds from the

sale of the applicable Agency Assets with the same validity and priority and to the same extent and amount that any such Interests had with respect to such Agency Assets.

F.      The Dispute Resolution Procedures are fair and reasonable and comply with applicable law.

G.      The relief set forth herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and the Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the relief approved herein.

H.      Agent is not an "insider" of the Debtors as such term is defined in section 101(31) of the Bankruptcy Code.  No common identity of directors or controlling shareholders exists between Agent and the Debtors.

I.      The entry of this Interim Approval Order is in the best interest of the Debtors and their estates, creditors, and all other parties in interest herein.

J.      Time is of the essence in effectuating the Agency Agreement and the Interim Sale contemplated therein without interruption pending the Final Approval Hearing.  The Interim Sale under the Agency Agreement must be permitted, on an interim basis, to maximize the value that Agent may realize from the Interim Sale and the value that the Debtors may realize from operating under the Agency Agreement.

K.      The Debtors have represented that, pursuant to the Motion, they are not seeking to either sell or lease personally identifiable information during the course of the Interim Sale or that the Debtors' privacy parties permit the sale or lease of such information.

L.      No sale, transfer, or other disposition of the Agency Assets pursuant to the Agency Agreement, or entry into the Agency Agreement, will subject Agent, solely in its capacity as Agent under the Agency Agreement, to any liability for claims, obligations, or Interests asserted against

the Debtors or the Debtors' interests in such Agency Assets by reason of such transfer under any laws, including, without limitation, any bulk-transfer laws or any theory of successor or transferee liability, antitrust, environmental, product line, de facto merger or substantial continuity or similar theories.  Agent, in its capacity as Agent under the Agency Agreement, is not a successor to the Debtors or their respective estates.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED, on an interim basis, as provided herein.

2.      A final hearing on the relief sought in the Motion shall be conducted on [_____], 2025, at [_____] **(ET)** (the "<u>Final Approval Hearing</u>").  Any party-in-interest objecting to the relief sought at the Final Approval Hearing or the Final Approval Order shall file and serve a written objection, which objection shall be served upon (a) proposed counsel for the Debtors (i) Keller Benvenutti Kim LLP, 101 Montgomery Street, Suite 1950, San Francisco, CA  94104, Attn:  Tobias S. Keller (tkeller@kbkllp.com) and Scott J. Friedman (sfriedman@kbkllp.com), and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn:  Edmon L. Morton, Esq. (emorton@ycst.com), Sean M. Beach (sbeach@ycst.com), and Timothy R. Powell (tpowell@ycst.com); (b) counsel to any official committee appointed in the Chapter 11 Cases (each, a "<u>Committee</u>"); (c) the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy Fox (timothy.fox@usdoj.com); (d) counsel to Compass Group Diversified Holdings LLC, the Debtors' prepetition secured lender and postpetition secured lender, (i) Squire Patton Boggs (US) LLP, 1000 Key Tower 127 Public Square, Cleveland, OH 44114, Attn:  Peter R. Morrison, Esq. (peter.morrison@squirepb.com), and (ii) Polsinelli PC, as Delaware counsel to the DIP Lender and Prepetition Lender, 222 Delaware Avenue, Suite 1101,

Wilmington, DE 19801, Attn: Shanti Katona (skatona@polsinelli.com); and (e) counsel to Agent, (i) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com), and (ii) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attn: Gregory A. Taylor (gtaylor@ashby-geddes.com), in each case no later than _____, 2025, at 4:00 p.m. (ET). If no objections to the entry of the Final Approval Order are timely filed, this Court may enter the Final Approval Order without further notice or a hearing.

3.       A special hearing, if necessary, shall be conducted on **[_____], 2025, at [_____] (ET)** (the "Agent Protections Hearing") to consider entry of an order (a) approving the Agent Protections; (b) scheduling, if necessary, an Auction; and (c) approving (i) the Bidding Procedures, and (ii) the Sale Notice.

4.       The Debtors and Agent are authorized and empowered to take any and all further actions as may be reasonably necessary or appropriate to give effect to this Interim Approval Order.

A.       Effectiveness and Authority to Perform Under the Agency Agreement

5.       The Debtors are authorized to act and perform in accordance with the terms of the Agency Agreement pursuant to sections 363 of the Bankruptcy Code, including making payments required by the Agency Agreement, including, without limitation, the payment of Tier 1 Consulting Fees and proceeds of sales of Additional Agent Goods, if any, and reimbursement of Tier 1 Expenses to Agent, in each case without the need for any application of Agent or a further order of this Court, and such amounts shall be paid free and clear of any and all Interests of whatever kind or nature. Agent's fees and expenses shall be paid from the gross proceeds of the Interim Sale (including proceeds of sales of Additional Agent Goods, if any), but shall be subject to the terms of the Agency Agreement itself, including as to any expense budget attached thereto.

33769091.1

6.      Subject to this Interim Approval Order and the Sale Guidelines, the Debtors and Agent hereby are authorized to take any and all actions as may be necessary or desirable to implement the Agency Agreement and the Interim Sale.  Each of the transactions contemplated by the Agency Agreement and any actions taken by the Debtors and Agent necessary or desirable to implement the Agency Agreement and/or the Interim Sale prior to the date of this Interim Approval Order hereby are approved.

7.      The Debtors are authorized to amend the Agency Agreement from time to time in accordance with its terms, including by extending the Sale Term, without further order of this Court; *provided* that any such amendment is not materially adverse to the Debtors or their estates, and such amendment is consented to by the DIP Lender.

8.      Notwithstanding anything to the contrary in the Agency Agreement, the Debtors and their estates shall not indemnify Agent for any damages arising primarily out of Agent's fraud, willful misconduct, or gross negligence.

B.      <u>Interim Approval Order Binding</u>

9.      This Interim Approval Order shall be binding upon and shall govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Agency Assets.

10.     This Interim Approval Order and, subject to approval on a final basis of the assumption of the Agency Agreement, the terms and provisions of the Agency Agreement shall be binding on all of the Debtors' creditors (whether known or unknown), the Debtors, Agent, and

33769091.1

their respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting an interest in the Agency Assets, notwithstanding any subsequent appointment of any trustee, party, entity, or other fiduciary under any section of the Bankruptcy Code with respect to the forgoing parties, and as to such trustee, party, entity, or other fiduciary, such terms and provisions likewise shall be binding. The provisions of this Interim Approval Order and the terms and provisions of the Agency Agreement, and any actions taken pursuant hereto or thereto shall survive the entry of any order which may be entered confirming or consummating any plan(s) of the Debtors or converting the Debtors' cases from chapter 11 to chapter 7, and the terms and provisions of the Agency Agreement, as well as the rights and interests granted pursuant to this Interim Approval Order and the Agency Agreement, shall continue in these or any superseding cases and shall be binding upon the Debtors, Agent, and their respective successors and permitted assigns, including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code. Any trustee appointed in the Chapter 11 Cases shall be and hereby is authorized to operate the business of the Debtors to the fullest extent necessary to permit compliance with the terms of this Interim Approval Order and the Agency Agreement, and Agent and the trustee shall be and hereby are authorized to perform under the Agency Agreement upon the appointment of the trustee without the need for further order of this Court.

C.     Authority to Engage in the Interim Sale

11.     The Debtors and Agent are authorized, on an interim basis pending the Final Approval Hearing, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, to immediately conduct the Interim Sale in accordance with this Interim Approval Order, the Sale Guidelines, and the Agency Agreement.

12.     To facilitate the Interim Sale, the Sale Guidelines are approved in their entirety.

13.     To facilitate the Interim Sale, the Debtors are authorized to make modifications to the programs contained in the *Motion of Debtors for Interim and Final Orders (A) Authorizing the Debtors to (I) Maintain and Administer Their Customer Programs, (II) Honor Prepetition Obligations, and (B) Granting Related Relief* [Docket No. [●]].

14.     All entities that are presently in possession of some or all of the Agency Assets in which the Debtors hold an interest that are or may be subject to the Agency Agreement or this Interim Approval Order hereby are directed to surrender possession of such Agency Assets to the Debtors or Agent.

15.     Neither the Debtors nor Agent, nor any of their officers, employees, or agents, shall be required to obtain the approval of any third party, including (without limitation) any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code) or landlord, to conduct the Interim Sale and to take the related actions authorized herein.

D.     Conduct of the Interim Sale

16.     All newspapers and other advertising media in which the Interim Sale may be advertised and all landlords are directed to accept this Interim Approval Order as binding authority so as to authorize the Debtors and Agent to conduct the Interim Sale and the sale of the Agency Assets and Additional Agent Goods pursuant to the Agency Agreement, including, without limitation, to conduct and advertise the sale of the Agency Assets and Additional Agent Goods in the manner contemplated by and in accordance with this Interim Approval Order, the Sale Guidelines, and the Agency Agreement.

17.     The Debtors and Agent are hereby authorized to take such actions as may be necessary and appropriate to implement the Agency Agreement and to conduct the Interim Sale as provided in the Agency Agreement or the Sale Guidelines, without necessity of further order of this Court, including, without limitation, promotion the Interim Sale on a highly promotional basis

utilizing sale themes as are customary in the industry, as determined by Agent from time to time in its discretion.  In furtherance of the foregoing, Agent shall be authorized to use sign-walkers, banners, or other advertising, and if the Debtors and Agent are unable to consensually resolve any dispute arising from the use of such promotional activities in any particular location, any party may request an expedited telephonic hearing with this Court pursuant to this Interim Approval Order.

18.     Provided that the conduct of the Interim Sale is conducted in accordance with the terms of this Interim Approval Order, the Agency Agreement and the Sale Guidelines, any restrictive provision of any lease, sublease, restrictive covenant, or other agreement relative to occupancy affecting or purporting to restrict the conduct of the  Interim Sale (including the sale of the Agency Assets and Additional Agent Goods), the rejection of leases, abandonment of assets, or "going dark" provisions shall not be enforceable in conjunction with the Interim Sale or the transactions provided for in the Agency Agreement.  Breach of any such provisions in the Chapter 11 Cases in conjunction with the conduct of the Interim Sale shall not constitute a default under a lease or provide a basis to terminate the lease.

19.     The Debtors, Agent, and landlords of the Debtors' corporate offices and other operating locations (each, a "Sale Location," and collectively, the "Sale Locations"), with the consent of the DIP Lender are authorized to enter into agreements (each, a "Side Letter," and collectively, the "Side Letters") between themselves modifying the Sale Guidelines without further order of this Court, and such Side Letters shall be binding as among the Debtors, Agent, and any such landlords.

20.     Except as expressly provided for herein or in the Sale Guidelines, and except with respect to any Governmental Unit (as to which paragraphs 34-37 herein shall apply), no person or

entity, including, but not limited to, any landlord, shopping center manager, licensor, service provider, utility, or creditor, shall take any action to directly or indirectly prevent, interfere with, or otherwise hinder consummation of the Interim Sale, or the sale of Agency Assets or Additional Agent Goods, or the advertising and promotion of such Interim Sale, and all such parties and persons of every nature and description, including, but not limited to, any landlord, licensor, service provider, utility, or creditor and all those acting for or on behalf of such parties, are prohibited and enjoined from (a) interfering in any way with, obstructing, or otherwise impeding, the Interim Sale and/or (b) instituting any action or proceeding in any court (other than in this Court), or administrative body seeking an order or judgment against, among others, the Debtors, Agent, or the landlords, at the Sale Locations that might in any way directly or indirectly obstruct, otherwise interfere with, or adversely affect the conduct of the Interim Sale, and/or seek to recover damages for breaches of covenants or other provisions in any lease, sublease, license, or contract based upon any relief authorized herein.

21.    In accordance with and subject to the terms and conditions of the Agency Agreement, Agent shall have the right to use the Sale Locations and all related services, FF&E, supplies, and other assets of the Debtors for the purpose of conducting the Interim Sale, free of any interference from any entity or person, subject to compliance with the Agency Agreement, Sale Guidelines, and this Interim Approval Order.

22.    The Interim Sale of Agency Assets and Additional Agent Goods shall be "as is" and final.  However, all state and federal laws relating to implied warranties for latent defects shall be complied with and are not superseded by the sale of said goods or the use of the terms "as is" or "final sales."

23.     Except as may otherwise expressly provided in the Agency Agreement, Agent shall not be liable for sales taxes (except with respect to sale of the Additional Agent Goods), and the payment of any and all sales taxes (except with respect to the Additional Agent Goods) is the responsibility of the Debtors.  The Debtors are directed to remit all taxes arising from the Interim Sale to the applicable Governmental Units as and when due; *provided* that in the case of a *bona fide* dispute the Debtors are only directed to pay such taxes upon the resolution of the dispute, if and to the extent that the dispute is decided in favor of the applicable Governmental Unit.  For the avoidance of doubt, sales taxes collected and held in trust by the Debtors shall not be used to pay any creditor or any other party, other than the applicable Governmental Unit for which the sales taxes are collected.  Agent shall collect, remit to the Debtors, and account for sales taxes as, and to the extent provided in, the Agency Agreement.  This Interim Approval Order does not enjoin, suspend, or restrain the assessment, levy, or collection of any tax under state law, and does not constitute a declaratory judgment with respect to any party's liability for taxes under state law.

24.     Except as expressly provided for in the Agency Agreement, nothing in this Interim Approval Order or the Agency Agreement, and none of Agent's actions taken in respect of the Interim Sale shall be deemed to constitute an assumption by Agent of any of the Debtors' obligations relating to any of the Debtors' employees.  Moreover, Agent shall not become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

25.     Pursuant to section 363(f) of the Bankruptcy Code, Agent, on behalf of the Debtors, is authorized to sell the Agency Assets, and the Interim Sale of Agency Assets and Additional Agent Goods, whether by Agent or the Debtors, shall be free and clear of any and all Interests; *provided, however*, that any such Interests shall attach to the amounts to be received by the Debtors

33769091.1

under the Agency Agreement that are not otherwise payable to Agent, in each case with the same

validity, in the amount, with the same priority as, and to the same extent that any such Interests

have with respect to the Agency Assets, subject to any claims and defenses that the Debtors may

possess with respect thereto.

26.    To the extent that the Debtors propose to sell or abandon FF&E which may contain

personal and/or confidential information about Debtors' employees and/or customers

(the "Confidential Information"), the Debtors shall remove the Confidential Information from such

items of FF&E before such sale or abandonment.

27.    The Debtors and/or Agent (as the case may be) are authorized and empowered to

transfer Agency Assets and Additional Agent Goods among the Sale Locations.  Agent is hereby

authorized to sell the Debtors' Owned FF&E and abandon the same, in each case, as provided for

and in accordance with the terms of the Agency Agreement and Sale Guidelines; *provided* that

Agent and the Debtors are not authorized to abandon, and are directed to remove, any hazardous

materials defined under applicable law from any leased premises as and to the extent they are

required to do so by applicable law.

28.    Notwithstanding anything to the contrary in this Interim Approval Order or the

Agency Agreement, the Debtors shall not sell or abandon any property that the Debtors know is

not owned by a Debtor without the owner's consent; *provided* that the Debtors will work in good

faith with the owner of any such property to arrange for the return of the property to the owner;

*provided, further*, that the Debtors may abandon property owned by any landlord at the applicable

Sale Location(s) in accordance with the terms of this Interim Approval Order.

29.    No later than seven days prior to the objection deadline to entry of the Final

Approval Order, Agent shall file a declaration disclosing connections to the Debtors, their

creditors, and other parties in interest in the Chapter 11 Cases, and the Debtors shall serve the same on the U.S. Trustee, any Committee, and all parties who have filed requests for service under Bankruptcy Rule 2002, by email, or if the email address is not available to the Debtors, then by first-class mail.

30.     Notwithstanding this or any other provision of this Interim Approval Order, nothing shall prevent or be construed to prevent Agent (individually, as part of a joint venture, or otherwise) or any of its affiliates from providing additional services to and/or bidding on the Debtors' assets not subject to the Agency Agreement pursuant to an agency agreement or otherwise ("Additional Assets").  Nothing contained in this Interim Approval Order shall be deemed to prohibit Agent (individually, as part of a joint venture, or otherwise) or any of its affiliates to bid on, guarantee, or otherwise acquire such Additional Assets, or offer to provide additional services, notwithstanding anything to the contrary in the Bankruptcy Code or other applicable law.

31.     Nothing in this Interim Approval Order shall (a) alter or affect the Debtors' obligations to comply with section 365(d)(3) of the Bankruptcy Code or (b) alter or modify the rights of any lessor or other counterparty to a lease with the Debtors to file an appropriate motion or otherwise seek appropriate relief if the Debtors fail to comply with section 365(d)(3) of the Bankruptcy Code; *provided* that the conduct of the Interim Sale in accordance with the Sale Guidelines, as may have been modified by a Side Letter, shall not be a violation of section 365(d)(3) of the Bankruptcy Code.

32.     During the Interim Sale, Agent shall be granted a limited license and right to use the Debtors' Intellectual Property, including, without limitation, trade names, logos, e-mail lists, mailing lists, customer lists, and e-commerce sites (including (without limitation) websites and social media sites such as Facebook and X), relating to and used in connection with the operation

of the Sale Locations as identified in the Agency Agreement, solely for the purpose of advertising the Interim Sale in accordance with the terms of the Agency Agreement, Sale Guidelines, and this Interim Approval Order; *provided, however,* that Agent shall not receive Personally Identifiable Information (as defined in section 101(41A) of the Bankruptcy Code) from the Debtors.

E.    Dispute Resolution Procedures with Governmental Units

34.    Nothing in this Interim Approval Order, the Agency Agreement, or the Sale Guidelines releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery, or injunctive relief) to which any entity would be subject as the owner, lessor, lessee, or operator of the property after the date of entry of this Interim Approval Order.  Nothing contained in this Interim Approval Order, the Agency Agreement, or the Sale Guidelines shall in any way: (a) diminish the obligation of any entity to comply with environmental laws; or (b) diminish the obligations of the Debtors to comply with environmental laws consistent with its rights and obligations as debtor in possession under the Bankruptcy Code.  The Debtors' and Agent's conduct of the Interim Sale shall not be exempt from laws of general applicability, including, without limitation, public health and safety, criminal, tax, labor, employment, environmental, antitrust, fair competition, traffic and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").  Nothing in this Interim Approval Order, the Agency Agreement, or the Sale Guidelines shall alter or affect obligations to comply with all applicable federal safety laws and regulations.  Nothing in this Interim Approval Order shall be deemed to bar any Governmental Unit from enforcing General Laws in the applicable non-bankruptcy forum, subject to the Debtors' rights to assert in that forum or before this Court that any such laws are not in fact General Laws or that such enforcement is impermissible under the Bankruptcy Code, this Interim Approval Order, or otherwise, pursuant to paragraph 36 herein.

33769091.1

Notwithstanding any other provision in this Interim Approval Order, no party waives any rights to argue any position with respect to whether the conduct was in compliance with this Interim Approval Order and/or any applicable law, or that enforcement of such applicable law is preempted by the Bankruptcy Code.  Nothing in this Interim Approval Order shall be deemed to have made any rulings on any such issues.

35.     Provided that the Interim Sale is conducted in accordance with the terms of this Interim Approval Order, the Agency Agreement, and the Sale Guidelines, and in light of the provisions in the laws of many Governmental Units that exempt court-ordered sales from their provisions, to the extent that the sale of Agency Assets is subject to any Liquidation Sale Laws, including any federal, state, or local statute, ordinance, or rule, or licensing requirement directed at regulating "going out of business," "store closing," similar inventory liquidation sales, or fast pay laws, bulk sale laws, including laws restricting safe, professional, and non-deceptive, customary advertising such as signs, banners, posting of signage, and use of sign-walkers solely in connection with the Interim Sale and including ordinances establishing license or permit requirements, waiting periods, time limits or bulk sale restrictions that would otherwise apply solely to the sale of the Agency Assets, the Debtors and Agent will be presumed to be in compliance with any Liquidation Sale Laws and are authorized to conduct the Interim Sale in accordance with the terms of this Interim Approval Order, the Agency Agreement and the Sale Guidelines without the necessity of further showing compliance with any Liquidation Sale Laws.

36.     To the extent that between the Petition Date and the date of the entry of the Final Approval Order or Sale Order, as applicable, there is a dispute arising from or related to the manner in which the Interim Sale is being conducted pursuant to this Interim Approval Order, the Agency

Agreement, or the Sale Guidelines, which disputes relate to any Liquidation Sales Laws, the following Dispute Resolution Procedures shall apply:

(a)    Within three business days after entry of this Interim Approval Order, the Debtors will serve by first-class mail copies of this Interim Approval Order, the Agency Agreement, and the Sale Guidelines on the following: (i) the Attorney General's office for each state where the Interim Sale is being held, (ii) the county consumer protection agency or similar agency for each county where the Interim Sale is being held, (iii) the division of consumer protection for each state where the Interim Sale are being held, (iv) the chief legal counsel for the local jurisdiction, and (E) the landlords for the Sale Locations (collectively, the "<u>Dispute Notice Parties</u>").

(b)    To the extent that there is a dispute arising from or relating to the Interim Sale, this Interim Approval Order, or the proposed Final Approval Order, as applicable, the Agency Agreement, or the Sale Guidelines, which dispute relates to any Liquidation Sale Laws (a "<u>Reserved Dispute</u>"), this Court shall retain jurisdiction to resolve the Reserved Dispute. Any time within 10 days following entry of this Interim Approval Order, any Governmental Unit may assert that a Reserved Dispute exists by serving written notice of such Reserved Dispute (the "<u>Dispute Notice</u>"), explaining the nature of the dispute to: (i) proposed counsel to the Debtors (1) Keller Benvenutti Kim LLP, 101 Montgomery Street, Suite 1950, San Francisco, CA 94104, Attn: Tobias S. Keller, Esq. (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com), and (2) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn: Edmon L. Morton, Esq. (emorton@ycst.com), Sean M. Beach (sbeach@ycst.com), and Timothy R. Powell (tpowell@ycst.com); (ii) counsel to Agent, (1) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com), and (2) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attn: Gregory A. Taylor (gtaylor@ashby-geddes.com); (iii) the U.S. Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Timothy Fox (timothy.fox@usdoj.com); (iv) counsel to the DIP Lender and Prepetition Lender, (1) Squire Patton Boggs (US) LLP, 1000 Key Tower 127 Public Square, Cleveland, OH, 44114 Attn: Peter R. Morrison (peter.morrison@squirepb.com), and (2) Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, Attn: Shanti Katona (skatona@polsinelli.com); and (v) counsel to any Committeeany Committee. If the Debtors, Agent, and the Governmental Unit are unable to resolve the Reserved Dispute within 15 days after service of the Dispute Notice, the Governmental Unit may file a motion with this Court requesting that this Court resolve the Reserved Dispute (a "<u>Dispute Resolution Motion</u>").

(c)     In the event that a Dispute Resolution Motion is filed, nothing in this Interim Approval Order shall preclude the Debtors, a landlord, or any other interested party from asserting (i) that the provisions of any Liquidation Sale Laws are preempted by the Bankruptcy Code, or (ii) that neither the terms of this Interim Approval Order nor the conduct of the Debtors pursuant to this Interim Approval Order violates such Liquidation Sale Laws.  Filing a Dispute Resolution Motion as set forth herein shall not be deemed to affect the finality of the Interim Approval Order or to limit or interfere with the Debtors' or Agent's ability to conduct or to continue to conduct the Interim Sale pursuant to this Interim Approval Order, absent further order of this Court.  Upon the entry of this Interim Approval Order this Court grants authority for the Debtors and Agent to conduct the Interim Sale pursuant to the terms of this Interim Approval Order, the Agency Agreement, and/or the Sale Guidelines and to take all actions reasonably related thereto or arising in connection therewith.  The Governmental Unit will be entitled to assert any jurisdictional, procedural, or substantive arguments it wishes with respect to the requirements of its Liquidation Sale Laws or the lack of any preemption of such Liquidation Sale Laws by the Bankruptcy Code.  Nothing in this Interim Approval Order will constitute a ruling with respect to any issues to be raised in any Dispute Resolution Motion.

(d)     If, at any time, a dispute arises between the Debtors and/or Agent and a Governmental Unit as to whether a particular law is a Liquidation Sale Law, and subject to any provisions contained in this Interim Approval Order related to the Liquidation Sale Laws, then any party to that dispute may utilize the provisions of subparagraphs (b) and (c) above by serving a notice to the other party and proceeding thereunder in accordance with those paragraphs.  Any determination with respect to whether a particular law is a Liquidation Sale Law shall be made *de novo*.

37.     Subject to paragraphs 34-36 above, each and every federal, state, or local agency, departmental or Governmental Unit with regulatory authority over the Interim Sale and all newspapers and other advertising media in which the Interim Sale are advertised shall consider this Interim Approval Order as binding authority that no further approval, license, or permit of any Governmental Unit shall be required, nor shall the Debtors or Agent be required to post any bond, to conduct the Interim Sale.

38.     Within three business days of entry of this Interim Approval Order, the Debtors shall serve, or shall cause to be served, copies of this Interim Approval Order, the Agency

Agreement, and the Sale Guidelines via email, facsimile or regular mail, on:  (a) the U.S. Trustee; (b) the United States Attorney's Office for the District of Delaware; (c) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (d) counsel to Compass Group Diversified Holdings LLC, the Debtors' prepetition secured lender and postpetition secured lender, Squire Patton Boggs (US) LLP, 1000 Key Tower 127 Public Square, Cleveland, OH 44114, Attn:  Peter Morrison, Esq. (peter.morrison@squirepb.com);  (e) the Internal Revenue Service; (vi) the Attorney General's office for each state where the Interim Sale is being held; (f) the division of consumer protection for each state where the Interim Sale is being held; (g) the chief legal counsel for the local jurisdiction; (h) the landlords for the Sale Locations; and (i) the Securities and Exchange Commission.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

F.    Other Provisions

39.    The Debtors are authorized, but not directed, to implement and make payments under the Incentives Program (as defined in the *Motion of Debtors for Interim and Final Order (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (II) Continue Employee Benefits Programs, and (B) Granting Related Relief* [Docket No. [●]]).  For the avoidance of doubt, no Incentives Program bonuses shall be paid to any executives, directors, or "insiders," as that term is defined in the Bankruptcy Code, absent further Court order.

40.    Agent is authorized to supplement the Merchandise in the Sale Locations with Additional Agent Goods; *provided* that any such Additional Agent Goods must be of like kind and no lesser quality than the Merchandise.  The Interim Sale of Additional Agent Goods shall be recorded through the Debtors' existing systems; *provided, however*, that Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number or in such other

manner that shall distinguish the Additional Agent Goods from the Merchandise. Agent and the Debtors shall cooperate to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could distinguish the Additional Agent Goods from the Merchandise.

41.    All transactions relating to the Additional Agent Goods are, shall be construed as, and are acknowledged by the Debtors to be, a true consignment from Agent to the Debtors under Article 9 of the Uniform Commercial Code in effect in the State of Delaware (the "UCC") and not a consignment for security purposes.

42.    Agent shall pay to the Debtors an amount equal to five percent of the gross proceeds (excluding sales taxes) from the Interim Sale of Additional Agent Goods completed during the Sale Term. All remaining amounts from the Interim Sale of the Additional Agent Goods shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds. At Agent's sole cost and expense, the Debtors shall insure the Additional Agent Goods at Agent's request and, if required, promptly file any proofs of loss with regard to the same with the Debtors' insurers. The Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods.

43.    The Additional Agent Goods are not and shall not be treated as property of the estate within the meaning of section 541 of the Bankruptcy Code.

44.    With respect to each Sale Locations, at the conclusion of the Interim Sale at such Sale Locations Agent shall vacate the Sale Locations; *provided* that Debtors or Agent may abandon any FF&E, including any Owned FF&E, not sold in the Interim Sale at such location at the conclusion of the Sale (the "Termination Date"), without cost or liability of any kind to Agent. The Debtors will have the option to remove the FF&E prior to the Termination Date. For the

avoidance of doubt, as of the Termination Date with respect to each Sale Locations, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E.

45.      Agent shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement, as modified by this Interim Approval Order.

46.      To the extent the Debtors are subject to any state "fast pay" laws in connection with the Interim Sale, the Debtors shall be presumed to be in compliance with such laws to the extent, in applicable states, such payroll payments are made by the later of: (a) the Debtors' next regularly scheduled payroll; and (b) seven calendar days following the termination date of the relevant employee, and in all such cases consistent with, and subject to, any previous orders of this Court regarding payment of same.

47.      Notwithstanding the relief granted in this Interim Approval Order and any actions taken pursuant to such relief, nothing in this Interim Approval Order shall be deemed: (a) an admission as to the validity, priority, nature, or extent of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party-in-interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Approval Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, other than assumption of the Agency Agreement (subject to entry of the Final Approval Order); (f) a waiver or limitation of the Debtors' rights or the rights of any other person under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors or any other party-in-interest that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors and all

other parties-in-interest expressly reserve their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

48.     Except as otherwise provided herein, nothing herein shall be construed to (a) create or perfect, in favor of any person or entity, any interest in cash of a Debtor that did not exist as of the Petition Date or (b) alter or impair any security interest or perfection thereof, in favor of any person or entity, that existed as of the Petition Date (and nothing in this paragraph 48 shall be construed to supersede any provisions of the Interim DIP Order.

49.     Nothing herein, nor as a result of any payment made pursuant to this Interim Approval Order, shall be deemed or construed as a waiver of the right of Debtors, or shall impair the ability of Debtors to contest the validity and amount of any payment made pursuant to this Interim Approval Order (other than any payment in respect of the Tier 1 Consulting Fee and reimbursement of any Tier 1 Expenses as provided in the Agency Agreement).

50.     Nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by any party.

51.     Notwithstanding anything to the contrary set forth herein, any payment made, or authorization contained, hereunder shall be subject in all respects to the Approved Budget (as defined in Interim DIP Order or Final DIP Order).

52.     Cause exists to shorten the notice period set forth in Bankruptcy Rule 2002, to the extent possible.  Accordingly, notice of the Motion as provided therein is deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the local rules of this Court are satisfied by such notice.

53.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Approval Order are immediately effective and enforceable upon its entry.

54.      This Court shall retain jurisdiction with regard to all issues or disputes relating to this Interim Approval Order, the Agency Agreement, the Sale Guidelines, and any Side Letter, including, but not limited to, (a) any claim or issue relating to any efforts by any party or person to prohibit, restrict or in any way limit advertising, including with respect to any allegations that such advertising is not being conducted in a safe, professional, and non-deceptive manner, (b) any claim of the Debtors, the landlords of any Sale Locations and/or Agent for protection from interference with the conduct of the Interim Sale, (c) any other disputes related to the conduct of the Interim Sale, and (d) protect the Debtors and/or Agent against any assertions of any Interests. No such parties or person shall take any action against the Debtors, Agent, the landlords of the Sale Locations, or the Interim Sale until this Court has resolved such dispute.  This Court shall hear the request of such parties or persons with respect to any such disputes on an expedited basis, as may be appropriate under the circumstances.

55.      Upon entry of the Final Approval Order, nothing contained in any plan confirmed in the Chapter 11 Cases or any order of this Court confirming such plan or in any other order in the Chapter 11 Cases (including any order entered after any conversion of this case to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Agency Agreement or the terms of this Interim Approval Order.

56.      Agent, solely in its capacity as Agent contemplated under the Agency Agreement and for exclusively the purposes contemplated therein, shall not be liable for any claims against the Debtors, and the Debtors shall not be liable for any claims against Agent, in each case, other than as expressly provided for in the Agency Agreement.  Agent, in the capacity described in this paragraph 56, shall have no successor liability whatsoever with respect to any Interests or claims of any nature that may exist against the Debtors, including, without limitation, Agent shall not be,

or to be deemed to be (a) a successor in interest or within the meaning of any law, including any revenue, successor liability, pension, labor, ERISA, bulk transfer, products liability, tax or environmental law, rule or regulation, or any theory of successor or transferee liability, antitrust, environmental, product line, *de facto* merger or substantial continuity or similar theories, or (b) a joint employer, co-employer or successor employer with the Debtors, and the Agent shall have no obligation to pay the Debtors' wages, bonuses, severance pay, vacation pay, WARN act claims if any), benefits or any other payments to employees of the Debtors, including pursuant to any collective bargaining agreement, employee pension plan, or otherwise, except as expressly set forth in the Agency Agreement.

57.     In the event any of the provisions of this Interim Approval Order are modified, amended or vacated by a subsequent order of this Court or any other court, Agent shall be entitled to the protections provided in section 363(m) of the Bankruptcy Code, and no such appeal, modification, amendment, or vacatur shall affect the validity and enforceability of the Interim Sale under the Agency Agreement or this Interim Approval Order.

58.     In the event of any conflict between the Sale Guidelines, the Agency Agreement, and any Side Letter with any landlord, the terms of such Side Letter shall control.  To the extent there is a conflict between either the Sale Guidelines, the Agency Agreement, or the Side Letter on the one hand, and this Interim Approval Order, this Interim Approval Order shall control.

**<u>EXHIBIT 1</u>**

**Agency Agreement**

## AGENCY AGREEMENT

This Agency Agreement (this "Agreement") is made as of November 16, 2025, by and between LUGANO DIAMONDS & JEWELRY, INC., a California corporation ("Merchant") and ENHANCED RETAIL FUNDING, LLC, a Massachusetts limited liability company ("Agent").

Section 1.     Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the following purposes: (A) during the Tier 1 Period (as defined below), to retain Consultant as its exclusive consultant to provide certain consulting services to Merchant with respect to the (1) disposition of the Merchandise (including Memo Merchandise), Merchant's Consignment Goods, and Remaining Merchandise (each as defined below) through (w) Merchant's retail stores (each individually, a "Store," and, collectively, the "Stores") identified on Exhibit A hereto (including any secure on-site or third-party safe, vault, and/or other similar secure storage facility maintained by the Merchant in the ordinary course of its business), (x) Merchant's corporate offices (including any secure on-site or third-party safe, vault, and/or other similar secure storage facility maintained by the Merchant in the ordinary course of its business), (y) Merchant's sales representatives in possession of Memo Merchandise (as hereinafter defined) ((1)(w-y) collectively the "Sale Locations"), and/or (z) through sales completed in one or more wholesale sales channels; and (2) disposing of the Owned FF&E (as hereinafter defined) in the Sale Locations, in each case by means of a highly promotional sale strategy utilizing sale themes as shall be determined by Agent from time-to-time, in its exclusive discretion (as further described below, the "Sale"); (B) provided Merchant does not consummate an Alternative Transaction (as defined below), during the Tier 2 Period (as defined below), where and to the extent applicable, Agent shall act as Merchant's exclusive agent to (1) conduct the Sale in accordance with the terms of Section B of this Agreement; and (C) subject to entry of the Final Approval Order (as hereinafter defined) disposing of Owned Intellectual Property and Underlying Occupancy Agreements (each as hereinafter defined).

WHEREAS, Merchant has advised Agent that Merchant is entering into this Agreement in contemplation of filing a voluntary petition for relief under chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agree as follows:

## A.     **Tier 1 Period Consulting Engagement**.

Section 2.     Agent's Tier 1 Period Consulting Services

2.1     If following execution of this Agreement Merchant commences a case under Chapter 11 of the Bankruptcy Code, then no later than three (3) days after the Petition Date Merchant shall file a motion for interim and final approval of this Agreement under, inter alia, sections 105(a), 363 and 365 of the Bankruptcy Code, which motion shall be reasonably acceptable to Agent and the DIP Lender (as hereinafter defined), and use commercially reasonable efforts to seek approval of an order of the Bankruptcy Court to permit Merchant and Agent's performance of this Agreement during the Tier 1 Period (hereinafter, the "Interim Approval Order").  For purposes of this Agreement, "Petition Date" means the date on which Merchant files a petition for relief under the Bankruptcy Code.

2.2     The Interim Approval Order shall provide, in a form reasonably satisfactory to Merchant, DIP Lender and Agent, *inter alia,* that: (i) this Agreement is in the best interest of the Merchant, Merchant's estate, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved on an interim basis; (iii) during the Tier 1 Period, Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby, including, but not limited to, authorizing Merchant to pay Agent any amount earned by Agent in respect of the Tier 1 Consulting Fee (as defined below) and reimburse Agent for any Tier 1 Expenses (as defined below); (iv) Agent shall be entitled to sell all Merchandise, Merchant's Consignment Goods, Remaining Merchandise, and Owned FF&E, with such sales to be in each case free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of such assets or the Proceeds thereof attaching only to the any amounts to be received by Merchant under this Agreement (net of any Tier 1 Consulting Fees and Tier 1 Expenses for which Merchant is obligated to reimburse Agent hereunder); (v) Agent shall have the right to use the Sale Locations, the E-Commerce Platform (as defined below) and all related services, FF&E (as defined below) and other assets of Merchant for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below), this Agreement, the Interim Approval Order, and to the extent applicable, the DIP Order; (vi) Agent, as consultant to Merchant, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the Sale utilizing highly promotional sale themes as are customary in the industry, in each case as shall be determined by Agent from time-to-time, in its exclusive discretion, and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Interim Approval Order and Sale Guidelines (as the same may be modified from time to time and approved by the Bankruptcy Court); (vii) Agent shall be granted a limited license and right to use, during the Tier 1 Period, the E-Commerce Platform, trade names, logos, e-mail lists, customer lists, relating to and used in connection with the operation of the Sale Locations, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be authorized to accept the Interim Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which (1) in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale or (2) with respect to Merchandise, Merchant's Consignment Goods, Remaining Merchandise, and Owned FF&E, or any proceeds therefrom; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement and the Interim Approval Order, respectively; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) a finding that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Sale Locations uninterrupted; (xiii) any amounts owed by Merchant to Agent under this Agreement shall be payable from the proceeds of the Sale and, to the extent required, from the Agent Carve-Out (as defined below); (xiv) a finding that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement are a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and are in the best interests of the Merchant, the estates, their creditors, and other parties in interest; (xv) a finding that this Agreement was negotiated in good faith and at arm's length between the Merchant and Agent, and further that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; and (xvi) in the event any of the provisions of the Interim Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in section 363(m) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the Sale under this Agreement or the Interim Approval Order.

2.3      In addition to the Interim Approval Order contemplated in <u>Section 2.2</u> above, Merchant shall seek approval of an additional order (the "<u>Agent Protections Order</u>") to be entered prior to any auction to be conducted with respect to an Alternative Transaction. The Agent Protections Order shall provide that in consideration for Agent having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of the assets of Merchant and to compensate Agent in the event that this Agreement is terminated because Merchant determines to consummate an Alternative Transaction, Merchant shall pay and Agent shall receive, (i) a breakup fee equal to $3,000,000.00 (the "<u>Break-Up Fee</u>") *plus* (ii) reimbursement of any and all actual, reasonable and documented expenses incurred by Agent though the date of Merchant's consummation of such Alternative Transaction, *plus* (iii) an amount equal to the reasonable and documented third party costs, fees, and expenses incurred by Agent (including, without limitation, actual and reasonable fees and expenses of legal advisors) in connection with this Agreement and the transactions contemplated hereby in an aggregate amount not to exceed $250,000.00 (the "<u>Expense Reimbursement</u>" and, together with the Break-Up Fee, the "<u>Agent Protections</u>").  Merchant and Agent also agree that Agent shall be entitled to credit bid the amount of the Agent Protections as part of any competitive bid auction that may be conducted by Merchant. The Agent Protections Order shall approve the Agent Protections, and the payment of any Agent Protections shall be subject to, and payable upon, the closing of a Bankruptcy Court approved Alternative Transaction. Merchant shall be permitted to terminate this agreement if (x) Merchant enters into a definitive agreement for an Alternative Transaction, (y) the Bankruptcy Court enters an order approving such Alternative Transaction, and (z) there is a closing on such Alternative Transaction. Agent's receipt of Agent Protections shall constitute liquidated damages (and not a penalty) in a reasonable amount that will compensate Agent in the circumstances where Merchant terminates this Agreement upon entry into an Alternative Transaction, which amount would otherwise be impossible to calculate with precision, and be the sole and exclusive remedy (whether at law, in equity, in contract, in tort, or otherwise) of Agent against Merchant, and any of Merchant's former, current, or future stockholders, managers, members, directors, officers, affiliates, or agents for any loss suffered as a result of any breach of any covenant, representation, warranty, or agreement in this Agreement by Merchant or the failure of the transactions contemplated hereby to be consummated, and upon payment of the Agent Protections, none of Agent nor any of Agent's former, current, or future general or limited partners, stockholders, managers, members, directors, officers, affiliates, or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby. In no event shall Merchant's liabilities under this Agreement for termination upon entry into an Alternative Transaction exceed an amount equal to the Agent Protections.

2.4      Subject to entry of the Interim Approval Order, during the Tier 1 Period Merchant hereby retains Agent, and Agent hereby agrees to serve as Merchant's exclusive independent consultant in connection with the conduct of the Sale as set forth herein. With respect to the Sale, Agent shall serve as the sole and exclusive consultant to the Merchant relative to the conduct of the Sale, including disposition of the Owned FF&E.  For purposes of this Agreement, "<u>Tier 1 Period</u>" means the period commencing on the first calendar day following entry of the Interim Approval Order and continuing through and including the earlier of (i) the date the Bankruptcy Court (as defined below) enters an order approving an Alternative Transaction (as defined below) and (ii) the entry of the Final Approval Order.  Although Agent shall provide its consulting services under this Agreement in a manner designed to achieve the desired results of the Sale and to maximize the recovery to the Merchant during the Tier 1 Period, Merchant expressly acknowledges that Agent is not guaranteeing the results of the Sale during the Tier 1 Period.

2.5      Upon entry of the Interim Approval Order, and on the terms and conditions set forth herein, during the Tier 1 Period Agent shall provide Merchant with the following consulting services ("<u>Services</u>") with respect to the conduct of the Sale:

(i)     Direct appropriate staffing levels for the Sale Locations and appropriate bonus and/or incentive programs for Sale Location employees of Merchant (to be funded by Merchant in accordance with the Approved Budget (as defined in the DIP Order));

(ii)     Direct appropriate discounting to effectively sell all of the Merchandise, (including Memo Merchandise), Merchant's Consignment Goods, and Owned FF&E located at or to be delivered to the Sale Locations, and recommend appropriate point-of-purchase, point-of-sale, and other internal and external advertising in connection therewith;

(iii)     Provide qualified supervision (each a "Supervisor", and collectively the "Supervisors") to oversee the conduct of the Sale and disposition of Owned FF&E;

(iv)     Maintain focused and constant communication with Retained Employees (as defined below) to keep them abreast of strategy and timing;

(v)     Establish and monitor accounting functions for the Sale, including evaluation of sales reporting and expense monitoring, all of which shall be shared with the Merchant's advisors and the DIP Lender (as defined below);

(vi)     Direct loss prevention and appropriate security strategies; and

(vii)     Direct the operation of the Sale Locations to ensure they are being properly maintained, including ongoing customer service and housekeeping activities;

2.6     In connection with the Sale, Agent shall directly or indirectly retain and engage the Supervisors. The Supervisors are engaged by Agent as independent contractors and are not and shall not be deemed to be employees or agents of Merchant in any manner whatsoever; nor do the Supervisors have any relationship with Merchant by virtue of this Agreement or otherwise that creates any liability or responsibility on behalf of Merchant for the Supervisors, except with respect to indemnification pursuant to Section 13 hereof. During the Tier 1 Period, the Supervisors shall perform Services during normal Sale Location operating hours and for the period of time prior to the Sale Locations' opening and subsequent to the Sale Locations' closing, as required in connection with the Sale, in Agent's discretion.

2.7     All expenses incident to the conduct of the Sale and the operation of the Sale Locations during the Tier 1 Period, including, without limitation, all Agent Tier 1 Expenses (including, without limitation, Supervisors Costs), and all other Sale Location-level and corporate expenses associated with the Sale) shall be approved by the DIP Lender, incorporated in the Approved Budget, and borne by Merchant. Attached hereto as Exhibit 2.4 is an expense budget for the "Agent Tier 1 Expenses". Agent will advance funds for Agent Tier 1 Expenses, and the Merchant shall reimburse Agent for any reasonable and documented Agent Tier 1 Expenses on a weekly basis in connection with the Weekly Reconciliation (as defined below), which reimbursement or payment shall be in addition to any Tier 1 Consulting Fee (as defined below) earned and payable hereunder. All Agent Tier 1 Expenses shall be billed at cost, without markup, and evidence of incurrence shall be provided to Merchant and DIP Lender. From time to time during the Tier 1 Period the Merchant and Agent may mutually agree in writing, following consultation with the DIP Lender, to increase or decrease the budget applicable to Agent Tier 1 Expense based upon circumstances of the Sale. For purposes of this Agreement, "Supervisor Costs" shall mean the following customary costs and expenses incurred by Agent with respect to Supervisors in accordance with and subject to the Agent Tier 1 Expense budget: (i) the weekly compensation paid during the Tier 1 Period, calculated on a per Supervisor basis (which in each case represents Agent's actual costs); (ii) reasonable and documented travel expenses of the Supervisors between Sale Locations during the Tier 1 Period, and to and from the Sale Locations at the commencement and conclusion of such period (and reasonable travel

to and from the Supervisors' homes during the Tier 1 Period as is typical and customary in the liquidation industry); and (iii) Supervisor deferred compensation (as is typical and customary in the liquidation industry).

2.8     In consideration of Agent's provision of the Services during the Tier 1 Period, Merchant shall pay to Agent, from Proceeds (as defined below) of the Sale, a consulting fee in an amount equal to the aggregate of (a) three percent (3.0%) of the Gross Sales at all of the Sale Locations, plus (b) twenty percent (20.0%) of the Gross Sales realized from dispositions of Owned FF&E ((a) and (b) collectively the "<u>Tier 1 Consulting Fee</u>").  In connection with each Weekly Reconciliation, Merchant shall pay Agent an amount equal to the Tier 1 Consulting Fee on account of the prior week's sales.  For purposes of this Agreement, "<u>Gross Sales</u>" shall mean the sum of all proceeds derived from the sale of Merchandise and Merchant's Consignment Goods during the Tier 1 Period (excluding amounts paid for sales, excise, or gross receipts taxes); *plus* the amount of any gift cards or merchandise credits redeemed at the Sale Locations during the Tier 1 Period; <u>provided</u>, <u>however</u>, that it is expressly understood and agreed, that Gross Sales shall not include sales made by or on behalf of Merchant prior to the commencement of the Tier 1 Period, regardless of when the applicable Merchandise is delivered to or picked up by the customer(s).

2.9     During the Tier 1 Period Merchant shall have control over the personnel in the Sale Locations and shall handle the cash, debit and charge card payments for all Merchandise and other sales in accordance with Merchant's normal cash management procedures (except as may be modified by an order of a Bankruptcy Court having jurisdiction over Merchant's estate(s)), subject to Agent's right to audit any such items in the event of a good faith dispute as to the amount thereof.  Except as may be otherwise set forth in the Interim Approval Order, Merchant and Agent shall be responsible for ensuring that the Sale, and the operation of the Sale Locations during the Tier 1 Period shall be conducted in compliance with all applicable Underlying Occupancy Agreements, laws and regulations. For purposes of this Agreement, "<u>Underlying Occupancy Agreements</u>" means all leases, occupancy agreements, reciprocal easement, license, or similar agreements pursuant to which Merchant has the right to occupy or utilize the Sale Locations.

2.10    Merchant shall collect all Proceeds from the sale of Merchandise (including all Gross Sales) and Owned FF&E and deposit such Proceeds  in  the Designated Deposit Accounts (as defined below) consistent with Merchant's existing cash management system (except as may be modified by an order of a Bankruptcy Court having jurisdiction over Merchant's estate(s)).  Upon request by Agent or DIP Lender, Merchant shall deliver to Agent and DIP Lender account statements and such other information relating to sales of Merchandise and Owned FF&E.

2.11    Merchant shall be solely responsible for computing, collecting, holding, reporting, and paying all sales, excise and/or gross receipts taxes associated with the sale of Merchandise and Merchant's Consignment Goods during the Tier 1 Period, and Agent shall have no responsibilities or liabilities therefor, except that Agent shall provide all assistance reasonably required or requested by Merchant in connection with the preparation and processing of any such reporting forms, certificates, reports and other documentation required in connection with the payment of all applicable taxes to the appropriate taxing authorities.

2.12    Merchant acknowledges that (i) the Parties are not conducting a physical inventory count of the Merchandise and Merchant's Consignment Goods; (ii) Agent has made no independent assessment of the beginning levels of such goods; and (iii) Agent shall not bear any liability for shrink or other loss to Merchant's goods located at the Sale Locations (including, without limitation, Merchandise and Merchant's Consignment Goods) unless such shrink or loss is primarily attributed to the gross negligence

of Agent.  Merchant may, at its election, conduct a physical inventory count at some or all of the Sale Locations and Agent agrees to cooperate with such inventory taking if and when done.

**B.**     **Tier 2 Period Agency Services**.

Agent acknowledges and agrees that following execution and delivery of this Agreement, (i) Merchant's obligations under this Agreement are subject to Merchant's ability to seek higher or better offers for the sale of the Merchandise, Owned FF&E, Owned Intellectual Property, and any other assets of Merchant, and further determine to consummate an alternative transaction, including, but not limited to, a transaction with a liquidation firm, a going concern transaction, a combination  of the foregoing, or otherwise (any such transaction an "Alternative Transaction"), in each case in accordance with procedures approved under order of the Bankruptcy Court and (ii) Merchant's seeking of higher or better offers for the sale of the Merchandise, Owned FF&E, Owned Intellectual Property, and any other assets of Merchant or entry into an agreement for an Alternative Transaction, and any determination to terminate this Agreement in furtherance of any such Alternative Transaction, shall not constitute a breach of this Agreement, in each case subject to the Merchant's payment to Agent of the Agent Protections.

In the event Merchant determines not to consummate an Alternative Transaction by not later than December 19, 2025 (the "Alternative Transaction Outside Date"), Merchant and Agent agree that during the Tier 2 Period (as defined below) (a) Agent shall no longer provide the Services as set forth in Section 2 hereof, (b) Merchant shall not be obligated to pay Agent the Tier 1 Consulting Fee or reimburse Agent for any Agent Tier 1 Expenses, (c) if prior to the entry of the Final Approval Order (as defined below) Merchant paid to Agent any amount in respect of the Tier 1 Consulting Fee or reimbursed Agent for any Agent Tier 1 Expenses, Merchant and Agent shall reconcile such amounts as part of the next regularly scheduled Weekly Reconciliation and the Final Reconciliation, as applicable, (d) during the Tier 2 Period Merchant shall implement the terms of this Agreement (other than Section 2) on an equity (i.e., guaranty) basis as hereinafter set forth, and in furtherance thereof upon entry of the Final Approval Order Agent shall act as Merchant's exclusive agent to (1) conduct the Sale in accordance with the terms of this Section B, including disposing of (i) Owned Intellectual Property and (ii) Underlying Occupancy Agreements (each as defined below), (2) all Proceeds and Expenses (each as defined below) of the Sale shall be treated in the manner provided in Sections B.3 and B.4, respectively, below. For the avoidance of doubt, it is the intention of Merchant and Agent that if Merchant determines not to consummate an Alternative Transaction by the Alternative Transaction Outside Date, this Agreement will (x) automatically, and without further action of Agent or Merchant, continue in accordance with the terms this Section B and (y) the foregoing reconciliations are intended to place Merchant and Agent in the same economic position in respect of the Guaranteed Amount, Expenses, Sharing Amounts, and Additional Agent Goods Fees as if the Sale was conducted without giving effect the Tier 1 Period.  For Purposes of this Agreement, "Tier 2 Commencement Date" means the first calendar day following entry of the Final Approval Order, and "Tier 2 Period" means the period commencing on the first calendar following entry of the Interim Approval Order and continuing through the later of the (x) applicable Sale Termination Date and (y) Remaining Merchandise Outside Date (each as defined below).

Section 3.      Tier 2 Period Consideration to Merchant and Agent

3.1     Payments to Merchant

(a)     Subject to Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive forty percent (40.0%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"). The Agent shall pay the Guaranteed Amount to Merchant in the manner and at the times specified in Section 3.3 hereof.

(b)     The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (i) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, (ii) the aggregate Cost Value of the Merchandise subject to Gross Rings, and (iii) any other adjustments to Cost Value as expressly contemplated by this Agreement.

(c)     The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale determined for purposes of this Section B.3 as of the Sale Commencement Date being (i) not less than one hundred forty-seven million eight hundred thousand dollars ($147,800,000.00) and (ii) not greater than one hundred seventy-five million dollars ($175,000,000.00). Following the Sale Commencement Date, Agent shall be entitled in its reasonable discretion, after consultation with the Merchant and Compass Group Diversified Holdings LLC, in its capacities as prepetition secured lender and post-petition debtor-in-possession lender (together, the "DIP Lender"), to implement procedures to verify the accuracy of the Cost Value and represented quality and authenticity of the Merchandise (including any Memo Merchandise)(the "Verification Procedures").

3.2     Payments to Agent.

(a)     After Proceeds (as defined below) are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated as between Merchant and Agent in accordance with the table annexed hereto as Exhibit 3.2(a) and incorporated herein (hereinafter, "Sharing Amounts").

(b)     In addition to the Guaranteed Amount and Merchant's portion of the Sharing Amount, if any, Agent shall pay to Merchant an amount equal to five percent (5.0%) of the gross proceeds (net of Sales Taxes) of the sale of Additional Agent Goods, if any (the "Additional Agent Goods Fee"). All proceeds of the sale of Additional Agent Goods in excess of the Additional Agent Goods Fee shall be retained by Agent for its own account (the "Additional Agent Goods Proceeds").

3.3     Proceeds; Control of Proceeds; Time of Payments.

(a)     For purposes of this Agreement, "Proceeds" shall mean (i) in the case of sales of Merchandise (including any Remaining Merchandise), the aggregate of the total amount (in dollars) of all sales of Merchandise (including Remaining Merchandise) made under this Agreement and all service and shipping revenue, in each case (x) during the Sale Term (as hereinafter defined) and (y) after the Sale Term, during the period commencing upon expiration of the Sale Term and on or prior to the Remaining Merchandise Outside Date (as hereinafter defined), in each case exclusive of Sales Taxes (as hereinafter defined); (ii) all proceeds of Merchant's insurance for loss or damage to Merchandise (including Remaining Merchandise) arising from events occurring during the Sale Term and after the Sale Term, during the period commencing upon expiration of the Sale Term and on or prior to the Remaining Merchandise Outside Date; (iii) in the case of Owned FF&E, the total amount (in dollars) from the sale of Owned FF&E, and (iv) in the case of Owned Intellectual Property the total amount (in dollars) from the sale of Owned Intellectual Property. For the avoidance of doubt, proceeds realized from the sale of Additional Agent Goods ("Additional Agent Goods Proceeds") shall not constitute Proceeds and shall be the exclusive property of Agent (subject to Agent's payment of the Additional Agent Goods Fee to Merchant as provided herein).

(b)     All Proceeds and Additional Agent Goods Proceeds shall be transferred to Agent in the manner provided for below.

(1)     Agent may (but shall not be required to) establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the

Proceeds, Additional Agent Goods Proceeds, and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts"), and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts (at Agent's sole cost and expense, with any such costs and expenses constituting Expenses hereunder); provided, however, Agent shall have the right, in its sole and absolute discretion, to continue to use the Designated Deposit Accounts (defined below) as the Agency Accounts in which case the Designated Deposit Accounts shall be deemed to be Agency Accounts and in which case Agent shall have the right to sweep such accounts on a daily basis. Agent shall exercise sole signing authority with respect to the Agency Accounts, other than as to those Designated Deposit Accounts deemed to be Agency Accounts hereunder. Upon request, Agent shall deliver to Merchant and DIP Lender copies of all bank statements and other information relating to such accounts on a monthly basis or upon request of the Merchant or DIP Lender. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, any bank fees and charges, including wire transfer charges, related to the Sale and the Agency Accounts, whether received during or after the Sale Term. Upon Agent's notice to Merchant and DIP Lender of Agent's designation of the Agency Accounts (other than Designated Deposit Accounts), all Proceeds of the Sale (including processor receivables and credit card Proceeds and Additional Agent Goods Proceeds) shall be deposited into the Agency Accounts.

(2)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card transactions relating solely to the Sale. In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s). At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account. Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, any credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term. For the avoidance of doubt, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received prior to, during or after the Sale Term shall be the sole and exclusive responsibility of Merchant.

(3)     Unless and until Agent establishes its own Agency Accounts (other than Designated Deposit Accounts), all Proceeds, Additional Agent Goods Proceeds, and other amounts contemplated by this Agreement (including processor receivables and credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, and owned and in the name of, Merchant, which accounts shall be designated solely for the deposit of Proceeds, Additional Agent Goods Proceeds, and other amounts contemplated by this Agreement (including processor receivables and credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). If, notwithstanding the provisions of this Section 2, and subject to the provisions of the DIP Order, Merchant receives or otherwise has dominion over or control of any Proceeds, Additional Agent Goods Proceeds, or other amounts due to Agent under this Agreement, Merchant shall be deemed to hold such Proceeds, Additional Agent Goods Proceeds and other amounts "in trust" for Agent and shall not commingle Proceeds, Additional Agent Goods Proceeds or other amounts due to Agent with any of Merchant's other funds or deposit such Proceeds, Additional Agent Goods Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent. If any Proceeds, Additional Agent Goods Proceeds or other amounts due to Agent under this Agreement are commingled with any of Merchant's other funds, such commingled funds and any account

into which they are deposited shall be deemed to consist first of Proceeds, Additional Agent Goods Proceeds or other amounts due to Agent under this Agreement (up to the full amount thereof).

(4)    On each Business Day (defined below), Merchant shall promptly pay to Agent by wire transfer all funds in the Designated Deposit Accounts (including, without limitation, Proceeds (including from credit card sales) and all other amounts) without any offset or netting of Expenses or other amounts that may be due to Merchant.  Agent shall notify Merchant and DIP Lender of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall. For purposes of this Agreement, "Business Day" means any day, other than a Saturday or Sunday, on which commercial banks in New York, NY are authorized or required by applicable law to close.

(5)    Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) Business Days' notice to Merchant and DIP Lender, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) Business Days' notice to Agent and DIP Lender, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.  In the event that the Agent funds or pays all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent by means of an offset, and, as a result of such funding or payment, Merchant (or DIP Lender) received more value than Merchant (or DIP Lender) would have otherwise received under this Agreement had Agent not funded or paid such obligations, Merchant (or DIP Lender (subject to the Agent Carve-Out)) shall pay all such funded or paid amounts to Agent within two (2) Business Days of Agent's request.  If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount within two (2) Business Days of written demand by Agent, Merchant (or DIP Lender (subject to the Agent Carve-Out)) shall, within two (2) Business Days of written demand by Agent, pay to the Agent the over-funded amount.

(6)    In addition to the Guaranteed Amount, Agent shall purchase all cash in the Sale Locations on and as of the start of business on the Tier 2 Commencement Date on a dollar-for-dollar basis.

3.4    Timing of Payments; Security.

(a)    On the first Business Day of each calendar month following the Tier 2 Commencement Date (commencing with the first full calendar month following the Tier 2 Commencement Date), and subject to the final reconciliation of the Inventory Taking and issuance of the Merchandise Report, Agent shall, subject to the last sentence of this Section 3.4(a), pay to Merchant all Proceeds from the sale of Merchandise, net of all Expenses incurred in the immediately preceding calendar month, in partial satisfaction of the Guaranteed Amount, which monthly payment(s) shall be by wire transfer to an account designated in writing by Merchant ("Merchant's Account"); provided, that the foregoing notwithstanding, Agent shall be entitled to establish from the first Proceeds of the Sale a reserve in respect of any potential Excess Expense Amount in an amount of $2,500,00.00, *plus* such additional amount as Merchant and Agent shall mutually agree from time-to-time in conjunction with each Weekly Reconciliation (hereinafter, the "Excess Expense Reserve"). The amount and timing of any disposition of the Excess Expense Reserve shall be in accordance with Section 8.7 hereof.  Following the payment in full of the Guaranteed Amount, all remaining Proceeds shall be paid first, to Agent in respect of any Expenses, and second to Agent and Merchant in respect of any applicable Sharing Amount, if any.  Notwithstanding anything to the contrary contained in Section B of this Agreement, Merchant shall direct Agent to make all payments due to Merchant under this Agreement in respect of the Tier 2 Period directly to the DIP Lender

by wire transfer of immediately available funds pursuant to instructions provided in writing (which may be by email) by the DIP Lender to Merchant and Agent.

(b)      In order to secure Agent's obligations under this Agreement to pay the Guaranteed Amount and Expenses, no later than two (2) Business Days after the Tier 2 Commencement Date, Agent shall furnish Merchant an irrevocable standby Letter of Credit naming Merchant and DIP Lender as beneficiaries (collectively, the "Beneficiary") in the aggregate original face amount equal to the sum of: (a) one hundred percent (100.0%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), *plus* (b) the parties' mutually agreed upon estimate of three (3) weeks of Expenses, which letter of credit shall be substantially in the form of Exhibit 3.4 hereof, which shall be reasonably acceptable to the DIP Lender (the "Letter of Credit").  Following issuance of the Merchandise Report (defined below), no later than two (2) Business Days after issuance of the Merchandise Report, Agent, if necessary, shall arrange to have the face amount of the Letter of Credit increased to the actual calculated amount of the Guaranteed Amount (less any amount previously funded by Agent in respect of the Guaranteed Amount in accordance with Section 3.2(a) hereof. The Beneficiary shall not be entitled to make any draw under the Letter of Credit for any amount in respect of the Guaranteed Amount or Expenses until such time as (i) Agent has completed Agent's verification of the Cost Value of the Merchandise in accordance with the Verification Procedures and (ii) the Merchandise Report and Memo Merchandise Report have been issued by the Inventory Taking Service.  The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Agent shall furnish the Beneficiary an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If the Beneficiary fails to receive such amendment to the Letter of Credit on or before the date that is ten (10) days before the then scheduled expiry date, then the Beneficiary shall be permitted to draw under the Letter of Credit, and hold as security, an amount equal to the then-remaining unpaid portion of the estimated Guaranteed Amount for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) Business Days' written notice, fails to pay any undisputed portion of the Guaranteed Amount or Expenses, the Beneficiary may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute. Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount prior to the time of each such request (and Merchant shall cooperate with respect to each such request); provided, however, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three (3) weeks of Expenses. Contemporaneously with the issuance of the Letter of Credit by Agent to Merchant, as Beneficiary, Merchant shall pledge the Letter of Credit to the DIP Lender as collateral for repayment of the obligations owed to the DIP Lender.

Section 4.      Expenses of the Sale.

4.1      Expenses.  Subject to the Agent Expense Cap and the occurrence of the Tier 2 Commencement Date, Agent shall be unconditionally responsible for all "Expenses" , which expenses shall be paid and/or reimbursed by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Sale Location-level operating expenses of the Sale arising on or after the commencement of Tier 1 Period and attributable to the Sale, limited to the following:

(a)      a minimum of not less than ninety (90) days' actual payroll with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Sale Location during the Sale Term, including any overtime premium payments associated with overtime hours worked and wages and expenses payable to any temporary labor or other employees hired in connection

with the Sale, including, without limitation wages, commissions (solely to the extent such commissions are earned on account of sales completed through the normal retail sales channel);

(b)      any amounts payable by Merchant for employee benefits (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale;

(c)      the actual Occupancy Expenses for the Sale Locations, categorized on Exhibit 4.1(c) for all Sale Locations through the earlier to occur of the applicable (x) Vacate Date (as defined below) for such location and (y) the Sale Termination Date; *plus* the portion of any percentage rent obligations allocable to the sale of Merchandise during the Sale to the extent set forth on Exhibit 4.1(c);

(d)      Incentive Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)      advertising and direct mailings relating to the Sale, interior and exterior signage and banners, including, without limitation, promotional materials and activities in connection with special events and trunk-style shows, among others, in each case relating to the Sale;

(f)      subject to Agent's prior approval (which approval may be by email) of any associated special event budget, the actual cost of ordinary course retail sale "events" conducted by Merchant in the ordinary course of business;

(g)      credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(h)      bank service charges (for Store, Agency Accounts and any Designated Deposit Accounts utilized by Agent to process Proceeds of the Sale), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(i)      costs for additional supplies necessary to conduct the Sale as requested by Agent;

(j)      all fees and charges required to comply with applicable laws in connection with the Sale;

(k)      Sale Location cash theft and other Sale Location cash shortfalls;

(l)      all Supervisor Costs, including, without limitation, any Third Party payroll costs and expenses, and Supervisors' deferred compensation, and reasonable out-of-pocket expenses relating thereto;

(m)      postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(n)      one hundred percent (100%) of cost of the Inventory Taking Service in accordance with Section 4.1 hereof;

(o)      Third Party payroll processing fees and expenses associated with the Sale;

(p)      costs of transfers initiated by Agent of Merchandise and any Remaining Merchandise between and among the Sale Locations (and where applicable, transfer costs associated with

Memo Merchandise, including, without limitation, transfers to and from off-site sales representatives) during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of Section 8.1(e);

(q)     to the extent not included in CAM or otherwise included on Exhibit 4.1(c), cash register maintenance, routine repairs, trash and snow removal, housekeeping and cleaning expenses, telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance);

(r)     subject to Section 12 below, a pro rata portion of insurance premiums for liability, casualty, property, inventory and any policies attributable to Merchandise and Sale Locations during the Sale Term;

(s)     Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(t)     Agent's out-of-pocket costs and expenses incurred in connection with the review of data, preparation, negotiation, and execution of this Agreement and any ancillary documents, and the conduct of the Sale, or the transactions contemplated by this Agreement, including, but not limited to, reasonable legal fees and expenses, in an aggregate amount not to exceed $250,000.00;

(u)     The actual costs of appropriate security measures for all Sale Locations and the Merchandise (including any Remaining Merchandise);

(v)     the actual costs and expenses of Agent providing such additional services as the Agent deems appropriate for the Sale;

(w)     Central Service Expenses for the Sale Term in respect of the cost of Merchant providing Central Services in accordance with Section 8.1(c) hereof, in an amount and at such times as shall be mutually agreed by Merchant and Agent;

(x)     E-Commerce Platform Expenses; and

(z)     the Armory Sale Fee.

Notwithstanding anything herein to the contrary:

(A) (i) Agent's obligation hereunder in respect of Expenses shall not exceed a sum equal to thirty percent (30%) of the aggregate Cost Value of the Merchandise as determined by the Merchandise Report ( the "Agent Expense Cap"), and (ii) Merchant shall be exclusively and unconditionally responsible for any amount incurred in respect of Expenses that exceeds the Agent's Expense Cap (such excess amount being defined as the "Excess Expense Amount"). Merchant shall be unconditionally responsible for reimbursing Agent for any Excess Expense Amount paid by Agent as part of the Sale, with such reimbursement being made in accordance with the provisions of Section 8.7(b) hereof. Merchant and Agent shall determine the amount of any Excess Expense Amount, if any, as part of the Final Reconciliation conducted in accordance with Section 8.7(b) hereof.

(B) To the extent that any Expense category listed in this Section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double-counted. For the avoidance of doubt, there will be no double counting or payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

(C) "<u>Expenses</u>" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses in excess of the amounts set forth in <u>Section 4.1(w)</u>; (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Sale Location, per diem occupancy-related categories and amounts expressly provided for as an Expense under <u>Section 4.1(c)</u> above or incurred after the designated Vacate Date set forth in any Vacate Notice (as defined below); (iv) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and Final Approval Order (as defined below), where and to the extent applicable.

4.2    <u>Certain Definitions</u>.  As used herein the following terms have the following respective meanings:

a)   "<u>Armory Sale Fee</u>" means a fee equal to two and three-quarters percent (2.75%) of Proceeds from the sale of Merchandise as set forth in that certain amended engagement letter between Merchant and Armory Group, LLC, dated as of November 2, 2025.

b)   "<u>Central Service Expenses</u>" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, email preparation and distribution, information technology and e-commerce site updates and maintenance, and accounting (collectively, "<u>Central Services</u>").

c)   "<u>Excluded Payroll Benefits</u>" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term: (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any payments due under the WARN Act.

d)   "<u>Occupancy Expenses</u>" means, with respect to the Sale Locations, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

e)   "<u>E-Commerce Platform</u>" means Merchant's internet website www.luganodiamonds.com.

f)   "<u>E-Commerce Platform Expenses</u>" means an amount, and at such times, as shall be mutually agreed by Merchant and Agent in connection with the provision of E-Commerce Platform Services during the Sale Term and ending on the day that Agent terminates its use of the E-Commerce Platform pursuant to the terms hereof.

g)   "<u>E-Commerce Platform Services</u>" means those services customarily performed by the Merchant in connection with maintaining the E-Commerce Platform, including, without limitation, (i) payroll and related employee benefits of E-Commerce Platform-level employees, and (ii) any required supplies in connection with the foregoing.

h) "<u>Third Party</u>" means, with reference to any Expenses to be paid to a Third Party, a party that is not affiliated with or related to the Merchant or Agent.

4.3     <u>Payment of Expenses</u>.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds); <u>provided</u>, that as set forth in <u>Section 4.1</u> above, Merchant shall be unconditionally responsible for reimbursing Agent for any amount paid by Agent in respect of Expenses above the Agent Expense Cap.  Subject to the Agent Expense Cap, all Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant immediately following the Weekly Sale Reconciliation; <u>provided</u>, <u>however</u>, that (i) in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available and (ii) Agent shall fund any payroll amounts in accordance with <u>Section 9.3</u> of this Agreement. Agent and/or Merchant may review or audit the Expenses at any time.

Section 5.     <u>Inventory Taking; Gross Rings; Merchandise</u>.

5.1     <u>Inventory Taking</u>.

(a)     Commencing on the Tier 2 Commencement Date, Merchant and Agent shall cause to be taken a SKU level Cost Value and retail price physical inventory of the Merchandise (collectively, the "<u>Inventory Taking</u>").  The Inventory Taking shall be completed as soon as practicable (the date of the Inventory Taking at each Sale Location being the "<u>Inventory Date</u>" for each such location), but in any event no later than twenty-one (21) days after the Tier 2 Commencement Date (subject to the availability of the Inventory Taking Service).  Merchant and Agent shall jointly employ a mutually agreed upon inventory taking service in consultation with the DIP Lender (the "<u>Inventory Taking Service</u>") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on <u>Exhibit 5.1(a)</u> (together with the Verification Procedures, the "<u>Inventory Taking Instructions</u>").  Agent shall be responsible for one hundred percent (100%) of the cost of the Inventory Taking Service as an Expense.  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking; <u>provided</u> that, and notwithstanding anything to the contrary in <u>Section 4.1(a)</u> or <u>4.1(b)</u>, Agent shall be obligated to pay one hundred percent (100%) of the payroll and related benefit costs for Retained Employees used during the Inventory Taking.  Merchant, the DIP Lender, and the Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking, the applicable Sale Location shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Sale Location; <u>provided</u>, <u>however</u>, the Parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the applicable Sale Location will be closed for business.  Merchant and Agent further agree that until the Inventory Taking in a particular Sale Location is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Sale Location so as to make any such items unavailable for counting as part of the Inventory Taking, or (ii) remove or add any hang tags, price tickets, inventory control tags (where applicable) affixed to any Merchandise or any other kind of in-store pricing signage within the Sale Location.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including, without limitation, by making available to Agent information relating to sales, units, costs, Cost Value, and retail price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and retail price of the Merchandise).  The Inventory Taking, including, but not limited to, the Merchandise Report, shall be reviewed, reconciled, and mutually verified by the Merchant, the DIP

Lender and Agent in writing as soon as practicable following the Inventory Taking. After Merchant's, DIP Lender's, and Agent's respective review, reconciliation and mutual written verification of the listing and tabulation of the Inventory Taking Service, the Inventory Taking Service shall issue a final report reflecting the final, agreed listing and tabulation of the Inventory Taking at the Sale Locations (such report, the "Merchandise Report"). Merchant and Agent will direct the Inventory Taking Service to deliver the Merchandise Report no later than seven (7) calendar days, if practicable, after the completion of the Inventory Taking at the last Sale Location that is subject to an Inventory Taking. In addition to the Merchandise Report, Merchant and Agent shall also prepare a separate written report (such report, the "Memo Merchandise Report") of all Memo Merchandise in the possession of any sales representative or any Third Party (such Memo Merchandise to be counted and verified in accordance with procedures mutually agreed to by Merchant and Agent. The Merchandise Report and Memo Merchandise Report shall be provided to the DIP Lender immediately upon their completion.

(b) For the period from the Sale Commencement Date until the Inventory Date for such Sale Location, Merchant and Agent shall jointly keep (i) a strict count of gross register receipts less applicable sales taxes but excluding any prevailing Sale discounts ("Gross Rings"), and (ii) cash reports of sales. Register reports shall show for each item sold the Cost Value and retail price for such item and the markdown or discount, if any, specifically granted by the Agent. Merchant and Agent shall also jointly keep a strict count of all Gross Rings attributed to sales of Memo Merchandise between the Sale Commencement Date and the issuance of the Merchandise Report. All such records and reports shall be made available to Merchant, DIP Lender, and Agent during regular business hours upon reasonable notice. Any Merchandise sold prior to the Inventory Taking at a Sale Location shall be included as Merchandise based upon Gross Rings, and all Merchandise sold during such period shall be included in the Merchandise Report at its applicable Cost Value (without taking into account any of Agent's point of sale discounts or point of sale markdowns).

(c) Neither the Merchandise Report nor the Memo Merchandise Report shall include: (1) goods that belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise (as hereinafter below); (4) Merchant Consignment Goods (as hereinafter below); (5) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies (defined below), conveyor systems, racking, rolling stock, and other personal property or improvements to real property; provided, that Agent shall be permitted to sell Owned FF&E as set forth in Section 6 below; and (6) Additional Agent Goods ((1) through (6) collectively the "Excluded Goods"), in each case, determined in accordance with usual and customary practices of the industry.

(d) Each of the Merchandise Report and Memo Merchandise Report shall include all Merchandise, excluding the Excluded Goods, but including any portion or all of the Excluded Goods for which Merchant and Agent are able to mutually agree (in each party's sole and absolute discretion) on the Cost Value and retail price thereof.

(e) Each of the Merchandise Report and Memo Merchandise Report prepared by the Inventory Taking Service shall be prepared in accordance with the usual and customary practices, policies and procedures of Merchant and shall show, among other things, the aggregate Cost Value and retail price determined in the manner provided above.

5.2    Merchandise Subject to This Agreement.

(a) For purposes of this Agreement, "Merchandise" shall mean all (i) finished, first-quality goods that are saleable in the ordinary course of business located at the Sale Locations as of the Sale Commencement Date (including Merchandise subject to Gross Rings), (ii) all Transferred Merchandise,

(iii) all cut or uncut loose stones and metals ("Job Order Inventory"), (iv) Memo Merchandise (subject to each such item having been verified in accordance with the Verification Procedures); (v) Defective Merchandise, and (vi) saleable goods that are deemed to be Merchandise under this Agreement pursuant to this Section 5.2. "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee ("Consignment Goods"); (3) Excluded Defective Merchandise (defined below); (4) Merchant Consignment Goods (defined below); (5) Additional Agent Goods; and (6) furniture, furnishings, trade fixtures, machinery, equipment, office supplies, Supplies, conveyor systems, racking, rolling stock, airplane(s), and other personal property or improvements to real property; provided, that Agent shall have the right to sell Owned FF&E as set forth in Section 7 below.

(b)     As used in this Agreement, the following terms have the respective meanings set forth below:

"Defective Merchandise" means any item of Merchandise that is (a) not, finished, first-quality, saleable goods sold in the normal or ordinary course and (b) reasonably determined by Agent following implementation of the Verification Procedures and consultation with Merchant to not be of the quality and/or authenticity as represented by Merchant to Agent; provided, however, that Job Order Inventory shall not be deemed to be Defective Merchandise solely by virtue of not constituting finished, first-quality, saleable goods, i.e., not incorporated into or set in jewelry. Examples of Defective Merchandise include but are not limited to goods that are used, damaged, defective, scratched, soiled, dented, shopworn, out of box (if normally sold as new in-the-box), out of season, missing pieces, mismatched, mis-mated, parts, items typically sold as a set which are incomplete, or gift with purchase items, watches that are not running, watches without boxes, watches without applicable instructions, and pierced earrings without backs, earing backs without the corresponding earing, and diamonds and gemstones constituting melee.

"Excluded Defective Merchandise" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose or for which the parties cannot mutually agree upon a Cost Value, and (ii) obsolete or discontinued goods or goods that have been marked out of stock or have received a similar designation. Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"Memo Merchandise" means first-quality saleable goods in the ordinary course of business (a) located with (i) Merchant's sales representatives and (ii) with third parties approved by Merchant in the ordinary course of business (including any items on temporary loan to customers with the consent of Merchant and Agent), and (b) such additional goods denominated by Merchant in the Merchandise File as "Out" goods.

"Merchandise File" means Merchant's Cost Value file denominated "Project Bespoke_Inventory Summary (10.24.2025) V2".

"Memo Merchandise File" means a column labeled "Lot Status" within the Merchandise File (that designates Memo Merchandise as lot status MEMO or OUT).

"Transferred Merchandise" means (a) first-quality goods that are saleable in the ordinary course of business located at Merchant's retail locations in Greenwich, Connecticut, Washington, D.C. and London, England that is designated for, has been, or is in transit to a Sale Location and (b) any Job Order Inventory located at Merchant's retail locations in Greenwich, Connecticut, Washington, D.C. and London, England that is designated for, has been, or is in transit to a Sale

16

Location; provided, that in the case of (a) and (b) hereof, upon receipt of such items in the designated location such items shall be included in Merchandise only following Agent's verification of the applicable Cost Value and quality of subject goods in accordance with the Verification Procedures.

5.3     Valuation.

(a)     For purposes of this Agreement, "Cost Value" shall mean, with respect to each item of Merchandise, the lower of (x) the actual cost of such item (as verified in accordance with the Verification Procedures) and (y) the lowest cost of such item as reflected in the Merchandise File.

(b)     Notwithstanding the provisions of Section 5.3(a), with respect to each item of Defective Merchandise, the parties shall mutually agree upon the Cost Value (and if Agent and Merchant are unable to mutually agree on the Cost Value of any one or more items of Defective Merchandise, such items shall be deemed Excluded Defective Merchandise).

5.4     Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale at prices mutually agreed upon by Agent and Merchant (such goods, "Merchant's Consignment Goods").  The Agent shall retain twenty percent (20.0) % of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive eighty percent (80.0)% of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods following the Final Sale Reconciliation.  If Merchant does not elect to have Agent sell goods not included as Merchandise or Merchant and Agent are unable to agree upon prices, then all such items will be removed by Merchant from the Sale Locations at Merchant's expense as soon as practicable.  Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.     Sale Term.

6.1     Term.

(a)     Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, and solely for purposes of Section B of this Agreement, the Sale shall be deemed to have commenced at each Sale Location on the date that is the first calendar day after the Bankruptcy Court enters the Interim Approval Order (the "Sale Commencement Date").  Subject to Section 6.1(b) hereof, Agent shall complete the Sale at each Sale Location no later than May 1, 2026 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Sale Location being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Sale Location-by- Sale Location basis upon not less than fourteen (14) days' prior written notice (a "Vacate Notice") to Merchant and the DIP Lender (the "Vacate Date").  Agent's obligations to pay all Expenses, including Occupancy Expenses for each Sale Location subject to Vacate Notice shall continue only until the earlier of the applicable (x) Vacate Date for such Sale Location, or (y) Sale Termination Date; provided, however, that Agent shall be responsible for the full amount of all Occupancy Expenses the month in which the applicable Vacate Date occurs.

(b)     Agent shall exercise commercially reasonable efforts to dispose of all of the Merchandise during the Sale Term.  To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), such Remaining Merchandise shall be deemed transferred to Agent free and clear of all liens, claims, and encumbrances, and Agent shall use commercially reasonable efforts to dispose of all such Remaining Merchandise by means reasonably determined by Agent

on or before the date that is not later than three hundred sixty (360) days after the Sale Termination Date (the "Remaining Merchandise Outside Date").  The proceeds received by Agent after expiration of the Sale Term and on or prior to the Remaining Merchandise Outside Date from such sales or other dispositions shall constitute Proceeds hereunder; provided, that in the event Agent incurs additional  expenses related to the sale of Remaining Merchandise in the period between the Sale Termination Date and the Remaining Merchandise Outside Date (pursuant to a budget determined by Agent and Merchant), such additional expenses shall constitute Expenses for purposes of this Agreement, including, without limitation, for purposes of calculation of the Sharing Amount, if any. During the period between the Sale Termination Date and the Remaining Merchandise Outside Date, Agent and its affiliates shall be authorized to sell or otherwise dispose of the Remaining Merchandise with all logos, brand names, and other intellectual property on the Merchandise intact, and shall be authorized to advertise the sale of the Remaining Merchandise using Merchant's name and logo, in each case consistent with the terms of the IP License.

6.2   Vacating the Sale Locations.  Subject to Section 6.1(b) hereof, Agent shall vacate each Sale Location on or before the earlier of (x) the applicable Vacate Date and (y) the Sale Termination Date, in either case as provided for herein, at which time Agent shall surrender and deliver the Sale Location premises and keys to Merchant.  At the conclusion of the Sale, Agent agrees to leave each Sale Location in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may, at Agent's option, be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  All assets of Merchant used by Agent in the conduct of the Sale (e.g., FF&E, Supplies, etc.) shall be returned by Agent to Merchant or left at the Sale Location, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of Agent.  Any reference in this Section 6 to vacating the Sale Location means vacating the subject Sale Location in favor of Merchant, its representatives, or assignee and shall not mean Merchant vacating possession or disclaimer of lease in favor of the landlord or owner of the Sale Location premises.

Section 7.     FF&E.

7.1   Owned FF&E.  Agent shall be entitled, but not obligated, to sell all furniture, fixtures and equipment ("FF&E") owned by Merchant (the "Owned FF&E") at the Sale Locations; provided, however, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Merchant and Agent following execution of this Agreement. Proceeds realized from the sale of Owned FF&E, net of the amount applied to satisfy any expenses incurred in connection with such sale(s), shall be treated in the manner applicable to Proceeds under Section 3 hereunder.   Merchant hereby represents, warrants, covenants, and agrees in favor of Agent that: (i) Merchant owns all Owned FF&E and has good and marketable title to and all right, power, and authority to sell the Owned FF&E (subject to entry of the Interim and/or Final Approval Order(s), as applicable); (ii) to the knowledge of Merchant, all Owned FF&E is devoid of Hazardous Materials (defined below); and (iii) subject to entry of the Interim and/or Final Approval Order(s), as applicable, all of the Owned FF&E may be sold by Agent free and clear of all liens, claims, and encumbrances.

7.2   Abandonment of FF&E.  Agent shall be authorized to abandon its exclusive right to sell any and all sold and unsold FF&E to Merchant, including Owned FF&E, and upon such abandonment it shall be entitled to leave in place, without any cost or liability on the part of Agent to any party, including, but not limited to, Merchant, the DIP Lender, and/or any landlord or lessor of such FF&E or any counter-party to any Underlying Occupancy Agreement, for any claim resulting from or related to any such abandonment. For the avoidance of doubt, Agent shall have no responsibility whatsoever with respect to FF&E that is not owned by Merchant.

7.3    <u>Hazardous Materials</u>. Anything in this Agreement to the contrary notwithstanding, Agent will not have any obligation whatsoever to purchase, sell, make, store, handle, treat, dispose, generate, transport or remove any Hazardous Materials that may be located at the Sale Locations, corporate offices, or otherwise. Agent shall have no liability to any party for any environmental action brought: (i) that is related to the storage, handling, treatment, disposition, generation, or transportation of Hazardous Materials, or (ii) in connection with any remedial actions associated therewith at any Sale Locations, corporate offices, or otherwise. Agent shall not be responsible to remove any Hazardous Materials from any Sale Locations, corporate offices, or otherwise. For purposes of this Agreement, the term "Hazardous Materials" means, collectively, any chemical, solid, liquid, gas, or other substance having the characteristics identified in, listed under, or designated pursuant to (i) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C.A. 9601(14), as a "hazardous substance", (ii) the Resource Conservation and Recovery Act, 42 U.S.C.A. 6903(5) and 6921, as a "hazardous waste", or (iii) any other laws, statutes or regulations of a government or political subdivision or agency thereof, as presenting an imminent and substantial danger to the public health or welfare or to the environment or as otherwise requiring special handling, collection, storage, treatment, disposal, or transportation.

Section 8.    <u>Conduct of the Sale.</u>

8.1    <u>Rights of Agent</u>. In addition to any other rights granted to Agent elsewhere in this Agreement, subject to the entry of the Interim and/or Final Approval Order(s), as applicable, and the Sale Guidelines, Agent shall retain the exclusive discretion to determine appropriate sale and promotional strategies, activities, and sale-related themes throughout the Sale Term (without the need to comply with any Liquidation Sale Laws), including, but not limited to, selling Merchandise on a wholesale basis. The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Interim and/or Final Approval Order(s), as applicable, and the sale guidelines attached hereto as <u>Exhibit 8.1</u> (the "<u>Sale Guidelines</u>"). In addition to any other rights granted to Agent hereunder, and subject to the Interim and/or Final Approval Order(s), as applicable, and Sale Guidelines, in conducting the Sale the Agent, in the exercise of its reasonable discretion, shall have the right:

(a)    to establish sale prices and discounts (it being agreed that any deviation from Merchant's usual and customary sales prices shall be at the sole discretion and prior approval of Agent) and Sale Location hours, which are consistent with the terms of applicable Underlying Occupancy Agreements and local laws or regulations, including, without limitation, "Sunday Blue Laws" where applicable; <u>provided</u>, <u>however</u>, to the extent that Agent extends the hours of operation at one or more of the Sale Locations beyond the hours historically operated by Merchant, which results in additional utilities charges and increased Occupancy Expenses in excess of the average utilities charges and Occupancy Expenses for such Sale Location over the twelve (12) months preceding the Sale Commencement Date, Agent shall reimburse Merchant the amounts, if any, of such additional costs and such additional costs shall constitute Expenses (subject to the Agent Expense Cap);

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing Supplies, intangible assets (including Merchant's name, logo and tax identification numbers), Sale Location keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Sale Locations, and any other assets of the Merchant located at the Sale Locations (whether owned, leased, or licensed);

(c)    subject to Agent's payment in accordance with <u>Section 4.1</u> above in respect of Central Services, (i) to be provided by Merchant with central office facilities, central administrative services and personnel to process and perform Central Services and provide other central office services reasonably

necessary for the Sale; and (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale;

        (d)    to sell Merchandise through Merchant's traditional sales channels, and in Agent's exclusive discretion, through one or more wholesale channels;

        (e)    to establish and implement advertising, signage and promotion programs by means of media advertising, and similar interior and exterior signs and banners, and the use of special events and trunk-style events;

        (f)    to transfer Merchandise between and among the Sale Locations at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Sale Locations so as to make the Merchandise unavailable for purposes of the Inventory Taking; and

        (g)    subject to the provisions of Section 8.10 below, to include Additional Agent Goods as part of the Sale.

    8.2    Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise, Owned FF&E and Owned Intellectual Property will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise or any Owned FF&E in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  The Agent shall clearly mark all receipts for the Merchandise sold at the Sale Locations during the Sale Term so as to distinguish such Merchandise from the goods sold prior to the Sale Commencement Date.

    8.3    Sales Taxes.

        (a)    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections. Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, any taxing authority, or any other party, and Merchant (and the DIP Lender (to the extent it has received any funds on account of Sales Taxes) shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)     Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant various payments that this Agreement contemplates that one party may make to the other party do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4     Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Sale Locations that are reasonably required in connection with the Sale, including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Sale Locations during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse the Merchant at Merchant's cost therefor.

8.5     Artwork and Wine Stock.  Merchant and Agent agree that Agent shall be authorized to sell or otherwise dispose of any (i) artwork owned by Merchant and located at any Sale Location and (ii) any wine located at or otherwise stored at any Sale Location. Proceeds realized from the sale of any such artwork and/or wine, net of the amount applied to satisfy any expenses incurred in connection with such sale(s), shall be treated in the manner applicable to Proceeds under Section 3 hereunder.

8.6     Gift Certificates; Membership Program.

(a)     Agent shall not be required to accept any gift certificate, gift card, return credit, and/or similar merchandise credit issued by Merchant prior to the Sale Commencement Date (collectively, the "Gift Certificates"). In the event Agent determines, after consultation with Merchant and DIP Lender, to accept any such gift Certificates, Merchant shall reimburse Agent in cash for such amounts in conjunction with the Weekly Sale Reconciliation(s) provided for in Section 7.7.   Agent shall not sell any Gift Certificates.

(b)     During the Sale Term, Agent may in its exclusive discretion, but shall not be required to, allow customers to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons (collectively, "Merchant Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis.  To the extent the customer elects an applicable Merchant Discount, then Merchant shall reimburse Agent in cash during the Weekly Sale Reconciliation for the value/differential between the applicable Merchant Discount and the then-prevailing Sale discounts being offered by Agent.

8.7     Sale Reconciliation.

(a)     On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments on account of the sales of Additional Agent Goods, Owned FF&E and Owned Intellectual Property, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e., Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation"). Each Weekly Sale Reconciliation shall be provided to the DIP Lender promptly upon completion.

(b)     Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (inclusive of a reconciliation of gift card redemptions and a determination of whether there is any Excess Expense Amount, the "Final Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant, DIP Lender and Agent as a final settlement of accounts between the Merchant and Agent during the Sale Term.  Within five (5) Business Days after the completion of the Final Reconciliation Agent shall pay to Merchant or Merchant shall pay to Agent (or its designee), as the case may be, any and all amounts due the

other pursuant to the Final Reconciliation.  In the event the Final Reconciliation reveals that there is an Excess Expense Amount, such excess shall be paid (i.e., deducted from) first from Merchant's entitlement to the Sharing Amount, if any; provided, that in the event Merchant is not entitled to receive any Sharing Amount (or if Merchant's allocable portion of any Sharing Amount is not sufficient to satisfy in full its obligation to pay such Excess Expense Amount), any Excess Expense Amount (or portion thereof) shall be paid from the Excess Expense Reserve established under Section 3.4(a) hereof, with the remaining amount of the Excess Expense Reserve, if any, being paid to Merchant; provided, further, that in the event the Excess Expense Reserve is not sufficient to satisfy in full its obligation to pay such Excess Expense Amount, any unpaid amount due from Merchant shall be deducted from the Guaranteed Amount.  Once executed by Merchant and Agent, such settlement and Final Reconciliation (including the determination of any Excess Expense Amount and allocation and disposition of the Excess Expense Reserve) shall be deemed approved without further order of the Bankruptcy Court (other than the Sale Approval Order).

(c)   Within thirty (30) days after the Remaining Asset Outside Date, or as soon as practicable thereafter, Agent and Merchant shall complete a reconciliation of all sales of Remaining Merchandise, which reconciliation shall include, among other things, a determination of whether there is any Excess Expense Amount (the "Remaining Merchandise Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant, DIP Lender and Agent as a final settlement of accounts between the Merchant and Agent with respect to sales of the Remaining Merchandise.  Within five (5) Business Days after the completion of the Remaining Merchandise Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant or Merchant shall pay to Agent (or its designee), as the case may be, any and all amounts due the other pursuant to the Remaining Merchandise Reconciliation, and any Excess Expense Amount, if any, shall be satisfied in the manner set forth in Section 8.7(b) above. Once executed by Merchant and Agent, such settlement and Remaining Merchandise Reconciliation shall be deemed approved without further order of the Bankruptcy Court (other than the Sale Approval Order).

(d)   During the Sale Term, and thereafter until all of Merchant's and Agent's obligations under this Agreement have been satisfied, (i) Merchant, DIP Lender and Agent shall have reasonable access to Merchant's and Agent's records with respect to the Sale (including, but not limited to, Cost Value, retail price, Merchandise, Expenses, and Proceeds) to review and audit such records; and (ii) Merchant, Agent and DIP Lender shall participate in weekly update conference calls during which Agent shall provide an update on the progress of the Sale, the current status of Expenses, and proposed future Expense budgeting.

8.8   Intellectual Property.

(a)   Merchant hereby grants to Agent, effective as of the Sale Commencement Date and ending on the Sale Termination Date (or where applicable, the Remaining Merchandise Outside Date) a temporary, irrevocable, royalty-free and non-exclusive sub-license and right (without the right to grant further sublicenses) to use all of Merchant's Intellectual Property (as hereinafter defined) (notwithstanding the sale of the same) in connection with the Sale, subject to applicable laws governing the use and dissemination of confidential consumer personal data and additional mutually agreed reasonable measures (hereinafter, the "IP License"); provided, that the IP License shall continue in effect for all Remaining Merchandise as provided in Section 6.1(b). Without limiting the generality of the foregoing, Agent shall be authorized by Merchant to use such Intellectual Property to advertise and promote the Sale, including (without limitation) the hanging of customary liquidation sign packages and banners and the use of trade names, logos, trademarks, e-mail lists, customer lists, catalog recipient lists, loyalty card information. Agent shall be permitted to promote the   Sale in all advertisements and promotions (including email distributions)by executing a highly promotional sale strategy utilizing sale themes and language, as shall be determined by Agent from time-to-time, in its exclusive discretion.  Agent shall have the right to use the

E-Commerce Platform to advertise the Sale and the right to use e-mail lists, customer lists, catalog recipient lists and loyalty card information to send emails advertising the Sales at the Sale Locations.

(b)     Agent shall be entitled to sell Intellectual Property owned by Merchant ("Owned Intellectual Property"). Proceeds realized from the sale of Owned Intellectual Property shall be applied first to satisfy any expenses incurred in connection with such sale(s), with any remaining balance being treated in the manner applicable to Proceeds under Section 3 hereof. For purposes of this Agreement, "Intellectual Property" means all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans, logos, designs, symbols, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, any fictitious names, d/b/a's or similar filings related thereto, or any variant of any of them, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iii) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, intangibles, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, industrial property rights, and methodologies; (iv) computer software, computer programs, and databases (whether in source code, object code or other form); (v) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith; and (vi) creative materials and other similar items (other than the Excluded Records) owned by, or otherwise in the possession or control of, Merchant or held by a Third Party on behalf of Merchant, whether in written or electronic or any other format, including telephone numbers, email addresses and accounts, customer and supplier lists and contact information, mailing lists, sales and promotional literature, other sales related materials, marketing plans, reports or data, forecasts, drawings, schematics, technical plans, reports, trade secrets, user data, and customer personal information.

8.9     Right to Monitor. Provided that Merchant's and/or DIP Lender's presence does not unreasonably disrupt the conduct of the Sale, Merchant and DIP Lender shall have the right to monitor the Sale and activities attendant thereto and to be present in the Sale Locations during the hours when the Sale Locations are open for business.  Merchant shall also have a right of access to the Sale Locations at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10     Additional Agent Goods.

(a)     Agent shall have the right to supplement the Merchandise in the Sale with additional goods procured by Agent which are of like kind, and no lesser quality to the Merchandise in the Sale ("Additional Agent Goods"). The Additional Agent Goods shall be purchased by Agent as part the Sale at Agent's sole expense (and such purchase price shall not constitute an Expense).  Sales of Additional Agent Goods shall be run through Merchant's or cash register systems or utilizing such other procedures as are mutually acceptable to Agent and Merchant; provided, however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise.  Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods.  Additionally, Agent shall provide signage in the Sale Locations notifying customers that the Additional Agent Goods have been included in the Sale.

(b)     Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects (but not a

consignment for security purposes). At all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(c)     Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(d)     Merchant acknowledges, and the Final Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in and lien upon (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Final Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant, as the consignee therefor, and Agent's security interest in and lien upon such Additional Agent Goods and Additional Agent Goods proceeds).

(e)     Merchant shall have no liability, and Agent shall hold Merchant harmless from, any and all liabilities arising in connection with any Additional Agent Goods.

8.11    Force Majeure. If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Sale Locations, the Merchandise located at such Sale Location(s) shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or DIP Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) Business Days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.12    Underlying Occupancy Agreements.

(a)     Agent shall not be obligated to comply with any of Merchant's Underlying Occupancy Agreements; except as provided for in Sections 4.1(c) and 8 herein.

(b)     Agent shall be granted so-called "designation rights" in order to enable it to market for sale Merchant's Underlying Occupancy Agreements in accordance with procedures to be mutually agreed upon by Merchant and Agent. Proceeds realized from the sale of Underlying Occupancy Agreements shall be applied first to satisfy any expenses incurred in connection with sale(s) of any such Underlying Occupancy Agreements, with any remaining balance being treated in the manner applicable to Proceeds under Section 3 hereof. Notwithstanding the foregoing, Agent's designation rights shall expire if not exercised five (5) Business Days before the expiration the 210 day period provided in § 365(d)(4) of the Bankruptcy Code as applicable to Merchant.

Section 9.    Employee Matters.

9.1    Merchant's Employees.  Subject to the applicable provisions of the Final Approval Order and any other provisions in this Agreement relating to employees, Agent may use Merchant's employees (i) at the Sale Locations, and (ii) outside sales representatives (each such individual under (i) and (ii) is referred to as a "Retained Employee") in the conduct of the Sale to the extent Agent deems such individual(s) necessary for the Sale, and Agent may select and schedule the number and type of said Retained Employees required for the Sale.  As promptly as practicable after the execution of this Agreement, Agent shall identify any of those Retained Employees it desires to use in connection with the Sale. Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations. Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Retained Employees prior to the Sale Termination Date.  Merchant shall not transfer any employee in anticipation of the Sale nor any Retained Employee during the Sale Term, in each case without Agent's prior consent.  Notwithstanding any provisions of this Agreement to the contrary, Merchant shall be permitted to provide one or more notices to Retained Employees pursuant to the WARN Act or any similar state law at any time during the Sale Term.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least seven (7) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the seven (7) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause." From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Sale Locations except "for cause" without Agent's prior consent. Notwithstanding the foregoing, Agent shall not have the right to terminate the employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3    Payroll Matters.  Subject to Section 4.1 (including, without limitation, the Agent Expense Cap), during the Sale Term Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale. Each Monday prior to the date on which such payroll is payable (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base wages for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week.

9.4    Employee Incentive Bonuses.  Subject to approval by the DIP Lender and the Bankruptcy Court, and subject further to the Agent Expense Cap, Agent shall pay, as an Expense, incentive bonuses ("Incentive Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of five percent (5.0%) of gross sales for all Retained Employees, to such

Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent (in consultation with Merchant) may determine in its discretion.  Subject to approval by the Bankruptcy Court, the amount of such Incentive Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.     <u>Conditions Precedent and Subsequent.</u>

(a)     The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

a)  All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

b)  The Bankruptcy Court shall have entered the Interim Approval Order by November 20, 2025, or such later date as mutually agreed upon by the Merchant, Agent and DIP Lender (the "<u>Interim Approval Order Deadline</u>").

c)  The Bankruptcy Court shall have entered the Agent Protections Order by December 10, 2025, or such later date as mutually agreed upon by the Merchant, Agent and DIP Lender (the "<u>Agent Protections Order Deadline</u>").

d)  The Bankruptcy Court shall have entered the Final Approval Order by December 19, 2025, or such later date as mutually agreed upon by the Merchant, Agent and DIP Lender (the "<u>Final Approval Order Deadline</u>").

e)  The Bankruptcy Court shall have entered the DIP Order by the Interim Approval Order Deadline, which DIP Order shall be in form and substance acceptable to the Agent, in its discretion.

f)  With respect to the transactions contemplated by <u>Section B</u> hereof, the Tier 2 Commencement Date shall occur not later than December 20, 2025, or such later date as mutually agreed upon by the Merchant, Agent, and the DIP Lender.

(b)     The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

a)  All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

b)  The Bankruptcy Court shall have entered the Interim Approval Order and DIP Order by the Interim Approval Order Deadline (each in form and substance acceptable to the Agent, in its discretion).

Section 11.    <u>Representations, Warranties and Covenants.</u>

11.1    <u>Merchant's Representations, Warranties and Covenants</u>.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)    Merchant, including its direct and indirect subsidiaries, (i) are corporations or limited liability companies duly organized or formed, as applicable, validly existing and in good standing under the laws of their respective jurisdictions of incorporation or formation, as applicable; (ii) subject to entry of the Sale Approval Order (if applicable), has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Sale Locations are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to entry of the Interim Approval Order and DIP Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (together with this Agreement, collectively, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder.  Subject to entry of the Sale Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder. Subject to entry of the Interim Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)    On the Sale Commencement Date and subject to the provisions of the Interim Approval Order and DIP Order, all of the Merchandise to be included in the Sale may be sold free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder).   Subject to the Interim Approval Order and any Order entered in the Bankruptcy Cases with respect to any debtor-in-possession financing (each a "<u>DIP Order</u>"), from and after the date hereof, Merchant shall not create, incur, assume or suffer to exist any additional security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds.

(d)    Merchant has maintained its pricing files (including (without limitation) the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)    Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Sale Locations in a manner consistent

with similar Merchandise located at the Sale Locations, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory. Since August 1, 2025, and except in the ordinary course of business, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     From the date hereof, Merchant shall not, purchase for or transfer to or from the Sale Locations (except for any Transferred Merchandise) any merchandise or goods outside the ordinary course.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Interim Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Sale Locations, the assets currently located at the Sale Locations, and the utilities and other services provided at the Sale Locations. To the extent not constituting Occupancy Expenses, Merchant shall, during the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Sale Locations. Except as otherwise restricted by the Bankruptcy Code, order of the Bankruptcy Court, or as provided herein and absent a bona fide dispute, and subject to Agent complying with its obligations under Section 4.1 of this Agreement throughout the Sale Term (subject to the Agent Expense Cap), Merchant shall remain current on all expenses and payables reasonably necessary and appropriate for the conduct of the Sale.

(i)     Subject to approval by the Bankruptcy Court, Merchant has paid, and subject to Agent complying with its obligations under Section 4.1 of this Agreement will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Retained Employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)     Since August 1, 2025, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including, without limitation, increasing salaries or other amounts payable to employees; except to the extent a Retained Employee was due an annual raise in the ordinary course.

(k)     Since August 1, 2025, Merchant has operated, and, except as otherwise restricted by the filing of the Bankruptcy Cases and the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date, Merchant shall continue to  operate, each Sale Location in all material respects in the ordinary course of business, including, without limitation, by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except with respect to the Transferred Merchandise or as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Sale Locations; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Sale Locations; (v) replenishing the Sale Locations in the ordinary course of business, and (vi) with respect to the Merchandise, maintaining

all usual and customary (x) insurance coverages and (y) security measures, and making all required payments accruing prior to the Sale Commencement Date.

(l)     Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-store transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Sale Locations or on order or in transit.

(m)     [Reserved].

(n)     To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)     On and as of the Sale Commencement Date, the level of goods (as to quantity) and the mix of goods (as to type, category, style, brand and description) at the Sale Locations shall be in all material respects, subject to ordinary course of business changes and adjustments, consistent with, the level and mix set forth in the Merchandise File.

(p)     Except for the Transferred Merchandise, Merchant has not and shall not purchase or transfer to or from the Sale Locations any Merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(q)     Except as may be included in the Transferred Merchandise, from the date hereof, Merchant will not ship any Excluded Defective Merchandise to the Sale Locations.

(r)     Other than filing the Bankruptcy Case as of the date hereof other than those identified on Schedule 11.1(r), no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

(s)     Merchant shall not, prior to the Sale Commencement Date, offer any promotions or discounts at Merchant's retail locations or E-Commerce Platform except in the ordinary course and consistent with prior practices of Merchant, or as otherwise may be consented to by Agent in writing, in Agent's exclusive discretion.

(t)     Merchant is not a party to any collective bargaining agreements.

11.2     Agent's Representations, Warranties and Covenants.   Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a)     Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Sale Locations are located, except, in each case, to the extent that the failure to

be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)      Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)      No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)      The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Interim and/or Final Approval Order, as applicable.

(e)      Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Sale Location premise or to ensure customer safety) to be conducted at the Sale Locations.

(f)      To the best of Agent's knowledge, all Additional Agent Goods are in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Sale Locations.

Section 12.    Insurance.

12.1    Merchant's Liability Insurance.  Subject to Agent's obligations under Section 4.1 of this Agreement, Merchant shall continue at the respective cost and expense thereof until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, commercial general liability, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Sale Locations; and Merchant shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies, on a primary, non-contributory basis. Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the fraud, bad faith, willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change

30

in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.2    <u>Merchant's Casualty Insurance</u>.  Merchant shall provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured or loss payee (as its interest may appear).  In the event of a loss to the Merchandise during the period beginning on or after the Sale Commencement Date and ending on the Sale Termination Date, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder; <u>provided</u>, that, in the event on the Sale Termination Date there remains any Remaining Merchandise, Merchant shall cause any applicable insurance covering the Remining Merchandise to be extended to occur the earlier to occur of (x) the sale or other disposition of the last item of Remaining Merchandise and (y) the Remaining Merchandise Outside Date.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured or loss payee, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

12.3    <u>Agent's Insurance</u>.  Agent shall maintain at Agent's cost as an Expense (subject to the Agent Expense Cap) hereunder throughout the Sale Term, in such amounts as it currently has in effect, commercial general liability policies covering injuries to persons and property in or in connection with Agent's agency at the Sale Locations, and shall cause Merchant to be named as an additional insured with respect to such policies. Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the fraud, bad faith, willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

12.4    <u>Worker's Compensation Insurance</u>.  Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

Section 13.    <u>Indemnification.</u>

13.1    <u>Merchant's Indemnification</u>.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents, representatives, and independent contractors (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under <u>Section 8.3</u> hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term to the extent required hereunder; (iv) any consumer warranty or products liability

claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; any failure of Merchant to pay to any Occupancy Expenses or Central Service Expenses during the Sale Term to the extent required hereunder; and (vii) the gross negligence (including omissions) or willful misconduct of the Merchant or its officers, directors, employees, agents (other than Agent) or representatives.  Agent agrees that any claim by any Agent Indemnified Party for indemnification under this <u>Section 13.1</u> shall be subject to approval of the Bankruptcy Court.

13.2    <u>Agent Indemnification</u>.    Agent shall indemnify and hold the Merchant, its officers, directors, employees, agents and representatives harmless from and against all claims, causes of action, demands, penalties, losses, liability, damage, or other obligations, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) as set forth in <u>Section 7.3</u> above; (v) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives; (vi) any Additional Taxes and Penalties arising out of Agent's failure to collect and/or remit to Merchant correct amounts of Sales Taxes (including any such failure resulting from Agent's use of any system other than Merchant's point of sale system to compute Sales Taxes relating to the Sale; (vii) and any consumer warranty or products liability claims arising out of or related to the sale of Additional Agent Goods. The indemnification obligations set forth in this <u>Section 13.2</u> shall be in addition to (and shall not limit) any other indemnification obligations of Agent set forth in this Agreement, including without limitation those set forth in <u>Section 9.3(a)</u>.

Section 14.    <u>Defaults</u>.  The following shall constitute "Events of Default" hereunder:

(a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured seven (7) days after receipt of written notice thereof, a copy of which shall be provided to the DIP Lender; <u>provided</u>, that any failure on the part of Agent to deliver such notice to the DIP Lender shall not serve as a waiver of any such default or an extension of any time period provided herein;

(b)    Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party; or

(c)    If applicable, the grant of a motion by any party to convert the Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11) or the grant of a motion by any party to appoint a chapter 11 trustee.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by the Bankruptcy Court or, if the Bankruptcy Court does not have jurisdiction, by a court of competent jurisdiction.

Section 15.     Agent's Payment Rights.  The Bankruptcy Court order authorizing the Merchant to obtain debtor-in-possession financing from the DIP Lender (whether interim or final) (the "DIP Order") shall be in form and substance reasonably acceptable to Agent, and shall, as a condition to the effectiveness of this Agreement, establish a Carve-Out (as defined in the DIP Order) for the benefit of the Agent, which provides that the DIP Collateral, DIP Liens, DIP Superiority Claims, the Adequate Protection Liens and the Adequate Protection Obligations (all as defined in the DIP Order, the "DIP Lender Interests") shall be subordinate to the payments to which the Agent is entitled under this Agreement (the "Agent Carve-Out").

Section 16.     Potential Joint Ventures.  Agent shall have the right to form a contractual joint venture with additional entities to serve as "Agent" hereunder as to this Agreement.

Section 17.     Final Approval Order.

(a)     The Final Approval Order shall provide, in a form reasonably satisfactory to Merchant, DIP Lender and Agent, *inter alia,* that during the Tier 2 Period: (i) this Agreement is in the best interest of the Merchant, Merchant's estate, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved ; (iii) during the Tier 2 Period, Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby, including, but not limited to, authorizing Merchant to pay Agent any amount due hereunder; (iv) Agent shall be entitled to sell all Merchandise, Merchant's Consignment Goods, Remaining Merchandise, Owned FF&E, and Owned Intellectual Property, with such sales to be in each case free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of such assets or the Proceeds thereof attaching only to the any amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Sale Locations, the E-Commerce Platform and all related services, FF&E and other assets of Merchant for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines, this Agreement, Interim Approval Order and Final Approval Order, and to the extent applicable, the DIP Order; (vi) Agent, as Merchant's exclusive agent, is authorized to conduct, advertise, post signs, utilize sign-walkers, and otherwise promote the Sale by means of a highly promotional sale strategy utilizing sale themes that are customary in the industry and otherwise  as shall be determined by Agent from time-to-time, in its exclusive discretion, in each case without further compliance with the Liquidation Sale Laws, subject to compliance with the Final Approval Order and Sale Guidelines (as the same may be modified from time to time and approved by the Bankruptcy Court); (vii) Agent shall be granted a limited license and right to use during the Tier 2 Period the E-Commerce Platform, trade names, logos, e-mail lists, customer lists, relating to and used in connection with the operation of the Sale Locations, solely for the purpose of advertising the Sale in accordance with the terms of this Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Final Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which (1) in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale or (2) with respect to Merchandise, Merchant's Consignment Goods, Remaining Merchandise, the Owned FF&E, and Owned Intellectual Property, or any Proceeds therefrom; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement and the Interim Approval Order, and Final Approval Order, respectively; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) a finding that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Sale Locations uninterrupted; (xiii) any amounts owed by Merchant to agent under this Agreement shall be payable from the Agent Carve-Out; (xiv) a finding that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and

make payments required by this Agreement are a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and are in the best interests of the Merchant, the estates, their creditors, and other parties in interest; (xv) a finding that this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent, and further that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvi) in the event any of the provisions of the Interim Approval Order or Final Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in section 363(m) of the Bankruptcy Code, and no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the Sale under this Agreement, the Interim Approval Order and/or Final Approval Order.

Section 18.    <u>Miscellaneous.</u>

18.1    <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, or by Federal Express or other recognized overnight delivery service, as follows:

| If to the Agent: | Enhanced Retail Funding, LLC<br>Prudential Tower<br>101 Huntington Avenue, 11th Floor<br>Boston, MA 02199<br>Attn:    Rick Edwards<br><br>With a copy to (which shall not constitute notice):<br><br>Riemer & Braunstein LLP<br>Times Square Tower<br>Seven Times Square, Suite 2506<br>New York, NY 10036<br>Attn:  Steven E. Fox, Esq.<br>Email:  sfox@riemerlaw.com |
|---|---|
| | |
| If to the Merchant: | Lugano Diamonds & Jewelry, Inc.<br>620 Newport Center Drive, Suite 380<br>Newport Beach, CA 92660<br>Attn:  Christoph Pachler<br>Email:  cpachler@luganodiamonds.com<br><br>With a copy to (which shall not constitute notice): |

| | |
|---|---|
| | Young Conaway Stargatt & Taylor, LLP<br>Rodney Square<br>1000 N King Street<br>Wilmington, DE 19801<br>Attention:  Sean M. Beach, Esq.<br>             Edmon Morton, Esq.<br>             Craig D. Grear, Esq.<br>Email:      sbeach@ycst.com<br>             emorton@ycst.com<br>             cgrear@ycst.com<br><br>-and-<br><br>Keller Benvenutti Kim LLP<br>101 Montgomery Street, Suite 1950<br>San Francisco, CA 94104<br>Attention:  Tobias S. Keller, Esq.<br>             Scott J. Friedman, Esq.<br>Email:      tkeller@kbkllp.com<br>             sfrieman@kbkllp.com |
| If to DIP Lender or<br>Pre-Petition Lender | Compass Group Diversified Holdings LLC<br>301 Riverside Avenue,<br>Second Floor<br>Westport, CT 06880<br>Attention:  Chief Financial Officer<br><br>With a copy to (which shall not constitute notice):<br><br>Squire Patton Boggs (US) LLP<br>201 E. Fourth Street, Suite 1900<br>Cincinnati, Ohio 45202<br>Attention:       Ben Glassman<br>                Evan Toebbe<br>                Peter Morrison<br>Email:   benjamin.glassman@squirepb.com<br>         evan.toebbe@squirepb.com<br>         peter.morrison@squirepb.com<br><br>Polsinelli PC<br>222 Delaware Avenue<br>Suite 1101<br>Wilmington, DE 19801<br>Attention:       Shanti M. Katona<br>                Christopher A. Ward<br>Email:   skatona@polsinelli.com<br>         cward@polsinelli.com |

18.2    Governing Law/Exclusive Jurisdiction.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Subject to entry of the Sale Approval Order, each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

18.3    Amendments.   This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

18.4    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

18.5    Currency.   All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

18.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

18.7    Execution in Counterparts.  This Agreement may be executed in one or more counterparts. Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of electronic mail or other electronic transmission (including via DocuSign) in which the actual or electronic signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a electronic mail or other electronic transmission in which the actual or electronic signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of electronic mail or other electronic transmission in which the actual or electronic signature is evident as a defense to the formation of a contract and each party forever waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

18.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

18.9    Wiring of Funds.   All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent to Merchant no later than 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that

the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

18.10   Nature of Remedies.  Except to the extent expressly set forth herein, all rights, remedies, powers, privilege and adjustments under this Agreement shall be in addition to and not in limitation of those provided elsewhere in this Agreement or by applicable law.  No failure to exercise and no delay in exercising, on the part of the Agent, any right, remedy, power, privilege or adjustment hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, privilege, or adjustment hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, privilege, or adjustment.

18.11   Third Party Beneficiary. The Merchant and the Agent hereby designate Compass Group Diversified Holdings LLC, as DIP Lender and pre-petition secured lender, as a third-party beneficiary of this Agreement with the right to enforce each of the terms herein.

18.12   Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto. In the event of any conflict between the terms of this Agreement and the Sale Approval Order, the Sale Approval Order shall control.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**ENHANCED RETAIL FUNDING, LLC**

By: _____
*Patricia Parent*
DocuSigned by:
5469A6860B3840D...

      Name:  Tricia Parent
      Title:   Authorized Officer


**LUGANO DIAMONDS & JEWELRY, INC.**

By: _____
Name:
Title:


**List of Exhibits**

Exhibit A – Sale Locations
Exhibit 3.2(a) – Sharing Amount Thresholds
Exhibit 3.3- Form of Letter of Credit
Exhibit 4.1(c) – Per Sale Location, Per Diem Occupancy Expenses
Exhibit 5.1 – Inventory Taking Instructions
Exhibit 6.1 – Sale Guidelines

     IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**ENHANCED RETAIL FUNDING, LLC**

By:_____

     Name:

     Title:

**LUGANO DIAMONDS & JEWELRY, INC.**

By:_____

Name:  Christoph Pachler

Title:

     CFO

**<u>List of Exhibits</u>**

Exhibit A – Sale Locations

Exhibit 3.2(a) – Sharing Amount Thresholds

Exhibit 3.3- Form of Letter of Credit

Exhibit 4.1(c) – Per Sale Location, Per Diem Occupancy Expenses

Exhibit 5.1 – Inventory Taking Instructions

Exhibit 6.1 – Sale Guidelines

## **EXHIBIT 2**

**Sale Guidelines**

### Interim Sale Guidelines[1]

1.    The Interim Sale shall be conducted so that the Sale Locations in which the Interim Sale is/are to occur will remain open no longer than during the normal hours of operation provided for in the respective underlying occupancy agreement for the Sale Locations.

2.    The Interim Sale shall be conducted in accordance with applicable state and local "Blue Laws", where applicable, so that no Interim Sale shall be conducted on Sunday unless the Merchant had been operating such Debtor Location on a Sunday.

3.    On "shopping center" property, Agent shall not distribute handbills, leaflets or other written materials to customers outside of any Sale Locations' premises, unless permitted by the lease or, if distribution is customary in the "shopping center" in which such Sale Location is located; provided, that Agent may solicit customers in the Sale Locations themselves.  On "shopping center" property, Agent shall not use any flashing lights or amplified sound to advertise the Interim Sale or solicit customers, except as permitted under the applicable lease or agreed to by the landlord.

4.    At the conclusion of the Interim Sale, Agent shall vacate the Sale Locations in broom clean condition; provided, that Agent may abandon any furniture, fixtures and equipment (including, but not limited to, machinery, rolling stock, office equipment and personal property, and conveyor systems and racking), shelving, racking, and other trade fixtures, (collectively, "FF&E") not sold in the Interim Sale at the conclusion of the Interim Sale, without cost or liability of any kind to Agent for any claims asserted by either Merchant or any third party, including, without limitation, any lessor of the subject FF&E.  Any abandoned FF&E left in a Sale Location(s) after a lease is rejected shall be deemed abandoned to the landlord having a right to dispose of the same as the landlord chooses without any liability whatsoever on the part of the landlord to any party and without waiver of any damage claims against the Merchant.  For the avoidance of doubt, as of the Interim Sale Termination Date or Vacate Date, as applicable, Agent may abandon, in place and without further responsibility or liability of any kind, any FF&E.

5.    Agent may advertise the Interim Sale by means of a highly promotional sale strategy utilizing sale themes as are customary in the industry, in each case as shall be determined by Agent from time-to-time, in its exclusive discretion.  All signs, banners, ads and other advertising collateral, promotions, and campaigns will be approved by the Merchant in accordance the Agency Agreement.

6.    Agent shall be permitted to utilize display, hanging signs, and interior banners in connection with the Interim Sale; provided, that such display, hanging signs, and interior banners shall be professionally produced and hung in a professional manner.  The Merchant and Agent shall not use neon or day-glo on its display, hanging signs, or interior banners.  Furthermore, with respect to enclosed mall locations, no exterior signs or signs in common areas of a mall shall be used unless otherwise expressly permitted in these Sale Guidelines.  In addition, the Merchant and Agent shall be permitted to utilize exterior banners at (i) non-enclosed mall locations and (ii) enclosed mall locations to the extent the entrance to the applicable Sale Location(s) does not require entry into the enclosed mall common area; provided, however, that such banners shall be located or hung so as to make clear that the Interim Sale is being conducted only at the affected Sale Location, shall not be wider than the storefront of the subject Sale Location, and shall not be larger than 4 feet x

---

[1]    Capitalized terms used but not defined in these Sale Guidelines have the meanings given to them in the Agency Agreement.

40 feet.  In addition, the Merchant and Agent shall be permitted to utilize sign-walkers and A-frames in a safe and professional manner and in accordance with the terms of the Interim Approval Order.  Nothing contained in these Sale Guidelines shall be construed to create or impose upon Agent any additional restrictions not contained in the applicable underlying occupancy agreement.

7.      Conspicuous signs shall be posted in the cash register areas of each of the affected Sale Locations to effect that "all sales are final."

8.      Except with respect to the hanging of exterior banners, Agent shall not make any alterations to the storefront or exterior walls of any Sale Location(s).

9.      Agent shall not make any alterations to interior or exterior Closing Location lighting.  No property of the landlord of a Sale Location shall be removed or sold during the Interim Sale.  The hanging of exterior banners or in-store signage and banners shall not constitute an alteration to a Sale Location.

10.     Agent shall keep Sale Location premises and surrounding areas clear and orderly consistent with present practices.

11.     Subject to the provisions of the Agency Agreement, Agent shall have the right to sell all Owned FF&E, approved by the Merchant.  Agent may advertise the Interim Sale of the Owned FF&E in a manner consistent with these guidelines.  The purchasers of any Owned FF&E sold during the Interim Sale shall be permitted to remove the Owned FF&E either through the back shipping areas at any time, or through the front door of a Sale Location during business hours provided such item may be carried out by one person.  For the avoidance of doubt, as of the Sale Termination Date or the Vacate Date, as applicable, Agent may abandon, in place and without further responsibility, any FF&E.

12.     The Agent shall be entitled to include Additional Agent Goods in the Interim Sale in accordance with the terms of the Agency Agreement and Interim Approval Order.

13.     At the conclusion of the Interim Sale at each Sale Location, pending assumption or rejection of applicable leases, the landlords of the Sale Locations shall have reasonable access to the Sale Locations' premises as set forth in the applicable leases.  The Merchant, Agent and their agents and representatives shall continue to have access to the Sale Locations as provided for in the Agreement.

14.     The rights of landlords against Merchant for any damages to a Sale Location shall be reserved in accordance with the provisions of the applicable lease.

15.     If and to the extent that the landlord of any Sale Location affected hereby contends that Agent or Merchant is in breach of or default under these Sale Guidelines, such landlord shall email or deliver written notice by overnight delivery on the Merchant and Agent as follows:

If to Agent:

Enhanced Retail Funding, LLC
Prudential Tower
101 Huntington Avenue, 11th Floor
Boston, MA 02199
Attn:    Rick Edwards

With a copy to (which shall not constitute notice):

Riemer & Braunstein LLP
Times Square Tower
Seven Times Square, Suite 2506
New York, NY 10036
Attn:  Steven E. Fox
Email:  sfox@riemerlaw.com

If to Merchant:

Lugano Diamonds & Jewelry, Inc.
620 Newport Center Drive, Suite 380
Newport Beach, CA 92660
Attn:  Christoph Pachler
Email:  cpachler@luganodiamonds.com

With a copy to (which shall not constitute notice):

 Young Conaway Stargatt & Taylor, LLP
 Rodney Square
 1000 N King Street
 Wilmington, DE 19801
 Attention:  Sean M. Beach, Esq.
             Edmon Morton, Esq.
             Craig D. Grear, Esq.
 Email:    sbeach@ycst.com
             emorton@ycst.com
             cgrear@ycst.com

If to the DIP Lender:

 Compass Group Diversified Holdings LLC
 301 Riverside Avenue,
 Second Floor
 Westport, CT 06880
 Attention:  Chief Financial Officer

With a copy to (which shall not constitute notice):

Squire Patton Boggs (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, Ohio 45202
Attention:     Ben Glassman
               Evan Toebbe
               Peter Morrison
Email: benjamin.glassman@squirepb.com
      evan.toebbe@squirepb.com
      peter.morrison@squirepb.com

Polsinelli PC
222 Delaware Avenue
Suite 1101
Wilmington, DE 19801
Attention:     Shanti M. Katona
               Christopher A. Ward
Email: skatona@polsinelli.com
      cward@polsinelli.com

4532703.3

4

**<u>EXHIBIT 3</u>**

**Bidding Procedures**

## BIDDING PROCEDURES

On November 16, 2025, Lugano Diamonds & Jewelry Inc., Lugano Holding, Inc., Lugano Buyer, Inc., K.L.D. Jewelry, LLC, and Lugano Prive, LLC (collectively, the "Debtors") commenced chapter 11 cases (collectively, the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors are authorized to continue to operate their business and manage their properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Set forth below are the bidding procedures (the "Bidding Procedures")[1] to be used with respect to the sale or disposition (the "Sale") of some, or all, of the Assets (as defined below) of the Debtors.

Any party interested in bidding on the Assets should contact: (a) counsel to the Debtors, (i) Keller Benvenutti Kim LLP, Attn: Tobias S. Keller (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Attn: Sean M. Beach (sbeach@ycst.com), Edmon L. Morton (emorton@ycst.com), and Timothy R. Powell (tpowell@ycst.com); and (b) the Debtors' investment banker, Armory Securities, LLC, Attn: Nicholas Tell (ntell@armorysecurities.com), Eben Perison (eperison@armorysecurities.com), and Matthew Curtis (mcurtis@armorysecurities.com).

## KEY SALE PROCESS DATES

| Date | Deadline/Event |
|---|---|
| November 18, 2025 | • Interim Approval Hearing<br>• Entry of Interim Approval Order |
| December 2, 2025, at 12:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| December 3, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline for Debtors to notify Potential Bidders of whether their Bids are Qualified Bids |

---

[1] Capitalized terms used but otherwise not defined herein shall have the meanings ascribed to them in the *Motion of Debtors for (A) an Interim Order (I) Authorizing the Debtors to Perform Under the Agency Agreement, (II) Approving the Sale Guidelines, Dispute Resolution Procedures, Waiver of Various Lease Restrictions, and Modifications to the Debtors' Customer Programs, (III) Scheduling, If Necessary and Prior to Any Auction, the Agent Protections Hearing to Consider Entry of the Agent Protections Order (1) Approving the Agent Protections, (2) Scheduling, If Necessary, the Auction, and (3) Approving (X) the Bidding Procedures, and (Y) the Sale Notice; (IV) Authorizing, If Necessary, the Debtors to Execute an Alternative Transaction Agreement, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief; and (B) a Final Order (I) Authorizing the Debtors to Assume (1) the Agency Agreement, or (2) an Alternative Transaction, (II) Authorizing (1) Agent to Sell the Agency Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, or Authorizing (2) Another Successful Bidder to Sell the Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, and (III) Granting Related Relief* [Docket No. [●]] (the "Motion").

| Date | Deadline/Event |
|------|----------------|
| December 4, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to the Sale[2] of the Assets |
| December 5, 2025 | Deadline for the Debtors to file a reply before the Agent Protections Hearing |
| December 9, 2025 | • Agent Protections Hearing (if necessary)<br>• Entry of Agent Protections Order |
| December 10, 2025, at [●] (prevailing Eastern Time) | Auction (if necessary) |
| December 11, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline to file and serve Notice of Successful Bidder(s) |
| December 12, 2025, at 4:00 p.m. (prevailing Eastern Time) | Deadline to object to (a) conduct of the Auction; (b) the sale to the Successful Bidder; and (c) ability of the Successful Bidder to provide adequate assurance of future performance or the proposed form of adequate assurance of future performance |
| December 15, 2025 | Deadline for Debtors to file a reply before the Final Approval Hearing |
| December 17-19, 2025 | Final Approval Hearing |
| December 23, 2025, at 12:00 p.m. (prevailing Eastern Time) | Sale Closing Date (as applicable) |

## I.    Description of the Assets to Be Sold

The Debtors are seeking to sell some, or all, of their assets (the "Assets"), in each case free and clear of all liens, claims, and encumbrances thereon.  Potential Bidders are encouraged to submit Bids for some, or all, of the Assets.

The sale(s) of the Assets shall be subject to a competitive Bidding Process (as defined below) as set forth herein and approval by the United States Bankruptcy Court for the District of Delaware (the "Court") pursuant to sections 105, 363, and 365 of the Bankruptcy Code, rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1, 6004-1, and 9006-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").  The Debtors may

---

[2]    For the avoidance of doubt, this objection deadline applies to all objections to this Motion, final approval of the Agency Agreement, and the Sale of the Assets to a Successful Bidder; *provided, however*, that this objection deadline does not apply to objections related solely to conduct of the Auction, if any, identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder.

consider Bids for some, or all, of the Assets in a single Bid from a single bidder, or in multiple Bids from multiple bidders.

## II.    Confidentiality Agreement

Unless otherwise ordered by the Court for cause shown, to participate in the Bidding Process (as defined below), each person or entity must enter into (unless previously entered into) with the Debtors, on or before the Bid Deadline (as defined below), a confidentiality agreement in form and substance reasonably satisfactory to the Debtors (the "Confidentiality Agreement"). Further, to participate in the diligence process and receive access to due diligence information, a party must submit to the Debtors, or their advisors, sufficient information, as reasonably determined by the Debtors, to allow the Debtors to determine that the interested party (a) has the financial wherewithal to consummate the applicable sale, and (b) intends to access the Data Room (as defined below) for a purpose consistent with these Bidding Procedures. Each person or entity that enters into the Confidentiality Agreement with the Debtors in contemplation of participating in the Bidding Process on or before the Bid Deadline is hereinafter referred to as a "Potential Bidder."

After a Potential Bidder (as defined below) enters into a Confidentiality Agreement with the Debtors and demonstrates the financial wherewithal to potentially consummate a sale transaction, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information (including, if applicable, financial data) with respect to the Assets.

## III.    Determination by the Debtors

As appropriate throughout the Bidding Process (as defined below), the Debtors will consult with the Consultation Parties and shall (a) coordinate with Potential Bidders regarding the conduct of their respective due diligence, (b) evaluate bids from Potential Bidders on some, or all, of the Assets, (c) following consultation with the Consultation Parties, negotiate any Bid made to acquire some, or all, of the Assets, and (d) following consultation with the Consultation Parties, make such other determinations as are provided in these Bidding Procedures (collectively, the "Bidding Process").

## IV.    Due Diligence

The Debtors have established a confidential electronic data room concerning the Assets (the "Data Room") and will grant each Potential Bidder or Consultation Party access to such Data Room.  Up to and including the Bid Deadline (as defined below) (such period, the "Diligence Period"), the Debtors shall afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate under the circumstances. The Debtors will provide the Agency Agreement, or a form Alternative Transaction Agreement for the sale of some, or all, of the Assets (the "Form Agreement"), as applicable, and will grant each Potential Bidder or Consultation Party, as applicable, access to such in the Data Room.  The Debtors may designate a representative or representatives to coordinate all reasonable requests

for additional information and due diligence access from such Potential Bidders and/or Consultation Parties, as applicable.  Each Potential Bidder shall be required to acknowledge that it has had an opportunity to conduct any and all due diligence regarding the Assets in conjunction with submitting its Bid (as defined below).

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person or entity who is not a Potential Bidder who does not otherwise comply with the participation requirements set forth above.  Moreover, the Debtors shall be entitled to restrict any Potential Bidder's access to information if the Debtors determine, in their business judgment, that providing a Potential Bidder with access to the Data Room, or any information contained therein, would harm the sale process or compromise or otherwise impair the Debtors' business or the value of the Assets.

## V.     <u>Bid Deadline</u>

A Potential Bidder that desires to make a Bid shall deliver written copies of its Bid in both Portable Document Format (.pdf) and Microsoft Word (.doc/.docx) format to the following: (a) counsel to the Debtors, (i) Keller Benvenutti Kim LLP, Attn:  Tobias S. Keller (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Attn:  Sean M. Beach (sbeach@ycst.com), Edmon L. Morton (emorton@ycst.com), and Timothy R. Powell (tpowell@ycst.com); and (b) the Debtors' investment banker, Armory Securities, LLC, Attn:  Nicholas Tell (ntell@armorysecurities.com), Eben Perison (eperison@armorysecurities.com), and Matthew Curtis (mcurtis@armorysecurities.com), **by no later than December 2, 2025, at 12:00 p.m. (prevailing Eastern Time)** (the "<u>Bid Deadline</u>").  As soon as reasonably practicable following the Bid Deadline, the Debtors will provide to the Consultation Parties copies of all Qualified Bids (with such distribution permissible by electronic means).

## VI.    <u>Bid Requirements</u>[3]

All bids (each hereinafter, a "<u>Bid</u>") must comply with the following requirements (collectively, the "<u>Bid Requirements</u>"):

    (a)      be accompanied by a letter or email:

        (i)      fully disclosing the identity of the Potential Bidder and providing the contact information of the specific person(s) whom the Debtors or their advisors should contact (including any equity holder or other financial backer if the Potential Bidder is an entity formed for the purpose of consummating the proposed sale) in the event that the Debtors have any questions or wish to discuss the Bid submitted by the Potential Bidder;

---

[3]    The Debtors will also consider proposals to acquire some, or all, of the Assets through a plan of reorganization. Should any such proposal be received prior to the Bid Deadline that the Debtors, in consultation with the Consultation Parties, conclude is in the best interest of the estates and stakeholders, then the Debtors reserve the right to postpone the Auction and proceed toward the confirmation of a plan.

(ii)    setting forth the purchase price to be paid by such Potential Bidder and forms of consideration the Potential Bidder intends to use to pay such purchase price; *provided, however*, that all Bids (either viewed individually or in the aggregate) must provide consideration to the Debtors of at least the sum of (1) the amount provided for in the Agency Agreement, (2) the Agent Protections, (3) and a reasonable minimum overbid amount equal to or greater than $100,000 or such other amount determined by the Debtors, in consultation with the Consultation Parties, (the "Incremental Overbid") over the Starting Bid (as defined below) or the Leading Bid (as defined in the Bidding Procedures);

(iii)    stating with specificity the Assets (including the specific executory contracts and unexpired leases) such Potential Bidder wishes to bid on and the liabilities and obligations (including applicable cure costs) to be assumed by the Potential Bidder in the sale;

(iv)    agreeing that the Potential Bidder's offer is binding, unconditional, and irrevocable until two business days after the closing of the sale;

(v)    containing a commitment to close the contemplated transaction(s) by a Closing Date (as defined below) of no later than December 23, 2025, at 12:00 p.m. (prevailing Eastern Time);

(vi)    providing that such Bid is not subject to contingencies of any kind, including, without limitation, contingencies related to financing, internal approval, or due diligence;

(vii)    containing an acknowledgment that the Potential Bidder has had an opportunity to conduct any and all due diligence regarding the Assets, has relied solely upon its own independent review and investigation and/or inspection of any documents and any other information in making the Bid;

(viii)    setting forth (1) a statement or evidence that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, if applicable, and pay the fees associated with such filings, and (2) any regulatory and third-party approval required for the Potential Bidder to close the contemplated transactions, and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than five days following execution and delivery of such Potential Bidder's Alternative Transaction Agreement, those actions the bidder will take to ensure receipt of such approval(s) as promptly as possible); *provided* that a Potential Bidder agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable; *provided, further*, that the offer contains a

covenant to cooperate with the Debtors to provide pertinent factual information regarding the bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

(ix)    providing that the Potential Bidder agrees to serve as a backup bidder (the "<u>Next-Highest Bidder</u>") if the Potential Bidder's Qualified Bid (as defined below) is the next highest or best bid after the Successful Bid (as defined below) (the "<u>Next Highest Bid</u>") with respect to the relevant Assets through the Closing Date;

(b)    be accompanied by (i) an executed Alternative Transaction Agreement in form and substance reasonably satisfactory to the Debtors (a "<u>Qualified Bid Agreement</u>"), and (ii) redline of the executed Qualified Bid Agreement compared to the Agency Agreement or the Form Agreement, as applicable, to reflect any proposed amendments and modifications to the Agency Agreement or the Form Agreement, as applicable, and the schedules and exhibits thereto;

(c)    be accompanied by adequate assurance of future performance information (the "<u>Adequate Assurance Information</u>"), which may include (i) information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements, (ii) information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed sale, (iii) evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid, and (iv) such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.  By submitting a Bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected counterparties to any contracts or leases potentially being assumed and assigned in connection with the sale if the Debtors determine such bid to be a Qualified Bid (as defined below); and

(d)    be accompanied by (i) a deposit made by wire transfer to the Debtors, in the amount of 10% of the cash consideration of the Bid, which funds will be deposited, prior to the Bid Deadline, into an escrow account to be identified and established by the Debtors (a "<u>Good Faith Deposit</u>"), and (ii) written evidence, documented to the Debtors' satisfaction, that demonstrates the Potential Bidder has available cash, a commitment for financing if selected as the Successful Bidder (as defined below) with respect to the relevant Assets (*provided, however*, that the closing shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction(s) as the Debtors may request, including proof that any such funding or other financing commitments are not subject to any internal approvals, syndication requirements, diligence or credit committee approvals (provided further that such commitments may have covenants and conditions acceptable to the Debtors).  The Debtors reserve the right to increase the Good Faith Deposit for one or more Qualified Bidders (as defined below) in

their sole discretion after consulting with the Consultation Parties. Notwithstanding the foregoing, any party submitting a Credit Bid shall not be required to provide a Good Faith Deposit.

The Debtors will review, in consultation with the Consultation Parties, each Bid received from a Potential Bidder to determine whether it meets the requirements set forth above. A bid received from a Potential Bidder for some, or all, of the Assets that is determined by the Debtors, in consultation with the Consultation Parties, to meet the above requirements will be considered a "Qualified Bid" and each Potential Bidder that submits such a Qualified Bid will be considered a "Qualified Bidder." For the avoidance of doubt, (a) the Agency Agreement, or (b) any credit bid submitted under section 363(k) or any other applicable provision of the Bankruptcy Code (a "Credit Bid") will be deemed a Qualified Bid and each of Agent and any bidder that submits a Credit Bid will be deemed a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that a Potential Bidder must satisfy to be a Qualified Bidder. To the extent applicable, the Debtors shall inform Agent of the Qualified Bids received and shall provide copies of the Qualified Bid(s) to Qualified Bidders prior to the commencement of the Auction.

A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent in their reasonable business judgment, including, among others, (a) the amount of the Qualified Bid; (b) the risks and timing associated with consummating the transactions(s) with the Qualified Bidder; (c) any excluded assets or executory contacts and leases; and (d) any other factors that the Debtors, in consultation with the Consultation Parties, may reasonably deem relevant.

The Debtors, in their business judgment and in consultation with the Consultation Parties, reserve the right to reject any Bid if such Bid, among other things:

(a)     requires any indemnification of the Potential Bidder in any Qualified Bid Agreement submitted as part of the Bid;

(b)     is not received by the Bid Deadline;

(c)     does not comport with the Bid Requirements;

(d)     is subject to any contingencies (including representations, warranties, covenants and timing requirements) of any kind or any other conditions precedent to such party's obligation to acquire the relevant Assets; or

(e)     does not, in the Debtors' determination, in consultation with the Consultation Parties, include a fair and adequate price or the acceptance of which would not be in the best interests of the Debtors' estates or the Auction.

Any Bid rejected pursuant to the foregoing shall not be deemed to be a Qualified Bid; *provided* that the Debtors have the right to work with the parties to any rejected Bid to cure any such defects. If any Bid is so rejected and not cured, the Debtors shall cause the Good Faith

Deposit of such Potential Bidder (including all accumulated interest thereon) to be refunded to it as soon as reasonably practicable, but no later than five business days after the Bid Deadline.

The Debtors may, in consultation with the Consultation Parties, among other things, (a) extend such Bid Deadline with respect to the subject Assets and postpone the Auction, or (b) cancel the Auction and terminate the proposed sale for the subject Assets.

## VII.   **No Qualified Bids**

If no Qualified Bids other than a Agency Agreement are received by the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, may cancel the Auction, and may decide, in the Debtors' reasonable business judgment, to designate the Agent as the Successful Bidder, and pursue entry of the Final Approval Order approving the Agency Sale to Agent.

## VIII.   **Auction**

Unless otherwise ordered by the for cause shown, only the Qualified Bidders are eligible to participate at the Auction (as defined below).  The Consultation Parties shall be permitted to attend the Auction.  In addition, any creditor of the Debtors or party the Debtors deem appropriate may observe the Auction; *provided, however*, that creditors who are not Qualified Bidders shall provide three business days' written notice to counsel to the Debtors of their intent to attend the Auction; *provided, further*, that the Debtors reserve the right to retract their permission at any point during the Auction if such creditor party who is not a Qualified Bidder does not act in good faith and in orderly fashion during the Auction.  For the avoidance of doubt, only Qualified Bidders will be entitled to make any Bids at the Auction.  At least one day prior to the start of the Auction, each Qualified Bidder must inform the Debtors in writing whether it intends to participate in the Auction.  If the Debtors do not receive a Qualified Bid, other than the Agency Agreement, with regard to some, or all, of the Assets, (a) the Debtors shall not hold an Auction with respect to such Assets; (b) the Agency Agreement will be deemed the Successful Bid with respect to such Assets; and (c) Agent will be named the Successful Bidder with respect to such Assets.  At any point and at their sole discretion, the Debtors shall have the right to remove any Assets from the Auction.

If at least one Qualified Bid, other than the Agency Agreement, is received by the Bid Deadline with regard to any particular Assets the Debtors will conduct an auction (the "Auction") with respect to such Assets and shall determine, after consultation with the Consultation Parties, which Qualified Bid is the highest or otherwise best Qualified Bid for purposes of constituting the opening bid at the Auction for the relevant Assets (the "Starting Bid(s)").  The Starting Bid(s) will be communicated to Qualified Bidders prior to the commencement of the Auction.  The determination of which Qualified Bid constitutes the Starting Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, including, among other things, the following:   (a) the amount and nature of the consideration, including any obligations to be assumed; (b) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such bid; (c) the number, type and nature of any changes to the Agency

Agreement, as applicable, requested by each Qualified Bidder; (d) the extent to which such modifications are likely to delay closing of the sale of the Assets and the cost to the Debtors of such modifications or delay; (e) the likelihood of the Qualified Bidder being able to close the proposed transaction (including obtaining any required regulatory approvals) and the timing thereof; (f) the net benefit to the Debtors' estates (including after taking account of the Bid Protections); (g) the tax consequences of such Qualified Bid; and (h) the impact on employees and members and the proposed treatment of employee and member obligations.

The Auction, if required, will be conducted on **December 10, 2025, starting at [●] (prevailing Eastern Time)** at [●]. Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), the Consultation Parties, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction. Each Qualified Bidder participating in the Auction will be required to confirm, in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

Bidding at the Auction for some, or all, of the Assets that are subject to Qualified Bids will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one Subsequent Bid (defined below) is submitted by a Qualified Bidder that (a) improves on such Qualified Bidder's immediately prior Qualified Bid (a "Subsequent Bid") and (b) the Debtors reasonably determine, in consultation with the Consultation Parties, that such Subsequent Bid is (i) for the first round, a higher or otherwise better offer than the Starting Bid, and (ii) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined below). Each Subsequent Bid at the Auction shall be equal to or greater than the Incremental Bid. After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest or otherwise best offer for the subject Assets (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid, subject to the Debtors' authority to revise the Auction procedures as set forth below. In any Subsequent Bid by Agent, if designated, the amount of the Agent Protections shall be included in the calculation of such Bid.

The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make Subsequent Bids, the amount of the Incremental Overbid, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bidding Procedures, including by providing for different procedural rules for different portions or categories of Assets; *provided* that such rules (a) are not materially inconsistent with these Bidding Procedures, the Bankruptcy Code, or applicable orders of the Bankruptcy Court, and (b) are disclosed to each Qualified Bidder during the Auction. The bidding at the Auction shall be transcribed and the Debtors shall maintain a transcript of all Bids made and announced at the Auction.

Immediately prior to the conclusion of the Auction, the Debtors, in consultation with the Consultation Parties, will, for some, or all, of the Assets that were subject to the Auction: (a) determine, consistent with the Bidding Procedures, which Bid constitutes the highest or

otherwise best bid (the "Successful Bid"); and (b) notify all Qualified Bidders at the Auction for the subject Assets, prior to its conclusion, of the name of the maker of the Successful Bid (the "Successful Bidder") with respect to the subject Assets, and the amount and other material terms of the Successful Bid. The Debtors may, in consultation with the Consultation Parties, designate the Next-Highest Bid (and the corresponding Next-Highest Bidder) to close with respect to the subject Assets in the event that the Successful Bidder does not close the sale; *provided* that Agent's Bid shall only constitute the Next-Highest Bid, and Agent shall only constitute the Next-Highest Bidder, in each case, if Agent agrees to such treatment in its sole and absolute discretion at the Auction. Unless the Court orders otherwise upon application by the Debtors, the Debtors shall not consider any Bids or Subsequent Bids submitted after the conclusion of the Auction and any and all such Bids and Subsequent Bids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

As soon as practicable following the conclusion of the Auction, the Debtors shall file a notice on the Court's docket identifying (with specificity) the Successful Bidder(s) for some, or all, of the Assets and any applicable Next-Highest Bidder(s) (the "Notice of Successful Bidder"). Objections related solely to the conduct of the Auction, the identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder (other than Agent) must be in writing, state the basis of such objection with specificity, and be filed with the Court and served so as to be received by the Notice Parties on or before **December 11, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

All bidders at the Auction will be deemed to have consented to the core jurisdiction and constitutional authority of the Court and waived any right to jury trial in connection with any disputes relating to the Auction, the sale and all agreements entered into in connection with any proposed sale transaction.

## IX.    Acceptance of Qualified Bids

The Debtors may reject at any time, before entry of an order of the Court approving the sale, any Bid that, in the Debtors' business judgment, upon consultation with the Consultation Parties, is (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures; or (c) contrary to the best interests of the Debtors' and their estates.

The Debtors' presentation to the Court for approval of a selected Qualified Bid as a Successful Bid does not constitute the Debtors' acceptance of such Bid. The Debtors will be deemed to have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Final Approval Hearing.

## X.    No Fees for Potential Bidders or Qualified Bidders

Potential Bidders or Qualified Bidders, other than Agent, if applicable, shall not be allowed any bidding protections or fees as a precondition to, or in consideration of, presenting any bid or participating in the Bidding Process reflected herein.

33769090.1

XI.     **Final Approval Hearing**

Each Successful Bid and any Next-Highest Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to some, or all, of the Assets, then the Qualified Bid of such Qualified Bidder) shall be subject to approval by the Court.  The hearing to approve a Successful Bid and any Next-Highest Bid (or if no Qualified Bid other than that of one Qualified Bidder is received with respect to some, or all, of the Assets, then the Qualified Bid of such Qualified Bidder) shall take place on **December 17-19, 2025, at [●] (prevailing Eastern Time)** (the "Final Approval Hearing").  The Final Approval Hearing may be adjourned by the Debtors, in consultation with the Consultation Parties, from time to time without further notice to other creditors or other parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Final Approval Hearing or by filing a notice, which may be a hearing agenda stating the adjournment, on the docket of the Chapter 11 Cases.

XII.    **Return of Good Faith Deposit**

The Good Faith Deposits of all Qualified Bidders shall be held in escrow, but shall not become property of the Debtors' estates absent further order of the Court.  The Debtors shall retain any Good Faith Deposit submitted by each Successful Bidder.  At the closing of a sale contemplated by a Successful Bid, the applicable Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit to the extent such a deposit was provided.  The Good Faith Deposits of any Next-Highest Bidder shall be retained until three business days after the applicable closing date (the "Closing Date").  The Good Faith Deposits of any other Qualified Bidders will be returned as soon as reasonably practicable, but no later than ten business days following the Auction.

If a Successful Bidder (or, if the sale is to be closed with a Next-Highest Bidder, then the Next-Highest Bidder) fails to consummate the sale because of a breach or failure to perform on the part of such bidder, then, subject to the terms of the applicable Qualified Bid Purchase Agreement (as such agreement may be amended or modified at the Auction) or any other form of purchase agreement reasonably satisfactory to the Debtors, the Debtors and their estates shall be entitled to retain the Good Faith Deposit of such Successful Bidder (or, if the sale is to be closed with the Next-Highest Bidder, then such Next-Highest Bidder) as part of the damages resulting to the Debtors and their estates for such breach or failure to perform.

XIII.   **Reservation of Rights and Modifications**

Notwithstanding any of the foregoing, the Debtors, in consultation with the Consultation Parties, reserve the right to modify these Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all potential bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Final Approval Hearing.

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures; *provided, however*, that the Debtors shall not be required to consult with any Consultation Party (or its advisors) if such Consultation Party is actively participating in the Bidding Process.

## XIV.   <u>Next-Highest Bidder</u>

Notwithstanding any of the foregoing, in the event that a Successful Bidder fails to close a aale prior to such date as specified in the applicable purchase agreement (or such date as may be extended by the Debtors), the Debtors, upon written notice to the Next-Highest Bidder, may designate the applicable Next-Highest Bid as the Successful Bid for some, or all, of the Assets, the Next-Highest Bidder will be deemed to be the Successful Bidder for such Assets, and the Debtors will be authorized, but not directed, to close the sale to the Next-Highest Bidder subject to the terms of the Next-Highest Bid as approved by further order of the Court.

**<u>EXHIBIT 4</u>**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (___) |
| Debtors. | (Jointly Administered) |

## NOTICE OF AUCTION AND FINAL APPROVAL HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.    On November 16, 2025, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), filed voluntary petitions for relief pursuant to chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

2.    On November 17, 2025, the Debtors filed a motion (the "Motion"),[2] pursuant to sections 363 and 365 of the Bankruptcy Code and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), seeking:

    (a)    entry of the Interim Approval Order:

        (i)    authorizing the Debtors to perform, on an interim basis, under the Agency Agreement;

        (ii)    approving the Sale Guidelines, Dispute Resolution Procedures, waiver of various restrictions under the Debtors' real property leases, and modifications to the Debtors' customer programs;

        (iii)    scheduling, if necessary and prior to any Auction, the Agent Protections Hearing to consider entry of the Agent Protections Order:

            (1)    approving the Agent Protections;

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(2)  scheduling, if necessary, the Auction; and

(3)  approving (x) the Bidding Procedures; and (y) the Sale Notice;

(iv)  authorizing, if necessary, the Debtors to execute an Alternative Transaction Agreement, consistent with the Bidding Procedures;

(v)  scheduling the Final Approval Hearing;

(vi)  granting related relief; and

(b)  entry of either the Final Approval Order or Sale Order:

(i)  authorizing (1) the assumption of the Agency Agreement, pursuant to the Final Approval Order; or (2) the assumption of an Alternative Transaction Agreement, pursuant to the Sale Order;

(ii)  authorizing (1) Agent to act as the Debtors' consultant and exclusive agent, pursuant to the Agency Agreement and Final Approval Order, to dispose of and/or sell the Agency Assets free clear of all Interests; or (2) in the case of a Sale Order and an Alternative Transaction Agreement, the sale of some, or all, of the Assets to the Successful Bidder(s) (as defined below), free and clear of all Interests; and

(iii)  granting related relief.

3.      On [●], 2025, the Court entered the Interim Approval Order and scheduled the Agent Protections Hearing to consider entry of the Agent Protections Order.  On [●], 2025, the Court entered the Agent Protections Order.  Pursuant to the Agent Protections Order, if at least one Qualified Bid, other than the Agency Agreement, with regard to any particular Assets (as defined in the Agent Protections Order) are received by the Bid Deadline (as defined below), the Debtors will conduct the Auction.  The Auction shall be held on **December 10, 2025, starting at [●] (prevailing Eastern Time)** or such other time as the Debtors shall designate and notify all Qualified Bidders.  Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), the Consultation Parties, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction.  Only parties that have submitted a Qualified Bid, as set forth in the Agent Protections Order, by no later than **December 2, 2025, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline") may bid at the Auction.  Any party that wishes to take part in this process and submit a Bid for any portion of the Assets must submit their competing Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.      The Final Approval Hearing to consider approval of the sale of the Assets to the Successful Bidder(s) at the Auction, free and clear of all liens, claims, encumbrances, and interests, will be held before the Honorable [●], United States Bankruptcy Judge, 824 North Market Street, Wilmington, Delaware 19801 on **December 17-19, 2025, at [●] (prevailing Eastern Time)**, or at such other time thereafter as counsel may be heard.  The Final Approval Hearing may be adjourned by the Debtors from time to time without further notice to creditors or parties in interest other than

33769090.1

by announcement of the adjournment in open court on the date scheduled for the Final Approval Hearing or by including such adjournment on any agenda filed with the Court or by the filing of a notice with the Court.

5.      Objections to approval of the sale (with the exception of objections related solely to the conduct of the Auction, identity of the Successful Bidder, and ability of the Successful Bidder to provide adequate assurance of future performance, which must be received by a different deadline), must be in writing, state the basis of such objection with specificity, and be filed with the Bankruptcy Court and served before **4:00 p.m. (prevailing Eastern Time) on December 4, 2025**, (the "Sale Objection Deadline") by the following parties (collectively, the "Notice Parties"):

      (a)      counsel to the Debtors, (i) Keller Benvenutti Kim LLP, Attn: Tobias S. Keller (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Attn: Sean M. Beach (sbeach@ycst.com), Edmon L. Morton (emorton@ycst.com), and Timothy R. Powell (tpowell@ycst.com);

      (b)      the Debtors' investment banker, Armory Securities, LLC, Attn: Nicholas Tell (ntell@armorysecurities.com), Eben Perison (eperison@armorysecurities.com), and Matthew Curtis (mcurtis@armorysecurities.com);

      (c)      the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Timothy Fox (timothy.fox@usdoj.gov); and

      (d)      counsel to the Committee, if any.

6.      Objections related solely to conduct of the Auction, identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder (other than Agent) must be in writing, state the basis of such objection with specificity, and be filed with the Court and served on or before **December 12, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Auction Objection Deadline") by the Notice Parties.

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.**

7.      This Sale Notice is subject to the fuller terms and conditions of the Motion, the Interim Approval Order, and the Agent Protections Order, with applicable Interim Approval order or Agent Protections Order controlling in the event of any conflict. In addition, copies of the aforementioned documents are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtors' claims and noticing agent's website free of charge at https://omniagentsolutions.com/Lugano.

33769090.1

Dated:  November [●], 2025
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ _____
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Timothy R. Powell (Del. No. 6894)
Benjamin C. Carver (Del. No. 7176)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:    emorton@ycst.com
        sbeach@ycst.com
        tpowell@ycst.com
        bcarver@ycst.com

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (*pro hac vice* pending)
Traci L. Shafroth (*pro hac vice* pending)
Scott Friedman (*pro hac vice* pending)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone:  (415) 496-6723
Facsimile:  (650) 636-9251
Email:    tkeller@kbkllp.com
        tshafroth@kbkllp.com
        sfriedman@kbkllp.com

*Proposed Attorneys for Debtors and Debtors-in-Possession*

# **EXHIBIT 5**

## **Agent Protections Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al*.,[1] | Case No. 25-12055 (___) |
|  | (Jointly Administered) |
| Debtors. | Ref. Docket Nos. _____ & ____ |

## AGENT PROTECTIONS ORDER

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for the entry of this order (this "Order"):  (a) approving the Agent Protections; (b) scheduling, if necessary, the Auction; and (c) approving (i) the Bidding Procedures, and (ii) the Sale Notice; and upon the First Day Declaration; and upon the statements of counsel made in support of the relief requested in the Motion at the hearing before this Court; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated February 29, 2012; and it appearing that venue of the Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that it may enter a final order consistent with Article III of the United States Constitution; and it appearing that proper and adequate notice of the Motion has been given under the circumstances and in accordance with the Bankruptcy Rules and Local Rules and that no other or further notice

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

is necessary; and after due deliberation thereon; and this Court having found that the relief herein is in the best interests of the Debtors' estates; and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A.    This Court has jurisdiction over this matter and over the property of the Debtors and their bankruptcy estates pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory and legal predicates for the relief requested herein are sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014.   Venue of the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The Debtors have offered good and sufficient reasons for, and the best interest of their estates will be served by, this Court granting the Motion, to the extent provided in this Order, including (a) approving the Agent Protections and related provisions; (b) scheduling the Auction, if necessary; (c) approving the Bidding Procedures, attached hereto as **Exhibit A**; and (d) approving the Sale Notice, attached hereto as **Exhibit B**.

C.    Good and sufficient notice of the relief sought in the Motion, to the extent provided in this Order, has been given under the circumstances, and no further notice is required except as set forth herein with respect to the Auction and the Final Approval Hearing.   Subject to the immediately preceding sentence, a reasonable opportunity to object or to be heard regarding the

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.   All findings of fact and conclusions of law announced by this Court at the Agent Protections Hearing are hereby incorporated herein to the extent not inconsistent herewith.

33769090.1

relief requested in the Motion, to the extent provided in this Order, was afforded to all interested persons and entities.

D.       In accordance with Local Rule 6004-1, the Debtors have properly filed and noticed the Motion, to the extent provided in this Order.  The issuance and immediate effectiveness of this Order as of the date hereof, including approval of the Bidding Procedures, is supported by evidence of compelling business justifications and other circumstances demonstrating that the relief granted by this Order is necessary to prevent immediate and irreparable harm to the Debtors and their estates.

E.       The proposed Sale Notice, as set forth in the Motion and this Order, is appropriate, sufficient, and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Final Approval Hearing, and the Bidding Procedures, and no other or further notice shall be required for the sale of the Assets.

F.       The Bidding Procedures are fair, reasonable, and appropriate under the circumstances and are reasonably designed to maximize the value to be achieved for the Assets.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.       The Motion is GRANTED on a final basis solely to the extent provided herein.

**The Agent Protections**

2.       Agent shall receive from Debtors a breakup fee equal to $3,000,000.00, pursuant to the Agency Agreement.

3.       Agent shall receive from Debtors an amount equal to the reasonable and documented third-party costs, fees, and expenses incurred by Agent (including, without limitation, actual and reasonable fees and expenses of legal advisors) in connection with the Agency Agreement and the transactions contemplated thereby in an aggregate amount not to exceed $250,000.00.

33769090.1

4.      Agent shall be entitled to Credit Bid the amount of the Agent Protections as part of the Auction.

5.      The Debtors shall be permitted to terminate the Agency Agreement if (a) the Debtors enter into a definitive agreement for an Alternative Transaction, (b) this Court enters an order approving such Alternative Transaction, and (c) there is a closing on such Alternative Transaction.

6.      The Debtors' liabilities under the Agency Agreement for termination upon entry into an Alternative Transaction shall not exceed an amount equal to the Agent Protections.

**Bidding Procedures, Auction, and Final Approval Hearing**

7.      The Bidding Procedures, attached as **Exhibit A** to this Order, are hereby approved in their entirety, incorporated by reference as if fully set forth herein, and shall govern all Bids and Bid proceedings relating to the Assets.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

8.      The Debtors will file and serve a proposed Sale Order or proposed Final Approval Order on or before **4:00 p.m. (prevailing Eastern Time) on December 15, 2025**.  Objections to approval of the sale(s) of some, or all, of the Assets (with the exception of objections related solely to the conduct of the Auction, identity of the Successful Bidder, and ability of the Successful Bidder to provide adequate assurance of future performance, which must be received by a different deadline), must be in writing, state the basis of such objection with specificity, and be filed with this Court and served on or before **4:00 p.m. (prevailing Eastern Time) on December 4, 2025**, (the "Sale Objection Deadline"), on the following parties (collectively, the "Notice Parties"):

    (a)      counsel to the Debtors, (i) Keller Benvenutti Kim LLP, Attn:  Tobias S. Keller (tkeller@kbkllp.com) and Scott Friedman (sfriedman@kbkllp.com); and (ii) Young Conaway Stargatt & Taylor, LLP, Attn:  Sean M. Beach (sbeach@ycst.com), Edmon L. Morton (emorton@ycst.com), and Timothy R. Powell (tpowell@ycst.com);

(b) the Debtors' investment banker, Armory Securities, LLC, Attn: Nicholas Tell (ntell@armorysecurities.com), Eben Perison (eperison@armorysecurities.com), and Matthew Curtis (mcurtis@armorysecurities.com);

(c) counsel to CODI, (i) Squire Patton Boggs (US) LLP, 1000 Key Tower 127 Public Square, Cleveland, OH, 44114 Attn: Peter R. Morrison (peter.morrison@squirepb.com), and (ii) Polsinelli PC, 222 Delaware Avenue, Suite 1101, Wilmington, DE 19801, Attn: Shanti Katona (skatona@polsinelli.com);

(d) counsel to Agent, (i) Riemer & Braunstein LLP, Times Square Tower, Seven Times Square, Suite 2506, New York, NY 10036, Attn: Steven E. Fox (sfox@riemerlaw.com), and (ii) Ashby & Geddes, P.A., 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899, Attn: Gregory A. Taylor (gtaylor@ashby-geddes.com);

(e) the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 North King Street, Suite 2207, Wilmington, Delaware 19801, Attn: Timothy Fox (timothy.fox@usdoj.gov); and

(f) counsel to the Committee, if any.

9.     All objections to the entry of this Order or to the relief provided herein that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

10.     The deadline for submitting a Qualified Bid shall be **December 2, 2025, at 12:00 p.m. (prevailing Eastern Time)**, unless extended by the Debtors pursuant to the Bidding Procedures (the "Bid Deadline").

11.     For the purposes of the Bidding Procedures:  (a) Agent will be considered a Qualified Bidder, and the Agency Agreement will be considered a Qualified Bid; (b) a Credit Bid submitted under section 363(k) or any other applicable provision of the Bankruptcy Code will be considered a Qualified Bid and any bidder that submits a Credit Bid will be considered a Qualified Bidder; and (c) in determining whether the Potential Bidders constitute Qualified Bidders, the Debtors may consider a combination of bids for the Assets.

12.     All bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Assets.

13.     If no Qualified Bid other than Agent is submitted on or before the Bid Deadline, the Debtors will not hold the Auction and will request at the Final Approval Hearing that this Court approve the Debtors' assumption of the Agency Agreement.

14.     If at least one Qualified Bid, other than the Agency Agreement, is received by the Bid Deadline with regard to some, or all, of the Assets, the Debtors will conduct the Auction.  The Auction will take place on **December 10, 2025, starting at [●] (prevailing Eastern Time)** at [●]. Professionals and principals for the Debtors, each Qualified Bidder (including, its representative(s), if any), the Consultation Parties, and any other parties the Debtors deem appropriate shall be permitted to attend and observe the Auction.

15.     Each Qualified Bidder participating at the Auction will be required to confirm in writing, and on the record at the Auction, that (a) it has not engaged in any collusion with respect to the Bidding Process, and (b) its Qualified Bid is a good faith *bona fide* offer that it intends to consummate if selected as the Successful Bidder.

16.     Following the Auction, the Debtors will determine in consultation with the Consultation Parties, which Qualifying Bid is the highest or otherwise best Bid for the Assets or subsets thereof.  As soon as possible following the Auction, but no later than 24 hours after conclusion of the Auction, the Debtors shall file a notice on this Court's docket identifying the

Successful Bidder(s) for some, or all, of the Assets and any applicable Next-Highest Bidder(s) (the "Notice of Successful Bidder").

17.    Objections related solely to conduct of the Auction, the identity of the Successful Bidder, and adequate assurance of future performance by the Successful Bidder (other than Agent) must be in writing, state the basis of such objection with specificity, and be filed with this Court and served so as to be received by the Notice Parties on or before **December 12, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Auction Objection Deadline").

18.    This Court shall convene the Final Approval Hearing on **December 17-19, 2025, at [●] (prevailing Eastern Time)** or as soon thereafter as counsel and interested parties may be heard, at which time this Court will consider approval of the sale(s) to the Successful Bidder(s) or Next-Highest Bidder(s) and the entry of the Sale Order or Final Approval Order.  At the Final Approval Hearing, the Debtors will seek the entry of (a) the Final Approval Order approving, among other things, the Debtors' assumption of the Agency Agreement, or (b) the Sale Order approving and authorizing the sale(s) to the Successful Bidder(s) or Next-Highest Bidder(s).  Subject to consultation with the Consultation Parties, the Debtors may adjourn the Final Approval Hearing from time to time without further notice to creditors or other parties in interest other than by announcement of said adjournment at the Final Approval Hearing or in notice or agenda filed with this Court.

19.    The form of the Sale Notice annexed hereto is hereby approved and appropriate and sufficient for all purposes and no other or further notice shall be required.  No finding or ruling is made in this Order as to the merits of any motion for approval of the sale of the Assets.

20.    As soon as reasonably practicable after entry of this Order, the Debtors shall cause the Sale Notice to be served upon the following:  (a) the United States Trustee for the District of

Delaware (the "U.S. Trustee"); (b) those creditors holding the 30 largest unsecured claims against the Debtors' estates (on a consolidated basis); (c) the office of the attorney general for each of the states in which the Debtors operate; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Securities and Exchange Commission; (h) counsel to Compass Group Diversified Holdings LLC, the Debtors' prepetition secured lender and postpetition secured lender; (i) counsel for Agent; (j) all parties who are known by the Debtors to assert liens, if any, against any Assets; (k) any party known or reasonably believed to have expressed an interest in acquiring some, or all, of the Assets within six months prior to the Petition Date, which service may be sent electronically if a mailing address for any such parties is unknown; (l) any party that, as of the filing of this Motion is entitled to notice pursuant to Bankruptcy Rule 2002; and (m) any party on the Debtors' matrix of creditors not listed in this paragraph.

21.     The Debtors will also cause the Sale Notice to be published in The New York Times, or another publication with similar national circulation, and the Orange County Business Journal, as well as post the Sale Notice, the Interim Approval Order, and this Order on the website of the Debtors' claims and noticing agent, Omni Agent Solutions, LLC: https://omniagentsolutions.com/Lugano  Publication of the Sale Notice as described in this Order conforms to the requirements of Bankruptcy Rules 2002(l) and 9008 and is reasonably calculated to provide notice to any affected party, including any Potential Bidder(s), and to afford the affected party the opportunity to exercise any rights affected by the Motion and the relief granted by this Order.

22.     Failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, entry of the Sale Order or Final Approval Order, or

consummation of the sale(s) of some, or all, of the Assets, and shall be deemed to constitute consent to entry of the Sale Order or Final Approval order and consummation of such sale(s) and all transactions related thereto including, without limitation, for purposes of section 363(f) of the Bankruptcy Code.

23.     All parties (whether or not Qualified Bidders) that participate in the Bidding Process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion or this Order (including any disputes relating to the Bidding Process, the Auction, and/or the sale(s) of the Assets) to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution, and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

24.     In the event there is any conflict between this Order and the Bidding Procedures, the terms and conditions of this Order shall control and govern in all respects.

**<u>Miscellaneous</u>**

25.     The requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied, modified, or waived.

26.     Notwithstanding any applicability of Bankruptcy Rule 6004(h), 6006(d), 7052, or 9014, this Order shall be immediately effective and enforceable upon its entry.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

27.     The Debtors are authorized, but not directed, to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

28.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **EXHIBIT A**

**Bidding Procedures**

**[Reserved]**

# **EXHIBIT B**

**Sale Notice**

**[Reserved]**

## **EXHIBIT B-1**

**Final Approval Order**

**[Reserved]**

## **EXHIBIT B-2**

**Sale Order**

**[Reserved]**