**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC.,<br>*et al.*,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered)<br><br><br>**Re:  Docket No. 312**<br>**Hearing Date:**  April 20, 2026, at 11:00 a.m. (ET) |

**DECLARATION OF TRACI L. SHAFROTH IN SUPPORT OF
DEBTORS' OBJECTION TO MORDECHAI FERDER'S
MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

I, Traci L. Shafroth, declare as follows:

1.      I am an attorney licensed to practice in the State of California and admitted to practice *pro hac vice* before the United States Bankruptcy Court for the District of Delaware.  I am a partner of the firm Keller Benvenutti Kim LLP, attorneys for the above-captioned debtors and debtors in possession (collectively, the "Debtors").

2.      I submit this declaration in support of the *Debtors' Objection to Mordechai Ferder's Motion for Relief from the Automatic Stay* (the "Objection")[2] filed concurrently herewith. The facts set forth herein are of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

3.      Attached hereto as **Exhibit A** is a true and correct copy of the *First Amended Complaint* filed on November 21, 2025, in *Lugano Diamonds & Jewelry Inc. v. Ferder, et al.*,

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc.  (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2]    Capitalized terms used but not otherwise defined herein have the meaning given to such terms in the Objection.

Superior Court of the State of California, County of Orange, Case No. 30-2025-01492210-CU-CO-CJC.

4.      Attached hereto as **Exhibit B** is a true and correct copy of the *Proof of Claim* of Mordechai Ferder, individually and in his capacity as Trustee of The Haim Family Trust, Claim No. 160, filed in the Chapter 11 Cases on January 27, 2026.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the *Complaint* filed in *Avina LLC, et al. v. Lugano Diamonds & Jewelry, Inc., et al.*, Case No. 30-2025-01495834-CU-FR-WJF (Cal. Super. Ct., Orange Cty., July 9, 2025).

6.      Attached hereto as **Exhibit D** is a true and correct copy of the *Voluntary Petition* filed in *In re Simba IL Holdings, LLC*, Case No. 8:25-bk-12616-MH (C.D. Cal. Sept. 16, 2025).

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.  Executed this 30th day of March, 2026, in Piedmont, California.

/s/ *Traci L. Shafroth*
Traci L. Shafroth

## <u>EXHIBIT A</u>

**First Amended Complaint**

(See Attached)

Electronically Filed by Superior Court of California, County of Orange, 11/26/2025 03:29:00 PM.
30-2025-01492210-CU-CO-CJC - ROA # 53 - DAVID H. YAMASAKI, Clerk of the Court By S. Berry, Deputy Clerk.
Case 25-12055-BLS   Doc 451   Filed 03/30/26   Page 4 of 243

Amjad M. Khan (SBN 237325)
  amjad@bnsklaw.com
Arun S. Avva (SBN 354481)
  arun@bnsklaw.com
**BROWN NERI SMITH & KHAN LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
T: (310) 593-9890
F: (310) 593-9980

*Attorneys for Plaintiff Lugano Diamonds &
Jewelry Inc.*

GARRETT S. LLEWELLYN (SBN 267427)
garrett.llewellyn@btlaw.com
**BARNES & THORNBURG LLP**
2029 Century Park East, Suite 300
Los Angeles, California 90067-2904
T: (310) 284-3880
F: (310) 284-3894

*Attorneys for Plaintiff Lugano Diamonds & Jewelry
Inc., by and through the Special Committee of the
Board of Directors of Lugano Diamonds*

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## COUNTY OF ORANGE
## CIVIL COMPLEX CENTER

| | |
|---|---|
| LUGANO DIAMONDS & JEWELRY INC., a California corporation<br><br>        Plaintiff,<br><br>        v.<br><br>MORDECHAI FERDER, an individual acting on his own behalf, and in his capacity as Trustee of the Haim Family Trust; VAD & COMPANY, INC., a Florida corporation; and DOES 1–50;<br><br>        Defendants. | Case No.  30-2025-01492210-CU-CO-CJC<br><br>**FIRST AMENDED COMPLAINT:**<br><br>1.  **FRAUD**<br>2.  **CONCEALMENT**<br>3.  **CONSTRUCTIVE FRAUD**<br>4.  **BREACH OF FIDUCIARY DUTY**<br>5.  **CIVIL THEFT**<br>6.  **CONVERSION**<br>7.  **MONEY HAD AND RECEIVED**<br>8.  **CONVERSION**<br>9.  **INTENTIONAL INTERFERENCE WITH CONTRACT**<br>10. **VOIDABLE TRANSFER**<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT

Plaintiff Lugano Diamonds & Jewelry Inc. ("Lugano" or "Plaintiff") hereby alleges against Defendants Mordechai Ferder ("Moti"), individually and in his capacity as trustee of the Haim Family Trust ("Haim Family Trust"); VAD & Company, Inc. ("VAD"); and DOES 1 through 50, inclusive as follows:

**INTRODUCTION**

1.      Lugano is a renowned high-end diamond and jewelry retailer. It sells diamonds, other precious stones, and high-end jewelry directly to clients around the world. Lugano is known for selling unique pieces and for fostering strong, lasting relationships with its many clients and the communities in which it operates. Since 2005, it has grown rapidly on the back of its robust retail business, expanding from a single boutique in Newport Beach, California to multiple boutiques throughout the United States and a boutique in London, staffed by over 150 employees.

2.      Unfortunately, Defendant Moti, Lugano's former Chief Executive Officer of Lugano, conspired with his son, Tom Ferder ("Tom"), to engage in fraudulent schemes outside of Lugano's retail business to steal millions of dollars from the company and expose it to significant potential liabilities and reputational harm. Among other things, Moti concealed and mispresented the nature of numerous financing transactions he entered into with third party, high net worth individuals ("Outside Contracts"). By their terms, the Outside Contracts created potential liabilities for Lugano, but Moti disguised them as direct sales. He forged invoices and sale documents, sent out empty box shipments, falsely recorded the money from the third-party individuals as revenue for Lugano, and concealed the repayment obligations from Lugano's books. Moti lied to Lugano officers and directors and Lugano employees to perpetuate their scheme and avoid detection. Moti even misappropriated Lugano funds to repay some of the third-party individuals by concealing the repayments as legitimate business expenses and vendor payments. Moti's scheme has potentially exposed Lugano to over $100 million in liability.

3.      Moti also stole millions more from Lugano by authorizing fraudulent wire transfers to his own Haim Family Trust while putting false beneficiary information in the wire transfer documents.

4.      When Lugano and Compass Diversified, Lugano's majority shareholder, discovered accounting discrepancies resulting from Defendants' scheme, Moti resigned. He is currently staying in Tel Aviv, Israel, and has moved assets out of the United States or sold his assets in the United States and

funneled the money out of the United States and to Israel.

5. Through this Complaint, Lugano seeks to hold Moti responsible for the substantial harm he has caused through his fraudulent activities.

## PARTIES

6. Plaintiff Lugano is, and all times mentioned herein was, a California corporation with its principal place of business in Newport Beach, California.

7. Defendant Moti is an individual residing in Corona del Mar, California.

8. Defendant Haim Family Trust, of which Moti is trustee, is and at all times mentioned herein was, a trust with its principal residence in Corona del Mar, California.

9. Defendant VAD & Company, Inc. is a Florida corporation with its principal place of business in Orlando, Florida.

## JURISDICTION AND VENUE

10. This Court has jurisdiction and venue over this matter because the events giving rise to this action occurred within this county.

## GENERAL ALLEGATIONS

**A.      Moti Serves as CEO of Lugano.**

11. Lugano is a thriving high-end diamond and jewelry retailer. It began in 2005 with a single store in Newport Beach, California. Lugano has a robust retail business selling unique diamonds, other precious stones, and high-end jewelry directly to clients all over the world. Many of its clients have been loyal customers of Lugano for years and have acquired several valuable items from Lugano.

12. On the strength of this retail business, Lugano now operates boutiques in California, Colorado, Connecticut, Florida, Illinois, Washington, D.C., and London and sources unique stones for its clients from all over the world. Lugano employs over 150 employees and prides itself on its close involvement in the communities in which it operates and the diligence and care by which it conducts its operations.

13. Up until his resignation in May 2025, Moti previously served as Chief Executive Officer of Lugano. He was closely involved with customer relationships and handled virtually all his communications with third parties through personal emails and text messages, often on his phone.

14.     Tom, Moti's son, has held several corporate positions with Lugano, and most recently served as its Director of Business Development prior to his termination in May 2025. Tom worked closely with Moti on sales and had at least monthly closed door meetings with Moti about Moti's sales plans. Tom had intimate knowledge of all of Moti's clients and the details of all of Moti's sales. He was well positioned to identify any false or non-genuine sales by Moti.

15.     In 2021, Compass Group Diversified Holdings LLC ("Compass Diversified") acquired a majority ownership stake in Lugano.  As part of that transaction, Lugano agreed not to procure outside investments or financing without Compass Diversified's approval. Moti was closely involved with this transaction and had actual knowledge of this agreement.

**B.      Moti Enters Into Outside Contracts with Third Parties and Conceals the Nature of these Outside Contracts in Lugano's Books by Forging Documents and Sending Sham Shipments.**

16.     Moti clearly grew dissatisfied with Lugano's retail business and sought to enrich himself through other schemes.

17.     Notwithstanding Lugano's 2021 agreement with Compass Diversified, Moti entered into numerous unauthorized transactions, the Outside Contracts, outside of Lugano's ordinary retail business, with high-net-worth individuals in California, Florida, and other states.

18.     Although the specific terms of each of these Outside Contracts varied, they adhered to a common scheme orchestrated by Moti. In each instance, Moti represented to the third party that Lugano already owned or intended to acquire a specific diamond—purportedly verified by a unique identification number—and expected to sell it at a significant profit. Moti proposed that Lugano and the third party would each contribute a percentage of the purchase price or that the third party could purchase a percentage interest in the diamond purportedly already owned by Lugano. Moti further represented that the anticipated profits from the sale of the diamond would be shared pro rata with the third party. Alternatively, if the third party chose not to wait for resale, Moti promised that Lugano would return the third party's funds, plus a guaranteed, and substantially above market, interest rate.

19.     Moti deliberately concealed the true nature of these Outside Contracts from Lugano by disguising them as part of Lugano's robust, legitimate retail business.  He falsely claimed to Lugano

personnel that these were ordinary sales—transactions in which Lugano sold diamonds outright to third parties. This was a lie. Moti then manipulated Lugano's internal accounting records to characterize the incoming funds as revenue rather than liabilities, thus obscuring the repayment obligations under the Outside Contracts. By doing so, Moti misled internal stakeholders and auditors regarding Lugano's actual performance and valuation.

20. To sustain the illusion that Lugano had completed legitimate diamond sales, Moti forged invoices and other documentation purporting to evidence arms-length transactions. In some cases, Moti arranged for empty boxes to be shipped to addresses across the United States, including, for example, to Montana, so that he could point to shipping records as false proof that the transactions had been fulfilled. These fictitious documents and shipping records were then presented to auditors and others as legitimate proof of sales, when in fact, they were manufactured to complete the illusion of the sales.

21. During the time Moti carried out this scheme, Compass Diversified retained Grant Thornton to conduct an audit of Lugano in preparation for the issuance of required SEC filings by Compass Diversified. Grant Thornton's audits failed to detect crucial evidence of the fraud. Because Moti received advanced notice from Grant Thornton of its anticipated inventory audits, Moti could obtain and replace diamonds and other jewelry in Lugano's inventory prior to Grant Thornton's audits and thereby create the false impression that Lugano had possession of items that it did not actually possess.

22. Moti used Lugano funds to repay some of the third parties. In at least some instances, Moti concealed these outgoing repayments to the third parties as payments to vendors. But Moti did not repay all the third-party investors, which potentially exposed Lugano to over $100 million in liability. Several third parties have already sued Lugano in relation to the Outside Contracts.

23. Numerous third-party vendors assisted Moti with his Outside Contracts scheme by serving as apparent counterparties, guarantors, payment conduits, and shipping targets that helped conceal the transactions. Moti arranged for vendors and related entities (such as VAD) to accept or route shipments, to buy or take in client pieces, and to send funds that were then applied to accounts receivable or characterized as vendor payments. He also had a consigned diamond redirected to VAD instead of Lugano. These outside parties (sometimes used as purchasers of unwanted pieces or as payors on behalf of clients) and the shipping records they produced—including empty or redirected

shipments—were presented as evidence of legitimate sales, while funds were furtively funneled through vendor-like payees to mask repayments and misstate Lugano's revenues and liabilities.

24.    Tom knew of Moti's Outside Contracts scheme. Tom served in a variety of corporate roles for Lugano and worked closely with Moti on sales for the company. Tom and Moti had at least monthly closed-door meetings to discuss Moti's sales plans, and Tom had close knowledge of all of Moti's sales and clients. Tom knew or should have known that Moti's sham sales described above were not genuine sales.

25.    On one occasion, a salesperson working in a Houston boutique of Lugano asked Tom whether the salesperson should get to know a particular third party, whom Moti had misrepresented as a client. To prevent the salesperson from contacting that third party and avoid detection of the fraudulent scheme, Tom told the salesperson that the third party was not a client of Lugano but did not disclose the true relationship through the Outside Contract.

26.    As a result of Moti's fraud and concealment of the Outside Contracts from Lugano, Lugano has been exposed to numerous lawsuits from the third parties and has suffered substantial reputational harm. Some of the third parties have shown up to Lugano boutiques, yelled at and harassed Lugano staff, and even threatened to call the police on Lugano employees.

**C.    Moti Embezzles Millions of Dollars from Lugano and Directs it to His Family Trust.**

27.    Separate from the Outside Contracts, Moti also embezzled millions of dollars from Lugano.

28.    Moti used his position as CEO to authorize wire transfers from Lugano bank accounts to a bank account belonging to the Haim Family Trust, for which Moti serves as trustee.

29.    Moti concealed the recipient of these wire transfers by designating a different entity as the beneficiary on the documentation for the wire transfer. For example, Moti caused "Charles Schwab & Co. Inc." to be listed as the beneficiary for certain wires. But the bank account information on those wires confirms that these went to bank accounts belonging to the Haim Family Trust.

30.    Between January and February 2024, Moti engaged in at least four of these fraudulent wire transfers totaling at least $2.3 million. The full extent of Moti's embezzlement is still under investigation.

**D.      Moti Steals a Diamond on Consignment to Lugano and Transfers it to VAD, Which Continues to Retain the Diamond**

31.    In January 2025, Moti arranged for Scarselli Diamonds ("Scarselli") to provide a diamond on consignment to Lugano ("Scarselli Diamond"). Moti represented to Scarselli that he wanted to show the diamond to a potential buyer in Miami, Florida, and directed Scarselli to send the diamond to Miami for pickup by a Lugano employee.

32.    After Scarselli shipped the diamond, Moti caused the Scarselli Diamond to be re-routed to an address in Oviedo, Florida, belonging to VAD. On information and belief VAD entered an agreement with Moti, a California resident, to take possession of the Scarselli Diamond.

33.    Moti never added information to Lugano's records about the Scarselli Diamond, the consignment from Scarselli, or the agreement with VAD for VAD to take possession of the Scarselli Diamond, all in an effort to conceal this scheme from detection. Lugano did not even learn of Moti's theft or VAD's possession of the Scarselli Diamond until Scarselli asked Lugano about the diamond and provided evidence that it had been consigned to Lugano.

34.    On July 3, 2025, Scarselli filed a lawsuit in Orange County Superior Court captioned *N.B.S. Diamonds Inc. dba Scarselli Diamonds v. Lugano Diamonds & Jewelry, Inc. et al.*, Case No. 30-2025-01494948-CU-BC-CJC, bringing claims against Lugano for the loss of the Scarselli Diamond.

35.    VAD is aware that the Scarselli Diamond was furnished by Scarselli on a consignment basis and that Moti had no right to send it to VAD, but VAD nonetheless refuses to return it, knowingly causing harm to Lugano in California.

**E.      Moti Resigns and Begins Moving Assets Out of the Country.**

36.     Separately, in or around April 2025, accounting discrepancies resulting from Moti's scheme were identified, which prompted an investigation into Lugano's accounts and Moti's actions, which investigation is currently ongoing. At the time, Moti was in Tel Aviv, Israel. Faced with the prospect of the full depth of his fraudulent activities coming to light and being terminated for cause, Moti chose to resign as CEO of Lugano in May 2025. Since then, he has remained in Tel Aviv and has not returned to the United States.

37.    On information and belief, since that date, Moti has transferred valuable assets, including

artwork, cars, and other valuable items from his residence in California to Tel Aviv, presumably to remove those assets from the jurisdiction of courts in California and the United States.

38.    On June 17, 2025, Moti sold his California residence to Serenade Newport, LLC ("Serenade Newport"), a California limited liability company that was formed on June 13, 2025, apparently for the sole purpose of effectuating this transaction. Upon information and belief, Moti sold his residence for about $7 million, which is less than its market value of about $9 million.

39.    On information and belief, Moti sold his California residence for less because Moti wanted to quickly liquidate his assets and move the money out of California. At the time that Moti sold his California residence, an *ex parte* application was pending in a case brought by a third party, *Winters v. Lugano Diamonds & Jewelry Inc., et al.*, Case No. 8:25-cv-01202, United Stated District Court, Central District of California. The Winters court entered a temporary protective order against Moti placing a lien on the property, but Moti had managed to sell it the day before.

40.    Serenade Newport is managed by Sahand Zargari, a real estate agent who works for the Daftarian Group. Upon information and belief, the owners of the Daftarian Group, Paul and Lili Daftarian, are friends with Moti and have worked with Moti in community organizations and fundraisers in Newport Beach. They knew that Moti was facing impending legal trouble and knew that he had fled the United States and took advantage of the situation by buying Moti's California residence for less than its fair market value.

### FIRST CAUSE OF ACTION

### FRAUD (against Moti)

41.    Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

42.    At all relevant times, Moti was the CEO of Lugano.

43.    Moti entered several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

44. Moti misrepresented the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the repayment obligations of the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

45. Moti also presented forged sales documents and shipping records of empty shipments to Lugano to support the misrepresentation that these transactions were sales. To repay some of the third parties and avoid detection of his scheme, Moti directed payments from Lugano to VAD, misrepresenting to Lugano that these were legitimate business payments to a vendor.

46. Moti's varied efforts to conceal the Outside Contracts scheme confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

47. Moti intended Lugano to rely on these false misrepresentations designed to conceal the nature of the Outside Contracts.

48. Lugano did, in fact, rely on these misrepresentations and was kept in the dark about the true nature of the Outside Contracts.

49. Moti's misrepresentations were a substantial factor in causing Lugano to now face numerous lawsuits from some of the third parties with whom Moti entered into Outside Contracts. Moti's fraudulent scheme was also a substantial factor in causing substantial reputational harm to Lugano.

50. Separately Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

51. Moti misrepresented the beneficiaries on the documentation accompanying the wire transfers to prevent Lugano from realizing that that these were not legitimate business expenditures.

52. Moti intended for Lugano to rely on the misrepresentations as to the true beneficiary of these wire transfers.

53. Lugano did, in fact, rely on the misrepresentations as to the true beneficiary of these wire transfers.

54. Moti's misrepresentation was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

55.    In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## SECOND CAUSE OF ACTION

### CONCEALMENT (against Moti)

56.    Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

57.    At all relevant times, Moti was the CEO of Lugano and owed a duty to Lugano to be truthful with regard to business dealings he engaged in purportedly on behalf of Lugano.

58.    Moti entered several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

59.    Moti concealed the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the repayment obligations of the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

60.    Moti also presented forged sales documents and shipping records of empty shipments to Lugano to conceal the true nature of the Outside Contracts. To repay some of the third parties and avoid detection of his scheme, Moti directed payments from Lugano to VAD, misrepresenting to Lugano that these were legitimate business payments to a vendor, and concealing the true purpose of these payments.

61.    Moti's varied efforts to conceal the Outside Contracts scheme confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

62.    Moti intended for Lugano to rely on these false misrepresentations designed to conceal the nature of the Outside Contracts.

63.    Lugano did, in fact, rely on these misrepresentations and was kept in the dark about the true nature of the Outside Contracts.

64. Moti's concealment was a substantial factor in causing Lugano to now face numerous lawsuits from some of the third parties with whom Moti entered into Outside Contracts. Moti's concealment was also a substantial factor in causing substantial reputational harm to Lugano.

65. Separately, Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

66. Moti misrepresented the beneficiaries on the documentation accompanying the wire transfers to prevent Lugano from realizing that these were not legitimate business expenditures.

67. Moti intended for Lugano to rely on the misrepresentations as to the true beneficiary of these wire transfers.

68. Lugano did, in fact, rely on the misrepresentations as to the true beneficiary of these wire transfers.

69. Moti's concealment was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

70. In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## THIRD CAUSE OF ACTION

### CONSTRUCTIVE FRAUD (against Moti)

71. Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

72. At all relevant times, Moti was the CEO of Lugano and owed fiduciary duties to Lugano.

73. Moti entered several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

74. Moti concealed the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the repayment obligations of the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

75.    Moti also presented forged sales documents and shipping records of empty shipments to Lugano to conceal the true nature of the Outside Contracts. To repay some of the third parties and avoid detection of his scheme, Moti funneled payments to third parties by misrepresenting to Lugano that these were legitimate business payments to a vendor and concealing the true purpose of these payments.

76.    Moti's varied efforts to conceal the Outside Contracts scheme confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

77.    Moti intended for Lugano to rely on these false misrepresentations designed to conceal the nature of the Outside Contracts.

78.    Lugano did, in fact, rely on these misrepresentations and was kept in the dark about the true nature of the Outside Contracts.

79.    Moti's failure to disclose accurate information regarding the Outside Contracts Lugano was a substantial factor in causing Lugano to now face numerous lawsuits from some of the third parties with whom Moti entered into Outside Contracts. Moti's failure to disclose accurate information regarding the Outside Contracts was a substantial factor in causing substantial reputational harm to Lugano.

80.    Separately, Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

81.    Moti misrepresented to Lugano that these were legitimate business expenses by concealing that the Haim Family Trust was the true beneficiary for these wire transfers.

82.    Moti intended for Lugano to rely on the misrepresentations as to the true beneficiary of these wire transfers.

83.    Lugano did, in fact, rely on the misrepresentations as to the true beneficiary of these wire transfers.

84.    Moti's failure to disclose accurate information regarding the wire transfer was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

85.    In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

### **FOURTH CAUSE OF ACTION**

### **BREACH OF FIDCUIARY DUTY (against Moti)**

86. Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

87. At all relevant times, Moti was the CEO of Lugano and owed fiduciary duties to Lugano.

88. Moti entered several Outside Contracts with third parties in which he solicited funds from the third parties to either acquire an interest in diamonds that Moti claimed Lugano already owned or to purchase diamonds with additional funds from Lugano, with the agreement that the parties would then share the profits from Lugano's later sale of that diamond.

89. Moti concealed the true nature of the Outside Contracts to Lugano by causing these transactions to be falsely recorded as sales in Lugano's books, causing the money received from the third parties to be falsely recorded as revenue in Lugano's books, and preventing the repayment obligations of the Outside Contracts from being properly recorded as obligations or liabilities in Lugano's books.

90. Moti also presented forged sales documents and shipping records of empty shipments to Lugano to conceal the true nature of the Outside Contracts. To repay some of the third parties and avoid detection of his scheme, Moti directed payments from Lugano to VAD, misrepresenting to Lugano that these were legitimate business payments to a vendor, and concealing the true purpose of these payments.

91. Moti's varied efforts to conceal the Outside Contracts scheme confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

92. Moti's conduct with respect to the Outside Contracts breached his fiduciary duties to Lugano.

93. This breach of fiduciary duty was a substantial factor in causing Lugano to now face numerous lawsuits from some of the third parties with whom Moti entered into Outside Contracts. It was also a substantial factor in causing substantial reputational harm to Lugano.

94. Separately, Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

95. Moti misrepresented to Lugano that these were legitimate business expenses by concealing that the Haim Family Trust was the true beneficiary for these wire transfers.

96. Moti's conduct with respect to the wire transfers sent to an account belonging to the Haim Family Trust breached his fiduciary duties to Lugano.

97. This breach of fiduciary duty was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

98. Separately, Moti used his position as CEO to obtain a diamond on consignment from Scarselli and then steal the diamond to transfer to VAD.

99. Moti concealed from Lugano the consignment and subsequent diversion of the Scarselli Diamond to VAD.

100. Moti never returned the diamond to either Lugano or Scarselli.

101. Moti's conduct with respect to the Scarselli diamond breached his fiduciary duties to Lugano.

102. This breach of fiduciary duty was a substantial factor in exposing Lugano to potential liability for the stolen diamond to Scarselli.

103. In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## FIFTH CAUSE OF ACTION

### CIVIL THEFT (Penal Code § 496(c)) (against Moti)

104. Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

105. At all relevant times, Moti was the CEO of Lugano.

106. Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

107. Moti intentionally concealed the true beneficiary of these wire transfers by misrepresenting to Lugano that these were legitimate business expenses and intentionally putting false beneficiary information in the documentation accompanying the wire transfers.

108. Moti's efforts to conceal the recipients and nature of these wire transfers confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

109.   Moti knew that he did not have any right to the money he obtained from Lugano through these fraudulent wire transfers.

110.   Moti's conduct reflects a specific intent to obtain money from Lugano under false pretenses.

111.   Through his conduct, Moti obtained property belonging to Lugano under false pretenses.

112.   Moti's conduct was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

113.   In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

## SIXTH CAUSE OF ACTION

### CONVERSION (against Moti)

114.   Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

115.   At all relevant times, Moti was the CEO of Lugano.

116.   Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

117.   Moti intentionally concealed the true beneficiary of these wire transfers by misrepresenting to Lugano that these were legitimate business expenses and intentionally putting false beneficiary information in the documentation accompanying the wire transfers.

118.   Moti's efforts to conceal the recipients and nature of these wire transfers confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

119.   Lugano had ownership and a right to possess the money in its bank accounts.

120.   Moti was aware that Lugano had a right to possess the money in Lugano's bank accounts.

121.   Through his fraudulent wire transfers, Moti interfered with Lugano's right to possess the money in its bank accounts and instead wrongfully took possession of that money.

122.   Moti's conduct was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

123. In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

### SEVENTH CAUSE OF ACTION

### MONEY HAD AND RECEIVED (against Moti)

124. Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

125. At all relevant times, Moti was the CEO of Lugano.

126. Moti caused numerous wire transfers totaling millions of dollars to go from Lugano's bank accounts to accounts belonging to the Haim Family Trust.

127. Moti intentionally concealed the true beneficiary of these wire transfers by misrepresenting to Lugano that these were legitimate business expenses and intentionally putting false beneficiary information in the documentation accompanying the wire transfers.

128. Moti's efforts to conceal the recipients and nature of these wire transfers confirm that he conducted the scheme without the knowledge of others at Lugano and that he knew his conduct was wrongful.

129. Through this conduct, Moti obtained money that was intended to be used for the benefit of Lugano.

130. Moti took the money for himself and did not use it for the benefit of Lugano.

131. Moti has not returned the money to Lugano and has been unjustly enriched as a result.

132. Moti's conduct was a substantial factor in causing Lugano to lose millions of dollars in fraudulent wire transfers.

133. In his conduct described above, Moti acted with malice, oppression, and/or fraud, making him liable for punitive damages.

### EIGHTH CAUSE OF ACTION

### CONVERSION (against VAD)

134. Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

135. Moti obtained the Scarselli Diamond from Scarselli by entering into a consignment agreement with Scarselli on behalf of Lugano, without Lugano's knowledge or consent. This consignment agreement gave Lugano a possessory interest in the Scarselli Diamond but obligated Lugano to return the Scarselli Diamond to Scarselli.

136. VAD substantially interfered with Lugano's possessory interest in the Scarselli Diamond by taking possession of the Scarselli Diamond from Moti and then knowingly and wrongfully keeping possession of the Scarselli Diamond to date.

137. Lugano did not consent to VAD keeping possession of the Scarselli Diamond.

138. VAD's conduct was a substantial factor in exposing Lugano to potential liability for the stolen diamond to Scarselli.

139. In its conduct described above, VAD acted with malice, oppression, and/or fraud, making it liable for punitive damages.

### NINTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACT (against VAD)

140. Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

141. Lugano had a valid consignment agreement with Scarselli whereby Scarselli was to give the Scarselli Diamond to Lugano on consignment and Lugano would either return the Scarselli Diamond or pay the value of the Scarselli Diamond to Scarselli.

142. VAD has actual knowledge of Lugano's consignment agreement with Scarselli.

143. VAD has knowingly and wrongfully retained possession of the Scarselli Diamond, which it received from Moti, which is preventing Lugano from returning the Scarselli Diamond to Scarselli and performing its obligations under the consignment agreement.

144. VAD knows and intends that its conduct prevents Lugano from performing its obligations under the consignment agreement with Scarselli.

145. Lugano has suffered harm because it has been exposed to potential liability to Scarselli.

146. VAD's conduct is a substantial factor in causing this harm to Lugano.

147.    In its conduct described above, VAD acted with malice, oppression, and/or fraud, making it liable for punitive damages.

### TENTH CAUSE OF ACTION

### VOIDABLE TRANSFER (Civil Code § 3439 *et seq.*) (against Moti)

148.    Lugano realleges and incorporates by reference each and every allegation contained in the paragraphs set forth above.

149.    Lugano has a right to payment from Moti arising from Lugano's claims against Moti in this action.

150.    Moti was aware that his schemes were on the cusp of being discovered and knew that he would be liable to Lugano and others for millions of dollars.

151.    On or about June 17, 2025, Moti sold his California residence, located at 1501 Serenade Terrace, Corona Del Mar, California 92625, to Serenade Newport for about $7 million, which is less than its fair market value of $9 million.

152.    Moti sold his California residence for less than its fair market value because he had fled the United States to Israel and wanted to liquidate his assets and then transfer the proceeds from the sale out of the country as well.

153.    Serenade Newport is managed by an employee of the Daftarian Group, and on information and belief, the owners of the Daftarian Group, Paul and Lili Daftarian, are the members or beneficial owners of Serenade Newport. Paul and Lili Daftarian are friends with Moti and have participated in community events and fundraisers with Moti and Newport.

154.    On information and belief, Paul and Lili Daftarian were aware of Moti's impending legal issues and knew that he needed to quickly liquidate his assets. They took advantage of the situation by forming Serenade Newport and using it to acquire Moti's California residence for less than fair market value.

155.    Moti sold his California residence and transferred the proceeds to Israel with the specific intent to hinder, delay, or defraud his creditors.

156.    Lugano is harmed because Moti does not have sufficient assets in the United States to satisfy his obligations to Lugano.

157.   Moti's conduct was a substantial factor in causing Lugano's harm.

## **PRAYER**

WHEREFORE, Plaintiff Lugano prays against Defendants Moti, VAD, and the Doe Defendants for the following relief:

    A.  Compensatory damages according to proof;

    B.  Statutory damages, including treble damages, according to proof;

    C.  Return of the Scarselli Diamond;

    D.  Prejudgment interest according to proof;

    E.  Punitive damages;

    F.  Disgorgement of profits;

    G.  Restitution;

    H.  Attorney's fees and costs;

    I.  Such other relief that the Court deems just and proper.

Dated: November 21, 2025                    **BROWN, NERI, SMITH & KHAN LLP**

By _____
        Amjad M. Khan

*Attorneys for Plaintiff Lugano Diamonds & Jewelry Inc.,*

Dated: November 21, 2025                    **BARNES & THORNBURG LLP**

By _____
        Garrett S. Llewellyn

*Attorneys for Plaintiff Lugano Diamonds & Jewelry Inc., by and through the Special Committee of the Board of Directors of Lugano Diamonds*

**DEMAND FOR JURY TRIAL**

Plaintiff Lugano hereby demands trial of this matter by jury.

Dated: November 21, 2025                    **BROWN, NERI, SMITH & KHAN LLP**


By _____
        Amjad M. Khan

*Attorneys for Plaintiff Lugano Diamonds & Jewelry Inc.*


Dated: November 21, 2025                    **BARNES & THORNBURG LLP**


By _____
        Garrett S. Llewellyn

*Attorneys for Plaintiff Lugano Diamonds & Jewelry Inc., by and through the Special Committee of the Board of Directors of Lugano Diamonds*

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Orange, State of California. My business address is 650 Town Center Drive, Suite 520, Costa Mesa, California 92626.

On November 21, 2025, I served true copies of the following document(s) described as:

**FIRST AMENDED COMPLAINT**

On the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address kaitlyn@bnsklaw.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on November 21, 2025, at Westminster, California.

Kaitlyn S. Alexander

FIRST AMENDED COMPLAINT
21

## <u>SERVICE LIST</u>

**Lugano Diamonds & Jewelry Inc. v. Ferder, et al.**
**Case No. 30-2025-01492210-CU-CO-CJC**

Jeffrey Reeves
Reeves & Weiss LLP
3333 Michelson Drive, Suite 300
Irvine, CA 92612
JReeves@reevesandweiss.com
SSchuster@reevesandweiss.com

*Attorneys for Defendant*

MORDECHAI FERDER, an individual acting on his own behalf, and in his capacity as Trustee of the Haim Family Trust

**EXHIBIT B**

**Proof of Claim**

(See Attached)

<table>
<tr><td>UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE<br><br>Lugano Diamonds & Jewelry Inc. - Case No. 25-12055</td><td>**FILED**<br><br>Claim No. 160<br><br>**January 27, 2026**<br><br>By Omni Claims Agent<br>For U.S. Bankruptcy Court<br>District of Delaware</td></tr>
</table>

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form.  This form is for making a claim for payment in a bankruptcy case.  Do not use this form to make a request for payment of an administrative expense.  Make such a request according to 11 U.S.C.  § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents.  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements.  **Do not send original documents;** they may be destroyed after scanning.  If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.  18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.  That date is on the notice of bankruptcy (Form 309) that you received.**

Carefully read instructions included with this Proof of Claim before completing.  In order to have your claim considered for payment and/or voting purposes, complete ALL applicable questions.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Mordechai Ferder, individually and in his capacity as Trustee of The Haim Family Trust
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No
[ ] Yes    From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Jeffrey H. Reeves c/o Reeves & Weiss LLP<br>Name | Jeffrey H. Reeves c/o Reeves & Weiss LLP<br>Name |
| 3333 Michelson Drive Suite 300<br>Number        Street | 3333 Michelson Drive Suite 300<br>Number        Street |
| Irvine, CA 92612<br>City                State            ZIP Code | Irvine, CA 92612<br>City                State            ZIP Code |
| Contact Phone  949-231-9975 | Contact Phone  949-231-9975 |
| Contact email  JReeves@reevesandweiss.com | Contact email  JReeves@reevesandweiss.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one) _____

**4. Does this claim amend one already filed?**

[X] No
[ ] Yes    Claim Number on court claims registry (if known) _____    Filed On _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No
[ ] Yes    Who made the earlier filing? _____

| Official Form 410 | **Proof of Claim** | **Page 1** |
|---|---|---|

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes    Last 4 digits of the debtor's account or any number you use to identify the debtor:

**7. How much is the claim?**    $ 36,024,500.00

**Does this amount include interest or other charges?**

☐ No

☒ Yes    Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information

See attached

**9. Is all or part of the claim secured?**

☒ No

☐ Yes    The claim is secured by a lien on property

**Nature of property:**

☐ Real Estate   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*

☐ Motor Vehicle

☐ Other    Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.

**Value of Property:**    $ _____

**Amount of the claim that is secured:**    $ _____

**Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7).

**Amount necessary to cure any default as of the date of the petition:**    $ _____

**Annual Interest Rate:**    (when case was filed)    _____ %

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes    **Amount necessary to cure any default as of the date of the petition.**    $ _____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes    Identify the property: _____

**12. Is this claim for the value of goods received by the debtor within 20 days before the commencement date of this case (11 U.S.C. §503(b)(9))?**

☒ No

☐ Yes    Amount of 503(b)(9) Claim:    $ _____

Official Form 410    **Proof of Claim**    **Page 2**

| | | Amount entitled to priority |
|---|---|---|
| **13. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☒ No<br>☐ Yes    *Check all that apply* | |
| A claim may be partly priority and partly nonpriority.  For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use.  11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier.  11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other.  Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

| **Part 3:** | **Sign Below** |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it.**<br>**FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**<br>**18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☒ I am the creditor.<br><br>☐ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent.  Bankruptcy Rule 3004.<br><br>☐ I am the guarantor, surety, endorser, or other codebtor.  Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date    1/27/2026<br>　　　　　　　　　　MM / DD / YYYY<br><br>Mordechai Ferder<br>Signature<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name    Mordechai Ferder<br>　　　　　Full Name<br><br>Title<br><br>Company    c/o Reeves & Weiss LLP<br>　　　　　　Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address    3333 Michelson Drive Suite 300<br>　　　　　　Number　　　　Street<br>　　　　　　Irvine, CA 92612<br>　　　　　　City　　　　State　　ZIP Code<br><br>Contact Phone    949.231.9975　　　　Email    JReeves@reevesandweiss.com |

**Fill in this information to identify the case:**

Debtor 1    Lugano Diamonds & Jewelry Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  District of Delaware

Case number   25-12055 (BLS)

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:  Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Mordechai Ferder, individually and in his capacity as Trustee of The Haim Family Trust<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Jeffrey H. Reeves C/O Reeves & Weiss LLP<br>Name | <br>Name |
| 3333 Michelson Drive Ste. 300<br>Number    Street | <br>Number    Street |
| Irvine    CA    92612<br>City    State    ZIP Code | <br>City    State    ZIP Code |
| Contact phone 949-231-9975 | Contact phone _____ |
| Contact email JReeves@reevesandweiss.com | Contact email _____ |

Uniform claim identifier (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — —

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____      Filed on _____<br>                                                                MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**

$_____36,024,500_____.  **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Attached
_____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes.   The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**  _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property**:  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

❑ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ❑ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ❑ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ❑ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ❑ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ❑ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ❑ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\*  Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑  I am the creditor.

❑  I am the creditor's attorney or authorized agent.

❑  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

❑  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   ___01/27/2026_____
                            MM  /  DD  /  YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name          Mordechai Ferder
                   First name          Middle name          Last name

Title          _____

Company     c/o Reeves & Weiss LLP
                   Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     3333 Michelson Drive Ste. 300
                   Number          Street
                   Irvine                                    CA          92612
                   City                                      State      ZIP Code

Contact phone  949-231-9975                    Email  JReeves@reevesandweiss.com

---

Official Form 410                    **Proof of Claim**                    page 3

Mordechai Haim Ferder, individually and in his capacity as Trustee of The Haim Family Trust ("**Mr. Ferder**" or "**Claimant**") founded Debtor Lugano Diamonds & Jewelry, Inc. ("**Lugano**") in Newport Beach, California in 2005.  In 2021, Compass Diversified Holdings, Inc., ("**Compass**"), a publicly traded company recognized Lugano's potential and bought 60% of Mr. Ferder's beneficially held 100% stake in the company.  Mr. Ferder stayed on as CEO pursuant to an Employment Agreement entered into by and between Lugano and Mr. Ferder dated September 3, 2021 ("**Employment Agreement**").

**The components of Claimant's claim are as follows:**

1. **Funds Paid by Claimant on Contracts that Lugano Was Obligated to Pay**

Lugano is the party to and the primary obligor on a number of contracts ("**Diamond Contracts**") entered into with third-party clients ("**Diamond Contractors**") wherein the Diamond Contractors provided funds to Lugano.  Despite the funds generated by these contracts going directly into Lugano's accounts, and being used entirely for Lugano business purposes, Lugano failed to honor those contracts. In connection with the Diamond Contracts, Lugano received another $6.4 million from Claimant.

2. **Funds Paid by Claimant to Cover Lugano Business Expenses**

In addition to the funds paid by Claimant for the obligations of Lugano on the Diamond Contracts, Claimant advanced approximately $8,500,000 in additional funds to pay Lugano business expenses, including for unpaid salary and accrued bonuses owed by Lugano.  Claimant paid a number of the Diamond Contractors and other obligations of Lugano from his own personal funds totaling $29,624,500 as set forth in Addendum A - $27,672,500.00 and Addendum B - $1,952,000.00.

3. **Labor Code Violations and Wrongful Termination**

Claimant has California Employment law claims against Lugano, in an amount to be determined, at which time this Claim will be amended based on the following:

A. **Indemnification for Necessary Expenditures (Cal. Lab. Code § 2802):** At all relevant times, Mr. Ferder was an employee of Lugano. During his employment, Mr. Ferder personally incurred necessary expenditures and losses in direct consequence of the discharge of his duties, including injecting upwards of millions of his personal funds to cover Lugano's day-to-day operations, payroll, and other debts. Lugano has failed and refused to indemnify Mr. Ferder for these expenditures as required by law.

B. **Failure to Pay Wages Upon Termination (Cal. Lab. Code §§ 201-203):** Upon Mr. Ferder's separation from employment in May 2025, Lugano willfully failed to pay him all wages due, including but not limited to unpaid salary, accrued bonuses, and the reimbursement of business expenses owed pursuant to Labor Code § 2802. Mr.

Ferder is therefore entitled to waiting time penalties equal to his daily rate of pay for up to 30 days.

C. **Wrongful Termination in Violation of Public Policy:** Mr. Ferder was forced to resign under duress and was effectively terminated by Lugano and Compass. This termination was motivated by a desire to make him a scapegoat for business practices that Lugano was aware of, had endorsed, and from which they had profited, and to conceal their own breaches of fiduciary duty and securities law violations from shareholders and the public. Terminating an employee for such a purpose violates fundamental public policies of the State of California.

4. **Indemnity Claims Resulting from Actions Brought By Diamond Contractors Against Mr. Ferder**

There are a total of eight (8) state court actions currently pending before the Orange County Superior Court of the State of California ("**State Court**") in which Mr. Ferder (as well as Lugano as to seven of the actions) are named defendants.  Each of the seven actions involve materially the same core set of facts and arise out of the Diamond Contracts.  In the seventh action, Simba IL Holdings, LLC ("**Simba Holdings**") is named instead of Lugano as a defendant.  Simba Holdings is the 40% equity interest holder of Lugano Holding, Inc. (one of the debtors in the jointly administered Lugano bankruptcy cases).

The State Court cases are:

*Bryan Gadol v. Mordechai Ferder*, Case No. 30-2025-01488102-CU-BC-CJC (stay filed by Lugano); *Raymond W. Cohen v. Lugano Diamonds & Jewelry Inc.*, Case No. 30-2025-01490111-CU-BC-CJC; *Ken Kraus v. Lugano Diamonds & Jewelry, Inc.*, Case No. 30-2025-014901065-CU-BC-CJC (stay filed by Lugano); *Barry Aronoff v. Mordechai Ferder*, Case No. 30-2025-01490509-CU-FR-CJC (stay filed by Lugano); *Lugano Diamonds & Jewelry Inc. v. Mordechai Ferder*, Case No. 30-2025-01492210-CU-CO-CJC; *Avina LLC v. Lugano Diamonds & Jewelry, Inc.*, Case No. 30-2-25-1495834-CU-FR-CJC; *The Arvielo Family Trust v. Lugano Diamonds & Jewelry Inc.*, Case No. 30-2025-01506931-CU-BC-CJC (stay filed by Lugano), and *Champion Force Industrial Limited v. Lugano Diamonds & Jewelry Inc.*, Case No. 30-2025-01499613-CU-BC-CJC (Stay filed by Lugano).

Claimant has claims against Lugano for equitable indemnity for all monetary expenses, including, but not limited to litigation expenses, that he has been forced to incur as a result of Lugano's failure to honor its obligation to satisfy the Diamond Contracts, in an amount to be determined, at which time this Claim will be amended.

**5.  Set off and Recoupment Claims**

Claimant has set off and recoupment claims for all of the foregoing in an amount to be determined, at which time this Claim will be amended.

**6.  Claim of Interest**

Claimant asserts a claim of interest in Lugano.

**Addendum A**

Transfers from Mordecai Ferder's Charles Schwab account to pay obligations of Lugano Diamonds & Jewelry, Inc.

| Date | Amount |
|---|---|
| 9/8/21 | $875,000 |
| 9/24/21 | $850,000 |
| 9/20/21 | $1,200,000 |
| 9/23/21 | $1,300,000 |
| 9/28/21 | $2,525,000 |
| 10/12/21 | $1,500,000 |
| 10/14/21 | $850,000 |
| 10/20/21 | $1,125,000 |
| 11/2/21 | $510,000 |
| 11/23/21 | $3,500,000 |
| 12/1/21 | $625,000 |
| 1/28/22 | $750,000 |
| 2/8/22 | $1,946,000 |
| 9/12/22 | $2,150,000 |
| 11/2/23 | $364,000 |
| 1/16/24 | $1,480,000 |
| 1/17/24 | $300,000 |
| 10/11/24 | $357,500 |
| 1/29/25 | $250,000 |
| 2/7/25 | $2,500,000 |
| 2/10/25 | $650,000 |

| | | |
|---|---|---|
| 2/11/25 | | $2,065,000 |
| | **Total** | **$27,672,500.00** |

CORE/3536099.0002/237243040.1

**Addendum B**

Transfers from Mordecai Ferder's Bank of America Account to pay obligations of Lugano Diamonds & Jewelry, Inc.

| Claim Date | Claim Amount |
|---|---|
| April 1, 2024 | $92,000 |
| December 17, 2024 | $1,110,000 |
| January 29, 2025 | $50,000 |
| March 4, 2025 | $500,000 |
| March 31, 2025 | $200,000 |
| **Total** | **$1,952,000.00** |

**Addendum C**

CORE/3536099.0002/237248850.1

**LUGANO DIAMONDS & JEWELRY INC.,**
**EMPLOYMENT AGREEMENT**
**MORDECHAI HAIM FERDER**

THIS EMPLOYMENT AGREEMENT (this "**Agreement**") is made as of September 3, 2021, between Lugano Diamonds & Jewelry, Inc., a California corporation (the "**Company**"), and Mordechai Haim Ferder ("**Executive**").

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1.     EMPLOYMENT**.  The Company shall employ Executive, and Executive hereby accepts employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the date hereof and ending as provided in paragraphs 4 and 5 hereof (the Initial Period and the Extended Period (both as defined in paragraph 4), if there is any Extended Period, together the "**Employment Period**").

**2.     POSITION AND DUTIES**.

(a)     During the Employment Period, Executive shall serve as the Chief Executive Officer of the Company and shall have the normal duties, responsibilities, functions and authority customarily associated with such position and such other duties and responsibilities as may be assigned from time to time to Executive by the Company's Board of Directors (the "**Board**") that are consistent with Executive's position, all subject to the power and authority of the Board or the Executive Committee of the Board (the "**Executive Committee**") to expand or limit such duties, responsibilities, functions and authority and to overrule actions of officers of the Company, *provided* that any limitation approved by the Board or the Executive Committee may give rise to Good Reason in the event such limitation constitutes a material diminution in the duties, responsibilities or authority of the Executive unless Executive provides written consent to such limitation.

(b)     Executive shall report to the Board, and Executive shall devote substantially all of Executive's business time to the business and affairs of the Company and its Subsidiaries.  Executive shall perform Executive's duties, responsibilities and functions to the Company and its Subsidiaries hereunder in a diligent, trustworthy and professional manner and shall comply with the written policies and written procedures of the Company and its Subsidiaries applicable to Executive.  So long as Executive is employed by the Company, Executive shall not, except as provided herein or with the prior written consent of the Board, render to any other person, corporation, firm, company, joint venture or other entity any services of any kind for compensation, or engage in any other activity that would materially interfere with the performance of Executive's duties for the Company and its Subsidiaries.  Notwithstanding the foregoing, Executive may engage in charitable, civic, fraternal, educational and trade association activities, and may manage his and his family's investments in a manner that is not competitive with the Company, in each case, to the extent that the same do not interfere materially with Executive's obligations to the Company.  A schedule of activities of the nature

referenced in this paragraph 2(b) in which Executive is currently engaged is set forth on Schedule A attached hereto and Executive's continued participation in such entities shall not be considered a violation of this paragraph 2(b).  Further, nothing in this Agreement shall limit Executive's ability to:  (i) serve as a member of any board of directors for any non-profit organization, so long as such membership does not interfere materially or conflict with Executive's obligations to the Company or (ii) engage in activities as otherwise agreed by the Board in writing.

(c)      For purposes of this Agreement, "**Subsidiary**" shall mean any corporation or other entity of which the securities or other ownership interests having the voting power to elect a majority of the board of directors or other governing body are, now or hereafter, owned directly or indirectly by the Company.

3.      **COMPENSATION AND BENEFITS**.

(a)      Base Salary and Target Bonus.  During the Employment Period, Executive's base salary shall be $600,000 per annum, to be paid in accordance with the Company's customary payroll practices.  Executive's applicable base salary as adjusted pursuant to this paragraph is referred to herein as the "**Base Salary**." Executive's Base Salary will be reviewed on an annual basis by the Compensation Committee of the Board (the "**Compensation Committee**") and may be increased (but not decreased), from time to time thereafter, at the discretion of the Compensation Committee.

(b)      Performance Bonus.

(i)      For the year ending December 31, 2021, Executive will receive a cash bonus calculated as follows: (i) an amount equal to Executive's cash bonus opportunity for fiscal year 2022 per Section 3(b)(ii) below ($225,000 _multiplied by_  (ii) a fraction with (x) a numerator equal to the number of days Executive is employed by the Company between the date of this Agreement and December 31, 2021 and (y) a denominator equal to 365.  Executive's bonus for the year ending December 31, 2021 shall be paid in accordance with the Company's bonus payment arrangement with Executive prior to the date of this Agreement.

(ii)      Beginning with the fiscal year ending December 31, 2022, Executive will be eligible to participate in the Incentive Bonus Plan attached hereto as Exhibit A (the "**Bonus Plan**").  Pursuant to the terms of the Bonus Plan, Executive will be eligible to receive a cash bonus of $225,000 at target (the "**Target Bonus**") or such other amount as may be determined by the Company in accordance with the Bonus Plan (the "**Performance Bonus**").  Except as otherwise specifically provided in Section 5(b)(ii) below, in order to receive a Performance Bonus with respect to a Plan Year (as defined under the Bonus Plan) Executive must be employed at such time as Performance Bonuses are paid to other officers with respect to such year; provided, however, in the Compensation Committee's sole discretion, the Company shall be entitled to pay Executive a Performance Bonus for a year that has already ended if Executive's employment with the Company ceases after the end of such year, but before such payment date.  In no event shall the payment date for a Performance Bonus occur later

2

than 2.5 months following the end of the Plan Year during which such Performance Bonus was earned.  Nothing contained herein shall restrict the Company's right in its sole discretion to adopt, modify or otherwise alter, in whole or in part, any and/or all of the Bonus Plan in accordance with its terms.

(c)     Employee Benefits.  Executive shall be included, to the extent eligible under the terms and conditions, as such terms and conditions may be established or changed from time to time by the Board in its sole discretion, in any and all of the Company plans providing benefits for its executives or employees.  Nothing contained herein shall obligate the Company to adopt or maintain any benefit plan and nothing herein shall restrict the Company's right in its sole discretion to adopt, modify or otherwise alter, in whole or in part, any and/or all of its benefit plans.  In addition, (i) in the event that Executive travels for business purposes, Executive may elect to fly on a private plane to the extent consistent with past practice, or if Executive elects not to fly on a private plane, may elect to travel first class, and in either case, the Company shall pay all of Executive's expenses relating to the foregoing (but the aggregate amount paid in respect of flights on private planes shall not exceed $300,000 during any calendar year) and (ii) the Company shall pay (grossed-up for taxes, if any, at the time of payment) Executive's lease payments relating to Executive's current automobile until such current lease expires in a manner consistent with the Company's practice through the date of this Agreement.

(d)     Time Off.  Executive shall participate in the Company's unlimited time off policy for officers, as may be in effect from time to time.

(e)     Business Expenses.  During the Employment Period, the Company shall reimburse Executive for all reasonable business expenses incurred by Executive in the course of performing Executive's duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(f)     Payroll Withholdings.  From each payment to Executive under this Agreement, the Company may report, withhold and pay to the proper governmental authorities any and all amounts required by law to be withheld for federal, state and local income and employment taxes, and any and all other amounts required by law to be reported and/or withheld from Executive's income.  The Company may also deduct from Executive's income those sums authorized by Executive in writing and approved by the Company.

**4.     TERM**.  Subject to paragraph 5 hereof, the Employment Period shall be for a period commencing on the date of this Agreement and ending on December 31, 2023 (the "**Initial Period**") and shall thereafter automatically renew for successive periods of one year each (collectively, the successive periods, the "**Extended Period**"), unless either party provides at least 60 days' written notice to the other party prior to the expiration of the Initial Period or any Extended Period, as applicable, that this Agreement shall not be renewed.

**5.      TERMINATION OF EMPLOYMENT**.

(a)      <u>Termination</u>.  This Agreement, the Employment Period and the employment of Executive by the Company may be terminated at any time as follows:

(i)      By mutual agreement of the parties;

(ii)      By the Company if Executive dies or becomes Disabled.  For purposes of this Agreement, "**Disabled**" shall mean Executive is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months.

(iii)      By the Company for Cause.  For purposes of this Agreement, "**Cause**" shall mean with respect to Executive, one or more of the following:  (A) willful violation of the Executive's fiduciary duties to the Company, including the duty of loyalty and the corporate opportunity doctrine, (B) conviction for, or the entry of a plea of nolo contendere (or similar plea) to a charge of, (1) any crime involving fraud, misappropriation or embezzlement, or (2) any felony, (C) any violation of law that causes material injury to the business of the Company or any of its Subsidiaries, (D) failure or refusal to comply with the Board's reasonable and lawful orders or directives that are consistent with Executive's position or the Company's reasonable written rules, written regulations, written policies or written procedures that are applicable to Executive and that are not inconsistent with applicable law, in each case, which results in material harm to the Company, (E) gross negligence or willful misconduct in connection with the performance of the Executive's duties to the Company and (F) any breach by the Executive of any provision of this Agreement that causes material injury to the business of the Company, or any breach by Executive of any non-competition covenant between Executive and the Company, and in the case of each of (A), (D), (E) or (F), which, if curable, continues uncured for 30 days following written notice thereof from the Company to Executive;

(iv)      By the Company without Cause;

(v)      By Executive for Good Reason.  For purposes of this Agreement, "**Good Reason**" means Executive's resignation from employment at any time within 30 days following the expiration of the Company cure period (discussed below) following the occurrence of one or more of the following without the Executive's written consent: (A) a reduction in the Executive's base salary (excluding bonuses and all other compensation) (other than a substantially similar reduction applicable to all executives of the Company and not exceeding 15% of Executive's Base Salary), (B) a material diminution in the duties, responsibilities or authority of the Executive, (C) the Company's material breach of this Agreement other than any such breach arising from the actions or omissions of Executive, or (D) the Company moves the Executive's primary location of employment outside of Orange County, California, provided that (x) "primary location of employment" shall refer to the offices of the Company and not be deemed to refer to the location where Executive is providing services during any stay-at-home, safer-at-home or

4

similar governmental orders, directives, or recommendations issued in response to COVID-19 (or any other pandemic) and (y) reasonable business travel in connection with the performance of Executive's duties pursuant to this Agreement shall not constitute Good Reason.  Under this Agreement, the Executive will not be able to resign for Good Reason without first providing the Company with written notice of the acts or omissions constituting the grounds for "**Good Reason**" within 30 days of the initial existence of the grounds for "**Good Reason**" and a reasonable cure period of 30 days following the date of such notice;

(vi)     By Executive without Good Reason; provided that Executive agrees to give the Company not less than 90 days' written notice of Executive's resignation without Good Reason.

(b)     <u>Consequences of Termination</u>.  Executive shall be entitled to the following compensation in the event of termination of Executive's employment pursuant to the terms of paragraph 5(a):

(i)     Following any termination under paragraphs 5(a)(i), (ii), (iii) or (vi), Executive (or, in the event of Executive's death, Executive's estate) shall be entitled to receive a lump sum payment in an amount equal to the accrued and unpaid portion of Executive's Base Salary earned through the date of termination or death *plus* any business expenses incurred (in accordance with Company policy) and un-reimbursed as of the date of termination or death, *plus*, in the event of a termination under paragraph 5(a)(ii), Performance Bonus for the immediately preceding year if the date of termination or death is after the end of such year, to the extent unpaid as of the date of termination or death (which Performance Bonus amount shall be payable at such time as such bonus would have otherwise been paid), *plus* all vested benefits in accordance with the employee benefit plans in which Executive was participating prior to such termination or death.

(ii)     Following any termination under paragraphs 5(a)(iv) or 5(a)(v), Executive shall be entitled to receive (A) a lump sum payment in an amount equal to Executive's accrued and unpaid Base Salary through the date of termination plus any authorized business expenses incurred (in accordance with Company policy) and un-reimbursed as of the date of termination, (B) Performance Bonus for the immediately preceding year if the date of termination is after the end of such year, to the extent unpaid as of the date of termination (which Performance Bonus amount shall be payable at such time as such bonus would have otherwise been paid), (C) all vested benefits in accordance with the employee benefit plans in which Executive was participating prior to such termination and (D) subject to Executive's compliance with Sections 6 and 7, severance in an amount equal to 18 months of Executive's Base Salary at the rate in effect as of the date of termination (unless Executive's Base Salary was reduced in violation of Section 5(a)(v)(A), in which case it shall be an amount based on the per annum rate of Base Salary as in effect immediately prior to such reduction) (the "**Salary Severance**"), which Salary Severance shall be payable over the Severance Period (as defined below) in substantially equal monthly payments, plus payment by the Company of Executive's and Executive's eligible dependents' COBRA premiums for the Severance

5

Period (the "**COBRA Severance**").   The "**Severance Period**" shall be 18 months. Executive agrees that, as a condition to and in consideration of receiving any Salary Severance and COBRA Severance pursuant to this section, Executive will be required to execute and deliver to the Company a release of only employment-related claims in a form mutually acceptable to Executive and the Company (such release to be provided to Executive within 5 days after the date of termination).  Such release shall be executed and delivered (and no longer subject to revocation, if applicable) within the sixty (60) day period following Executive's termination of employment (the revocation period shall be 7 days).  Any Salary Severance or COBRA Severance payments that would otherwise be provided before the date such release becomes irrevocable shall be accumulated and paid in a lump sum on the date such release becomes irrevocable; provided that to the extent that the payment of any amount constitutes "nonqualified deferred compensation" for purposes of Code Section 409A, then if such 60 day period crosses two calendar years, then to the extent required by Code Section 409A, the first payment of the Salary Severance and COBRA Severance shall be paid on the later of the first day of such second calendar year and the first regularly scheduled pay date following the effective date of such release (and in all events, within 74 days after the date of termination), and shall include payment of any amount that was otherwise scheduled to be paid prior thereto, with all remaining payments to be made as if no such delay had occurred.  For the avoidance of doubt, the Company's decision to not renew this Agreement shall not entitle Executive to receive the Salary Severance or COBRA Severance.

(iii)    Any payment under paragraphs 5(b)(i) and (ii) shall be made in accordance with the Company's normal payroll practices (except as otherwise provided in such paragraphs), and, other than the payment of such amounts, the Company's obligation to make any further severance payments of any kind or provide any severance benefits of any kind to Executive shall cease and terminate upon Executive's date of termination.

(c)    Suspension of 409A Payments.  To the extent any amount payable under this Agreement on account of Executive's termination of employment constitutes deferred compensation subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "**Code**"), such payments shall be made when the Executive incurs a Separation from Service (as such term is defined herein below).  However, any payment or benefit under this Agreement that is subject to Code Section 409A(a)(2)(B)(i) of the Code and was scheduled to be paid or provided on or before the date that is six months following Executive's Separation from Service (as defined below) shall be delayed to the extent required by Code Section 409A until a date that is six months and one day from the date of Executive's Separation from Service (or the date of Executive's death if earlier) (the "**409A Suspension Period**").  Within 10 days after the end of the 409A Suspension Period, the Company shall pay to Executive in one lump sum the aggregate of such delayed payments (but such payments and benefits shall not be paid or provided earlier than otherwise scheduled).  After the 409A Suspension Period, Executive shall receive any remaining cash payments or benefits in accordance with the terms of this Agreement (as if there had not been any 409A Suspension Period beforehand).  For purposes of this Agreement, "**Separation from Service**" shall have the meaning set forth in Treasury Regulation Section 1.409A-1(h)(1)(i); provided, however, that pursuant to Treasury Regulation Section 1.409A-1(h)(1)(ii), the parties hereby provide that a "separation from service" shall occur within the

6

meaning of Treasury Regulation Section 1.409A-1(h)(1)(i) and (ii) as of the first date coincident with or following a termination of employment that the Company and Executive reasonably anticipate that the level of bona fide services that Executive will perform for Company (and any entity that would be considered the same "service recipient" as Company under Code Section 409A) (collectively, the "**Service Recipient**") in the future (whether as an employee or an independent contractor) will permanently decrease to a level equal to twenty percent or less of the average level of bona fide services Executive provided to the Service Recipient in the 36 months immediately preceding such date (or the full period of service to the Service Recipient if Executive has been providing services to the Service Recipient for less than 36 months).

6.      **CONFIDENTIAL INFORMATION**.

(a)      Executive acknowledges that the continued success of the Company and its Subsidiaries and affiliates depends upon the use and protection of a large body of confidential and proprietary information. All of such confidential and proprietary information now existing or to be developed in the future will be referred to in this Agreement as "**Confidential Information**." Confidential Information will be interpreted as broadly as possible to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (i) related to the Company's or its Subsidiaries' or affiliates' current or potential business or is disclosed to the Company or its Subsidiaries by any third party pursuant to a confidentiality agreement, and (ii) is not generally or publicly known. Confidential Information includes, without specific limitation, information, observations and data created or obtained by Executive, or to which Executive otherwise has access, during the course of Executive's performance of the services under this Agreement, information concerning acquisition opportunities in or reasonably related to the Company's or its Subsidiaries' or affiliates' business or industry of which Executive becomes aware during the Employment Period, the persons or entities that are current, former or prospective suppliers or customers of any one or more of them during Executive's course of performance of services under this Agreement, as well as development, transition and transformation plans, methodologies and methods of doing business, strategic marketing, product development and business expansion plans, including plans regarding planned and potential sales and financial projections, employee lists and telephone numbers, locations of sales representatives, product designs and specifications, including any future or proposed products, manufacturing techniques and information, integration processes and financial information and forecasts. Therefore, Executive agrees that Executive shall not at any time, directly or indirectly, use or disclose any Confidential Information except in the ordinary course of performance of Executive's duties. Executive agrees to deliver to the Company promptly after the end of the Employment Period (but in no event later than 14 business days following the end of the Employment Period) all memoranda, notes, plans, records, reports and other documents relating to the business of the Company or its Subsidiaries or affiliates (including, without limitation, all Confidential Information), whether on paper or in any other tangible form or medium, and all copies thereof, in each case, that Executive may then possess or have under Executive's control. To the extent such delivery is not feasible, Executive agrees that (x) Executive will irretrievably erase all such materials from all computer memories and other media storage devices within Executive's possession or control that are not so delivered to the Company, (y) Executive will not retain any copies, summaries or compilations ("versions") of any such Confidential Information of any kind or in any form, and (z) Executive will provide written certification that Executive has irretrievably erased all such materials and

7

has not retained any versions of such Confidential Information upon the Company's request. Notwithstanding the foregoing, Executive may retain copies of the contact information of his personal contacts.

(b)     During the Employment Period, Executive shall not use or disclose any confidential information or trade secrets, if any, of any former employers or any other person to whom Executive has an obligation of confidentiality, and shall not bring onto the premises of the Company or its Subsidiaries or affiliates or copy any such information to Company technology such as computers or other media storage devices any unpublished documents or any property belonging to any former employer or any other person to whom Executive has an obligation of confidentiality unless consented to in writing by the former employer or person.  Executive shall use in the performance of Executive's duties only information that is (i) generally known and used by persons with training and experience comparable to Executive's and that is (x) common knowledge in the industry or (y) otherwise legally in the public domain, (ii) otherwise provided or developed by the Company or its Subsidiaries or affiliates or (iii) in the case of materials, property or information belonging to any former employer or other person to whom Executive has an obligation of confidentiality, approved for such use in writing by such former employer or person.  If at any time during this employment with the Company or any Subsidiary, Executive believes Executive is being asked to engage in work that will, or will be likely to, jeopardize any confidentiality or other obligations Executive may have to former employers, Executive shall immediately advise the Board so that Executive's duties can be modified appropriately.

(c)     The obligations of Executive provided in this paragraph 6 shall last, as to any Confidential Information, for so long as that Confidential Information has proprietary value, whether during the Employment Period or after the termination of the Employment Period.

(d)     Notwithstanding the foregoing or anything contained in this Agreement to the contrary, Executive may disclose Confidential Information and other proprietary information (x) to the extent required by law, subpoena or court or government order, *provided*, *however*, that Executive shall give prompt written notice to the Company of such requirement (to the extent legally permissible), disclose no more information than is so required, and cooperate (at the Company's expense) with any attempts by the Company to obtain a protective order or similar treatment and (y) to the limited extent necessary to defend Executive against any suit or action by the Company or any of its Subsidiaries or affiliates.

## 7.     INTELLECTUAL PROPERTY, INVENTIONS AND PATENTS.

(a)     Executive acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable works, mask works and moral rights (in each case, whether or not including any Confidential Information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable or trademarkable) which (i)(A) are developed using the equipment, supplies, facilities or Confidential Information of the Company or its Subsidiaries, or (B) relate to the Company's or its Subsidiaries' actual or demonstrably anticipated business, research and development or existing or future products or services, or (C) result from work performed by Executive for the Company or its Subsidiaries in connection with the designing, making, manufacturing, selling,

8

distributing, sourcing and/or marketing of tactical or tactical-inspired apparel, outerwear, nylon, footwear, gear (including backpacks, bags, packs) and/or accessories (the "**Tactical Business**"), and (ii) are conceived in connection with the Tactical Business, developed or made by Executive (whether solely or jointly with others) while employed by the Company and/or its Subsidiaries or after the termination of the Employment Period using the Company's Confidential Information, whether before or after the date of this Agreement ("**Work Product**"), belong to the Company or such Subsidiary.  Work Product does not include any discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable works, mask works and moral rights developed by Executive without the use of Confidential Information after the termination of the Employment Period.  Executive shall promptly disclose such Work Product to the Board and, at the Company's expense, perform all actions reasonably requested by the Board (whether during or after the Employment Period) to establish, confirm and perfect such ownership in the Company or its Subsidiaries, as applicable (including, without limitation, assignments, consents, powers of attorney, waivers of rights, including moral rights, and other instruments).  Executive acknowledges that all original works of authorship protected by copyright included in the Work Product are "works made for hire" as defined in the United States Copyright Act, 17 U.S.C. §101 and similar state law that is applicable to this Agreement.

(b)     As further consideration for the Company's entering into this Agreement, Executive hereby assigns to the Company all right, title and interest Executive owns or at any time may have to the Work Product (whether during the Employment Period or after the termination of the Employment Period).  At any time, whether during the Employment Period or after the termination of the Employment Period, upon reasonable request (and at the expense) of the Company, Executive shall fully cooperate with and assist the Company to protect the Company's right to and interest in the Work Product in any and all countries of the world, and, upon reasonable request of the Company, shall execute all documents and instruments and do all things that may be reasonably required in connection therewith.

Notwithstanding the foregoing, this Paragraph 7 does not apply to Work Product that qualifies fully as a non-assignable invention under the provisions of Section 2870 of the California Labor Code.  By signing this Agreement, Executive acknowledges that Executive has received and reviewed the notification attached to this Agreement as <u>Exhibit B</u>, and has disclosed to the Company all inventions that Executive believes are his property under Labor Code section 2870.

## 8.     SEVERABILITY; REMEDIES.

(a)     Whenever possible, each provision and term of this Agreement will be interpreted in a manner to be effective and valid, but, if any provision or term of this Agreement is held to be prohibited or invalid, then such provision or term will be ineffective only to the extent of such prohibition or invalidity, without invalidating or affecting in any manner whatsoever the remainder of such provision or term or the remaining provisions or terms of this Agreement.

(b)     Executive acknowledges the confidential and secret nature of Confidential Information and that the Company has devoted, and will continue to devote, considerable resources to the development or acquisition of the Confidential Information and Work Product.

9

In light of this expenditure of resources, Executive further acknowledges (i) that the Confidential Information and Work Product has great economic value and is proprietary to the Company, (ii) that access to and use of the Confidential Information is necessary and essential to the performance of Executive's duties and that development of Work Product is an inherent part of Executive's duties, (iii) that Executive's violation of Sections 6 or 7 would cause the Company to suffer immediate and irreparable harm and damage, (iv) that money damages would not provide an adequate remedy to the Company for any breach of Sections 6 or 7, and (v) that the restrictions and continuing obligations set forth in Sections 6 or 7 are fair and reasonably required for the protection of the Company and do not impose a greater restraint on Executive than is necessary to protect the rights and other business interests of the Company.  Therefore, in addition and supplementary to other rights and remedies existing in its favor, the Company shall be entitled to specific performance and/or injunctive or other equitable relief from a court of competent jurisdiction in order to enforce or prevent any violations of the provisions thereof (without posting a bond or other security).  Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it, at law or in equity, for any breach or threatened breach of this Agreement (including any of the provisions of paragraphs 6, or 7) by Executive, including recovery of damages from Executive and forfeiture of any and all Salary Severance.

(c)    A court may, but shall not be required to, award the prevailing party in any action to enforce the terms of this Agreement its reasonable attorneys' fees and legal costs in any such action.

9.    **EXECUTIVE'S REPRESENTATIONS**.  Executive hereby represents and warrants to the Company that (a) the execution, delivery and performance of this Agreement by Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which Executive is bound, (b) Executive is not a party to or bound by any employment agreement or noncompete agreement or confidentiality agreement with any other person or entity that would impact the performance of Executive's duties hereunder and (c) upon the execution and delivery of this Agreement by the Executive, this Agreement shall be a legal, valid and binding obligation of Executive, enforceable in accordance with its terms.  Executive hereby acknowledges and represents that Executive has consulted with independent legal counsel regarding Executive's rights and obligations under this Agreement and that Executive fully understands the terms and conditions contained herein.

10.    **MISCELLANEOUS**.

(a)    Survival.  Paragraphs 5 through 10 shall survive and continue in full force and effect notwithstanding the termination of the Employment Period and this Agreement.

(b)    Notices.  Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service or mailed by first class mail, return receipt requested, to the recipient at the address below indicated:

10

Notices to Executive: At the last address on file with the Company.

With a copy (which shall not constitute notice) to:

> Holland & Knight LLP
> 3 Park Plaza - Suite 1400
> Irvine, California 92614
> Attention:  Bryan S. Gadol
> E-mail:  bryan.gadol@hklaw.com

Notices to the Company:

> Board of Directors
> Lugano Diamonds & Jewelry, Inc.
> 610 Newport Center Drive, Suite 950
> Newport Beach, CA 92660

With a copy (which shall not constitute notice) to:

> Mr. Raj Dalal, Principal
> Compass Group Management LLC
> 301 Riverside Avenue, Second Floor
> Westport, CT 06880

With a copy (which shall not constitute notice) to:

> Gibson, Dunn & Crutcher LLP
> 3161 Michelson Drive
> Irvine, California 92612
> Attention:  John M. Williams; Michelle M. Gourley
> E-mail:  jwilliams@gibsondunn.com; mgourley@gibsondunn.com

or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement shall be deemed to have been given when delivered.

(c)     Complete Agreement.  This Agreement, including the appendices and exhibits attached hereto, embody the complete agreement and understanding between the parties and supersede and preempt all prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way, including all prior employment agreements between the Company and Executive (the "**Prior Employment Agreements**").  For the avoidance of doubt, the entry into this Agreement and the supersedure of the Prior Employment Agreements shall be deemed not to be a termination resulting in any right to severance or similar payments on the part of Executive under any Prior Employment Agreements, and Executive acknowledges and agrees that the rights of Executive hereunder shall be the exclusive rights of Executive in connection with a termination of Executive's employment as of and following the date of this Agreement.  Notwithstanding the foregoing or anything contained in this Agreement to the contrary, this Agreement does not

supersede, and is not superseded by, (i) that certain Stock Purchase Agreement, dated as of September 3, 2021, by and among Lugano Buyer, Inc., Mordechai Haim Ferder, as trustee of the Ferder Family Trust dated 2/24/2009, Edit Fintzi Ferder, as trustee of The RF 2021 Irrevocable Trust dated 8/30/2021, Mordechai Haim Ferder, as trustee of The TF 2021 Irrevocable Trust dated 8/30/2021, Simba IL Holdings, LLC, a Delaware limited liability company, and, solely for the purposes of Article VII and Article VIII set forth therein, Executive, an individual resident of the State of California in his individual capacity; (ii) that certain Stockholders Agreement of Lugano Holding, Inc., dated as of September 3, 2021 by and among Lugano Holding, Inc., Compass Group Diversified Holdings LLC, each of the stockholders listed on the signature page thereto, and any additional holders from time to time a party thereto (as amended and/or restated from time to time) or (iii) that certain Restrictive Covenant Agreement, dated as of September 3, 2021, by and between Lugano Buyer, Inc. and Executive, each of which preceding (i), (ii), and (iii) shall remain in full force and effect and are unaffected by this Agreement.

(d)     No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(e)     Counterparts.  This Agreement may be executed in separate counterparts (including by means of facsimile or portable document format (PDF)), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(f)     Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of the Company and any successor to the Company, including without limitation any persons acquiring directly or indirectly all or substantially all of the business or assets or interests of the Company whether by purchase, merger, consolidation, reorganization or otherwise (in which case, the Company and its successor shall agree to assign this Agreement to such successor), and any such successor shall thereafter be deemed the "**Company**" for purposes of this Agreement.  This Agreement will inure to the benefit of and be enforceable by Executive's personal or legal representatives, executors, administrators, successors, heirs, distributees and legatees, but otherwise will not otherwise be assignable, transferable or delegable by Executive.  This Agreement is personal in nature and neither of the parties hereto shall, without the consent of the other, assign, transfer or delegate this Agreement or any rights or obligations hereunder except as otherwise expressly provided in this paragraph 11(f).

(g)     Choice of Law; Venue.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of California or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of California.  All disputes relating to this Agreement, Executive's employment or other service with the Company or any of its Subsidiaries or affiliates or the termination thereof shall be heard in the state or federal courts located in Orange County, California.

(h)     Amendment and Waiver.  The provisions of this Agreement may be amended or waived only with the prior written consent of the Company (as approved by the

12

Board) and Executive, and no course of conduct or course of dealing or failure or delay by any party hereto in enforcing or exercising any of the provisions of this Agreement (including, without limitation, the Company's right to terminate the Employment Period with or without Cause) shall affect the validity, binding effect or enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

(i)     Insurance.  The Company may procure in its own name and for its own benefit life and/or disability insurance on Executive in any amount or amounts considered advisable.  Executive agrees to cooperate in any reasonable medical or other examination, supply any available information and execute and delivery any applications or other instruments in writing as may be reasonably necessary to obtain and maintain such insurance.

(j)     Indemnification.  During and after the Employment Period, the Company shall indemnify (and provide advancement of all expenses to) Executive to the fullest extent permitted by law for all actions and omissions of Executive in the capacity of an officer or director of the Company or any of its Subsidiaries or affiliates (whether before, on or after the Effective Date), and shall provide coverage to Executive under its (and its parent's) directors and officers insurance policy.

(k)     Code Section 409A.  This Agreement is intended to comply with, or be exempt from, Code Section 409A and the parties hereto agree to interpret this Agreement accordingly. To the maximum extent possible, any severance owed under this Agreement shall be construed to fit within the "short-term deferral rule" under Code Section 409A and/or the "two times two year" involuntary separation pay exception under Code Section 409A. If the Executive's termination of employment hereunder does not constitute a "separation from service" within the meaning of Code Section 409A, then any amounts payable hereunder on account of a termination of the Executive's employment and which are subject to Code Section 409A shall not be paid until the Executive has experienced a "separation from service" within the meaning of Code Section 409A. In addition, no reimbursement or in-kind benefit shall be subject to liquidation or exchange for another benefit and the amount available for reimbursement, or in-kind benefits provided, during any calendar year shall not affect the amount available for reimbursement, or in-kind benefits to be provided, in a subsequent calendar year. Any reimbursement to which the Executive is entitled hereunder shall be made no later than the last day of the calendar year immediately following the calendar year in which such expenses were incurred. Each payment payable hereunder shall be treated as a single payment in a series of payments within the meaning of, and for purposes of, Code Section 409A.

(l)     Corporate Opportunity.  All business, commercial and investment opportunities or offers presented to Executive, or of which Executive becomes aware, at any time during the Employment Period which relate to the Tactical Business are referred to herein as "**Corporate Opportunities.**" Unless approved by the Board, during the Employment Period, Executive shall not accept or pursue, directly or indirectly, any Corporate Opportunities on Executive's own behalf or on behalf of Executive's beneficiaries or immediate family members.

(m)     Executive's Cooperation. During the Employment Period and thereafter, Executive shall cooperate with the Company and its Subsidiaries in (i) any internal investigation or (ii) any administrative, regulatory or judicial proceeding, in each case, as reasonably requested

13

by the Company (including, without limitation, Executive being available to the Company upon reasonable notice for interviews and factual investigations and appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, all at times and on schedules that do not unreasonably interfere with Executive's other activities and commitments); provided, however, that (a) the cooperation and assistance under clause (i) shall not be required after the second anniversary of the date on which Executive's employment with the Company terminates, (b) all cooperation and assistance under this Section 10(m) shall be provided over the phone, by email or by video conferencing unless absolutely necessary to be provided in person and (c) the cooperation and assistance under this Section 10(m) shall not take up a material amount of Executive's time. The Company shall reimburse Executive for any reasonable out of pocket expenses incurred in connection with such cooperation.

\* \* \* \* \*

14

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

COMPANY
LUGANO DIAMONDS & JEWELRY, INC.

By: _Scott Sussman_ _____
Name: Scott Sussman
Title: Chief Financial Officer

*Signature Page to Employment Agreement*

EXECUTIVE:

Mordechai Haim Ferder

*[Signature Page to Employment Agreement]*

Exhibit A

**LUGANO DIAMONDS & JEWELRY, INC.,**
**INCENTIVE BONUS PLAN**

This Incentive Bonus Plan (hereinafter, the "Plan") is provided to employees at the discretion of Lugano Diamonds & Jewelry Inc., a California corporation (the "Company").

**Purpose:** This Plan is designed to reward the participating employees of the Company for attainment by the Company of its established financial performance objectives. The Plan is intended to motivate Participants toward even higher achievement and business results and to link Participants' goals and interests more closely with those of the Company and its shareholders.

**Eligibility and Participation:** All employees who satisfy the following criteria (each a "Participant" and collectively, "Participants") shall be eligible to participate in the Plan:

1. Employees who are invited by the Company to participate in the Plan and timely execute and deliver a Participation Notice or who have entered into an employment agreement with the Company that states that such Employee will be eligible to participate in the Plan; and

2. Employees who are employed by the Company during the Plan Year.

**Plan Year:** The fiscal year of the Plan (the "Plan Year") shall be the annual twelve-month period that coincides with the Company's budget year, commencing on January 1 and ending on December 31.

**Performance Objectives**: Participants will be eligible to receive an annual bonus award based on the achievement of certain EBITDA targets by the Company (the "Payout Percentage"). If the Company achieves its Target EBITDA during any Plan Year, then the Payout Percentage shall be 100% and each Participant shall receive a bonus award equal to the Target Bonus amount established for each such Participant and set forth in such Participant's Participation Notice or, if applicable, employment agreement with the Company (the "Bonus Award"). If the Company's actual results deviate from the established Target EBITDA for a Plan Year, then the Payout Percentage will be adjusted in accordance with the schedule set forth on Exhibit A attached hereto, and the Bonus Award payable to each Participant shall be equal to the product of (i) such Participant's Target Bonus, times (ii) the Payout Percentage for such Plan Year.

If the Company's actual EBITDA during any Plan Year is at or below ninety-five (95%) percent of Target EBITDA, the Payout Percentage shall be 0% and Participants will not be eligible to receive a Bonus Award. The maximum Payout Percentage hereunder is fixed at 160%. For the avoidance of doubt, no additional Bonus Award shall be due and owing hereunder to the extent the Company exceeds one-hundred and forty (140%) percent of Target EBITDA for any Plan Year.

**Final Award Determinations:** Bonus Awards shall be computed for each Participant by the Company, and subject to the approval of the Compensation Committee of the Board of Directors of the Company (the "Compensation Committee"). Each individual Bonus Award shall be based upon:

(a) the Participant's Target Bonus for the applicable Plan Year, as set forth in the Participant's Participation Notice or, if applicable, employment agreement with the Company
*multiplied by*

(b) the Payout Percentage for the applicable Plan Year.

The Company's calculation and determination of the Payout Percentage for any Plan Year, and the Bonus Award due any Participant in any Plan Year shall be subject to the ratification and approval of the Compensation Committee, and shall be final, conclusive, and binding.

**Payment of Bonus Award**: Subject to terms of the Plan and the applicable Participant Notice or, if applicable, employment agreement with the Company, approved Bonus Awards, if any, shall be payable by the Company to each Participant in a lump sum cash payment, less applicable deductions and withholdings, as soon as practicable after the end of each Plan Year and after the Compensation Committee has determined and the Chief Financial Officer has certified in writing, the Company's EBITDA for such Plan Year.  In order to be paid a Bonus Award with respect to a Plan Year, a Participant must be employed by the Company at the time that Bonus Awards are paid to Participants with respect to such Plan Year; provided, however, in the Compensation Committee's sole discretion, the Company shall be entitled to pay to a Participant a Bonus Award for a year that has already ended if Participant's employment with the Company ceases after the end of such year, but before such payment date (and provided further that an employment agreement may require the payment of a Bonus Award regardless of the Participant's employment with the Company on the payment date).  In no event shall the payment date for a Bonus Award occur later than December 31 of the year following the Plan Year during which such Bonus Award was earned.

**Adjustment of Performance Goals.** The Company, subject to the approval of the Compensation Committee, shall have the right to adjust the Target EBITDA goals and corresponding Payout Percentages (either up or down) during a Plan Year if it is determined that external changes or other unanticipated business conditions have materially affected the fairness of the goals and have unduly influenced the Company's ability to meet them.

**Amendment or Termination of the Plan.** The Company, subject to the approval of the Compensation Committee, shall have complete and exclusive power and authority to amend, modify, suspend, revoke, or terminate the Plan or any Participation Notice issued hereunder in any or all respects, with or without notice and without any Participant's consent at any time or from time to time.  Notwithstanding the foregoing, any amendment, modification, suspension, revocation or termination of any of the terms of participation in the Plan set forth in an employment agreement shall require the prior written consent of the Participant who has entered into such employment agreement with the Company.

**Notices.** Upon any amendment to or modification, suspension, revocation, or termination of the Plan or any Participation Notice by the Company, the Company shall notify the Participant or Participants, as applicable, in writing of such amendment, modification, suspension, revocations, or termination.

**Impact on Other Benefits; No Entitlements.** Compensation paid pursuant to the Plan to a Participant is intended to have no impact on any other employee benefit plans with respect to the Participant except to the extent specifically provided under the terms of any such employee benefit plan or compensatory arrangement or as required under applicable law. The granting of a Bonus Award to any Participant shall not entitle that Participant to receive any future Bonus Awards or to receive any additional Bonus Awards on terms equivalent to or no less favorable than the terms of any preceding Bonus Award to such Participant.

**No Entitlement to Future Employment.** A Participant's participation in the Plan shall not provide any guarantee, promise, or entitlement to continued employment by the Company, and the Company retains the right to terminate the employment of any Participant at any time, with or without cause, for any reason or no reason, except as restricted by law or contract. Nothing contained herein and no actions taken by the Company shall be construed as or interpreted to create a contract of employment between the Participant and the Company.

**Limitation on Transferability and Assignment.** A Participant's rights under the Plan and any Participation Notice are personal to the Participant, may not be transferred by the Participant, and any attempt to do so shall be void, *ab initio*. The Company may, in its sole discretion and without the consent of any Participant, assign the Plan and any Participation Notice at any time.

**Overpayment.** If, for any reason, any compensation is erroneously paid pursuant to the Plan to a Participant, the Participant shall be responsible for refunding the overpayment to the Company. The refund shall be a lump sum payment, a reduction of the amount of future benefits otherwise payable or any other method as the Company, in its sole discretion, may require, subject to applicable law (including Section 409A of the Internal Revenue Code of 1986, as amended). Any amount paid in error to a Participant does not create a legally binding right of the Participant to retain such payment.

**Tax Withholding.** The obligation to pay a Bonus Award to any Participant shall be subject to the right of the Company to make adequate provision for the amounts, if any, required to be withheld or deducted under all applicable international, federal, state, local, and other tax laws.

**Choice of Law.** This Plan and all related Participation Notices shall be governed by and construed in accordance with the laws of the State of California without regard to conflict of laws principles.

**Headings and Severability.** The headings in the Plan are inserted for convenience only and shall not be deemed to constitute a part hereof nor to affect the meaning thereof. If any provision of the Plan (or portion thereof, including any Participation Notice) is held to be invalid, illegal or unenforceable by any court or arbitrator of competent jurisdiction, then solely as to such jurisdiction and subject to this Section, that provision will be limited ("blue-penciled") to the

minimum extent necessary so that the Plan or the Participation Notice, as applicable, will otherwise remain enforceable in full force and effect in such jurisdiction and without affecting in any way the enforceability of the Plan or the Participation Notice, as applicable, in other jurisdictions. To the extent such provision cannot be so modified, the offending provision will, solely as to such jurisdiction, be deemed severable from the remainder of the Plan or the Participation Notice, as applicable, and the remaining provisions contained in the Plan or the Participation Notice, as applicable, will be construed to preserve to the maximum permissible extent the intent and purposes of the Plan or the Participation Notice, as applicable, in such jurisdiction and without affecting in any way the enforceability of the Plan or the Participation Notice, as applicable, in other jurisdictions.

**Miscellaneous.** Except as set forth otherwise in the Plan, no provision of the Plan or any Participation Notice may be waived except by an instrument in writing signed by the party sought to be charged with the waiver. The waiver by a party of any provisions of the Plan or any Participation Notice shall not constitute a waiver of any other provision of the Plan or the Participation Notice, as applicable. The Plan and all outstanding Participation Notices shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, legal representatives, successors and permitted assigns. Each Participation Notice is for the sole benefit of the Participant and the Company.

**Definitions:**

**Target EBITDA** means for each Plan Year, the EBITDA set forth in the operating budget of the Company, as approved by the Company's Board of Directors, for that Plan Year.

**EBITDA** means the earnings before interest, taxes, depreciation and amortization of the Company, calculated in accordance with generally accepted accounting principles applied on a consistent basis; provided that any management fees paid to Compass Group Management LLC or any affiliate thereof and deducted from the calculation of EBITDA in accordance with generally accepted accounting principles shall be disregarded and added back to EBITDA for purposes of this Plan.  All determinations of EBITDA shall be derived from the Company's annual audited financial statements and determined by the Compensation Committee, whose determination shall be conclusive and final.

**Participation Notice** means the written notice, in form and substance approved by the Company in its sole discretion, whereby the Participant is notified of (i) the Participant's eligibility to participate in the Plan, subject to the terms and conditions of the Plan, (ii) the Participant's Target Bonus amount applicable to Participant, and (iii) any other terms applicable to the Participant that are not set forth in the Plan. Each Participation Notice shall be incorporated herein by reference. The terms of any Participation Notice under which any Participant participates in the Plan may be different from the terms of any other Participation Notice under which any other Participant participates in the Plan, as determined in the sole discretion of the Company.

**LUGANO DIAMONDS & JEWELRY, INC.,**
**INCENTIVE BONUS PLAN**
**Exhibit A**

| EBITDA % of Target | |
|---|---|
| Budget | Payout % |
| No bonus at or below 95% of budget | |
| 95% | 70.0% |
| 96% | 76.0% |
| 97% | 82.0% |
| 98% | 88.0% |
| 99% | 94.0% |
| 100% | 100.0% |
| 104% | 106.0% |
| 108% | 112.0% |
| 112% | 118.0% |
| 116% | 124.0% |
| 120% | 130.0% |
| 124% | 136.0% |
| 128% | 142.0% |
| 132% | 148.0% |
| 136% | 154.0% |
| 140% | 160.0% |
| Max bonus at 140% or greater of budget | |

The bonus will be determined on a straight line basis for performance between targets (e.g., if EBITDA is 138% of budget, then the bonus would be 157% of the Target Bonus).

Exhibit B

LIMITED EXCLUSION NOTIFICATION

THIS IS TO NOTIFY you, in accordance with Section 2872 of the California Labor Code, that the obligations set forth in this Section 7 do not apply to an invention that you developed entirely on your own time without using the Company's equipment, supplies, facilities, or trade secret information unless the invention either:  (1) relates at the time of conception or reduction to practice of the invention to the Company's business, or action or demonstrably anticipated research or development of the Company; or (2) results from any work performed by you for the Company.  To the extent a provision in this Section 7 purports to require you to assign an invention otherwise excluded from this paragraph, the provision is against the public policy of California and is unenforceable.  However, this limited exclusion does not apply to any patent or invention covered by a contract between the Company and the United States or any of its agencies requiring full title to such patent or invention to be in the United States.

You must disclose on Exhibit C all inventions that have been developed by you, whether solely or jointly with others, for the purpose of determining the parties' respective rights to the invention.  Moreover, during the course of your employment with the Company, you must promptly disclose all inventions developed by you, whether solely or jointly with others, for the purpose of determining the parties' respective rights to the invention.

Exhibit C

List of Inventions

None

Schedule A

List of Activities

Board member of Anderson Ranch

Board member of AFI

Board member of the Performing Arts Center (in Orange County, California)

Board member Lupus Research Alliance

ACB - a real estate company

**Addendum D**

Ferder reserves the right to amend or supplement this proof of claim, including, without limitation, the right to (i) add documents; (ii) assert claims for damages, including, without limitation, for past, present and/or future damages arising from the Diamond contracts, payments made on account of claims against the Debtors,  claims arising from his employment, breaches of his employment agreement and/or for damages arising from the rejection of such agreement, as well as indemnity, contribution, or similar rights, claims or defenses; and/or (iii) change priority and fix, increase, or amend in any respect the amounts and claims referred to herein.

Ferder further reserves the right to file additional proofs of claim for additional claims, including, without limitation, claims for administrative expenses and all other claims, at law or in equity, arising prior to, on, or after the Debtors' Petition Date. Ferder reserves the right to amend or supplement this proof of claim if he should deem it necessary and appropriate, for any reason, or for any other purpose for which a proof of claim filed in this case could be amended. Ferder further reserves any and all rights to setoff or recoupment and, if appropriate, may exercise such rights without further order of the Court and without amending this claim. Ferder reserves all rights under his employment agreements or any other contracts or agreements between the parties, as well as under applicable law, and to review and audit records of the Debtors with regard to the calculation of his claim. Ferder does not waive any rights at law or equity or any rights or causes of action that it has or may have against any person, including, but not limited to, the Debtors and their affiliates. Further, Ferder does not consent to jurisdiction of the Bankruptcy Court or District Court with respect to (i) the pending action captioned *Lugano Diamonds and Jewelry, Inc. v. Ferder, et. al.*, Case No. 30-2025-01492210-CU-CO-CJC ("State Court Action") filed by *Plaintiff Lugano Diamonds & Jewelry Inc.*, which action was removed by Plaintiff from the Orange County Superior Court of the State of California and is now pending in the United States District Court, Central District of California, Southern Division, which upon removal was assigned Case No. 8:25-cv-02845-FWS-JDE; (ii) any counterclaims, crossclaims and/or any third-party actions.

The proof of claim is not intended to be, and shall not be construed as: (i) an election of remedies; (ii) an admission as to the jurisdiction of the Bankruptcy Court or District Court and/or a waiver to contest the jurisdiction of the Bankruptcy Court or District Court; (iii) a waiver of the right to trial by jury in this Court or any other court in any proceeding, notwithstanding the designation or not of any matter as a "core proceeding" pursuant to 28 U.S.C. §157(b)(2), and whether such jury trial right is pursuant to statute or the United States Constitution; (iv) a waiver or release of Ferder's right to have any and all final orders in any and all non-core matters or proceedings entered only after a de novo review by a United States District Court Judge; (v) a waiver of the right to withdraw the reference with respect to the subject matter of this proof of claim, any objection thereto or other proceeding that may be commenced in these cases against or otherwise involving Ferder; (vi) a waiver or limitation of any rights, remedies, claims, interests or defenses of Ferder in any pending or future motion or other matter in these cases; (vii) a waiver or release of Ferder's rights against any person, entity, or property (including, without limitation, any person or entity that is or may become a debtor in a case pending in this Court); (viii) a waiver of the right to seek an administrative claim; (ix) a waiver or release of any

counterclaims, crossclaims and/or any third-party actions Ferder may have; or (x) a waiver or release of any right of setoff or recoupment that Ferder may hold against Debtors or their affiliates.

Notices regarding this Claim should be sent to Ferder at the address in the proof of claim form and to Ferder's counsel as follows:

REEVES & WEISS LLP
3333 Michelson Dr.
Suite 300
Irvine, CA 92612
Tel No. 714.717.4606
Jeffrey Reeves, Esq. and
Daniel Weiss, Esq.

With Copy to:

STINSON LLP
1901 Avenue of the Stars
Suite 450
Los Angeles, CA 90067-6006
Tel No. 310.730.7020
Sandford L. Frey, Esq. and
Dennette A. Mulvaney, Esq.

**EXHIBIT C**

**Complaint**

(See Attached)

Electronically Filed by Superior Court of California, County of Orange, 07/09/2025 01:03:25 PM.
30-2025-01495834-CU-FR-WJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By A. Wilcher, Deputy Clerk.
Case 25-12055-BLS    Doc 451    Filed 03/30/26    Page 68 of 243

Darren S. Enenstein (SBN 195894)
*dse@epgrlawyers.com*
Matthew W. Rosene (SBN 294158)
*mrosene@epgrlawyers.com*
Adrian Canzoneri (SBN 265168)
*acanzoneri@epgrlawyers.com*
Bao Pham (SBN 322899)
*bpham@epgrlawyers.com*
**ENENSTEIN PHAM GLASS & RABBAT LLP**
3200 Bristol St., Suite 500
Costa Mesa, CA 92626
Phone: (714) 292-0262

Attorneys for Plaintiffs Avina LLC and
Global Innovations, LLC

Assigned for All Purposes
Judge Carmen Luege

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ORANGE

| | |
|---|---|
| AVINA LLC, a California limited liability company; GLOBAL INNOVATIONS, LLC, a California limited liability company<br><br>Plaintiff,<br><br>v.<br><br>LUGANO DIAMONDS & JEWELRY, INC., a California corporation; MORDECHAI HAIM FERDER a/k/a MOTI FERDER, an individual; MORDECHAI HAIM FERDER, TRUSTEE OF THE HAIM FAMILY TRUST DATED 2/24/2009; EDIT FERDER, an individual; SERENADE NEWPORT, LLC, a California limited liability company, SAHAND ZARGARI, an individual, LUXE MAISON PROPERTIES, INC., a California corporation doing business as DAFTARIAN GROUP; PAYMAN PAUL DAFTARIAN, an individual; LILI DAFTARIAN, an individual; JACOB WOLF, an individual; and DOES 1-50, inclusive,<br><br>Defendants. | Case No. 30-2025-01495834-CU-FR-WJC<br><br>**COMPLAINT FOR:**<br><br>**1) Breach of Contract;**<br>**2) Fraud;**<br>**3) Conversion;**<br>**4) Violation of Penal Code Section 496;**<br>**5) Breach of Fiduciary Duty;**<br>**6) Promissory Estoppel;**<br>**7) Money Had and Received;**<br>**8) Unjust Enrichment;**<br>**9) Quantum Meruit;**<br>**10) Violation of Uniform Voidable Transfer Act (Civ. Code § 3439.04(a)(1))**<br>**11) Fraudulent Transfer**<br><br>**DEMAND FOR JURY TRIAL** |

1

COMPLAINT

Plaintiffs AVINA LLC, a California limited liability company ("Avina") and GLOBAL INNOVATIONS, LLC, a California limited liability company ("Global") (Avina and Global, collectively, "Plaintiffs") hereby complain and allege as follows:

**INTRODUCTION**

1. Defendant Mordechai Haim Ferder ("Moti") co-founded and ran a seemingly legitimate and successful high-end jewelry and diamond business for decades. For nearly a decade, his business—defendant Lugano Diamonds & Jewelry, Inc. ("Lugano")—entered into joint venture agreements with Plaintiffs by which Plaintiffs funded the purchase of diamonds and gems for Moti and Lugano to use in custom one-of-a-kind high-end, commissioned jewelry for clients. Once Lugano and Moti sold those pieces, they would return the capital investment to Plaintiffs, along with a share of the profits.

2. In middle 2024, Moti and Lugano started asking Plaintiffs for more and more money for these projects in a supposed attempt to increase Lugano's business and therefore its valuation for an upcoming sale. But Moti and Lugano were not actually buying any diamonds, and were instead sending the money to accounts held in the name of Mordechai Ferder, Trustee of the Haim Family Trust, and to foreign accounts in preparation to flee the country with $12,430,000 of Plaintiffs' money.

3. And Plaintiffs were not the only victims. Indeed, it turns out Moti and Lugano did this to numerous business contacts and appear to have bilked their victims of tens of millions of dollars.

4. Moti and Lugano did not work alone in this scheme. In fact, it involved Moti's family members and used a mix of entities and real estate agents to manufacture a sale of property owned by Moti at an obviously depressed and unreasonably low price meant to evade creditors.

5. Plaintiffs seek to recover their investment and other damages caused by all the defendants who participated in this scheme.

**THE PARTIES**

6. Plaintiff Avina is a limited liability company duly formed under the laws of the State of California with its principal place of business in Woodland Hills, California.

7. Plaintiff Global is a limited liability company duly formed under the laws of the State of California with its principal place of business in Woodland Hills, California.

8. Defendant Lugano Diamonds & Jewelry, Inc. ("Lugano") is a corporation duly formed

2

under the laws of the State of California with its principal place of business in Newport Beach, California.

9. Plaintiffs are informed and believe, and on that basis allege, that defendant Mordechai Haim Ferder ("Moti") is an individual citizen of the State of California and resides in Corona Del Mar, Orange County, California. Plaintiffs are further informed and believe, and on that basis allege, that defendant Mordechai Haim Ferder is the Trustee of the Haim Family Trust, which trust is and at all times mentioned herein was a California trust.

10. Plaintiffs are informed and believe, and on that basis allege, that defendant Edit Ferder ("Edit") is an individual citizen of the State of California and resides in Corona Del Mar, Orange County, California.

11. Defendant Serenade Newport, LLC is a California limited liability company with its principal place of business in Orange, California.

12. Plaintiffs are informed and believe, and thereon allege, that defendant Luxe Maison Properties, Inc. is a California corporation with its principal place of business in Newport Beach, California. Plaintiffs are informed and believe, and thereon allege, that Luxe Maison Properties, Inc. is doing business as Daftarian Group ("Daftarian Group").

13. Plaintiffs are informed and believe, and thereon allege, that defendant Payman Paul Daftarian ("Paul") is an individual citizen of the State of California and resides in Newport Beach, California, and is a real estate agent licensed in the State of California currently associated with defendant Daftarian Group.

14. Plaintiffs are informed and believe, and thereon allege, that defendant Lili Daftarian ("Lili") is an individual citizen of the State of California and resides in Newport Beach, California, and is a real estate agent licensed in the State of California currently associated with defendant Daftarian Group. Plaintiffs are informed and believe, and thereon allege, that Lili is the Chief Executive Officer, Secretary, Chief Financial Officer, Director, and Agent for Service of Process for defendant Daftarian Group.

15. Plaintiffs are informed and believe, and thereon allege, that defendant Sahand Zargari ("Zargari") is an individual citizen of the State of California and resides in Irvine, California. Plaintiffs

3

COMPLAINT

are informed and believe, and thereon allege, that Zargari is the manager of Serenade Newport, LLC, and is a real estate agent licensed in the State of California currently associated with defendant Luxe Maison Properties, Inc.

16.     Plaintiffs are informed and believe, and thereon allege, that defendant Jacob Wolf is an individual citizen of the State of California and resides in Newport Beach, California, and is a real estate agent licensed in the State of California currently associated with defendant Luxe Maison Properties, Inc.

17.     Plaintiffs do not now know the true names and capacities of the fictitious remaining Defendants DOES 1 through 50, inclusive. Plaintiffs are informed and believe and thereon allege that each of these fictitious defendants is legally responsible in some way for the transactions, actions, occurrences, and liabilities alleged herein. Plaintiffs, therefore, sue such defendants using the fictitious names of the remaining DOES 1 through 50, and Plaintiffs will request leave of Court to amend this Complaint to identify the name and capacity of these defendants when they are ascertained.

18.     Plaintiffs are informed and believe, and thereon allege, that each Defendant, whether expressly or fictitiously named, was at all times herein mentioned the agent, employee, partner, joint venturer, co-conspirator, representative or alter ego of each remaining Defendant, and that each Defendant, at all times herein mentioned, committed such acts or omissions within the course and scope of such agency, servitude, employment, partnership, joint venture, conspiracy, representation or alter ego relationship with the full knowledge, consent, authority and ratification of each remaining Defendant.

19.     Plaintiffs are informed and believe, and thereon allege, that there exists a unity of ownership between Moti and Edit and Lugano and Does 1-40 such that any individuality and separateness between Moti and Edit and Lugano and Does 1-40 has ceased to exist and that Moti and Edit and Lugano and Does 1-40 are each the alter egos of each other and that Moti and Edit and Does 1-40 have, among other things, failed to properly capitalize Lugano and Does 1-40; co-mingled assets for their own personal benefit and gain; directed corporate and business assets for their own personal benefit; failed to follow business, corporate, and accounting formalities; and failed to maintain the appearance of appropriate business and corporate formalities. Plaintiffs are further informed and believe,

4

COMPLAINT

and thereon allege, that adherence to the fiction of the separate existence of Lugano and Does 1-40 distinct from Moti or Edit or Does 1-40, or any of them, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice by shielding Moti or Edit or Does 1-40, or any of them, from liability.

20. Plaintiffs are informed and believe, and thereon allege, that there exists a unity of ownership between Moti and Edit and Zargari and Serenade Newport, LLC and Does 20-43 such that any individuality and separateness between Moti or Edit or Zargari or Does 20-43 and Serenade Newport, LLC and Does 20-43 has ceased to exist and that Moti and Edit and Zargari and Serenade Newport, LLC and Does 20-43 are each the alter egos of each other and that Moti and Edit and Zargari and Does 20-43 have, among other things, failed to properly capitalize Serenade Newport, LLC and Does 20-43; co-mingled assets for their own personal benefit and gain; directed corporate and business assets for their own personal benefit; failed to follow business, corporate, and accounting formalities; and failed to maintain the appearance of appropriate business and corporate formalities. Plaintiffs are further informed and believe, and thereon allege, that adherence to the fiction of the separate existence of Serenade Newport, LLC and Does 20-43 distinct from Moti and Edit and Zargari and Does 20-43, or any of them, would permit an abuse of the corporate privilege and would sanction fraud and promote injustice by shielding Moti and Edit and Zargari and Does 20-43, or any of them, from liability.

21. Plaintiffs are informed and believe, and thereon allege, that there exists a unity of ownership between Lili and Paul and Luxe Maison Properties, Inc. doing business as Daftarian Group and Does 44-50 such that any individuality and separateness between Lili and Paul and Luxe Maison Properties, Inc. doing business as Daftarian Group and Does 44-50 has ceased to exist and that Lili and Paul and Luxe Maison Properties, Inc. doing business as Daftarian Group and Does 44-50 are each the alter egos of each other and that Lili and Paul and Does 44-50 have, among other things, failed to properly capitalize Luxe Maison Properties, Inc. doing business as Daftarian Group and Does 44-50; co-mingled assets for her own personal benefit and gain; directed corporate and business assets for her own personal benefit; failed to follow business, corporate, and accounting formalities; and failed to maintain the appearance of appropriate business and corporate formalities. Plaintiffs are further informed and believe, and thereon allege, that adherence to the fiction of the separate existence of Luxe Maison

COMPLAINT

Properties, Inc. doing business as Daftarian Group and Does 44-50 distinct from Lili and Paul and Does 44-50 would permit an abuse of the corporate privilege and would sanction fraud and promote injustice by shielding Lili and Paul and Does 44-50, and any of them, from liability.

## JURISDICTION AND VENUE

22.    Jurisdiction is proper in the Orange County Superior Court pursuant to Code of Civil Procedure section 410.10 because the acts or omissions alleged herein were committed, and the harm suffered, within the County of Orange, California. The amount in controversy also exceeds the jurisdictional minimum of this Court.

23.    Venue is proper in the County of Orange pursuant to Code of Civil Procedure section 395 because some or all of the Defendants reside there. Moreover, venue is proper in the County of Orange because the acts or omissions and subsequent harms giving rise to the claims herein occurred there. Specifically, venue is proper in Orange County Superior Court because the acts giving rise to liability occurred in Orange County, California.

## GENERAL ALLEGATIONS

**A.  Avina and Lugano Enjoyed a Decade-Long, Successful Business Relationship**

24.    Lugano is a jewelry manufacturer and retailer that was co-founded by Moti and his wife, Edit, in 2005. Moti is a second-generation diamond dealer, following in his dad, Giora Ferder's, footsteps. Tom is Moti's son, and an apparent third-generation diamond dealer.

25.    Up until his resignation in May 2025, Moti served as Chief Executive Officer of Lugano and was intimately involved in all customer relations and transactions on behalf of Lugano. He controlled movement of gems to and from the company, including consignment inventory.

26.    Edit was also closely involved in Lugano's business and had intimate knowledge of Moti's actions. Indeed, Edit acted as Lugano's Chief Operating Officer and facilitated payments for many of Lugano's transactions.

27.    Plaintiffs are informed and believe, and thereon allege, that Tom has held several corporate positions with Lugano, and most recently served as its Director of Business Development prior to his termination in May 2025. Plaintiffs are informed and believe, and thereon allege, that Tom worked closely with Moti on all Lugano's business transactions and had at least monthly closed-door

6
COMPLAINT

meetings with Moti to discuss Lugano's business and Moti's plans. Plaintiffs are informed and believe, and thereon allege, that Tom had close knowledge of all of Moti's sales and clients.

28.    Starting in 2015, Lugano and Avina joined forces on numerous joint ventures, many of which had the same basic structure. Specifically, when Lugano was commissioned to create a custom piece of jewelry, Lugano, through Moti, requested money from Avina to purchase the diamonds or gems Lugano needed for the custom piece. Avina generally would provide part or all the capital for Lugano to purchase diamonds or gems needed to manufacture these pieces. If Avina did not provide all the necessary capital, Lugano would contribute the balance needed to purchase the diamonds and gems.

29.    For each joint venture, Avina and Lugano signed a separate agreement that stated the amount of capital Avina was lending to Lugano (often referred to as the "Principal Amount"), the date Avina supplied the capital, and the date upon which Lugano was obligated to repay the capital, and the amount of Avina's share in the profit earned from the sale of the commissioned piece of jewelry.

30.    Each joint venture agreement identified the diamonds or gems by their Gemological Institute of America (GIA) certificate numbers or European Gemological Laboratory (EGL) certificate numbers. In other words, all the diamonds and gems were graded, certified, and specifically identifiable. For each joint venture agreement, Lugano also provided what were supposed to be the GIA or EGL certificates identifying and authenticating the stones.

31.    Each joint venture agreement also provided that Avina had an ownership interest in the diamond or gems that Lugano was using for the commissioned piece, and provided that in the event the commissioned jewelry does not ultimately get delivered, Avina shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Lugano, or require the collateral be delivered to Avina's possession.

32.    Also starting in or around 2015, Avina consigned diamonds it owned to Lugano for Lugano to sell through its retail presence.

33.    The frequency of the joint ventures between Lugano and Avina gradually increased and became a regular part of their business, with Avina dutifully providing the capital for each as promised. Indeed, Plaintiffs are informed and believe, and thereon allege, that the volume and consistency of Avina's investments in these joint ventures significantly contributed to Lugano's growth over the past

7

COMPLAINT

decade. In fact, Moti often bragged to Avina that he alone generated about 50% of Lugano's business.

34.     In 2020, the COVID pandemic caused Lugano to suffer financial hardship, but Avina remained steadfast in its investments and even granted extensions to Lugano when Lugano missed deadlines to return payments for their joint ventures.

35.     In 2021, Moti and Edit sold 60% of their stake in Lugano to Compass Diversified, a publicly traded company ("Compass"). Leading up to this sale, Moti was heavily involved in Lugano's finance management and in preparing and soliciting the company for sale. Plaintiffs are informed and believe, and thereon allege, that Lugano was given an enterprise value at this time of approximately $256,000,000.

36.     After the sale, Moti remained as CEO of Lugano, and, upon information and belief, Edit remained as its COO. On information and belief, Moti, Edit, and Tom remained in charge of Lugano's daily operations, even after Moti and Edit sold 60% of their stake to Compass.

**B. Moti and Edit Purchased Real Estate in Corona del Mar and Sold it for Far Less than What it Was Worth.**

37.     Plaintiffs are informed and believe, and thereon on allege, this on or around June 23, 2020, Moti and Edit purchased real property located at 1501 Serenade Terrace, Corona del Mar, California 92625, APN: 050-282-16 ("Serenade Property") from an entity called Serenade Properties LP for $5,588,000 and recorded title in their names, Mordechai Ferder and Edit Ferder.

38.     Plaintiffs are informed and believe, and thereon allege, that on or around December 14, 2021, Moti and Edit transferred title of the Serenade Property from their names, individually, to be held in the name of Mordechai H. Ferder, Trustee of the Haim Family Trust and recorded title reflecting this transfer.

39.     Plaintiffs are informed and believe that Moti and Edit used the Serenade Property as their residence when they purchased it in 2020.

40.     Plaintiffs are informed and believe, and thereon allege, that on June 18, 2025, Moti and Edit, acting on behalf of themselves and Moti also acting as the Trustee of the Haim Family Trust, caused documents to be filed in the public records indicating they sold the Serenade Property for $7,037,500 to Serenade Newport, LLC.

41.    Plaintiffs are informed and believe, and thereon allege, that the Serenade Property was not listed as being for sale in any public property listing services before this sale.

42.    Plaintiffs are informed and believe, and thereon allege, that the sales price of $7,037,500 was substantially below the fair market value of the Serenade Property at the time of this sale, which fair market price Plaintiffs are informed and believe, and thereon allege, was at least $8,600,000.

43.    Plaintiffs are informed and believe, and thereon allege, that Serenade Newport, LLC was created on June 13, 2025. Plaintiffs are informed and believe, and thereon allege, that Serenade Newport, LLC was created specifically to transfer title of the Serenade Property in an attempt to hide the property from Moti's and Edit's creditors and that Moti and Edit are owners or otherwise involved with Serenade Newport, LLC.

44.    Plaintiffs are informed and believe, and thereon allege, that on June 27, 2025, Serenade Newport, LLC listed the Serenade Property for sale for $8,995,000—nearly $2,000,000 more than Serenade Newport, LLC paid for the Serenade Property just nine days earlier.

45.    Plaintiffs are informed and believe, and thereon allege, that Serenade Newport, LLC was created for this sale and that Moti, either individually or as Trustee of the Haim Family Trust, and Edit retained possession or control over the Serenade Property after the June 18, 2025 sale because they are business partners or relatives or otherwise insiders in Serenade Newport, LLC.

46.    Plaintiffs are informed and believe, and thereon allege, that the June 18, 2025 sale to Serenade Newport, LLC was concealed from the public record until after the sale was complete.

47.    Plaintiffs are informed and believe, and thereon allege, that Moti, individually and in his capacity as Trustee of the Haim Family Trust, and Edit made the transfer after Moti, individually and as Trustee of the Haim Family Trust, and Edit were threatened with suit.

48.    Plaintiffs are informed and believe, and thereon allege, that Moti and Edit fled. Indeed, Plaintiffs are informed and believe, and thereon allege, that Moti and Edit went to Israel in an effort to avoid litigation and removed or concealed the funds from the sale of the Serenade Property, and other funds and property, and took the funds and property to Israel, including furnishing and art that were in the Serenade Property.

49.    Plaintiffs are informed and believe, and thereon allege, that the $7 million sales for the

9

COMPLAINT

Serenade Property was not reasonably equivalent value for that property because it is valued at over $8.6 million and was re-listed for sale only nine days after the Serenade Property was sold to Serenade Newport, LLC for a reasonable value of $8,995,000.

**C. Moti Claimed He was Selling More of His Stake in Lugano, this Time Through an Investment Banker**

50.     In or around May of 2024, Moti represented to the Manager of both Avina and Global that he was planning to sell more of his stake in Lugano. Plaintiffs are informed and believe, and thereon allege, that Moti or Lugano hired Goldman Sachs as their investment banker for the potential sale, and that Goldman Sachs was targeting a valuation of $2–2.5 billion for Lugano.

51.     Moti advised the Manager of both Avina and Global that if the sale happened, Lugano would no longer be able to engage Avina in joint ventures and that their decade-long relationship would end. In the meantime, starting in late-2024, Moti aggressively promoted to the Chief Executive Officer and Manager of both Avina and Global that Lugano and Avina conduct a flurry of joint ventures before the sale could occur. At the time Moti misrepresented to Plaintiff's Manager that Lagano more than doubled in revenue in the past two years and reported publicly nearly $500 million in revenue in 2024, and was projecting $600 million of revenue for 2025. This misrepresentation was designed in part to allay Plaintiffs' concern over increasing its level of investment in Lugano. Plaintiffs are informed and believe, and thereon allege, that Moti and Lugano suggested this strategy to increase Lugano's valuation and ensure its eventual sale. Regardless of Moti's or Lugano's motivation, ramping up sales for the fourth quarter was a reasonable suggestion because the jewelry, diamond and gem industry generates most retail sales in the fourth quarter as customers buy gifts for the holidays. These material misrepresentations encouraged Plaintiffs to rollover investments as described in paragraphs 61, 62, and 64, below.

52.     Plaintiffs later discovered that Moti's and Lugano's push to create a plethora of new joint ventures starting in late-2024 was part of a plan by Moti, Edit, Tom, and Lugano to betray and defraud Avina and others out of tens of millions of dollars, burn their business relationships, and flee the country with other people's money.

///

10

COMPLAINT

**D. Lugano Entered Into Eleven New Joint Ventures with Avina Knowing Lugano, Moti, Edit, and Tom Had No Intention of Repaying Plaintiffs Anything**

53.    Starting in September 2024, Moti approached the Chief Executive Officer and Manager of both Avina and Global with a plethora of additional joint ventures, and the parties agreed on the same fundamental terms as they have always done in their course of dealing.

54.    Joint Venture #1: On or about September 5, 2024, Lugano and Avina created a joint venture by which Avina would provide $900,000 to Lugano; in return, Lugano would repay Avina $900,000 for its capital investment plus $270,000 of the profits from the commissioned piece on or before December 5, 2024 ("JVIA #1"). Per the normal course of their joint ventures, Avina had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #1 was secured by the diamond identified in GIA Report No. 6214960084. Pursuant to the terms of JVIA #1, Avina had the option to force the sale of that diamond at Avina's sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Avina's possession. As part of JVIA #1, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #1, Avina could collect the amount due under JVIA #1 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. On September 5, 2024, Avina wired $900,000 directly into an account in the name of Lugano for JVIA #1. True and correct copies of JVIA #1 and the related Personal Guaranty and GIA Report No. 6214960084 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit A**.

55.    Joint Venture #2: On or about September 6, 2024, Lugano and Avina created another joint venture, this one required Avina to provide $900,000 to Lugano; in return, Lugano would repay Avina $900,000 for its capital investment plus $315,000 of the profits from the commissioned piece on or before December 20, 2024 ("JVIA #2"). Per the normal course of their joint ventures, Avina had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #2 was secured by the diamond identified in GIA Report No. 2235251009. Pursuant to the terms of JVIA #2, Avina had the option to force the sale of that diamond at Avina's sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to

Avina's possession. As part of JVIA #2, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #2, Avina could collect the amount due under JVIA #2 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. On September 6, 2024, Avina wired $900,000 directly into an account in the name of Lugano for JVIA #2. True and correct copies of JVIA #2 and the related Personal Guaranty and GIA Report No. 2235251009 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit B**.

56.      Joint Venture #3: On or about October 9, 2024, Lugano and Plaintiffs created another joint venture, this one required Plaintiffs to provide $800,000 to Lugano; in return, Lugano would repay Plaintiffs $800,000 for the capital investment plus $140,000 of the profits from the commissioned piece on or before November 27, 2024 ("JVIA #3"). Per the normal course of their joint ventures, Plaintiffs had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #3 was secured by the diamond identified in GIA Report No. 2231333231. Pursuant to the terms of JVIA #3, Plaintiffs had the option to force the sale of that diamond at Plaintiffs' sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Plaintiffs' possession. As part of JVIA #3, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #3, Plaintiffs could collect the amount due under JVIA #3 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. On October 9, 2024, Avina wired $800,000 directly into an account in the name of Lugano for JVIA #3. True and correct copies of JVIA #3 and the related Personal Guaranty and GIA Report No. 2231333231 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit C**.

57.      Towards the end of 2024, it was becoming increasingly evident that Moti and Edit's sale of their remaining interest in Lugano was not going to happen by year's end. Moti instead claimed that they were likely to complete the sale in early 2025, which meant Lugano and Avina could continue to create joint ventures in the interim.

58.      Moti touted that Lugano was experiencing tremendous sales growth and was therefore launching and stocking new locations. Moti also claimed that Lugano needed to expand its business

12
COMPLAINT

operations to obtain a higher valuation, but to do so Lugano needed a consistent inflow of funds and thus did not have the funds available to repay the capital owed to Avina under JVIA #1, JVIA #2, and JVIA #3. Moti proposed that Avina could roll over the capital from those joint ventures into even more joint ventures, which would help prevent a cash crunch as Lugano expanded and would allow Avina to earn a higher return on the money it invested in JVIA #1, JVIA #2, and JVIA #3.

59.     To that end, Moti suggested a new arrangement in which instead of Lugano repaying Avina its capital investments in JVIA #1, JVIA #2, and JVIA #3 on their respective due dates, Lugano would pay Avina the promised profits from those joint ventures but would retain and rollover the capital investments. Each of these rollover joint ventures would carry a new, extended date for Lugano to repay the capital and would provide that Avina would earn a share of the profit Lugano earned from the commissioned pieces it made and sold using the rollover capital. As usual, Avina would be given ownership of the diamonds and gems purchased for each new rollover joint venture in the event the joint venture failed to yield a profit, and Avina had the power to demand sale or possession of the diamond and gems used in each of those pieces.

60.     Rollover JVI #1: On or around December 4, 2024, Lugano paid Avina its $270,000 profit from JVIA #1, but, given Lugano's cash crunch, Lugano and Avina agreed to the first rollover joint venture and applied Avina's $900,000 capital investment from JVIA #1 to a new joint venture by which Lugano would repay Avina its $900,000 capital investment and the share of profit earned on another commissioned piece on or before March 5, 2025 ("Rollover JV #1"). A true and correct copy of Rollover JV #1 is attached hereto as **Exhibit D.**

61.     Rollover JV #3: On or about December 4, 2024, Lugano also paid Avina its $140,000 profit from JVIA #3, but, given Lugano's cash crunch, Lugano and Avina agreed to apply Avina's $800,000 capital investment from JVIA #3 to a new joint venture by which Lugano would repay Avina its $800,000 capital investment plus $240,000 as Avina's share of the projected profit earned on another commissioned piece on or before February 25, 2025 ("Rollover JV #3"). A true and correct copy of Rollover JV #3 is attached hereto as **Exhibit E**.

62.     Joint Venture #4: On or about January 22, 2025, Lugano and Plaintiffs created another joint venture, this one required Plaintiffs to provide $2,000,000 to Lugano; in return, Lugano would

13

COMPLAINT

repay Plaintiffs $2,000,000 for the capital investment plus $200,000 of the profits from the commissioned piece on or before February 19, 2025 ("JVIA #4"). Per the normal course of their joint ventures, Plaintiffs had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #4 was secured by the diamond identified in GIA Report No. 2191463494. Pursuant to the terms of JVIA #4, Plaintiffs had the option to force the sale of that diamond at Plaintiffs' sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Plaintiffs' possession. As part of JVIA #4, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #4, Plaintiffs could collect the amount due under JVIA #4 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. For JVIA #4, the capital came from repayment of a capital investment in another joint venture. Specifically, on November 15, 2024, Avina wired to Lugano $2,000,000 for a joint venture, but instead of Lugano repaying $2,000,000 to Avina for the capital investment of that joint venture once it was completed, on January 2, 2025, Lugano applied $2,000,000 to the capital investment in JVIA #4. True and correct copies of JVIA #4 and the related Personal Guaranty and GIA Report No. 2191463494 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit F**.

63.    Rollover JV #2: On or about January 28, 2025, Lugano paid to Avina $315,000 as its share of the profit on JVIA #2, but, given Lugano's cash crunch, Lugan and Avina agreed to rollover Avina's capital investment of $900,000 from JVIA #2 to a new joint venture by which Lugano would repay Avina its $900,000 capital investment plus $180,000 as Avina's share of the projected profit earned on another commissioned piece on or before March 24, 2025 ("Rollover JV #2"). A true and correct copy of Rollover JV #2 is attached hereto as **Exhibit G.**

64.    Joint Venture #5: On or about January 31, 2025, Lugano and Plaintiffs created another joint venture, this one required Plaintiffs to provide $1,430,000 to Lugano; in return, Lugano would repay Plaintiffs $1,430,000 for the capital investment plus $286,000 of the profits from the commissioned piece on or before March 28, 2025 ("JVIA #5"). Per the normal course of their joint ventures, Plaintiffs had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #5 was secured by the diamond identified in

14

COMPLAINT

GIA Report No. 2231333231. Pursuant to the terms of JVIA #5, Plaintiffs had the option to force the sale of that diamond at Plaintiffs' sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Plaintiffs' possession. As part of JVIA #5, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #5, Plaintiffs could collect the amount due under JVIA #5 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. On January 31, 2025, Avina wired $1,430,000 directly into an account in the name of Lugano for JVIA #5. True and correct copies of JVIA #5 and the related Personal Guaranty and GIA Report No. 2231333231 are attached hereto as **Exhibit H**.

65.   Joint Venture #6: On or about February 5, 2025, Lugano and Plaintiffs created another joint venture, this one required Plaintiffs to provide $1,100,000 to Lugano; in return, Lugano would repay Plaintiffs $1,100,000 for its capital investment plus $220,000 of the profits from the commissioned piece on or before April 4, 2025 ("JVIA #6"). Per the normal course of their joint ventures, Plaintiffs had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #6 was secured by the diamond identified in GIA Report No. 2221287133. Pursuant to the terms of JVIA #6, Plaintiffs had the option to force the sale of that diamond at Plaintiffs' sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Plaintiffs' possession. As part of JVIA #6, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #6, Plaintiffs could collect the amount due under JVIA #6 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. For JVIA #6, the capital came from repayment of a capital investment in another joint venture. Specifically, on June 13, 2024, Avina wired Lugano $1,100,000 for a joint venture, but instead of Lugano repaying $1,100,000 to Avina for the capital investment of that joint venture once it was completed, on February 5, 2025, Lugano applied $,100,000 to the capital investment in JVIA #6. True and correct copies of JVIA #6 and the related Personal Guaranty and GIA Report No. 2221287133 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit I**.

66.   Joint Venture #7: On or about February 13, 2025, Lugano and Avina created another joint venture, this one required Avina to provide $1,400,000 to Lugano; in return, Lugano would repay Avina

$1,400,000 for its capital investment plus $280,000 of the profits from the commissioned piece on or before April 10, 2025 ("JVIA #7"). Per the normal course of their joint ventures, Avina had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #7 was secured by the diamond identified in GIA Report No. 2125253676. Pursuant to the terms of JVIA #7, Avina had the option to force the sale of that diamond at Avina's sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Avina's possession. As part of JVIA #7, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #7, Avina could collect the amount due under JVIA #7 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. On February 13, 2025, Avina wired $1,400,000 directly into an account in the name of Lugano for JVIA #7. True and correct copies of JVIA #7 and the related Personal Guaranty and GIA Report No. 2125253676 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit J**.

67.     Joint Venture #8: On or about February 19, 2025, Lugano and Avina created another joint venture, this one required Avina to provide $1,100,000 to Lugano; in return, Lugano would repay Avina $1,100,000 for its capital investment plus $330,000 of the profits from the commissioned piece on or before May 16, 2025 ("JVIA #8"). Per the normal course of their joint ventures, Avina had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #8 was secured by the diamond identified in GIA Report No. 5234191310. Pursuant to the terms of JVIA #8, Avina had the option to force the sale of that diamond at Avina's sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Avina's possession. As part of JVIA #8, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #8, Avina could collect the amount due under JVIA #8 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. For JVIA #8, the capital came from repayment of a capital investment in another joint venture. Specifically, on July 5, 2024, Avina wired Lugano $1,100,000 for a joint venture, but instead of Lugano repaying $1,100,000 to Avina for the capital investment of that joint venture once it was completed, on February 19, 2025, Lugano applied $1,100,000 to the capital

16

COMPLAINT

investment in JVIA #8. True and correct copies of JVIA #8 and the related Personal Guaranty and GIA Report No. 5234191310 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit K**.

68.    Joint Venture #9: On or about March 26, 2025, Lugano and Avina created another joint venture, this one required Avina to provide $800,000 to Lugano; in return, Lugano would repay Avina $800,000 for its capital investment plus $240,000 of the profits from the commissioned piece on or before June 25, 2025 ("JVIA #9"). Per the normal course of their joint ventures, Avina had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #9 was secured by the diamond identified in GIA Report No. 2125339698. Pursuant to the terms of JVIA #9, Avina had the option to force the sale of that diamond at Avina's sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Avina's possession. As part of JVIA #9, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #9, Avina could collect the amount due under JVIA #9 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. For JVIA #9, the capital came from repayment of a capital investment in another joint venture. Specifically, on July 10, 2024, Avina wired Lugano $800,000 for a joint venture, but instead of Lugano repaying $800,000 to Avina for the capital investment of that joint venture once it was completed, on March 26, 2025, Lugano applied $1,100,000 to the capital investment in JVIA #9. True and correct copies of JVIA #9 and the related Personal Guaranty and GIA Report No. 2125339698 and the advice of debit for the wire to Lugano are attached hereto as **Exhibit L**.

69.    Joint Venture #10: On or about April 2, 2025, Lugano and Plaintiffs created another joint venture, this one required Plaintiffs to provide $1,000,000 to Lugano; in return, Lugano would repay Plaintiffs $1,000,000 for the capital investment plus $100,000 of the profits from the commissioned piece on or before May 2, 2025 ("JVIA #10"). Per the normal course of their joint ventures, Plaintiffs had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #10 was secured by the diamond identified in GIA Report No. 5221795816. Pursuant to the terms of JVIA #10, Plaintiffs had the option to force the sale of that diamond at Plaintiffs' sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Plaintiffs' possession. As part of JVIA #10, Moti also executed a Personal

17

COMPLAINT

Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #10, Plaintiffs could collect the amount due under JVIA #10 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. For JVIA #10, the capital came from repayment of a capital investment in another joint venture. Specifically, on April 15, 2024, Avina wired to Lugano $2,000,000 for a joint venture by which Avina would receive $300,000 in a projected share of the profit. On October 2, 2024, Lugano wired the $300,000 share of the profit to Avina, along with $1,000,000 of the capital investment. Instead of paying Avina the other $1,000,000 portion of the capital investment, that amount was applied to another joint venture dated October 2, 2024, which was later revised on April 2, 2025, as JVIA #10. True and correct copies of JVIA #10 and the related Personal Guaranty and GIA Report No. 5221795816 and the advice of debit for $2,000,000 and the advice of credit for $1,300,000 for the wires for the capital investment are attached hereto as **Exhibit M**.

70.    Joint Venture #11: On or about April 25, 2025, Lugano and Plaintiffs created another joint venture, this one required Plaintiffs to provide $1,000,000 to Lugano; in return, Lugano would repay Plaintiffs $1,000,000 for the capital investment plus $300,000 of the profits from the commissioned piece on or before July 24, 2025 ("JVIA #11"). Per the normal course of their joint ventures, Plaintiffs had a security interest in the specific graded and certified diamond or gem that Lugano was going to use in the commissioned piece. JVIA #11 was secured by the diamond identified in GIA Report No. 2231252640. Pursuant to the terms of JVIA #11, Plaintiffs had the option to force the sale of that diamond at Plaintiffs' sole discretion and price on thirty days' notice to Lugano or to require the diamond to be delivered to Plaintiffs' possession. As part of JVIA #11, Moti also executed a Personal Guaranty by which Moti promised that in the event Lugano defaulted on its payment obligations under JVIA #11, Plaintiffs could collect the amount due under JVIA #11 from Moti and his assets and could recover attorneys' fees enforcing the Personal Guaranty. For JVIA #11, the capital came from repayment of a capital investment in another joint venture. Specifically, October 4, 2024, Avina wired $1,000,000 directly into an account in the name of Lugano for a joint venture, but instead of Lugano repaying $1,000,000 to Avina for the capital investment of that joint venture once it was completed, on April 25, 2025, Lugano applied $1,000,000 for the capital investment in JVIA #11. True and correct copies of JVIA #11 and the related Personal Guaranty and GIA Report No. 2231252640 and

18

COMPLAINT

the advice of debit for the wire to Lugano are attached hereto as **Exhibit N**.

71.    The joint ventures JVIA #1–JVIA #11 and Rollover JV #1–Rollover JV #3 (Exhibits A–N) are collectively referred to as the "Joint Venture Agreements."

### E.  Moti Resigned as Lugano's CEO; Moti and Edit Fled the United States in Face of a Multitude of Lawsuits and Absconded with Plaintiffs' Money.

72.    After Plaintiffs and Defendants entered into the last of the Joint Venture Agreements, Lugano held over $12,430,00 of Plaintiffs' money as capital investments in the Joint Venture Agreements, and owed Plaintiffs millions more in projected profits. Around this time, in early 2025, Defendants started acting weird and Plaintiffs got suspicious.  In order to mask the true nature of a partial return of prior joint venture funds wired to Plaintiffs, Moti fabricated stories as to the source of the wires to Plaintiffs. The fabricated stories included that the source of the wire was from another diamond dealer who was not aware of the source being Lugano, in order to maintain a lower diamond purchase price. Plaintiffs discovered recently that the wires from various accounts were in fact, based upon information and belief, due to a shortfall of cash at Lugano and through Moti's theft and embezzlement of funds. In part, Avina received wires directly from Edit, and from other third parties. There was no obvious reason Lugano would instruct its suppliers, or its co-founder, to send money to Avina to pay profits from the Joint Venture Agreements between Lugano and Plaintiffs.

73.    In May 2025, Plaintiffs got news that Lugano and Compass (a 60% stakeholder in Lugano) started an internal investigation into Moti's transactions at Lugano after Compass discovered irregularities in Lugano's accounting, financing, and inventory. Plaintiffs are informed and believe, and thereon allege, the day after Lugano and Compass started this investigation, Moti resigned as Lugano's CEO. Both Moti and his civil counsel have refused to guarantee or pay or refund the stolen funds, as well as have refused to provide diamonds or replacement diamonds, despite demands by plaintiff and their counsel.

74.    Upon information and belief, Moti used his position as CEO to authorize wire transfers from Lugano to a bank account held in the name of the Haim Family Trust, for which Moti serves as Trustee.

75.    After the fallout, on or about June 16, 2025, Avina, through counsel, sent a letter to

19

COMPLAINT

Lugano demanding that Lugano deliver payment to Avina due under the Joint Venture Agreements, or deliver the diamonds used as collateral for the Joint Venture Agreements.

76.    Lugano, after purportedly engaging in an internal search, responded that it had no knowledge of Moti's dealings on behalf of Lugano nor the existence or whereabouts of any of the diamonds Lugano purchased for the Joint Venture Agreements or itemized in the GIA certificates that were part of the Joint Venture Agreements. Indeed, Lugano claimed that it had no records evidencing that it ever owned any of the diamonds referenced in or secured under any of the Joint Venture Agreements.

77.    In its response, Lugano also claimed it could not repay Avina for the capital investments or profits under any of the Joint Venture Agreements, although Lugano admitted to having records that it received all the wire transfers from Plaintiffs for the Joint Venture Agreements.

78.    Avina later discovered that there were more than forty other creditors who had fallen victim to Moti's and Lugano's schemes, had sent money to Lugano, and were likely defrauded out of large sums of money. In all, it appears that Moti, Lugano, Edit, and Tom bilked their victims for hundreds of millions of dollars. Upon information and belief, in or around April 2025, Moti, Edit, and Tom fled the United States, and are now in Israel with their victims' money.

79.    Plaintiffs are aware of an ongoing investigation by the Federal Bureau of Investigations into Moti's conduct.

80.    Defendants owe Plaintiffs at least $12,430,000—and that is just the capital investments Plaintiffs made in the Joint Venture Agreements with Lugano but does not include Plaintiffs' projected profit from the Joint Venture Agreements.

**FIRST CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(All Plaintiffs Against Mordechai Ferder and Lugano Diamonds & Jewelry, Inc.)**

81.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

82.    Plaintiffs and Lugano entered into enforceable contracts. Specifically, the Joint Venture Agreements. As CEO and founder of Lugano, Moti had the authority or ostensible authority to enter into

20

COMPLAINT

each of the Joint Venture Agreements on behalf of Lugano. A corporation is bound by contracts into which its CEO entered if done with his actual or apparent authority, which is the case here. (Corp. Code, § 208; Civ. Code, § 2337; *see* Exhibits A–N.) Moti also personally guaranteed each of the Joint Venture Agreements and is thus also personally liable.

83. For each of the Joint Venture Agreements, Plaintiffs did all or substantially all that was required of them. Indeed, Plaintiffs wired the full amount of the capital investment detailed in each of the Joint Venture Agreements or allowed Lugano to roll over capital investments that were due to be repaid to Plaintiffs. Further, after Moti left Lugano, Lugano confirmed that it received the wires from Plaintiffs related to the Joint Venture Agreements.

84. Lugano and Moti breached their obligations under the Joint Venture Agreements. They failed to return the capital investments to Plaintiffs by the agreed dates, all but one of which has now passed. They failed to pay Plaintiffs their share of the profits earned from the Joint Venture Agreements by the agreed-upon dates, all but one of which has now passed. They failed to deliver the diamonds or the collateral used for the Joint Venture Agreements within thirty days of Avina's demands. Indeed, Lugano's successor CEO claimed that the specified diamond security in each of the Joint Venture Agreements is either missing or Lugano never owned or possessed it.

85. Alternatively, Lugano's breach of the Joint Venture Agreements is an anticipatory because Lugano has stated that it will not and cannot pay back the principal or profits due under the Joint Venture Agreements, and cannot and will not return the diamonds pledged as security because they are either missing or Lugano never owned or possessed it.

86. Plaintiffs have been harmed by Defendants' breaches of the Joint Venture Agreements.

87. Defendants' breaches of the Joint Venture Agreements were a substantial factor in causing Plaintiffs' harm.

88. Plaintiffs have been damaged in amount to be proven at trial, but in excess of the $12,430,000 Plaintiffs transferred to Defendants as capital investments in the Joint Venture Agreements.

///

///

///

**SECOND CAUSE OF ACTION**

**FRAUD**

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Lugano Diamonds & Jewelry, Inc.)**

89.     Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

90.     Lugano, through Moti, represented to Plaintiffs that Lugano needed the capital investments identified in the Joint Venture Agreements to purchase diamonds for commissioned pieces of jewelry, and that Lugano or Moti would repay Plaintiffs' capital investment in these ventures, plus a share of the projected profits earned on the commissioned jewelry, by specific dates identified in each of the Joint Venture Agreements, as set forth in detail in paragraphs 28-45, above. Indeed, Lugano, through Moti, made these representations in writing. (*See* Exhibits A-N).

91.     Lugano, through Moti, also represented to the Manager of both Avina and Global that Lugano would use Plaintiffs' capital investments to purchase the diamonds for the commissioned pieces and even provided supposedly legitimate GIA reports for diamonds associated with each of the Joint Venture Agreements and represented that Lugano was in possession of those diamonds and that those diamonds would be available to Plaintiffs upon demand. Indeed, Lugano, through Moti, made these representations in writing. (*See* Exhibits A-N). On numerous occasions in late 2024 and early 2025, Lugano, through Moti, and Moti and Edit represented that Lugano needed the influx of cash and could not repay Avina its capital investments in Joint Venture Agreements in late 2024 because Lugano needed liquidity to expand its business, open new locations, and stock merchandise in the new locations to increase Lugano's enterprise value for the sale of the remaining shares Moti and Edit owned in Lugano.

92.     Lugano's representations, made through Moti, and Moti's representations made on his own behalf and on behalf of Lugano, and Edit's representations were false. Neither Lugano nor Moti were going to (and never did) return the capital investments Plaintiffs made in the Joint Venture Agreements, or any of them. Neither Lugano nor Moti was going to (or ever did) deliver to Plaintiffs a share of the profits earned from all the Joint Venture Agreements. Neither Lugano nor Moti was going

22

COMPLAINT

to (or ever did) deliver to Plaintiffs the diamonds that supposedly served as the collateral for Avina's capital investments. Indeed, Plaintiffs are informed and believe, and thereon allege, that neither Lugano nor Moti was going to (or ever did) purchase the diamonds identified in the GIA reports associated with the Joint Venture Agreements. Plaintiffs are informed and believe, and thereon allege, that neither Lugano nor Moti was going to (or ever did) create any of the commissioned pieces they were supposedly going to make under any of the Joint Venture Agreements. Further, Lugano did not need Avina's capital investments to increase its enterprise value for sale or to expand its business.

93.     Lugano and Moti and Edit knew the representations were false when they made them. Indeed, Neither Lugano nor Moti had any intention of returning Plaintiffs' capital investments Defendants received from Plaintiffs for the Joint Venture Agreements or paying the profits under the Joint Venture Agreements or turning over or selling for Plaintiffs' benefit the diamonds identified in the GIA reports associated with each of the Joint Venture Agreements. And Lugano did not need the money to fund new locations or to expand its business. Rather, Plaintiffs are informed and believe, and thereon allege, that Lugano, Moti, Edit and Tom planned to run off with all the money Avina wired to Lugano for the capital investments in the Joint Venture Agreements. In fact, Plaintiffs are informed and believe, and thereon allege, that Defendants, and each of them, participated in wiring Plaintiffs' money out of Lugano accounts and into personal accounts held in the name of Moti, Edit, Tom, or in the name of Moti as Trustee of the Haim Family Trust. Plaintiffs are informed and believe, and thereon allege that Defendants, and each of them, made or participated in these transfers with the intent to shield the money from Plaintiffs and to stash it in accounts in which only they have access. Plaintiffs are informed and believe, and thereon allege, that when Lugano and Moti and Edit made these knowingly false representations to Plaintiffs, Lugano and Moti and Edit knew Moti and Edit were going to flee the United States with the money Avina was transferring to Lugano for the capital investments in the Joint Venture Agreements. Further, as Lugano subsequently confirmed, Lugano is not in possession of any of the diamonds identified in the GIA reports associated with the Joint Venture Agreements and cannot and will not obtain the diamonds for Plaintiffs.

94.     Lugano and Moti intended to induce Plaintiffs to rely on these knowingly false representations. Lugano and Moti and Edit pressed Plaintiffs to make additional capital investments and

23

COMPLAINT

wire the funds to Lugano with the promise that Plaintiffs would be repaid for their investment and would make a healthy profit on the investments. Indeed, Lugano and Moti put in writing and executed the exact financial terms and healthy returns that Plaintiffs should expect from the capital investments in the Joint Venture Agreements. Moti also intended to and did induce Plaintiffs to roll over its investments into new ventures, which meant Plaintiffs could profit again from the investment as not be out additional capital.

95.     Edit aided Moti's fraud by transmitting money from her own account that she and Moti purported was principle and profit share.

96.     Plaintiffs reasonably relied on Lugano's representations (made through Moti and Edit), and the representations of Moti and Edit because the supposed transactions were documented in writing with apparent security interests with seemingly legitimate GIA reports and personal guarantees from Moti. Moreover, Plaintiffs and Defendants had a history of doing business together during which Plaintiffs and Moti and Edit and Lugano all made good money and during which Moti and Edit and Lugano lived up to their contractual obligations, promises, and their word until mid-2024. Indeed, Lugano had not previously failed to either repay the capital or to provide the promised profit share.

97.     Plaintiffs were harmed by this fraud. Plaintiffs have lost $12,430,000 in capital investments in the Joint Venture Agreements, have been denied repayment of those funds, have been denied possession of the diamonds that were supposedly pledged as security, were denied the profits from the Joint Venture Agreements, and have nothing to show in return for the $12,430,000 they wired to Lugano.

98.     As CEO and COO for Lugano, Moti and Edit had the actual and apparent authority to enter into contracts and to make promises on behalf of Lugano. Likewise, in their capacity as high-ranking officers and directors of Lugano, Moti's and Edit's frauds or other wrongful acts which they committed in and part of the scope of their positions with Lugano may be imputed to Lugano.

99.     Plaintiffs' reliance on Lugano's, Moti's and Edit's knowingly fraudulent representations was a substantial factor in causing Plaintiffs to transfer $12,430,000 to Lugano, which transfer and Lugano's, Moti's and Edit's failure to return the money is the harm Plaintiffs suffered.

///

100.   Lugano's, Moti's, and Edit's acts were willful and malicious in that they knew that their misrepresentations, omissions, and intentional misconduct would induce Plaintiffs into sending millions of dollars with the intention that it be used for the Joint Venture Agreements and Plaintiffs are therefore entitled to punitive damages.

### THIRD CAUSE OF ACTION

### CONVERSION

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Tom Ferder, Lugano Diamonds & Jewelry, Inc., and Does 1-25)**

101.   Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

102.   Plaintiffs are the rightful owners of, and have the right to take possession of, the capital investments that Plaintiffs transmitted by wire to Lugano in accordance with the Joint Venture Agreements, and of the diamonds associated with the joint venture agreements and identified in the referenced GIA certificates. The time for Lugano to return the capital investments under the Joint Venture Agreements or, alternatively, the surrender or sell the diamonds secured by the Joint Venture Agreements has expired and thus Plaintiffs have right to ownership and possession of the capital investments and the diamonds identified in the Joint Venture Agreements.

103.   Defendants Lugano, Moti, Edit, Tom and Does 1-25 have substantially interfered with Plaintiffs' property by knowingly and intentionally taking possession of the property or preventing Plaintiffs from having access to the property or destroying or otherwise disposing of the property or refusing to return the property. More particularly, Lugano, Moti, Edit, Tom and Does 1-25 received the wire payments from Plaintiffs in specific amounts to act as capital investments for the Joint Venture Agreements but Lugano, Moti, Edit, Tom and Does 1-25 have retained possession of the money by keeping it in their own accounts or transferring it to accounts or physical locations where Plaintiffs cannot access it and refusing to return it despite Plaintiffs' demands, or have destroyed, spent, or otherwise disposed of the money. Likewise, Lugano, Moti, Edit, Tom and Does 1-25 have possession of the diamonds identified in the GIA reports associated with the Joint Venture Agreements and refuse to provide them to Plaintiffs or have destroyed or otherwise disposed of those diamonds and deprived

Plaintiffs of their right to possession and ownership.

104.    Plaintiffs did not consent to Lugano's, Moti's, Edit's, Tom's, and Does 1-25's interference or control over the capital investments Plaintiffs made under the Joint Venture Agreements, nor did Plaintiffs consent to their interference or control over the diamonds identified in the GIA reports associated with the Joint Venture Agreements.

105.    Plaintiffs have been harmed. More particularly, have been deprived of the cumulative $12,430,000 capital invested in the Joint Venture Agreements and in the value of the diamonds over which Plaintiffs have a right to demand possession.

106.    Lugano's, Moti's, Edit's, Tom's, and Does 1-25's conduct was a substantial factor and direct and proximate cause of Plaintiffs' harm. Indeed, Defendants took the capital investment and the diamonds for their own benefit and have failed and refused to return possession or ownership to Plaintiffs.

107.    Plaintiffs are entitled to damages against Lugano, Moti, Edit, Tom and Does 1-25 in an amount to be proven at trial, but in no less than $12,430,000.00.

## FOURTH CAUSE OF ACTION

### VIOLATION OF PENAL CODE SECTION 496

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Tom Ferder, Lugano Diamonds & Jewelry, Inc., and Does 1-25)**

108.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

109.    Penal Code section 496 provides:

> Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling or withholding any property from the owner, knowing the property to be stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170.

110.    Any person who feloniously steal, take, carry, or fraudulently obtain money by false or fraudulent pretense has committed "theft" under California Law. (Pen. Code, § 484.)

111.    Lugano's, Moti's, Edit's, Tom's and Does 1-25's actions constitute theft and are

26

COMPLAINT

violations of Penal Code section 496 as Lugano, through Moti, fraudulently induced Plaintiffs into investing millions of dollars into nonexistent ventures and spent months concealing and withholding Plaintiffs' money despite their requests for the return of the money or the diamonds identified in the GIA reports associated with the Joint Venture Agreements. Moti and Edit have absconded to another country with the money and have demonstrated an intention to permanently deprive Plaintiffs of their money and the diamonds. Accordingly, Moti's actions constitute theft in violation of Penal Code section 496.

112. Edit also committed violations of Penal Code section 496. By making fraudulent wire transfers to delay Plaintiffs' detection of Moti's fraud, Edit aided in and concealed Moti's theft in violation of Penal Code section 496. The Haim Family Trust is an instrument of fraud as Moti and Edit used the Haim Family Trust to shelter the money received from Plaintiffs. As Moti was the CEO of Lugano and Trustee of the Haim Family Trust, Moti, in his capacity as Trustee of the Haim Family Trust, is complicit in Lugano's, Edit's, Tom's and Does 1-25's wrongful conduct and can be used to satisfy Lugano's, Moti's, Edit's, Tom's and Does 1-25's liability.

113. Upon information and belief, Moti and Edit stole money from Plaintiffs and deposited the stolen funds into bank accounts held in the name of the Haim Family Trust. As Trustee of the Haim Family Trust, Moti knew that the money he deposited was stolen. Accordingly, Moti, in his capacity as Trustee of the Haim Family Trust violated Penal Code section 496 by receiving stolen property with the knowledge that it was stolen, and the res of the Haim Family Trust can be used to satisfy their liability.

114. Lugano, Moti, Edit Tom and Does 1-25 knew their actions would constitute theft but nevertheless intended to commit and did commit theft of Plaintiffs' money. Their actions in concealing the extent of the fraud, transferring the money to shield it from Plaintiffs, fleeing the country with the money, and refusing to return the money demonstrate criminal intent to commit theft and thus subject them to Penal Code section 496.

115. As a direct and proximate result of Lugano's, Moti's, Edit's, Tom's and Does 1-25's misconduct, Plaintiffs are entitled to three times the amount of actual damages, for an amount of at least $37,290,000, plus costs of suit and attorneys' fees pursuant to Penal Code section 496(c).

///

27

COMPLAINT

**FIFTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Lugano Diamonds & Jewelry, Inc., and Does 1-25)**

116.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

117.    At all relevant times, Plaintiffs, on the one hand, and Lugano and Moti and Does 20-40, on the other hand had a fiduciary relationship as joint venturers under the Joint Venture Agreements, and each of them, and under the law.

118.    Lugano and Moti and Does 20-40 materially breached their fiduciary duties to Plaintiffs in multiple ways described in the preceding paragraphs, including fraud, intentional misconduct, grossly negligent conduct, reckless conduct, knowing violations of law, failing to comply with the obligation of good faith and fair dealing towards Plaintiffs, and using the money Plaintiffs sent to Lugano and Moti and Does 20-40 for the purpose of furthering the parties' joint ventures for Defendants' personal use and benefit.

119.    As a direct and proximate result of Lugano's and Moti's and Does 20-40's breach of their fiduciary duty to Plaintiffs, Plaintiffs have suffered damages in an amount to be proven at trial, but not less than $12,430,000.00.

120.    Lugano's and Moti's and Does 20-40's acts were willful and malicious in that they knew that their misrepresentations, omissions, and intentional misconduct would induce Plaintiffs into sending millions of dollars with the intention that it be used for Joint Venture Agreements and Plaintiffs are therefore entitled to punitive damages.

**SIXTH CAUSE OF ACTION**

**PROMISSORY ESTOPPEL**

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Lugano Diamonds & Jewelry, Inc., and Does 20-40)**

121.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

28

COMPLAINT

122. Defendants Moti, Edit, Lugano and Does 1-25 made clear and unambiguous promises to Plaintiffs that Lugano and Moti would use Plaintiffs' capital investments in the Joint Venture Agreements to acquire and sell certain diamonds identified in the Joint Venture Agreements, and clear promises to repay Plaintiffs the money Plaintiffs invested, plus a profit.

123. Plaintiffs relied on the promises of Moti, Edit, Lugano and Does 1-25 to Plaintiffs' detriment by giving to Moti, Edit, Lugano and Does 1-25 at least $12,430,000.

124. Plaintiffs' reliance on the promises from Moti, Edit, Lugano and Does 1-25 was reasonable and foreseeable based on their long-standing business relationship and prior instances of following through on similar promises, and because Lugano and Moti executed legal agreements comprising the Joint Venture Agreements to not only repay the money, but to pay a projected share of profits and to provide personal guarantees and security for the promises to repay Plaintiffs.

125. Plaintiffs were injured by their reliance on the promises of Moti, Edit, Lugano and Does 1-25 in the amount of the $12,430,000 Plaintiffs transferred to Lugano but for which Moti, Edit, Lugano and Does 1-25 have failed and refused to repay despite their many promises to repay the amount plus a share in projected profits.

126. Injustice can only be avoided by enforcing the promises made by Moti, Edit, Lugano and Does 1-25.

127. Plaintiffs are entitled to damages in an amount to be proven at trial, but no less than $12,430,000, or, in the alternative, any other equitable relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION

### MONEY HAD AND RECEIVED

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Tom Ferder, Lugano Diamonds & Jewelry, Inc. and Does 1-25)**

128. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129. Defendants Moti, Edit, Tom, Lugano and Does 1-25 received money that was intended to be used for the benefit of Plaintiffs. More particularly, Lugano and Moti received wire transfers from Plaintiffs totaling $12,430,000 for the capital investments associated with the Joint Venture Agreements

29

COMPLAINT

(*i.e.*, Exhibits A–N). Moti, Edit, Tom, Lugano and Does 1-25 were obligated to return that money to Plaintiffs, along with the associated projected profits from the joint ventures.

130.    That money was not used for the benefit of Plaintiffs.

131.    Moti, Edit, Tom, Lugano and Does 1-25 have not given the money to Plaintiffs. In equity and good conscious, Moti, Edit, Tom, Lugano and Does 1-25 should return the money to Plaintiffs. By retaining the money owed to Plaintiffs, defendants Moti, Edit, Tom, Lugano and Does 1-25, and each of them, is unjustly enriched in the amount of $12,430,000 plus profits earned because this money belongs to Plaintiffs under contract and under the principles of equity.

## EIGHTH CAUSE OF ACTION

## UNJUST ENRICHMENT

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Tom Ferder, Lugano Diamonds & Jewelry, Inc. and Does 1-25)**

132.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

133.    Moti, Edit, Tom, Lugano and Does 1-25 received a benefit. Specifically, Moti, Edit, Tom, Lugano and Does 1-25 received wire transfers of $12,430,000 from Plaintiffs meant for capital investments in joint ventures created by Moti, Edit, Tom, Lugano and Does 1-25 and Plaintiffs pursuant to agreements.

134.    Moti, Edit, Tom, Lugano and Does 1-25 have retained the benefit and failed and refused to return any benefit to Plaintiffs. More particularly, bank accounts held by Moti, Edit, Tom, Lugano and Does 1-25 received wires from Plaintiffs totaling $12,430,000, all of which was meant to be capital investments in joint ventures for the benefit of Plaintiffs and Lugano.

135.    The benefit received by Moti, Edit, Tom, Lugano and Does 1-25 came at the expense of Plaintiffs. Indeed, the money came directly out of Plaintiffs' accounts and was wired into Lugano's accounts, and Moti, Edit, Tom, Lugano and Does 1-25 were to return the capital investment to Plaintiffs plus a portion of the profits earned from those capital investments supplied by Plaintiffs.

136.    In equity and good conscious, Moti, Edit, Tom, Lugano and Does 1-25 should return the money to Plaintiffs. By retaining the money owed to Plaintiffs, defendants Moti, Edit, Tom, Lugano and

COMPLAINT

Does 1-25, and each of them, is unjustly enriched in the amount of $12,430,000 plus profits earned because this money belongs to Plaintiffs under contract and under the principles of equity.

## NINTH CAUSE OF ACTION

### QUANTUM MERUIT

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Tom Ferder, Lugano Diamonds & Jewelry, Inc. and Does 1-25)**

137.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

138.    Defendants Moti, Edit, Tom, Lugano and Does 1-25 requested by words or conduct, including in writing in the Joint Venture Agreements, that Plaintiff deliver capital investments to Lugano for the benefit of the joint venture, including Moti, Edit, Tom, Lugano and Does 1-25.

139.    Plaintiffs delivered the requested capital investments.

140.    Moti, Edit, Tom, Lugano and Does 1-25 have not paid Plaintiffs for the value of the capital investments.

141.    The reasonable value of the capital investments Plaintiffs delivered to Moti, Edit, Tom, Lugano and Does 1-25 is $12,430,000. It would be unjust and inequitable for Moti, Edit, Tom, Lugano and Does 1-25 to retain the value of the capital investments provided by Plaintiffs, and Moti, Edit, Tom, Lugano and Does 1-25 should in equity and good conscious be ordered to repay Plaintiffs the full amount.

## TENTH CAUSE OF ACTION

### VIOLATION OF UNIFORM VOIDABLE TRANSFER ACT –

### CIV. CODE SECTION 3439 *ET SEQ.*

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Serenade Newport, LLC, Sahand Zargari, Luxe Maison Properties, Inc. Dba Daftarian Group, Lili Daftarian, Payman Paul Daftarian, Jacob Wolf, and Does 15-30 and 35-50)**

142.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

31

COMPLAINT

143.    Civil Code Section 3439.04(a)(1) provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor … if the debtor made the transfer or incurred the obligation … [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor."

144.    Plaintiffs have a right to payment from Moti, individually and as Trustee of the Haim Family Trust, and from Edit for $12,430,000, related to the personal guarantees under the Joint Venture Agreements, and to the expected claims against Moti, individually and as Trustee of the Haim Family Trust, and Edit for their fraudulent conduct described in the paragraphs above.

145.    Defendants Moti, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, and each of them, violated Civil Code section 3439.04(a)(1), inasmuch as Moti, individually and as Trustee of the Haim Family Trust, and Edit transferred the Serenade Property to Serenade Newport, LLC, an insider on information and belief owned or operated for the benefit of Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, at a time when Moti and Edit had been threatened with Plaintiffs' lawsuit.

146.    Plaintiffs are informed and believe, and thereon allege, that Moti, individually and as Trustee of the Haim Family Trust, and Edit transferred the Serenade Property to Serenade Newport, LLC with the intent to hinder, delay, or defraud one or more of their creditors. More particularly, Plaintiffs are informed and believe, and thereon allege, that Moti, individually and as Trustee of the Haim Family Trust, and Edit intended to remove or conceal assets, including the Serenade Property, to make it more difficult for their creditors (including Plaintiffs) to collect payment from them.

147.    Plaintiffs are further informed and believe, and thereon allege, that Moti, individually and as Trustee of the Haim Family Trust, and Edit retained use and control of the Serenade Property after the transfer and that reasonably equivalent value was not paid for the Serenade Property. Indeed, Plaintiffs are informed and believe, and thereon allege, that Serenade Newport, LLC buying the Serenade Property for $7 million and then listing it for sale nine days later, for almost $9 million, shows that Moti, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50 knew the $7 million sale was not for reasonably equivalent value.

148.    At the time of the June 18, 2025 sale of the Serenade Property, Moti, individually and as the Trustee of the Haim Family Trust, was obligated to pay Plaintiffs in excess of $12,430,000 and that

32

COMPLAINT

judgment on that debt was imminent. As a result of the transfer, Moti, individually and as Trustee of the Haim Family Trust, were left with insufficient assets to satisfy the debt and judgment.

149. The Serenade Property was one of the principal assets of Moti, individually and as Trustee of the Haim Family Trust, and Edit.

150. Plaintiffs were harmed.

151. The conduct of Moti, individually and as Trustee of the Haim Family Trust, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50 was a substantial factor in causing Plaintiffs' harm.

152. Serenade Newport, LLC, who accepted title to the Serenade Property at issue in exchange for $7 million, and those it is owned by and operated for the benefit of, including Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, were aware the purpose of the transfer was to prevent creditors from levying on the Serenade Property to satisfy the debts of Moti, individually and as Trustee of the Haim Family Trust, and Edit.

153. As a result of the foregoing, Plaintiffs are entitled to the remedies set forth in Civil Code section 3439.07, including an order setting aside the transfer of the Serenade Property from Mordechai Ferder as Trustee of the Haim Family Trust, to Serenade Newport, LLC or allowing the judgment to be recoverable against Moti, individually and as Trustee of the Haim Family Trust, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, and each of them.

**ELEVENTH CAUSE OF ACTION**

**COMMON LAW FRAUDULENT TRANSFER**

**(All Plaintiffs Against Defendants Mordechai Ferder (individually and as Trustee of the Haim Family Trust), Edit Ferder, Serenade Newport, LLC, Sahand Zargari, Luxe Maison Properties, Inc. dba Daftarian Group, Lili Daftarian, Payman Paul Daftarian, Jacob Wolf, and Does 15-30 and 35-50)**

154. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

155. Defendants Moti, individually and as Trustee of the Haim Family Trust, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, and each of them

33

COMPLAINT

engaged in a fraudulent transfer by transferring the Serenade Property from Mordechai Ferder, Trustee of the Haim Family Trust, to Serenade Newport, LLC, an insider on information and belief owned or operated for the benefit of Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, at a time when Moti and Edit had been threatened with Plaintiffs' lawsuit.

156.   Defendants Moti and Edit retained use and control of the Serenade Property after the transfer and that reasonably equivalent value was not paid for the Serenade Property. Indeed, Plaintiffs are informed and believe, and thereon allege, that Serenade Newport, LLC buying the Serenade Property for $7 million and then listing it for sale nine days later, for almost $9 million, shows that Moti, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50 knew the $7 million sale was not for reasonably equivalent value.

157.   At the time of the June 18, 2025 sale of the Serenade Property, Moti, individually and as the Trustee of the Haim Family Trust, was obligated to pay Plaintiffs in excess of $12,430,000 and that judgment on that debt was imminent. As a result of the transfer, Moti, individually and as Trustee of the Haim Family Trust, were left with insufficient assets to satisfy the debt and judgment.

158.   The Serenade Property was one of the principal assets of Moti, individually and as Trustee of the Haim Family Trust, and Edit.

159.   Plaintiffs are informed and believe, and thereon allege, that Moti, individually and as Trustee of the Haim Family Trust, and Edit transferred the Serenade Property to Serenade Newport, LLC with the intent to hinder, delay, or defraud one or more of their creditors. More particularly, Plaintiffs are informed and believe, and thereon allege, that Moti, individually and as Trustee of the Haim Family Trust, and Edit intended to remove or conceal assets, including the Serenade Property, to make it more difficult for their creditors (including Plaintiffs) to collect payment from them.

160.   Serenade Newport, LLC, who accepted title to the Serenade Property at issue in exchange for $7 million and those it is owned by and operated for the benefit of, including Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50, were aware the purpose of the transfer was to prevent creditors from levying on the Serenade Property to satisfy the debts of Moti, individually and as Trustee of the Haim Family Trust, and Edit.

161.   Plaintiffs were harmed.

34
COMPLAINT

162.    The conduct of defendants Moti individually and as Trustee of the Haim Family Trust, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50 was a substantial factor in causing Plaintiffs' harm.

163.    As a result of the foregoing, Plaintiffs are entitled to avoidance of the transfer of the Serenade Property from Mordechai Ferder, Trustee of the Haim Family Trust, to Serenade Newport, LLC, in the alternative, monetary recover from Moti, individually and as Trustee of the Haim Family Trust, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50 sufficient to satisfy the debts owed to Plaintiffs by Moti, individually and as Trustee of the Haim Family Trust, and Edit.

164.    The acts of defendants Moti, individually and as Trustee of the Haim Family Trust, Edit, Serenade Newport, LLC, Zargari, Daftarian Group, Lili, Paul, Wolf and Does 15-30 and 35-50 were willful and malicious in that they knew that their conduct was fraudulent and Plaintiffs are therefore entitled to punitive damages.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

1.  Compensatory damages in an amount to be determined in accordance with proof at trial of at least $12,430,000.00;

2.  Special damages in an amount to be proven at trial;

3.  Punitive damages;

4.  Treble damages, jointly and severally against Defendants, and each of them, under Penal Code section 496;

5.  Reasonable attorneys' fees and costs of suit, jointly and severally against Defendants, and each of them, under Penal Code 496;

6.  Reasonable attorneys' fees by contract;

7.  A declaration that the transfer of the Serenade Property from Mordechai Ferder, Trustee of the Haim Family Trust, to Serenade Newport, LLC is void and will be set aside;

8.  A right of attachment or provisional remedy against the Serenade Property or other property of Moti, individually and as Trustee of the Haim Family Trust, and Edit;

COMPLAINT

9.  Injunctive relief;

10. Pre-judgment and post-judgment interest as allowed by law; and

11. For such other and further relief as the Court may deem just and proper.

Dated:  July 9, 2025                                    **ENENSTEIN PHAM GLASS & RABBAT LLP**


                                            By: _____
                                                    Darren S. Enenstein
                                                    Attorney for Plaintiffs Avina LLC and Global
                                                    Innovations, LLC

COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs Avina LLC and Global Innovations, LLC hereby demand a trial by jury of all matters triable by jury.

Dated:  July 9, 2025                                    **ENENSTEIN PHAM GLASS & RABBAT LLP**


By: _____
　　　　Darren S. Enenstein
　　　　Attorney for Plaintiffs Avina LLC and Global
　　　　Innovations, LLC

37
COMPLAINT

# Exhibit A

# SECURED PROMISSORY NOTE 09052024

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $900,000.00

Note Date: September 5, 2024

Maturity Date: December 5, 2024

Annual Interest rate: 0.0%

Profit Share: $270,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $900,000.00 together with accrued interest and/or profit share of $270,000.00 on the unpaid principal, to total $1,170,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 6214960084 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.

 "Maker"


 Lugano Diamonds

Moti Ferder – President


Date    9/5/2024 _____

---

Notes:

Docusign Envelope ID: E13A4D23-5F5B-4C7E-87D6-192DA55E5C34

## PERSONAL GUARANTY OF PROMISSORY NOTE 09052024

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of September 05, 2024, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in <u>Paragraph 9</u> hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 09052024, in the amount of $900,000.00 dated September 5, 2024 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note.  So long as any of Guarantor' obligations hereunder


Initial

Docusign Envelope ID: E13A4D23-5F5B-4C7E-87D6-192DA55E5C34

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.　　　Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.　　　The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.　　　Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.　　　With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.　　　The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been



Docusign Envelope ID: E13A4D23-5F5B-4C7E-87D6-192DA55E5C34

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.     Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:     Moti Ferder

1501 Serenade Terrace

Corona Del Mar, CA 92625

To Lender:     Avina, LLC
22704 Ventura Blvd., #218
Woodland Hills, California 91364
Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)     No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)     The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.



Docusign Envelope ID: E13A4D23-5F5B-4C7E-87D6-192DA55E5C34

11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without


Initial

Docusign Envelope ID: E13A4D23-5F5B-4C7E-87D6-192DA55E5C34

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.


**"GUARANTOR(S)"**

Signed by:

_____
CEC0434D5C3C435...
Moti Ferder, an individual

9/5/2024



GIA REPORT
6214960084

Verify this report at GIA.edu

FACSIMILE

This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.

## GIA NATURAL COLORED DIAMOND REPORT

August 08, 2022

Report Type .................................... **Grading Report**
GIA Report Number .......................... **6214960084**
Shape and Cutting Style ......... **Cut-Cornered Rectangular Modified Brilliant**
Measurements ......................... **15.70 x 13.22 x 8.73 mm**

Carat Weight ................................... **15.56 carat**
Color Grade ..................................... **Light Pink**
Color Origin ..................................... **Natural**
Color Distribution ........................ **Not Applicable**
Clarity Grade ................................... **VVS1**

Proportions:



55%
slightly thick - thick (polished)
66.0%
none

Profile not to actual proportions

Polish .............................................. **Excellent**
Symmetry ....................................... **Very Good**
Fluorescence ................................. **Faint**
Inscription(s): GIA 6214960084

**Comments:** Clarity grade is based on internal graining that is not shown.

## ADDITIONAL INFORMATION

GIA COLORED DIAMOND SCALE



Illustration of GIA fancy color grade interrelationships

GIA CLARITY SCALE

FLAWLESS
INTERNALLY FLAWLESS
VVS₁
VVS₂
VS₁
VS₂
SI₁
SI₂
I₁
I₂
I₃

CLARITY CHARACTERISTICS



Image is approximate





reportcheck.gia.edu

The results documented in this report reflect only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee of valuation. For additional information and important limitations and disclaimers, please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500. © 2021 Gemological Institute of America Inc.

GIA.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Thursday, September 5, 2024 at 12:20:41 PM Pacific Daylight Time

**From:** wireconfirmation@banksocal.com <wireconfirmation@banksocal.com>

**To:** aviw@businessmax.com <aviw@businessmax.com>

## WIRE TRANSFER ADVICE OF DEBIT

ON SEPTEMBER 05, 2024, WE DEBITED YOUR ACCOUNT \*\*\*\*\*\*1694 FOR USD 900,000.00

## DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 05-SEP-2024 14:19:01 CT |
| PAID AMOUNT: | USD 900,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202409050106736 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20240905/MMQFMP6D/000093/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20240905/B6B7HU4R/017473/ |
| REFERENCE: | 3962171967 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | \*\*\*\*\*\*6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | \*\*\*\*\*\*1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 09052024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202409050106736.

# Exhibit B

# SECURED PROMISSORY NOTE 09062024

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $900,000.00

Note Date: September 6, 2024

Maturity Date: December 20, 2024

Annual Interest rate: 0.0%

Projected Profit Share: $315,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $900,000.00 together with accrued interest and/or profit share of $315,000.00 on the unpaid principal, to total $1,215,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2235251009 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.

"Maker"

Lugano Diamonds

Signed by:

CEC0434D5C3C435

Moti Ferder – President

Date  9/6/2024

Notes:

Docusign Envelope ID: 4AE2226B-5C4F-4586-8BA7-13B762A628DD

## PERSONAL GUARANTY OF PROMISSORY NOTE 09062024

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this **"Guaranty"**) is made as of September 06, 2024, by Moti Ferder, an individual, (individually, a **"Guarantor"**), whose addresses are set forth in <u>Paragraph 9</u> hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 09062024, in the amount of $900,000.00 dated September 6, 2024 (the **"Note"**); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the **"Obligations"**), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder



Docusign Envelope ID: 4AE2226B-5C4F-4586-8BA7-13B762A628DD

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.    Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.    The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.    Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.    With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.    The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been


Initial

Docusign Envelope ID: 4AE2226B-5C4F-4586-8BA7-13B762A628DD

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10. Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:    Moti Ferder

1501 Serenade Terrace

Corona Del Mar, CA 92625

To Lender:    Avina, LLC
22704 Ventura Blvd., #218
Woodland Hills, California 91364
Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a) No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b) The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.



Docusign Envelope ID: 4AE2226B-5C4F-4586-8BA7-13B762A628DD

11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Docusign Envelope ID: 4AE2226B-5C4F-4586-8BA7-13B762A628DD

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.


**"GUARANTOR(S)"**

Signed by:

Moti Ferder, an individual

9/6/2024

 GIA®

GIA REPORT
2235251009

Verify this report at GIA.edu

**FACSIMILE**

This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.

## GIA NATURAL DIAMOND GRADING REPORT

April 15, 2024
GIA Report Number .............................. 2235251009
Shape and Cutting Style ......................... Emerald Cut
Measurements ........................ 15.08 x 10.65 x 6.69 mm

## GRADING RESULTS

Carat Weight ........................................ 10.09 carat
Color Grade .................................................... D
Clarity Grade ......................................... Flawless

## ADDITIONAL GRADING INFORMATION

Polish .......................................................... Excellent
Symmetry .................................................... Excellent
Fluorescence ..................................................... None
Inscription(s): GIA 2235251009

## PROPORTIONS



63%

medium - slightly thick (polished)

62.8%

Profile not to actual proportions

## CLARITY CHARACTERISTICS



## GRADING SCALES

| GIA COLOR SCALE | GIA CLARITY SCALE |
|---|---|
| D | |
| E | FLAWLESS |
| F | |
| G | INTERNALLY FLAWLESS |
| H | |
| I | VVS₁ |
| J | VVS₂ |
| K | |
| L | VS₁ |
| M | |
| N | VS₂ |
| O | |
| P | SI₁ |
| Q | |
| R | SI₂ |
| S | |
| T | I₁ |
| U | |
| V | I₂ |
| W | |
| X | I₃ |
| Y | |
| Z | |




reportcheck.gia.edu

The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee or valuation. For additional information and important limitations and disclaimers, please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500. ©2023 Gemological Institute of America Inc.



GIA.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Friday, September 6, 2024 at 2:01:21 PM Pacific Daylight Time

**From:** wireconfirmation@banksocal.com <wireconfirmation@banksocal.com>

**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

## WIRE TRANSFER ADVICE OF DEBIT

ON SEPTEMBER 06, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 900,000.00

## DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 06-SEP-2024 16:00:01 CT |
| PAID AMOUNT: | USD 900,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202409060145572 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20240906/MMQFMP6D/000102/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20240906/B6B7HU4R/019512/ |
| REFERENCE: | 2680291604 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 09062024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202409060145572.

# Exhibit C

# SECURED PROMISSORY NOTE 10092024

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.


Principal Amount: $800,000.00

Note Date: October 9, 2024

Maturity Date: November 27, 2024


Annual Interest rate: 0.0%

Profit Share: $140,000.00


Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $800,000.00 together with accrued interest and/or profit share of $140,000.00 on the unpaid principal, to total $940,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2231333231 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC8434B5C3C435

Moti Ferder – President


Date  10/10/2024

_____

Notes:

Docusign Envelope ID: C454385E-8832-49A3-8401-0F20C3F8263C

## PERSONAL GUARANTY OF PROMISSORY NOTE 10092024

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of October 9, 2024, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 10092024, in the amount $800,000.00 dated October 9, 2024 (the "**Note**"); and

10092024

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder


Initial

Docusign Envelope ID: C454385E-8832-49A3-8401-0F20C3F8263C

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.    Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.    The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.    Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.    With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.    The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been



Docusign Envelope ID: C454385E-8832-49A3-8401-0F20C3F8263C

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.     Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:      Moti Ferder

1501 Serenade Terrace

Corona Del Mar, CA 92625

To Lender:      Avina, LLC
22704 Ventura Blvd., #218
Woodland Hills, California 91364
Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)     No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)     The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.



Docusign Envelope ID: C454385E-8832-49A3-8401-0F20C3F8263C

11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without


Initial

Docusign Envelope ID: C454385E-8832-49A3-8401-0F20C3F8263C

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.

**"GUARANTOR(S)"**

Signed by:

_____
Moti Ferder, an individual

10/10/2024



GIA REPORT
5221795816

Verify this report at GIA.edu

FACSIMILE

This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.

## GIA NATURAL COLORED DIAMOND REPORT

### ADDITIONAL INFORMATION

March 03, 2023

Report Type ..................................Grading Report
GIA Report Number ............................ 5221795816
Shape and Cutting Style ..Cut-Cornered Square Step Cut
Measurements ......................... 12.10 x 12.03 x 8.25 mm

Carat Weight ..................................... 10.87 carat
Color Grade ........................... Fancy Vivid Yellow
Color Origin ....................................... Natural
Color Distribution ................................... Even
Clarity Grade ......................................... VS2
Proportions:



67%

thick
(polished)

68.6%

Profile not to actual proportions

Polish ............................................ Excellent
Symmetry ......................................... Excellent
Fluorescence ......................................... None
Inscription(s): GIA 5221795816

**GIA COLORED DIAMOND SCALE**



Illustration of GIA fancy color grade interrelationships

**GIA CLARITY SCALE**

FLAWLESS
INTERNALLY FLAWLESS
VVS₁
VVS₂
VS₁
VS₂
SI₁
SI₂
I₁
I₂
I₃

**CLARITY CHARACTERISTICS**



**KEY TO SYMBOLS***

Cloud
Feather

* Red symbols denote internal characteristics (inclusions). Green or black symbols denote external characteristics (blemishes). Diagram is an approximate representation of the diamond, and symbols shown indicate type, position, and approximate size of clarity characteristics. All clarity characteristics may not be shown. Details of finish are not shown.

The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee or valuation. For additional information and important limitations and disclaimers please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500. ©2023 Gemological Institute of America, Inc.

reportcheck.gia.edu

 

THE SECURITY FEATURES ON THIS DOCUMENT INCLUDING THE HOLOGRAM SECURITY SCREEN AND MICROPRINT LINES, IN ADDITION TO THOSE NOT LISTED, EXCEED CURRENT SECURITY INDUSTRY GUIDELINES.

GIA.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL
**Date:** Wednesday, October 9, 2024 at 1:22:26 PM Pacific Daylight Time
**From:** wireconfirmation@bankcbc.com <wireconfirmation@bankcbc.com>
**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

### WIRE TRANSFER ADVICE OF DEBIT

ON OCTOBER 09, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 800,000.00

### DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 09-OCT-2024 15:21:07 CT |
| PAID AMOUNT: | USD 800,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202410090106981 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20241009/MMQFMP6D/000188/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20241009/B6B7HU4R/016258/ |
| REFERENCE: | 832444280 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 10092024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202410090106981.

# Exhibit D

# SECURED PROMISSORY NOTE 09052024

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $900,000.00

Note Date: September 5, 2024

Maturity Date: December 5, 2024       Revised Maturity: March 5, 2025

Annual Interest rate: 0.0%

Profit Share: $270,000.00        Revised Profit share: $270,000

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $900,000.00 together with accrued interest and/or profit share of $270,000.00 on the unpaid principal, to total $1,170,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 6214960084 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC8434D5C3C435...

Moti Ferder – President


Date ___9/5/2024___


Notes:

# Exhibit E

# SECURED PROMISSORY NOTE 10092024

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $800,000.00

Note Date: October 9, 2024

Maturity Date: November 27, 2024    Revised Maturity: Feb 25, 2025


Initial

Annual Interest rate: 0.0%

Profit Share: $140,000.00    Revised profit share: $240,000

Initial

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $800,000.00 together with accrued interest and/or profit share of $140,000.00 on the unpaid principal, to total $940,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2231333231 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC0434B5C3C435

Moti Ferder – President


Date  10/10/2024

_____

Notes:

# Exhibit F

## SECURED PROMISSORY NOTE 01222025 (FMR-11152024)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.


Principal Amount: $2,000,000.00

Note Date: Jan 22, 202

Maturity Date: February 19, 2025


Annual Interest rate: 0.0%

Profit Share: $200,000.00


Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $2,000,000.00 together with accrued interest and/or profit share of $200,000.00 on the unpaid principal, to total $2,200,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

MF

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2191463494 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.

 "Maker"


 Lugano Diamonds

Signed by:

*Moti Ferder*

CEC0434D5C3C435...

Moti Ferder – President


Date 1/22/2025

Notes:

Docusign Envelope ID: 1560F5ED-BDB2-4882-AF68-1ED0639AE2E2

## PERSONAL GUARANTY OF PROMISSORY NOTE 01222025 (FMR 11152024)

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of January 22, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 01222025, in the amount $2,000,000.00 dated January 22, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder

Initial
MF

Docusign Envelope ID: 1560F5ED-BDB2-4882-AF68-1ED0639AE2E2

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.      The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been

Initial

MF

Docusign Envelope ID: 1560F5ED-BDB2-4882-AF68-1ED0639AE2E2

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.     Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

> To Guarantor:     Moti Ferder
>
> 1501 Serenade Terrace
>
> Corona Del Mar, CA 92625
>
> To Lender:     Avina, LLC
> 22704 Ventura Blvd., #218
> Woodland Hills, California 91364
> Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)     No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)     The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

Initial

MF

Docusign Envelope ID: 1560F5ED-BDB2-4882-AF68-1ED0639AE2E2

11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Initial

MF

Docusign Envelope ID: 1560F5ED-BDB2-4882-AF68-1ED0639AE2E2

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.


**"GUARANTOR(S)"**

Signed by:

*Moti Ferder*

CE0043405C3C435

Moti Ferder, an individual


1/22/2025



## GIA®

FACSIMILE

GIA REPORT
2191463494

### GIA COLORED DIAMOND REPORT

August 22, 2018

Report Type ..............................................Grading Report
GIA Report Number ...........................2191463494
Shape and Cutting Style . **Cut-Cornered Square Modified Brilliant**
Measurements .....................11.45 x 10.93 x 6.99 mm

Carat Weight ....................................8.03 carat
Color Grade ...........................Fancy Vivid Pink
Color Origin .................................Natural
Color Distribution .................................Even
Clarity Grade ...............................VS1

Proportions:

Polish ................................................Excellent
Symmetry ........................................Very Good
Fluorescence .....................................None
Inscription(s): GIA 2191463494

### ADDITIONAL INFORMATION

GIA COLORED DIAMOND SCALE

GIA CLARITY SCALE

Illustration of GIA fancy color grade interrelationships

CLARITY CHARACTERISTICS

KEY TO SYMBOLS
Feather
^ Extra Facet

www.gia.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL
**Date:** Friday, November 15, 2024 at 2:51:54 PM Pacific Standard Time
**From:** wireconfirmation@bankcbc.com <wireconfirmation@bankcbc.com>
**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

## WIRE TRANSFER ADVICE OF DEBIT

ON NOVEMBER 15, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 2,000,000.00

### DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 15-NOV-2024 16:51:01 CT |
| PAID AMOUNT: | USD 2,000,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202411150169644 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20241115/MMQFMP6D/000246/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20241115/B6B7HU1R/020914/ |
| REFERENCE: | 3253140033 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 11152024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202411150169644.

# Exhibit G

# SECURED PROMISSORY NOTE 09062024

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $900,000.00

Note Date: September 6, 2024

Maturity Date: December 20, 2024        Revised Maturity Date: March 24, 2025

Annual Interest rate: 0.0%

Projected Profit Share: $315,000.00        Revised projected profit: $180,000.00

1/28/2025

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $900,000.00 together with accrued interest and/or profit share of $315,000.00 on the unpaid principal, to total $1,215,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Security. This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2235251009 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns. The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto. This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release. After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law. This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Moti Ferder – President


Date 9/6/2024


Notes:

# Exhibit H

## SECURED PROMISSORY NOTE 01312025 (FMR 10042024-2)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $1,430,000.00

Note Date: January 31, 2025

Maturity Date: March 28, 2025

Annual Interest rate: 0.0%

Profit Share Projected: $330,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $1,430,000.00 together with accrued interest and/or profit share of $286,000.00 on the unpaid principal, to total $1,716,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2231333231 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.

"Maker"

Lugano Diamonds

Signed by:

CEC0434D5C3C435...

Moti Ferder – President

Date  1/30/2025

Notes:

## PERSONAL GUARANTY OF PROMISSORY NOTE 01312025

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of January 31, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 01312025, in the amount $1,430,000.00 dated January 31, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder

Initial

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5. Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6. The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7. Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8. With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9. The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been

Initial

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10. Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

> To Guarantor: Moti Ferder
>
> 1501 Serenade Terrace
>
> Corona Del Mar, CA 92625
>
> To Lender: Avina, LLC
> 22704 Ventura Blvd., #218
> Woodland Hills, California 91364
> Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a) No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b) The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.



Initial

11.     The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12.     This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13.     In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14.     This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15.     Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16.     This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17.     No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18.     This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19.     The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20.     Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Initial

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.


**"GUARANTOR(S)"**

Signed by:

CEC0434D5C3C435...
Moti Ferder, an individual


1/30/2025



GIA REPORT
2231333231

Verify this report at GIA.edu

FACSIMILE

This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.

## GIA NATURAL DIAMOND GRADING REPORT

July 02, 2024
GIA Report Number ............................... 2231333231
Shape and Cutting Style ....... **Cut-Cornered Rectangular Modified Brilliant**
Measurements ........................ **15.77 x 11.03 x 6.98 mm**

### GRADING RESULTS

Carat Weight ............................. **10.31 carat**
Color Grade ...................................... **D**
Clarity Grade ............................. **Flawless**

### ADDITIONAL GRADING INFORMATION

Polish ................................................... **Excellent**
Symmetry ............................................ **Excellent**
Fluorescence ....................................... **None**
Inscription(s): GIA 2231333231

### PROPORTIONS



thick
-
very
thick
(polished)

68%

63.3%

Profile not to actual proportions

### CLARITY CHARACTERISTICS



### GRADING SCALES



| GIA COLOR SCALE | GIA CLARITY SCALE |
|---|---|
| D | |
| E | FLAWLESS |
| F | |
| G | INTERNALLY FLAWLESS |
| H | VVS₁ |
| I | |
| J | VVS₂ |
| K | |
| L | VS₁ |
| M | |
| N | VS₂ |
| O | |
| P | SI₁ |
| Q | |
| R | SI₂ |
| S | |
| T | I₁ |
| U | |
| V | I₂ |
| W | |
| X | I₃ |
| Y | |
| Z | |





reportcheck.gia.edu

The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee or valuation. For added value information and important limitations and disclaimers, please see GIA procedures or call +1 800 421 7250 or +1 760 603 4500. © 2020 Gemological Institute of America, Inc.

GIA.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Friday, January 31, 2025 at 8:50:54 AM Pacific Standard Time

**From:** wireconfirmation@bankcbc.com <wireconfirmation@bankcbc.com>

**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

## WIRE TRANSFER ADVICE OF DEBIT

ON JANUARY 31, 2025, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 1,430,000.00

## DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 31-JAN-2025 10:49:45 CT |
| PAID AMOUNT: | USD 1,430,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202501310061371 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20250131/MMQFMP6D/000068/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20250131/B6B7HU4R/011557/ |
| REFERENCE: | 1806581211 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | AVINA LLC REF 01312025 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202501310061371.

# Exhibit I

## SECURED PROMISSORY NOTE 02052025 (FMR-06132024)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $1,100,000.00

Note Date: February 5, 2025

Maturity Date: April 4, 2025

Annual Interest rate: 0.0%

Profit Share Projected: $220,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $1,100,000.00 together with accrued interest and/or profit share of $220,000.00 on the unpaid principal, to total $1,320,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2221287133 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC0434D5C3C435

Moti Ferder – President


Date 2/5/2025

Notes:

Docusign Envelope ID: FA26F12D-0483-4D79-A1C0-FB388650725A

## PERSONAL GUARANTY OF PROMISSORY NOTE 02052025 (FMR 06132024)

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of February 5, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 02052025, in the amount $1,100,000.00 dated February 5, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder



Docusign Envelope ID: FA26F12D-0483-4D79-A1C0-FB388650725A

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.      The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been



Docusign Envelope ID: FA26F12D-0483-4D79-A1C0-FB388650725A

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

| To Guarantor: | Moti Ferder |
| | 1501 Serenade Terrace |
| | Corona Del Mar, CA 92625 |
| To Lender: | Avina, LLC |
| | 22704 Ventura Blvd., #218 |
| | Woodland Hills, California 91364 |
| | Attn: Avi Wazana |

Each Guarantor represents and warrants to Lender as follows:

(a)    No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

Initial

Docusign Envelope ID: FA26F12D-0483-4D79-A1C0-FB388650725A

11.     The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12.     This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed.  As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13.     In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14.     This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15.     Every provision of this Guaranty is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16.     This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page.  Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17.     No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18.     This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof.  No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19.     The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20.     Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without


Initial

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.


**"GUARANTOR(S)"**

Signed by:

CEC0434D5C3C435

Moti Ferder, an individual

2/5/2025



## GIA

### GIA NATURAL DIAMOND GRADING REPORT

February 23, 2022
GIA Report Number ................................ 2221287133
Shape and Cutting Style .......................... Emerald Cut
Measurements ........................... 17.01 x 11.78 x 7.37 mm

### GRADING RESULTS

Carat Weight ........................................ 14.27 carat
Color Grade ................................................... D
Clarity Grade ............................................. VVS1

### ADDITIONAL GRADING INFORMATION

Polish ................................................. Excellent
Symmetry .............................................. Excellent
Fluorescence ............................................. None
Inscription(s): GIA 2221287133
**Comments:** Clarity grade is based on internal graining that is not shown.

GIA REPORT
2221287133

Verify this report at GIA.edu

### PROPORTIONS



65%

slightly thick - thick

62.5%

Profile not to actual proportions

### CLARITY CHARACTERISTICS



FACSIMILE
This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible in this facsimile.

### GRADING SCALES



| GIA COLOR SCALE | GIA CLARITY SCALE |
|---|---|
| D | FLAWLESS |
| E | |
| F | INTERNALLY FLAWLESS |
| G | |
| H | VVS₁ |
| I | |
| J | VVS₂ |
| K | |
| L | VS₁ |
| M | |
| N | VS₂ |
| O | |
| P | SI₁ |
| Q | |
| R | SI₂ |
| S | |
| T | I₁ |
| U | |
| V | I₂ |
| W | |
| X | I₃ |
| Y | |
| Z | |





reportcheck.gia.edu

The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee or valuation. For additional information and important limitations and disclaimers, please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500 ©2021 Gemological Institute of America, Inc.



GIA.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL
**Date:**    Thursday, June 13, 2024 at 11:37:55 AM Pacific Daylight Time
**From:**    wireconfirmation@banksocal.com <wireconfirmation@banksocal.com>
**To:**      AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

## WIRE TRANSFER ADVICE OF DEBIT

ON JUNE 13, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 1,100,000.00

### DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 13-JUN-2024 13:36:41 CT |
| PAID AMOUNT: | USD 1,100,000.00 |
| OUTGOING WIRE FEE: | USD 10.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202406130091027 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20240613/MMQFMP6D/000073/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20240613/B6B7HU3R/015351/ |
| REFERENCE: | 4234104372 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 06132024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202406130091027.

# Exhibit J

# SECURED PROMISSORY NOTE 02132025 (FMR 07162024)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $1,400,000.00

Note Date: February 13, 2025

Maturity Date: April 10, 2025

Annual Interest rate: 0.0%

Projected Profit Share: $280,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $1,400,000.00 together with accrued interest and/or profit share of $280,000.00 on the unpaid principal, to total $1,680,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.



Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2125253676 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC0434D5C3C435

Moti Ferder – President


Date  2/12/2025

_____

Notes:

Docusign Envelope ID: 3B2E3DCC-34CB-470B-82F2-9D1B2AA6EE3C

## PERSONAL GUARANTY OF PROMISSORY NOTE 02132025

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of February 13, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 02132025, in the amount of $1,400,000.00 dated February 13, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note.  So long as any of Guarantor' obligations hereunder



Docusign Envelope ID: 3B2E3DCC-34CB-470B-82F2-9D1B2AA6EE3C

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.      The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been


Initial

Docusign Envelope ID: 3B2E3DCC-34CB-470B-82F2-9D1B2AA6EE3C

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:    Moti Ferder

1501 Serenade Terrace

Corona Del Mar, CA 92625

To Lender:    Avina, LLC
22704 Ventura Blvd., #218
Woodland Hills, California 91364
Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)    No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.



Docusign Envelope ID: 3B2E3DCC-34CB-470B-82F2-9D1B2AA6EE3C

11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Docusign Envelope ID: 3B2E3DCC-34CB-470B-82F2-9D1B2AA6EE3C

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.


**"GUARANTOR(S)"**

Signed by:

CEC0434D5C3C435

Moti Ferder, an individual


2/12/2025

Docusign Envelope ID: 3B2E3DCC-34CB-470B-82F2-9D1B2AA6EE3C



## GIA NATURAL COLORED DIAMOND REPORT

October 08, 2021

Report Type ............................................. Grading Report
GIA Report Number ............................... 2125253676
Shape and Cutting Style ........ Cut-Cornered Rectangular
Step Cut
Measurements ...................... 11.46 x 8.89 x 5.74 mm

Carat Weight ........................................... 5.02 carat
Color Grade ................................... Fancy Deep Blue
Color Origin ................................................. Natural
Color Distribution ......................................... Even
Clarity Grade ................................................... VS1

Proportions:



medium - thick    56%    64.6%    small

Profile not to actual proportions

Polish ..................................................... Very Good
Symmetry .............................................. Very Good
Fluorescence ................................................. None

Comments: Pinpoints are not shown.

GIA edu

GIA REPORT
2125253676

Verify this report at GIA.edu

## ADDITIONAL INFORMATION

GIA COLORED DIAMOND SCALE

GIA CLARITY SCALE

FLAWLESS
INTERNALLY FLAWLESS
VVS1
VVS2
VS1
VS2
SI1
SI2
I1
I2
I3

Illustration of GIA fancy color grade interrelationships

CLARITY CHARACTERISTICS



KEY TO SYMBOLS"
Crystal
Needle

* Red symbols denote internal characteristics (inclusions). Green or black symbols denote external characteristics (blemishes). Diagram is an approximate representation of the diamond, and symbols shown indicate type, position, and approximate size of clarity characteristics. All clarity characteristics may not be shown. Details of finish are not shown.

FACSIMILE
This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.



The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee or valuation. For additional information and important limitations and disclaimers please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500. © 2021 Gemological Institute of America, Inc.

reportcheck.gia.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:**    Thursday, February 13, 2025 at 9:47:14 AM Pacific Standard Time

**From:**    wireconfirmation@bankcbc.com <wireconfirmation@bankcbc.com>

**To:**      AVIW@BUSINESSMAX.COM <aviw@businessmax.com>

## WIRE TRANSFER ADVICE OF DEBIT

ON FEBRUARY 13, 2025, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 1,400,000.00

## DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 13-FEB-2025 11:45:52 CT |
| PAID AMOUNT: | USD 1,400,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202502130045657 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20250213/MMQFMP6D/000070/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20250213/B6B7HU1R/011370/ |
| REFERENCE: | 1404633555 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVETSMENTS |
| | AVINA LLC REF 02132025 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202502130045657.

# Exhibit K

## SECURED PROMISSORY NOTE 02192025 (FMR 07052024-2)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.


Principal Amount: $1,100,000.00

Note Date: February 19, 2025

Maturity Date: May 16, 2025


Annual Interest rate: 0.0%

Profit Share: $330,000.00


Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $1,100,000.00 together with accrued interest and/or profit share of $330,000.00 on the unpaid principal, to total $1,430,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.



Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 5234191310 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC0434D5C3C435

Moti Ferder – President


Date 2/19/2025

---

Notes:

Docusign Envelope ID: EA4AB171-2D27-4040-955B-7D84A3DD385D

## <u>PERSONAL GUARANTY OF PROMISSORY NOTE 02192025 (FMR 07052024-2)</u>

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of February 19, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in <u>Paragraph 9</u> hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 02192025, in the amount of S1,100,000.00 dated February 19, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1. It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2. This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3. Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4. Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder


Initial

Docusign Envelope ID: EA4AB171-2D27-4040-955B-7D84A3DD385D

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.      The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been


Initial

Docusign Envelope ID: EA4AB171-2D27-4040-955B-7D84A3DD385D

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.     Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

> To Guarantor:     Moti Ferder
>
> 1501 Serenade Terrace
>
> Corona Del Mar, CA 92625
>
> To Lender:     Avina, LLC
> 22704 Ventura Blvd., #218
> Woodland Hills, California 91364
> Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)     No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)     The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.


Initial

Docusign Envelope ID: EA4AB171-2D27-4040-955B-7D84A3DD385D

11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Initial



Docusign Envelope ID: EA4AB171-2D27-4040-955B-7D84A3DD385D

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.

**"GUARANTOR(S)"**

Moti Ferder, an individual

2/19/2025

 **GIA®**

## GIA NATURAL DIAMOND GRADING REPORT

February 12, 2024

GIA Report Number ..................................... 5234191310
Shape and Cutting Style .......................... Round Brilliant
Measurements .......................... 13.89 - 13.91 x 8.58 mm

## GRADING RESULTS

Carat Weight ........................................... 10.17 carat
Color Grade ................................................ D
Clarity Grade ........................................... Flawless
Cut Grade ................................................ Excellent

## ADDITIONAL GRADING INFORMATION

Polish .................................................... Excellent
Symmetry ................................................ Excellent
Fluorescence ............................................. None
Inscription(s): GIA 5234191310

### GIA REPORT
### 5234191310

Verify this report at GIA.edu

## PROPORTIONS



Profile to actual proportions

## CLARITY CHARACTERISTICS



**FACSIMILE**

This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.

## GRADING SCALES

| GIA COLOR SCALE | GIA CLARITY SCALE | GIA CUT SCALE |
|---|---|---|
| D | FLAWLESS | EXCELLENT |
| E | | |
| F | INTERNALLY FLAWLESS | |
| G | | |
| H | VVS₁ | |
| I | VVS₂ | VERY GOOD |
| J | | |
| K | | |
| L | VS₁ | |
| M | | |
| N | VS₂ | GOOD |
| O | | |
| P | SI₁ | |
| Q | | |
| R | SI₂ | |
| S | | FAIR |
| T | I₁ | |
| U | | |
| V | I₂ | |
| W | | POOR |
| X | I₃ | |
| Y | | |
| Z | | |



The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee of valuation. For additional information and important limitations and disclaimers, please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500. ©2023 Gemological Institute of America, Inc.


reportcheck.gia.edu


THE SECURITY FEATURES IN THIS DOCUMENT INCLUDING THE HOLOGRAM, SECURITY SCREEN AND MICROPRINT LINES (IN EARLIER TO THESE) ARE EITHER ABSENT BETWEEN SECURITY INDUSTRY GUIDELINES.

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Friday, July 5, 2024 at 10:59:50 AM Pacific Daylight Time

**From:** wireconfirmation@banksocal.com <wireconfirmation@banksocal.com>

**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

## WIRE TRANSFER ADVICE OF DEBIT

ON JULY 05, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 1,100,000.00

### DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 05-JUL-2024 12:58:33 CT |
| PAID AMOUNT: | USD 1,100,000.00 |
| OUTGOING WIRE FEE: | USD 10.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202407050078102 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20240705/MMQFMP6D/000066/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20240705/B6B7HU2R/015003/ |
| REFERENCE: | 4039210864 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 07052024 2 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202407050078102.

# Exhibit L

# SECURED PROMISSORY NOTE 03262025 (FMR 07102024)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $800,000.00

Note Date: March 26, 2025

Maturity Date: June 25, 2025

Annual Interest rate: 0.0%

Profit Share: $240,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Avina LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $800,000.00 together with accrued interest and/or profit share of $240,000.00 on the unpaid principal, to total $1,040,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.



Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2125339698 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.

 "Maker"


 Lugano Diamonds

Moti Ferder – President


Date  3/26/2025

Notes:

## PERSONAL GUARANTY OF PROMISSORY NOTE 03262025

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of March 26, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention:  Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 03262025, in the amount of $800,000.00 dated March 26, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder


Initial

Docusign Envelope ID: EEC79505-8E40-4120-80EA-9FD387520193

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5. Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6. The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7. Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code. Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8. With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9. The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim. Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been


Initial

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:        Moti Ferder

1501 Serenade Terrace

Corona Del Mar, CA 92625

To Lender:        Avina, LLC
22704 Ventura Blvd., #218
Woodland Hills, California 91364
Attn: Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)    No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.



11. The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12. This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns. Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed. As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13. In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14. This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15. Every provision of this Guaranty is intended to be severable. In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16. This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page. Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17. No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18. This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof. No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19. The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20. Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without


Initial

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.

**"GUARANTOR(S)"**

Signed by:

_____
CEC0434D5C9C435...
Moti Ferder, an individual

3/26/2025



### GEMOLOGICAL INSTITUTE OF AMERICA®

## COLORED DIAMOND GRADING REPORT

**Electronic**

5355 Armada Drive | Carlsbad, CA 92008-4602
T: 760-603-4500 | F: 760-603-1814

**GIA Laboratories**
Bangkok      Carlsbad      Gaborone
Johannesburg   Mumbai      New York

www.gia.edu

**GIA REPORT 2125339698**

July 07, 2010

Shape and Cutting Style .... **Pear Modified Brilliant**
Measurements ................. 12.22 x 8.50 x 5.63 mm

### GRADING RESULTS

Carat Weight ..................................... **4.51 carat**
Color
   Origin ........................................ **NATURAL**
   Grade ........................... **FANCY INTENSE**
   ........................ **YELLOWISH GREEN**
   Distribution .......................................... **Even**
Clarity Grade ......................................... **VS2**

### ADDITIONAL GRADING INFORMATION

Finish
   Polish ................................... Very Good
   Symmetry ...................................... Good
Fluorescence ................................... None
Comments:
Additional clouds, surface graining and brown patches
of color are not shown.

**GIA CLARITY SCALE**

FLAWLESS
INTERNALLY FLAWLESS
VVS₁
VVS₂
VS₁
VS₂
SI₁
SI₂
I₁
I₂
I₃

**GIA COLORED DIAMOND SCALE**



```
510106710837
```

### REFERENCE DIAGRAMS





68%
66.2%
very thick - extremely thick (faceted)
none

Profile not to actual proportions

**KEY TO SYMBOLS**

   Feather
   Crystal
   Cloud
   ^ Extra Facet

Red symbols denote internal characteristics (inclusions). Green or black symbols denote external characteristics (blemishes). Diagram is an approximate representation of the diamond, and symbols shown indicate type, position, and approximate size of clarity characteristics. All clarity characteristics may not be shown. Details of finish are not shown.

This is an electronic version of a GIA Report. This Report is not a guarantee, valuation or appraisal and contains only the characteristics of the diamond described herein after it has been graded, tested, examined and analyzed by the laboratory providing this Report ("GIA") and/or has been inscribed using the techniques and equipment used by GIA at the time of the examination and/or inscription. Inscriptions reported in this document are not a guarantee, validation, or warranty of a diamond's quality, country of origin or source, or that the diamond will be identifiable by the inscription in the future. Laser inscriptions can be renewed. GIA makes no representation concerning any trademark, word or symbol which is inscribed by GIA or which is identified on this Report. The recipient of this Report may wish to consult a credentialed jeweler or gemologist about the information contained herein.

Page 1 of 2

**IMPORTANT LIMITATIONS ON PAGE 2**
© 2008 GEMOLOGICAL INSTITUTE OF AMERICA, INC.

07102024

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Wednesday, July 10, 2024 at 8:13:59 AM Pacific Daylight Time

**From:** wireconfirmation@banksocal.com <wireconfirmation@banksocal.com>

**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

### WIRE TRANSFER ADVICE OF DEBIT

ON JULY 10, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 800,000.00

### DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 10-JUL-2024 10:12:47 CT |
| PAID AMOUNT: | USD 800,000.00 |
| OUTGOING WIRE FEE: | USD 10.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202407100039111 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20240710/MMQFMP6D/000006/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20240710/B6B7HU3R/008059/ |
| REFERENCE: | 2525896794 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 07102024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202407100039111.

# Exhibit M

## SECURED PROMISSORY NOTE 04022025 (FMR 10032024)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $1,000,000.00

Note Date: April 2, 2025

Maturity Date: May 2, 2025

Annual Interest rate: 0.0%

Profit Share: $100,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $1,000,000.00 together with accrued interest and/or profit share of $100,000.00 on the unpaid principal, to total $1,100,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.


Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 5221795816 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

*Moti Ferder*

CEC0434B5C3C435

Moti Ferder – President


Date  4/2/2025

_____

Notes:

## PERSONAL GUARANTY OF PROMISSORY NOTE 04022025

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of April 2, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention:  Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 04022025, in the amount $1,000,000.00 dated April 2, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note.  Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note.  So long as any of Guarantor' obligations hereunder

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code.  Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note.  Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein.  Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.      The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim.  Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note. Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced. Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given. By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

| To Guarantor: | Moti Ferder |
| | 1501 Serenade Terrace |
| | Corona Del Mar, CA 92625 |

| To Lender: | Avina, LLC |
| | 22704 Ventura Blvd., #218 |
| | Woodland Hills, California 91364 |
| | Attn: Avi Wazana |

Each Guarantor represents and warrants to Lender as follows:

(a)    No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.


Initial

11.     The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12.     This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed.  As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13.     In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14.     This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15.     Every provision of this Guaranty is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16.     This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page.  Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17.     No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18.     This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof.  No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19.     The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20.     Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Initial

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.

**"GUARANTOR(S)"**

Moti Ferder, an individual

4/2/2025



GIA REPORT
5221795816

Verify this report at GIA.edu

**FACSIMILE**

This is a digital representation of the original GIA Report. This representation might not be accepted in lieu of the original GIA Report in certain circumstances. The original GIA Report includes certain security features which are not reproducible on this facsimile.

## GIA NATURAL COLORED DIAMOND REPORT

March 03, 2023

| | |
|---|---|
| Report Type | Grading Report |
| GIA Report Number | 5221795816 |
| Shape and Cutting Style | Cut-Cornered Square Step Cut |
| Measurements | 12.10 x 12.03 x 8.25 mm |

| | |
|---|---|
| Carat Weight | 10.87 carat |
| Color Grade | Fancy Vivid Yellow |
| Color Origin | Natural |
| Color Distribution | Even |
| Clarity Grade | VS2 |

Proportions:



67%

thick (polished)

68.6%

Profile not to actual proportions

| | |
|---|---|
| Polish | Excellent |
| Symmetry | Excellent |
| Fluorescence | None |

Inscription(s): GIA 5221795816

## ADDITIONAL INFORMATION

GIA COLORED DIAMOND SCALE

GIA CLARITY SCALE



Illustration of GIA fancy color grade interrelationships

### CLARITY CHARACTERISTICS



**KEY TO SYMBOLS\***

Cloud

Feather

* Red symbols denote internal characteristics (inclusions). Green or black symbols denote external characteristics (blemishes). Diagram is an approximate representation of the diamond, and symbols shown indicate type, position, and approximate size of clarity characteristics. All clarity characteristics may not be shown. Details of finish are not shown.





The results documented in this report refer only to the diamond described, and were obtained using the techniques and equipment available to GIA at the time of examination. This report is not a guarantee or valuation. For additional information and important limitations and disclaimers please see GIA.edu/terms or call +1 800 421 7250 or +1 760 603 4500. ©2023 Gemological Institute of America, Inc.

reportcheck.gia.edu

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Monday, April 15, 2024 at 8:37:23 AM Pacific Daylight Time

**From:** wireconfirmation@banksocal.com <wireconfirmation@banksocal.com>

**To:** AVIW@BUSINESSMAX.COM <AVIW@BUSINESSMAX.COM>

**WIRE TRANSFER ADVICE OF DEBIT**

ON APRIL 15, 2024, WE DEBITED YOUR ACCOUNT ******7493 FOR USD 2,000,000.00

**DETAILS OF PAYMENT**

| | |
|---|---|
| PAYMENT DATE AND TIME: | 15-APR-2024 10:36:18 CT |
| PAID AMOUNT: | USD 2,000,000.00 |
| OUTGOING WIRE FEE: | USD 10.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202404150055267 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20240415/MMQFMP6D/000014/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20240415/B6B7HU4R/010663/ |
| REFERENCE: | 3837818206 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******7493 |
| | GLOBAL INNOVATIONS LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | GLOBAL INNOVATIONS LLC REF 04152024 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202404150055267.

**Subject:** ADVICE OF CREDIT - BANK CONFIDENTIAL

**Date:** Wednesday, October 2, 2024 at 11:45:58 AM Pacific Daylight Time

**From:** wireconfirmation@bankcbc.com <wireconfirmation@bankcbc.com>

**To:** AVIW@BUSINESSMAX.COM <aviw@businessmax.com>

## WIRE TRANSFER ADVICE OF CREDIT

ON OCTOBER 02, 2024, WE CREDITED YOUR ACCOUNT ******1694 FOR USD 1,300,000.00

## DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 02-OCT-2024 13:45:17 CT |
| RECEIVED AMOUNT: | USD 1,300,000.00 |
| METHOD OF PAYMENT: | FED Receive |
| TRANSACTION NUMBER: | 202410020099684 |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20241002/MMQFMP6D/000169/ |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20241002/MMQFMP2M/029108/ |
| REFERENCE: | 3554264276ES |
| RELATED REFERENCE: | DCD OF 24/10/02 |
| RECEIVED FROM: | F/021000021 |
| | JPMORGAN CHASE BANK, NA |
| | NEW YORK |
| | NY |
| ORIGINATOR: | *****2080 |
| | VAD & COMPANY, INC. |
| | 114 BAYTREE CT |
| | WINTER SPRINGS FL 32708-5123 US |
| CREDITED TO: | ******1694 |
| | AVINA LLC |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | MOTI PURCHASE |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202410020099684.

# Exhibit N

## SECURED PROMISSORY NOTE 04252025 (FMR 10042024-1)

Maker: Lugano Diamonds, a California Corporation.

Holder: Avina LLC.

Principal Amount: $1,000,000.00

Note Date: April 25, 2025

Maturity Date: July 24, 2025

Annual Interest rate: 0.0%

Profit Share: $300,000.00

Promise to Pay: FOR VALUE RECEIVED, Lugano Diamonds, a California Corporation ("Maker"), hereby promises to pay upon sale of security (the "Maturity Date") to the order of Global Innovations, LLC. ("Holder"), at 22704 Ventura Blvd., #218, Woodland Hills, CA 91364, or at such other place or to such other party as the Holder may from time to time designate in writing, the principal sum of $1,000,000.00 together with accrued interest and/or profit share of $300,000.00 on the unpaid principal, to total $1,300,000.00, as set forth in this Secured Promissory Note (this "Note") until fully paid.

Payment.  The principal, together with all accrued interest or profit share as indicated, on this Note shall be payable on the Maturity Date (the "Note Payment").

Fixed Interest Rate.  Commencing the date hereof, this Note shall accrue interest on the unpaid principal from time to time outstanding at a rate indicated above per annum. Accrued interest shall be due and payable concurrently with the Note Payment.

Prepayment.  Prepayment of the principal and all accrued interest on this Note shall be allowed with the consent of Holder, and any such prepayment shall be applied first to interest accrued but unpaid to such date on the outstanding principal balance hereof immediately preceding such prepayment and then to reduction of the principal balance hereof.

Initial

Security.  This Note is secured by the collateral described in attached GIA (or EGL) certificate(s) number (s) 2231252640 or as newly assigned. Holder shall have the option to force sale of the collateral at its sole discretion and price with a 30-day notice to Maker, or require the collateral be delivered to its possession.

Successors and Assigns.  The provisions contained herein shall be binding upon, and inure to the benefit of, the heirs and successors of the parties hereto.  This Note may not be assigned by either party without the prior written consent of the other party, which consent shall not be reasonably withheld.

Release.  After the payment of all sums for which the Maker is obligated under this Note, the Holder shall deliver a signed copy of this note release as designated below.

Governing Law.  This Note, and every other agreement entered into, or document signed in connection with this Note, shall be governed by and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the undersigned has caused this Secured Promissory Note to be executed at County of Los Angeles, California as of the date first set forth above.


 "Maker"


 Lugano Diamonds

Signed by:

CEC0434D5C3C435

Moti Ferder – President


Date  4/25/2025


Notes:

**PERSONAL GUARANTY OF PROMISSORY NOTE 04252025**

THIS PERSONAL GUARANTY OF PROMISSORY NOTE (this "**Guaranty**") is made as of April 25, 2025, by Moti Ferder, an individual, (individually, a "**Guarantor**"), whose addresses are set forth in <u>Paragraph 9</u> hereof, in favor of Avina, LLC, a California limited liability company (the "Lender"), having an office at 22704 Ventura Blvd., #218, Woodland Hills, California 91364, Attention: Avi Wazana.

WHEREAS, Lender and Lugano Diamonds, a California Corporation ("Borrower") desire to enter into that certain Promissory Note number 04252025, in the amount $1,000,000.00 dated April 25, 2025 (the "**Note**"); and

WHEREAS, Lender would not execute the Note if Guarantor did not execute and deliver to Lender this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the Note and as a material inducement to Lender to execute said Note, Guarantor hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty the prompt payment by Borrower of all other sums payable by Borrower under said Note and the faithful and prompt performance by Borrower of each and every one of the terms, conditions and covenants of said Note to be kept and performed by Borrower (collectively, the "**Obligations**"), and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Note may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Lender and Borrower, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Borrower under the Note as so altered, affected, modified, amended, compromised, released or changed and the Note may be assigned by or with the consent of Lender or any assignee of Lender with written consent or notice to Guarantor, that shall not be unreasonably withheld, and that this Guaranty shall thereupon and thereafter guaranty the performance of said Note as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Lender to enforce any of the rights or remedies of Lender under the Note, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Note (including, without limitation, Borrower) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantor' obligations hereunder.

3.      Each Guarantor's liability under this Guaranty shall continue until all sums due under the Note have been paid in full in cash and until all other obligations to Lender have been satisfied. If all or any portion of Borrower's obligations under the Note is paid or performed by Borrower, the obligations of Guarantor hereunder shall continue and remain in full force and effect until such Note obligation is paid in full.

4.      Each Guarantor warrants and represents to Lender that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Note, the Borrower's financial status and its ability to pay and perform the obligations owed to Lender under the Note. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Note and is fully informed of the remedies Lender may pursue, with or without notice to Borrower, in the event of default under the Note. So long as any of Guarantor' obligations hereunder

Initial

remains unsatisfied or owing to Lender, each Guarantor shall keep fully informed as to all aspects of Borrower's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Lender that if a default shall at any time occur in the payment of any sums due under the Note by Borrower or in the performance of any other obligation of Borrower under the Note, such Guarantor shall and will forthwith upon demand pay such sums due under the terms of the Note, and any arrears thereof, to Lender in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Borrower.

6.      The liability of Guarantor under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Note or the pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law, with exception of cure periods and notices as set forth in the Note: (i) all notices to Guarantor (or any of them), to Borrower, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Lender under the Note and, except to the extent set forth in Section 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; or (iii) demand of payment, presentation and protest; (iv) any statute of limitations affecting Guarantor's liability hereunder or the enforcement thereof; (v) right or defense that may arise by reason of the incapability, lack or authority, death or disability of Borrower or any other person; (vi) all principles or provisions of law which conflict with the terms of this Guaranty; and (vii) any other rights and defenses that are or may become available to Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code.  Each Guarantor further agrees that Lender may enforce this Guaranty upon the occurrence of a default under the Note, notwithstanding any dispute between Lender and Borrower with respect to the existence of said default or performance of the obligations under the Note.  Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      With the understanding and agreement to cure periods and notices as set forth in the Note, each Guarantor agrees that Lender may enforce this Guaranty without the necessity of proceeding against Borrower or any other guarantor, including, without limitation, any other Guarantor named herein.  Each Guarantor hereby waives the right to require Lender to proceed against Borrower, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Note or to pursue any other remedy or to enforce any other right.

9.      The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any defense which Borrower may have by reason of order, decree or decision of any court or administrative body resulting from any such case. Lender shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim.  Each Guarantor acknowledges and agrees that any payment which accrues with respect to Borrower's obligations under the Note after the commencement of any such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been

Initial

commenced) shall be included in Guarantor' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Borrower of any of its obligations under the Note.  Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Lender, or allow the claim of Lender in respect of, any such payment accruing after the date on which such proceeding is commenced.  Each Guarantor hereby assigns to Lender such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if (a) delivered by a nationally recognized overnight courier, or (b) delivered personally, and shall be deemed to have been given, rendered or made on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no notice was given.  By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantor:    Moti Ferder

1501 Serenade Terrace

Corona Del Mar, CA 92625

To Lender:    Avina, LLC
22704 Ventura Blvd., #218
Woodland Hills, California 91364
Attn:  Avi Wazana

Each Guarantor represents and warrants to Lender as follows:

(a)    No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval, or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder. This Guaranty has been duly executed and delivered by such Guarantor and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.


Initial

11.     The obligations of Borrower under the Lease to deliver financial statements, as therein provided, shall be deemed to also require the Guarantor hereunder to do and provide the same relative to Guarantor.

12.     This Guaranty shall be binding upon each Guarantor, such residual Guarantor's, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Lender, its successors, endorsees and assigns.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed.  As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

13.     In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Lender, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

14.     This Guaranty shall be governed by and construed in accordance with the laws of the State of California, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State of California.

15.     Every provision of this Guaranty is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

16.     This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page.  Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

17.     No failure or delay on the part of Lender to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

18.     This Guaranty shall constitute the entire agreement between each Guarantor and Lender with respect to the subject matter hereof.  No provision of this Guaranty or right of Lender hereunder may be waived nor may any Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Lender.

19.     The liability of each Guarantor and all rights, powers and remedies of Lender hereunder and under any other agreement now or at any time hereafter in force between Lender and such Guarantor relating to the Note or any note created hereafter shall be cumulative and not alternative and such rights, powers and remedies shall be in addition to all rights, powers and remedies given to Lender by law.

20.     Notwithstanding any contrary provision of this Guaranty, the Guarantor shall be jointly and severally liable for the Obligations of Borrower, shall not be reduced by, amounts recovered or collected by Lender from the Guarantor and/or Borrower to the extent such amounts are reimbursement for late charges and interest due under the Note and/or this Guaranty or are incurred by Lender in collecting or attempting to collect amounts due Lender under the Note and/or this Guaranty, including without

Initial

limitation, attorneys' fees and costs (collectively, the **"Enforcement Costs"**).IN WITNESS WHEREOF, Guarantor have executed this Guaranty as of the day and year first above written.

**"GUARANTOR(S)"**

Signed by:

_____
CEC0434D5C3C435...
Moti Ferder, an individual

4/25/2025



**GIA** ®

GIA REPORT
2231252640

Verify this report at GIA.edu

This is a digital representati...
be accepted in lieu of the or...
Report includes certain sec...

## GIA NATURAL DIAMOND GRADING REPORT

April 17, 2024

GIA Report Number ............................... 2231252640
Shape and Cutting Style ..................... Pear Brilliant
Measurements ........................... 19.73 x 11.74 x 7.38 mm

## GRADING RESULTS

Carat Weight ............................................ 10.03 carat
Color Grade ................................................ D
Clarity Grade ............................................ Flawless

## ADDITIONAL GRADING INFORMATION

Polish ............................................................ Excellent
Symmetry .................................................... Excellent
Fluorescence .............................................. None
Inscription(s): GIA 2231252640

## PROPORTIONS



Profile not to actual proportions

## CLARITY CHARACTERISTICS



## GRADING SCALES

GIA
COLO
SCAL

The results documented i...
the diamond described, as ...
techniques and equipment...
of examination. This rep...
cimation. For additional i...
limitations and disclaimers ...
or call +1 800 421 725...
©2023 Gemological Inc



GIA.edu

Moti Ferder
Chief Executive Officer

**L U G A N O** ˙
620 Newport Center Drive, Suite 800
Newport Beach, CA 92660
**Office** +1 949.720.0080 (866.LUGANO6)
**Cell** +1 213.200.8200

**NEWPORT BEACH | ASPEN | PALM BEACH | OCALA
HOUSTON | WASHINGTON D.C. | GREENWICH | LONDON**

**Subject:** ADVICE OF DEBIT - BANK CONFIDENTIAL

**Date:** Friday, October 4, 2024 at 9:49:44 AM Pacific Daylight Time

**From:** wireconfirmation@bankcbc.com <wireconfirmation@bankcbc.com>

**To:** AVIW@BUSINESSMAX.COM <Aviw@businessmax.com>

## WIRE TRANSFER ADVICE OF DEBIT

ON OCTOBER 04, 2024, WE DEBITED YOUR ACCOUNT ******1694 FOR USD 1,000,000.00

## DETAILS OF PAYMENT

| | |
|---|---|
| PAYMENT DATE AND TIME: | 04-OCT-2024 11:48:34 CT |
| PAID AMOUNT: | USD 1,000,000.00 |
| METHOD OF PAYMENT: | FED Payment |
| TRANSACTION NUMBER: | 202410040075362 |
| IMAD(CYCLE DATE/LTERM/IMSN) | 20241004/MMQFMP6D/000072/ |
| OMAD(CYCLE DATE/LTERM/OMSN) | 20241004/B6B7HU3R/011117/ |
| REFERENCE: | 3675352417 |
| PAID TO: | F/026009593 |
| | BANK OF AMERICA, N.A., NY |
| | NEW YORK |
| | NY |
| BENEFICIARY: | ******6485 |
| | LUGANO DIAMONDS JEWELRY INC. |
| | 620 NEWPORT CENTER DR. SUITE 100 |
| | NEWPORT BEACH, CA 92660 |
| DEBITED TO: | ******1694 |
| | AVINA LLC. |
| | 22704 VENTURA BLVD 218 |
| | WOODLAND HILLS CA 91364-1333 |
| ORIGINATOR TO BENEFICIARY INFO: | INVESTMENTS |
| | AVINA LLC REF 10042024 1 |

This e-mail contains confidential and privileged information. If you are not the intended recipient (or have received this e-mail in error), please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the material in this e-mail is strictly prohibited. When contacting this institution, please use reference number: 202410040075362.

## EXHIBIT D

**Voluntary Petition**

(See Attached)

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

Central District of California
_____  _____
                                      (State)

Case number (*If known*): _____ Chapter 11

☐ Check if this is an
   amended filing

Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/24

**If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.**

| | | |
|---|---|---|
| 1. | **Debtor's name** | SIMBA IL HOLDINGS, LLC, a Delaware limited liability company |

| | | |
|---|---|---|
| 2. | **All other names debtor used in the last 8 years**<br><br>Include any assumed names, trade names, and *doing business as* names | |

| | | |
|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 87 – 2413827 |

4. **Debtor's address**

**Principal place of business**

610 Newport Center Drive, Suite 950
_____
Number          Street

Newport Beach, CA 92660
_____

_____
City                State        ZIP Code

Orange
_____
County

**Mailing address, if different from principal place of business**

_____
Number          Street

_____
P.O. Box

_____
City                State        ZIP Code

**Location of principal assets, if different from principal place of business**

_____
Number          Street

_____

_____
City                State        ZIP Code

5. **Debtor's website** (URL)     None
_____

Debtor    SIMBA IL HOLDINGS, LLC, a Delaware limited liability company        Case number *(if known)*_____
         Name

**6. Type of debtor**

- ☑ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other. Specify: _____

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☑ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

<u>551112</u> ___ ___

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☑ Chapter 11. *Check **all** that apply*:
  - ☑ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).
  - ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
  - ☑ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
  - ☐ A plan is being filed with this petition.
  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☑ No
- ☐ Yes. District _____ When _____ Case number _____
                                               MM / DD / YYYY
     District _____ When _____ Case number _____
                                               MM / DD / YYYY

Debtor    SIMBA IL HOLDINGS, LLC, a Delaware limited liability company                    Case number (if known)_____
_____
Name

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

☑ No

List all cases. If more than 1, attach a separate list.

☐ Yes.    Debtor _____    Relationship _____

District _____    When _____
MM  /  DD  / YYYY

Case number, if known _____

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☑ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☑ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** (*Check all that apply.*)

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?**_____
Number        Street

_____

_____    _____ _____
City                                    State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

---

**13. Debtor's estimation of available funds**

*Check one:*

☑ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

☐ 1-49
☑ 50-99
☐ 100-199
☐ 200-999

☐ 1,000-5,000
☐ 5,001-10,000
☐ 10,001-25,000

☐ 25,001-50,000
☐ 50,001-100,000
☐ More than 100,000

---

Official Form 201                Voluntary Petition for Non-Individuals Filing for Bankruptcy                page **3**

Debtor  SIMBA IL HOLDINGS, LLC, a Delaware limited liability company
_____
Name

Case number (*if known*)_____

| | | | |
|---|---|---|---|
| **15. Estimated assets** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☑ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |
| **16. Estimated liabilities** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☐ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☑ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  9/12/2025
_____
MM  / DD / YYYY

✖ _____
Signature of authorized representative of debtor

Mordechai H. Ferder
_____
Printed name

Title  Manager
_____

**18. Signature of attorney**

✖ /s/ Leonard M. Shulman
_____
Signature of attorney for debtor

Date  9/12/2025
_____
MM  / DD / YYYY

Leonard M. Shulman
_____
Printed name

Shulman Bastian Friedman Bui & O'Dea LLP
_____
Firm name

100 Spectrum Center Drive, Suite 600
_____
Number      Street

Irvine
_____
City

CA
State

92618
ZIP Code

949-340-3400
_____
Contact phone

lshulman@shulmanbastian.com
_____
Email address

126349
_____
Bar number

CA
_____
State

# STATEMENT OF NO DOCUMENTS

## OF

## SIMBA IL HOLDINGS, LLC

### a Delaware limited liability company

In accordance with 11 U.S.C. § 1116(1)(B), the undersigned, being the Manager of SIMBA IL HOLDINGS, LLC, a Delaware limited liability company (the "Company") hereby states that no balance sheet, statement of operations, or cash-flow statement has been prepared by the Company.

IN WITNESS WHEREOF, the undersigned, being the Manager the Company, declares under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.



**MANAGER:**

By:_____
_____
Name: Mordechai H. Ferder

ACTION BY WRITTEN CONSENT
OF THE MANAGER AND ALL MEMBERS
OF
**SIMBA IL HOLDINGS, LLC**
a Delaware limited liability company

The undersigned, being the Manager and all of the Members of SIMBA IL HOLDINGS, LLC, a Delaware limited liability company (the "Company"), and pursuant to the laws of the State of Delaware and the Amended and Restated Operating Agreement of the Company dated as of August 1, 2024 (the "Operating Agreement"), do hereby take the following actions by their written consent:

**CHAPTER 11 FILING**

WHEREAS, the Manager and the Members have reviewed and considered, among other things, the financial condition of the Company, and determine it to be in the best interests of the Company to (a) prepare, authorize, and direct a process to be commenced by the Company under Title 11 of the U.S. Code (the "Bankruptcy Code"), or any similar or alternative insolvency-related options or regimes (a "Bankruptcy Proceeding"), (b) authorize and direct the Company's retention of professionals, (c) select and authorize the Company to negotiate, finalize, consummate, and otherwise proceed with transactions to be consummated through a Bankruptcy Proceeding, and (d) approve and authorize decisions impacting the employment or retention of the Company's employees, agents, contractors, and representatives.

NOW, THEREFORE, BE IT RESOLVED, that, after due consideration, taking into account the information available to them at this time, and in the exercise of their reasonable business judgment, the Manager and the Members have determined that it is in the best interests of the Company to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Case"), in the Bankruptcy Court for the Central District of California (the "Bankruptcy Court") and perform any and all such acts as are reasonable, advisable, expedient, convenient, proper, or necessary to effectuate the purpose and intent of the foregoing;

RESOLVED FURTHER, that the Manager (the "Authorized Person") be, and hereby is, authorized, empowered, and directed, with full power of delegation, to negotiate, execute, verify, deliver, and file with the Bankruptcy Court, in the name and on behalf of the Company, the petition, schedules, statements, motions, lists, applications, pleadings, papers, affidavits, declarations, orders, plans, and other documents (collectively, the "Chapter 11 Filings") (with such changes therein and additions thereto as the Authorized Person may deem necessary, appropriate or advisable);

RESOLVED FURTHER, that the Authorized Person be, and hereby is, authorized, empowered, and directed, with full power of delegation, in the name and on behalf

1

of the Company, to take and perform any and all further acts and deeds that such Authorized Person deems necessary, appropriate, or desirable in connection with the Chapter 11 Case or the Chapter 11 Filings, including, without limitation (i) the payment of fees, expenses and taxes such Authorized Person deems necessary, appropriate, or desirable, and (ii) negotiating, executing, delivering, performing and filing any and all additional documents, schedules, statements, lists, papers, agreements, certificates and/or instruments (or any amendments or modifications thereto) in connection with, or in furtherance of, the Chapter 11 Case with a view to the successful prosecution thereof;

RESOLVED FURTHER, that all acts lawfully done or actions lawfully taken by the Authorized Person or any professionals engaged by the Company in connection with the Chapter 11 Case or any proceedings related thereto, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company.

### RETENTION OF PROFESSIONALS AND SERVICE PROVIDERS

RESOLVED FURTHER, that the Authorized Person be and hereby is, authorized, empowered, and directed, in the name and on behalf of the Company, to engage and retain: (i) Shulman Bastian Friedman Bui & O'Dea LLP as general counsel, (ii) Reeves & Weiss LLP as special counsel, and (iii) Richard Marshack, Esq., of Marshack Hays Wood LLP as Chief Restructuring Officer, in each case on such terms as the Authorized Person shall deem necessary, appropriate, or desirable and subject to the required approvals of the Bankruptcy Court;

FURTHER RESOLVED, that Shulman Bastian Friedman Bui & O'Dea LLP, Reeves & Weiss LLP, and any additional co-counsel or special counsel selected by the Company, shall be, and hereby are, authorized, empowered and directed to represent the Company, as debtor and/or debtor in possession, in connection with any Chapter 11 Case commenced by or against it under the Bankruptcy Code; and

FURTHER RESOLVED, that the Authorized Person be, and hereby is, authorized, empowered, and directed, with full power of delegation, in the name and on behalf of the Company, to take and perform any and all further acts or deeds, including but not limited to (i) the engagement or retention of such other accountants, counsel, consultants, or advisors; (ii) the negotiation of such additional agreements, amendments, modifications, supplements, reports, documents, instruments, applications, notes or certificates not now known but which may be required; (iii) the execution, delivery and filing (if applicable) of any of the foregoing; and (iv) the payment of all fees, payments, taxes and other expenses; (v) the procurement of Errors & Omissions insurance; all of the foregoing, as the Authorized Person, in his sole discretion, may approve or deem necessary, appropriate, or desirable in order to carry out the intent and accomplish the purposes of the foregoing resolutions and the transactions contemplated thereby.

**CRO APPOINTMENT**

WHEREAS, Section 5.1 of the Operating Agreement authorizes the Manager to hire persons or entities in the operation and management of the Company's business;

WHEREAS, a proposal has been made to the Manager and the Members to elect and/or appoint a qualified individual or company as the Chief Restructuring Officer ("CRO") for the purposes of providing business advice and consultation to the Company, including, evaluation of its financial position and development of a restructuring plan;

WHEREAS, the Company has reviewed and considered (i) the qualifications of Richard Marshack, Esq., of Marshack Hays Wood LLP, in the provision of fiduciary and consulting services, including CRO services, and (ii) that certain CRO engagement letter from Marshack Hays Wood LLP dated September 11, 2025 (the "CRO Engagement") outlining its scope of CRO business advice services to the Company and the retainer and fees required for those services;

WHEREAS, a proposal has been submitted to the Manager and the Members after review of the CRO Engagement for the Company to enter into and execute the CRO Engagement, to be effective immediately upon filing of the Chapter 11 Case, and to enter into and execute certain instruments and documents as referenced, related and/or ancillary thereto, and any amendments to the foregoing documentation; and

WHEREAS, after due deliberation, these proposals are considered to be in the best interests of the Company and its Members and are thereby approved.

NOW, THEREFORE, BE IT RESOLVED, that Richard Marshack, Esq., of Marshack Hays Wood LLP is hereby elected and appointed CRO of the Company, effective immediately upon filing of the Chapter 11 Case, pursuant to the terms of the CRO Engagement under which it will provide business advice and consultation to the Company, and the Company will pay the retainer and fees referenced in the CRO Engagement;

RESOLVED FURTHER, that the Manager is authorized to (i) execute the CRO Engagement, (ii) reimburse expenses to Marshack Hays Wood LLP required thereunder, (iii) pay the initial retainer and all additional sums due thereunder, and (iv) enter into and execute certain instruments and documents as referenced, related and/or ancillary thereto and to take all such further actions as may be necessary to carry out the purpose and intent of the foregoing resolutions; and

3

RESOLVED FURTHER, that any act or acts of any person or persons designated and authorized to act by the Manager and the Members of the Company, which acts would have been authorized by the foregoing resolutions, except that such acts were taken prior to the adoption of such resolutions, be, and they hereby are, severally ratified, confirmed, approved and adopted in all respects as acts in the name and on behalf of this Company.

## DELEGATION OF RIGHTS, POWERS, AND DUTIES

WHEREAS, Section 18-407 of the Delaware Limited Liability Company Act provides, in pertinent part, that (i) a manager or a member may delegate to one or more persons or companies any or all of the manager's or member's rights, powers, and duties to manage and control the business and affairs of a limited liability company, and (ii) such delegation shall be irrevocable if so stated;

WHEREAS, in relation to his engagement as CRO of the Company, it is in the best interests of the Company for the Manager and all of the Members to delegate to Richard Marshack, Esq., of Marshack Hays Wood LLP, effective immediately upon filing of the Chapter 11 Case, all of the rights, powers and duties to manage and control the business and affairs of the Company designated to the Manager and the Members under the Operating Agreement or applicable law, including without limitation the power to procure Errors & Omissions insurance coverage if not already placed by the Company; the power to enter into arrangements with creditors of the Company and the power to dissolve and wind down the Company; and

WHEREAS, the delegation herein is intended to irrevocably, completely, and absolutely transfer to the CRO all of the Manager's and each Member's rights, powers, and duties to manage and control the business and affairs of the Company, such that, not withstanding anything to the contrary in the Operating Agreement, the Manager and the Members shall no longer hold or maintain such rights, powers, and duties once the delegation takes effect upon the filing of the Chapter 11 Case.

NOW, THEREFORE, BE IT RESOLVED, that Richard Marshack, Esq., of Marshack Hays Wood LLP, as the newly appointed CRO of the Company, effective upon the filing of the Chapter 11 Case, be authorized to manage and control the business and affairs of the Company and be granted the rights, powers, and duties relating thereto, including without limitation the power to procure Errors & Omissions insurance coverage if not already placed by the Company; the power to enter into arrangements with creditors of the Company and the power to dissolve and wind down the Company; and

RESOLVED FURTHER, that such delegation and transfer shall be irrevocable, complete, and absolute, and notwithstanding anything to the contrary in the Operating Agreement, upon the filing of the Chapter 11 Case, the CRO solely shall have all the rights, powers, and duties to manage and control the business and affairs of the Company, subject only to court order having proper jurisdiction, and

4

provided, however, that the CRO may subsequently delegate such rights, powers, and duties to professionals, advisers, and other service providers if the CRO determines it to be in the best interests of the Company.

### ADDITIONAL RESOLUTIONS

RESOLVED FURTHER, that Richard Marshack, Esq., of Marshack Hays Wood LLP, in his capacity as CRO, effective upon the filing of the Chapter 11 Case, be authorized, directed and empowered, in the name and on behalf of the Company, to negotiate, execute, deliver, and perform, or cause to be negotiated, executed, delivered, and performed, and take such actions and execute, acknowledge, deliver and verify such agreements, certificates, instruments, guaranties, notices and any and all other documents as he may deem necessary, desirable or appropriate.

IN WITNESS WHEREOF, the undersigned, being the Manager and the Members of the Company, have executed this action and adopted these resolutions by their written consent, evidenced by their signatures herein below, which may be delivered by facsimile, email or other internet transmission of .pdf, .jpg, .tiff, or other image files or other signature mechanism.  This action and such resolutions shall become effective as of and on September 14, 2025.

**MANAGER**:

By:_____
Name:  Mordechai H. Ferder

**MEMBERS**:

By:_____
Name:  Mordechai H. Ferder

By:_____
Name:  Edit F. Ferder

The RF 2021 Irrevocable Trust, dated August 30, 2021

By:_____
Name:  Edit F. Ferder
Title:  Trustee

5

**Fill in this information to identify the case:**

Debtor name  SIMBA IL HOLDINGS, LLC, a Delaware limited liability company

United States Bankruptcy Court for the:  Central _____  District of  CA _____
                                                                                      (State)

Case number (If known):  _____

☐ Check if this is an
   amended filing

## Official Form 204

## Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
                                                                                      **12/15**

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim  If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1  SEE ATTACHED | | | | | | |
| 2 | | | | | | |
| 3 | | | | | | |
| 4 | | | | | | |
| 5 | | | | | | |
| 6 | | | | | | |
| 7 | | | | | | |
| 8 | | | | | | |

ATTACHMENT TO 20 LARGEST LIST

| Name of Creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of Claim | Indicate if claim is contingent, unliquidated or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| Champion Force – c/o Leib M Lerner/Alston & Bird LLP 350 South Grand Ave 51st Floor Los Angeles, CA 90071 | Leib M. Lerner (213) 576-1000 Leib.lerner@alston.com | | Contingent Unliquidated Disputed | $56,393,258.18 |
| Testa, Darren c/o Todd C Theodora Theodora Oringher PC 535 Anton Blvd Ninth Floor Costa Mesa, CA 92626-7109 | Todd Theodora (714) 549-6200 ttheodora@tocounsel.com | | Contingent Unliquidated Disputed | $6,377,794.84 |
| c/o Mark Eckard Raines Feldman Littrell LLP 824 N. Market Street, Suite 805 Wilmington, DE 19801 | Mark Eckard (302) 647-1018 meckard@raineslaw.com | | | |
| c/o Mark Eckard Raines Feldman Littrell LLP 1900 Avenue of the Stars 19th Fl Los Angeles, CA 90067 | | | | |
| c/o Michelle Schindler Ferguson Schindler Law Firm 119 South Spring Street Suite 201 Aspen, CO 81611 | Michelle Schindler (970) 925-6288 michelle@fsaspenlaw.com | | | |
| Belgium New York LLC c/o Patrick Papalia/Archer & Greiner PC 1211 Avenue of the Americas #2750 New York, NY 10036 | Patrick Papalia (212) 682-4940 ppapalia@archerlaw.com | | Contingent Unliquidated Disputed | $1,032,784.43 |
| Aronoff, Barry c/o Lance N Jurich/Loeb & Loeb LLP 10100 Santa Monica Blvd Ste 2200 Los Angeles, CA 90067 | Lance Jurich (310) 282-2000 ljurich@loeb.com | | Contingent Unliquidated Disputed | $18,367,608.00 |
| Wazana, Avi - c/o Darren Enenstein Enenstein Pham Glass & Rabbat 8439 W Sunset Blvd Suite 300 Los Angeles, CA 90069 | Darren Enenstein (310) 899-2070 dse@epgrlawyers.com | | Contingent Unliquidated Disputed | $12,430,000.00 |

ATTACHMENT TO 20 LARGEST LIST

| Name of Creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of Claim | Indicate if claim is contingent, unliquidated or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| N.B.S. Diamonds/c/o Joseph M. Kar<br>Law Office of Joseph M. Kar PC<br>15250 Ventura Blvd Suite PH-1220<br>Sherman Oaks, CA 91403 | Joseph Kar<br>(818) 501-6930<br>info@civillegal.com | | Contingent<br>Unliquidated<br>Disputed | $10,500,000.00 |
| Simon, Scott<br>641 St James Road<br>Newport Beach, CA 92663 | Scott Simon<br>(949) 500-3686<br>Wss.sfo@gmail.com | | Contingent<br>Unliquidated<br>Disputed | $9,000,000.00 |
| Winters, Kristopher-c/o S. Katzman<br>Bienert Katzman Littrell Williams LLP<br>903 Calle Amanecer Ste 350<br>San Clemente, CA 92673 | Steven Katzman<br>(949) 369-3700<br>skatzman@bklwlaw.com | | Contingent<br>Unliquidated<br>Disputed | $8,550,000.00 |
| Holzer, Rusty - c/o B Capitummino<br>Woods Oviatt Gilman LLP<br>1900 Bausch & Lomb Place<br>Rochester, NY 14604 | Brian Capitummino<br>(585) 987-2863<br>bcapitummino@woodsoviatt.com | | Contingent<br>Unliquidated<br>Disputed | $8,000,000.00 |
| Gadol, Bryan<br><br>c/o Todd C Theodora<br>Theodora Oringher PC<br>535 Anton Blvd Ninth Floor<br>Costa Mesa, CA 92626-7109<br><br>c/o Mark Eckard<br>Raines Feldman Littrell LLP<br>824 N Market Street Suite 805<br>Wilmington, DE 19801<br><br>c/o Mark Eckard<br>Raines Feldman Littrell LLP<br>1900 Avenue of the Stars 19th Floor<br>Los Angeles, CA 90067<br><br>c/o Michelle Schindler<br>Ferguson Schindler Law Firm<br>119 South Spring Street Suite 201<br>Aspen, CO 81611 | Todd Theodora<br>(714) 549-6200<br>ttheodora@tocounsel.com<br><br><br><br>Mark Eckard<br>(302) 647-1018<br>meckard@raineslaw.com<br><br><br><br><br><br><br>Michelle Schindler<br>(970) 925-6288<br>michelle@fsaspenlaw.com | | Contingent<br>Unliquidated<br>Disputed | $7,929,072.00 |

ATTACHMENT TO 20 LARGEST LIST

| Name of Creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of Claim | Indicate if claim is contingent, unliquidated or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| Sydney Holdings Limited<br><br>c/o J Levin<br>Glaser Weil Fink Howard Jordan et al<br>10250 Constellation Blvd 19th Floor<br>Los Angeles, CA 90067<br><br>c/o B. Capitummino - Woods Oviatt<br>1900 Bausch & Lomb Place<br>Rochester, NY 14604 | Jesse Levin<br>(310) 553-3000<br>jlevin@glaserweil.com<br><br><br>Brian Capitummino<br>(585) 987-2863<br>bcapitummino@woodsoviatt.com | | Contingent<br>Unliquidated<br>Disputed | $5,580,000.00 |
| Kelsay, Kaci<br>110 Westminster Road<br>West Palm Beach, FL 33405 | Kaci Kelsay<br>(561) 889-7754<br>Kaci.kelsay@gmail.com | | Contingent<br>Unliquidated<br>Disputed | $5,000,000.00 |
| McMacken, Ron<br>1660 South Ocean Blvd<br>Manalapan, FL 33462-6210 | Ron McMacken<br>(949) 285-9750<br>ron@panpacplumbing.com | | Contingent<br>Unliquidated<br>Disputed | $4,650,000.00 |
| Dacus, Debbie<br>5444 Candlewood Drive<br>Houston, TX 77056 | Debbie Darcus<br>(281) 804-4489<br>debdacus@me.com | | Contingent<br>Unliquidated<br>Disputed | $4,000,000.00 |
| Simon, Ron<br>620 Newport Center Drive<br>Newport Beach, CA 92660 | Ron Simon<br>(949) 887-5430<br>rsimon@rsiequity.com | | Contingent<br>Unliquidated<br>Disputed | $4,000,000.00 |
| Perl, Daniel/c/o Omar J. Yassin<br>Yassin Law APC<br>1010 E. Union Street Suite 201<br>Pasadena, CA 91106 | Omar Yassin<br>(626) 921-4144<br>oyassin@yassinlegal.com | | Contingent<br>Unliquidated<br>Disputed | $3,175,200.00 |
| Brandes, Adrienne<br>919 Gardenia Way<br>Corona Del Mar, CA 92625 | Adrienne Brandes<br>(714) 401-8277<br>abrandes@suterreproperties.com | | Contingent<br>Unliquidated<br>Disputed | $2,500,000.00 |
| Cohen, Raymond<br>c/o Jonathan Hersey/K&L Gates<br>1 Park Plaza Twelfth Floor<br>Irvine, CA 92614 | Jonathan Hersey<br>(949) 253-0900<br>Jonathan.hersey@klgates.com | | Contingent<br>Unliquidated<br>Disputed | $2,200,000.00 |

ATTACHMENT TO 20 LARGEST LIST

| Name of Creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of Claim | Indicate if claim is contingent, unliquidated or disputed | Amount of Unsecured Claim |
|---|---|---|---|---|
| Moens, Lawrence<br>2335 S Ocean Blvd<br>Palm Beach, FL 33480 | Lawrence Moens<br>(561) 797-9711<br>moens@moensrealestate.com | | Contingent<br>Unliquidated<br>Disputed | $2,000,000.00 |
| Shelly, Damon<br>9881 Research Drive<br>Irvine, CA 92618 | Damon Shelly<br>(949) 877-1099<br>damon@shellygroup.com | | Contingent<br>Unliquidated<br>Disputed | $2,000,000.00 |

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

| In re:<br><br>SIMBA IL HOLDINGS, LLC, a Delaware limited liability company<br><br>Debtor. | Chapter 11<br><br>Case No. _____ |
|---|---|

## LIST OF EQUITY HOLDERS

| Member | Approximate Percentage Held |
|---|---|
| MORDECHAI H. FERDER & EDIT F. FERDER, as community property | 99% |
| EDIT F. FERDER, Trustee of THE RF 2021 IRREVOCABLE TRUST, dated August 30, 2021 | 1% |

I, Mordechai H. Ferder, declare, under penalty of perjury, that the foregoing is true and correct.

Dated:  September 12, 2025

_____
Mordechai H. Ferder, Manager

## STATEMENT OF RELATED CASES
## INFORMATION REQUIRED BY LBR 1015-2
## UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA

1.  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, his or her current or former domestic partner, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of each such of prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof.  If none, so indicate.  Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

    N/A - None

2.  (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows:  (Set forth the complete number and title of each such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

    N/A

3.  (If petitioner is a corporation)  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate.  Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

    N/A - None

4.  (If petitioner is an individual) A petition under the Bankruptcy Reform Act of 1978, including amendments thereof, has been filed by or against the debtor within the last 180 days:  (Set forth the complete number and title of each such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and if not, the disposition thereof. If none, so indicate.  Also, list any real property included in Schedule A/B that was filed with any such prior proceeding(s).)

    N/A

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed at _____

Date: 9/12/2025

Mordechai H. Ferder - Manager
Signature of Debtor 1

_____
Signature of Debtor 2

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

| United States Bankruptcy Court<br>Central District of California | |
|---|---|
| In re:<br>Simba IL Holdings, LLC | CHAPTER NO.: 11 |
| | CASE NO.: 8:25–bk–12616–MH |

# NOTICE OF CASE DEFICIENCY
## UNDER 11 U.S.C. § 521(a)(1) AND BANKRUPTCY RULE 1007

**To Debtor and Debtor's Attorney of Record,**

**Pursuant to F.R.B.P. 1007, you must file the following documents within 14 days from the date of the filing of your petition. Your case may be dismissed if you fail to do so.**

**Schd A/B(Form106A/B or 206A/B)**
**Schedule D (Form 106D or 206D)**
**Summary(Form 106Sum or 206Sum)**
**Schd E/F(Form106E/F or 206E/F)**
**StmtFinAffairs(Form107 or 207)**
**Schedule G (Form 106G or 206G)**
**Schedule H (Form 106H or 206H)**
**Decl for Non–Indiv (Form 202)**

**The Revised Official Bankruptcy Forms are mandatory and are available at www.cacb.uscourts.gov/forms**

According to Bankruptcy Rule 1007(c), within 14 days after you filed the petition, **YOU MUST EITHER:**

(1)    File the required documents. If the document is filed electronically, no hard copy need to be submitted to the court. (See Local Bankruptcy Rule 5005–2(d) and Court Manual, Appendix "F" as to whether a copy must be served on the judge.)

**OR**

(2)    File and serve a motion for an order extending the time to file the required document(s).

**IF YOU DO NOT COMPLY**, in a timely manner with either of the above alternatives, your case may be the subject of an order to show cause to dismiss the case. Motion for extension of time to file schedules and other papers shall comply with Local Bankruptcy Rule 1007–1, and shall be supported by admissible evidence demonstrating cause for the requested extension.

Dated: September 16, 2025

For the Court
**Kathleen J. Campbell**
Clerk of Court