> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS PROPOSED DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO BUY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (BLS) |
| | (Jointly Administered) |
| Debtors. | |

**DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

Dated:  June 24, 2026

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Emails: emorton@ycst.com
    sbeach@ycst.com
    sborovinskaya@ycst.com

-and-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc.  (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (admitted *pro hac vice*)
Traci L. Shafroth (admitted *pro hac vice*)
Scott Friedman (admitted *pro hac vice*)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone:  (415) 496-6723
Facsimile:   (650) 636-9251
Emails: tkeller@kbkllp.com
           tshafroth@kbkllp.com
           sfriedman@kbkllp.com

*Attorneys for Debtors
and Debtors-in-Possession*

**DISCLAIMER**

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS*, WHICH PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  THE DEBTORS RESERVE THE RIGHT TO MODIFY THE PLAN CONSISTENT WITH SECTION 1127 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3019.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN.  ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT

i

**MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS. STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE PLAN OR DISTRIBUTIONS THEREUNDER. IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.**

**THE DEADLINE TO VOTE ON THE PLAN IS AUGUST 18, 2026 AT 4:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS (THE "<u>VOTING DEADLINE</u>").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE.**

**PLEASE BE ADVISED THAT ARTICLE XI OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AMONG OTHER PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.**

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................2

    A.  Overview of the Plan.......................................................................................3

        1.  General Structure of the Plan.................................................................3
        2.  Material Terms of the Plan....................................................................4
        3.  Summary of Treatment of Claims and Equity Interests Under the Plan ............5

    B.  Plan Voting Instructions and Procedures .......................................................6

        1.  Voting Rights.........................................................................................6
        2.  Solicitation Materials ............................................................................7
        3.  Voting Instructions and Procedures ......................................................8
        4.  Elections and Contributions.................................................................10
        5.  Confirmation Hearing and Deadline for Objections to Confirmation ............11

II.  BACKGROUND REGARDING LUGANO ..........................................................12

    A.  General Background .......................................................................................12
    B.  Corporate and Capital Structure....................................................................12
    C.  Events Leading Up to the Chapter 11 Cases..................................................13

        1.  Discovery of Irregular Financing, Accounting, and Inventory Practices ........13
        2.  Corporate Governance .........................................................................14
        3.  Financing Matters ................................................................................14
        4.  The Sales Process and Commencement of These Cases.......................15

III.  THE CHAPTER 11 CASES ...............................................................................15

    A.  First Day Orders and Initial Employment Applications ...............................16
    B.  The Agency Agreement and Related Motions................................................16
    C.  DIP Financing Motion and Cash Collateral..................................................17
    D.  Appointment of the Creditors' Committee ...................................................18
    E.  Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims ......18
    F.  Other Events During the Chapter 11 Cases ..................................................19

        1.  Executory Contracts and Unexpired Leases and Related Settlements.............19
        2.  Requests for Relief from the Automatic Stay. .....................................19
        3.  Litigation and Settlements ...................................................................20
        4.  CODI Settlement..................................................................................20

IV.  SUMMARY OF THE JOINT CHAPTER 11 PLAN............................................22

    A.  Purpose and Effect of the Plan .....................................................................23
    B.  Substantive Consolidation and Its Relationship to the Plan Treatment of Claims .......23
    C.  The Liquidation Trust and the Liquidation Analysis.....................................24
    D.  Treatment of Claims and Equity Interests.....................................................25

        1.  Unclassified Claims .............................................................................25

            (a)  Administrative Claims ...............................................................25
            (b)  Professional Fee Claims and Ordinary Course Professional Fee Claims .................26

(c)    Priority Tax Claims..................................................................26
(d)    DIP Claims.............................................................................27

2.    Class 1: Other Secured Claims ...............................................27
3.    Class 2: Priority Claims ..........................................................28
4.    Class 3: CODI Claim ..............................................................28
5.    Class 4: General Unsecured Claims.........................................29
6.    Class 5: Convenience Class Claims .........................................30
7.    Class 6: Intercompany Claims .................................................30
8.    Class 7: Subordinated Claims ..................................................30
9.    Class 8: Equity Interests..........................................................30
10.   Special Provisions Regarding Insured Claims.........................31
11.   Resolution of Claims and Controversies..................................31

E.    Acceptance or Rejection of Plan..........................................................31

1.    Impaired Classes of Claims Entitled to Vote ..........................31
2.    Modifications of Votes.............................................................32
3.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ...............32
4.    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes
.................................................................................................32

F.    Implementation of the Plan ..................................................................32

1.    Implementation of the Plan .....................................................32
2.    Streamlining the Debtors' Corporate Affairs...........................32

(a)    Debtors' Existing Directors, Officers, and Managers.......................32
(b)    Dissolution of the Debtors and Cancellation of Equity Interests.......33
(c)    Corporate Documents and Corporate Authority ..............................33
(d)    Vesting of Estate Assets.................................................................33
(e)    Disposal and Use of Property ........................................................33
(f)    Representative of the Estates .........................................................34
(g)    Tax Refund.....................................................................................34

3.    Liquidation Trust ....................................................................34

(a)    Liquidation Trust Interests.............................................................34
(b)    Appointments.................................................................................34
(c)    Creation and Governance of the Liquidation Trust .........................35
(d)    Vesting of Liquidation Trust Assets ...............................................35
(e)    Contribution of Contributed Claims. ..............................................35
(f)    Purpose of the Liquidation Trust ...................................................35
(g)    Authority........................................................................................36
(h)    Limitation of Liability....................................................................36
(i)    Indemnification..............................................................................36
(j)    Distributions from the Liquidation Trust........................................36
(k)    Exemption......................................................................................36
(l)    Termination of the Liquidation Trust .............................................36
(m)   Control Provision...........................................................................36

4.    Preservation of Privileges and Defenses.................................36
5.    Creation and Funding of Reserves...........................................37

(a)    Reserves for Specified Purposes Only.............................................37

|     |     | (b) | Professional Fee Reserve | 37 |
|     |     | (c) | Liquidation Trust Expense Reserve | 37 |
|     |     | (d) | Effective Date Reserves | 37 |
|     | 6.  | Preservation of Causes of Action | | 38 |
|     |     | (a) | Preservation of All Causes of Action Not Expressly Settled or Released | 38 |
|     | 7.  | Cancellation of Instruments | | 38 |
|     | 8.  | Substantive Consolidation | | 38 |
| G.  | Executory Contracts and Unexpired Leases | | | 39 |
|     | 1.  | Assumption of Certain Executory Contracts and Unexpired Leases | | 39 |
|     |     | (a) | Assumption of Agreements | 39 |
|     |     | (b) | Cure Payments | 40 |
|     |     | (c) | Objections to Assumption/Cure Payment Amounts | 40 |
|     |     | (d) | Resolution of Claims Relating to Assumed Contracts and Leases | 41 |
|     |     | (e) | Insurance Policies | 41 |
|     | 2.  | Rejection of Executory Contracts and Unexpired Leases | | 42 |
|     |     | (a) | Rejected Agreements | 42 |
|     |     | (b) | Rejection Claims Bar Date | 42 |
| H.  | Provisions Governing Distributions | | | 43 |
|     | 1.  | Timing of Distributions for Allowed Claims | | 43 |
|     | 2.  | Calculating Distributions and Related Matters | | 43 |
|     | 3.  | Interest and Other Amounts Regarding Claims | | 43 |
|     | 4.  | Distributions | | 43 |
|     | 5.  | Means of Cash Payment | | 43 |
|     | 6.  | Form of Currency for Distributions | | 44 |
|     | 7.  | Fractional Distribution | | 44 |
|     | 8.  | De Minimis Distributions | | 44 |
|     | 9.  | No Distributions with Respect to Certain Claims | | 44 |
|     | 10. | Distributions After Allowance | | 45 |
|     | 11. | Delivery of Distributions | | 45 |
|     | 12. | Application of Distribution Record Date and Other Transfer Restrictions | | 45 |
|     | 13. | Withholding, Payment, and Reporting Requirements Regarding Distributions | | 46 |
|     | 14. | Defenses and Setoffs | | 46 |
|     | 15. | Allocation of Distributions | | 46 |
|     | 16. | Joint Distributions | | 46 |
|     | 17. | Forfeiture of Distributions | | 47 |
| I.  | Disputed, Contingent, and Unliquidated Claims | | | 47 |
|     | 1.  | Objections to and Resolution of Disputed Claims | | 47 |
|     | 2.  | Claim Objections | | 47 |
|     | 3.  | Estimation of Certain Claims | | 47 |
| J.  | Conditions Precedent to the Effective Date | | | 48 |
|     | 1.  | Conditions to the Effective Date | | 48 |
|     | 2.  | Waiver of Conditions to the Effective Date | | 48 |

3. Effect of Non-Occurrence of Conditions to the Effective Date ........................48
4. Notice of the Effective Date ..........................................................................49

K. Retention of Jurisdiction and Power ......................................................................49
1. Scope of Retained Jurisdiction and Power ......................................................49
2. Reserved Rights to Seek Bankruptcy Court Approval ......................................50
3. Non-Exercise of Jurisdiction ..........................................................................51

L. Miscellaneous Provisions ......................................................................................51
1. Payment of Statutory Fees and Post-Confirmation Reports ..............................51
2. Dissolution of the Creditors' Committee ..........................................................51
3. Modifications and Amendments ......................................................................51
4. Severability of Plan Provisions ......................................................................52
5. Binding Effect of Plan ....................................................................................52
6. Injunctions ....................................................................................................52
7. Exculpation ..................................................................................................53
8. Releases by the Debtors ................................................................................54
9. Releases by Holders of Claims ......................................................................55
10. Term of Injunctions or Stays ........................................................................56
11. Revocation, Withdrawal, or Non-Consummation ............................................56
12. Exemption from Transfer Taxes ....................................................................56
13. Computation of Time ....................................................................................57
14. Transactions on Business Days ......................................................................57
15. Good Faith ....................................................................................................57
16. Governing Law ..............................................................................................57
17. Notices ..........................................................................................................57
18. Final Decree ..................................................................................................57
19. Closing of Certain Chapter 11 Cases ............................................................58
20. Additional Documents ....................................................................................58
21. Conflicts ........................................................................................................58

V. RISK FACTORS ..............................................................................................................58
A. Parties May Object to the Plan's Classification of Claims and Equity Interests ..........59
B. The Debtors May Not Be Able to Obtain Confirmation of the Plan ..........................59
C. The Conditions Precedent to the Effective Date of the Plan May Not Occur ............59
D. Claims Estimation and Allowance of Claims ..........................................................59
E. Potential Pursuit of Liquidation Trust Actions Against Creditors and Others ............59
F. Risks Regarding Liquidation Trust Assets ..............................................................60
G. Tax Considerations ..............................................................................................61

VI. CONFIRMATION OF THE PLAN ................................................................................61
A. The Confirmation Hearing ....................................................................................61
B. Requirements for Confirmation of the Plan ............................................................61
C. Best Interests of Creditors ....................................................................................62
D. Feasibility ..............................................................................................................63
E. Acceptance by Impaired Classes ............................................................................63
F. Confirmation Without Acceptance by All Impaired Classes ......................................64
1. No Unfair Discrimination ..............................................................................64
2. Fair and Equitable Test ..................................................................................65

G.     Alternatives to Confirmation and Consummation of the Plan ...................................... 65

VII.     CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN ................................... 65

A.     General ....................................................................................................................... 65
B.     Exemption from Registration Under the Securities Act and Blue Sky Laws .............. 66

1.     Issuance of Liquidation Trust Interests under Plan ........................................ 66
2.     Resale of Liquidation Trust Interests After Plan Effective Date .................... 66

VIII.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......................................................................................................................... 67

A.     Certain U.S. Federal Income Tax Consequences of the Liquidation Trust ................. 69
B.     Consequences to Holders of Claims Generally .......................................................... 70
C.     Consequences to Liquidation Trust Beneficiaries ....................................................... 71
D.     Withholding on Distributions and Information Reporting ........................................... 72

IX.     RECOMMENDATION ................................................................................................... 73

## **EXHIBITS & SCHEDULES**

**EXHIBIT A**          Joint Chapter 11 Plan of Liquidation

**EXHIBIT B**          Liquidation Analysis

---

**THE EXHIBITS AND SCHEDULES ATTACHED TO THIS DISCLOSURE STATEMENT ARE INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

## GENERAL OVERVIEW AND SUMMARY

This Disclosure Statement (the "Disclosure Statement") describes the historical background that led to the bankruptcy cases of Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds") and its affiliated debtors and debtors in possession (collectively, "Lugano" or the "Debtors"), explains what has happened in the Debtors' bankruptcy cases, and sets forth the treatment of Claims and Equity Interests in the Debtors' proposed plan of liquidation, titled the *Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* (as amended, modified, or supplemented from time to time pursuant to its terms, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A**.

This overview and summary section highlights the main points discussed in the Disclosure Statement and should be read in conjunction with the remainder of the Disclosure Statement.  This general overview and summary section is qualified by the discussion below and by the express terms of the Plan.

### 1.    Background

The Debtors were established by Mordechai Haim Ferder and his wife, Idit Ferder, in 2004 as a designer, manufacturer, and retailer of high-end jewelry.  Until early spring 2025, Lugano appeared to be a highly profitable and rapidly growing business, operating eight retail locations in the United States, as well as an equestrian division and pop-up show rooms.  One of Lugano Diamond's subsidiaries operated a retail store in London, UK.

In May 2025, the Debtors' majority shareholder publicly disclosed an investigation into the Debtors' financing, accounting, and inventory practices and that Mr. Ferder had resigned from his offices and directorships with Lugano and its affiliates. Following the announcement of the investigation, the Debtors took steps to stabilize their operations and engaged Armory Securities, LLC as their financial advisor and investment banker in connection with a possible restructuring, sale, or financing.  The ensuing sale and restructuring efforts led to the Debtors' entry into an Agency Agreement (the "Agency Agreement") with Enhanced Retail Funding, LLC (the "Agent") dated as of November 16, 2025.

On November 16, 2025 (the "Petition Date"), the Debtors commenced their chapter 11 cases.  They immediately sought certain "First Day" relief, including interim approval of the Agency Agreement, interim approval of debtor-in-possession financing and the use of cash collateral, and authority to make payments to certain prepetition creditors, including their employees for accrued wages and expenses.  The Bankruptcy Court granted certain relief, including authorizing the Debtors to perform under the Agency Agreement on an interim basis. The Bankruptcy Court authorized the Debtors to assume the Agency Agreement on a final basis on December 31, 2025.  Further information about the first day motions and the commencement of the Chapter 11 Cases is provided below.

---

[2]    All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

2.    **Debtors' Proposed Bankruptcy Plan**

The Plan provides for the creation of a Liquidation Trust, which will own (a) the Debtors' remaining assets, other than any tax refunds owed to Lugano Holding, Inc., and (b) the stock of Debtor Lugano Holding, Inc. after the Effective Date of the Plan. The Plan also implements a settlement agreement among the Debtors, the Creditors' Committee and CODI.

As a result of a settlement among the Debtors (acting through the Special Committee), CODI, and the Committee (the "CODI Settlement"), the Debtors anticipate a recovery to holders of Allowed General Unsecured Claims. The Plan incorporates the terms of the CODI Settlement and provides that the Liquidation Trustee will monetize any of the Debtors' remaining non-cash assets, including litigation claims against third parties, and distribute the proceeds to creditors in accordance with the Plan and the Liquidation Trust Agreement. The Plan provides that the Liquidation Trustee may pursue additional causes of action against third parties, other than CODI who will receive a complete release. Because of the unpredictable and highly contingent nature of the litigation claims, the estimated recoveries to creditors set forth below do not take into account potential proceeds of these litigation claims.

Under the Plan, Administrative Claims, Priority Claims, and Other Secured Claims, and Priority Tax Claims will receive Cash Distributions in the amount of their Allowed Claims on or soon after the Effective Date (or, if later, following their Claim becoming Allowed) in accordance with the Plan and as described further herein. Priority Tax Claims will receive Cash Distributions in the amount of their Allowed Claims on or after the Effective Date or in regular installment payments plus interest (subject to prepayment). Holders of Convenience Class Claims (those non-priority unsecured Claims less than or equal to $10,000 or which the Holders elect to reduce their Claims to $10,000) will be paid 50% of the amount of their Allowed Claims on or soon after the Effective Date.

The Holders of Allowed General Unsecured Claims will receive General Beneficial Interests in the Liquidation Trust, and the Holder of the CODI Claim will receive the Special Beneficial Interest. The Special Beneficial Interest and the General Beneficial Interests receive allocations and distributions from the Liquidation Trust based on the type of asset being liquidated. Holders of Subordinated Claims or Equity Interests will not receive any Distribution on account of Subordinated Claims or Equity Interests.

The Plan provides for the substantive consolidation of all of the Debtors into one consolidated estate for purposes of voting and the treatment of Claims and Distributions under the Plan. Thus, for example, if one debtor holds $100 of assets and owes $0 of liabilities, and a different debtor holds $0 of assets and owes $100 of liabilities, the consolidation of those two entities would treat those two entities for all purposes under the Plan as a single entity that will hold $100 of assets and owe $100 of liabilities.

I.    **INTRODUCTION**

Lugano Diamonds and the other Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan.

The purpose of this Disclosure Statement is to enable Creditors that are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated orderly liquidation of the Estate Assets. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

## A.    Overview of the Plan

### 1.    General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders.

In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is therefore referred to as a "plan of liquidation." The Debtors' remaining assets largely consist of cash and the proceeds of the Bankruptcy Court-approved Agency Agreement, tax refunds, and Causes of Action. The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates. The estimated recoveries to creditors set forth in this Disclosure Statement do not include any estimate of potential proceeds of the Liquidation Trust Actions because they are unpredictable and highly contingent. Among other things, although the Debtors believe that such litigation claims exist, the ability to collect any judgment on certain of those claims is unknown at this time.

The Plan proposes to consolidate the Debtors' assets and liabilities, and thereafter provides for the creation of a Liquidation Trust and the appointment of a Liquidation Trustee. The Liquidation Trustee will administer and liquidate property of the Debtors and their Estates pursuant to the Liquidation Trust Agreement, subject to the supervision and oversight of the Liquidation Trust Oversight Board and the Liquidation Trustee, respectively, all as described more fully in Section IV.F of this Disclosure Statement. The Plan also provides for the funding of the Liquidation Trust and for Distributions to be made to Holders of Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed DIP Claims, Allowed CODI Claims, Allowed Other Secured Claims, Allowed Priority Claims, Allowed General Unsecured Claims, and Allowed Convenience Class Claims. The Plan also provides for the cancellation of all Subordinated Claims and all Equity Interests in the Debtors, the issuance of a share Lugano Holding, Inc. to the Liquidation Trust, the dissolution and wind up of the affairs of the Debtors, and the administration of any remaining assets of the Debtors' Estates by the Liquidation Trustee (other than the Tax Refunds, which will be administered by Lugano Holding, Inc., referred to in the Plan as a Post-Confirmation Debtor).

3

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS AND THE CREDITORS' COMMITTEE URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.**

### 2.      Material Terms of the Plan

The following is a general overview of certain material terms of the Plan:

- All Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Claims will be paid or otherwise satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Holders of such Claims and the Liquidation Trustee.

- Holders of Allowed CODI Claims will receive the Special Beneficial Interest in full satisfaction of their Claims against the Debtors and their estates and the Allowed DIP Claim is deemed satisfied in connection with the CODI Settlement.

- Holders of Allowed General Unsecured Claims will receive General Beneficial Interests in full satisfaction of their Claims against the Debtors and their estates.

- Holders of Allowed Convenience Class Claims will receive 50% of their Allowed Claims in Cash in full satisfaction of their Claims against the Debtors and their estates.

- Holders of Subordinated Claims will not receive or retain any property or interest in property under the Plan on account of such Subordinated Claims.

- Holders of Intercompany Claims (i.e., Claims that could be asserted by one Debtor against another Debtor) will not receive or retain any property or interest under the Plan on account of such Intercompany Claims.

- All Equity Interests in the Debtors shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests.  The Liquidation Trust will become the sole owner of the Post-Confirmation Debtor and will hold such ownership interest as a Liquidation Trust Asset.

- The Debtors will be substantively consolidated into Lugano Diamonds, with the result that any claim against any Debtor will be deemed a claim against Lugano Diamonds, identical claims against multiple Debtors will be treated as a single claim, and the assets of the Debtors collectively will be treated as belonging to a single, consolidated estate.

- The Liquidation Trust will (a) sell, liquidate, transfer, or otherwise dispose of the Liquidation Trust Assets, (b) pursue Causes of Action for the collective benefit of all the

4

Liquidation Trust Beneficiaries, (c) wind down the Debtors and the Post-Confirmation Debtor, and (d) make Distributions, all in accordance with the Plan.

**3.      Summary of Treatment of Claims and Equity Interests Under the Plan**

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES FOR PREPETITION SECURED CLAIMS AND GENERAL UNSECURED CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.**

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | PROJECTED RECOVERY |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | 100% |
| None | Professional Fee Claims | Unimpaired | 100% |
| None | Priority Tax Claims | Unimpaired | 100% |
| None | DIP Claims | Unimpaired | 100% (deemed satisfied by treatment of the CODI Claims) |
| Class 1 | Other Secured Claims | Unimpaired (presumed to accept) | 100% |
| Class 2 | Priority Claims | Unimpaired (presumed to accept) | 100% |
| Class 3 | CODI Claims | Impaired | Allocable portion of Litigation Trust distributions |
| Class 4 | General Unsecured Claims | Impaired | Allocable portion of Litigation Trust distributions |
| Class 5 | Convenience Class Claims | Impaired | 50% of Allowed Claim (Allowed Claim not to exceed $10,000). |
| Class 6 | Intercompany Claims | Impaired (deemed to reject) | 0% |
| Class 7 | Subordinated Claims | Impaired (deemed to reject) | 0% |
| Class 8 | Equity Interests | Impaired (deemed to reject) | 0% |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

**B.      Plan Voting Instructions and Procedures**

**1.      Voting Rights**

a.      <u>Unclassified Claims</u>.      Unclassified Claims (i.e., DIP Claim, Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are entitled to be paid in full unless each Holder of such a Claim agrees otherwise and are not entitled to vote on the Plan.

b.      <u>Classified Claims.</u>      Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under section 1126 of the Bankruptcy Code are entitled to vote to accept or reject such plan. A class of claims or interests is deemed not to have accepted the plan if such class is not entitled to receive or retain any property under the plan on account of such claims or interests. Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan. As set forth in section 1124 of the Bankruptcy Code, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan. Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under section 502 of the Bankruptcy Code or temporarily allowed for purposes of accepting or rejecting a plan.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the dollar amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan, without counting votes of creditors whose claims are "designated" because, for example, the votes were procured in bad faith. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Class 3, Class 4, and Class 5 are Impaired by, and entitled to receive a Distribution under, the Plan; and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed allowed for voting purposes are entitled to vote to accept or reject the Plan. Only Holders of Claims in Class 3, Class 4, and Class 5 as of the dates specified in the Disclosure Statement Order (the "<u>Voting Record Date</u>") may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Class 1 and Class 2 are Unimpaired by the Plan. Such Holders are conclusively presumed to have accepted the Plan and are therefore not entitled to vote on the Plan.

6

The Debtors will not solicit the votes of Holders of any Intercompany Claims in Class 6, Subordinated Claims in Class 7, or Equity Interests in Class 8.  Intercompany Claims in Class 6, Subordinated Claims in Class 7, and Equity Interests in Class 8 will not receive or retain any property under the Plan on account of such Claims or Equity Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

## 2.       Solicitation Materials

The Debtors, with the approval of the Bankruptcy Court, have engaged Omni Agent Solutions, Inc. (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process.  The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto, are accessible via a QR Code link or at the Voting Agent's website, https://omniagentsolutions.com/lugano;

- The Bankruptcy Court order approving this Disclosure Statement on a conditional basis (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, to be used in voting to accept or to reject the Plan make a Convenience Class Election, contribute and assign any and all of their Contributed Claims, and opt-out of third party releases, and applicable instructions with respect thereto (the "Voting Instructions");

- A Contribution Form for certain Holders of Claims to contribute Contributed Claims to the Liquidation Trust.

- A pre-addressed, postage pre-paid return envelope;

- A Plan support letter prepared by the Creditors' Committee; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.  The Solicitation Package is also available without charge at the Debtors' restructuring website at https://omniagentsolutions.com/lugano.

Seven days before the earlier of the Voting Deadline or the deadline for filing objections to Confirmation of the Plan, the Debtors will File a Plan Supplement.  As the Plan Supplement is updated or otherwise modified, it will be made available without charge at the Debtors' restructuring website at https://omniagentsolutions.com/lugano.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to:

> Lugano Diamonds & Jewelry Inc., et al. Ballot Processing
> c/o Omni Agent Solutions
> 5955 De Soto Ave., Suite 100
> Woodland Hills, CA 91367
> Email:  LuganoInquiries@OmniAgnt.com
> Phone:  888.902.1791

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File with the Bankruptcy Court a motion pursuant to Bankruptcy Rule 3018 for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS AND THE LIQUIDATION TRUST, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

### 3. Voting Instructions and Procedures

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed the Voting Record Date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is August 18, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline")**.  In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline, either by (i) submitting an electronic ballot through the case website at https://omniagentsolutions.com/lugano or (ii) by mailing your Ballot so it is received no later than the Voting Deadline at the following address:

> Lugano Diamonds & Jewelry Inc., et al. Ballot Processing
> c/o Omni Agent Solutions
> 5955 De Soto Ave., Suite 100
> Woodland Hills, CA 91367

Email:  LuganoInquiries@OmniAgnt.com
Phone:  888.902.1791

Only the Holders of (i) CODI Claims in Class 3, which are Allowed Claims pursuant to the Plan and the CODI Settlement Agreement, and (ii) General Unsecured Claims and Convenience Class Claims that are deemed valid for purposes of voting on the Plan in Class 4, and Class 5 as of the Voting Record Date are entitled to vote to accept or reject the Plan.  They may do so by completing the appropriate Ballot(s) and returning them electronically or in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline.  Each Holder of a Claim must vote its entire Claim either to accept or to reject the Plan and may not split such vote.  A Holder of a General Unsecured Claim who makes a Convenience Class Election is deemed to have voted to accept the Plan.  If you (1) hold Claims in more than one voting Class, or (2) hold multiple Claims within one Class, you may receive more than one Ballot.  The Ballots will clearly indicate the appropriate return address.  It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or the Voting Deadline is extended with respect to such Ballot by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and

- Any Ballot that is not signed, does not contain an original signature, or is not properly submitted through electronic means.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal

9

must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above.  Copies of the Plan, Disclosure Statement, and other documents Filed in these Chapter 11 Cases may be obtained free of charge at the Debtors' restructuring website at https://omniagentsolutions.com/lugano Documents Filed in these Chapter 11 Cases may also be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") no later than two business days prior to the Confirmation Hearing.  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

### 4.    Elections and Contributions

Section 11.09 of the Plan provides that all Holders of Claims, whether or not voting in a Class that can vote to accept or reject the Plan, will be deemed to have released each Released Party (as defined in the Plan), including without limitation, a release of Claims and Causes of Action, unless such Holder makes an Opt-Out Election of the releases set forth in Section 11.09 of the Plan.

**The Opt-Out Election is only for the releases set forth in Section 11.09 of the Plan. All other releases, injunctions, and exculpations will be binding on all Persons and entities as set forth in the Plan.**  You are not entitled to opt out of the releases, exculpation, or injunctions set forth in other provisions of the Plan.

To make an Opt-Out Election, each Holder of a Claim entitled to vote on the Plan must make an Opt-Out Election by checking the applicable box on its Ballot and returning the Ballot in accordance with the Voting Instructions and Procedures noted above.  Holders of Claims (whether

or not entitled to vote) may make an Opt-Out Election by submitting an Opt-Out Form to the Voting Agent so that it is received no later than **August 18, 2026 at 4:00 p.m. (prevailing Eastern Time)**.  Opt-Out Forms submitted by email, fax, or other electronic means **are not valid.**

Each Holder of a General Unsecured Claim can make two elections on its Ballot.  First, such Holder may make a Convenience Class Election by checking the applicable box on its Ballot. By making a Convenience Class Election, the Holder of a General Unsecured Claim will have the Allowed amount of its Claim  reduced to $10,000 (if the Allowed amount of such Claim exceeded $10,000) and will receive the treatment provided to Convenience Class Claims in Class 5. Such treatment is equal to 50% of its Allowed Convenience Class Claim. If a Holder of a General Unsecured Claim makes the Convenience Class Election, such Holder will receive, in full satisfaction, settlement and release of its General Unsecured Claim, the lesser of $5,000 and 50% of its Allowed Claim.

Second, each Holder of a General Unsecured Claim may contribute and assign to the Liquidation Trust its Contributed Claims (i.e., Claims and Causes of Action against Grant Thornton LLP and its affiliates) by checking the applicable box on its Ballot or by submitting a Claim Contribution Form (i.e., the Claim Contribution and Assignment Form). If a Holder of a General Unsecured Claim (i.e., a Contributing Creditor) contributes such Contributed Claims to the Liquidation Trust, then such Contributing Creditor will be entitled an additional Distribution (that does not count against any other Distribution) on account of that Contributing Creditor's General Beneficial Interest equal that Contributing Creditor's Pro Rata portion of 10% of the Net Proceeds of all Causes of Action against GT, net of the CODI share of those Net Proceeds under Section 3.02(c)(v) of the Plan, not to exceed the amount of that Contributing Creditor's Allowed General Unsecured Claim, provided that (i) the Contributing Creditor certifies on its Ballot or its Contribution Form under penalty of perjury that the Contributed Claim is colorable and supportable by evidence and (ii) the Liquidation Trustee (in consultation with the Liquidation Trust Oversight Board) independently and reasonably confirms that the Contributed Claim is colorable and supportable by evidence.

To make a contribution and assignment of a Contributed Claim, each Holder of a Claim making such a contribution and assignment must make such contribution and certification by checking the applicable box on its Ballot and returning the Ballot in accordance with the Voting Instructions and Procedures noted above.  Holders of General Unsecured Claims (whether or not entitled to vote in accordance with the voting procedures) may make such a contribution and assignment by submitting a Contribution Form to the Voting Agent so that it is received no later than **August 18, 2026 at 4:00 p.m. (prevailing Eastern Time)**.  Contribution Forms submitted by email, fax, or other electronic means **are not valid.**

### 5.      Confirmation Hearing and Deadline for Objections to Confirmation

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **August [18], 2026 at 4:00 p.m. (prevailing Eastern Time)**. Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.  For further information, refer to Section VI of this Disclosure Statement, "Confirmation of the Plan."

11

## II.    BACKGROUND REGARDING LUGANO

### A.    General Background

Lugano, a designer, manufacturer, and retailer of high-end jewelry with its headquarters in Newport Beach, California, enjoyed success selling one-of-a-kind jewelry to wealthy clientele and partnering with organizations to host and sponsor equestrian, social, and philanthropic events. Lugano opened its first retail store in Newport Beach in 2005 with an exclusive, appointment-only sales strategy. Thereafter, Lugano added three additional retail locations, started its equestrian division in 2008, and expanded production capabilities in 2020.

Lugano achieved success in the high-end jewelry market through unique positioning and its business model. Lugano is attentive to the preferences of its sophisticated, high-net-worth clientele who tend to highly value unique or exclusive jewelry and a personalized sales approach involving long-standing relationships. Thus, Lugano's approach focuses on building lasting relationships and the creation of jewelry to tell a story.

In 2021, Compass Diversified Holdings ("CODI Parent"), through its subsidiary Compass Group Diversified Holdings LLC ("CODI" and collectively with CODI Parent, at times referred to herein as "CODI"), acquired a majority interest in Lugano Holding from Mr. Ferder and affiliated entities for an enterprise value of $256 million. Mr. Ferder and his affiliated entities retained a significant portion of the equity (approximately 40% of Lugano Holding), and Mr. Ferder continued as chief executive officer and a member of the board of directors of certain Debtors. CODI currently owns approximately 59.9% of Lugano Holding and Mr. Ferder's affiliated entities own approximately 39.6% of Lugano Holding.

Following the CODI acquisition, Lugano added additional locations and opened a private social club – Lugano Privé – for its clients. By 2025, Lugano expanded to operate nine retail locations – eight in the United States and one in London, UK – as well as an equestrian division and pop-up show rooms.

Lugano Diamonds conducts the Debtors' day-to-day jewelry operations and Lugano Prive operates the Lugano Privé social club, where members can dine, lounge, socialize, and participate in enriching cultural experiences. Until KLD's suspension of its operations shortly before the Petition Date, KLD acquired diamonds from third parties and sold them to its sole customer, Lugano Diamonds.

The Debtors are operating their business but expect that the Agent will either convey the business operations to a third party or cease operations entirely in advance of the Plan Effective Date.

### B.    Corporate and Capital Structure

Lugano Holding, Inc. (Lugano Holding") is the direct or indirect parent of the other Debtors and their foreign subsidiaries. Lugano Holding is the sole shareholder of Lugano Buyer, Inc. ("Lugano Buyer"), and Lugano Buyer is the sole shareholder of Lugano Diamonds. Lugano Diamonds is the sole member of K.L.D. Jewelry, LLC ("KLD"), the trustor and sole beneficiary of the Lugano Prive Investment Trust ("Lugano Trust"), and the sole owner of the non-U.S.

12

entities. Lugano Trust is the sole member of Lugano Prive. Lugano Diamonds is a California corporation. All the other Debtors are Delaware entities.

Lugano Diamonds and Lugano Buyer, as co-borrowers, and CODI, as lender, entered into a Credit Agreement (as amended, the "Credit Agreement") dated as of September 3, 2021. The other Debtors are guarantors under the Credit Agreement. The Credit Agreement provides for both revolving and term loans. Pursuant to a Guarantee and Collateral Agreement dated as of September 3, 2021, the Credit Agreement is secured by liens on substantially all of the Debtors' personal property and the obligations under the Credit Agreement are guaranteed by the other Debtors.

The Credit Agreement, as amended, provided revolving loan and term loan commitments. The outstanding obligations under the credit agreement, including principial, prepetition interest, and fees, exceed $718 million. The Credit Agreement is secured by substantially all of the Debtors' assets.

## C.    Events Leading Up to the Chapter 11 Cases

### 1.    Discovery of Irregular Financing, Accounting, and Inventory Practices

On May 7, 2025, CODI and CODI Parent filed a Form 8-K (the "May 8-K") disclosing that CODI had commenced an internal investigation into the financing, accounting, and inventory practices of Lugano Holding, based on concerns reported to CODI senior leadership as to such practices. The May 8-K also disclosed that Mr. Ferder had resigned from all of his positions at Lugano.

Within weeks of the 8-K disclosures, the Debtors heard from close to sixty (60) persons asserting substantial claims relating to alleged transactions ("Investment Contracts") entered into by Mr. Ferder. The Investment Contracts, which were outside Lugano Diamonds' ordinary course of business, were generally joint investment agreements in which a third party would co-invest in a loose diamond, ostensibly for resale at a significant profit. Since the summer of 2025, approximately a dozen parties have commenced lawsuits against Lugano Diamonds, Mr. Ferder, and/or other parties, including those related to the Investment Contracts.

On June 24, 2025, Lugano Diamonds commenced an action against Mr. Ferder and a related trust for which he is a trustee. The complaint included claims for fraud, concealment, constructive fraud, and breach of fiduciary duty. The complaint alleges that Mr. Ferder "concealed and mispresented the nature of numerous financing transactions he entered into with third party, high net worth individuals." It further alleges that these contracts "created potential liabilities for Lugano [Diamonds], but [Mr. Ferder] disguised them as direct sales. He forged invoices and sale documents, sent out empty box shipments, falsely recorded the money from the third-party individuals as revenue for Lugano [Diamonds], and concealed the payment obligations from Lugano [Diamonds'] books."

13

### 2. Corporate Governance

Beginning in early 2024, Lugano Diamonds brought in a new management team, including Mr. Joshua Gaynor as President and Christoph Pachler as Chief Financial Officer. On June 4, 2025, among other governance changes, Mr. Gaynor and Mr. Pachler were selected as directors of Lugano Holding, Lugano Buyer, and Lugano Diamonds. The next day, certain of the directors and managers appointed by CODI pursuant to the applicable governance documents resigned their positions throughout the Company.

To address potential conflicts and to provide for independent governance where appropriate, the Board added two independent directors (to supplement two legacy independent directors that remain on the Board) with no prior connection to the Company, CODI, or the Ferders. Mr. Thomas FitzGerald and Mr. L. Spencer Wells joined the Lugano Diamonds Board on July 9, 2025, and a week later, on July 16, 2025, the Board delegated certain matters to a Special Committee of the Board (the "Special Committee") comprised of Messrs. FitzGerald and Wells.

The purview of the Special Committee includes overseeing an investigation of the fraud described above and commencing, prosecuting, or settling any actions related to matters addressed by, or causes of action that may be developed in, the investigation. By doing so, the Board ensured that Board members who were officers or directors of the Company at the time of the scheme would not be involved in the related investigation or litigation. The Special Committee also assumed responsibility for, among other things, reviewing, evaluating, and, if appropriate, making recommendations to the Board about strategic transactions (whether within or outside a bankruptcy) and the commencement of an insolvency proceeding. The Special Committee retained professionals to assist it in carrying out its delegated responsibilities.

The Special Committee commenced an internal investigation surrounding the fraud to determine, among other things, what happened and what claims may exist as a result thereof. In accordance with the delegation from the Board, the Special Committee also took the lead role in evaluating various proposals and ultimately made recommendations to the Board regarding potential strategic transactions and the commencement of the Chapter 11 Cases. The Board accepted those recommendations.

### 3. Financing Matters

On June 6, 2025, CODI sent Lugano Diamonds and Lugano Buyer a notice of default and reservation of rights under the Credit Agreement. Thereafter, on August 29, 2025, the Debtors and CODI entered into a forbearance agreement (the "Forbearance Agreement"). Pursuant to the Forbearance Agreement, CODI agreed not to exercise certain remedies, suspended the payment of interest and principal, and suspended certain financial covenant testing, if the Debtors met certain sale milestones, did not default under the Forbearance Agreement or the Credit Agreement (or other loan documents) and were not subjected to material prejudgment remedies. In exchange, the Debtors, among other things, acknowledged the outstanding principal amount and accrued but unpaid interest, released certain claims against CODI and certain related parties, acknowledged that CODI had valid, perfected, enforceable first priority liens and security interests in its collateral, subject to certain exceptions, and agreed to certain milestones in a sales process, agreed to suspend certain covenant carve-outs, and agreed to certain additional covenants.

Due in part to the complications relating to the fraud, the sale process took longer than anticipated. To address these delays and to provide the Debtors with necessary liquidity, on October 2, 2025, the Debtors and CODI entered into to the First Amendment to Forbearance Agreement and the Twenty Third Amendment to Credit Agreement (the "Twenty Third Amendment"). The Twenty Third Amendment, among other things, limited enabled Lugano Diamonds' and Lugano Buyer's ability to borrow up to an aggregate amount of $4 million under the Credit Agreement, subject to CODI's discretion, on and after the Twenty-Third Amendment Effective Date. Following entry into the Twenty Third Amendment and as of the Petition Date, CODI provided an additional $2.2 Million under the Credit Agreement. A Second Amendment to Forbearance Agreement dated as of October 10, 2025, followed, and among other things, extended certain sale process milestones contained in the Forbearance Agreement.

### 4. The Sales Process and Commencement of These Cases

In May 2025, Lugano Diamonds engaged Armory Securities, LLC ("Armory") on an exclusive basis to be its financial advisor and investment banker in connection with a possible restructuring, sale, or financing. The Debtors and their professionals identified over 100 parties that might be interested in a purchase or financing transaction with the Debtors. Over 50 parties signed non-disclosure agreements and received a confidential information memorandum. Multiple parties submitted indications of interest. The Debtors provided those parties with due diligence materials, including access to a virtual data room and meetings with management. The Debtors subsequently received six letters of intent that proposed to acquire a controlling interest in Lugano Diamonds or substantially all of its assets. The proposals included "going concern" and liquidation proposals, certain of which the Special Committee (in consultation with the full Board), instructed Armory and the Debtors' counsel to further negotiate.

Following those discussions, the Debtors determined that the proposed transaction with the Agent, subject to higher or better offers, was the path that would maximize the value to its stakeholders. The Debtors engaged the Agent in good faith, arms'-length negotiations and entered into that certain Agency Agreement (the "Agency Agreement") dated as of November 16, 2025, with the Agent.

The Agency Agreement contemplated that the Debtors would pursue higher or better offers through the Chapter 11 Cases. On November 16, 2025, the Debtors commenced these actions to maximize the value of their estates and to efficiently distribute value to their creditors.

## III. THE CHAPTER 11 CASES

On the Petition Date, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Cases are being jointly administered under the case caption *In re Lugano Diamonds & Jewelry Inc., et al.*, Case No. 25-12055 (BLS) (Bankr. D. Del.). The commencement the Chapter 11 Cases automatically imposed a stay under section 362(a) of the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The stay will remain in effect, unless modified by the Bankruptcy Court, until the closing of the Chapter 11 Cases.

A.     **First Day Orders and Initial Employment Applications**

On and shortly after the Petition Date, the Debtors Filed certain "first day" motions and applications with the Bankruptcy Court (the "First Day Motions") seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. The Bankruptcy Court held a hearing on these first-day motions on November 18, 2025. In connection with these hearings, the Bankruptcy Court entered a series of "first day" and "second day" orders that, among other things, authorized the Debtors to (i) pay certain prepetition obligations, such as those owing to their employees and taxing authorities, (ii) maintain their bank accounts, cash management system, and insurance programs, (iii) continue their customer programs, (iv) redact certain confidential and personally identifiable information, (v) provide adequate assurance to utilities; (vi) retain a claims and noticing agent, and (vii) jointly administer the Chapter 11 Cases. The motions, to the extent not approved on November 18, 2025, were thereafter approved by the Bankruptcy Court.

On November 26, 2025, the Debtors filed applications to employ (i) (a) Keller Benvenutti Kim LLP and (b) Young Conaway Stargatt & Taylor, LLP as bankruptcy counsel, (ii) GlassRatner Advisory & Capital Group, LLC to provide J. Michael Issa as Chief Restructuring Officer of the Debtors, (iii) Armory Securities, LLC as the Debtors' investment banker, (iv) Omni Agent Solutions, Inc. as administrative agent, and (v) Barnes & Thornburg LLP as special counsel to the special committee of the Board of Directors of Lugano Diamonds. The Debtors also filed motions to retain ordinary course professionals and to establish procedures for the compensation of professionals. The Bankruptcy Court entered orders for each of the applications and motions.

B.     **The Agency Agreement and Related Motions**

On November 17, 2025, the Debtors filed a motion (the "Agency Approval and Sale Motion") seeking, among other things, (i) interim authorization to perform under the Agency Agreement and certain related sale guidelines, (ii) approval of certain bidding protections for the Agent and bidding procedures, and (iii) either assumption of the Agency Agreement or authorization for the Debtors to sell their assets from and clear of liens, claims, and encumbrances to another bidder. *See* Docket No. 13.

The Agency Agreement contemplated two time periods. During the Tier 1 Period, which ran from the day following entry of an interim approval order through the date of entry of the final approval order), the Agent served as the Debtors' consultant and exclusive agent to sell certain of the Debtors' merchandise and owned furniture, fixtures, and equipment (the "Agency Assets") on a commission basis, with the Debtors responsible for expenses. The Bankruptcy Court entered an interim approval Order on November 20, 2025, s*ee* Docket No. 71, and the Tier 1 Period began on November 21, 2025.

On December 17, 2025, the Bankruptcy Court entered an order approving the Debtors' bidding procedures and the provision of bidding protections for the Agent. Thereafter, prior to the bid deadline, the Debtors received one additional bid. The Debtors determined, in consultation with CODI and the Creditors' Committee, that the bid was not a qualified bid. Accordingly, the Debtors cancelled the auction. On December 31, 2025, the Bankruptcy Court entered an order authorizing the Debtors to assume the Agency Agreement. S*ee* Docket No. 263.

16

As a result of the Agent being the successful bidder, the Agency Agreement advanced to Tier 2.  During the Tier 2 Period, the Agent is responsible for the sale of the Agency Assets.  The Tier 2 payment structure provides, among other things, for (i) the Debtors to receive a guaranteed amount equal to 40% of the aggregate cost value of certain merchandise, (ii) proceeds in excess of that amount are allocated between the Debtors and the Agent, and (iii) the Agent to be responsible for sale expenses (including related payroll and occupancy costs).  In addition, there was a reconciliation to put the Debtors and the Agent in the same economic position as they would have been if the Tier 2 Period commenced on November 21, 2025.

Proceeds from the Agency Agreement will be distributed pursuant to the terms of the Plan.

## C.    DIP Financing Motion and Cash Collateral

On the Petition Date, the Debtors filed a motion (the "DIP Motion") seeking interim and final orders authorizing the Debtors to, among other things, (i) borrow up to $12 million (with $1.5 million to be available on an interim basis) in postpetition financing from the "DIP Lenders"; (ii) grant priming liens and security interests to the DIP Lenders to secure the applicable Debtors' obligations under the DIP Loan; (iii) subject to the terms and conditions set forth in the DIP Motion, use the DIP Lenders' cash collateral; and (iv) provide adequate protection to the holders of alleged prepetition liens.

On November 19, 2025, the Bankruptcy Court entered the interim order approving the DIP Motion, authorizing the Debtors to, among other things, borrow up to $1.5 million for the period from the Petition Date through the entry of a final order.  *See* Docket No. 66.  Thereafter, the Debtors, the DIP Lender, and the Committee agreed that it was in the Estates' best interests for the Debtors not to pursue approval of the DIP Loan on a final basis and to instead only seek authority to use cash collateral.  On February 10, 2026, the Bankruptcy Court entered its final order on the authorizing the Debtors to use cash collateral.  *See* Docket No. 364 (the "Cash Collateral Order").  The Cash Collateral Order entered by the Bankruptcy Court contains various important features, including:

- authorization for the Debtors to use CODI's Cash Collateral (as defined in the Cash Collateral Order), subject to the conditions set forth in the Cash Collateral Order;

- carve-outs providing for the payment of certain expenses incurred during the Chapter 11 Cases, including amounts that may be payable to professionals retained by the Debtors and the Creditors' Committee;

- certain Events of Default provisions setting forth CODI's rights upon the occurrence thereof;

- standard waivers of certain provisions of the Bankruptcy Code, including under section 552 of the Bankruptcy Code, as well as adequate protection liens and superpriority claims granted to CODI; and

The Debtors anticipate that they will have access to use CODI's Cash Collateral through the Effective Date of the Plan.

17

**D.      Appointment of the Creditors' Committee**

On November 25, 2025, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases. *See* Docket Nos. 88 and 93. The members of the Creditors' Committee are Royalty T Diamonds Group Ltd., NBS Diamonds Inc. (dba Scarselli Diamonds, "Scarselli"), Ponte Gadea Chicago, LLC, The Irvine Company, William Scott Simon, Barry Aronoff, Avina LLC/Global Innovations LLC, Adam Rothstein, and Kristoffer Winters. Counsel to the Creditors' Committee is Pachulski Stang Ziehl & Jones LLP and its financial advisor is Force Ten Advisors, LLC.

Following approval of the Scarselli Stipulation (as defined below), Scarselli resigned from the Creditors' Committee.

**E.      Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims**

On December 13, 2025, the Debtors Filed their Schedules and Statements of Financial Affairs under seal and filed proposed redacted versions thereof. The redacted Schedules (but not the Schedules filed under seal) were withdrawn on December 15, 2025, and re-filed on December 17, 2025 with revisions to certain redactions. A Creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated, or disputed may, but need not, file a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan.

The Bankruptcy Court established (i) January 27, 2026 at 11:59 p.m. (prevailing Eastern Time) as the deadline (or "bar date") for Creditors (other than governmental units) to File proofs of claim against the Debtors (including Claims arising under section 503(b)(9) of the Bankruptcy Code); and (ii) as to each Debtor, May 15, 2026 at 11:59 p.m. (prevailing Eastern Time) as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to File proofs of claim against the Debtors. *See* Docket No. 223.

As of June 17, 2026, approximately 230 claims have been filed against the Debtors. The aggregate dollar amount of the filed claims (including claims filed against multiple Debtors and duplicative claims) is approximately $2.6 billion. After giving effect to the Debtors' substantive consolidation (e.g., counting claims by one creditor against multiple Debtors as a single claim, the total number of filed and scheduled claims is approximately $1.1 billion. The Debtors have not completed reconciling the claims filed in the Chapter 11 Cases and do not anticipate doing so before the Effective Date of the Plan.

The Debtors have undertaken a preliminary review of the filed proofs of claim. At this time, the Debtors estimate that their Allowed Claims (exclusive of any CODI Claims (including the CODI Claim), Administrative Claims, Intercompany Claims, and Subordinated Claims) are as follows. For purposes of these estimates, the filed Investment Contract Claims are estimated based on the "invested" amount and a standardized rate of interest. Because of the uncertainty of the claims process, including the potential exposure on account of unliquidated claims, and the likely objections to one or more high value disputed claims, the ultimate amount of Allowed Claims may differ materially from the estimated provided below.

18

The Debtors' estimates for other prepetition Claims are as follows:

Priority Tax Claims: $1.0 million - $1.5 million

Priority Claims: Less than $50,000

Other Secured Claims: Less than $2 million[3]

General Unsecured Claims $[●] million to $[●] million

Convenience Class Claims: $350,000-400,000 (assuming no Convenience Class Elections).

## F.    Other Events During the Chapter 11 Cases

### 1.    Executory Contracts and Unexpired Leases and Related Settlements

During the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to reject four (4) leases of nonresidential real property relating to domestic retail locations.  The Debtors also obtained approval to reject agreements related to leases where their non-Debtor Canadian and UK subsidiaries were tenants.  With respect to their Canadian subsidiary, the Debtors thereafter obtained approval of a settlement with the landlord, where the Debtors and the landlord, among other things, exchanged mutual releases. *See* Docket Nos. 150, 151, 338, and 388.

The Debtors entered into a stipulation with the Aspen Art Museum that provided for the rejection of a 10-year sponsorship agreement.  The Court approved the stipulation on March 17, 2026. *See* Docket No. 433.

In addition, the Debtors obtained an extension of time to assume or reject certain of their remaining nonresidential real property leases at least through and including July 31, 2026.  The Debtors and the Palm Beach landlord have agreed that the Palm Beach lease will terminate on July 31, 2026, with a payment being made to the Debtors. *See* Docket Nos. 597.

### 2.    Requests for Relief from the Automatic Stay.

On January 27, 2025, the Debtors' former Chief Executive Officer, Mr. Ferder, filed a motion for relief from the automatic stay [Docket No. 312] (the "Ferder Stay Relief Motion") to file counterclaims in the action commenced by Lugano Diamonds against Mr. Ferder on June 24, 2025 in the Superior Court of California, County of Orange (the "State Court"), Case No. 30-2025-01492210-CU-CO-CJC. *See* Docket No. 312.  The Debtors and Mr. Ferder have agreed to adjourn the hearing on the Ferder Stay Relief Motion until July 14, 2026.

On February 11, 2025, Bulley & Andrews, LLC filed a motion for relief from the automatic stay to foreclose on its mechanics lien asserted against the landlord of a rejected lease.  The Debtors agreed to relief from the automatic stay.  *See* Docket Nos. 369 and 396.

---

[3]    The Debtors anticipate that most of these claims, to the extent Allowed, will be satisfied by the retention of collateral.

On April 10, 2026, Travelers Casualty and Surety Company of America ("Travelers") filed a motion for relief from the automatic stay to make certain payments under the Debtors' directors' and officers' liability insurance policy. *See* Docket No. 524.   The Debtors and Travelers have agreed to adjourn the hearing on the Travelers' motion for relief from the automatic stay until July 14, 2026.

On March 4, 2026, the Debtors entered into a stipulation with a landlord to permit the landlord to draw on a letter of credit, which stipulation was approved by the Court. *See* Docket Nos. 418-19.

### 3.      Litigation and Settlements

On February 4, 2026, the Debtors commenced an adversary proceeding titled *Lugano Diamonds & Jewelry Inc. v. Travelers Casualty and Surety Co. of America*, Case No. 25-12055 (BLS), Adv. Pro. No. 25-50036 (BLS) (Bankr. D. Del) against their directors' and officers' liability insurer, Travelers.  In that lawsuit, among other things, the Debtors seek a declaratory judgment that requires Travelers to tender the policy limits ($3 million) to allow the Debtors to defend themselves in connection with the matters related to Mr. Ferder's actions and related litigation, including requiring Travelers to reimburse the Debtors' litigation counsel's fees and expenses in connection therewith.  Travelers filed a motion requesting that the Bankruptcy Court abstain from that adversary proceeding.  A hearing on the abstention motion has been adjourned until July 14, 2026.

The Debtors entered into a stipulation with Scarselli and CODI, providing for, among other things, the assignment of certain insurance rights to Scarselli, modification of the automatic stay to permit Scarselli to pursue such insurance rights, and waiver of Scarselli's $10.5 million proof of claim except to the extent necessary to effectuate the stipulation or to preserve its standing to pursue the assigned insurance claims.  The Bankruptcy Court approved the stipulation on June 2, 2026. *See* Docket Nos. 525 and 564.

### 4.      CODI Settlement

During the Chapter 11 Cases, the Special Committee continued its internal investigation surrounding Mr. Ferder's fraud and an analysis of potential causes of action relating thereto. That investigation encompassed alleged acts or omissions by CODI (both as a direct and indirect parent of the Debtors and a lender) and by third parties.  Likewise, after the commencement of the Chapter 11 Cases, the Creditors' Committee commenced its own investigation, focused on potential grounds on which CODI's Claim might be challenged, including disallowance of the Claim, avoidance of CODI's asserted liens, or subordination of the Claim.  The Special Committee and the Creditors' Committee consulted under a common interest agreement, and the Creditors' Committee had the benefit of some of the work performed by the Special Committee.  The investigations included the review of over 1.2 million documents obtained from the Debtors and others, and interviews or participation in depositions, including with the Debtors' current and former employees and relevant current and former CODI-related personnel. As part of the investigation process, the Special Committee obtained authority from the Bankruptcy Court for the Debtors to hire and compensate counsel for its current and former employees who participate in interviews or depositions to promote the efficiency of the investigations. *See* Docket Nos. 329 & 389.

Based upon information developed during the course of their investigations, the Creditors' Committee and the Special Committee determined that the Estates could bring various affirmative claims against CODI and its affiliated entities, as well as certain individuals. The Creditors' Committee and the Special Committee also determined that various defenses could be interposed to CODI's claims. The Creditors' Committee and the Special Committee believe such claims and defenses are meritorious and would provide value to the Estates. CODI disputes any liability and the validity of alleged claims against it and asserts that it has valid, perfected, and enforceable secured claims against the Estates.

Recognizing the significant cost of potential litigation, in early May 2026, the Debtors (through the Special Committee), the Creditors' Committee, and CODI voluntarily participated in a mediation. By the end of the mediation, the parties had agreed in principle on a settlement framework, to be documented by a separate settlement agreement and plan support agreement, and implemented pursuant to the Plan. The CODI Settlement provides for, among other things, the allocation of Estate assets between CODI on the one hand, and General Unsecured Creditors on the other hand, the funding of certain classes of Claims that are unimpaired or, in the case of Convenience Class Claims, to be paid in cash, and full and mutual releases between the Debtors' and their creditors and CODI. The material terms of the CODI Settlement are set forth below:[4]

The Settlement Agreement provides for CODI to receive certain recoveries, which have been incorporated into the Plan. CODI is to receive:

- An initial Distribution equal to 34.79% of the Cash in the Estates on the Effective Date of the Plan, less Cash used to fund the Effective Date Reserves and Professional Fee Reserve.

- Cash Distributions equal to:

  o   34.79% of Cash in the Effective Date Reserves and the Professional Fee Reserve to the extent not necessary to satisfy the Claims for which such reserves were established;

  o   34.79% of the Cash recovered on account of the proceeds from the Agency Agreement, the Tax Refund, the Theft Policy, Causes of Action to establish, and realize upon, the amounts due to the Estates under any agreement or law with respect to foregoing, less all expenses incurred in obtaining such recoveries;

  o   45% of the Cash recovered on account of the Claims and Causes of Action against Grant Thornton and its affiliates, less all expenses incurred in obtaining such recoveries;

---

[4]   This summary is qualified in its entirety by reference to the CODI Settlement Agreement. In the event of a conflict between this description and the CODI Settlement Agreement, the CODI Settlement Agreement shall control. A copy of the CODI Settlement Agreement is attached as Exhibit C to the Plan.

o 25% of the Cash received on account of all other Causes of Action, less all expenses incurred in obtaining such recoveries;

o After Holders of Allowed General Unsecured Claims have received Cash equal to 100% of their Allowed General Unsecured Claims and GUC Interest, CODI will receive all of the Cash recovered on account of assets of the Liquidation Trust, less all expenses incurred in obtaining such recoveries;

The CODI Settlement Agreement also provides for mutual releases between the Debtors, the Creditors' Committee, and their Related Parties (if controlled by the Debtors or the Creditors Committee), on the one hand and CODI, certain affiliates, and its and their Related Parties, on the other hand, of all Claims and Causes of Action as of the Effective Date of the Plan, except that the Plan does not release or waive the CODI Claims, CODI's recoveries under the Plan, the obligations of the parties to the Settlement Agreement, and claims against certain parties (including Excluded Parties, Investment Contract Counterparties, and members of the Creditors' Committee in any capacity other than as a member of the Creditors' Committee).

Other material provisions of the Settlement Agreement provide (a) that CODI will assign its claims against Grant Thornton and its affiliates to the Liquidation Trust upon the Effective Date of the Plan, (b) composition of the Liquidation Trust Oversight Board, and (c) for the ongoing confidentiality of mediation materials.

## IV.  SUMMARY OF THE JOINT CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Equity Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, the Plan Supplement, or any other operative document, the terms of the Plan, Confirmation Order, Plan Supplement, or such other operative document, as applicable, shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, inclusive of any Plan Supplement, in that order, shall govern and control over all other related documents.

22

### A.   Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents.  Chapter 11 also specifically allows a debtor to formulate and consummate a plan of liquidation.  *See* 11 U.S.C. § 1129(a)(11).  A plan of liquidation sets forth the means for satisfying claims against and equity interests in a debtor.  Confirmation of a plan of liquidation by a bankruptcy court makes that plan binding on the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the proceeds of the liquidation of all Estate Assets to various Creditors as contemplated under the Plan and for the wind up of the Debtors' corporate affairs.  More specifically, the Plan provides for the creation and funding of a Liquidation Trust to administer and liquidate all remaining property of the Debtors (other than Tax Refunds), including the Liquidation Trust Actions, and the implementation of the CODI Settlement.

Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria.  If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class, and the Liquidation Trust will make Distributions as provided in the Plan and the Liquidation Trust Agreement.  A general description of the Classes of Claims and Equity Interests created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

### B.   Substantive Consolidation and Its Relationship to the Plan Treatment of Claims

Although the Plan contemplates a substantive consolidation of all the Debtors into one estate, the ultimate Distributions that will be made pursuant to the Plan will be paid by the Liquidation Trust.  The Liquidation Trust has been structured to generally be a successor to the Debtors by acting as the estate representative and administrator for all the Liquidation Trust Assets. The Liquidation Trust will distribute to the Holders of Liquidation Trust Interests (*i.e.*, Holders of the Allowed CODI Claim and Allowed General Unsecured Claims) the proceeds of the Liquidation Trust  Assets, including an allocation of Causes of Action and proceeds under the Agency Agreement, and cash on hand, as well as the proceeds of the Tax Refund obtained by the Post-Confirmation Debtor, subject to payment of Litigation Trust Expenses and the creation of the Effective Date Reserves for Holders of certain Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims, Priority Claims, and Convenience Class Claims.

The substantive consolidation of the Debtors is for all purposes, including voting on the Plan, Confirmation, and Distributions.  As all of the Debtors' assets (other than the Tax Refund) will be transferred to the Liquidation Trust, and all of the Debtors, other than the post-Confirmation Debtor, will be deemed dissolved and the Liquidation Trust will, as representative of their Estates, handle any other winding down of those entities, the substantive consolidation will not otherwise materially affect the Debtors after the Effective Date.

If the Bankruptcy Court approves the Debtors' substantive consolidation, Claims asserted any Debtor, or against multiple Debtors, will be treated as a single Claim against a consolidated

23

Estate, and the assets of all Debtors will be treated as assets of a single Estate. Thus, for example, a Holder of a $100 Allowed Claim against Lugano Diamonds will receive the same recovery as a Holder of a $100 Allowed Claim against Lugano Prive, LLC. In addition, a creditor asserting a $100 Allowed Claim with joint and several liability against multiple Debtors (e.g., Lugano Diamonds and Lugano Prive, LLC) will receive the same Distribution as a Creditor asserting a single Claim against either Lugano Diamonds or Lugano Prive, for example. The Post-Confirmation Debtor will hold the Tax Refund and nothing in the Plan assigns or transfers the Tax Refund to a Debtor other than the Post-Confirmation Debtor, Lugano Holding, Inc.

If substantive consolidation is challenged, the Debtors intend to present evidence that establishes that substantive consolidation is appropriate under the circumstances of the Chapter 11 Cases. That evidence would include, but not be limited to, the following: All of the Debtors' assets, other than certain claims against CODI and related parties, are subject to CODI's Liens. Moreover, with the exception of the Lugano Privé club, all of the Debtors' operations were conducted by Lugano Diamonds. The Creditors' Committee and the Special Committee, the parties that negotiated potential claims against CODI, have no objection to the Debtors' substantive consolidation. If necessary, the Debtors will demonstrate that either the requisite Impaired Classes have accepted the Plan or that, by virtue of their treatment, those Classes are likely to receive more under the Plan than had the Debtors not been consolidated; and, except as described below, all of the Debtors' assets are and were CODI's collateral, such that if proceeds of those assets are made available to General Unsecured Creditors based on theories identified by the Creditors' Committee or the Special Committee, differential distributions to General Unsecured Creditors of any particular Debtor would be inequitable to the General Unsecured Creditors of the other Debtors.

More information on the substantive consolidation is set forth in Section IV.F.7 below.

**C.      The Liquidation Trust and the Liquidation Analysis**

The Plan contemplates the creation of a Liquidation Trust. All Liquidation Trust Assets will vest in the Liquidation Trust. The Liquidation Trust will be administered by the Liquidation Trustee, subject to the supervision and oversight of the Liquidation Trust Oversight Board. The initial members of the Liquidation Trust Oversight Board will be one CODI designee (initially, Stephen Keller), two Creditors' Committee designees (initially, Adam Rothstein and Avi Wazana), and two independent members (initially, Spencer Wells and Craig Barbarosh). If there is a vacancy on the Liquidation Trust Oversight Board, the vacancy is filled as follows. If the Board Member was selected by CODI, the successor will be selected by CODI. If the vacancy pertains to a Board Member selected by the Creditors' Committee, the remaining Board member selected by the Creditors' Committee will select the successor. If the vacancy pertains to an Independent Board Member, the other Independent Board Member will select an independent person as successor, as long as the CODI-designated Board Member approves the selection (such approval may not be unreasonably withheld).

Following the Effective Date, the Liquidation Trust will own and administer the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement. The realization of proceeds from the Liquidation Trust will be for the benefit of the Liquidation Trust Beneficiaries. The Liquidation Trustee will proceed to liquidate the Estate Assets, which consist primarily of the Causes of Action, proceeds of the Agency Agreement, and the Debtors' remaining

24

property.  The Post-Confirmation Debtor will pursue the Tax Refund.  The Liquidation Trust will make Distributions of Cash to Creditors, including, as appropriate, Distributions of Liquidation Trust Available Cash and Distributions from the Effective Date Reserves and the Professional Fee Reserve.  Except for the Initial CODI Distribution, no payments to Liquidation Trust Beneficiaries will be made until all Liquidation Trust Expenses have been paid from the Trust Expense Reserve and all Allowed Administrative Claims, Professional Fee Claims, Priority Claims, Priority Tax Claims, and Convenience Class Claims, and Other Secured Claims have been paid from the Effective Date Reserves and the Professional Fee Reserve.

The liquidation process will be administered by the Liquidation Trust. The net proceeds of this liquidation process have been estimated in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis"). As set forth in the current Liquidation Analysis:

- The Debtors estimate that the remaining Cash in the estate plus the guaranteed proceeds under the Agency Agreement will be approximately $[●]-$[●]  million and that there may be additional proceeds under the Agency Agreement on account of the sharing proceeds in the range of $[●] million to $[●] million.

- The Debtors estimate that the Post-Confirmation Debtor will receive proceeds on account of the Tax Refund in the range of $[●] million to $[●] million.

- The Debtors have not ascribed any value to recoveries that may be realized by the Liquidation Trust in respect of any Causes Action nor have they estimated any expenses related to the prosecution of the Causes of Action.  While the Causes of Action may have material value, it is possible that the Causes of Action may not generate sufficient proceeds to cover the expenses associated with prosecuting such Causes of Action.

- Actual distributions and recoveries may differ materially from these estimates.

The Liquidation Analysis relies on various assumptions and is subject to material modifications from time to time. If the Liquidation Analysis is revised by the Debtors prior to the Confirmation Hearing, the Debtors will include their revisions in the Plan Supplement.

**D.      Treatment of Claims and Equity Interests**

**1.      Unclassified Claims**

**(a)      Administrative Claims**

Administrative Claims are Claims arising under sections 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, otherwise satisfied, or withdrawn, including (a) all fees and charges assessed against the Estates under 28 U.S.C. § 1930, (b) all Section 503(b)(9) Claims, (c) Professional Fee Claims, and (d) Ordinary Course Professional Fee Claims.

25

Except as otherwise provided for in the Plan, on or as soon as reasonably practicable after the later of the Effective Date and the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Administrative Claim or (2) such other less favorable treatment as to which such Holder and the Liquidation Trust have agreed upon in writing.  All requests for payment of an Administrative Claim (other than a Professional Fee Claim) must be Filed with the Bankruptcy Court no later than the Administrative Claims Bar Date.  In the event of an objection to Allowance of an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim.  **The failure to File and properly and timely serve a request for payment of an Administrative Claim on or before the Administrative Claims Bar Date forever bars, estops, and enjoins the Holder of such Administrative Claim from asserting such Administrative Claim and such Administrative Claim is deemed released and extinguished as of the Effective Date without need for any objection from the Debtors or the Liquidation Trustee or any notice to or action, order, or approval of, the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed**.

### (b)     Professional Fee Claims and Ordinary Course Professional Fee Claims

Professional Fee Claims and Ordinary Course Professional Claims are Administrative Claims of Professionals and Ordinary Course Professionals for compensation or reimbursement of costs and expenses (or of members of the Creditors' Committee for reimbursement of expenses) relating to services provided during the period from the Professional's or the Ordinary Course Professionals' retention date, as applicable, through the Effective Date.

The Holder of an Allowed Professional Fee Claim or an Ordinary Course Professional Fee Claim receives Cash from the Professional Fee Reserve equal to the unpaid portion of such Allowed Professional Fee Claim or Allowed Ordinary Course Professional Fee Claim.  All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trust, counsel to CODI, and counsel to the U.S. Trustee no later than 45 calendar days after the Effective Date.  Objections to such applications must be Filed and served on counsel to the Liquidation Trust, counsel to CODI, counsel to the U.S. Trustee, and the requesting Professional on or before the date that is 21 calendar days after the date on which the applicable application was Filed (or such longer period as may be allowed by order of the Bankruptcy Court or by agreement with the requesting Professional).  All Professional Fee Claims and Ordinary Course Professional Fee Claims are paid by the Liquidation Trustee from the Professional Fee Reserve or Liquidation Trust Assets, as applicable, to the extent approved by Final Order of the Bankruptcy Court within five Business Days after entry of such order.

### (c)     Priority Tax Claims

Priority Tax Claims are Claims that are entitled to priority under Bankruptcy Code section 507(a)(8).

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holder of an Allowed Priority Tax Claim is paid, at the option of the Liquidation Trustee, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code as follows: (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and 30 calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (2) in regular installment payments in Cash from the Liquidation Trust over a period not exceeding five years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election is without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (3) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Liquidation Trustee have agreed upon in writing, *provided* that Allowed Priority Tax Claims that are not due and payable on the Effective Date will be paid in the ordinary course by the Liquidation Trustee, and that, in the event an Allowed Priority Tax Claim is also an Other Secured Claim, such Claim, to the extent it is Allowed, is treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### (d)    DIP Claims

DIP Claims are any and all Claims held by the DIP Lender arising from or in connection with (a) the *Superpriority Secured Debtor-in-Possession Credit Agreement* dated as of November 18, 2025, by and among the Debtors and DIP Lender, (b) any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, and (c) the DIP Order.

Pursuant to the terms of the CODI Settlement, the DIP Claims do not receive a separate distribution but are accounted for by the CODI Claim as described in Section 3.02(c) of the Plan.

### 2.    Class 1: Other Secured Claims

Other Secured Claims are Secured Claims that are not DIP Claims or CODI Claims.

Class 1 consists of all Other Secured Claims.  Class 1 is Unimpaired under the Plan, is not entitled to vote to accept or reject the Plan, and is conclusively presumed to accept the Plan without voting under Bankruptcy Code section 1126(f).

Unless the Holder of an Allowed Class 1 Other Secured Claim agrees to other treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which an Other Secured Claim becomes an Allowed Claim, the Holder of such Allowed Other Secured Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Other Secured Claim, at the Liquidation Trustee's option: (i) Cash from the Liquidation Trust in the Allowed amount of such Holder's Allowed Class 1 Claim;  (ii) the return of the Collateral securing such Allowed Class 1 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Other Secured Claim); or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code to render such Claim Unimpaired.

### 3.      Class 2: Priority Claims

Priority Claims are Claims entitled to priority under Bankruptcy Code section 507(a), other than Administrative Claims and Priority Tax Claims.

Class 2 consists of all Priority Claims.  Class 2 is Unimpaired under the Plan, is not entitled to vote to accept or reject the Plan, and is conclusively presumed to accept the Plan without voting under Bankruptcy Code section 1126(f).

Unless the Holder of an Allowed Class 2 Priority Claim agrees to other treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which a Priority Claim becomes an Allowed Claim, the Holder of such Allowed Priority Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Claim.

### 4.      Class 3: CODI Claim

The CODI Claim is the CODI Claim to the extent such Claim is a Secured Claim, including to the extent Secured by any Lien.

Class 3 consists of the CODI Claim.  Class 3 is Impaired under the Plan and is entitled to vote on the Plan.

Pursuant to the CODI Settlement Agreement, as of the Effective Date, the CODI Claim is Allowed and its Holder receives, in full satisfaction, settlement, and release of and in exchange for the CODI Claim, the Special Beneficial Interest in the Liquidation Trust.  The Special Beneficial Interest provides the following consideration to the Holder of the CODI Claim:

(i)      An initial Distribution from the Liquidation Trust on the Effective Date equal to 34.79% of the Effective Date Cash;

(ii)     A subsequent Distribution from the Liquidation Trust equal to 34.79% of Cash released from the Effective Date Reserves and Professional Fee Reserve to the extent not necessary to satisfy all Allowed Administrative, Professional Fee, Priority, Priority Tax, Other Secured, and Convenience Class Claims.

(iii)    Periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 34.79% of all Net Proceeds of Specified Assets received by the Liquidation Trust after the Effective Date;

(iv)    Periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 25% of Net Proceeds of Causes of Action (including recoveries under any representations and warranty policy and Avoidance Actions) other than the GT Claims and Specified Assets;

(v)     Periodic Distributions equal to 45% of Net Proceeds of all GT Claims;

28

(vi)     One or more Distributions of any Net Proceeds remaining in the Liquidation Trust after Holders of General Beneficial Interests receive Distributions equal to the full amount of their Allowed General Unsecured Claims plus GUC Interest.

All Cash, net of the Effective Date Reserves and Professional Fee Reserve, held by the Liquidation Trust as of the Effective Date or received by the Liquidation Trust after the Effective Date not used for Distributions on account of the Special Beneficial Interest is Liquidation Trust Available Cash.

### 5.     Class 4: General Unsecured Claims

General Unsecured Claims is any unsecured, non-priority Claim asserted against any of the Debtors or the Estates that is not a Convenience Class Claim, Subordinated Claim, or Intercompany Claim, including all Rejection Claims but excluding (a) any Claims arising from any executory contracts or unexpired leases that are assumed during the Chapter 11 Cases, and (b) any vendor or other Claims satisfied in the ordinary course of business or pursuant to any order of the Bankruptcy Court.

Class 4 consists of all General Unsecured Claims.  Class 4 is Impaired under the Plan and is entitled to vote on the Plan.

Each Holder of a General Unsecured Claim, in full satisfaction, settlement, and release of and in exchange for such General Unsecured Claim receives on the Effective Date its Pro Rata share of the General Beneficial Interests in the Liquidation Trust.  Holders of General Beneficial Interests are entitled to GUC Interest to the extent of the Liquidation Trust Available Cash, if they receive Distributions equal to the full amount of their Allowed General Unsecured Claims.

Each Contributing Creditor who executes any documents the Liquidation Trustee reasonably requests to complete the Contributing Creditor's transfer of its Contributed Claim to the Liquidation Trust will be entitled to an additional Distribution (that does not count against any other Distribution) on account of that Contributing Creditor's General Beneficial Interest equal to that Contributing Creditor's Pro Rata portion of 10% of the Net Proceeds of all Causes of Action against GT, net of the CODI share of those Net Proceeds under Section 3.02(c)(v) above, not to exceed the amount of that Contributing Creditor's Allowed General Unsecured Claim, provided that (i) the Contributing Creditor certifies on its Ballot or its Contribution Form under penalty of perjury that the Contributed Claim is colorable and supportable by evidence and (ii) the Liquidation Trustee (in consultation with the Liquidation Trust Oversight Board) independently and reasonably confirms that the Contributed Claim is colorable and supportable by evidence.

*For example*:  Assume the Net Proceeds of all Causes of Action against GT are $1,000,000.  Those net proceeds would be Distributed thus:  (i) $450,000 to CODI under Section 3.02(c)(v) above; (ii) $55,000 to be shared Pro Rata among all Contributing Creditors based on each Contributing Creditor's Allowed General Unsecured Claim amount in relation to all Contributing Creditors' Allowed General Unsecured Claim Amounts—*for example*, if Contributing Creditor #12's Allowed General Unsecured Claim is 6% of the total of all Contributing Creditors' Allowed General Unsecured Claim Amounts, Contributing Creditor #12 would receive 6% of the $55,000 = $3,300 (which is greater than $5,000); and (iii) $405,000 to the Liquidation Trust as Liquidation Trust Available Cash.

29

### 6.      Class 5: Convenience Class Claims

Convenience Class Claims are any Claim that would otherwise be a General Unsecured Claim but, with respect to any such Claim, the applicable Claim either (a) is in an amount less than or equal to $10,000 or (b) is reduced to $10,000 pursuant to a Convenience Class Election.

Class 5 consists of all Convenience Class Claims.  Class 5 is Impaired under the Plan and is entitled to vote on the Plan.

Each Holder who makes a Convenience Class Election is deemed to have voted to accept the Plan irrespective of any vote to reject the Plan reflected on a Ballot that also reflects a Convenience Class Election.  Each Holder of an Allowed Convenience Class Claim, in full satisfaction, settlement, and release of and in exchange for such Allowed Convenience Class Claim, on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Convenience Class Claim becomes an Allowed Claim, receives Cash from the Liquidation Trust in the amount equal to 50% of its Allowed Convenience Class Claim.

### 7.      Class 6: Intercompany Claims

Intercompany Claims are any Claims of one Debtor against another Debtor.

Class 6 consists of all Intercompany Claims.  Class 6 is Impaired under the Plan.

Holders of Intercompany Claims do not receive any property or interest in property under the Plan on account of such Intercompany Claims.  Class 6 is deemed to have rejected the Plan under Bankruptcy Code section 1126(g) and, therefore, Holders of Class 6 Claims are not entitled to vote on the Plan.

### 8.      Class 7: Subordinated Claims

Subordinated Claims are, collectively, (a) any Non-Compensatory Penalty Claims, and (b) any Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code, a Final Order, or by consent of the Holder of such Claim.

Class 7 consists of all Subordinated Claims.  Class 7 is Impaired under the Plan.

Holders of Subordinated Claims do not receive any property or interest in property under the Plan on account of such Subordinated Claims.  Class 7 is deemed to have rejected the Plan under Bankruptcy Code section 1126(g) and, therefore, Holders of Class 7 Claims are not entitled to vote on the Plan.

### 9.      Class 8: Equity Interests

Equity Interests are all previously issued and outstanding common stock, preferred stock, membership interests, or other ownership interests in any of the Debtors outstanding immediately prior to the Effective Date, including restricted stock, treasury stock, and all options, warrants, calls, rights, puts, awards, commitments, appreciation rights, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive any such common stock,

30

preferred stock, membership interests, or other ownership interests.  Equity Interests include all stock in and options to acquire stock of Lugano Holding.

Class 8 consists of all Equity Interests. Class 8 is Impaired under the Plan.

As of the Effective Date, all Equity Interests are cancelled.  On and after the Effective Date, Holders of Equity Interests are not entitled to, and do not receive or retain any property or interest in property under the Plan on account of such Equity Interests.  Class 8 is deemed to have rejected the Plan under Bankruptcy Code section 1126(g) and, therefore, Holders of Equity Interests are not entitled to vote on the Plan.

### 10.     Special Provisions Regarding Insured Claims

(a)     Any Allowed General Unsecured Claim that is an Insured Claim is Allowed only to the extent of the Uninsured Portion of such Claim.


(b)     Nothing in Section 3.03 of the Plan constitutes a waiver of any Causes of Action the Debtors, the Estates, or the Liquidation Trust may hold against any Person, including the Debtors' insurance carriers.  The Debtors and the Liquidation Trust do not waive and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

### 11.     Resolution of Claims and Controversies.

Pursuant to sections 1123(a)(5), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and in consideration of the Distributions and other benefits provided under the Plan and the Liquidation Trust Agreement, the provisions of the Plan and the Liquidation Trust Agreement constitute a good faith compromise and settlement of the claims and controversies set forth in the Plan, including the CODI Settlement and the Intercompany Claims.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, including the CODI Settlement and the Intercompany Claims, and the Bankruptcy Court's finding that such compromises are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable.


## E.     Acceptance or Rejection of Plan

### 1.     Impaired Classes of Claims Entitled to Vote

Only the votes of Holders of Allowed Claims in Class 3, Class 4, and Class 5 are solicited with respect to the Plan.

### 2. Modifications of Votes

Following the Voting Deadline, no Creditor entitled to vote on the Plan may change its vote cast on the Plan or any attendant elections or preferences without the written consent of the Debtors, which consent may be given or withheld in the Debtors' reasonable discretion.

### 3. Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 4. Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, is deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class is deemed to have accepted the Plan.

## F. Implementation of the Plan

### 1. Implementation of the Plan

The Plan is implemented by various acts and transactions as set forth in the Plan, including, among other things, the CODI Settlement, the establishment of the Liquidation Trust, the appointment of the Liquidation Trustee, and the making of Distributions by the Liquidation Trust.

### 2. Streamlining the Debtors' Corporate Affairs

### (a) Debtors' Existing Directors, Officers, and Managers

On the Effective Date, each of the Debtors' existing directors, officers, and managers are terminated automatically without the need for any Corporate Action and the Special Committee is disbanded. Such directors, officers, and managers have no ongoing rights against or obligations (except confidentiality obligations) to the Debtors or the Estates on and after the Effective Date, except that each such Person may file (i) a proof of claim by the Rejection Claims Bar Date if not barred by the Bar Date Order or (ii) a request for payment of an Administrative Claim in accordance with the Plan, and, if Allowed, receive Distributions on account of such Claims in accordance with the Plan.

32

**(b)     Dissolution of the Debtors and Cancellation of Equity Interests**

(i)     <u>Debtors Other Than the Post-Confirmation Debtor</u>.  On the Effective Date, each of the Debtors other than the Post-Confirmation Debtor is dissolved automatically without the need for any further Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; *provided* that any such Debtor may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of such Debtor.  All existing Equity Interests in the Debtors are cancelled as of the Effective Date.

(ii)     <u>Post-Confirmation Debtor</u>.  The Post-Confirmation Debtor continues and remains in existence on and after the Effective Date solely for implementation of the Post-Confirmation Debtor Functions.  On the Effective Date, the 100% ownership interest in the Post-Confirmation Debtor is issued to the Liquidation Trust, and the Liquidation Trustee serves as the Post-Confirmation Debtor's sole board member and officer and performs the Post-Confirmation Debtor Functions.  On the Effective Date, the certificate of incorporation and bylaws of the Post-Confirmation Debtor are deemed amended to the extent necessary to carry out the provisions of the Plan and for the Post-Confirmation Debtor to carry out the Post-Confirmation Debtor Functions.

**(c)     Corporate Documents and Corporate Authority**

The entry of the Confirmation Order constitutes authorization for the Debtors to take or cause to be taken all actions (including, if applicable, Corporate Actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken are deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation, including, without limitation, carrying out the Post-Confirmation Debtor Functions.

**(d)     Vesting of Estate Assets**

On the Effective Date, all property of the Debtors' Estates, including the Specified Assets (but excluding the Tax Refund), all Causes of Action, and any Cash (including the Liquidation Trust Expense Reserve but excluding the Effective Date Reserves and the Professional Fee Reserve), vests in the Liquidation Trust subject only to any Liens and the terms of the CODI Settlement.  To the extent avoided, Liens are preserved for the benefit of the Liquidation Trust.  The Tax Refund is vested in the Post-Confirmation Debtor on the Effective Date.

**(e)     Disposal and Use of Property**

The Liquidation Trustee may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions imposed by the Plan, the Liquidation Trust Agreement, any other documents in the Plan Supplement, or the Confirmation Order.  The Liquidation Trustee (and, with respect to the Tax Refund, the Post-Confirmation Debtor), on and after the Effective Date, may conduct any sales, liquidations, or monetization of Estate Assets on

33

any terms it deems without further order of the Bankruptcy Court, except as otherwise provided in the Plan, the Confirmation Order, or the Liquidation Trust Agreement.

### (f)        Representative of the Estates

The Liquidation Trustee is the successor to and representative of the Estates for purposes of section 1123(b)(3)(B) of the Bankruptcy Code, including, without limitation, with respect to Avoidance Actions and any other Causes of Action, except for the Tax Refund for which the Post-Confirmation Debtor shall be the representative of the Estates for such purposes.  Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trustee retains and may enforce any claims, demands, rights and Causes of Action (including Avoidance Actions) that any Estate may hold against any Person to the extent not released under the Plan, provided that the Post-Confirmation Debtor may enforce such claims, demands, and Causes of Action with respect to the Tax Refund.

### (g)        Tax Refund

Whenever received by the Post-Confirmation Debtor, the Cash proceeds of the Tax Refund, after payment of any reasonable expenses (including fees and expenses of counsel) incurred in connection with the collection of such funds, must be irrevocably transferred to the Liquidation Trust and paid in accordance with the terms of the Plan and the CODI Settlement Agreement.  The Post-Confirmation Debtor holds its rights in the Tax Refund in trust for the Liquidation Trust.

### 3.        Liquidation Trust

### (a)        Liquidation Trust Interests

The Liquidation Trust has two series of Liquidation Trust Interests: (i) the Special Beneficial Interest; and (ii) General Beneficial Interests.  All Liquidation Trust Interests must be recorded on the books and records of the Liquidation Trust in accordance with the Liquidation Trust Agreement. Such recording is all that is required for Liquidation Trust Interests to be Distributed to Holders of Claims.

### (b)        Appointments

(iii)        On and after the Effective Date, the initial Liquidation Trustee, Michael Goldberg, becomes and serves as Liquidation Trustee.  The Liquidation Trustee receives compensation and reimbursement of expenses as set forth in the Liquidation Trust Agreement.

(iv)        On and after the Effective Date, the initial Liquidation Trust Oversight Board, as designated in the Plan, begins to serve without further action. Any compensation and reimbursement of reasonable expenses are as set forth in the Liquidation Trust Agreement.

### (c)      Creation and Governance of the Liquidation Trust

On the Effective Date, the Liquidation Trustee must execute the Liquidation Trust Agreement, assume and begin performing his duties under the Plan and the Liquidation Trust Agreement, and take any other steps necessary to establish the Liquidation Trust in accordance with the Plan.  The powers, rights, and responsibilities of the Liquidation Trustee are specified in the Liquidation Trust Agreement.

### (d)      Vesting of Liquidation Trust Assets

On the Effective Date, the Liquidation Trust is automatically vested with all Liquidation Trust Assets; provided that, to the extent that the Debtors cannot or are prohibited from transferring any asset or assets to the Liquidation Trust, the Post-Confirmation Debtor holds such Liquidation Trust Asset and its proceeds in trust for the benefit of the Liquidation Trust.  Except as otherwise provided in the Plan or the Confirmation Order, the Liquidation Trust Assets automatically vest in the Liquidation Trust free and clear of all Claims, Liens, or interests subject only to the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the Liquidation Trust Agreement, and such vesting is exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax.  The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code regarding all Liquidation Trust Assets. The Liquidation Trust holds and distributes the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement.

### (e)      Contribution of Contributed Claims.

On the Effective Date, all Contributed Claims are irrevocably contributed to the Liquidation Trust for all purposes.  No Person may rely on the absence of a specific reference to any Contributed Claims in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to indicate that the Liquidation Trust will not pursue any available Contributed Claims.  The objection to the Allowance of any Claims held by a Contributing Creditor does not limit the Liquidation Trust's right to prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement waives, releases, or relinquishes any Contributed Claim.  The Liquidation Trust may assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the Liquidation Trust.

### (f)      Purpose of the Liquidation Trust

The Liquidation Trust is established for the purpose of pursuing or liquidating the Liquidation Trust Assets and making Distributions to the Liquidation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701- 4(d), with no objective to continue or engage in the conduct of a trade or business.

35

**(g)     Authority**

Subject to the supervision of the Liquidation Trust Oversight Board, the Liquidation Trustee has the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan or to the Liquidation Trust Agreement) to carry out and implement all applicable provisions of the Plan, all as described in the Liquidation Trust Agreement. The Liquidation Trust Oversight Board has only those rights and powers conferred on it under the Liquidation Trust Agreement.

**(h)     Limitation of Liability**

The Liquidation Trust Agreement limits the liability of the Liquidation Trustee and the Liquidation Trust Oversight Board to the extent provided therein.

**(i)     Indemnification**

The Liquidation Trust indemnifies the Liquidation Trustee, the Liquidation Trust Oversight Board, and their respective Related Parties in accordance with the Liquidation Trust Agreement.

**(j)     Distributions from the Liquidation Trust**

The Liquidation Trust Agreement controls all Distributions to Liquidation Trust Beneficiaries.

**(k)     Exemption**

To the extent the Liquidation Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act and any applicable state and local laws requiring registration of securities.

**(l)     Termination of the Liquidation Trust**

The Liquidation Trustee and the Liquidation Trust are discharged or terminated, as the case may be, when and under the circumstances established in the Liquidation Trust Agreement.

**(m)     Control Provision**

To the extent there is any inconsistency between the Plan and the Liquidation Trust Agreement, the Plan controls.

**4.     Preservation of Privileges and Defenses**

The actions taken by the Debtors, the Liquidation Trust, or any of their respective Related Parties in connection with the Plan do not waive any privilege or defense of the Debtors or the Liquidation Trust, as applicable, including any attorney-client privilege or work-product doctrine. All privileges shall be preserved and shall vest in the Liquidation Trust.

### 5.      Creation and Funding of Reserves

On the Effective Date, the Liquidation Trustee must create and, thereafter, maintain the Effective Date Reserves, Professional Fee Reserve, and the Liquidation Trust Expense Reserve.

#### (a)      Reserves for Specified Purposes Only

A Cash reserve may only be used to make Distributions for which it has been established. Any Cash remaining in a reserve ultimately not needed for Distributions becomes Liquidation Trust Available Cash.

#### (b)      Professional Fee Reserve

The Liquidation Trustee must fully fund the Professional Fee Reserve on the Effective Date in an amount equal to the Professionals' and Ordinary Course Professionals' estimates of unpaid Fee Claims as of the Effective Date (incorporating any Cash already set aside under the Cash Collateral Order).  Each Professional or Ordinary Course Professional must deliver to the Debtors, the Creditors' Committee, and CODI its estimate no later than three Business Days prior to the Effective Date.  If a dispute regarding the amount of the Professional Fee Reserve arises, then any Professional or Ordinary Course Professional may submit the issue to the Bankruptcy Court, which, following notice and a hearing, fixes the amount of the required funding.  Any Cash in the Professional Fee Reserve in excess of the aggregate Allowed Professional Fee Claims (as reduced to reflect payment) shall be distributed in accordance with Section 3.02(c)(ii) of the Plan (described above in Section IV.D.4(ii) of this Disclosure Statement) and, thereafter, any additional amounts become Liquidation Trust Available Cash.  The Professional Fee Reserve is not an Effective Date Reserve.

#### (c)      Liquidation Trust Expense Reserve

The Liquidation Trust Agreement must include provisions for additional future funding of the Liquidation Trust Expense Reserve.

#### (d)      Effective Date Reserves

The initial amount of the Effective Date Reserves must be agreed upon among the Creditors' Committee, the Debtors, and CODI and set forth in the Plan Supplement.  The Effective Date Reserves are established, maintained, and administered by the Liquidation Trustee as a disbursing agent for the Debtors. The Liquidation Trustee must administer, and the Liquidation Trust Oversight Board must oversee the Liquidation Trustee in connection with, the Effective Date Reserves as if the terms and conditions governing the rights, powers, obligations, and protections set forth in the Liquidation Trust Agreement applying to the Liquidation Trustee and the Liquidation Trust Oversight Board applied to the Effective Date Reserves.

### 6.      Preservation of Causes of Action

#### (a)      Preservation of All Causes of Action Not Expressly Settled or Released

The Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor, as a successor in interest to the Debtors and the Estates, has the exclusive right, power, and interest on behalf of itself, the Debtors and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Causes of Action (including any GT Claim and any Contributed Claim) without any further order of the Bankruptcy Court, except as otherwise provided in the Liquidation Trust Agreement. The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action is not intended to and does not limit the rights of the Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor, to pursue any such Avoidance Actions or Causes of Action. Unless a Cause of Action (including any GT Claim and any Contributed Claim) is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action for later resolution by the Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor. As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches applies to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order, or based on any Claim becoming Allowed, in each case unless such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or the Liquidation Trust is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits. A non-exclusive list of Causes of Action is included in the Plan Supplement.

### 7.      Cancellation of Instruments

Except with respect to any executory contracts and unexpired leases that are assumed and assigned to the Liquidation Trust under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors is deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto are automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto are discharged.

### 8.      Substantive Consolidation

(a)      Pursuant to section 1123(a)(5)(C) of the Bankruptcy Code and the Bankruptcy Court's equitable powers under section 105(a) of the Bankruptcy Code, the Plan substantively consolidates all Debtors' Estates into a single consolidated Estate for all purposes under the Plan and the Liquidation Trust Agreement, including the Allowance of Claims, Distributions, and voting. On the Effective Date: (i) the Assets and liabilities of the Debtors are merged into the single consolidated Estate; (ii) all a Debtor's guaranties of another Debtor's obligations are eliminated and extinguished so that any Claim against any Debtor, and any

38

guaranty thereof executed by any Debtor and any joint or several liability of any of the Debtors constitutes only one obligation of the consolidated Estate; (iii) each Claim Filed against any Debtor is treated as Filed against the consolidated Estate and treated as one Claim against and obligation of the consolidated Estate; (iv) all Intercompany Claims are eliminated and extinguished, and Holders of Intercompany Claims do not receive any Distributions or retain any property pursuant to the Plan on account of such Intercompany Claims; and (v) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors are treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors.  Such consolidation does not affect any subordination provisions set forth in any agreement relating to any Claim or Equity Interest or the ability of the Liquidation Trust to seek to have any Claim or Equity Interest subordinated in accordance with any contractual rights or equitable principles. Notwithstanding anything in Section 5.09 of the Plan to the contrary, all post-Effective Date fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, if any, are calculated on a separate legal entity basis for each Post-Effective Date Debtor.

(b)      The Disclosure Statement and the Plan constitute a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed consolidation is made in writing by any Creditor purportedly affected by such consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

(c)      If the Bankruptcy Court determines that consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis or otherwise treat the Plan as a separate Plan for each Debtor. Furthermore, the Debtors reserve their rights to seek confirmation of the Plan without implementing consolidation of any given Debtor, and, in the Debtors' reasonable discretion, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis.

## G.      Executory Contracts and Unexpired Leases

### 1.      Assumption of Certain Executory Contracts and Unexpired Leases

#### (a)      Assumption of Agreements

On the Effective Date, the Debtors assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements and retain or assign such contracts and leases as set forth on the Schedule of Assumed Agreements and all other executory contracts and unexpired leases are rejected under Section 6.02 of the Plan.  Any assumed contracts and leases not assigned to a third party are transferred to the Liquidation Trust and constitute Liquidation Trust Assets.  The Debtors reserve the right to amend the Schedule of Assumed Agreements at any

time prior to the Effective Date, in the Debtors' reasonable discretion (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors must provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment.  Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein includes any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.  The Confirmation Order constitutes a Bankruptcy Court order approving the assumption and assignment, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

### (b)    Cure Payments

Any amount that must be paid under section 365(b)(1) of the Bankruptcy Code to cure a default under and compensate the non-Debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements, if any. Unless the parties mutually agree to a different date, such payment must be made in Cash within ten Business Days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Liquidation Trust or such other entity to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment.

### (c)    Objections to Assumption/Cure Payment Amounts

Any Person that is a party to an executory contract or unexpired lease that to be assumed or assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must File with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any Person that fails to timely File and serve such a statement and, if applicable, a declaration waives any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order constitutes a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Liquidation Trust has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

40

**(d)**      **Resolution of Claims Relating to Assumed Contracts and Leases**

Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed and assigned executory contract or unexpired lease, satisfies in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of claim or listed on the Schedules) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of claim or the Schedules). Upon the tendering of the Cure Payment, any such Filed or Scheduled Claim is disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

**(e)**      **Insurance Policies**

(i)      <u>Assumption or Rejection</u>.  On the Effective Date, the Theft Policy and the Debtors' Insurance Contracts relating to directors and officers liability insurance and any other Insurance Contracts set forth in the Plan Supplement that are in force, current, and not expired are treated as and deemed to be executory contracts under the Plan.  On the Effective Date, the rights and interests in the above-referenced policies are assumed by the Debtors and assigned to the Liquidation Trust pursuant to section 365 of the Bankruptcy Code (the "<u>Insurance Rights Transfer</u>").  All other Insurance Contracts, if they are deemed executory contracts under the Plan, are rejected as of the Petition Date pursuant to section 365 of the Bankruptcy Code. Entry of the Confirmation Order constitutes the Bankruptcy Court's approval of the assumption Insurance Rights Transfer and rejection of the Insurance Contracts, as applicable.

(ii)      <u>Reservation of Rights</u>. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, the Disclosure Statement Order, the Bar Date Order and any related notices, any claim objection, or any document related to the foregoing, except as set forth in Section 6.01(e) of the Plan, nothing (A) alters the rights and obligations of the Debtors, their Estates, the Post-Confirmation Debtor, the Liquidation Trust, and the Insurers under any Insurance Contracts, (B) modifies the coverage provided under any Insurance Contract or the terms and conditions thereof, or (C) affects the insurers' rights and interests in any collateral or security they hold. For the avoidance of doubt, all rights and obligations under the Insurance Contracts are governed by the applicable Insurance Contracts and applicable law.

(iii)      <u>Relief from Stay/Injunction for Limited Purposes</u>. The automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XI of the Plan, if and to the extent applicable, are deemed modified without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; and (B) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XI of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing. For the avoidance of doubt, to the extent that a workers' compensation claim (A) is not (1) payable pursuant to one of the Insurance Contract(s) or (2) paid by a party that is not the Debtors, the Liquidation Trust or the Liquidation Trustee, and (B) is an Allowed Claim, such workers' compensation claim is

treated in a manner consistent with the terms of the Plan.  The Liquidation Trust is never liable for such Claims.

(iv)     Prohibition on Certain Acts. Each Insurer is prohibited from, and the Confirmation Order must include an injunction against, denying, refusing, altering, or delaying coverage solely on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan; provided that nothing in the Plan grants or should be deemed to grant any claimant relief from the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XI of the Plan, if applicable, to proceed with their claims (other than workers' compensation and direct action claims, as provided for in Section 6.01(e) of the Plan) without first seeking and receiving relief from the Bankruptcy Court from the automatic stay and/or such injunctions, to the extent applicable; provided further Insurers may take any actions relating to the Insurance Contracts (including effectuating a setoff or recoupment), to the extent permissible in accordance with applicable non-bankruptcy law or the terms of the Insurance Contracts, provided that the Insurers must return any remaining collateral or security to the Liquidation Trust in accordance with the terms of the Insurance Contracts.

(v)     Insurance Rights Transfer Back-Up. Except as otherwise expressly provided in the Plan, the Debtors will make the Insurance Rights Transfer to the Liquidation Trust as required by the Plan.  If any entity or individual is, at any time, legally precluded from transferring its rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or arising in the future, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, Disputed or undisputed, fixed or contingent, arising under or attributable to the insurance rights and interests subject to the  Insurance Rights Transfer, then that entity or individual must: (A) take any actions reasonably requested by the Liquidation Trust to pursue any such insurance rights and interests for the benefit of the Liquidation Trust; and (B) promptly transfer to the Liquidation Trust any amounts recovered under or on account of any of such insurance rights and interests; provided, that while any such amounts are held by or under the control of any entity or individual, such amounts are held for the benefit of the Liquidation Trust.

## 2.     Rejection of Executory Contracts and Unexpired Leases

### (a)     Rejected Agreements

On the Effective Date all executory contracts and unexpired leases of the Debtors are rejected except for (i) executory contracts and unexpired leases that have been previously assumed or rejected by the Debtors, and (ii) executory contracts and unexpired leases that are set forth in the Schedule of Assumed Agreements.  The Confirmation Order constitutes a Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

### (b)     Rejection Claims Bar Date

Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served are forever

42

disallowed, barred, and unenforceable, and Persons holding such Claims do not receive and are barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed, the Liquidation Trust may object to any Rejection Claim on or prior to the Claim Objection Deadline. The Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired lease that was previously rejected in these Chapter 11 Cases.

**H.      Provisions Governing Distributions**

### 1.        Timing of Distributions for Allowed Claims

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date must be made on or as soon as practicable after the applicable Distribution Date. Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth in the Plan shall be deemed to have been made on such date.

### 2.        Calculating Distributions and Related Matters

The Liquidation Trustee, in his reasonable discretion, must calculate Liquidation Trust Available Cash and other amounts for or relating to Distributions for Liquidation Trust Beneficiaries (including the Disputed Claims Reserve) and may establish and hold back from Distributions reasonable reserves for other contingencies.

### 3.        Interest and Other Amounts Regarding Claims

Except to the extent provided in (a) section 506(b) of the Bankruptcy Code and Allowed by a Final Order, (b) the Plan, (c) the Confirmation Order, or (d) the Liquidation Trust Agreement, postpetition interest does not accrue and is not paid on any Claims, and no Holder of an Allowed Claim is entitled to interest, penalties, fees, or late charges accruing or chargeable on any Claim from and after the Petition Date. Notwithstanding the previous sentence, if Holders of General Beneficial Interests are entitled to GUC Interest as provided in Section 3.02(d) above.

### 4.        Distributions

The Liquidation Trustee makes all Distributions under the Plan to Holders of Allowed Claims and is the Estates' disbursing agent under the Plan for all distributions to Holders of Allowed Claims entitled to distribution from one or more of the Effective Date Reserves. The Liquidation Trustee is not required to give any bond or surety or other security for the performance of any duties as disbursing agent. Distributions to Liquidation Trust Beneficiaries are made in accordance with the Liquidation Trust Agreement.

### 5.        Means of Cash Payment

Cash payments under the Plan must be made, at the option and in the sole discretion of the Liquidation Trustee, by (a) checks drawn on or (b) wire transfer, electronic funds transfer, or ACH from a domestic bank. Cash payments to foreign Holders of Allowed Claims may be made, at the

43

option and in the sole discretion of the Liquidation Trustee, by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks are null and void if not cashed within 180 calendar days of the date of the issuance thereof.  Requests for reissuance of any check within 180 calendar days of the date of the issuance thereof must be made directly to the Liquidation Trustee.

### 6.        Form of Currency for Distributions

All Distributions under the Plan must be made in U.S. Dollars. Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim must be calculated in U.S. Dollars based upon the currency conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

### 7.        Fractional Distribution

Notwithstanding anything in the Plan to the contrary, no Distribution of fractional cents will be made.  Whenever any Distribution of a fraction of a cent would otherwise be required, the actual Distribution made must reflect a rounding of such fraction to the nearest whole cent (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

### 8.        De Minimis Distributions

Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee is not required to Distribute, and will not Distribute, Cash or other property to a Liquidation Trust Beneficiary or to a Holder of an Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim on any given Distribution Date is less than $10.00, and such amount will be Distributed to other Creditors on such Distribution Date in accordance with the terms of the Plan. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed on any given Distribution Date is less than $10.00 is forever barred from asserting any Claim with respect to such eliminated Distribution against any Estate Assets.

### 9.        No Distributions with Respect to Certain Claims

Notwithstanding anything in the Plan to the contrary, no Distributions or other consideration of any kind are made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, and then only to the extent that such Claim becomes an Allowed Claim and as provided under the Plan for such Allowed Claim.  Nonetheless, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of Distributions due to Liquidation Trust Beneficiaries, each Contingent Claim, Disputed Claim, or Unliquidated Claim is treated as if it were an Allowed Claim (which, for Unliquidated Claims, means they are treated as if Allowed in such amounts as determined in the reasonable discretion of the Liquidation Trustee) except that if a Claim is estimated under Section 8.03 of the Plan, such estimated amount is used with respect to such Claim. Distributions that may become due in respect of a Contingent Claim, Disputed Claim, or Unliquidated Claim must be held in reserve by the Liquidation Trust in the Disputed Claims Reserve.  The Liquidation Trust elects to treat any reserve as a "disputed ownership fund," pursuant to Treasury Regulation section 1.468B-9(c)(2)(ii). As outlined in this election, Creditors

holding such Claims are not treated as transferors of the money or property transferred to the Disputed Claims Reserve.

### 10.    Distributions After Allowance

Notwithstanding any other provision of the Plan or the Confirmation Order, if any portion of a Claim is a Disputed Claim no payment or Distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  To the extent a Disputed Claim ultimately becomes an Allowed Claim, Distributions will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan, the Confirmation Order, and the Liquidation Trust Agreement.  When the Bankruptcy Court's order or judgment allowing any Disputed Claim becomes a Final Order, the Liquidation Trustee must provide—on the earlier of the next regularly-scheduled Distribution Date and 30 days after such order or judgment becomes a Final Order—to the Holder of such Claim the Distribution under Section 7.10 of the Plan as a catch-up Distribution to the extent any Distributions have by then been made to Holders of General Beneficial Interests.  Any taxes payable by the Disputed Claims Reserve must be withheld from the assets to be Distributed on account of such General Unsecured Claim.

### 11.    Delivery of Distributions

Distributions to Holders of Liquidation Trust Interests or Allowed Claims are made (a) at the addresses set forth in the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Claims Agent or to the Liquidation Trustee.  If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder will be made unless and until the Liquidation Trustee is notified of such Holder's then-current address. The responsibility to provide the Claims Agent or the Liquidating Trustee with a current address of a Holder of Liquidation Trust Interests or Claims is the responsibility of such Holder.  Amounts in respect of undeliverable Distributions made by the Liquidation Trustee must be held in trust on behalf of the Holder of the Liquidation Trust Interest or Claim to which they are payable by the Liquidation Trustee until the earlier of the date that such undeliverable Distributions are claimed by such Holder and 180 calendar days after the date the undeliverable Distributions were made, after which time the Liquidation Trustee deals with any such remaining Cash as provided in the Liquidation Trust Agreement.

### 12.    Application of Distribution Record Date and Other Transfer Restrictions

At the close of business on the Distribution Record Date, the claims register for all Claims must be closed, and there may be no further changes in the record holders of any Claims on the claims register. Except as provided in the Plan or in the Liquidation Trust Agreement, the Liquidation Trustee and his Related Parties have no obligation to recognize any putative transfer of Claims occurring after the Distribution Record Date.

45

### 13. Withholding, Payment, and Reporting Requirements Regarding Distributions

All Distributions under the Plan, to the extent applicable, must comply with all Tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions are subject to any such withholding, payment, and reporting requirements. The Liquidation Trustee is authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including, to the extent such information is not already available to the Liquidation Trust, requiring each Holder of a Liquidation Trust Interest or Claim to provide an executed current Form W-9, Form W-8, or similar Tax form as a prerequisite to receiving a Distribution. Notwithstanding any other provision of the Plan, (a) each Holder of a Liquidation Trust Interest or an Allowed Claim that is to receive a Distribution pursuant to the Plan has sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any governmental unit, including income, withholding, and other Tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any Tax obligation that would be imposed on the Liquidation Trust in connection with such Distribution; and (b) no Distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding Tax obligations or such Tax obligation that would be imposed in connection with such Distribution.

### 14. Defenses and Setoffs

On and after the Effective Date, the Liquidation Trust has all the Debtors' and the Estates' rights under section 558 of the Bankruptcy Code with respect to Claims. Nothing under the Plan affects the rights and defenses of the Debtors, the Estates, or the Liquidation Trust in respect of any Claim, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims. Accordingly, the Liquidation Trustee may, but is not required to, with prior notice to the affected Creditor, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Estates, or the Liquidation Trust, as applicable, may have against the Holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim under the Plan waives or releases of any such claim or rights that may exist against such Holder.

### 15. Allocation of Distributions

All Distributions received under the Plan by Holders of Liquidation Trust Interests and Claims are deemed to be allocated first to the principal amount of such Claim, or the Claim to which the applicable Liquidation Trust Interest relates, as determined for United States federal income Tax purposes, and then to accrued interest, if any, with respect to such Claim.

### 16. Joint Distributions

The Liquidation Trustee may, in its sole discretion, make Distributions jointly to any Holder of a Claim and any other Person that the Liquidation Trustee has determined to have an interest in such Claim.

### 17.  Forfeiture of Distributions

If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 7.05 of the Plan, fails to claim an undeliverable Distribution within the time limit set forth in Section 7.11 of the Plan, or fails to complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9 within 180 calendar days after a request for the completion and return of the appropriate form pursuant to Section 7.13 of the Plan (or such later time as approved by a Bankruptcy Court order), then such Holder is deemed to have forfeited its right to any reserved and future Distributions under the Plan. Any such forfeited Distributions become Liquidation Trust Available Cash for all purposes, notwithstanding any federal or state escheat laws to the contrary.

## I.  Disputed, Contingent, and Unliquidated Claims

### 1.  Objections to and Resolution of Disputed Claims

Except as otherwise provided in the Liquidation Trust Agreement, from and after the Effective Date, the Liquidation Trust has the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Liquidation Trust with respect to the Allowance of any Claim is conclusive evidence and a final determination of the Allowance of such Claim.  Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

### 2.  Claim Objections

All objections to (or requests to estimate) Claims (other than Professional Fee Claims) must be Filed by the Liquidation Trust on or before the Claim Objection Deadline, which may be extended on the Liquidation Trustee's motion to the Bankruptcy Court made prior to the expiration of such period.  The Claim Objection Deadline is automatically extended as provided by Local Rule 9006-2 upon the Filing of a motion by the Liquidation Trust requesting an extension of the Claim Objection Deadline. If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates is treated as an Allowed Claim.

### 3.  Estimation of Certain Claims

The Liquidation Trust may, at any time, move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court retains jurisdiction and power to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  The estimated amount of any Claim so determined by the Bankruptcy Court constitutes the maximum recovery that the Holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately Allowed.  All of the aforementioned Claims objection,

estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

## J. Conditions Precedent to the Effective Date

### 1. Conditions to the Effective Date

The occurrence of the Effective Date does not occur and the Plan does not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.02 of the Plan:

(a) the Bankruptcy Court enters the Confirmation Order;

(b) the Confirmation Order is not subject to any stay;

(c) all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, have been obtained and are in full force and effect;

(d) all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan, including the Liquidation Trust Agreement, are effected or executed and delivered, as applicable; and

(e) the Liquidation Trust Expense Reserve, Professional Fee Reserve, Disputed Claim Reserve, and Effective Date Reserves are funded in the amounts set forth in the Plan Supplement.

### 2. Waiver of Conditions to the Effective Date

The conditions to the Effective Date set forth in clauses Section 9.01(c) and Section 9.01(d) of the Plan may be waived in writing by the Debtors, the Creditors' Committee, and CODI; provided nothing contained in the Plan exempts the Debtors from complying with their legal obligations.

### 3. Effect of Non-Occurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not capable of being satisfied and not duly waived in accordance with Section 9.01and Section 9.02 of the Plan, upon notification Filed by the Debtors with the Bankruptcy Court, (a) the Confirmation Order is vacated; (b) no Distributions shall be made; (c) the Debtors, the Estates, and all Creditors are restored to the status quo as of the moment immediately preceding the entry of the Confirmation Order; and (d) all of the Debtors' and the Estates' obligations with respect to Claims remain unchanged and nothing contained in the Plan waives or releases of any Causes of Action by or against the Debtors, the Estates, or any other Person, or prejudices in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

### 4. Notice of the Effective Date

Promptly after the occurrence of the Effective Date, the Liquidation Trust must File and mail or cause to be mailed to all Creditors a notice that informs such Creditors of (a) entry of the Confirmation Order and the resulting confirmation of the Plan; (b) the occurrence of the Effective Date; (c) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (d) the deadline established under the Plan for the filing of Administrative Claims; and (e) such other matters as the Liquidation Trustee deems appropriate.

## K.   Retention of Jurisdiction and Power

### 1. Scope of Retained Jurisdiction and Power

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court retains jurisdiction and power over all matters arising in, arising under, or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction and power to do the following:

(a)      except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

(b)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(c)      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

(d)      effectuate performance of and payments under the provisions of the Plan and enforce remedies on any default under the Plan;

(e)      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases or the Plan, including the Causes of Action;

(f)      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or the Liquidation Trust Agreement;

(g)      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (including the Liquidation Trust Agreement), or to maintain the integrity of the Plan following consummation;

(h)      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan, the Confirmation Order, or the Liquidation Trust Agreement;

(j)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)      hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, the CODI Settlement Agreement, the Plan Support Agreement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and orders;

(l)      enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings associated with the Plan or otherwise entered in connection with the Chapter 11 Cases (whether or not any or all of the Chapter 11 Cases have been closed);

(m)      except as otherwise limited by the Plan, recover all Estate Assets, wherever located;

(n)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(o)      hear and determine all disputes involving the existence, nature, or scope of the Plan's release, exculpation and injunction provisions;

(p)      hear and determine such other matters as may be provided in the Confirmation Order or the Liquidation Trust Agreement or as may be authorized under, or not inconsistent with, the Bankruptcy Code and title 28 of the United States Code;

(q)      resolve any cases, controversies, suits, or disputes related to the Liquidation Trust and the Liquidation Trustee; and

(r)      enter a final decree closing any or all of the Chapter 11 Cases.

## 2.      Reserved Rights to Seek Bankruptcy Court Approval

Notwithstanding any provision of the Plan or the Liquidation Trust Agreement allowing an act to be taken without Bankruptcy Court approval, the Liquidation Trustee has the right to

submit to the Bankruptcy Court any question or questions on which it may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the Liquidation Trust, as applicable, including the administration, settlement, distribution, or proposed sale of any of the Estate Assets or Liquidation Trust Assets. The Bankruptcy Court retains jurisdiction and power for such purposes and will approve or disapprove any such proposed action upon motion Filed by the Liquidation Trust.

### 3.  Non-Exercise of Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.01 of the Plan, the provisions of Article X of the Plan have no effect on, and do not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## L.  Miscellaneous Provisions

### 1.  Payment of Statutory Fees and Post-Confirmation Reports

All statutory fees payable pursuant to 28 U.S.C. § 1930 that are due and owing as of the Effective Date must be paid by the Debtors in full in Cash on the Effective Date. The Debtors must file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidation Trustee must file with the Bankruptcy Court the final monthly operating reports and separate UST Form 11- PCR reports when they become due. After the Effective Date, the Liquidation Trustee must pay any and all applicable statutory fees in full in Cash when due and payable. Notwithstanding the consolidation of the Debtors called for in the Plan, the Liquidation Trustee remains obligated to pay any applicable statutory fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee provides no release under the Plan. Statutory Fees are Allowed. The U.S. Trustee need not file any proof of claim or any request for administrative expense for Statutory Fees. The provisions of this paragraph control notwithstanding any other provision in the Plan to the contrary.

### 2.  Dissolution of the Creditors' Committee

The Creditors' Committee is automatically dissolved on the Effective Date and, on the Effective Date, each member of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee) and each Professional retained by the Creditors' Committee is released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Creditors' Committee.

### 3.  Modifications and Amendments

(a)  In the Debtors' reasonable discretion, the Debtors may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time at or prior to the conclusion of the Confirmation Hearing with the consent of the Creditors' Committee and CODI. All alterations,

51

amendments, or modifications to the Plan must comply with section 1127 of the Bankruptcy Code. The Debtors must provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Creditor that has accepted the Plan is deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

(b)   After entry of the Confirmation Order and prior to the Effective Date, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, the Confirmation Order, or the Liquidation Trust Agreement, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with section 1127 of the Bankruptcy Code. To the extent required, prior notice of such proceedings must be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court.

### 4.   Severability of Plan Provisions

If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision then applies as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions remain in full force and effect and are in no way affected, impaired, or invalidated. The Confirmation Order constitutes a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section 11.07 of the Plan, is valid and enforceable under its terms.

### 5.   Binding Effect of Plan

Upon the Effective Date, section 1141 of the Bankruptcy Code becomes applicable with respect to the Plan and the Plan binds all Persons to the fullest extent permitted by section 1141(a) of the Bankruptcy Code. Confirmation of the Plan binds each Holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Equity Interest is Allowed, whether or not such Holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan. Any Holder of a Claim or Equity Interest that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 11.09 of the Plan but is bound by the other releases, exculpations, and injunctions in the Plan.

### 6.   Injunctions

**(a)   From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), along with their respective present or former employees, agents,**

52

officers, directors, principals, and Affiliates are permanently enjoined, solely with respect to any Claims dealt with under the Plan, Equity Interests dealt with under the Plan, and Causes of Action dealt with under the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or the property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; or the property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or the property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; (iv) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a document Filed with the Bankruptcy Court prior to entry of the Confirmation Order; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided*, *however*, notwithstanding anything to the contrary in the Plan, the injunction set forth in this Section 11.06 of the Plan does not apply to any action taken by one CODI Party against another CODI Party.

(b)     As of the Effective Date, all Persons are precluded and barred from asserting against any property to be Distributed under the Plan any Causes of Action, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.

(c)     Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Equity Interests, and other parties in interest, along with their Related Parties, are enjoined from taking any actions to interfere with the implementation or substantial consummation of the Plan by the Debtors, the Liquidation Trustee, or their respective Related Parties.

(d)     By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim is deemed to have specifically consented to the Injunctions set forth in Section 11.06 of the Plan.

7.     Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party has or has incurred, and each Exculpated Party is exculpated from any Causes of Action for any Claim related to any act or omission taking place between the Petition Date and the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Confirmation Order, the Liquidation Trust Agreement, the CODI Settlement Agreement, the Plan Support Agreement, or any agreement or document (including providing any legal opinion requested by any entity regarding any transaction,

53

**contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the CODI Settlement Agreement, the Plan Support Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan or these Chapter 11 Cases, or the Distribution of property under the Plan or any other related agreement, except for Claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects all Exculpated Parties are entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

## 8.       Releases by the Debtors

**Notwithstanding anything contained in the Plan to the contrary, pursuant to Bankruptcy Code § 1123(b), in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, effective on the Effective Date, each Released Party is hereby deemed to be released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing entities on behalf of the Debtors, from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Equity Interest in, a Debtor or other entity, or that any Holder of any Claim against, or Equity Interest in, a Debtor or other entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation of the Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, documents associated with or related to the DIP Order and Cash Collateral Order, the Plan (including the Plan Supplement(s)), the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any aspect of the associated transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, the Disclosure Statement, the DIP Order and Cash Collateral Order, the Plan, the Plan Supplement(s), before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of**

54

consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence of such Person (*provided* that the foregoing exception does not apply to the CODI Parties with respect to claims that are within the scope of those settled by the CODI Settlement Agreement). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement(s)) executed to implement the Plan or any Claim or obligation arising under the Plan.

### 9.      Releases by Holders of Claims

Except as otherwise expressly set forth in the Plan or the Confirmation Order—and except to the extent a Holder of a Claim makes an Opt-Out Election—on and after the Effective Date, and with respect to all other Releasing Parties, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the Holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation of the Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, documents associated with or related to the DIP Order and Cash Collateral Order, the Plan (including the plan supplement(s)), the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement), or any aspect of the associated transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, the Disclosure Statement, the DIP Order and Cash Collateral Order documents, the Plan, the plan supplement(s), before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any

55

other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence of such Person. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan or any Claim or obligation arising under the Plan; (ii) any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits judgments, damages, debts, rights, remedies, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that a CODI Party would have been legally entitled to assert in its own right (whether individually, derivatively, or collectively) against another CODI Party or any of their officers, directors, members, managers, trustees, or employees; or (iii) Allowed Claims solely against the Debtors.

### 10.    Term of Injunctions or Stays

Without affecting the injunctions contained in Section 11.06 of the Plan, the exculpations contained in Section 11.07 of the Plan, and the releases contained in Section 11.08 of the Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to Bankruptcy Code §§ 105 or 362, or otherwise, in existence on the Confirmation Date remain in full force and effect until the Chapter 11 Cases are closed.

### 11.    Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan is void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, (i) waive or release any Claims against, or any Equity Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.    Exemption from Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, the vesting of the Liquidation Trust Assets in the Liquidation Trust, the vesting of the Tax Refund in the Post-Confirmation Debtor, the issuance of the Liquidation Trust Interests, the issuance, transfer, or exchange of any equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, is not subject to any stamp, real estate transfer, mortgage recording, or other similar Tax.

56

### 13. Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) apply.

### 14. Transactions on Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan occurs on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day instead occur on the next succeeding Business Day.

### 15. Good Faith

Confirmation of the Plan constitutes a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

### 16. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of Delaware govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or formation of each Debtor govern corporate or limited liability company governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof. Any applicable nonbankruptcy law that would prohibit, limit, or otherwise restrict implementation of the Plan based on (i) the commencement of the Chapter 11 Cases, (ii) the appointment of the Liquidation Trustee, (iii) the wind down of the Debtors, (iv) the liquidation of some or all of the Liquidation Trust Assets, or (v) any other act or action to be done pursuant to or contemplated by the Plan is superseded and rendered inoperative by the Plan and federal bankruptcy law.

### 17. Notices

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Persons or Entities that Filed such renewed requests.

### 18. Final Decree

Upon the determination by the Liquidation Trustee that all Claims have been Allowed, disallowed, expunged, or withdrawn and that all Liquidation Trust Assets have been liquidated, abandoned, or otherwise administered, the Liquidation Trustee must move for the entry of the

Final Decree with respect to the Post-Confirmation Debtor. On entry of the Final Decree, the Liquidation Trustee, the Liquidation Trust Oversight Board, and their respective Related Parties, are, in each case to the extent not previously discharged by the Bankruptcy Court, discharged and have no further duties or obligations to any Person.

### 19.      Closing of Certain Chapter 11 Cases

At any time following the Effective Date, the Liquidation Trust may, upon notice and, if necessary, a hearing, to (a) close all of the Chapter 11 Cases except for the Chapter 11 Case of the Post-Confirmation Debtor, and any contested matters relating to each of the Debtors, including objections to Claims, are administered and heard in such Chapter 11 Case and (b) change the name of the Post-Confirmation Debtor and case caption of the remaining open Chapter 11 Case as desired. After the full administration of the Chapter 11 Cases, the Liquidation Trust must promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to Local Rule 3022-1(a), and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### 20.      Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidation Trust, all Holders receiving Distributions pursuant to the Plan, and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other acts as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 21.      Conflicts

If any provision of the Plan or any agreement entered into under the Plan conflicts with any provision of the Disclosure Statement, the Plan controls. If any order entered in the Chapter 11 Cases conflicts with any provision of the Plan, the Plan controls. If any provision of the Confirmation Order conflicts with any provision of the Plan or any agreement entered into under the Plan (other than the CODI Settlement Agreement and the Liquidation Trust Agreement), the Confirmation Order controls. If any provision of the Liquidation Trust Agreement conflicts with any provision of the Disclosure Statement, the Plan, or the Confirmation Order, the Plan controls unless the Confirmation Order specifically refers to this Section 11.21, in which case the Confirmation Order controls. If any provision of the CODI Settlement Agreement conflicts with any provision of the Disclosure Statement, the Plan, the Liquidation Trust Agreement, or the Confirmation Order, the Plan controls, unless the Confirmation Order specifically refers to Section 11.21, in which case the Confirmation Order controls.

## V.   RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

**A.      Parties May Object to the Plan's Classification of Claims and Equity Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.      The Debtors May Not Be Able to Obtain Confirmation of the Plan**

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still may not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code have not been met.

**C.      The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth herein and in the Plan, the Effective Date is subject to several conditions precedent. There can be no assurance that any or all of such conditions will be satisfied or waived.  If the conditions precedent are not met or waived, the Effective Date will not occur. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

**D.      Claims Estimation and Allowance of Claims**

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary materially from those estimated herein.

Distributions to Holders of Allowed Class 4 Claims will be affected by the pool of Allowed Claims in Class 4.  Upon completion of further analysis of Filed Claims, the total amount of Claims that ultimately become Allowed Claims in Class 4 may differ from the estimates in this Disclosure Statement, and such difference could be material. As a result, the amount of Distributions that may be received by a particular Holder of an Allowed Claim may be either adversely or favorably affected by the aggregate amount Class 4 Claims ultimately Allowed.

**E.      Potential Pursuit of Liquidation Trust Actions Against Creditors and Others**

In accordance with section 1123(b) of the Bankruptcy Code, after the Effective Date, the Liquidation Trustee shall have and retain and may enforce any Causes of Action. Accordingly, a Holder of a Claim may be subject to one or more such Causes of Action being asserted against it.

59

The failure to specifically identify in the Disclosure Statement, the Plan Supplement, or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trust to pursue any such Avoidance Actions or Causes of Action. The Debtors expressly reserve all Avoidance Actions and Causes of Action, other than those Avoidance Actions and Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as Causes of Action for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Avoidance Actions or Causes of Action as Liquidation Trust Assets on or after the Effective Date.

No Person should rely on the absence of a specific reference in the Plan, the Plan Supplement, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to any Avoidance Action or Cause of Action against such Person as any indication that the Liquidation Trust will not pursue any and all available Avoidance Actions and Causes of Action against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidation Trust to assert, commence, or prosecute any Avoidance Action or Cause of Action. Nothing contained in the Plan, the Plan Supplement, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Avoidance Action or Cause of Action that the Debtors or their Estates had immediately prior to the Effective Date. The Liquidation Trust shall have, retain, reserve, and be entitled to assert all Avoidance Actions and Causes of Action fully as if the Avoidance Actions and Causes of Action had not been contributed to the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

Without limiting the generality of the preceding two paragraphs and associated reservations, the Debtors note that all parties in interest should review the Plan Supplement, which will contain a non-exclusive analysis of the Liquidation Trust Actions that are being preserved under the Plan.

## F.    Risks Regarding Liquidation Trust Assets

The Liquidation Trust's ability to monetize the Estate Assets is subject to material risk and uncertainty.

There are three broad groups of Estate Assets that can provide a recovery to creditors. First, successful prosecution of the Causes of Action may generate funds for the Liquidation Trust through payment by third parties. The outcome of the Causes of Action is inherently uncertain and subject to material risk. There can be no assurance that the Liquidation Trust will prevail in any such prosecution and the amount of any such proceeds. Second, the Tax Refund represents a material potential source of funds. The amount and timing of the Tax Refund is subject to uncertainty, the amounts received and the timing of receipt may be materially different than the estimates. Finally, the proceeds that may be generated through the sharing provision of the Agency Agreement and any other assets is subject to material risk, including those associated with the high-end jewelry market in general and the wholesale market in particular, as well as local, national, and international economic conditions.

## G.    Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VIII for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## VI.    **CONFIRMATION OF THE PLAN**

## A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **August 31, 2026, at 11:00 a.m.** (prevailing Eastern Time), before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.   The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than **August 18, 2026, at 4:00 p.m.** (prevailing Eastern Time). **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

## B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code, including:

•    The Plan complies with the applicable provisions of the Bankruptcy Code.

•    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

•    The Plan has been proposed in good faith and not by any means forbidden by law.

61

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C.    Best Interests of Creditors

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan. Accordingly, if an impaired class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find, before confirming the Plan, that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

The Plan is a plan of liquidation. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in new General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed Claims. (For these purposes, the Debtors assume that the Litigation Trust Expenses would be similar to the expenses of a chapter 7 trustee).

Second, as a result of the agreement with CODI, funds are available to pay Administrative Claims, Priority Tax Claims, Priority Claims, and Other Secured Claims, as well as a portion of the Liquidation Trust Expenses.  In a chapter 7 case, these amounts would need to be paid prior to the Distribution to Holders of General Unsecured Claims.  Absent the construct proposed by the Plan, there is no reason to expect that CODI would agree to the payment of such amounts from its Collateral, thus reducing the potential Distributions to General Unsecured Creditors absent a successful Challenge (as defined in the Cash Collateral Order) to the CODI Claim.  Further, in a chapter 7 case, there would be no immediate settlement with CODI that provides for a definition allocation of the Debtors' assets for Distributions to General Unsecured Creditors.

Because funds would be limited, the Debtors believe that creditors would recover less in proceeds, in the aggregate, in a chapter 7 case, due at least in part to the need for litigation financing to liquidate the assets.  That is because (i) a chapter 7 trustee likely would not have the right to use cash collateral as it would be unable to adequately protect secured parties, and (ii) a chapter 7 trustee likely would be required quickly to otherwise monetize some of the Estate Assets (to the extent unencumbered) in order to assure that he or she had adequate staffing or funding to dispose of the Debtors' assets over an extended period of time, and (iii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business to the extent required by the Agency Agreement, which is relief that should be granted only "for a limited period" in any event, *see* 11 U.S.C. § 721.

As a result, a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain the benefits of the compromises and settlements available under the Plan. Therefore, the Debtors believe that Confirmation of the Plan will provide each Holder of a General Unsecured Claim, Convenience Class Claim, and Subordinated Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

## D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, or any successor to the Debtors, unless such liquidation or reorganization is proposed in the plan. This requirement is satisfied as the Plan specifically proposes a liquidation and the Debtors believe the Debtors' Cash and any additional proceeds from the Liquidation Trust Assets will be sufficient to allow the Liquidation Trustee to make all payments required to be made under the Plan. Accordingly, the Debtors believe that the Plan is feasible.

## E.    Acceptance by Impaired Classes

As a condition to confirmation, the Bankruptcy Code requires that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan.

63

A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

## F.      Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan, and because Holders of Claims and Equity Interests in Classes 7 and 8 are deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

### 1.      No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will consider various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submit that if the Debtors are required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

64

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Debtors submit that if the Debtors are required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that the applicable "fair and equitable" standards are met.

### G. Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of a General Unsecured Claim, Subordinated Claim, or Convenience Class Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

### VII. CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN

### A. General

The Plan provides for the establishment of the Liquidation Trust and for the issuance of Liquidation Trust Interests therein issued in respect of any Allowed CODI Claim, Allowed General Unsecured Claims, and Allowed Subordinated Claims. In general, interests in trusts such as the Liquidation Trust Interests may sometimes be subject to regulation as "securities" under applicable non-bankruptcy law, including federal and state securities laws. The Debtors believe even if the Liquidation Trust Interests were deemed to constitute "securities," they would not be subject to registration (by reason of an available exemption) under the Securities Act of 1933, as amended (the "Securities Act") or under applicable state securities laws (which are preempted).

**B.      Exemption from Registration Under the Securities Act and Blue Sky Laws**

**1.        Issuance of Liquidation Trust Interests under Plan**

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under Section 5 of the Securities Act of 1933, as amended (the "Securities Act").

In the event that the Liquidation Trust Interests are deemed to constitute securities, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws and regulations ("Blue Sky Laws") if three principal requirements are satisfied:

1.        the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

2.        the recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

3.        the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Liquidation Trust Interests may constitute securities, the Debtors believe that they are being issued in respect of any Allowed CODI Claim, Allowed General Unsecured Claims, and Allowed Subordinated Claims, and will therefore qualify as securities "of the debtor . . . or of a successor to the debtor" pursuant to section 1145(a)(1). In addition, the Liquidation Trust Interests will be issued entirely in exchange for such Claims.  Thus, the Debtors believe that the issuance of the Liquidation Trust Interests pursuant to the Plan will satisfy the applicable requirements of section 1145(a)(1) of the Bankruptcy Code, and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

The Debtors believe that their reliance upon the foregoing exemption in respect of the issuance of the Liquidation Trust Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other debtors in possession. However, the Debtors have not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

**2.        Resale of Liquidation Trust Interests After Plan Effective Date**

Under the terms of the Liquidation Trust Agreement, the Liquidation Trust Interests initially will be uncertificated and subject to transfer restrictions set forth in the Liquidation Trust Agreement (the "Transfer Restrictions"). Under the Transfer Restrictions, the Liquidation Trust Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. The Transfer Restrictions will be effective upon issuance of the Liquidation Trust Interests on the Effective Date

of the Plan and will remain in effect during the initial and any renewal term of the Liquidation Trust unless sooner terminated or modified by the Liquidation Trustee in accordance with the Liquidation Trust Agreement.

## VIII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

This discussion is provided for informational purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the Holder's status and method of accounting (including Holders of Claims within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the accuracy of the statements and conclusions set forth below as well as the tax consequences to the Holders of Claims and Equity Interests. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the U.S. federal income tax consequences of the Plan.

The following summary does not address the U.S. federal income tax consequences to the Holders of Claims and Equity Interests not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

• An individual who is a citizen or resident of the United States;

• A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

• An estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

• A trust that (a) is subject to the primary supervision of a United States court and which has

67

one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed.

The U.S. federal income tax treatment of Holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

A.      **Certain U.S. Federal Income Tax Consequences of the Liquidation Trust**

Under the terms of the Plan, for U.S. federal income tax purposes the Liquidation Trust Assets will be treated as transferred to the Liquidation Trust Beneficiaries in a taxable disposition, and immediately thereafter contributed into the Liquidation Trust in a non-taxable contribution. Any income or gain from the deemed transfer of assets to the Liquidation Trust Beneficiaries shall flow through to the Post-Confirmation Debtor, on whose behalf the Liquidation Trust will be responsible to pay any resulting tax liability. The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties with regard to the U.S. federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the deemed transfer of assets to the Liquidation Trust Beneficiaries.

As of the Effective Date, the Liquidation Trust shall be established for the benefit of all Liquidation Trust Beneficiaries. The Liquidation Trustee will make a good faith valuation of the Liquidation Trust Assets. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee will (a) elect to treat any Liquidation Trust Assets allocable to a Distribution Reserve (a reserve for amounts and Liquidation Trust Interests retained on account of, Contingent Claims, Disputed Claims or Unliquidated Claims) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Distribution Reserves will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all  distributions from such reserves will be treated as received by Holders on account of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

The Liquidation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) are required to treat for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Although the following discussion assumes that the Liquidation Trust would be so treated for U.S. federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidation Trust and the Liquidation Trust Beneficiaries could vary from those discussed herein, and, thus, there could be less Available Cash than projected, resulting in lower recoveries for Liquidation Trust.

**B.    Consequences to Holders of Claims Generally**

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim, and (ii) such Holder's adjusted tax basis in such Claim (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). The "amount realized" by a Holder of an Allowed Claim in satisfaction of its Claim will equal the sum of cash and the aggregate fair market value of the property received by such Holder in satisfaction of its Claim pursuant to the Plan (such as a Holder's undivided beneficial interest in the assets transferred to the Liquidation Trust). Where gain or loss is recognized by a Holder in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the Holder, whether the Claim constituted a capital asset in the hands of the Holder and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the Holder had previously claimed a bad debt deduction or theft loss in respect of the Claim. It is possible that any loss, or a portion of any gain, realized by a Holder of an Allowed Claim may have to be deferred until all of the Distributions to such Holder are received.

Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder of an Allowed Claim that receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction in any particular taxable year. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income

(as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims that were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for U.S. federal income tax purposes may be required to recognize currently any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC section 453B.

Holders of Disallowed Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC section 166(a). As noted above, the rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Disallowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction in any particular taxable year.

## C.    Consequences to Liquidation Trust Beneficiaries

After the Effective Date, any amount that a Liquidation Trust Beneficiary (as a Holder of a Liquidation Trust Interest) receives as a distribution from the Liquidation Trust in respect of its beneficial interest in the Liquidation Trust should not be included, for U.S. federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the Liquidation Trust. In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date, and the Holder's holding period in such assets will begin the day following the Effective Date.

Distributions to any Liquidation Trust Beneficiary that also is a Holder of an Allowed Claim in respect of such Allowed Claim will be allocated first to the original principal portion of such Claim as determined for U.S. federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

For all U.S. federal income tax purposes, all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust, in accordance with the terms of the Plan, as a transfer of those assets to the Liquidation Trust Beneficiaries by the deemed consolidated Debtor followed by a deemed transfer of such assets by such Liquidation Trust Beneficiaries to the Liquidation Trust. Consistent

71

therewith, all parties shall treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are to be the owners and grantors.  Thus, the Liquidation Trust Beneficiaries shall be treated as the direct owners of an undivided beneficial interest in the Liquidation Trust Assets.  Accordingly, each Liquidation Trust Beneficiary will be required to report on its U.S. federal income tax return(s) the Liquidation Trust Beneficiary's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust.  Allocations of taxable income of the Liquidation Trust (other than taxable income allocable to a Distribution Reserve) among Liquidation Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value, and other than assets allocable to a Distribution Reserve) to the Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne by the Liquidation Trust Beneficiaries if the Liquidating Trust were to distribute in liquidation the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose shall be equal to the fair market value of the Liquidation Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, deduction and credit to any Liquidation Trust Beneficiary and the ability of such Liquidation Trust Beneficiary to benefit from any deductions or losses may depend on the situation of such Liquidation Trust Beneficiary. The U.S. federal income tax reporting obligation of a Liquidation Trust Beneficiary is not dependent upon the Liquidation Trust distributing any cash or other proceeds to such Liquidation Trust Beneficiary. Therefore, a Liquidation Trust Beneficiary may incur a U.S. federal income tax liability regardless of the fact that the Liquidation Trust has not made, or will not make, any concurrent or subsequent distributions to the Liquidation Trust Beneficiary. If a Liquidation Trust Beneficiary incurs a U.S. federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its Liquidation Trust Interests in the Liquidation Trust, the Liquidation Trust Beneficiary may be allowed a subsequent or offsetting loss.

As noted above, the Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidation Trustee also will send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct each Liquidation Trust Beneficiary to report such items on its U.S. federal income tax return.

## D.    Withholding on Distributions and Information Reporting

All Distributions to Holders of Allowed Claims under the Plan and any Distributions to the Liquidation Trust Beneficiaries are subject to any applicable tax withholding, including employment tax withholding. *See* Plan Section 7.13. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate (currently 24%). Backup withholding generally applies if the payment recipient (i) fails to furnish the recipient's social security number or other

taxpayer identification number; (ii) furnishes an incorrect taxpayer identification number; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the taxpayer's identification number provided is the recipient's correct taxpayer identification number and that such recipient is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain Persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, a Holder of an Allowed Claim that is a not a U.S. entity may be subject to additional withholding, depending on, among other things, the type of income and whether it is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to distributions by the Debtor making such Distribution or by the Liquidation Trust, as applicable, even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Non-U.S. Holders are urged to consult their own tax advisors regarding potential withholding on Distributions under the Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## IX.    **RECOMMENDATION**

The Debtors and the Creditors' Committee believe that Confirmation and implementation of the Plan are the best option to maximize value under the circumstances and urge all Holders of Claims in Impaired Classes entitled to vote on the Plan to vote in favor of and support Confirmation of the Plan.

*[Signature Page Follows]*

Dated: June 24, 2026                    Respectfully submitted,


**LUGANO DIAMONDS & JEWELRY INC.**


By: */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer


**LUGANO HOLDING, INC.**


By: */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer


**LUGANO BUYER, INC.**


By: */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer


**K.L.D. JEWELRY, LLC**


By: */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer


**LUGANO PRIVE, LLC.**


By: */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer

**<u>Exhibit A</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (BLS) |
| Debtors. | (Jointly Administered) |

**CHAPTER 11 PLAN OF LIQUIDATION OF**
**LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

Dated:  June 24, 2026

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (admitted *pro hac vice*)
Traci L. Shafroth (admitted *pro hac vice*)
Scott Friedman (admitted *pro hac vice*)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone: (415) 496-6723
Facsimile: (650) 636-9251

*Attorneys for Debtors and Debtors-in-Possession*

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

**INTRODUCTION**[2]

The Plan provides for the resolution of the outstanding Claims and Equity Interests asserted against the Debtors. The Disclosure Statement to the Plan includes (a) a discussion of the Debtors' history, business, results of operations, and financial projections; (b) a summary and analysis of the Plan; and (c) certain related matters, including risk factors relating to the consummation of the Plan and Distributions to be made under the Plan. The Debtors are the proponents of the Plan within the meaning of Bankruptcy Code § 1129.

All Holders of Claims entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement before voting to accept or reject the Plan. Subject to certain restrictions and requirements set forth in Bankruptcy Code § 1127, Bankruptcy Rule 3019, and Section 11.03 and Section 11.11 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

Other than the Disclosure Statement and related materials transmitted therewith (which includes a letter from the Official Committee of Unsecured Creditors supporting acceptance of the Plan), no solicitation materials have been approved by the Bankruptcy Court for use in soliciting acceptances and rejections of the Plan. Nothing in the Plan should be construed as constituting a solicitation of acceptances of the Plan unless and until the Disclosure Statement has been approved by the Bankruptcy Court and distributed as required by Bankruptcy Code § 1125.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ CAREFULLY THE DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS AND SCHEDULES THERETO) AND THE PLAN, EACH IN ITS ENTIRETY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I**
**DEFINED TERMS AND RULES OF INTERPRETATION**

For purposes of the Plan, except as expressly provided or unless the context otherwise requires:

(a)     all defined terms have the meanings ascribed to them in this Article I;

(b)     any term used in the Plan that is not a Defined Term, but that is used in the Bankruptcy Code or Bankruptcy Rules has the meaning assigned to such term in the Bankruptcy Code or Bankruptcy Rules, as applicable;

(c)     whenever the context requires, terms include the plural as well as the singular number, the masculine gender includes the feminine, and the feminine gender includes the masculine;

(d)     any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such agreement or document is substantially in such form or substantially on such terms and conditions;

(e)     any reference to a specific Person includes any successors or lawful assigns of such Person, and all rights, benefits, interests, and obligations of any Person named or

---

[2]     Capitalized terms used but not defined in this Introduction have the meaning given to them in Article I.

2

referred to in the Plan are binding on, and inure to the benefit of, any heir, executor, administrator, trustee, liquidator, rehabilitator, conservator, successor, or lawful assignee of such Person;

(f)    unless otherwise indicated, the phrase "under the Plan" and similar words or phrases refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(g)    unless otherwise specified, all references in the Plan to sections, articles, schedules, and exhibits are references to sections, articles, schedules, and exhibits of or to the Plan;

(h)    the words "herein," "hereof," "hereto," "hereunder," "herewith," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan;

(i)    "including" means "including, without limitation";

(j)    captions and headings to articles and sections are not intended to be a part of the Plan;

(k)    whenever the Plan provides that a document or thing must be "acceptable" or "satisfactory" to any Person, such requirement in each case is subject to a reasonableness qualifier;

(l)    Unless otherwise expressly noted, all events required to occur on the Effective Date are required to occur on the Effective Date or as soon after as reasonably practicable;

(m)    the definition given to any term or provision in the Plan supersedes and controls any different meaning that may be given to that term or provision in the Disclosure Statement, on any Ballot, or in any other document other than the Confirmation Order; and

(n)    all other rules of construction set forth in Bankruptcy Code § 102 and in the Bankruptcy Rules apply.

The following Defined Terms have the following meanings:

1.    **Administrative Claim:** A Claim arising under Bankruptcy Code §§ 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2), to the extent not previously paid, otherwise satisfied, or withdrawn, including (a) all fees and charges assessed against the Estates under 28 U.S.C. § 1930, (b) all Section 503(b)(9) Claims, (c) Professional Fee Claims, and (d) Ordinary Course Professional Fee Claims.

2.    **Administrative Claims Bar Date:** The last date by which any Person must File a request for payment of an Administrative Claim other than a Section 503(b)(9) Claim, which is the first Business Day that is 35 calendar days after the Effective Date, or, alternatively, such subsequent date as is set by the Bankruptcy Court with the consent of the Liquidation Trustee. The Claims Bar Date for Section 503(b)(9) Claims was the General Claims Bar Date.

3.      **Administrative Claims Objection Deadline**: Subject to extension as set forth in Section 8.02 of the Plan, the date that is the latest of the first Business Day: (a) 90 days after the Administrative Claims Bar Date; (b) 45 days after the Filing of any request for payment of an Administrative Claim; (c) such date as may be agreed by the Liquidation Trustee and the Holder of a purported Administrative Claim; and (d) such other period of limitations for objecting to Administrative Claims as may be specifically fixed by the Plan, Confirmation Order, or Bankruptcy Court. The Administrative Claims Objection Deadline may be extended one or more times by the Bankruptcy Court.

4.      **Agency Agreement Proceeds**: All Cash, including proceeds from the irrevocable standby letter of credit naming Lugano Diamond & Jewelry, Inc. and CODI Parent as beneficiaries (and any amendment, modification, or replacement of it), received by the Debtors under the Agency Agreement between the Debtors and Enhanced Retail Funding LLC, including all such Cash held by the Debtors before the Effective Date and all such Cash received by the Liquidation Trust on and after the Effective Date, net of any reasonable expenses necessary to recover such proceeds.

5.      **Agreed Pre-Effective Date Fee Budget**: The budget attached as Exhibit A to this Plan, agreed to among CODI, the Debtors, the Special Committee, and the Creditors' Committee, establishing the maximum amount of Professional Fees that CODI, the Debtors, the Special Committee, and the Creditors' Committee have agreed can be deducted from Effective Date Cash for purposes of determining the Effective Date Distribution on account of the CODI Claim, *provided* that the Agreed Pre-Effective Date Fee Budget is not a cap on the total amount of Professional Fees Allowable for the period between the Petition Date and the Effective Date.

6.      **Allowed**:

(a)      with respect to a Claim arising prior to the Petition Date, including a Section 503(b)(9) Claim:

(i)      either (A) a proof of claim was timely Filed by the applicable Claims Bar Date, or (B) a proof of claim is deemed timely Filed either as a result of such Claim being Scheduled or by a Final Order; and

(ii)      either (A) the Claim is not a Contingent Claim, a Disputed Claim, an Unliquidated Claim, or a Disallowed Claim, or (B) the Claim is expressly allowed by a Final Order or under the Plan;

(b)      with respect to a Claim arising on or after the Petition Date (excluding a Section 503(b)(9) Claim), a Claim that has been allowed by a Final Order, under the Plan, or by settlement.

Unless otherwise specified in the Plan or by a Final Order, an "Allowed Claim" does not include interest, penalties, fees, or late charges from and after the Petition Date. Any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim.

7.      **Amended Schedules Bar Date**: With respect to an amendment or supplement to the Schedules (a) to reduce the undisputed, noncontingent, and liquidated amount of a Claim listed in the Schedules, (b) change the nature or classification of a Claim listed in the Schedules, or (c) to add a new Claim to the Schedules, the later of (i) the General Bar Date or the Governmental Bar Date, as applicable, to such claim, and (ii) 11:59 p.m. (ET) on the date that is 21 days from the date on which the Debtors provide notice of the amendment to the Schedules.

4

8.      **Avoidance Actions**: Any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties-in-interest under Bankruptcy Code §§ 510, 544, 547, 548, 549, 550, 551, 553(b) and 724(a) or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 and Bankruptcy Code § 724(a) or under similar or related local, state, federal, or foreign statutes or common Law, including fraudulent transfer Law or other Law.

9.      **Ballot**: The applicable ballot form(s) distributed to each Holder of a Claim entitled to vote to accept or reject the Plan.

10.     **Bankruptcy Code**: Title 11 of the United States Code sections 101 *et seq.*, as applicable to the Chapter 11 Cases.

11.     **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court of the District of Delaware, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case.

12.     **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure promulgated by the Supreme Court of the United States under 28 U.S.C. § 2075 and the Local Rules, in each case, as applicable to the Chapter 11 Cases.

13.     **Bar Date Order**: The *Order (A) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (B) Establishing the Amended Schedules Bar Date and Rejection Damages Bar Date, (C) Approving the Form of and Manner for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9) of the Bankruptcy Code, (D) Approving Form and Manner of Notice Thereof, and (E) Granting Related Relief* [Dkt. No. 223] entered by the Bankruptcy Court on December 19, 2025.

14.     **Business Day**: Any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in New York, New York are required or authorized to close by Law or executive order.

15.     **Cash:** Cash and cash equivalents, including bank deposits, wire transfers, checks representing good funds, and legal tender of the United States of America or instrumentalities thereof.

16.     **Cash Collateral Order**: The *Final Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Prepetition Lender; (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on February 10, 2026 [Dkt. No. 364].

17.     **Causes of Action**: Any and all Claims (including Investment Contract Claims), rights, actions, Avoidance Actions, Contributed Claims, proceedings, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, rights of setoff, third-party claims, subordination claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims, legal remedies, equitable remedies, claims, damages, or judgments whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, foreseen or unforeseen, asserted or unasserted, existing or hereafter arising, secured or unsecured, whether asserted directly or derivatively, in Law, at equity, or otherwise, by statute, whether for tort, fraud, contract, or otherwise, including any

5

recharacterization, subordination, avoidance or other claim under any other similar provision of applicable state or federal Law.

18. **Chapter 11 Cases**: With respect to all Debtors, the chapter 11 bankruptcy cases commenced by the Debtors, which are being jointly administered under the case caption *In re Lugano Diamonds & Jewelry Inc. et al.*, Case No. 25-12055 (BLS) (Bankr. D. Del.), and with respect to a particular Debtor, the chapter 11 bankruptcy case of such Debtor pending in the Bankruptcy Court.

19. **Claim**: Any "claim," as defined in Bankruptcy Code § 101(5), against any of the Debtors or against any property of the Debtors.

20. **Claim Objection Deadline**: Subject to extension as set forth in Section 8.02 of the Plan, the date that is the latest of the first Business Day: (a) 90 calendar days after the Effective Date; (b) 45 days after the Claim is Filed; (c) such date as may be agreed by the Liquidation Trustee and the Holder of a Claim; and (d) such other period as may be specifically fixed by the Plan, the Confirmation Order, or the Bankruptcy Court. The Claim Objection Deadline may be extended one or more times by the Bankruptcy Court.

21. **Claims Agent**: Omni Agent Solutions, Inc., the Debtors' court- appointed claims, noticing, and balloting agent.

22. **Claims Bar Date**: As applicable, the Administrative Claims Bar Date, the Amended Schedules Bar Date, the General Claims Bar Date, the Governmental Claims Bar Date, or the Rejection Claims Bar Date.

23. **Class**: A category of Claims or Equity Interests designated pursuant to the Plan, or any subclass thereof.

24. **Closing Date**: The date on which all of the Chapter 11 Cases have been closed in accordance with Section 11.18 of the Plan.

25. **CGM**: Compass Group Management LLC.

26. **CODI**: Compass Group Diversified Holdings LLC.

27. **CODI Cash Collateral Claim**: Any and all Claims held by CODI arising from or in connection with the Cash Collateral Order, which are more specifically detailed in the Cash Collateral Order and which include any Claims for adequate protection due to the diminution in value of CODI's collateral.

28. **CODI Claim**: Collectively, any and all Claims of any CODI Party, including the CODI Cash Collateral Claim, DIP Claims, CODI Secured Claim, and any other Claim arising under the *Credit Agreement* dated as of September 3, 2021, by and among each of the Debtors (whether in its capacity as a borrower, co-borrower, or a guarantor), and CODI as lender, as such credit agreement was thereafter amended, modified, and restated as of the Petition Date, including any Claims for diminution in value, any other Claims arising out of CODI's relationship with the Debtors, and the Claim of Bank of America against the Debtors to which CODI is subrogated.

29. **CODI Parent**: Compass Diversified Holdings.

30. **CODI Parties**: CODI Parent, CODI, CGM, and Sostratus, and any of their subsidiaries other than the Debtors and their subsidiaries, collectively and individually as context requires.

6

31.     **CODI Secured Claim**: The CODI Claim to the extent such Claim is a Secured Claim, including to the extent Secured by any Lien.

32.     **CODI Settlement**: The settlement embodied in the CODI Settlement Agreement.

33.     **CODI Settlement Agreement**: The Settlement Agreement and Mutual Release dated as of June 23, 2026, attached as Exhibit C to this Plan, implementing the CODI Settlement.

34.     **Collateral**: Any Estate Asset that is subject to a Lien to secure the payment or performance of a Claim, which Lien is perfected and not subject to avoidance under the Bankruptcy Code or otherwise invalid or unenforceable under the Bankruptcy Code or applicable nonbankruptcy Law.

35.     **Confirmation**: Entry of the Confirmation Order on the docket of the Chapter 11 Cases by the Bankruptcy Court.

36.     **Confirmation Date**: The date of Confirmation.

37.     **Confirmation Hearing**: The hearing or hearings held by the Bankruptcy Court to consider confirmation of the Plan as required by Bankruptcy Code § 1128(a).

38.     **Confirmation Order**: The order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code § 1129 and approving the CODI Settlement Agreement, which order must be acceptable to the CODI Parties and the Creditors' Committee in all respects.

39.     **Contingent Claim**: Any Claim that is Scheduled or Filed as contingent.

40.     **Contributed Claims**: All Causes of Action against GT, which are related in any way to the Debtors, their predecessors, their affiliates, their businesses, or any Excluded Party and that the holder of such Cause of Action elects to contribute to the Liquidation Trust.

41.     **Contributing Creditor**: A Creditor that elects on its Ballot or on the Contribution Form to contribute its Contributed Claims to the Liquidation Trust.

42.     **Contribution Form**: The form on which a Contributing Creditor may indicate that it contributing is Contributed Claims to the Liquidation Trust.

43.     **Convenience Class Claim**: Any Claim that would otherwise be a General Unsecured Claim but, with respect to such Claim, the applicable Claim either (a) is in an amount less than or equal to $10,000 or (b) is reduced to $10,000 pursuant to a Convenience Class Election.

44.     **Convenience Class Election**: The timely election by the Holder of a General Unsecured Claim on the Ballot to reduce the amount of such Claim to become a Convenience Class Claim.

45.     **Corporate Action**: Any action, approval, authorization, decision, or other act of any kind that would be necessary on the part of any Person for any corporation, limited liability company, or other Person to in turn act.

46.     **Creditor**: Any Holder of a Claim.

7

47.     **Creditors' Committee**: The official committee of unsecured creditors appointed in the Chapter 11 Cases as of November 25, 2025, as it may be reconstituted from time to time.

48.     **Cure Payment**: The payment of Cash or the distribution of other property (as the parties to an executory contract or unexpired lease may agree or the Bankruptcy Court may order) that is necessary to cure defaults required to be cured under an executory contract or unexpired lease so that such contract or lease may be assumed, or assumed and assigned, pursuant to Bankruptcy Code §§ 365 and 1123(b)(2).

49.     **Debtor** or **Debtors:** Individually and collectively, as applicable, each of the debtors in the Chapter 11 Cases: Lugano Diamonds & Jewelry Inc.; Lugano Holding, Inc.; Lugano Buyer, Inc.; K.L.D. Jewelry, LLC; and Lugano Prive, LLC.

50.     **Defined Term**: Any capitalized term that is defined in this Article I of the Plan.

51.     **DIP Claims:** Any and all Claims held by the DIP Lender arising from or in connection with the (a) DIP Loan Agreement, (b) any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, and (c) the DIP Order.

52.     **DIP Lender:** Compass Group Diversified Holdings LLC, solely in its capacity as lender under the DIP Loan Agreement.

53.     **DIP Loan Agreement**: The *Superpriority Secured Debtor-in-Possession Credit Agreement* dated as of November 18, 2025, by and among the Debtors and the DIP Lender annexed as Exhibit 1 to the DIP Order.

54.     **DIP Order**: The *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Lender; (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* entered on November 19, 2025 [Dkt. No. 66].

55.     **Disallowed Claim**: Any Claim that (a) is not Scheduled, or is listed thereon as contingent, unliquidated, disputed, or in an amount equal to zero, and whose Holder failed to timely File a proof of claim by the applicable Claims Bar Date (unless such late filing was permitted by an order of the Bankruptcy Court), but excluding any Claim that is expressly Allowed by a Final Order or under the Plan; or (b) has been disallowed pursuant to a Final Order of the Bankruptcy Court or a settlement.

56.     **Disclosure Statement**: The disclosure statement relating to the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Bankruptcy Code § 1125, as it subsequently may be amended, modified, or supplemented by the Debtors.

57.     **Disclosure Statement Order**: The order of the Bankruptcy Court conditionally approving the Disclosure Statement, authorizing the Debtors to solicit acceptances of the Plan, and establishing certain related procedures and deadlines, which order must be acceptable to the CODI Parties and the Creditors' Committee in all respects.

58.     **Disputed Claim**: Any Claim (other than a Disallowed Claim):

(a)     that is disputed in whole or in part under the Plan; or

8

(b)    that:

    (i)    is not expressly Allowed by a Final Order or under the Plan; and

    (ii)    as to which a proof of claim is Filed or is deemed Filed as a result of such Claim being Scheduled or request for payment of an administrative expense is Filed; and

    (iii)    as to which either:

        (1)    an objection or request for estimation or subordination (A) has been timely Filed within the applicable period of limitations fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order under which the applicable period of limitation has expired, and (B) has not been denied by a Final Order or withdrawn; or

        (2)    the Administrative Claims Objection Deadline or Claim Objection Deadline, as applicable, has not passed as to such Claim.

59.    **Disputed Claims Reserve**: A Distribution reserve, or portion thereof, treated as a "disputed ownership fund" as described in Section 7.09 of the Plan.

60.    **Distribute**, **Distributed**, or **Distribution**: Any initial or subsequent issuance, payment, or transfer of consideration made under the Plan, including the recording on the books and records of the Liquidation Trust of the Liquidation Trust Interests.

61.    **Distribution Date**: Any date on which a Distribution is made.

62.    **Distribution Record Date**: The record date for determining entitlement of Holders of Claims to receive Distributions under the Plan, which is the later of (a) the Confirmation Date and (b) the date not later than the Effective Date established by the Liquidation Trust Agreement.

63.    **Effective Date**: The date that is the first Business Day after the entry of the Confirmation Order on which (a) no stay of the Confirmation Order is in effect, (b) all conditions in Article IX of the Plan have been satisfied or waived as set forth therein, and (c) the Debtors, in consultation with the CODI Parties and the Creditors' Committee, declare the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

64.    **Effective Date Cash**: All Cash in the Estates on the Effective Date, less (a) the amount of Cash required to fund the Effective Date Reserves and (b) the lesser of (i) the amount of Professional Fees incurred between the Petition Date and the Effective Date and (ii) the Agreed Pre-Effective Date Fee Budget.

65.    **Effective Date Reserves**: Cash reserves, subject to CODI's approval in all respects, for payments on account of estimated Allowed Administrative Claims other than Professional Fee Claims, Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Convenience Claims.

66.    **Equity Interests**: All previously issued and outstanding common stock, preferred stock, membership interests, or other ownership interests in any of the Debtors outstanding immediately prior to

9

the Effective Date, including restricted stock, treasury stock, and all options, warrants, calls, rights, puts, awards, commitments, appreciation rights, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive any such common stock, preferred stock, membership interests, or other ownership interests.

67.     **Estate Assets**: Collectively, (a) any and all right, title, and interest of the Debtors and the Estates in and to property of whatever type or nature, including their books and records and all their Avoidance Actions and Causes of Action, as of the Effective Date, and (b) any proceeds thereof.

68.     **Estates**: The chapter 11 estates of the Debtors created by Bankruptcy Code § 541(a).

69.     **Excluded Parties**: Collectively, (a) Ferder Affiliated Parties, (b) GT, (c) Josh Gaynor, (d) Investment Contract Counterparties, (e) any Person or entity set forth on Exhibit I.69 to the Plan Supplement, (f) any relative, shareholder, member, advisor, attorney, professional, Related Party, or beneficiaries of any of the persons or entities listed in the foregoing (a) – (e), and (g) any immediate or mediate transferee of property from any of the foregoing, *provided* that the following are not Excluded Parties: (i) the CODI Parties, (ii) the Debtors, (iii) the Lugano Prive Investment Trust, (iv) the Creditors' Committee and its members only in their capacities as members of the Creditors' Committee, and (v) the Related Parties of the Persons or entities listed in the foregoing (i) – (iv) who are not Ferder Affiliated Parties and who are not specifically identified in the preceding clauses of this definition. If any Person is both an Excluded Party and a Released Party based on the definitions in this Plan, that Person is only an Excluded Party and not a Released Party.

70.     **Exculpated Parties**: Collectively, (a) the Debtors, (b) the Creditors' Committee, and each of its members solely in the member's capacity as such; (c) Thomas FitzGerald, (d) L. Spencer Wells, and (e) each of the preceding's respective Related Parties serving in such capacities after the Petition Date; *provided* that no Ferder Affiliated Party is an Exculpated Party.

71.     **Ferder Affiliated Party:** Collectively, (a) Mordechai Haim Ferder, (b) Edit Ferder, (c) Tom Ferder, (d) RF 2021 Irrevocable Trust, dated August 30, 2021, (e) TF 2021 Irrevocable Trust, dated August 30, 2021, (f) Simba IL Holdings, LLC, (g) Serenade Newport, LLC, (h) The Haim Family Trust, dated February 24, 2009, (i) VAD & Company, Inc., and (j) any relative, shareholder, member, advisor, attorney, professional, Related Party, or beneficiary of any of the Persons or entities listed in the foregoing (a) – (i), and (k) any immediate or mediate transferee of property from any of the foregoing; *provided* that the Debtors and the CODI Parties are not Ferder Affiliated Parties.

72.     **File**, **Filed**, or **Filing**: Duly and properly filed with (a) the Bankruptcy Court and reflected on the docket of the Chapter 11 Cases or (b) the Claims Agent, with respect to any proof of claim or request for payment of an administrative expense and reflected on the official claims register maintained by the Claims Agent.

73.     **Final Decree**: An order entered pursuant to Bankruptcy Code § 350, Bankruptcy Rule 3022, and Local Rule 3022-1 closing any Debtors' Chapter 11 Case.

74.     **Final Order**: As applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, rescinded, stayed, modified, or amended and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing thereof has been timely sought or, if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment has been affirmed by the highest court to which such order was appealed or certiorari has been denied, or a new trial, reargument, or rehearing

10

has been denied, or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired; *provided* that no order or judgment fails to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, Bankruptcy Rules 9023 or 9024 (or any analogous rules applying in another court of competent jurisdiction) or Bankruptcy Code § 502(j) or 1144 has been or may be Filed with respect to such order or judgment.

75.    **General Beneficial Interest**: The beneficial interest in the Liquidation Trust issued to Holders of General Unsecured Claims.

76.    **General Claims Bar Date**: January 27, 2026.

77.    **General Unsecured Claim**: Any unsecured, non-priority Claim asserted against any of the Debtors or the Estates that is not a Convenience Class Claim, Subordinated Claim, or Intercompany Claim, including all Rejection Claims but excluding (a) any Claims arising from any executory contracts or unexpired leases that are assumed during the Chapter 11 Cases, and (b) any vendor or other Claims satisfied in the ordinary course of business or pursuant to any order of the Bankruptcy Court.

78.    **Governmental Claims Bar Date**: May 15, 2026.

79.    **GT**: Grant Thornton LLP and its affiliates, which served as auditor for the Debtors and CODI.

80.    **GT Claims**: All Causes of Action against GT held by (a) a Debtor, (b) CODI, and (c) any Contributing Creditor who irrevocably assigns and transfers its Cause(s) of Action against GT to the Liquidation Trust as of or after the Effective Date.

81.    **GUC Interest**: Interest at the federal judgment rate in effect at the time interest is calculated (the "**Effective Interest Rate**"), on Allowed General Unsecured Claims, paid to a Holder of a General Beneficial Interest under Section 3.02(d) below, calculated by applying the Effective Interest Rate to each Distribution made to a Holder of a General Beneficial Interest for the period between the Petition Date and the date of such Distribution, payable if and when such a Distribution results in the Allowed General Unsecured Claim of such Holder being satisfied in full.

82.    **Holder**: The Person that is the owner of record of a Claim, Equity Interest, or Liquidation Trust Interest, as applicable.

83.    **Impaired**: Any Class of Claims or Equity Interests that is impaired within the meaning of Bankruptcy Code § 1124.

84.    **Insurance Contract.** All insurance policies that have been issued at any time to or provide coverage to any of the Debtors and all agreements, documents or instruments relating thereto.

85.    **Insured Claim**: Any Claim or portion of a Claim (other than a Claim held by an employee of the Debtors for workers' compensation coverage under the workers' compensation program applicable in the particular state in which the employee is employed by the Debtors) that is insured under the Debtors' insurance policies, but only to the extent of such coverage.

86.    **Insurer**. Any company or other Person that issued an Insurance Contract, any third party administrator, and any respective predecessors or affiliates thereof.

11

87.     **Intercompany Claim**: A Claim of one Debtor against another Debtor.

88.     **Investment Contract**: Any contract or agreement with one or more of the Debtors or with any Ferder Affiliated Party under which an Investment Contract Counterparty provided consideration purportedly for the shared purchase of, or a loan in connection with the purported acquisition of, or secured by, diamonds, precious stones or minerals, or jewelry in exchange for a return of principal or invested amount with interest or other additional return on principal or other consideration, and guarantee of such a contract or agreement. The CODI Claims are not Investment Contracts.

89.     **Investment Contract Claims**: Any Claim or Cause of Action a Debtor may have against an Investment Contract Counterparty or a Related Party to such Investment Contract Counterparty.

90.     **Investment Contract Counterparty**: A non-Debtor party to an Investment Contract.

91.     **Law**: Any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, listing rule, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court) or stock exchange.

92.     **Lien**: A lien as defined in Bankruptcy Code § 101(37).

93.     **Liquidation Trust**: A liquidation trust established on the Effective Date for the benefit of the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidation Trust Agreement.

94.     **Liquidation Trust Agreement**: The agreement substantially in the form attached as **Exhibit B** to this Plan establishing and delineating the terms and conditions of the Liquidation Trust, including the rights and duties of the Liquidation Trustee and the Liquidation Trust Oversight Board.

95.     **Liquidation Trust Assets**: All assets of the Estates, including all Causes of Action, Cash in the Estates after payment required to be made on the Effective Date including on account of the CODI Claim as provided in Section 3.02(c)(i) below, the equity interest in the Post-Confirmation Debtor, any proceeds of the Tax Refund realized by the Post-Confirmation Debtor and transferred to the Liquidation Trust on receipt as provided in the Plan, any proceeds realized or received from such assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from the assets but excluding (a) the Tax Refund, (b) the Effective Date Reserves, and (c) the Professional Fee Reserve.

96.     **Liquidation Trust Available Cash**: All Cash held by the Liquidation Trust after payment, allocation, or reserve in accordance with the Plan for any Effective Date Reserves, the Professional Fee Reserve, the initial Distribution on account of the CODI Claim as provided in Section 3.02(c)(i) below, or other requirements (including Liquidation Trust Expenses) in connection with the Plan, any agreements, or any Bankruptcy Court orders.

97.     **Liquidation Trust Beneficiary**: Each Holder of a Liquidation Trust Interest.

98.     **Liquidation Trust Expense Reserve**: The reserve of segregated Cash held by the Liquidation Trust in an amount reasonably necessary to: (a) maintain the value of the Liquidation Trust Assets pending their monetization or other disposition; (b) fund Liquidation Trust Expenses; and (c) satisfy or reserve for other liabilities incurred or anticipated by the Liquidation Trustee in accordance with the Plan and the Liquidation Trust Agreement (including indemnification obligations and similar expenses in

amounts and for the period the Trustee determines, in good faith without the need for the Liquidation Trust Oversight Board's consent).

99.   **Liquidation Trust Expenses**: Any and all reasonable fees, costs, and expenses incurred or reasonably anticipated to be incurred by the Liquidation Trustee not inconsistent with the Plan or the Liquidation Trust Agreement, including the maintenance or disposition of the Liquidation Trust Assets (including fees of the Liquidation Trustee, insurance, indemnity reserves, attorneys' fees, the fees of professionals, and other Persons retained by the Liquidation Trustee, personnel-related expenses, and any Taxes imposed on the Liquidation Trust or in respect of the Liquidation Trust Assets), the payment of all fees and expenses (including fees and expenses of counsel) in connection with winding down the Estates and the Post-Confirmation Debtor, and any other expenses incurred or otherwise payable in accordance with the Liquidation Trust Agreement.

100.   **Liquidation Trust Interests**: Together, the various classes of beneficial interests in the Liquidation Trust issued under the Plan and the Liquidation Trust Agreement on account of a Claim under the Plan, which are not certificated and are recorded on the books and records of the Liquidation Trust (and such recording is all that is required for Liquidation Trust Interests to be entitled to a Distribution).

101.   **Liquidation Trust Oversight Board**: The board comprising five members established under the Plan and Article III of the Liquidation Trust Agreement to oversee the Liquidation Trustee's performance of his duties and otherwise serve the functions set forth in the Liquidation Trust Agreement. The initial members of the Liquidation Trust Oversight Board are: (a) Stephen Keller; (b) Adam Rothstein; (c) Avi Wazana; (d) Spencer Wells; and (e) Craig Barbarosh. The last two named individuals are the independent members of the Liquidation Trust Oversight Board.

102.   **Liquidation Trustee**: Michael Goldberg and any successor appointed pursuant to the Liquidation Trust Agreement.

103.   **Local Rules**: The Local Rules of the United States Bankruptcy Court for the District of Delaware applying to the Chapter 11 Cases.

104.   **Net Proceeds**: Cash recoveries from Liquidation Trust Assets, less all reasonable expenses incurred in obtaining such recoveries.

105.   **Non-Compensatory Penalty Claims**: Any Claim, secured or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, to the extent such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss suffered by the Holder of such Claim.

106.   **Opt-Out Election**: The election by a Holder of a Claim or Interest to opt out of the release of the non-Debtor Released Parties under Section 11.09 of the Plan (but not any other releases, exculpations, or injunctions), made by either (i) checking the "opt out" box on the Ballot submitted in accordance with the instructions set forth on it or (ii) submitting an Opt-Out Form in accordance with the instructions set forth on it.

107.   **Opt-Out Form**: The form included with the Plan voting solicitation materials that a Holder of a Claim or Interest may use to make an Opt-Out Election.

108.   **Ordinary Course Professional**. An Ordinary Course Professional, as that term is defined in the *Order (A) Authorizing the Debtors to Retain and Compensate Professionals Used in the Ordinary Course of Business, and (B) Granting Related Relief* [Dkt. No. 194] and who has been retained by the Debtors in accordance with that order.

13

109. **Ordinary Course Professional Fee Claim**: A Claim of an Ordinary Course Professional, for compensation or reimbursement of costs and expenses relating to services provided during the period from the Petition Date through and including the Effective Date.

110. **Other Secured Claims**: Any Secured Claims that are not a CODI Secured Claim.

111. **Person**: Any person or organization created or recognized by law, including any association, company, cooperative, corporation, entity, estate, fund, individual, joint stock company, joint venture, limited liability company, partnership, trust, trustee, unincorporated organization, government (including any federal, state, local, municipal, or foreign government) or any political subdivision or agency, department, or instrumentality thereof, or any other entity or organization of whatever nature, and any other entity as defined in Bankruptcy Code § 101(15).

112. **Petition Date**: November 16, 2025.

113. **Plan:** This *Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. of and Its Affiliated Debtors* and all exhibits thereto, including the Plan Supplement, as the same may be amended, modified, or supplemented in accordance with Section 11.03 of this Plan.

114. **Plan Supplement**: The ancillary documents regarding the implementation and effectuation of the Plan, Filed on or before the date that is seven calendar days prior to the Voting Deadline, as such documents may be amended and supplemented prior to the Confirmation Hearing.

115. **Plan Support Agreement**: The agreement by and among the CODI Parties, the Debtors, and the Creditors' Committee establishing the Debtors' obligations to, among other things, propose this Plan containing provisions consistent with all material terms of the CODI Settlement and all such parties' obligations to, among other things, vote to accept this Plan and support its Confirmation.

116. **Post-Confirmation Debtor**: Lugano Holding, Inc.

117. **Post-Confirmation Debtor Functions**: The functions and duties to be carried out by the Post-Confirmation Debtor on and after the Effective Date through the action of the Liquidation Trustee, limited to the winding up of the affairs of the Post-Confirmation Debtor and the other Debtors and their subsidiaries, if and to the extent necessary, including the taking of any steps to terminate the corporate or organizational existence of the Debtors and their subsidiaries and the monetization of the Tax Refund.

118. **Priority Claim**: A Claim that is entitled to priority under Bankruptcy Code § 507(a), other than an Administrative Claim and a Priority Tax Claim.

119. **Priority Tax Claim**: A Claim that is entitled to priority under Bankruptcy Code § 507(a)(8).

120. **Professional**: Any (a) professional (excluding any Ordinary Course Professional) employed in the Chapter 11 Cases pursuant to Bankruptcy Code §§ 327, 328, 363, 1103, or 1104 and GlassRatner Advisory & Capital Group, LLC, (b) professional or other Person (in each case, other than an Ordinary Course Professional) seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to Bankruptcy Code § 503(b)(3) or (4).

121.     **Professional Fee Claim:** An Administrative Claim of a Professional for compensation or reimbursement of costs and expenses (or of members of the Creditors' Committee for reimbursement of expenses) relating to services provided during the period from the Petition Date through the Effective Date.

122.     **Professional Fee Reserve:** The cash reserve established on the Effective Date and maintained by the Liquidation Trust in an amount estimated to pay all Professional Fee Claims and Ordinary Course Professional Fee Claims, including the amounts set forth in the Agreed Pre-Effective Date Fee Budget. The Professional Fee Reserve is not an Effective Date Reserve.

123.     **Pro Rata:** Proportionately so that the ratio of (a) with respect to an Allowed Claim, the proportion of the Allowed Claim bears to the aggregate amount of Allowed and Disputed Claims within the same Class, as of the time of calculation, and (b) with respect to Liquidation Trust Interests, the proportion of the Liquidation Trust Interests of a particular series bears to the aggregate amount of Liquidation Trust Interests within the same series, as of the time of calculation.

124.     **Rejection Claim**: Any Claim for monetary damages as a result of the rejection of any prepetition executory contract or unexpired lease, whether rejected pursuant to the Confirmation Order or otherwise.

125.     **Rejection Claims Bar Date:** With respect to a prepetition executory contract or unexpired lease rejected (a) pursuant to the Plan or the Confirmation Order, the first Business Day that is 30 calendar days after the Effective Date, and (b) pursuant any order of the Bankruptcy Court other than the Confirmation Order, the earlier of the (i) date established by prior order of the Bankruptcy Court and (ii) the first Business Day that is 30 calendar days after the Effective Date.

126.     **Related Parties**: Collectively, with respect to any Person or entity, and in each case solely in its capacity as such, all current and former directors, managers, officers, committee members, members of any governing body, shareholders, unitholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assignees (whether by operation of Law or otherwise), subsidiaries, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trusts, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in the capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or entity's respective heirs, executors, estates, and nominees; *provided* that no Excluded Party is a Related Party. Related Parties of the Debtors include the Special Committee and its members, advisors, and attorneys.

127.     **Released Parties:** Each of: (a) the Debtors and each of the Estates and any of their subsidiaries and retained Professionals and Ordinary Course Professionals and their following directors and officers: (i) Frederic Cumenal; (ii) David Arnold; (iii) L. Spencer Wells (including as a member of the Special Committee); (iv) Thomas FitzGerald (including as a member of the Special Committee); (v) Stuart Winston; (vi) Lisa Calvert; and (vii) Christoph Pachler; (b) the Creditors' Committee and its individual members solely in their capacities as members of the Creditors' Committee, together with all their retained Professionals, agents, and other representatives of the Creditors' Committee and its members solely in their capacities with respect to service on or representation of the Creditors' Committee; (c) the CODI Parties and each of their Related Parties; *provided* that no Excluded Party is a Released Party.

128.     **Releasing Parties**: Each of, and in each case in its capacity as such: (a) the Debtors and each of the Estates; (b) L. Spencer Wells and Thomas FitzGerald; (c) any successor to the Debtors or any other representative of the Estates pursuant to Bankruptcy Code § 1123(b)(3), including the Liquidation

15

Trust; (d) all holders of Claims, other than holders of Claims only in Classes 6 and 7, who do not make an Opt-Out Election; (e) each Released Party; and (f) each Related Party of each entity in clauses (a) – (e) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clauses (a) – (e); *provided* that, in each case, an entity is not a Releasing Party if it makes an Opt-Out Election; *provided* further that no Excluded Party is a Releasing Party.

129.    **Schedule of Assumed Agreements**: The schedule of executory contracts and unexpired leases, if any, that the Debtors have determined, in the Debtors' reasonable discretion, to assume or assume and assign on the Effective Date. The initial Schedule of Assumed Agreements, if any, included in the Plan Supplement, subject to any modifications that may be made prior to the Effective Date pursuant to Section 6.01 of the Plan.

130.    **Scheduled**: A Claim that is set forth in the Schedules.

131.    **Schedules**: The Schedules of Assets and Liabilities initially Filed by the Debtors on December 13, 2025, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009.

132.    **Section 503(b)(9) Claim**: A Claim arising under Bankruptcy Code § 503(b)(9).

133.    **Secured Claim**: A Claim that is secured by a valid, perfected, and enforceable Lien on property in which the Debtors or the Estates have an interest, which Lien is valid, perfected, and enforceable under applicable law and not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law or that is subject to a valid right of setoff under Bankruptcy Code § 553. A Claim is a Secured Claim only to the extent of the value of the Holder's interest in the Debtors' interest in the Collateral or to the extent of the amount subject to setoff against a Cause of Action held by the Debtors, whichever is applicable, and as determined under Bankruptcy Code § 506(a). To the extent that the value of such interest in the Debtors' interest in the subject Collateral or the amount subject to setoff against a Cause of Action held by the Debtors (as applicable) is less than the amount of the Claim which has the benefit of such security or is supported by such setoff right, such portion of the Claim is unsecured and treated as a General Unsecured Claim (or, if applicable, a Convenience Class Claim) unless, in any such case, the Class of which the Secured Claim is a part makes a valid and timely election in accordance with Bankruptcy Code § 1111(b) to have such Claim(s) treated as a Secured Claim to the extent Allowed. For the avoidance of doubt, Intercompany Claims are not defined, classified, or treated as Secured Claims under the Plan.

134.    **Securities Act**: The Securities Act of 1933, as amended.

135.    **Sostratus**: Sostratus, LLC.

136.    **Special Beneficial Interest**: The beneficial interest in the Liquidation Trust issued to CODI under the Plan.

137.    **Special Committee**: The Special Committee of the Board of Directors of Lugano Diamonds & Jewelry Inc.

138.    **Specified Assets**: Collectively, (a) the Agency Agreement Proceeds; (b) the Tax Refund; and (c) the Theft Policy, and (d) Causes of Action to establish, and realize upon, the amounts due to the Estates under any agreement or law with respect to clauses (a) – (c).

16

139.    **Subordinated Claim**: Any Non-Compensatory Penalty Claim or any Claim subordinated to General Unsecured Claims under Bankruptcy Code § 510 or a Final Order, or by consent of the Holder of such Claim.

140.    **Tax**: Collectively, (i) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, employment, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (ii) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

141.    **Tax Refund**: All federal, state, and local income tax refunds or other tax refunds owing or that become owing to any of the Debtors, including refunds owing to the Post-Confirmation Debtor from any taxing authorities, including the United States government and any state and local governments.

142.    **Theft Policy**: The Primary and Excess All Risks (LDI) policies, policy numbers B080123941W24 and B080123942W24, issued by Lloyd's (syndicated) that insure against, among other things, theft of certain of the Debtors' precious stone inventory under which the Debtors are the insured.

143.    **Unclassified Claims**: Collectively, Administrative Claims (including Professional Fee Claims), Priority Tax Claims, and DIP Claims.

144.    **Unimpaired**: Any Class of Claims that is not impaired within the meaning of Bankruptcy Code § 1124.

145.    **Uninsured Portion**: The portion of any Insured Claim, if any, that is not insured under the Debtors' insurance policies or that is beyond the extent of such coverage.

146.    **Unliquidated Claim**: Any Claim that is Scheduled as unliquidated or that was Filed in an unliquidated amount.

147.    **U.S. Trustee**: The Office of the United States Trustee for the District of Delaware.

148.    **Voting Deadline**: The date and time set forth in the Disclosure Statement Order, or any subsequent Order of the Court, by which all Ballots to accept or reject the Plan must be received to be counted under the Disclosure Statement Order.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

**Section 2.01    Summary and Classification of Claims.** Pursuant to Bankruptcy Code §§ 1122 and 1123, this Section classifies Claims (other than Administrative Claims, Priority Tax Claims, and DIP Claims, which are not classified for any purpose) and Equity Interests in the Debtors for purposes of voting and Distribution. A Claim is classified in a particular Class only to the extent that the Claim falls within the Class description. A Claim or an Equity Interest is classified in a particular Class for the purpose of receiving a Distribution only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid, released, or otherwise satisfied before the Effective Date. Except as provided herein or in the Confirmation Order, the aggregate value of property received or retained under the Plan on account of an Allowed Claim may never exceed 100% of the underlying Claim, except for payment of interest to

17

the extent provided in the Plan. To the extent that part of a Claim falls within a different Class description, that part of the Claim is classified in that different Class. The following table summarizes the Classes of Claims and Equity Interests under the Plan:

| CLASS | DESCRIPTION | IMPAIRMENT | VOTING STATUS |
|---|---|---|---|
| Class 1 | Other Secured Claims[3] | Unimpaired | Not Entitled to Vote (conclusively presumed to accept) |
| Class 2 | Priority Claims | Unimpaired | Not Entitled to Vote (conclusively presumed to accept) |
| Class 3 | CODI Claim | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Convenience Class Claims | Impaired | Entitled to Vote |
| Class 6 | Intercompany Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 7 | Subordinated Claims | Impaired | Not Entitled to Vote (deemed to reject) |
| Class 8 | Equity Interests | Impaired | Not Entitled to Vote (deemed to reject) |

**Section 2.02    Classification and Voting Controversies**.

(a)    If a controversy arises regarding whether any Claim is properly classified under the Plan, then the Bankruptcy Court, upon proper motion and notice, determines such controversy at the Confirmation Hearing.

(b)    If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim is reclassified into, and the Claim receives the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified.

## ARTICLE III
## TREATMENT OF CLAIMS AND EQUITY INTERESTS

**Section 3.01    Unclassified Claims**.

(a)    **Administrative Claims.** Except as otherwise provided for herein, on or as soon as reasonably practicable after the later of the Effective Date and the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Administrative Claim or (2) such other less favorable treatment as to which such Holder and the Liquidation Trust have agreed upon in writing. All requests for payment of an Administrative Claim (other than a Professional Fee Claim) must be Filed with the Bankruptcy Court no later than the Administrative Claims Bar Date. In the event of an objection to Allowance of an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. **The failure to File and properly and timely serve a request for**

---

3    For voting purposes and to comply with Bankruptcy Code § 1122(a), each Allowed Other Secured Claim is deemed to be in its own subclass (unless such Holder shares the same Lien on Collateral with a different Holder of another Other Secured Claim, in which case such Claims are deemed to be included together in the same subclass).

18

**payment of an Administrative Claim on or before the Administrative Claims Bar Date forever bars, estops, and enjoins the Holder of such Administrative Claim from asserting such Administrative Claim and such Administrative Claim is deemed released and extinguished as of the Effective Date without need for any objection from the Debtors or the Liquidation Trustee or any notice to or action, order, or approval of, the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.**

(b)    **Professional Fee Claims and Ordinary Course Professional Fee Claims.** The Holder of an Allowed Professional Fee Claim or an Ordinary Course Professional Fee Claim receives Cash from the Professional Fee Reserve equal to the unpaid portion of such Allowed Professional Fee Claim or Allowed Ordinary Course Professional Fee Claim. All final requests for payment of Professional Fee Claims pursuant to Bankruptcy Code §§ 327, 328, 330, 331, 363, 503(b), or 1103 must be made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trust, counsel to CODI, and counsel to the U.S. Trustee no later than 45 calendar days after the Effective Date. Objections to such applications must be Filed and served on counsel to the Liquidation Trust, counsel to CODI, counsel to the U.S. Trustee, and the requesting Professional on or before the date that is 21 calendar days after the date on which the applicable application was Filed (or such longer period as may be allowed by order of the Bankruptcy Court or by agreement with the requesting Professional). All Professional Fee Claims and Ordinary Course Professional Fee Claims are paid by the Liquidation Trustee from the Professional Fee Reserve or Liquidation Trust Assets, as applicable, to the extent approved by Final Order of the Bankruptcy Court within five Business Days after entry of such order.

(c)    **Priority Tax Claims.** In full satisfaction, settlement, and release of and in exchange for such Claims, the Holder of an Allowed Priority Tax Claim is paid, at the option of the Liquidation Trustee, in accordance with Bankruptcy Code § 1129(a)(9)(C) as follows: (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and 30 calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (2) in regular installment payments in Cash from the Liquidation Trust over a period not exceeding five years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election is without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (3) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Liquidation Trustee have agreed upon in writing, *provided* that Allowed Priority Tax Claims that are not due and payable on the Effective Date will be paid in the ordinary course by the Liquidation Trustee, and that, in the event an Allowed Priority Tax Claim is also an Other Secured Claim, such Claim, to the extent it is Allowed, is treated as an Other Secured Claim if such Claim is not otherwise paid in full.

(d)    **DIP Claim.** Pursuant to the terms of the CODI Settlement, the DIP Claims do not receive a separate distribution but are deemed satisfied by the treatment provided to the CODI Claim as described in Section 3.02(c).

**Section 3.02    Classes.**

(a)    **Class 1: Other Secured Claims**. Class 1 consists of all Other Secured Claims. Class 1 is Unimpaired under the Plan, is not entitled to vote to accept or reject the Plan, and is conclusively presumed to accept the Plan without voting under Bankruptcy Code § 1126(f). Unless the Holder of an Allowed Class 1 Other Secured Claim agrees to other treatment, on or as soon as reasonably practicable after the later of the Effective Date  and the date on which an Other Secured Claim becomes an Allowed Claim, the Holder of such Allowed Other Secured Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Other Secured Claim, at the Liquidation Trustee's option: (i) Cash from the

19

Liquidation Trust in the Allowed amount of such Holder's Allowed Class 1 Claim;  (ii) the return of the Collateral securing such Allowed Class 1 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Other Secured Claim); or (iii) such other recovery necessary to satisfy Bankruptcy Code § 1129 to render such Claim Unimpaired.

(b)      **Class 2: Priority Claims**. Class 2 consists of all Priority Claims. Class 2 is Unimpaired under the Plan, not entitled to vote to accept or reject the Plan, and is conclusively presumed to accept the Plan without voting under Bankruptcy Code § 1126(f). Unless the Holder of an Allowed Class 2 Priority Claim agrees to other treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which a Priority Claim becomes an Allowed Claim, the Holder of such Allowed Priority Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Claim.

(c)      **Class 3: CODI Claim**. Class 3 consists of the CODI Claim. Class 3 is Impaired under the Plan and is entitled to vote on the Plan. Pursuant to the CODI Settlement Agreement, as of the Effective Date, the CODI Claim is Allowed and its Holder receives, in full satisfaction, settlement, and release of and in exchange for the CODI Claim, the Special Beneficial Interest in the Liquidation Trust. The Special Beneficial Interest provides the following consideration to the Holder of the CODI Claim:

(i)      An initial Distribution from the Liquidation Trust on the Effective Date equal to 34.79% of the Effective Date Cash;

(ii)      A subsequent Distribution from the Liquidation Trust equal to 34.79% of Cash released from the Effective Date Reserves and Professional Fee Reserve to the extent not necessary to satisfy all Allowed Administrative, Professional Fee, Priority, Priority Tax, Other Secured, and Convenience Claims.

(iii)      Periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 34.79% of all Net Proceeds of Specified Assets received by the Liquidation Trust after the Effective Date;

(iv)      Periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 25% of Net Proceeds of Causes of Action (including recoveries under any representations and warranty policy and Avoidance Actions) other than the GT Claims and Specified Assets;

(v)      Periodic Distributions equal to 45% of Net Proceeds of all GT Claims; and

(vi)      One or more Distributions of any Net Proceeds remaining in the Liquidation Trust after Holders of General Beneficial Interests receive Distributions equal to the full amount of their Allowed General Unsecured Claims plus GUC Interest.

All Cash, net of the Effective Date Reserves and Professional Fee Reserve, held by the Liquidation Trust as of the Effective Date or received by the Liquidation Trust after the Effective Date not used for Distributions on account of the Special Beneficial Interest is Liquidation Trust Available Cash.

(d)      **Class 4: General Unsecured Claims**. Class 4 consists of all General Unsecured Claims. Class 4 is Impaired under the Plan and is entitled to vote on the Plan. Each Holder of a General Unsecured Claim, in full satisfaction, settlement, and release of and in exchange for such General Unsecured Claim receives on the Effective Date its Pro Rata share of the General Beneficial Interests in the Liquidation Trust.

20

Holders of General Beneficial Interests are entitled to GUC Interest to the extent of the Liquidation Trust Available Cash, if they receive Distributions equal to the full amount of their Allowed General Unsecured Claims.

Each Contributing Creditor who executes any documents the Liquidation Trustee reasonably requests to complete the Contributing Creditor's transfer of its Contributed Claim to the Liquidation Trust will be entitled to an additional Distribution (that does not count against any other Distribution) on account of that Contributing Creditor's General Beneficial Interest equal to that Contributing Creditor's Pro Rata portion of 10% of the Net Proceeds of all Causes of Action against GT, net of the CODI share of those Net Proceeds under Section 3.02(c)(v) above, not to exceed the amount of that Contributing Creditor's Allowed General Unsecured Claim, *provided* that (i) the Contributing Creditor certifies on its Ballot or its Contribution Form under penalty of perjury that the Contributed Claim is colorable and supportable by evidence and (ii) the Liquidation Trustee (in consultation with the Liquidation Trust Oversight Board) independently and reasonably confirms that the Contributed Claim is colorable and supportable by evidence.

*For example:* Assume the Net Proceeds of all Causes of Action against GT are $1,000,000. Those net proceeds would be Distributed thus: (i) $450,000 to CODI under Section 3.02(c)(v) above; (ii) $55,000 to be shared Pro Rata among all Contributing Creditors based on each Contributing Creditor's Allowed General Unsecured Claim amount in relation to all Contributing Creditors' Allowed General Unsecured Claim Amounts—*for example*, if Contributing Creditor #12's Allowed General Unsecured Claim is 6% of the total of all Contributing Creditors' Allowed General Unsecured Claim Amounts, Contributing Creditor #12 would receive 6% of the $55,000 = $3,300; and (iii) $405,000 to the Liquidation Trust as Liquidation Trust Available Cash.

(e)     **Class 5: Convenience Class Claims**. Class 5 consists of all Convenience Class Claims. Class 5 is Impaired under the Plan and is entitled to vote on the Plan. Each Holder who makes a Convenience Class Election is deemed to have voted to accept the Plan irrespective of any vote to reject the Plan reflected on a Ballot that also reflects a Convenience Class Election. Each Holder of an Allowed Convenience Class Claim, in full satisfaction, settlement, and release of and in exchange for such Allowed Convenience Class Claim, on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Convenience Class Claim becomes an Allowed Claim, receives Cash from the Liquidation Trust in the amount equal to 50% of its Allowed Convenience Class Claim.

(f)     **Class 6: Intercompany Claims**. Class 6 consists of all Intercompany Claims. Class 6 is Impaired under the Plan. Holders of Intercompany Claims do not receive any property or interest in property under the Plan on account of such Intercompany Claims. Class 6 is deemed to have rejected the Plan under Bankruptcy Code § 1126(g) and, therefore, Holders of Class 6 Claims are not entitled to vote on the Plan.

(g)     **Class 7: Subordinated Claims**. Class 7 consists of all Subordinated Claims. Class 7 is Impaired under the Plan. Holders of Subordinated Claims do not receive any property or interest in property under the Plan on account of such Subordinated Claims. Class 7 is deemed to have rejected the Plan under Bankruptcy Code § 1126(g) and, therefore, Holders of Class 7 Claims are not entitled to vote on the Plan.

(h)     **Class 8: Equity Interests**. Class 8 consists of all Equity Interests. Class 8 is Impaired under the Plan. As of the Effective Date, all Equity Interests are cancelled. On and after the Effective Date, Holders of Equity Interests are not entitled to, and do not receive or retain, any property or interest in property under the Plan on account of such Equity Interests. Class 8 is deemed to have rejected the Plan under Bankruptcy Code § 1126(g) and, therefore, Holders of Equity Interests are not entitled to vote on the Plan.

21

**Section 3.03    Special Provisions Regarding Insured Claims.**

(a)    Any Allowed General Unsecured Claim that is an Insured Claim is Allowed only to the extent of the Uninsured Portion of such Claim.

(b)    Nothing in this Section 3.03 constitutes a waiver of any Causes of Action the Debtors, the Estates, or the Liquidation Trust may hold against any Person, including the Debtors' insurance carriers. The Debtors and the Liquidation Trust do not waive, and expressly reserve their rights to assert, that any insurance coverage is property of the Estates to which they are entitled.

**Section 3.04    Resolution of Claims and Controversies**. Pursuant to Bankruptcy Code §§ 1123(a)(5), 1123(b)(3), and 1123(b)(6) and in consideration of the Distributions and other benefits provided under the Plan and Liquidation Trust Agreement, the provisions of the Plan and the Liquidation Trust Agreement constitute a good faith compromise and settlement of the claims and controversies set forth in the Plan, including the CODI Settlement and the Intercompany Claims. The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, including the CODI Settlement and the Intercompany Claims, and the Bankruptcy Court's finding that such compromises are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

**Section 4.01    Impaired Class of Claims Entitled to Vote.** Only the votes of Holders of Allowed Claims in Class 3, Class 4, and Class 5 are solicited with respect to the Plan.

**Section 4.02    Modifications of Votes.** Following the Voting Deadline, no Creditor entitled to vote on the Plan may change its vote on the Plan or any attendant elections or preferences without the written consent of the Debtors, which consent may be given or withheld in the Debtors' reasonable discretion.

**Section 4.03    Confirmation Pursuant to Bankruptcy Code § 1129(b).** Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors request confirmation of the Plan under Bankruptcy Code § 1129(b). The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code § 1129(b), if necessary.

**Section 4.04    Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes.** Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, is deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code. If a Class contains Claims eligible to vote and no Holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class are deemed to have accepted the Plan.

22

# ARTICLE V
# IMPLEMENTATION OF THE PLAN

**Section 5.01    Implementation of the Plan.** The Plan is implemented by various acts and transactions as set forth in the Plan, including, among other things, the CODI Settlement, the establishment of the Liquidation Trust, the appointment of the Liquidation Trustee, and the making of Distributions by the Liquidation Trust.

**Section 5.02    Streamlining the Debtors' Corporate Affairs.**

(a)    **Debtors' Existing Directors, Officers, and Managers.** On the Effective Date, each of the Debtors' existing directors, officers, and managers are terminated automatically without the need for any Corporate Action and the Special Committee is disbanded. Such directors, officers, and managers have no ongoing rights against or obligations (except confidentiality obligations) to the Debtors or the Estates on and after the Effective Date, except that each such Person may file (i) a proof of claim by the Rejection Claims Bar Date if not barred by the Bar Date Order or (ii) a request for payment of an Administrative Claim in accordance with the Plan, and, if Allowed, receive Distributions on account of such Claims in accordance with the Plan.

(b)    **Dissolution of the Debtors and Cancellation of Equity Interests.**

(i)    *Debtors Other Than the Post-Confirmation Debtor.* On the Effective Date, each of the Debtors other than the Post-Confirmation Debtor is dissolved automatically without the need for any further Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; *provided* that any such Debtor may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of such Debtor. All existing Interests in the Debtors are cancelled as of the Effective Date.

(ii)    *Post-Confirmation Debtor.* The Post-Confirmation Debtor continues and remains in existence on and after the Effective Date solely for implementation of the Post-Confirmation Debtor Functions. On the Effective Date, the 100% ownership interest in the Post-Confirmation Debtor is issued to the Liquidation Trust, and the Liquidation Trustee serves as the Post-Confirmation Debtor's sole board member and officer and performs the Post-Confirmation Debtor Functions. On the Effective Date, the certificate of incorporation and bylaws of the Post-Confirmation Debtor are deemed amended to the extent necessary to carry out the provisions of the Plan and for the Post-Confirmation Debtor to carry out the Post-Confirmation Debtor Functions.

(c)    **Corporate Documents and Corporate Authority**. The entry of the Confirmation Order constitutes authorization for the Debtors to take or cause to be taken all actions (including, if applicable, Corporate Actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken are deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation, including, without limitation, carrying out the Post-Confirmation Debtor Functions.

(d)    **Vesting of Estate Assets**. On the Effective Date, all property of the Debtors' Estates, including the Specified Assets (but excluding the Tax Refund), all Causes of Action, and any Cash (including the Liquidation Trust Expense Reserve, but excluding the Effective Date Reserves and the Professional Fee Reserve), vests in the Liquidation Trust subject only to any Liens and the terms of the

23

CODI Settlement. To the extent avoided, Liens are preserved for the benefit of the Liquidation Trust. The Tax Refund is vested in the Post-Confirmation Debtor on the Effective Date.

(e)       **Disposal and Use of Property**. The Liquidation Trustee may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions imposed by the Plan, the Liquidation Trust Agreement, any other documents in the Plan Supplement, or the Confirmation Order. The Liquidation Trustee (and, with respect to the Tax Refund, the Post-Confirmation Debtor), on and after the Effective Date, may conduct any sales, liquidations, or monetization of Estate Assets on any terms it deems without further order of the Bankruptcy Court, except as otherwise provided in the Plan, the Confirmation Order, or the Liquidation Trust Agreement.

(f)       **Representative of the Estates.** The Liquidation Trustee is the successor to and representative of the Estates for purposes of Bankruptcy Code § 1123(b)(3)(B), including with respect to Avoidance Actions and any other Causes of Action, except for the Tax Refund for which the Post-Confirmation Debtor is the representative of the Estates for such purposes. Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with Bankruptcy Code § 1123(b), the Liquidation Trustee retains and may enforce any claims, demands, rights and Causes of Action (including Avoidance Actions) that any Estate may hold against any Person to the extent not released under the Plan, *provided* that the Post-Confirmation Debtor may enforce such claims, demands, and Causes of Action with respect to the Tax Refund.

(g)       **Tax Refund**. Whenever received by the Post-Confirmation Debtor, the Cash proceeds of the Tax Refund, after payment of any expenses (including fees and expenses of counsel) incurred in connection with the collection of such funds, must be irrevocably transferred to the Liquidation Trust and paid in accordance with the terms of this Plan and the CODI Settlement. The Post-Confirmation Debtor holds its rights in the Tax Refund in trust for the Liquidation Trust.

**Section 5.03    Liquidation Trust.**

(a)       **Liquidation Trust Interests**. The Liquidation Trust has two series of Liquidation Trust Interests: (i) the Special Beneficial Interest; and (ii) General Beneficial Interests. All Liquidation Trust Interests must be recorded on the books and records of the Liquidation Trust in accordance with the Liquidation Trust Agreement. Such recording is all that is required for Liquidation Trust Interests to be Distributed to Holders of Claims.

(b)       **Appointments**.

(i)       On and after the Effective Date, the initial Liquidation Trustee, Michael Goldberg, becomes and serves as Liquidation Trustee. The Liquidation Trustee receives compensation and reimbursement of expenses as set forth in the Liquidation Trust Agreement.

(ii)       On and after the Effective Date, the initial Liquidation Trust Oversight Board, as designated in this Plan, begins to serve without further action. Any compensation and reimbursement of reasonable expenses are as set forth in the Liquidation Trust Agreement.

(c)       **Creation and Governance of the Liquidation Trust.** On the Effective Date, the Liquidation Trustee must execute the Liquidation Trust Agreement, assume and begin performing his duties under the Plan and the Liquidation Trust Agreement, and take any other steps necessary to establish the Liquidation Trust in accordance with the Plan. The powers, rights, and responsibilities of the Liquidation Trustee are specified in the Liquidation Trust Agreement.

24

(d)        **Vesting of Liquidation Trust Assets.** On the Effective Date, the Liquidation Trust is automatically vested with all Liquidation Trust Assets; *provided* that, to the extent that the Debtors cannot or are prohibited from transferring any asset or assets to the Liquidation Trust, the Post-Confirmation Debtor holds such Liquidation Trust Asset and its proceeds in trust for the benefit of the Liquidation Trust. Except as otherwise provided in the Plan or the Confirmation Order, the Liquidation Trust Assets automatically vest in the Liquidation Trust free and clear of all Claims, Liens, or interests subject only to the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the Liquidation Trust Agreement, and such vesting is exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Liquidation Trustee is the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to Bankruptcy Code § 1123(b)(3) regarding all Liquidation Trust Assets. The Liquidation Trust holds and distributes the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement.

(e)        **Contribution of Contributed Claims.** Except with respect to CODI's GT Claim, on the Effective Date, all Contributed Claims are irrevocably contributed to the Liquidation Trust for all purposes. No Person may rely on the absence of a specific reference to any Contributed Claims in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to indicate that the Liquidation Trust will not pursue any available Contributed Claims. The objection to the Allowance of any Claims held by a Contributing Creditor does not limit the Liquidation Trust's right to prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement waives, releases, or relinquishes any Contributed Claim. The Liquidation Trust may assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the Liquidation Trust. CODI's GT Claim is deemed contributed to the Liquidation Trust as of the later of September 15, 2026, and the Effective Date.

(f)        **Purpose of the Liquidation Trust.** The Liquidation Trust is established for the purpose of pursuing or liquidating the Liquidation Trust Assets and making Distributions to the Liquidation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701- 4(d), with no objective to continue or engage in the conduct of a trade or business.

(g)        **Authority.** Subject to the supervision of the Liquidation Trust Oversight Board, the Liquidation Trustee has the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan or the Liquidation Trust Agreement) to carry out and implement all applicable provisions of the Plan, all as described in the Liquidation Trust Agreement. The Liquidation Trust Oversight Board has only those rights and powers conferred on it under the Liquidation Trust Agreement.

(h)        **Limitation of Liability.** The Liquidation Trust Agreement limits the liability of the Liquidation Trustee and the Liquidation Trust Oversight Board to the extent provided therein.

(i)        **Indemnification.** The Liquidation Trust indemnifies the Liquidation Trustee, the Liquidation Trust Oversight Board, and their respective Related Parties in accordance with the Liquidation Trust Agreement.

25

(j)      **Distributions from the Liquidation Trust**. The Liquidation Trust Agreement controls all Distributions to Liquidation Trust Beneficiaries.

(k)      **Exemption.** To the extent the Liquidation Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to Bankruptcy Code § 1145, from registration under the Securities Act and any applicable state and local laws requiring registration of securities.

(l)      **Termination of the Liquidation Trust.** The Liquidation Trustee and the Liquidation Trust are discharged or terminated, as the case may be, when and under the circumstances established in the Liquidation Trust Agreement.

(m)      **Control Provision.** To the extent there is any inconsistency between the Plan and the Liquidation Trust Agreement, the Plan controls.

**Section 5.04      Preservation of Privileges and Defenses.** The actions taken by the Debtors, the Liquidation Trust, or any of their respective Related Parties in connection with the Plan do not waive any privilege or defense of the Debtors or the Liquidation Trust, as applicable, including any attorney-client privilege or work-product doctrine. All privileges are preserved and vest in the Liquidation Trust.

**Section 5.05      Creation and Funding of Reserves.** On the Effective Date, the Liquidation Trustee must create and, thereafter, maintain the Effective Date Reserves, Professional Fee Reserve, and the Liquidation Trust Expense Reserve.

(a)      **Reserves for Specified Purposes Only.** A Cash reserve may only be used to make Distributions for which it has been established. Any Cash remaining in a reserve ultimately not needed for Distributions becomes Liquidation Trust Available Cash.

(b)      **Professional Fee Reserve.** The Liquidation Trustee must fully fund the Professional Fee Reserve on the Effective Date in an amount equal to the Professionals' and Ordinary Course Professionals' estimates of unpaid Fee Claims as of the Effective Date (incorporating any Cash already set aside under the Cash Collateral Order). Each Professional or Ordinary Course Professional must deliver to the Debtors, the Creditors' Committee, and CODI its estimate no later than three Business Days prior to the Effective Date. If a dispute regarding the amount of the Professional Fee Reserve arises, then any Professional or Ordinary Course Professional may submit the issue to the Bankruptcy Court, which, following notice and a hearing, fixes the amount of the required funding. Any Cash in the Professional Fee Reserve in excess of the aggregate Allowed Professional Fee Claims (as reduced to reflect payment) is to be distributed in accordance with Section 3.02(c)(ii) above and, thereafter, any additional amounts become Liquidation Trust Available Cash. The Professional Fee Reserve is not an Effective Date Reserve.

(c)      **Liquidation Trust Expense Reserve.** The Liquidation Trust Agreement must include provisions for additional future funding of the Liquidation Trust Expense Reserve.

(d)      **Effective Date Reserves**. The initial amount of the Effective Date Reserves must be agreed upon among the Creditors' Committee, the Debtors, and CODI and set forth in the Plan Supplement. The Effective Date Reserves are established, maintained, and administered by the Liquidation Trustee as a disbursing agent for the Debtors. The Liquidation Trustee must administer, and the Liquidation Trust Oversight Board must oversee the Liquidation Trustee in connection with, the Effective Date Reserves as if the terms and conditions governing the rights, powers, obligations, and protections set forth in the Liquidation Trust Agreement applying to the Liquidation Trustee and the Liquidation Trust Oversight Board applied to the Effective Date Reserves.

26

**Section 5.06    Preservation of Causes of Action**.

(a)    **Preservation of All Causes of Action Not Expressly Settled or Released.** The Liquidation Trust and, with respect to the Tax Refund, the Post-Confirmation Debtor, as a successor in interest to the Debtors and the Estates, has the exclusive right, power, and interest on behalf of itself, the Debtors and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Causes of Action (including any GT Claim and any Contributed Claim) without any further order of the Bankruptcy Court, except as otherwise provided in the Liquidation Trust Agreement. The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action is not intended to and does not limit the rights of the Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor, to pursue any such Avoidance Actions or Causes of Action. Unless a Cause of Action (including any GT Claim and any Contributed Claim) is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action for later resolution by the Liquidation Trust and, with respect to the Tax Refund, the Post-Confirmation Debtor. As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches applies to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order, or based on any Claim becoming Allowed, in each case unless such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or the Liquidation Trust is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits. A non-exclusive list of Causes of Action is included in the Plan Supplement.

**Section 5.07    Cancellation of Instruments.** Except with respect to any executory contracts and unexpired leases that are assumed and assigned to the Liquidation Trust under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors is deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto are automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto are discharged.

**Section 5.08    Substantive Consolidation**.

(a)    Pursuant to Bankruptcy Code § 1123(a)(5)(C) and the Bankruptcy Court's equitable powers under Bankruptcy Code § 105(a), this Plan substantively consolidates all Debtors' Estates into a single consolidated Estate for all purposes under the Plan and the Liquidation Trust Agreement, including the Allowance of Claims, Distributions, and voting. On the Effective Date: (i) the Assets and liabilities of the Debtors are merged into the single consolidated Estate; (ii) all of a Debtor's guaranties of another Debtor's obligations are eliminated and extinguished so that any Claim against any Debtor, and any guaranty thereof executed by any Debtor and any joint or several liability of any of the Debtors constitutes only one obligation of the consolidated Estate; (iii) each Claim Filed against any Debtor is treated as Filed against the consolidated Estate and treated as one Claim against and obligation of the consolidated Estate; (iv) all Intercompany Claims are eliminated and extinguished, and Holders of Intercompany Claims do not receive any Distributions or retain any property pursuant to the Plan on account of such Intercompany Claims; and (v) for purposes of determining the availability of the right of setoff under Bankruptcy Code § 553, the Debtors are treated as one entity so that, subject to the other provisions of Bankruptcy Code § 553, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such consolidation does not affect any subordination provisions set forth in any agreement relating to any Claim

27

or Equity Interest or the ability of the Liquidation Trust to seek to have any Claim or Equity Interest subordinated in accordance with any contractual rights or equitable principles. Notwithstanding anything in this section to the contrary, all post-Effective Date fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, if any, are calculated on a separate legal entity basis for each Post-Effective Date Debtor.

(b)     The Disclosure Statement and the Plan constitute a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed consolidation is made in writing by any Creditor purportedly affected by such consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

(c)     If the Bankruptcy Court determines that consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis or otherwise treat the Plan as a separate Plan for each Debtor. Furthermore, the Debtors reserve their rights to seek confirmation of the Plan without implementing consolidation of any given Debtor, and, in the Debtors' reasonable discretion, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis.

## ARTICLE VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**Section 6.01     Assumption of Certain Executory Contracts and Unexpired Leases**.

(a)     **Assumption of Agreements**. On the Effective Date, the Debtors assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements and retain or assign such contracts and leases as set forth on the Schedule of Assumed Agreements and all other executory contracts and unexpired leases are rejected under Section 6.02 of the Plan. Any assumed contracts and leases not assigned to a third party are transferred to the Liquidation Trust and constitute Liquidation Trust Assets. The Debtors reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date, in the Debtors' reasonable discretion (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors must provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment. Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein includes any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements. The Confirmation Order constitutes a Bankruptcy Court order approving the assumption and assignment, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

(b)     **Cure Payments**. Any amount that must be paid under Bankruptcy Code § 365(b)(1) to cure a default under and compensate the non-Debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed Agreements, if any. Unless the parties mutually agree to a different date, such payment must be made in Cash within ten Business Days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any

28

disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Liquidation Trust or such other entity to provide "adequate assurance of future performance" within the meaning of Bankruptcy Code § 365 with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment.

(c)    **Objections to Assumption/Cure Payment Amounts**. Any Person that is a party to an executory contract or unexpired lease to be assumed or assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must File with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any Person that fails to timely File and serve such a statement and, if applicable, a declaration waives any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease. In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order constitutes a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Liquidation Trust has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

(d)    **Resolution of Claims Relating to Assumed Contracts and Leases.** Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed and assigned executory contract or unexpired lease, satisfies in full any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of claim or listed on the Schedules) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of claim or the Schedules). Upon the tendering of the Cure Payment, any such Filed or Scheduled Claim is disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

(e)    **Insurance Policies.**

(i)    *Assumption or Rejection.* On the Effective Date, the Theft Policy and the Debtors' Insurance Contracts relating to directors and officers liability insurance and any other Insurance Contracts set forth in the Plan Supplement that are in force, current, and not expired are treated as and deemed to be executory contracts under the Plan. On the Effective Date, the rights and interests in the above-referenced policies are assumed by the Debtors and assigned to the Liquidation Trust under Bankruptcy Code § 365 (the "**Insurance Rights Transfer**"). All other Insurance Contracts, if they are deemed executory contracts under the Plan, are rejected as of the Petition Date under Bankruptcy Code § 365. Entry of the Confirmation Order constitutes the Bankruptcy Court's approval of the assumption, Insurance Rights Transfer, and rejection of the Insurance Contracts, as applicable.

(ii)    *Reservation of Rights.* Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, the Disclosure Statement Order, the Bar Date Order and any related notices, any claim objection, or any document related to the foregoing, except as set forth in this Section 6.01(e), nothing (A) alters the rights and obligations of the Debtors, their Estates, the Post-Confirmation Debtor, the Liquidation Trust, and the Insurers under any Insurance Contracts, (B) modifies the coverage provided under any Insurance Contract or the terms and conditions thereof, or (C) affects the insurers' rights and interests in any collateral or security they hold. For the avoidance of doubt, all rights and obligations under the Insurance Contracts are governed by the applicable Insurance Contracts and applicable law.

29

(iii)    *Relief from Stay/Injunction for Limited Purposes.* The automatic stay of Bankruptcy Code § 362(a) and the injunctions set forth in Article XI of the Plan, if and to the extent applicable, are deemed modified without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid workers' compensation claims or with valid direct action claims against an insurer under applicable non-bankruptcy law to proceed with their claims; and (B) insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any insurer under applicable non-bankruptcy law, or where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XI of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing. For the avoidance of doubt, to the extent that a workers' compensation claim (A) is not (1) payable pursuant to one of the Insurance Contract(s) or (2) paid by a party that is not the Debtors, the Liquidation Trust or the Liquidation Trustee, and (B) is an Allowed Claim, such workers' compensation claim is treated in a manner consistent with the terms of the Plan. The Liquidation Trust is never liable for such Claims.

(iv)    *Prohibition on Certain Acts.* Each Insurer is prohibited from, and the Confirmation Order must include an injunction against, denying, refusing, altering, or delaying coverage solely on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan; *provided* that nothing in the Plan grants or should be deemed to grant any claimant relief from the automatic stay of Bankruptcy Code § 362(a) and the injunctions set forth in Article XI of the Plan, if applicable, to proceed with their claims (other than workers' compensation and direct action claims, as provided for in this Section 6.01(e)) without first seeking and receiving relief from the Bankruptcy Court from the automatic stay and/or such injunctions, to the extent applicable; *provided further* Insurers may take any actions relating to the Insurance Contracts (including effectuating a setoff or recoupment), to the extent permissible in accordance with applicable law or the terms of the Insurance Contracts, *provided* that the Insurers must return any remaining collateral or security to the Liquidation Trust in accordance with the terms of the Insurance Contracts.

(v)    *Insurance Rights Transfer Back-Up.* Except as otherwise expressly provided in the Plan, the Debtors will make the Insurance Rights Transfer to the Liquidation Trust as required by this Plan. If any entity or individual is, at any time, legally precluded from transferring its rights, titles, privileges, interests, claims, demands, or entitlements to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or arising in the future, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, Disputed or undisputed, fixed or contingent, arising under or attributable to the insurance rights and interests subject to the  Insurance Rights Transfer, then that entity or individual must: (A) take any actions reasonably requested by the Liquidation Trust to pursue any such insurance rights and interests for the benefit of the Liquidation Trust; and (B) promptly transfer to the Liquidation Trust any amounts recovered under or on account of any of such insurance rights and interests; *provided*, that while any such amounts are held by or under the control of any entity or individual, such amounts are held for the benefit of the Liquidation Trust.

**Section 6.02    Rejection of Executory Contracts and Unexpired Leases**.

(a)    **Rejected Agreements.** On the Effective Date, all executory contracts and unexpired leases of the Debtors are rejected except for (i) executory contracts and unexpired leases that have been previously assumed or rejected by the Debtors, and (ii) executory contracts and unexpired leases that are set forth in the Schedule of Assumed Agreements. The Confirmation Order constitutes a Bankruptcy Court order

30

approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

(b)     **Rejection Claims Bar Date.** Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served are forever disallowed, barred, and unenforceable, and Persons holding such Claims do not receive and are barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed, the Liquidation Trust may object to any Rejection Claim on or prior to the Claim Objection Deadline. The Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired lease that was previously rejected in these Chapter 11 Cases.

## ARTICLE VII
## PROVISIONS GOVERNING DISTRIBUTIONS

**Section 7.01     Timing of Distributions for Allowed Claims.** Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date must be made on or as soon as practicable after the applicable Distribution Date. Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth herein are deemed to have been made on such date.

**Section 7.02     Calculating Distributions and Related Matters.** The Liquidation Trustee, in his reasonable discretion, must calculate Liquidation Trust Available Cash and other amounts for or relating to Distributions for Liquidation Trust Beneficiaries (including the Disputed Claims Reserve) and may establish and hold back from Distributions reasonable reserves for other contingencies.

**Section 7.03     Interest and Other Amounts Regarding Claims.** Except to the extent provided in (a) Bankruptcy Code § 506(b) and Allowed by a Final Order, (b) the Plan, (c) the Confirmation Order, or (d) the Liquidation Trust Agreement, postpetition interest does not accrue and is not paid on any Claims, and no Holder of an Allowed Claim is entitled to interest, penalties, fees, or late charges accruing or chargeable on any Claim from and after the Petition Date. Notwithstanding the previous sentence, Holders of General Beneficial Interests are entitled to GUC Interest as provided in Section 3.02(d) above.

**Section 7.04     Distributions.** The Liquidation Trustee makes all Distributions under the Plan to Holders of Allowed Claims and is the Estates' disbursing agent under the Plan for all distributions to Holders of Allowed Claims entitled to distribution from one or more of the Effective Date Reserves. The Liquidation Trustee is not required to give any bond or surety or other security for the performance of any duties as disbursing agent. Distributions to Liquidation Trust Beneficiaries are made in accordance with the Liquidation Trust Agreement.

**Section 7.05     Means of Cash Payment.** Cash payments under the Plan must be made, at the option and in the sole discretion of the Liquidation Trustee, by (a) checks drawn on, or (b) wire transfer, electronic funds transfer, or ACH from a domestic bank. Cash payments to foreign Holders of Allowed Claims may be made, at the option and in the sole discretion of the Liquidation Trustee, by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks are void if not cashed within 180 calendar days of the date of the issuance thereof. Requests for reissuance of any check within 180 calendar days of the date of the issuance thereof must be made directly to the Liquidation Trustee.

**Section 7.06      Form of Currency for Distributions.** All Distributions under the Plan must be made in U.S. Dollars. Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim must be calculated in U.S. Dollars based upon the currency conversion rate in place as of the Petition Date and in accordance with Bankruptcy Code § 502(b).

**Section 7.07      Fractional Distributions**. Notwithstanding anything in the Plan to the contrary, no Distribution of fractional cents will be made. Whenever any Distribution of a fraction of a cent would otherwise be required, the actual Distribution made must reflect a rounding of such fraction to the nearest whole cent (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

**Section 7.08      De Minimis Distributions.** Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee is not required to Distribute, and will not Distribute, Cash or other property to a Liquidation Trust Beneficiary or to a Holder of an Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim on any given Distribution Date is less than $10.00, and such amount will be Distributed to other Creditors on such Distribution Date in accordance with the terms of the Plan. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed on any given Distribution Date is less than $10.00 is forever barred from asserting any Claim with respect to such eliminated Distribution against any Estate Assets.

**Section 7.09      No Distributions with Respect to Certain Claims.** Notwithstanding anything in the Plan to the contrary, no Distributions or other consideration of any kind are made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, and then only to the extent that such Claim becomes an Allowed Claim and as provided under the Plan for such Allowed Claim. Nonetheless, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of Distributions due to Liquidation Trust Beneficiaries, each Contingent Claim, Disputed Claim, or Unliquidated Claim is treated as if it were an Allowed Claim (which, for Unliquidated Claims, means they are treated as if Allowed in such amounts as determined in the reasonable discretion of the Liquidation Trustee) except that if a Claim is estimated under Section 8.03 of the Plan, such estimated amount is used with respect to such Claim. Distributions that may become due in respect of a Contingent Claim, Disputed Claim, or Unliquidated Claim must be held in reserve by the Liquidation Trust in the Disputed Claims Reserve. The Liquidation Trust elects to treat any reserve as a "disputed ownership fund," pursuant to Treasury Regulation section 1.468B-9(c)(2)(ii). As outlined in this election, Creditors holding such Claims are not treated as transferors of the money or property transferred to the Disputed Claims Reserve.

**Section 7.10      Distributions After Allowance.** Notwithstanding any other provision of the Plan or the Confirmation Order, if any portion of a Claim is a Disputed Claim no payment or Distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. To the extent a Disputed Claim ultimately becomes an Allowed Claim, Distributions will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan, the Confirmation Order, and the Liquidation Trust Agreement. When the Bankruptcy Court's order or judgment allowing any Disputed Claim becomes a Final Order, the Liquidation Trustee must provide— on the earlier of the next regularly-scheduled Distribution Date and 30 days after such order or judgment becomes a Final Order—to the Holder of such Claim the Distribution under this Section 7.10 as a catch-up Distribution to the extent any Distributions have by then been made to Holders of General Beneficial Interests. Any taxes payable by the Disputed Claims Reserve must be withheld from the assets to be Distributed on account of such General Unsecured Claim.

**Section 7.11      Delivery of Distributions.** Distributions to Holders of Liquidation Trust Interests or Allowed Claims are made (a) at the addresses set forth in the proofs of claim Filed by such Holders,

32

(b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Claims Agent or to the Liquidation Trustee. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder will be made unless and until the Liquidation Trustee is notified of such Holder's then-current address. The responsibility to provide the Claims Agent or the Liquidation Trustee with a current address of a Holder of Liquidation Trust Interests or Claims is the responsibility of such Holder. Amounts in respect of undeliverable Distributions made by the Liquidation Trustee must be held in trust on behalf of the Holder of the Liquidation Trust Interest or Claim to which they are payable by the Liquidation Trustee until the earlier of the date that such undeliverable Distributions are claimed by such Holder and 180 calendar days after the date the undeliverable Distributions were made, after which time the Liquidation Trustee deals with any such remaining Cash as provided in the Liquidation Trust Agreement.

Section 7.12    **Application of Distribution Record Date and Other Transfer Restrictions.** At the close of business on the Distribution Record Date, the claims register for all Claims must be closed, and there may be no further changes in the record holders of any Claims on the claims register. Except as provided herein or in the Liquidation Trust Agreement, the Liquidation Trustee and his Related Parties have no obligation to recognize any putative transfer of Claims occurring after the Distribution Record Date.

Section 7.13    **Withholding, Payment, and Reporting Requirements Regarding Distributions.** All Distributions under the Plan, to the extent applicable, must comply with all Tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions are subject to any such withholding, payment, and reporting requirements. The Liquidation Trustee is authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including, to the extent such information is not already available to the Liquidation Trust, requiring each Holder of a Liquidation Trust Interest or Claim to provide an executed current Form W-9, Form W-8, or similar Tax form as a prerequisite to receiving a Distribution. Notwithstanding any other provision of the Plan, (a) each Holder of a Liquidation Trust Interest or an Allowed Claim that is to receive a Distribution pursuant to the Plan has sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any governmental unit, including income, withholding, and other Tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any Tax obligation that would be imposed on the Liquidation Trust in connection with such Distribution; and (b) no Distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidation Trustee for the payment and satisfaction of such withholding Tax obligations or such Tax obligation that would be imposed in connection with such Distribution.

Section 7.14    **Defenses and Setoffs.** On and after the Effective Date, the Liquidation Trust has all the Debtors' and the Estates' rights under Bankruptcy Code § 558 with respect to Claims. Nothing under the Plan affects the rights and defenses of the Debtors, the Estates, or the Liquidation Trust in respect of any Claim, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims. Accordingly, the Liquidation Trustee may, but is not required to, with prior notice to the affected Creditor, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Estates, or the Liquidation Trust, as applicable, may have against the Holder of such Claim; *provided* that neither the failure to do so nor the allowance of any Claim hereunder waives or releases any such claim or rights that may exist against such Holder.

Section 7.15    **Allocation of Distributions.** All Distributions received under the Plan by Holders of Liquidation Trust Interests and Claims are deemed to be allocated first to the principal amount of such

Claim, or the Claim to which the applicable Liquidation Trust Interest relates, as determined for United States federal income Tax purposes, and then to accrued interest, if any, with respect to such Claim.

**Section 7.16    Joint Distributions.** The Liquidation Trustee may, in its sole discretion, make Distributions jointly to any Holder of a Claim and any other Person that the Liquidation Trustee has determined to have an interest in such Claim.

**Section 7.17    Forfeiture of Distributions.** If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 7.05, fails to claim an undeliverable Distribution within the time limit set forth in Section 7.11, or fails to complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9 within 180 calendar days after a request for the completion and return of the appropriate form pursuant to Section 7.13 (or such later time as approved by a Bankruptcy Court order), then such Holder is deemed to have forfeited its right to any reserved and future Distributions under the Plan. Any such forfeited Distributions become Liquidation Trust Available Cash for all purposes, notwithstanding any federal or state escheat laws to the contrary.

**ARTICLE VIII**
**DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS**

**Section 8.01    Resolution of Disputed Claims.** Except as otherwise provided in the Liquidation Trust Agreement, from and after the Effective Date, the Liquidation Trust has the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Liquidation Trust with respect to the Allowance of any Claim is conclusive evidence and a final determination of the Allowance of such Claim. Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

**Section 8.02    Claim Objections.** All objections to (or requests to estimate) Claims (other than Professional Fee Claims) must be Filed by the Liquidation Trust on or before the Claim Objection Deadline, which may be extended on the Liquidation Trustee's motion to the Bankruptcy Court made prior to the expiration of such period. The Claim Objection Deadline is automatically extended as provided by Local Rule 9006-2 upon the Filing of a motion by the Liquidation Trust requesting an extension of the Claim Objection Deadline. If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates is treated as an Allowed Claim.

**Section 8.03    Estimation of Certain Claims.** The Liquidation Trust may, at any time, move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim pursuant to Bankruptcy Code § 502(c), regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court retains jurisdiction and power to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. The estimated amount of any Claim so determined by the Bankruptcy Court constitutes the maximum recovery that the Holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately Allowed. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

**Section 9.01    Conditions to the Effective Date.** The occurrence of the Effective Date does not occur and the Plan is not consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.02 of the Plan:

(a)    the Bankruptcy Court enters the Confirmation Order;

(b)    the Confirmation Order is not subject to any stay;

(c)    all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, have been obtained and are in full force and effect;

(d)    all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan, including the Liquidation Trust Agreement, are effected or executed and delivered, as applicable; and

(e)    the Liquidation Trust Expense Reserve, Professional Fee Reserve, Disputed Claim Reserve, and Effective Date Reserves are funded in the amounts set forth in the Plan Supplement.

**Section 9.02    Waiver of Conditions to the Effective Date.** The conditions to the Effective Date set forth in clauses Section 9.01(c) and Section 9.01(d) of the Plan may be waived only in a joint writing by the Debtors, the Creditors' Committee, and CODI; *provided* nothing contained in this Plan exempts the Debtors from complying with their legal obligations.

**Section 9.03    Effect of Non-Occurrence of Conditions to the Effective Date.** If each of the conditions to the Effective Date is not capable of being satisfied and not duly waived in accordance with Section 9.01 and Section 9.02 of the Plan, upon notification Filed by the Debtors with the Bankruptcy Court, (a) the Confirmation Order is vacated; (b) no Distributions will be made; (c) the Debtors, the Estates, and all Creditors are restored to the *status quo* as of the moment immediately preceding the entry of the Confirmation Order; and (d) all of the Debtors' and the Estates' obligations with respect to Claims remain unchanged and nothing contained in the Plan waives or releases any Causes of Action by or against the Debtors, the Estates, or any other Person, or prejudices in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

**Section 9.04    Notice of the Effective Date.** Promptly after the occurrence of the Effective Date, the Liquidation Trust must File and mail or cause to be mailed to all Creditors a notice that informs such Creditors of (a) entry of the Confirmation Order and the resulting confirmation of the Plan; (b) the occurrence of the Effective Date; (c) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (d) the deadline established under the Plan for the filing of Administrative Claims; and (e) such other matters as the Liquidation Trustee deems appropriate.

## ARTICLE X
## RETENTION OF JURISDICTION AND POWER

**Section 10.01    Scope of Retained Jurisdiction and Power.** Under Bankruptcy Code §§ 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court retains jurisdiction and power

35

over all matters arising in, arising under, or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction and power to do the following:

(a)      except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

(b)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under Bankruptcy Code §§ 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4);

(c)      hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the liquidation or allowance of any Claims arising therefrom;

(d)      effectuate performance of and payments under the provisions of the Plan and enforce remedies on any default under the Plan;

(e)      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases or the Plan, including the Causes of Action;

(f)      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Liquidation Trust Agreement;

(g)      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (including the Liquidation Trust Agreement), or to maintain the integrity of the Plan following consummation;

(h)      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan, the Confirmation Order, or the Liquidation Trust Agreement;

(j)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)      hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, the CODI Settlement Agreement, the Plan Support Agreement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and orders;

(l)      enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings associated with the Plan or otherwise entered in connection with the Chapter 11 Cases (whether or not any or all of the Chapter 11 Cases have been closed);

(m)      except as otherwise limited in the Plan, recover all Estate Assets, wherever located;

(n)      hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code § 346, 505 and 1146;

(o)      hear and determine all disputes involving the existence, nature, or scope of the Plan's release, exculpation, and injunction provisions;

(p)      hear and determine such other matters as may be provided in the Confirmation Order or the Liquidation Trust Agreement or as may be authorized under, or not inconsistent with, the Bankruptcy Code and title 28 of the United States Code;

(q)      resolve any cases, controversies, suits, or disputes related to the Liquidation Trust and the Liquidation Trustee; and

(r)      enter a final decree closing any or all of the Chapter 11 Cases.

**Section 10.02    Reserved Rights to Seek Bankruptcy Court Approval.** Notwithstanding any provision of the Plan or the Liquidation Trust Agreement allowing an act to be taken without Bankruptcy Court approval, the Liquidation Trustee has the right to submit to the Bankruptcy Court any question or questions on which it may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the Liquidation Trust, as applicable, including the administration, settlement, distribution, or proposed sale of any of the Estate Assets or Liquidation Trust Assets. The Bankruptcy Court retains jurisdiction and power for such purposes and will approve or disapprove any such proposed action upon motion Filed by the Liquidation Trust.

**Section 10.03    Non-Exercise of Jurisdiction.** If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.01 of the Plan, the provisions of this Article X have no effect on, and do not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

# ARTICLE XI
## MISCELLANEOUS PROVISIONS

**Section 11.01    Payment of Statutory Fees and Post-Confirmation Reports**. All statutory fees payable pursuant to 28 U.S.C. § 1930 that are due and owing as of the Effective Date must be paid by the Debtors in full in Cash on the Effective Date. The Debtors must file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidation Trustee must file with the Bankruptcy Court the final monthly operating reports and separate UST Form 11- PCR reports when they become due. After the Effective Date, the Liquidation Trustee must pay any and all applicable statutory fees in full in Cash when due and payable. Notwithstanding the consolidation of the Debtors called for in the Plan, the Liquidation Trustee remains obligated to pay any applicable statutory fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee provides no release under

37

the Plan. Statutory Fees are Allowed. The U.S. Trustee need not file any proof of claim or any request for administrative expense for Statutory Fees. The provisions of this paragraph control notwithstanding any other provision in this Plan to the contrary.

**Section 11.02    Dissolution of the Creditors' Committee.** The Creditors' Committee is automatically dissolved on the Effective Date and, on the Effective Date, each member of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee) and each Professional retained by the Creditors' Committee is released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Creditors' Committee.

**Section 11.03    Modifications and Amendments.**

(a)    In the Debtors' reasonable discretion, the Debtors may alter, amend, or modify the Plan under Bankruptcy Code § 1127(a) at any time at or prior to the conclusion of the Confirmation Hearing with the consent of the Creditors' Committee and CODI. All alterations, amendments, or modifications to the Plan must comply with Bankruptcy Code § 1127. The Debtors must provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Creditor that has accepted the Plan is deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

(b)    After entry of the Confirmation Order and prior to the Effective Date, the Debtors may, under Bankruptcy Code § 1127(b), institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, the Confirmation Order, or the Liquidation Trust Agreement, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan. Such proceedings must comply with Bankruptcy Code § 1127. To the extent required, prior notice of such proceedings must be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court.

**Section 11.04    Severability of Plan Provisions.** If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision. That term or provision then applies as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions remain in full force and effect and are in no way affected, impaired, or invalidated. The Confirmation Order constitutes a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.

**Section 11.05    Binding Effect of Plan.** Upon the Effective Date, Bankruptcy Code § 1141 becomes applicable with respect to the Plan and the Plan binds all Persons to the fullest extent permitted by Bankruptcy Code § 1141(a). Confirmation of the Plan binds each Holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Equity Interest is Allowed, whether or not such Holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan. Any Holder of a Claim that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 11.09 of the Plan but is bound by the other releases, exculpations, and injunctions in the Plan.

38

**Section 11.06   Injunctions.**

(a)      **From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), along with their respective present or former employees, agents, officers, directors, principals, and Affiliates are permanently enjoined, solely with respect to any Claims dealt with under the Plan, Equity Interests dealt with under the Plan, and Causes of Action dealt with under the Plan, from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or the property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; or the property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or the property of any of the Debtors, the Released Parties, Liquidation Trustee or the Liquidation Trust; (iv) asserting setoff, unless such setoff was formally asserted in a timely Filed proof of Claim or in a document Filed with the Bankruptcy Court prior to entry of the Confirmation Order, or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided, however,* notwithstanding anything to the contrary in this Plan, the injunction set forth in this Section 11.06 does not apply to any action taken by one CODI Party against another CODI Party.**

(b)      **As of the Effective Date, all Persons are precluded and barred from asserting against any property to be Distributed under the Plan any Causes of Action, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.**

(c)      **Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Equity Interests, and other parties in interest, along with their Related Parties, are enjoined from taking any actions to interfere with the implementation or substantial consummation of this Plan by the Debtors, the Liquidation Trustee, or their respective Related Parties.**

(d)      **By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim is deemed to have specifically consented to the Injunctions set forth in this Section 11.06.**

**Section 11.07   Exculpation. Except as otherwise specifically provided in the Plan, no Exculpated Party has or has incurred, and each Exculpated Party is exculpated from any Causes of Action for any Claim related to any act or omission taking place between the Petition Date and the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Confirmation Order, the Liquidation Trust Agreement, the CODI Settlement Agreement, the Plan Support Agreement, or any agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument,**

document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the CODI Settlement Agreement, the Plan Support Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan or these Chapter 11 Cases, or the Distribution of property under the Plan or any other related agreement, except for Claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects all Exculpated Parties are entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

Section 11.08    Releases by the Debtors. Notwithstanding anything contained in the Plan to the contrary, pursuant to Bankruptcy Code § 1123(b), in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, effective on the Effective Date, each Released Party is hereby deemed to be released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing entities on behalf of the Debtors, from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Equity Interest in, a Debtor or other entity, or that any Holder of any Claim against, or Equity Interest in, a Debtor or other entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation of the Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, documents associated with or related to the DIP Order and Cash Collateral Order, the Plan (including the Plan Supplement(s)), the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any aspect of the associated transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, the Disclosure Statement, the DIP Order and Cash Collateral Order, the Plan, the Plan Supplement(s), before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence of such Person (*provided* that the foregoing exception does not apply to the CODI Parties with respect to claims that are within the scope of those settled by the CODI Settlement Agreement). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or

40

any document, instrument, or agreement (including those set forth in the Plan Supplement(s)) executed to implement the Plan or any Claim or obligation arising under the Plan.

Section 11.09    Releases by Holders of Claims. Except as otherwise expressly set forth in the Plan or the Confirmation Order—and except to the extent a Holder of a Claim makes an Opt-Out Election—on and after the Effective Date, and with respect to all other Releasing Parties, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the Holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation of the Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, documents associated with or related to the DIP Order and Cash Collateral Order, the Plan (including the plan supplement(s)), the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement), or any aspect of the associated transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, the Disclosure Statement, the DIP Order and Cash Collateral Order documents, the Plan, the plan supplement(s), before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual intentional fraud, willful misconduct, or gross negligence of such Person. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any document, instrument, or agreement (including those set forth in the plan supplement) executed to implement the Plan or any Claim or obligation arising under the Plan; (ii) any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits judgments, damages, debts, rights, remedies, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that a CODI Party would have been legally entitled to assert in its own right (whether individually, derivatively, or collectively) against another CODI Party or any of their officers, directors, members, managers, trustees, or employees; or (iii) Allowed Claims solely against the Debtors.

Section 11.10    Terms of Injunctions or Stays. Without affecting the injunctions contained in Section 11.06, the exculpations contained in Section 11.07, and the releases contained in Section 11.08 of the Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to Bankruptcy Code §§ 105

41

or 362, or otherwise, in existence on the Confirmation Date remain in full force and effect until the Chapter 11 Cases are closed.

**Section 11.11    Revocation, Withdrawal, or Non-Consummation.** The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan is void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, (i) waive or release any Claims against, or any Equity Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

**Section 11.12    Exemption from Transfer Taxes.** Pursuant to Bankruptcy Code § 1146, the vesting of the Liquidation Trust Assets in the Liquidation Trust, the vesting of the Tax Refund in the Post-Confirmation Debtor, the issuance of the Liquidation Trust Interests, the issuance, transfer, or exchange of any equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, is not subject to any stamp, real estate transfer, mortgage recording, or other similar Tax.

**Section 11.13    Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) apply.

**Section 11.14    Transactions on Business Days.** If the Effective Date or any other date on which a transaction may occur under the Plan occurs on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day instead occur on the next succeeding Business Day.

**Section 11.15    Good Faith.** Confirmation of the Plan constitutes a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

**Section 11.16    Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of Delaware govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or formation of each Debtor govern corporate or limited liability company governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof. Any applicable nonbankruptcy law that would prohibit, limit, or otherwise restrict implementation of the Plan based on (i) the commencement of the Chapter 11 Cases, (ii) the appointment of the Liquidation Trustee, (iii) the wind down of the Debtors, (iv) the liquidation of some or all of the Liquidation Trust Assets, or (v) any other act or action to be done pursuant to or contemplated by the Plan is superseded and rendered inoperative by the Plan and federal bankruptcy law.

**Section 11.17    Notices.** After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidation Trustee is authorized to limit

42

the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Persons or Entities that Filed such renewed requests.

Section 11.18    **Final Decree.** Upon the determination by the Liquidation Trustee that all Claims have been Allowed, disallowed, expunged, or withdrawn and that all Liquidation Trust Assets have been liquidated, abandoned, or otherwise administered, the Liquidation Trustee must move for the entry of the Final Decree with respect to the Post-Confirmation Debtor. On entry of the Final Decree, the Liquidation Trustee, the Liquidation Trust Oversight Board, and their respective Related Parties are, in each case to the extent not previously discharged by the Bankruptcy Court, discharged and have no further duties or obligations to any Person.

Section 11.19    **Closing of Certain Chapter 11 Cases.** At any time following the Effective Date, the Liquidation Trust may, upon notice and a hearing, (a) close all of the Chapter 11 Cases except for the Chapter 11 Case of the Post-Confirmation Debtor, and any contested matters relating to each of the Debtors, including objections to Claims, are administered and heard in such Chapter 11 Case and (b) change the name of the Post-Confirmation Debtor and case caption of the remaining open Chapter 11 Case as desired. After the full administration of the Chapter 11 Cases, the Liquidation Trust must promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to Local Rule 3022-1(a), and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

Section 11.20    **Additional Documents.** On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidation Trust, all Holders receiving Distributions pursuant to the Plan, and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other acts as may be necessary or advisable to effectuate the provisions and intent of the Plan.

Section 11.21    **Conflicts.** If any provision of the Plan or any agreement entered into under the Plan conflicts with any provision of the Disclosure Statement, the Plan controls. If any order entered in the Chapter 11 Cases conflicts with any provision of the Plan, the Plan controls. If any provision of the Confirmation Order conflicts with any provision of the Plan or any agreement entered into under the Plan (other than the CODI Settlement Agreement and the Liquidation Trust Agreement), the Confirmation Order controls. If any provision of the Liquidation Trust Agreement conflicts with any provision of the Disclosure Statement, the Plan, or the Confirmation Order, the Plan controls unless the Confirmation Order specifically refers to this Section 11.21, in which case the Confirmation Order controls. If any provision of the CODI Settlement Agreement conflicts with any provision of the Disclosure Statement, the Plan, the Liquidation Trust Agreement, or the Confirmation Order, the Plan controls, unless the Confirmation Order specifically refers to Section 11.21, in which case the Confirmation Order controls.

## ARTICLE XII
## REQUEST FOR CONFIRMATION AND RECOMMENDATION

Section 12.01    **Request for Confirmation.** The Debtors request confirmation of the Plan in accordance with Bankruptcy Code § 1129.

Section 12.02    **Recommendation.** The Debtors believe that Confirmation and implementation of the Plan are the best option to maximize value under the circumstances and urge all Holders of Claims in Impaired Classes entitled to vote on the Plan to vote in favor of and support confirmation of the Plan.

Respectfully submitted,

**LUGANO DIAMONDS & JEWELRY INC.,** *et al.*


By: */s/ J. Michael Issa*
    J. Michael Issa
    Chief Restructuring Officer of Lugano Diamonds
    & Jewelry Inc. and its affiliated Debtors

**EXHIBIT A**

**Agreed Pre-Effective Date Fee Budget**

[*Intentionally Omitted*]

**EXHIBIT B**

**Liquidation Trust Agreement**

## LIQUIDATION TRUST AGREEMENT

Lugano Diamonds & Jewelry Inc., Lugano Holding, Inc. ("**Lugano Holding**"), Lugano Buyer, Inc., K.L.D. Jewelry, LLC, and Lugano Prive, LLC (collectively, the "**Debtors**"), as settlors, Michael Goldberg, as trustee (the "**Trustee**"), and CSC Delaware Trust Company, as Delaware trustee (solely in such capacity, the "**Delaware Trustee**," and together with the Debtors and the Trustee, the "**Parties**") enter into this trust agreement (as may be amended in accordance with its terms, this "**Agreement**") as of [●], 2026.

### RECITALS

A.    On November 16, 2025 (the "**Petition Date**"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the jointly-administered cases captioned *In re Lugano Diamonds & Jewelry Inc.*, Case No. 25-12055 (BLS) (the "**Chapter 11 Case**").

B.    On June 23, 2026, the Debtors filed the *Chapter 11 Plan of Liquidation* [Dkt. No. [●]] (as may be amended, the "**Plan**"), which the Bankruptcy Court confirmed by order [Dkt. [●]] entered [●], 2026 (the "**Confirmation Order**").

C.    This Agreement, including all its exhibits, is the "Liquidation Trust Agreement" described in the Plan to be executed on or before the Effective Date to implement the Plan.

D.    The Plan provides for the appointment of the Trustee, as of the Effective Date, vested with the powers and duties set forth in the Plan, the Confirmation Order, and this Agreement.

E.    Under the Plan and Confirmation Order, the Trust Assets are to be transferred to the Trust (each as defined below) created and governed by this Agreement so that: (i) the Trust Assets are held in a trust for the benefit of the holders of the CODI Secured Claim and General Unsecured Claims (the "**Beneficiaries**") under Treasury Regulation § 301.7701-4(d) for the objectives and purposes set forth in this Agreement and in the Plan; (ii) the Trust Assets can be monetized; (iii) proceeds of the Trust Assets, including Causes of Action, may be distributed to the Beneficiaries in accordance with the Plan; (v) the Trustee can resolve Disputed Claims; and (vi) the Trustee can implement the Plan and perform the Trust's administrative services.

F.    Under the Plan and Confirmation Order, the Trustee will administer the Effective Date Reserves and the Professional Fee Reserve and make distributions as the Debtors' disbursing agent to the holders of Allowed Professional Fee Claims from the Professional Fee Reserve and the holders Allowed Administrative (other than Professional Fee Claims), Priority, Priority Tax, Other Secured, and Convenience Claims (collectively, the "**APSC Claims**" and the "**APSC Creditors**"), none of whom are Beneficiaries on account of such APSC Claims.

G.    On [●], 2026, the conditions to the Plan's effectiveness were satisfied or waived in accordance with the Plan's terms, and the Effective Date occurred.

4927-0048-4740.22 53772.00002

**DECLARATION OF TRUST**

In consideration of the mutual covenants contained in this Agreement, the confirmation of the Plan, and other value, the receipt and sufficiency of which the Parties acknowledge, the Parties have executed this Agreement at the direction, and for the benefit, of the Beneficiaries as provided in the Plan.

TO HAVE AND TO HOLD unto the Trustee and the Trustee's successors in trust, under and subject to the terms and conditions set forth in this Agreement for the benefit of the Beneficiaries and for the performance of and compliance with the terms of this Agreement and of the Plan, except that, upon termination of the Trust in accordance with Article 9 below, this Agreement terminates with no further effect unless this Agreement otherwise provides. The Trustee holds and distributes the Trust Assets subject strictly to this Agreement's terms.

## Article 1
### DEFINITIONS AND INTERPRETATION

1.1     **Interpretive Rules**. Except if the context indicates otherwise:

(a)     any capitalized term used in this Agreement not defined in this Article 1 retains the meaning given to that term in the Plan or the Bankruptcy Code;

(b)     masculine pronouns are neutral and refer to any person of any gender;

(c)     "including" means "including without limitation";

(d)     article and section headings are not a substantive part of this Agreement and may not be used to interpret any of this Agreement's provisions; and

(e)     all events required to occur on the Effective Date are required to occur on the Effective Date or as soon after as reasonably practicable.

1.2     **Definitions**. Unless the context otherwise requires and except as contained in this Section 1.1 or as otherwise defined in this Agreement, the capitalized terms used in this Agreement retain the meanings given to them in the Plan. This Agreement defines the following terms:

(a)     "**Agency Agreement Cash**" means all cash, including the proceeds of any letter of credit, received by the Debtors under the Agency Agreement between the Debtors and Enhanced Retail Funding LLC, including all such cash held by the Debtors before the Effective Date and all such cash received by the Trust on and after the Effective Date.

(b)     "**Agreed Pre-Effective Date Fee Budget**" means the budget attached as Exhibit A to the Plan, agreed to among CODI, the Debtors, the Special Committee, and the Creditors' Committee, establishing the maximum amount of Professional Fees that CODI, the Debtors, the Special Committee, and the Creditors' Committee have agreed can be deducted from Effective Date Cash for purposes of determining the Initial CODI Distribution, *provided* that the Agreed Pre-Effective Date Fee Budget is not a cap on the total amount of Professional Fees Allowable for the period between the Petition Date and the Effective Date.

2

(c)      "**Beneficial Interest**" means a beneficial interest in the Trust granted on account of an Allowed Claim under the Plan, which the Plan calls a "Liquidation Trust Interest."

(d)      "**Board Member**" means a member of the Oversight Board.

(e)      "**Cause**" means (i) a person's willful failure to perform his material duties under this Agreement (including, with respect to a Member or the Trustee, regular attendance at regularly scheduled meetings of the Oversight Board), not remedied within 30 days of notice; (ii) a person's commission of an act of fraud, theft, or embezzlement during the performance of his duties under this Agreement; (iii) a person's conviction of a felony involving fraud, theft, embezzlement, or prison time, with all appeals having been exhausted or appeal periods lapsed; or (iv) a person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his duties under this Agreement.

(f)      "**Causes of Action**" means all Claims (including Investment Contract Claims), rights, actions, Avoidance Actions, Contributed Claims, proceedings, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, rights of setoff, third-party claims, subordination claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims, legal remedies, equitable remedies, claims, damages, or judgments whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, foreseen or unforeseen, asserted or unasserted, existing or hereafter arising, secured or unsecured, whether asserted directly or derivatively, in law, at equity, or otherwise, by statute, whether for tort, fraud, contract, or otherwise, including any recharacterization, subordination, avoidance or other claim under any other similar provision of applicable state or federal law.

(g)      "**CODI**" means, collectively, Compass Diversified Holdings, Compass Group Diversified Holdings LLC, Sostratus, LLC, Compass Group Management LLC, and any of their subsidiaries other than the Debtors and their subsidiaries.

(h)      "**Committee**" means the official committee of unsecured creditors appointed in the Chapter 11 Case.

(i)      "**Disability**" means, as a result of the Trustee's or a Board Member's incapacity due to physical or mental illness as determined by an accredited physician or psychologist selected by the Trustee or the Board Member, as applicable, the Trustee or Board Member has been substantially unable to perform his duties under this Agreement for three consecutive months or for an aggregate of 180 days during any period of twelve consecutive months.

(j)      "**Disputed**" means, with respect to a Claim, one or more of Disputed, Contingent, or Unliquidated as defined in the Plan.

(k)      "**DSTA**" means the Delaware Statutory Trust Act, 12 Del C. § 3801 *et seq*.

4927-0048-4740.22 53772.00002

(l)      "**GT**" means Grant Thornton LLP and its affiliates, which served as auditor for the Debtors and CODI.

(m)      "**GT Claims**" means all claims and Causes of Action against GT held by (a) a Debtor, (b) CODI, and (c) any creditor who irrevocably assigns and transfers its claims and Causes of Action against GT to the Trust as of or after the Effective Date.

(n)      "**Effective Date**" means the date that is the first Business Day after the entry of the Confirmation Order on which (a) no stay of the Confirmation Order is in effect, (b) all conditions in Article IX of the Plan have been satisfied or waived as set forth in the Plan, and (c) the Debtors, in consultation with the CODI Parties and the Creditors' Committee, declare the Plan effective. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

(o)      "**Effective Date Cash**" means all cash in the Estate on the Effective Date, less (a) the amount of cash required to fund the Effective Date reserves; and (b) the lesser of (i) the amount of Professional Fees incurred between the Petition Date and the Effective Date and (ii) the Agreed Pre-Effective Date Fee Budget.

(p)      "**Effective Date Reserves**" means cash reserves, subject to CODI's approval in all respects, for payments on account of Allowed APSC Claims.

(q)      "**Estate**" means the consolidated estate comprising the Debtors' estates under Bankruptcy Code § 541.

(r)      "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(s)      "**Ferder Affiliated Party**" means (a) Mordechai Haim Ferder, (b) Edit Ferder, (c) Tom Ferder, (d) RF 2021 Irrevocable Trust, dated August 30, 2021, (e) TF 2021 Irrevocable Trust, dated August 30, 2021, (f) Simba IL Holding, LLC, (g) Serenade Newport, LLC, (h) The Haim Family Trust, dated February 24, 2009, (i) VAD & Company, Inc., and (j) any relative, shareholder, member, advisor, attorney, professional, Related Party (as defined in the Plan), or beneficiaries of any of the persons or entities listed in the foregoing (a) – (i), and (k) any immediate or mediate transferee of property from any of the foregoing.

(t)      "**Investment Company Act**" means the Investment Company Act of 1940, as amended.

(u)      "**Investment Contract**" means any contract or agreement with one or more of the Debtors or with any Ferder Affiliated Party under which an Investment Contract Counterparty provided consideration purportedly for the shared purchase of, or a loan in connection with the purported acquisition of, or secured by, diamonds, precious stones or minerals, or jewelry in exchange for a return of principal or invested amount with interest or other additional return on principal or other consideration, and guarantee of such a contract or agreement.

(v)      "**Investment Contract Claims**" means any Claim a Debtor may have against an Investment Contract Counterparty or one or more of an Investment Contract Counterparty's Related Parties.

4

(w)     "**Investment Contract Counterparty**" means a non-Debtor party to an Investment Contract.

(x)     "**Net Proceeds**" means cash recoveries or the value in Cash of property recovered from Trust Assets, less all reasonable expenses associated with obtaining such recoveries.

(y)     "**Oversight Board**" means the board comprising five members established under the Plan and Article III of this Agreement to oversee the Trustee's performance of his duties and otherwise serve the functions set forth in this Agreement and those of the "Liquidation Trust Oversight Board" described in the Plan. The initial members of the Oversight Board are: (i) Stephen Keller; (ii) Adam Rothstein; (iii) Avi Wazana; (iv) Spencer Wells; and (v) Craig Barbarosh. Messrs. Wells and Barbarosh are the "**Independent Board Members**" of the Oversight Board.

(z)     "**Privileges**" means the Debtors' interests in any privilege or immunity attaching to any documents or communications associated with any Estate Claim, including attorney-client privilege and work-product privilege as defined in Federal Rule of Evidence 502(g).

(aa)    "**Professional Fee Reserve**" means the cash reserve established on the Effective Date and maintained by the Trust in an amount estimated to pay all Professional Fee Claims and Ordinary Course Professional Fee Claims, including the amounts set forth in the Agreed Pre-Effective Date Fee Budget.

(bb)    "**Reorganized Lugano**" means Lugano Holding as reorganized under the Plan and Confirmation Order, wholly owned by the Trust and controlled by the Trustee as its sole officer and director.

(cc)    "**Securities Act**" means the Securities Act of 1933, as amended.

(dd)    "**Specified Assets**" means, collectively, (i) the Agency Agreement Cash; (ii) the Tax Refund; and (iii) the Theft Policy, all net of any reasonable expenses the Trust incurs in recovering or liquidating one or more of the Agency Agreement Cash, the Tax Refund, and the Theft Policy.

(ee)    "**Theft Policy**" means the Primary and Excess All Risks (LDI) policies, policy numbers B080123941W24 and B080123942W24, issued by Lloyd's (syndicated) that insure against, among other things, theft of certain of the Debtors' precious stone inventory under which the Debtors are the insured.

(ff)    "**TIA**" means the Trust Indenture Act of 1939, as amended.

(gg)    "**Trust Assets**" means all Assets of the Estate including all Causes of Action, Cash in the Estate after payments required to be made on the Effective Date, including the Initial CODI Distribution, the equity in the Reorganized Lugano, any proceeds of the Tax Refund realized by Reorganized Lugano and transferred to the Trust on receipt as provided in the Plan, any proceeds realized or received from such Assets, all rights of setoff, recoupment, and other

5

defenses with respect, relating to, or arising from the Assets but excluding (i) the Tax Refund, (ii) the Effective Date Reserves, and (iii) the Professional Fee Reserve.

(hh)    "**Trust Cash**" means all cash held by the Trust (what the Plan refers to as "Liquidation Trust Available Cash") after payment, allocation, or reserve in accordance with the Plan for any Effective Date Reserves, the Professional Fee Reserve, the Initial CODI Distribution, or other requirements (including Trust Expenses) in connection with the Plan, any agreements, or any Bankruptcy Court orders.

(ii)    "**Trustee**" means Michael Goldberg and any successor appointed under this Agreement.

(jj)    "**Trust Expenses**" means all reasonable fees, costs, and expenses incurred by the Trustee not inconsistent with the Plan or this Agreement, including the maintenance or disposition of the Trust Assets (including the Trustee's fees, insurance, indemnity reserves, attorney fees, the fees of professionals and other Persons retained by the Trustee, personnel-related expenses, and any Taxes imposed on the Trust or in respect of the Trust Assets), the payment of all fees and expenses (including fees and expenses of counsel) in connection with winding down the Estate and Reorganized Lugano, and any other expenses incurred or otherwise payable in accordance with this Agreement.

## Article 2
### ESTABLISHMENT OF THE TRUST

2.1    **Name**. The Trust is created as a statutory trust under the DSTA and is called the "Lugano Liquidation Trust." The Trustee is empowered to conduct all business and hold all property constituting the Trust Assets in that name in accordance with this Agreement. The Trustees must cause to be executed and filed in the office of the Secretary of State of the State of Delaware the Certificate of Trust and agree to execute, acting solely in their capacity as Trustees, any additional certificates required under the DSTA or any other Delaware law.

2.2    **Objectives**. The Trust is established for the purpose of monetizing all Trust Assets and distributing the proceeds to the Beneficiaries. The Trust, through the service of the Trustee, and at the direction and approval of the Oversight Board as required by this Agreement, prosecutes and resolves objections to certain Claims as provided in this Agreement and the Plan. The Trust may not continue or engage in any trade or business except to the extent reasonably necessary to monetize and distribute the Trust Assets consistent with this Agreement and the Plan. The Trustee must, in his business judgment, make continuing reasonable, good-faith efforts to dispose of or monetize the Trust Assets and resolve Claims, make timely distributions to the Beneficiaries, and not unduly prolong the Trust's duration.

2.3    **Nature and Purposes of the Trust**.

(a)    The Trust is organized and established as a trust for the purpose of monetizing the Trust Assets and making distributions to Beneficiaries as a "liquidating trust" under Treasury Regulation § 301.7701-4(d). The Trust retains all rights to commence and pursue all Causes of Action and all rights, defenses, cross-claims and counter-claims held by the Debtors with respect to any Claim as of the Petition Date. Subject to this Agreement, the Trustee has the

6

4927-0048-4740.22 53772.00002

authority to compromise, settle, withdraw, or otherwise resolve any Cause of Action, any objections to Claims, and any Disputed Claims without the Bankruptcy Court's approval. The Trust, under Bankruptcy Code § 1123(b)(3)(B) and applicable state trust law, is the representative of the Estate for the retention, enforcement, settlement, and adjustment of all Claims.

(b)    The Trust is intended under Bankruptcy Code § 1145 to be exempt from the requirements of the Securities Exchange Act, the Investment Company Act, and any applicable state and local laws requiring registration of securities.

(c)    The Trustee administers the Trust, in accordance with this Agreement, to:

(i)    manage and monetize the Trust Assets orderly and expeditiously with an intent to maximize value within a reasonable time;

(ii)    litigate or settle all Claims and Causes of Action, subject to the Oversight Board's approval if required under Section 3.3 below;

(iii)    distribute net proceeds of the Trust Assets to the Beneficiaries;

(iv)    distribute funds from the Disputed Claims Reserve in accordance with the Plan as any Disputed Claim becomes an Allowed Claim under the Plan; and

(v)    perform any other functions and take any other actions provided for or permitted by this Agreement and the Plan and in any other agreement the Trustee executes.

2.4    **Transfer of Assets and Rights to the Trust**.

(a)    Under the Plan and on the Effective Date, the Debtors irrevocably transfer all interests in all Trust Assets and related Privileges to the Trust free and clear of all Claims, Interests, Liens, and other encumbrances and liabilities. Following the transfer of Privileges, the Trustee may invoke or waive any Privilege in his sole discretion.

(b)    No later than the Effective Date, the Debtors must transfer to the Trustee or provide the Trustee with reasonable access to all records in the Debtors' possession or control, including all file servers, email servers, email archiving systems, master journals, and all software platforms used to hold, process, organize, or display any data related to the Debtors' businesses and affairs, as well as any backups of the foregoing. The Trust may invoke Bankruptcy Code § 542 to pursue turnover of Trust Assets.

(c)    Until the Trust terminates in accordance with this Agreement, legal title to the Trust Assets and all constituent property is vested at all times in the Trust as a separate legal entity, except if applicable law in any relevant jurisdiction requires title to any part of the Trust Assets to be vested in the Trustee, in which case title is deemed to be vested in the Trustee solely in his capacity as Trustee. For purposes of those jurisdictions, the term Trust, as used in this Agreement, means the Trustee.

(d)      All cash held by the Estate on the Effective Date other than the cash needed to (i) fund the Effective Date Reserves, the Professional Fee Reserve, and the Trust Expense Reserve, and (ii) make the Initial CODI Distribution, becomes Trust Cash on the Effective Date.

2.5      **Principal Office**. The Trustee maintains the Trust's principal office at [●].

2.6      **Acceptance**. The Trustee accepts the Trust imposed by this Agreement and agrees to observe and perform all its duties as the Trust's trustee, on and subject to this Agreement and the Plan.

2.7      **Incidents of Ownership**. The Beneficiaries are the sole beneficiaries of the Trust. The Trustee retains only those incidents of ownership necessary to undertake the actions and transactions authorized in this Agreement.

## Article 3
### TRUSTEES

3.1      **Role**. In furtherance of and consistent with the Trust's purpose, the Plan, and this Agreement, the Trustee serves as trustee of Trust Assets for the benefit of the Beneficiaries and maintains, manages, and takes action on behalf of the Trust subject to this Agreement, the Plan, and the Confirmation Order. The Trustee has accepted his appointment as Trustee.

3.2      **Authority**.

(a)      In connection with the administration of the Trust, in addition to all powers enumerated elsewhere in this Agreement, the Trustee, subject to the consent of the majority of the Oversight Board as required in Section 3.3 below, must expeditiously and orderly monetize the Trust Assets, make timely distributions to Beneficiaries, and not unduly prolong the Trust's duration. The Trustee has the power and authority to perform all acts necessary and desirable to accomplish the purposes of this Agreement and the provisions of the Plan and the Confirmation Order relating to the Trust, within the bounds of this Agreement, the Plan, the Confirmation Order, and applicable law.

(b)      The Trustee, subject to the limitations enumerated in Section 3.3 below, may prosecute, defend, compromise, adjust, arbitrate, abandon, estimate, or otherwise deal with and settle all Disputed Claims and all Causes of Action as the Trustee determines is in the best interests of the Trust and the Beneficiaries. If any action has been taken to prosecute, defend, compromise, adjust, arbitrate, abandon, or otherwise deal with and settle any Claims or Causes of Action before the Effective Date, the Trustee is to be substituted on the Effective Date for the Debtors or the Estate, as applicable, in connection with such Claims or Causes of Action under Federal Rule of Civil Procedure 25, made applicable by Federal Rule of Bankruptcy Procedure 7025, with the caption of any such pending action changed to the following "[Trustee], not individually but solely as Trustee for the Lugano Liquidation Trust v. [Defendant]."

(c)      Subject to any limitations contained in this Agreement, including those in in Section 3.3 below, the Plan, or the Confirmation Order, the Trustee may:

4927-0048-4740.22 53772.00002

(i)        solely as required by Section 2.4 above, hold legal title to all rights of the Trust and Beneficiaries in or arising from the Trust Assets, including collecting and receiving all money and other property belonging to the Trust and to vote or exercise any other right with respect to any claim or interest relating to the Trust Assets in any case and receive any related distribution;

(ii)       open accounts for the Trust and make distributions of Trust Assets in accordance with this Agreement;

(iii)      as set forth in Section 3.11 below, exercise and perform the rights, powers, and duties held by the Debtors with respect to the Trust Assets, including the authority under Bankruptcy Code § 1123(b)(3), and is deemed to be acting as a representative of the Estate with respect to the liquidation, sale, transfer, or other disposition of the Trust Assets;

(iv)      object to any Claim under Section 3.17(a) below;

(v)       settle or resolve all Claims;

(vi)      sell or otherwise monetize all non-cash Trust Assets for which there is a reasonably accessible market;

(vii)     protect and enforce the rights to the Trust Assets by any appropriate method, including by judicial proceedings or any applicable bankruptcy, insolvency, or similar law and general principles of equity;

(viii)    obtain reasonable insurance coverage with respect to any liabilities and obligations of the Trustees and the Board Members solely in their capacities as such, in the form of fiduciary liability insurance, a directors and officers policy, an errors and omissions policy, or otherwise. The cost of any such insurance is a Trust Expense to be paid by the Trustee from the Trust Assets;

(ix)      without further order of the Bankruptcy Court, but subject to this Agreement, employ consultants, third-party service providers, and other professionals, including legal counsel, tax advisors, consultants, brokers, investment bankers, valuation counselors, and financial advisors (collectively, "**Advisors**") the Trustee deems necessary to aid him in fulfilling his obligations under this Agreement, all as approved by a majority of the Oversight Board. Any Advisor's fees and expenses are Trust Expenses to be paid by the Trustee from the Trust Assets;

(x)       engage, and approve compensation arrangements for, a public accounting firm to perform all reviews and audits of the Trust's books and records as required by this Agreement, the Plan, the Confirmation Order, and applicable laws in the Trustee's discretion, and must pay that accounting firm agreed-on compensation and reasonable and documented out-of-pocket expenses from Trust Assets;

(xi)      prepare and file (A) tax returns for the Trust treating it as a grantor trust under Treasury Regulation § 1.671-4(a), (B) an election under Treasury Regulation § 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Trustee

9

must file federal income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity, and (C) any periodic or current reports required under applicable law;

(xii)   prepare and send annually to the Beneficiaries, in accordance with the tax laws, a separate statement stating a Beneficiary's interest in the Trust and its share of the Trust's income, gain, loss, deduction, or credit, instructing all Beneficiaries to report such items on their federal tax returns;

(xiii)   when applicable, assert, enforce, release, or waive any Privilege or defense on the Trust's behalf, including to provide any information to insurance carriers that the Trustee deems necessary to access applicable insurance coverage for any Claim or Claims;

(xiv)   subject to Section 3.4 below, invest Trust Cash and the proceeds of the Trust Assets and all income earned by the Trust, pending any distributions, in short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as Treasury bills;

(xv)   request any appropriate tax determination with respect to the Trust under Bankruptcy Code § 505 or otherwise;

(xvi)   take or refrain from taking any action the Trustee reasonably deems necessary to continue, protect, and maximize of the value of the Trust Assets;

(xvii)   take all steps and execute all instruments and documents necessary to effect the Trust's purpose and the activities contemplated in this Agreement, the Plan, and the Confirmation Order and the Plan;

(xviii)   exercise any other powers and authority vested in or assumed by the Trustee by any Final Order; and

(xix)   with respect to (a) the Beneficiaries, perform all duties and functions as a distribution agent, including distributing cash from the Disputed Claims Reserve, solely on account of Claims that were Disputed Claims on the Effective Date but become Allowed and (b) APSC Creditors, perform all distribution-related duties and functions under the Plan from the Effective Date Reserves and the Professional Fee Reserve, as applicable.

(the foregoing subparagraphs (i)–(xix) are collectively, the "**Authorized Acts**").

(d)   The Trustee has the power and authority to act as trustee of the Trust and perform the Authorized Acts through the date he resigns, is removed, or is otherwise unable to serve for any reason.

3.3   **Limitation of Authority**.

(a)   The Trust and the Trustee may not (i) engage in any trade or business, (ii) take any actions inconsistent with the management of the Trust Assets as required or contemplated by applicable law, the Confirmation Order, the Plan, and this Agreement, or (iii) take any action in contravention of the Confirmation Order, the Plan, or this Agreement.

4927-0048-4740.22 53772.00002

(b)     Unless specifically required in the Plan or this Agreement, the Trustee may, but is not required to, seek Bankruptcy Court authority for any action he proposes to take.

(c)     The Trustee must obtain the Oversight Board's majority consent to:

(i)     terminate or extend the Trust's term;

(ii)     commence any litigation or pursue any Cause of Action, including any objection to a Claim, with a value in excess of $250,000;

(iii)     subject to Section 3.17 below, settle or otherwise resolve Disputed Claims without approval of the Bankruptcy Court;

(iv)     engage any Advisor and agree to any fee arrangement for such Advisor, but the Trustee need not obtain the Oversight Board's consent to engage any Advisor whose expected fees and expenses are estimated to total less than $150,000;

(v)     monetize any Trust Asset valued greater than $250,000 or more;

(vi)     file a motion to establish procedures for objecting to Claims;

(vii)     make distributions from the Disputed Claims Reserve in accordance with the Plan and this Agreement;

(viii)     reserve or retain any cash or cash equivalents reasonably necessary to meet contingent liabilities (including Disputed Claims and any indemnification obligations) or to maintain the value of the Trust Assets;

(ix)     borrow as necessary to fund the Trust's activities, including through one or more litigation financing arrangements;

(x)     invest Trust Assets or any income earned by the Trust;

(xi)     change the Trustee's compensation;

(xii)     subject to Article 10, make structural changes to the Trust;

(xiii)     take action with respect to Reorganized Lugano, including its dissolution;

(xiv)     dispute, settle, or otherwise resolve the Tax Refund;

(xv)     appoint a Registrar; or

(xvi)     dispose of books and records other than in accordance with Section 9.2 below.

3.4     **Investment of Cash**. The Trustee may only invest cash in any reserve with majority approval of the Oversight Board and only in cash and U.S. Government securities as defined in

4927-0048-4740.22 53772.00002

§ 29(a)(16) of the Investment Company Act; but: (a) the scope of any such investments may include only those investments that a "liquidating trust" within the meaning of Treasury Regulation § 301.7701-4(d) may be permitted to hold, under the Treasury Regulations or other IRS guidelines; (b) the Trustee may retain any Trust Assets received that are not cash only for as long as required to promptly monetize or otherwise dispose of them; and (c) the Trustee may expend the assets of the Trust (i) as reasonably necessary to meet contingent liabilities (including indemnification and similar obligations) and maintain the value of the Trust Assets, (ii) to pay Trust Expenses (including any taxes imposed on the Trust and reasonable attorney fees and expenses in connection with litigation), and (iii) to satisfy other liabilities incurred or assumed by the Trust in accordance with the Plan or this Agreement.

3.5    **Actions Binding.** All actions taken and determinations made by the Trustee in accordance with this Agreement are final and bind all Beneficiaries.

3.6    **Term of Service**. The Trustee serves for the duration of the Trust unless he dies, resigns, or is removed in accordance with this Agreement.

3.7    **Resignation**. The Trustee may resign by an instrument in writing delivered to the Bankruptcy Court and Oversight Board at least 30 days before the proposed effective date of the resignation. The Trustee continues to serve after delivery of the resignation until the proposed effective date of the resignation unless the Trustee and a majority of the Oversight Board consent to an earlier effective date, which may not be earlier than a successor Trustee appointed under Section 3.9 below assumes office.

3.8    **Removal**.

(a)    The Trustee may be removed by a majority vote of the Oversight Board for Cause immediately on notice or without Cause on 60 days' prior written notice.

(b)    If any dispute arises regarding the removal of a Trustee (including any dispute relating to any compensation or expense reimbursement due under this Agreement) the Bankruptcy Court retains jurisdiction to consider and adjudicate the dispute, but the Trustee continues to serve after his removal until the earlier of (i) a successor Trustee's assumption of the trustee role and (ii) the date the Bankruptcy Court otherwise orders.

3.9    **Successor Trustee**.

(a)    **Appointment**. If the Trustee dies, resigns, or is removed, the Oversight Board must select a successor Trustee by a majority vote. The successor Trustee must be appointed as soon as practicable but in any event no later than 60 days after the prior Trustee's death or removal or the effective date of the prior Trustee's resignation.

(b)    **Vesting or Rights in Successor Trustee**. Every successor Trustee must execute, acknowledge, and deliver to the Trust, the prior Trustee (if possible), and the Oversight Board, and file with the Bankruptcy Court, an instrument accepting appointment as Trustee subject to this Agreement. The successor Trustee, without any further act, becomes vested with all the rights, powers, and duties of the prior Trustee, except that the successor Trustee is not liable for

12

the acts or omissions of the prior Trustee. The prior Trustee cannot be liable for the acts or omissions of the successor Trustee.

(c)    **Interim Trustee**. During any period in which there is a vacancy in the position of Trustee, the Oversight Board must appoint, by majority vote, one of its Independent Board Members to serve as the interim Trustee until a successor Trustee is appointed under Section 3.9(a). The interim Trustee is subject to all the terms and conditions applying to a Trustee under this Agreement and is not limited from exercising any rights or powers as a Board Member merely because of his appointment as interim Trustee.

3.10    **Continuance of Trust**. The death, resignation, or removal of the Trustee does not terminate the Trust or revoke any existing agency (other than the Trustee's agency) created under this Agreement or invalidate any action taken by the Trustee. If the Trustee resigns or is removed, the Trustee must promptly: (i) execute and deliver, by the effective date of resignation or removal, all documents, instruments, records, and other writings reasonably requested by his successor to effect termination of the prior Trustee's capacity under this Agreement and the conveyance of the Trust Assets then held by the prior Trustee to the successor Trustee, but the prior Trustee may make and retain copies of all such documents, instruments, records and other writings with the cost of making such copies to be paid by the prior Trustee; and (ii) otherwise assist and cooperate in effecting the assumption of the prior Trustee's obligations and functions by his successor, with the fees and expenses of such assistance and cooperation to be paid to the prior Trustee as a Trust Expense by the Trust. Immediately upon the prior Trustee's death, resignation, or removal, the prior Trustee is deemed to have irrevocably appointed the successor Trustee as his attorney-in-fact and agent with full power of substitution to do all acts the prior Trustee is obligated to perform under this section.

3.11    **Trustee as Estate Representative.** The Trustee is the exclusive bankruptcy trustee of the Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed under Bankruptcy Code § 1123(b)(3)(B) with respect to the Trust Assets, with all attendant rights and powers in addition to all rights and powers granted in the Plan and in this Agreement. The Trustee is the Estate's successor-in-interest with respect to any action pertaining to the Trust Assets that was or could have been commenced by the Estate before to the Effective Date, except as otherwise provided in the Plan or Confirmation Order. All actions, claims, rights, or interests constituting Trust Assets are preserved and retained and may be enforced by the Trustee as the Estate's representative.

3.12    **Books and Records**.

(a)    **Maintenance.** The Trustee must maintain in respect of the Trust and the Beneficiaries books and records reflecting Trust Assets in its possession, and Trust's income, and the Trust's expenses, liabilities, and claims against or assumed by the Trust in the detail and for the period necessary to enable the Trustee to make full and proper accounting for the Trust. The Trust's books and records must be maintained as reasonably necessary to facilitate compliance with the Trust's tax reporting requirements and the requirements of Article 7 below. Nothing in this Agreement requires the Trustee to file or provide to any person or entity any accounting or seek approval of any court with respect to the administration of the Trust or as a condition for managing any payment or distribution out of the Trust Assets.

13

4927-0048-4740.22 53772.00002

(b)      **Quarterly Reports.** The Trustee must provide quarterly reporting to the Oversight Board of (i) the status of the Trust Assets, (ii) the balance of cash held by the Trust (including in all reserves), (iii) the determination and any re-determination, as applicable, of the total amount allocated to the Disputed Claim Reserve, (iv) the status of Disputed Claims, (v) the status of all Causes of Action, and (vi) all Trust Expenses. The Trustee may, with respect to any Board Member, redact any portion of any report relating to that Board Member's Claim.

(c)      **Disposition.** Except as otherwise provided by applicable law, the Trustee may dispose of some or all of the books and records maintained by the Trustee at the later of (i) when the Trustee determines, with the Oversight Board's majority consent, that the continued possession or maintenance of such books and records is no longer necessary for the Trust's benefit, and (ii) upon the termination and winding up of the Trust under Article 9.

3.13      **Compensation and Expenses**. As compensation for any services rendered by the Trustee in connection with this Agreement, the Trustee receives compensation comprising:

(a)      [●]; and

(b)      Reimbursement for all the Trustee's reasonable out-of-pocket expenses actually incurred in the performance of his duties.

3.14      **Reliance**. Except as otherwise provided in this Agreement, the Trustee may rely, and is fully protected in acting or refraining from acting, on any resolution, statement, certificate, instrument, opinion, report, notice, request, consent, order, or other document the Trustee has no reason to believe to be other than genuine and to have been signed or presented by the proper parties. The Trustee may conclusively rely on the truth of the statements and correctness of the opinions or directions expressed in any such document. The Trustee may consult with Advisors, and any advice of such Advisors constitutes full authorization in respect of any action taken or not taken by the Trustee in accordance with that advice. The Trustee may at any time to seek instructions from the Bankruptcy Court or any other court of competent jurisdiction concerning the Trust Assets, this Agreement, the Plan, and any other related document, and any instructions given constitute full authorization in respect of any action taken or not taken by the Trustee in accordance those instructions. The Trust may seek orders from the Bankruptcy Court as set forth in the Plan.

3.15      **No Commingling of Trust Assets**. The Trustee may not commingle any of the Trust Assets with his own property or the property of any other person or entity.

3.16      **Delaware Trustee**.

(a)      The Delaware Trustee has the limited power and authority, and is hereby authorized and empowered, to (i) accept legal process served on the Trust in the State of Delaware, and (ii) execute any certificates required to be executed under the DSTA and file such certificates in the office of the Secretary of State of the State of Delaware, and take any action or refrain from taking any action under this Agreement as directed in a writing delivered to the Delaware Trustee by the Trustee, on which the Delaware Trustee may conclusively and exclusively rely. The Delaware Trustee need not take or refrain from taking any such action if the Delaware Trustee believes, or is advised by counsel, that such action is likely to involve the Delaware Trustee in

14

4927-0048-4740.22 53772.00002

personal liability or is contrary to this Agreement or any document contemplated by this Agreement to which the Trust or the Delaware Trustee is or becomes a party or is otherwise contrary to law. No party to this Agreement may instruct the Delaware Trustee to take any action or to refrain from taking any action contrary to the terms of this Agreement or of any document contemplated by this Agreement to which the Trust or the Delaware Trustee is or becomes party or that is otherwise contrary to law. Other than as expressly provided for in this Agreement, the Delaware Trustee has no duty or power to take any action for or on behalf of the Trust. The Delaware Trustee has only those rights and obligations expressly provided in this Agreement. The Delaware Trustee may not exercise any powers nor undertake any duties of the Trustee set forth in this Agreement, and no such duties are implied. The Delaware Trustee is not liable for the acts or omissions of the Trustee, nor is the Delaware Trustee liable for supervising or monitoring the performance and the duties and obligations of the Trustee or the Trust under this Agreement. The Delaware Trustee serves as one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the DSTA and for taking actions required to be taken by a Delaware trustee under the DSTA. The duties (including fiduciary duties) and liabilities of the Delaware Trustee are limited to those expressly set forth in this section.

(b)     The Delaware Trustee serves for the duration of the trust until the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with this Agreement. The Delaware Trustee may be removed at any time by the Trustee by providing 30 days' advance written notice to the Delaware Trustee. The Delaware Trustee may resign at any time on at least 30 days' advance written notice to the Trustee. Such resignation or removal does not become effective unless and until a successor Delaware Trustee has been appointed by the Trustee in accordance with this Agreement. If the Trustee does not act within that 30-day period, the Delaware Trustee may apply to the Court of Chancery of the State of Delaware for the appointment of a successor Delaware Trustee.

(c)     Upon the resignation or removal of the Delaware Trustee, the Trustee must appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the DSTA. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee is not effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee and any undisputed fees, expenses, and indemnity due to the outgoing Delaware Trustee are paid by the Trust as a Trust Expense. After complying with the preceding sentence, the successor Delaware Trustee becomes fully vested with all rights, powers, and duties of the outgoing Delaware Trustee under this Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee is discharged of its duties and obligations under this Agreement.

(d)     The Delaware Trustee must be paid compensation agreed to under a separate fee agreement. The Trust must promptly advance and reimburse the Delaware Trustee for all reasonable out-of-pocket costs and expenses (including reasonable legal fees and expenses) incurred by the Delaware Trustee in connection with the performance of its duties under this Agreement. Although it is not intended or expected that the Delaware Trustee will ever handle funds, if the Delaware Trustee receives funds, the Delaware Trustee may earn compensation in the form of short-term interest ("float") on items like uncashed distribution checks (from the date issued until the date cashed), funds that the Delaware Trustee is directed not to invest, deposits

15

awaiting investment direction or received too late to be invested overnight in previously directed investments.

(e)     The Delaware Trustee is not responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its control, including any act or provision of any present or future law or regulation or governmental authority, acts of God, earthquakes, fires, floods, wars, terrorism, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service, accidents, labor disputes, acts of civil or military authority or governmental actions, or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

(f)     Any corporation or association into which the Delaware Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer all or substantially all its corporate trust business and assets as a whole or substantially as a whole, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which the Delaware Trustee is a party, becomes the successor Delaware Trustee under this Agreement and succeeds to the rights, powers, duties, immunities, and privileges as its predecessor, without executing or filing any instrument or performing any act.

(g)     No provision of this Agreement requires the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers under this Agreement if the Delaware Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(h)     The Delaware Trustee is not liable for punitive, exemplary, consequential, special, or other similar damages under any circumstances.

3.17   **Administering Claims.** After the Effective Date, the Trustee, subject to this Agreement, including Section 3.3 above, is responsible for administering and paying distributions to Beneficiaries.

(a)     The Trustee, on the Trust's behalf, may object to the allowance of any Claim on any ground, file, withdraw, or litigate to judgment those objections, settle or compromise any Disputed Claim, assert all defenses owned by the Estate, and assert all the Estate's rights under Bankruptcy Code § 558 and seek estimation of any Claims under Bankruptcy Code § 502(c). The Trustee may, but need not, seek Bankruptcy Court approval of any settlement of a Disputed Claim.

(b)     The Trustee may settle or otherwise resolve any Disputed Claim:

(i)     without Oversight Board approval where the asserted amount of the Disputed Claim is less than $250,000;

(ii)     without Oversight Board approval where the asserted amount of the Disputed Claim is equal to or more than $250,000 but less than $1.5 million and the Oversight Board does not object within five business days of receiving the Trustee's written notice of the proposed resolution; and

16

(iii)    only with Oversight Board approval where the asserted amount of the Disputed Claim is $1.5 million or more.

3.18    **No Bond.** Notwithstanding any applicable law to the contrary, the Trustee and the Delaware Trustee are exempt from giving any bond or other security in any jurisdiction.

3.19    **Fiduciary and Other Duties.** Notwithstanding anything in the Plan or this Agreement to the contrary, the Trustee must always act in the Beneficiaries' best interests and in furtherance of the Trust's purpose. The Trustee owes the fiduciary duties to the Beneficiaries consistent with the fiduciary duties that a bankruptcy trustee owes to a bankruptcy estate. Except for obligations this Agreement expressly imposes on the Trustee, any duties imposed on the Trustee under law or in equity to the Beneficiaries or to any other person party to this Agreement are waived to the fullest extent applicable law permits. This Agreement does not waive the implied contractual covenant of good faith and fair dealing.

## Article 4
### OVERSIGHT BOARD

4.1    **Oversight Board Members**. The Oversight Board comprises five Board Members appointed to serve as the Trust's managing board.

4.2    **Authority and Responsibilities**.

(a)    The Oversight Board, as and when the Trustee requests or when the Board Members deem it appropriate or as otherwise required under the Plan, the Confirmation Order, or this Agreement, consults with and advises the Trustee regarding the administration and management of the Trust and has the other responsibilities and powers set forth in the Plan or this Agreement. The Oversight Board oversees, reviews, and governs the activities of the Trust and the Trustee's performance and has the authority to remove the Trustee in accordance with Section 3.8 above. The Oversight Board may not direct the Trustee to act inconsistently with his duties under this Agreement, the Plan, the Confirmation Order, or applicable law.

(b)    The Trustee must consult with and provide information to the Oversight Board in accordance with the Plan, the Confirmation Order, and this Agreement to enable the Oversight Board to meet its obligations under this Agreement.

(c)    The Trustee is not required to: (i) obtain the Oversight Board's approval of any action if the Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that the action is required to be taken by applicable law, the Plan, the Confirmation Order, or this Agreement; or (ii) follow the Oversight Board's directions to take any action if the Trustee, in good faith, reasonably determines, based on the advice of legal counsel, that the action is prohibited by applicable law, the Plan, the Confirmation Order, or this Agreement.

4.3    **Fiduciary Duties**. The Oversight Board (and each Board Member) owes fiduciary duties to the Beneficiaries consistent with the fiduciary duties that the members of the Committee had to unsecured creditors and must act in the best interests of the Beneficiaries as a whole. No Board Member owes any fiduciary duty to a Beneficiary named as a defendant in any Cause of Action, in the Beneficiary's capacity as such, because the Oversight Board's fiduciary duties are

17

intended to maximize the value of the Trust Assets, including the Causes of Action. In all circumstances, the Oversight Board must act in the best interests of the Beneficiaries as a whole and in furtherance of the Trust's purpose. Nothing in this Agreement vitiates or otherwise affects the implied contractual covenant of good faith and fair dealing.

4.4    **Meetings**. Meetings of the Oversight Board are to be held as necessary to ensure the optimal operation of the Trust but in no event less often than quarterly. Special meetings of the Oversight Board may be held whenever and wherever called for by the Trustee or any Board Member on no less than 48 hours prior written notice (unless notice is waived in the Oversight Board's minutes). Unless the Oversight Board decides otherwise in its reasonable discretion, the Trustee, and each of the Trustee's designated Advisors may, but are not required to, attend meetings of the Oversight Board.

4.5    **Unanimous Written Consent**. Any action required or permitted to be taken by the Oversight Board in a meeting may be taken without a meeting if the action is taken by unanimous written consents describing the actions taken, signed by all Board Members and recorded. If any Member informs the Trustee in writing that he objects to the decision, determination, action, or inaction proposed to be made by unanimous written consent, the Trustee must use reasonable good faith efforts to schedule a meeting on the issue within 48 hours of the request or as soon after as practical for which all Board Members are available in person or by telephone or videoconference.

4.6    **Manner of Acting**.

(a)    **Quorum.** A quorum for the transaction of business at any meeting of the Oversight Board consists of at least three Board Members. Except as otherwise specified in this Agreement or required by law, the majority vote of the Board Members present at a duly called meeting at which a quorum is present throughout constitutes the act of the Oversight Board. All Board Members may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone, videoconference, or similar communications equipment enabling all participants in the meeting to hear each other. With advance notice to the other Board Members, a Board Member may participate in a meeting by proxy. Any Board Member participating in a meeting by electronic means is deemed to be present in person at the meeting. Voting (including on negative notice) may be conducted by email or individual communications by the Trustee and each Board Member.

(b)    **Conflicts.**

(i)    Before a substantive discussion or vote on, or the taking of any action with respect to, any issue, upon which a Board Member has or may have a conflict of interest such that the Board Member's interests may be adverse to the Trust's interests, each Board Member must fully disclose to the Oversight Board and the Trustee the nature of the conflict or potential conflict (including disclosing any pecuniary interests the Board Member may have with respect to or in connection with the issue, other than solely as a Beneficiary) (a **"Conflicted Member"**). Based on the foregoing disclosure and any other relevant information, the two Independent Directors and the Trustee will determine, on the advice of counsel, to what extent, if any, the Conflicted Member may participate in a substantive discussion, but not vote, in connection with that issue. Any vote or action with respect to an issue giving rise to a conflict may be

18

4927-0048-4740.22 53772.00002

undertaken only by Board Members who are not Conflicted Members and, notwithstanding anything contained in this Agreement to the contrary, the affirmative vote of only a majority of the Board Members present at a meeting who are not Conflicted Members is required to approve the issue as the act of the Oversight Board. A Conflicted Member counts toward a quorum despite that the Conflict Member may not vote on a particular issue. A Conflicted Member may not be given access to any analyses, reports, work product (including draft pleadings), or other materials in the Trust's possession relating to the matter in which the Conflicted Member's conflict exists.

(ii)      Without limiting clause (i) immediately above: (A) no Board Member who holds a Claim that is not then an Allowed Claim may participate in deliberations and decisions vote or take any action regarding that Board Member's Claim; and no Board Member that was a member of the Committee (or an advisor to the Committee or its members) may participate in deliberations and decisions regarding any Claims or Causes of Action relating to a former Committee member and is deemed a Conflicted Member for all purposes relating to such Claims or Causes of Action; and (B) only the Independent Board Members and the Trustee may vote or take any action as a Board Member with respect to any matter pertaining to the pursuit, recovery, or resolution of Causes of Action relating to a potential Ponzi scheme or other fraud (including actual or constructive fraudulent transfers) in respect of Investment Contracts.

4.7      **Tenure**. The Board Members' authority is effective as of the Effective Date and continues in full effect until the Trust is terminated in under Article 9 below. A Board Member serves until his successor is duly appointed or until his earlier death, resignation under Section 4.8 below, or removal under Section 4.9 below.

4.8      **Resignation**. A Board Member may resign by giving prior written notice to the Trustee and all other Board Members. The resignation becomes effective on the earlier of (i) the day that is 30 days following the delivery of such notice, (ii) the appointment of a successor in accordance with Section 4.10 below, and (iii) another date agreed to by the Trustee and the rest of the Oversight Board. Upon the Trust's termination all Board Members are deemed to have resigned.

4.9      **Removal**. A majority of the Oversight Board may remove any Board Member for Cause or Disability but the CODI-designated Board Member may only be removed by Bankruptcy Court order. If any Board Member has all its Claims disallowed or transferred in their entirety, that Board Member is immediately and permanently removed from the Oversight Board without the requirement for a vote, and a successor must be appointed in the manner described in Section 4.10 below.

4.10    **Successors**.

(a)      If there arises a vacancy on the Oversight Board (whether by a Board Member's removal, death, or resignation), the vacancy is filled thus:

(i)      If the vacancy pertains to the Board Member selected by CODI, CODI may select the successor to fill that vacancy.

19

(ii)    If the vacancy pertains to a Board Member selected by the Committee, the other Board Member selected by the Committee selects the successor to fill that vacancy.

(iii)    If the vacancy pertains to an Independent Board Member, the remaining Board Members select an independent person as successor to fill that vacancy as long as the CODI-designated Board Member approves the selection (such approval may not be unreasonably withheld).

(b)    The Trustee must evidence the appointment of a successor Board Member by filing a notice with the successor Board Member's name, address, and telephone number with the Bankruptcy Court.

(c)    Immediately upon his appointment, the successor Board Member assumes all rights, powers, duties, authority, and privileges of a Board Member under this Agreement without any further act. Every successor Board Member must execute, acknowledge, and deliver to the Trustee and all other Board Members an instrument accepting the appointment under, and agreeing to be bound by, this Agreement. A successor Board Member is not liable personally for any act or omission of a predecessor Board Member.

4.11    **Compensation and Reimbursement of Expenses**. Except for an Independent Board Member, no Board Member is entitled to compensation in connection with his service on the Oversight Board. No later than the Effective Date, the Committee and CODI must agree on the terms of compensation for each Independent Board Member to be paid as a Trust Expense. The Trustee must reimburse all Board Members as a Trust Expense for all reasonable and documented out-of-pocket expenses (excluding fees, costs, and expenses of legal counsel) incurred in connection with the performance of their duties.

4.12    **Confidentiality**. Each Board Member must, at all times including after the Trust's termination or the Board Member's removal or resignation, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any person to which any of the Trust Assets relates or of which the Board Member becomes aware in his capacity as a Board Member, including any personally-identifiable information and protected health information ("**Confidential Trust Information**"), except as otherwise required by law. A Board Member may not disclose Confidential Trust Information to any person, including any Beneficiary.

## Article 5
### BENEFICIAL INTERESTS

5.1    **Types.** The Trust has two types of beneficial interests: (a) the Special Beneficial Interest issued under the Plan to the holder of the CODI Secured Claim; and (b) the General Beneficial Interests issued Pro Rata under the Plan to the holders of General Unsecured Claims.

5.2    **Interests Beneficial Only**. The ownership of Beneficial Interests does not entitle any Beneficiary to any title in the Trust Assets (such title being vested in the Trust) or to any right to a partition or division of the Trust Assets. No Beneficiary has any governance right or other right to direct Trust activities.

20

4927-0048-4740.22 53772.00002

5.3     **No Right to Accounting.** Except with respect to CODI as provided in the next sentence, neither a Beneficiary nor its successors, assignees, creditors, or any other person or entity claiming a right through a Beneficiary (a "**Derivative**") has any right to demand or receive an accounting from the Trustee and the Trustee is not obligated to provide any accounting to any Beneficiary or Derivative. On account of its Special Beneficial Interest, CODI and its agents, auditors, and advisors may receive from the CODI-designated Board Member, subject to the confidentiality provisions in Section 4.12 above, unredacted quarterly reports provided under Section 3.12(b) above. Nothing in this Agreement is intended to require the Trustee at any time or for any purpose to file any accounting or seek approval of any court with respect to the administration of the Trust or as a condition of making any advance, payment, or distribution out of proceeds of Trust Assets.

5.4     **Non-Transferability**. Except as required or effected by operation of law, a Beneficiary may not sell, transfer, assign, pledge, hypothecate, or otherwise dispose of its Beneficial Interest without the Trustee's written consent.

5.5     **Registry**.

(a)     **Registrar**. The Trustee must appoint a registrar, which may be the Trustee (the "**Registrar**"), to record ownership of all Beneficiaries' interests in the Trust. The Registrar, if other than the Trustee, must be an institution or person acceptable to the Oversight Board. The Registrar, unless it is the Trustee, may receive reasonable compensation for the Registrar's service from the Trust as a Trust Expense.

(b)     **Register**. The Trustee must cause to be kept at the Registrar's office or other place the Registrar designates a registry of the Beneficiaries (the "**Register**"), maintained in accordance with reasonable regulations the Trustee and the Registrar prescribe. Beneficiaries and their duly authorized representatives have the right, on reasonable prior written notice to the Trustee, and in accordance with reasonable regulations prescribed by the Trustee, to inspect and, at the Beneficiary's expense, make copies of the Register for any reasonable purpose related to the Beneficiary's interest in the Trust.

5.6     **Exemption from Registration**. The Beneficiaries' interests in the Trust are not intended to constitute "securities" under applicable laws. The Plan and Bankruptcy Code § 1145 provide that the Beneficial Interests, if they constitute securities, are exempt from registration under applicable securities laws. The Oversight Board, acting unanimously, and the Trustee may amend this Agreement in accordance with Article 10 below to make any changes deemed necessary or appropriate with the advice of counsel to ensure that the Trust is not subject to registration or reporting requirements of the Securities Act, the Exchange Act, the TIA, or the Investment Company Act. Their interests in the Trust do not grant Beneficiaries consent or voting rights or otherwise confer any rights similar to those of a shareholder of a corporation in respect of any actions taken or to be taken, or decisions made or to be made, by the Oversight Board or the Trustee under this Agreement.

5.7     **Effect of Death, Incapacity, or Bankruptcy**. The death, incapacity, or bankruptcy of any Beneficiary during the term of the Trust does not entitle the representatives or creditors of that Beneficiary to any right to any Trust Assets, to any additional rights under this Agreement, or

21

otherwise affect any other Beneficiary's rights and obligations under this Agreement. This provision does not affect the rights of the Beneficiary's heirs or other legal successors or assignees to any distribution under this Agreement or the Plan.

5.8    **Change of Address**. Any Beneficiary may, after the Effective Date, select an alternative distribution address by notifying the Trustee in writing. The notice is effective upon the Trustee's receipt. Unless the Trustee actually receives the notice, the Trustee need not recognize any change of distribution address.

5.9    **Standing**. No Beneficiary has standing to direct the Trustee to do or not to do any act or to institute any action or proceeding at law or in equity against any party with respect to the Trust Assets. Beneficiaries have no rights other than those set forth in this Agreement, the Confirmation Order, or the Plan.

5.10    **Actions by Beneficiaries.** In any action taken by a Beneficiary against the Trust, a Trustee, or a Board Member, in their capacity as such: (i) the prevailing party is entitled to reimbursement of attorney fees and other costs, with any fees and costs incurred by a Trustee or Board Member paid as a Trust Expense by the Trust; and (ii) the Beneficiary may be required by request made by the Trust and by order of the Bankruptcy Court to post a bond ensuring that the full costs of a legal defense can be reimbursed. Any action brought by a Beneficiary must be brought in the United States Bankruptcy Court for the District of Delaware. Beneficiaries are deemed to have waived any right to a trial by jury. The rights of Beneficiaries to bring an action against the Trust, a Trustee, or a Board Member, in their capacity as such, do not survive the Trust's termination.

## Article 6
### DISTRIBUTIONS

6.1    **Specified Asset Account**. On the Effective Date or as promptly after as practicable, the Trustee must open and maintain one or more segregated bank accounts (the "**Specified Asset Account**"), containing: (a) all Agency Agreement Cash held by the Estate on the Effective Date, less amounts required to fund the Agreed Pre-Effective Date Fee Budget, the Professional Fee Reserve, the Effective Date Reserves, the Trust Expense Reserve, and the Initial CODI Distribution; and (b) all Net Proceeds of Specified Assets received by the Trust after the Effective Date.

6.2    **Priority**. All distributions of cash from the Trust are made in the following order:

(a)    **Allowed APSC Claims**. On the Effective Date or as soon after as practicable, the Trust must: (i) fund the Trust Expense Reserve, the Professional Fee Reserve, and the Effective Date Reserves; and (ii) pay all Allowed APSC and Professional Fee Claims from the Effective Day Reserves or the Professional Fee Reserve, as applicable. To the extent that the foregoing reserves are inadequate to satisfy all Allowed APSC and Professional Fee Claims, as applicable, the Trustee must supplement the applicable reserve with Trust Cash.

(b)    **Initial CODI Distribution**. On the Effective Date or as soon after as practicable, the Trust must make an initial distribution to the holder of the Special Beneficial Interest on the Effective Date equal to 34.79% of the cash in the Specified Asset Account (the

4927-0048-4740.22 53772.00002

"**Initial CODI Distribution**"), with the remaining 65.21% becoming Trust Cash available for distribution to holders of General Beneficial Interests.

(c)     **Subsequent CODI Distribution**. The Trust must make a subsequent distribution to the holder of the Special Beneficial Interest equal to 34.79% of cash released from the Effective Date Reserves (to the extent not necessary to satisfy all Allowed Administrative, Priority, Priority Tax, Other Secured, and Convenience Claims) (the "**Subsequent CODI Distribution**"), with the remaining 65.21% becoming Trust Cash available for distribution to holders of General Beneficial Interests.

(d)     **Periodic Distributions**. After the Initial CODI Distribution is complete, the Trust makes periodic distributions to the holder of the Special Beneficial Interest and holders of General Beneficial Interests thus:

(i)     to the holder of the Special Beneficial Interest equal to 34.79% of all Net Proceeds of Specified Assets received by the Trust after the Effective Date from the Specified Asset Account, with the remaining 65.21% becoming Trust Cash available for distribution to holders of General Beneficial Interests;

(ii)     to the holder of the Special Beneficial Interest equal to 25% of Net Proceeds of all Causes of Action (including recoveries under any representations and warranty policy and Avoidance Actions) other than the GT Claims and Specified Assets, with the remaining 75% becoming Trust Cash available for distribution to holders of General Beneficial Interests;

(iii)     to the holder of the Special Beneficial Interest equal to 45% of Net Proceeds of all GT Claims, with the remaining 55% becoming Trust Cash available for distribution to holders of General Beneficial Interests;

(iv)     to holders of General Beneficial Interests from Trust Cash, Pro Rata, up to the amount of their respective Allowed General Unsecured Claims;

(v)     to holders of General Beneficial Interests from Trust Cash, GUC Interest.

(e)     **Final CODI Distribution**. Any Net Proceeds remaining in the Trust after Holders of General Beneficial Interests receive all distributions required in (d)(iv) and (v) immediately above are distributed to the holder of the Special Beneficial Interest.

6.3     **Timing**. The Trustee must distribute Trust Assets in accordance with this Agreement and the Plan at least annually or whenever the Trustee believes it appropriate and must make distributions if the Oversight Board so directs the Trustee, as long as that direction does not conflict with this Agreement, the Plan, or the Confirmation Order. The Trustee may retain an amount of Trust Assets reasonably necessary to meet contingent Trust Expenses and to maintain the value of the Trust Assets pending their liquidation during the term of the Trust or that are determined to be necessary to pay or be reserved for reasonably incurred or anticipated expenses

4927-0048-4740.22 53772.00002

or claims of the Trust and the Trustee, and retention of such amount may preclude distributions to Beneficiaries.

6.4     **Manner**. The Trustee must make all distributions to Beneficiaries of record at the address of each Beneficiary as set forth on the Schedules or on the books and records of the Debtors unless the Trustee has been notified in writing of a change of a Beneficiary's address under Section 5.8 above.

6.5     **Trust Expense Reserve.** The Trust must reserve and segregate cash in an amount reasonably necessary to: (i) maintain the value of the Trust Assets pending their monetization or other disposition; (ii) fund Trust Expenses; and (iii) satisfy or reserve for other liabilities incurred or anticipated by the Trustee in accordance with the Plan and this Agreement (including indemnification obligations and similar expenses in amounts and for the period the Trustee determines, in good faith without the need for the Oversight Board's consent) (the "**Trust Expense Reserve**"). The initial Trust Expense Reserve established on the Effective Date is subject to approval by CODI and a majority of the Oversight Board. Such approval may not be unreasonably withheld. The Trustee may from time to time increase the amount of the Trust Expense Reserve to address reasonably unforeseen Trust Expenses and potential indemnification claims arising under Section 8.2 below, each time only with the Oversight Board's majority consent. When the Trust terminates, all cash remaining in the Trust Expense Reserve becomes Trust Cash and must be distributed to the Beneficiaries in the manner of all other distributions under this Agreement.

6.6     **Disputed Claims**. No distributions under this Agreement or the Plan may be made to any Beneficiary on account of that Beneficiary's Disputed Claim unless and until that claim is Allowed and then only to the extent of such Allowance. The Trust must fund and maintain a Disputed Claims Reserve as required in the Plan. After a Disputed Claim becomes an Allowed Claim by Final Order or agreement, the holder of that Claim receives a Beneficial Interest of a priority corresponding to that Claim's priority under the Plan and in an amount corresponding to the amount of any resulting Allowed Claim. Upon each such resolution of a Disputed Claim: (i) any remaining Beneficial Interests in the Disputed Claims Reserve that had been held with respect to such formerly Disputed Claim are canceled; and (ii) any remaining cash in the Disputed Claims Reserve that had been held with respect to the Disputed Claim in excess of what is required for distribution on account of the resulting Allowed Claim becomes Trust Cash available for distribution to holders of General Beneficial Interests.

6.7     **IRS Forms.** As a condition to receiving any distribution under the Plan, each Beneficiary entitled to a distribution must, if the Trustee requests it, provide an executed IRS Form W-9 or other similar documentation. Any holder of an Allowed Claim that fails to do so within 30 days of the Trustee's request forfeits all rights to all distributions.

6.8     **Undeliverable Distributions and Unclaimed Property**. Forfeited distributions become Trust Assets to be redistributed to Beneficiaries under this Agreement. The Trustee must hold all unclaimed distributions and distributions returned as undeliverable in an unclaimed property reserve for 180 days and may be released before the 180-day period expires if the intended recipient of the distribution presents to the Trustee reasonable proof of entitlement to the distribution. After the 180 days expires, all unclaimed property reverts to the Trust for redistribution to Beneficiaries under this Agreement and the Beneficial Interest of the non-

24

claiming Beneficiary is cancelled and discharged such that the Beneficiary forfeits any future right to any distribution from the Trust. The Trustee is not required to attempt to locate any holder of an Allowed Claim. Unclaimed property held by the Trust is not subject to the laws of the United States, or any state, provincial, or local governmental units pertaining to escheatment or abandoned or unclaimed property. If, at the Trust's termination, cash associated with forfeited distributions under this section remains, the Trustee may donate that cash to a charity exempt from taxation under Section 501(c) of the Internal Revenue Code of the Trustee's choice.

6.9     **U.S. Trustee Fees and Reports**. After the Effective Date, the Trust must pay as a Trust Expense all fees incurred under 28 U.S.C. § 1930(a)(6) by reason of the Trust's disbursements until all the Chapter 11 Cases are closed. After the Effective Date, the Trust must prepare and serve on the Office of the United States Trustee quarterly disbursement reports for the Trust as required by the Office of the United States Trustee for as long as the Chapter 11 Case remains open.

6.10     **Conflicting Claims**. If any conflicting claims or demands are made or asserted with respect to a Beneficiary's interest in the Trust, or if there is a disagreement between the assignees, transferees, heirs, representatives, or legatees succeeding to all or a part of such an interest resulting in adverse claims or demands being made, the Trustee may, in his sole discretion, refuse to comply with any such conflicting claims or demands. The Trustee may elect to cause the Trust to make no distribution with respect to the conflicting claim or demand and refer such conflicting claim or demands to the Bankruptcy Court, which retains jurisdiction under the Plan and the Confirmation Order to resolve such conflicting claims or demands. Neither the Trust nor the Trustee may be liable to any party for the Trustee's refusal to comply with any such conflicting claims or demands, nor may the Trust or Trustee be liable for interest on any funds so withheld. The Trustee may refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction or (ii) all differences have been resolved by a valid written agreement among all such parties that satisfies the Trustee and provides a complete release of the Trust and Trustee. Until the Trustee receives written notice that one of the conditions of the preceding sentence is met, the Trustee may deem the holder of the disputed Beneficial Interest to be the Beneficiary identified as the owner of that interest in the Trust's books and records for all purposes.

6.11     **Effective Date Reserves**. The Trustee must hold the Effective Date Reserves, which are not Trust Assets, in trust for the benefit of the APSC Creditors. But, after the Claims of all APSC Creditors have been Allowed or not Allowed and such creditors have received their Distributions from the Effective Date Reserves, the remaining funds in the Effective Date Reserves must be transferred to the Trust and become Trust Cash. The rights, powers, and obligations in this Agreement apply to the Effective Date Reserves, except that the preceding sections of this Article 6 do not apply with respect to the Effective Date Reserves and any fees payable under Section 6.9 above with respect to the Effective Date Reserves are a Trust Expense. Distributions to the APSC Creditors from the Effective Date Reserves must be made in accordance with the Plan.

4927-0048-4740.22 53772.00002

**Article 7**
**TAX MATTERS**

7.1    **Tax Treatment and Tax Returns**.

(a)    The parties intend for the initial transfer of the Trust Assets to the Trust to be treated as an irrevocable grant of assets to the Trust such that the Trust is a grantor trust for all tax purposes as if the Debtors transferred the Trust Assets (other than the amounts set aside in the Disputed Claim Reserve, if the Trustee makes the election under subsection 7.1(c) below) to the Beneficiaries and then, immediately thereafter, the Beneficiaries transferred the Trust Assets to the Trust such that the Beneficiaries are treated as the grantors of the Trust and owners of their respective share of the Trust Assets for all tax purposes. The Trustee must file all required income tax returns for the Trust as a grantor trust under Treasury Regulation § 1.671-4(a).

(b)    The Trustee must determine the fair market value of the Trust Assets as of the Effective Date and notify the Beneficiaries of that valuation, which must be used consistently by all parties for all income tax purposes.

(c)    The Trustee must elect under Treasury Regulation § 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Trustee will file income tax returns and pay taxes for the Disputed Claim Reserve as a separate taxable entity.

7.2    **Withholding**. The Trustee may withhold from any amount distributed from the Trust to any Beneficiary any sum required to be withheld under the income tax laws of any applicable jurisdiction. Any amounts withheld are deemed to have been distributed to and received by the applicable Beneficiary. As a condition to receiving any distribution from the Trust, a Beneficiary must provide to the Trustee the Beneficiary's taxpayer identification number and any other information and certification the Trustee reasonably requests as necessary to comply with applicable tax reporting and withholding laws. If a Beneficiary fails to comply with such a request within one year, that Beneficiary's distribution becomes an unclaimed distribution and treated in accordance with Section 6.7 above.

7.3    **Tax Refund Claims**. Under the Plan, any claims against any governmental entity for tax refunds attributable to any period ("**Tax Refund Claims**") are not transferred to the Trust as a Trust Asset. Rather, the Tax Refund Claims are retained and prosecuted by Reorganized Lugano. The Trustee is appointed as the Plan Administrator and Reorganized Lugano's chief executive officer. The Oversight Board is its board. Reorganized Lugano must irrevocably transfer any proceeds of Tax Refund Claims to the Trust free and clear of all claims and interests. The Trustee must deposit such proceeds in the Specified Asset Account. Once all Tax Refund Claims are prosecuted to completion (including any appeals) and all proceeds transferred to the Trust as Liquidation Trust Available Cash, the Trustee may dissolve Reorganized Lugano in accordance with the Plan and applicable non-bankruptcy law.

**Article 8**
**STANDARD OF CARE; INDEMNIFICATION**

8.1    **Standard of Care**. None of the Trustee, acting in any capacity contemplated by this Agreement, the Delaware Trustee, acting in its capacity as such, the Oversight Board, and any

26

Board Member, solely in his capacity as such, nor any of their respective employees, agents, and Advisors, may be personally liable to the Trust, a Beneficiary, or any other person or entity in connection with the Trust's affairs unless the Bankruptcy Court determines (or, if the Bankruptcy Court either declines to or cannot exercise jurisdiction, another court of competent jurisdiction) that an act or omission constitutes fraud, willful misconduct, or gross negligence. None of the Trustee, the Delaware Trustee, the Oversight Board, and any Board Member may be personally liable to the Trust or to any person or entity for the acts or omissions of any employee, agent or Advisor of the Trust taken or not taken in good faith reliance on the advice of counsel or, as applicable, with the approval of the Bankruptcy Court, unless the Bankruptcy Court determines (or, if the Bankruptcy Court either declines to or cannot exercise jurisdiction, another court of competent jurisdiction) that the Trustee, the Delaware Trustee, the Oversight Board, or the Board Member acted with gross negligence or willful misconduct in the selection, retention, or supervision of such employee, agent, or Advisor.

8.2     **Indemnification**. All current and former Trustees, the Delaware Trustee, the Oversight Board, all past and present Board Members, and all their respective employees, agents and professionals (each, in his or its capacity as such, an "**Indemnified Party**") are indemnified by the Trust against any losses, claims, damages, liabilities, or expenses (including attorney fees, disbursements, and related expenses) to which the Indemnified Party becomes subject in connection with any action, suit, proceeding, or investigation brought or threatened against any Indemnified Party in its capacity under this Agreement unless the Bankruptcy Court determines (or, if the Bankruptcy Court either declines to or cannot exercise jurisdiction, another court of competent jurisdiction) that the Indemnified Party's acts or omissions constituted fraud, willful misconduct, or gross negligence. If the Indemnified Party becomes involved in any action, proceeding, or investigation in connection with acts or omissions in its capacity under this Agreement for which an indemnification obligation could arise (an "**Indemnifiable Claim**"), the Indemnified Party must promptly notify the Trustee or Oversight Board, as practicable, but the Indemnified Party's failure to do so does not excuse the Trust from indemnifying the Indemnified Party unless that failure has materially harmed the Trust. The Trust must pay, advance, or otherwise reimburse on the Indemnified Party's demand the Indemnified Party's reasonable legal and other defense expenses incurred in connection with an Indemnifiable Claim or in connection with enforcing his rights under this Section 8.2 as a Trust Expense. The Trust may not refuse to make any payments to the Indemnified Party by asserting that the Indemnified Party engaged in willful misconduct or acted in bad faith. But the Indemnified Party must repay promptly to the Trust the amount of any advanced or reimbursed expenses paid to the Indemnified Party if the Bankruptcy Court determines (or, if the Bankruptcy Court either declines to or cannot exercise jurisdiction, another court of competent jurisdiction) that the Indemnified Party engaged in fraud, willful misconduct, or gross negligence in connection with the Indemnifiable Claim. Any such repayment obligation is unsecured and interest-free. The indemnification provided in this Section 8.2 does not exclude any other rights to which the Indemnified Party may ever be entitled to under the Plan or any applicable insurance policy. The Trust's failure to pay or reimburse an Indemnified Party as required under this Section 8.2 constitutes irreparable harm to the Indemnified Party, entitling the Indemnified Party to specific performance. This section survives the Trust's termination and the Indemnified Party's resignation or removal.

8.3     **No Personal Liability**. Except as otherwise expressly provided in this Agreement, none of the Trustee, the Delaware Trustee, and the Board Members is subject to personal liability,

27

whether in tort, contract, or otherwise, to any person or entity in connection with the Trust's affairs to the fullest extent provided under Section 3803 of the DSTA. All persons and entities asserting claims against the Trustee, the Delaware Trustee, or any Board Members, or otherwise asserting claims in connection with the Trust's affairs must look solely to the Trust Assets for satisfaction of those claims.

## Article 9
### TERMINATION

9.1    **Duration**. The Trustees, the Trust, and the Oversight Board are discharged or dissolved when: (a) the Trustee determines that the pursuit of any remaining unresolved Causes of Action is unlikely to yield sufficient additional proceeds to justify further pursuit; (b) the Trustee determines that the pursuit of monetization of other Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit; (c) all objections to Disputed Claims are fully resolved; and (d) all distributions required to be made to the Beneficiaries have been made.

9.2    **Continuance of the Trustee for Winding Up**. After the Trust dissolves, the Trustee may continue to act as trustee to wind up the Trust's affairs. Before finally distributing all remaining Trust Assets, the Trustee may reserve any amounts required to provide for the Trustee's own costs and expenses, including a reserve to fund any potential indemnification or similar obligations of the Trust, until the Trust is completely wound up. When the Trust is dissolved and completely wound up under the DSTA (the "**Cancelation Date**"), the Trustee must notify all Beneficiaries that the Cancelation Date has occurred and prepare and file a certificate of cancelation with the State of Delaware to terminate the Trust under DSTA § 3810. If the Delaware Trustee's signature is required for the certificate of cancelation, the Trustee must provide the Delaware Trustee with written direction to execute the certificate of cancelation. The Delaware Trustee may conclusively rely on the Trustee's written direction without further inquiry. The Trustee must retain for a period of two years after Cancelation Date, as a Trust Expense, the books, records, Registry, Beneficiary lists, and other documents and files that have been delivered to or created by the Trustee. At the Trustee's discretion, all such records and documents may, but need not, be destroyed at any time after that two-year period.

9.3    **Termination After Five Years Unless Extended.** If the Trust has not been previously terminated under Section 9.2, on the fifth anniversary of the Effective Date, the Trust terminates and dissolves unless the Bankruptcy Court, on a motion made within the six-month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, on motion made within six months before the end of the preceding extension), determines that a fixed-period extension (not to exceed five years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel satisfactory to the Trustee that any further extension would not adversely affect the status of the Trust as a liquidating trust for U.S. federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation and distribution of, the Trust Assets. Upon such termination, the Trustee must distribute all the Trust Assets to the Beneficiaries in accordance with the Plan and this Agreement, and immediately thereafter the Trust terminates and the Trustee has no further responsibility in connection with the Trust except to the limited extent set forth in this Agreement.

4927-0048-4740.22 53772.00002

9.4     **Termination of Duties**. Except as otherwise specifically provided in this Agreement, the Trustee, the Delaware Trustee, the Oversight Board and its Board Members are permanently discharged from all duties under this Agreement as of the Cancelation Date.

9.5     **No Survival**. The Beneficiaries' rights under this Agreement do not survive the Cancelation Date.

## Article 10
### AMENDMENTS AND WAIVER

The Trustee, with the Oversight Board's majority consent, may amend this Agreement to correct or clarify any non-material provision. This Agreement may not otherwise be amended, and no provision may be waived, except with the Oversight Board's unanimous approval, a written instrument signed by the Trustee, and the Bankruptcy Court's approval after notice and a hearing. No amendment or waiver of this Agreement adversely affecting the Delaware Trustee is effective unless the Delaware Trustee has consented to it in writing in its sole discretion.

## Article 11
### MISCELLANEOUS

11.1     **Trust Irrevocable**. Establishment of the Trust by this Agreement is irrevocable.

11.2     **Agreement for Benefit of Parties Only**. Nothing in this Agreement may be construed to give any person or entity other than the Trustee, the Delaware Trustee, the Oversight Board and Board Members, and the Beneficiaries any legal or equitable right, remedy, or claim under or in respect of this Agreement. The Trust Assets are held for the Beneficiaries' sole benefit.

11.3     **Notices**. All notices, directions, instructions, confirmations, consents, and requests required or permitted by this Agreement must be in writing sent by (a) first class mail, (b) overnight delivery, or (c) email with "read receipt" enabled, addressed to:

If to the Trustee:

Michael I. Goldberg
Akerman LLP
201 East Las Olas Boulevard, Suite 1800
Fort Lauderdale, FL 33301
michael.goldberg@akerman.com

If to the Delaware Trustee:

CSC Delaware Trust Company
251 Little Falls Drive
Wilmington, DE 19808
Attn: Trust Administration
Email: ustrustagency@delawaretrust.com
Phone: 866-291-6119

4927-0048-4740.22 53772.00002

If to the Oversight Board:

[●]

Notice is effective when received.

11.4    **Conflict Among Plan Documents**. If a conflict among the Plan, the Confirmation Order, and this Agreement exists, the Confirmation Order controls. If a conflict between the Plan and this Agreement exists, the Plan controls (unless stated otherwise in this Agreement or the Confirmation Order).

11.5    **Severability**. Any provision of this Agreement held unenforceable in any jurisdiction is, only in that jurisdiction, ineffective strictly to the extent of such unenforceability without invalidating any other of this Agreement's provisions.

11.6    **Headings**. The headings used in this Agreement are for convenience of reference only and do not define, limit, or inform the interpretation of any this Agreement's provisions.

11.7    **Governing Law**. This Agreement is governed by, and must be construed in accordance with, the laws of the State of Delaware without regard to conflict of laws principles.

11.8    **Consent to Jurisdiction**. All parties to this Agreement consent and submit to the exclusive jurisdiction of the Bankruptcy Court for any proceeding to enforcement and construe this Agreement or any right, remedy, obligation, or liability arising under or related to this Agreement, the Plan, or any act or omission of the Trustee (acting in his capacity as such), the Oversight Board, or any individual Board Member (solely in those capacities). If the Bankruptcy Court either declines to or cannot exercise jurisdiction over such proceeding, it may be brought in the federal court located in the District of Delaware.

30

**Lugano Diamonds & Jewelry Inc. and its affiliated Debtors**

By: _____
      Michael Issa
      Chief Restructuring Officer

**Trustee**

      _____
      Michael Goldberg, solely in his capacity as Trustee

**Delaware Trustee**
**CSC Delaware Trust Company**

By: _____
Name:
Title:

4927-0048-4740.22 53772.00002       SIGNATURE PAGE FOR
LIQUIDATION TRUST AGREEMENT

## **EXHIBIT C**

**CODI Settlement Agreement**

NOTHING CONTAINED IN THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This SETTLEMENT AGREEMENT AND MUTUAL RELEASE (this, "*Agreement*") is made and entered into by and among (i) Lugano Diamonds & Jewelry Inc., (ii) Lugano Buyer, Inc., (iii) K.L.D. Jewelry, LLC, (iv) Lugano Prive, LLC, (v) Lugano Holding, Inc. (together with the entities identified in (i)-(iv), the "*Debtors*"), (vi) Compass Diversified Holdings ("*CODI Parent*"); (vii) Compass Group Diversified Holdings LLC ("*CODI*"), (viii) Compass Group Management LLC ("*CGM*"), (ix) Sostratus, LLC ("*Sostratus*"), and (x) the Official Committee of Unsecured Creditors of the Debtors (the "*UCC*"). The Debtors, CODI, CGM, Sostratus, and the UCC are each referred to herein individually as a "*Party*" and collectively as the "*Parties*."

## RECITALS

**WHEREAS**, the Debtors were established by Mordechai Haim Ferder and his wife, Idit Ferder, in 2004 as a designer, manufacturer, and retailer of high-end jewelry.

**WHEREAS**, in 2021, CODI acquired an indirect majority interest in Lugano Diamonds & Jewelry Inc. from Mr. Ferder and his affiliated entities. Following the transaction, Lugano Holding, Inc. was the sole shareholder of Lugano Buyer, Inc., and Lugano Buyer, Inc. was the sole shareholder of Lugano Diamonds & Jewelry Inc. In connection with the transaction, Mr. Ferder and his affiliated acquired a significant portion of the equity of Lugano Holding, Inc. and CODI became the majority equity holder of Lugano Holding, Inc. Mr. Ferder continued as chief executive officer and a member of the board of directors of certain Debtors.

**WHEREAS**, Lugano Diamonds & Jewelry Inc. and Lugano Buyer, Inc., as co-borrowers (the "*Borrowers*"), and CODI, as lender, entered into a Credit Agreement (as amended, the "*Credit Agreement*") dated as of September 3, 2021. The other Debtors are guarantors (the "*Guarantors*") under the Credit Agreement. Pursuant to a Guarantee and Collateral Agreement dated as of September 3, 2021, the Borrowers' obligations under the Credit Agreement are secured by liens on substantially all of the Debtors' personal property and the obligations under the Credit Agreement are guaranteed by the Guarantors. The outstanding obligations under the Credit Agreement, including principial, prepetition interest, and fees, exceed $718 million.

**WHEREAS**, on May 7, 2025, CODI and its parent entity filed a Form 8-K (the "*May 8-K*") disclosing that CODI had commenced an internal investigation into the financing, accounting, and inventory practices of Lugano Holding, Inc., based on concerns reported to CODI management. The May 8-K also disclosed that Mr. Ferder had resigned from his position as Chief Executive Officer of Lugano Holding, Inc. and from all offices and directorships previously held with the applicable Debtors and its subsidiaries and affiliates.

**WHEREAS**, on June 24, 2025, Lugano Diamonds & Jewelry, Inc. commenced an action against Mr. Ferder and a related trust for which he is a trustee, asserting Claims for fraud,

concealment, constructive fraud, and breach of fiduciary duty.

**WHEREAS**, on July 9, 2025, Mr. Thomas FitzGerald and Mr. L. Spencer Wells joined the board of directors for Lugano Diamonds & Jewelry Inc. (the "***Lugano Board***"), and a week later, on July 16, 2025, the Lugano Board delegated certain matters to a newly formed Special Committee of the Board of Directors of Lugano Diamonds (the "***Special Committee***"), which is comprised of Messrs. FitzGerald and Wells.

**WHEREAS**, the Special Committee retained independent advisors and commenced an internal investigation surrounding the fraud allegations, including to determine what Claims may exist as a result thereof. The Special Committee and the full board of Lugano Diamonds & Jewelry Inc., and the board of directors, board of managers, or manager/member of the other Debtors, authorized the commencement of the Chapter 11 Cases.

**WHEREAS**, on November 16, 2025 (the "***Petition Date***"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their assets as debtors-in-possession pursuant to Section 1107 and 1108 of the Bankruptcy Code.

**WHEREAS**, on November 25, 2025, the U.S. Trustee appointed the UCC.

**WHEREAS**, the UCC, working with the Special Committee, on behalf of the Debtors, also commenced an investigation into the fraud allegations and the extent and validity of the liens and Claims (as defined below) asserted by CODI.

**WHEREAS**, on January 27, 2026, CODI filed a secured Claim against the Debtors, identified in the Debtors' Claims register as proof of claim number 153 in the amount of $718,222,591.91 (the "***CODI Prepetition Claim***") and withdrew two proofs of claim filed on January 19, 2026.

**WHEREAS**, in addition to the CODI Prepetition Claim, CODI has asserted Claims arising under the DIP Order and the Cash Collateral Order for, among other things, the interim financing and adequate protection (the "***CODI Postpetition Claims***").

**WHEREAS**, as part of the on-going investigations, the Debtors (through the Special Committee), CODI, and the UCC agreed to non-binding mediation (the "***Mediation***"), which Mediation resulted in an agreement in principle to material terms to resolve the disputes between the Parties and which is memorialized herein.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement and for other valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

1.    Defined Terms. Unless otherwise defined in this Agreement, the capitalized terms shall have the following meanings. Any capitalized terms not defined herein shall have the meaning set forth in the Plan.

a.      "***Agency Order***" means that *Final Approval Order (I) Authorizing the Debtors to Assume the Agency Agreement, (II) Approving the Sale Guidelines, Dispute Resolution Procedures, Waiver of Various Lease Restrictions, and Modifications to The Debtors' Customer Programs, and (III) Granting Related Relief* [Docket No. 263].

b.      "***Affiliate***" has the meaning ascribed thereto in Section 101(2) of the Bankruptcy Code as if such entity were a debtor in a case under the Bankruptcy Code.

c.      "***Agreement***" has the meaning ascribed thereto in the Preamble of this Agreement.

d.      "***Avoidance Actions***" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties-in-interest under Bankruptcy Code §§ 510, 544, 547, 548, 549, 550, 551, 553(b) and 724(a) or applicable non-bankruptcy Law, including Claims, Causes of Action, or remedies arising under chapter 5 and Bankruptcy Code § 724(a) or under similar or related local, state, federal, or foreign statutes or common Law, including fraudulent transfer Law or other Law.

e.      "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended.

f.      "***Bankruptcy Court***" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases, including to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court of the District of Delaware, or in the event such court ceases to exercise jurisdiction over any Chapter 11 Case.

g.      "***Bankruptcy Release Parties***" means each of, and in each case in its capacity as such: (i) the Debtors and each of the Estates; (ii) the UCC (and its individual members solely in their capacities as members of the UCC and not in their capacity as parties that conducted business with or otherwise transacted with the Debtors or any Excluded Party); and (iii) each Related Party of each entity in clauses (i) and (ii); *provided, however*, no Excluded Party shall be a Bankruptcy Release Party.

h.      "***Business Day***" means any day other than a Saturday, a Sunday, a "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in New York, New York are required or authorized to close by Law or executive order.

i.      "***Cash***" means cash and cash equivalents, including bank deposits, wire transfers, checks representing good funds, and legal tender of the United States of America or instrumentalities thereof.

j.      "***Cash Collateral Order***" means that *Final Order (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to the Prepetition*

*Lender; (III) Modifying the Automatic Stay; and (IV) Granting Related Relief* entered by the Bankruptcy Court on February 10, 2026 [Docket No. 364].

k.       "***Causes of Action***" mean any and all Claims (including Investment Contract Claims), rights, actions, Avoidance Actions, Contributed Claims, proceedings, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, rights of setoff, third-party claims, subordination claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims, legal remedies, equitable remedies, claims, damages, judgments whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, foreseen or unforeseen, asserted or unasserted, existing or hereafter arising, secured or unsecured, whether asserted directly or derivatively, in Law, at equity, or otherwise, by statute, whether for tort, fraud, contract, or otherwise, including any recharacterization, subordination, avoidance or other claim under any other similar provision of applicable state or federal Law.

l.       "***CGM***" has the meaning ascribed thereto in the Preamble of this Agreement.

m.       "***Chapter 11 Cases***" means with respect to all Debtors, the chapter 11 bankruptcy cases commenced by the Debtors, which are being jointly administered under the case caption *In* re *Lugano Diamonds & Jewelry Inc. et al.*, Case No. 25-12055 (BLS) (Bankr. D. Del.), and with respect to a particular Debtor, the chapter 11 bankruptcy case of such Debtor pending in the Bankruptcy Court.

n.       "***Claim***" means any "claim," as defined in Bankruptcy Code § 101(5) against any of the Debtors or against any property of the Debtors.

o.       "***CODI***" has the meaning ascribed thereto in the Preamble of this Agreement.

p.       "***CODI Auditor Claim***" means all Causes of Action CODI now holds or could hold against GT arising from or related to GT's services to any of the Debtors and services GT rendered to CODI in connection with the Debtors.

q.       "***CODI Auditor Recovery***" means the recovery set forth in Paragraph 3.b of this Agreement.

r.       "***CODI Claims***" mean the CODI Prepetition Claim and CODI Postpetition Claims.

s.       "***CODI Parent***" has the meaning ascribed thereto in the Preamble of this Agreement.

4

t.      "*CODI Parties*" means CODI Parent, CODI, CGM, Sostratus, and each of their subsidiaries in their individual capacities and collectively as context requires, provided that no Excluded Party and no Debtor or any of its subsidiaries is a CODI Party.

u.      "*CODI Related Parties*" means the Related Parties of the CODI Parties, which includes Patrick A Maciariello and Raj U. Dalal, in each case solely in its capacity as such; *provided, however* that none of the Excluded Parties are CODI Related Parties; *provided further,* that the Debtors and their subsidiaries shall not be considered CODI Related Parties.

v.      "*CODI Recoveries*" mean the CODI Specified Asset Recoveries, CODI Auditor Recovery, CODI Remainder Recovery, and CODI Residual Recovery.

w.      "*CODI Remainder Recovery*" means the recovery set forth in Paragraph 3.c of this Agreement.

x.      "*CODI Residual Recovery*" means the recovery set forth in Paragraph 3.d of this Agreement.

y.      "*CODI Specified Asset Recoveries*" means the recovery set forth in Paragraph 3.a of this Agreement.

z.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code § 1129 and approving this Agreement, which order must be acceptable to CODI and the UCC in all respects.

aa.     "*Debtors*" has the meaning ascribed thereto in the Preamble of this Agreement.

bb.     "*DIP Order*" means the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III) Granting Adequate Protection to the Prepetition Lender; (IV) Modifying the Automatic Stay; (V) Scheduling a Final Hearing; and (VI) Granting Related Relief* [Docket No. 66].

cc.     "*Disclosure Statement*" means the disclosure statement relating to the Plan, including all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to Bankruptcy Code § 1125, as it subsequently may be amended, modified, or supplemented by the Debtors.

dd.     "*Effective Date*" has the meaning set forth in Paragraph 2 of this Agreement.

ee.     "*Estates*" mean the chapter 11 estates of the Debtors created by Bankruptcy Code § 541(a).

ff.     "*Excluded Parties*" mean, collectively, (a) Feder Affiliated Parties, (b) GT, (c) Josh Gaynor, (d) Investment Contract Counterparties, (e) any Person or entity set forth

5

on Exhibit I. to the Plan Supplement, (f) any relative, shareholder, member, advisor, attorney, professional, Related Party, or beneficiaries of any of the persons or entities listed in the foregoing (a) – (e), and (g) any immediate or mediate transferee of property from any of the foregoing, *provided* that the following are not Excluded Parties: (i) the CODI Parties, (ii) the Debtors, (iii) the Lugano Prive Investment Trust, (iv) the Creditors' Committee and its members only in their capacities as members of the Creditors' Committee, and (v) the Related Parties of the Persons or entities listed in the foregoing (i) – (iv) who are not Ferder Related Parties and who are not specifically identified in the preceding clauses of this definition.

gg.     "*GT*" means Grant Thornton LLP and its affiliates, which served as auditor for the Debtors and CODI.

hh.     "*Investment Contract*" means any contract or agreement with one or more of the Debtors or with any Ferder Affiliated Party under which an Investment Contract Counterparty provided consideration purportedly for the shared purchase of, or a loan in connection with the purported acquisition of, or secured by, diamonds, precious stones or minerals, or jewelry in exchange for a return of principal or invested amount with interest or other additional return on principal or other investment and guarantee of such a contract or agreement. The CODI Claims are not Investment Contracts.

ii.     "*Investment Contract Claims*"  mean any Claim or Cause of Action a Debtor may have against an Investment Contract Counterparty or a Related Party to such Investment Contract Counterparty.

jj.     "*Investment Contract Counterparty*" means a non-Debtor party to an Investment Contract.

kk.     "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, listing rule, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court) or stock exchange.

ll.     "*Liquidation Trust*" means a liquidation trust established on the Effective Date for the benefit of the Liquidation Trust Beneficiaries in accordance with the terms of the Plan and the Liquidation Trust Agreement.

mm.     "*Liquidation Trust Agreement*" means the agreement establishing and delineating the terms and conditions of the Liquidation Trust, including the rights and duties of the Liquidation Trustee and the Liquidation Trust Oversight Board.

nn.     "*Liquidation Trust Assets*" mean all assets of the Estates, including all Causes of Action, Cash in the Estates, any proceeds of the Tax Refund realized by the Post-Confirmation Debtor and transferred to the Liquidation Trust on receipt as provided in the Plan, the equity in the Post-Confirmation Debtor, any proceeds realized or received from such assets, all rights of setoff, recoupment, and other defenses with respect, relating to, or arising from the assets but excluding (a) the Tax Refund, (b) the Effective Date Reserves, and (c) the Professional Fee Reserve.

6

oo.    "*Liquidation Trust Oversight Board*" means the board set forth in Paragraph 11 of this Agreement.

pp.    "*Liquidation Trustee*" means Michael Goldberg and any successor appointed pursuant to the Liquidation Trust Agreement.

qq.    "*Mediation Materials*" mean all communications, documents, information, and other materials disclosed or submitted during the mediation held between May 6 and May 7, 2026.

rr.    "*Net Proceeds*" mean Cash recoveries from Liquidation Trust Assets, less all reasonable expenses incurred in obtaining such recoveries.

ss.    "*Ordinary Course Professional*" has the meaning as that term is defined in the *Order (A) Authorizing the Debtors to Retain and Compensate Professionals Used in the Ordinary Course of Business, and (B) Granting Related Relief* [Docket No. 194] and who has been retained by the Debtors in accordance with the order.

tt.    "*Person*" means any person or organization created or recognized by Law, including any association, company, cooperative, corporation, entity, estate, fund, individual, joint stock company, joint venture, limited liability company, partnership, trust, trustee, unincorporated organization, government (including any federal, state, local, municipal, or foreign government) or any political subdivision or agency, department, or instrumentality thereof, or any other entity or organization of whatever nature, and any other entity as defined in Bankruptcy Code § 101(15).

uu.    "*Plan*" means the chapter 11 plan of the Debtors, which incorporates this Agreement, in the pending Chapter 11 Cases, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, as the same may be amended, modified, or supplemented in accordance with the Plan.

vv.    "*Plan Effective Date*" means the date the Plan becomes effective in accordance with its terms.

ww.    "*Plan Effective Date Cash*" means all Cash in the Estates on the Plan Effective Date, less the amount of Cash required to fund the Effective Date Reserves (as defined in the Plan). I think the Plan definition is a tad broader—again, we'll track that.

xx.    "*Post-Confirmation Debtor*" means Lugano Holding, Inc.

yy.    "*PSA*" means the agreement by and among the CODI Parties, the Debtors, and the UCC establishing the Debtors' obligations to, among other things, propose the Plan containing provisions consistent with all material terms of this Agreement and all such parties' obligations to, among other things, vote to accept this Plan and support its confirmation.

zz.    "*Related Parties*" means, collectively, with respect to any Person or entity, and in each case solely in its capacity as such, all current and former directors, managers,

7

officers, committee members, members of any governing body, shareholders, unitholders, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, assignors, participants, successors, assignees (whether by operation of Law or otherwise), subsidiaries, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, fiduciaries, employees, agents, trusts, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or entity's respective heirs, executors, estates, and nominees; *provided* that no Excluded Party is a Related Party. Related Parties of the Debtors include the Special Committee and its members, advisors, and attorneys.

aaa.    "*Sostratus*" has the meaning ascribed thereto in the Preamble of this Agreement.

bbb.    "*Specified Assets*" means, collectively, (a) the Agency Agreement Proceeds; (b) the Tax Refund; and (c) the Theft Policy, and (d) Causes of Action to establish, and realize upon, the amounts due to the Estates under any agreement or law with respect to clauses (a) – (c).

ccc.    "*Tax Refund*" means any federal, state, and local income tax refunds or other tax refunds owing or that become owing to any of the Debtors, including refunds owing to the Post-Confirmation Debtor from any taxing authorities, including the United States government and any state and local governments.

ddd.    "*Theft Policy*" means the Primary and Excess All Risks (LDI) policies, policy numbers B080123941W24 and B080123942W24, issued by Lloyd's (syndicated) that insure against, among other things, theft of certain of the Debtors' precious stone inventory under which the Debtors are the insured.

eee.    "*Third-Party Litigation*" means any litigation or investigation between a third-party and CODI relating to the Debtors.

fff.    "*UCC*" has the meaning ascribed thereto in the Preamble of this Agreement.

2.    <u>Conditions to Effectiveness</u>.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m. (prevailing Eastern Time), on the Effective Date, which is the date on which all the following conditions have been satisfied or waived in accordance with this Agreement:

a.    Entering into this Agreement must be approved and executed by the requisite majority of the members of the relevant boards of directors or managers of CODI Parent, CODI, CGM, and Sostratus in accordance with their respective governing documents;

b.      Each of the Parties shall have executed and delivered counterpart signature pages of this Agreement and the PSA to counsel for the other Parties (as applicable); and

c.      The Plan Effective Date shall have occurred.

3.      <u>CODI Recoveries</u>.  The Plan shall provide for the following treatment on account of the CODI Claims, which treatment shall be in full and final satisfaction of the CODI Claims:

a.      *CODI Specified Asset Recoveries*.

i.      On the Plan Effective Date, the Debtors shall pay CODI 34.79% of the amount of the Effective Date Cash.

ii.     After the Plan Effective Date, the Liquidation Trustee shall pay CODI (A) a subsequent Distribution from the Liquidation Trust equal to 34.79% of Cash released from the Effective Date Reserves and Professional Fee Reserve to the extent not necessary to satisfy all Allowed Administrative, Professional Fee, Priority, Priority Tax, Other Secured, and Convenience Claims; and (B) periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 34.79% of all Net Proceeds of Specified Assets received by the Liquidation Trust after the Effective Date.

b.      *CODI Auditor Recovery*.  The Liquidation Trust shall pay CODI 45% of any Net Proceeds of all GT Claims.  The Liquidation Trustee shall ensure its professionals maintain a record of fees and expenses under a separate billing designation for all work associated with the CODI Auditor Recovery.

c.      *CODI Remainder Recovery*.  The Liquidation Trust shall pay CODI 25% of any Net Proceeds of Causes of Action (including recoveries under any representations and warranty policy and Avoidance Actions) other than the GT Claims and Specified Assets.

d.      *CODI Residual Recovery*.  The Liquidation Trust shall pay CODI any Net Proceeds remaining in the Liquidation Trust after Holders of General Beneficial Interests receive Distributions equal to the full amount of their Allowed General Unsecured Claims plus GUC Interest (as defined in the Plan).

4.      <u>CODI Recoveries Mechanics</u>.  All CODI Recoveries shall be made by wire transfer or similar transfer of immediately available funds pursuant to written directions provided by CODI to the Debtors or the Liquidation Trustee, as applicable.

5.      <u>Assignment of Certain Claims and Causes of Action to Liquidation Trust</u>.  CODI irrevocably assigns and transfers the CODI Auditor Claims to the Liquidation Trust.  The Plan shall offer holders of general unsecured Claims in the Chapter 11 Cases the opportunity to assign

9

any individual Claims or Causes of Action such creditor may have against GT to the Liquidation Trust in exchange for an enhanced recovery on such creditor's unsecured Claim against a Debtor; *provided* that such enhanced recovery shall not affect the treatment of the CODI Claims, reduce the CODI Recoveries, or have any material adverse effect of any kind on any of the CODI Parties or CODI Related Parties.

6.     <u>Disputes</u>. Prior to the Plan Effective Date, the Parties agree to submit any disputes arising under this Agreement to the mediator, Honorable Lee R. Bogdanoff (Ret.), for a binding decision. After the Plan Effective Date, the Parties agree that any disputes arising under or relating to this Agreement shall be decided by the Bankruptcy Court and hereby agree to the sole and exclusive jurisdiction of the Bankruptcy Court for purposes of such disputes.

7.     <u>Further Assurances</u>. To the extent they remain in existence at the relevant time—it being understood that the Debtors (except for the Post-Confirmation Debtor) and the UCC cease to exist on the Plan Effective Date:

    a.     *Agreement Cooperation*. The Parties shall cooperate reasonably with each other and with each other's respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (i) furnish upon request to each other such further information, (ii) execute and deliver to each other such other documents, and (iii) do such other acts as a Party may reasonably request for the purpose of carrying out the transactions and compromises contemplated by this Agreement. The Parties shall cooperate with each other as necessary to obtain all consents and authorizations of third-parties, if any, to make all filings with and give all notices to third-parties that may be necessary or reasonably required in order to carry out the intent of this Agreement and the transactions and compromises contemplated hereby. .

    b.     *Third-Party Litigation Cooperation*. Each of the Parties agrees to (i) respond (at the requesting Party's expense) to each other's reasonable requests for information relating to any Third-Party Litigation for 24 months after the Effective Date and (ii) upon request from a Party, and to the extent a common interest or joint defense exists, enter into a reasonable Common Interest Agreement or Joint Defense Agreement to govern the sharing of such information as contemplated in this Paragraph 7b; *provided, however*, that no Party is required to participate in any Third-Party Litigation in which it is not a party, to create or provide work product or other documents that do not already exist, or to take, assist with, or support any position or action in any Third-Party Litigation that the responding Party does not support or agree with, in its sole or absolute discretion. Nothing in this subparagraph alters or is intended to alter any Party's obligation to respond to a valid subpoena or any Party's right to object to a subpoena pursuant to applicable Law. Nothing in this Agreement shall require any CODI Release Parties to incur any expenses or costs in providing such cooperation.

    c.     *No Cooperation Regarding Litigation Against the CODI Release Parties*. No Party to this Agreement shall encourage or voluntarily cooperate in any litigation or anticipated litigation against the CODI Release Parties.

10

8.     Releases by the Bankruptcy Release Parties.  Except as provided in Paragraph 10, the Bankruptcy Release Parties, to the extent controlled by a Party hereto, shall forever release the CODI Release Parties from any and all Claims, actions, Causes of Action, suits, debts, dues, sums of money, accounts, controversies, agreements, promises, damages, judgments, executions, and demands whatsoever, in Law or equity, whether known or unknown, liquidated or unliquidated, which the Bankruptcy Release Parties ever had, now have, or hereafter can, shall, or may have against any of the CODI Release Parties or Bankruptcy Release Parties for any matter, cause, thing, or reason whatsoever as of the Plan Effective Date, including but not limited to, for or arising out of, or related to, prepetition matters with the Debtors, the Debtors' business, the Debtors' actual or alleged fraud, the Chapter 11 Cases, the CODI Claims, and other actual or potential Claims that were or could have been asserted against any of the CODI Release Parties or any of the Bankruptcy Release Party.

9.     Releases by the CODI Release Parties.  Except as provided in Paragraph 10 and except for the CODI Claims, the CODI Release Parties, to the extent controlled by a Party hereto, hereby forever release and discharge the Bankruptcy Release Parties from any and all Claims, actions, Causes of Action, suits, debts, dues, sums of money, accounts, controversies, agreements, promises, damages, judgments, executions, and demands whatsoever, in Law or equity, whether known or unknown, liquidated or unliquidated, which the CODI Release Parties ever had, now have, or hereafter can, shall, or may have against any of the Bankruptcy Release Parties for any matter, cause, thing, or reason whatsoever as of the Plan Effective Date, including but not limited to, for or arising out of, or related to, prepetition matters with the Debtors, the Debtors' business, the Debtors' actual or alleged fraud, the Chapter 11 Cases, and any other actual or potential Claims (other than the CODI Claims) that were or could have been asserted against any of the Bankruptcy Release Parties.

10.    Exclusions from Releases.    Notwithstanding anything to the contrary in Paragraph 8, Paragraph 9, or any other Paragraph of this Agreement, the Parties agree and acknowledge that, subject to their treatment in the Plan, this Agreement and the releases to be provided in the Plan shall not release or waive:

      a.     The CODI Claims;

      b.     The CODI Recoveries;

      c.     Any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies, and liabilities of any unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law equity, contract, tort, or otherwise, that a CODI Party would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) against another CODI Party or any of their officers, directors, members, managers, trustees, or employees;

      d.     any obligation of a Party arising under or created by this Agreement; and

11

e.    any Claim or litigation by a Party against a third-party that is not expressly released pursuant to this Agreement and the Plan, including but not limited to, Claims or litigation by the Debtors, Estates, Liquidation Trust, or CODI Release Parties against (a) any Excluded Party, (b) against any member of the UCC (in a capacity other than as a member of the UCC, and (c) against any Investment Contract Counterparty.

11.    <u>Liquidation Trust Oversight Board</u>.  The Plan shall provide that the Liquidation Trust shall have a board comprising five members established under the Plan and Article III of the Liquidation Trust Agreement to oversee the Liquidation Trustee's performance of his duties and otherwise serve the functions set forth in the Liquidation Trust Agreement.  The initial members of the Liquidation Trust Oversight Board are: (i) Stephen Keller; (ii) Adam Rothstein; (iii) Avi Wazana; (iv) Spencer Wells; and (v) Craig Barbarosh. The last two named Board Members are the independent board members of the Liquidation Trust Oversight Board.

12.    <u>Confidentiality</u>.  Except as explicitly provided in the Plan or required under applicable law, the Parties agree, and the Plan shall provide, that the Parties shall keep all Mediation Materials confidential to the maximum extent allowable by Law and that they shall not make, or cause any other person or entity to make, any public statements or other communications concerning this Agreement or its subject matter.  In the event a Party, in its sole discretion, makes a good faith determination that disclosure of any Mediation Materials is necessary to comply with its obligations, including but not limited to, in order to comply with direction of the Bankruptcy Court or to respond to request for compelled disclosure, such disclosing Party shall (to the extent reasonably possible) provide the other Parties with reasonably prompt, advance written notice so as to permit the other Parties an opportunity to consult with, and advise the disclosing Party of, the other Parties' position.  In the event of a filing, subpoena, or similar request for compelled disclosure of the terms of any Mediation Materials, the Party receiving such filing, subpoena, or request shall provide a copy of such request to the other Parties promptly upon receipt.  This notice and consultation requirement does not impose any obligation upon any Party to forego or resist disclosure if such Party determines in its good faith discretion that such disclosure is necessary to comply with such Party's obligations.  The obligations of the Parties set forth in this Paragraph 12 shall survive the termination of this Agreement regardless of whether the Effective Date has occurred.

13.    <u>Miscellaneous</u>.  Each Party acknowledges, represents, and agrees that:

a.    no promise, inducement, or consideration has been offered or promised to any Party except as expressly set forth herein;

b.    this Agreement is executed without reliance upon any statement or representation by any other Party or other Party's attorneys or representatives concerning the nature and extent of any Claims and/or damages or legal liability therefor;

c.    this Agreement, together with the PSA and Plan, constitutes the final and fully-integrated agreement of the Parties concerning the subject matter hereof and supersedes all prior or contemporaneous oral and written

12

statements, understandings, and agreements between them or their counsel regarding the subject matter hereof;

    d.    this Agreement shall be governed by the Laws of the State of Delaware without regard to any choice of Law analysis that might call for application of some different Law;

    e.    this Agreement may not be modified except in a writing signed by each Party and no Party shall be entitled to rely on any other manner of attempted modification, which shall be void (and not merely voidable);

    f.    no Party has assigned or purported to assign any Claim that otherwise would be released or discharged by this Agreement;

    g.    this Agreement may be executed in two or more counterparts, but all of which taken together shall constitute one and the same agreement; and

    h.    signatures exchanged by email or facsimile transmission shall be deemed original signatures for all purposes and shall indicate and evidence such Party's final and fully-enforceable agreement to the terms of this Agreement.

14.    Authority.  Each Party and each signatory below represents that the signatory has all necessary authority to enter into the terms of this Agreement on behalf of the Party for which she or he is signing and to bind that Party to the terms of this Agreement.  Each Party acknowledge that each other Party is specifically relying on these representations in entering into this Agreement and that the Parties' respective signatories have actual, apparent, and inherent authority to bind the Parties to the terms of this Agreement.  Each of the Parties agree that none of the Parties has an obligation to inquire into the authority of the signatories for any Party and the Parties' reliance on the representations in this Agreement and apparent authority is reasonable and justifiable.

15.    Third-Party Beneficiaries.

    a.    Except as set forth in Paragraph 15(b), the Parties do not confer any rights or remedies upon any person other than the Parties to this Agreement and their respective successors and assigns.

    b.    The Parties hereby designate the Bankruptcy Release Parties and CODI Release Parties as third-party beneficiaries of this Agreement having the right to enforce the releases provided under this Agreement.

16.    Conflicts.  In the event of any inconsistency between this Agreement and the Plan Support Agreement of even date herewith, this Agreement shall govern until such time as the Plan has been confirmed, at which time, the terms and conditions set forth in the Plan, to the extent intended to supersede this Agreement, shall govern.

Docusign Envelope ID: F8791AF2-C82D-80B8-8207-6FB9A50B06D6

14

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed as of the dates indicated below.

**LUGANO DIAMONDS & JEWELRY INC.**, acting through the Special Committee, on behalf of the following entities:

**LUGANO DIAMONDS & JEWELRY INC.:**

By: *Spencer Wells*

Printed Name: Spencer Wells

Title:  Member of the Special Committee

Date: 6/23/2026

**LUGANO HOLDING, INC.:**

By: *Spencer Wells*

Printed Name: Spencer Wells

Title:  Member of the Special Committee

Date: 6/23/2026

**LUGANO BUYER, INC.:**

By: *Spencer Wells*

Printed Name: Spencer Wells

Title:  Member of the Special Committee

Date: 6/23/2026

**K.L.D. JEWELRY, LLC:**

By: *Spencer Wells*

Printed Name: Spencer Wells

Title:  Member of the Special Committee

Date: 6/23/2026

**LUGANO PRIVE, LLC:**

By: *Spencer Wells*

Printed Name: Spencer Wells

Title:  Member of the Special Committee

Date: 6/23/2026

*[Signature Page to Settlement Agreement and Mutual Release]*

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

By: _____

Printed Name: Adam Rothstein

Title: Chair

Date: 06/24/2026

*[Signature Page to Settlement Agreement and Mutual Release]*

**COMPASS DIVERSIFIED HOLDINGS LLC:**

By: _____

Printed Name: Stephen Keller

Title: Regular Trustee

Date: 6/22/2026

**COMPASS GROUP DIVERSIFIED HOLDINGS LLC:**

By: _____

Printed Name: Stephen Keller

Title: Chief Financial Officer

Date: 6/22/2026

*[Signature Page to Settlement Agreement and Mutual Release]*

1107458266AMERICAS

**COMPASS GROUP MANAGEMENT LLC:**

By: <u>Wayfinder Partners LLC</u>

Its: <u>Sole Manager</u>

By: _____

Printed Name: <u>Zachary T. Sawtelle</u>

Title: <u>Managing Member</u>

Date: <u>   June 22, 2026</u>

[*Signature Page to Settlement Agreement and Mutual Release*]

**SOSTRATUS, LLC:**

By: <u>Compass Group Management LLC</u>

Its: <u>Sole Manager</u>

By: <u>Wayfinder Partners LLC</u>

Its: <u>Sole Manager</u>

By: _____

Printed Name: <u>Zachary T. Sawtelle</u>

Title: <u>Managing Member</u>

Date: <u>  June 22, 2026</u>

*[Signature Page to Settlement Agreement and Mutual Release]*

**Exhibit B**

**Liquidation Analysis**

[*To Come*]