**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>**LUGANO DIAMONDS & JEWELRY INC.,** et al.,[1]<br><br>*Debtors.* | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 614** |

**OBJECTION OF THE FERDER PARTIES TO APPROVAL OF THE DEBTORS' DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

## I. PRELIMINARY STATEMENT

The question at this stage is straightforward: Does the Debtors' Joint Disclosure Statement provide the "adequate information" required by 11 U.S.C. § 1125(a)? It does not. The Disclosure Statement[2] is a highly curated, misleading advocacy document. It actively conceals critical financial realities, obscures a massive insider enrichment scheme, and presents mathematically impossible financial restatements.

Mordechai Ferder individually ("**Mr. Ferder**") and as Trustee of the Haim Family Trust ("**Trust**", and together with Mr. Ferder, the "**Ferder Parties**") objects to approval of the Disclosure Statement. Most egregious is the complete information blackout surrounding the proposed settlement with the Debtors' majority shareholder and secured lender, Compass

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2] This refers to the Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors [Docket No. 614] (as may be amended, modified, or supplemented, the "Disclosure Statement"), filed by the above-captioned Debtors and Debtors in Possession (collectively, the "Debtors" or "Lugano"), and, in the alternative and to the extent the matter proceeds on a combined basis, to confirmation of the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors (as may be amended, modified, or supplemented, the "Plan").

Diversified Holdings ("**CODI**" or "**Compass**").[3] Although the Disclosure Statement dedicates pages to unadjudicated, inflammatory, disputed, and false allegations against Mr. Ferder, it is completely silent about the allegations and evidence supporting the estate's massive, highly valuable claims against Compass and its affiliates.

The Disclosure Statement also obfuscates a multi-million-dollar source of direct estate exposure. Mr. Ferder holds highly meritorious, affirmative claims against the Debtors arising from Lugano's own corporate knowledge of, acquiescence in, and direct participation in, the very financing arrangements and inventory practices now branded as "fraud." The Special Committee and its advisors are not in the dark here; they are not only fully aware of these claims, but they have intimate knowledge of the voluminous and credible evidence that supports them. The Special Committee and its counsel know the claims have substantial merit, and they know they create direct, crushing liability for Lugano, yet they have chosen to omit them entirely from the pages of the Disclosure Statement. That choice is telling and intentional.

How can a reasonable investor determine whether a settlement favoring Compass is a good deal for creditors when the Special Committee fails to describe what is being settled and the strength of the claims being given up? And how can that same investor evaluate the true risk profile of this estate when the Disclosure Statement fails to disclose a meritorious, multi-million-dollar claim that threatens to dilute or consume the remaining liquidation pool? The short answer is that they cannot.

The Disclosure Statement describes what Compass is getting under this deal—allowed claims, cash, future litigation payouts and extraordinary third-party releases and injunctive relief that flouts applicable law. But the Disclosure Statement keeps interested parties in the dark about

---

[3] Capitalized terms shall have the meaning ascribed to them in the Disclosure Statement unless defined otherwise in this Objection.

what consideration Compass is providing to the estate in exchange for this lengthy list of benefits. If the details of the Compass deal were supplied, the creditors would justifiably ask why Compass is not giving up so much more than it is. And there is no mention in the Disclosure Statement of the massive, direct liabilities Lugano still faces. No reasonable investor, knowing that Lugano itself faces direct liability for participating in the very financing arrangements that it claims are at the heart of its collapse, would consent to this deal that allows CODI to be rewarded for its active involvement in the underlying actions. It lets Lugano off the hook, and allows CODI to walk away with significant cash, all while leaving general unsecured creditors holding nothing more than speculative litigation paper.

To set up this deal, the Debtors and the Creditors' Committee spent the last year promoting a highly convenient "rogue CEO" narrative. They paint Mr. Ferder as a lone actor who single-handedly brought down Lugano. But that false story is a sideshow. There was no fraud, as the Debtors and CODI well know. The record shows that the financing arrangements used at Lugano were common, documented practices in the luxury jewelry industry, and the use of these agreements is fully detailed in Lugano's own books. The participants in these innovative business arrangements were aware that they not only came with potential upside, but with significant and well-known risks. It so happened that those risks materialized and the business plan ultimately failed. Compass and Lugano did not simply passively tolerate these financing arrangements; they left them in place for years because they directly enjoyed substantial benefits from them. Rather than admit their knowing participation, they now turn to finger-pointing to distract from their own responsibility.

Their hope is to distract this Court and creditors from a much larger, documented corporate truth: Compass and Lugano's senior executives knew about, approved, and pocketed millions from

the exact same off-book financing arrangements they now say were improper. The arrangements inflated Lugano's EBITDA, which allowed Compass to pull down over $250 million on its credit lines to pay out investor dividends and funnel $252 million in management fees to Compass's Manager, Compass Group Management LLC ("**CGM**"), and its CEO, Elias Sabo.

When evaluating a disclosure statement, Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a)(1). The Disclosure Statement falls far short of this standard in multiple critical respects. For example, the Disclosure Statement fails to disclose that Mr. Ferder is preparing to file sweeping counterclaims and independent actions that will reveal the truth and that the Plan's broad release and injunction scheme is designed to obfuscate the facts and prevent Mr. Ferder from pulling back the curtain on this entire arrangement.

Now that their own post-resignation mismanagement has driven a premier, two-decade-old brand into liquidation, the Debtors are asking this Court to bless a highly conflicted, insider-financed transaction designed to immunize the parent entity from fiduciary liability. The mechanics of this deal are as simple as they are troubling:

1. **The Paid-For Investigation:** CODI—the majority owner and the primary target of massive potential claims—paid millions and millions of dollars to fund the Special Committee's "independent" investigation.

2. **The Sweetheart Release:** Having allowed the target of the investigation to fund the gatekeepers, the Special Committee negotiated a deal that grants CODI a sweeping

release—including for claims within the CODI Settlement that otherwise would be carved out for actual fraud, willful misconduct, or gross negligence—while allowing CODI's disputed $718 million claim in full and handing CODI the lion's share of cash and future litigation proceeds.

3. **The Information Blackout and Liability Concealment:** To push this deal through, the Debtors simply omitted any description of the viable, multi-million-dollar claims against Compass. Worse, they completely concealed Mr. Ferder's meritorious $37 million claims against the Debtors, leaving creditors in the dark about the true financial condition of the estate and the patent bad faith of the proposed settlement.

Under 11 U.S.C. § 1125, a disclosure statement cannot be approved if it contains misleading, incomplete, or vague information that undermines the integrity of the voting process. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 99 (Bankr. D. Del. 1999); *In re USN Communs., Inc.*, 280 B.R. 573 (Bankr. D. Del. 2002). Further, under the Third Circuit's decision in *In re American Capital Equipment, LLC*, 688 F.3d 145 (3d Cir. 2012), a disclosure statement must be rejected if the underlying plan is patently unconfirmable on its face.

This Plan is facially unconfirmable. It violates the Bankruptcy Code through illegal nonconsensual third-party releases, overbroad exculpations, and one-sided injunctions that are in effect improper releases that strip Mr. Ferder of his independent contribution and indemnity rights and materially impair the rights of creditors against non-debtor third parties. To make matters worse, it relies on discriminatory "double-dipping" distribution schemes and a patently unfeasible, unbudgeted Litigation Trust that faces immediate administrative insolvency.

Further, the Disclosure Statement is confusing and opaque because it fails to explain the structural interplay between the Plan's opt-out release and the Plan's injunction provisions. If

creditors read the Disclosure Statement, they might think they have a real choice. The document informs creditors that they may "opt out" of the Section 11.09 releases, but it does not plainly explain that the opt-out applies only to those releases and does not opt creditors out of the Plan's other releases, exculpations, or injunctions. Read together, the provisions create a practical trap: even a creditor that opts out may still be enjoined from pursuing claims or remedies against the Debtors, Released Parties, the Liquidation Trustee, Liquidation Trust, or their property if the claim is treated as dealt with under the Plan. That omission is material because it obscures the real effect of the Plan on creditor remedies and on the Ferder Parties' contribution, indemnity, setoff, and comparative-fault rights.

The Court should decline to approve the Disclosure Statement.[4]

## II. JURISDICTION, STANDING, AND BACKGROUND

### A. Jurisdiction and Standing

1. This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2).

2. The Ferder Parties are "parties in interest" under 11 U.S.C. § 1109(b) and have standing to object under 11 U.S.C. §§ 1125(b) and 1128(b). The Ferder Parties (1) hold, through affiliated entities, equity interests in Debtor Lugano Holding, Inc., (2) are the primary targets of the proposed Liquidation Trust, (3) are defendants in pending bankruptcy

---

[4] Nothing in this Objection constitutes a concession to, or admission of, the correctness of any allegation made by the Debtors, the CODI Parties, the Creditors' Committee, or any other party. All allegations against the Ferder Parties are vigorously disputed and are the subject of pending, stayed, and forthcoming litigation in which the Ferder Parties intend to assert affirmative claims, counterclaims and affirmative defenses. The Ferder Parties expressly reserve all rights.

litigation brought by the Debtors, and (4) hold substantial claims and defenses against the estates.

3.  Any party-in-interest may object to the adequacy of the disclosure statement.

**B. Relevant Background**

4.  Mr. Ferder founded Lugano Diamonds in 2004, elevating it over two decades into an internationally respected luxury jewelry enterprise. In 2021, CODI bought a 59.9% majority stake in Lugano Holding, Inc. for an enterprise value of $256 million. Mr. Ferder kept a 39.6% equity stake and stayed on as CEO.

5.  On May 7, 2025, CODI filed a Form 8-K. The filing announced Mr. Ferder's resignation and disclosed that CODI had launched an internal investigation into Lugano's accounting and inventory practices.

6.  On June 24, 2025, Lugano sued Mr. Ferder in California, in Orange County Superior Court. Mr. Ferder has vigorously disputed every single allegation of wrongdoing from the start. He also made it clear to Lugano's lawyers that he had major, direct claims of his own that he intended to bring against the company.

7.  On November 16, 2025, the Debtors filed these Chapter 11 cases. Afterwards, Lugano tried to remove its California state court lawsuit to Delaware, with the aim of bringing that case before this bankruptcy court. Mr. Ferder resisted, filing a motion to remand, and the Central District of California agreed with him, granting his motion. Specifically, Judge Fred Slaughter, sitting in the Central District, Santa Ana, rejected Lugano's attempt to move the litigation to Delaware and remanded the case back to Orange County. Judge Slaughter found that California law predominated, that the parties had a clear agreement to litigate

their disputes in California, and that the exercise of federal jurisdiction in Delaware would only create wasteful, piecemeal litigation.

8. Once the case was returned to Orange County, Lugano spent the next several months delaying prosecution and avoiding the litigation entirely. Instead, the Special Committee induced Mr. Ferder to repeatedly delay the hearing on his Stay Relief Motion where he was seeking leave to file his compulsory, defensive counterclaims against Lugano and Compass in the Orange County case. It did so by (falsely) promising that Lugano was interested in good-faith negotiations to settle with Mr. Ferder, and agreeing to provide him "credit" in those settlement negotiations for his cooperation in its investigation into Compass's wrongdoing.

9. Under the same pretext, Lugano convinced Mr. Ferder to sign a standstill agreement and hand over a "look-see" preview of evidence known to him showing CODI's (and Lugano's) knowledge of and conduct related to the off-balance sheet financing transactions. Lugano's representatives affirmatively assured Mr. Ferder, through counsel, that the company's interests were in complete alignment with his when it came to holding CODI accountable. Believing those representations, Mr. Ferder worked cooperatively with Lugano and its counsel including facilitating the Special Committee's receipt of explosive and damning evidence against Compass.

10. As it turned out, Lugano never intended to honor its commitments to settle with Mr. Ferder in exchange for its receipt of this evidence. It took the "look-see preview" of some of the evidence known to Mr. Ferder, bypassed him entirely, and used his disclosures to extract a quick, sweetheart settlement with CODI. Under this deal, CODI walks away with 34.79% of the estate's cash, 45% of the Grant Thornton litigation proceeds, 25% of all other

litigation, and a release for claims within the CODI Settlement. Lugano entered into this sweetheart deal with CODI before even learning the full scope of the evidence known to Mr. Ferder. Then, it hung Mr. Ferder out to dry.

11. After securing a favorable settlement for CODI—the quid pro quo for CODI's funding of Lugano's deeply flawed purported investigation—Lugano violated the Central District of California's remand Order by filing the *exact same fraud claims* against Mr. Ferder in this Bankruptcy Court. And to make sure Mr. Ferder could not ask this Court to abstain in favor of the California state court, Lugano dismissed its own Orange County case against Mr. Ferder.

12. In the Debtors' 9019 Motion [Docket No. 525] to approve the NBS Diamonds LLC dba Scarselli ("**Scarselli**") compromise and assign insurance rights, the Debtors embedded gratuitous "stipulations" of purported "fact" prejudicial to Mr. Ferder, declaring *inter alia* that the diamond at issue in that case was lost "as a result of the unauthorized conduct of" Mr. Ferder and that "Ferder acted adversely to Lugano's interests" thereby trying to secure findings of implied fraud against Mr. Ferder without the hassle of a trial. Mr. Ferder was not a party to this settlement, and the disparaging remarks were not only false, but had nothing to do with whether the deal reflected sound business judgment. It was simply a roadmap to convict Mr. Ferder by implication, forcing him to file yet another objection just to protect his rights.

13. The Debtors then filed the current Disclosure Statement on June 24, 2026, but it omits this history and the context necessary for creditors to evaluate the Plan, the CODI Settlement, and the Debtors' litigation posture toward Mr. Ferder.

## III. ARGUMENT

**A. The Disclosure Statement does not contain "adequate information" within the meaning of 11 U.S.C. § 1125(a).**

14. Under 11 U.S.C. § 1125(a), a disclosure statement must provide "adequate information" in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment about the plan. In a Delaware bankruptcy court, a disclosure statement should not be approved if it contains vague, confusing, or insufficient financial information regarding the debtor's pre- and post-confirmation operations, or if it omits essential facts necessary for those voting on the plan to make an informed decision. *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 99 (Bankr. D. Del. 1999) (stating that disclosure statement must contain "adequate information," not be used as an advocacy tool).

### 1.  Missing financial information.

15. To begin with, the Disclosure Statement lacks the basic financial information required as a matter of law to evaluate a Chapter 11 plan.

16. **Missing Liquidation Analysis[5] (11 U.S.C. § 1129(a)(7))**: Exhibit B to the Plan (the Liquidation Analysis) is marked "[To Come]" and has not been provided. Without a liquidation analysis, a creditor cannot legally evaluate the "best interests of creditors" test under Section 1129(a)(7) or determine whether recoveries under the Plan exceed those that would be received in a hypothetical Chapter 7 liquidation.

---

[5] The Liquidation Analysis (Exhibit B to the Disclosure Statement) was not filed or served with the Disclosure Statement on June 24, 2026, and was instead filed separately on July 7, 2026 [Dkt. No. 636] — mere hours before the deadline to file objections to the Disclosure Statement. The Ferder Parties have not had a meaningful opportunity to review, analyze, or comment upon the sufficiency of the Liquidation Analysis for disclosure purposes. The Ferder Parties expressly reserve all rights to object to the adequacy of the Liquidation Analysis at any continued hearing on the Disclosure Statement or at confirmation, as applicable.

17. **Omitted Fee Budget**: Exhibit A to the Plan (the Agreed Pre-Effective Date Fee Budget) is marked "[Intentionally Omitted]." The administrative expense burden of the Debtors' professionals is a critical factor in evaluating distributions. Omitting this budget deprives creditors of the ability to assess whether the Plan is feasible or in their interest.

18. **Blank General Unsecured Claims Estimate**: The Disclosure Statement leaves blank the estimated range of General Unsecured Claims ("$[●] million to $[●] million"). Creditors have filed approximately 230 claims totaling $2.6 billion ($1.1 billion post-consolidation). Leaving the estimated range blank prevents creditors from calculating their projected recovery percentage.

19. **Deferred Identification of Preserved Causes of Action**: The list and analysis of preserved Causes of Action are deferred to a future, unfiled Plan Supplement. Because these claims are the primary asset of the proposed Liquidation Trust, creditors cannot cast an informed vote without knowing the nature, extent, and estimated value of these litigation assets. Deferral to a later-filed supplement that creditors will not have the opportunity to evaluate before voting violates the purpose of the disclosure statement.

20. These information gaps are not minor or ministerial; they go to the heart of what creditors need to cast an informed vote. A disclosure statement that omits a liquidation analysis, a claims estimate, and a description of the estate's principal litigation assets fails the "adequate information" standard of 11 U.S.C. § 1125(a) as a matter of law. This Court should not approve the Disclosure Statement until these deficiencies are cured. *See In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–72 (Bankr. S.D. Ohio 1988) (holding that a disclosure statement must provide sufficient data to enable an informed vote); *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 570–71 (Bankr. N.D. Ga. 1984) (holding that a disclosure statement lacked adequate information where it omitted meaningful discussion of the estimated Chapter 7 recovery and the nature, value, and

status of potential estate causes of action); *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991) (holding that a disclosure statement must provide projected amounts of undisputed and disputed unsecured claims so creditors can evaluate the expected distribution under the plan).

### 2. The Disclosure Statement fails to adequately disclose the claims and allegations against CODI.

21. A disclosure statement must contain a detailed description of the claims and causes of action being settled under a plan, so that creditors can evaluate whether the settlement is fair, equitable, and in the best interests of the estate.

22. The Disclosure Statement in this case completely violates this mandate. Although the Disclosure Statement asserts that the Special Committee and the Creditors' Committee determined the Debtors could bring various affirmative claims against CODI and its affiliated entities and that such claims are meritorious, the document provides no detail regarding the nature, merits and value of those claims.

23. This silence is fatal to the adequacy of the disclosure. A reasonable investor cannot determine whether the settlement, which allows CODI's $718 million claim in full and pays CODI the lion's share of cash, is a good deal when there is no factual basis provided to enable the investor to assess the value of the claims against CODI that are being relinquished. The value of those claims is massive. To cure this deficiency, the Disclosure Statement must disclose the results of the Special Committee's investigation (perhaps a redacted version of the report) that was sponsored by Compass, or at least disclose the specific, actionable claims against CODI that were investigated and are now being extinguished.

24. The Disclosure Statement fails to disclose that Compass's $718 million prepetition claim is highly vulnerable to equitable subordination under 11 U.S.C. § 510(c). To subordinate a claim,

the estate must show that (1) the claimant engaged in inequitable conduct, (2) the misconduct resulted in injury to creditors or conferred an unfair advantage on the claimant, and (3) subordination is not inconsistent with the Bankruptcy Code. *See In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009).

25. The evidence of CODI's inequitable conduct related to its majority ownership of and control over Lugano is overwhelming. Compass was a public company, with all the attendant auditing, oversight and disclosure obligations that carries; it was Lugano's controlling majority shareholder (59.9%). Compass senior leadership admitted in public investor calls that they were aware of the financing practices in place at Lugano before and after CODI acquired its majority stake in the company, and these executives have admitted that "controls… were put in place" ostensibly to control risk associated with those practices, yet high-ranking CODI executives have also admitted they did nothing to enforce the internal controls. These executives have also admitted to knowing from the outset about the off-book financing arrangements in place at Lugano that they now say were improper, and to "turning a blind eye" so as to not disrupt how business was being conducted and for fear of "stopping a winning horse". Compass left these speculative off-book arrangements in place because they directly inflated Lugano's EBITDA, allowing Compass to draw down $250 million on its credit line, earn nine-figure fees for its Manager, and pay massive dividends to its own investors.

26. The Disclosure Statement fails to adequately inform creditors of the estate's direct claims against Compass and its Manager, CGM, and its CEO, Elias Sabo, for breach of fiduciary duty. As a publicly traded majority owner, Compass owed strict fiduciary duties of care and loyalty to Lugano Holding and its subsidiaries. CGM received $252 million in management fees since the acquisition, with $143 million paid in just the last two years. CGM and Sabo knew and allowed

the subsidiary to operate off-book because it directly benefited the parent company's borrowing capacity. The Disclosure Statement fails to disclose that the estate has a highly valuable claim to claw back the $252 million in management fees paid to CGM for services it failed to perform and that any such potential claim is being compromised as part of the Plan.

27. The Disclosure Statement provides none of these details. By keeping creditors blind to the strength, value, and viability of these claims, the Debtors are preventing an informed vote on the merits of the settlement between Lugano and Compass and the value of what is being given up in exchange for a massive insider release being obtained by CODI.

4. **There is inadequate disclosure of Mr. Ferder's meritorious claims against Lugano and the resulting estate exposure.**

28. A disclosure statement must contain a balanced and candid assessment of the liabilities, contingent claims, and potential exposures facing the estate, so that voting parties can appreciate the true size of the distribution pool and the good faith of the proposed plan.

29. The Debtors' Disclosure Statement is fatally deficient because it completely conceals that Mr. Ferder holds highly meritorious, $37-million-plus affirmative claims against Lugano for, among other things, Mr. Ferder's personal eight-figure funding of Lugano business expenses in late 2024 and 2025, as detailed in his Proof of Claim, as well as claims based on Lugano's corporate knowledge, acquiescence, active participation, and direct operational benefit from the financing arrangements and inventory practices that the Debtors and the Special Committee now say were wrongful.

30. The Special Committee and its advisors are fully aware of these claims, the evidence that supports them, and the severe financial exposure these claims create for the estates. They know the following facts, none of which they have disclosed to creditors.

31. First, Lugano was the contracting party and sole beneficiary of the financing arrangements. Lugano was not a passive victim of a "rogue CEO." Lugano was the primary obligor on the financing and "Investment Contract" agreements. Every dollar generated by these contracts went directly into Lugano's corporate bank accounts and funded its physical operations—payroll, inventory, marketing, and payables. None of these funds ever went to Mr. Ferder.

32. Second, there was widespread corporate knowledge and participation. These sorts of financing arrangements are common in the industry, and were common knowledge throughout Lugano.

33. Because Lugano was the corporate beneficiary and an active participant in these agreements, Mr. Ferder possesses substantial affirmative claims against Lugano for indemnification, contribution, breach of contract, and operational reimbursement. The Debtors know that Mr. Ferder's claims represent a significant, valid threat to the estate's remaining assets. Mr. Ferder's claims will drastically dilute the recovery of other general unsecured creditors.

34. By failing to disclose this exposure, the creditors are misled into believing the estate has no major unsecured liabilities other than trade debt and the "Investment Contracts" themselves. If creditors knew that the estate faced significant, valid exposure to Mr. Ferder for its own corporate conduct, they would realize that the Plan's projected recoveries are illusory. They would refuse to grant CODI, the parent company that collected $252 million in fees from these very practices, a favorable release while trade creditors absorb the impact of Mr. Ferder's claims. Concealing this exposure violates Section 1125(a) and prevents a fair, informed vote.

35. Indeed, if Lugano's claims against Mr. Ferder are as strong as it proclaims, and Mr. Ferder's defenses and claims are as weak as it contends, there is no reason for Lugano to have expended such extraordinary effort to deny Mr. Ferder his day in court to test those claims. The

omissions about Mr. Ferder's claims are especially material because the Plan does not simply leave Mr. Ferder's claims alone: any counterclaims or affirmative claims against the Debtors would be classified, objected to, estimated, capped, set-off, and distributed only through the Plan and Liquidation Trust structure, while the Section 11.06 injunction separately restricts post-confirmation litigation and setoff activity.  Lugano is apparently so concerned about Mr. Ferder raising his claims that it violated the Central District of California's Remand Order and sought to obtain a backdoor release of the Ferder Parties' claims through the Plan's impermissible injunction and release provisions. These facts directly bear on whether the Disclosure Statement adequately informs creditors about estate exposure and the true risk profile of the proposed Litigation Trust.

5.    **Active misleading of creditors about the flow of funds and the nature of the financing arrangements.**

36. A disclosure statement cannot be approved if it actively misleads creditors regarding the debtor's prepetition operations. *See In re Zenith Elecs. Corp.*, 241 B.R. at 99. The Debtors' Disclosure Statement is highly misleading because it falsely alleges that Mr. Ferder personally pocketed or diverted funds through an unauthorized, secret scheme.

37. This is an active misrepresentation of how the financing arrangements worked, and the Special Committee knows as much. There was no diversion of proceeds away from Lugano. Every dollar paid by third parties under these agreements went directly into Lugano's corporate bank accounts. Lugano was a party to, and the sole obligor on, these contracts. Lugano used the money entirely to buy inventory, meet payroll, fund marketing, and pay its trade creditors. No funds were ever diverted to Mr. Ferder, his family, or any affiliated entities. Mr. Ferder's compensation package remained unchanged from 2021 to 2024.

38. In addition, these financing arrangements were common, accepted practices in the luxury jewelry industry, and they were documented in Lugano's corporate records. Both Compass and Lugano were fully aware of these arrangements and chose to leave them in place to enjoy the operational benefits and cash flows that supported Compass's public reporting and corporate management fees.

39. The financial numbers presented by Compass and repeated by the Debtors in the Disclosure Statement are mathematically unsound and designed to mislead creditors about the true cause of Lugano's demise. Lugano's California complaint alleges that the financing arrangements exposed Lugano to, at most, "$100 million in liability." Yet, in its restatements, Compass claims that what it originally recorded as a $42 million profit in 2024 is actually a $327 million loss. Compass attempts to blame a write-down of more than $370 million in profit on an allegedly unknown potential liability of only $100 million. This is a mathematical impossibility, and was the result of Compass trying to whitewash a lot of its red ink created by its other unsuccessful investments through its scapegoating allegations against Mr. Ferder.

40. Then Compass claims that 2024 revenue declined by more than 85% from previously reported levels, asserting that Lugano's 2024 revenue was only $75 million (down from $500 million in 2023). This is a physical impossibility. In 2024, Lugano maintained nearly 200 active employees, a full executive team (including interim CEO Joshua Gaynor), multiple active luxury salons, and ongoing sales operations. A premier brand does not silently lose 85% of its revenue while maintaining full-scale, highly staffed physical operations.

41. If one hypothetically removes all impacts of the Lugano financing from Compass's public disclosures—subtracting the $700 million in associated debt and removing the $194 million in EBITDA previously attributed to Lugano—Compass's core business is left with $1.2 billion in

debt and $230 million in EBITDA. This represents an extreme leverage ratio of 5.2x, which would place Compass at immediate risk of breaching its lending covenants with its banking syndicate.

42. Compass is using the Lugano bankruptcy and the unadjudicated allegations against Mr. Ferder as a "dust cloud" to shift the financial losses of its other failing portfolio companies into the Lugano estate. The Disclosure Statement's failure to disclose this leverage crisis creates a fatal information gap.

**B.  The Plan is patently unconfirmable on its face.**

43. Although plan confirmation issues are typically reserved for the confirmation hearing, it is well established in the Third Circuit that a Delaware bankruptcy court has the authority to consider and resolve such issues at the disclosure statement stage if the underlying plan contains a patent defect that makes it inherently unconfirmable as a matter of law. *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation."); *see also In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). Addressing these fatal defects now prevents the futility, delay, and extreme expense of soliciting votes on a plan that cannot legally be confirmed.

44. This Plan contains at least ten facially unconfirmable defects.

45. First, the nonconsensual third-party releases violate *Harrington v. Purdue Pharma.*, 603 U.S. 204 (2024). Plan Section 11.09 contains nonconsensual third-party releases. It releases non-debtor third parties (including the CODI Parties, current directors, and their "Related Parties") from claims held by creditors unless those creditors affirmatively "opt out" by checking a box on a ballot.

46. The Supreme Court's decision in *Purdue Pharma* held that the Bankruptcy Code does not authorize a bankruptcy court to discharge or release the claims of non-consenting third parties against non-debtor parties through a Chapter 11 plan. The Plan's "opt-out" mechanism does not cure this statutory defect. "Deemed consent" through silence or inaction does not constitute meaningful consent. This is especially true for unimpaired creditors who do not receive ballots, or for creditors who receive no distribution and have no incentive to participate. As Delaware courts have held, "deemed consent" through silence is a legal fiction. *See In re Smallhold, Inc.*, 665 B.R. 704, 710 (Bankr. D. Del. 2024) (Court states that *Purdue Pharma* holds that the text of the Bankruptcy Code does not authorize the nonconsensual third-party release). And after that decision, there does not appear to be a principled basis for authorizing "opt out" third-party releases in cases, even if such releases might be supported by strong policy arguments. *In re Wash. Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (opt out mechanism is not sufficient to support the third-party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)). Failing to return a ballot is not a sufficient manifestation of consent to a third-party release. *In re Emerge Energy Services LP*, No. 19-11563, 2019 WL 7634308 at *18-19 (Bankr. D. Del. Dec. 5, 2019) (rejecting opt-out consent where creditors failed to return ballots or opt out).

47. The Plan incorporates the CODI Settlement Agreement and imposes the following key release, injunction, and exculpation provisions upon third parties:

**Section 11.08 (Releases by the Debtors):** The Debtors and their estates release each "Released Party" - which expressly includes the CODI Parties - from all claims "known or unknown, foreseen or unforeseen, matured or unmatured,

existing or hereinafter arising, in law, equity, contract, tort, or otherwise." See, Plan § 11.08.

**Section 11.09 (Releases by Holders of Claims):** Each "Released Party" (including the CODI Parties) is deemed "conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party," except where a Holder of a Claim makes an Opt-Out Election. The "Releasing Parties" include "all holders of Claims, other than holders of Claims only in Classes 6 and 7, who do not make an Opt-Out Election." See, Plan § 11.09.

**Section 11.06 (Injunction):** "[A]ll Persons and Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors" are permanently enjoined from "commencing or continuing in any manner any action or other proceeding" against or affecting the Released Parties.

48. <u>Second</u>, the Exculpation Provision is overbroad under Third Circuit law. Plan Section 11.07 exculpates each "Exculpated Party" (defined to include the Debtors, the Creditors' Committee and its members, Special Committee members Thomas FitzGerald and L. Spencer Wells, and their "Related Parties") from all liability arising between the Petition Date and the Effective Date, with a carve-out only for actual fraud, willful misconduct, or gross negligence. Under established Third Circuit law, exculpation provisions in Chapter 11 plans must be strictly limited to fiduciaries of the estate acting in their official capacities during the case. *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000). Extending exculpation to individual Committee members, who owe duties only to their constituency and not to the estate, individual directors, and their personal "Related Parties" (which encompasses non-estate actors and personal advisors) exceeds the permissible scope of exculpation as a matter of law.

49. <u>Third</u>, the release and injunction scheme is impermissibly one-sided and punitive. The Plan's release, exculpation, and injunction architecture is asymmetric, non-reciprocal, and fundamentally inequitable. Under the Plan, CODI, the current directors, the Committee and their related parties receive the benefit of Debtor Releases, Third-Party Releases, Exculpation, and the Injunction. The Ferder Parties, by contrast, are designated as "Excluded Parties" and no Excluded Party is a Released Party, Releasing Party, Related Party, or an Exculpated Party. The Plan and Liquidation Trust preserve every conceivable claim against the Ferder Parties, while Section 11.06 broadly enjoins persons holding Claims or Equity Interests from commencing actions or asserting setoff against the Debtors, Released Parties, the Liquidation Trustee, or the Liquidation Trust.

50. The net effect of this scheme is to leave the Ferder Parties exposed as litigation targets while eliminating their ability to pursue contribution, indemnity, comparative-fault, and setoff rights against the co-actors who receive releases and injunction protection. This structure is inequitable, non-confirmable, and inconsistent with basic due process.

51. <u>Fourth</u>, the Plan's release of the CODI Parties to the extent binding on creditors through an opt-out is a textbook nonconsensual third-party release. The CODI settlement release is a bad-faith whitewash. The Plan incorporates the CODI Settlement Agreement and grants CODI extraordinary protection. Although the Debtor Release contains a carve-out for actual fraud, willful misconduct, or gross negligence, the Plan expressly provides that this exception *"does not apply to the CODI Parties with respect to claims that are within the scope of those settled by the CODI Settlement Agreement."* Plan § 11.08, at 40, ECF No. 612. This means CODI receives protection for the very claims that matter most – claims within the CODI Settlement even if they involve actual fraud, willful misconduct, or gross negligence. The release is intended to extinguish claims held by third parties against the CODI Parties. The Section 11.06 injunction bars "all Persons and

Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors" from asserting claims against the CODI Parties. This appears to sweep in Mr. Ferder's direct claims for equitable indemnity and contribution - claims that are independent of the estate and belong solely to Mr. Ferder. Although the Ferder Parties are "Excluded Parties" (and thus not "Releasing Parties" under Section 11.09), the Section 11.06 injunction nonetheless purports to bar Mr. Ferder from asserting claims against the CODI Parties by virtue of his status as a holder of Equity Interests and an unsecured claim. Mr. Ferder has not consented to this release and to the extent such releases are approved without modification, Mr. Ferder hereby opts-out.

52. Under California law, which governs the underlying transactions, a defendant held liable for concurrent fault possesses independent rights of equitable indemnity and contribution against joint tortfeasors. *American Motorcycle Ass'n v. Superior Court*, 20 Cal. 3d 578 (1978). If Mr. Ferder is held liable to the "Investment Contract" claimants, he possesses direct, independent claims against CODI based on its role as the controlling majority owner and secured lender that directed operations. These claims belong to Mr. Ferder, not to the estate.

53. Although the Plan designates Mr. Ferder as an "Excluded Party" and therefore not a "Releasing Party" under Section 11.09, the Plan nonetheless attempts to materially affect and extinguishes Mr. Ferder's claims against the CODI Parties in at least three ways.

54. First, as stated, the Section 11.06 injunction bars "all Persons and Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtors" from asserting claims against the Released Parties (which include the CODI Parties).  As stated, the Ferder Parties hold equity, and Mr. Ferder holds a claim and thus potentially fall within the scope of this injunction.

55. Second, the CODI Settlement Agreement Paragraph 7.c prohibits any party to the settlement (including the Debtors and the Creditors' Committee) from encouraging or voluntarily

cooperating in "any litigation or anticipated litigation against the CODI Release Parties." This provision is clearly intended to effectively bar Mr. Ferder from obtaining cooperation in prosecuting his indemnity claims against the CODI Parties.

56. Third, the Debtors release (Section 11.08) and the CODI Settlement purport to extinguish estate claims against CODI that the Special Committee and Creditors' Committee found meritorious, thereby potentially impairing any avenue for Mr. Ferder to seek subrogation to estate claims or to establish CODI's liability as a joint tortfeasor through estate-held evidence and claims.

57. The "deemed consent" mechanism of the Plan's opt-out structure does not cure the illegality of the releases because, among other reasons, Mr. Ferder appears to be already excluded from the opt-out mechanism as an "Excluded Party" and because a failure-to-opt-out cannot constitute meaningful consent to the involuntary release of a non-consenting party's affirmative claims against a non-debtor. The Plan's opt-out mechanism (Section 11.09) seems to apply only to the "Releases by Holders of Claims" in Section 11.09. It does not permit a party to opt out of the Section 11.06 injunction, which independently bars "all Persons and Entities" holding equity interests from asserting claims against the CODI Parties. The Plan explicitly states that "all other releases, injunctions, and exculpations bind all persons regardless of opt-out." Plan §§ 11.06-11.08. Thus, it seems that even if the opt-out were a sufficient substitute for consent (which it is not), it does not cure the constitutional and statutory defects of the Section 11.06 injunction.

58. By enjoining "all Persons" holding Claims or Equity Interests from asserting actions or setoff against Released Parties, the Section 11.06 injunction attempts to strip Mr. Ferder of direct indemnity, contribution, comparative-fault, and setoff rights without his consent. This constitutes a nonconsensual third-party release of direct, non-estate claims by another name, and it is unauthorized under the Bankruptcy Code. Mr. Ferder has not consented to the extinguishment of

his direct claims. He is not a signatory to the CODI Settlement Agreement. He has not opted into any release. Mr. Ferder has received no individualized adjudication of his claims. He has been afforded no hearing at which the merits of his claims against CODI could be determined. The blanket release of the CODI Parties - imposed through a Plan negotiated between the Debtors, the Creditors' Committee, and CODI - is not a constitutionally adequate substitute for the adjudication of Mr. Ferder's individual rights.

59. Further, the CODI Settlement constitutes patent "unfair discrimination" under Section 1129(b). Despite colorable claims against CODI, the Debtors agreed to allow CODI's disputed $718 million claim in full on day one. Under the Plan, CODI receives 34.79% of Effective Date Cash, 45% of GT litigation proceeds, and 25% of other litigation proceeds. Meanwhile, Class 4 General Unsecured Creditors are left with only speculative litigation paper. This insider buyout violates the absolute priority rule and cannot be confirmed over the rejection of Class 4.

60. Fifth, to the extent that the Plan purports to discharge or cancel the Debtors' obligations, it violates Section 1141(d)(3). Although the Plan is a liquidation plan, Section 5.07 provides that obligations of the Debtors under cancelled instruments are "discharged." Under 11 U.S.C. § 1141(d)(3), however, a debtor is not entitled to a discharge if the plan provides for liquidation of all or substantially all of the estate's property, the debtor does not engage in business after consummation, and the debtor would be denied a discharge under Section 727(a) in a Chapter 7 case. Corporate debtors do not receive Chapter 7 discharges, and the Debtors here are liquidating their assets, transferring remaining litigation claims to a trust, and dissolving or winding down their corporate existence. Any provision that purports to discharge obligations beyond what the Bankruptcy Code permits is facially unconfirmable.

61. Sixth, the Plan's voting and deemed acceptance mechanics violate Section 1126(c). The Plan contains illegal voting provisions designed to manufacture an accepting impaired class under Section 1129(a)(10). Section 3.02(e) of the Plan provides that any Holder of a General Unsecured Claim who makes a Convenience Class Election is *"deemed to have voted to accept the Plan irrespective of any vote to reject the Plan reflected on a Ballot."* This flatly violates 11 U.S.C. § 1126(c). The Bankruptcy Code does not permit a debtor to override a creditor's physical vote to reject a plan by tying it to an administrative convenience class election. A creditor has a statutory right to elect convenience treatment and to vote against a deficient plan.

62. In addition, Section 4.04 of the Plan provides that if a Class contains Claims eligible to vote and no ballots are cast, the Class is *"deemed to have accepted the Plan."* This "deemed acceptance" by a silent class is a legal fiction rejected by Delaware courts. Under Section 1126(c), an impaired class accepts a plan *only* if active, affirmative votes are cast representing two-thirds in dollar amount and more than one-half in number of the allowed claims actually voting. Silence does not constitute consent. *In re Wash. Mut., Inc*., 442 B.R. 314, 331 (D. Del. 2011) (opt out mechanism is not sufficient to support the third-party releases anyway, particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)). *See In re Wash. Mut., Inc.*, 442 B.R. at 331.

63. The Plan also violates Section 1123(a)(4) by providing discriminatory treatment within Class 4. A plan must provide *"the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment."* The Plan's "Contributed Claims" scheme in Section 3.02(d) violates this statutory requirement. Under Section 3.02(d), a "Contributing Creditor" who assigns their individual claims against Grant Thornton to the Liquidation Trust receives an *"additional Distribution (that does not count against any other*

*Distribution) on account of that Contributing Creditor's General Beneficial Interest equal to that Contributing Creditor's Pro Rata portion of 10% of the Net Proceeds of all Causes of Action against GT."*

64. This structure creates an unlawful, two-tiered distribution system within Class 4. Unsecured creditors who do not, or cannot, contribute third-party claims are relegated to a lower recovery, while "Contributing Creditors" receive a super-priority bonus from estate-administered litigation. Further, the Plan makes the Liquidation Trustee the sole arbiter of whether a contributed claim is "colorable," giving the trustee unbridled and unreviewable discretion to grant financial windfalls to favored creditors. Because the Plan treats members of the same class differently based on conduct outside the estate, it is patently unconfirmable.

65. Seventh, the Plan is patently unfeasible under Section 1129(a)(11). Under 11 U.S.C. § 1129(a)(11), the Debtors must prove that confirmation is not likely to be followed by liquidation, other than the liquidation proposed in the Plan, or the need for further financial reorganization. The Plan fails this test because its sole distribution engine—the Liquidation Trust—is structurally underfunded and administratively infeasible. The aggregate dollar amount of filed claims is $2.6 billion ($1.1 billion consolidated). Yet, the cash on hand is minimal. The Plan requires the creation of three separate cash reserves: the Trust Expense Reserve, the Professional Fee Reserve, and the Effective Date Reserves. Once these reserves are funded on the Effective Date, the remaining cash will be nearly exhausted

66. The entire Plan is built on the pursuit of speculative, highly contested litigation against Mr. Ferder and Grant Thornton. Yet, the Debtors have failed to provide any budget showing how the Liquidation Trust can survive a long-term, multi-year legal battle without running out of cash and

becoming administratively insolvent. A plan built on speculative litigation with no funding budget is an infeasible fantasy.

67. Eighth, the Plan fails to adequately disclose and improperly impairs D&O insurance rights. Mr. Ferder is a former director and officer and is entitled to defense and indemnification coverage under the Debtors' $3 million D&O Policy. The availability of this coverage is directly relevant to Mr. Ferder's ability to defend against the claims the estate intends to pursue.

68. The Debtors have undertaken a series of actions to deplete or divert this finite insurance fund, including filing an adversary proceeding (*Lugano Diamonds v. Travelers*, Adv. Pro. No. 25-50036) seeking to force Travelers to tender the full $3 million policy limits to fund the Debtors' own litigation expenses. The Disclosure Statement fails to disclose the current status of the D&O Policy, the impact of the CODI Settlement and Scarselli stipulations on coverage, or what coverage will remain available to Mr. Ferder. Any Plan provision that impairs an officer's contractual right to a defense funded by D&O insurance raises serious due process and equity concerns and is objectionable.

69. Ninth, substantive consolidation is not supported by adequate disclosure or evidence. The Plan provides for substantive consolidation of all Debtors' Estates into a single consolidated Estate. The Disclosure Statement states that the Plan itself "constitutes a motion" for consolidation, shifting the burden to creditors to object or be deemed to have consented.

70. Substantive consolidation is an "extreme remedy and is therefore rarely used." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) ("substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies.") It requires a showing that, prepetition, the entities disregarded corporate separateness or that creditors relied

on the financial status of a single entity. *Id.* at 211. The Disclosure Statement's support for consolidation is entirely conclusory and fails to provide entity-by-entity asset and liability disclosures. This lack of disclosure makes it impossible to evaluate the propriety of consolidation or its effect on the Ferder Parties' 39.6% equity interest in Lugano Holding, Inc. The "deemed motion" procedure is an improper attempt to bypass the Debtors' evidentiary burden.

71. Tenth, the Disclosure Statement lacks information to assess cramdown or best interests. The Plan will be "crammed down" on Classes 6, 7, and 8, all of which are deemed to reject. Confirmation over their objection requires that the Plan satisfy the "fair and equitable" requirement of Section 1129(b)(1) and not discriminate unfairly.

72. The Disclosure Statement contains no information to evaluate compliance with these requirements. Without a Liquidation Analysis, a GUC claims estimate, and a valuation of preserved Causes of Action, it is impossible to assess whether the Plan satisfies the "best interests" test or complies with the absolute priority rule.

C.     **The Disclosure Statement is an improper, misleading advocacy document that presents disputed allegations as fact.**

73. Section 1125 requires that a disclosure statement provide creditors with balanced, neutral information sufficient to make an informed voting decision. A disclosure statement is not a brief; it is not a vehicle for litigating contested factual issues or advocating a particular narrative. *See e.g. In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021) ("a disclosure statement is intended to be a source 'of factual information upon which one can make an informed judgment about a reorganization plan,' and not 'an advertisement or a sales brochure.'"); *In re Civitella*, 15 B.R. 206 (Bankr. E.D. Pa. 1981) (holding that the disclosure statement would be not approved where the allegations therein were unsupported by factual information); *In re KM Allied*

*of Nampa, LLC,* No. 10-03056-TLM, 2011 WL 1434915, at *7 (Bankr. D. Idaho Apr. 14, 2011) (denying approval of the disclosure statement where it contained "extensive argument" that belonged in a separate brief and holding that "[u]tilizing a disclosure statement as a legal brief is improper").

74. The "Rogue CEO" narrative is a fiction contradicted by the Debtors' own operations and knowledge. The Disclosure Statement suggests that Mr. Ferder, acting entirely on his own, somehow managed to execute an elaborate, multi-year secret plan that generated tens of millions of dollars for Lugano. This narrative is a complete fiction that does not align with reality. The financing arrangements were common knowledge at the company. They were well known to Lugano's sales teams (none of whom reported to Mr. Ferder) and to the executive team, including current interim CEO Joshua Gaynor, and to the auditors. None of what Compass now alleges could have occurred without the active knowledge and involvement of many people.

75. Indeed, Compass itself admits in its public filings that the financial records were created by a "complex network" of parties. Other complaints specifically allege that multiple Lugano executives were involved in generating this financing. As reported in the *Aspen Daily News* (Dec. 8, 2025), other parties contend these practices were part of a larger business pattern carried out by multiple executives and not the work of a single rogue CEO.

76. Furthermore, Compass's claims of ignorance are simply not credible. Compass admits that it knew from the beginning about the financing and inventory practices Lugano was using. In its December 4 Investor Call, Compass stated that controls were put in place to prevent this type of misconduct but thereafter took no steps to determine whether those controls were followed. In other words, Compass was fully aware of the practices it now calls misconduct, but intentionally left them undisturbed because it was enjoying the substantial cash flows.

77. In addition, the restatement numbers are mathematically absurd. The financial figures put forward by Compass in its restatement and repeated in the Disclosure Statement do not add up. They are mathematically absurd.

78. Lugano's California complaint alleges that the financing arrangements exposed Lugano to, at most, "$100 million in liability." Yet, in its restatements, Compass claims that what it originally booked as a $42 million profit in 2024 is actually a $327 million loss. Compass attempts to blame a write-down of more than $370 million in profit on an allegedly unknown potential liability of only $100 million. This is mathematically impossible.

79. Compass claims that 2024 revenue declined by more than 85% from previously reported levels, asserting that Lugano's 2024 revenue was only $75 million (down from $500 million in 2023). This is physically impossible. In 2024, Lugano maintained nearly 200 active employees, a full executive team (including interim CEO Joshua Gaynor), multiple active luxury salons, and ongoing sales operations. A premier brand does not silently lose 85% of its revenue while maintaining such active, visible, and highly staffed operations.

80. Rather than presenting neutral, balanced disclosure, the Special Committee, Compass, its Manager, and its CEO Elias Sabo, have all used the Disclosure Statement to advance a personal and reputational attack on Mr. Ferder. The disclosures ignore Mr. Ferder's longstanding record of public and private philanthropy in Orange County and beyond—a record established decades before Compass entered the picture. Instead, the disclosures belittle Mr. Ferder's service and mock his Ellis Island Medal of Honor. This is not corporate disclosure; it is a personal smear campaign designed to poison the well and prejudice Mr. Ferder before he can assert his counterclaims.

81. In the event the Court is not inclined to continue the hearing and is inclined to approve the Disclosure Statement, Mr. Ferder proposes the following general language be inserted in the Disclosure Statement:

THE DISCLOSURE STATEMENT REPEATEDLY MISCHARACTERIZES DISPUTED ALLEGATIONS AGAINST MR. FERDER AS ESTABLISHED FACT. FOR EXAMPLE, IT REFERS TO "MR. FERDER'S FRAUD," "THE FRAUD DESCRIBED ABOVE," AND "THE SCHEME," AND DESCRIBES AT LENGTH MR. FERDER'S ALLEGED CONCEALMENT AND MISREPRESENTATION OF FINANCING TRANSACTIONS, FORGERY OF INVOICES AND SALE DOCUMENTS, SHIPMENT OF "EMPTY BOXES," AND FALSE RECORDING OF REVENUE - ALL AS THOUGH THESE ALLEGATIONS HAD BEEN ESTABLISHED. THEY HAVE NOT. THESE ARE UNADJUDICATED ALLEGATIONS ASSERTED IN A COMPLAINT AND THEY ARE ALL DISPUTED; NO COURT HAS MADE ANY FINDING OF FRAUD, CONCEALMENT, FORGERY, OR ANY OTHER WRONGDOING BY MR. FERDER. MR. FERDER VIGOROUSLY DENIES THESE ALLEGATIONS AND INTENDS TO DEFEND AGAINST THEM AND ASSERT COUNTERCLAIMS (UNLESS HE IS UNCONSTITUTIONALLY STRIPPED OF THOSE RIGHTS BY WAY OF THIS PLAN).

COMPASS WAS NOT AN ARM'S-LENGTH LENDER; IT WAS THE CONTROLLING MAJORITY SHAREHOLDER (59.9%). COMPASS SENIOR LEADERSHIP ADMITTED IN PUBLIC INVESTOR CALLS THAT THEY WERE AWARE OF THE FINANCING PRACTICES AND THAT "CONTROLS... WERE PUT IN PLACE," YET THEY DID NOTHING TO ENFORCE THEM. INSTEAD, COMPASS LEFT THESE HIGHLY SPECULATIVE OFF-BOOK ARRANGEMENTS IN PLACE BECAUSE THEY DIRECTLY INFLATED LUGANO'S EBITDA, ALLOWING COMPASS TO DRAW DOWN $250 MILLION ON ITS CREDIT LINE AND PAY MASSIVE DIVIDENDS TO ITS OWN INVESTORS. BY FUNDING A HIGHLY LEVERAGED PUBLIC STRUCTURE USING OFF-BOOK SUBSIDIARY LIABILITIES, COMPASS ENGAGED IN CLASSIC INSIDER MISCONDUCT THAT DIRECTLY HARMED LUGANO'S TRADE CREDITORS. THE ESTATE'S DIRECT CLAIMS AGAINST COMPASS AND ITS MANAGER, CGM, FOR BREACH OF FIDUCIARY DUTY ARE BEING COMPROMISED IN THE SETTLEMENT AND UNDER THE PLAN. AS MAJORITY OWNER, COMPASS OWED STRICT FIDUCIARY DUTIES OF CARE AND LOYALTY TO LUGANO HOLDING AND ITS SUBSIDIARIES. CGM RECEIVED $252 MILLION IN MANAGEMENT FEES SINCE THE ACQUISITION, WITH $143 MILLION PAID IN JUST THE LAST TWO YEARS. CGM AND ITS CEO ELIAS SABO KNEW AND ALLOWED THE SUBSIDIARY TO OPERATE OFF-BOOK BECAUSE IT IS CONTENDED

**THAT IT DIRECTLY BENEFITED THE PARENT COMPANY'S BORROWING CAPACITY. UNDER THE SETTLEMENT AND PLAN, A VALUABLE CLAIM TO CLAW BACK THE $252 MILLION IN MANAGEMENT FEES PAID TO CGM FOR SERVICES IS BEING COMPROMISED.**

Additionally, set forth below are detailed objectionable Sections and specific misleading language of the Disclosure Statement, the Plan, and the CODI Settlement Agreement where the documents reference the alleged wrongdoing by Mr. Ferder as though they were established fact rather than the disputed, unadjudicated fraud allegations that they are. Included in red font is Mr. Ferder's proposed language to attempt to ameliorate these deficiencies.

**Category 1 — Language that presents the allegations as established fact.**

| Document / Section | Quoted language |
|---|---|
| Disclosure Statement, § II.C.2 (Corporate Governance), p. 23 | "The purview of the Special Committee includes overseeing an investigation of **the alleged fraud described above**…" Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties. |
| Disclosure Statement, § II.C.2 (Corporate Governance), p. 24 | "the Board ensured that Board members who were officers or directors of the Company **at the time of the alleged scheme** would not be involved in the related investigation or litigation." Mr. Ferder vehemently disputes the allegations. |
| Disclosure Statement, § II.C.2 (Corporate Governance), p. 24 | "The Special Committee commenced an internal investigation **surrounding the alleged fraud** to determine, among other things, what happened and what claims may exist as a result thereof." Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties. |
| Disclosure Statement, § II.C.3 (Financing Matters), p. 24 | "**Due in part to the complications relating to the alleged fraud**, the Debtors contend that the sale process allegedly took longer than anticipated." Mr. Ferder vehemently disputes the allegation. |

| Document / Section | Quoted language |
|---|---|
| Disclosure Statement, § III.F.4 (CODI Settlement), p. 30 | "the Special Committee continued its internal investigation **surrounding Mr. Ferder's** <span style="color:red">purported</span> **fraud** and an analysis of potential causes of action relating thereto." <span style="color:red">Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties.</span> |

**Category 2 — Language couched as allegation, complaint, or investigation.**

| Document / Section | Quoted language |
|---|---|
| Disclosure Statement, General Overview & Summary, § 1 (Background), p. 11 | "the Debtors' majority shareholder <span style="color:red">asserts that it</span> publicly disclosed an investigation into the Debtors' financing, accounting, and inventory practices and that Mr. Ferder had resigned from his offices and directorships…" <span style="color:red">Mr. Ferder at all times vehemently disputed and disputes the CODI Parties' allegations, asserts that the CODI Parties had knowledge of all such practices, and intends to defend himself and assert claims against the CODI Parties.</span> |
| Disclosure Statement, § II.C.1 (Discovery of Irregular Financing, Accounting, and Inventory Practices), p. 23 | "the Debtors heard from close to sixty (60) persons asserting substantial claims relating to alleged transactions ('Investment Contracts') entered into by Mr. Ferder." <span style="color:red">Mr. Ferder vehemently disputes the allegations and intends to defend himself.</span> |
| Disclosure Statement, § II.C.1, p. 23 | "The complaint included claims for fraud, concealment, constructive fraud, and breach of fiduciary duty. The complaint alleges that Mr. Ferder 'concealed and mispresented the nature of numerous financing transactions he entered into with third party, high net worth individuals.' It further alleges that these contracts 'created potential liabilities for Lugano [Diamonds], but [Mr. Ferder] disguised them as direct sales.'" <span style="color:red">Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties.</span> |
| Disclosure Statement, § II.C.1, p. 23 (continuation of the quoted complaint) | "'He <span style="color:red">purportedly</span> forged invoices and sale documents, <span style="color:red">allegedly</span> sent out empty box shipments, <span style="color:red">allegedly</span> falsely recorded the money from the third-party individuals as revenue for Lugano [Diamonds], and <span style="color:red">purportedly</span> concealed the payment obligations from Lugano [Diamonds'] books.'" <span style="color:red">Mr. Ferder vehemently disputes the allegations</span> |

| Document / Section | Quoted language |
|---|---|
| | and intends to defend himself and assert claims against the CODI Parties. |
| Disclosure Statement, § III.F.3 (Litigation and Settlements), p. 30 | "the Debtors seek a declaratory judgment that requires Travelers to tender the policy limits ($3 million) to allow the Debtors to defend themselves in connection with the matters **related to Mr. Ferder's alleged actions** and related litigation…"  Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties. |
| Disclosure Statement, Definitions — "Investment Contract," p. 96 (¶ 88) | "any contract or agreement with one or more of the Debtors or with any Ferder Affiliated Party under which an Investment Contract Counterparty provided consideration  for the shared purchase of … diamonds … in exchange for a return of principal…" |
| Plan, Definitions — "Investment Contract," p. 135 (¶ u) | Same defined term, repeated in the Plan: "…with any Ferder Affiliated Party under which an Investment Contract Counterparty provided consideration for the shared purchase of…" |
| CODI Settlement Agreement (Plan Ex. C), Recitals, p. 164 | "on June 24, 2025, Lugano Diamonds & Jewelry, Inc. commenced an action against Mr. Ferder and a related trust for which he is a trustee, asserting Claims for fraud, concealment, constructive fraud, and breach of fiduciary duty." Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties. |
| CODI Settlement Agreement, Recitals, p. 164 | "the Special Committee retained independent advisors and commenced an internal investigation **surrounding the alleged fraud allegations**, including to determine what Claims may exist as a result thereof." Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties. |
| CODI Settlement Agreement, Recitals, p. 165 | "the UCC, working with the Special Committee … also commenced an investigation into the purported **fraud allegations** and the extent and validity of the liens and Claims … asserted by CODI."  That investigation consisted of the following [Special Committee to disclose or provide its report resulting from the investigation].  Mr. Ferder vehemently disputes the allegations and intends to defend himself and assert claims against the CODI Parties. |

| Document / Section | Quoted language |
|---|---|
| CODI Settlement Agreement, ¶ 8 (Releases by the Bankruptcy Release Parties), p. 173 | release of claims "arising out of, or related to, prepetition matters with the Debtors, the Debtors' business, **the Debtors' actual or alleged fraud**, the Chapter 11 Cases…" |
| CODI Settlement Agreement, ¶ 9 (Releases by the CODI Release Parties), p. 174 | release of claims "related to, prepetition matters with the Debtors, the Debtors' business, **the Debtors' actual or alleged fraud**, the Chapter 11 Cases…" |

## IV. RESERVATION OF RIGHTS

82.    The Ferder Parties expressly reserve all rights to:

(a)    object to confirmation of the Plan on all grounds, including under Section 1129(a) and (b);

(b)    supplement, amend, or modify this Objection, including after receipt of the Plan Supplement and any amendments to the Plan or Disclosure Statement;

(c)    conduct discovery in connection with confirmation proceedings;

(d)    be heard at the Confirmation Hearing and any adjournments thereof;

(e)    object to the Plan Supplement when filed, including the list of preserved Causes of Action and any other documents or exhibits not yet provided;

(f)    protect and enforce the Ferder Parties' rights to D&O insurance coverage and a defense funded thereby, including by seeking appropriate carve-outs from any injunction or release;

(g)    join in or adopt the objections of other parties in interest; and

(h)    raise any and all additional grounds for denial of approval of the Disclosure Statement or denial of confirmation of the Plan.

83.    The Ferder Parties do not waive, and expressly preserve, all claims, defenses, counterclaims, rights of setoff and recoupment, and any and all other rights in the State Court Action, these chapter 11 cases, and any other proceedings. Nothing herein shall be deemed an

admission of the validity, priority, or amount of any claim asserted against the Ferder Parties, or a concession of any allegation made by the Debtors, CODI, or any other party.

## V. CONCLUSION

**WHEREFORE**, the Ferder Affiliated Parties respectfully request that the Court enter an order:

(i)    declining to approve the Disclosure Statement unless and until it is revised to provide adequate information within the meaning of Section 1125, including a completed Liquidation Analysis, General Unsecured Claims estimate, and identification and analysis of preserved Causes of Action;

(ii)    declining to approve the Disclosure Statement to the extent it describes a patently unconfirmable Plan, including by reason of the impermissible nonconsensual third-party releases under Plan § 11.09, the overbroad exculpation under Plan § 11.07, and the one-sided release and injunction scheme under Plan §§ 11.06 and 11.08;

(iii)    requiring revisions to the Disclosure Statement to (a) remove all characterizations of disputed allegations as established fact and include appropriate disclaimers that nothing therein constitutes a finding against, or is admissible against, the Ferder Parties; (b) adequately disclose the impact of the Plan, the CODI Settlement, the Scarselli stipulation, and the Travelers adversary proceeding on D&O insurance coverage available to former directors and officers; and (c) protect the Ferder Parties' rights to contribution, indemnity, setoff, and recoupment;

(iv)    in the alternative, and to the extent this matter proceeds on a combined basis, denying confirmation of the Plan for the reasons set forth herein; and

(v)    granting such other and further relief as is just and proper.

Dated: July 7, 2026

/s/ Jeffrey M. Schlerf
Jeffrey M. Schlerf (No. 3047)
STINSON LLP
1007 N. Orange St.
3rd Floor #127
Wilmington, DE 19801
Telephone: (302) 509-4634
Email: jeffrey.schlerf@stinson.com
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*

Sandford L. Frey (CA Bar No. 117058)
STINSON, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067
Telephone: (310) 730-7020
Email:  Sandford.frey@stinson.com
*Admitted Pro Hac Vice*
*Counsel to Mordechai Ferder individually and*
*as Trustee of the Haim Family Trust*

Jeffrey Reeves (CA Bar No. 156648)
Daniel Weiss (CA Bar No. 242022)
REEVES & WEISS LLP
3333 Michelson Dr.
Suite 300
Irvine, California 92612
Telephone: (818) 554-7601
Email:  JReeves@reevesandweiss.com
         DWeiss@reevesandweiss.com
*Admitted Pro Hac Vice*
*Counsel to Mordechai Ferder individually and*
*as Trustee of the Haim Family Trust*