**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Re Doc 614, 637, 638** |
| | **Hearing: July 14, 2026, 10:00 a.m.** |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' RESPONSE**
**TO DISCLOSURE STATEMENT OBJECTIONS**

The Official Committee of Unsecured Creditors (the "**Committee**") responds to: (a) the *Objection of the Ferder Parties to Approval of the Debtors' Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Doc 637] (the "**Ferder Objection**") filed by Mordechai Ferder and the Haim Family Trust (the "**Ferder Parties**"); and (b) the Objection of the United States Trustee to Approval of Solicitation Procedures [Doc 638].[2] The Committee also joins the responses to the Ferder Objection and the UST Objection filed by the Debtors, CODI, and the Special Committee contemporaneously with this response and, therefore, addresses here only some of the elements of the Ferder Objection.

**Response to Ferder Objection**

The Committee knows that the Debtors have responded thoroughly to the arguments the Ferder Parties make regarding alleged bases for denying approval of the Disclosure Statement,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2] Any capitalized terms used without definition in this response retain the definitions given to them in the *Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement on an Interim Basis; (B) Establishing Solicitation and Tabulation Procedures; (C) Approving the Forms of Ballots and Solicitation Materials; (D) Establishing the Voting Record Date; (E) Fixing the Date, Time, and Place for the Combined Confirmation Hearing and the Deadline for Filing Objections Thereto; and (F) Granting Related Relief* [Doc 615].

including all ten of what the Ferder Parties believe constitute "facially unconfirmable defects"[3] in the Plan. All ten of these arguments raise issues pertaining strictly to confirmation of the Plan, not to the adequacy of the Disclosure Statement, which this Court is considering only on a conditional basis at this juncture, anyway. The Ferder Parties may raise confirmation objections at the confirmation hearing. Nonetheless, without inviting the Court to engage with confirmation objections at this point, the Committee adopts all preliminary responsive arguments to the Ferder Parties' confirmation objections contained in today's filings by the Debtors, the Special Committee, and CODI. The Committee responds separately here to address the Ferder Parties' uninformed and false allegations regarding the Estates' settlement with CODI that the Plan is based on and Mr. Ferder's mischaracterizing the CODI settlement as a "sweetheart" deal. The Committee now sets the record straight.

When these cases began in November 2025, the newly-formed Committee—comprising trade creditors, diamond investment creditors, and landlords with claims totaling more than $150 million, almost surely more than half in amount of all general unsecured claims—faced a grim reality: CODI asserted a senior secured claim exceeding $700 million, secured by liens on substantially all the Estates' assets, which appeared to be worth only a fraction of CODI's claim amount. General unsecured creditors appeared to be woefully out of the money, with the Debtors pursuing a liquidation that would almost surely generate a zero recovery to all creditors other than CODI. The only way general unsecured creditors would ever be able to wrest any sort of recovery from the Estates was to prevail on claims and causes of action against CODI that would invalidate CODI's liens, equitably subordinate CODI's claims, recharacterize some or all of CODI's debt as equity, or some combination of those. To state the obvious, the Committee's principal function in

---

[3] The Committee interprets this phrase to mean that the Plan contains defects that make the plan facially unconfirmable. Obviously, the defects themselves are not "facially unconfirmable."

these cases was then, and remained for months, to investigate potential means to reduce CODI's secured claims and use what it found to create value for general unsecured creditors that, at least on paper, did not exist when these cases began.

The Committee took that function extremely seriously, commencing and conducting, for months in collaboration with the Special Committee, an aggressive, exhaustive, unrelenting investigation of CODI's relationship with the Debtors independent of influence by the Debtors, CODI, or any other party in interest. Over the course of months, the Committee and the Special Committee sought, received, and analyzed tens of thousands of documents produced by CODI and the Debtors, deposed or interviewed dozens of individuals with pertinent knowledge regarding CODI's relationship with the Debtors, and researched numerous potential legal and factual bases for articulating and substantiating affirmative claims against CODI. That investigation's results caused CODI to agree to a mediation with representatives of the Special Committee and the Committee. For what it's worth, the Committee shared Mr. Ferder's view that these potential claims were meritorious and valuable—although pursuing them would likely have been extremely expensive (without any obvious source of funding) and beset with the kind of risk that typically attends complex litigation against a senior secured creditor. For example, establishing a basis for equitable subordination of CODI's claim would have been one thing, but obtaining a remedy for that subordination that would have conferred a genuine economic benefit on unsecured creditors was quite another. The law on the practical implications of equitably subordinating a secured creditor's claim is anything but clear.

The mediation lasted several days and ultimately resulted in a highly detailed, strenuously negotiated settlement that became the basis for the Plan. Most importantly for the Committee and its constituency, the settlement wrought a seismic shift in the economics of these Chapter 11 cases. General unsecured creditors went from facing a complete wipeout to a Plan that is estimated to

produce a cash dividend to general unsecured creditors of approximately 28–39% of allowed claims. In a liquidating estate where the senior secured creditor asserts a claim exceeding the value of all estate property by a significant multiple, going from a zero recovery to a 28–39% recovery is an extraordinary, laudable, even surprising result. That kind of turnabout is not commonplace in liquidating Chapter 11 cases, to say the least.

Hardly a "sweetheart" deal, the CODI settlement and the resulting Plan produce a recovery for general unsecured creditors that, on a percentage basis, far, far exceeds CODI's recovery on its senior secured claim.[4] It is certainly fair to say that CODI never would have agreed to such a settlement had the Committee and the Special Committee not succeeded spectacularly in substantiating meritorious potential claims against CODI based on a rigorous, thorough investigation. Although CODI has always maintained that it is not liable to the Estates under any of these potential claims, it chose to settle with the Estates to avoid the substantial risks associated with defending the claims the Committee and the Special Committee identified and supported with extensive evidence obtained during the course of a months-long investigation.

To be fair, the Ferder Parties did not have the benefit of the Debtors' liquidation analysis when they filed the Ferder Objection. The Debtors filed their liquidation analysis [Doc 636], showing the economic implications of the CODI settlement the same day as the deadline to object to the Disclosure Statement. Had Mr. Ferder been able to review the liquidation analysis, one hopes he—as someone who claims to be a large general unsecured creditor himself—would appreciate, even revel in, the extraordinary result obtained for unsecured creditors.

As for the Disclosure Statement's portrayal of Mr. Ferder, his conduct as the Debtors' CEO, and his dealings with the Debtors' customers and suppliers, Mr. Ferder is entitled to his own

---

[4] The Debtor's liquidation analysis [Doc 636] estimates that CODI will receive approximately a 6% return on its senior secured claim while general unsecured creditors (apart from convenience claim creditors) will receive approximately a 28-39% return.

opinions. The Committee agrees with the Debtors' approach to include in the Disclosure Statement much of Mr. Ferder's proposed language, albeit not so floridly and not with RED CAPITAL LETTERS.

Further, the Committee supports the Debtors' including additional language in the Disclosure Statement that better depicts the investigation, mediation, and settlement process described above. That additional disclosure will allow all creditors to gain a more complete understanding of what occurred and why the CODI settlement constitutes an extraordinary development that has produced an extraordinary result for unsecured creditors.

## Conclusion

For these reasons, and those argued in responses filed today by the Debtors, the Special Committee, and CODI (which the Committee fully adopts), the Court should conditionally approve the Disclosure Statement and permit these Estates to commence a process to confirm a Plan that represents what can only be considered a rousing success for all unsecured creditors.

Dated:    July 9, 2026          Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

James E. O'Neill, Esq. (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone:    (302) 652-4100
Email:          joneill@pszjlaw.com

- and -

Jeffrey N. Pomerantz, Esq. (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone:    (310) 277-6910
Email:          jpomerantz@pszjlaw.com

- and -

John A. Morris, Esq. (admitted *pro hac vice*)
Jordan A. Kroop, Esq. (admitted *pro hac vice*)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone:    (212) 561-7700
Email:          jmorris@pszjlaw.com
                   jkroop@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*