**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al*.,[1] | Case No. 25-12055 (BLS) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 614** |

**NOTICE OF FILING OF BLACKLINE OF DISCLOSURE STATEMENT**
**FOR THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF**
**LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE** that, on June 24, 2026, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 614] (as may be amended, modified, or supplemented from time to time, the "Disclosure Statement") with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, to address certain informal comments received to the Disclosure Statement, contemporaneously herewith, the Debtors filed a revised version of the Disclosure Statement (the "Amended Disclosure Statement").

**PLEASE TAKE FURTHER NOTICE** that, for the convenience of the Court and all parties in interest, a blackline reflecting the revisions made to the Amended Disclosure Statement against the Disclosure Statement is attached hereto as **Exhibit A**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights to further amend, supplement or modify the Amended Disclosure Statement. Copies of the Amended Disclosure Statement and other related documents in these chapter 11 cases are on file with the Clerk of Court, Third Floor, 824 North Market Street, Wilmington, Delaware 19801 and are available on the Debtors' claims and noticing agent's website free of charge at https://omniagentsolutions.com/Lugano.

*[Signature Page to Follow]*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

Dated: July 9, 2026
     Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

/s/ Shella Borovinskaya
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Brynna M. Gaffney (Del. No. 7402)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:   emorton@ycst.com
      sbeach@ycst.com
      sborovinskaya@ycst.com
      bgaffney@ycst.com

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (admitted *pro hac vice*)
Traci L. Shafroth (admitted *pro hac vice*)
Scott Friedman (admitted *pro hac vice*)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone:  (415) 496-6723
Facsimile:  (650) 636-9251
Email:   tkeller@kbkllp.com
      tshafroth@kbkllp.com
      sfriedman@kbkllp.com

*Attorneys for Debtors*
*and Debtors-in-Possession*

**<u>Exhibit A</u>**

**Blackline**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS PROPOSED DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO BUY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC., *et al*.,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered) |

**DISCLOSURE STATEMENT FOR THE**
**AMENDED CHAPTER 11 PLAN OF LIQUIDATION**
**OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

Dated:  ~~June 24~~July 9, 2026

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Emails: emorton@ycst.com
         sbeach@ycst.com
         sborovinskaya@ycst.com

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows:  Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc.  (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308).  The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

60267091.6

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (admitted *pro hac vice*)
Traci L. Shafroth (admitted *pro hac vice*)
Scott Friedman (admitted *pro hac vice*)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone:  (415) 496-6723
Facsimile:   (650) 636-9251
Emails: tkeller@kbkllp.com
       tshafroth@kbkllp.com
       sfriedman@kbkllp.com

*Attorneys for Debtors*
*and Debtors-in-Possession*

60267091.6

## DISCLAIMER

THIS DISCLOSURE STATEMENT PROVIDES INFORMATION REGARDING THE *AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS*, WHICH PLAN THE DEBTORS ARE SEEKING TO HAVE CONFIRMED BY THE BANKRUPTCY COURT.  THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT REGARDING THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN DOCUMENTS RELATING TO THE PLAN.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  THE DEBTORS RESERVE THE RIGHT TO MODIFY THE PLAN CONSISTENT WITH SECTION 1127 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3019.

THE STATEMENTS CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN.  ALTHOUGH THE DEBTORS HAVE MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERIES UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OR DO NOT OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR ANY OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER SUCH AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.  ALL PERSONS OR ENTITIES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENTS WERE PREPARED.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT

i

MAY BE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.   STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES AND REPRESENT THE DEBTORS' ESTIMATES AND ASSUMPTIONS ONLY AS OF THE DATE SUCH STATEMENTS WERE MADE AND INVOLVE KNOWN AND UNKNOWN RISKS, UNCERTAINTIES, AND OTHER UNKNOWN FACTORS THAT COULD IMPACT THE PLAN OR DISTRIBUTIONS THEREUNDER.   IN ADDITION TO STATEMENTS THAT EXPLICITLY DESCRIBE SUCH RISKS AND UNCERTAINTIES, READERS ARE URGED TO CONSIDER STATEMENTS LABELED WITH THE TERMS "BELIEVES," "BELIEF," "EXPECTS," "INTENDS," "ANTICIPATES," "PLANS," OR SIMILAR TERMS TO BE UNCERTAIN AND FORWARD-LOOKING. CREDITORS AND OTHER INTERESTED PARTIES SHOULD ALSO REVIEW THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "RISK FACTORS" FOR A DISCUSSION OF CERTAIN FACTORS THAT MAY AFFECT THE PLAN AND DISTRIBUTIONS THEREUNDER.

THE DEADLINE TO VOTE ON THE PLAN IS AUGUST 18, 2026 AT 4:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT BEFORE THE VOTING DEADLINE.

 PLEASE BE ADVISED THAT ARTICLE XI OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AMONG OTHER PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MAY BE AFFECTED THEREUNDER.

60267091.6

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................... 2

    A.    Overview of the Plan ............................................................................................. 3

        1.    General Structure of the Plan ..................................................................... 3
        2.    Material Terms of the Plan ......................................................................... 4
        3.    Summary of Treatment of Claims and Equity Interests Under the Plan ...... 5

    B.    Plan Voting Instructions and Procedures ............................................................... 6

        1.    Voting Rights .............................................................................................. 6
        2.    Solicitation Materials ................................................................................. 7
        3.    Voting Instructions and Procedures ............................................................ 8
        4.    Elections and Contributions .................................................................... ~~10~~2
        5.    Confirmation Hearing and Deadline for Objections to Confirmation ....... ~~11~~3

II.    BACKGROUND REGARDING LUGANO ................................................................... ~~12~~4

    A.    General Background ........................................................................................... ~~12~~4
    B.    Corporate and Capital Structure ........................................................................ ~~12~~5
    C.    Events Leading Up to the Chapter 11 Cases ....................................................... ~~13~~5

        1.    Discovery of Irregular Financing, Accounting, and Inventory Practices ... ~~13~~5
        2.    Corporate Governance .............................................................................. ~~14~~6
        3.    Financing Matters ..................................................................................... ~~14~~6
        4.    The Sales Process and Commencement of These Cases .............................. ~~15~~7

III.    THE CHAPTER 11 CASES ......................................................................................... ~~15~~7

    A.    First Day Orders and Initial Employment Applications ....................................... ~~16~~8
    B.    The Agency Agreement and Related Motions ..................................................... ~~16~~8
    C.    DIP Financing Motion and Cash Collateral ........................................................ ~~17~~9
    D.    Appointment of the Creditors' Committee .......................................................... ~~18~~10
    E.    Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims .. ~~18~~10

        1.    General Information .................................................................................. 10
        2.    Investment Contract Claims ...................................................................... 11
        3.    Claims Asserted by Ferder Parties ............................................................ 12

    F.    Other Events During the Chapter 11 Cases .......................................................... ~~19~~12

        1.    Executory Contracts and Unexpired Leases and Related Settlements ........ ~~19~~12
        2.    Requests for Relief from the Automatic Stay. ............................................. ~~19~~12
        3.    Litigation and Settlements ......................................................................... ~~20~~13

            (a)    Ferder Litigation ........................................................................ 13
            (b)    Other Litigation and Settlements ................................................ 14

        4.    CODI Settlement ....................................................................................... ~~20~~14

IV.    SUMMARY OF THE JOINT CHAPTER 11 PLAN ..................................................... ~~22~~17

    A.    Purpose and Effect of the Plan ............................................................................ ~~23~~17
    B.    Substantive Consolidation and Its Relationship to the Plan Treatment of Claims ... ~~23~~18

60267091.6

C.  The Liquidation Trust and the Liquidation Analysis ................................... 2419
D.  Treatment of Claims and Equity Interests ................................................. 2520

   1.  Unclassified Claims .......................................................................... 2520

      (a)  Administrative Claims ........................................................... 2520
      (b)  Professional Fee Claims and Ordinary Course Professional Fee
           Claims .................................................................................. 2621
      (c)  Priority Tax Claims ............................................................... 2622
      (d)  DIP Claims ........................................................................... 2722

   2.  Class 1: Other Secured Claims ......................................................... 2722
   3.  Class 2: Priority Claims ................................................................... 2823
   4.  Class 3: CODI Claim ....................................................................... 2823
   5.  Class 4: General Unsecured Claims .................................................. 2924
   6.  Class 5: Convenience Class Claims .................................................. 3025
   7.  Class 6: Intercompany Claims .......................................................... 3025
   8.  Class 7: Subordinated Claims .......................................................... 3025
   9.  Class 8: Equity Interests .................................................................. 3025
   10. Special Provisions Regarding Insured Claims ................................... 3126
   11. Resolution of Claims and Controversies. ......................................... 3126

E.  Acceptance or Rejection of Plan ............................................................. 3126

   1.  Impaired Classes of Claims Entitled to Vote .................................... 3126
   2.  Modifications of Votes ..................................................................... 3227
   3.  Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .. 3227
   4.  Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes 3227

F.  Implementation of the Plan ..................................................................... 3227

   1.  Implementation of the Plan .............................................................. 3227
   2.  Streamlining the Debtors' Corporate Affairs .................................... 3227

      (a)  Debtors' Existing Directors, Officers, and Managers ............. 3227
      (b)  Dissolution of the Debtors and Cancellation of Equity Interests .. 3327
      (c)  Corporate Documents and Corporate Authority ..................... 3328
      (d)  Vesting of Estate Assets ....................................................... 3328
      (e)  Disposal and Use of Property ................................................ 3328
      (f)  Representative of the Estates ................................................. 3429
      (g)  Tax Refund ........................................................................... 3429

   3.  Liquidation Trust ............................................................................. 3429

      (a)  Liquidation Trust Interests .................................................... 3429
      (b)  Appointments ....................................................................... 3429
      (c)  Creation and Governance of the Liquidation Trust ................ 3529
      (d)  Vesting of Liquidation Trust Assets ....................................... 3530
      (e)  Contribution of Contributed Claims. ..................................... 3530
      (f)  Purpose of the Liquidation Trust ........................................... 3530
      (g)  Authority .............................................................................. 3630
      (h)  Limitation of Liability ........................................................... 3631
      (i)  Indemnification ..................................................................... 3631
      (j)  Distributions from the Liquidation Trust ................................ 3631
      (k)  Exemption ............................................................................ 3631

60267091.6

|  |  |  |  |
|---|---|---|---|
| (l) | Termination of the Liquidation Trust | | 36 31 |
| (m) | Control Provision | | 36 31 |
| 4. | Preservation of Privileges and Defenses | | 36 31 |
| 5. | Creation and Funding of Reserves | | 37 31 |
| (a) | Reserves for Specified Purposes Only | | 37 32 |
| (b) | Professional Fee Reserve | | 37 32 |
| (c) | Liquidation Trust Expense Reserve | | 37 32 |
| (d) | Effective Date Reserves | | 37 32 |
| 6. | Preservation of Causes of Action | | 38 32 |
| (a) | Preservation of All Causes of Action Not Expressly Settled or Released | | 38 32 |
| 7. | Cancellation of Instruments | | 38 33 |
| 8. | Substantive Consolidation | | 38 33 |
| G. | Executory Contracts and Unexpired Leases | | 39 34 |
| 1. | Assumption of Certain Executory Contracts and Unexpired Leases | | 39 34 |
| (a) | Assumption of Agreements | | 39 34 |
| (b) | Cure Payments | | 40 35 |
| (c) | Objections to Assumption/Cure Payment Amounts | | 40 35 |
| (d) | Resolution of Claims Relating to Assumed Contracts and Leases | | 41 35 |
| (e) | Insurance Policies | | 41 36 |
| 2. | Rejection of Executory Contracts and Unexpired Leases | | 42 38 |
| (a) | Rejected Agreements | | 42 38 |
| (b) | Rejection Claims Bar Date | | 42 38 |
| H. | Provisions Governing Distributions | | 43 38 |
| 1. | Timing of Distributions for Allowed Claims | | 43 38 |
| 2. | Calculating Distributions and Related Matters | | 43 38 |
| 3. | Interest and Other Amounts Regarding Claims | | 43 38 |
| 4. | Distributions | | 43 39 |
| 5. | Means of Cash Payment | | 43 39 |
| 6. | Form of Currency for Distributions | | 44 39 |
| 7. | Fractional Distribution | | 44 39 |
| 8. | De Minimis Distributions | | 44 39 |
| 9. | No Distributions with Respect to Certain Claims | | 44 40 |
| 10. | Distributions After Allowance | | 45 40 |
| 11. | Delivery of Distributions | | 45 40 |
| 12. | Application of Distribution Record Date and Other Transfer Restrictions | | 45 41 |
| 13. | Withholding, Payment, and Reporting Requirements Regarding Distributions | | 46 41 |
| 14. | Defenses and Setoffs | | 46 41 |
| 15. | Allocation of Distributions | | 46 42 |
| 16. | Joint Distributions | | 46 42 |
| 17. | Forfeiture of Distributions | | 47 42 |
| I. | Disputed, Contingent, and Unliquidated Claims | | 47 42 |
| 1. | Objections to and Resolution of Disputed Claims | | 47 42 |

|    | 2. | Claim Objections | 47 42 |
|    | 3. | Estimation of Certain Claims | 47 43 |
| J. |    | Conditions Precedent to the Effective Date | 48 43 |
|    | 1. | Conditions to the Effective Date | 48 43 |
|    | 2. | Waiver of Conditions to the Effective Date | 48 43 |
|    | 3. | Effect of Non-Occurrence of Conditions to the Effective Date | 48 44 |
|    | 4. | Notice of the Effective Date | 49 44 |
| K. |    | Retention of Jurisdiction and Power | 49 44 |
|    | 1. | Scope of Retained Jurisdiction and Power | 49 44 |
|    | 2. | Reserved Rights to Seek Bankruptcy Court Approval | 50 46 |
|    | 3. | Non-Exercise of Jurisdiction | 51 46 |
| L. |    | Miscellaneous Provisions | 51 46 |
|    | 1. | Payment of Statutory Fees and Post-Confirmation Reports | 51 46 |
|    | 2. | Dissolution of the Creditors' Committee | 51 47 |
|    | 3. | Modifications and Amendments | 51 47 |
|    | 4. | Severability of Plan Provisions | 52 47 |
|    | 5. | Binding Effect of Plan | 52 48 |
|    | 6. | Injunctions | 52 48 |
|    | 7. | Exculpation | 53 48 |
|    | 8. | Releases by the Debtors | 54 49 |
|    | 9. | Releases by Holders of Claims | 55 50 |
|    | 10. | Term of Injunctions or Stays | 56 51 |
|    | 11. | Revocation, Withdrawal, or Non-Consummation | 56 51 |
|    | 12. | Exemption from Transfer Taxes | 56 51 |
|    | 13. | Computation of Time | 57 52 |
|    | 14. | Transactions on Business Days | 57 52 |
|    | 15. | Good Faith | 57 52 |
|    | 16. | Governing Law | 57 52 |
|    | 17. | Notices | 57 52 |
|    | 18. | Final Decree | 57 53 |
|    | 19. | Closing of Certain Chapter 11 Cases | 58 53 |
|    | 20. | Additional Documents | 58 53 |
|    | 21. | Conflicts | 58 53 |
| V. | | RISK FACTORS | 58 54 |
| A. | | Parties May Object to the Plan's Classification of Claims and Equity Interests | 59 54 |
| B. | | The Debtors May Not Be Able to Obtain Confirmation of the Plan | 59 54 |
| C. | | The Conditions Precedent to the Effective Date of the Plan May Not Occur | 59 54 |
| D. | | Claims Estimation and Allowance of Claims | 59 54 |
| E. | | Potential Pursuit of Liquidation Trust Actions Against Creditors and Others | 59 55 |
| F. | | Risks Regarding Liquidation Trust Assets | 60 55 |
| G. | | Tax Considerations | 61 56 |
| VI. | | CONFIRMATION OF THE PLAN | 61 56 |
| A. | | The Confirmation Hearing | 61 56 |
| B. | | Requirements for Confirmation of the Plan | 61 56 |
| C. | | Best Interests of Creditors | 62 57 |

60267091.6

D.     Feasibility ..................................................................................... ~~63~~58

E.     Acceptance by Impaired Classes ................................................... ~~63~~59

F.     Confirmation Without Acceptance by All Impaired Classes ........... ~~64~~59

    1.     No Unfair Discrimination ....................................................... ~~64~~59

    2.     Fair and Equitable Test ......................................................... ~~65~~60

G.     Alternatives to Confirmation and Consummation of the Plan ........ ~~65~~60

VII.     CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN ............... ~~65~~61

A.     General ............................................................................................ ~~65~~61

B.     Exemption from Registration Under the Securities Act and Blue Sky Laws .......... ~~66~~61

    1.     Issuance of Liquidation Trust Interests under Plan ................... ~~66~~61

    2.     Resale of Liquidation Trust Interests After Plan Effective Date .......... ~~66~~62

VIII.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... ~~67~~62

A.     Certain U.S. Federal Income Tax Consequences of the Liquidation Trust .......... ~~69~~64

B.     Consequences to Holders of Claims Generally ................................ ~~70~~65

C.     Consequences to Liquidation Trust Beneficiaries ............................ ~~71~~67

D.     Withholding on Distributions and Information Reporting .................. ~~72~~68

IX.     RECOMMENDATION ......................................................................... ~~73~~69

60267091.6

## EXHIBITS & SCHEDULES

**EXHIBIT A**         Joint Chapter 11 Plan of Liquidation

**EXHIBIT B**         Liquidation Analysis

> **THE EXHIBITS AND SCHEDULES ATTACHED TO THIS DISCLOSURE STATEMENT ARE INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

60267091.6

### GENERAL OVERVIEW AND SUMMARY

This Disclosure Statement (the "Disclosure Statement") describes the historical background that led to the bankruptcy cases of Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds") and its affiliated debtors and debtors in possession (collectively, "Lugano" or the "Debtors"), explains what has happened in the Debtors' bankruptcy cases, and sets forth the treatment of Claims and Equity Interests in the Debtors' proposed plan of liquidation, titled the *Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* (as amended, modified, or supplemented from time to time pursuant to its terms, the "Plan").[2]  A copy of the Plan is attached hereto as **Exhibit A**.

This overview and summary section highlights the main points discussed in the Disclosure Statement and should be read in conjunction with the remainder of the Disclosure Statement.  This general overview and summary section is qualified by the discussion below and by the express terms of the Plan.

1.    **Background**

The Debtors were established by Mordechai Haim Ferder and his wife, Idit Ferder, in 2004 as a designer, manufacturer, and retailer of high-end jewelry.  Until early spring 2025, Lugano appeared to be a highly profitable and rapidly growing business, operating eight retail locations in the United States, as well as an equestrian division and pop-up show rooms.  One of Lugano Diamond's subsidiaries operated a retail store in London, UK.

In May 2025, the Debtors' majority shareholder publicly disclosed an investigation into the Debtors' financing, accounting, and inventory practices and that Mr. Ferder had resigned from his offices and directorships with Lugano and its affiliates. Following the announcement of the investigation, the Debtors took steps to stabilize their operations and engaged Armory Securities, LLC as their financial advisor and investment banker in connection with a possible restructuring, sale, or financing.  The ensuing sale and restructuring efforts led to the Debtors' entry into an Agency Agreement (the "Agency Agreement") with Enhanced Retail Funding, LLC (the "Agent") dated as of November 16, 2025.

On November 16, 2025 (the "Petition Date"), the Debtors commenced their chapter 11 cases.  They immediately sought certain "First Day" relief, including interim approval of the Agency Agreement, interim approval of debtor-in-possession financing and the use of cash collateral, and authority to make payments to certain prepetition creditors, including their employees for accrued wages and expenses.  The Bankruptcy Court granted certain relief, including authorizing the Debtors to perform under the Agency Agreement on an interim basis.  The Bankruptcy Court authorized the Debtors to assume the Agency Agreement on a final basis on December 31, 2025.  Further information about the first day motions and the commencement of the Chapter 11 Cases is provided below.

---

[2]    All capitalized terms used but not defined herein shall have the meanings provided to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

60267091.6

2. **Debtors' Proposed Bankruptcy Plan**

The Plan provides for the creation of a Liquidation Trust, which will own (a) the Debtors' remaining assets, other than any tax refunds owed to Lugano Holding, Inc., and (b) the stock of Debtor Lugano Holding, Inc. after the Effective Date of the Plan.  The Plan also implements a settlement agreement among the Debtors, the Creditors' Committee and CODI.

As a result of a settlement among the Debtors (acting through the Special Committee), CODI, and the Committee (the "CODI Settlement"), the Debtors anticipate a recovery to holders of Allowed General Unsecured Claims.  The Plan incorporates the terms of the CODI Settlement and provides that the Liquidation Trustee will monetize any of the Debtors' remaining non-cash assets, including litigation claims against third parties, and distribute the proceeds to creditors in accordance with the Plan and the Liquidation Trust Agreement.  The Plan provides that the Liquidation Trustee may pursue additional causes of action against third parties, other than CODI who will receive a complete release.  Because of the unpredictable and highly contingent nature of the litigation claims, the estimated recoveries to creditors set forth below do not take into account potential proceeds of these litigation claims.

Under the Plan, Administrative Claims, Priority Claims, and Other Secured Claims, and Priority Tax Claims will receive Cash Distributions in the amount of their Allowed Claims on or soon after the Effective Date (or, if later, following their Claim becoming Allowed) in accordance with the Plan and as described further herein.  Priority Tax Claims will receive Cash Distributions in the amount of their Allowed Claims on or after the Effective Date or in regular installment payments plus interest (subject to prepayment).  Holders of Convenience Class Claims (those non-priority unsecured Claims less than or equal to $10,000 or which the Holders elect to reduce their Claims to $10,000) will be paid 50% of the amount of their Allowed Claims on or soon after the Effective Date.

The Holders of Allowed General Unsecured Claims will receive General Beneficial Interests in the Liquidation Trust, and the Holder of the CODI Claim will receive the Special Beneficial Interest.  The Special Beneficial Interest and the General Beneficial Interests receive allocations and distributions from the Liquidation Trust based on the type of asset being liquidated.  Holders of Subordinated Claims or Equity Interests will not receive any Distribution on account of Subordinated Claims or Equity Interests.

The Plan provides for the substantive consolidation of all of the Debtors into one consolidated estate for purposes of voting and the treatment of Claims and Distributions under the Plan.  Thus, for example, if one debtor holds $100 of assets and owes $0 of liabilities, and a different debtor holds $0 of assets and owes $100 of liabilities, the consolidation of those two entities would treat those two entities for all purposes under the Plan as a single entity that will hold $100 of assets and owe $100 of liabilities.

I. **INTRODUCTION**

Lugano Diamonds and the other Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") hereby submit this Disclosure Statement pursuant to sections 1125 and

1126(b) of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan.

The purpose of this Disclosure Statement is to enable Creditors that are entitled to vote on the Plan to make an informed decision when exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, their reasons for seeking protection under chapter 11 of the Bankruptcy Code, the course of these Chapter 11 Cases, and the anticipated orderly liquidation of the Estate Assets. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting and election procedures that Creditors entitled to vote under the Plan must follow for their votes to be counted.

## A.      Overview of the Plan

### 1.      General Structure of the Plan

A bankruptcy plan is a vehicle for satisfying the rights of holders of claims against and equity interests in a debtor. Consummation of a plan is the overriding purpose of a chapter 11 case. Upon confirmation and effectiveness, a plan becomes binding on the debtor and all of its creditors and equity interest holders.

In these Chapter 11 Cases, the Plan contemplates a liquidation of each of the Debtors and is therefore referred to as a "plan of liquidation." The Debtors' remaining assets largely consist of cash and the proceeds of the Bankruptcy Court-approved Agency Agreement, tax refunds, and Causes of Action. The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates. The estimated recoveries to creditors set forth in this Disclosure Statement do not include any estimate of potential proceeds of the Liquidation Trust Actions because they are unpredictable and highly contingent. Among other things, although the Debtors believe that such litigation claims exist, the ability to collect any judgment on certain of those claims is unknown at this time.

The Plan proposes to consolidate the Debtors' assets and liabilities, and thereafter provides for the creation of a Liquidation Trust and the appointment of a Liquidation Trustee. The Liquidation Trustee will administer and liquidate property of the Debtors and their Estates pursuant to the Liquidation Trust Agreement, subject to the supervision and oversight of the Liquidation Trust Oversight Board and the Liquidation Trustee, respectively, all as described more fully in Section IV.F of this Disclosure Statement. The Plan also provides for the funding of the Liquidation Trust and for Distributions to be made to Holders of Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed DIP Claims, Allowed CODI Claims, Allowed Other Secured Claims, Allowed Priority Claims, Allowed General Unsecured Claims, and Allowed Convenience Class Claims. The Plan also provides for the cancellation of all Subordinated Claims and all Equity Interests in the Debtors, the issuance of a share Lugano Holding, Inc. to the Liquidation Trust, the dissolution and wind up of the affairs of the Debtors, and the administration of any remaining assets of the Debtors' Estates by

the Liquidation Trustee (other than the Tax Refunds, which will be administered by Lugano Holding, Inc., referred to in the Plan as a Post-Confirmation Debtor).

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE RECOVERIES TO CREDITORS, AND IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CONSTITUENTS. FOR THESE REASONS, THE DEBTORS AND THE CREDITORS' COMMITTEE URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN.**

### 2.      Material Terms of the Plan

The following is a general overview of certain material terms of the Plan:

- All Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Claims will be paid or otherwise satisfied in full as required by the Bankruptcy Code, unless otherwise agreed to by the Holders of such Claims and the Liquidation Trustee.

- Holders of Allowed CODI Claims will receive the Special Beneficial Interest in full satisfaction of their Claims against the Debtors and their estates and the Allowed DIP Claim is deemed satisfied in connection with the CODI Settlement.

- Holders of Allowed General Unsecured Claims will receive General Beneficial Interests in full satisfaction of their Claims against the Debtors and their estates.

- Holders of Allowed Convenience Class Claims will receive 50% of their Allowed Claims in Cash in full satisfaction of their Claims against the Debtors and their estates.

- Holders of Subordinated Claims will not receive or retain any property or interest in property under the Plan on account of such Subordinated Claims.

- Holders of Intercompany Claims (i.e., Claims that could be asserted by one Debtor against another Debtor) will not receive or retain any property or interest under the Plan on account of such Intercompany Claims.

- All Equity Interests in the Debtors shall be deemed void, cancelled, and of no further force and effect. On and after the Effective Date, Holders of Equity Interests shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Equity Interests. The Liquidation Trust will become the sole owner of the Post-Confirmation Debtor and will hold such ownership interest as a Liquidation Trust Asset.

- The Debtors will be substantively consolidated into Lugano Diamonds, with the result that any claim against any Debtor will be deemed a claim against Lugano Diamonds, identical claims against multiple Debtors will be treated as a single claim, and the assets of the Debtors collectively will be treated as belonging to a single, consolidated estate.

- The Liquidation Trust will (a) sell, liquidate, transfer, or otherwise dispose of the Liquidation Trust Assets, (b) pursue Causes of Action for the collective benefit of all the Liquidation Trust Beneficiaries, (c) wind down the Debtors and the Post-Confirmation Debtor, and (d) make Distributions, all in accordance with the Plan.

### 3. Summary of Treatment of Claims and Equity Interests Under the Plan

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan.

THE PROJECTED RECOVERIES FOR PREPETITION SECURED CLAIMS AND GENERAL UNSECURED CLAIMS SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ACTUAL RECOVERIES MAY DIFFER MATERIALLY. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE PLAN.

| CLASS | DESCRIPTION | IMPAIRED/ UNIMPAIRED | PROJECTED RECOVERY |
|---|---|---|---|
| None | Administrative Claims | Unimpaired | 100% |
| None | Professional Fee Claims | Unimpaired | 100% |
| None | Priority Tax Claims | Unimpaired | 100% |
| None | DIP Claims | Unimpaired | 100% (deemed satisfied by treatment of the CODI Claims) |
| Class 1 | Other Secured Claims | Unimpaired (presumed to accept) | 100% |
| Class 2 | Priority Claims | Unimpaired (presumed to accept) | 100% |
| Class 3 | CODI Claims | Impaired | 6.0% to 6.4% Allocable portion of Litigation Trust distributions [3] |
| Class 4 | General Unsecured Claims | Impaired | 27.9% to 39.0% Allocable portion of Litigation Trust distributions [4] |
| Class 5 | Convenience Class Claims | Impaired | 50% of Allowed Claim (Allowed Claim not to |

---

[3] Assumes no proceeds or expenses associated with litigation against GT or other third parties.

[4] Assumes no proceeds or expenses associated with litigation against GT or other third parties.

| | | | exceed $10,000). |
|---|---|---|---|
| Class 6 | Intercompany Claims | Impaired (deemed to reject) | 0% |
| Class 7 | Subordinated Claims | Impaired (deemed to reject) | 0% |
| Class 8 | Equity Interests | Impaired (deemed to reject) | 0% |

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTORS AND THUS RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

**B.      Plan Voting Instructions and Procedures**

**1.      Voting Rights**

a.      <u>Unclassified Claims</u>.    Unclassified Claims (i.e., DIP Claim, Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are entitled to be paid in full unless each Holder of such a Claim agrees otherwise and are not entitled to vote on the Plan.

b.      <u>Classified Claims.</u>    Under the Bankruptcy Code, only classes of claims or interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan under section 1126 of the Bankruptcy Code are entitled to vote to accept or reject such plan.  A class of claims or interests is deemed not to have accepted the plan if such class is not entitled to receive or retain any property under the plan on account of such claims or interests.  Any class that is "unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted such plan.  As set forth in section 1124 of the Bankruptcy Code, a class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified or altered by the proposed plan.  Holders of claims or interests within an impaired class are entitled to vote to accept or reject a plan if such claims or interests are "allowed" under section 502 of the Bankruptcy Code or temporarily allowed for purposes of accepting or rejecting a plan.

Under the Bankruptcy Code, acceptance of a plan by a class of claims is determined by calculating the number and the dollar amount of allowed claims voting to accept such plan. Acceptance by a class of claims requires more than one-half of the number of total allowed claims voting in the class to vote in favor of the plan and at least two-thirds in dollar amount of the total allowed claims voting in the class to vote in favor of the plan, without counting votes of creditors whose claims are "designated" because, for example, the votes were procured in bad faith.  Thus, a Class of Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number that actually vote cast their Ballots in favor of acceptance.

Pursuant to the Plan, Claims in Class 3, Class 4, and Class 5 are Impaired by, and entitled to receive a Distribution under, the Plan; and only the Holders of Claims in those Classes that are Allowed Claims or have been deemed allowed for voting purposes are entitled to vote to accept or reject the Plan.  Only Holders of Claims in Class 3, Class 4, and Class 5 as of the dates

specified in the Disclosure Statement Order (the "Voting Record Date") may vote to accept or reject the Plan.

Pursuant to the Plan, Claims in Class 1 and Class 2 are Unimpaired by the Plan. Such Holders are conclusively presumed to have accepted the Plan and are therefore not entitled to vote on the Plan.

The Debtors will not solicit the votes of Holders of any Intercompany Claims in Class 6, Subordinated Claims in Class 7, or Equity Interests in Class 8.  Intercompany Claims in Class 6, Subordinated Claims in Class 7, and Equity Interests in Class 8 will not receive or retain any property under the Plan on account of such Claims or Equity Interests, and are therefore deemed to reject the Plan and are not entitled to vote on the Plan.

**2.      Solicitation Materials**

The Debtors, with the approval of the Bankruptcy Court, have engaged Omni Agent Solutions, Inc. (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots and to generally oversee the voting process.  The following materials constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits and Schedules thereto, are accessible via a QR Code link or at the Voting Agent's website, https://omniagentsolutions.com/lugano;

- The Bankruptcy Court order approving this Disclosure Statement on a conditional basis (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, to be used in voting to accept or to reject the Plan make a Convenience Class Election, contribute and assign any and all of their Contributed Claims, and opt-out of third party releases, and applicable instructions with respect thereto (the "Voting Instructions");

- A Contribution Form for certain Holders of Claims to contribute Contributed Claims to the Liquidation Trust.

- A pre-addressed, postage pre-paid return envelope;

- A Plan support letter prepared by the Creditors' Committee; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtors, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.  The Solicitation Package is also available without charge at the Debtors' restructuring website at https://omniagentsolutions.com/lugano.

Seven days before the earlier of the Voting Deadline or the deadline for filing objections to Confirmation of the Plan, the Debtors will File a Plan Supplement.  As the Plan Supplement is updated or otherwise modified, it will be made available without charge at the Debtors' restructuring website at https://omniagentsolutions.com/lugano.

If you are the Holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to:

Lugano Diamonds & Jewelry Inc., et al. Ballot Processing
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367
Email:  LuganoInquiries@OmniAgnt.com
Phone:  888.902.1791

If your Claim is subject to a pending claim objection and you wish to vote on the Plan, you must File with the Bankruptcy Court a motion pursuant to Bankruptcy Rule 3018 for the temporary allowance of your Claim for voting purposes and your Claim or portion thereof, as applicable, must be temporarily allowed by the Bankruptcy Court for voting purposes by the Voting Deadline or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTORS AND THE LIQUIDATION TRUST, AS APPLICABLE, RESERVE THE RIGHT, THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW OR SUBORDINATE ANY CLAIM, EXCEPT AS MAY BE EXPRESSLY PROVIDED OTHERWISE IN THE PLAN OR CONFIRMATION ORDER.**

### 3.    Voting Instructions and Procedures

As set forth in the Disclosure Statement Order, all votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtors or the Voting Agent.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed the Voting Record Date for the determination of the Holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is August 18, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline")**.  In order for your vote to be counted, your Ballot must be

properly completed in accordance with the Voting Instructions on the Ballot, and actually received no later than the Voting Deadline, either by (i) submitting an electronic ballot through the case website at https://omniagentsolutions.com/lugano or (ii) by mailing your Ballot so it is received no later than the Voting Deadline at the following address:

Lugano Diamonds & Jewelry Inc., et al. Ballot Processing
c/o Omni Agent Solutions
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367
Email:  LuganoInquiries@OmniAgnt.com
Phone:  888.902.1791

Only the Holders of (i) CODI Claims in Class 3, which are Allowed Claims pursuant to the Plan and the CODI Settlement Agreement, and (ii) General Unsecured Claims and Convenience Class Claims that are deemed valid for purposes of voting on the Plan in Class 4, and Class 5 as of the Voting Record Date are entitled to vote to accept or reject the Plan.  They may do so by completing the appropriate Ballot(s) and returning them electronically or in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline.  Each Holder of a Claim must vote its entire Claim either to accept or to reject the Plan and may not split such vote.  A Holder of a General Unsecured Claim who makes a Convenience Class Election is deemed to have voted to accept the Plan.  If you (1) hold Claims in more than one voting Class, or (2) hold multiple Claims within one Class, you may receive more than one Ballot.  The Ballots will clearly indicate the appropriate return address.  It is important to follow the specific Voting Instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtors have granted an extension of the Voting Deadline with respect to such Ballot in writing, or the Voting Deadline is extended with respect to such Ballot by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim Holder;

- Any Ballot cast by a Person that does not hold a Claim in the voting Class; and

- Any Ballot that is not signed, does not contain an original signature, or is not properly submitted through electronic means.

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote or elections by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan.  In the case where multiple Ballots are received from the same Holder with respect to the same Claim prior to the Voting Deadline, the last

60267091.6

timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline.  To be valid, a notice of withdrawal must (i) contain the description of the Claims to which it relates and the aggregate principal amount represented by such Claims, (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn, and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or making elections on your Ballot, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices, schedules, or exhibits to such documents, please contact the Voting Agent at the address specified above.  Copies of the Plan, Disclosure Statement, and other documents Filed in these Chapter 11 Cases may be obtained free of charge at the Debtors' restructuring website at https://omniagentsolutions.com/luganohttps://omniagentsolutions.com/lugano Documents Filed in these Chapter 11 Cases may also be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will File a voting report (the "Voting Report") no later than two business days prior to the Confirmation Hearing.  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTORS URGE HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO <u>ACCEPT</u> THE PLAN BY THE VOTING DEADLINE.**

### 4.    Elections and Contributions

Section 11.09 of the Plan provides that all Holders of Claims, whether or not voting in a Class that can vote to accept or reject the Plan, will be deemed to have released each Released Party (as defined in the Plan), including without limitation, a release of Claims and Causes of Action, unless such Holder makes an Opt-Out Election of the releases set forth in Section 11.09 of the Plan.

**The Opt-Out Election is only for the releases set forth in Section 11.09 of the Plan. All other releases, injunctions, and exculpations will be binding on all Persons and entities**

[Link-to-previous setting changed from off in original to on in modified.]

60267091.6                                                    2

*[Link-to-previous setting changed from off in original to on in modified.]*

**as set forth in the Plan.** You are not entitled to opt out of the releases, exculpation, or injunctions set forth in other provisions of the Plan.

To make an Opt-Out Election, each Holder of a Claim entitled to vote on the Plan must make an Opt-Out Election by checking the applicable box on its Ballot and returning the Ballot in accordance with the Voting Instructions and Procedures noted above. Holders of Claims (whether or not entitled to vote) may make an Opt-Out Election by submitting an Opt-Out Form to the Voting Agent so that it is received no later than **August 18, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Opt-Out Forms submitted by email, fax, or other electronic means **are not valid.**

Each Holder of a General Unsecured Claim can make two elections on its Ballot. First, such Holder may make a Convenience Class Election by checking the applicable box on its Ballot. By making a Convenience Class Election, the Holder of a General Unsecured Claim will have the Allowed amount of its Claim reduced to $10,000 (if the Allowed amount of such Claim exceeded $10,000) and will receive the treatment provided to Convenience Class Claims in Class 5. Such treatment is equal to 50% of its Allowed Convenience Class Claim. If a Holder of a General Unsecured Claim makes the Convenience Class Election, such Holder will receive, in full satisfaction, settlement and release of its General Unsecured Claim, the lesser of $5,000 and 50% of its Allowed Claim.

Second, each Holder of a General Unsecured Claim may contribute and assign to the Liquidation Trust its Contributed Claims (i.e., Claims and Causes of Action against Grant Thornton LLP and its affiliates) by checking the applicable box on its Ballot or by submitting a Claim Contribution Form (i.e., the Claim Contribution and Assignment Form). If a Holder of a General Unsecured Claim (i.e., a Contributing Creditor) contributes such Contributed Claims to the Liquidation Trust, then such Contributing Creditor will be entitled an additional Distribution (that does not count against any other Distribution) on account of that Contributing Creditor's General Beneficial Interest equal that Contributing Creditor's Pro Rata portion of 10% of the Net Proceeds of all Causes of Action against GT, net of the CODI share of those Net Proceeds under Section 3.02(c)(v) of the Plan, not to exceed the amount of that Contributing Creditor's Allowed General Unsecured Claim, provided that (i) the Contributing Creditor certifies on its Ballot or its Contribution Form under penalty of perjury that the Contributed Claim is colorable and supportable by evidence and (ii) the Liquidation Trustee (in consultation with the Liquidation Trust Oversight Board) independently and reasonably confirms that the Contributed Claim is colorable and supportable by evidence.

To make a contribution and assignment of a Contributed Claim, each Holder of a Claim making such a contribution and assignment must make such contribution and certification by checking the applicable box on its Ballot and returning the Ballot in accordance with the Voting Instructions and Procedures noted above. Holders of General Unsecured Claims (whether or not entitled to vote in accordance with the voting procedures) may make such a contribution and assignment by submitting a Contribution Form to the Voting Agent so that it is received no later than **August 18, 2026 at 4:00 p.m. (prevailing Eastern Time)**. Contribution Forms submitted by email, fax, or other electronic means **are not valid.**

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

**5.      Confirmation Hearing and Deadline for Objections to Confirmation**

Objections to Confirmation of the Plan must be Filed and served on the Debtors and certain other entities, all in accordance with the Confirmation Hearing Notice, so that such objections are actually received by no later than **August [18], 2026 at 4:00 p.m. (prevailing Eastern Time)**. Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court. For further information, refer to Section VI of this Disclosure Statement, "Confirmation of the Plan."

## II.      BACKGROUND REGARDING LUGANO

### A.      General Background

Lugano, a designer, manufacturer, and retailer of high-end jewelry with its headquarters in Newport Beach, California, enjoyed success selling one-of-a-kind jewelry to wealthy clientele and partnering with organizations to host and sponsor equestrian, social, and philanthropic events. Lugano opened its first retail store in Newport Beach in 2005 with an exclusive, appointment-only sales strategy. Thereafter, Lugano added three additional retail locations, started its equestrian division in 2008, and expanded production capabilities in 2020.

Lugano achieved success in the high-end jewelry market through unique positioning and its business model. Lugano is attentive to the preferences of its sophisticated, high-net-worth clientele who tend to highly value unique or exclusive jewelry and a personalized sales approach involving long-standing relationships. Thus, Lugano's approach focuses on building lasting relationships and the creation of jewelry to tell a story.

In 2021, Compass Diversified Holdings ("CODI Parent"), through its subsidiary Compass Group Diversified Holdings LLC ("CODI" and collectively with CODI Parent, at times referred to herein as "CODI"), acquired a majority interest in Lugano Holding from Mr. Ferder and affiliated entities for an enterprise value of $256 million. Mr. Ferder and his affiliated entities retained a significant portion of the equity (approximately 40% of Lugano Holding), and Mr. Ferder continued as chief executive officer and a member of the board of directors of certain Debtors. CODI currently owns approximately 59.9% of Lugano Holding and Mr. Ferder's affiliated entities own approximately 39.6% of Lugano Holding.

Following the CODI acquisition, Lugano added additional locations and opened a private social club – Lugano Privé – for its clients. By 2025, Lugano expanded to operate nine retail locations – eight in the United States and one in London, UK – as well as an equestrian division and pop-up show rooms.

Lugano Diamonds conducts the Debtors' day-to-day jewelry operations and Lugano Prive operates the Lugano Privé social club, where members can dine, lounge, socialize, and participate in enriching cultural experiences. Until KLD's suspension of its operations shortly

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                                              4

*[Link-to-previous setting changed from off in original to on in modified.]*

before the Petition Date, KLD acquired diamonds from third parties and sold them to its sole customer, Lugano Diamonds.

The Debtors are operating their business but expect that the Agent will either convey the business operations to a third party or cease operations entirely in advance of the Plan Effective Date.

## B.    Corporate and Capital Structure

Lugano Holding, Inc. (Lugano Holding") is the direct or indirect parent of the other Debtors and their foreign subsidiaries.  Lugano Holding is the sole shareholder of Lugano Buyer, Inc. ("Lugano Buyer"), and Lugano Buyer is the sole shareholder of Lugano Diamonds.  Lugano Diamonds is the sole member of K.L.D. Jewelry, LLC ("KLD"), the trustor and sole beneficiary of the Lugano Prive Investment Trust ("Lugano Trust"), and the sole owner of the non-U.S. entities.  Lugano Trust is the sole member of Lugano Prive.  Lugano Diamonds is a California corporation. All the other Debtors are Delaware entities.

Lugano Diamonds and Lugano Buyer, as co-borrowers, and CODI, as lender, entered into a Credit Agreement (as amended, the "Credit Agreement") dated as of September 3, 2021.  The other Debtors are guarantors under the Credit Agreement.  The Credit Agreement provides for both revolving and term loans.  Pursuant to a Guarantee and Collateral Agreement dated as of September 3, 2021, the Credit Agreement is secured by liens on substantially all of the Debtors' personal property and the obligations under the Credit Agreement are guaranteed by the other Debtors.

The Credit Agreement, as amended, provided revolving loan and term loan commitments. The outstanding obligations under the credit agreement, including principal, prepetition interest, and fees, exceed $718 million.  The Credit Agreement is secured by substantially all of the Debtors' assets.

## C.    Events Leading Up to the Chapter 11 Cases

### 1.    Discovery of Irregular Financing, Accounting, and Inventory Practices

On May 7, 2025, CODI and CODI Parent filed a Form 8-K (the "May 8-K") disclosing that CODI had commenced an internal investigation into the financing, accounting, and inventory practices of Lugano Holding, based on concerns reported to CODI senior leadership as to such practices.  The May 8-K also disclosed that Mr. Ferder had resigned from all of his positions at Lugano.

Within weeks of the 8-K disclosures, the Debtors heard from close to sixty (60) persons asserting substantial claims relating to alleged transactions ("Investment Contracts") entered into by Mr. Ferder.  The Investment Contracts, which were outside Lugano Diamonds' ordinary course of business, were generally joint investment agreements in which a third party would co-invest in a loose diamond, ostensibly for resale at a significant profit.  Since the summer of

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

2025, approximately a dozen parties have commenced lawsuits against Lugano Diamonds, Mr. Ferder, and/or other parties, including those related to the Investment Contracts.

On June 24, 2025, Lugano Diamonds commenced an action against Mr. Ferder and a related trust for which he is a trustee. The complaint included claims for fraud, concealment, constructive fraud, and breach of fiduciary duty. The complaint alleges that Mr. Ferder "concealed and ~~mispresented~~misrepresented the nature of numerous financing transactions he entered into with third party, high net worth individuals." It further alleges that these contracts "created potential liabilities for Lugano [Diamonds], but [Mr. Ferder] disguised them as direct sales. He forged invoices and sale documents, sent out empty box shipments, falsely recorded the money from the third-party individuals as revenue for Lugano [Diamonds], and concealed the payment obligations from Lugano [Diamonds'] books."

Mr. Ferder disputes the allegations against him and intends to defend himself.

## 2.    Corporate Governance

Beginning in early 2024, Lugano Diamonds brought in a new management team, including Mr. Joshua Gaynor as President and Christoph Pachler as Chief Financial Officer. On June 4, 2025, among other governance changes, Mr. Gaynor and Mr. Pachler were selected as directors of Lugano Holding, Lugano Buyer, and Lugano Diamonds. The next day, certain of the directors and managers appointed by CODI pursuant to the applicable governance documents resigned their positions throughout the Company.

To address potential conflicts and to provide for independent governance where appropriate, the Board added two independent directors (to supplement two legacy independent directors that remain on the Board) with no prior connection to the Company, CODI, or the Ferders. Mr. Thomas FitzGerald and Mr. L. Spencer Wells joined the Lugano Diamonds Board on July 9, 2025, and a week later, on July 16, 2025, the Board delegated certain matters to a Special Committee of the Board (the "Special Committee") comprised of Messrs. FitzGerald and Wells.

The purview of the Special Committee includes overseeing an investigation of the fraud described above and commencing, prosecuting, or settling any actions related to matters addressed by, or causes of action that may be developed in, the investigation. By doing so, the Board ensured that Board members who were officers or directors of the Company at the time of the scheme would not be involved in the related investigation or litigation. The Special Committee also assumed responsibility for, among other things, reviewing, evaluating, and, if appropriate, making recommendations to the Board about strategic transactions (whether within or outside a bankruptcy) and the commencement of an insolvency proceeding. The Special Committee retained professionals to assist it in carrying out its delegated responsibilities.

The Special Committee commenced an internal investigation surrounding the fraud to determine, among other things, what happened and what claims may exist as a result thereof. In accordance with the delegation from the Board, the Special Committee also took the lead role in evaluating various proposals and ultimately made recommendations to the Board regarding

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

potential strategic transactions and the commencement of the Chapter 11 Cases. The Board accepted those recommendations.

<u>Mr. Ferder disputes the allegations against him and intends to defend himself.</u>

### 3.    Financing Matters

On June 6, 2025, CODI sent Lugano Diamonds and Lugano Buyer a notice of default and reservation of rights under the Credit Agreement. Thereafter, on August 29, 2025, the Debtors and CODI entered into a forbearance agreement (the "<u>Forbearance Agreement</u>"). Pursuant to the Forbearance Agreement, CODI agreed not to exercise certain remedies, suspended the payment of interest and principal, and suspended certain financial covenant testing, if the Debtors met certain sale milestones, did not default under the Forbearance Agreement or the Credit Agreement (or other loan documents) and were not subjected to material prejudgment remedies. In exchange, the Debtors, among other things, acknowledged the outstanding principal amount and accrued but unpaid interest, released certain claims against CODI and certain related parties, acknowledged that CODI had valid, perfected, enforceable first priority liens and security interests in its collateral, subject to certain exceptions, and agreed to certain milestones in a sales process, agreed to suspend certain covenant carve-outs, and agreed to certain additional covenants.

Due in part to the complications relating to the fraud, the sale process took longer than anticipated. To address these delays and to provide the Debtors with necessary liquidity, on October 2, 2025, the Debtors and CODI entered into to the First Amendment to Forbearance Agreement and the Twenty Third Amendment to Credit Agreement (the "<u>Twenty Third Amendment</u>"). The Twenty Third Amendment, among other things, limited enabled Lugano Diamonds' and Lugano Buyer's ability to borrow up to an aggregate amount of $4 million under the Credit Agreement, subject to CODI's discretion, on and after the Twenty-Third Amendment Effective Date. Following entry into the Twenty Third Amendment and as of the Petition Date, CODI provided an additional $2.2 Million under the Credit Agreement. A Second Amendment to Forbearance Agreement dated as of October 10, 2025, followed, and among other things, extended certain sale process milestones contained in the Forbearance Agreement.

### 4.    The Sales Process and Commencement of These Cases

In May 2025, Lugano Diamonds engaged Armory Securities, LLC ("<u>Armory</u>") on an exclusive basis to be its financial advisor and investment banker in connection with a possible restructuring, sale, or financing. The Debtors and their professionals identified over 100 parties that might be interested in a purchase or financing transaction with the Debtors. Over 50 parties signed non-disclosure agreements and received a confidential information memorandum. Multiple parties submitted indications of interest. The Debtors provided those parties with due diligence materials, including access to a virtual data room and meetings with management. The Debtors subsequently received six letters of intent that proposed to acquire a controlling interest in Lugano Diamonds or substantially all of its assets. The proposals included "going concern" and liquidation proposals, certain of which the Special Committee (in consultation with the full Board), instructed Armory and the Debtors' counsel to further negotiate.

*[Link-to-previous setting changed from off in original to on in modified.]*

60267091.6                                                           7

*[Link-to-previous setting changed from off in original to on in modified.]*

Following those discussions, the Debtors determined that the proposed transaction with the Agent, subject to higher or better offers, was the path that would maximize the value to its stakeholders. The Debtors engaged the Agent in good faith, arms'-length negotiations and entered into that certain Agency Agreement (the "Agency Agreement") dated as of November 16, 2025, with the Agent.

The Agency Agreement contemplated that the Debtors would pursue higher or better offers through the Chapter 11 Cases. On November 16, 2025, the Debtors commenced these actions to maximize the value of their estates and to efficiently distribute value to their creditors.

## III. THE CHAPTER 11 CASES

On the Petition Date, the Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Chapter 11 Cases are being jointly administered under the case caption *In re Lugano Diamonds & Jewelry Inc., et al.*, Case No. 25-12055 (BLS) (Bankr. D. Del.). The commencement the Chapter 11 Cases automatically imposed a stay under section 362(a) of the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by Creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors during the pendency of the Chapter 11 Cases. The stay will remain in effect, unless modified by the Bankruptcy Court, until the closing of the Chapter 11 Cases.

### A. First Day Orders and Initial Employment Applications

On and shortly after the Petition Date, the Debtors Filed certain "first day" motions and applications with the Bankruptcy Court (the "First Day Motions") seeking certain immediate relief to aid in the efficient administration of these Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. The Bankruptcy Court held a hearing on these first-day motions on November 18, 2025. In connection with these hearings, the Bankruptcy Court entered a series of "first day" and "second day" orders that, among other things, authorized the Debtors to (i) pay certain prepetition obligations, such as those owing to their employees and taxing authorities, (ii) maintain their bank accounts, cash management system, and insurance programs, (iii) continue their customer programs, (iv) redact certain confidential and personally identifiable information, (v) provide adequate assurance to utilities; (vi) retain a claims and noticing agent, and (vii) jointly administer the Chapter 11 Cases. The motions, to the extent not approved on November 18, 2025, were thereafter approved by the Bankruptcy Court.

On November 26, 2025, the Debtors filed applications to employ (i) (a) Keller Benvenutti Kim LLP and (b) Young Conaway Stargatt & Taylor, LLP as bankruptcy counsel, (ii) GlassRatner Advisory & Capital Group, LLC to provide J. Michael Issa as Chief Restructuring Officer of the Debtors, (iii) Armory Securities, LLC as the Debtors' investment banker, (iv) Omni Agent Solutions, Inc. as administrative agent, and (v) Barnes & Thornburg LLP as special counsel to the special committee of the Board of Directors of Lugano Diamonds. The Debtors also filed motions to retain ordinary course professionals and to establish procedures for the

*[Link-to-previous setting changed from off in original to on in modified.]*.

[Link-to-previous setting changed from off in original to on in modified.]

compensation of professionals.  The Bankruptcy Court entered orders for each of the applications and motions.

**B.      The Agency Agreement and Related Motions**

On November 17, 2025, the Debtors filed a motion (the "Agency Approval and Sale Motion") seeking, among other things, (i) interim authorization to perform under the Agency Agreement and certain related sale guidelines, (ii) approval of certain bidding protections for the Agent and bidding procedures, and (iii) either assumption of the Agency Agreement or authorization for the Debtors to sell their assets from and clear of liens, claims, and encumbrances to another bidder. *See* Docket No. 13.

The Agency Agreement contemplated two time periods.  During the Tier 1 Period, which ran from the day following entry of an interim approval order through the date of entry of the final approval order), the Agent served as the Debtors' consultant and exclusive agent to sell certain of the Debtors' merchandise and owned furniture, fixtures, and equipment (the "Agency Assets") on a commission basis, with the Debtors responsible for expenses.  The Bankruptcy Court entered an interim approval Order on November 20, 2025, s*ee* Docket No. 71, and the Tier 1 Period began on November 21, 2025.

On December 17, 2025, the Bankruptcy Court entered an order approving the Debtors' bidding procedures and the provision of bidding protections for the Agent.  Thereafter, prior to the bid deadline, the Debtors received one additional bid.  The Debtors determined, in consultation with CODI and the Creditors' Committee, that the bid was not a qualified bid.  Accordingly, the Debtors cancelled the auction.  On December 31, 2025, the Bankruptcy Court entered an order authorizing the Debtors to assume the Agency Agreement.  S*ee* Docket No. 263.

As a result of the Agent being the successful bidder, the Agency Agreement advanced to Tier 2.  During the Tier 2 Period, the Agent is responsible for the sale of the Agency Assets.  The Tier 2 payment structure provides, among other things, for (i) the Debtors to receive a guaranteed amount equal to 40% of the aggregate cost value of certain merchandise, (ii) proceeds in excess of that amount are allocated between the Debtors and the Agent, and (iii) the Agent to be responsible for sale expenses (including related payroll and occupancy costs).  In addition, there was a reconciliation to put the Debtors and the Agent in the same economic position as they would have been if the Tier 2 Period commenced on November 21, 2025.

Proceeds from the Agency Agreement will be distributed pursuant to the terms of the Plan.

As of June 30, 2026, the Debtors' cash balance is approximately $7.3 million and the Debtors have received payments on account of the Agency Agreement in the amount of approximately $18.5 million.  The remaining guaranteed amount under the Agency Agreement is approximately $53.4 million.

[Link-to-previous setting changed from off in original to on in modified.]

*[Link-to-previous setting changed from off in original to on in modified.]*

## C.    DIP Financing Motion and Cash Collateral

On the Petition Date, the Debtors filed a motion (the "DIP Motion") seeking interim and final orders authorizing the Debtors to, among other things, (i) borrow up to $12 million (with $1.5 million to be available on an interim basis) in postpetition financing from the "DIP Lenders"; (ii) grant priming liens and security interests to the DIP Lenders to secure the applicable Debtors' obligations under the DIP Loan; (iii) subject to the terms and conditions set forth in the DIP Motion, use the DIP Lenders' cash collateral; and (iv) provide adequate protection to the holders of alleged prepetition liens.

On November 19, 2025, the Bankruptcy Court entered the interim order approving the DIP Motion, authorizing the Debtors to, among other things, borrow up to $1.5 million for the period from the Petition Date through the entry of a final order. *See* Docket No. 66. Thereafter, the Debtors, the DIP Lender, and the Committee agreed that it was in the Estates' best interests for the Debtors not to pursue approval of the DIP Loan on a final basis and to instead only seek authority to use cash collateral. On February 10, 2026, the Bankruptcy Court entered its final order on the authorizing the Debtors to use cash collateral. *See* Docket No. 364 (the "Cash Collateral Order"). The Cash Collateral Order entered by the Bankruptcy Court contains various important features, including:

- authorization for the Debtors to use CODI's Cash Collateral (as defined in the Cash Collateral Order), subject to the conditions set forth in the Cash Collateral Order;

- carve-outs providing for the payment of certain expenses incurred during the Chapter 11 Cases, including amounts that may be payable to professionals retained by the Debtors and the Creditors' Committee;

- certain Events of Default provisions setting forth CODI's rights upon the occurrence thereof;

- standard waivers of certain provisions of the Bankruptcy Code, including under section 552 of the Bankruptcy Code, as well as adequate protection liens and superpriority claims granted to CODI; and

The Debtors anticipate that they will have access to use CODI's Cash Collateral through the Effective Date of the Plan.

## D.    Appointment of the Creditors' Committee

On November 25, 2025, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases. *See* Docket Nos. 88 and 93. The members of the Creditors' Committee are Royalty T Diamonds Group Ltd., NBS Diamonds Inc. (dba Scarselli Diamonds, "Scarselli"), Ponte Gadea Chicago, LLC, The Irvine Company, William Scott Simon, Barry Aronoff, Avina LLC/Global Innovations LLC, Adam Rothstein, and Kristoffer Winters. Counsel to the

*[Link-to-previous setting changed from off in original to on in modified.]*

Creditors' Committee is Pachulski Stang Ziehl & Jones LLP and its financial advisor is Force Ten Advisors, LLC.

Following approval of the Scarselli Stipulation (as defined below), Scarselli resigned from the Creditors' Committee.

**E.      Schedules, Statements of Financial Affairs, Claims Bar Dates, and Filed Claims**

**1.         General Information**

On December 13, 2025, the Debtors Filed their Schedules and Statements of Financial Affairs under seal and filed proposed redacted versions thereof.  The redacted Schedules (but not the Schedules filed under seal) were withdrawn on December 15, 2025, and re-filed on December 17, 2025 with revisions to certain redactions.  A Creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated, or disputed may, but need not, file a proof of claim to be entitled to participate in the Chapter 11 Cases or to receive a Distribution under the Plan.

The Bankruptcy Court established (i) January 27, 2026 at 11:59 p.m. (prevailing Eastern Time) as the deadline (or "bar date") for Creditors (other than governmental units) to File proofs of claim against the Debtors (including Claims arising under section 503(b)(9) of the Bankruptcy Code); and (ii) as to each Debtor, May 15, 2026 at 11:59 p.m. (prevailing Eastern Time) as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code) to File proofs of claim against the Debtors. *See* Docket No. 223.

As of June 17, 2026, approximately 230 claims have been filed against the Debtors.  The aggregate dollar amount of the filed claims (including claims filed against multiple Debtors and duplicative claims) is approximately $2.6 billion.  After giving effect to the Debtors' substantive consolidation (e.g., counting claims by one creditor against multiple Debtors as a single claim), the total number of filed and scheduled claims is approximately $1.1 billion.  The Debtors have not completed reconciling the claims filed in the Chapter 11 Cases and do not anticipate doing so before the Effective Date of the Plan.

The Debtors have undertaken a preliminary review of the filed proofs of claim.  At this time, the Debtors estimate that their Allowed Claims (exclusive of any CODI Claims (including the CODI Claim), Administrative Claims, Intercompany Claims, and Subordinated Claims) are as follows.  For purposes of these estimates, the filed Investment Contract Claims are estimated based on the "invested" amount and a standardized rate of interest.  Because of the uncertainty of the claims process, including the potential exposure on account of unliquidated claims, and the likely objections to one or more high value disputed claims, the ultimate amount of Allowed Claims may differ materially from the ~~estimated~~estimates provided below.

The Debtors' estimates for other prepetition Claims are as follows:

Priority ~~Tax~~ Claims: approximately $~~1.0~~1.35 million ~~– $1.5 million~~

~~Priority Claims: Less than $50,000~~

*[Link-to-previous setting changed from off in original to on in modified.]*.

Other Secured Claims: Less than $2 million[35]

CODI Claim: approximately $718 million

General Unsecured Claims approximately $[●]210 million to $[●]260 million

Convenience Class Claims: approximately $350,000-400,000300,000-$400,000 (assuming no Convenience Class Elections).

### 2. Investment Contract Claims

Based on the Debtors' review of the proofs of claim filed through June 30, 2026, the Debtors believe 51 Persons filed 73 proofs of claim relating to Investment Contracts. Assuming claims filed by the same Person against different Debtors on account of Investment Contracts are treated as a single claim, the liquidated amount of the filed proofs of claim with respect to Investment Contracts is approximately $163 million. The amounts such Persons funded to the Debtors or Ferder Affiliated Parties, based on the Proofs of Claim, is estimated to be approximately $103 million, though the actual amount funded may be materially different and is unknown to the Debtors at this time.

With limited exception, the Debtors have not analyzed their Causes of Action against Investment Contract Counterparties and potential defenses (including subordination) with respect to Investment Contract Claims. Nor have the Debtors analyzed whether the Investment Contracts were part of a Ponzi scheme at this time. The Debtors anticipate that such determinations will be made by the Liquidation Trustee in accordance with the Liquidation Trust Agreement.

### 3. Claims Asserted by Ferder Parties

On January 27, 2026, Mr. Ferder, individually and in his capacity as Trustee of the Haim Family Trust (collectively, the "Ferder Parties"), filed a proof of claim in Lugano Diamonds & Jewelry, Inc.'s chapter 11 case. That claim is asserted in a face amount of approximately $36 million and alleges various bases for the amounts claimed, including obligations on account of third-party contracts, reimbursement of business expenses, employment law claims under California law, indemnity for numerous lawsuits that currently name Mr. Ferder and/or others of the Ferder Parties as a defendant, setoff and recoupment claims, and claims for interest.

On June 24, 2026, the Debtors, acting through the Special Committee, filed an objection to the Ferder Parties' claims, which, among other things, seeks the disallowance or subordination of the Ferder Parties' claims in their entirety. That objection remains pending. In the event that Mr. Ferder's claims are Allowed in whole or in part under the Plan notwithstanding such objection, and such claims are not classified as Class 7 Subordinated Claims, those claims may be treated as Class 4 General Unsecured Claims and receive the treatment provided under the Plan for such claims.

---

[35] The Debtors anticipate that most of these claims, to the extent Allowed, will be satisfied by the retention of collateral.

60267091.6

*[Link-to-previous setting changed from off in original to on in modified.]*

**F.    Other Events During the Chapter 11 Cases**

**1.    Executory Contracts and Unexpired Leases and Related Settlements**

During the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to reject four (4) leases of nonresidential real property relating to domestic retail locations.  The Debtors also obtained approval to reject agreements related to leases where their non-Debtor Canadian and UK subsidiaries were tenants.  With respect to their Canadian subsidiary, the Debtors thereafter obtained approval of a settlement with the landlord, where the Debtors and the landlord, among other things, exchanged mutual releases. *See* Docket Nos. 150, 151, 338, and 388.

The Debtors entered into a stipulation with the Aspen Art Museum that provided for the rejection of a 10-year sponsorship agreement.  The Court approved the stipulation on March 17, 2026. *See* Docket No. 433.

In addition, the Debtors obtained an extension of time to assume or reject certain of their remaining nonresidential real property leases at least through and including July 31, 2026.  The Debtors and the Palm Beach landlord have agreed that the Palm Beach lease will terminate on July 31, 2026, with a payment being made to the Debtors. *See* Docket Nos. 597.

**2.    Requests for Relief from the Automatic Stay.**

On January 27, 2025, the Debtors' former Chief Executive Officer, Mr. Ferder, filed a motion for relief from the automatic stay [Docket No. 312] (the "Ferder Stay Relief Motion") to file counterclaims in the action commenced by Lugano Diamonds against Mr. Ferder on June 24, 2025 in the Superior Court of California, County of Orange (the "State Court"), Case No. 30-2025-01492210-CU-CO-CJC. *See* Docket No. 312.  The Debtors and Mr. Ferder have agreed to adjourn the hearing on the Ferder Stay Relief Motion until July 14, 2026.

On February 11, 2025, Bulley & Andrews, LLC filed a motion for relief from the automatic stay to foreclose on its mechanics lien asserted against the landlord of a rejected lease.  The Debtors agreed to relief from the automatic stay. *See* Docket Nos. 369 and 396.

On April 10, 2026, Travelers Casualty and Surety Company of America ("Travelers") filed a motion for relief from the automatic stay to make certain payments under the Debtors' directors' and officers' liability insurance policy. *See* Docket No. 524.  The Debtors and Travelers have agreed to adjourn the hearing on the Travelers' motion for relief from the automatic stay until July 14, 2026.

On March 4, 2026, the Debtors entered into a stipulation with a landlord to permit the landlord to draw on a letter of credit, which stipulation was approved by the Court. *See* Docket Nos. 418-19.

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                                   13

*[Link-to-previous setting changed from off in original to on in modified.]*

### 3.    Litigation and Settlements

#### (a)    Ferder Litigation

On January 27, 2026, Mr. Ferder, individually and in his capacity as trustee of the Haim Family Trust, filed a proof of claim against Lugano Diamonds in the approximate amount of $36 million.  On June 24, 2026, the Debtors commenced an adversary proceeding against Mr. Ferder, captioned *Lugano Diamonds & Jewelry Inc. v. Ferder*, Case No. 25-12055 (BLS), Adv. Pro. No. 26-50528 (BLS) by filing their *Complaint and Objection to Proof of Claim* against Mr. Ferder individually, and in his capacity as trustee of the Haim Family Trust seeking, among other things, disallowance or subordination of Mr. Ferder's claims and judgment in an  amount to be determined at trial. On the same day, the Debtors dismissed pending litigation against Mr. Ferder in California.

Mr. Ferder disputes the allegations against him and intends to defend himself.

The following language has been added at the request of Mr. Ferder:

*THE DISCLOSURE STATEMENT REPEATEDLY MISCHARACTERIZES DISPUTED ALLEGATIONS AGAINST MR. FERDER AS ESTABLISHED FACT. FOR EXAMPLE, IT REFERS TO "MR. FERDER'S FRAUD," "THE FRAUD DESCRIBED ABOVE," AND "THE SCHEME," AND DESCRIBES AT LENGTH MR. FERDER'S ALLEGED CONCEALMENT AND MISREPRESENTATION OF FINANCING TRANSACTIONS, FORGERY OF INVOICES AND SALE DOCUMENTS, SHIPMENT OF "EMPTY BOXES," AND FALSE RECORDING OF REVENUE - ALL AS THOUGH THESE ALLEGATIONS HAD BEEN ESTABLISHED. THEY HAVE NOT. THESE ARE UNADJUDICATED ALLEGATIONS ASSERTED IN A COMPLAINT AND THEY ARE ALL DISPUTED; NO COURT HAS MADE ANY FINDING OF FRAUD, CONCEALMENT, FORGERY, OR ANY OTHER WRONGDOING BY MR. FERDER. MR. FERDER VIGOROUSLY DENIES THESE ALLEGATIONS AND INTENDS TO DEFEND AGAINST THEM AND ASSERT COUNTERCLAIMS (UNLESS HE IS UNCONSTITUTIONALLY STRIPPED OF THOSE RIGHTS BY WAY OF THIS PLAN).*

Throughout the Disclosure Statement, where allegations are made against Mr. Ferder, it should be understood that Mr. Ferder disputes such allegations against him and intends to defend himself.

#### (b)    Other Litigation and Settlements

On February 4, 2026, the Debtors commenced an adversary proceeding titled *Lugano Diamonds & Jewelry Inc. v. Travelers Casualty and Surety Co. of America*, Case No. 25-12055 (BLS), Adv. Pro. No. 25-50036 (BLS) (Bankr. D. Del) against their directors' and officers' liability insurer, Travelers.  In that lawsuit, among other things, the Debtors seek a declaratory judgment that requires Travelers to tender the policy limits ($3 million) to allow the Debtors to defend themselves in connection with the matters related to Mr. Ferder's actions and related litigation, including requiring Travelers to reimburse the Debtors' litigation counsel's fees and expenses in connection therewith.  Travelers filed a motion requesting that the Bankruptcy Court

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                14

*[Link-to-previous setting changed from off in original to on in modified.]*

abstain from that adversary proceeding.  A hearing on the abstention motion has been adjourned until July 14, 2026.

The Debtors entered into a stipulation with Scarselli and CODI, providing for, among other things, the assignment of certain insurance rights to Scarselli, modification of the automatic stay to permit Scarselli to pursue such insurance rights, and waiver of Scarselli's $10.5 million proof of claim except to the extent necessary to effectuate the stipulation or to preserve its standing to pursue the assigned insurance claims.  The Bankruptcy Court approved the stipulation on June 2, 2026.  *See* Docket Nos. 525 and 564.

### 4.      CODI Settlement

During the Chapter 11 Cases, the Special Committee continued its internal investigation surrounding Mr. Ferder's fraud and an analysis of potential causes of action relating thereto. That investigation encompassed alleged acts or omissions by CODI (both as a direct and indirect parent of the Debtors and a lender) and by third parties.  Likewise, after the commencement of the Chapter 11 Cases, the Creditors' Committee commenced its own investigation, focused on potential grounds on which CODI's Claim might be challenged, including disallowance of the Claim, avoidance of CODI's asserted liens, or subordination of the Claim.  The Special Committee and the Creditors' Committee consulted under a common interest agreement, and the Creditors' Committee had the benefit of some of the work performed by the Special Committee.

The investigations included the review of over 1.2 million documents obtained from the Debtors ~~and others, and interviews or participation in depositions, including with the Debtors'~~, CODI, and other relevant third parties, including over 103,000 documents obtained from CODI.  In addition, the Special Committee conducted twenty-nine (29) interviews of twenty-three (23) individuals, including fourteen (14) current and former ~~employees and relevant~~Lugano personnel, eight (8) current and former ~~CODI-related personnel~~CODI personnel, and one other relevant third party.  Other than the interviews of current and former CODI personnel, CODI did not participate in those interviews.  As part of the investigation process, the Special Committee obtained authority from the Bankruptcy Court for the Debtors to hire and compensate counsel for its current and former employees who participate in interviews or depositions to promote the efficiency of the investigations.  *See* Docket Nos. 329 & 389.

Based upon information developed during the course of their investigations, the Creditors' Committee and the Special Committee determined that the Estates could bring various affirmative claims against CODI and its affiliated entities, as well as certain individuals.  The ~~Creditors' Committee and the Special Committee~~ ~~also determined that various defenses could be interposed to CODI's claims~~specific claims identified were primarily allegations that CODI or its agents breached fiduciary duties owed to the Debtors and that CODI's conduct would warrant subordination of its claim.  The Creditors' Committee and the Special Committee believe such claims and defenses are meritorious and would provide value to the Estates.  CODI disputes any liability and the validity of alleged claims against it and asserts that it has valid, perfected, and enforceable secured claims against the Estates; CODI also asserts that, even if it had liability (which CODI disputes), the damages would be negligible.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

Recognizing the significant cost of potential litigation, in early May 2026, the Debtors (through the Special Committee), the Creditors' Committee, and CODI voluntarily participated in a ~~mediation~~two-day mediation overseen by the Honorable Lee R. Bogdanoff (Ret.) in Los Angeles, California.  Through the mediation, the parties exchanged their views on the merits of their respective claims and defenses, taking into account litigation uncertainties and the costs of pursuing their claims to a final resolution.  By the end of the mediation, the parties had agreed in principle on a settlement framework, to be documented by a separate settlement agreement and plan support agreement, and implemented pursuant to the Plan.  The CODI Settlement provides for, among other things, the allocation of Estate assets between CODI on the one hand, and General Unsecured Creditors on the other hand, the funding of certain classes of Claims that are unimpaired or, in the case of Convenience Class Claims, to be paid in cash, and full and mutual releases between the Debtors' and their creditors and CODI.  The material terms of the CODI Settlement are set forth below, and the full CODI Settlement Agreement is attached as Exhibit C to the Plan:[46]

The Settlement Agreement provides for CODI to receive certain recoveries, which have been incorporated into the Plan.  CODI is to receive:

- An initial Distribution equal to 34.79% of the Cash in the Estates on the Effective Date of the Plan, less Cash used to fund the Effective Date Reserves and Professional Fee Reserve.

- Cash Distributions equal to:

     o   34.79% of Cash in the Effective Date Reserves and the Professional Fee Reserve to the extent not necessary to satisfy the Claims for which such reserves were established;

     o   34.79% of the Cash recovered on account of the proceeds from the Agency Agreement, the Tax Refund, the Theft Policy, Causes of Action to establish, and realize upon, the amounts due to the Estates under any agreement or law with respect to foregoing, less all expenses incurred in obtaining such recoveries;

     o   45% of the Cash recovered on account of the Claims and Causes of Action against Grant Thornton and its affiliates, less all expenses incurred in obtaining such recoveries;

     o   25% of the Cash received on account of all other Causes of Action, less all expenses incurred in obtaining such recoveries;

---

[46]   This summary is qualified in its entirety by reference to the CODI Settlement Agreement.  In the event of a conflict between this description and the CODI Settlement Agreement, the CODI Settlement Agreement shall control.  ~~A copy of the CODI Settlement Agreement is attached as Exhibit C to the Plan.~~

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

     o   After Holders of Allowed General Unsecured Claims have received Cash equal to 100% of their Allowed General Unsecured Claims and GUC Interest, CODI will receive all of the Cash recovered on account of assets of the Liquidation Trust, less all expenses incurred in obtaining such recoveries;

The CODI Settlement Agreement also provides for mutual releases between the Debtors, the Creditors' Committee, and their Related Parties (if controlled by the Debtors or the Creditors Committee), on the one hand and CODI, certain affiliates, and its and their Related Parties, on the other hand, of all Claims and Causes of Action as of the Effective Date of the Plan, except that the Plan does not release or waive the CODI Claims, CODI's recoveries under the Plan, the obligations of the parties to the Settlement Agreement, and claims against certain parties (including Excluded Parties, Investment Contract Counterparties, and members of the Creditors' Committee in any capacity other than as a member of the Creditors' Committee).

Other material provisions of the Settlement Agreement provide (a) that CODI will assign its claims against Grant Thornton and its affiliates to the Liquidation Trust upon the Effective Date of the Plan, (b) composition of the Liquidation Trust Oversight Board, and (c) for the ongoing confidentiality of mediation materials.

Mr. Ferder has asserted that CODI engaged in inequitable conduct, the value of the claims against CODI is substantial, and that CODI's claims of ignorance about the Investment Contracts are not credible. Mr. Ferder also asserts that the Debtors' estates have claims against certain CODI Parties for breach of fiduciary duty, including claims to claw back management fees paid Compass Group Management LLC, that would exceed the amounts implicitly recovered under the CODI Settlement Agreement.

The Debtors and the Creditors' Committee believe that the CODI Settlement Agreement, including the releases provided thereunder, is supported by valuable consideration, is reasonable, and is in the best interests of the Debtors' estates and their creditors. The estates' claims against CODI are valuable, as is evident from the allocation of value under the CODI Settlement Agreement. Based on the Liquidation Analysis, General Unsecured Creditors are expected to receive $72 to $82 million, compared to CODI's estimated recovery of $43 - $46 million, even though CODI's (secured) Claim is expected to be more than double the Allowed General Unsecured Claims.

By implementing the Settlement Agreement, the Debtors and their General Unsecured Creditors will obtain the benefit of the Settlement Agreement and avoid millions of dollars in litigation costs. Absent the Settlement Agreement, there is no certainty that the Creditors' Committee and the Special Committee would prevail in the litigation. Even assuming they prevailed in the litigation against CODI, it is uncertain whether the remedies would have resulted in any material recoveries for General Unsecured Creditors. For example, CODI's claim is alleged as a secured claim in an amount over $718 million. Given the nature of equitable subordination, there is no certainty that CODI's entire Claim would be subordinated, that all of CODI's liens would be avoided, or that CODI would be unable to set off any claims against its claims against the Debtors. Given that the likely amount of assets (other than  proceeds of litigation) is estimated to be substantially less than $150 million, there is a material risk that,

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6

*[Link-to-previous setting changed from off in original to on in modified.]*

absent the Settlement, the General Unsecured Creditors would receive less value than they receive under the CODI Settlement Agreement on their claims, or no Distribution whatsoever, even if they were to prevail in the litigation and significantly reduced CODI's Claims.

The Debtors believe that the Settlement Agreement is fair and equitable and in the best interests of the Debtors, their estates, and their creditors.

## IV.    SUMMARY OF THE JOINT CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtors under the Plan and will, upon the occurrence of the Effective Date, be binding on all Holders of Claims against and Equity Interests in the Debtors, the Debtors' Estates, all parties receiving property under the Plan, and other parties in interest.  In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Confirmation Order, the Plan Supplement, or any other operative document, the terms of the Plan, Confirmation Order, Plan Supplement, or such other operative document, as applicable, shall govern and control; *provided* that, in any event, the terms of (1) the Confirmation Order and then (2) the Plan, inclusive of any Plan Supplement, in that order, shall govern and control over all other related documents.

### A.    Purpose and Effect of the Plan

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization.  Under chapter 11, a debtor is authorized to reorganize its business for the benefit of its constituents.  Chapter 11 also specifically allows a debtor to formulate and consummate a plan of liquidation.  *See* 11 U.S.C. § 1129(a)(11).  A plan of liquidation sets forth the means for satisfying claims against and equity interests in a debtor.  Confirmation of a plan of liquidation by a bankruptcy court makes that plan binding on the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The Plan provides for the distribution of the proceeds of the liquidation of all Estate Assets to various Creditors as contemplated under the Plan and for the wind up of the Debtors' corporate affairs.  More specifically, the Plan provides for the creation and funding of a Liquidation Trust to administer and liquidate all remaining property of the Debtors (other than

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

Tax Refunds), including the Liquidation Trust Actions, and the implementation of the CODI Settlement.

Under the Plan, Claims against, and Equity Interests in, the Debtors are divided into Classes according to their relative seniority and other criteria. If the Plan is confirmed by the Bankruptcy Court and consummated, the Claims and Equity Interests of the various Classes will be treated in accordance with the provisions in the Plan for each such Class, and the Liquidation Trust will make Distributions as provided in the Plan and the Liquidation Trust Agreement. A general description of the Classes of Claims and Equity Interests created under the Plan, the treatment of those Classes under the Plan, and the property to be distributed under the Plan are described below.

**B.     Substantive Consolidation and Its Relationship to the Plan Treatment of Claims**

Although the Plan contemplates a substantive consolidation of all the Debtors into one estate, the ultimate Distributions that will be made pursuant to the Plan will be paid by the Liquidation Trust. The Liquidation Trust has been structured to generally be a successor to the Debtors by acting as the estate representative and administrator for all the Liquidation Trust Assets. The Liquidation Trust will distribute to the Holders of Liquidation Trust Interests (*i.e.*, Holders of the Allowed CODI Claim and Allowed General Unsecured Claims) the proceeds of the Liquidation Trust  Assets, including an allocation of Causes of Action and proceeds under the Agency Agreement, and cash on hand, as well as the proceeds of the Tax Refund obtained by the Post-Confirmation Debtor, subject to payment of Litigation Trust Expenses and the creation of the Effective Date Reserves for Holders of certain Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Secured Claims, Priority Claims, and Convenience Class Claims.

The substantive consolidation of the Debtors is for all purposes, including voting on the Plan, Confirmation, and Distributions. As all of the Debtors' assets (other than the Tax Refund) will be transferred to the Liquidation Trust, and all of the Debtors, other than the post-Confirmation Debtor, will be deemed dissolved and the Liquidation Trust will, as representative of their Estates, handle any other winding down of those entities, the substantive consolidation will not otherwise materially affect the Debtors after the Effective Date.

If the Bankruptcy Court approves the Debtors' substantive consolidation, Claims asserted against any Debtor, or against multiple Debtors, will be treated as a single Claim against a consolidated Estate, and the assets of all Debtors will be treated as assets of a single Estate. Thus, for example, a Holder of a $100 Allowed Claim against Lugano Diamonds will receive the same recovery as a Holder of a $100 Allowed Claim against Lugano Prive, LLC. In addition, a creditor asserting a $100 Allowed Claim with joint and several liability against multiple Debtors (e.g., Lugano Diamonds and Lugano Prive, LLC) will receive the same Distribution as a Creditor asserting a single Claim against either Lugano Diamonds or Lugano Prive, for example. The Post-Confirmation Debtor will hold the Tax Refund and nothing in the Plan assigns or transfers the Tax Refund to a Debtor other than the Post-Confirmation Debtor, Lugano Holding, Inc.

If substantive consolidation is challenged, the Debtors intend to present evidence that establishes that substantive consolidation is appropriate under the circumstances of the Chapter

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                                    19

*[Link-to-previous setting changed from off in original to on in modified.]*

11 Cases.  That evidence would include, but not be limited to, the following:  All of the Debtors' assets, other than certain claims against CODI and related parties, are subject to CODI's Liens. Moreover, with the exception of the Lugano Privé club, all of the Debtors' operations were conducted by Lugano Diamonds.  The Creditors' Committee and the Special Committee, the parties that negotiated potential claims against CODI, have no objection to the Debtors' substantive consolidation.  If necessary, the Debtors will demonstrate that either the requisite Impaired Classes have accepted the Plan or that, by virtue of their treatment, those Classes are likely to receive more under the Plan than had the Debtors not been consolidated; and, except as described below, all of the Debtors' assets are and were CODI's collateral, such that if proceeds of those assets are made available to General Unsecured Creditors based on theories identified by the Creditors' Committee or the Special Committee, differential distributions to General Unsecured Creditors of any particular Debtor would be inequitable to the General Unsecured Creditors of the other Debtors.

The Debtors believe substantive consolidation is appropriate in these cases.  The Debtors anticipate that substantive consolidation will be consensual and thus does not contravene the Third Circuit's decision in *In re Owens Corning*, 419 F.3d 105 (3d Cir. 2005), *as amended by*, 2005 U.S. App. LEXIS 18043 (3d Cir. Aug. 23, 2005) and 2007 U.S. App. LEXIS 25525 (3d Cir. Nov. 1, 2007).  Moreover, substantive consolidation is not being used tactically to advantage one group of creditors over another. Rather, substantive consolidation is part of an agreed plan that implements a comprehensive settlement with CODI and the Creditors' Committee.  Absent that settlement, CODI would likely rely on its adequate protection liens on substantially all the Debtors' assets, its superpriority claims, DIP Claim, and unsecured claim exceeding 95% of all unsecured claims against Debtors other than Lugano Diamonds to preclude any material recovery to unsecured creditors.  Holders of claims against multiple Debtors were well represented by the Creditors' Committee – three members hold, on an aggregate basis, 90% claims asserted (other than claims asserted by CODI or a Lugano Diamonds) against Debtors other than Lugano Diamonds.  Moreover, in light of the fraud Mr. Ferder allegedly perpetrated prepetition, the Debtors believe that fraud related issues may affect claims asserted against multiple Debtors.

To the extent that an objection to substantive consolidation is raised and sustained, the Debtors preserve the right to seek confirmation of the Plan as an essential and permissible condition to the CODI Settlement Agreement and/or as a "deemed" consolidation of the Debtors allowing collective voting and distribution.

More information on the substantive consolidation is set forth in Section IV.F.~~7~~8 below.

**C.      The Liquidation Trust and the Liquidation Analysis**

The Plan contemplates the creation of a Liquidation Trust.  All Liquidation Trust Assets will vest in the Liquidation Trust.  The Liquidation Trust will be administered by the Liquidation Trustee, subject to the supervision and oversight of the Liquidation Trust Oversight Board.  The initial members of the Liquidation Trust Oversight Board will be one CODI designee (initially, Stephen Keller), two Creditors' Committee designees (initially, Adam Rothstein and Avi Wazana), and two independent members (initially, Spencer Wells and Craig Barbarosh).  If there is a vacancy on the Liquidation Trust Oversight Board, the vacancy is filled as follows.  If the Board Member was selected by CODI, the successor will be selected by CODI.  If the vacancy

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

pertains to a Board Member selected by the Creditors' Committee, the remaining Board member selected by the Creditors' Committee will select the successor.  If the vacancy pertains to an Independent Board Member, the other Independent Board Member will select an independent person as successor, as long as the CODI-designated Board Member approves the selection (such approval may not be unreasonably withheld).

Following the Effective Date, the Liquidation Trust will own and administer the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement.  The realization of proceeds from the Liquidation Trust will be for the benefit of the Liquidation Trust Beneficiaries.  The Liquidation Trustee will proceed to liquidate the Estate Assets, which consist primarily of the Causes of Action, proceeds of the Agency Agreement, and the Debtors' remaining property.  The Post-Confirmation Debtor will pursue the Tax Refund.  The Liquidation Trust will make Distributions of Cash to Creditors, including, as appropriate, Distributions of Liquidation Trust Available Cash and Distributions from the Effective Date Reserves and the Professional Fee Reserve.  Except for the Initial CODI Distribution, no payments to Liquidation Trust Beneficiaries will be made until all Liquidation Trust Expenses have been paid from the Trust Expense Reserve and all Allowed Administrative Claims, Professional Fee Claims, Priority Claims, Priority Tax Claims, and Convenience Class Claims, and Other Secured Claims have been paid from the Effective Date Reserves and the Professional Fee Reserve.

The liquidation process will be administered by the Liquidation Trust. The net proceeds of this liquidation process have been estimated in the liquidation analysis attached hereto as **Exhibit B** (the "Liquidation Analysis"). As set forth in the current Liquidation Analysis:

- The Debtors estimate that the remaining Cash in the estate plus the guaranteed proceeds under the Agency Agreement will be approximately $[●]58-$[●]60 million and that there may be additional proceeds under the Agency Agreement on account of the sharing proceeds in the range of $[●]0 million to $[●]9.8 million.

- The Debtors estimate that ~~the Post-Confirmation Debtor will receive~~ proceeds ~~on account of~~associated with the Tax Refund ~~in the range of $[●] million to $[●]~~, to the extent realized, would be approximately $68 million.

- The Debtors have not ascribed any value to recoveries that may be realized by the Liquidation Trust in respect of any Causes Action nor have they estimated any expenses related to the prosecution of the Causes of Action.  While the Causes of Action may have material value, it is possible that the Causes of Action may not generate sufficient proceeds to cover the expenses associated with prosecuting such Causes of Action.

- Actual distributions and recoveries may differ materially from these estimates.

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6

*[Link-to-previous setting changed from off in original to on in modified.]*

The Liquidation Analysis relies on various assumptions and is subject to material modifications from time to time. If the Liquidation Analysis is revised by the Debtors prior to the Confirmation Hearing, the Debtors will include their revisions in the Plan Supplement.

## D.    Treatment of Claims and Equity Interests

### 1.    Unclassified Claims

#### (a)    Administrative Claims

Administrative Claims are Claims arising under sections 364(c)(1), 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, to the extent not previously paid, otherwise satisfied, or withdrawn, including (a) all fees and charges assessed against the Estates under 28 U.S.C. § 1930, (b) all Section 503(b)(9) Claims, (c) Professional Fee Claims, and (d) Ordinary Course Professional Fee Claims.

Except as otherwise provided for in the Plan, on or as soon as reasonably practicable after the later of the Effective Date and the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Administrative Claim (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Administrative Claim or (2) such other less favorable treatment as to which such Holder and the Liquidation Trust have agreed upon in writing.  All requests for payment of an Administrative Claim (other than a Professional Fee Claim) must be Filed with the Bankruptcy Court no later than the Administrative Claims Bar Date.  In the event of an objection to Allowance of an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim.  **The failure to File and properly and timely serve a request for payment of an Administrative Claim on or before the Administrative Claims Bar Date forever bars, estops, and enjoins the Holder of such Administrative Claim from asserting such Administrative Claim and such Administrative Claim is deemed released and extinguished as of the Effective Date without need for any objection from the Debtors or the Liquidation Trustee or any notice to or action, order, or approval of, the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed**.

#### (b)    Professional Fee Claims and Ordinary Course Professional Fee Claims

Professional Fee Claims and Ordinary Course Professional Claims are Administrative Claims of Professionals and Ordinary Course Professionals for compensation or reimbursement of costs and expenses (or of members of the Creditors' Committee for reimbursement of expenses) relating to services provided during the period from the Professional's or the Ordinary Course Professionals' retention date, as applicable, through the Effective Date.

The Holder of an Allowed Professional Fee Claim or an Ordinary Course Professional Fee Claim receives Cash from the Professional Fee Reserve equal to the unpaid portion of such Allowed Professional Fee Claim or Allowed Ordinary Course Professional Fee Claim.  All final

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503(b), or 1103 of the Bankruptcy Code must be made by application Filed with the Bankruptcy Court and served on counsel to the Liquidation Trust, counsel to CODI, and counsel to the U.S. Trustee no later than 45 calendar days after the Effective Date.  Objections to such applications must be Filed and served on counsel to the Liquidation Trust, counsel to CODI, counsel to the U.S. Trustee, and the requesting Professional on or before the date that is 21 calendar days after the date on which the applicable application was Filed (or such longer period as may be allowed by order of the Bankruptcy Court or by agreement with the requesting Professional).  All Professional Fee Claims and Ordinary Course Professional Fee Claims are paid by the Liquidation Trustee from the Professional Fee Reserve or Liquidation Trust Assets, as applicable, to the extent approved by Final Order of the Bankruptcy Court within five Business Days after entry of such order.

### (c) Priority Tax Claims

Priority Tax Claims are Claims that are entitled to priority under Bankruptcy Code section 507(a)(8).

In full satisfaction, settlement, and release of and in exchange for such Claims, the Holder of an Allowed Priority Tax Claim is paid, at the option of the Liquidation Trustee, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code as follows: (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and 30 calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (2) in regular installment payments in Cash from the Liquidation Trust over a period not exceeding five years after the Petition Date, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election is without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (3) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Liquidation Trustee have agreed upon in writing, *provided* that Allowed Priority Tax Claims that are not due and payable on the Effective Date will be paid in the ordinary course by the Liquidation Trustee, and that, in the event an Allowed Priority Tax Claim is also an Other Secured Claim, such Claim, to the extent it is Allowed, is treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### (d) DIP Claims

DIP Claims are any and all Claims held by the DIP Lender arising from or in connection with (a) the *Superpriority Secured Debtor-in-Possession Credit Agreement* dated as of November 18, 2025, by and among the Debtors and DIP Lender, (b) any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith, and (c) the DIP Order.

Pursuant to the terms of the CODI Settlement, the DIP Claims do not receive a separate distribution but are accounted for by the CODI Claim as described in Section 3.02(c) of the Plan.

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

### 2.    Class 1: Other Secured Claims

Other Secured Claims are Secured Claims that are not DIP Claims or CODI Claims.

Class 1 consists of all Other Secured Claims.  Class 1 is Unimpaired under the Plan, is not entitled to vote to accept or reject the Plan, and is conclusively presumed to accept the Plan without voting under Bankruptcy Code section 1126(f).

Unless the Holder of an Allowed Class 1 Other Secured Claim agrees to other treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which an Other Secured Claim becomes an Allowed Claim, the Holder of such Allowed Other Secured Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Other Secured Claim, at the Liquidation Trustee's option: (i) Cash from the Liquidation Trust in the Allowed amount of such Holder's Allowed Class 1 Claim;  (ii) the return of the Collateral securing such Allowed Class 1 Claim, without representation or warranty by any Person (and without recourse against any Person regarding such Other Secured Claim); or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code to render such Claim Unimpaired.

### 3.    Class 2: Priority Claims

Priority Claims are Claims entitled to priority under Bankruptcy Code section 507(a), other than Administrative Claims and Priority Tax Claims.

Class 2 consists of all Priority Claims.  Class 2 is Unimpaired under the Plan, is not entitled to vote to accept or reject the Plan, and is conclusively presumed to accept the Plan without voting under Bankruptcy Code section 1126(f).

Unless the Holder of an Allowed Class 2 Priority Claim agrees to other treatment, on or as soon as reasonably practicable after the later of the Effective Date and the date on which a Priority Claim becomes an Allowed Claim, the Holder of such Allowed Priority Claim receives, in full satisfaction, settlement, and release of and in exchange for such Allowed Priority Claim, Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Claim.

### 4.    Class 3: CODI Claim

The CODI Claim is the CODI Claim to the extent such Claim is a Secured Claim, including to the extent Secured by any Lien.

Class 3 consists of the CODI Claim.  Class 3 is Impaired under the Plan and is entitled to vote on the Plan.

Pursuant to the CODI Settlement Agreement, as of the Effective Date, the CODI Claim is Allowed and its Holder receives, in full satisfaction, settlement, and release of and in exchange for the CODI Claim, the Special Beneficial Interest in the Liquidation Trust.  The Special Beneficial Interest provides the following consideration to the Holder of the CODI Claim:

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

(i)   An initial Distribution from the Liquidation Trust on the Effective Date equal to 34.79% of the Effective Date Cash;

(ii)   A subsequent Distribution from the Liquidation Trust equal to 34.79% of Cash released from the Effective Date Reserves and Professional Fee Reserve to the extent not necessary to satisfy all Allowed Administrative, Professional Fee, Priority, Priority Tax, Other Secured, and Convenience Class Claims.

(iii)   Periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 34.79% of all Net Proceeds of Specified Assets received by the Liquidation Trust after the Effective Date;

(iv)   Periodic Distributions from the Liquidation Trust pursuant to the Liquidation Trust Agreement equal to 25% of Net Proceeds of Causes of Action (including recoveries under any representations and warranty policy and Avoidance Actions) other than the GT Claims and Specified Assets;

(v)   Periodic Distributions equal to 45% of Net Proceeds of all GT Claims;

(vi)   One or more Distributions of any Net Proceeds remaining in the Liquidation Trust after Holders of General Beneficial Interests receive Distributions equal to the full amount of their Allowed General Unsecured Claims plus GUC Interest.

All Cash, net of the Effective Date Reserves and Professional Fee Reserve, held by the Liquidation Trust as of the Effective Date or received by the Liquidation Trust after the Effective Date not used for Distributions on account of the Special Beneficial Interest is Liquidation Trust Available Cash.

### 5.      Class 4: General Unsecured Claims

General Unsecured Claims is any unsecured, non-priority Claim asserted against any of the Debtors or the Estates that is not a Convenience Class Claim, Subordinated Claim, or Intercompany Claim, including all Rejection Claims but excluding (a) any Claims arising from any executory contracts or unexpired leases that are assumed during the Chapter 11 Cases, and (b) any vendor or other Claims satisfied in the ordinary course of business or pursuant to any order of the Bankruptcy Court.

Class 4 consists of all General Unsecured Claims.  Class 4 is Impaired under the Plan and is entitled to vote on the Plan.

Each Holder of a General Unsecured Claim, in full satisfaction, settlement, and release of and in exchange for such General Unsecured Claim receives on the Effective Date its Pro Rata share of the General Beneficial Interests in the Liquidation Trust.  Holders of General Beneficial Interests are entitled to GUC Interest to the extent of the Liquidation Trust Available Cash, if they receive Distributions equal to the full amount of their Allowed General Unsecured Claims.

*[Link-to-previous setting changed from off in original to on in modified.]*.

[Link-to-previous setting changed from off in original to on in modified.]

Each Contributing Creditor who executes any documents the Liquidation Trustee reasonably requests to complete the Contributing Creditor's transfer of its Contributed Claim to the Liquidation Trust will be entitled to an additional Distribution (that does not count against any other Distribution) on account of that Contributing Creditor's General Beneficial Interest equal to that Contributing Creditor's Pro Rata portion of 10% of the Net Proceeds of all Causes of Action against GT, net of the CODI share of those Net Proceeds under Section 3.02(c)(v) above, not to exceed the amount of that Contributing Creditor's Allowed General Unsecured Claim, provided that (i) the Contributing Creditor certifies on its Ballot or its Contribution Form under penalty of perjury that the Contributed Claim is colorable and supportable by evidence and (ii) the Liquidation Trustee (in consultation with the Liquidation Trust Oversight Board) independently and reasonably confirms that the Contributed Claim is colorable and supportable by evidence.

*For example*:  Assume the Net Proceeds of all Causes of Action against GT are $1,000,000.  Those net proceeds would be Distributed thus:  (i) $450,000 to CODI under Section 3.02(c)(v) above; (ii) $55,000 to be shared Pro Rata among all Contributing Creditors based on each Contributing Creditor's Allowed General Unsecured Claim amount in relation to all Contributing Creditors' Allowed General Unsecured Claim Amounts—*for example*, if Contributing Creditor #12's Allowed General Unsecured Claim is 6% of the total of all Contributing Creditors' Allowed General Unsecured Claim Amounts, Contributing Creditor #12 would receive 6% of the $55,000 = $3,300 ~~(which is greater than $5,000)~~; and (iii) $~~405,000~~495,000 to the Liquidation Trust as Liquidation Trust Available Cash.

### 6.    Class 5: Convenience Class Claims

Convenience Class Claims are any Claim that would otherwise be a General Unsecured Claim but, with respect to any such Claim, the applicable Claim either (a) is in an amount less than or equal to $10,000 or (b) is reduced to $10,000 pursuant to a Convenience Class Election.

Class 5 consists of all Convenience Class Claims.  Class 5 is Impaired under the Plan and is entitled to vote on the Plan.

~~Each Holder who makes a Convenience Class Election is deemed to have voted to accept the Plan irrespective of any vote to reject the Plan reflected on a Ballot that also reflects a Convenience Class Election.~~  Each Holder of an Allowed Convenience Class Claim, in full satisfaction, settlement, and release of and in exchange for such Allowed Convenience Class Claim, on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Convenience Class Claim becomes an Allowed Claim, receives Cash from the Liquidation Trust in the amount equal to 50% of its Allowed Convenience Class Claim.

### 7.    Class 6: Intercompany Claims

Intercompany Claims are any Claims of one Debtor against another Debtor.

Class 6 consists of all Intercompany Claims.  Class 6 is Impaired under the Plan.

[Link-to-previous setting changed from off in original to on in modified.]

*[Link-to-previous setting changed from off in original to on in modified.]*

Holders of Intercompany Claims do not receive any property or interest in property under the Plan on account of such Intercompany Claims. Class 6 is deemed to have rejected the Plan under Bankruptcy Code section 1126(g) and, therefore, Holders of Class 6 Claims are not entitled to vote on the Plan.

### 8.    Class 7: Subordinated Claims

Subordinated Claims are, collectively, (a) any Non-Compensatory Penalty Claims, and (b) any Claim that is subordinated to General Unsecured Claims pursuant to section 510 of the Bankruptcy Code, a Final Order, or by consent of the Holder of such Claim.

Class 7 consists of all Subordinated Claims. Class 7 is Impaired under the Plan.

Holders of Subordinated Claims do not receive any property or interest in property under the Plan on account of such Subordinated Claims. Class 7 is deemed to have rejected the Plan under Bankruptcy Code section 1126(g) and, therefore, Holders of Class 7 Claims are not entitled to vote on the Plan.

### 9.    Class 8: Equity Interests

Equity Interests are all previously issued and outstanding common stock, preferred stock, membership interests, or other ownership interests in any of the Debtors outstanding immediately prior to the Effective Date, including restricted stock, treasury stock, and all options, warrants, calls, rights, puts, awards, commitments, appreciation rights, or any other agreements of any character to convert, exchange, exercise for, or otherwise receive any such common stock, preferred stock, membership interests, or other ownership interests. Equity Interests include all stock in and options to acquire stock of Lugano Holding.

Class 8 consists of all Equity Interests. Class 8 is Impaired under the Plan.

As of the Effective Date, all Equity Interests are cancelled. On and after the Effective Date, Holders of Equity Interests are not entitled to, and do not receive or retain any property or interest in property under the Plan on account of such Equity Interests. Class 8 is deemed to have rejected the Plan under Bankruptcy Code section 1126(g) and, therefore, Holders of Equity Interests are not entitled to vote on the Plan.

### 10.    Special Provisions Regarding Insured Claims

(a)    Any Allowed General Unsecured Claim that is an Insured Claim is Allowed only to the extent of the Uninsured Portion of such Claim.

(b)    Nothing in Section 3.03 of the Plan constitutes a waiver of any Causes of Action the Debtors, the Estates, or the Liquidation Trust may hold against any Person, including the Debtors' insurance carriers. The Debtors and the Liquidation Trust do not waive and expressly reserve their rights to assert that any insurance coverage is property of the Estates to which they are entitled.

[Link-to-previous setting changed from off in original to on in modified.]

**11.      Resolution of Claims and Controversies.**

Pursuant to sections 1123(a)(5), 1123(b)(3), and 1123(b)(6) of the Bankruptcy Code and in consideration of the Distributions and other benefits provided under the Plan and the Liquidation Trust Agreement, the ~~provisions of~~settlements contained in the Plan and the Liquidation Trust Agreement and the provisions related thereto constitute a good faith compromise and settlement of the claims and controversies ~~set forth in the Plan~~resolved pursuant thereto, including the CODI Settlement and the Intercompany Claims.  The entry of the Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies, including the CODI Settlement and the Intercompany Claims, and the Bankruptcy Court's finding that such compromises are (i) in the best interest of the Debtors, the Estates, and their respective property and stakeholders; and (ii) fair, equitable, and reasonable.

**E.      Acceptance or Rejection of Plan**

**1.      Impaired Classes of Claims Entitled to Vote**

Only the votes of Holders of Allowed Claims in Class 3, Class 4, and Class 5 are solicited with respect to the Plan.

**2.      Modifications of Votes**

Following the Voting Deadline, no Creditor entitled to vote on the Plan may change its vote cast on the Plan or any attendant elections or preferences without the written consent of the Debtors, which consent may be given or withheld in the Debtors' reasonable discretion.

**3.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

Because at least one Impaired Class is deemed to have rejected the Plan, the Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**4.      Elimination of Vacant Classes; Presumed Acceptance by Non-Voting Classes**

Any Class of Claims or Equity Interests that does not contain, as of the date of the commencement of the Confirmation Hearing, a Holder of an Allowed Claim, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, is deemed deleted from the Plan for purposes of determining acceptance of the Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.  ~~If a Class contains Claims eligible to vote and no Holders of Claims eligible~~

[Link-to-previous setting changed from off in original to on in modified.].

*[Link-to-previous setting changed from off in original to on in modified.]*

~~to vote in such Class vote to accept or reject the Plan, the Holders of such Claims in such Class is deemed to have accepted the Plan.~~

## F.    Implementation of the Plan

### 1.    Implementation of the Plan

The Plan is implemented by various acts and transactions as set forth in the Plan, including, among other things, the CODI Settlement, the establishment of the Liquidation Trust, the appointment of the Liquidation Trustee, and the making of Distributions by the Liquidation Trust.

### 2.    Streamlining the Debtors' Corporate Affairs

#### (a)    Debtors' Existing Directors, Officers, and Managers

On the Effective Date, each of the Debtors' existing directors, officers, and managers are terminated automatically without the need for any Corporate Action and the Special Committee is disbanded.  Such directors, officers, and managers have no ongoing rights against or obligations (except confidentiality obligations) to the Debtors or the Estates on and after the Effective Date, except that each such Person may file (i) a proof of claim by the Rejection Claims Bar Date if not barred by the Bar Date Order or (ii) a request for payment of an Administrative Claim in accordance with the Plan, and, if Allowed, receive Distributions on account of such Claims in accordance with the Plan.

#### (b)    Dissolution of the Debtors and Cancellation of Equity Interests

(i)    <u>Debtors Other Than the Post-Confirmation Debtor</u>.  On the Effective Date, each of the Debtors other than the Post-Confirmation Debtor is dissolved automatically without the need for any further Corporate Action, without the need for any corporate or limited liability company filings, and without the need for any other or further actions to be taken by or on behalf of such dissolving Debtor or any other Person or any payments to be made in connection therewith; *provided* that any such Debtor may in its discretion file any certificates of cancellation as may be appropriate in connection with dissolution of such Debtor.  All existing Equity Interests in the Debtors are cancelled as of the Effective Date.

(ii)    <u>Post-Confirmation Debtor</u>.  The Post-Confirmation Debtor continues and remains in existence on and after the Effective Date solely for implementation of the Post-Confirmation Debtor Functions.  On the Effective Date, the 100% ownership interest in the Post-Confirmation Debtor is issued to the Liquidation Trust, and the Liquidation Trustee serves as the Post-Confirmation Debtor's sole board member and officer and performs the Post-Confirmation Debtor Functions.  On the Effective Date, the certificate of incorporation and bylaws of the Post-Confirmation Debtor are deemed amended to the extent necessary to carry out the provisions of the Plan and for the Post-Confirmation Debtor to carry out the Post-Confirmation Debtor Functions.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

### (c)  Corporate Documents and Corporate Authority

The entry of the Confirmation Order constitutes authorization for the Debtors to take or cause to be taken all actions (including, if applicable, Corporate Actions) necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken are deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation, including, without limitation, carrying out the Post-Confirmation Debtor Functions.

### (d)  Vesting of Estate Assets

On the Effective Date, all property of the Debtors' Estates, including the Specified Assets (but excluding the Tax Refund), all Causes of Action, and any Cash (including the Liquidation Trust Expense Reserve but excluding the Effective Date Reserves and the Professional Fee Reserve), vests in the Liquidation Trust subject only to any Liens and the terms of the CODI Settlement.  To the extent avoided, Liens are preserved for the benefit of the Liquidation Trust. The Tax Refund is vested in the Post-Confirmation Debtor on the Effective Date.

### (e)  Disposal and Use of Property

The Liquidation Trustee may use, acquire and dispose of property without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, (other than, to the extent applicable, Bankruptcy Rule 7023.1), other than those restrictions imposed by the Plan, the Liquidation Trust Agreement, any other documents in the Plan Supplement, or the Confirmation Order.  The Liquidation Trustee (and, with respect to the Tax Refund, the Post-Confirmation Debtor), on and after the Effective Date, may conduct any sales, liquidations, or monetization of Estate Assets on any terms it deems without further order of the Bankruptcy Court, except as otherwise provided in the Plan, the Confirmation Order, or the Liquidation Trust Agreement.

### (f)  Representative of the Estates

The Liquidation Trustee is the successor to and representative of the Estates for purposes of section 1123(b)(3)(B) of the Bankruptcy Code, including, without limitation, with respect to Avoidance Actions and any other Causes of Action, except for the Tax Refund for which the Post-Confirmation Debtor shall be the representative of the Estates for such purposes.  Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trustee retains and may enforce any claims, demands, rights and Causes of Action (including Avoidance Actions) that any Estate may hold against any Person to the extent not released under the Plan, provided that the Post-Confirmation Debtor may enforce such claims, demands, and Causes of Action with respect to the Tax Refund.

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

**(g)      Tax Refund**

Whenever received by the Post-Confirmation Debtor, the Cash proceeds of the Tax Refund, after payment of any reasonable expenses (including fees and expenses of counsel) incurred in connection with the collection of such funds, must be irrevocably transferred to the Liquidation Trust and paid in accordance with the terms of the Plan and the CODI Settlement Agreement.  The Post-Confirmation Debtor holds its rights in the Tax Refund in trust for the Liquidation Trust.

**3.      Liquidation Trust**

**(a)      Liquidation Trust Interests**

The Liquidation Trust has two series of Liquidation Trust Interests: (i) the Special Beneficial Interest; and (ii) General Beneficial Interests.  All Liquidation Trust Interests must be recorded on the books and records of the Liquidation Trust in accordance with the Liquidation Trust Agreement. Such recording is all that is required for Liquidation Trust Interests to be Distributed to Holders of Claims.

**(b)      Appointments**

(iii)    On and after the Effective Date, the initial Liquidation Trustee, Michael Goldberg, becomes and serves as Liquidation Trustee.  The Liquidation Trustee receives compensation and reimbursement of expenses as set forth in the Liquidation Trust Agreement.

(iv)    On and after the Effective Date, the initial Liquidation Trust Oversight Board, as designated in the Plan, begins to serve without further action. Any compensation and reimbursement of reasonable expenses are as set forth in the Liquidation Trust Agreement.

**(c)      Creation and Governance of the Liquidation Trust**

On the Effective Date, the Liquidation Trustee must execute the Liquidation Trust Agreement, assume and begin performing his duties under the Plan and the Liquidation Trust Agreement, and take any other steps necessary to establish the Liquidation Trust in accordance with the Plan.  The powers, rights, and responsibilities of the Liquidation Trustee are specified in the Liquidation Trust Agreement.

**(d)      Vesting of Liquidation Trust Assets**

On the Effective Date, the Liquidation Trust is automatically vested with all Liquidation Trust Assets; provided that, to the extent that the Debtors cannot or are prohibited from transferring any asset or assets to the Liquidation Trust, the Post-Confirmation Debtor holds such Liquidation Trust Asset and its proceeds in trust for the benefit of the Liquidation Trust.  Except as otherwise provided in the Plan or the Confirmation Order, the Liquidation Trust Assets automatically vest in the Liquidation Trust free and clear of all Claims, Liens, or interests subject only to the Liquidation Trust Interests and the Liquidation Trust Expenses, as provided for in the

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

Liquidation Trust Agreement, and such vesting is exempt from any stamp, real estate transfer, other transfer, mortgage reporting, sales, use, or other similar tax. The Liquidation Trustee shall be the exclusive trustee of the Liquidation Trust Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estates appointed pursuant to section 1123(b)(3) of the Bankruptcy Code regarding all Liquidation Trust Assets. The Liquidation Trust holds and distributes the Liquidation Trust Assets in accordance with the provisions of the Plan and the Liquidation Trust Agreement.

### (e)    Contribution of Contributed Claims.

On the Effective Date, all Contributed Claims are irrevocably contributed to the Liquidation Trust for all purposes. No Person may rely on the absence of a specific reference to any Contributed Claims in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to indicate that the Liquidation Trust will not pursue any available Contributed Claims. The objection to the Allowance of any Claims held by a Contributing Creditor does not limit the Liquidation Trust's right to prosecute any Contributed Claims. Nothing contained in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement waives, releases, or relinquishes any Contributed Claim. The Liquidation Trust may assert all Contributed Claims fully as if the Contributed Claims had not been contributed to the Liquidation Trust.

### (f)    Purpose of the Liquidation Trust

The Liquidation Trust is established for the purpose of pursuing or liquidating the Liquidation Trust Assets and making Distributions to the Liquidation Trust Beneficiaries in accordance with Treasury Regulation section 301.7701- 4(d), with no objective to continue or engage in the conduct of a trade or business.

### (g)    Authority

Subject to the supervision of the Liquidation Trust Oversight Board, the Liquidation Trustee has the authority and right on behalf of the Debtors and the Estates and without the need for Bankruptcy Court approval (in each case, unless otherwise provided in the Plan or to the Liquidation Trust Agreement) to carry out and implement all applicable provisions of the Plan, all as described in the Liquidation Trust Agreement. The Liquidation Trust Oversight Board has only those rights and powers conferred on it under the Liquidation Trust Agreement.

### (h)    Limitation of Liability

The Liquidation Trust Agreement limits the liability of the Liquidation Trustee and the Liquidation Trust Oversight Board to the extent provided therein.

### (i)    Indemnification

The Liquidation Trust indemnifies the Liquidation Trustee, the Liquidation Trust Oversight Board, and their respective Related Parties in accordance with the Liquidation Trust Agreement.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

### (j)    Distributions from the Liquidation Trust

The Liquidation Trust Agreement controls all Distributions to Liquidation Trust Beneficiaries.

### (k)    Exemption

To the extent the Liquidation Trust Interests are deemed to be "securities," the issuance of such interests under the Plan are exempt, pursuant to section 1145 of the Bankruptcy Code, from registration under the Securities Act and any applicable state and local laws requiring registration of securities.

### (l)    Termination of the Liquidation Trust

The Liquidation Trustee and the Liquidation Trust are discharged or terminated, as the case may be, when and under the circumstances established in the Liquidation Trust Agreement.

### (m)    Control Provision

To the extent there is any inconsistency between the Plan and the Liquidation Trust Agreement, the Plan controls.

### 4.    Preservation of Privileges and Defenses

The actions taken by the Debtors, the Liquidation Trust, or any of their respective Related Parties in connection with the Plan do not waive any privilege or defense of the Debtors or the Liquidation Trust, as applicable, including any attorney-client privilege or work-product doctrine. All privileges shall be preserved and shall vest in the Liquidation Trust.

### 5.    Creation and Funding of Reserves

On the Effective Date, the Liquidation Trustee must create and, thereafter, maintain the Effective Date Reserves, Professional Fee Reserve, and the Liquidation Trust Expense Reserve.

### (a)    Reserves for Specified Purposes Only

A Cash reserve may only be used to make Distributions for which it has been established. Any Cash remaining in a reserve ultimately not needed for Distributions becomes Liquidation Trust Available Cash.

### (b)    Professional Fee Reserve

The Liquidation Trustee must fully fund the Professional Fee Reserve on the Effective Date in an amount equal to the Professionals' and Ordinary Course Professionals' estimates of unpaid Fee Claims as of the Effective Date (incorporating any Cash already set aside under the Cash Collateral Order). Each Professional or Ordinary Course Professional must deliver to the Debtors, the Creditors' Committee, and CODI its estimate no later than three Business Days

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

prior to the Effective Date.  If a dispute regarding the amount of the Professional Fee Reserve arises, then any Professional or Ordinary Course Professional may submit the issue to the Bankruptcy Court, which, following notice and a hearing, fixes the amount of the required funding.  Any Cash in the Professional Fee Reserve in excess of the aggregate Allowed Professional Fee Claims (as reduced to reflect payment) shall be distributed in accordance with Section 3.02(c)(ii) of the Plan (described above in Section IV.D.4(ii) of this Disclosure Statement) and, thereafter, any additional amounts become Liquidation Trust Available Cash. The Professional Fee Reserve is not an Effective Date Reserve.

### (c)    Liquidation Trust Expense Reserve

The Liquidation Trust Agreement must include provisions for additional future funding of the Liquidation Trust Expense Reserve.

### (d)    Effective Date Reserves

The initial amount of the Effective Date Reserves must be agreed upon among the Creditors' Committee, the Debtors, and CODI and set forth in the Plan Supplement.  The Effective Date Reserves are established, maintained, and administered by the Liquidation Trustee as a disbursing agent for the Debtors. The Liquidation Trustee must administer, and the Liquidation Trust Oversight Board must oversee the Liquidation Trustee in connection with, the Effective Date Reserves as if the terms and conditions governing the rights, powers, obligations, and protections set forth in the Liquidation Trust Agreement applying to the Liquidation Trustee and the Liquidation Trust Oversight Board applied to the Effective Date Reserves.

## 6.    Preservation of Causes of Action

### (a)    Preservation of All Causes of Action Not Expressly Settled or Released

The Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor, as a successor in interest to the Debtors and the Estates, has the exclusive right, power, and interest on behalf of itself, the Debtors and the Estates to institute, commence, file, pursue, prosecute, enforce, abandon, settle, compromise, release, waive, dismiss, or withdraw any and all Causes of Action (including any GT Claim and any Contributed Claim) without any further order of the Bankruptcy Court, except as otherwise provided in the Liquidation Trust Agreement or, if applicable, as required by Bankruptcy Rule 7023.1.  The failure to specifically identify in the Disclosure Statement or the Plan any potential or existing Avoidance Actions or Causes of Action is not intended to and does not limit the rights of the Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor, to pursue any such Avoidance Actions or Causes of Action.  Unless a Cause of Action (including any GT Claim and any Contributed Claim) is expressly waived, relinquished, released, compromised, or settled in the Plan or any Final Order (including the Confirmation Order), the Debtors expressly reserve such Cause of Action for later resolution by the Liquidation Trust, and, with respect to the Tax Refund, the Post-Confirmation Debtor. As such, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial,

*[Link-to-previous setting changed from off in original to on in modified.]*

60267091.6

34

*[Link-to-previous setting changed from off in original to on in modified.]*

equitable, or otherwise), or laches applies to any such Avoidance Actions or Causes of Action upon or after Confirmation of the Plan based on the Disclosure Statement, the Plan, the Confirmation Order, or based on any Claim becoming Allowed, in each case unless such Avoidance Actions or Causes of Action have been expressly released. In addition, the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor or the Liquidation Trust is a plaintiff, defendant, or an interested party is fully reserved as against any Person that is not a Released Party, including the plaintiffs or co-defendants in such lawsuits. A non-exclusive list of Causes of Action is included in the Plan Supplement.

### 7. Cancellation of Instruments

Except with respect to any executory contracts and unexpired leases that are assumed and assigned to the Liquidation Trust under the Plan or otherwise assumed and assigned pursuant to a Final Order, any agreement, bond, certificate, contract, indenture, lease, note, security, warrant, or other instrument or document evidencing or creating any indebtedness or obligation of the Debtors is deemed cancelled on the Effective Date, and all Liens, mortgages, pledges, grants, trusts, and other interests relating thereto are automatically cancelled, and all obligations of the Debtors thereunder or in any way related thereto are discharged.

### 8. Substantive Consolidation

(a) Pursuant to section 1123(a)(5)(C) of the Bankruptcy Code and the Bankruptcy Court's equitable powers under section 105(a) of the Bankruptcy Code, the Plan substantively consolidates all Debtors' Estates into a single consolidated Estate for all purposes under the Plan and the Liquidation Trust Agreement, including the Allowance of Claims, Distributions, and voting. On the Effective Date: (i) the Assets and liabilities of the Debtors are merged into the single consolidated Estate; (ii) all a Debtor's guaranties of another Debtor's obligations are eliminated and extinguished so that any Claim against any Debtor, and any guaranty thereof executed by any Debtor and any joint or several liability of any of the Debtors constitutes only one obligation of the consolidated Estate; (iii) each Claim Filed against any Debtor is treated as Filed against the consolidated Estate and treated as one Claim against and obligation of the consolidated Estate; (iv) all Intercompany Claims are eliminated and extinguished, and Holders of Intercompany Claims do not receive any Distributions or retain any property pursuant to the Plan on account of such Intercompany Claims; and (v) for purposes of determining the availability of the right of setoff under section 553 of the Bankruptcy Code, the Debtors are treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such consolidation does not affect any subordination provisions set forth in any agreement relating to any Claim or Equity Interest or the ability of the Liquidation Trust to seek to have any Claim or Equity Interest subordinated in accordance with any contractual rights or equitable principles. Notwithstanding anything in Section 5.09 of the Plan to the contrary, all post-Effective Date fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930, if any, are calculated on a separate legal entity basis for each Post-Effective Date Debtor.

(b) The Disclosure Statement and the Plan constitute a motion requesting that the Bankruptcy Court approve the substantive consolidation contemplated by the Plan. Unless an objection to the proposed consolidation is made in writing by any Creditor purportedly affected

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

by such consolidation on or before the deadline to object to confirmation of the Plan, or such other date as may be fixed by the Bankruptcy Court, the consolidation contemplated by the Plan may be approved by the Bankruptcy Court at the Confirmation Hearing. In the event any such objections are timely filed, a hearing with respect thereto will be scheduled by the Bankruptcy Court, which hearing may, but need not, be the Confirmation Hearing.

(c)    If the Bankruptcy Court determines that consolidation of any given Debtors is not appropriate, then the Debtors may request that the Bankruptcy Court otherwise confirm the Plan and approve the treatment of and Distributions to the different Classes under the Plan on an adjusted, Debtor-by-Debtor basis or otherwise treat the Plan as a separate Plan for each Debtor. Furthermore, the Debtors reserve their rights to seek confirmation of the Plan without implementing consolidation of any given Debtor, and, in the Debtors' reasonable discretion, to request that the Bankruptcy Court approve the treatment of and Distributions to any given Class under the Plan on an adjusted, Debtor-by-Debtor basis.

## G.    Executory Contracts and Unexpired Leases

### 1.    Assumption of Certain Executory Contracts and Unexpired Leases

#### (a)    Assumption of Agreements

On the Effective Date, the Debtors assume all executory contracts and unexpired leases that are listed on the Schedule of Assumed Agreements and retain or assign such contracts and leases as set forth on the Schedule of Assumed Agreements and all other executory contracts and unexpired leases are rejected under Section 6.02 of the Plan.  Any assumed contracts and leases not assigned to a third party are transferred to the Liquidation Trust and constitute Liquidation Trust Assets.  The Debtors reserve the right to amend the Schedule of Assumed Agreements at any time prior to the Effective Date, in the Debtors' reasonable discretion (i) to delete any executory contract or unexpired lease and provide for its rejection under the Plan or otherwise, or (ii) to add any executory contract or unexpired lease and provide for its assumption and assignment under the Plan. The Debtors must provide notice of any amendment to the Schedule of Assumed Agreements to the party or parties to those agreements affected by the amendment. Unless otherwise specified on the Schedule of Assumed Agreements, each executory contract and unexpired lease listed or to be listed therein includes any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is also listed on the Schedule of Assumed Agreements.  The Confirmation Order constitutes a Bankruptcy Court order approving the assumption and assignment, on the Effective Date, of all executory contracts and unexpired leases identified on the Schedule of Assumed Agreements.

#### (b)    Cure Payments

Any amount that must be paid under section 365(b)(1) of the Bankruptcy Code to cure a default under and compensate the non-Debtor party to an executory contract or unexpired lease to be assumed under the Plan is identified as the "Cure Payment" on the Schedule of Assumed

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

Agreements, if any. Unless the parties mutually agree to a different date, such payment must be made in Cash within ten Business Days following the later of: (i) the Effective Date and (ii) entry of a Final Order resolving any disputes regarding (A) the amount of any Cure Payment, (B) the ability of the Liquidation Trust or such other entity to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code with respect to a contract or lease to be assumed, to the extent required, or (C) any other matter pertaining to assumption and assignment.

#### (c)    Objections to Assumption/Cure Payment Amounts

Any Person that is a party to an executory contract or unexpired lease that to be assumed or assigned under the Plan and that objects to such assumption or assignment (including the proposed Cure Payment) must File with the Bankruptcy Court and serve on parties entitled to notice a written statement and, if applicable, a supporting declaration stating the basis for its objection. This statement and, if applicable, declaration must be Filed and served on or before the deadline established by the Disclosure Statement Order. Any Person that fails to timely File and serve such a statement and, if applicable, a declaration waives any and all objections to the proposed assumption and assignment (including the proposed Cure Payment) of its contract or lease.

In the absence of a timely objection by a Person that is a party to an executory contract or unexpired lease, the Confirmation Order constitutes a conclusive determination regarding the amount of any cure and compensation due under the applicable executory contract or unexpired lease, as well as a conclusive finding that the Liquidation Trust has demonstrated adequate assurance of future performance with respect to such executory contract or unexpired lease, to the extent required.

#### (d)    Resolution of Claims Relating to Assumed Contracts and Leases

Payment of the Cure Payment established under the Plan, by the Confirmation Order, or by any other order of the Bankruptcy Court, with respect to an assumed and assigned executory contract or unexpired lease, satisfies in full, any prepetition or postpetition arrearage or other Claim (including any Claim asserted in a Filed proof of claim or listed on the Schedules) with respect to such contract or lease (irrespective of whether the Cure Payment is less than the amount set forth in such proof of claim or the Schedules). Upon the tendering of the Cure Payment, any such Filed or Scheduled Claim is disallowed with prejudice, without further order of the Bankruptcy Court or action by any Person.

#### (e)    Insurance Policies

(i)    <u>Assumption or Rejection</u>.  On the Effective Date, the Theft Policy and the Debtors' Insurance Contracts relating to directors and officers liability insurance and any other Insurance Contracts set forth in the Plan Supplement that are in force, current, and not expired are treated as and deemed to be executory contracts under the Plan.  On the Effective Date, the rights and interests in the above-referenced policies are assumed by the Debtors and assigned to the Liquidation Trust pursuant to section 365 of the Bankruptcy Code (the "<u>Insurance Rights Transfer</u>").  All other Insurance Contracts, if they are deemed executory contracts under the Plan, are rejected as of the

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

Petition Date pursuant to section 365 of the Bankruptcy Code. Entry of the Confirmation Order constitutes the Bankruptcy Court's approval of the assumption Insurance Rights Transfer and rejection of the Insurance Contracts, as applicable.

(ii)    Reservation of Rights. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Confirmation Order, the Disclosure Statement Order, the Bar Date Order and any related notices, any claim objection, or any document related to the foregoing, except as set forth in Section 6.01(e) of the Plan, nothing (A) alters the rights and obligations of the Debtors, their Estates, the Post-Confirmation Debtor, the Liquidation Trust, and the Insurers under any Insurance Contracts, (B) modifies the coverage provided under any Insurance Contract or the terms and conditions thereof, or (C) affects the insurers' rights and interests in any collateral or security they hold. For the avoidance of doubt, all rights and obligations under the Insurance Contracts are governed by the applicable Insurance Contracts and applicable law.

(iii)    Relief from Stay/Injunction for Limited Purposes. The automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XI of the Plan, if and to the extent applicable, are deemed modified without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; and (B) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of the Bankruptcy Court, (1) workers' compensation claims, (2) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, or where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article XI of the Plan to proceed with its claim, and (3) all costs in relation to each of the foregoing. For the avoidance of doubt, to the extent that a workers' compensation claim (A) is not (1) payable pursuant to one of the Insurance Contract(s) or (2) paid by a party that is not the Debtors, the Liquidation Trust or the Liquidation Trustee, and (B) is an Allowed Claim, such workers' compensation claim is treated in a manner consistent with the terms of the Plan.  The Liquidation Trust is never liable for such Claims.

(iv)    Prohibition on Certain Acts. Each Insurer is prohibited from, and the Confirmation Order must include an injunction against, denying, refusing, altering, or delaying coverage solely on any basis regarding or related to the Chapter 11 Cases, the Plan or any provision within the Plan; provided that nothing in the Plan grants or should be deemed to grant any claimant relief from the automatic stay of section 362(a) of the Bankruptcy Code and the injunctions set forth in Article XI of the Plan, if applicable, to proceed with their claims (other than workers' compensation and direct action claims, as provided for in Section 6.01(e) of the Plan) without first seeking and receiving relief from the Bankruptcy Court from the automatic stay and/or such injunctions, to the extent applicable; provided further Insurers may take any actions relating to the Insurance Contracts (including effectuating a setoff or recoupment), to the extent permissible in accordance with applicable non-bankruptcy law or the terms of the Insurance Contracts, provided that the Insurers must return any remaining collateral or security to the Liquidation Trust in accordance with the terms of the Insurance Contracts.

(v)    Insurance Rights Transfer Back-Up. Except as otherwise expressly provided in the Plan, the Debtors will make the Insurance Rights Transfer to the Liquidation Trust as required by the Plan.  If any entity or individual is, at any time, legally precluded from transferring its rights, titles,

privileges, interests, claims, demands, or entitlements to any proceeds, payments, benefits, Causes of Action, choses in action, defense, or indemnity, now existing or arising in the future, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, Disputed or undisputed, fixed or contingent, arising under or attributable to the insurance rights and interests subject to the Insurance Rights Transfer, then that entity or individual must: (A) take any actions reasonably requested by the Liquidation Trust to pursue any such insurance rights and interests for the benefit of the Liquidation Trust; and (B) promptly transfer to the Liquidation Trust any amounts recovered under or on account of any of such insurance rights and interests; provided, that while any such amounts are held by or under the control of any entity or individual, such amounts are held for the benefit of the Liquidation Trust.

(vi)     D&O Indemnification and Setoff Rights.   Nothing in the Plan (including Definitions 17 and 95, Sections 5.02(a), 5.06 5.07, 6.01(e), 10.01, 10.03,11.06(a),11.08, and 11.09) or the Liquidation Trust Agreement (including Sections 1.2(f) and (hh), 2.3(a), and 2.4(a)) has, or may be interpreted or deemed to have, any of the following effects: (a) transfer to the Liquidation Trust, impair, enjoin, or preclude any of the Debtors' directors or officers from asserting any right of setoff, recoupment, or other defense (including any right arising from or related to any indemnification obligation, director and officer insurance coverage (the "D&O Insurance"), or any other agreement with the Debtors) in connection with any Cause of Action asserted against any such director or officer by or on behalf of the Debtors, the Estates, the Liquidation Trust, or any of their successors; (b) release, waive, impair, limit, extinguish, or otherwise affect any right of any of the Debtors' directors or officers to access, claim, or receive the benefits of coverage under any D&O Insurance or other Insurance Contract and such director's or officer's rights to indemnification, advancement of expenses, contribution, setoff, recoupment, or other defense arising under the Debtors' organizational documents, any agreement to which a Debtor is a party, or applicable law; provided, however, such rights to indemnification, advancement of expenses, contribution, setoff, recoupment or other defenses are subject to the provisions of the Bar Date Order, the Plan and the Confirmation Order; (c) require any of the Debtors' directors or officers to seek relief from the automatic stay, the injunctions contained in the Plan, or any other provision of the Plan as a precondition to accessing coverage under any D&O Insurance or other Insurance Contract; or (d) grant the Estates or the Liquidation Trust any interest in any payment to or on behalf of any of the Debtors' directors and officers under a D&O Insurance or other Insurance Contract.  Except as explicitly provided in the Plan, including in Article XI of the Plan, the Debtors, the Estates, and the Liquidation Trust reserve all rights to pursue any Causes of Action against any of the Debtors' directors or officers and to oppose any such director's or officer's assertion of any setoff, recoupment, defense, indemnification, contribution, or right under any D&O Insurance or other Insurance Contract.

## 2.     Rejection of Executory Contracts and Unexpired Leases

### (a)     Rejected Agreements

On the Effective Date all executory contracts and unexpired leases of the Debtors are rejected except for (i) executory contracts and unexpired leases that have been previously assumed or rejected by the Debtors, and (ii) executory contracts and unexpired leases that are set forth in the Schedule of Assumed Agreements.   The Confirmation Order constitutes a

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                             39

*[Link-to-previous setting changed from off in original to on in modified.]*

Bankruptcy Court order approving the rejection, on the Effective Date, of the executory contracts and unexpired leases to be rejected under the Plan.

### (b)    Rejection Claims Bar Date

Any Rejection Claim or other Claim for damages arising from the rejection under the Plan of an executory contract or unexpired lease must be Filed and served no later than the Rejection Claims Bar Date. Any such Rejection Claims that are not timely Filed and served are forever disallowed, barred, and unenforceable, and Persons holding such Claims do not receive and are barred from receiving any Distributions on account of such untimely Claims. If one or more Rejection Claims are timely Filed, the Liquidation Trust may object to any Rejection Claim on or prior to the Claim Objection Deadline.  The Rejection Claims Bar Date established by the Plan does not alter any rejection claims bar date established by a prior order of the Bankruptcy Court with respect to any executory contract or unexpired lease that was previously rejected in these Chapter 11 Cases.

## H.    Provisions Governing Distributions

### 1.    Timing of Distributions for Allowed Claims

Except as otherwise provided in the Plan or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Claims as of the applicable Distribution Date must be made on or as soon as practicable after the applicable Distribution Date.  Distributions made as soon as reasonably practicable after the Effective Date or such other date set forth in the Plan shall be deemed to have been made on such date.

### 2.    Calculating Distributions and Related Matters

The Liquidation Trustee, in his reasonable discretion, must calculate Liquidation Trust Available Cash and other amounts for or relating to Distributions for Liquidation Trust Beneficiaries (including the Disputed Claims Reserve) and may establish and hold back from Distributions reasonable reserves for other contingencies.

### 3.    Interest and Other Amounts Regarding Claims

Except to the extent provided in (a) section 506(b) of the Bankruptcy Code and Allowed by a Final Order, (b) the Plan, (c) the Confirmation Order, or (d) the Liquidation Trust Agreement, postpetition interest does not accrue and is not paid on any Claims, and no Holder of an Allowed Claim is entitled to interest, penalties, fees, or late charges accruing or chargeable on any Claim from and after the Petition Date.  Notwithstanding the previous sentence, if Holders of General Beneficial Interests are entitled to GUC Interest as provided in Section 3.02(d) above.

### 4.    Distributions

The Liquidation Trustee makes all Distributions under the Plan to Holders of Allowed Claims and is the Estates' disbursing agent under the Plan for all distributions to Holders of Allowed Claims entitled to distribution from one or more of the Effective Date Reserves.  The Liquidation Trustee is not required to give any bond or surety or other security for the performance

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

of any duties as disbursing agent. Distributions to Liquidation Trust Beneficiaries are made in accordance with the Liquidation Trust Agreement.

## 5.      Means of Cash Payment

Cash payments under the Plan must be made, at the option and in the sole discretion of the Liquidation Trustee, by (a) checks drawn on or (b) wire transfer, electronic funds transfer, or ACH from a domestic bank.  Cash payments to foreign Holders of Allowed Claims may be made, at the option and in the sole discretion of the Liquidation Trustee, by such means as are necessary or customary in a particular foreign jurisdiction. Cash payments made pursuant to the Plan in the form of checks are null and void if not cashed within 180 calendar days of the date of the issuance thereof.  Requests for reissuance of any check within 180 calendar days of the date of the issuance thereof must be made directly to the Liquidation Trustee.

## 6.      Form of Currency for Distributions

All Distributions under the Plan must be made in U.S. Dollars. Where a Claim has been denominated in foreign currency on a proof of claim, the Allowed amount of such Claim must be calculated in U.S. Dollars based upon the currency conversion rate in place as of the Petition Date and in accordance with section 502(b) of the Bankruptcy Code.

## 7.      Fractional Distribution

Notwithstanding anything in the Plan to the contrary, no Distribution of fractional cents will be made.  Whenever any Distribution of a fraction of a cent would otherwise be required, the actual Distribution made must reflect a rounding of such fraction to the nearest whole cent (up or down), with half cents or more being rounded up and fractions less than half of a cent being rounded down.

## 8.      De Minimis Distributions

Notwithstanding anything in the Plan to the contrary, the Liquidation Trustee is not required to Distribute, and will not Distribute, Cash or other property to a Liquidation Trust Beneficiary or to a Holder of an Allowed Claim if the amount of Cash or other property to be distributed on account of such Claim on any given Distribution Date is less than $10.00, and such amount will be Distributed to other Creditors on such Distribution Date in accordance with the terms of the Plan. Any Holder of an Allowed Claim on account of which the amount of Cash or other property to be distributed on any given Distribution Date is less than $10.00 is forever barred from asserting any Claim with respect to such eliminated Distribution against any Estate Assets.

## 9.      No Distributions with Respect to Certain Claims

Notwithstanding anything in the Plan to the contrary, no Distributions or other consideration of any kind are made on account of any Contingent Claim, Disputed Claim, or Unliquidated Claim unless and until such Claim becomes an Allowed Claim, and then only to the extent that such Claim becomes an Allowed Claim and as provided under the Plan for such Allowed Claim.  Nonetheless, in undertaking the calculations concerning Allowed Claims under the Plan, including the determination of Distributions due to Liquidation Trust Beneficiaries,

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

each Contingent Claim, Disputed Claim, or Unliquidated Claim is treated as if it were an Allowed Claim (which, for Unliquidated Claims, means they are treated as if Allowed in such amounts as determined in the reasonable discretion of the Liquidation Trustee) except that if a Claim is estimated under Section 8.03 of the Plan, such estimated amount is used with respect to such Claim. Distributions that may become due in respect of a Contingent Claim, Disputed Claim, or Unliquidated Claim must be held in reserve by the Liquidation Trust in the Disputed Claims Reserve.  The Liquidation Trust elects to treat any reserve as a "disputed ownership fund," pursuant to Treasury Regulation section 1.468B-9(c)(2)(ii). As outlined in this election, Creditors holding such Claims are not treated as transferors of the money or property transferred to the Disputed Claims Reserve.

### 10.      Distributions After Allowance

Notwithstanding any other provision of the Plan or the Confirmation Order, if any portion of a Claim is a Disputed Claim no payment or Distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  To the extent a Disputed Claim ultimately becomes an Allowed Claim, Distributions will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan, the Confirmation Order, and the Liquidation Trust Agreement.  When the Bankruptcy Court's order or judgment allowing any Disputed Claim becomes a Final Order, the Liquidation Trustee must provide—on the earlier of the next regularly-scheduled Distribution Date and 30 days after such order or judgment becomes a Final Order—to the Holder of such Claim the Distribution under Section 7.10 of the Plan as a catch-up Distribution to the extent any Distributions have by then been made to Holders of General Beneficial Interests.  Any taxes payable by the Disputed Claims Reserve must be withheld from the assets to be Distributed on account of such General Unsecured Claim.

### 11.      Delivery of Distributions

Distributions to Holders of Liquidation Trust Interests or Allowed Claims are made (a) at the addresses set forth in the proofs of claim Filed by such Holders, (b) at the addresses reflected in the Schedules if no proof of claim has been Filed, or (c) at the addresses set forth in any written notices of address changes delivered to the Claims Agent or to the Liquidation Trustee. If any Holder's Distribution is returned as undeliverable, no further Distributions to such Holder will be made unless and until the Liquidation Trustee is notified of such Holder's then-current address.  The responsibility to provide the Claims Agent or the Liquidating Trustee with a current address of a Holder of Liquidation Trust Interests or Claims is the responsibility of such Holder.  Amounts in respect of undeliverable Distributions made by the Liquidation Trustee must be held in trust on behalf of the Holder of the Liquidation Trust Interest or Claim to which they are payable by the Liquidation Trustee until the earlier of the date that such undeliverable Distributions are claimed by such Holder and 180 calendar days after the date the undeliverable Distributions were made, after which time the Liquidation Trustee deals with any such remaining Cash as provided in the Liquidation Trust Agreement.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

12.    **Application of Distribution Record Date and Other Transfer Restrictions**

At the close of business on the Distribution Record Date, the claims register for all Claims must be closed, and there may be no further changes in the record holders of any Claims on the claims register. Except as provided in the Plan or in the Liquidation Trust Agreement, the Liquidation Trustee and his Related Parties have no obligation to recognize any putative transfer of Claims occurring after the Distribution Record Date.

13.    **Withholding, Payment, and Reporting Requirements Regarding Distributions**

All Distributions under the Plan, to the extent applicable, must comply with all Tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions are subject to any such withholding, payment, and reporting requirements. The Liquidation Trustee is authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements, including, to the extent such information is not already available to the Liquidation Trust, requiring each Holder of a Liquidation Trust Interest or Claim to provide an executed current Form W-9, Form W-8, or similar Tax form as a prerequisite to receiving a Distribution. Notwithstanding any other provision of the Plan, (a) each Holder of a Liquidation Trust Interest or an Allowed Claim that is to receive a Distribution pursuant to the Plan has sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed by any governmental unit, including income, withholding, and other Tax obligations, on account of such Distribution, and including, in the case of any Holder of a Disputed Claim that has become an Allowed Claim, any Tax obligation that would be imposed on the Liquidation Trust in connection with such Distribution; and (b) no Distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidating Trustee for the payment and satisfaction of such withholding Tax obligations or such Tax obligation that would be imposed in connection with such Distribution.

14.    **Defenses and Setoffs**

On and after the Effective Date, the Liquidation Trust has all the Debtors' and the Estates' rights under section 558 of the Bankruptcy Code with respect to Claims. Nothing under the Plan affects the rights and defenses of the Debtors, the Estates, or the Liquidation Trust in respect of any Claim, including all rights in respect of legal and equitable objections, defenses, setoffs, or recoupment against such Claims. Accordingly, the Liquidation Trustee may, but is not required to, with prior notice to the affected Creditor, set off against any Claim or any Allowed Claim, and the payments or other Distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors, the Estates, or the Liquidation Trust, as applicable, may have against the Holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim under the Plan waives or releases of any such claim or rights that may exist against such Holder.

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

### 15.    Allocation of Distributions

All Distributions received under the Plan by Holders of Liquidation Trust Interests and Claims are deemed to be allocated first to the principal amount of such Claim, or the Claim to which the applicable Liquidation Trust Interest relates, as determined for United States federal income Tax purposes, and then to accrued interest, if any, with respect to such Claim.

### 16.    Joint Distributions

The Liquidation Trustee may, in its sole discretion, make Distributions jointly to any Holder of a Claim and any other Person that the Liquidation Trustee has determined to have an interest in such Claim.

### 17.    Forfeiture of Distributions

If the Holder of a Claim fails to cash a check payable to it within the time period set forth in Section 7.05 of the Plan, fails to claim an undeliverable Distribution within the time limit set forth in Section 7.11 of the Plan, or fails to complete and return to the Liquidation Trustee the appropriate Form W-8 or Form W-9 within 180 calendar days after a request for the completion and return of the appropriate form pursuant to Section 7.13 of the Plan (or such later time as approved by a Bankruptcy Court order), then such Holder is deemed to have forfeited its right to any reserved and future Distributions under the Plan. Any such forfeited Distributions become Liquidation Trust Available Cash for all purposes, notwithstanding any federal or state escheat laws to the contrary.

## I.    Disputed, Contingent, and Unliquidated Claims

### 1.    Objections to and Resolution of Disputed Claims

Except as otherwise provided in the Liquidation Trust Agreement, from and after the Effective Date, the Liquidation Trust has the exclusive authority to compromise, resolve, and Allow any Disputed Claim without the need to obtain approval from the Bankruptcy Court, and any agreement entered into by the Liquidation Trust with respect to the Allowance of any Claim is conclusive evidence and a final determination of the Allowance of such Claim.  Until the Effective Date, the Debtors expressly reserve the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against them or any Avoidance Actions and Causes of Action belonging to the Estates.

### 2.    Claim Objections

All objections to (or requests to estimate) Claims (other than Professional Fee Claims) must be Filed by the Liquidation Trust on or before the Claim Objection Deadline, which may be extended on the Liquidation Trustee's motion to the Bankruptcy Court made prior to the expiration of such period.  The Claim Objection Deadline is automatically extended as provided by Local Rule 9006-2 upon the Filing of a motion by the Liquidation Trust requesting an extension of the Claim Objection Deadline. If a timely objection has not been Filed to a proof of claim or the Schedules have not been amended with respect to a Claim that was Scheduled by the

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

Debtors but was not Scheduled as contingent, unliquidated, or disputed, then the Claim to which the proof of claim or Scheduled Claim relates is treated as an Allowed Claim.

### 3.    Estimation of Certain Claims

The Liquidation Trust may, at any time, move for a Bankruptcy Court order estimating any Contingent Claim, Disputed Claim, or Unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court retains jurisdiction and power to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  ~~The~~Subject to section 502(j) of the Bankruptcy Code, the estimated amount of any Claim so determined by the Bankruptcy Court constitutes the maximum recovery that the Holder thereof may recover after the ultimate liquidation of its Claim, irrespective of the actual amount that is ultimately Allowed.  All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another.

## J.    Conditions Precedent to the Effective Date

### 1.    Conditions to the Effective Date

The occurrence of the Effective Date does not occur and the Plan does not be consummated unless and until each of the following conditions has been satisfied or duly waived pursuant to Section 9.02 of the Plan:

> (a)    the Bankruptcy Court enters the Confirmation Order;

> (b)    the Confirmation Order is not subject to any stay;

> (c)    all governmental and material third-party approvals and consents necessary in connection with the transactions contemplated by the Plan, if any, have been obtained and are in full force and effect;

> (d)    all actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan, including the Liquidation Trust Agreement, are effected or executed and delivered, as applicable; and

> (e)    the Liquidation Trust Expense Reserve, Professional Fee Reserve, Disputed Claim Reserve, and Effective Date Reserves are funded in the amounts set forth in the Plan Supplement.

### 2.    Waiver of Conditions to the Effective Date

The conditions to the Effective Date set forth in clauses Section 9.01(c) and Section 9.01(d) of the Plan may be waived in writing by the Debtors, the Creditors' Committee, and

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

CODI; provided nothing contained in the Plan exempts the Debtors from complying with their legal obligations.

### 3. Effect of Non-Occurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not capable of being satisfied and not duly waived in accordance with Section 9.01 and Section 9.02 of the Plan, upon notification Filed by the Debtors with the Bankruptcy Court, (a) the Confirmation Order is vacated; (b) no Distributions shall be made; (c) the Debtors, the Estates, and all Creditors are restored to the status quo as of the moment immediately preceding the entry of the Confirmation Order; and (d) all of the Debtors' and the Estates' obligations with respect to Claims remain unchanged and nothing contained in the Plan waives or releases of any Causes of Action by or against the Debtors, the Estates, or any other Person, or prejudices in any manner the rights, claims, or defenses of the Debtors, the Estates, or any other Person.

### 4. Notice of the Effective Date

Promptly after the occurrence of the Effective Date, the Liquidation Trust must File and mail or cause to be mailed to all Creditors a notice that informs such Creditors of (a) entry of the Confirmation Order and the resulting confirmation of the Plan; (b) the occurrence of the Effective Date; (c) the assumption, assignment, and rejection of executory contracts and unexpired leases pursuant to the Plan, as well as the deadline for the filing of resulting Rejection Claims; (d) the deadline established under the Plan for the filing of Administrative Claims; and (e) such other matters as the Liquidation Trustee deems appropriate.

## K. Retention of Jurisdiction and Power

### 1. Scope of Retained Jurisdiction and Power

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court retains jurisdiction and power over all matters arising in, arising under, or related to the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including jurisdiction and power to do the following:

(a) except as otherwise Allowed pursuant to the Plan or in the Confirmation Order, Allow, classify, determine, disallow, establish the priority or secured or unsecured status of, estimate, limit, liquidate, or subordinate any Claim, in whole or in part, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims;

(b) hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 363, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(c) hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required cure or the

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

liquidation or allowance of any Claims arising therefrom;

(d)        effectuate performance of and payments under the provisions of the Plan and enforce remedies on any default under the Plan;

(e)        hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases or the Plan, including the Causes of Action;

(f)        enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created, executed, or contemplated in connection with the Plan, the Disclosure Statement, or the Confirmation Order, or the Liquidation Trust Agreement;

(g)        hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (including the Liquidation Trust Agreement), or to maintain the integrity of the Plan following consummation;

(h)        consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including the Confirmation Order;

(i)        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with the implementation, consummation, or enforcement of the Plan, the Confirmation Order, or the Liquidation Trust Agreement;

(j)        enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)        hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, the Liquidation Trust Agreement, the CODI Settlement Agreement, the Plan Support Agreement, or any contract, instrument, release, or other agreement or document created, executed, or contemplated in connection with any of the foregoing documents and orders;

(l)        enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings associated with the Plan or otherwise entered in connection with the Chapter 11 Cases (whether or not any or all of the Chapter 11 Cases have been closed);

(m)        except as otherwise limited by the Plan, recover all Estate Assets, wherever located;

(n)        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6

47

*[Link-to-previous setting changed from off in original to on in modified.]*

(o)      hear and determine all disputes involving the existence, nature, or scope of the Plan's release, exculpation and injunction provisions;

(p)      hear and determine such other matters as may be provided in the Confirmation Order or the Liquidation Trust Agreement or as may be authorized under, or not inconsistent with, the Bankruptcy Code and title 28 of the United States Code;

(q)      resolve any cases, controversies, suits, or disputes related to the Liquidation Trust and the Liquidation Trustee; and

(r)      enter a final decree closing any or all of the Chapter 11 Cases.

### 2.      Reserved Rights to Seek Bankruptcy Court Approval

Notwithstanding any provision of the Plan or the Liquidation Trust Agreement allowing an act to be taken without Bankruptcy Court approval, the Liquidation Trustee has the right to submit to the Bankruptcy Court any question or questions on which it may desire to have explicit approval of the Bankruptcy Court for the taking of any specific action proposed to be taken by the Liquidation Trust, as applicable, including the administration, settlement, distribution, or proposed sale of any of the Estate Assets or Liquidation Trust Assets. The Bankruptcy Court retains jurisdiction and power for such purposes and will approve or disapprove any such proposed action upon motion Filed by the Liquidation Trust.

### 3.      Non-Exercise of Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Section 10.01 of the Plan, the provisions of Article X of the Plan have no effect on, and do not control, limit, or prohibit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## L.      Miscellaneous Provisions

### 1.      Payment of Statutory Fees and Post-Confirmation Reports

All statutory fees payable pursuant to 28 U.S.C. § 1930 and any interest thereon pursuant to 31 U.S.C. § 3717 (together, "Statutory Fees") that are due and owing as of the Effective Date must be paid by the Debtors in full in Cash on the Effective Date.  The Debtors must file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidation Trustee must file with the Bankruptcy Court the final monthly operating reports and separate UST Form 11- PCR reports when they become due. After the Effective Date, the Liquidation Trustee must pay any and all applicable statutory feesStatutory Fees in full in Cash when due and payable.  Notwithstanding the consolidation of the Debtors called for in the Plan, the Liquidation Trustee remains obligated to pay any applicable statutory feesand must pay any Statutory Fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. The U.S. Trustee provides no release under the Plan. Statutory Fees are Allowed. The U.S. Trustee need not file any proof of claim or any request for administrative

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

expense for Statutory Fees. The provisions of this paragraph control notwithstanding any other provision in the Plan and/or Plan Supplement to the contrary.  Notwithstanding anything in the Plan and/or Plan Supplement to the contrary, nothing in the Plan and/or Plan Supplement (i) constitutes a determination (judicial or otherwise) that future distributions in the Chapter 11 Cases are not disbursements under 28 U.S.C. § 1930; (ii) otherwise exempts or shelters future distributions in the Chapter 11 Cases from § 1930; nor (iii) in any way prejudice the U.S. Trustee's rights under 28 U.S.C. § 1930 (which rights are fully reserved and preserved).

### 2.    Dissolution of the Creditors' Committee

The Creditors' Committee is automatically dissolved on the Effective Date and, on the Effective Date, each member of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee) and each Professional retained by the Creditors' Committee is released and discharged from all rights, duties, responsibilities, and obligations arising from, or related to, the Debtors, their membership on the Creditors' Committee, the Plan, or the Chapter 11 Cases, except with respect to any matters concerning any Professional Fee Claims held or asserted by any Professional retained by the Creditors' Committee.

### 3.    Modifications and Amendments

(a)    In the Debtors' reasonable discretion, the Debtors may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time at or prior to the conclusion of the Confirmation Hearing with the consent of the Creditors' Committee and CODI.  All alterations, amendments, or modifications to the Plan must comply with section 1127 of the Bankruptcy Code.  The Debtors must provide parties in interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court. A Creditor that has accepted the Plan is deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim of such Creditor.

(b)    After entry of the Confirmation Order and prior to the Effective Date, the Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement approved with respect to the Plan, the Confirmation Order, or the Liquidation Trust Agreement, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan.  Such proceedings must comply with section 1127 of the Bankruptcy Code.  To the extent required, prior notice of such proceedings must be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court.

### 4.    Severability of Plan Provisions

If, at or before the Confirmation Hearing, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.  That term or provision then applies as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the Plan's

*[Link-to-previous setting changed from off in original to on in modified.]*

[Link-to-previous setting changed from off in original to on in modified.]

remaining terms and provisions remain in full force and effect and are in no way affected, impaired, or invalidated.  The Confirmation Order constitutes a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with Section 11.07 of the Plan, is valid and enforceable under its terms.

## 5.    Binding Effect of Plan

Upon the Effective Date, section 1141 of the Bankruptcy Code becomes applicable with respect to the Plan and the Plan binds all Persons to the fullest extent permitted by section 1141(a) of the Bankruptcy Code. Confirmation of the Plan binds each Holder of a Claim or Equity Interest to all the terms and conditions of the Plan, whether or not such Holder's Claim or Equity Interest is Allowed, whether or not such Holder holds a Claim or Equity Interest that is in a Class that is Impaired under the Plan, and whether or not such Holder has accepted the Plan.  Any Holder of a Claim or Equity Interest that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 11.09 of the Plan but is bound by the other releases, exculpations, and injunctions in the Plan.

## 6.    Injunctions

**a)    (a)    From Without limiting the maximum effect of Bankruptcy Code § 1141(c) and except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, all Persons and Entities who have ever held, or will ever hold, or may hold Claims a Claim against or Equity Interests in the Debtors (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against, or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan)Interest in a Debtor, along with their respective present or former employees, agents, officers, directors, members, principals, and Affiliates, are permanently enjoined, solely with respect to any Claims dealt with under the Plan, Equity Interests dealt with under the Plan, and Causes of Action dealt with under the Plan,  from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or theany property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trustdealt with by the Plan; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering byin any manner or means, whetherway, directly or indirectly, any judgment, award, decree, or order against the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust; or theany property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trustdealt with by the Plan; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien or encumbrance of any kind against the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or theany property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trustdealt with by the Plan; (iv) asserting setoff, unless such setoff was formally asserted in a timely Filed proof of Claim or in a document Filed with the Bankruptcy Court prior to entry of the Confirmation Order, or right of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (v) acting or**

[Link-to-previous setting changed from off in original to on in modified.]

*[Link-to-previous setting changed from off in original to on in modified.]*

proceeding in any manner~~, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; *provided, however,* notwithstanding~~ **that interferes with the implementation or consummation of the Plan or any instrument or transaction required or contemplated by the Plan or is inconsistent with, or otherwise does not comply with, the Plan, the Liquidation Trust Agreement, or applicable law.**

b) **Notwithstanding** anything to the contrary in ~~the~~this Plan, the injunction set forth in this Section 11.06 ~~of the Plan~~ does not apply to any action taken by one CODI Party against another CODI Party.

~~(b)     As of the Effective Date, all Persons are precluded and barred from asserting against any property to be Distributed under the Plan any Causes of Action, Equity Interests, or other action or remedy based on any act, omission, transaction, or other activity that occurred before the Effective Date except as expressly provided in the Plan or the Confirmation Order.~~

~~(c)     Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Equity Interests, and other parties in interest, along with their Related Parties, are enjoined from taking any actions to interfere with the implementation or substantial consummation of the Plan by the Debtors, the Liquidation Trustee, or their respective Related Parties.~~

c) ~~(d)~~     By accepting ~~Distributions pursuant to the Plan~~any Distribution, each Holder of an Allowed Claim is deemed to have specifically consented to the ~~Injunctions~~Injunction set forth in this Section 11.06 ~~of the Plan~~.

7.     **Exculpation**

Except as otherwise specifically provided in the Plan, no Exculpated Party has or has incurred, and each Exculpated Party is exculpated from any Causes of Action for any Claim related to any act or omission taking place between the Petition Date and the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Confirmation Order, the Liquidation Trust Agreement, the CODI Settlement Agreement, the Plan Support Agreement, or any agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the CODI Settlement Agreement, the Plan Support Agreement, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of the Plan or these Chapter 11 Cases, or the Distribution of property under the Plan or any other related agreement, except for Claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects all Exculpated Parties are entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

### 8.      Releases by the Debtors

Notwithstanding anything contained in the Plan to the contrary, pursuant to Bankruptcy Code § 1123(b), in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, effective on the Effective Date, each Released Party is hereby deemed to be released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing entities on behalf of the Debtors, from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Equity Interest in, a Debtor or other entity, or that any Holder of any Claim against, or Equity Interest in, a Debtor or other entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation of the Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, documents associated with or related to the DIP Order and Cash Collateral Order, the Plan (including the Plan Supplement(s)), the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any aspect of the associated transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, the Disclosure Statement, the DIP Order and Cash Collateral Order, the Plan, the Plan Supplement(s), before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence of such Person (*provided* that the foregoing exception does not apply to the CODI Parties with respect to claims that are within the scope of those settled by the CODI Settlement Agreement). Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any document, instrument, or agreement (including those set forth in the Plan Supplement(s)) executed to implement the Plan or any Claim or obligation arising under the Plan.

### 9.    Releases by Holders of Claims

Except as otherwise expressly set forth in the Plan or the Confirmation Order—and except to the extent a Holder of a Claim makes an Opt-Out Election—on and after the Effective Date, and with respect to all other Releasing Parties, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits, judgments, damages, debts, rights, remedies and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that such entity would have been legally entitled to assert in their own right (whether individually, derivatively, or collectively) or on behalf of the Holder of any Claim or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation of the Debtors), the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, any Avoidance Actions, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, documents associated with or related to the DIP Order and Cash Collateral Order, the Plan (including the plan supplement(s)), the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement), or any aspect of the associated transactions, including any contract, instrument, release, or other agreement or document (including any legal opinion requested by any entity regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) relating to any of the foregoing, created or entered into in connection with the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, the Disclosure Statement, the DIP Order and Cash Collateral Order documents, the Plan, the plan supplement(s), before or during the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence of such Person. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Effective Date obligations of any party or entity under the Plan, the Confirmation Order, the Liquidation Trust Agreement, the Plan Support Agreement, the CODI Settlement Agreement, or any document, instrument, or agreement (including those set

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

forth in the plan supplement) executed to implement the Plan or any Claim or obligation arising under the Plan; (ii) any and all Claims, Causes of Action, derivative claims and causes of action, obligations, suits judgments, damages, debts, rights, remedies, and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, contract, tort or otherwise, that a CODI Party would have been legally entitled to assert in its own right (whether individually, derivatively, or collectively) against another CODI Party or any of their officers, directors, members, managers, trustees, or employees; or (iii) Allowed Claims solely against the Debtors.

### 10.    Term of Injunctions or Stays

Without affecting the injunctions contained in Section 11.06 of the Plan, the exculpations contained in Section 11.07 of the Plan, and the releases contained in Section 11.08 of the Plan, all injunctions or stays provided for in these Chapter 11 Cases pursuant to Bankruptcy Code §§ 105 or 362, or otherwise, in existence on the Confirmation Date remain in full force and effect until the Chapter 11 Cases are closed. **Notwithstanding anything to the contrary in the Plan, and consistent with 11 U.S.C. § 1141(d)(3), the Debtors do not receive a discharge.**

### 11.    Revocation, Withdrawal, or Non-Consummation

The Debtors reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Hearing and to File subsequent plans. If the Debtors revoke or withdraw the Plan prior to the Confirmation Hearing, or if the Effective Date does not occur, then (a) the Plan is void in all respects; and (b) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, (i) waive or release any Claims against, or any Equity Interests in, any Debtor, or any Causes of Action by or against any Debtor or any other Person, (ii) prejudice in any manner the rights of any Debtor or any other Person in any further proceedings involving a Debtor, or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 12.    Exemption from Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, the vesting of the Liquidation Trust Assets in the Liquidation Trust, the vesting of the Tax Refund in the Post-Confirmation Debtor, the issuance of the Liquidation Trust Interests, the issuance, transfer, or exchange of any equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge, or other security interest, or the making or assignment of any lease or sublease, or making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, is not subject to any stamp, real estate transfer, mortgage recording, or other similar Tax.

### 13.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) apply.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

### 14.     Transactions on Business Days

If the Effective Date or any other date on which a transaction may occur under the Plan occurs on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day instead occur on the next succeeding Business Day.

### 15.     Good Faith

Confirmation of the Plan constitutes a conclusive determination that: (a) the Plan, and all the transactions and settlements contemplated thereby, have been proposed in good faith and in compliance with all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules; and (b) the solicitation of acceptances or rejections of the Plan has been in good faith and in compliance with all applicable provisions of the Bankruptcy Code, and the Bankruptcy Rules, and, in each case, that the Debtors and all Related Parties have acted in good faith in connection therewith.

### 16.     Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (a) the laws of the State of Delaware govern the construction and implementation of the Plan and (except as may be provided otherwise in any such agreements, documents, or instruments) any agreements, documents, and instruments executed in connection with the Plan and (b) the laws of the state of incorporation or formation of each Debtor govern corporate or limited liability company governance matters with respect to such Debtor; in each case without giving effect to the principles of conflicts of law thereof. Any applicable nonbankruptcy law that would prohibit, limit, or otherwise restrict implementation of the Plan based on (i) the commencement of the Chapter 11 Cases, (ii) the appointment of the Liquidation Trustee, (iii) the wind down of the Debtors, (iv) the liquidation of some or all of the Liquidation Trust Assets, or (v) any other act or action to be done pursuant to or contemplated by the Plan is superseded and rendered inoperative by the Plan and federal bankruptcy law.

### 17.     Notices

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to (i) those Persons or Entities that Filed such renewed requests; and (ii) those Persons and Entities whose rights are directly affected by such documents.

### 18.     Final Decree

Upon the determination by the Liquidation Trustee that all Claims have been Allowed, disallowed, expunged, or withdrawn and that all Liquidation Trust Assets have been liquidated, abandoned, or otherwise administered, the Liquidation Trustee must move for the entry of the Final Decree with respect to the Post-Confirmation Debtor. On entry of the Final Decree, the Liquidation Trustee, the Liquidation Trust Oversight Board, and their respective Related Parties,

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                      55

*[Link-to-previous setting changed from off in original to on in modified.]*

are, in each case to the extent not previously discharged by the Bankruptcy Court, discharged and have no further duties or obligations to any Person.

### 19.        Closing of Certain Chapter 11 Cases

At any time following the Effective Date, the Liquidation Trust may, upon notice and, if necessary, a hearing, to (a) close all of the Chapter 11 Cases except for the Chapter 11 Case of the Post-Confirmation Debtor, and any contested matters relating to each of the Debtors, including objections to Claims, are administered and heard in such Chapter 11 Case and (b) change the name of the Post-Confirmation Debtor and case caption of the remaining open Chapter 11 Case as desired.  After the full administration of the Chapter 11 Cases, the Liquidation Trust must promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to Local Rule 3022-1(a), and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### 20.        Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidation Trust, all Holders receiving Distributions pursuant to the Plan, and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other acts as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### 21.        Conflicts

If any provision of the Plan or any agreement entered into under the Plan conflicts with any provision of the Disclosure Statement, the Plan controls. If any order entered in the Chapter 11 Cases conflicts with any provision of the Plan, the Plan controls. If any provision of the Confirmation Order conflicts with any provision of the Plan or any agreement entered into under the Plan (other than the CODI Settlement Agreement and the Liquidation Trust Agreement), the Confirmation Order controls. If any provision of the Liquidation Trust Agreement conflicts with any provision of the Disclosure Statement, the Plan, or the Confirmation Order, the Plan controls unless the Confirmation Order specifically refers to this Section 11.21, in which case the Confirmation Order controls. If any provision of the CODI Settlement Agreement conflicts with any provision of the Disclosure Statement, the Plan, the Liquidation Trust Agreement, or the Confirmation Order, the Plan controls, unless the Confirmation Order specifically refers to Section 11.21, in which case the Confirmation Order controls.

## V.    RISK FACTORS

Prior to voting on the Plan, each Holder of a Claim entitled to vote should consider carefully the risk factors described below, as well as all other information contained in this Disclosure Statement, including the exhibits hereto. These risk factors should not be regarded as the only risks involved in connection with the Plan and its implementation.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

## A.    Parties May Object to the Plan's Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Equity Interests under the Plan complies with this requirement. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.    The Debtors May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan, the Debtors may not receive the requisite acceptances to confirm a plan. In the event that votes with respect to Claims in the Classes entitled to vote are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors may not be able to obtain Confirmation of the Plan. Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court still may not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under section 1129 of the Bankruptcy Code have not been met.

## C.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth herein and in the Plan, the Effective Date is subject to several conditions precedent. There can be no assurance that any or all of such conditions will be satisfied or waived.  If the conditions precedent are not met or waived, the Effective Date will not occur. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Effective Date will occur.

## D.    Claims Estimation and Allowance of Claims

There can be no assurance that the estimated Claim amounts set forth in this Disclosure Statement are correct, and the actual amount of Allowed Claims may differ significantly from the estimates. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary materially from those estimated herein.

Distributions to Holders of Allowed Class 4 Claims will be affected by the pool of Allowed Claims in Class 4.  Upon completion of further analysis of Filed Claims, the total amount of Claims that ultimately become Allowed Claims in Class 4 may differ from the estimates in this Disclosure Statement, and such difference could be material. As a result, the amount of Distributions that may be received by a particular Holder of an Allowed Claim may be either adversely or favorably affected by the aggregate amount Class 4 Claims ultimately Allowed.

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

### E.    Potential Pursuit of Liquidation Trust Actions Against Creditors and Others

In accordance with section 1123(b) of the Bankruptcy Code, after the Effective Date, the Liquidation Trustee shall have and retain and may enforce any Causes of Action. Accordingly, a Holder of a Claim may be subject to one or more such Causes of Action being asserted against it.

The failure to specifically identify in the Disclosure Statement, the Plan Supplement, or the Plan any potential or existing Avoidance Actions or Causes of Action as a Liquidation Trust Action is not intended to and shall not limit the rights of the Liquidation Trust to pursue any such Avoidance Actions or Causes of Action. The Debtors expressly reserve all Avoidance Actions and Causes of Action, other than those Avoidance Actions and Causes of Action that are expressly waived, relinquished, released, compromised, or settled in the Plan, pursuant to the Confirmation Order, or pursuant to any other order of the Bankruptcy Court, as Causes of Action for later adjudication, and no preclusion doctrine (including the doctrines of res judicata, collateral estoppel, judicial estoppel, equitable estoppel, issue preclusion, claim preclusion, and laches) shall apply to such Avoidance Actions or Causes of Action as Liquidation Trust Assets on or after the Effective Date.

No Person should rely on the absence of a specific reference in the Plan, the Plan Supplement, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement to any Avoidance Action or Cause of Action against such Person as any indication that the Liquidation Trust will not pursue any and all available Avoidance Actions and Causes of Action against such Person. The objection to the Allowance of any Claims will not in any way limit the ability or the right of the Liquidation Trust to assert, commence, or prosecute any Avoidance Action or Cause of Action. Nothing contained in the Plan, the Plan Supplement, the Confirmation Order, the Liquidation Trust Agreement, or the Disclosure Statement will be deemed to be a waiver, release, or relinquishment of any Avoidance Action or Cause of Action that the Debtors or their Estates had immediately prior to the Effective Date. The Liquidation Trust shall have, retain, reserve, and be entitled to assert all Avoidance Actions and Causes of Action fully as if the Avoidance Actions and Causes of Action had not been contributed to the Liquidation Trust in accordance with the Plan and the Liquidation Trust Agreement.

Without limiting the generality of the preceding two paragraphs and associated reservations, the Debtors note that all parties in interest should review the Plan Supplement, which will contain a non-exclusive analysis of the Liquidation Trust Actions that are being preserved under the Plan.

### F.    Risks Regarding Liquidation Trust Assets

The Liquidation Trust's ability to monetize the Estate Assets is subject to material risk and uncertainty.

There are three broad groups of Estate Assets that can provide a recovery to creditors. First, successful prosecution of the Causes of Action may generate funds for the Liquidation Trust through payment by third parties.  The outcome of the Causes of Action is inherently uncertain and subject to material risk.  There can be no assurance that the Liquidation Trust will prevail in any such prosecution and the amount of any such proceeds.  Second, the Tax Refund

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

represents a material potential source of funds.  The amount and timing of the Tax Refund is subject to uncertainty, the amounts received and the timing of receipt may be materially different than the estimates.  Finally, the proceeds that may be generated through the sharing provision of the Agency Agreement and any other assets is subject to material risk, including those associated with the high-end jewelry market in general and the wholesale market in particular, as well as local, national, and international economic conditions.

## G.    Tax Considerations

There are several material income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims, Holders of Equity Interests, and other interested parties should read carefully the discussion set forth in Article VIII for a discussion of certain U.S. federal income tax consequences of the transactions contemplated under the Plan.

## VI.    CONFIRMATION OF THE PLAN

## A.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing regarding Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **August 31, 2026, at 11:00 a.m.** (prevailing Eastern Time), before the Honorable Brendan L. Shannon, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be Filed and served so that they are actually received by no later than **August 18, 2026, at 4:00 p.m.** (prevailing Eastern Time). **Unless objections to Confirmation of the Plan are timely served and Filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

## B.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims, or, if rejected by an Impaired Class of Claims, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

faith. More specifically, the Debtors believe that the Plan satisfies or will satisfy the following applicable Confirmation requirements of section 1129 of the Bankruptcy Code, including:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- Either each Holder of a Claim in an Impaired Class of Claims has accepted the Plan, or each such Holder will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- The Classes of Claims that are entitled to vote on the Plan will have accepted the Plan, or at least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class, and the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Allowed Administrative Claims and Allowed Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid through the Effective Date.

## C.    Best Interests of Creditors

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the effective date of the plan. Accordingly, if an impaired class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find, before confirming the Plan, that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

*[Link-to-previous setting changed from off in original to on in modified.]*.

The Plan is a plan of liquidation. The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

Conversion to chapter 7 of the Bankruptcy Code would mean the establishment of a new claims bar date, which could result in new General Unsecured Claims being asserted against the Estates, thereby diluting the recoveries of other Holders of Allowed Claims. (For these purposes, the Debtors assume that the Litigation Trust Expenses would be similar to the expenses of a chapter 7 trustee).

Second, as a result of the agreement with CODI, funds are available to pay Administrative Claims, Priority Tax Claims, Priority Claims, and Other Secured Claims, as well as a portion of the Liquidation Trust Expenses. In a chapter 7 case, these amounts would need to be paid prior to the Distribution to Holders of General Unsecured Claims. Absent the construct proposed by the Plan, there is no reason to expect that CODI would agree to the payment of such amounts from its Collateral, thus reducing the potential Distributions to General Unsecured Creditors absent a successful Challenge (as defined in the Cash Collateral Order) to the CODI Claim. Further, in a chapter 7 case, there would be no immediate settlement with CODI that provides for a definition allocation of the Debtors' assets for Distributions to General Unsecured Creditors.

Because funds would be limited, the Debtors believe that creditors would recover less in proceeds, in the aggregate, in a chapter 7 case, due at least in part to the need for litigation financing to liquidate the assets. That is because (i) a chapter 7 trustee likely would not have the right to use cash collateral as it would be unable to adequately protect secured parties, and (ii) a chapter 7 trustee likely would be required quickly to otherwise monetize some of the Estate Assets (to the extent unencumbered) in order to assure that he or she had adequate staffing or funding to dispose of the Debtors' assets over an extended period of time, and (iii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business to the extent required by the Agency Agreement, which is relief that should be granted only "for a limited period" in any event, *see* 11 U.S.C. § 721.

As a result, a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain the benefits of the compromises and settlements available under the Plan. Therefore, the Debtors believe that Confirmation of the Plan will provide each Holder of a General Unsecured Claim, Convenience Class Claim, and Subordinated Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan would be on terms as favorable to any Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtors' creditors.

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                                             61

*[Link-to-previous setting changed from off in original to on in modified.]*

### D.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, or any successor to the Debtors, unless such liquidation or reorganization is proposed in the plan. This requirement is satisfied as the Plan specifically proposes a liquidation and the Debtors believe the Debtors' Cash and any additional proceeds from the Liquidation Trust Assets will be sufficient to allow the Liquidation Trustee to make all payments required to be made under the Plan. Accordingly, the Debtors believe that the Plan is feasible.

### E.    Acceptance by Impaired Classes

As a condition to confirmation, the Bankruptcy Code requires that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims held by creditors that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted that plan, *provided* that the plan has been accepted by at least one impaired class of claims, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan, and because Holders of Claims and Equity Interests in Classes 7 and 8 are deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

### 1. No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair" under the circumstances. In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will consider various factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtors submit that if the Debtors are required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending on the type of claims or interests in such rejecting class. The Debtors submit that if the Debtors are required to cram down the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that the applicable "fair and equitable" standards are met.

## G. Alternatives to Confirmation and Consummation of the Plan

The Debtors believe that the Plan affords Holders of Claims the potential for a materially better realization on the Estate Assets than a chapter 7 liquidation, and, therefore, is in the best interests of all such Holders. If, however, the requisite acceptances of the voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative chapter 11 plan or plans, or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors or another party in interest could attempt to formulate and propose a different plan or plans. The Debtors believe that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any alternative plan, has the greatest chance to be confirmed and consummated.

The Chapter 11 Cases may also be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a statutory trustee would be elected or appointed to complete the liquidation of the Estate Assets for distribution to Creditors in accordance with the priorities established by the Bankruptcy Code. As described above, the Debtors believe that the Plan will provide each Holder of a General Unsecured Claim, Subordinated Claim, or Convenience Class

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

Claim with an equal or greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## VII.    CERTAIN SECURITIES LAW CONSEQUENCES OF THE PLAN

### A.    General

The Plan provides for the establishment of the Liquidation Trust and for the issuance of Liquidation Trust Interests therein issued in respect of any Allowed CODI Claim, Allowed General Unsecured Claims, and Allowed Subordinated Claims.  In general, interests in trusts such as the Liquidation Trust Interests may sometimes be subject to regulation as "securities" under applicable non-bankruptcy law, including federal and state securities laws. The Debtors believe even if the Liquidation Trust Interests were deemed to constitute "securities," they would not be subject to registration (by reason of an available exemption) under the Securities Act of 1933, as amended (the "Securities Act") or under applicable state securities laws (which are preempted).

### B.    Exemption from Registration Under the Securities Act and Blue Sky Laws

#### 1.    Issuance of Liquidation Trust Interests under Plan

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the SEC under Section 5 of the Securities Act of 1933, as amended (the "Securities Act").

In the event that the Liquidation Trust Interests are deemed to constitute securities, section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws and regulations ("Blue Sky Laws") if three principal requirements are satisfied:

1.    the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

2.    the recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

3.    the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Liquidation Trust Interests may constitute securities, the Debtors believe that they are being issued in respect of any Allowed CODI Claim, Allowed General Unsecured Claims, and Allowed Subordinated Claims, and will therefore qualify as securities "of the debtor . . . or of a successor to the debtor" pursuant to section 1145(a)(1). In addition, the Liquidation Trust Interests will be issued entirely in exchange for such Claims. Thus, the Debtors believe that the issuance of the Liquidation Trust Interests pursuant to the Plan

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

will satisfy the applicable requirements of section 1145(a)(1) of the Bankruptcy Code, and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

The Debtors believe that their reliance upon the foregoing exemption in respect of the issuance of the Liquidation Trust Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other debtors in possession. However, the Debtors have not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

### 2. Resale of Liquidation Trust Interests After Plan Effective Date

Under the terms of the Liquidation Trust Agreement, the Liquidation Trust Interests initially will be uncertificated and subject to transfer restrictions set forth in the Liquidation Trust Agreement (the "Transfer Restrictions"). Under the Transfer Restrictions, the Liquidation Trust Interests cannot be assigned or transferred by any holder thereof other than by will or intestate succession upon the death of such holder or otherwise by operation of law. The Transfer Restrictions will be effective upon issuance of the Liquidation Trust Interests on the Effective Date of the Plan and will remain in effect during the initial and any renewal term of the Liquidation Trust unless sooner terminated or modified by the Liquidation Trustee in accordance with the Liquidation Trust Agreement.

### VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

This discussion is provided for informational purposes only, and is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect on the date hereof. Due to the complexity of certain aspects of the Plan, the lack of applicable legal precedent, the possibility of changes in the law, the differences in the nature of the Claims (including Claims within the same Class) and Equity Interests, the Holder's status and method of accounting (including Holders of Claims within the same Class) and the potential for disputes as to legal and factual matters with the IRS, the tax consequences described herein are subject to significant uncertainties. No legal opinions have been requested from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. Further, legislative, judicial or administrative changes may occur, perhaps with retroactive effect, which could affect the

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                                65

accuracy of the statements and conclusions set forth below as well as the tax consequences to the Holders of Claims and Equity Interests. Any such changes or interpretations may be retroactive and could significantly, and adversely, affect the U.S. federal income tax consequences of the Plan.

The following summary does not address the U.S. federal income tax consequences to the Holders of Claims and Equity Interests not entitled to vote to accept or reject the Plan. In addition, to the extent that the following discussion relates to the consequences to Holders of Claims entitled to vote to accept or reject the Plan, it is limited to Holders that are United States persons within the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

• An individual who is a citizen or resident of the United States;

• A corporation, or other entity or arrangement taxed as a corporation for U.S. federal income tax purposes, created or organized under the laws of the United States or any state or political subdivision thereof;

• An estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

• A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable Treasury Regulations to be treated as a United States person.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder in light of its particular facts and circumstances, or to certain types of Holders subject to special treatment under the IRC. Examples of Holders subject to special treatment under the IRC are governmental entities and entities exercising governmental authority, foreign companies, persons who are not citizens or residents of the United States, banks and certain other financial institutions, broker-dealers, insurance companies, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, persons that have a functional currency other than the U.S. dollar, persons subject to tax accounting rules under IRC section 451(b), and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction. This discussion does not address the tax consequences to Holders of Claims who did not acquire such Claims at the issue price on original issue. No aspect of foreign, state, local or estate and gift taxation is addressed, nor does this discussion address federal taxes other than income taxes.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes is a Holder of Allowed Claims, the U.S. federal income tax treatment of a partner in the partnership generally will depend on the status of the partner and the activities of the partnership. If you are treated as a partner in such an entity that is a Holder of Allowed Claims, you should consult your tax advisor as to the U.S. federal income tax consequences applicable to you.

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                                          66

*[Link-to-previous setting changed from off in original to on in modified.]*

The U.S. federal income tax treatment of Holders of Claims and the character, amount, and timing of income, gain, or loss recognized as a consequence of the Plan and the Distributions provided for by the Plan may vary, depending upon the following factors, among others: (i) whether the Claim or portion thereof constitutes a Claim for principal or interest; (ii) the type of consideration, if any, received by the Holder in exchange for the Claim, and whether the Holder receives Distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction or a worthless securities deduction with respect to the Claim or any portion thereof in the current or prior taxable years; (viii) whether the Holder has previously included in gross income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules apply to the Holder. Therefore, each Holder should consult such Holder's own tax advisor for tax advice with respect to that Holder's particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

A significant amount of time may elapse between the date of the Disclosure Statement and the receipt of a final Distribution under the Plan. Events occurring after the date of the Disclosure Statement, such as new or additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any Holder of a Claim. This discussion is not binding upon the IRS or other taxing authorities. No assurance can be given that the IRS or another authority would not assert, or that a court would not sustain, a different position from any discussed herein.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, ~~and~~ that all Distributions to Holders of Claims will be taxed accordingly~~.~~, and that the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form..

**THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT SUCH HOLDER'S INDEPENDENT TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

*[Link-to-previous setting changed from off in original to on in modified.]*.

*[Link-to-previous setting changed from off in original to on in modified.]*

### A.    Certain U.S. Federal Income Tax Consequences of the Liquidation Trust

Under the terms of the Plan, for U.S. federal income tax purposes the Liquidation Trust Assets will be treated as transferred to the Liquidation Trust Beneficiaries (subject to any liabilities and obligations relating to those assets) in a taxable disposition, and immediately thereafter contributed by the Liquidation Trust Beneficiaries into the Liquidation Trust in a non-taxable contribution in exchange for beneficial interests in the Liquidation Trust. Any income or gain from the deemed transfer of assets to the Liquidation Trust Beneficiaries shall flow through to the Post-Confirmation Debtor, on whose behalf the Liquidation Trust will be responsible to pay any resulting tax liability. The tax consequences of the Plan, however, are subject to many uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law. Uncertainties with regard to the U.S. federal income tax consequences of the Plan also arise due to the inherent nature of estimates of value that will impact the determination of the amount of income or gain from the deemed transfer of assets to the Liquidation Trust Beneficiaries.

As of the Effective Date, the Liquidation Trust shall be established for the benefit of all Liquidation Trust Beneficiaries. The Liquidation Trustee will make a good faith valuation of the Liquidation Trust Assets. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee will (a) elect to treat any Liquidation Trust Assets allocable to a Distribution Reserve (a reserve for amounts and Liquidation Trust Interests retained on account of, Contingent Claims, Disputed Claims or Unliquidated Claims) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, the Distribution Reserves will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidation Trust Assets in such reserves, and all distributions from such reserves will be treated as received by Holders on account of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Liquidation Trustee and the Liquidation Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

The Liquidation Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for U.S. federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) are required to treat for U.S. federal income tax purposes, the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are the owners and grantors. Although the following discussion assumes that the Liquidation Trust would be so treated for U.S. federal income tax purposes, no ruling has been

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Liquidation Trust and the Liquidation Trust Beneficiaries could vary from those discussed herein, and, thus, there could be less Available Cash than projected, resulting in lower recoveries for Liquidation Trust.

## B.    Consequences to Holders of Claims Generally

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim, and (ii) such Holder's adjusted tax basis in such Claim (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income). The "amount realized" by a Holder of an Allowed Claim in satisfaction of its Claim will equal the sum of cash and the aggregate fair market value of the property received by such Holder in satisfaction of its Claim pursuant to the Plan (such as a Holder's undivided beneficial interest in the assets transferred to the Liquidation Trust). Where gain or loss is recognized by a Holder in respect of its Allowed Claim, the character of such gain or loss (*i.e.*, long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the Holder, whether the Claim constituted a capital asset in the hands of the Holder and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the Holder had previously claimed a bad debt deduction or theft loss in respect of the Claim.  It is possible that any loss, or a portion of any gain, realized by a Holder of an Allowed Claim may have to be deferred until all of the Distributions to such Holder are received.

Each Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

A Holder of an Allowed Claim that receives, in respect of the Holder's Allowed Claim, an amount that is less than that Holder's tax basis in such Allowed Claim may be entitled to a bad debt deduction under IRC section 166(a). The rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction in any particular taxable year. A Holder that has previously recognized a loss or deduction in respect of that Holder's Allowed Claim may be required to include in gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Allowed Claim.

Holders of Allowed Claims that were not previously required to include any accrued but unpaid interest with respect to an Allowed Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. A Holder previously required to include in gross income any accrued but unpaid interest with

*[Link-to-previous setting changed from off in original to on in modified.]*.

[Link-to-previous setting changed from off in original to on in modified.]

respect to an Allowed Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

A Holder of an Allowed Claim constituting an installment obligation for U.S. federal income tax purposes may be required to recognize currently any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than at face value or distributed, transmitted, sold or otherwise disposed of within the meaning of IRC section 453B.

Holders of Disallowed Claims will not receive any Distribution as part of the Plan. Accordingly, because such a Holder may receive an amount that is less than that Holder's tax basis in such Claim, such Holder may be entitled to a bad debt deduction under IRC section 166(a). As noted above, the rules governing the character, timing, and amount of a bad debt deduction place considerable emphasis on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a bad debt deduction is claimed. Holders of Disallowed Claims, therefore, are urged to consult their own tax advisors with respect to the ability to take a bad debt deduction in any particular taxable year.

## C.    Consequences to Liquidation Trust Beneficiaries

After the Effective Date, any amount that a Liquidation Trust Beneficiary (as a Holder of a Liquidation Trust Interest) receives as a distribution from the Liquidation Trust in respect of its beneficial interest in the Liquidation Trust should not be included, for U.S. federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such Holder's beneficial interest in the Liquidation Trust. In general, a Holder's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date, and the Holder's holding period in such assets will begin the day following the Effective Date.

Distributions to any Liquidation Trust Beneficiary that also is a Holder of an Allowed Claim in respect of such Allowed Claim will be allocated first to the original principal portion of such Claim as determined for U.S. federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.

For all U.S. federal income tax purposes, all parties (including the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets to the Liquidation Trust, in accordance with the terms of the Plan, as a transfer of those assets to the Liquidation Trust Beneficiaries by the deemed consolidated Debtor followed by a deemed transfer of such assets by such Liquidation Trust Beneficiaries to the Liquidation Trust. Consistent therewith, all parties shall treat the Liquidation Trust as a grantor trust of which the Liquidation Trust Beneficiaries are to be the owners and grantors.  Thus, the Liquidation Trust Beneficiaries shall be treated as the direct owners of an undivided beneficial interest in the Liquidation Trust Assets.  Accordingly, each Liquidation Trust Beneficiary will be required to report on its U.S. federal income tax return(s) the Liquidation Trust Beneficiary's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust.

[Link-to-previous setting changed from off in original to on in modified.]

*[Link-to-previous setting changed from off in original to on in modified.]*

Allocations of taxable income of the Liquidation Trust (other than taxable income allocable to a Distribution Reserve) among Liquidation Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value, and other than assets allocable to a Distribution Reserve) to the Liquidation Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust shall be allocated by reference to the manner in which an economic loss would be borne by the Liquidation Trust Beneficiaries if the Liquidating Trust were to distribute in liquidation the remaining Liquidation Trust Assets. The tax book value of the Liquidation Trust Assets for this purpose shall be equal to the fair market value of the Liquidation Trust Assets on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

The character of items of income, deduction and credit to any Liquidation Trust Beneficiary and the ability of such Liquidation Trust Beneficiary to benefit from any deductions or losses may depend on the situation of such Liquidation Trust Beneficiary. The U.S. federal income tax reporting obligation of a Liquidation Trust Beneficiary is not dependent upon the Liquidation Trust distributing any cash or other proceeds to such Liquidation Trust Beneficiary. Therefore, a Liquidation Trust Beneficiary may incur a U.S. federal income tax liability regardless of the fact that the Liquidation Trust has not made, or will not make, any concurrent or subsequent distributions to the Liquidation Trust Beneficiary. If a Liquidation Trust Beneficiary incurs a U.S. federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its Liquidation Trust Interests in the Liquidation Trust, the Liquidation Trust Beneficiary may be allowed a subsequent or offsetting loss.

As noted above, the Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidation Trustee also will send to each Liquidation Trust Beneficiary a separate statement setting forth the Liquidation Trust Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct each Liquidation Trust Beneficiary to report such items on its U.S. federal income tax return.

**D.      Withholding on Distributions and Information Reporting**

All Distributions to Holders of Allowed Claims under the Plan and any Distributions to the Liquidation Trust Beneficiaries are subject to any applicable tax withholding, including employment tax withholding. *See* Plan Section 7.13. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the applicable withholding rate (currently 24%). Backup withholding generally applies if the payment recipient (i) fails to furnish the recipient's social security number or other taxpayer identification number; (ii) furnishes an incorrect taxpayer identification number; (iii) fails to properly report interest or dividends; or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the taxpayer's identification number provided is the recipient's correct taxpayer identification

*[Link-to-previous setting changed from off in original to on in modified.]*

*[Link-to-previous setting changed from off in original to on in modified.]*

number and that such recipient is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain Persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, a Holder of an Allowed Claim that is a not a U.S. entity may be subject to additional withholding, depending on, among other things, the type of income and whether it is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to distributions by the Debtor making such Distribution or by the Liquidation Trust, as applicable, even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Non-U.S. Holders are urged to consult their own tax advisors regarding potential withholding on Distributions under the Plan.

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their own tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## IX.    RECOMMENDATION

The Debtors and the Creditors' Committee believe that Confirmation and implementation of the Plan are the best option to maximize value under the circumstances and urge all Holders of Claims in Impaired Classes entitled to vote on the Plan to vote in favor of and support Confirmation of the Plan.

*[Signature Page Follows]*

*[Link-to-previous setting changed from off in original to on in modified.]*.

60267091.6                                72

*[Link-to-previous setting changed from off in original to on in modified.]*

Dated: ~~June 24~~July 9, 2026                    Respectfully submitted,

**LUGANO DIAMONDS & JEWELRY INC.**


By:  */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer

**LUGANO HOLDING, INC.**


By:  */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer

**LUGANO BUYER, INC.**


By:  */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer

**K.L.D. JEWELRY, LLC**


By:  */s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer

**LUGANO PRIVE, LLC.**


By:  */s/ J. Michael ~~Issa~~Issa*
J. Michael Issa
Chief Restructuring Officer

*[Link-to-previous setting changed from off in original to on in modified.]*

60267091.6                              73

**Exhibit A**

**Plan**

[*Intentionally Omitted*]

**Exhibit B**

**Liquidation Analysis**

[*Intentionally Omitted*Filed at Docket No. 636]

60267091.6