**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>**LUGANO DIAMONDS & JEWELRY INC., *et al.*,**[1]<br><br>*Debtors.* | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 658** |

**OBJECTION OF THE FERDER PARTIES TO THE DEBTORS' SECOND MOTION FOR ENTRY OF AN ORDER (I) EXTENDING THE DEBTORS' EXCLUSIVE PERIODS TO (A) FILE A CHAPTER 11 PLAN AND (B) SOLICIT ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1121 OF THE BANKRUPTCY CODE AND (II) GRANTING RELATED RELIEF**

## I. PRELIMINARY STATEMENT

Mordechai Ferder individually ("**Mr. Ferder**") and as Trustee of the Haim Family Trust ("**Trust**", and together with Mr. Ferder, the "**Ferder Parties**") respectfully submit this Objection to the Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to (A) File a Chapter 11 Plan and (B) Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief [Docket No. 658] ("**Motion**"). The Motion should be denied because the Debtors have not demonstrated "cause" for extension under any recognized standard.

The Debtors filed their Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors [Docket No. 612] ("**Plan**") and Disclosure Statement [Docket No. 614] on June 24, 2026, amending it on July 9, 2026 [Docket Nos. 649, 651]. Over the objection of the Ferder Parties, the Debtors scheduled the confirmation hearing for August 31, 2026, a short period of time for a case this size with issues of this complexity, to the detriment and prejudice of the Ferder Parties, which as a result are being deprived of a full and fair

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

opportunity to conduct discovery in support of their opposition, particularly to the proposed settlement with Compass Group Diversified Holdings ("**CODI**" or "**Compass**").[2]

Since the Plan of liquidation is already filed, there is no rational cause for the Debtors to seek (a) a further extension of the date by which the Debtors have the exclusive right to file a chapter 11 plan through October 13, 2026 ("**Exclusive Filing Period**") when the Plan sponsored by the Debtors is already filed, and (b) a further extension of the date by which the Debtors have the exclusive right to solicit votes on their Plan ("**Exclusive Solicitation Period**") when the confirmation hearing is set for August 31 some three and a half months earlier than the requested extension of December 14, 2026. The requested extension is antithetical to "cause" required for the extension and is instead tantamount to an admission that the Debtors lack confidence in the feasibility of their own Plan. Even in *arguendo* if the Debtors respond claiming that they have confidence in their Plan and contend that the requested extension is being made out of an abundance of caution, an "abundance of caution" does not equate to "cause," especially under the circumstances of this case.

Importantly, the requested extension deprives creditors of the opportunity to evaluate, consider, compare and vote on an alternative plan (particularly if the Debtors are unable to confirm their current Plan (particularly after incurring over $10 million in professional fees) – one that instead –

- proposes the same liquidating plan
- forms and transfers litigation assets to the same litigation trust
- only without the CODI settlement
- without the extraordinary unlawful releases

---

[2] The prejudice is compounded by the fact that as of the date of this Objection, the only production made in response to Ferder's production request is one single document – an excel spreadsheet of the Debtor's liquidation analysis – marked "confidential" – which is perplexing given the disclosure requirement of Section 1125.

- that retains the very contingency lawyer that is proposed in the Debtors' own liquidation analysis to pursue the valuable litigation claims against CODI (in lieu of a settlement whose value is impossible to assess based on the information provided)

The Debtors trumpet their "substantial progress" toward confirming a chapter 11 plan. But, as the Ferder Parties detailed at length in their Objection to Approval of the Debtors' Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors [Docket No. 637], filed July 7, 2026, the Debtors' Plan suffers from no fewer than ten independent, facially fatal defects that render it unconfirmable as a matter of law. The Debtors' subsequent amendment cured a few peripheral disclosure gaps, but it left every defect that actually drives confirmability – the nonconsensual releases, the illusory opt-out, the CODI fraud carve-out, and the one-sided injunction – completely untouched.

The Plan is not a vehicle for reorganizing Lugano or maximizing value for its creditors. It is a vehicle for consummating the CODI Settlement Agreement – a sweetheart deal, negotiated behind closed doors, that hands the Debtors' majority shareholder and secured lender, Compass, 34.79% of Effective Date Cash, 45% of the Grant Thornton litigation proceeds, 25% of all other litigation proceeds, and full allowance of its disputed $718 million claim – while the Ferder Parties and the rest of the general unsecured creditor body are left holding nothing but speculative, structurally underfunded litigation paper. To lock in this one-sided arrangement, the Plan relies on nonconsensual third-party releases that violate *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), an injunction so broad that it strips creditors of their own independent contribution, indemnity, and setoff rights, and an opt-out mechanism that promises creditors a choice it does not actually deliver.

The Debtors' true motivation for seeking this extension is transparent from the face of the Motion itself: they concede that loss of exclusivity triggers termination of the Plan Support Agreement. In other words, the extension is not sought to negotiate in good faith with all creditor constituencies – it is sought to preserve leverage and coerce creditors into accepting an inequitable plan under threat that the only deal on the table will collapse. This is precisely the type of abuse of the exclusivity privilege that courts have held warrants termination. *See In re Situation Mgmt. Sys., Inc.*, 252 B.R. 859, 863 (Bankr. D. Mass. 2000) ("the debtor's use of [the] exclusivity period to force creditors to accept an unsatisfactory or unconfirmable plan" is a cause for terminating the debtor's exclusivity period) (quoting *In re Texaco, Inc.*, 81 B.R. 806, 812–13 (Bankr. S.D.N.Y. 1988)).

No amount of additional time can cure the Plan's fundamental structural defects. The nonconsensual releases, the overbroad injunction, the discriminatory treatment of creditors, and the biased allocation of estate value are not problems of timing – they are problems of law. Extending exclusivity merely prolongs the inevitable, increases administrative costs, and prejudices the Ferder Parties and other creditors who are denied the opportunity to propose a fair, confirmable alternative. The exclusivity periods should be terminated.

## II. JURISDICTION, STANDING, AND BACKGROUND

1. This United States Bankruptcy Court for the District of Delaware ("**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The Ferder Parties are "parties in interest" within the meaning of 11 U.S.C. § 1109(b) and have standing to be heard on any issue in these Chapter 11 Cases, including objecting to a motion to extend exclusivity under 11 U.S.C. § 1121(d). The Ferder Parties (i) hold, through affiliated entities, equity interests in Debtor Lugano Holdings, Inc., (ii) are a primary target of

the proposed Liquidation Trust, (iii) are defendants in pending bankruptcy litigation brought by the Debtors, and (iv) hold substantial claims and defenses against the estates.

4. On November 16, 2025 ("**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. On March 31, 2026, the Court entered the First Exclusivity Extension order [Docket No. 457], extending the Exclusive Filing Period through July 14, 2026 and the Exclusive Solicitation Period through September 14, 2026.

5. On June 24, 2026, the Debtors filed their Plan of liquidation [Docket No. 612] and Disclosure Statement [Docket No. 614], amended on July 9, 2026 [Docket Nos. 649, 651]. On July 7, 2026, the Ferder Parties filed a comprehensive Objection to the Disclosure Statement [Docket No. 637], identifying at least ten independent, facially fatal defects in the Plan rendering it patently unconfirmable as a matter of law. The Debtors' amendments, filed a mere two days later, made a small number of discrete fixes. But the amendments left every defect that matters most to creditors fully intact: the nonconsensual third-party releases under Sections 11.08 and 11.09, the illusory opt-out mechanism, the carve-out that shields the CODI Parties from liability even for actual fraud, the one-sided Section 11.06 injunction, the discriminatory "Contributed Claims" scheme within Class 4, and the conclusory, evidence-free request for substantive consolidation. A handful of housekeeping fixes does not rehabilitate a Plan whose core architecture remains patently unconfirmable.

6. On July 13, 2026, the Debtors filed the instant Motion seeking a 90-day extension of both Exclusive Periods.

## III. ARGUMENT

### A. The Legal Standard Governing Extension of Exclusivity Under 11 U.S.C. § 1121(d)

7. Section 1121(d)(1) of the Bankruptcy Code provides that "on request of a party in interest made within the respective periods … and after notice and a hearing, the court may for

cause reduce or increase" the exclusive periods. 11 U.S.C. § 1121(d)(1). The debtor bears the burden of demonstrating "cause" for extension. *In re Sharon Steel Corp*., 78 B.R. 762, 765 (Bankr. W.D. Pa. 1987); *In re Ravenna Indus., Inc*., 20 B.R. 886, 889 (Bankr. N.D. Ohio 1982) ("11 U.S.C. Section 1121(d) requires that an affirmative showing of cause, supported by evidence, be made by the party seeking the extension or reduction of time.").

8. Courts consider a non-exhaustive set of factors in determining whether cause exists, including: i.) the size and complexity of the case, ii.) the necessity of sufficient time to negotiate and prepare adequate information, iii.) the existence of good faith progress, iv.) whether the debtor is paying its debts as it becomes due, v.) whether the debtor has demonstrated reasonable prospects for filing a viable plan, vi.) whether the debtor has made progress negotiating with creditors, vii.) the length of time a case has been pending, viii.) whether the debtor is seeking an extension to pressure creditors, and ix.) whether or not unresolved contingencies exist. *See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re Dow Corning Corp*., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *In re McLean Indus., Inc*., 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987).

9. Importantly, the legislative history of 11 U.S.C. § 1121(d) makes clear that Congress intended extensions of exclusivity to be granted only upon "a showing of some promise of probable success" in achieving a successful reorganization. *Matter of Newark Airport/Hotel Ltd. P'ship*, 156 B.R. 444, 451 (Bankr. D.N.J. 1993). Congress further cautioned that "[a]n extension should not be employed as a tactical measure to put pressure on parties in interest to yield to a plan they consider unsatisfactory." *Id.*

10. Accordingly, an extension of the exclusivity period is not warranted where the debtor has no realistic prospect of confirming the plan it seeks to protect. In determining whether "cause" exists under 11 U.S.C. § 1121(d), courts consider whether extending exclusivity would advance the goal of obtaining a confirmable plan of reorganization. *See In re Congoleum*

*Corp.*, 362 B.R. 198, 204–05 (Bankr. D.N.J. 2007). Where a proposed plan is patently unconfirmable – including because it affords impermissible preferential treatment to a particular class of creditors – an extension of exclusivity serves no legitimate reorganization purpose and should be denied. *Id.* at 205.

**B. The Debtors Have NOT Made Substantial Progress Toward Confirming a Plan.**

11. The Plan is a liquidating plan. After eight months in Chapter 11, the creditors get a liquidating plan. There is nothing particularly unique about a liquidating plan that should justify cause to freeze out the possibility of an alternative. In fact, Ferder may be interested in proposing an alternative plan (as outlined earlier) but for the Debtors' efforts to rush to confirmation and force this Plan down the throats of creditors. The Debtors will no doubt trumpet the CODI settlement as their justification for rushing to confirmation. But, if the CODI settlement is as beneficial to the estate and creditors as the Debtors' and the Committee profess, then why the rush? – why all the secrecy? – why the reluctance to disclose the details of the CODI claims and investigation results? – why hide behind privilege in refusing to respond to Ferder's production requests? After spending eight months in bankruptcy, there is suddenly a fire-drill to confirmation, and one is left wondering why the sudden rush. The answer is clear as day – to deprive creditors of a full and fair opportunity to look under the hood of a questionable settlement – one that gets administrative claims paid, keeps lawyers employed, but promises a hope and a prayer for creditors.

12. The Debtors' principal argument in the Motion is that they have made "substantial progress" toward confirming a plan, citing the filing of the Plan, Disclosure Statement, and the scheduled combined hearing. Motion ¶ 25. But this argument confuses activity with progress. Filing a plan that is facially unconfirmable is not "progress" – it is an exercise in futility.

13. As the Ferder Parties detailed in their Objection to the Disclosure Statement [Docket No. 637], the Plan is patently unconfirmable for several independent reasons, including:

(a) The Plan's nonconsensual third-party releases (Plan § 11.09) violate *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), which holds the Bankruptcy Code does not authorize nonconsensual third-party releases;

(b) The opt-out mechanism is illusory and does not cure the impermissible releases because it applies only to "Releases by Holders of Claims" under Plan § 11.09 but does *not* extend to the Plan's independent injunction (§ 11.06), Debtor Release (§ 11.08), or exculpation (§ 11.07), all of which bind all persons regardless of any opt-out;[3]

(c) The Debtor Release (Plan § 11.08) contains an express carve-out for fraud, willful misconduct, or gross negligence – but exempts the CODI Parties from that carve-out for claims "within the scope of those settled by the CODI Settlement Agreement," granting CODI immunity even for actual fraud;

(d) The injunction under Plan § 11.06 is overly broad, stripping the Ferder Parties and other creditors of independent, non-estate equitable indemnity and contribution rights;

(e) The Plan is structurally infeasible under 11 U.S.C. § 1129(a)(11) – the Liquidation Trust is underfunded, the Liquidation Analysis is flawed (at least the one attached to the disclosure statement)[4]; and the list of preserved Causes of Action is deferred to an unfiled Plan Supplement; and

(f) The Plan's "deemed motion" approach to substantive consolidation is conclusory and fails to meet the "extreme remedy" standard. *In re Owens Corning,* 419 F.3d 195, 211 (3d Cir. 2005).

---

[3] The Committee claims that in response to Ferder's objection, it materially carved-down the injunction provision –and it did – just not enough as will be demonstrated at confirmation.

[4] The Committee has represented to the Ferder Parties that the detailed liquidation analysis fills in the missing information and reconciles the inadequacies. If so, why was it not provided to creditors.

14. Courts have repeatedly recognized that a debtor's "accomplishments" – such as filing a plan, negotiating with select creditor constituencies, or obtaining routine first-day relief – do not constitute "cause" for extension where the debtor has not shown genuine, good-faith progress toward a confirmable plan. *See In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va. 1986) ("If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation.").

15. Tellingly, the Debtors' amendments filed on July 9, 2026 [Docket Nos. 649, 651] – filed just two days after the Ferder Parties' Objection and four days before the instant Motion – fixed only the defects that cost the Debtors nothing to fix. They struck the illegal deemed-acceptance voting provisions, added a discharge disclaimer, filled in a blank claims estimate, and filed the overdue Liquidation Analysis. Not the releases. Not the injunction. Not the CODI fraud carve-out.

16. Worse, the Debtors count the filing of contested litigation against a major creditor constituency as if it were evidence of good-faith progress. The Motion cites, among the Debtors' principal accomplishments since the First Exclusivity Extension, that they "filed a complaint and objection to claim against Mr. Ferder, individually and in his capacity as trustee of the Haim Family Trust." Motion ¶ 14. That is not progress toward a negotiated, consensual plan – it is the opposite. While the Debtors were negotiating exclusively and cooperatively with CODI and the Committee behind closed doors by misusing information that the special committee tricked Ferder into providing under pretense of settlement negotiations, they were simultaneously escalating adversarial litigation against the Ferder Parties, who hold claims and defenses central to Class 4. The asymmetry in how the Debtors have treated CODI and the Ferder Parties throughout these cases is not an accident; it mirrors, and helps explain, the asymmetry baked into the Plan itself.

**C. The Plan and CODI Settlement Agreement Are Fundamentally Biased, Inequitable, and Unconfirmable.**

17. The Debtors' claimed "progress" consists entirely of negotiating the CODI Settlement Agreement and securing a Plan Support Agreement with CODI and the Committee. But negotiating a deal that systematically benefits one favored constituency at the expense of all others is not the kind of "good-faith progress" that warrants continued exclusivity. Courts have held that a debtor's "capitulation" to one favored creditor to the exclusion of a fair, evenhanded negotiation with all constituencies undermines any claim of good-faith progress. *See In re All Seasons Indus., Inc*., 121 B.R. 1002 (Bankr. N.D. Ind. 1990) (Creditors' loss of confidence in capability of debtor's management is factor that court should and must consider in deciding whether to extend exclusive time for debtor to file proposed Chapter 11 plan).

18. The Plan's bias in favor of CODI is stark and undeniable:

(a) CODI receives 34.79% of Effective Date Cash, 45% of Grant Thornton litigation proceeds, and 25% of all other litigation proceeds under the CODI Settlement, while its disputed $718 million claim – which is highly vulnerable to equitable subordination under 11 U.S.C. § 510(c) given CODI's admitted knowledge of and participation in the very practices now branded as "fraud" – is allowed in full;

(b) CODI receives Debtor Releases, Third-Party Releases, Exculpation, and Injunction protection – including protection even for actual fraud, willful misconduct, or gross negligence within the scope of the CODI Settlement – while the Ferder Parties are designated as "Excluded Parties" entitled to no protections whatsoever;

(c) The CODI Settlement Agreement ¶ 7.c prohibits parties to the settlement from encouraging or cooperating in litigation against CODI Release Parties, further insulating CODI from accountability and prejudicing the Ferder Parties' ability to prosecute indemnity claims;

(d) Class 4 General Unsecured Creditors (including the Ferder Parties) are left with only speculative litigation paper from a Liquidation Trust that faces immediate administrative insolvency – aggregate claims total $2.6 billion[5] against minimal remaining cash; and

(e) The asymmetric treatment is non-reciprocal: CODI, current directors, and the Committee receive every form of protection the Plan offers; the Ferder Parties remain fully exposed as litigation targets of the Liquidation Trust while simultaneously being stripped of all defensive rights through the Plan's injunction and release structure.

19. This pattern also implicates an independent and well-recognized factor in the cause analysis: whether creditors have lost confidence in the Debtors' stewardship of these cases. *See In re All Seasons Indus., Inc.*, 121 B.R. 1002 (Bankr. N.D. Ind. 1990) (loss of creditor confidence in debtor's management relevant to extension analysis). The Ferder Parties have lost that confidence, and with good reason. The Special Committee induced Mr. Ferder into a standstill agreement and a "look-see" exchange of evidence supporting claims against CODI, on the representation that Lugano's interests were aligned with his in holding CODI accountable. The Debtors then used that same evidence to extract a favorable settlement for CODI, abandoned any pretense of negotiating with Mr. Ferder, and pivoted to litigating against him – violating a District Court remand order in the process. A debtor who induces a major creditor's cooperation through representations it never intended to honor, and then turns that cooperation into ammunition against the very creditor who provided it, should not be afforded continued exclusivity.

20. CODI's $718 million claim is particularly vulnerable to equitable subordination under 11 U.S.C. § 510(c) given evidence that CODI admitted awareness of the financing practices at issue, admitted "turning a blind eye," and benefited from over $250 million drawn on credit

---

[5] Suddenly and inexplicably projected to be substantially less in the Disclosure Statement in response to Ferder's objection.

lines and $252 million in management fees to its Manager, CGM, and its CEO, Elias Sabo. *See In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009) (elements of equitable subordination). Yet the Plan and CODI Settlement hand CODI a full release and priority recovery instead of subjecting the claim to appropriate scrutiny.

**D. These Chapter 11 Cases Have Been Pending for Eight Months and Further Extension Will Not Benefit the Estates and Creditors**

21. The length of time a case has been pending is a well-recognized factor weighing against extension of exclusivity. *See In re McLean Indus.*, 87 B.R. at 834. These Chapter 11 Cases were filed on November 16, 2025. Eight months have elapsed. The Debtors have already received one extension of exclusivity.

22. Nor does the size and complexity of these cases salvage the Motion. Size and complexity alone do not control the cause analysis, and courts have terminated exclusivity notwithstanding a debtor's complexity where continued exclusivity no longer offered the most constructive path to resolution. *See In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J. 2010) (terminating exclusivity notwithstanding the debtor's significant size and complexity). The complexity the Debtors invoke here is not an accident of scale – it flows directly from CODI's own conduct as controlling shareholder and secured lender, and from the Debtors' decision to shield that conduct through the CODI Settlement rather than test it in litigation. As stated, if the Debtors elected to back one horse over the other and yet cannot get that horse over the finish-line pursuant to the Plan they elected to sponsor, they should not be entitled to retain exclusivity for a proverbial second bite at the apple. Let's open the door for alternatives.

23. The traditional rationale for exclusivity also carries little force here because this is a liquidating, not a reorganizing, plan. Exclusivity exists to give a debtor breathing room to stabilize an ongoing business and negotiate a plan without the distraction of a competing proposal. There is no ongoing business left to stabilize. The only question remaining is how

liquidation proceeds are divided among creditors – a question a competing plan proponent could answer just as readily, and far more evenhandedly, than the Debtors.

24. Under these circumstances, granting another 90 days of exclusivity is futile. The Debtors have demonstrated no intention of addressing the Plan's fatal defects. Extension will not move these cases closer to a confirmable resolution.

**E. Further Extension of Exclusivity Will Pressure and Prejudice Creditors**

25. Whether the debtor is seeking an extension to pressure creditors into accepting an unsatisfactory plan is a critical factor in the cause analysis. *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587–90 (Bankr. S.D.N.Y. 2006); *See In re Situation Mgmt. Sys., Inc.*, 252 B.R. at 863 ("the debtor's use of [the] exclusivity period to force creditors to accept an unsatisfactory or unconfirmable plan" is a cause for terminating the debtor's exclusivity period).

26. Here, the Debtors' own Motion, their inadequate transparency and rush to confirmation reveals the coercive purpose of the extension. The Motion concedes that loss of exclusivity is a termination event under the Plan Support Agreement, and argues that this fact alone justifies extension because termination would "prejudice the estate." Motion ¶¶ 26–27. But this argument turns the exclusivity analysis on its head: the Debtors are effectively asking the Court to extend exclusivity because they have contractually bound themselves to a deal that collapses if creditors are permitted to propose alternatives. That is textbook use of exclusivity as leverage. It is a problem of their own making – it is inappropriate and should not be countenanced.

27. The Motion itself supplies the clearest evidence of pretext. The Debtors state that they seek the extension "out of an abundance of caution to avoid the potential confusion and distraction that would result if a competing plan were filed at this time." Motion ¶ 3. Read plainly, that is an admission that the purpose of the extension is to foreclose competing plans, not to permit any additional negotiation the Debtors could not otherwise complete on their own

timeline. Courts have condemned exactly this use of exclusivity. *See In re Innkeepers USA Trust*, 442 B.R. 227, 234 (Bankr. S.D.N.Y. 2010) (a debtor may not use exclusivity "as a tactical devise to put pressure on parties to yield to a plan they consider unsatisfactory").

28. The reality is that extension will pressure creditors in multiple ways:

(a) Creditors face a Hobson's choice: accept a plan that strips their rights and transfers value to CODI, or endure continued delay, mounting administrative costs, and the threat that the Plan Support Agreement will be terminated – leaving the estate without any plan at all;

(b) During the extended exclusivity period, the Debtors retain exclusive control over the confirmation process, denying creditors the ability to propose a fair, equitable alternative that addresses the Plan's legal deficiencies;

(c) Administrative costs continue to accrue during the extended period, diminishing the pool available for distribution to unsecured creditors; and

(d) The Debtors' litigation against the Ferder Parties proceeds during exclusivity, further depleting estate resources while the Ferder Parties are denied the opportunity to propose a plan that addresses the estate's claims against CODI.

29. The Debtors assert that the Committee and CODI "support the Plan." Motion ¶ 26. Of course, CODI does – it is the Plan's primary beneficiary. But the "support" of party who benefit from the Plan's inequitable structure at the expense of other creditors does not demonstrate that a further extension will benefit the estate as a whole. Moreover, the fact that the Committee and CODI "support the Plan" is not cause for a further extension at this juncture if the Debtors fail to confirm the very Plan that they support regardless of that support. The relevant inquiry is whether extension will facilitate a fair resolution for all creditor constituencies – and here, it plainly will not under the circumstances.

30. Termination of exclusivity, by contrast, would not prejudice the estates. It does not deprive the Debtors of the opportunity to confirm their Plan. It will permit the Ferder Parties or other creditors to propose an alternative plan once the existing period terminates, which will

be after the currently scheduled August 31 confirmation hearing. It will permit the Ferder Parties or other creditors to propose an alternative plan that liquidates the estates without the draconian, prohibited releases and injunctions, corrects the biased allocation of estate value, and provides a fair, equitable path to emergence from chapter 11. Competition among plans promotes good-faith negotiation and maximizes value for all stakeholders – precisely the goals the Bankruptcy Code was designed to achieve.

## IV. CONCLUSION

31. For the foregoing reasons, the Ferder Parties respectfully request that the Court deny the Debtors' Motion and terminate the Debtors' Exclusive Periods, or, in the alternative, leave the current periods unaltered but deny any further extensions.

**WHEREFORE**, the Ferder Parties respectfully request that the Court enter an order:

(i) denying the Motion and terminating the Debtors' Exclusive Filing Period and Exclusive Solicitation Period;

(ii) in the alternative, deny the Motion and leave the current periods as they stand; and,

(iii) granting such other and further relief as is just and proper.

Dated: July 27, 2026

*/s/ Jeffrey M. Schlerf*
Jeffrey M. Schlerf (No. 3047)
STINSON LLP
1007 N. Orange St.
3rd Floor #127
Wilmington, DE 19801
Telephone: (302) 509-4634
Email: jeffrey.schlerf@stinson.com
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*

Sandford L. Frey (CA Bar No. 117058)
STINSON, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067
Telephone: (310) 730-7020

Email: Sandford.frey@stinson.com
*Admitted Pro Hac Vice*
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*

Jeffrey Reeves (CA Bar No. 156648)
Daniel Weiss (CA Bar No. 242022)
REEVES & WEISS LLP
3333 Michelson Dr.
Suite 300
Irvine, California 92612
Telephone: (818) 554-7601
Email: JReeves@reevesandweiss.com
DWeiss@reevesandweiss.com
*Admitted Pro Hac Vice*
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*