**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1]<br><br>*Debtors.* | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered)<br><br>**Ref. Docket No. 649**<br><br>**Hearing Date: August 31, 2026 at 11:00 a.m. (ET)**<br>**Objection Deadline: August 18, 2026 at 4:00 p.m. (ET)** |

**OBJECTION OF THE FERDER PARTIES TO CONFIRMATION OF THE AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

## I. PRELIMINARY STATEMENT

Mordechai Ferder individually ("**Mr. Ferder**") and as Trustee of the Haim Family Trust ("**Trust**", and together with Mr. Ferder, the "**Ferder Parties**") hereby objects to confirmation of the Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors [Docket No. 649] (as amended, the "**Plan**").[2] The Court should not confirm the Plan in its present iteration because it violates the Bankruptcy Code in multiple, independently fatal respects, including because the overly broad third-party releases, injunctions and exculpations deny Mr. Ferder his due process rights.

At the July 14, 2026 hearing on the Disclosure Statement, counsel for the Official Committee of Unsecured Creditors ("**Creditors Committee**"), Jordan Kroop, dismissed Mr. Ferder's objections by claiming that his counsel misread the revised release, injunction and

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

[2] The "Plan" refers to the Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors [Docket No. 649], as further amended, modified, or supplemented from time to time. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

exculpation sections of the Plan. Mr. Kroop suggested Mr. Ferder could opt-out of the injunction and thus his rights under the Plan would not be impaired. He also suggested that the injunction is essentially the equivalent of a discharge (and in this regard he might be correct, but for the fact that these Debtors are not entitled to one, as will be discussed below). Without revealing the content of any privileged settlement discussions, it is fair to say that Mr. Ferder, through counsel, has for the past several weeks sought written confirmation in the Plan of Mr. Kroop's representations, but to no avail. Counsel for the Special Committee has made it clear in no uncertain terms that Mr. Ferder ***could not*** opt-out of the Section 11.06 injunction, the Section 11.07 exculpation provisions, or the effect of the Section 11.08 Debtor releases, which cannot be reconciled with Mr. Kroop's representations to the Court.

Even with an opt-out, the exculpation and the releases, coupled with the injunctions, go well beyond permissible standards. These provisions violate Mr. Ferder's due process rights because they would bar him from bringing his valid claims against third-parties, including CODI, and CODI's Manager, CGM, as well as both his pre- and post-petition claims against the Debtors and their representatives.

The Debtors' July 9, 2026 amendments [Docket No. 649] cured a few peripheral disclosure gaps but left every core structural defect fully intact. This Plan remains patently unconfirmable in its present form for at least the following independent reasons:

First, the Plan's nonconsensual third-party releases violate *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), which holds that the Bankruptcy Code does not authorize a bankruptcy court to discharge or release claims of non-consenting third parties against non-debtor parties through a Chapter 11 plan.

Second, the Debtor Release (Plan Section 11.08) and the accompanying injunction and third-party release provisions (Plan Sections 11.06 and 11.09) taken together provide the Debtors with the functional equivalent of a discharge. That structure violates 11 U.S.C. §

1141(d)(3), which forbids a liquidating corporate debtor from receiving a discharge. The Plan's own disclaimer in Section 11.10 that "the Debtors do not receive a discharge" is misleading at best, and evidence that the Debtors know they are not entitled to a discharge.

Third, the opt-out mechanism is illusory and does not cure the impermissible releases/injunctions. It applies only to "Releases by Holders of Claims" under Plan Section 11.09 but does *not* extend to the Plan's independent injunction (Section 11.06), Debtor Release (Section 11.08), or exculpation (Section 11.07), all of which bind all persons regardless of any opt-out. The Plan explicitly states: "Any Holder of a Claim that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 11.09 of the Plan *but is bound by the other releases, exculpations, and injunctions in the Plan*." This creates a trap: even a creditor that opts out is still enjoined and bound.

Fourth, the injunction under Plan Section 11.06 is overly broad, thereby stripping the Ferder Parties (and other creditors) of independent, non-estate equitable indemnity and contribution rights that under California law belong solely to Mr. Ferder. The Plan's own definition of "Cause of Action" expressly includes indemnity and contribution claims, confirming that the injunction's "affecting property dealt with by the Plan" language is broad enough to reach Mr. Ferder's independent claims against CODI. When Mr. Ferder sought clarifying language from Debtors' counsel simply confirming the preservation of his claims, the Special Committee's counsel rejected it.

Fifth, the Debtor Release (Plan Section 11.08) contains an express carve-out for fraud, willful misconduct, or gross negligence, but exempts the CODI Parties from that carve-out for claims "within the scope of those settled by the CODI Settlement Agreement," granting CODI immunity even for actual fraud, willful misconduct, or gross negligence with respect to the most significant claims in these cases. As Mr. Ferder will demonstrate at the August 31, 2026 hearing on confirmation, CODI rewrote the release provisions and had extensive involvement

in drafting the language of the injunction and releases it hopes to secure for itself through confirmation of the Plan.

Sixth, the Plan's "deemed motion" approach to substantive consolidation is conclusory and fails to meet the "extreme remedy" standard. *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

Seventh, the Plan and CODI Settlement Agreement are fundamentally biased, inequitable, and were not proposed in good faith under 11 U.S.C. § 1129(a)(3). This is a defect reinforced by (a) a post-confirmation governance structure that hands a formal vote over the fate of the CODI Settlement to one of its own architects, and (b) the Plan's allowance in full, without adjudication, of a CODI claim that is independently vulnerable to equitable subordination under 11 U.S.C. § 510(c).

Eighth, the Plan's discriminatory "Contributed Claims" scheme in Class 4 (Plan § 3.02(d)) violates 11 U.S.C. § 1123(a)(4)'s requirement that a plan provide the same treatment for each claim within a particular class, by granting creditors who contribute third-party claims against Grant Thornton LLP a superior distribution that other, similarly situated Class 4 creditors do not receive.

Ninth, the Exculpation Provision under Plan Section 11.07 improperly extends exculpation beyond the Debtors and other true estate fiduciaries to individual Special Committee members and their personal "Related Parties," exceeding the scope permitted under Third Circuit law.

The Plan is not a vehicle for reorganizing Lugano or maximizing creditor value. This entire bankruptcy proceeding has never been about that. Rather, it has always been a vehicle for consummating the CODI Settlement Agreement, a sweetheart deal, negotiated behind closed doors, that hands the Debtors' majority shareholder and secured lender, CODI, 34.79% of Effective Date Cash, 45% of Grant Thornton litigation proceeds, 25% of all other litigation

proceeds, and full allowance of its disputed $718 million claim, all while ensuring that Mr. Ferder and others cannot pursue their meritorious equitable contribution claims against CODI.

Had Debtors' representatives done what they represented to Mr. Ferder they would do when fraudulently inducing him into the March 6, 2026 Stipulation Regarding the Production of Confidential Information between Mr. Ferder and the Special Committee ("**Cooperation Agreement**"), which was to pursue their claims against CODI that they admit in the Disclosure Statement were meritorious, then CODI's oft-referenced $718 million secured claim would have had a realistic chance of being subordinated in its entirety. This assertion is not hyperbole. At the time Lugano mediated and settled with CODI, it possessed, in significant degree due to the Cooperation Agreement, direct, compelling evidence of CODI's knowledge of and involvement in the Lugano financing arrangements that CODI now claims ignorance of and says were improper. Had those claims been pressed in litigation, rather than settled in the sweetheart CODI Settlement Agreement, then CODI's claim almost certainly would have been significantly below the level Debtors gave to CODI in settlement. Had the Debtors positioned themselves to litigate with CODI rather than become beholden to it through DIP Financing and other arrangements, the Debtors could have reasonably been expected to free up at least 34.79% of Effective Date Cash for the unsecured creditors.

The Debtors' advisors, who have received millions from the estate in professional fees, knew the Debtors had claims against CODI from the outset of the bankruptcy, but chose to file a Chapter 11 instead of a Chapter 7 liquidation. The Debtors' advisors then entered into arrangements with CODI where CODI paid for the bankruptcy proceeding. By giving CODI control over the Debtors' and their advisors' purse strings, the Debtors and their advisors had to bend a knee to CODI at the expense of the Ferder Parties and the rest of the general unsecured creditor body. Now, the Creditors are left holding nothing but speculative, structurally underfunded litigation paper. To lock in this one-sided arrangement, the Plan relies on (1)

nonconsensual third-party releases that violate *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), (2) an injunction that is tantamount to an improper discharge and is so broad that it strips creditors of their own independent contribution, indemnity, and setoff rights, (3) an exculpation clause that, in application, shields Debtors' and CODI's representatives from liability even for intentional malfeasance and fraud, and (4) an opt-out mechanism that promises creditors a choice that they do not actually have.

This is not ordinary secured-creditor leverage. CODI engineered a closed loop in which it – the target of Lugano's equitable-subordination claim – controlled the money needed to prosecute it. CODI admits that it was "paying for these Chapter 11 cases" and that Debtors, the Special Committee, and the Committee were "subsisting" on CODI's cash collateral. The DIP terms, in turn, barred estate financing from being used to investigate or prosecute claims against CODI, except for narrow investigation allowances. CODI then locked that financial control into the Plan Support Agreement, which prohibits Debtors and the Committee from encouraging or voluntarily cooperating in litigation against CODI and requires Debtors to oppose any proceeding challenging CODI's claim treatment. The Plan completes the scheme by releasing CODI from virtually every Estate claim, known or unknown, including claims arising from its pre-petition conduct and alleged fraud. The point is unmistakable: although the record identifies substantial grounds to equitably subordinate CODI's $718 million claim, CODI orchestrated these cases so that those claims would never be adjudicated. It controlled the purse strings, disabled the Estate from financing a challenge, barred cooperation with any challenger, and now seeks a release that extinguishes the claim before any court can reach its merits.

For the reasons set forth below, the Court should deny confirmation of the Plan.

## II. JURISDICTION, STANDING, AND BACKGROUND

### A. Jurisdiction and Standing

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The Ferder Parties are "parties in interest" within the meaning of 11 U.S.C. § 1109(b) and have standing to be heard on any issue in these Chapter 11 Cases, including objecting to confirmation of the Plan under 11 U.S.C. § 1128(b). The Ferder Parties (i) hold, through affiliated entities, equity interests in Debtor Lugano Holding, Inc., (ii) are primary targets of the proposed Liquidation Trust, (iii) are defendants in pending bankruptcy litigation brought by the Debtors, and (iv) hold substantial claims and defenses against the estates.

### B. Relevant Background

4. In 2004, Mr. Ferder founded Lugano Diamonds & Jewelry Inc. and built it over two decades into an internationally respected luxury jewelry enterprise. Until 2021, Lugano was 100% privately owned and operated. In 2021, however, publicly traded CODI purchased a 59.9% majority stake in Lugano Holding, Inc., based on an enterprise value of $256 million. Mr. Ferder retained a 39.6% equity stake and remained Chief Executive Officer.

5. On May 7, 2025, CODI filed a Form 8-K with the Securities and Exchange Commission announcing Mr. Ferder's resignation and an internal investigation. On June 24, 2025, Lugano sued Mr. Ferder in California (Orange County Superior Court). Mr. Ferder has vigorously disputed every allegation.

6. On November 16, 2025 ("**Petition Date**"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

7. In a calculated procedural maneuver, Lugano then removed the California case to the U.S. District Court in the Central District of California and also sought to transfer such

case to this Court in Delaware. The United States District Court in the Central District of California (the Honorable Fred Slaughter, United States District Court Judge, presiding) ordered the California case to be remanded back to the Orange County Superior Court. Undeterred, the Debtors filed the same fraud claims against Mr. Ferder directly in this Court as an adversary proceeding and then dismissed their own Orange County complaint. Ironically, through the Plan, the Debtors hope to deprive Mr. Ferder of the right to even file counterclaims in the adversary proceeding should the Debtors ever effectively serve that complaint.

8. Thereafter, the Special Committee and Mr. Ferder participated in detailed and substantive settlement negotiations. In those discussions, certain non-public evidence of CODI's knowledge and culpability was disclosed to the Special Committee. The Special Committee, and its then-counsel Eric Sussman of Barnes & Thornburg, was keenly interested in learning more. Under the auspices of settlement, the Special Committee induced Mr. Ferder into a standstill agreement and a "look-see" exchange of evidence against CODI, representing that Lugano's interests were 100% aligned with Mr. Ferder's and assuring Mr. Ferder that Lugano had every intention of pursuing litigation against CODI or otherwise assuring that CODI was ultimately accountable for its conduct. In breach of the Cooperation Agreement and contrary to Mr. Sussman's written and oral representations, Lugano and the UCC used the confidential "look-see" material in a draft complaint that it used in mediation with CODI to negotiate a sweetheart settlement with CODI. Once the sweetheart deal was inked, the Special Committee and Mr. Sussman reneged on their commitments, refused to follow through on the promised *quid pro quo* to Mr. Ferder, abandoned settlement negotiations with him, and filed the new adversary action against him referenced above. Based on their time records, it is evident that the Special Committee and its counsel never intended to follow through on their representations to Mr. Ferder, and they knew that at the time they made those representations.

9. On June 24, 2026, the Debtors filed their Plan of Liquidation [Docket No. 612] and Disclosure Statement [Docket No. 614].

10. On July 7, 2026, the Ferder Parties filed a comprehensive Objection to the Disclosure Statement [Docket No. 637], identifying at least ten independent, facially fatal defects in the Plan rendering it patently unconfirmable as a matter of law.

11. On July 9, 2026, a mere two days later, the Debtors filed the Amended Plan [Docket No. 649] and Amended Disclosure Statement [Docket No. 651]. The Debtors' amendments made only a small number of discrete, housekeeping fixes. But the amendments left completely untouched every defect that actually drives confirmability, the nonconsensual releases, the illusory opt-out, the CODI fraud carve-out, and the one-sided injunction. This Court approved the Disclosure Statement. However, the Court acknowledged that many of the points raised by Mr. Ferder would likely be at issue at the confirmation hearing.

12. On July 27, 2026, the Ferder Parties filed their Objection to the Debtors' Second Motion to Extend Exclusivity [Docket No. 739], asserting, among other things, that the Debtors failed to demonstrate cause for the extension and that the extension was, in fact, unnecessary; and that the Plan is patently unconfirmable and that no amount of additional time can cure the Plan's fundamental structural defects.

13. The Confirmation Hearing is currently scheduled for August 31, 2026.

## III. <u>OBJECTION</u>

### A. The Plan's Nonconsensual Third-Party Releases Violate *Harrington v. Purdue Pharma* and Are Unauthorized Under the Bankruptcy Code.

14. In *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), the Supreme Court held that the Bankruptcy Code does not authorize a bankruptcy court to discharge or release claims of non-consenting third parties against non-debtor parties through a Chapter 11 plan. The Supreme Court explained that "nothing in the Bankruptcy Code contemplates (much less

authorizes)" a bankruptcy court to extinguish nonconsensual claims against non-debtor third parties. *Id.* at 223.

15. Plan Section 11.09 releases non-debtor third parties (including current directors, officers, the Creditors' Committee and its members, CODI Parties and their "Related Parties") from claims held by creditors unless the creditors affirmatively "opt out." This is precisely the type of nonconsensual third-party release that *Purdue Pharma* held is unauthorized under the Bankruptcy Code.

16. The opt-out mechanism does *not* cure the statutory defect identified in *Purdue Pharma*. "Deemed consent" through silence or inaction does not constitute the meaningful, affirmative consent required under the Bankruptcy Code. Several Delaware bankruptcy courts have recognized this principle in the wake of *Purdue Pharma*:

- In *In re Smallhold, Inc.*, 665 B.R. 704, 721 (Bankr. D. Del. 2024), Judge Goldblatt, who had previously approved opt-out release mechanisms, changed his position in light of *Purdue Pharma*, stating that the court "no longer believes it is appropriate" to deem consent from failure to opt out. Judge Goldblatt agreed that consent requires an affirmative act, such as "check[ing] a box on its ballot indicating that it intend[s] to 'opt in' to the third-party release." *Id. at 708-711*.
- In *In re First Mode Holdings Inc.*, Case No. 24-12794 (KBO) (Bankr. D. Del. Feb. 6, 2025), Judge Owens stated that the opt-in mechanism is the "gold standard" and potentially "appeal-proof." *See In re First Mode Holdings Inc.*, Case No. 24-12794 (KBO) (Bankr. D. Del. Feb. 6, 2025) [Docket No. 266] *Hr'g. Tr.* at 37:14-38:9; 41:14-23 (overruling disclosure statement objection, finding that opt-in mechanism for third-party release is "gold standard" and potentially "appeal-proof").
- In *In re Yellow Corp.*, Judge Goldblatt specifically disagreed with the debtors' position that a vote to accept the plan provides affirmative consent to all of the plan's provisions,

thus showing that the affirmative act needs to be something more than voting to accept a plan. *In re Yellow Corp., et al.*, Case No. 23-11069 (CTG) (Bankr. D. Del. Nov. 21, 2024) [Docket No. 5026].

17. Even if this Court disagrees and finds deemed consent could theoretically cure an otherwise impermissible release (which Mr. Ferder respectfully asserts that it cannot after *Purdue Pharma*), the Plan's opt-out mechanism is *illusory* because, among other reasons, it applies *only* to the Section 11.09 releases. Section 11.05 of the Amended Plan explicitly provides:

> Any Holder of a Claim that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 11.09 of the Plan *but is bound by the other releases, exculpations, and injunctions in the Plan*.

Plan § 11.05 (emphasis added).

18. This creates a trap for creditors: even a creditor that opts out of Section 11.09 is still bound by (i) the Plan's independent injunction (Section 11.06), (ii) the Debtor Release (Section 11.08), and (iii) the exculpation provision (Section 11.07). A creditor that opts out may be exempted from the narrow Section 11.09 release, but nevertheless remains **permanently** enjoined from pursuing any claim or remedy against the Released Parties under the Plan's other provisions. The opt-out is meaningless if it does not actually restore the creditor's right to bring claims. The contradiction was made clear to Mr. Ferder when he requested and was denied the following clarifying language:

> None of the Ferder Affiliated Parties has or shall be deemed to have granted the releases contained in Section 11.09 of this Plan and are hereby deemed to have opted out of all releases, exculpations and injunctions, including, without limitation, those set forth in Sections 11.06, 11.07, 11.08, and 11.09 of the Plan. Notwithstanding anything to the contrary in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the CODI Settlement Agreement:
>
> (a) Any and all rights of the Ferder Affiliated Parties to assert, prosecute, defend, or recover on account of any Claims, Causes of Action, or similar matters, including, without limitation, any claims or causes of action for fraud, indemnity, contribution, reimbursement, subrogation, breach of fiduciary duty, aiding and

> abetting, conspiracy, or any other theory of liability, whether at law or in equity, against any Released Parties, Exculpated Parties, CODI Parties, or any other Person or Entity (other than the Debtors and their Estates), shall not be released, enjoined, exculpated, impaired, or otherwise affected by Sections 11.06, 11.07, 11.08, or 11.09 of the Plan, or by any provision of the Confirmation Order, the Liquidation Trust Agreement, or the CODI Settlement Agreement;
>
> (b) The Ferder Affiliated Parties expressly reserve all rights of setoff, recoupment, and any other defense (whether at law or in equity) against any Claim, Cause of Action, or demand asserted or that may be asserted against any Ferder Affiliated Party by the Debtors, the Estates, the Liquidation Trust, the Liquidation Trustee, or any of their successors or assigns, and nothing in Section 11.06(a)(iv) of the Plan or elsewhere in the Plan or the Confirmation Order shall be deemed to enjoin, limit, or impair any such right of setoff, recoupment, or defense;
>
> (c) Nothing in Section 11.08 of the Plan shall release, waive, or impair any Claim or Cause of Action held by any Ferder Affiliated Party, whether such Claim or Cause of Action is characterized as direct, derivative, or otherwise;
>
> (d) Nothing in the exculpation provisions of Section 11.07 of the Plan shall constitute a defense to, or otherwise limit or impair, any Claim or Cause of Action asserted by any Ferder Affiliated Party against any Person, including any Exculpated Party; and
>
> (e) Nothing in the Plan shall permit any of the Ferder Affiliated Parties to recover any amounts from the Estates except on account of any Allowed Claims.
>
> For the avoidance of doubt, the foregoing provisions are in addition to, and shall not be deemed to limit, any rights of the Ferder Affiliated Parties arising from their status as Excluded Parties under this Plan.

The foregoing language would have resolved Mr. Ferder's primary objection, but it was rejected.

19. While the Plan ostensibly provides creditors with the ability to opt-out, the practical effect is that Creditors are precluded from opting-out of the Sections 11.06, 11.07 and 11.08. Worse yet, the fact that creditors are precluded from opting out of Sections 11.06, 11.07 and 11.08 is not conspicuously disclosed in the Disclosure Statement and Plan. Rather than being clearly delineated for the hypothetical investor, it requires a meticulous reading of the provisions by a professional to figure out. The Debtors and the Committee are boastingly confident in their ability to get the Plan confirmed, so there is little motivation for them to compromise.

20. The Plan's release provisions violate due process. Moreover, the release/injunction scheme is particularly unfair and inequitable as it applies to Mr. Ferder. As referenced above, the Debtors have sued Mr. Ferder twice (more on that shortly). At a minimum, to be fair and equitable Mr. Ferder should be permitted a full and fair opportunity to file, present and prosecute his defenses, claims, crossclaims and counterclaims in response to Lugano's complaints against him. But at every stage of the case, the Debtors and the various constituencies have sought to impair and thwart his ability to do so – the Plan is the *coup d'état*. In other words, the Plan seeks to preserve each and every claim asserted by the Debtors or the Liquidation Trust against Mr. Ferder, while at the same time seeking to materially impair, indeed preclude, Mr. Ferder's ability to defend himself and bring counterclaims. The Plan is expressly designed to channel all liability onto Mr. Ferder and the Ferder Affiliated Parties while releasing every other potential target. Mr. Ferder is excluded from every protective mechanism, exposed to the full arsenal of the Liquidation Trust's preserved causes of action, denied contribution from Released Parties, blocked from obtaining cooperation from parties to the Settlement, and faces the Liquidation Trust backed by a five-member Oversight Board, while every entity that might share culpability (CODI, the directors, Holland & Knight, Grant Thornton, all being separately pursued) is either released or protected by exculpation.

21. The inherent unfairness and inequality are particularly apparent when one considers the condemnable totality of the circumstances. The Debtors sue Mr. Ferder; they remove the action to Federal District Court and seek to transfer the action to Delaware; Mr. Ferder seeks a remand which is granted and the case is remanded back to state court; Mr. Ferder files his stay relief motion seeking leave to file counterclaims; the Subcommittee induces Mr. Ferder to enter into a standstill for the pretextual purpose of purportedly negotiating a settlement; the Subcommittee induces Mr. Ferder's counsel to provide a "look-see" of evidence that implicates CODI, which Mr. Ferder's counsel agreed to provide in exchange for since-

broken promises; the Debtors, Creditors Committee and Subcommittee use that information in breach of the Cooperation Agreement to obtain the CODI Settlement, which is now the very cornerstone of the Plan; the Debtors and the Special Committee immediately disavow proposed settlement with Mr. Ferder; and the Debtors then end-run the District Court remand order by filing the same lawsuit in the bankruptcy court under the auspices of a claims objection. Now, the Plan proposes to insulate the Special Committee from Mr. Ferder's claims against it and its members, and seeks to enjoin Mr. Ferder from pursuing indemnity, contribution and other claims. The entire scheme is the antithesis of what is fair and equitable.

22. A third-party release extinguishes substantive legal rights, rights that creditors hold against non-debtor parties entirely independent of the bankruptcy case. Extinguishing such rights without the affirmative consent of the rights-holder implicates fundamental due process concerns. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"). An opt-out mechanism that purports to extinguish rights through silence does not satisfy this standard, particularly where the opt-out applies only to a narrow subset of the Plan's release provisions while the more sweeping injunction and exculpation provisions remain binding regardless.

23. The Plan's release structure is also internally inconsistent in a manner that undermines any claim of fairness. The Plan designates certain parties, including the Ferder Parties, as "Excluded Parties" who are excluded from the definition of "Released Parties" under Section 11.09. This means that the Ferder Parties' claims *against* other creditors may be released (through the opt-out mechanism), while the Ferder Parties themselves receive no reciprocal protection. This one-sided structure, in which the Ferder Parties give up rights but receive nothing in return, lacks basic contractual consideration and fairness.

### B. The Debtor Release and Injunction Provide the Functional Equivalent of a Discharge Prohibited by 11 U.S.C. § 1141(d)(3)

24. Section 1141(d)(3) of the Bankruptcy Code provides that confirmation of a plan does not discharge a debtor if the plan provides for the liquidation of all or substantially all of the property of the estate, the debtor does not engage in business after consummation of the plan, and the debtor would be denied a discharge under § 727(a) of the Bankruptcy Code. 11 U.S.C. § 1141(d)(3). Corporate debtors are categorically denied a discharge under § 727(a)(1), which limits Chapter 7 discharge to individual debtors. 11 U.S.C. § 727(a)(1). Because this is a liquidating plan under which the Debtors will dissolve and cease business operations, the Debtors are not entitled to a discharge, and the Plan itself acknowledges as much: Section 11.10 recites that, "consistent with 11 U.S.C. § 1141(d)(3), the Debtors do not receive a discharge." Plan § 11.10.

25. Sections 11.06 and 11.08 do not merely achieve the equivalent of a discharge; they achieve a result *broader* than a discharge. A discharge under § 1141(d) would only relieve Debtors of their own liability to creditors and, under § 524(e), would not affect the liability of any other entity. But Section 11.08 releases each "Released Party," a defined term that includes not only the Debtors themselves but also the CODI Parties, the Creditors' Committee, Special Committee members, and their respective "Related Parties." Plan, Definitions ¶ 127. Furthermore, the Section 11.08 release is executed not only by the Debtors and their Estates, but also purportedly "on behalf of ... any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing entities on behalf of the Debtors." Plan § 11.08. This language sweeps in derivative claims that creditors like Mr. Ferder could otherwise assert, and uses the vehicle of a "Debtor Release" to extinguish those creditors' claims against non-debtor Released Parties (including CODI and the Special Committee members) without their consent. A discharge could never

accomplish this: even a permissible discharge under § 1141(d)(1) would only protect the debtor, not immunize CODI and the Special Committee from liability. Section 11.08 is therefore not merely antithetical to § 1141(d)(3); it exceeds the scope of anything the Bankruptcy Code authorizes.

26. Sections 11.06 and 11.09 compound this problem. Section 11.09 requires every "Releasing Party," defined to include "all holders of Claims ... who do not make an Opt-Out Election," to release every "Released Party," again including the Debtors themselves. Plan, Definitions ¶¶ 127–128; Plan § 11.09. Additionally, Section 11.06 broadly enjoins any Person holding a Claim against a Debtor from commencing or continuing any action directly or indirectly affecting any property dealt with by the Plan, regardless of whether that Person opted out of Section 11.09. Plan § 11.06. The combined effect of Sections 11.06, 11.08, and 11.09 is to extinguish, or permanently enjoin the enforcement of, creditors' claims against the Debtors themselves. That is precisely the substantive event that a discharge accomplishes, and precisely what § 1141(d)(3) forbids a liquidating corporate debtor from obtaining.

27. The Plan cannot achieve through "release" and "injunction" what Section 1141(d)(3) forbids it from achieving through "discharge." Section 11.10's recitation that, "notwithstanding anything to the contrary in this Plan, and consistent with 11 U.S.C. § 1141(d)(3), the Debtors do not receive a discharge," correctly states the governing rule but does not achieve compliance with it. A conclusory recitation that a plan provision is not a discharge does not retroactively narrow the operative text of Sections 11.06, 11.08, and 11.09, which, as shown above, extinguish and permanently enjoin creditors' direct claims against the Debtors regardless of what label the Plan attaches to that result.

28. Courts have consistently upheld the principle that Section 1141(d)(3) prohibits liquidating corporate debtors from receiving a discharge, whether directly or indirectly, through plan provisions such as permanent injunctions. *In re Cypresswood Land Partners, I*, 409 B.R.

396 (2009) ("The Amended Plan also runs afoul of another provision in Title 11. Paragraph 11.3 of the Amended Plan sets forth that upon confirmation, the Debtor will receive a discharge . . . . There is no question that the Amended Plan provides for liquidation of all the Debtor's assets . . . . Additionally, the Debtor will not continue its real-estate business post confirmation; the only action that the Debtor will undertake post-confirmation is the prosecution of the Adversary Proceeding."). Mr. Ferder has found no case in the Third Circuit that explicitly ruled on whether a permanent injunction in a Chapter 11 liquidating plan that bars creditors from pursuing claims against the debtor violates Section 1141(d)(3).

29. However, the permanent injunction in this Plan, which bars creditors from pursuing claims against the Debtors, violates Section 1141(d)(3) when the corporate debtor is not entitled to a discharge. Such an injunction operates as the functional equivalent of a discharge, which is expressly prohibited under Sections 1141(d)(3) and 727(a)(1). Courts have invalidated plan provisions that attempt to circumvent these statutory limitations, emphasizing the importance of preserving creditor rights in liquidating cases. For example, in *In re Bigler LP*, 442 B.R. 537 (Bankr. S.D. Tex. 2010) the court emphasized that an injunction preventing post-confirmation prosecution of claims against a liquidating debtor is impermissible because it effectively grants a discharge in violation of Section 1141(d)(3), stating in pertinent part as follows:

> The injunction is inappropriate as applied to the Debtors because a liquidating Chapter 11 plan may not provide for the discharge of the debtor. § 1141(d)(3). An injunction preventing the post-confirmation prosecution of claims would certainly operate as a discharge of the Debtors. Accordingly, it is impermissible under the Code. For the same reasons, actions against property of the Estate may not be enjoined after the confirmation of a liquidating plan.
>
> The injunction is also inappropriate as applied to the Committee. Whereas the Committee, its members, and its representatives are eligible for qualified immunity for acts or omissions during the pendency of the Chapter 11 case pursuant to Pacific Lumber, such immunity may not include willful or gross misconduct, nor acts outside the scope of their duty, nor may it extend outside the time period of the pendency of the case. See 584 F.3d at 253; In re Pilgrim's Pride Corporation, 2010 WL 200000, at *4, 2010 Bankr.LEXIS 72 at *13 (Bankr.N.D.

Tex. 2010) ("... committees and their members are entitled to qualified immunity for any acts or omissions during a [C]hapter 11 case that were within the scopes of their duties."). Because these limits are not imposed on the injunction as applied to the Committee, it is impermissible.

Finally, the injunction is also inappropriate as applied to the Liquidating Trust. The Liquidating Trust is a third-party who is not entitled to discharge under the plain language of § 524(e) and Pacific Lumber. 584 F.3d at 253.

**C. The Plan's Injunction (Section 11.06) Is Effectively an Impermissible Nonconsensual Third-Party Release by Another Name.**

30. Section 11.06, as revised in the Amended Plan, now permanently enjoins "all Persons and Entities who have ever held or will ever hold a Claim against or Equity Interest in a Debtor", solely with respect to any Claims, Equity Interest, and "Causes of Action dealt with under the Plan," from "commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind" against or affecting "any property dealt with by the Plan." The original Plan enjoined actions against or affecting "the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust, or the property of any of the Debtors, the Released Parties, the Liquidation Trustee or the Liquidation Trust." The Debtors revised this language after the Ferder Parties' Objection to the Disclosure Statement identified Section 11.06 as an impermissible nonconsensual release of non-estate claims by another name. But the revision is not a narrowing of the injunction. It is an expansion disguised as a retreat. The original language at least identified the protected parties by name, giving creditors notice of what was prohibited. The revised language replaces that specificity with a phrase, "any property dealt with by the Plan," that is undefined, has no limiting principle, and sweeps far more broadly than the original.

31. Section 11.06(c) provides that "[b]y accepting any Distribution, each Holder of an Allowed Claim is deemed to have specifically consented to the Injunction set forth in this Section 11.06." Any unsecured creditor that accepts a distribution is *deemed* to have consented to the permanent injunction. There is no opt-in or opt-out for that matter. Thus, creating the

quintessential Hobson's choice of either forgoing recovery or forfeiting the ability to pursue independent actions. Moreover, it applies to "all Persons and Entities who have ever held or will ever hold a Claim" from taking any action "against or affecting any property dealt with by the Plan." The injunction applies to "all Persons and Entities **who have ever held or will ever hold a Claim against or Equity Interest** in a Debtor, along with their respective present or former employees, agents, officers, directors, members, principals, and Affiliates, are **permanently** enjoined, solely with respect to any Claims, **Equity Interests**, and **Causes of Action dealt with** under the Plan". Plan, Section 11.06(a) (emphasis added). The term "dealt with" is so vague that it potentially scoops up every conceivable right and claim. Furthermore, the injunction bars setoff rights providing that "unless such setoff was formally asserted in a timely Filed proof of Claim or in a document Filed with the Bankruptcy Court prior to entry of the Confirmation Order." Again, there is no opt-in or opt-out. Creditors who did not formally assert setoff in their proofs of claim permanently lose these rights.

32. As a former equity holder and claimant, the effect of the Plan is to permanently enjoin Mr. Ferder from pursuit of any action against estate property because his equity interest and claim are "dealt with" under the Plan. This appears to include any claims for compensation, contractual payments, or indemnification relating to estate property.

33. Because the Plan is a liquidating plan that transfers all remaining estate assets to the Liquidation Trust, by definition everything remaining in these estates is "property dealt with by the Plan." The preserved Causes of Action are property dealt with by the Plan. The CODI Settlement Agreement is property dealt with by the Plan. CODI's allowed $718 million claim is property dealt with by the Plan. CODI's distributions (34.79% of Effective Date Cash, 45% of GT litigation proceeds, 25% of all other litigation proceeds) are property dealt with by the Plan. The Liquidation Trust itself and all claims it holds are property dealt with by the Plan. Under this formulation, virtually any action by any creditor that could in any conceivable way

touch upon any asset, claim, distribution, or arrangement addressed by the Plan is potentially enjoined.

34. Moreover, the Plan's own definition of "Cause of Action" (Plan, Definition ¶ 17) expressly includes "contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims." Mr. Ferder's equitable indemnity and contribution claims against CODI are, by the Plan's own definitional terms, "Causes of Action." Because Mr. Ferder's independent indemnity claims against CODI arise from the identical financing arrangements and would necessarily implicate the same factual and legal terrain as the Trust's own preserved indemnity and contribution Causes of Action, a judgment in Mr. Ferder's favor would inescapably "affect" property dealt with by the Plan. The Debtors' revision from naming the Released Parties to using the phrase "property dealt with by the Plan" makes the coverage even broader, because it sweeps in not only actions directed at the Released Parties themselves but also potentially covers any action that touches any asset, claim, or arrangement the Plan administers.

35. Under California law, which governs the underlying transactions, a defendant held liable for concurrent fault possesses independent rights of equitable indemnity and contribution against joint tortfeasors. *See American Motorcycle Ass'n v. Superior Court*, 20 Cal. 3d 578 (1978). These rights are personal to Mr. Ferder, arose prepetition under non-bankruptcy law, and are not, and never were, property of the Debtors' estates. Mr. Ferder's independent claims against CODI are not the Debtors' rights; they cannot be enjoined simply because their prosecution might indirectly affect distributions or litigation controlled by the Liquidation Trust. As the Supreme Court stated, nothing in the Bankruptcy Code permits claims held by third parties to be bargained away "as if the claims were somehow [the debtor's] own property." *Purdue Pharma L.P.*, 603 U.S. at 220.

36. Bankruptcy courts look to the substance and practical effect of a plan provision, not its label or drafting form, in determining whether it operates as an impermissible release of non-debtor claims. *See Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 132 F.4th 353, 358 (5th Cir. 2025) ("bankruptcy injunctions, though not in themselves releases, similarly act to shield persons and entities from liability and therefore may not be entered to protect non-debtors not legally entitled to release"). The Third Circuit applied this principle after *Purdue Pharma*, holding unlawful (and ordering the reformation of) a plan's judgment-reduction mechanism that, though not styled as a direct release, operated to release and enjoin contribution and indemnity claims that non-settling insurers could otherwise have asserted against settling non-debtor insurers, absent their consent and full satisfaction of those claims. *See In re Boy Scouts of Am. & Del. BSA, LLC*, 137 F.4th 126, 167–69 (3d Cir. 2025). Recasting Section 11.06 to protect "any property dealt with by the Plan," rather than naming the CODI Parties directly, is precisely the kind of indirect mechanism that cannot survive *Purdue Pharma*. The Plan should not be confirmed where it circumvents the Supreme Court's holding by drafting language so broad and undefined that a court must apply it case by case to determine whether it enjoins a particular creditor's claims. A blanket injunction whose scope cannot be ascertained without litigation over its meaning is inherently nonconsensual, because no creditor can meaningfully "consent" to the extinguishment of rights whose scope it cannot identify.

### D. The CODI Settlement Release Is a Bad-Faith Whitewash: The Fraud Carve-Out Exception.

37. The Debtor Release (Plan § 11.08) releases the Debtors' estates' claims against the Released Parties, including the CODI Parties. It contains an express carve-out for "actual fraud, willful misconduct, or gross negligence." This carve-out is standard and appropriate — no party should receive a release for fraud.

38. But the Plan expressly provides that this fraud exception "does not apply to the CODI Parties with respect to claims that are within the scope of those settled by the CODI Settlement Agreement." Plan § 11.08. In other words, CODI receives release protection ***even for actual fraud, willful misconduct, or gross negligence*** with respect to the most significant claims in these cases, the very claims that formed the basis of the Special Committee's investigation, the very claims that Mr. Ferder was induced to provide evidence supporting, and the very claims that constitute the Estate's most valuable assets.

39. The evidence of CODI's inequitable conduct is overwhelming. CODI admitted in public investor calls that it was aware of the financing practices that the Debtors now brand as "fraud." CODI admitted "turning a blind eye." CODI was not only well aware of these practices, but it directly benefitted from these practices because, among other things, $250 million was drawn on credit lines that were inflated by those arrangements, and CODI's manager, CGM, extracted at least $252 million in management fees, a figure it could never have earned had Lugano not been using the financing methods that CODI and Debtors now malign. Such conduct supports equitable subordination of CODI's claims under 11 U.S.C. § 510(c). *See In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 411 (3d Cir. 2009).

40. Yet under this Plan, CODI dodges these viable equitable subordination claims. Instead, CODI's disputed $718 million claim is allowed *in full*, CODI receives a material share of estate value (34.79% of Effective Date Cash, 45% of GT litigation proceeds, 25% of all other litigation proceeds), and CODI receives extraordinary releases from fraud liability.

41. A plan that grants immunity for actual fraud to the party most culpable for the debtor's collapse does not satisfy the good faith requirement of Section 1129(a)(3) of the Bankruptcy Code or the fair and equitable standard of Section 1129(b). If the Court is inclined to approve the settlement based upon the Debtors' business judgment, it should not be permitted to preclude non-debtor parties from asserting counterclaims for fraud at the same

time. Entering into a settlement and compromising the estates' claims against CODI is one thing. It is quite another to compromise the rights of non-debtor third parties as a condition of the settlement. The CODI carve-out exception should be stricken.

42. The prejudice to the Ferder Parties is direct and immediate. The Debtors have filed litigation against Mr. Ferder alleging the same conduct in which CODI admittedly participated. If CODI receives a fraud release while Mr. Ferder remains exposed as a litigation target, CODI escapes liability for its own culpable conduct while Mr. Ferder bears the full weight of claims based on conduct in which CODI knowingly participated. This asymmetric treatment is fundamentally unfair and demonstrates that the Plan was not proposed with honesty and good intentions toward all constituencies.

43. The asymmetry is compounded by the Plan's use of different fraud thresholds in its release provisions. Section 11.08 (Debtor Release) carves out claims based on "actual fraud, willful misconduct, or gross negligence." But Section 11.09 (Third-Party Release) uses the more restrictive formulation "actual intentional fraud, willful misconduct, or gross negligence", adding the word "intentional" before "fraud." This heightened standard makes it materially harder for creditors to fall within the carve-out when asserting claims against Released Parties under Section 11.09 than it would be under the Debtor Release in Section 11.08. The discrepancy is not explained or justified anywhere in the Plan or Disclosure Statement and further demonstrates that the release architecture was designed to maximize the protection afforded to CODI and other Released Parties at the expense of creditors.

**E. The Plan's "Deemed Motion" Approach to Substantive Consolidation Is Conclusory and Fails to Meet the Required Standard**

44. The Plan provides for substantive consolidation of all Debtors' estates into a single consolidated estate. Section 5.08 of the Plan states that the Disclosure Statement and

Plan "constitute a motion" for consolidation, effectively shifting the burden to creditors to object or be deemed to have consented.

45. Substantive consolidation is an "extreme remedy" that is "rarely used." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005). The Third Circuit emphasized that because substantive consolidation "may affect profoundly creditors' rights and recoveries" and is inherently "imprecise," it should be treated as a "'rough justice' remedy" that is "one of last resort after considering and rejecting other remedies." *Id.*

46. To obtain substantive consolidation in the Third Circuit, the proponent must demonstrate that, prepetition, the entities disregarded corporate separateness such that creditors dealt with the entities as a single economic unit, *or* that the entities' affairs are so entangled that separating them is prohibitive and consolidation will benefit all creditors. *Id.* at 211–12. This requires a rigorous, entity-by-entity analysis of assets, liabilities, intercompany transactions, and creditor expectations.

47. The Plan's support for consolidation is entirely conclusory. The Amended Disclosure Statement merely states that if challenged, "the Debtors intend to present evidence". But they provide no entity-by-entity asset and liability analysis, no identification of intercompany transactions, no analysis of creditor expectations, and no demonstration that consolidation will benefit all creditors rather than merely simplify administration.

48. The "deemed motion" procedure is an improper attempt to bypass the Debtors' evidentiary burden. The Plan proposes an "extreme remedy" simply by declaring it in a plan and deeming creditor silence to be consent without any affirmative showing that the Third Circuit's stringent standards are met. *Id*. Absent is admissible evidence demonstrating a benefit to creditors and a lack of prejudice to the creditors of the respective estates. The Disclosure Statement and Plan fail dismally in this regard.

49. This lack of disclosure is particularly prejudicial to the Ferder Parties. Mr. Ferder holds a 39.6% equity interest in Lugano Holding, Inc., not in the other Debtor entities. Substantive consolidation would merge this equity interest into a consolidated pool, potentially diluting or destroying it entirely, without any showing that the entities' creditors dealt with them as a single unit or that the Ferder Parties' interests would be appropriately protected. The Ferder Parties cannot evaluate the propriety of consolidation, or its effect on their interests, without the entity-by-entity analysis that the Debtors have failed to provide.

50. The Debtors' failure to provide adequate information regarding substantive consolidation is particularly concerning because the Debtor entities may have materially different creditor constituencies and asset profiles. The Ferder Parties hold equity interests in Lugano Holding, Inc., not in the operating subsidiaries. Substantive consolidation could result in the Ferder Parties' equity position being subordinated to claims that would otherwise be satisfied from subsidiary assets. Without an entity-by-entity analysis, it is impossible to determine whether consolidation benefits or prejudices particular creditor groups.

51. The Third Circuit has warned that substantive consolidation should never be ordered merely for administrative benefit. *Id.* at 214. Where, as here, the proponent offers no substantive justification beyond conclusory assertions, the court should deny the request. The "deemed motion" approach, which shifts the burden to creditors by requiring them to affirmatively object rather than requiring the proponent to carry its own evidentiary burden, is inconsistent with the Third Circuit's framework and should be rejected.

### F. The Plan and CODI Settlement Agreement Are Fundamentally Biased, Inequitable, and Were Not Proposed in Good Faith Under 11 U.S.C. § 1129(a)(3)

52. Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The good faith

standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code. *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001). In evaluating the totality of circumstances surrounding a plan a court has "'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan." *Id.*

53. The Plan's bias in favor of CODI is stark and undeniable:

(a) CODI receives 34.79% of Effective Date Cash, 45% of Grant Thornton litigation proceeds, and 25% of all other litigation proceeds under the CODI Settlement, while its disputed $718 million claim is allowed in full. As explained above, CODI's entire claim is highly vulnerable to equitable subordination under 11 U.S.C. § 510(c) given 1) non-public information made available to Lugano under the Cooperation Agreement, 2) the documents produced thus far in this proceeding, and 3) CODI's own public acknowledgements, all showing not only CODI's awareness of, but also its acquiescence and direct profitable participation in, the very practices Debtors and CODI now claim to have been fraudulent;

(b) CODI receives Debtor Releases, Third-Party Releases, Exculpation, and Injunction protection, including protection even for actual fraud, willful misconduct, or gross negligence within the scope of the CODI Settlement, while the Ferder Parties are designated as "Excluded Parties" entitled to no protections whatsoever;

(c) The CODI Settlement Agreement ¶ 7.c prohibits parties to the CODI Settlement from encouraging or cooperating in litigation against CODI

Released Parties, further insulating CODI from accountability and prejudicing the Ferder Parties' ability to prosecute indemnity claims;

(d) The treatment is non-reciprocal: CODI receives every protection the Plan can confer; the Ferder Parties remain fully exposed as litigation targets of the Liquidation Trust while stripped of their independent defensive rights of contribution, indemnity, setoff, and recoupment; and

(e) The CODI Settlement Agreement's anti-cooperation clause (¶ 7.c) not only bars the parties from encouraging litigation against CODI, but also deprives Mr. Ferder of access to the very parties – Debtors, the Creditors' Committee, and the Liquidation Trust – who possess the most relevant documentary and testimonial evidence of CODI's involvement in the alleged financing practices. This effectively handicaps Mr. Ferder's defense in the adversary proceeding by ensuring that the entities with firsthand knowledge of CODI's role cannot assist him, even voluntarily, in establishing that CODI was a knowing participant.

54. The Plan's post-confirmation governance structure compounds this bad faith. The Liquidation Trust Oversight Board (which will supervise the Liquidation Trustee's decisions whether to pursue, settle, or abandon claims) will be comprised of five members: one designee of CODI (Stephen Keller), two designees of the Creditors' Committee (Adam Rothstein and Avi Wazana), and two members designated as allegedly "independent" (Spencer Wells and Craig Barbarosh).

55. Designating Mr. Wells as "independent" is a fiction that this Court should reject. Mr. Wells is one of the two members of the Special Committee, the other one being Thomas FitzGerald. The Special Committee ostensibly ran the underlying investigation, and ultimately negotiated the very CODI Settlement Agreement this Objection challenges. Yet, Mr. Wells is simultaneously an "Exculpated Party" under Plan Section 11.07. Under the Liquidation Trust

Agreement's own conflicts provisions, only "***Independent*** Board Members" (emphasis added) may vote on matters concerning the pursuit, recovery, or resolution of Causes of Action relating to fraud in respect of Investment Contracts, precisely the claims against CODI that Mr. Wells himself helped investigate, settle, and release. Additionally, Mr. Wells is a member of the same Special Committee whose counsel induced Mr. Ferder into entering the Cooperation Agreement, that Lugano ultimately breached. Under that agreement, Mr. Ferder's counsel facilitated the Special Committee's receipt of the very information that led to the CODI settlement. Under these circumstances, Mr. Wells is hardly independent, and his lack of independence further supports denial of confirmation under 11 U.S.C. §§ 1129(a)(3) and 1129(a)(5).

56. The process that produced this Plan and the CODI Settlement was tainted by bad faith. The Special Committee induced Mr. Ferder and his counsel with promises of a settlement if he would make certain non-public evidence against CODI available to the Special Committee. Its counsel, Mr. Sussman, repeatedly assured Mr. Ferder that Lugano's interests were aligned with Mr. Ferder's in holding CODI accountable, and that Mr. Ferder would be fairly compensated in settlement in exchange for access to this information. Lugano then short-circuited the Cooperation Agreement by using the non-public information in its draft complaint against CODI, that was a central feature of the mediation, without providing the promised quid pro quo to Mr. Ferder. The CODI Settlement that resulted not only proves that Lugano's and Mr. Ferder's interests were not aligned, as Mr. Sussman had assured Mr. Ferder's counsel, but it also benefits CODI at the expense of all other creditors, including Mr. Ferder. This bait-and-switch tactic is the antithesis of the "honesty and good intentions" required under § 1129(a)(3).

57. The Plan constitutes impermissible "unfair discrimination" under Section 1129(b). CODI, whose claim should be subordinated, receives priority recovery in the form of guaranteed cash distributions and litigation proceeds. Class 4 creditors, who hold legitimate,

undisputed claims, primarily receive speculative litigation paper. This treatment is discriminatory and lacks a reasonable justification.

58. The lack of good faith is further demonstrated by the Debtors' treatment of Mr. Ferder's claims. Mr. Ferder holds meritorious affirmative claims against Debtors arising from Lugano's own corporate knowledge of, acquiescence in, and direct participation in the very financing arrangements CODI and Debtors now blame for Lugano's demise. The Special Committee and its advisors are fully aware of these claims and the voluminous evidence supporting them. Yet the Plan makes no provision for resolving or even acknowledging Mr. Ferder's claims and instead treats Mr. Ferder solely as a litigation target from whom value is to be extracted.

59. The Debtors cannot argue that the Plan exhibits "fundamental fairness" in dealing with the creditors when the Plan (i) grants CODI immunity for fraud, (ii) allows CODI's $718 million claim in full despite its vulnerability to subordination, (iii) hands CODI the lion's share of estate distributions, (iv) strips Mr. Ferder of his independent defensive rights, (v) designates Mr. Ferder as a primary litigation target, and (vi) refuses to acknowledge or provide for Mr. Ferder's own meritorious claims against the Estate. A plan that treats similarly situated parties so disparately, rewarding the party most culpable for the debtor's collapse while punishing the party with legitimate defenses, fails the fundamental fairness test under § 1129(a)(3).

60. For all of the foregoing reasons, it is respectfully submitted that the Plan is not proposed in good faith and should not be confirmed under Section 1129(a)(3). The Plan's fundamental purpose is not to reorganize the Debtors or to maximize value for creditors as a whole, but rather to consummate a settlement that systematically favors CODI at the expense of all other creditor constituencies. This Court should deny confirmation.

61. Moreover, the Plan fails the "best interests" test under 11 U.S.C. § 1129(a)(7) with respect to the Ferder Parties. Under Section 1129(a)(7), each holder of an impaired claim or interest must receive at least as much under the Plan as it would receive in a Chapter 7 liquidation. Because the Plan strips the Ferder Parties of their contribution, indemnity, and setoff rights, rights that would be preserved in a Chapter 7 case where no plan is confirmed, the Ferder Parties will receive less under the Plan than they would in a hypothetical liquidation. This independent requirement for confirmation has not been met.

62. Furthermore, Section 11.10 of the Plan continues all prior injunctions and stays "in full force and effect until the Chapter 11 Cases are closed," compounding the effect of the Plan's injunction under Section 11.06. The Plan simultaneously disclaims a discharge ("consistent with 11 U.S.C. § 1141(d)(3), the Debtors do not receive a discharge") while maintaining in full force every injunction. This creates a regime in which creditors are perpetually restrained from pursuing their claims against the Debtors long after confirmation, the functional equivalent of a discharge by another name.

**G. The Plan's "Contributed Claims" Scheme Violates 11 U.S.C. § 1123(a)(4)'s Equal Treatment Requirement**

63. Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

64. Plan Section 3.02(d) violates this mandate. Under the Plan's "Contributed Claims" scheme, a "Contributing Creditor" who assigns its individual claims against Grant Thornton to the Liquidation Trust receives an additional distribution (one that "does not count against any other Distribution") equal to that creditor's pro rata portion of 10% of the net proceeds of all Causes of Action against Grant Thornton. Class 4 General Unsecured Creditors

who do not, or cannot, contribute such third-party claims receive no comparable enhancement, even though they hold Allowed Claims of the identical legal character within the same Class.

65. This structure creates an unlawful, two-tiered distribution system within a single class. Unsecured creditors who contribute third-party claims receive a super-priority bonus funded by estate-administered litigation, while non-contributing creditors holding equivalent claims are relegated to a lower recovery. Section 1123(a)(4) tolerates disparate treatment only where "the holder of a particular claim or interest agrees to a less favorable treatment", not where, as here, the disparity is imposed on creditors who simply lack a third-party claim to contribute or decline to assign one.

66. The disparity is compounded by the unreviewable discretion the Plan vests in the Liquidation Trustee to determine, in his sole judgment, whether a contributed claim is "colorable." This unchecked gatekeeping function gives the Trustee (who, as demonstrated above, operates under a Board dominated by conflicted constituencies) the power to grant or withhold a material financial windfall to favored creditors without any standard a reviewing court could apply. That structure independently undermines the Plan's good faith under Section 1129(a)(3) and confirms that the Contributed Claims scheme was not designed to treat similarly situated creditors equally.

67. Because the Plan does not provide equal treatment to all Class 4 claims and no affected creditor has agreed to the resulting disparity, the Plan fails to satisfy Section 1123(a)(4) and, by extension, cannot satisfy Section 1129(a)(1), which conditions confirmation on compliance with "the applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1).

### H. The Exculpation Provision (Plan § 11.07) Improperly Extends Beyond Estate Fiduciaries in Violation of Third Circuit Law

68. Exculpation provisions in Chapter 11 plans must be strictly limited to fiduciaries of the estate acting in their official capacities during the case. *In re Washington Mut., Inc.*, 442 B.R. 314, 350-351 (Bankr. D. Del. 2011).

69. This limitation exists because exculpation, unlike a release, is a form of qualified immunity that only estate fiduciaries, who owe duties to the estate as a whole and act under this Court's supervision, may properly receive.

70. Section 11.07 exceeds this boundary. The Plan defines "Exculpated Party" to include not only Debtors and the Creditors' Committee and its members, but also Special Committee members Tom FitzGerald and Spencer Wells individually, together with their "Related Parties." Individual Committee members and Special Committee members owe duties only to their own constituencies, not necessarily to the estate as a whole, and their personal advisors and representatives are non-estate actors who owe no fiduciary duty to the estate at all. That is particularly true of the members of the Special Committee for the reasons stated earlier.

71. Extending exculpation to these individuals and their personal representatives exceeds the permissible scope of exculpation as a matter of law. The overbreadth of Section 11.07's exculpation is especially troubling here because Mr. Wells did not act solely as a passive Committee member. As detailed above, Mr. Wells personally investigated and negotiated the CODI Settlement Agreement as one of only two members of the Special Committee, he was a named recipient of the non-public information supplied to the Special Committee under the Cooperation Agreement discussed above, and he is now slated to sit as a purportedly "independent" member of the Liquidation Trust Oversight Board, which is tasked with, among other things, pursuing claims *against* Mr. Ferder.

72. Section 11.07 should be narrowed to exculpate only Debtors and other true estate fiduciaries acting in their official capacities. As drafted, the exculpation provision is unconfirmable.

## IV. RESERVATION OF RIGHTS

73. The Ferder Parties expressly reserve all rights to:

(a) supplement, amend, or modify this Objection, including after receipt of any additional Plan Supplement documents;

(b) conduct discovery in connection with confirmation proceedings;

(c) be heard at the Confirmation Hearing and any adjournments thereof;

(d) protect and enforce the Ferder Parties' rights to D&O insurance coverage;

(e) join in or adopt objections of other parties in interest;

(f) raise any and all additional grounds for denial of confirmation of the Plan;

(g) vote the full amount of Mr. Ferder's claim as set forth in his Proof of Claim; and

(h) assert all claims, defenses, counterclaims, rights of setoff and recoupment, and any and all other rights in these Chapter 11 cases and any other proceedings.

74. Nothing herein constitutes a concession to, or admission of, the correctness of any allegation made by Debtors, the CODI Parties, the Creditors' Committee, or any other party. All allegations of misconduct of any sort against the Ferder Parties are vigorously disputed.

## V. CONCLUSION

**WHEREFORE**, the Ferder Parties respectfully request that the Court enter an order:

(i) denying confirmation of the Plan; and

(ii) granting such other and further relief as is just and proper.

Dated: August 18, 2026

*<u>/s/ Gregory W. Hauswirth</u>*
Gregory W. Hauswirth (DE Bar No. 5679)
Carothers & Hauswirth LLP
1007 N. Orange Street, 4th Floor
Wilmington, DE 19801
Telephone: 302 990-4850
Email: ghauswirth@ch-legal.com
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*

Sandford L. Frey (CA Bar No. 117058)
STINSON, LLP
1901 Avenue of the Stars, Suite 450
Los Angeles, California 90067
Telephone: (310) 730-7020
Email: Sandford.frey@stinson.com
*Admitted Pro Hac Vice*
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*

Jeffrey Reeves (CA Bar No. 156648)
Daniel Weiss (CA Bar No. 242022)
REEVES & WEISS LLP
3333 Michelson Dr.
Suite 300
Irvine, California 92612
Telephone: (818) 554-7601
Email: JReeves@reevesandweiss.com
DWeiss@reevesandweiss.com
*Admitted Pro Hac Vice*
*Counsel to Mordechai Ferder individually and as Trustee of the Haim Family Trust*