**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered) |

**DECLARATION OF J. MICHAEL ISSA IN SUPPORT OF APPROVAL OF THE DISCLOSURE STATEMENT ON A FINAL BASIS AND CONFIRMATION OF THE SECOND AMENDED CHAPTER 11 PLAN OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS**

I, J. Michael Issa, do hereby declare as follows:

1. I am the Chief Restructuring Officer ("CRO") of Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds"), Lugano Holding, Inc. ("Lugano Holding"), Lugano Buyer, Inc. ("Lugano Buyer"), K.L.D. Jewelry, LLC ("KLD"), and Lugano Prive, LLC ("Lugano Prive") (collectively, "Lugano" or the "Debtors").

**A. Background.**

2. I am over the age of 18 years and am authorized to submit this declaration (this "Declaration") on behalf of the Debtors. If called to testify, I could and would testify competently to the facts set forth herein.

3. I submit this Declaration pursuant to 28 U.S.C. § 1746 in support of final approval of the *Disclosure Statement for the Amended Chapter 11 Plan of Lugano Diamonds & Jewelry*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

*Inc. and Its Affiliated Debtors* [Docket No. 651] (the "Disclosure Statement") and confirmation of the *Second Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* (as modified, amended, or supplemented from time to time hereafter, the "Plan"), filed contemporaneously herewith.[2]

4. I am a Senior Managing Director of GlassRatner Advisory & Capital Group LLC ("GlassRatner"), have over 30 years of experience in corporate turnarounds, restructurings, and bankruptcies, and have led or been involved in more than 100 corporate rehabilitations. I have managed billions in debt restructuring and financing and served as chief restructuring officer for dozens of clients. I have held court-appointed fiduciary roles including chapter 11 trustee and liquidating trustee, as well as receiver. I am a certified public accountant and certified turnaround professional and hold FINRA Series 79 and 63 licenses. I am a well-published author whose work has been included in the "Best of 2019" special publication of the ABI Journal. I have also advised numerous clients, regarding debtor in possession financing, bankruptcy preparation and compliance and plans, asset sales, forecasting, and restructuring and sale strategies. Attached as **Exhibit A** hereto is a copy of my curriculum vitae.

5. In the course of my professional engagements, I have worked on or contributed to the development of liquidation analyses in dozens of cases. I have also been involved in numerous chapter 11 cases in which plans were confirmed and in which plans could not be confirmed and, on occasion, instead converted to chapter 7 cases.

---

2 Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Debtors' Memorandum of Law in Support of Approval of the Disclosure Statement on a Final Basis and Confirmation of the Second Amended Joint Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Debtor Affiliates*, as applicable.

6. Except as otherwise indicated, all facts set forth in this declaration are based upon (a) my personal knowledge of the Debtors' operations and finances; (b) my review of relevant documents, including information provided by the Debtors and other parties; (c) information provided to me by, or discussions with, members of the Debtors' management, employees, and professionals; and/or (d) my opinion based upon my experience and information supplied to me. If called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this declaration.

7. I am generally familiar with the Plan, the Disclosure Statement, the Confirmation Order, the Debtors' memorandum of law in support of confirmation of the Plan, filed contemporaneously herewith, and the *Notice of Filing of Plan Supplement for the Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 778] filed on August 11, 2026. Based on my discussions with the Debtors' advisors, I am also generally familiar with the requirements for final approval of the Disclosure Statement under section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and confirmation of the Plan under section 1129 of the Bankruptcy Code.

**B. The Exercise of the Debtors' Business Judgment in Formulating the Plan Is Appropriate and in Good Faith.**

8. I understand that section 1129(a)(3) of the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan be proposed in good faith and not by any means forbidden by law. The Debtors, in conjunction with their advisors, have engaged with interested parties to reach the best outcome for the Debtors' Estates and their creditor constituencies and to maximize value for the Estates.

9. The commencement of the Chapter 11 Cases was necessitated by factors described in detail in the *Declaration of J. Michael Issa in Support of Chapter 11 Petitions and First Day*

*Motions* [Docket No. 2], which is incorporated herein by reference. As discussed therein, the Chapter 11 Cases were commenced in part in the expectation that proceeding with the sale process managed by Armory Securities, LLC and the interim arrangement with Enhanced Retail Funding, LLC was the approach best calculated to maximize the value to the Debtors and their stakeholders.

10. As I understand will be fully addressed by the Special Committee and the Creditors' Committee, and the evidence that they introduce, I understand that after two days of mediation the basic terms of the Settlement Agreement were agreed. While the Debtors' counsel participated in the mediation, the negotiations were handled on behalf of the Debtors by the Special Committee and its counsel, which had been delegated the responsibility for reviewing and considering claims against CODI and whether to prosecute or settle those claims.

11. The Debtors proposed the Plan after negotiations with their key stakeholders – the Creditors' Committee and CODI – to, among other things, implement the Settlement Agreement, to prosecute Causes of Action and objections to Claims, monetize any other assets, and make Distributions to creditors. I engaged in numerous conversations surrounding Plan-related issues with advisors to the other constituencies, reviewed and responded to drafts and proposals of the Plan and related documents, and provided counsel with input in connection with the negotiation of Plan-related issues on behalf of the Debtors.

12. Based on the foregoing and my assessment of the Debtors' assets, liabilities, and prospects, I believe that the Plan provides for the efficient distribution of the Estates' assets to the Debtors' creditor constituencies and the Liquidation Trust to monetize the Debtors' remaining assets consistently with the terms of the CODI Settlement; and further believe that the Debtors have exercised sound business judgment in formulating the Plan.

**C. Section 1129(a)(7) – The Best Interest of Creditors.**

13. With respect to each Impaired Class of Claims and Equity Interests, I understand that each Holder of such Claim or Interest must either (a) accept the Plan or (b) receive or retain property under the Plan of a value that is not less than the amount that such Holder would receive or retain in a chapter 7 liquidation.

14. For the purposes of determining whether the Plan meets this requirement, I was responsible for preparing the liquidation analysis attached to the Disclosure Statement as Exhibit B (the "Initial Liquidation Analysis"). In order to complete the Initial Liquidation Analysis, I relied on support from colleagues from GlassRatner and consulted regularly with other professionals in the Chapter 11 cases, including the Debtor's counsel and the financial advisors to the Creditors' Committee and to CODI. As a result of these efforts, I believe that the Initial Liquidation Analysis presented fairly and adequately the Debtors' financial position for purposes of considering the Plan and its terms.

15. I was deposed on August 19, 2026. In the course of the deposition, an error in one of the calculations was identified.[3] That error has been corrected, and an update of the Liquidation Analysis is attached hereto as **Exhibit B** (as updated, the "Liquidation Analysis").

16. The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of allowed Claims under the Plan. As illustrated in the Liquidation Analysis, all holders of impaired Claims will receive property with a value as of the Effective Date that is not less than the value such holders would receive in a liquidation

[3] The error reduced amounts payable to CODI in the "CODI Recovery" based on chapter 7 assumptions; the corrected cells reveal that in the chapter 7 scenarios CODI would have received approximately $3.5 million (low) or $1.8 million (high) more than shown in the Initial Liquidation Analysis.

under chapter 7. Holders of Subordinated Claims and Equity Interests would not receive a distribution under the Plan or under a hypothetical chapter 7 case.

17. Based on my own review and in consultation with the other professionals involved in the Chapter 11 Cases, I believe that the assumptions, methodologies, and estimates in the Liquidation Analysis are reasonable and appropriate.

**D. Section 1129(a)(11) – Feasibility.**

18. I understand that section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court determine that the Plan is feasible prior to confirmation, *i.e.*, it is not likely to be followed by liquidation or the need for further financial reorganization unless such liquidation or reorganization is proposed in the plan. For a liquidating plan, the feasibility test can be met if the debtor or liquidation trust has sufficient resources to meet its obligations under the plan, administer the plan, and to close the chapter 11 cases or if successful performance of the plan is not contingent on an uncertain event.

19. Based on my review of the Debtors' current cash and the proceeds of letter of credit issued in connection with the Agency Agreement, the Debtors' Cash on the Effective Date is anticipated to be more than $45 million. Based on the Debtors' estimates, that amount of cash is sufficient to satisfy all projected Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims, Priority Claims, and Statutory Fees; to fund the Liquidation Trust Expense Reserve; and have funds available to provide recoveries to the Allowed Claims in Class 3 (CODI Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims), consistent with the Plan.

**E. Section 1129(a)(6), (13)-(16) Not Applicable in the Chapter 11 Cases.**

20. The Debtors are not subject to any governmental regulatory commission with jurisdiction over rates of the debtor.

21. The Debtors do not have any retiree benefits, as such term is defined in section 1114 of the Bankruptcy Code.

22. The Debtors do not have any domestic support obligations.

23. The Debtors are a moneyed, business, or commercial corporation.

**F. Section 1129(d) – Proper Purpose.**

24. The purpose of the Plan is set forth in the preceding paragraphs. The Plan was not proposed in order to avoid taxes or the application of section 5 of the Securities Act of 1933.

**G. Section 1129(a)(1) and Section 1123.**

**1. Executory Contracts and Unexpired Leases**

25. Having reviewed the underlying agreements and circumstances, in my business judgment it is appropriate for the Debtors to reject the executory contracts and unexpired leases, and the assumption and assignment to the Liquidation Trust of the agreements set forth on the Schedule of Assumed Agreements. The executory contracts and unexpired leases do not provide any benefit to the Estates or to parties in interest as part of the Debtors' wind-down.

**2. Substantive Consolidation**

26. I have concluded that consolidating the assets and liabilities of the Debtors will increase recoveries for all creditors, for the following reasons:

a. Sorting out assets and liabilities among the individual Debtors would be cost prohibitive compared to the *de minimis* claims asserted solely against entities other than Lugano Diamonds. Consolidating the estates avoids the costs of analyzing and

negotiating (or litigating) the following allocations of assets and liabilities among the Debtors: (i) the proceeds of the Agency Agreement and the Tax Refund, (ii) Intercompany Claims, (iii) the nature and amount of CODI's Claims, and (iv) Administrative Claims (including Professional Claims).

b. The combination of the Administrative Claims associated with this work and CODI's asserted $718 million secured claim against each one of the Debtors means that all of the Debtors' creditors – and even those creditors holding claims against multiple Debtors – would recover less absent substantive consolidation.

c. In addition, the nominal diminution to Class 4 Claims against Lugano Diamonds that arises from the dilution caused by consolidation with creditors of other of the Debtors is (i) offset by the costs that would be imposed from additional Administrative Claims incurred in allocating the Debtors' assets and liabilities and (ii) outweighed by the increase in the value of assets that could be attributed to other of the Debtors.

d. To the extent that any estate is negatively affected by consolidation, it would be Lugano Holdings, whose only material assets are (i) its interest in the other Debtors, and (ii) its interest in the Tax Refund. However, Lugano Holding is insolvent in all circumstances because of the CODI Claim. Since CODI's $718 million claim exceeds the value of all of the Debtors' assets collectively, there would be no recovery for Holders of Equity Interests of Lugano Holdings absent CODI's agreement to permit Lugano Holdings' shareholders to recover value ahead of CODI, or a legal determination that CODI's claim could not be enforced ahead of the holders of Equity Interests in Lugano Holdings.

**H. Bankruptcy Rule 3020I – Stay Waiver**

27. Each day the Debtors remain in chapter 11, they incur administrative and professional costs that directly reduce the amount of distributable value for creditors.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Orange County, California, on August 27, 2026.

*/s/ J. Michael Issa*
J. Michael Issa
Chief Restructuring Officer

**Exhibit A**

GlassRatner

19800 MacArthur Boulevard, Suite 820
Irvine, CA 92612
Tel: (949) 561-3750
glassratner.com

# J. MICHAEL ISSA

## CPA, CTP, FINRA Series 79, 63

### Senior Managing Director

---

GlassRatner is a national advisory firm with offices in a number of major cities. The firm received the award for Middle Market Turnaround Firm of the Year in 2013. The firm and its principals have provided significant benefits to clients in many industries including automotive, manufacturing, distribution, healthcare, retailing, restaurants, professional practices, services, real estate, oil and gas, and construction. The firm has an extensive real estate consulting and capital raising operation as part of its practice. The firm's services to its clients have been diverse, and have included the following:

- Mr. Issa is often engaged as a court-appointed liquidating trustee or Receiver of portfolios of real property and/or of operating companies. As a Bankruptcy Responsible Officer, he managed a diversified portfolio of 27 properties in four states, ultimately liquidating the assets and making a very meaningful distribution to creditors. He has worked on more than 100 bankruptcy matters in various capacities, including Trustee, CRO, Financial Adviser to the Debtor, and Investment Banker to the Debtor.
- Mr. Issa is a well-known expert witness and is highly experienced in litigation matters, both in bankruptcy matters and in civil litigation. He has twice been named a "Top Three Expert-Economic" by Daily Report. He has testified live and by declaration more than 100 times in his career. He has been the testifying expert in Plan confirmation hearings dozens of times. He has recently been the Federal Receiver over a luxury residential property in Hollywood Hills and orchestrated a successful sale. He is also the Financial Advisor over a major mixed-use development project in Los Angeles.
- As a part of crisis management for their clients, the firm frequently engages in debt restructuring. Mr. Issa has personally managed billions of dollars of debt restructuring on behalf of his clients.
- Mr. Issa has advised a number of investors on acquisitions of assets including portfolios of distressed real estate assets and underperforming companies from banks with significant economic success.
- Mr. Issa and his team have raised various types of equity financing and joint venture participations on behalf of their clients. One of Mr. Issa's 2023 transactions won "M&A Deal of the Year (under $25M)" by M&A Advisors. One of his 2012 transactions received a major category award in 2013 at the Atlas Turnaround Event. Mr. Issa also won the M&A Advisors Award for Middle Market Retailing Deal of the Year in 2005 and Distressed Middle Market Deal of the Year in 2022.

GlassRatner

## Other Qualifications:

After completing graduate school, Mr. Issa worked as a commercial banker with a regional bank and a money center bank for a total of five years. Mr. Issa is a Beta Gamma Sigma Master of Business Administration from the University of Texas at Austin.

Mr. Issa is a Certified Public Accountant; a Certified Turnaround Professional; and holds FINRA Series 79 and 63 investment banking licenses. He is a member of the following professional organizations: Orange County Bankruptcy Forum, Turnaround Management Association, Association for Corporate Growth, and the AICPA. He speaks frequently at industry conferences on a variety of topics. He is also a Pulitzer nominee and award-winning writer (Journal of American Bankruptcy Institute-Best of 2019). He is also Fellow of the American College of Bankruptcy.

**Exhibit B**

# Lugano Diamonds & Jewelry Inc., et al.
# United States Bankruptcy Court - District of Delaware
# Case No. 25-12055 BLS (Jointly Administered)

**Debtors' Liquidation Analysis**
**As of Effective Date: September 04, 2026**
**All Amounts Estimated**

| | Chapter 11 Plan of Liquidation [1] | | Chapter 7 Liquidation [2] | |
|---|---|---|---|---|
| | Low | High | Low | High |
| **Assets** | | | | |
| Cash as of 7/3/26 [3] | $ 7,896,581 | $ 7,896,581 | $ 7,896,581 | $ 7,896,581 |
| Cash Reduction through 8/28/26 [4] | (2,918,568) | (2,918,568) | (2,918,568) | (2,918,568) |
| Payment from ERF/GB [5] | 52,552,895 | 52,552,895 | 52,552,895 | 52,552,895 |
| Additional Sharing ERF/GB [5] | - | 9,777,200 | - | 9,777,200 |
| Tax Refund [6] | 67,634,161 | 67,634,161 | 67,634,161 | 67,634,161 |
| Litigation Causes of Action + Other Assets [7] | TBD | TBD | TBD | TBD |
| **Total Sources of Recovery** | **$ 125,165,068** | **$ 134,942,268** | **$ 125,165,068** | **$ 134,942,268** |
| | | | | |
| **Liquidation Costs** | | | | |
| Liquidating Trustee & Oversight Board Costs [8] | $ 1,620,000 | $ 1,620,000 | $ 0 | $ 0 |
| Trust Professional Fees [8] | 6,380,000 | 2,380,000 | | - |
| Chapter 7 Trustee Statutory Commission [2] | - | - | 4,071,600 | 3,778,300 |
| Chapter 7 Trustee's Professional Fees [9] | - | - | 12,123,000 | 5,928,000 |
| Contingency Counsel Fees for CODI Litigation [9] | - | - | 10,000,000 | 5,000,000 |
| Administrative/UST Fees | 491,100 | 442,000 | 1,690 | 1,690 |
| **Total Administrative Costs** | **8,491,100** | **4,442,000** | **26,196,290** | **14,707,990** |
| | | | | |
| **Assets Available for Distribution to Creditors** | **116,673,968** | **130,500,268** | **98,968,778** | **120,234,278** |
| | | | | |
| **Claims** | | | | |
| Administrative Claims (other than professional fees) | 101,737 | 11,737 | 101,737 | 11,737 |
| Priority Claims | 1,347,590 | 1,347,590 | 1,347,590 | 1,347,590 |
| CODI [10] | 718,222,592 | 718,222,592 | 718,222,592 | 718,222,592 |
| Convenience Claims [11] | 317,000 | 317,000 | - | - |
| General Unsecured Creditor Claims [12] | 259,205,595 | 212,106,442 | 259,522,595 | 212,423,442 |
| **Total Claims** | **$ 979,194,514** | **$ 932,005,361** | **$ 979,194,514** | **$ 932,005,361** |
| | | | | |
| **CODI [10]** | | | | |
| **CODI Recovery** | **$ 42,814,711** | **$ 46,264,591** | **$ 41,623,609** | **$ 45,158,447** |
| CODI Recovery % | 5.96% | 6.44% | 5.80% | 6.29% |
| | | | | |
| **Convenience Class Creditor Recovery [11]** | **158,500** | **158,500** | **-** | **-** |
| Convenience Class Creditor Recovery % [11] | 50% | 50% | No convenience class in chapter 7 | |
| | | | | |
| **General Unsecured Creditor Recovery [12]** | **72,251,431** | **82,717,850** | **55,895,843** | **73,716,505** |
| General Unsecured Creditor Recovery % | 27.87% | 39.00% | 21.54% | 34.70% |

**Lugano Diamonds & Jewelry Inc., et al.**
**United States Bankruptcy Court - District of Delaware**
**Case No. 25-12055 BLS (Jointly Administered)**
**Debtors' Liquidation Analysis**
**As of Effective Date: September 04, 2026**
**All Amounts Estimated**

**Notes:**

[1] The Chapter 11 columns reflect the settlement economics embodied in the Plan and the Settlement Agreement. Effective Date Reserves — including Administrative Claims, Priority Claims, the Convenience Class payment, and Administrative/UST Fees — are funded before allocation, and the remaining estate value subject to the Settlement Agreement allocation is divided 65.21% to the Liquidation Trust for the benefit of Holders of General Unsecured Claims and 34.79% to CODI. Liquidation Trust expenses, including the costs of the Liquidating Trustee, the Oversight Board, and Trust Professionals, are borne solely by the General Unsecured Creditors' allocation. Net Proceeds of GT Claims and other Causes of Action are allocated as described in the Plan.

[2] The Chapter 7 columns assume the Settlement Agreement's economic allocation is preserved or replicated following conversion. The trustee's statutory commission and UST fees are deducted before that allocation (estate-level costs under sections 326 and 1930, borne ratably by both allocations); the fees of the trustee's professionals are borne by the General Unsecured Creditors' allocation, consistent with the treatment of Liquidation Trust professional costs under the Plan. The Debtors believe this is reasonable: even if a Chapter 7 trustee prevailed in litigation against CODI, the result — net of costs, delay, and risk — would be unlikely to materially improve upon the settlement allocation. The assumption remains subject to material uncertainty, however, because the Settlement Agreement would not take effect upon conversion; in a less favorable outcome, CODI's asserted lien and claim are not avoided or disallowed, leaving minimal or no recovery for General Unsecured Creditors. This is not a prediction of any negotiation or litigation outcome.

[3] Cash reflects the projected ending cash balance for the week ending 7/3/26 per the Debtors' cash collateral budget (5/15/26 - 8/28/26), which reflects only the funds held in the estate's U.S. Bank account ending in 8643.

[4] Reflects all remaining disbursements projected under the Debtors' cash collateral budget through 8/28/26. Costs of administering the Chapter 11 cases through the assumed Effective Date are provided for under the cash collateral budget; accordingly, no such amounts remain unpaid at the assumed Effective Date in either scenario. If the Effective Date were 09/15/2026, any resulting variance in the projected cash balance would be minimal and not material to the analysis.

[5] Payment from ERF/GB reflects the remaining amounts projected to be received under the Agency Agreement, pursuant to which the Debtors' inventory is being monetized through a sale process conducted by the agent. The Debtors' recovery consists of (a) the remaining guaranteed amount under the Agency Agreement, which is secured by a letter of credit; and (b) Additional Sharing, representing the Debtors' share of projected profits from the sale process after recovery of the guaranteed amount and sale-related expenses. Because any recovery above the guaranteed amount depends on sales performance through the conclusion of the sale process, expense levels subject to recoupment, any extension of the sale term, and final reconciliations and true-ups under the Agency Agreement, the low estimate assumes no Additional Sharing is realized; the high estimate reflects the agent's current projection of the maximum profit sharing under the sale process. Actual amounts realized under the Agency Agreement may differ materially from the estimates shown.

[6] The Tax Refund reflects the estimated recovery of federal and state income taxes paid by the Debtors for prior tax years based on the Debtors' restated financial results. The refund process is in progress: amended returns for certain prior years are in final preparation, and a refund claim for certain years has been filed and is pending with the IRS, which has opened an examination. Refunds of this size are also subject to review by the Joint Committee on Taxation. The IRS has filed a claim for estimated taxes that may offset refunds until the Debtors' most recent returns, which are expected to reflect a loss, are filed and processed. State refunds across multiple jurisdictions remain subject to separate processing. The estimate is based on income tax balances reflected on the Debtors' balance sheet as of 6/23/26. Actual refunds may differ materially from the amounts shown. The Tax Refund is presented net of estimated professional fees associated with its collection.

[7] Litigation Causes of Action + Other Assets consist of all Causes of Action (as defined in the Plan) and all other assets of the Debtors, other than the assets separately presented above (Cash, amounts payable under the Agency Agreement, and the Tax Refund), whose allocation is already reflected in this analysis. The sharing of net proceeds of litigation Causes of Action between CODI and the estate are set forth in the Plan.

**Lugano Diamonds & Jewelry Inc., et al.**
**United States Bankruptcy Court - District of Delaware**
**Case No. 25-12055 BLS (Jointly Administered)**
**Debtors' Liquidation Analysis**
**As of Effective Date: September 04, 2026**
**All Amounts Estimated**

[8] Liquidating Trustee fees and Oversight Board costs are estimated at fixed monthly amounts over an assumed three-year term of the Liquidation Trust, plus estimated fees of professionals retained by the Liquidation Trust. The amounts exclude fees of litigation counsel retained to prosecute Causes of Action, which are assumed to be engaged on a contingency basis, and fees associated with collection of the Tax Refund, which are netted against the Tax Refund line (see note [6]).

[9] Represents the estimated fees of counsel and financial advisors retained by a Chapter 7 trustee following conversion, which is assumed to occur on or about the assumed Effective Date. Estimated on a task basis consistent with the Liquidation Trust cost estimate in note [8]: (a) a three-month transition period during which the trustee's professionals become familiar with the Debtors' affairs, the Tax Refund, and potential Causes of Action; (b) base administration over the remainder of an assumed 36-month wind-down, including oversight of tax refund collection and distributions; and (c) claims objections and investigation of the co-investment scheme, estimated at a premium to the corresponding Liquidation Trust estimates to reflect professionals without prior knowledge of the Debtors' affairs. In addition to the Chapter 7 trustee's statutory commission, which is shown separately, and fees associated with collection of the Tax Refund, which are netted against the Tax Refund line (see note [6]), the Chapter 7 trustee would need to engage litigation counsel to pursue Causes of Action. Amounts reflected here assume all litigation counsel would be engaged on a contingency basis, which would not necessarily be possible under all circumstances. Fees for non-contingency litigation counsel would be materially higher than the amounts reflected here.

[10] The CODI claim is Allowed under the Plan and the Settlement Agreement in the amount of CODI's filed proof of claim, is presented at the same amount in all cases. CODI's recovery reflects the 34.79% allocation of the estate value subject to the Settlement Agreement allocation (see note [1]), and the CODI Recovery % divides CODI's recovery by CODI's Allowed Claim.

[11] Under the Plan, Holders of Convenience Claims receive the Convenience Class payment shown above. Convenience-class treatment exists only under the Plan. Upon a conversion to Chapter 7, the Convenience Class falls away and the underlying claims are treated as General Unsecured Claims and are included in the Chapter 7 General Unsecured Claims pool. The Convenience Class Creditor Recovery % shown in the Chapter 7 columns is therefore the General Unsecured Creditor recovery rate.

[12] Claim amounts are based on the claims analysis as of June 30, 2026, reflecting reconciled estimates of Allowed Claims after elimination of duplicate claims, reconciliation of filed proofs of claim to the Debtors' schedules, and anticipated claim objections. Columns are presented on a consistent worst-to-best basis for creditors: the Low case reflects the higher claims estimates, including asserted interest, profit share, damages, and fee components of diamond claimant claims; the High case assumes diamond claimant claims are allowed at principal/investment amounts only. The Debtors and the Liquidation Trust reserve the right to object to and challenge any and all claims on any and all bases, whether or not identified in the claims analysis, and nothing in this analysis constitutes an allowance of, or an admission with respect to, any claim. Allowed Claims may be materially higher or lower than the amounts shown. The General Unsecured Creditor Recovery % divides the General Unsecured Creditor recovery by the General Unsecured Claims pool for the applicable case, which in the Chapter 7 columns includes Convenience Claims (see note [11]).