**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered) |

**DECLARATION OF L. SPENCER WELLS IN SUPPORT OF CONFIRMATION OF DEBTORS' SECOND AMENDED PLAN OF LIQUIDATION**

I, L. Spencer Wells, do hereby declare as follows:

1. I am an independent director on the board of directors (the "Board") of Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds"). I am one of two members of the Special Committee of the Board, which was formed on July 16, 2025 (the "Special Committee"). I am over the age of 18 years and am competent to make this declaration (the "Declaration").

2. I submit this Declaration in support of confirmation of the Second Amended Joint Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors (the "Plan"). Except as otherwise noted, I have personal knowledge of the matters set forth herein. I have relied on information provided to me by the Special Committee's primary counsel, Steptoe LLP ("Steptoe") in preparing this Declaration.

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

3. I am currently a partner in Drivetrain LLC, an advisory firm whose professionals specialize in complex restructuring matters. I have extensive experience guiding companies through sophisticated financings, restructurings, and special situations. Prior to my role at Drivetrain LLC, I was a Partner and Senior Advisor with TPG Special Situations Partners, as well as a Partner and Senior Analyst at Silverpoint Capital.

**ESTABLISHMENT AND ROLE OF THE SPECIAL COMMITTEE**

4. On July 9, 2025, the Board appointed me as a member in light of its finding that I did not have material business or other relationships or affiliations with any parties (including Compass Group Diversified Holdings LLC) that might cause me to be unable to exercise independent judgment based on the best interests of Lugano Diamonds. The Board also appointed Thomas FitzGerald, another independent director, as a second member of the Board and the Special Committee after making the same finding.

5. On July 16, 2025, the Board determined that it was advisable and in the best interests of the Debtors and their stakeholders to establish the Special Committee.

6. As described in more detail below, the Board delegated to the Special Committee the authority to, among other things, oversee: (a) matters related to the alleged fraud perpetrated upon Lugano Diamonds by its former Chief Executive Officer, Mordechai Haim Ferder; and (b) strategic and/or financial alternatives for Lugano Diamonds, including, financing, sale, restructuring, reorganization, recapitalization, a chapter 11 proceeding, or other transactions.

7. Specifically, the Board elected via its resolutions passed on July 16, 2025, to delegate to the Special Committee the authority to undertake the following actions related to an investigation of the fraud perpetrated upon Lugano Diamonds by Mr. Ferder (the "Investigation"):

a. Oversee the Investigation;

b. Oversee the commencement, prosecution, settlement, or discontinuation of any action or proceeding against any individuals or entities (including, without limitation, Mr. Ferder, investors (whether or not customers), professionals, and/or CODI or its affiliates) relating to any matters addressed by, or causes of action that may be supported by facts developed in, the Investigation (any such action or proceeding, the "Litigation");

c. Oversee discussions with Lugano Diamonds' key stakeholders with respect to, or matters related to, the Investigation and Litigation, including, without limitation, any committee, examiner, trustee or other party in interest in a Chapter 11 proceeding;

d. Manage and direct the officers, employees, financial advisors, investment bankers, counsel, and other professionals and advisors of Lugano Diamonds in furtherance of the Investigation and any Litigation, including the hiring, retention, and termination of professionals engaged with respect to the Investigation and any Litigation; and

e. Take any other action deemed necessary or advisable to carry out the foregoing within the scope of authority delegated to the Special Committee by the Board.

8. With respect to a strategic and/or financial transaction (which includes a financing, sale, restructuring, reorganization, recapitalization, bankruptcy proceeding, or other transaction), the Special Committee was authorized by the Board to undertake numerous actions, including:

a. Overseeing (i) a sale of all or substantially all of Lugano Diamonds' assets, (ii) a sale of the equity of Lugano Diamonds, (iii) any merger or other business combination of Lugano Diamonds with another entity, and (iv) any financing or refinancing transaction, including any amendments, waivers, consents, and forbearances, whether or not with CODI;

b. Reviewing, evaluating, and if appropriate, making a recommendation to the Board to approve or disapprove any material strategic transaction-related events or processes, including, without limitation, the selection of any stalking horse purchaser, the selection of any successful bidder, the sales procedure within and outside of a bankruptcy, and the marketing process for and selection of one or more lenders;

c. Reviewing, evaluating, and approving a key employee incentive plan or a key employee retention plan calculated to help maximize the value of Lugano Diamonds;

d. Overseeing discussions with Lugano Diamonds' key stakeholders with respect to any strategic transaction;

e. Managing and directing the officers, employees, financial advisors, investment bankers, counsel, and other professionals and advisors of Lugano Diamonds in furtherance of any strategic transaction, including the hiring, retention and termination of professionals engaged with respect thereto; and

f. Taking any other action deemed necessary or advisable to carry out the foregoing within the scope of authority delegated to the Special Committee by the Board.

9. With respect to a bankruptcy proceeding, the Special Committee is empowered to take actions on behalf of the Board as the Special Committee deems appropriate or desirable, including:

a. Overseeing any contingent planning related to a bankruptcy proceeding;

b. Reviewing, evaluating, and, if appropriate, making a recommendation to the Board regarding material events or processes in a bankruptcy proceeding; provided, however, that the Board authorized the Special Committee to make determinations relating to a bankruptcy proceeding on (i) determination of any appropriate venue and (ii) selection of local counsel;

c. Overseeing discussions with Lugano Diamonds' key stakeholders with respect to a bankruptcy proceeding;

d. Managing and directing the officers, employees, financial advisors, investment bankers, counsel, and other professionals and advisors of Lugano Diamonds in furtherance of bankruptcy proceeding, including the hiring, retention and termination of professionals engaged with respect to the bankruptcy proceeding; and

e. Taking any other action deemed necessary or advisable to carry out the foregoing within the scope of authority delegated to the Special Committee by the Board.

10. The Special Committee retained Barnes & Thornburg LLP and, later, Steptoe LLP as counsel to assist it in the performance of its duties.

**THE INVESTIGATION OF AND SETTLEMENT WITH CODI**

**1. Investigation of Claims Against CODI and its Affiliates**

11. Consistent with its mandate described above, the Special Committee, through its counsel, began an investigation of potential claims held by the Debtors even before the Petition

Date. That investigation followed, but was unrelated to, an internal investigation begun by CODI in April 2025 that related to, according to a Form 8-K filed by CODI, "the financing, accounting, and inventory practices of [Lugano Holding, Inc.]…based on concerns reported to [CODI] management as to those practices."

12. The Special Committee's investigation covered a number of matters, one of which was an investigation of the alleged fraud at Lugano and what claims may exist as a result that could be asserted against third parties, including CODI and its affiliates. That investigation took place over several months both before and after the Petition Date, beginning shortly after the Special Committee was appointed in July 2025 and resulting in an initial report in March/April 2026. As part of the investigation, over a seven-month period, counsel collected over 1.2 million documents from various parties and conducted a targeted review of those materials. Counsel also conducted 29 interviews of 23 relevant individuals and parties. CODI's participation was limited strictly to the interviews of its eight (8) current and former personnel.

13. Counsel for the Special Committee also participated in negotiations relating to the Debtors' use of cash collateral and debtor-in-possession financing at the outset of the chapter 11 cases to ensure that the Debtors' ability (and later that of the Creditors' Committee) to bring actions against CODI if warranted was preserved.

**2. Evaluating Potential Claims Against CODI and its Affiliates**

14. The Special Committee's investigation concluded that there were numerous meritorious claims that Lugano could bring against CODI, including objections seeking the disallowance of CODI's claims. The claims identified by the Special Committee and the Creditors' Committee included, without limitation, claims that CODI or its affiliates breached fiduciary duties owed to the Debtors.

15. The Special Committee has been advised by its counsel that the claims against CODI were meritorious and would likely have provided substantial value to the Debtors' estates. I further understand that CODI consistently (a) denied (and continues to deny) that it has liability to the Debtors on any such claims, (b) asserted that its liens on substantially all of the Debtors' personal property are valid, and (c) asserted that any damages incurred by the Debtors' estates as a result of CODI's conduct are negligible, even if the claims against CODI were meritorious.

16. The Special Committee, while confident in the viability of the claims identified, has also consistently been mindful of the risks posed by litigation with CODI. CODI's dominant position in the Debtors' capital structure (*i.e.*, a secured claim in the face amount of $718 million) means that only an overwhelming litigation victory over CODI would have allowed for any distributions to unsecured creditors. If, for example, CODI's claim were allowed as a secured claim, CODI would be entitled to 100% of the value of the personal property subject to its liens. Even if liens and security interests were avoided in full, CODI's unsecured claims would still entitle it a large majority of the estates' value. The Special Committee noted these and similar circumstances to the Board in its presentation on the CODI Settlement, as shown in the Board presentation attached to this Declaration as Exhibit A at 5-6.

17. As specifically noted in the illustrations included in that presentation, holders of general unsecured claims would recover:

- Nothing from the assets subject to CODI's liens if CODI's secured claim were allowed in full (or in any amount over roughly $150 million); and
- 21.8% of the estates' value if CODI's claim were allowed as an unsecured claim only and general unsecured claims were ultimately allowed at $200 million.

This compares to recoveries for general unsecured creditors of over 60% under the CODI Settlement. *See* Exhibit A at 6.

18. The Special Committee also considered that prosecuting claims against CODI through litigation would have been lengthy and costly to the Debtors or any successor, depleting eventual recoveries for non-CODI creditors. Although the timing of complex litigation is inherently difficult to predict, prosecuting the estates' claims against CODI would likely have consumed most of the Debtors' energies for years to come. The cost and uncertainty of that litigation, moreover, would have prevented meaningful distributions to unsecured creditors during the period while the litigation was pending. I am informed, based on publicly-available information about CODI, that CODI is well-funded and would have been capable of and incentivized to mount a formidable defense to the claims against it. The Liquidation Trust, in contrast, would have been required to pursue its claims against CODI presumably without the benefit of the consensual use of CODI's cash collateral, requiring it to obtain litigation financing, agree to a substantial contingency fee, or similar financial arrangements imposing further costs. The Special Committee and the Board were mindful of all of these factors in determining how to proceed in asserting and potentially resolving the claims they identified against CODI, again as demonstrated by the Board presentation. *See* Exhibit A at 4.

**3. Mediation with CODI and the Creditors' Committee**

19. With these factors – both favorable and unfavorable – in mind, the Debtors, the Special Committee, the Creditors' Committee, and CODI participated in a two-day voluntary mediation in May 2026 overseen by the Honorable Lee R. Bogdanoff (Ret.) in Los Angeles, California. I personally participated in that mediation, along with Thomas FitzGerald (the other

member of the Special Committee) and the Special Committee's counsel at Steptoe LLP and Barnes & Thornburg LLP.

20. In that mediation, the parties exchanged their views on the merits of the claims identified by the Special Committee, and the defenses thereto identified by CODI. The merits of various subordination and similar arguments identified by the Creditors' Committee, and CODI's counterarguments thereto, were also raised and discussed. The parties also considered litigation uncertainties, the costs associated with prosecuting and defending the various claims against and defenses to be asserted by CODI, and the delay in making distributions to non-CODI creditors and fully administering the Debtors' estates.

21. At the end of the two-day discussion, the mediation resulted in a negotiated allocation of the estates' value. The resulting settlement, which is the product of good faith, arm's-length negotiations and is documented in the Plan and the CODI Settlement Agreement, provides for distribution of approximately 63% to 64% of the Debtors' current cash and liquid assets to the Liquidation Trust for the benefit of the holders of General Unsecured Claims. Those holders also receive the proceeds of 75% of most litigation pursued by the Liquidation Trust, and 55% of the proceeds of claims against Grant Thornton, CODI's (and the Debtors') outside auditors. CODI receives the balance of the Debtors' cash and liquid assets and litigation proceeds, as well as releases from claims that might be asserted by the Debtors' estates, as set forth in Sections 3.02(c) and 11.08 of the Plan. This allocation delivers the bulk of the estates' value to general unsecured creditors and not to CODI, notwithstanding CODI's alleged $718 million secured claim.

**4. Evaluation and Recommendation of the Settlement with CODI**

22. To evaluate the settlement, the Special Committee (along with, I understand, the Creditors' Committee and the Debtors) considered the potential strengths and weaknesses against

certain portions of CODI's claim, given that CODI's claim accrued over a period of roughly four years. To provide a specific illustration, the Debtors borrowed $102 million from CODI on September 3, 2021 – the same day Mr. Ferder sold a 60% stake in the Debtors to CODI. If only that portion of CODI's secured claim were allowed as a secured claim, CODI would receive roughly 78% of the estates' distributable value as of the Effective Date (i.e., $102 million / $130 million), while 22% would go to unsecured creditors. The Debtors would as a result have to demonstrate that CODI's malfeasance was so pervasive as to justify invalidating its liens and security interests from the moment it first bought the business from Mr. Ferder, or the result for general unsecured creditors would be worse than the CODI Settlement on that one issue alone.

23. I understand based on a review of the Debtors' liquidation analysis that the Debtors expect to have roughly $117 million to $131 million in assets available for distribution to creditors as of the Effective Date, exclusive of future litigation proceeds. Approximately $72 million to $83 million of that will go to holders of general unsecured claims, while $43 to $46 million will go to CODI. In percentage terms, roughly 63% of the estates' assumed recoveries at the Effective Date (after allowance for projected Liquidation Trust fees and expenses and payment of projected administrative and priority claims) goes to holders of general unsecured claims, while 37% goes to CODI. Future litigation recoveries from all parties other than Grant Thornton go to general unsecured claimholders on a 75%/25% basis with CODI as well, and Grant Thornton recoveries are allocated 55% to general unsecured creditors. Holders of General Unsecured Claims are projected to receive recoveries of 28% to 39% under the Plan, while CODI receives 6% to 6.4%. All of this value other than the proceeds of further litigation is available for distribution to the holders of General Unsecured Claims relatively quickly (subject to the reconciliation of non-CODI claims), at minimal cost, and without litigation risk.

24. I believe, after discussions with the Special Committee's counsel and with the Debtors and the Creditors' Committee and their respective advisors, that this result is comparable to what the estates would achieve in a significant litigation victory over CODI. Assuming that there is ultimately $250 million in Allowed General Unsecured Claims for purposes of illustration,[2] even fully avoiding CODI's liens and security interests would result in an allocation of approximately 74% of the estates' value to CODI and 26% to the holders of General Unsecured Claims (compared to 37% and 63%, respectively, under the CODI Settlement). To get a result similar to the Plan and the CODI Settlement, the estates would have to avoid *all* of CODI's liens and security interests *and* obtain disallowance or subordination of roughly $570 million of CODI's $718 million claim, without taking into account delay, litigation risk, and costs.

25. Based on (i) these results; (ii) considerations of litigation risk, delay, and cost, (iii) the support for the CODI Settlement expressed by the Creditors' Committee (whose constituents are the beneficiaries of non-CODI distributions under the Plan), and (iv) given the advice of the Special Committee's counsel with respect to the strengths and weaknesses of the potential claims against CODI, the Special Committee determined that the terms of the CODI Settlement were fair and reasonable. The Special Committee further decided to support the Debtors' entry into the CODI Settlement and to recommend approval of that settlement to the Board.

26. In connection with that approval, the Special Committee and its counsel prepared the presentation attached to this Declaration as Exhibit A. That presentation (i) describes in summary the economics of the CODI Settlement, including the allocation of value to general

[2] The Liquidation Analysis provides for a range of estimated Allowed General Unsecured Claims of $212 million to $260 million. The June 15, 2026 presentation to Lugano's Board of Directors attached to my Declaration as Exhibit A modeled potential recoveries to CODI and to unsecured creditors assuming hypothetical Allowed General Unsecured Claims at $100 million and $200 million, respectively, solely for illustrative effect and without the benefit of the later-created Liquidation Analysis.

unsecured creditors and to CODI; (ii) sets forth illustrative recoveries to creditors both with and without the CODI Settlement, and (iii) outlines the releases to be granted under the Plan, among other things. The presentation also describes the basic intended structure of the Liquidation Trust, its tasks, and its governance.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 26, 2026

L. Spencer Wells

# **Exhibit A**

Steptoe

www.steptoe.com

# Lugano Diamonds & Jewelry, Inc.:

# Chapter 11 Plan and CODI Settlement

June 15, 2026

*World-class legal advice at the intersection of business, regulation, policy, and the courts*

# Lugano's Chapter 11 Plan of Liquidation

www.steptoe.com

- **What is the Chapter 11 Plan?**
  - A court-approved contract among Lugano and its creditors and equity holders
  - Provides for the treatment of Lugano's remaining cash and assets and the payment of its creditors in accordance with priorities set out in bankruptcy law
  - In short, the Plan provides who gets what and in what priority
- Plan also provides for settlements of some disputes and litigation involving Lugano
- Unresolved disputes and litigation will be the responsibility of the Liquidation Trust, established by the Plan
- Company counsel has prepared chapter 11 plan with Special Committee review and input

# Key Points of Plan – The CODI Settlement

www.steptoe.com

- **Centerpiece of the Lugano Plan is the CODI Settlement**
  - Result of a mediation involving Lugano, CODI, the Unsecured Creditors' Committee, and the Special Committee in May 2026
  - CODI originally filed a $718 million secured claim against Lugano in the bankruptcy cases stemming from pre-bankruptcy financing
  - Special Committee investigated CODI's conduct and, based on its findings, raised informal objections to that claim based on various aspects of CODI's pre-bankruptcy conduct
  - Unsecured Creditors' Committee also conducted a complementary investigation focused primarily on grounds for equitably subordinating CODI's claims

www.steptoe.com

# Key Points of Plan – The CODI Settlement

- CODI Settlement resolves CODI's claims and Lugano's/creditors' objections to CODI's pre-bankruptcy conduct
- Key terms of the CODI Settlement:
  - CODI gets **34.79%** of Lugano's current cash plus future distributions of **34.79%** from the proceeds of most of Lugano's assets
  - Special terms for future anticipated litigation proceeds: CODI gets **25%** of "ordinary" litigation proceeds but **45%** of proceeds of claims against Grant Thornton
  - CODI releases its claims over these recoveries
- CODI Settlement Agreement is attached to the Plan and approved by the Bankruptcy Court as part of the Plan process
- CODI agrees to a plan support agreement as part of the Plan process that commits it to support the plan and forego potential alternatives
- **CODI Settlement provides**
  - **Certain, near-term recoveries to non-CODI creditors**
  - **Increased distributions to general unsecured creditors**
  - **Finality to CODI and CODI-related issues**

# Illustrative Recoveries With/Without Settlement

www.steptoe.com

- Basic Facts and Assumptions:
  - CODI Secured Claim is valued at $718.2m (per CODI proof of claim)
  - Distributable proceeds of inventory, tax refunds, and theft policy = $137.5 million
  - Litigation recoveries assumed at $20.0 million; GT recoveries at $5 million
  - Administrative claims (paid at 100%) = $12.2 million
    - Consist of estate administration and operating costs
  - Priority Claims (paid at 100%)= $1.3 million
    - Consist principally of tax and employee claims
  - Convenience claims = $0.2 million
    - Small-dollar (< $20,000) vendor claims to be paid a flat 50% recovery for administrative ease
  - **Administrative, priority, and convenience claims are paid without taking into account the CODI/general unsecured creditor split**

www.steptoe.com

# Illustrative Recoveries With/Without Settlement

<table>
<tr><th>Assets</th><th>Assumed Value</th><th>CODI Recovery w/ Settlement</th><th>Unsecured Creditor Recoveries w/ Settlement</th><th>CODI Recovery w/o Settlement</th><th>Unsecured Creditor Recoveries w/Settlement</th></tr>
<tr><td>Effective Date (Inventory + Cash)</td><td>$55.3 million ($69 million - $13.7m admin, priority, conv. claims)</td><td>$19.2 million</td><td>$36.1 million</td><td rowspan="5">• $148.8m (100% of estates' value) if secured claim is not set aside<br>• If CODI claim is allowed as an unsecured claim only :<br>  • CODI gets $130.6m (87.8% of estates' value) if non-CODI unsecured claims = $100m<br>  • CODI gets $116.4 (78.2% of estates' value) if non-CODI unsecured claims = $200m</td><td rowspan="5">• $0 if secured claim not set aside<br>• $18.2m (12.2% of estates' value) if non-CODI unsecured claims = $100m<br>• $35.4m (21.8% of estates' value) if non-CODI unsecured claims = $200m</td></tr>
<tr><td>Litigation Recoveries</td><td>$20 million</td><td>$5.0 million</td><td>$15 million</td></tr>
<tr><td>Tax Refund</td><td>$67.5 million</td><td>$23.5 million</td><td>$44.0 million</td></tr>
<tr><td>GT Recoveries</td><td>$5 million</td><td>$2.3 million</td><td>$2.7 million</td></tr>
<tr><td>Theft Policy</td><td>$1 million</td><td>$0.4 million</td><td>$0.6 million</td></tr>
<tr><td>Total</td><td>$148.8 million</td><td>$50.4 million (33.9%)<br><br>$19.2m on Effective Date</td><td>$98.4 million (66.1%)<br><br>$36.1m on Effective Date</td><td>$116.4 million - $148.8 million (78.2% - 100%)</td><td>$0 - $35.4 million (0% - 21.8%)</td></tr>
</table>

# Key Points of Plan – Other Distributions

www.steptoe.com

- Various claims given priority by the Bankruptcy Code are **paid in full** out of Lugano's cash
  - These include post-bankruptcy claims, tax claims, employee claims
- Unsecured creditors (such as trade creditors and lease counterparties) receive the balance of Lugano's cash and proceeds from other asset sales and resolution of future litigation
  - Small dollar (< $10,000) unsecured creditors get a flat payment of 50% for ease of administration
- Lugano equity (owned by CODI/Moti) receives nothing
- Existing contracts and leases to be generally rejected if liquidation is pursued; may be generally assumed/assigned if a going concern sale occurs

www.steptoe.com

# Key Points of Plan – Releases

- Plan contains broad release and exculpation provisions
- Releases cover all matters relating to Lugano, its pre-bankruptcy operations, and the bankruptcy and plan processes
- Releases are given by Lugano, its non-CODI affiliates and, separately, by holders of claims and equity interests in Lugano
  - All parties that get releases must give releases
  - Claim holders also give releases under the Plan unless they opt out
  - Anyone opting out of releases does not get released
- Releases are in favor of **Released Parties** under the Plan, which include:
  - Lugano and its non-CODI affiliates
  - The Unsecured Creditors Committee and its members (solely in their capacity as committee members)
  - The CODI entities
  - And each of the Released Parties' "**Related Parties**," which include directors and officers, equity holders, affiliates, and outside professionals and advisors, among others
- **Various parties are specifically excluded from the releases, including Moti, his wife and son, various trusts affiliated with Moti and his family, Grant Thornton, Lugano CEO, and investment contract counterparties, among others**

# The Liquidation Trust

www.steptoe.com

- The Plan creates a liquidation trust to wind down Lugano
- On the Effective Date of the Plan, directors and officers will be discharged and have no further role in operating the company
- The Liquidation Trust will:
  - liquidate remaining assets
  - manage and resolve remaining litigation
  - negotiate and resolve/litigate remaining claims that could be brought by or on behalf of Lugano
  - distribute cash resulting from all of the above to creditors
- Liquidation Trust Agreement is attached to the Plan and contains principal terms of the Liquidation Trust
- Liquidation Trust to be overseen by Liquidation Trustee, with a five-member advisory board (2 CODI appointees, 2 UCC appointees, 1 outside independent member (Spencer Wells))
  - Spencer Wells + 1 CODI appointee to be independent members

# Scope of Liquidation Trust's Tasks

- As of April 30, 2026, Lugano has approximately $224m total assets, including $16m cash, $34m A/R, $121m inventory
- Lugano also has numerous potentially valuable claims and causes of action against third parties, including Moti, Grant Thornton, and others
- Liquidation Trustee will take possession of those assets and reduce them to cash, then distribute that cash to holders of claims
- The Liquidating Trustee (with an advisory board) also will be responsible for resolving remaining bankruptcy proofs of claim outstanding against Lugano

# Plan Process – Finishing the Bankruptcy Cases

www.steptoe.com

- Plan and Disclosure Statement (a required document describing the Plan) expected to be filed on Monday, June 15, assuming Board approval
- Hearing to conditionally approve the Disclosure Statement expected in early July
- Disclosure Statement is then sent to creditors for voting
  - CODI plus holders of unsecured claims can vote to accept or reject the Plan
  - Holders of Unsecured Claims can opt out of releases; CODI is bound to grant them as a condition of settlement
  - Roughly 30 day voting period
- Bankruptcy Court holds hearing to confirm the Plan in August 2026
- Plan goes effective shortly thereafter; bankruptcy case concludes and Liquidation Trust begins operations

# Conclusions and Recommendation

- The CODI Settlement represents a fair resolution of CODI's claims that provides meaningful recoveries to non-CODI unsecured creditors
- CODI Settlement was aggressively and thoroughly negotiated by the Special Committee, the Unsecured Creditors' Committee, and CODI with mediator oversight
- The Plan accurately incorporates the CODI Settlement and allows a near term conclusion to the chapter 11 cases with broad creditor support
- Meaningful opposition to the Plan is unlikely
  - **Moti** is most likely objector
  - Moti will have plan vote at nominal ($1) value

**FOR THESE REASONS, THE SPECIAL COMMITTEE AND ITS COUNSEL RECOMMEND FINALIZING AND FILING THE CHAPTER 11 PLAN AND RELATED DOCUMENTS, AND THAT LUGANO PURSUE CONFIRMATION OF THE PLAN, AS QUICKLY AS PRACTICABLE**

www.steptoe.com

# Steptoe

www.steptoe.com

*World-class legal advice at the intersection of business, regulation, policy, and the courts*

For more information about Steptoe, the partners and their qualifications, see **www.steptoe.com**.

Where case studies are included, results achieved do not guarantee similar outcomes for other clients. Attorney advertising. Images of people may feature current or former lawyers and employees at Steptoe or models not connected with the firm.

© Steptoe 2026. All rights reserved