**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1] | Case No. 25-12055 (BLS) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF (I) APPROVAL OF THE DISCLOSURE STATEMENT ON A FINAL BASIS AND CONFIRMATION OF THE SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION OF LUGANO DIAMONDS & JEWELRY INC. AND ITS AFFILIATED DEBTORS AND (II) OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION AND THE EXTENSION OF EXCLUSIVITY**

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (admitted *pro hac vice*)
Traci L. Shafroth (admitted *pro hac vice*)
Scott Friedman (admitted *pro hac vice*)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone: (415) 496-6723
Facsimile: (650) 636-9251
Emails: tkeller@kbkllp.com
tshafroth@kbkllp.com
sfriedman@kbkllp.com

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Brynna M. Gaffney (Del. No. 7402)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Emails: emorton@ycst.com
sbeach@ycst.com
sborovinskaya@ycst.com
bgaffney@ycst.com

*Attorneys for Debtors and Debtors-in-Possession*

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ..... 2

I. BACKGROUND ..... 3

A. Historical Background. ..... 3

B. General Case Background. ..... 4

C. The CODI Investigation and Mediation. ..... 5

D. The Plan and Disclosure Statement ..... 7

E. Plan Solicitation and Notification Process ..... 9

F. Objections and Informal Comments ..... 10

II. THE COURT SHOULD APPROVE THE DISCLOSURE STATEMENT ON A FINAL BASIS ..... 11

III. THE COURT SHOULD CONFIRM THE PLAN ..... 13

A. The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code ..... 13

B. Section 1129(a)(1) - The Plan Complies with the Applicable Provisions of the Bankruptcy Code ..... 13

1. Classification of Claims and Interests (11 U.S.C. § 1122) ..... 14

2. Mandatory Contents of the Plan (11 U.S.C. § 1123(a)) ..... 15

a. Designation of Classes of Claims and Interests (11 U.S.C. § 1123(a)(1)) ..... 16

b. Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2)) ..... 16

c. Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)) ..... 16

d. Equal Treatment Within Classes (11 U.S.C. § 1123(a)(4)) ..... 16

e. Means for Implementation (11 U.S.C. § 1123(a)(5)) ..... 17

f. Issuance of Non-Voting Securities (11 U.S.C. § 1123(a)(6)) ..... 17

g. Directors and Officers (11 U.S.C. § 1123(a)(7)) ..... 18

h. Inapplicable Provisions (11 U.S.C. §§ 1123(a)(8) and (c). ..... 18

3. Discretionary Contents of the Plan (11 U.S.C. § 1123(b)) ..... 19

i. Impairment and Unimpairment of Classes (11 U.S.C. § 1123(b)(1)) ........ 19

j. Treatment of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2)) ........ 19

k. Settlements and the Plan's Release, Exculpation, and Injunction Provisions (11 U.S.C. § 1123(b)(3)) ........ 20

i. The Debtor Release Is Appropriate ........ 20

(a) Release of CODI Parties ........ 21

(b) Release of the non-CODI Parties ........ 23

ii. The Third Party Release Is Wholly Consensual and Appropriate Under the Facts and Circumstances of These Cases ........ 24

iii. The Exculpation Provision Is Appropriate ........ 25

iv. The Injunction Provision Is Appropriate ........ 26

l. The Retention of the Causes of Action Is Appropriate ........ 27

m. The Plan Complies with the Additional Provisions of Section 1123(b) of the Bankruptcy Code ........ 27

4. Section 1123(d) - The Plan Complies with Section 1123(d) of the Bankruptcy Code ........ 27

C. Section 1129(a)(2) - The Debtors Have Complied with the Applicable Provisions of Title 11 ........ 28

5. The Debtors Complied with Section 1125 of the Bankruptcy Code ........ 28

6. The Debtors Complied with Section 1126 of the Bankruptcy Code ........ 29

D. Section 1129(a)(3) - The Plan Has Been Proposed in Good Faith ........ 31

E. Section 1129(a)(4) - All Payments to Be Made by the Debtors in Connection with These Cases Are Subject to the Approval of the Court ........ 32

F. Section 1129(a)(5) - The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders ........ 33

G. Section 1129(a)(6) - The Plan Does Not Require Governmental Regulatory Approval ........ 34

H. Section 1129(a)(7) - The Plan is in the Best Interest of Creditors ........ 34

I. Sections 1129(a)(8) -- The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code ........ 36

J. Section 1129(a)(9) - The Plan Provides for the Payment of Priority Claims ........ 36

K. Section 1129(a)(10) - The Plan Has Been Accepted by at Least One Impaired, Non-Insider Class ........ 38

L. Section 1129(a)(11) - The Plan is Feasible ........ 39

M. Section 1129(a)(12) - The Plan Provides for the Payment of U.S. Trustee Fees ........ 41

N. Sections 1129(a)(13), (a)(14), (a)(15) and (a)(16) Are Inapplicable to the Debtors ........ 41

O. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code ........ 42

1. The Plan is Fair and Equitable and Thus Satisfies Section 1129(b)(2)(B) of the Bankruptcy Code ........ 42

2. The Plan Does Not Unfairly Discriminate with Respect to the Deemed Rejecting Classes in Accordance with Section 1129(b)(1) of the Bankruptcy Code ........ 43

P. Section 1129(c) - No Other Plan Has Been Proposed or Confirmed ........ 44

Q. Section 1129(d) - The Plan's Purpose is Consistent with the Bankruptcy Code ........ 44

R. Section 1129(e) Is Inapplicable to the Debtors ........ 44

S. Modifications to the Plan ........ 44

T. Good Cause Exist to Waive the Stay of the Confirmation Order ........ 46

IV. The OBJECTIONS Should be Overruled ........ 46

A. The Release and Plan Injunction Provisions Are Appropriate ........ 47

1. Opt-Out Releases Are Consensual Releases That Do Not Contravene *Purdue Pharma* ........ 47

2. The Opt-Out Election Is Appropriate ........ 50

3. The Debtor Release and Injunction Do Not Improperly Function as a Discharge Prohibited by 11 U.S.C. § 1141(d)(3) ........ 52

4. The Plan Injunction is Not a Third Party Release ........ 54

B. The CODI Settlement Delivers a Beneficial Result to Creditors, Satisfies Section 1123(b)(3), and Should be Approved ........ 55

1. Investigation of Claims Against CODI ........ 55

2. Standard of Approval for the CODI Settlement ........ 59

b. Likely Difficulties in Collection ........ 64

c. Litigation of the Estates' Claims Against CODI Would Be Costly, Expensive, and Time-Consuming ...... 64

d. The CODI Settlement Is in the Creditors' Best Interests ...... 65

e. The Scope of the CODI Release Is Essential to the CODI Settlement ...... 67

C. Substantive Consolidation is Justified in these Circumstances ...... 68

1. Owens Corning Does Not Bar Confirmation of the Plan ...... 68

2. If Owens Corning Applied, the Evidence Supports Substantive Consolidation. ...... 70

3. Alternatively, the Consolidation Can Be Deemed by Consent of All Creditors ...... 72

D. The CODI Settlement and the Plan Are Proposed in Good Faith ...... 72

E. The Plan Provides the Same Treatment for All Claims Within a Class ...... 75

F. The Exculpation Provision Is Limited to Estate Fiduciaries ...... 76

G. Ferder's Miscellaneous Other Issues are Meritless ...... 78

V. THE COURT SHOULD EXTEND EXCLUSIVITY ...... 79

CONCLUSION ...... 80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Comm. Of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*,
933 F.3d 918 (8th Cir. 2019)....................75

*In re Aleris Int'l., Inc.*,
No. 09-10478, 2010 Bankr. LEXIS 2997 (Bankr. D. Del. May 13, 2010)....................14, 28, 40

*In re Am. Cap. Equip., LLC*,
688 F.3d 145 (3d Cir. 2012)....................39

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (D. Del. 2006)....................14

*In re Armstrong World Indus., Inc.*,
432 F.3d 507 (3d Cir. 2005)....................13

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)....................35

*In re Broadway 401 LLC*,
No. 10-10070 (KJC) (Bankr. D. Del. Mar. 16, 2010)....................18

*In re Century Glove Inc.*,
No. 90-400-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993)....................31

*In re Chapel Gate Apartments, Ltd.*,
64 B.R. 569 (Bankr. N.D. Tex. 1986)....................32

*In re Combustion Eng'g, Inc.*,
391 F.3d 190 (3d Cir. 2004)....................31

*In re Continental Airlines*,
134 F.3d 536 (3d Cir. 1998)....................52

*In re Coram Healthcare Corp.*,
315 B.R. 321 (Bankr. D. Del. 2004)....................20

*In re Crdentia Corp.*,
No. 10-10926 (BLS), 2010 Bankr. LEXIS 2838 (Bankr. D. Del. May 26, 2010)....................32

*In re Crown Vill. Farm, LLC*,
No. 09-11522....................18

*In re Eagle-Picher Indus., Inc.*,
203 B.R. 256 (S.D. Ohio 1996) ....................13

*In re Emoral, Inc.*,
740 F.3d 875 (3d Cir. 2014)....................53

*In re Federal–Mogul Glob. Inc.*,
No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940 (Bankr. D. Del. Nov. 8, 2007)....................45

*In re Finlay Enters., Inc.*,
No. 09-14873 (JMP), 2010 Bankr. LEXIS 5592 (Bankr. S.D.N.Y. June 29, 2010) ....................40

*First Am. Bank v. Century Glove, Inc.*,
81 B.R. 274 (D. Del. 1988), *aff'd* 860 F.2d 94 (3d. Cir. 1988) ....................12, 37

*Hanson v. First Bank of S.D., N.A.*,
828 F.2d 1310 (8th Cir. 1987) ....................31

*Harrington v. Purdue Pharma, L.P.*,
603 U.S. 204 (2024).................... *passim*

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2011) ....................24, 26, 47, 48

*In re Jacobs*,
394 B.R. 646 (Bankr.E.D.N.Y.2008)....................62

*In re Kabbage Inc.*,
No. 2022-10951, 2023 Bankr. LEXIS 671 (Bankr. D. Del. Mar. 15, 2023) ....................79

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
843 F.2d 636 (2d Cir. 1988)....................13, 39

*In re Lackawanna Detective Agency. Inc.*,
82 B.R. 336 (Bankr. D. Del. 1988) ....................13

*In re Lason, Inc.*,
300 B.R. 227 (Bankr. D. Del. 2003) ....................35

*In re Lumio Holdings, Inc., et al.*,
No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025) [Docket No. 428] ....................49

*In re Master Mortg. Inv. Fund, Inc.*,
168 B.R. 930 (Bankr. W.D. Mo. 1994)....................22

*In re Molecular Templates, Inc., et al.*,
No. 25-10739 (BLS) (Bankr. D. Del. May 29, 2025) [Docket No. 188]....................47

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996)....................................................................................60

*NLRB v. Better Bldg. Supply Corp.*,
837 F.2d 377 (9th Cir. 1988)..................................................................................78

*In re Number Holdings, Inc.*,
No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1756] ...............................49

*In re Nutraquest, Inc.*,
434 F.3d 639 (3d Cir. 2006)....................................................................................64

*Official Comm. of Unsecured Creditors v. H.B. Michelson (In re H.B. Michelson)*,
141 B.R. 715 (Bankr. E.D. Cal. 1992)......................................................................28

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
848 F.2d 414 (3d Cir. 1988)....................................................................................11

*In re Owens Corning*,
419 F.3d 195 (3d Cir. 2005)..................................................................68, 69, 70, 71

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000)..................................................................28, 51, 77, 78

*In re Salander*,
450 B.R. 37 (Bankr. S.D.N.Y. 2011)........................................................................67

*In re SemCrude L.P.*,
796 F.3d 310 (3d Cir. 2015)....................................................................................67

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*,
554 F.3d 382 (3d Cir. 2009)....................................................................................70

*In re Smallhold, Inc.*,
665 B.R. 704 (Bankr. D. Del. 2024)........................................................................77

*In re Spansion, Inc.*,
426 B.R. 114 (Bankr. D. Del. 2010)........................................................................20

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010)..........................................................................76

*In re Toy & Sports Warehouse, Inc.*,
37 B.R. 141 (Bankr. S.D.N.Y. 1984)........................................................................13

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011)........................................................................60

*In re Tribune Co.*,
972 F.3d 228 (3d Cir. 2020)....43, 66

*In re Vision Adventures, LLC*,
544 B.R. 277 (Bankr. D.R.I. 2016)....62

*In re Wash. Mut., Inc.*,
442 B.R. 314 (Bankr. D. Del. 2011).... *passim*

*In re Woodbridge Grp. of Cos., LLC*,
592 B.R. 761 (Bankr. D. Del. 2018)....59, 60, 63, 66

*In re Yellow Corp.*,
676 B.R. 516 (Bankr. D. Del. 2025)....31

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. D. Del. 1999)....31

**Statutes**

11 U.S.C.
101(5)....54
327(e)....78
330....78
365(f)....46
503(b)....36
507(a)(1)....36
541....53
544(b)....55
101(31)....33
1107(a)....4
1108....4
1111(a)....24
1114....41
1122(a)....14
1122(b)....15
1123(a)....15
1123(a)(1)....15, 16
1123(a)(2)....16
1123(a)(3)....16
1123(a)(4)....16, 17, 75, 76
1123(a)(5)....17
1123(a)(6)....17, 18, 55
1123(a)(7)....18
1123(a)(8)....18
1123(b)....19, 27, 53
1123(b)(1)....19
1123(b)(2)....19, 20

1123(b)(3) .................... *passim*
1123(b)(5) .................... 27
1123(b)(6) .................... 27
1123(d) .................... 27, 28
1125(a)(1) .................... 11, 29
1125(b) .................... 11, 28, 29
1125(c) .................... 29
1126 .................... 9, 29, 30, 45
1126(c) .................... 30
1126(f) .................... 29, 30
1126(g) .................... 30
1127 .................... 45
1127(a) .................... 44
1129 .................... 2, 13, 44
1129(a) .................... 13, 42
1129(a)(1) .................... 13, 14
1129(a)(2) .................... 28, 30
1129(a)(3) .................... 31, 32
1129(a)(4) .................... 32, 33
1129(a)(5) .................... 33
1129(a)(5)(A)(i) .................... 33
1129(a)(5)(A)(ii) .................... 33
1129(a)(5)(B) .................... 33
1129(b)(2)(B)(ii), (C)(ii) .................... 42
1129(a)(6) .................... 34
1129(a)(7) .................... 34, 35, 36
1129(a)(8) .................... 36, 42
1129(a)(9) .................... 36, 37, 38
1129(a)(9)(A) .................... 36, 37
1129(a)(9)(B) .................... 37
1129(a)(9)(C) .................... 38
1129(a)(9)(D) .................... 37
1129(a)(10) .................... 38, 39
1129(a)(10) .................... 36
1129(a)(11) .................... 39, 40
1129(a)(12) .................... 41
1129(a)(13) .................... 41
1129(a)(14) .................... 41, 42
1129(a)(15) .................... 42
1129(a)(16) .................... 42
1129(b) .................... 42, 43
1129(b)(1) .................... 42, 43
1129(b)(2) .................... 42
1129(b)(2)(B) .................... 42
1129(c) .................... 44
1129(d) .................... 44

1129(e) ....................................................................................................44
1141(a) ....................................................................................................54
1141(b) ....................................................................................................27
1141(c) ....................................................................................................51, 53, 55
1141(d) ....................................................................................................54
1141(d)(3) ....................................................................................................52, 79
1930 ....................................................................................................41

**Other Authorities**

B. R 3019 ....................................................................................................44, 45

B. R 3020 ....................................................................................................46

B.R 6004 ....................................................................................................46

B. R 6006 ....................................................................................................46

Lugano Diamonds & Jewelry Inc. ("Lugano Diamonds") and its affiliated debtors and debtors in possession (collectively, "Lugano" or the "Debtors"), submit this memorandum of law (this "Memorandum") in support of final approval of the *Disclosure Statement for the Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 651] (the "Disclosure Statement") and confirmation of the *Second Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors*, filed contemporaneously herewith (as modified, amended, or supplemented from time to time hereafter, the "Plan"),[1] pursuant to sections 1125, 1126, 1128, 1129, 1145, and 1146 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") and in reply to objections to confirmation of the Plan and the requested extension of exclusivity. Contemporaneously herewith, the Debtors filed the *Declaration of J. Michael Issa in Support of Approval of the Disclosure Statement on a Final Basis and Confirmation of the Second Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* (the "Issa Declaration"), the *Declaration of L. Spencer Wells in Support of Confirmation of the Second Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* (the "Wells Declaration), and the *Declaration of Jeriad R. Paul Regarding the Solicitation and Tabulation of Votes on the Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* (the "Voting Certification, and together with the Issa Declaration and the Wells Declaration, the "Supporting Declarations"),[2] in support of the final approval of the Disclosure Statement and confirmation of the Plan, as applicable. The Debtors respectfully represent as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the Disclosure Statement, the Disclosure Statement Motion (as defined herein), or the Confirmation Order (as defined herein), as applicable

[2] At the Confirmation Hearing, the Debtors will request that the Court admit into evidence or take judicial notice of various filings, including affidavits of service in connection with the solicitation process, the Issa Declaration, the Wells Declaration, and the Voting Certification.

## PRELIMINARY STATEMENT[3]

1. After the disclosure of financial irregularities in May 2025, Lugano Diamonds' board retained independent directors and empowered a special committee comprised exclusively of those directors to investigate Lugano, its managers, and its parent and lender, Compass Group Diversified Holdings LLC ("CODI"). After comprehensive independent investigations undertaken by the Special Committee and, separately, the Creditors' Committee, it became evident that the path to resolving the Chapter 11 Cases required determination of the considerable claims that Lugano and CODI had against one another, including CODI's $718 million secured claim against Lugano. After two days of mediation before a respected arbitrator, Lugano, CODI, and the Creditors' Committee achieved a comprehensive settlement.

2. That settlement anticipates that general unsecured creditors will receive a distribution exceeding 30% of their allowed claims, notwithstanding the fraud that permeates the Chapter 11 Cases and facial validity of CODI's secured claim, and could yield substantially more depending on the outcome of claims to be litigated. As the evidence will establish, the CODI Settlement is an excellent outcome that easily clears "the lowest point in a range of reasonableness" as required by applicable law.

3. Because the Plan represents a significant recovery to general unsecured creditors, as shown by, among other things, the overwhelming vote of Lugano's creditors to accept the Plan and the support of the Official Committee of Unsecured Creditors and because the Plan satisfies all the mechanical requirements of section 1129 of the Bankruptcy Code, the Plan should be confirmed.

---

3 Capitalized terms used in this section have the meanings given to such terms elsewhere in this Memorandum.

4. Only three parties objected to the Plan: Mordechai Haim Ferder (individually, "Mr. Ferder" and, together in Mr. Ferder's capacity as trustee of the Haim Family Trust, "Ferder"); the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); and Travelers Casualty and Surety Company of America ("Travelers"). The Travelers objection has been resolved according to the terms set forth in the proposed form of Confirmation Order submitted herewith and subsequently withdrawn.

5. For the reasons set forth herein and in the Supporting Declarations, the Debtors submit that the Disclosure Statement and the Plan satisfy all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and non-bankruptcy law and, most significantly, represent a favorable outcome for all major constituencies in these Chapter 11 Cases. The Debtors therefore respectfully request that the Court approve the Disclosure Statement on a final basis and confirm the Plan.

# I. BACKGROUND

## A. Historical Background.

6. Mr. Ferder is the Debtors' founder, former CEO, and a minority shareholder of the Debtors. Following the discovery of his alleged fraud, Mr. Ferder resigned all of his positions with the Debtors.

7. Soon thereafter, the Board of Directors (the "Board") of Lugano Diamonds elected two independent members unconnected with the Debtors or Ferder. Thereafter, the Board appointed a special committee (the "Special Committee") comprised of these two independent Board members to investigate the alleged fraud.

8. Before the commencement of the Chapter 11 Cases, the Special Committee retained counsel and commenced an independent investigation that included potential Causes of Action against Ferder, CODI, and their respective Related Parties, among others. That investigation, as

described later in this Memorandum and in the Disclosure Statement, took several months to complete, involved extensive review of the Debtors' and other parties' (including CODI's) documents, and over two dozen interviews of key personnel.

**B. General Case Background.**

9. On November 16, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") in the Court. The Debtors are authorized to operate their business and manage their business as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[4]

10. On November 25, 2025, the U.S. Trustee appointed the official committee of unsecured creditors (the "Creditors' Committee") [Docket No. 88] (together with the Special Committee, the "Committees") and filed an Amended Notice of Appointment on June 24, 2026 [Docket No. 610]. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases.

11. On November 20, 2025, the Court entered an interim approval order [Docket No. 71] authorizing the Debtors to assume an Agency Agreement with the Agent (as such terms are defined in such order), whereby the Agent would sell substantially all of the Debtors' physical assets.

12. On December 17, 2025, the Court entered an order approving the Debtors' bidding procedures and the provision of bidding protections for the Agent [Docket No. 206].

13. On December 31, 2025, the Court entered an order on a final basis authorizing the Debtors to assume the Agency Agreement [Docket No. 263].

---

[4] Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these Chapter 11 Cases is set forth in the *Declaration of J. Michael Issa in Support of Chapter 11 Petitions and First Day Motions* [Docket No. 2], which is incorporated herein by reference.

**C. <u>The CODI Investigation and Mediation.</u>**

14. Both the Special Committee and the Creditors' Committee investigated CODI's conduct in connection with the allegedly fraudulent activities of Mr. Ferder. The Special Committee's investigation included the engagement of counsel from Barnes & Thornburg LLP and Steptoe LLP, and counsel's review of 1.2 million documents produced by various parties and 29 interviews of 23 relevant individuals and parties over a seven-month period. CODI did not participate in those interviews except for the fact that eight of the parties interviewed were current or former CODI employees. *See* Wells Decl. ¶ 12.

15. The Special Committee's investigation concluded that there were numerous meritorious claims that Lugano could bring against CODI, including objections seeking the disallowance of CODI's claims. *See Id.* ¶ 14. The Creditors' Committee's complementary investigation, which focused principally on grounds for subordinating CODI's claims, concluded that there were also numerous bases for such subordination. The claims identified by both the Special Committee and the Creditors' Committee included, without limitation, claims that CODI or its agents breached fiduciary duties owed to the Debtors. *See Id*.

16. With the foregoing analyses (and corresponding reservations) in mind, the Debtors, the Special Committee, the Creditors' Committee, and CODI participated in a two-day voluntary mediation in May 2026 overseen by the Honorable Lee R. Bogdanoff (Ret.) in Los Angeles, California. In that mediation, the parties exchanged their views on the merits of the claims identified by the Creditors' Committee and the Special Committee, and the defenses thereto identified by CODI. The parties also considered litigation uncertainties as to liability and likely remedies, the costs associated with prosecuting and defending the claims, and the delay in making distributions to non-CODI creditors and fully administering the Debtors' estates. *See Id*. ¶ 19.

17. The mediation was successful. The resulting settlement, which is documented in the Plan and Settlement Agreement (as more specifically defined in the Plan, the "CODI Settlement"), provides for distribution of approximately 65% of the Debtors' current cash and liquid assets to the Liquidation Trust for the benefit of the holders of Class 4 General Unsecured Claims. Those holders also receive the proceeds of 75% of most litigation pursued by the Liquidation Trust, and 55% of the proceeds of claims against Grant Thornton, CODI's (and the Debtors') outside auditors. CODI receives the balance of the Debtors' cash and liquid assets and litigation proceeds, as well as releases from claims that might be asserted by the Debtors' estates, as set forth in Section 3.02(c) of the Plan. *See Id.* ¶ 21.

18. The CODI Settlement delivers beneficial results to creditors on its face. The Debtors expect to have roughly $117 million to $131 million in assets available for distribution to creditors as of the Effective Date, exclusive of future litigation proceeds. *See* Liquidation Analysis. Approximately $72 million to $83 million of that will go to holders of general unsecured claims, while $43 to $46 million will go to CODI. In percentage terms, roughly 63% of the estates' assumed recoveries at the Effective Date goes to holders of general unsecured claims, while 37% goes to CODI. *See Id.* ¶ 23. Future litigation recoveries from all parties other than Grant Thornton go to general unsecured claimholders on a 75%/25% basis with CODI as well, and Grant Thornton recoveries are allocated 55% to general unsecured creditors.

19. This result is comparable to what the estates would achieve in a significant litigation victory over CODI. Assuming $250 million in Allowed General Unsecured Claims,[5] even fully

[5] The Liquidation Analysis provides for a range of estimated Allowed General Unsecured Claims of $212 million to $260 million. *See* Liquidation Analysis. The June 15, 2026 presentation to Lugano's Board of Directors modeled potential recoveries to CODI and to unsecured creditors assuming hypothetical Allowed General Unsecured Claims at $100 million and $200 million, respectively, solely for illustrative effect and without the benefit of the later-created Liquidation Analysis.

avoiding CODI's liens and security interests would result in an allocation of approximately 74% of the estates' value to CODI and 26% to the holders of General Unsecured Claims. To get a result similar to the Plan and the CODI Settlement, the estates would have to avoid all of CODI's liens and security interests and obtain disallowance or subordination of roughly $570 million of CODI's $718 million claim, without taking into account delay, litigation risk, and costs. *See Id.* ¶ 24.

20. In short, the Plan and the CODI Settlement deliver a risk-free allocation of value between CODI and the holders of General Unsecured Claims that results in near-term distributions to all parties at minimal cost and with finality to a long-running and complex dispute. The CODI Settlement is fully supported by both the Creditors' Committee (as the representative of the holders of General Unsecured Claims) and CODI – as well as all but three of the creditors eligible to vote in Classes 4 and 5 -- as fair and reasonable.

**D. <u>The Plan and Disclosure Statement</u>**

21. On June 24, 2026, the Debtors filed the *Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 612] and the *Disclosure Statement for the Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 614] (the "<u>Initial Disclosure Statement</u>"), along with a motion [Docket No. 615] (the "<u>Disclosure Statement Motion</u>") seeking approval of the Initial Disclosure Statement on an interim basis for solicitation purposes only and approval of related solicitation and voting procedures.

22. On July 9, 2026, the Debtors filed the *Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 649] and the *Disclosure Statement for the Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 651].

23. On July 14, 2026, the Court entered an order (the "<u>Disclosure Statement Order</u>") [Docket No. 661] approving the Disclosure Statement Motion which, among other things:

(a) approved the Disclosure Statement on an interim basis; (b) approved the forms of ballot, solicitation materials, and solicitation procedures set forth in the Disclosure Statement Motion; (c) established August 18, 2025 at 4:00 p.m. (prevailing Eastern Time) as the deadline for all Holders of Claims entitled to vote on the Plan to cast their ballots; (d) established August 18, 2026, at 4:00 p.m. (prevailing Eastern Time) as the deadline to object to final approval of the Disclosure Statement and confirmation of the Plan (the "Objection Deadline"); and (e) fixed the date, time, and place for the Combined Hearing on final approval of the Disclosure Statement and confirmation of the Plan.

24. On or about July 21, 2026, Omni Agent Solutions, Inc. (the "Notice and Claims Agent") served the Solicitation Packages and Combined Hearing Notice in accordance with the terms of the Disclosure Statement Order. *See Affidavit of Service* [Docket No. 750]. The Debtors caused the Publication Notice to be published in *The New York Times* (national edition) on July 17, 2026 and in the *Orange County Business Journal* on July 20, 2026. *See Proof of Publication* [Docket No. 713].

25. On August 11, 2026, the Debtors filed the *Notice of Filing of Plan Supplement for the Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Docket No. 778] (as may be amended, the "Plan Supplement"). The Plan Supplement includes the following Exhibits: (a) Additional Excluded Parties; (b) Assumed Agreements; (c) Insurance Contracts with Insurance Rights Transfer; (d) Effective Date Reserves; (e) Preserved Causes of Action; and (f) Compensation Arrangements for the Liquidation Trustee and Liquidation Trust Oversight Board.

26. Contemporaneously herewith, the Debtors filed the *Second Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* and the *Notice of Filing*

*Blackline of Second Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors*.

**E. <u>Plan Solicitation and Notification Process</u>**

27. In compliance with the Bankruptcy Code, the Debtors solicited votes on the Plan only from Holders of Claims in Class 3 (CODI Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims). *See* 11 U.S.C. § 1126. The Debtors did not solicit votes from Holders of Claims and Equity Interests in the remaining Classes set forth below because those Holders were not entitled to vote on the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not voting (conclusively presumed to accept) |
| 2 | Priority Claims | Unimpaired | Not voting (conclusively presumed to accept) |
| 6 | Intercompany Claims | Unimpaired /Impaired | Not voting (deemed to reject) |
| 7 | Subordinated Claims | Impaired | Not voting (deemed to reject) |
| 8 | Equity Interests | Impaired | Not voting (deemed to reject) |

28. The voting results for Class 3 (CODI Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims) as reflected in the Voting Certification, filed contemporaneously herewith, are summarized as follows:

| CLASS | TOTAL BALLOTS RECEIVED | | | |
|---|---|---|---|---|
| | Accept | | Reject | |
| | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) | AMOUNT (% of Amount Voted) | NUMBER (% of Number Voted) |
| Class 3 CODI Claims | $718,222,591.91<br>100% | 1<br>100% | $0<br>0% | 0<br>0% |
| Class 4 General Unsecured Claims | $188,192,872.71<br>99.86% | 70<br>95.89% | $264,684.14<br>0.14% | 3<br>4.11% |
| Class 5 Convenience Class Claims | $65,729.80<br>100% | 12<br>100% | $0<br>0% | 0<br>0% |

29. As set forth above and in the Voting Certification, Holders of Claims in Class 3 (CODI Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims) (the "Voting Classes") overwhelmingly voted to accept the Plan.[6]

**F. Objections and Informal Comments**

30. As noted above, three parties filed objections to final approval of the Disclosure Statement or certain provisions of the Plan (collectively, the "Objections"). The U.S. Trustee filed its Objection (the "UST Objection"), which restates arguments regarding the Debtors' use of an "Opt-Out" for consensual third-party releases (the "Opt-Out Election"). Ferder filed an objection (the "Ferder Objection") raising several objections, all of which should be overruled for the reasons

[6] Ferder's vote on his Disputed Claim is not included herein. However, even if fully allowed for voting purposes, Class 4 would have voted to accept the Plan with over 83% of the voting amount accepting the Plan.

set forth herein. Travelers filed a limited objection and reservation of rights, which has been resolved and withdrawn.[7]

31. The Debtors also received informal comments to the Plan from the Securities and Exchange Commission; Joshua Gaynor, the Debtors' Interim CEO; and the landlord for the Debtors' headquarters and boutique in Newport Beach, California, all of which were or will be resolved through the inclusion of language in the proposed form of Confirmation Order. The Debtors submit that the revisions made to the Plan to resolve these informal comments do not negatively impact any parties and do not require additional disclosure or re-solicitation of the Plan.

## II. THE COURT SHOULD APPROVE THE DISCLOSURE STATEMENT ON A FINAL BASIS

32. Section 1125 of the Bankruptcy Code requires that a disclosure statement approved by the bankruptcy court contain "adequate information" prior to a debtor's solicitation of acceptances or rejections of a plan. 11 U.S.C. § 1125(b). "Adequate information" is defined in the Bankruptcy Code as:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

33. In evaluating whether a disclosure statement provides "adequate information," courts adhere to the Bankruptcy Code's instruction that making this determination is a flexible exercise based on the facts and circumstances of each case. *See, e.g.*, *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125

[7] *See Notice of Withdrawal of Travelers Casualty and Surety Company of America's Limited Objection to Amended Plan and Reservation of Rights* [Docket No. 823].

we discern that adequate information will be determined by the facts and circumstances of each case.”); *First Am. Bank v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources), *aff'd* 860 F.2d 94 (3d. Cir. 1988).

34. In accordance with these precepts, the Disclosure Statement provides the pertinent information necessary for eligible Holders of Claims to make an informed decision about whether to vote to accept or reject the Plan. Specifically, the Disclosure Statement provides, among other things, information regarding:

- the major events that occurred prior to, and during the course of, these Chapter 11 Cases (Articles II and III);
- a summary of the classification and treatment of all Classes of Claims and Equity Interests under the Plan (Article I.A);
- an estimate of distributions to the Holders of Allowed Claims pursuant to the Plan (Article I.A);
- the treatment of all Classes of Claims and Equity Interests under the Plan (Article IV.D);
- risk factors regarding the Plan (Article V);
- the means for implementation of the Plan (Article IV.F);
- the provisions governing distributions under the Plan (Article IV.H); and
- federal income tax consequences of the Plan (Article VIII).

35. Accordingly, the Debtors respectfully submit that the Disclosure Statement contains “adequate information,” satisfies section 1125 of the Bankruptcy Code, and should be approved on a final basis.

## III. THE COURT SHOULD CONFIRM THE PLAN

### A. The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code

36. To confirm the Plan, the Court must find that both the Plan and the Debtors comply with the requirements of section 1129(a) of the Bankruptcy Code. *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 511 (3d Cir. 2005) ("A court will confirm a plan if it meets all of the requirements set out in section 1129(a)."); *In re Lackawanna Detective Agency. Inc.*, 82 B.R. 336, 337 (Bankr. D. Del. 1988) ("Section 1129(a) of title 11 recites the standards which must be met before a plan can be confirmed."). As set forth below, the Plan meets all the requirements of section 1129(a) of the Bankruptcy Code. Accordingly, the Plan should be confirmed.

### B. Section 1129(a)(1) - The Plan Complies with the Applicable Provisions of the Bankruptcy Code

37. Section 1129(a)(1) of the Bankruptcy Code provides that a plan of reorganization may be confirmed only if "[t]he plan complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1); *see In re Eagle-Picher Indus., Inc.*, 203 B.R. 256, 270-73 (S.D. Ohio 1996) (examining each requirement of chapter 11 to demonstrate that section 1129(a)(1) was satisfied); *In re Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984) ("In order for a plan of reorganization to pass muster for confirmation purposes, it must comply with all the requirements of Chapter 11…").

38. The legislative history of section 1129(a)(1) indicates that the primary focus of this requirement is to ensure that the Plan complies with sections 1122 and 1123 of the Bankruptcy Code, which sections govern classification of claims and interests and the contents of a plan, respectively. *See* S. Rep. No. 95-989, at 126 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6368; *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.),* 843 F.2d 636, 648–49 (2d Cir.

1988) (noting that legislative history indicates that section 1129(a)(1) was intended to require compliance with sections 1122 and 1123).

**1. Classification of Claims and Interests (11 U.S.C. § 1122)**

39. Section 1122 of the Bankruptcy Code provides that the claims or interests within a given class must be "substantially similar" to the other claims or interests in that class:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

11 U.S.C. § 1122.

40. Courts consistently have held that section 1122(a) of the Bankruptcy Code is satisfied so long as claims within a class are substantially similar. *See In re Armstrong World Indus., Inc.,* 348 B.R. 136, 160 (D. Del. 2006) ("A classification structure satisfies section 1122 of the Bankruptcy Code when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar"); *In re Aleris Int'l., Inc.*, No. 09-10478, 2010 Bankr. LEXIS 2997 at *41 (Bankr. D. Del. May 13, 2010) (same).

41. The Plan's classification of Claims and Equity Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places the Claims and Equity Interests into eight separate Classes, with Claims and Equity Interests in each Class differing from the Claims and Equity Interests in each other Class in a legal or factual manner, or based on other relevant criteria. *See* Plan, Art. III. Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

- Class 1: Other Secured Claims
- Class 2: Priority Claims
- Class 3: CODI Claim
- Class 4: General Unsecured Claims
- Class 5: Convenience Class Claims
- Class 6: Intercompany Interests
- Class 7: Subordinated Claims
- Class 8: Equity Interests

42. The foregoing Classes reflect the characteristics of the Claims and Equity Interests. The legal rights under the Bankruptcy Code of each of the holders of Claims or Equity Interests within a particular Class are substantially similar to other holders of Claims or Interests within that Class.

43. Valid business, factual and legal reasons exist for the separate classification of Claims and Equity Interests. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Statutory Fees and Professional Fee Claims) and Priority Tax Claims have not been classified. DIP Claims have not been classified but are resolved pursuant to the CODI Settlement. The CODI Claim (which was asserted as a Secured Claim) and Other Secured Claims are placed in separate Classes. Priority Claims and Subordinated Claims are in separate Classes according to the differing nature and treatment of such Claims. General Unsecured Claims are placed in a single class, except that Convenience Class Claims are separately classified in accordance with section 1122(b) of the Bankruptcy Code. Finally, Equity Interests are placed in a separate Class. The Debtors thus submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

**2. Mandatory Contents of the Plan (11 U.S.C. § 1123(a))**

44. Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy. The Plan satisfies each of these requirements. Except with respect

to section 1123(a)(4) of the Bankruptcy Code (to which Ferder objects), no party has asserted otherwise.

**a. Designation of Classes of Claims and Interests (11 U.S.C. § 1123(a)(1))**

45. For the reasons set forth above, Article III of the Plan properly designates classes of Claims and Interests and thus satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code. *See* Plan Art. III.

**b. Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))**

46. Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan." 11 U.S.C. § 1123(a)(2). The Plan meets this requirement by identifying in Article II and Article III each Class that is Unimpaired. *See* Plan, Art. II, Sections 3.02(a)–(b).

**c. Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))**

47. Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan." 11 U.S.C. § 1123(a)(3). The Plan meets this requirement by setting forth in Article II and Article III the treatment of each Class that is Impaired. *See* Plan, Art. II, Sections 3.02(c)–3.02(h).

**d. Equal Treatment Within Classes (11 U.S.C. § 1123(a)(4))**

48. Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). The Plan meets this requirement because holders of Allowed Claims or Interests will receive the same rights and treatment as other holders of Allowed Claims or Equity Interests within such holders' respective Class. *See* Plan, Art. III. The Debtors' response to Ferder's

argument that the Plan fails to satisfy section 1123(a)(4) of the Bankruptcy Code is set forth in Section IV.E below.

**e. Means for Implementation (11 U.S.C. § 1123(a)(5))**

49. Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. *See* 11 U.S.C. § 1123(a)(5). The Plan satisfies this requirement because Article V of the Plan, as well as other provisions thereof, provides for the means by which the Plan will be implemented. *See* Plan, Art. V.

50. Among other things, the Plan provides for: (a) the winding down and dissolution of the Debtors (other than the Post-Confirmation Debtor); (b) the formation of the Liquidation Trust and the vesting of the Liquidation Trust Assets therein, and the appointment of the Liquidation Trustee and the Liquidation Trust Oversight Board; (c) the issuance of one share of stock in the Post-Confirmation Debtor and the retention of the Tax Refund by the Post-Confirmation Debtor; (d) the treatment of executory contracts, unexpired leases, and Insurance Contracts; (e) the treatment of Claims and Interests; (f) the preservation and vesting of certain preserved Causes of Action in the Liquidation Trust; and (g) the taking of all necessary and appropriate actions by the Debtors to effectuate the transactions under and in connection with the Plan. *See* Plan, Art. V & VI. Accordingly, the Plan complies with section 1123(a)(5) of the Bankruptcy Code.

**f. Issuance of Non-Voting Securities (11 U.S.C. § 1123(a)(6))**

51. Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities. *See* 11 U.S.C. § 1123(a)(6). The Plan provides that the Post-Confirmation Debtor's charter is deemed amended to preclude the issuance of non-voting securities. *See* Plan, Art. V, § 5.02(b)(ii). This provision of the Bankruptcy Code does not apply to any of the Debtors other than the Post-Confirmation

Debtor because those entities are being dissolved on the Effective Date. *See In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Mar. 16, 2010) *14 (finding in confirmation order that Bankruptcy Code 1123(a)(6) was inapplicable because the Debtors would be dissolved subsequent to the effective date); *In re Crown Vill. Farm, LLC,* No. 09-11522 LEXIS 4810, at *9 (Bankr. D. Del. Dec. 18, 2009) (finding in confirmation order that section 1123(a)(6) of the Bankruptcy Code "does not apply to the Debtor because it is to be dissolved under the Plan" and that the Plan satisfied section 1123(a)(6)).

**g. Directors and Officers (11 U.S.C. § 1123(a)(7))**

52. Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." *See* 11 U.S.C. § 1123(a)(7). In accordance with Sections 5.02(a) of the Plan, the existing directors, officers, and managers of the Debtors are automatically terminated without any further action required. From and after the Effective Date, the Liquidation Trustee shall be the sole board member and officer of the Post-Confirmation Debtor. The identities of the initial Liquidation Trustee and members of the Liquidation Trust Oversight Board are disclosed in the Plan and the Disclosure Statement, and their appointment is consistent with the interests of creditors and with public policy. *See* Plan, Article I.101 and I.102. Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

**h. Inapplicable Provisions (11 U.S.C. §§ 1123(a)(8) and (c)).**

53. The Debtors are not individuals and thus sections 1123(a)(8) and (c) are inapplicable.

### 3. Discretionary Contents of the Plan (11 U.S.C. § 1123(b))

54. Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan. Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of a debtor's estate, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." *See* U.S.C. § 1123(b)(1)–(6).

#### a. Impairment and Unimpairment of Classes (11 U.S.C. § 1123(b)(1))

55. The Plan satisfies the requirements of section 1123(b)(1) of the Bankruptcy Code because Article III impairs or leaves Unimpaired each Class of Claims and Equity Interests. *See* Plan, Arts. II and III.

#### b. Treatment of Executory Contracts and Unexpired Leases (11 U.S.C. § 1123(b)(2))

56. The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code. Article VI of the Plan provides for the automatic rejection of the Debtors' executory contracts and unexpired leases not previously assumed or rejected pursuant to an order of the Court, other than any executory contracts set forth on the Schedule of Assumed Agreements. *See* Plan, Section 6.02. The Debtors determined, in their business judgment, that all of their remaining executory contracts, other than those identified to be assumed and assigned should be automatically rejected upon the

Effective Date, as they do not provide any benefit to the Estates or to parties in interest as part of the Debtors' wind-down. *See* Issa Decl. ¶ 25. Accordingly, the Plan satisfies the requirements of section 1123(b)(2) of the Bankruptcy Code.

**c. Settlements and the Plan's Release, Exculpation, and Injunction Provisions (11 U.S.C. § 1123(b)(3))**

57. The Plan incorporates the CODI Settlement. For the reasons set forth in Section IV.B below, the CODI Settlement Agreement should be approved.

58. The Plan also includes certain releases, an exculpation provision, and an injunction provision. These discretionary provisions are proper because, among other things, and as discussed in detail immediately below and in the response to the objections of Ferder and the U.S. Trustee, they are supported by the Debtors and are consistent with applicable precedent.

**i. The Debtor Release Is Appropriate**

59. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." *See* 11 U.S.C. § 1123(b)(3)(A). Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the debtor's bankruptcy estate.'") (internal citations omitted). *See also In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) ("the standards for approval of settlement under section 1123 are generally the same as those under [Bankruptcy] Rule 9019"). Section 11.08 of the Plan provides for releases by the Debtors and their Estates, as of the Effective Date, of, among other

things, certain claims, rights, and Causes of Action that the Debtors or their Estates may have against the Released Parties,[8] subject to certain carve-outs and limitations as reflected in Section 11.08 of the Plan (the "Debtor Release").

60. The Debtor Release covers only the release of the Debtors' claims against certain of their directors and officers, the Creditors' Committee and its members (in their capacity as such), certain professionals, and the CODI Parties (and the Related Parties of the CODI Parties).[9]

**(a) Release of CODI Parties**

61. The release of the CODI Parties is an appropriate exercise of the Debtors' business judgment. As set forth in more detail below, the CODI Settlement Agreement provides for a significant recovery for General Unsecured Creditors. Under the CODI Settlement Agreement, CODI – the Debtors' prepetition secured lender with liens on substantially all of the Debtors' assets – will receive approximately 35% of the proceeds of the Specified Assets, 45% of the proceeds of GT Claims, and 25% of the proceeds of remaining assets, and CODI's claims for adequate protection and under the DIP Loan are resolved by this allocation – an allocation less favorable to CODI than a payment of its secured claim (or even a fraction of its secured claim) or a pro rata distribution on CODI's $718 million claim even if it were treated as wholly unsecured. *See* Wells Decl. ¶ 16. CODI, a secured creditor and the Debtors' largest unsecured creditor on account of its deficiency claim, is releasing its claim to more than $70 million of assets (without

[8] The Plan defines "Released Parties" as: "Each of: (a) the Debtors and each of the Estates and any of their subsidiaries and retained Professionals and Ordinary Course Professionals and their following directors and officers: (i) Frederic Cumenal; (ii) David Arnold; (iii) L. Spencer Wells (including as a member of the Special Committee); (iv) Thomas FitzGerald (including as a member of the Special Committee); (v) Stuart Winston; (vi) Lisa Calvert; and (vii) Christoph Pachler; (b) the Creditors' Committee and its individual members solely in their capacities as members of the Creditors' Committee, together with all their retained Professionals, agents, and other representatives of the Creditors' Committee and its members solely in their capacities with respect to service on or representation of the Creditors' Committee; and (c) the CODI Parties and each of the Related Parties of the CODI Parties; provided that no Excluded Party is a Released Party." Plan Art. I.127.

[9] The Debtor Release is not a third-party release; issues arising from the Supreme Court's decision in *Purdue Pharma*, which are not relevant to the Debtor Release, are addressed in the next section.

considering value attributable to litigation claims). In exchange, the CODI Parties and their Related Parties are receiving a broad release. The CODI Settlement Agreement is the cornerstone of the Plan, and absent the CODI Settlement Agreement the Debtors and their estates (and any successor) would likely be engaged in prolonged litigation with an uncertain outcome that, if unsuccessful, would likely result in a small (if any) recovery for Holders of General Unsecured Claims. Thus, providing the release contemplated in the CODI Settlement Agreement is a fair, reasonable, and equitable exchange of value that provided substantial benefits to the Debtors' estates.

62. The Plan – which gives effect to the CODI Settlement Agreement – has been approved by an overwhelming majority of creditors in the voting creditor classes. Overwhelming creditor support is not surprising given the projected range of recoveries under the CODI Settlement Agreement and the possibility of a greatly diminished recovery absent that agreement. Such support for the Plan is compelling evidence that the Debtor Release as applied to CODI constitutes a valid exercise of the Debtors' business judgment, is fair, equitable, and reasonable, in the best interests of the Debtors' and their creditors, and should be approved. This is a significant endorsement of the Debtor Release as it applies to CODI that the Court should not overlook: it reinforces and affirms the Debtors' determination that such release is a valid exercise of the Debtors' business judgment and is in the best interest of the Estates. *See In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 938 (Bankr. W.D. Mo. 1994) (stating that creditor approval of a release is "the single most important factor" to determine whether a release is appropriate).

63. Finally, the Plan provides substantial recoveries for Holders of General Unsecured Claims in Class 4 and Convenience Class Claims in Class 5 that are affected by the Debtor Release (CODI, as the sole Holder of the CODI Claim in Class 3, is a party to the Plan Support Agreement).

The Debtors, together with the Released Parties, have worked diligently to preserve the Estates' limited resources and maximize recoveries for the benefit of all Holders of Allowed Claims. Accordingly, the Debtors submit that the Debtor Release of the CODI Parties is a sound exercise of their business judgment and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code.

**(b) Release of the non-CODI Parties**

64. The Debtor Release includes releases of the Debtors, their Estates, their retained professionals, certain directors and officers, the Creditors' Committee (and its members in such capacity) and the professionals and agents of the Creditors' Committee and its members (with respect to such service on or representation of the Creditors' Committee), except with respect to actual fraud, willful misconduct, or gross negligence. The Debtors do not believe that they have Causes of Action against such parties. With respect to the specified directors and officers, the Special Committee conducted a thorough investigation surrounding Ferder's alleged fraud and whether such directors and officers had any involvement therewith, and determined not to pursue any Causes of Action against such directors and officers.[10] Pursuing such Causes of Action would incur costs, and the directors and officers would be entitled to assert claims for indemnification for defense costs. Further, in some cases, liability may be limited by Debtors' organizational documents. Releasing these directors and officers thus is a valid exercise of the Debtors' business judgment, and is supported by the Creditors' Committee and CODI. Moreover, the Debtors' directors and officers, the Debtors' professionals, and the Creditors' Committee (and their members), and their professionals (in certain capacities) may also be exculpated under the Plan for their postpetition actions. The release of speculative claims against estate fiduciaries is well within

[10] An officer against whom the Committees believe colorable claims exist is not a beneficiary of the Debtor Release.

the Debtors' business judgment. These releases have typical carveouts for actual fraud, willful misconduct, or gross negligence.

65. For the reasons set forth above, the Debtors submit that the Debtor Release of the non-CODI Released Parties is a sound exercise of their business judgment and should be approved under section 1123(b)(3)(A) of the Bankruptcy Code.

**ii. The Third Party Release Is Wholly Consensual and Appropriate Under the Facts and Circumstances of These Cases**

66. Section 11.09 of the Plan provides for the release of each Released Party by the Releasing Parties from any and all claims and Causes of Action, as further provided in the Plan (the "Third Party Release"). Courts in this jurisdiction routinely approve such release provisions when, as here, they are consensual. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2011) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected").

67. In this case, all parties subject to the Third Party Release had ample opportunity to evaluate the Third Party Release. The Releasing Parties are the Debtors, their estates and successors, Holders of Claims (other than those in Classes deemed to reject the Plan) who do not make an Opt-Out Election, other Released Parties, and Related Parties to the extent such parties could assert a claim on behalf of or derivatively through a Releasing Party. Moreover, no Excluded Party is a Releasing Party.

68. Holders of Claims (including unclassified claims) were given the opportunity to make an Opt-Out Election. First, the Disclosure Statement put all parties on notice of the Opt-Out Election. *See* Disclosure Statement Section I.B.4. Second, all creditors who filed a proof of claim or whose claim is deemed filed pursuant to section 1111(a) of the Bankruptcy Code received

further information about the Opt-Out Election as follows: Holders of Class 4 (General Unsecured Claims) and Class 5 Claims (Convenience Class Claims) were able to make an Opt-Out Election on their Ballots, which provided information about the Third Party Release and Opt-Out Election, and Holders of Claims in Class 1 (Other Secured Claims), Class 2 (Priority Claims), and unclassified claims (Administrative Claims and Priority Tax Claims) received an Opt-Out Form and Notice of Non-Voting Status (which also provided information about the Third Party Release).[11] Finally, all equity holders and creditors and parties in the creditor matrix received the Combined Confirmation Hearing Notice that provided notice of the Opt-Out Election. The Opt-Out Form and other relevant pleadings were also made available on the website of the Notice and Claims Agent free of charge.

69. Consensual third party releases are not foreclosed by the Supreme Court's decision in *Harrington v. Purdue Pharma, L.P.,* 603 U.S. 204, 144 (2024) ("Purdue Pharma"). Because the Third Party Release is wholly consensual and is consistent with established case law within the Third Circuit, the Third Party Release should be approved. *See infra,* paragraphs 128-140.

**iii. The Exculpation Provision Is Appropriate**

70. Section 11.7 of the Plan provides for the exculpation of the Exculpated Parties (the "Exculpation Provision").[12] The Exculpation Provision is fair and appropriate under both applicable law and the facts and circumstances of these Chapter 11 Cases. *See Wash. Mut.*, 442

---

[11] As of the Voting Record Date, there were no creditors in Class 7 (Subordinated Claims) and the Holders of Intercompany Claims in Class 6 (i.e., the Debtors) cannot opt out of the Third Party Release (and are likewise bound by the Debtor Release of the Released Parties in Section 11.08 of the Plan). CODI, as a Released Party, has consented to the releases set forth in Section 11.09(a) of the Plan and did not have an Opt-Out Election on its Ballot.

[12] The Plan defines Exculpated Parties as follows: "Collectively, (a) the Debtors, (b) the Creditors' Committee, and each of its members solely in the member's capacity as such; (c) Thomas FitzGerald, (d) L. Spencer Wells, and (e) each of the preceding's respective Related Parties serving in such capacities after the Petition Date to the extent that such Related Parties are Estate fiduciaries; *provided further* that no Ferder Affiliated Party is an Exculpated Party."

B.R. at 351 (holding that an exculpation clause must be limited to "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers"); *Indianapolis Downs*, 486 B.R. at 306 ("The *Washington Mutual* court determined that exculpation clauses should be limited to fiduciaries who have served during the chapter 11 proceedings: estate professionals, committees and their members, and the debtors' directors and officers"). The Exculpation Provision is limited and does not exculpate acts or omissions that constitute actual fraud, willful misconduct, or gross negligence. *See* Plan Section 11.07. The Debtors believe that the Exculpation Provision is important because the Exculpated Parties have participated in these Chapter 11 Cases in good faith, and such provision is necessary to protect them from collateral attacks related to any good faith acts or omissions in connection with, or related to, among other things, these Chapter 11 Cases and the Plan. Indeed, the sole objector to the Section 11.07 exculpation provision – Mr. Ferder – appears to object to that provision precisely because he intends to launch collateral attacks against the Special Committee (and potentially other parties) relating to these Chapter 11 Cases and the Plan. Accordingly, the Debtors believe that the Exculpation Provision is consistent with applicable law and should be approved.

**iv. The Injunction Provision Is Appropriate**

71. The injunction provision set forth in Section 11.06 of the Plan (the "Injunction Provision") protects property distributed under the Plan and implements the Plan's release and exculpation provisions, in part, by permanently enjoining all entities from taking certain actions against or affecting property dealt with under the plan, asserting any right of setoff unless asserted in a proof of claim or prepetition document Filed with the Bankruptcy Court, or interfering with the implementation or consummation of the Plan or other does not comply with applicable law.

Thus, the Injunction Provision is a key provision of the Plan because it enforces sections 1141(b) and (c) of the Bankruptcy Code and protects property dealt with under the Plan. The Debtors respectfully submit that the Injunction Provision is appropriate and narrowly tailored to prevent existing creditors from reaching property that will be distributed to Holders of Allowed Claims. Thus, the Injunction Provision should be approved.

**d. The Retention of the Causes of Action Is Appropriate**

72. The Causes of Action to be preserved under the Plan, including those described in the Plan Supplement, and that will vest in the Liquidation Trust on the Effective Date, are essential to the Plan and appropriate under the facts and circumstances of these Chapter 11 Cases. Such Causes of Action are or may be a source of future recoveries for the benefit of the Debtors' creditors. Accordingly, the preservation of the Causes of Action should be approved.

**e. The Plan Complies with the Additional Provisions of Section 1123(b) of the Bankruptcy Code**

73. The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code. 11 U.S.C. 1123(b)(5). Article III of the Plan modifies or leaves unaffected, as is applicable, the rights of certain Holders of Claims, as permitted by section 1123(b)(5) of the Bankruptcy Code. Additionally, the other discretionary provisions in the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code. Accordingly, the Plan satisfies the requirements of sections 1123(b)(5) and (b)(6) of the Bankruptcy Code, and no party has asserted otherwise.

**4. Section 1123(d) - The Plan Complies with Section 1123(d) of the Bankruptcy Code**

74. Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the

underlying agreement and applicable non-bankruptcy law." 11 U.S.C. § 1123(d). The Plan does not seek to override Section 1123(d).

## C. **<u>Section 1129(a)(2) - The Debtors Have Complied with the Applicable Provisions of Title 11</u>**

75. Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a plan comply with applicable provisions of the Bankruptcy Code. The principal purpose of this section is to ensure compliance with the disclosure and solicitation requirements set forth in section 1125 of the Bankruptcy Code. *See In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) ("[Section] 1129(a)(2) [of the Bankruptcy Code] requires that the plan proponent comply with the adequate disclosure requirements of § 1125."); *In re Aleris Int'l, Inc.*, 2010 Bankr. LEXIS 2997 at *66 ("The legislative history of section 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); *Official Comm. of Unsecured Creditors v. H.B. Michelson (In re H.B. Michelson)*, 141 B.R. 715, 719 (Bankr. E.D. Cal. 1992) ("Compliance with the disclosure and solicitation requirements is the paradigmatic example of what the Congress had in mind when it enacted section 1129(a)(2)."). As explained below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of section 1125 regarding disclosure and Plan solicitation.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code

76. Section 1125 prohibits the solicitation of acceptances or rejections of a plan of reorganization from holders of claims or interests "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved . . . by the court as containing adequate information." 11 U.S.C. § 1125(b).

77. Section 1125 is satisfied here. Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement on an interim basis. *See generally* Disclosure Statement Order. The Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting on and objecting to the Plan. *Id.* The Debtors, through the Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code. *See Affidavit of Service* [Docket No. 750] and *Proof of Publication* [Docket No. 713]. The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. Here, the Debtors caused the Disclosure Statement to be transmitted via QR Code link to all parties entitled to vote on the Plan.

78. Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

**2. The Debtors Complied with Section 1126 of the Bankruptcy Code**

79. Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. *See* 11 U.S.C. § 1126. The Debtors did not solicit votes on the Plan from Class 1 (Other Secured Claims) and Class 2 (Priority Claims) as such Classes are Unimpaired under the Plan (the "Unimpaired Classes"). *See* Plan, Arts. II and III. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan. The Debtors also did not solicit votes from Class 6 (Intercompany

Claims), Class 7 (Subordinated Claims) and Class 8 (Equity Interests) as such Classes are Impaired under the Plan and not expected to receive any recovery on account of their Claims or Interests (the "Deemed Rejecting Classes"). *Id.* Pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan. Accordingly, Class 1 (Other Secured Claims), Class 2 (Priority Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Claims), and Class 8 (Equity Interests) are either Unimpaired and conclusively presumed to accept the Plan or Impaired and deemed to reject the Plan and, therefore, were not entitled to vote on the Plan.

80. The Debtors solicited votes only from the Voting Classes, which consist of the Holders of Allowed Claims in Class 3 (CODI Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims) because these Classes are Impaired and entitled to receive a distribution under the Plan. *Id.* With respect to the Voting Classes of Claims, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

81. The Voting Certification reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code. All Voting Classes voted to accept the Plan by over one-half in number and two-thirds in amount. Based on the voting results, the Debtors submit that they have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

**D. <u>Section 1129(a)(3) - The Plan Has Been Proposed in Good Faith</u>**

82. Section 1129(a)(3) of the Bankruptcy Code requires that a plan of reorganization be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). A plan is considered proposed in good faith "if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the [Bankruptcy] Code." *Hanson v. First Bank of S.D., N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987) (internal quotation marks omitted); *see In re Combustion Eng'g, Inc.,* 391 F.3d 190, 246 (3d Cir. 2004) ("For purposes of determining good faith under section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (quoting *In re PWS Holding Corp.*, 228 F.3d at 242) (internal modifications omitted); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) ("The good faith standard requires that the plan be proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.") (internal quotation marks omitted).

83. The requirement of good faith must be viewed in light of the totality of the circumstances surrounding the formulation of a chapter 11 plan. *See In re Yellow Corp.*, 676 B.R. 516, 527 (Bankr. D. Del. 2025) (whether a plan has been proposed in good faith "requires a factual inquiry into a totality of the circumstances surrounding the plan's proposal." *See* also *In re Century Glove Inc.*, No. 90-400-SLR, 1993 WL 239489, at *15 (D. Del. Feb. 10, 1993).

84. The record is clear that the Plan was developed and proposed with honesty, good intentions, and with the goal of maximizing stakeholder recoveries. Throughout these Chapter 11 Cases, the Debtors, their directors (including the members of the Special Committee), and their management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents. The Debtors proposed the Plan after negotiations with key stakeholders – the

Creditors' Committee and CODI – to, among other things, implement the CODI Settlement Agreement, facilitate the prosecution of Causes of Action and objections to Claims by the Liquidation Trust, monetize other any other assets, and to make Distributions to creditors. The Plan will provide greater value to the Debtors' stakeholders compared to the alternative of a chapter 7 liquidation. *See* Issa Decl. ¶ 13. Importantly, the Plan is supported by all Voting Classes. Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code.

**E. Section 1129(a)(4) - All Payments to Be Made by the Debtors in Connection with These Cases Are Subject to the Approval of the Court**

85. Section 1129(a)(4) of the Bankruptcy Code requires that:

> Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

11 U.S.C. § 1129(a)(4). In essence, section 1129(a)(4) of the Bankruptcy Code requires that any and all fees promised or received in connection with or in contemplation of a chapter 11 case must be disclosed and subject to the court's review. *See In re Crdentia Corp.*, No. 10-10926 (BLS), 2010 Bankr. LEXIS 2838, at *20 (Bankr. D. Del. May 26, 2010) (holding that plan complied with section 1129(a)(4) where all final fees and expenses payable to professionals remained subject to final review by the bankruptcy court); *In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (holding that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

86. In accordance with section 1129(a)(4) of the Bankruptcy Code, all fees to which parties may be entitled in connection with the Chapter 11 Cases, including Professional Fee Claims, are subject to the approval of the Court. Section 3.01(b) of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than forty-five (45) days

after the Effective Date for determination by the Court in accordance with the procedures set forth in the Plan. The compensation arrangements for the Liquidation Trustee and the members of the Liquidation Trust Oversight Board are disclosed in the Plan Supplement. Further, Section 10.01(b) of the Plan provides that the Court will retain jurisdiction after the Effective Date to hear and determine all Professional Fee Claims.

87. Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

### F. Section 1129(a)(5) - The Plan Discloses All Required Information Regarding Post-Confirmation Management and Insiders

88. The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan. *See* 11 U.S.C. § 1129(a)(5)(A)(i). Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy. *See* 11 U.S.C. § 1129(a)(5)(A)(ii). In addition, section 1129(a)(5)(B) also requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider. *See* 11 U.S.C. § 1129(a)(5)(B).

89. Section 5.02 of the Plan provides for the termination of the Debtors' directors, officers, and managers on the Effective Date. From and after the Effective Date, the Liquidation Trustee will be the sole officer and Director of the Post-Confirmation Debtor, and the other Debtors will be dissolved automatically on the Effective Date. The identities of the Liquidation Trustee and the members of the Liquidation Trust Oversight Board are disclosed in the Plan, and their respective compensation was disclosed in the Plan Supplement. Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code have been satisfied.

**G. Section 1129(a)(6) - The Plan Does Not Require Governmental Regulatory Approval**

90. Section 1129(a)(6) of the Bankruptcy Code is applicable only to debtors subject to governmental regulatory authority and requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). Section 1129(a)(6) of the Bankruptcy Code is inapplicable to the Plan because (i) the Debtors are not subject to any such governmental regulatory commission, (ii) the Plan does not contain any rate changes subject to the jurisdiction of any governmental regulatory commission, and (iii) the Debtors will not be operating their business post-Effective Date, all Debtors other than the Post-Confirmation Debtor will dissolved on the Effective Date, and the Post-Confirmation Debtor will be limited to the Post-Confirmation Debtor Functions. *See* Issa Decl. ¶ 20.

**H. Section 1129(a)(7) - The Plan is in the Best Interest of Creditors**

91. Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . .

92. The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate

against the estimated recoveries under that debtor's chapter 11 plan. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."). As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests, who must receive at least as much under a plan as they would receive in a chapter 7 liquidation. *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal quotation omitted).

93. Here, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test. As set forth in the Issa Declaration, the Debtors, with the assistance of their professionals and the input of the Creditors' Committee, prepared a liquidation analysis (as amended, the "Liquidation Analysis"), which is attached as Exhibit B to the Issa Declaration.

94. The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of allowed Claims under the Plan. *See* Issa Decl. ¶¶ 13-17. As illustrated in the Liquidation Analysis, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code, because all holders of impaired Claims will receive property with a value as of the Effective Date that is not less than the value such holders would receive in a liquidation under chapter 7. Holders of Subordinated Claims and Equity Interests would not receive a distribution under the Plan or under a hypothetical chapter 7 case. *Id.*

95. In contrast to the Plan, a hypothetical conversion to a chapter 7 case would impose additional costs on the Debtors and their Estates. Appointment of a chapter 7 trustee would incur

additional fees and expenses as new counsel becomes familiar with the Debtors' complex and voluminous history. Additional statutory fees of the chapter 7 trustee would result as well. In contrast, confirmation of the Plan and establishment of the Liquidation Trust offer a comparatively quick and reduced-cost option for winding down the Debtors' Estates.

96. Accordingly, the Plan satisfies the best interests test as required by section 1129(a)(7) of the Bankruptcy Code.[13]

## I. Sections 1129(a)(8) -- The Plan is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code

97. Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan. Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, thus, were not entitled to vote. Consequently, while the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Deemed Rejecting Classes, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.

## J. Section 1129(a)(9) - The Plan Provides for the Payment of Priority Claims

98. Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments. In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, unless otherwise agreed by the holder, holders of claims of a kind specified in section 507(a)(1) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the

[13] The Ferder Declaration does not fundamentally challenge the Plan on the "best interests" test of section 1129(a)(7), arguing only that the issue is raised by the release issues. *See* Ferder Objection at ¶ 61 ("Because the Plan strips the Ferder Parties of their contribution, indemnity, and setoff rights, rights that would be preserved in a Chapter 7 case where no plan is confirmed, the Ferder Parties will receive less under the Plan than they would in a hypothetical liquidation.") Because Ferder does not challenge the Liquidation Analysis itself, he has waived the issue.

Bankruptcy Code—must receive cash equal to the allowed amount of such claims on the effective date of a plan. In addition, section 1129(a)(9)(B) requires that the holders of claims of a kind specified in sections 507(a)(1) and 507(a)(4) through (7) (generally, wage and employee benefit claims and consumer deposits that are entitled to priority) must receive, if the class in which such claimants are members has accepted the plan, deferred cash payments of a value equal to the allowed amount of these claims or, if the class in which such claimants are members has not accepted the plan, cash equal to the allowed amount of these claims on the effective date of a plan. Finally, sections 1129(a)(9)(C) and (D) of the Bankruptcy Code provide for the payment of priority tax claims, including secured claims that would otherwise meet the requirements of section 507(a)(8) but for the secured status of such claims, in cash in regular installments. *See* 11 U.S.C. § 1129(a)(9).

99. *First*, Section 3.01 of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that on or as soon as reasonably practicable after the later of the Effective Date and the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of an Allowed Administrative Claim will receive either (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Administrative Claim or (2) such other less favorable treatment as to which such Holder and the Liquidation Trust have agreed upon in writing. Professional Fee Claims will be paid in accordance with Section 3.01(b) of the Plan to the extent their final fee applications are approved. *See* Plan Section 3.01.

100. *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code. Section 3.02(b) of the Plan provides that Holders of Priority Claims will be paid (to the extent not already paid), on or as soon as reasonably practicable after the later of the Effective Date and the

date on which a Priority Claim becomes an Allowed Claim, Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Claim. *See* Plan Section 3.02(b).

101. *Third*, Section 3.01(c) of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that Holders of Allowed Priority Tax Claims will receive either (1) Cash from the Liquidation Trust equal to the unpaid portion of such Allowed Priority Tax Claim on the later of the Effective Date and 30 calendar days following the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim; (2) regular installment payments in Cash from the Liquidation Trust over a period not exceeding five years after the Petition Date in the amount of the Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the rate determined under applicable nonbankruptcy law as of the calendar month in which the Effective Date occurs (*provided* that such election is without prejudice to the right to prepay any such Allowed Priority Tax Claim in full or in part without penalty); or (3) such other treatment as to which the Holder of an Allowed Priority Tax Claim and the Liquidation Trustee have agreed upon in writing, *provided* that Allowed Priority Tax Claims that are not due and payable on the Effective Date will be paid in the ordinary course by the Liquidation Trustee, and that, in the event an Allowed Priority Tax Claim is also an Other Secured Claim, such Claim, to the extent it is Allowed, is treated as an Other Secured Claim if such Claim is not otherwise paid in full. *See* Plan Section 3.01(c).

102. The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code.

**K. <u>Section 1129(a)(10) - The Plan Has Been Accepted by at Least One Impaired, Non-Insider Class</u>**

103. Section 1129(a)(10) of the Bankruptcy Code provides: "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted

the plan, determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10).

104. The Debtors have satisfied this requirement. As indicated in the Voting Certification, the Holders Claims in Class 4 (General Unsecured Claims) and Class 5 (Convenience Class Claims), each of which are Impaired, voted to accept the Plan independent of any insiders' votes. *See* Voting Certification ¶ 9.[14] Accordingly, the Plan may be confirmed in accordance with section 1129(a)(10) of the Bankruptcy Code.

**L. <u>Section 1129(a)(11) - The Plan is Feasible</u>**

105. Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible. Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

11 U.S.C.§ 1129(a)(11).

106. The feasibility test set forth in section 1129(a)(11) does not require the Debtors to "prove" that the Plan will succeed, only that the Plan has a "reasonable probability" of success or reasonable likelihood to succeed on its own terms. *See Kane*, 843 F.2d at 649 ("As the Bankruptcy Court correctly stated, the feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (noting that section 1129(a)(11) "does not require a plan's success to be guaranteed" but that the "plan must . . . propose a realistic and workable framework" and be "reasonably likely to succeed on its own terms without a need for further reorganization") (internal brackets and

---

14 Because Class 3 (CODI claim) has only one claimant (CODI), and it is an insider, its class cannot be counted for purposes of confirmation. 11 U.S.C. §1129(a)(10).

quotations omitted); *Aleris*, 2010 Bankr. LEXIS 2997 at 84 ("Courts in the Third Circuit have held that the feasibility standard 'requires courts to determine whether the Plan is feasible and has a reasonable likelihood of success.'") (quoting *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226 (Bankr. D.N.J. 2000). "In the context of a liquidating plan, feasibility is established by demonstrating the debtor's ability to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases. Notably, there is no requirement that such payments will be guaranteed." *In re Finlay Enters., Inc.*, No. 09-14873 (JMP), 2010 Bankr. LEXIS 5592, at *155-156 (Bankr. S.D.N.Y. June 29, 2010).

107. The Plan is feasible and satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code. The Debtors' Cash on the Effective Date is projected to be more than $45 million. *See* Issa Decl. ¶ 19. That amount is sufficient to satisfy all projected Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims, Priority Claims, and Statutory Fees, to fund the Liquidation Trust Expense Reserve, and have funds available to provide recoveries to the Allowed Claims in Class 3 (CODI Claim), Class 4 (General Unsecured Claims), and Class 5 (Convenience Class Claims) consistent with the Plan. *See id*. Moreover, payments under the Plan are not dependent or contingent upon any future or uncertain event. Accordingly, there is a reasonable assurance that the Plan is workable and has a reasonable likelihood of success, satisfying the feasibility standard of section 1129(a)(11) of the Bankruptcy Code.[15]

[15] The Ferder Objection asserts that the Debtors have not met their burden of demonstrating feasibility. That objection is addressed more specifically in Section IV below.

**M. Section 1129(a)(12) - The Plan Provides for the Payment of U.S. Trustee Fees**

108. Section 1129(a)(12) of the Bankruptcy Code requires that "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan." 11 U.S.C. § 1129(a)(12).

109. The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Section 11.01 of the Plan provides that all fees under section 1930 of title 28 of the United States Code that are due and owing as of the Effective Date will be paid by the Debtors on the Effective Date. *See* Plan Section 11.01. After the Effective Date, the Liquidation Trustee must pay any and all Statutory Fees in full in Cash when due and payable and, notwithstanding the consolidation of the Debtors under the Plan, the Liquidation Trustee must pay any applicable Statutory Fees until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. *See Id.* Accordingly, the Plan satisfies section 1129(a)(12) of the Bankruptcy Code.

**N. Sections 1129(a)(13), (a)(14), (a)(15) and (a)(16) Are Inapplicable to the Debtors**

110. Section 1129(a)(13) of the Bankruptcy Code requires that a plan of reorganization provide for the continuation, after the plan's effective date, of all retiree benefits at the level established by agreement or by court order pursuant to section 1114 of the Bankruptcy Code at any time prior to confirmation of the plan, for the duration of the period that the debtor has obligated itself to provide such benefits. The Debtors have no retiree plans subject to section 1114. *See* Issa Decl. ¶ 21. Accordingly, section 1129(a)(13) of the Bankruptcy Code is not applicable to the Plan.

111. Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. Since the Debtors are not subject to any domestic support obligations, the

requirements of section 1129(a)(14) of the Bankruptcy Code do not apply. *See Id.* ¶ 22. Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code. Because none of the Debtors is an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply. *See Id.* ¶ 23. Finally, the Debtors are moneyed, business, or commercial corporations and therefore section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of non-bankruptcy law, is not applicable to these Chapter 11 Cases. *See Id.* ¶ 23.

## O. <u>The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code</u>

112. Section 1129(b)(1) of the Bankruptcy Code allows for confirmation of a plan in cases where all requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) (i.e., the plan has not been accepted by all impaired classes of claims or interests), by allowing a court to "cram down" the plan notwithstanding objections or deemed rejections as long as the court determines that the plan is "fair and equitable" and does not "discriminate unfairly" with respect to the rejecting classes. 11 U.S.C. § 1129(b)(1).

### 1. The Plan is Fair and Equitable and Thus Satisfies Section 1129(b)(2)(B) of the Bankruptcy Code

113. Section 1129(b)(2) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of unsecured claims or interests if the plan provides that the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

114. The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code and is fair and equitable with respect to the Deemed Rejecting Classes. No Holder of any Claim or Interest that is junior to any Deemed Rejecting Class will receive or retain any property under the Plan on account of such junior Claim or Interest. Further, the Debtors do not anticipate sufficient recoveries to pay the principal amount of estimated claims in Classes 3, 4 and 5 in full (the CODI Claim alone is over $718 million).

**2. The Plan Does Not Unfairly Discriminate with Respect to the Deemed Rejecting Classes in Accordance with Section 1129(b)(1) of the Bankruptcy Code**

115. Section 1129(b)(1) prohibits a plan from unfairly discriminating against impaired classes that reject the Plan. In *In re Tribune Co.*, the Third Circuit noted that "the Bankruptcy Code does not define unfair discrimination" and then identified eight principles applicable to the analysis. *In re Tribune Co.*, 972 F.3d 228, 240 (3d Cir. 2020). Among those principles are that "unfair discrimination is determined from the perspective from the dissenting class." *Id*. at 242.

116. Here, the Plan does not discriminate unfairly with respect to the Deemed Rejecting Classes because those Claims and Equity Interests are of a different priority or nature than the Claims receiving a distribution. Holders of Intercompany Claims (Class 6) have proposed a Plan in which Intercompany Claims do not receive a Distribution and in which such claims are eliminated as a result of substantive consolidation. *See* Plan Sections 3.02(f) and 5.08(a). Subordinated Claims (Class 7) are, by definition, subject to subordination and not entitled to payment *pari passu* with General Unsecured Claims. Equity Interests likewise are subordinated to all Claims. Accordingly, the Holders in Class 7 and Equity Interests in Class 8 are not discriminated against unfairly because they are not entitled to any distribution until Holders of Claims are paid in full. Accordingly, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan.

## P. <u>Section 1129(c) - No Other Plan Has Been Proposed or Confirmed</u>

117. Section 1129(c) of the Bankruptcy Code provides that, with a limited exception, a bankruptcy court may only confirm one plan. 11 U.S.C. § 1129(c). The Plan is the only plan that has been filed in the Debtors' Chapter 11 Cases and is the only plan that satisfies the requirements of subsections (a) and (b) of section 1129 of the Bankruptcy Code. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code are satisfied.

## Q. <u>Section 1129(d) - The Plan's Purpose is Consistent with the Bankruptcy Code</u>

118. Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933." 11 U.S.C. § 1129(d). The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933, and no Governmental Unit or any other party has requested that the Court decline to confirm the Plan on such grounds. *See* Issa Decl. ¶ 24. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

## R. <u>Section 1129(e) Is Inapplicable to the Debtors</u>

119. Finally, section 1129(e) of the Bankruptcy Code is inapplicable because these Chapter 11 Cases are not "small business cases." 11 U.S.C. § 1129(e). Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements, and no party has asserted otherwise.

## S. <u>Modifications to the Plan</u>

120. Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code. Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan. Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by

all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor or the interest of any equity security holder.

121. Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated. *See, e.g., In re Federal–Mogul Glob. Inc.*, No. 01-10578 (JKF), 2007 Bankr. LEXIS 3940, at *113 (Bankr. D. Del. Nov. 8, 2007) (additional disclosure under section 1125 of the Bankruptcy Code and resolicitation of acceptances or rejections under section 1126 of the Bankruptcy Code was not required under where plan "modifications do not materially and adversely affect or change the treatment of any Claim against or Equity Interest in any Debtor").

122. Pursuant to section 1127 of the Bankruptcy Code, any modifications to the Plan described or set forth in the Confirmation Order or in any version of the Plan filed prior to the entry of the Confirmation Order constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan. In accordance with Bankruptcy Rule 3019, the Plan modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Debtors submit that the Plan, as modified, is properly before the Court and all votes cast with respect to the Plan prior to such modification should be binding and apply with respect to the Plan.

### T. Good Cause Exist to Waive the Stay of the Confirmation Order

123. Bankruptcy Rule 3020(e) provides that "unless the court orders otherwise, a confirmation order is stayed for 14 days after its entry." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code. Each rule also permits modification of the imposed stay upon court order.

124. The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry. As noted above, these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information. Moreover, each day the Debtors remain in chapter 11, they incur significant administrative and professional costs that directly reduce the amount of distributable value for creditors. *See* Issa Decl. ¶ 27.

125. Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

## IV. THE OBJECTIONS SHOULD BE OVERRULED

126. Only three parties have filed Objections to the Plan, one of which has been resolved and withdrawn.[16] Both the UST Objection and the Ferder Objection argue that the Opt-Out precludes confirmation of the Plan notwithstanding the fact that the Court has previously approved similar opt-out releases. In addition, the Ferder Objection raises various other issues, none of which have merit.

---

16 *See Notice of Withdrawal of Travelers Casualty and Surety Company of America's Limited Objection to Amended Plan and Reservation of Rights* [Docket No. 823].

## A. <u>The Release and Plan Injunction Provisions Are Appropriate</u>

### 1. Opt-Out Releases Are Consensual Releases That Do Not Contravene *Purdue Pharma*

127. The U.S. Trustee and Ferder object to the Third Party Release on the basis that the releases provided for in Section 11.09 of the Plan are purportedly non-consensual. *See* U.S. Trustee Obj. Ex. A ¶ 15; *See* Ferder Obj. ¶¶ 14-16. To reach this conclusion, both the U.S. Trustee and Ferder misinterpret and misapply the Supreme Court's decision in *Purdue Pharma*. The U.S. Trustee relies on *Purdue Pharma* to argue that the Third Party Release must be consensual under applicable state contract law. *See* U.S. Trustee Obj. ¶¶ 24-28. The U.S. Trustee then argues that the Third-Party Release is not consensual under state law because silence (*i.e.,* a party's failure to opt out of the Third Party Release) does not constitute acceptance under state law. *See Id.* ¶¶ 30-40. Ferder's argument, at its crux, is the same. *See* Ferder Obj. ¶ 16. The Debtors question Ferder's objection to the Third Party Release considering Ferder is an Excluded Party under the Plan and is not subject to the Third Party Release. Nevertheless, on the merits, these arguments are contrary to the Court's holdings following *Purdue Pharma*.

128. The existing, longstanding precedent established by this exact Court and courts within the Third Circuit and elsewhere is to approve third-party releases where creditors have the opportunity to opt out, consistently finding that, both pre-*Purdue Pharma* and post-*Purdue Pharma*, such opt out release provisions are consensual. *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third-Party Releases may be properly characterized as consensual and will be approved."); *see also In re Molecular Templates,*

*Inc., et al.*, No. 25-10739 (BLS) (Bankr. D. Del. May 29, 2025) [Docket No. 188] Hr'g Tr. 37:18-21 ("I have observed before that, consistent with my ruling in *Indianapolis Downs*, I am satisfied that the opt out structure is, when properly implemented, indeed effective to provide for releases under a confirmed chapter 11 plan.").

129. In *Purdue Pharma*, the Supreme Court expressly declined to opine on consensual third-party releases and only addressed whether a bankruptcy court may approve a plan of reorganization with a release and injunction that extinguishes claims against non-debtor third parties without the consent of affected claimants, holding that it may not. *Purdue Pharma*, 603 U.S. at 226. The Supreme Court expressly stated: "Nothing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy organization plan." *Id.* Thus, by its express terms, nothing in *Purdue Pharma* disturbs the Court's existing jurisprudence with respect to consensual releases and, given the Supreme Court's guidance on this point, the Court is fully entitled to rely on existing precedent.

130. Nevertheless, in the two years since *Purdue Pharma*, the U.S. Trustee has filed countless objections asserting the exact same or similar arguments to those raised in the U.S. Trustee Objection and the Ferder Objection, which have been overruled by courts in this jurisdiction time after time. In addition to the cases discussed above, in *In re Amerifirst Financial, Inc., et al.*, Judge Horan expressly rejected and overruled arguments (similar to those raised here), noting that those creditors "who returned ballots and did not check an opt-out box … clearly had the opportunity and did, in fact, review the [third-party release] materials. In short of an opt-in, which I'm not prepared to require, I can't think of anything else that would evidence affirmative consent more than having had the opportunity to [opt out], and actually having returned a ballot and not to tick the box to opt out of the releases." No. 23-11240 (TMH) (Bankr. D. Del. Jan. 13,

2026) [Docket No. 1225] Hr'g Tr. 40-41. Similarly, Judge Stickles ruled repeatedly that *Purdue Pharma* did not change the law on consensual third-party releases and applicable law continues to permit courts to approve opt outs in chapter 11 cases. *See In re Lumio Holdings, Inc., et al.*, No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025) [Docket No. 428] (indicating that the Court does not disapprove of opt-outs generally and applies a case-by-case analysis to determine whether the opt-out mechanism is appropriate under the circumstances); *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. Jan. 24, 2025) [Docket No. 1756] Hr'g Tr. 27:12-15 (finding an opt out consensual where it is applied to parties who affirmatively made the decision to submit a ballot and did not check the opt out box).

131. The analysis employed by, and ultimate conclusion of, bankruptcy courts addressing this very issue over the past two years applies with equal force. *Purdue Pharma* did not change the law on consensual third-party releases and applicable law continues to permit the Court to approve the Third-Party Release in the Chapter 11 Cases.

132. The Debtors submit that the Third-Party Release is consensual, proper, and consistent with the law in this Circuit. The Ballots approved by the Court and distributed to Holders of Claims entitled to vote on the Plan and the notices distributed to Unimpaired Holders who are receiving a full recovery under the Plan and are entitled to opt out of the Third-Party Release quote the entirety of the release that would be given in bold and clearly informs holders of the implications of failing to opt out of the Third-Party Release. There is also no argument made by either the U.S. Trustee or Ferder that the proposed Third-Party Release and the consequences thereof are not clearly and conspicuously stated. To safeguard against potential overlooking, the Ballots and notices distributed to Holders of Claims entitled to opt out of the

Third-Party Release contain the opt out in bolded text and in prominent format in the center of the page.

133. While conspicuous disclosure on the Ballots and notices is sufficient, the Debtors provided ample additional notice of the terms of the releases to all creditors, as they were contained in virtually all solicitation materials distributed. The Disclosure Statement, Ballots, Notice of Non-Voting Status, and Opt-Out Form, among other documents, conspicuously state the terms of the Third Party Release in bold font.

### 2. The Opt-Out Election Is Appropriate

134. Ferder, of course, is not subject to Section 11.09 of the Plan. First, Ferder made a valid Opt-Out Election. *See* Voting Certification, Ex. B-1. Second, Ferder is an Excluded Party (Plan Section I.69) and, thus, is not a Releasing Party. *See* Plan I.129 (proviso that "no Excluded Party is a Releasing Party") and Plan Section 11.09 (releasing claims held by "Releasing Parties").[17] Ferder is subject to Sections 11.06, 11.07, and 11.08 of the Plan because those provisions are not nonconsensual third party releases and are expressly binding on creditors and equity interest holders whether or not they are bound by Section 11.09. The Plan, Disclosure Statement, Ballots, and notices all make clear that the Opt-Out Election only applies to the release under Section 11.09 of non-Debtor Released Parties and other releases, injunctions, and exculpations are still applicable.[18]

---

[17] The Debtors have added specific language to the Confirmation Order making absolutely clear that Ferder is not granting the Third-Party Release. That revision alone justifies overruling his objection to confirmation on this point.

[18] *See*, e.g., Plan Section I.106 (definition of Out-Out Election) and Section 11.05; Disclosure Statement Section I.B.4 ("T**he Opt-Out Election is only for the releases set forth in Section 11.09 of the Plan. All other releases, injunctions, and exculpations will be binding on all Persons and entities as set forth in the Plan.**") (emphasis in Disclosure Statement) and IV.L.5 ("Any Holder of a Claim or Equity Interest that makes an Opt-Out Election is not bound by the release of non-Debtor Released Parties in Section 11.09 of the Plan but is bound by the other releases, exculpations, and injunctions in the Plan."); Class 4 (General Unsecured Claims) Ballot at p. 3 ("YOU MAY OPT-OUT OF THE RELEASE OF NON-DEBTOR PARTIES SET FORTH IN SECTION 11.09 OF THE PLAN (BUT NOT ANY OTHER RELEASE, INJUNCTION, OR EXCULPATION) BY MAKING THE

135. Sections 11.06 through 11.08 are typical provisions appropriately included in the Plan. Section 11.06 is a plan injunction that implements section 1141(c) of the Bankruptcy Code. Section 1141(c), in turn, provides that "the property dealt with by the plan is free and clear of all claims and interests of creditors [and] equity security holders." 11 U.S.C. § 1141(c). The Plan, thus, appropriately enjoins creditor and equity interest holder conduct that is contrary to the statutory dictate that property dealt with by the plan is "free and clear" of all claims and interests. *See* 11 U.S.C. § 1141(c). Section 11.07 of the Plan is a narrowly and appropriately tailored exculpation provision no broader than permitted by Third Circuit law. *See PWS Holding*, 228 F.3d. at 246-247. Exculpation is appropriate even where nonconsensual third party releases are not. *See In re Wash. Mut.* 442 B.R. at 352 (noting that estate fiduciaries may be exculpated but that the court "has previously held that it does not have the power to grant a third party release of a non-debtor."). Section 11.08 of the Plan is a release by the Debtors and their estates, which is expressly permitted by section 1123(b)(3)(A) of the Bankruptcy Code. Nothing in the Bankruptcy Code requires any opt out for these provisions.

136. The Plan, as is common, preserves causes of action against some or all other parties. Ferder is not unique – there are other Excluded Parties as well, and the Debtors are preserving their Causes of Action against all parties (except those expressly released in Section 11.08), some of whom are identified as Excluded Parties (including Grant Thornton and one of the Debtors' current officers). *See Plan Supplement* Ex. D and Plan Section I.69.

---

OPTOUT ELECTION IN ITEM 3.") (all-caps in original); Confirmation Hearing Notice at pp. 3-4; ("**YOU MAY OPT-OUT OF THE RELEASE OF NON-DEBTOR PARTIES SET FORTH IN SECTION 11.09 OF THE PLAN (BUT NOT ANY OTHER RELEASE, INJUNCTION, OR EXCULPATION) BY MAKING THE OPT-OUT ELECTION ON THE OPT-OUT ELECTION FORM OR ON YOUR BALLOT.**") (emphasis and all-caps in original)

137. Nor does the Plan deprive Ferder of any of his rights to pursue defenses, claims, cross-claims, or counterclaims (presumably in connection with the Adversary Proceeding commenced in this Court against him (Adv. Proc. No. 26-50528 (BLS)) (the "Adversary Proceeding") in a manner inconsistent with applicable law. He can assert any claims and defenses in the Adversary Proceeding, and in the unlikely event he is entitled to a recovery, he can receive his treatment under the Plan just like other creditors in the same class. Of course, his assertion of claims (or setoff rights) is subject to the Bar Date and seeking to exercise his setoff rights pre-confirmation. *See In re Continental Airlines,* 134 F.3d 536, 541-542 (3d Cir. 1998) (creditors who do not assert a setoff right in a timely filed proof of claim may lose those rights).

138. There is no due process violation. Ferder (and other creditors) had adequate notice and a meaningful opportunity to be heard, and in Ferder's case, actually to contest the release provisions and to conduct discovery in support of his confirmation objection.

139. Finally, the Debtors have added language to the proposed Confirmation Order to address certain of Ferder's concerns. A blackline comparing Ferder's requested language and the currently proposed language is attached hereto as **Exhibit A**. As is evident, the principal dispute is over Ferder's desire to be carved out from Sections 11.06 through 11.08 of the Plan, as well as potentially other provisions. There is no basis for Ferder to receive unique, special treatment under the Plan by carving him out of provisions that he simply does not wish to be bound by. The Court should not include any additional language in the Confirmation Order.

### 3. The Debtor Release and Injunction Do Not Improperly Function as a Discharge Prohibited by 11 U.S.C. § 1141(d)(3)

140. A debtor in a liquidating chapter 11 case does not receive a discharge, 11 U.S.C. § 1141(d)(3), and the Plan makes clear that the Debtors are not receiving a discharge. *See* Plan Section 11.10 ("Notwithstanding anything to the contrary in this Plan, and consistent with 11

U.S.C. § 1141(d)(3), the Debtors do not receive a discharge."). Nevertheless, Ferder erroneously argues that Section 11.06 and Section 11.08 provide relief broader than a discharge.

141. According to Ferder, Section 11.08 "sweeps in derivative actions that creditors like Mr. Ferder" could assert and thus improperly releases non-Debtors because the releases are also given "on behalf of ... any and all other Entities who may purport to assert any Claims or Causes of Action, directly or derivatively, by, through, for, or because of the foregoing entities on behalf of the Debtors." Obj. ¶ 25. Ferder is simply wrong. Section 11.08 only brings in claims of non-Released Parties who can bring such claims *directly or derivatively, by, through, or because of the foregoing entities on behalf of the Debtors.* Plan Section 11.08 (emphasis added). As the Supreme Court noted in *Purdue Pharma*, derivative actions belong to the estate, and thus a debtor can properly resolve derivative claims. *See Purdue Pharma*, 603 U.S. at 219 (a "bankruptcy court may resolve derivative claims under [section 1123(b) of the Bankruptcy Code] . . . because those claims belong to the debtor's estate."). Section 11.08 is consistent with the law. Ferder and other non-Releasing Parties are only releasing claims such parties could otherwise assert *by, through*, or because of the foregoing entities *on behalf of the Debtors.* (Emphasis added.) Thus, Section 11.08 is providing a release of claims that are property of the estate under section 541 of the Bankruptcy Code and for which creditors are bound by the trustee's (or debtor in possession's) actions, including a settlement. *See In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014).

142. Nothing in Sections 11.06 or 11.09 of the Plan compounds this problem. Section 11.06 does not constitute a discharge of the Debtors because it is an injunction limited to claims against property "dealt with" by the Plan. Those claims cannot be pursued because section 1141(c) of the Bankruptcy Code provides that such property is "free and clear" of those claims.

Section 11.06 does not discharge any personal liability of the Debtors.[19] Under Section 11.09 of the Plan, Releasing Parties (and Ferder is not a Releasing Party) are consensually releasing certain third parties. But that release is a voluntary release and thus not a "discharge" within the meaning of section 1141(d) of the Bankruptcy Code because a discharge (unlike a consensual release) binds all creditors regardless of whether they have accepted the plan and creditors cannot simply elect to opt out of a discharge. 11 U.S.C. § 1141(a).

**4. The Plan Injunction Is Not a Third Party Release**

143. Ferder argues that the Plan Injunction (Plan Section 11.06) is an impermissible third party release. He says that 11.06(c) of the Plan (parties accepting a distribution are deemed to consent to the injunction) presents parties with a Hobson's choice – those parties must either forego a distribution or forfeit an ability to pursue independent actions. Objection ¶ 32. But there is no Hobson's (or any) choice. Section 11.06(c) of the Plan does not preclude Ferder from pursuing actions that are not property of the estate or that do not otherwise belong to the Debtors. Indeed, nothing in Section 11.06 purports to preclude Ferder from bringing such direct actions against third parties – a proposition made crystal clear in the revised language included in the proposed Confirmation Order.[20]

144. Section 11.06 of the Plan applies to "property dealt with by the Plan" (Sections 11.06(a)(i), (ii) and (iii) of the Plan);[21] setoff against any debt, liability, or obligation due

---

[19] Here, all of the Debtors' property is "dealt with" by the Plan and is being transferred to the Liquidation Trust or, in the case of the Tax Refund, being held by the Post-Confirmation Debtor in trust for the Liquidation Trust and thus cannot be reached by any creditors of the Debtors.

[20] The language included in the Confirmation Order that is intended to address a portion of Ferder's Objection is similar to the language he included in his Objection, but omits the language proposed by Ferder that would carve him specially out of the Section 11.07 Exculpation and Section 11.08 Debtor Release provisions.

[21] Ferder takes issue the injunction using the "vague" term "dealt with." To clarify for Ferder, all of his Claims, Equity Interests, and Causes of Action are "dealt with" under the Plan – they will either be disallowed or Allowed, and if Allowed, will receive the treatment afforded to such Claims, Equity Interests, and Causes of Action under the Plan. The definition, much like the definition of claim under section 101(5) of the Bankruptcy Code, is intended to cover all of his Claims and Causes of Action against the estates. He also recognizes that all property

to the Debtors (which is likewise property of the estate that is dealt with by the plan) (Section 11.06(a)(iv) of the Plan); and interference with the implementation or consummation of the Plan or related documents or transactions (Section 11.06(a)(v) of the Plan). These provisions are consistent with section 1141(c) of the Bankruptcy Code. *See* 11 U.S.C. § 1141(c). Nor does Section 11.06 of the Plan interfere with Ferder's asserted claim for indemnification and contribution against non-Debtor parties. Ferder has not pointed to a single provision of the Bankruptcy Code that Section 11.06 violates. Accordingly, Section 11.06 of the Plan is consistent with the Bankruptcy Code for purposes of section 1123(a)(6) of the Bankruptcy Code and does not contravene *Purdue Pharma*.

145. If any of Ferder's claims asserted against third parties really belong to solely to Ferder and cannot be asserted by the Debtors, those claims are unaffected by Section 11.06 of the Plan. But Ferder cannot pursue claims, whether derivative or otherwise, that are fundamentally claims of the Debtors, including any derivative claims or avoidance actions subsumed by section 544(b) of the Bankruptcy Code and that have either been released under the Plan or transferred to the Liquidation Trust.

## B. **The CODI Settlement Delivers a Beneficial Result to Creditors, Satisfies Section 1123(b)(3), and Should be Approved**

### 1. **Investigation of Claims Against CODI**

146. A significant component of the Plan and a driver of the distributions to creditors thereunder, as well as a focus of Ferder's Objection, is the settlement with CODI. The importance of the CODI settlement is driven by the Debtors' capital structure, which consists in relevant part

remaining is "dealt with" by the Plan. That is the case. Section 1141(c) of the Bankruptcy Code – which Ferder ignores in his Objection –specifically provides for this by providing that "property dealt with by the plan is free and clear of all claims and interests of creditors" and equity interest holders. That protects the Debtors' property that is funding distributions to creditors, from being seized or otherwise affected by the claims of existing creditors and interest holders. If Ferder does not like the term "dealt with," he must take that up with Congress.

of (i) $718 million in obligations owed to CODI, which CODI asserts are secured by valid and perfected liens on and security interests in substantially all of the Debtors' assets, (ii) approximately $212 million to $260 million in estimated allowed unsecured claims, and (iii) equity interests. *See* Disclosure Statement § B. The asserted size and relative seniority of the CODI secured claim means that unsecured creditors would receive little to no recovery in these chapter 11 cases unless CODI's liens and security interests are avoided *and* the overwhelming majority of CODI's claims are disallowed or subordinated.

147. Both the Special Committee and the Creditors' Committee investigated CODI's conduct in connection with the allegedly fraudulent activities of Mr. Ferder. The Special Committee's investigation included the engagement of counsel from Barnes & Thornburg LLP and Steptoe LLP. Over a seven-month period, counsel collected over 1.2 million documents from various parties and conducted a target review of those documents. Counsel also conducted 29 interviews of 23 relevant individuals and parties. CODI's participation in those interviews was strictly limited to eight of the current or former CODI personnel. *See* Wells Decl. ¶ 12.

148. The Special Committee's investigation concluded that there were numerous meritorious claims that Lugano could bring against CODI, including objections seeking the disallowance of CODI's claims. *See Id*. ¶ 14. The Creditors' Committee's complementary investigation, which focused principally on grounds for subordinating CODI's claims, concluded that there were also numerous bases for such subordination. The claims identified by both the Special Committee and the Creditors' Committee included, without limitation, claims that CODI or its agents breached fiduciary duties owed to the Debtors. *See id*.

149. Both the Creditors' Committee and the Special Committee believed that the claims against CODI were meritorious and would have provided substantial value to the Debtors' estates.

CODI consistently denied (and continues to deny) that it has liability to the Debtors on any such claims, that its liens and security interests in the Debtors' assets are valid, and that any damages incurred by the Debtors' estates are negligible even if the claims against CODI were meritorious.

150. The Debtors, the Special Committee, and the Creditors' Committee were mindful of the risks posed by litigation with CODI. CODI's dominant position in the Debtors' capital structure meant that only an overwhelming litigation victory over CODI would have allowed for any distributions to unsecured creditors. If, for example, CODI's claim were reduced but allowed as a secured claim, CODI would be entitled to the vast majority of the Debtors' value. Even if CODI's liens and security interests were avoided in full, CODI's unsecured claims would still entitle it to over 75% of the estates' value. *See* Wells Declaration ¶ 16 and Ex. A.

151. Other factors also weighed on the potential pursuit of claims against CODI. It is beyond dispute that litigation with CODI would have been lengthy and costly to the Debtors or any successor, depleting eventual recoveries for non-CODI creditors. Prosecuting such litigation would have consumed most of the Debtors' energies for years (in all likelihood) to come, and would have prevented meaningful distributions to unsecured creditors during the period while the litigation was pending. CODI is well-funded and would have been capable of and incentivized to mount a formidable defense to the claims against it. The parties were mindful of all of these factors in determining how to proceed in asserting and potentially resolving the claims they identified against CODI. *See* Wells Decl. ¶ 18 and Ex. A.

152. With these considerations in mind, the Debtors, the Special Committee, the Creditors' Committee, and CODI participated in a two-day voluntary mediation in May 2026 overseen by the Honorable Lee R. Bogdanoff (Ret.) in Los Angeles, California. In that mediation, the parties exchanged their views on the merits of the claims identified by the Creditors'

Committee and the Special Committee, and the defenses thereto identified by CODI. The parties also considered litigation uncertainties, the costs associated with prosecuting and defending the claims, and the delay in making distributions to non-CODI creditors and fully administering the Debtors' estates.

153. The mediation was successful. The resulting settlement, which is documented in the Plan and the CODI Settlement Agreement, provides for distribution of approximately 65% of the Debtors' current cash and liquid assets to the Liquidation Trust for the benefit of the holders of Class 4 General Unsecured Claims. Those holders also receive the proceeds of 75% of most litigation pursued by the Liquidation Trust, and 55% of the proceeds of claims against Grant Thornton, as CODI's (and the Debtors') outside auditors. CODI receives the balance of the Debtors' cash and liquid assets and litigation proceeds, as well as releases from claims that might be asserted by the Debtors' estates, as set forth in Section 3.02(c) of the Plan.

154. The CODI Settlement delivers beneficial results to creditors on its face. The Debtors expect to have roughly $117 million to $131 million in assets available for distribution to creditors as of the Effective Date, exclusive of future litigation proceeds. *See* Liquidation Analysis. Approximately $72 million to $83 million of that will go to holders of General Unsecured Claims, while $43 to $46 million will go to CODI. In percentage terms, roughly 63% of the Estates' assumed recoveries at the Effective Date goes to holders of General Unsecured Claims, while 37% goes to CODI. *See id.* Future litigation recoveries from all parties other than Grant Thornton go to general unsecured claimholders on a 75%/25% basis with CODI as well, and Grant Thornton recoveries are allocated 55% to general unsecured creditors.

155. This result is comparable to what the Debtors' Estates would achieve in a significant litigation victory over CODI. Assuming $250 million in Allowed General Unsecured

Claims,[22] even fully avoiding CODI's liens and security interests would result in an allocation of approximately 74% of the estates' value to CODI and 26% to the holders of General Unsecured Claims. To get a result similar to the Plan and the CODI Settlement, the estates would have to avoid all of CODI's liens and security interests *and* obtain disallowance or subordination of roughly $570 million of CODI's $718 million claim, without taking into account delay, litigation risk, and costs.

156. In short, the Plan and the CODI Settlement delivers a risk-free allocation of value between CODI and the holders of General Unsecured Claims that results in near-term distributions to all parties at minimal cost and with finality to a long-running and complex dispute. The CODI Settlement is fully supported by both the Creditors' Committee (as the representative of the holders of General Unsecured Claims) and CODI – as well as all but three of the creditors eligible to vote in Classes 4 and 5 -- as fair and reasonable.

**2. Standard of Approval for the CODI Settlement**

157. The CODI Settlement should be evaluated under the well-established standard governing compromises incorporated into a chapter 11 plan. Under Bankruptcy Code § 1123(b)(3)(A), a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). Courts in the Third Circuit consistently apply the same standard to settlements embodied in a plan that they apply to settlements approved under Bankruptcy Rule 9019. *See, e.g., In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761, 762-63, 772-73 (Bankr. D. Del. 2018).

---

[22] The Liquidation Analysis provides for a range of estimated Allowed General Unsecured Claims of $212 million to $260 million. *See* Liquidation Analysis. The June 15, 2026 presentation to Lugano's Board of Directors modeled potential recoveries to CODI and to unsecured creditors assuming hypothetical Allowed General Unsecured Claims at $100 million and $200 million, respectively, solely for illustrative effect and without the benefit of the later-created Liquidation Analysis.

158. The governing standard under Bankruptcy Rule 9019, in turn, derives from the Third Circuit's decision in *Myers v. Martin (In re Martin)*, 91 F.3d 389 (3d Cir. 1996). Under the Martin standard, a bankruptcy court must determine whether the proposed compromise is fair and equitable by considering: (i) the probability of success in the litigation; (ii) likely difficulties in collection; (iii) the complexity, expense, inconvenience, and delay associated with continued litigation; and (iv) the paramount interests of creditors. *See id.* at 393, *Woodbridge*, 592 B.R. at 773. Each of these factors is discussed in turn below.

159. Importantly, the court is not required to determine whether the settlement is the best possible resolution. Rather, the court need only determine that the settlement falls within a reasonable range of litigation possibilities. *See Washington Mutual* 442 B.R. at 314, 338 (Bankr. D. Del. 2011) (*citing In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004)). Therefore, the settlement need only be above the "lowest point in the range of reasonableness." *Woodbridge*, 592 B.R. at 773 (quoting *In re Exide Techs.*, 303 B.R. 48, 68 (Bankr. D. Del. 2003)); *see also In re Tribune Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) (holding that a settlement need not be the best possible compromise and need only fall within a range of reasonable litigation outcomes).

**a. The CODI Settlement Yields a Result Comparable to Successful Litigation**

160. The first *Martin* factor is satisfied because the CODI Settlement delivers recoveries to holders of General Unsecured Claims that are comparable to what the estates would achieve in successful litigation with CODI. The CODI Settlement delivers over 60% of the estates' value to the holders of General Unsecured Claims, as the beneficiaries of any claims against CODI, exclusive of future litigation recoveries. The CODI Settlement also allocates a majority of the proceeds of future claims pursued by the Liquidation Trust to the holders of General Unsecured

Claims, further enhancing their recoveries under the Plan. Holders of General Unsecured Claims are projected to receive recoveries of 28% to 39% under the Plan, while CODI receives 6% to 6.4%. *See* Liquidation Analysis. All of this value is delivered immediately, at minimal cost, and without litigation risk.

161. This is a strong result for unsecured creditors. It inverts the traditional recovery priority and delivers most of the estates' value to holders of General Unsecured Claims notwithstanding the dominant secured position that CODI has in the Debtors' capital structure. Overcoming that position would require the estates both to avoid CODI's liens and security interests in their entirety and obtain the disallowance or subordination of roughly $570 million of CODI's $718 million claim. Holders of General Unsecured Claims receive a percentage recovery roughly five times that of CODI, notwithstanding CODI's liens and security interests, quickly and at minimal cost. There is no assurance, of course, that any of these results could be achieved in further litigation with CODI, let alone all of them.

162. As one illustration of the difficulty in overcoming CODI's secured position and claims, the Debtors borrowed $102 million from CODI on September 7, 2021 – the day Mr. Ferder sold a 60% stake in the Debtors to CODI. If only that portion of CODI's secured claim were allowed as a secured claim, CODI would receive roughly 78% of the estates' distributable value as of the Effective Date (i.e., $102 million / $130 million), while 22% would go to unsecured creditors. The estates would therefore have to demonstrate that CODI's malfeasance was so pervasive as to justify invalidating its liens and security interests from the moment it first bought the business from Ferder, or the result for unsecured creditors would be worse than the CODI Settlement on that one issue alone. The CODI Settlement avoids that risk and delivers favorable,

certain, near-term recoveries for creditors that are well within the range of reasonable legal outcomes.

163. Ferder, as the only objector to the CODI Settlement, ignore this analysis and instead dismiss the settlement as "a sweetheart deal." Ferder Objection at 4. They claim that litigation would have led to a better result for unsecured creditors than the CODI Settlement. *See id.* at 5 ("[h]ad those claims been pressed in litigation, rather than settled in the sweetheart CODI Settlement Agreement, then CODI's claim almost certainly would have been significantly below the level Debtors gave to CODI in settlement").

164. Ferder provides absolutely no support or evidence for this extraordinary claim. This failure is particularly remarkable given that Mr. Ferder claims to be in possession of damning evidence against CODI that he has not put before the Court nor even credibly described. *See id.* at 5. Ferder has introduced no documentary evidence whatsoever to support his assertions that a better settlement could have been had. Moreover, when asked about the basis for his Objection on this point, Mr. Ferder invoked his Fifth Amendment right against self-incrimination. When questioned under oath on what information he had "that supports the contention . . . that the CODI settlement is not reasonable", or "the factual basis of [his] objections to the CODI settlement", Ferder repeatedly invoked the Fifth Amendment right against self-incrimination. Ferder Dep 67:4- 7; 57:5-8. A bankruptcy court has full discretion to draw an adverse inference from Ferder's invocation. *See In re Vision Adventures, LLC*, 544 B.R. 277, 285 (Bankr. D.R.I. 2016) (noting that the privilege against self-incrimination "does not compel the trier of fact in a civil proceeding to accept the assertion of the Fifth Amendment as proof of innocence . . . Quite to the contrary, 'a bankruptcy court may draw a negative inference from the invocation of the Fifth Amendment privilege.'") (citations omitted); *see also In re Jacobs*, 394 B.R. 646, 663 (Bankr.E.D.N.Y.2008)

("It is similarly well established that the testimonial assertion of the Fifth Amendment is not a substitute for relevant and persuasive evidence.").

165. In addition to their failure of proof, Ferder ignores the applicable legal standard. The question before this Court is whether the CODI Settlement delivers a result for the estates above the "lowest point in the range of reasonableness." *Woodbridge*, 592 B.R. at 773 (*quoting In re Exide Techs*., 303 B.R. 48, 68 (Bankr. D. Del. 2003)). The answer is yes, based on the recoveries achieved and the comparison to what creditors might get after years of costly litigation against a well-funded opponent.

166. Ferder instead contends that CODI should be "giving up so much more than it is." *See* Ferder Disclosure Statement Objection at 2. That argument is again unsupported by the evidence. Ferder has not introduced any evidence showing – let alone proving – that CODI should objectively receive less, and the unsecured creditors more, than the recoveries provided in the Plan. They rely instead on unproven, unsupported allegations of CODI's malfeasance. The Debtors, the Special Committee, and the Creditors' Committee all agree with Ferder that Debtors' estates have meritorious claims against CODI. The only difference is Ferder's unsupported belief that those claims would inevitably result in complete victory over CODI with no litigation risk. Nothing in the record demonstrates they have any basis for such a belief.

167. Ferder also argues that the CODI Settlement provides only "speculative, structurally underfunded litigation paper" to holders of General Unsecured Claims. *See* Ferder Obj. at 5. This is false. The Debtors' liquidation analysis shows that there are $117 million to $131 million in assets available for distribution to creditors, including cash, proceeds of inventory

liquidation, and the Tax Refund, but excluding litigation recoveries.[23] Those assets are distributable in the near term to creditors with little to no risk and minimal cost.

168. In contrast, Ferder's proposed approach would saddle holders of General Unsecured Claims with a speculative outcome. Those holders' recoveries would be dependent on finding funding for, and funding to support, a future settlement with or litigation victory over CODI; while distributions would be deferred pending resolution of the legal disputes and litigation with CODI. The outcome of those disputes, moreover, is far from certain, but would have to be highly successful to achieve – in the future and after considerable cost – an outcome comparable to what the Plan and the CODI Settlement deliver today.

**b. Likely Difficulties in Collection**

169. The Plan supporters do not assert that there are any likely difficulties in collection from CODI were litigation to be successfully pursued.

**c. Litigation of the Estates' Claims Against CODI Would Be Costly, Expensive, and Time-Consuming**

170. The CODI Settlement, like nearly all settlements, reduces the complexity, expense, inconvenience, and delay to the estates in making distributions. *See In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006) ("[i]t is axiomatic that a settlement will almost always reduce the complexity and inconvenience of litigation"). The CODI Settlement facilitates near-term

[23] Ferder also alleges that "[t]he entire Plan is built on the pursuit of speculative, highly contested litigation against Mr. Ferder and Grant Thornton." Disclosure Statement Objection ¶ 66. This too is untrue. The Liquidation Analysis does not fix a value to any claims of the estates against either Mr. Ferder or Grant Thornton (or any other litigation claims) for purposes of setting the illustrative creditor recovery percentages discussed herein. *See* Liquidation Analysis. Rather, creditors will receive those proceeds over and above the proceeds from assets available for distribution on the Effective Date.

distributions to holders of General Unsecured Claims from assets already held by the estates with certainty.

171. The prospect of litigation with CODI amplifies the importance of this factor in approving the CODI Settlement. While the Special Committee and the Creditors' Committee believe the Estates' claims against CODI are meritorious and valuable, it is beyond dispute that litigation of those claims would be lengthy and expensive. CODI is a well-funded public company that would be expected to mount a substantial defense. Both the Special Committee and the Creditors' Committee considered these factors as substantial grounds in recommending the CODI Settlement. *See* Wells Decl. ¶ 18.

172. This factor is also made more important because Ferder says that litigation with CODI is their preferred alternative to the CODI Settlement. Specifically, Ferder suggests they wish to propose a plan substantially similar to the Plan already on file but with the CODI Settlement removed.[24] Their only approach is to dive into the costly and protracted litigation that the CODI Settlement avoids. This factor accordingly weighs in favor of approving the CODI Settlement.

**d. The CODI Settlement Is in the Creditors' Best Interests**

173. The CODI Settlement satisfies the "paramount interest of creditors" factor under Martin because the creditors themselves overwhelmingly support it. All voting classes voted to accept the Plan. Indeed, only three holders of general unsecured claims (excluding Mr. Ferder)

---

[24] *See Objection of the Ferder Parties to the Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to (A) File a Chapter 11 Plan and (B) Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the* Bankruptcy *Code and (II) Granting Related Relief* (D.I. 739) at 2 (describing similar alternative plan "only without the CODI settlement") and ¶ 28 (objecting to exclusivity extension because "…Ferder Parties are denied the opportunity to propose a plan").

voted to reject the Plan, with 99.9% in amount of such claims voting to accept. The Creditors' Committee was fully involved in negotiating the CODI Settlement and supports it.

174. Case law in this District properly places substantial weight on creditor support for a compromise. In *Woodbridge*, Judge Carey approved a global settlement in a Ponzi scheme-related case over dissenting creditors' objections because it represented an arm's-length resolution of highly contested disputes, avoided lengthy and expensive litigation, and enjoyed overwhelming support from voting creditors. 592 B.R. at 773–75. The court emphasized that the "paramount interest of creditors" strongly favored approval where creditors overwhelmingly voted for the plan embodying the settlement. *Id*. at 774–775. The same factors apply here.

175. Similarly, in *Tribune*, Judge Carey found the support of the creditor constituencies key in approving a complex settlement of causes of action against the Debtors' prepetition lenders over the objections of certain dissenting creditors, who preferred to preserve those causes of action for later litigation. There, as here, the debtors' creditors voted resoundingly to accept the Plan. There, also as here, the Creditors' Committee was actively involved in the settlement negotiations and supported the settlement. Judge Carey concluded that the creditors' committee's support and the votes of creditors in favor of the plan "weigh heavily in favor of approval of the settlement." *Id*. at 175–76.

176. Ferder maintains, in essence, that everyone is wrong about the CODI Settlement except him. He provides no evidence as to why he is right and everyone else is wrong. Instead, he offers repeated, unsupported accusations that the CODI Settlement is a "sweetheart deal," that the unsecured creditors would feel differently if they knew what he knows (but which he has chosen not to tell them), and that the investigations by the Special Committee and the Creditors' Committee must have been compromised. None of this is supported by the proffer of evidence (or

even credible on its face), and it certainly doesn't satisfy the Ferder's heavy burden to show why his judgment should be substituted for the unsecured creditors' support of the Plan and the CODI Settlement.

**e. The Scope of the CODI Release Is Essential to the CODI Settlement**

177. Ferder objects to the Debtors releasing CODI for actual fraud, willful misconduct, and gross negligence claims to the extent covered by the CODI Settlement Agreement. The broad release is a fundamental component of the CODI Settlement. CODI is foregoing tens of millions of dollars in value to buy peace. No economically rational actor would pay that much money only to leave open potential claims for fraud from the party it is settling with – particularly in a case arising from an alleged fraudulent scheme and in which the alleged fraudster accuses the settling party of being "most culpable for the debtor's collapse." *See* Ferder Objection ¶ 41.

178. A settlement agreement (or a chapter 11 plan) may release claims for actual fraud, willful misconduct, or gross negligence. *See In re Salander*, 450 B.R. 37, 47 (Bankr. S.D.N.Y. 2011) ("A bankruptcy Trustee may litigate or settle and release claims based upon fraud and forgery."). *See also In re SemCrude L.P.,* 796 F.3d 310, 321 (3d Cir. 2015) ("Accordingly, the Oklahoma Plaintiffs' claims for negligent misrepresentation and fraud are derivative of the claims belonging to—and, importantly, released by—the Litigation Trust"). Global releases, and releases for fraud, are common in settlement agreements. And, if releases for fraud, gross negligence, or willful misconduct were prohibited, how could an estate ever settle with a third party accused of such conduct?

179. The broad releases here are proposed in good faith as part of a settlement. The settlement far exceeds the lowest point in the range of reasonableness, provides estimated value of

more than $70 million to unsecured creditors, and has been overwhelmingly accepted by creditors– is appropriate. This is a textbook example of a fair, reasonable, and equitable settlement.

180. Ferder's opposition looks at the CODI Settlement solely from his perspective – that of a non-settling defendant. But, as noted above, his rights against third parties are preserved (unless he erroneously thought he could bring Causes of Action that are property of the estate or otherwise appropriately pursued by the Debtors). That Ferder, unlike CODI, could not reach an agreeable resolution with the Debtors, the Creditors' Committee, and the Special Committee is not evidence of a lack of good faith or an ulterior or improper motive. It has a far simpler explanation – settlement consideration. CODI agreed to forego sufficient consideration for the Special Committee, the Creditors' Committee, and the Debtors to settle the Estates' claims. Ferder did not.[25]

**C. <u>Substantive Consolidation is Justified in these Circumstances</u>**

181. There are three independent reasons that the Plan's common treatment of claims and liabilities through consolidation should be approved by this Court.

**1. *Owens Corning* Does Not Bar Confirmation of the Plan**

182. Ferder objects to the substantive consolidation of the Debtors arguing that the Debtors fail to satisfy the *Owens Corning* test. *See In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).

183. *Owens Corning* establishes parameters for when substantive consolidation can be approved *absent consent*. *See id.* at 211 ("In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought . . ."). Here, substantive

[25] Ferder notes a difference in the fraud exception in Section 11.08 and Section 11.09 of the Plan. Whether there is a distinction between "actual fraud" and "actual intentional fraud" need not be addressed by the Court; the Debtors have revised Section 11.09 to delete the word "intentional."

consolidation is fundamentally consensual – as all Voting Classes overwhelmingly have accepted the Plan and Ferder is the sole objecting party in interest. No legitimate creditor holding claims against multiple Debtors voted against the Plan.

184. Ferder does not fall within the ambit of *Owens Corning*. *Owens Corning* protects creditors who relied on corporate separateness. *See id*. at 210. "If an objecting creditor relied on the separateness of the entities, consolidation cannot be justified vis-à-vis the claims of that creditor." *Id*. Ferder offers no evidence whatsoever that he relied on the separate legal status of any of the Debtors.[26] His only claim (as opposed to his equity interest) is against Lugano Diamonds, the principal operating Debtor – a factual scenario diametrically opposed to the situation in *Owens Corning* where the lenders obtained structural seniority via subsidiary guarantees that other creditors did not have. Thus, while the Third Circuit left open the possibility of partial consideration providing additional consideration to the creditor relying on separateness (*Id*. at n.10), Ferder is not such a creditor; those creditors with the benefit of guarantees consented by not objecting to the Plan or and voting to accept the Plan. *See* Voting Certification, Exh. A-2.

185. Moreover, unlike the objecting creditors in *Owens Corning*, creditors of Lugano Diamonds economically benefit by substantive consolidation. Assuming his claim is allowed, substantive consolidation increases his recovery substantially. Any diminution on account of *de minimis* dilution caused by consolidation to Class 4 Claims against Lugano Diamonds is outweighed by the substantial increase in value coming from the CODI Settlement and is entirely offset by the costs that would be imposed from additional Administrative Claims incurred in allocating the Debtors' assets and liabilities. *See* Issa Decl. ¶ 26.

[26] It would be remarkable indeed if the Debtors' longtime CEO alleged that he had relied on the Debtors' corporate structure being something other than it had been on his watch. Ferder does not even try to do so here, and his objection to the Debtors' substantive consolidation fails as a result.

186. Ferder's other economic stake – his Equity Interest in Lugano Holding, Inc. ("Lugano Holding") – will receive no less under the Plan than in a chapter 11 plan that is not consolidated because Lugano Holding is insolvent in all circumstances. *See id*. Indeed, even assuming Ferder could equitably subordinate the *entire* CODI Claim, CODI's subordinated $718 million Claim against Lugano Holding would still exhaust the assets of Lugano Holding several times over, leaving nothing for Equity Interests. *See Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 554 F.3d 382, 414 (3d Cir. 2009) ("we read [section] 510(c) to clearly incorporate the distinction between claims and interests such that creditors' claims may not be equitably subordinated to equity interests.") Since CODI's $718 million claim exceeds the value of *all* of the Debtors' assets collectively, there is no recovery available on account of Ferder's Equity Interests, whether or not the Debtors are consolidated. *See* Issa Decl. ¶ 26.[27]

**2. If Owens Corning Applied, the Evidence Supports Substantive Consolidation.**

187. Even if Ferder fell within the scope of creditors *Owens Corning* protects, substantive consolidation is appropriate under *Owens Corning* because the Debtors' "postpetition … assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *Id* at 211. This practicality-based rationale looks to whether, "[w]ith consolidation the lot of all creditors will be improved" or if, absent consolidation, "all creditors will be worse off." *Id.* at n.20.

188. Here, *all* creditors benefit from substantive consolidation (and, conversely, all creditors are harmed without consolidation) because sorting out assets and liabilities among the individual Debtors would be cost prohibitive compared to the *de minimis* claims asserted solely

[27] Lugano Holding is the only one of the Debtors that might otherwise be negatively affected by consolidation. Issa Decl. ¶ 26. However, no creditor of Lugano Holding has objected to consolidation. *See* Voting Certification, Exhibit A-2.

against entities other than Lugano Diamonds. Consolidating the estates avoids the costs of analysis and negotiating (or litigating) the following allocations of assets and liabilities among the Debtors: (a) the proceeds of the Agency Agreement and the Tax Refund, (b) Intercompany Claims, (c) the nature and amount of CODI's Claims, and (d) Administrative Claims (including Professional Claims). *See* Issa Decl. ¶ 26. The combination of the Administrative Claims associated with this work and CODI's asserted $718 million secured claim against each of the Debtors means that all of the Debtors' creditors -- and even those creditors holding claims against multiple Debtors – would recover less absent substantive consolidation. *See id*. Thus, the Plan is using substantive consolidation to achieve cost savings to increase the recoveries for all creditors rather than benefitting one group at the expense of another, as evidenced by the fact that no creditor with claims against multiple entities has objected to or voted against the Plan. Accordingly, the *Owens Corning* test is satisfied.

189. Ferder complains about the lack of an entity-by-entity analysis. It is not clear why he, alone among the Debtors' creditors, requires such an analysis. All other parties in interest have had sufficient disclosure through the Debtors' Schedules and Statements, the First Day Declaration, the Disclosure Statement, and the publicly available claims register to make an informed decision about substantive consolidation. The Schedules and Statements make clear that Lugano Diamonds was the primary operating debtor, that Lugano Prive operated a social club, and that K.L.D. purchased inventory for the Debtors. Because of the CODI Claim, none of the Debtors had equity; however, substantially all of the assets other than entitlement to the Tax Return (which the Debtors might dispute on an intercompany basis) of the Debtors resided at Lugano Diamonds.

### 3. Alternatively, the Consolidation Can Be Deemed by Consent of All Creditors

190. The Voting Certification confirms that, if the Plan were severed into five separate plans – one for each Debtor – each plan would have been approved by *every* class that includes creditors (other than the Lugano Holding Convenience Class Claims, for which neither creditor voted). *See* Voting Certification, Exhibit A-2. Accordingly, were the Bankruptcy Court to decline to order substantive consolidation for any reason, it could still treat the Plan as five coordinated plans for which each class of impaired creditors had overwhelmingly voted to confirm the putatively severed plans applicable to their Debtors and confirm them concurrently, such that the Liquidation Trust could administer the five putatively severed plans according to the terms of the Plan and the Liquidation Trust Agreement.

## D. The CODI Settlement and the Plan Are Proposed in Good Faith

191. The Debtors have made a prima facie showing of good faith sufficient to carry their burden, as set forth above.

192. Ferder's argument that the Plan is not proposed in good faith because it is biased in CODI's favor, produced by a process tainted with bad faith, unfairly discriminates in CODI's favor, and inappropriately treats Ferder's claim is unconvincing and is merely an objection to the CODI Settlement under another theory.

193. Ferder's *ipse dixit* challenges to the CODI Settlement are not evidence that the Plan lacks good faith. His objections to the economics of the CODI Settlement, and the Plan's releases, injunctions, and exculpation, and his mistaken claims that the Plan eliminates his defenses are discussed elsewhere in this Section IV. His assertion that Section 7.c of the Settlement Agreement handicaps his defense in the Adversary Proceeding or interferes with his ability to prosecute indemnity claims, presumably against the CODI Parties, fails on its face. (That provision does not

interfere with his ability to obtain discovery in an appropriate proceeding, whether any action against a CODI Party or as a defendant in the Adversary Proceeding.) His rights are not impeded. Finally, as to the CODI Settlement Agreement's provision for non-cooperation in actions against CODI Parties, CODI is turning over tens of millions of dollars in value to buy peace. That deal would be thwarted in the CODI Settlement if parties to the settlement could voluntarily cooperate with others bringing actions against CODI, thereby doing indirectly what they cannot do directly.

194. Ferder asserts the post-confirmation structure of the Liquidation Trust Oversight Board supports his assertion of bad faith because Mr. Wells, a member of the special committee, is not "independent." An "Independent Board Member" is one (a) who initially was not a CODI employee or member of the Creditors' Committee, (b) whose successor is not designated by CODI or the other Committee designated Board Member, and (c) whose successor is an independent person agreed to by remaining Board Members (and approved of the CODI-designated board member). There is nothing in the Liquidation Trust Agreement or the Plan requiring the Independent Board Members to be "disinterested" under the Bankruptcy Code, or "independent" under any federal or state law, rule, or regulation.

195. Indeed, contrary to Ferder's assertion, Mr. Wells' experience generally, and his personal knowledge about the Debtors, Ferder, and the Special Committee's investigation of the Debtors' affairs and the various claims against and held by the Debtors are all reasons for him to be on the Liquidation Trust Oversight Board. He has been selected for the Liquidation Trust Oversight Board with the full agreement of the Creditors' Committee and CODI. His appointment to the Liquidation Trust Oversight Board is thus in good faith and consistent with the interests of creditors and public policy.

196. Ferder makes various unsupported accusations against Special Committee and its counsel, including that it provided a "look-see" preview of evidence for use against CODI and that the Special Committee was obligated to settle with him as a result – what Ferder himself calls a "*quid pro quo*." Ferder Obj. ¶ 8. As with Ferder's other allegations, there is absolutely no evidence in the record to support Ferder's demand for a settlement. Ferder has introduced no documentary evidence into the record, and he himself declined to answer all questions about his allegations, citing his Fifth Amendment right against self-incrimination. Even beyond those failings, Ferder's counsel is no doubt aware that any settlement with Ferder would have been subject to review and scrutiny by the Debtors, the Creditors' Committee, CODI, and ultimately the Court, and neither the Special Committee nor anyone else could have guaranteed approval of such a settlement, particularly in light of Ferder's status as an insider and the numerous fraud allegations surrounding Ferder.[28]

197. Moreover, his allegation that the Debtors and the Special Committee have not satisfied the "honesty and good faith" prong of the good faith test is simply wrong. Both the Special Committee and the Creditors' Committee concluded that the Debtors' Estates held meritorious claims against CODI. The Special Committee and the Creditors' Committee held CODI accountable – CODI gave up tens of millions of dollars in value to the holders of General Unsecured Claims in exchange for the CODI Settlement. That settlement, as discussed previously, speaks for itself, and Ferder provides no hard evidence to challenge it.

198. Ferder suggests that the Plan unfairly discriminates because CODI's claim should be subordinate and because CODI is receiving a priority recovery, and the foregoing somehow this

[28] Counsel has suggested that Ferder will file an administrative claim in connection with such allegations. That is his right, of course; as is the Liquidation Trust's right to challenge that claim.

shows lack of good faith. Not only does this argument put the cart before the horse by assuming the subordination of CODI's claim, it is contrary to 1129(b) of the Bankruptcy Code because Classes 1 through 5 voted to accept (or were conclusively presumed to accept) the Plan. Ferder cannot make an unfair discrimination claim on account of his Equity Interests (because, as stated above, they are subordinate even to an equitably subordinated claim). And, if his claim were ultimately allowed as a Subordinated Claim (in Class 7), there is no unfair discrimination because his claim would be subordinated and CODI's, by virtue of the CODI Settlement, is not.

199. Ferder, a defendant in an Adversary Proceeding and an insider credibly accused of extensive fraudulent activity, wants all the benefits of being a settling party without providing anything in return. His objection argues that numerous provisions of the Plan that bind all other creditors should not apply to him, and that applying those provisions to him amounts to a lack of good faith. Treating a current adversary differently that a settling party evidences common sense, however, not a lack of good faith.

200. For the above reasons, the Debtors have proposed the Plan in good faith.

## E. <u>The Plan Provides the Same Treatment for All Claims Within a Class</u>

201. Ferder argues that Holders of Claims in Class 4 are receiving different treatment because only certain Holders of General Unsecured Claims can be Contributing Creditors entitled to receive additional consideration on account of a Contributed Claim. Ferder is incorrect. Section 1123(a)(4) of the Bankruptcy Code requires the same treatment for each "claim." 11 U.S.C. § 1123(a)(4).

202. Courts "appear to agree that a reorganization plan may treat one set of claim holders more favorably than another so long as the treatment is not for the claim but for distinct, legitimate rights or contributions from the favored group separate from the claim." *Ad Hoc Comm. Of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d

918, 925 (8th Cir. 2019); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (backstop fee available only to certain noteholders did not violate section 1123(a)(4) because it was not a distribution on account of their claims).

203. Here, certain creditors receiving additional consideration are receiving it because they contributed something of value to the Liquidation Trust – the colorable Contributed Claims supported by evidence. This is not disparate treatment within the class on account of a claim, but an economic incentive to provide value to the Liquidation Trust in exchange for additional consideration. If there is no "colorable" and supportable claim, there is no reason for a creditor to receive additional consideration.

204. Ferder – who did not contribute a Contributed Claim – cannot complain about the discretion of the Liquidation Trustee (in consultation with the Liquidation Trust Oversight Board). Given the requirement that a Contributed Claim be colorable and supported by evidence, someone must make the determination. Ferder assumes, without any evidence or rationale, that the Liquidation Trustee will not act in good faith and that any creditor whose Contributed Claim is denied will have no recourse. Such assumptions are unsupported by the evidence and nothing in the Plan bars a creditor from challenging the Liquidation Trustee's determination as being unreasonable.

**F. <u>The Exculpation Provision Is Limited to Estate Fiduciaries</u>**

205. Ferder takes issue with the exculpation provision because it applies to the members of the Special Committee because those members "owe duties only to their own constituencies, and not necessarily to the estate as a whole," and their advisors and representatives. Objection at

¶ 70. The Objection is misplaced and fails under the Third Circuit's decision in *PWS Holding*, 228 F.3d 224.[29]

206. The definition of Exculpated Parties is limited only to those entities to exculpated under *PWS Holding*—the Debtors, the Committee and its members (in such capacity), two members of the Special Committee, and Related Parties that are estate fiduciaries. *PWS Holding*, 228 F.3d at 246-247 (approving an exculpation provision in the confirmation order that exculpated "the Debtors, . . . the Committee or any of their respective members, officers, directors, employees, advisors, professionals or agents" except for willful misconduct or gross negligence). Professionals are also covered by this exculpation because "committee members and the debtor are entitled to retain professionals to assist in the reorganization." *Id.* at 246.

207. Ferder cites *In re Washington Mutual* for the proposition that exculpation must be limited to estate fiduciaries, but then fails to note that *Washington Mutual* expressly identifies a debtor's directors and officers as estate fiduciaries to whom exculpation is properly provided. *See Wash. Mut.*, 442 B.R. at 350-51 ("[t]he exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers"). The exculpation provision in Section 11.07 of the Plan tracks those described in *PWS Holding* and *Washington Mutual*, and it should be approved here as well.

208. Ferder's Objection appears focused on the propriety of exculpation for Messrs. Wells and FitzGerald (who are the members of the Special Committee) and their personal representatives. Members of the Special Committee are members of the Board of Directors of

[29] The exculpation provisions are appropriately tailored by carving out actual fraud, willful misconduct, gross negligence and the exculpated parties are limited to estate fiduciaries. Exculpatory provisions are unaffected by *Purdue Pharma*. *See In re Smallhold, Inc.*, 665 B.R. 704, 725 (Bankr. D. Del. 2024) ("Nothing in *Purdue Pharma* can be read to call into question the kind of exculpation approved by the Third Circuit in *In re PWS*").

Lugano Diamonds (the "Board") and the Special Committee is a special committee of the Board with delegated authority to undertake certain actions. As such, the members of the Special Committee are thus directors who may be exculpated under *PWS Holding* and *Washington Mutual*. Naming Messrs. Spencer and FitzGerald does not change this result. In addition, counsel for the Special Committee is likewise appropriately exculpated and, in fact, has been retained pursuant to sections 327(e) and 330 of the Bankruptcy Code.

**G. Ferder's Miscellaneous Other Issues are Meritless**

209. Ferder makes a number of additional arguments that are meritless. First, he argues that the Plan fails the best interests test because he is being stripped of certain rights that would be preserved in a hypothetical chapter 7 case. As noted above, the Plan is not depriving Ferder of any of his contribution, indemnity, or setoff rights that would be preserved if the cases were converted.

210. He also complains that Section 11.10 of the Plan effectuates a discharge because it perpetually restrains creditors from pursuing claims against the Debtors. Section 11.10 of the Plan is a temporary injunction, lasting only until the Chapter 11 Cases are closed. It is not perpetual and thus does not function as a discharge. Nor does it contravene a purpose of section 727(a)(1) – the avoidance of trafficking in corporate shells – or preclude any creditor from assert a claim against the Debtors if they resume operations. *See NLRB v. Better Bldg. Supply Corp.*, 837 F.2d 377, 379 (9th Cir. 1988). Under Section 5.02(b) of the Plan, all Debtors other than the Post-Confirmation Debtor are dissolved automatically on the Effective Date, and Lugano Holding (the Post-Confirmation Debtor) exists solely for the implementation of the specified Post-Confirmation Debtor Functions (winding up the Debtors' affairs, taking steps, if necessary, to terminate organizational existence, and to monetize the Tax Refund for the benefit of creditors. The temporary injunction is appropriate because it is consistent with protecting the Tax Refund and the

jurisdiction of this Court to oversee (in the first instance) the claims process. S*ee In re Kabbage Inc.*, No. 2022-10951, 2023 Bankr. LEXIS 671 at *10 (Bankr. D. Del. Mar. 15, 2023) ("But there is neither an express nor implicit prohibition on imposing a temporary injunction against actions by creditors that would undermine the operation of the plan. Because the injunction will expire once the debtors' entities are corporate shells, this injunction is not inconsistent in any way with the underlying purposes of §§ 1141(d)(3) or 727(a).").[30]

## V. THE COURT SHOULD EXTEND EXCLUSIVITY

211. Ferder objects to the Debtors' extension of exclusivity. In light of the foregoing, the Debtors believe they have proposed a confirmable Plan or one that, if necessary, will need only minor or technical modifications to be confirmed. Accordingly, the Debtors believe that exclusivity should be extended to permit the Plan (if confirmed) to be substantially consummated or to enable the Debtors to seek confirmation of a modified or amended Plan, in each case, without the potential expense of a competing plan.

212. Moreover, the Debtors' use of cash collateral and related concessions from CODI—which inure to the direct benefit of General Unsecured Creditors—are given subject to the condition that the Debtors maintain exclusivity over their cases. Unless and until the CODI Settlement, which forms the economic core of the Plan, is terminated, the Debtors should be permitted to preserve exclusivity to maximize value for all of their stakeholders. Terminating exclusivity to permit Ferder to file a competing plan would drain estate resources to the detriment of all stakeholders, who almost unanimously support the Plan and the CODI Settlement, and would provide a bridge to nowhere other than ensuring the continuation of costly litigation.

[30] Other than making a technical objection, Ferder has not specified what harm, if any would befall him from the continuation of the injunction and stays.

## CONCLUSION

213. For all of the reasons set forth herein and in the Supplemental Declarations, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: August 27, 2026
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*
Edmon L. Morton (Del. No. 3856)
Sean M. Beach (Del. No. 4070)
Shella Borovinskaya (Del. No. 6758)
Brynna M. Gaffney (Del. No. 7402)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: emorton@ycst.com
sbeach@ycst.com
sborovinskaya@ycst.com
bgaffney@ycst.com

-and-

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (admitted *pro hac vice*)
Traci L. Shafroth (admitted *pro hac vice*)
Scott Friedman (admitted *pro hac vice*)
101 Montgomery Street, Suite 1950
San Francisco, California 94104
Telephone: (415) 496-6723
Facsimile: (650) 636-9251
Email: tkeller@kbkllp.com
tshafroth@kbkllp.com
sfriedman@kbkllp.com

*Attorneys for Debtors*
*and Debtors-in-Possession*

# EXHIBIT A

Mordechai Ferder. None of the Ferder Affiliated Parties has or shall be deemed to have granted the non-Debtor releases contained in Section 11.09 of ~~this~~the Plan and are hereby deemed to have opted out of ~~all releases, exculpations and injunctions, including, without limitation, those set forth in Sections 11.06, 11.07, 11.08, and 11.09 of the Plan~~such releases. Notwithstanding anything to the contrary in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or the CODI Settlement Agreement:

a. ~~(a)~~ Any and all rights of the Ferder Affiliated Parties to assert, prosecute, defend, or recover on account of any Claims, Causes of Action, or similar matters, including, without limitation, any claims or causes of action for fraud, indemnity, contribution, reimbursement, subrogation, breach of fiduciary duty, aiding and abetting, conspiracy, or any other theory of liability, whether at law or in equity, against any non-Debtor Released Parties~~, Exculpated Parties, CODI Parties,~~ or any other Person or Entity (other than the Debtors and their Estates), shall not be released, enjoined, ~~exculpated,~~ impaired, or otherwise affected by Sections 11.06~~, 11.07, 11.08,~~ or 11.09 of the Plan, the corresponding provisions of the Confirmation Order, or by any provision of the ~~Confirmation Order,~~ the Liquidation Trust Agreement, or the CODI Settlement Agreement;

b. ~~(b) The~~ To the extent set forth in any timely-filed proof of claim filed by any of the Ferder Affiliated Parties, the Ferder Affiliated Parties expressly reserve ~~all~~any rights of setoff, recoupment, and any other defense (whether at law or in equity) against any Claim, Cause of Action, or demand asserted or that may be asserted against any Ferder Affiliated Party by the Debtors, the Estates, the Liquidation Trust, the Liquidation Trustee, or any of their successors or assigns, and nothing in Section 11.06(a)(iv) of the Plan or elsewhere in the Plan or the Confirmation Order shall be deemed to enjoin, limit, or impair any such right of setoff, recoupment, or defense; and

~~(c) Nothing in Section 11.08 of the Plan shall release, waive, or impair any Claim or Cause of Action held by any Ferder Affiliated Party, whether such Claim or Cause of Action is characterized as direct, derivative, or otherwise;~~

~~(d) Nothing in the exculpation provisions of Section 11.07 of the Plan shall constitute a defense to, or otherwise limit or impair, any Claim or Cause of Action asserted by any Ferder Affiliated Party against any Person, including any Exculpated Party; and~~

c. (e) Nothing in the Plan shall permit anyNone of the Ferder Affiliated Parties tomay recover any amounts from the Estates or the Liquidation Trust except on account of any Allowed Claims.Claim

For the avoidance of doubt, the foregoing provisions are in addition to, and shall not be deemed to limit, any rights of the Ferder Affiliated Parties arising from their status as Excluded Parties under this Plan.