**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-12055 (BLS)<br>(Jointly Administered)<br><br>**Re Docs 649, 799**<br>**Hearing: August 31, 2026, 11:00 a.m.** |

**CREDITOR COMMITTEE'S REPLY**
**TO FERDER PARTIES' PLAN CONFIRMATION OBJECTION**

The Official Committee of Unsecured Creditors (the "**Committee**") replies to the *Objection of the Ferder Parties to Confirmation of the Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Doc 799] (the "**Ferder Objection**") filed by Mordechai Ferder and the Haim Family Trust (the "**Ferder Parties**") to confirmation of the *Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [Doc 649] (the "**Plan**").[1] The Committee fully joins the replies to the Ferder Objection (and the U.S. Trustee's objection to Plan confirmation [Doc 798]) filed by the Debtors and CODI contemporaneously with this reply and, therefore, addresses here only some of the elements of the Ferder Objection.

[1] Capitalized terms used without definition in this reply retain the definitions given to them in the Plan.

The Debtors have responded thoroughly to the Ferder Parties' arguments regarding alleged bases for denying confirmation of the Plan—which general unsecured creditors voted almost unanimously to accept[2]—including all nine of what the Ferder Parties believe constitute "core structural defects" that preclude confirmation of the Plan. The Committee adopts all parties' responsive arguments to the Ferder Parties' confirmation objections filed today and in response to the Ferder Parties' previous objection to the conditional approval of the Debtors' disclosure statement. The Committee replies separately here to address the Ferder Parties' uninformed and false allegations regarding, and mischaracterizations of, the Estates' settlement with CODI. The facts outlined below and the evidence to be offered at the confirmation hearing easily show how—intentionally or not—the Ferder Parties misconstrue the CODI settlement and how badly the Ferder Parties' objection to the CODI settlement misses the mark.

**The CODI Settlement**

Despite perpetrating a catastrophic fraud against the Debtor's customers, despite invoking his Fifth Amendment right against self-incrimination in response to every deposition question posed to him on August 24 after "state your name and date of birth," and despite directly causing many hundreds of millions of dollars of losses to the Debtors' creditors, Mr. Ferder presumes to offer his unsolicited opinion about whether the CODI Settlement is in creditors' best interests. The stunning temerity aside, he couldn't be more uninformed or more wrong.[3]

[2] Mr. Ferder is the only alleged creditor with a significant (albeit objected-to) claim to vote against the Plan. By claim amount, and not counting Mr. Ferder's claim (which has not been allowed for voting purposes), more than **99%** of all voting general unsecured creditors voted to accept the Plan. Real creditors with real claims are understandably and uniformly enthusiastic about the remarkable recovery they will receive under the Plan.

[3] Mr. Ferder is also wrong when he argues that the parties to this case were all conflicted because CODI provided DIP financing to fund these cases. This Court knows better. There is nothing remarkable about a prepetition senior secured creditor providing DIP financing. What *was* remarkable was that CODI still agreed to fund an investigation against itself. That fact alone should dispel any notion that the Committee and its professionals had any conflict in pursuing a settlement that provides a substantial return to general unsecured creditors.

The CODI Settlement enabled a tremendous result. When these cases began in November 2025, the newly-formed Committee—comprising trade creditors, diamond investment creditors, and landlords with claims totaling more than $150 million, more than half in amount of all general unsecured claims—faced a grim reality: CODI asserted a senior secured claim exceeding $700 million, secured by liens on substantially all the Estates' assets, which appeared to be worth only a fraction of CODI's claim amount; general unsecured creditors appeared to be far out of the money, with the Debtors likely pursuing a liquidation that would almost surely generate a zero recovery to all creditors other than CODI. The only way general unsecured creditors could wrest a recovery from the Estates was to prevail on claims and causes of action against CODI that would invalidate CODI's liens or equitably subordinate CODI's claims or both. The Committee's principal function in these cases was then, and remained, to investigate potential means to reduce CODI's secured claims and use what it found to create value for general unsecured creditors that, at least on paper, did not exist when these cases began.

The Committee took that function extremely seriously. For months, in collaboration with the Special Committee, it conducted an exhaustive investigation of CODI's relationship with the Debtors independent of influence by the Debtors, CODI, or any other party in interest. When the Committee was initially formed, the Special Committee was already in the early stages of an investigation into whether the Debtors had viable claims and causes of action against CODI and others. Nonetheless, the Committee, honoring its duties to all unsecured creditors, had to conduct its own investigation.

To facilitate that process, the Committee contacted the Special Committee to determine if the investigations could be coordinated to maximize efficiency and minimize duplication of costs and efforts. Within a short time, the Committee and the Special Committee entered into a common interest agreement that, among other things, formalized a division of labor between the two bodies

and their respective counsels. While the Special Committee focused on investigating whether the Debtors had viable affirmative claims against CODI, the Committee primarily focused on whether and to what extent CODI's claims could be equitably subordinated to the claims of general unsecured creditors.

From December 2025 to May 2026, the Committee participated in over two dozen interviews of current and former officers, directors, and employees of both the Debtors and CODI. The Committee reviewed thousands of documents voluntarily produced by the Debtors, CODI, Grant Thornton (the Debtors' and CODI's auditor), and others. Neither the Debtors nor CODI refused to produce any requested information (other than privileged information). Given that CODI produced numerous documents adverse to its own interests, the Committee had no reason to believe that CODI withheld any requested non-privileged documents or information.

Throughout this period, the Committee's legal and financial advisors provided weekly updates to the Committee regarding the status and findings of the investigation as well as relevant legal analyses and advice. Ultimately—only after the Special Committee and the Committee had concluded their respective investigations, and because all parties recognized that the investigations had uncovered considerable bases for potential causes of action against CODI, including equitable subordination of CODI's claims—CODI, the Special Committee, the Committee, and the Debtors all agreed to mediate their disputes, with former bankruptcy practitioner and former California state court judge Lee Bogdanoff serving as mediator.

In May 2026, after exchanging confidential mediation statements and supporting documentation, the parties spent two full days conducting an in-person mediation in Los Angeles. Two Committee members—Adam Rothstein (the Committee's chair) and Avi Wazana, both of whom are expected to serve on the post-confirmation Liquidation Trust Oversight Board—represented the Committee by participating in person, accompanied by the Committee's

professionals from the Pachulski firm and Force 10. During the course of the mediation, the Committee held approximately seven Zoom meetings with the full Committee's membership to obtain advice, strategize, analyze offers, and formulate counteroffers.

The parties emerged from the mediation with an agreement. The Committee concluded that its potential claims against CODI were meritorious and valuable but also recognized that pursuing them would likely have been extremely expensive (without any obvious source of funding), exceedingly time consuming, and beset with the kind of risk that typically attends complex litigation against a sophisticated, well-funded, and well-represented senior secured creditor. By agreeing to a settlement with CODI, the Committee ensured that general unsecured creditors would go from facing a complete wipeout to a Plan estimated to produce a prompt cash dividend to general unsecured creditors of approximately 28–39% of allowed claims. In a liquidating estate where the senior secured creditor asserts a claim exceeding the value of all estate property by a significant multiple, going from a zero recovery to a 28–39% recovery is an extraordinary result. That kind of turnabout is not commonplace in liquidating Chapter 11 cases, to say the least.

Exemplary numbers bear out why the Committee accepted the settlement negotiated at the mediation. Assume that, at the cases' outset, claims of general unsecured creditors ("**GUCs**") totaled $240 million and CODI's secured claim totaled $720 million, secured by a senior-priority security interest in substantially all the Debtors' assets with a net value of $120 million (i.e, after payment of all restructuring and operating expenses, including professional fees). If the Estates were unsuccessful in litigation against CODI, GUCs would be deeply out of the money. But with the settlement, CODI's claim is effectively treated thus: (a) $600 million is totally subordinated to GUCs; and (b) the remaining $120 million is treated as unsecured. That enables GUCs to receive approximately 2/3 of the value of all the Estates' assets ($80 million) and CODI to receive the remaining 1/3 ($40 million). The settlement subordinated $600 million of CODI's secured claim

and stripped CODI's lien from the remaining $120 million. Anyone looking at this with even a superficial appreciation of the litigation risk the parties faced would be forced to conclude that the settlement achieved a remarkable result for previously out-of-the-money GUCs.

And the litigation risk was meaningful. A principal focus in both the mediation and the investigations leading up to it was the viability of an equitable subordination action against CODI. The Committee and its professionals, informed by months of extensive factual investigation, scrupulously analyzed the potential factual underpinnings and legal considerations pertaining to a putative attempt to equitably subordinate CODI's claim. Among many other avenues of analysis, the Committee evaluated the factual record it had amassed regarding CODI's actions and omissions during the years between its acquiring the Debtors and the filing of these cases.

As this Court undoubtedly knows, any equitable subordination of a creditor's claim must be supported by satisfying three elements: (1) a factual record substantiating material actions taken and not taken that amounts to inequitable conduct such as fraud, illegality, or breach of fiduciary duty; (2) injury to creditors or an unfair advantage conferred on the defendant; and (3) a remedy consistent with the Bankruptcy Code.[4] Because the Third Circuit has repeatedly emphasized that equitable subordination is fundamentally a remedial rather than punitive doctrine "designed to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors,"[5] the third element is often where the crux of the inquiry resides.

Even when all three elements are met, the bankruptcy court must ensure that the remedy does not exceed what would be proportionate to the injury proximately caused by the inequitable conduct: "a claim or claims should be subordinated only to the extent necessary to offset the harm

[4] *See, e.g., Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998); *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009).

[5] *Winstar,* 554 F.3d at 411.

which the bankrupt and its creditors suffered on account of the inequitable conduct."[6] The central question is whether the bankruptcy court's findings demonstrate "proportionality of the remedy to the injury."[7]

Here, establishing a factual basis for equitable subordination of CODI's claim would have been one thing, but obtaining a proportional remedy would have been quite another. Third Circuit precedent militates against an all-or-nothing remedy, so this Court would not have been able to simply subordinate CODI's entire claim without considering the extent and timing of the harm caused by CODI's inequitable conduct. Fashioning a proportional remedy would require careful analysis of what CODI knew and when CODI knew it, what CODI did and when CODI did it, and why CODI did what it did when it knew what it knew. The Committee's investigation uncovered considerable evidence that would have provided the Estates with a colorable claim that CODI had engaged in inequitable conduct at some point. What was less clear was how that inequitable conduct would relate in extent and in time to the injury to creditors and to CODI's claim amount in a way that would ensure that a remedy would be proportional as required by Third Circuit law.

This was particularly vexing because CODI's claim arose from a series of more than 20 incremental loans to the Debtors over a period of years. The Estate's ability to demonstrate at trial that every one of those loans was made when inequitable conduct occurred—and in a proportionate amount—would have been challenging. Stated simply, there was a meaningful risk that the Committee would be unable to equitably subordinate CODI's *entire* claim as a proportionate remedy even if the Committee could prove inequitable conduct and proximately-caused injury. The Estates' assets were likely worth only a small fraction of CODI's secured claim. CODI claimed a senior security interest in all those assets. Even if, say, $600 million of CODI's claim

---

[6] *Id.* at 412, quoting *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 701 (5th Cir. 1977). *See also In re Broadstripe, LLC,* 444 B.R. 51 (Bankr. D. Del. 2010).

[7] *Citicorp Venture Capital,* 160 F.3d at 991.

were equitably subordinated, general unsecured creditors would *still* have been out of the money and would *still* have received no recovery from the Debtors' liquidation. In other words, the Committee faced the risk of having to persuade this Court that every penny of CODI's claim should be equitably subordinated *and* that such a remedy would be proportionate to CODI's alleged inequitable conduct and the harm it allegedly caused.

The settlement eliminates that risk. It gives previously out-of-the-money unsecured creditors an extraordinary dividend—in a liquidating Chapter 11 case, no less. This kind of settlement in this kind of case stands as the paradigm of a successful Chapter 11 proceeding.

Based on the depositions, Mr. Ferder—through his counsel—will likely try to press his personal grievances, attack the credibility of the witnesses testifying in favor of confirmation, and suggest that the Debtors should have rolled the dice and sued CODI (with no funding source) in the hope of securing an even better result. Such a course would have been irresponsible. The benefits to general unsecured creditors from entering into the CODI Settlement are plainly evident. The overwhelming support of virtually all creditors proves it. Mr. Ferder's objection should be overruled in its entirety.

**Lies in the Ferder Objection**

Finally, the Committee must briefly address the Ferder Parties' lies about what Committee counsel said at the hearing before this Court on July 14, 2026, and the unseemly ad hominem attack on Mr. Kroop. The Committee respectfully refers the Court to the transcript of that hearing [Doc 726].[8] The Committee responds to each of the Ferder Parties' four allegations about Mr. Kroop's statements:

---

[8] *Transcript of Hearing,* Case No. 25-12055 (BLS), July 14, 2026 [Doc 726] ("**Tr.**"). The transcript is not yet available on the public-facing docket but the Committee trusts the Court can access it nonetheless. Mr. Kroop's presentation begins on page 27 and ends on page 35.

- Mr. Kroop "dismissed Mr. Ferder's objections by claiming that his counsel misread the revised release, injunction and exculpation sections of the Plan." **That is untrue.** Mr. Kroop addressed changes made solely to the Plan's injunction provision (Section 11.06)—no changes were made to the release or exculpation provisions—describing how that provision had been revised to track Bankruptcy Code § 1141. Mr. Kroop did mention that Mr. Frey may have "inadvertently conflated release language in the plan that appears elsewhere to the injunction provision in 11.06"[9] but Mr. Kroop never accused anyone of misreading anything.

- "Mr. Kroop suggested Mr. Ferder could opt-out [*sic*] of the injunction and thus his [Mr. Ferder's] rights under the Plan would not be impaired." **That is untrue.** As the Court knows, the Plan gives creditors an opportunity to opt out of the Plan's releases running to non-Debtors found in Plan Section 11.09. Without ever using the words "opt out" or addressing creditors' right to opt out of the Plan's releases, Mr. Kroop stated only that Mr. Frey had inadvertently mixed up the release provision in Plan Section 11.09 and the exculpation provision of Plan Section 11.07 with the injunction provision in Plan Section 11.06.

- "He also suggested that the injunction is essentially the equivalent of a discharge." **That is untrue.** Mr. Kroop's characterization of the Plan's injunction provision was limited strictly to describing how it had been amended from a previous version to track the injunction provisions of Bankruptcy Code § 1141.[10] Mr. Kroop never used the word "discharge" and never even mentioned the discharge that all parties acknowledge the Debtors cannot receive under a liquidating Plan.

- Statements made by counsel for the Special Committee that Mr. Ferder could not opt out of the injunction or exculpation provisions "cannot be reconciled with Mr. Kroop's representations to the Court." **That is untrue.** Mr. Kroop made no representations about the Plan to the Court because the Plan speaks for itself. Mr. Kroop never addressed a creditor's ability to opt out of anything, never used the phrase "opt out," and certainly never said that anyone could opt out of the Plan's injunction or exculpation provisions.

Regrettably, the Ferder Parties and their counsel resorted to a personal attack on Committee counsel replete with four false statements. More regrettably, the Feder Parties and their counsel seem to have forgotten that the Court is more than capable of reviewing what Mr. Kroop *did* say over the course of a few minutes during the July 14 hearing. Perhaps they have also forgotten that litigants and their counsel owe a duty of candor to the Court.

---

[9] Tr. 28:6–8.

[10] "And for that reason, along with the comments and objections raised by Mr. Ferder's counsel, as well as by the U.S. Trustee, that injunction provision, now, as it appears in the plan and as described in the disclosure statement that is being proposed to be approved on an interim basis today, 11.06 is a pure injunction provision limited strictly to how 1141 would work." Tr. 28:13–19.

**Conclusion**

For these reasons, and those argued in replies filed today by the Debtors and CODI (which the Committee fully adopts), the Court should overrule the Ferder Objection and confirm the Plan.

August 27, 2026

Respectfully submitted,

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

James E. O'Neill, Esq. (DE Bar No. 4042)
919 North Market Street, 17th Floor
Wilmington, DE 19801
Telephone: (302) 652-4100
Email: joneill@pszjlaw.com

- and -

Jeffrey N. Pomerantz, Esq. (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Email: jpomerantz@pszjlaw.com

- and -

John A. Morris, Esq. (admitted *pro hac vice*)
Jordan A. Kroop, Esq. (admitted *pro hac vice*)
1700 Broadway, 36th Floor
New York, NY 10019
Telephone: (212) 561-7700
Email: jmorris@pszjlaw.com
jkroop@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*