**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>LUGANO DIAMONDS & JEWELRY INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-12055 (BLS)<br><br>(Jointly Administered)<br><br>**Re: D.I. 652, 798, 799 & 826** |

**COMPASS GROUP DIVERSIFIED HOLDINGS LLC'S OMNIBUS REPLY TO OBJECTIONS TO (I) THE FINAL APPROVAL OF DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE DISCLOSURE STATEMENT AND (II) CONFIRMATION OF THE DEBTORS' SECOND AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

Compass Group Diversified Holdings LLC ("CODI"), by and through its undersigned counsel, hereby files this reply (the "Reply") in support of (a) final approval the *Disclosure Statement for the Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [D.I. 652] (the "Disclosure Statement") and (b) confirmation of the *Second Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [D.I. 826] (the "Plan") and in response to the (i) *Objection of the United States Trustee to Confirmation of Debtor's Chapter 11 Plan* [D.I. 798] (the "UST Objection") and the (ii) *Objection of the Ferder Parties to Confirmation of the Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [D.I. 799] (the "Ferder Objection," together with the UST Objection, the "Objections"). In support hereof, CODI respectfully states as follows:

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's U.S. federal tax identification number, to the extent applicable, are as follows: Lugano Diamonds & Jewelry Inc. (6784), Lugano Holding, Inc. (9690), Lugano Buyer, Inc. (4565), K.L.D. Jewelry, LLC (0319), and Lugano Prive, LLC (4308). The notice address for the Debtors is 620 Newport Center Dr., Ste 100, Newport Beach, California 92660.

## PRELIMINARY STATEMENT

1. The Debtors are in these chapter 11 cases only because of the fraud that Mordechai Ferder ("Ferder") and his affiliates orchestrated. The Plan[2] represents the best path for preserving value, maximizing recoveries, and providing meaningful distributions to unsecured creditors. Unsurprisingly, Ferder is the only one that prefers to see the Plan fail. The Office of the United States Trustee (the "UST") has asserted a narrow objection related to the Plan's third-party release provisions. The Court should overrule both of these objections, approve the Disclosure Statement on a final basis, and confirm the Plan.

2. Ferder's well-documented fraud is the subject of numerous independent, regulatory, and law enforcement investigations. One must assume it is the reason Ferder has been hiding in Israel, beyond the reach of U.S. law enforcement. CODI is the largest victim of Ferder's fraud having suffered more than a half-billion dollars in losses as a direct result. Ferder now has the chutzpah to claim that the Plan and underlying CODI Settlement do not satisfy the requisite requirements for court approval and instead are prejudicial to ***his*** rights and constitute a sweetheart deal in favor of CODI. The court should reject this specious attack. The current record and the additional evidence to be presented compel this and Ferder offers no credible factual or legal bases for his objection. Instead, he seeks to obstruct a confirmation process that is demonstrably fair and reasonable and has garnered overwhelming creditor support with a strategy that is needlessly increasing the administrative cost of these chapter 11 cases.

3. The Plan and the CODI Settlement are anything but a "sweetheart deal" for CODI. CODI is the Debtors' largest creditor, holding a pre-petition secured claim in excess of $718 million and a claim from the DIP facility in the approximate amount of $1.2 million. As the

[2] Capitalized terms used but not otherwise defined shall have the meanings ascribed to such terms in the Plan.

evidence demonstrates, without the settlement, CODI would arguably be entitled to substantially all of the Debtors' distributable value. Nevertheless, CODI voluntarily agreed to participate in a mediation, during which the Debtors, the Special Committee, the Creditors' Committee, and CODI engaged in contentious, good-faith, arm's-length negotiations, mediated by a highly respected former judge. The CODI Settlement is the outcome of that process.

4. The settlement results in CODI receiving value for only a fraction of its secured claim, leaving the Estates tens of millions of dollars to fund the Liquidation Trust and make distributions to General Unsecured Creditors. Thanks to the CODI Settlement and the avoidance of litigation that conservatively would have cost the Estates more than $10 million, estimated unsecured creditor recoveries have gone from zero to thirty percent or more—a recovery the Creditors' Committee calls a "remarkable result." Indeed, if the Court ultimately determines that Ferder holds an Allowed Claim, he too could benefit from these enhanced recoveries. Nonetheless, Ferder continues to oppose confirmation to deflect attention from his own fraud and to settle some imagined score with the Special Committee.

5. None of Ferder's objections provides a valid basis to deny confirmation. His arguments lack support under applicable law, misapprehend fundamental bankruptcy principles, and fail to rebut evidence demonstrating that the Debtors can and do satisfy all of the confirmation requirements. Ferder is wrong, and the Court should overrule his objection.

6. The Court should also overrule the UST Objection because the Plan release provisions comply with applicable law and do not violate *Purdue*.

## BACKGROUND

### A. Ferder's Fraud

7. These cases were filed because Ferder, the Debtors' former CEO, engaged in widespread fraud that included sham financing transactions and embezzlement schemes, which

subjected the Debtors to overwhelming litigation and investigations into their financing, accounting, and inventory practices.

8. Ferder carried out much of his fraud by partnering with high-net worth individuals under the auspices of financing the purchase of diamonds that Ferder claimed he could resell at substantial profits. Every such transaction was fraudulent. The evidence suggests that the diamonds did not exist. To facilitate and conceal his scheme, Ferder forged customer signatures, manipulated shipping records, sent empty boxes to addresses throughout the country, and used unrelated public addresses to generate fraudulent delivery records.

9. Ferder falsified the Debtors' accounting records in myriad ways, including by: (i) recording the proceeds from the diamond scheme as revenue, when no such revenue existed; (ii) engaging in round-tripping transactions, transferring Debtor funds to third parties, receiving nearly identical amounts back, and recording these amounts against the Debtors' accounts receivables; (iii) transferring the Debtors' funds to purported diamond investors but recording these as payments to vendors; (iv) directing the Debtors' funds to be wired to other purported vendors as "down payments" on supposed inventory that never existed; and (v) deceiving gemologist auditors by borrowing diamonds from other diamond dealers and then returned them post-audit.

10. Meanwhile, Ferder directed millions of dollars of the Debtors' funds to bank accounts belonging to the Haim Family Trust, for which he serves as trustee. In May 2025, after CODI publicly disclosed that it was investigating the Debtors' accounting, financing, and inventory practices, Ferder fled to Tel Aviv, Israel. CODI understands that Ferder also may have moved artwork, cars, and other valuable property, including property belonging to the Debtors' Estates, to Israel.

11. Following the discovery of Ferder's fraud, on July 9, 2025, the Debtors' board of directors appointed two independent directors and formed the Special Committee to investigate and pursue claims arising from or related to Ferder's fraud.

**B. Commencement of the Bankruptcy Cases**

12. On November 16, 2025, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors continue to operate and manage their business as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these Chapter 11 Cases.

13. To fund these Chapter 11 Cases, CODI agreed to provide an initial DIP facility of up to $2 million and consented to the Debtors' use of CODI's cash collateral, which the Court approved on an interim basis on November 19, 2026 (the "Interim Order").[3] The Interim Order included customary limitations on the Debtors' use of cash to investigate CODI; however, those provisions explicitly provided that proceeds of Retained Actions, which includes Causes of Action against CODI, would not be encumbered by CODI's adequate protection liens and that the Special Committee could use estate funds to investigate and pursue such Retained Actions.[4]

14. On November 25, 2025, the UST appointed the Creditors' Committee.[5]

15. During the interim period, the Debtors, the Special Committee, the Creditors' Committee, and CODI recognized that the estates would have sufficient cash flow from the asset sale to Enhanced Retail Funding, and negotiated the terms of a final order only authorizing the

[3] *See* D.I. 66.

[4] *See* Interim Order, ¶¶ 5, 26.

[5] *See* D.I. 88.

Debtors to use cash collateral and not borrow on a DIP facility (the "Final Cash Collateral Order").[6] The Final Cash Collateral Order contained the same provisions relating to the Retained Actions.[7]

**C. The Investigation and CODI Settlement**

16. The Special Committee and the Creditors' Committee began investigating potential claims against CODI immediately. CODI has steadfastly denied any wrongdoing. Despite this investigation, CODI (i) provided initial DIP availability and (ii) consented to the Debtors' use of cash collateral that funded these multimillion-dollar investigations because it recognized the need to move the bankruptcy process forward in an efficient manner.

17. During these investigations, CODI produced over one million pages of documents and the Special Committee and Creditors' Committee interviewed numerous current and former CODI employees, including some on multiple occasions.[8] CODI even agreed to multiple extensions of the Effective Date Deadline and Challenge Period under the Final Cash Collateral Order.[9] Throughout this extended period, the Creditors' Committee and Special Committee had ample opportunity to evaluate claims against CODI and assess the costs and benefits of pursuing those claims.

18. Following that investigation, the Special Committee and the Creditors' Committee, as detailed in the Disclosure Statement, asserted that they could bring colorable claims against CODI and its affiliates.[10] CODI strongly disagreed with that conclusion. Even so, all parties

[6] *See* D.I. 364.

[7] *See* Final Cash Collateral Order, ¶¶ 11, 20.

[8] *See* Disclosure Statement, § III.F.4.

[9] *See* D.I. 430, 662.

[10] *See* Disclosure Statement, § III.F.4.

recognized that litigation would be lengthy, expensive, and disruptive to these proceedings. In an attempt to avoid those risks, the parties agreed to the Mediation.

19. In early May 2026, CODI, the Debtors (through the Special Committee), and the Creditors' Committee participated in the JAMS-administered Mediation with the Honorable Lee R. Bogdanoff (Retired) as the mediator. The Mediation was contentious, but all parties participated in good faith despite significant disagreements. Ultimately, the Mediation resulted in the terms of the CODI Settlement.

**D. The Plan Process**

20. On June 24, 2026, the Debtors filed the *Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors*,[11] the *Notice of Plan Support Agreement*,[12] the *Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors*,[13] and the *Debtors' Motion for Entry of an Order (A) Approving the Disclosure Statement on an Interim Basis; (B) Establishing Solicitation and Tabulation Procedures; (C) Approving the Forms of Ballots and Solicitation Materials; (D) Establishing the Voting Record Date; (E) Fixing the Date, Time, and Place for the Combined Confirmation Hearing and the Deadline for Filing Objections Thereto; and (F) Granting Related Relief*,[14] which documents incorporate and seek implementation of the CODI Settlement and provide for the establishment of the Liquidation Trust to pursue Causes of Action and make distributions.

---

[11] *See* D.I. 612.

[12] *See* D.I. 613.

[13] *See* D.I. 614.

[14] *See* D.I. 615.

21. After receiving input and incorporating revisions from various constituent parties, including the UST and Ferder, on July 9, 2026, the Debtors filed revised final versions of the Plan and the Disclosure Statement.

22. On July 14, 2026, the Court entered the *Order (A) Approving the Disclosure Statement on an Interim Basis; (B) Establishing Solicitation and Tabulation Procedures; (C) Approving the Forms of Ballots and Solicitation Materials; (D) Establishing the Voting Record Date; (E) Fixing the Date, Time, and Place for the Combined Confirmation Hearing and the Deadline for Filing Objections Thereto; and (F) Granting Related Relief* (the "Solicitation Procedures Order").[15]

23. Subsequently, the Debtors solicited votes on the Plan, as detailed in the *Debtors' Memorandum of Law in Support of (I) Approval of the Disclosure Statement on a Final Basis and Confirmation of the Second Amended Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry In. and Its Affiliated Debtors and (II) Omnibus Reply to Objections to Confirmation and the Extension of Exclusivity* (the "Debtor's Brief").[16] The *Declaration of Jeriad R. Paul Regarding the Solicitation and Tabulation of Votes on the Amended Chapter 11 Plan of Lugano Diamonds & Jewelry Inc. and Its Affiliates*[17] (the "Voting Declaration") shows that the Plan was overwhelmingly accepted by all voting classes.

---

[15] *See* D.I. 661.

[16] *See* D.I. 832, ⁋ 28.

[17] *See* D.I. 828.

## ARGUMENT

### I. The Plan's Release, Injunction, and Exculpation Provisions Are Appropriate and Should Be Approved.

24. Ferder's contention that the Plan's release, injunction, and exculpation provisions exceed the bounds permitted by the Bankruptcy Code is patently false and demonstrates a misunderstanding of basic bankruptcy principles. Article XI of the Plan includes, in relevant part, the following customary provisions:

> a) Debtor Releases: Releases by the Debtors, the Estates, and their respective successors, assigns, and representatives, in favor of the Released Parties[18] as more fully described in Section 11.08 of the Plan;
>
> b) Third-Party Releases: Releases by the Releasing Parties[19] in favor of the Released Parties, including all holders of Claims, other than holders of Claims only in Classes 6 and 7, who do not make an Opt-Out Election, and as more fully described in Section 11.09 of the Plan;
>
> c) Injunction: An injunction provision, as more fully described in Section 11.06 of the Plan, which bars holders of Claims against or Equity Interests in a Debtor from pursuing any action or judgment or encumbering property dealt with by the Plan, or asserting setoff against any obligation due to the

[18] "Released Parties," as defined in Article I of the Plan, means "Each of: (a) the Debtors and each of the Estates and any of their subsidiaries and retained Professionals and Ordinary Course Professionals and their following directors and officers: (i) Frederic Cumenal; (ii) David Arnold; (iii) L. Spencer Wells (including as a member of the Special Committee); (iv) Thomas FitzGerald (including as a member of the Special Committee); (v) Stuart Winston; (vi) Lisa Calvert; and (vii) Christoph Pachler; (b) the Creditors' Committee and its individual members solely in their capacities as members of the Creditors' Committee, together with all their retained Professionals, agents, and other representatives of the Creditors' Committee and its members solely in their capacities with respect to service on or representation of the Creditors' Committee; (c) the CODI Parties and each of their Related Parties; provided that no Excluded Party is a Released Party."

[19] **"**Releasing Parties,**"** as defined in Article I of the Plan, means "Each of, and in each case in its capacity as such: (a) the Debtors and each of the Estates; (b) L. Spencer Wells and Thomas FitzGerald; (c) any successor to the Debtors or any other representative of the Estates pursuant to Bankruptcy Code § 1123(b)(3), including the Liquidation Trust; (d) all holders of Claims, other than holders of Claims only in Classes 6 and 7, who do not make an Opt-Out Election; (e) each Released Party; and (f) each Related Party of each entity in clauses (a) – (e) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clauses (a) – (e); provided that, in each case, an entity is not a Releasing Party if it makes an Opt-Out Election; provided further that no Excluded Party is a Releasing Party."

Debtors, or interfering with the implementation or consummation of the Plan; and

d) Exculpation Provision: An exculpation provision, as more fully described in Section 11.07 of the Plan, which bars Causes of Action for any Claim related to any act or omissions against the Exculpated Parties[20] to the extent they are Estate fiduciaries.

25. These provisions comply with the Bankruptcy Code and applicable non-bankruptcy law and are necessary and integral components of the Plan. The releases in the Plan are in exchange for, and are supported by, fair, sufficient, and adequate consideration provided by the parties receiving such releases and are a good-faith compromise for the released Claims. These provisions are proper because, among other things, they are reasonable; in the best interests of the Debtors and their Estates; the product of good-faith, arm's-length negotiations; in exchange for substantial consideration from various parties, including CODI; and critical to obtaining the support of various constituencies for the Plan.[21]

**A. Ferder Misconstrues and Misstates the Plan and the Role of the Bankruptcy Process in Resolving Claims with Finality.**

26. The Ferder Objection misconstrues Plan provisions that are standard and straightforward. Contrary to Ferder's allegations, the Injunction, the Debtor Releases, and the Exculpation Provision do not have any hidden meaning and do not affect individual creditors' ability to bring claims against third parties. There is no "gotcha!" in this Plan and Ferder is unable

[20] "Exculpated Parties," as defined in Article I of the Plan means, "Collectively, (a) the Debtors, (b) the Creditors' Committee, and each of its members solely in the member's capacity as such; (c) Thomas FitzGerald, (d) L. Spencer Wells, and (e) each of the preceding's respective Related Parties serving in such capacities after the Petition Date to the extent that such Related Parties are Estate fiduciaries; *provided further* that no Ferder Affiliated Party is an Exculpated Party."

[21] *See Declaration of L. Spencer Wells in Support of Confirmation of Debtors' Second Amended Plan of Liquidation* [D.I. 831], ⁋ 21.

to articulate a basis for erroneously concluding otherwise. Rather, the simple purpose and function of each provision is as follows:

- the Injunction brings finality to ***Claims asserted solely against or affecting property of the Estates*** in accordance with the express goals of bankruptcy;
- the Debtor Releases release the Released Parties, including CODI, from ***claims belonging to the Debtors*** (not creditors like Ferder), in exchange for valuable consideration; and
- the Exculpation Provision ***exculpates Estate fiduciaries*** for acts or omissions that occurred during these Chapter 11 Cases.

Notably, none of these provisions affects Ferder's purported independent claims against CODI because none of these provisions enjoins any creditor, including Ferder, from pursuing their prepetition claims against third parties. Put simply, these provisions are standard, routinely approved, and do not create any traps for creditors.

### B. The Plan's Injunction Provision Is Necessary to Effectuate the Collective Claims Resolution Process.

27. Ferder argues, without any legal basis or support, that creditors should be able to opt out from the Injunction, which prevents creditors from taking action against property dealt with by the Plan (*i.e.*, property of the Estates). The Injunction is a necessary and appropriate device to prevent parties from acting in opposition to the court-approved Plan transaction and mechanisms. There is never an "opt-out" method from a plan injunction. Rather, the only recognized "opt-out" concept relates to the Third-Party Releases and is wholly inapplicable to the Injunction in Section 11.06 of the Plan. The holding in *Purdue* is inapposite in the context of the Injunction. Ferder's baffling argument not only misconstrues the central issue at play in *Purdue* regarding nonconsensual third-party releases, but it also advocates a result that would defy the express purpose of these Chapter 11 Cases—affording the Debtors full relief and protection that the Bankruptcy Code allows.

28. The Injunction brings finality to Claims against the property of the Estates. The central premise of bankruptcy is to provide a forum for the collective resolution of claims through a plan.[22] Like all creditors, Ferder was afforded the opportunity to assert his prepetition claims by filing a proof of claim, which he did.[23] The Plan provides for reconciliation and distributions for Allowed Claims. Ferder cannot be permitted to prosecute his purported claims against the Debtors outside of the claims administration process, which appears to be what he is seeking. Permitting piecemeal litigation like that would destroy the central purpose of the bankruptcy system—collective resolution of claims. In this way, by preventing piecemeal litigation, the Injunction is necessary to effectuate the Plan's collective resolution of claims and ensure an orderly administration of the Estates. Indeed, the Injunction is similar, or even more narrowly tailored, to those previously approved in this District and should be approved.[24]

### C. The Injunction Is Not an End Run Around the Opt-Out Mechanism.

29. Because the Plan Injunction only affects property dealt with by the Plan, it does not act as a "backstop that binds creditors, regardless of the vote opt-out," as Ferder alleges.[25] By contrast, the Third-Party Releases, from which creditors may voluntarily opt out as described in Section 11.09 of the Plan, release claims that are ***not*** property of the Estates and ***not*** "dealt with by the Plan." CODI, therefore, echoes comments made by the Creditors' Committee's counsel at

[22] *In re Am. Reserve Corp.*, 840 F.2d 487, 489 (7th Cir. 1988) ("The principal function of bankruptcy law is to determine and implement in a single collective proceeding the entitlements of all concerned.").

[23] *See* Claim No. 160.

[24] *See, e.g., In re SilverRock Development Company, LLC*, No. 24-11647 (MFW) (Bankr. D. Del. May 11, 2026) [D.I. 1111] at 97-98; *In re Norcold LLC*, No. 25-11933 (TMH) (Bankr. D. Del. Feb. 20, 2026) [D.I. 290-1] at 47-48; *In re AGDP Holdings Inc*, No. 25-11446 (MFW) (Bankr. D. Del. Feb. 12, 2026) [D.I. 589-1] at 55-56; *In re My Job Matcher, Inc.* No. 25-11280 (KBO) (Bankr. D. Del. Jan 23, 2026) [D.I. 502-1] at 59-60.

[25] *See* July 14, 2026 Hr'g Tr. at 13:14–15.

the hearing on July 14, 2026: the Plan's Injunction is ***not*** a Third-Party Release akin to section 11.09 of the Plan.[26]

30. Ferder further alleges his purported claims for contribution and equitable indemnification against CODI are enjoined because of the Injunction.[27] Not so. Per the Plan, holders of Claims and Equity are only enjoined from asserting "Causes of Action ***dealt with under the Plan***" when they are "against or affecting any ***property dealt with by the Plan***." Ferder's purported claims for indemnity and contribution against CODI are not property of the Estates, and thus, have not been "dealt with by the Plan." To the extent such claims are claims against the Debtors, they are dealt with under the Plan and will be resolved through the claims reconciliation process. And, if such claims are Allowed, Ferder will receive a distribution from the Liquidation Trust. Regardless, Ferder has not explained how his purported contribution or indemnity claims against CODI would "affect" property dealt with by the Plan.[28] As a result, the Injunction ***does not*** bar Ferder from suing CODI. The Injunction is a not a "gotcha" provision.[29]

**D. The Debtor Releases of CODI Are in Exchange for Substantial Consideration That Directly Benefits the Creditors.**

31. Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[30] Furthermore, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy

[26] *See id.* at 29:17–21 ("But I wanted to make sure that everybody, including the Court, most importantly, is aware that the injunction provision of 1106 is not intended, nor do I think it, on its face, has anything that resembles a release or invades onto the 1107 provision pertaining to exculpations.").

[27] *See* Ferder Objection at *3, 20–21.

[28] Ferder appears to argue that any such recovery by Ferder against CODI could impair the Liquidation Trust's recovery. But, the Liquidation Trust would never have a contribution claim against CODI, since CODI will be released by the Estates pursuant to the Debtor Releases and the CODI Settlement.

[29] July 14, 2026 Hr'g Tr. at 24:2–7.

[30] 11 U.S.C. § 1123(b)(3)(A); *see In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) ("The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019.").

Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[31]

32. Critical provisions of the CODI Settlement Agreement are embodied in the Plan (*i.e.*, the creditor payment waterfall) and Plan confirmation is a condition precedent to the effectiveness of the CODI Settlement Agreement.[32] Accordingly, the deferential business judgment standard courts apply to settlements under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") applies here as well.

33. Indeed, "[s]trong policy considerations suggest that settlement standards are the same in the context of a [bankruptcy plan] as in a stand-alone settlement."[33] Even so, settlements included in chapter 11 plans usually must meet both the requirements of Rule 9019 that a settlement "only be above the lowest point in the range of reasonableness"[34] and the requirements for confirmation under section 1129 of the Bankruptcy Code.[35] Additionally, when evaluating

Generally, courts in the Third Circuit approve a settlement by the debtors if the settlement "exceed[s] the lowest point in the range of reasonableness." *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 746–47 (Bankr. D. Del. 2008) (internal citation omitted); *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (internal citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (holding that a settlement must be within reasonable range of litigation possibilities).

[31] *U.S. Bank Nat'l Ass'n v. Wilmington Tr. Co. (In re Spansion, Inc.)*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether `the compromise is fair, reasonable, and in the best interest of the estate.") (internal citation omitted).

[32] *See* Plan, § 3.02(c). The occurrence of the Plan Effective Date is a condition precedent to the effectiveness of the CODI Settlement Agreement. *See* CODI Settlement Agreement § 2(c).

[33] *Settlements in Chapter 11 Plans*, WESTLAW PRACTICAL LAW BANKRUPTCY & RESTRUCTURING; *In re Best Products CoEven, Inc.*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."); *In re Telesphere Communications, Inc.*, 179 B.R. 544, 551 (Bankr. N.D. Ill. 1994) (rejecting pre-Code cases that imposed a higher standard of review that required judges to make an "informed and independent judgment" about settlements within a plan, finding that the Code only contemplates a supervisory role for bankruptcy judges).

[34] *See In re Coram Healthcare Corp.*, 315 B.R. at 330.

[35] *See Settlements in Chapter 11 Plans*, WESTLAW PRACTICAL LAW BANKRUPTCY & RESTRUCTURING; *In re NII Holdings, Inc.*, 536 B.R. 61, 98 (Bankr. S.D.N.Y. 2015) ("Courts analyze settlements under section 1123 by applying

whether to approve a settlement agreement, regardless of the context, courts have held that they must evaluate whether the settlement is both (1) fair and equitable and (2) within the best interests of the creditors.[36]

34. The CODI Settlement was the result of hard-fought, good-faith negotiations among the Debtors (as represented by the Special Committee), the Creditors' Committee, and CODI, following a two-day mediation overseen by the Honorable Lee R. Bogdanoff (Ret.).[37] The terms of the settlement are well within the range of reasonableness for a Rule 9019 settlement.[38] The mutual releases contained therein, including those related to actual or alleged fraud, are essential to the CODI Settlement, which the Debtors and the Creditors' Committee approved in their reasonable business judgment.

35. Ferder's objection assumes that any litigation the Debtors might bring against CODI would be entirely successful. But that assumption is strongly rebutted by the relevant facts, legal claims, and numerous defenses available to CODI. CODI is entering into the CODI Settlement not based on any acknowledgment that the claims have merit but rather based on a judgment that the time and expense of protracted litigation are less beneficial than the certainty of the Plan. If not for the CODI Settlement, CODI will aggressively defend the asserted claims. The Debtors, the Special Committee, and the Creditors' Committee rightly weighed all of the relevant factors, including the steep cost and potential benefits of litigation with CODI and concluded that this settlement was the best value-maximizing path forward. CODI should not be denied the

---

the same standard applied under Rule 9019 of the Bankruptcy Rules, which permits a court to 'approve a compromise or settlement.'").

[36] *See In re NII Holdings, Inc.*, 536 B.R. at 98 (holding that the approval of a settlement agreement lies within the bankruptcy court's sound discretion).

[37] *See* Disclosure Statement, § III.F.4.

[38] *See infra*, Section D.1.

benefit of its bargain, particularly given its substantial contribution to the Estates, which will inure to the benefit of all creditors.

36. Under the terms of the CODI Settlement, CODI is receiving a fraction of the amount to which it is arguably entitled. This result directly allows other creditors—including potentially Ferder (to the extent he has an Allowed Claim)—to recover more. Ferder's implication that the terms of the CODI Settlement are somehow "fundamentally biased" or "inequitable" to creditors misunderstands the purpose and effect of the CODI Settlement, ignores CODI's cooperation in ensuring the success of these Chapter 11 Cases, and highlights Ferder's continued ignorance of the bankruptcy process.

### 1. The Terms of the CODI Settlement Are Fair, Reasonable, and in the Best Interests of Creditors.

37. Rule 9019 of the Bankruptcy Rules provides that, after notice and a hearing, a court may approve a proposed compromise or settlement.[39] The Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy."[40] Moreover, "the court does not have to be convinced that the settlement is the best possible compromise," instead "the court must conclude that the settlement is 'within the reasonable range of litigation possibilities.'"[41] Courts should not substitute their judgment for that of the debtor but instead should canvas the issues to see whether the compromise falls below the lowest point in the range of reasonableness.[42]

---

[39] Fed. R. Bankr. P. 9019(a).

[40] *In re Martin*, 91 F.3d 389, 393 (3d Cir. 1996) (citation omitted).

[41] *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citations omitted); *In re Sea Containers Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *5 (Bankr. D. Del. Sept. 19, 2008); *Key3Media Grp., Inc. v. Pulver.com, et al. (In re Key3Media Grp., Inc.)*, No. 03-10323 (MFW), 2006 WL 2842462, at *3 (D. Del. Oct. 2, 2006).

[42] *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983).

38. The Third Circuit employs the following factors to determine if a proposed settlement should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[43] A review of these factors strongly weigh towards the Court approving the CODI Settlement.

39. *First*, any litigation against CODI is far from a guaranteed success. Securing any additional recoveries for the Estates would require both avoiding all of CODI's liens and security interests and disallowing or subordinating of at least $570 million of CODI's $718 million claim.[44] Without such an outcome, CODI would receive roughly 78% of the Estates' distributable value as of the Effective Date, which is far more than CODI will receive under the Plan and CODI Settlement. Thus, absent the proposed settlement, the Estates would need to hit the proverbial homerun in litigation against CODI and without such, the distributions to General Unsecured Creditors would be ***worse*** than the CODI Settlement.

40. *Second*, although CODI is well capitalized, CODI would exhaust all legal remedies before paying out any judgment from any hypothetical litigation brought by or on behalf of the Debtors.

41. *Third*, the CODI Settlement reduces the complexity, expense, inconvenience, and delay to the Estates in achieving a value maximizing resolution of these Chapter 11 Cases. If the Estates bring claims against CODI, CODI will use its resources to mount a comprehensive and vigorous defense, will oppose any plan of liquidation or reorganization, and these Debtors would

[43] *In re Martin*, 91 F.3d at 393; *Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) (finding that when determining whether a compromise is fair and equitable, courts must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal").

[44] Debtor's Brief, ¶ 156.

not be able to emerge promptly. Rather than engaging in such expensive, protracted litigation, the CODI Settlement enables prompt confirmation of a plan of liquidation that results in nearly immediate distributions to General Unsecured Creditors.

42. *Fourth*, the CODI Settlement is clearly in the best interests of the creditors. The Liquidation Analysis makes it clear that expected recoveries for General Unsecured Creditors increased from 0% to between 27.87% and 39% because of the CODI Settlement. Further, all Voting Classes voted to accept the Plan and only two Holders of General Unsecured Claims (excluding Ferder) voted to reject the Plan, while 99.86% in amount of such claims voted to accept the Plan. The overwhelming support for the Plan demonstrates that the CODI Settlement is, in the view of those creditors directly impacted, in their best interests.

**2. The Debtor Releases Are Permissible Under Recognized Precedent.**

43. The Debtor Releases dovetail with the mutual releases in the CODI Settlement Agreement. In addition to analyzing debtor releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a debtor release by considering five factors in the context of a chapter 11 plan:

(a) a substantial contribution to the debtor's reorganization;

(b) the necessity of the release to the debtor's reorganization;

(c) an agreement by a substantial majority of creditors to support the release;

(d) an identity of interest between the debtor and the third party; and

(e) a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the release.[45]

[45] *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999) (citing *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)); *In re Spansion, Inc.*, 426 B.R. at 143 n.47 (citing the *Zenith* factors).

No one factor is dispositive, nor must each factor be satisfied for the Court to confirm the Plan.[46]

44. Here, all the foregoing factors are satisfied. *First*, CODI has made a substantial contribution to the Debtors' reorganization efforts, including by permitting the Debtors to use CODI's cash collateral, irrevocably assigning the CODI Auditor Claims to the Liquidation Trust, and agreeing to substantially reduce its recovery. Indeed, the Debtors estimate CODI's recovery will be only 5.96% to 6.44%.[47] General Unsecured Creditors, on the other hand, are expected to recover between 27.87% and 39% of their prepetition Claims—4.5 to 6 times CODI's expected recovery. Said differently, because CODI agreed to reduce its recovery, in exchange for the mutual releases in the CODI Settlement Agreement, the General Unsecured Creditors, including Ferder (to the extent he has an Allowed Claim), will receive much larger distributions than they otherwise would have. Without CODI's contributions, the CODI Claim would have swallowed the Claims of the General Unsecured Creditors. As the Creditors' Committee stated in the Creditors' Committee Letter, "[t]his is a remarkable result" for General Unsecured Creditors.[48]

45. *Second*, the Debtor Releases of CODI are essential to the Plan because they constitute an integral term of the Plan. CODI supports the Plan and will only agree to contribute value to General Unsecured Creditors because of the mutual releases that are essential to the CODI

---

[46] *See, e.g.*, *Wash. Mut.*, 442 B.R. at 346 ("These factors are neither exclusive nor conjunctive requirements, but simply provide guidance in the [c]ourt's determination of fairness."); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements); *In re Caribbean Petroleum Corp.*, 512 B.R. 774, 778 (Bankr. D. Del. 2014) (finding "no question" that release of the Debtors' claims was proper because non-debtor "provided Debtors with substantial consideration in exchange for the releases, providing the justification for the Court approving the releases").

[47] Liquidation Analysis [D.I. 636].

[48] Open Letter to Holders of Unsecured Claims Against Lugano Diamonds & Jewelry Inc. Recommending Creditors to Accept the Plan of Liquidation (the "Creditors' Committee Letter"), https://casedocs.omniagentsolutions.com/cmsvol2/pub_47571/a60e4a4b-f2d1-45fc-962b-a6f37cb804b7_Lugano_Committee_Letter.pdf.

Settlement. Likewise, the Creditors' Committee supports the Plan because, without the CODI Settlement, recoveries for General Unsecured Creditors would be bleak.

46. *Third*, as the Voting Declaration demonstrates, of the Holders of Claims in the Voting Classes who cast ballots, 96.51% voted in support of the Plan.[49] The overwhelming support evidences the Debtors' key stakeholders' support for the Debtors Releases.

47. *Fourth*, an identity of interest exists between the Debtors and CODI because the CODI Settlement is foundational to the Plan. Further, the Debtors and their Estates will receive mutual releases from CODI pursuant to the CODI Settlement Agreement. CODI also funded these Chapter 11 Cases by permitting the Debtors to use CODI's cash collateral. Therefore, both CODI and the Debtors share an identity of interest in seeing that the Plan succeed.

48. *Fifth*, the Plan provides a substantially larger distribution to General Unsecured Creditors than would otherwise be available without the CODI Settlement. Moreover, the Liquidation Analysis establishes that the anticipated distributions to be made under the Plan are materially greater than under a chapter 7 liquidation. Accordingly, the possible recoveries for General Unsecured Creditors are also projected to be materially greater under the Plan than under a chapter 7 liquidation.

### 3. The Debtors' Release of Fraud Claims Against CODI Is a Permissible and Reasonable Term of the CODI Settlement.

49. The Debtor Releases provide a narrow exception for Claims related to any act or omission that constituted actual fraud, willful misconduct, or gross negligence.[50] This exception does not apply to CODI with respect to claims that are within the scope of the matters resolved

[49] Voting Declaration, ¶ 9 (83 / 86 total ballots).

[50] *See* Plan, § 11.08.

under the CODI Settlement Agreement.[51] The purpose of this exception-to-the-exception is to ensure that the Debtor Releases are consistent with section 8 of the CODI Settlement Agreement which releases the CODI Release Parties (defined therein) from "any and all Claims . . . including . . . the Debtors' actual or alleged fraud."[52] In a case like this, where allegations of fraud and fraud-adjacent conduct permeate the underlying disputes related to anyone who came in contact with Ferder, the inclusion of a fraud carve-out in CODI's release would leave open the very category of claims that the CODI Settlement was intended to resolve.

50. Ferder argues this exception-to-the-exception prejudices Ferder. It does not. Any potential claims the Debtors may have against CODI belong to the Debtors, not Ferder.[53] The Debtors are free to settle their claims with CODI.[54] Ferder's inability to make a comparable deal with the Debtors has no bearing on whether the Debtor Releases are appropriate.

51. The CODI Settlement is necessary for General Unsecured Creditors to receive their "remarkable" recovery. In light of the CODI Settlement, the exception-to-the-exception language in the Debtor Releases is fair, reasonable, and in the best interests of the Estates.

### E. Ferder Lacks Standing to Object to the Third-Party Releases Because He Is Not Affected by the Provision's Terms.

Ferder irrefutably lacks standing to object to the Third-Party Releases, which expressly excludes Ferder from their reach. "In the context of a confirmation hearing, creditors 'have

---

[51] *See id.*

[52] CODI Settlement Agreement, § 8.

[53] *In re Wilton Armetale, Inc.*, 968 F.3d 273, 280 (3d Cir. 2020) ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it."); *In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) ("After a company files for bankruptcy, "creditors lack standing to assert claims that are 'property of the estate.'") (citing *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)).

[54] 11 U.S.C. § 1123(b)(3)(A).

standing *only* to challenge those parts of a reorganization plan that affect their direct interests.'"[55] Consequently, where a creditor has affirmatively opted out of a third-party release provision or is not otherwise bound by its terms, the creditor lacks any right to object to the appropriateness of that provision.[56]

Under the plain terms of the Plan, the Third-Party Releases only release the Released Parties from claims held by the Releasing Parties.[57] The Plan's definition of Releasing Party, however, expressly excludes the Excluded Parties, which includes the Ferder Affiliated Parties.[58] Simply put, Ferder is not a Releasing Party whose rights or claims are impacted by the Third-Party Releases. On the contrary, the Plan permits Ferder to bring claims against any non-debtor third party he chooses. Ferder therefore lacks standing to make an objection to the Third-Party Releases.[59]

**F. The Court Should Approve the Third-Party Releases Because They Are Consensual.**

52. Consensual third-party releases are permitted by sections 1123(b)(6) and 105(a) of the Bankruptcy Code[60] and by the U.S. Supreme Court in *Purdue*.[61] The Third-Party Releases in the Plan are consensual and, therefore, the Court should confirm the Plan as presented.

---

[55] *In re Indianapolis Downs, LLC*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) (citing *In re Orlando Investors, L.P.*, 103 B.R. 593, 596 (Bankr. E.D. Pa. 1989)).

[56] *Id.*

[57] Plan, § 11.09.

[58] Plan, Art. I, ¶ 69.

[59] *See In re Indianapolis Downs, LLC*, 486 B.R. at 304 (overruling an objection to a third-party release provision where the third-party releases did not affect the objector's direct interests).

[60] *In Container Store Group, Inc*., 676 B.R. 356, 378 (S.D. Tex. 2026) ("In sum, a bankruptcy court's power to grant consensual third-party releases is based in its authority to include in reorganization plans 'appropriate' provisions that are not 'inconsistent' with the Code, 11 U.S.C. § 1123(b)(6), and to issue any 'order ... that is necessary or appropriate to carry out' such provisions, *id.* § 105(a).").

[61] *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 226 (2024) ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan.").

### 1. The Third-Party Releases Are Consensual Because the Releasing Parties Had a Right to Opt Out or Object to the Third-Party Releases.

53. The Third-Party Releases in Section 11.09 of the Plan allow a limited consensual release in favor of the Released Parties, including CODI, only by and among the Releasing Parties, which are comprised of: (a) the Debtors and each of the Estates; (b) L. Spencer Wells and Thomas FitzGerald; (c) any successor to the Debtors or any other representative of the Estates pursuant to section 1123(b)(3) of the Bankruptcy Code, including the Liquidation Trust; (d) all holders of Claims, other than holders of Claims only in Classes 6 and 7, who do not make an Opt-Out Election; (e) each Released Party; and (f) each Related Party of each entity in clauses (a) – (e) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an entity in clauses (a) – (e); provided that, in each case, an entity is not a Releasing Party if it makes an Opt-Out Election; provided further that no Excluded Party is a Releasing Party.[62] CODI respectfully submits that the Third-Party Releases are consensual, appropriate, consistent with established precedent, and integral to the formulation of the Plan.

54. This court and many others have approved opt-out provisions similar to the one in the Plan. These courts generally consider the following several factors when determining whether the opt-out provisions are consensual:

a) Whether the notice provided to the claimants was clear and prominent;

b) Whether the opt-out mechanism is easy to use, such as through an online portal, including whether there are multiple ways to opt out;

c) Whether the opt-out mechanism was separate from the vote for or against the plan;

d) Whether the opt-out and nondebtor releases have been consistently discussed, presented, and debated over the history of the case;

[62] Plan, Art. I, ¶ 128.

e) Whether the case has been subject to publicity and is well-known to the claimant population;

f) Whether the opt-out mechanism was used by claimants;

g) Whether there is a substantial amount of affirmative support for the plan;

h) Whether there are economic disincentives to follow the bankruptcy case or opt out;

i) Whether the payout to the claimants is fair, reasonable, and adequate.[63]

For the reasons stated below, all of the above are satisfied in these Chapter 11 Cases.

**a. Creditors Received Clear and Prominent Notice of the Third-Party Releases.**

55. In accordance with the Solicitation Procedures Order, the Debtors provided creditors with timely, sufficient, appropriate, and prominent notice of the proposed Third-Party Releases and the scope of the Releasing Parties along with copies of the Disclosure Statement; the Plan; the Ballots or Notice of Non-Voting Status, as applicable; the Opt-Out Form; and the Confirmation Hearing Notice. The Ballots sent to the Voting Classes and the Opt-Out Form and

> The purpose of this Opt-Out Form is to provide you with an opportunity to **opt out** of certain releases contained in the Plan. If you opt out using this Opt-Out Form, those releases will not bind you, and any claim you may have against the third parties included in the releases will be preserved for you to pursue, if you choose, later.
>
> If your claim is classified in a class entitled to vote on the Plan, you will receive a Ballot which will also provide you with an opportunity to opt out of these releases. **If you receive a Ballot, you must use the Ballot to opt out rather than this form.**
>
> **If you do not opt out of the Third Party Release by using a Ballot (if you received one), and if you do not opt out of the Third Party Release by declining or failing to complete and submit this Opt-Out Form by following the instructions at the bottom of this Opt-Out Form, the Third Party Release will bind you—meaning any claim you may have against the third parties (*i.e.*, the Released Parties) included in the releases set forth in Section 11.09 of the Plan will be forever released and you will not be able to pursue such claims in your individual capacity.**

[63] *In re Container Store*, 676 B.R. at 384 (allowing an opt-out provision except as applied to (1) creditors who did receive anything under the plan and (2) creditors who had been deemed to have rejected the plan); *In re Spirit Airlines, Inc.*, 668 B.R. 689, 707–08 (Bankr. S.D.N.Y. 2025) (allowing an opt-out provision, whereby creditors were deemed to have consented to the third-party releases if they failed to check an opt-out box on a ballot).

Notice of Non-Voting Status sent to the Non-Voting Classes included the full language of the Third-Party Releases as well as clear instructions on how to opt out. Specifically, the Opt-Out Form included the following disclaimers:

56. The Opt-Out Form, the Notice of Non-Voting Status, the Disclosure Statement, the Plan, and the Confirmation Hearing Notice were all published on the Debtors' Claims Agent's website, and all contain the full text of the Third-Party Releases. The Debtors also published the Publication Notice in *The New York Times* and the *Orange County Business Journal*, which clearly and conspicuously advised all parties in interest to carefully review and consider the Plan, including the Third-Party Releases.[64] The Publication Notice included a QR code which opens a link to the case portal and provides convenient access to the documents referenced above. Finally, the Publication Notice contained the following statements:

> ***Releases*. Please be advised that the Plan contains various releases, exculpation, and injunction provisions that may affect your rights.**

And

> **YOU ARE ADVISED TO CAREFULLY REVIEW AND CONSIDER THE PLAN, INCLUDING THE INJUNCTION, RELEASE, AND EXCULPATION PROVISIONS, AS YOUR RIGHTS MAY BE AFFECTED.**

57. Accordingly, the Debtors provided proper and sufficient notice of the Third-Party Releases and instructions for making an Opt-Out Election.

[64] Publication Notice [D.I. 713].

**b. The Other Factors That Courts Have Considered Also Weigh in Favor of Determining That the Third-Party Releases Were Consensual.**

58. *First*, the opt-out election was easy to use. The Voting Classes were able to make an Opt-Out Election by simply checking a box on their Ballots. Creditors in the Non-Voting Classes (and those in the Voting Classes who choose) were able to make an Opt-Out Election by filling out the Opt-Out Form and submitting it to the Debtors' Claims Agent. Moreover, the Debtor's Claims Agent maintains an online portal where Opt-Out Forms can be submitted electronically.

59. *Second*, the Opt-Out Election was separate from voting. Although the Voting Classes could make an Opt-Out Election on their Ballots, whether a creditor voted for or against the Plan had no bearing on whether that creditor could or could not make an Opt-Out Election. Likewise, whether a creditor made an Opt-Out Election had no bearing on whether that creditor could or could not vote for or against the Plan.

60. *Third*, the Third-Party Releases and the opt-out mechanism were consistently discussed, presented, and debated over the history of these Chapter 11 Cases, since before the Plan was first proposed. For example, the UST objected to the Disclosure Statement and Solicitation Procedures Motion, arguing that the Third-Party Releases were impermissible.[65] Moreover, prior to or during solicitation, Ferder filed two objections, both of which challenged the Third-Party Releases.[66] In addition, the Creditors' Committee, which supported the Plan, was instrumental in negotiating and drafting the Plan, including the section pertaining to the Third-Party Releases.

---

[65] *See Objection of the United States Trustee to Approval of Solicitation Procedures* [D.I. 638].

[66] *See Objection of the Ferder Parties to Approval of the Debtors' Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and its Affiliated Debtors* [D.I. 637] ("Ferder Disclosure Statement Objection"); *Objection of the Ferder Parties to the Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to (A) File a Chapter 11 Plan and (B) Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [D.I. 739] ("Ferder Exclusivity Objection").

61. *Fourth*, these Chapter 11 Cases have been subject to significant publicity and are well known among the claimant population because of Ferder's fraudulent conduct.[67] Given the notices described above, the flurry of activity in these Chapter 11 Cases regarding the Third-Party Releases, and the widespread publicity the circumstances around these Chapter 11 Cases have generated, this factor is satisfied.

62. *Fifth*, the Voting Declaration demonstrates that 42 creditors chose to make an Opt-Out Election. This is perhaps the best evidence that the mechanism works and that creditors were able to understand the Third-Party Releases and the Opt-Out Election.

63. *Sixth*, the Plan enjoyed widespread support among creditors. Among all voting creditors and General Unsecured Creditors, 96.51% and 95.77%, respectively, voted to support the Plan.[68] Finally, the Creditors' Committee was also instrumental in negotiating the Plan, and in an open letter to General Unsecured Creditors, it touted its proclaimed success by called the projected recoveries under the Plan "a remarkable result."[69]

64. *Seventh*, creditors are directly incentivized to follow these Chapter 11 Cases, read the terms of the Plan closely, and opt out of the Third-Party Releases if they so choose. The Liquidation Analysis provides that between $116 million and $130 million are expected to be available to distribute to creditors. This represents a projected recovery between 27.87 and 39% for General Unsecured Creditors, and a projected recovery of 50% for Convenience Class members. In fact, because of the CODI Settlement, creditors will be receiving significant recoveries, which directly incentives them to pay attention and read the terms of the Plan carefully.

---

[67] *See, e.g.*, Sara Cardine, Lawsuits Place Newport Beach Jeweler, Philanthropist at Center of Fraud Scheme, L.A. Times (Aug. 22, 2025), https://www.latimes.com/socal/daily-pilot/news/story/2025-08-22/newport-beach-businessman-philanthropist-at-center-of-complex-fraud-theft-scheme.

[68] Voting Declaration, ⁋ 9.

[69] Creditors' Committee Letter.

Moreover, a creditor's decision whether to make an Opt-Out Election does not affect its recovery. Therefore, creditors had no disincentive to make an Opt-Out Election.

65. *Eighth*, the payout to claimants is fair, reasonable, and adequate. As noted, General Unsecured Creditors stand to receive a substantial recovery despite being half a billion dollars "out of the money" when these Chapter 11 Cases began.[70]

### 2. Courts Allow Third-Party Releases with Similar Structures to Those Included in the Plan.

66. Courts in this District (including this Court) allow releases of third-party claims where there is express consent of the party giving the release.[71] Where parties receive sufficient notice of a plan's release provisions and have an opportunity to object to or opt out of the release and fail to do so, the releases are consensual.[72] As one court aptly stated, "in bankruptcy, consent is often implied from inaction—provided of course there is notice."[73]

---

[70] *Id.*

[71] *See In re Molecular Templates, Inc.*, No. 25-10739 (BLS) (Bankr. D. Del. July 7, 2025) [D.I. 186]; *In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) [D.I. 652]; *In re PBS Brand Co.*, No. 20-13157 (Bankr. D. Del. Apr. 28, 2021) (JKS) [D.I. 552]; *In re Furniture Factory Holding, L.P.* No. 20-12816 (JKS) (Bankr. D. Del. Sept. 21, 2021) [D.I. 507]; June 13, 2019 Hr'g Tr.48:9–11, *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. 2019) [D.I. 384] ("With respect to third-party releases I'm prepared to find that they are consensual because of opt-out box in the ballots."); *In re EV Energy Partners, L.P.*, No. 18-10814 (CSS) (Bankr. D. Del. May 16, 2018) [D.I. 238].

[72] *See In re Indianapolis Downs, LLC*, 486 B.R. at 306 (Bankr. D. Del. 2013) ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots. Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved."); *see also In re Alpha Latam Mgmt., LLC*, No. 21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) [D.I. 651 at 11:5–22] ("Importantly, I find the third-party releases are consensual. . . The ballot contained an opt out election box and holders had the right to opt out of the releases. Unimpaired holders in non-voting classes were provided with a notice of non-voting status that included the proposed third-party releases, prominent instructions on the right to object to the releases, and conspicuous disclaimers that the releases would be binding on holders if they did not timely object to the plan. As I have previously ruled, an opt-out mechanism is a valid means of obtaining consent. The court can imply consent from a creditor, not opting out or objecting to releases contained in a plan.").

[73] *In re Lutheran Home and Services for the Aged, Inc.*, No. 25-01705, 2026 WL 626606, *25 (Bankr. N.D. Ill. Mar. 4, 2026) ("The Supreme Court has confirmed that consent to a bankruptcy court's jurisdiction is implied unless an objection is raised expressly and timely. Executory contracts are assumed and cure amounts definitively set (even where the amount identified is wrong) where counterparties receive notice and do not object. Indeed, Section 1123(a)(4) of the Bankruptcy Code provides that holders in the same class must get the same treatment unless a holder agrees to worse treatment; surely they are bound if a debtor formally proposes a plan with worse treatment for some,

67. Here, each of the Releasing Parties were given clear and prominent notice of the Third-Party Releases and the ability to make an Opt-Out Election.

68. <u>The Voting Classes.</u> A holder of a claim, including a claim that is impaired under a plan, may be deemed to consent to a third-party release if the holder is provided with ample notice of the third-party release and is provided with an opportunity to opt out of the third-party release even if a creditor abstains from voting.[74] Here, Holders of Claims in Classes 3, 4, and 5 are Impaired and were entitled to vote to accept or reject the Plan. Moreover, each such Holder was provided with ample notice and had an opportunity to affirmatively make an Opt-Out Election by checking the opt-out box on the Ballot or by completing an Opt-Out Form.

69. <u>Non-Voting, Impaired Claims.</u> Holders of Claims in Classes 6 and 7 are Impaired and were not entitled to vote since they were deemed to have rejected the Plan. However, Holders of these Claims are not included as Releasing Parties, and therefore the Third-Party Releases are inapplicable to these creditors.

70. <u>Non-Voting, Unimpaired Claims.</u> Holders of Claims in Classes 1 and 2 are Unimpaired and are not entitled to vote since they are deemed to have accepted the Plan. As such, they were deemed to accept the Third-Party Releases if they did not object to the Plan or make an Opt-Out Election. Unimpaired creditors can be bound to third-party releases when they have not objected to the plan or opted out, as their silence constituted consent. Courts in this District and elsewhere have routinely recognized that third-party releases are consensual and appropriate where

---

gives them actual notice, and they entirely ignore the proposal. More generally, our [Local] Rules are explicit that relief may be granted if you are served with a motion and do not respond.”).

[74] *See Indianapolis Downs,* 486 B.R. at 306; *In re Spansion, Inc.* 426 B.R. at 144 (finding that returning a ballot is not essential to demonstrating consent to a release by unimpaired class); *In re DBSD N.A., Inc.,* 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009), *aff’d,* No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *aff’d in part, rev’d in part on other grounds,* 627 F.3d 496 (2d Cir. 2010) (determining that adequate notice of the proposed release was given to impaired creditors, and the ballots set forth the effect of abstaining without opting out of the release).

holders of unimpaired claims or interests are provided with detailed instructions on how to object to releases but nevertheless do not do so.[75] As such, the silence of the Holders of these Claims should constitute consent to be bound by the Releases.

**3. State Contract Law Does Not Govern Third-Party Releases Because the Plan Is Not a Contract.**

71. The UST contends that state contract law applies to the Plan, but this is incorrect. Courts have reasoned that, unlike a private contract, a chapter 11 plan "is an agreement whose every provision has been approved and therefore activated by court order."[76] As such, "a plan is not simply a private contract subject only to the rules of contract interpretation."[77] "Unlike the formation of a typical commercial contract, bankruptcy is a *collective* process involving a debtor and all stakeholders (many of whom the debtor usually lacks contractual privity with)."[78] Rather, a confirmed plan binds all stakeholders who receive notice, "whether or not they vote or otherwise affirmatively indicate consent."[79] In this way, a chapter 11 plan is more like a court-approved

[75] *See, e.g., In re Spansion, Inc.*, 426 B.R. at 144 (finding that a release was not overreaching to the extent it bound unimpaired classes deemed to have accepted the plan as those creditors had not objected to the release, were being paid in full, and had received adequate consideration for the release); *In re Indianapolis Downs, LLC*, 486 B.R. at 306 ("In this case, the third party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."); *see also In re Alpha Latam Mgmt., LLC,* 21-11109 (JKS) (Bankr. D. Del. Mar. 14, 2022) Hr'g. Tr. 11:19–24 [D.I. 651] ("The court can imply consent from a creditor, not opting out or objecting to releases contained in a plan. Creditors have an obligation to read their mail and respond if appropriate. This procedure is not unique and it's routinely utilized in the law."); *In re Lutheran*, No. 25-01705, 2026 WL 626606, at *28, *38 (Bankr. N.D. Ill. Mar. 4, 2026) (holding that both unimpaired creditors and creditors who voted "yes" to the plan were deemed to have consented to third-party releases despite failing to affirmatively opt out where they received adequate notice to opt out and finding "the 'opt-out' framework can work to imply consent to an appropriately scoped third-party release by some creditors in some circumstances").

[76] *In re Heartland Steel, Inc.*, 389 F.3d 741, 745 (7th Cir. 2004).

[77] *Id.* (declining to rely solely on Indiana contract law for a dispute relating to the plan).

[78] *In re Lutheran*, No. 25-01705, 2026 WL 626606 at *25–26 ("The UST's argument that creditors who receive full, complete notice but choose (for whatever reason) not to respond are not bound because they did not "affirmatively accept" the plan as a matter of state contract law is troubling. If accepted, the UST's theory could undermine all of Chapter 11 by exempting creditors who aren't paying attention, strategically follow proceedings without appearing, or otherwise refuse to affirmatively say yes for some other reason, from the terms of confirmed plans of reorganization. That is not how bankruptcy works.").

[79] *Id.* at *26.

class action settlement, than a contract.[80] As such, those creditors who do not "opt out" are "bound by the settlement and their claims are released."[81] Therefore, the Court should not apply state contract law principles to the Plan, and should instead look exclusively to bankruptcy law.

**4. Alternatively, Even If Common Law Contract Principles Apply, Silence in the Face of the Opt-Out Provisions Constitute Consent in this Case.**

72. Even under "basic contract principles" of state law, silence and inaction can constitute consent in the following circumstances: (a) "where the offeror has stated or given the offeree reason to understand that assent may be manifested by silence or inaction, and the offeree in remaining silent and inactive intends to accept the offer;" or (b) "[w]here because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept."[82] Both are present here.

73. As described above, the creditors in these Chapter 11 Cases have received clear notice with the Third-Party Release language prominently presented. The Third-Party Releases were not "just an unsolicited offer to a stranger."[83] Rather, the Third-Party Releases were an integral part of these Chapter 11 Cases, sent to creditors who had an incentive to review and respond to them. Moreover, this Court allowed an opt-out mechanism where it found that "mechanics of [the provision] were sufficiently clear, that stakeholders were afforded, and frankly

[80] *Id.* at *27 ("I see an even closer parallel between a confirmed plan of reorganization and the hornbook court-approved class action settlement.").

[81] *Id.*

[82] *See In re Spirit Airlines, Inc.*, 668 B.R. at 717 (citing Restatement (Second) of Contracts § 69(1)); *In re Azul S.A.*, 676 B.R. 277, 291 (Bankr. S.D.N.Y. 2026) (finding that creditors who returned a ballot but did not check an opt-out box had "clearly manifested their consent."); *In re Emerge Energy Services LP*, No. 19-11563 (KBO), 2019 WL 7634308, *18 (Bankr. D. Del. Dec. 5, 2019) (discussing the circumstances under which silence may be construed as acceptance under "basic contract principles"); *Klassen v. Allegro Development Corp.*, 106 A.3d 1035, 1045–48 (Del. 2014) (finding the doctrine of acquiescence under Delaware law can apply even in the absence of "conscious intent to approve the act").

[83] *In re Lutheran*, No. 25-01705, 2026 WL 626606 at *25 (internal quotation omitted).

exercised the opportunity to vote in favor of the plan but to opt out of the releases."[84] Therefore, CODI respectfully submits the Court should permit the Third-Party Releases.

## II. The Plan Is in the Best Interests of Creditors and Interest Holders.

74. Under the best interest analysis, "the court must measure what is to be received by rejecting creditors . . . under the plan against what would be received by them in the event of liquidation under chapter 7."[85] Accordingly, the Court is required to "take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation."[86] In evaluating a liquidation analysis, the Court must remain cognizant of the fact that "[t]he hypothetical liquidation entails a considerable degree of speculation about a situation that will not occur unless the case is actually converted to chapter 7."[87]

75. The Liquidation Analysis demonstrates that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code because under a chapter 7 liquidation, Holders of Claims and Interests would likely receive less than what is projected under the Plan.[88] The assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the knowledge and expertise of the Debtors' professionals and personnel who have extensive knowledge of the Debtors' business and financial affairs as well as relevant industry and financial experience. And, Ferder provides no evidence to the contrary. Thus, it is clear that the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

---

[84] *See* July 1, 2025, Hr'g Tr. at 40:2–5, *In re Molecular Templates Inc., et al.*, Case No. 25-10739 (BLS) (Bankr. D. Del.) (Shannon, J.).

[85] *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007).

[86] *See id.*

[87] *See In re Affiliated Foods, Inc.*, 249 B.R. 770, 788 (Bankr. W.D. Mo. 2000) (internal citations omitted).

[88] *See* Liquidation Analysis.

76. Ferder argues that he would do better in a chapter 7 process because that process would not "strip" his contribution, indemnity, and setoff rights.[89] Again, Ferder misreads the Plan. Ferder, just like any other creditor, preserves his rights through the filing of a proof of claim regardless of whether these cases are in chapter 7 or chapter 11. To extent such rights are asserted in Ferder's proof of claim, such rights are not impacted by the confirmation of the Plan as the Plan is clear that setoff rights and other defenses are preserved for the Debtors' directors and officers, which includes Ferder.[90] Thus, as demonstrated by the Liquidation Analysis, Ferder, to the extent of his Allowed Claim, will obtain a higher recovery under the Plan than in a hypothetical chapter 7. Ferder's argument that the Debtors' cannot satisfy the requirements in section 1129(a)(7) of the Bankruptcy Code fails.

## III. The Plan Is Feasible Under Section 1129(a)(11).

77. Ferder's contention that the Plan is not feasible because the Liquidation Trust is "underfunded"[91] is also inaccurate and wholly unsupported by the facts. Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible.[92] Feasibility requires a demonstration that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[93]

78. In the context of a liquidating plan, the analysis focuses on whether the liquidation itself, is feasible.[94] Finding "feasibility" of a chapter 11 plan does not require a guarantee of

---

[89] *See* Ferder Objection at *30.

[90] Plan, § 6.01(e)(vi).

[91] *See* Ferder Objection at *5.

[92] *See* 11 U.S.C. § 1129(a)(11).

[93] *Id*.

[94] *In re Two Streets, Inc.*, 597 B.R. 309, 317 (Bankr. S.D. Miss. 2019) (citing *In re Holmes*, 301 B.R. 911, 914 (Brank. M.D. Ga. 2003)); *see also In re Star Ambulance Serv., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015)

success by the debtor.[95] Rather, a debtor must demonstrate only a reasonable assurance of success.[96] There "is a relatively low threshold of proof necessary to satisfy the feasibility requirement."[97]

79. Here, the Debtors satisfy this threshold for this liquidation plan. The Debtors estimate that, notwithstanding the outcome of any litigation pursued by the Liquidation Trust, there will be sufficient available Cash to ensure that Holders of Allowed Claims under the Plan receive the Distributions required under the Plan. Specifically, the Debtors estimate that on the Effective Date, the Trust Assets will total $117 million to $131 million,[98] which is more than sufficient to satisfy the financial obligations under the Plan. Ferder's assertion that creditors are left only with "speculative litigation paper" is brazenly false.[99] Therefore, the Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

## IV. The Plan and CODI Settlement Agreement Were Proposed in Good Faith and Are Fundamentally Fair to Ferder.

80. Ferder raises numerous other alleged theories as to why the Plan should not be confirmed, most of which focus on the alleged "bias" toward CODI in the Plan. There is no such

---

("§ 1129(a)(11) requires a debtor to show that it can accomplish what it proposes to do, in the time period allowed, on the terms set forth in the plan.").

[95] *See In re W.R. Grace & Co.*, 729 F.3d 332, 349 (3d Cir. 2013) ("[Debtor] needed only to demonstrate a reasonable likelihood of success, not an absolute certainty."); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("Success need not be guaranteed."); *In re Tonopah Solar Energy, LLC*, 657 B.R. 393, 407 (D. Del. 2022) (same).

[96] *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011) (citing *In re Wash Mut., Inc.*, 461 B.R. 200, 252 (Bankr. D. Del. 2011) (quoting *In re Orlando Invs. LP*, 103 B.R. 593, 600 (Bankr. E.D. Pa. 1989))); *see also Kane v. Johns-Manville Corp.*, 843 at 649.

[97] *In re Tribune Co.*, 464 B.R. at 185 (quoting *In re Briscoe Enters, Ltd.*, 994 F.2d 1160, 1166 (5th Cir. 1993)).

[98] *See* Liquidation Analysis.

[99] *See Objection of the Ferder Parties to Approval of the Debtors' Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [D.I. 637] at *3, 24; *Objection of the Ferder Parties to the Debtors' Second Motion for Entry of an Order (I) Extending the Debtors' Exclusive Periods to (A) File a Chapter 11 Plan and (B) Solicit Acceptances of a Chapter 11 Plan Pursuant to Section 1121 of the Bankruptcy Code and (II) Granting Related Relief* [D.I. 739] at *11; Ferder Objection at *5, 29.

bias. To the extent such theories require a response, CODI responds to each unsubstantiated allegation below:

a. Ferder asserts that CODI's recovery (34.79% of Effective Date Cash, 45% of Grant Thornton litigation proceeds, and 25% of all other litigation proceeds) is unfair. Ferder's focus is misguided and is aimed solely at the percentage CODI receives from different baskets of assets/claims. The court should, however, focus on the relative recoveries that CODI and General Unsecured Creditors will receive.[100] Pursuant to the terms of the CODI Settlement, CODI's expected recoveries range from 5.96% to 6.44%, whereas, General Unsecured Creditors like Ferder are expected to recover between 27.87% and 39% of their prepetition claims.[101] An allowed CODI secured claim at full value would have resulted in zero unsecured creditor recovery. The CODI Settlement allows for General Unsecured Creditor recovery where one would otherwise not exist. Further, Ferder's opinion that CODI's claim is highly vulnerable to equitable subordination is irrelevant. An equitable subordination claim against CODI does not belong to Ferder; it belongs to the Estates.[102] The Debtors settled this potential claim against CODI on behalf of the Estates in their reasonable business judgment in exchange for substantial consideration.[103]

b. The Debtor Releases and Third-Party Releases are permissible.[104] Ferder misreads the Exculpation Provision and the Injunction. Neither protect CODI.

c. Ferder's objection to the language in the CODI Settlement Agreement, which prohibits the parties thereto from "encourage[ing] or voluntarily cooperat[ing] in any litigation" against CODI, is irrelevant.[105] The Debtors are free to make this bargain and courts are highly deferential when debtors settle estate claims. The Debtors should be afforded this deference with respect to the CODI Settlement. While the Debtors, Creditors' Committee,

---

[100] Per the Liquidation Analysis, CODI's claim is approximately $718 million while total claims are expected to be between $932 and $979 million.

[101] *See* Liquidation Analysis.

[102] *In re Wilton Armetale, Inc.*, 968 F.3d at 280 ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it."); *In re Emoral, Inc.*, 740 F.3d at 879 ("After a company files for bankruptcy, "creditors lack standing to assert claims that are 'property of the estate.'") (citing *Bd. of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)) (internal quotation marks omitted).

[103] *See supra*, Section I.D. *See also In re Coram Healthcare Corp.*, 315 B.R. at 330 (holding that a settlement must "only be above the lowest point in the range of reasonableness").

[104] *See supra*, Sections I.D, I.F.

[105] *See* CODI Settlement Agreement, § 7(c).

and Liquidation Trust cannot "voluntarily" cooperate in litigation against CODI. Ferder, however, retains all legal tools to compel these parties to produce documents and provide testimony.

d. There is a good reason CODI and Ferder are not treated in parallel under the Plan—the CODI Settlement. Unlike Ferder, CODI settled potential claims asserted by the Estates and will substantially contribute to recoveries for creditors.

e. The differing treatment between CODI and Ferder is not prohibited by section 1129(b) of the Bankruptcy Code as there is no impaired dissenting class asserting disparate treatment. The only party asserting such "unfairness" is Ferder, who is the reason the Debtors are in chapter 11. Notwithstanding, the treatment to General Unsecured Creditors, which includes Ferder, is not unfair because, as a result of the CODI Settlement, such creditors, before any litigation recoveries, are projected to obtain distributions between 27.87% and 39%, which is well in excess of CODI's projected distribution of between 5.96% and 6.44%.[106]

## V. The Amended Disclosure Statement Contains Adequate Information in Accordance with Section 1125(a) of the Bankruptcy Code.

81. Finally, each of Ferder's objections[107] to the adequacy of the Disclosure Statement (the "Disclosure Statement Objection") are meritless or became moot after the Debtors filed the amended Disclosure Statement on July 9, 2026. Nevertheless, CODI responds to Ferder's Disclosure Statement Objection as follows:

| **FERDER'S DISCLOSURE STATEMENT OBJECTIONS** | **RESPONSE** |
|---|---|
| Missing Liquidation Analysis, Fee Budget, claim estimates and disclosures of Causes of Action. | Resolved. The Debtors subsequently field the Liquidation Analysis, amended Plan [D.I. 636], amended Disclosure Statement [D.I. 651], and Plan Supplement [D.I. 778], addressing each of these issues. |

[106] *See* Liquidation Analysis.

[107] Including the *Objection of the Ferder Parties to Approval of the Debtors' Disclosure Statement for the Chapter 11 Plan of Liquidation of Lugano Diamonds & Jewelry Inc. and Its Affiliated Debtors* [D.I. 637] and Ferder's objections made at the July 14, 2026, hearing. *See* July 14, 2026 Hr'g Tr. at 11-12, 16-18.

| FERDER'S DISCLOSURE STATEMENT OBJECTIONS | RESPONSE |
|---|---|
| Inadequate disclosure of Ferder's claims against the Debtors, which subjects the estate to significant exposure. | The Disclosure Statement appropriately describes Ferder's asserted Claims[108] and also explains the Debtors' claims, defenses, and investigations arising from Ferder's conduct. |
| The Disclosure Statement actively misleads creditors about the flow of funds and the nature of Ferder's financing arrangements. | The Debtors and the Special Committee have thoroughly investigated Ferder and his schemes. Their findings are adequately described in the Disclosure Statement. Naturally, Ferder disagrees, which is why the Disclosure Statement includes the nature and scope of Ferder's Claims and defenses.[109] |
| Litigation costs, recoveries, and trust economics cannot be determined. | The Disclosure Statement, Liquidation Analysis, and the Plan Supplement provide adequate information regarding estimated litigation costs and trust economics. |
| The contingency fee imputed in the Liquidation Analysis skews the results in favor of chapter 11. As there is no disclosure of the CODI claims, there is no way to determine the true value of chapter 11. | The added contingency fees are the result of the Debtors' view that special contingency litigation costs related to litigation against CODI will be higher in a chapter 7 setting. Omitting that expense from the Liquidation Analysis does not change the conclusion that the creditors are best served by the Debtors' chapter 11 Plan rather than a chapter 7 liquidation.<br><br>The Disclosure Statement contains adequate information regarding the CODI claims. |
| Inconsistency between CODI's recovery in the Liquidation Analysis versus CODI's recovery in the Disclosure Statement. | Any inconsistencies between CODI's projected recovery shown in the Liquidation Analysis versus the recovery in the Disclosure Statement are immaterial.<br><br>The assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the knowledge and expertise of the |

[108] *See* Disclosure Statement, §§ III.E.3, III. F.3(a).

[109] *See* Disclosure Statement, §§ III.E.3, III. F.3(a).

| **FERDER'S DISCLOSURE STATEMENT OBJECTIONS** | **RESPONSE** |
|---|---|
| | Debtors' professionals and personnel who have extensive knowledge of the Debtors' business and financial affairs as well as relevant industry and financial experience. |
| Litigation causes of action are marked "to be determined" in the Liquidation Analysis, which makes total recovery for any creditor difficult to ascertain. | The Disclosure Statement states that the recovery amounts for creditors "assume[] no proceeds or expenses associated with litigation against GT or other third parties." Accordingly, the projected recoveries do not reflect any recovery from pending litigation and are not contingent on the outcome of that litigation. Any litigation recoveries will only improve creditor recoveries and speculative estimates of such recoveries are not necessary for the Disclosure Statement. |
| The Chapter 7 professional fees are materially higher than the Chapter 7 Trust's professional fees, and there is no explanation for the differential. | Simply, chapter 7 trustee replacement professionals will incur substantial additional costs to familiarize themselves with the complex factual nuances of these cases, in particular Ferder's fraudulent conduct. |
| There is no meaningful explanation as to why the General Unsecured Claim amount, after accounting for duplicative claims, decreased from billions of dollars to $212-216 million. | It is customary that there are duplicate claims both against the same or multiple debtors and that creditors assert otherwise objectionable claims. Additionally, any accounting for CODI's deficiency claim will have been removed from the calculation. CODI understands that the current estimates are based on an initial claims analysis and are presented in the Debtors' best business judgment. |

82. Based on the above, the Court should enter a final order approving the Disclosure Statement.

## <u>CONCLUSION</u>

83. Before the Court is a liquidating plan that provides for a significantly enhanced recovery for the Debtors' General Unsecured Creditors as a result of a hard-fought, good faith, and

arm's-length settlement between the Estates and CODI. The Plan is overwhelmingly supported by its Voting Classes. The only parties objecting are the UST and the party responsible for the commencement of these Chapter 11 Cases—Ferder. The objections raised by both parties should be overruled for the reasons set forth in the Debtors' Brief and in this Reply. Accordingly, CODI respectfully requests that the Court deny the Objections with prejudice, enter the Confirmation Order approving the Disclosure Statement, on a final basis, and confirming the Plan and grant such other and further relief as this Court deems just and appropriate.

[***Remainder of Page Left Intentionally Blank***]

Dated: August 27, 2026
Wilmington, Delaware

Respectfully submitted,

**BAYARD P.A.**

*/s// Ericka F. Johnson*
Ericka F. Johson (DE Bar No. 5024)
600 N. King Street
Suite 400
Wilmington, DE 19899
ejohnson@bayardlaw.com

- and -

Stephen D. Lerner (admitted *pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
201 E. Fourth Street, Suite 1900
Cincinnati, OH 45202
Telephone: (513) 361-1200
stephen.lerner@squirepb.com

- and -

Peter R. Morrison (admitted *pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
1000 Key Tower
127 Public Square
Cleveland, OH 44114
Telephone: (216) 479-8500
peter.morrison@squirepb.com

- and -

Jeffrey N. Rothleder (admitted *pro hac vice*)
SQUIRE PATTON BOGGS (US) LLP
2550 M Street NW
Washington, D.C. 20037
Telephone: (202) 457-6000
jeffrey.rothleder@squirepb.com

*Counsel to Compass Group Diversified Holdings LLC*